E2D5havA                          argument

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

HAVERHILL RETIREMENT SYSTEM,
*et al.*,

                    Plaintiffs,

           v.                          13 CV 7789 (LGS)
                                       13 CV 7953 (LGS)
                                       13 CV 9080 (LGS)
                                       13 CV 9125 (LGS)
                                       13 CV 9237 (LGS)
                                       14 CV 350 (LGS)
                                       14 CV 475 (LGS)
                                       14 CV 494 (LGS)
                                       14 CV 752 (LGS)
                                       14 CV 787 (LGS)
                                       14 CV 825 (LGS)
                                       14 CV 867 (LGS)

BARCLAYS BANK PLC, *et al.*,

                    Defendants.

------------------------------x

                                       February 13, 2014
                                       11:20 a.m.
Before:

                HON. LORNA G. SCHOFIELD,

                                       District Judge

1                              APPEARANCES

2   SCOTT & SCOTT, LLP
         Attorneys for Plaintiffs Haverhill, Longbottom, Employees'
3   Retirement System of the Government of the Virgin Islands,
    Oklahoma Firefighters Pension and Retirement System, and City
4   of Haverhill Retirement System
    BY:  CHRISTOPHER M. BURKE
5        DONALD A. BROGGI
         JOSEPH P. GUGLIELMO
6        KRISTEN M. ANDERSON
         WALTER W. NOSS
7             -and-
    HAUSFELD, LLP
8   BY:  MICHAEL D. HAUSFELD
              -and-
9   THE MOGIN LAW FIRM, P.C.
    BY:  DANIEL J. MOGIN
10            -and-
    KOREIN TILLERY, LLC
11  BY:  GEORGE A. ZELES
         STEVEN BEREZNEY
12

13  KIM & BAE, P.C.
         Attorneys for Plaintiff Simmtech Co., Ltd.
    BY:  BONG JUNE KIM
14       CHRISTINE M. BAE
         JOHN D. RUE
15

16  ROBBINS, GELLER, RUDMAN & DOWD, LLP
         Attorneys for Plaintiff Employees' Retirement System of
    the Government of the Virgin Islands
17  BY:  ALEXANDRA S. BERNAY
         BRIAN O. O'MARA
18       DAVID W. MITCHELL
         DAVID A. ROSENFELD
19       PATRICK J. COUGHLIN
         RANDI D. BANDMAN
20

21  BONI & ZACK, LLC
         Attorneys for Plaintiff City of Philadelphia Board of
    Pensions
22  BY:  JOSHUA D. SNYDER
              -and-
23  OBERMAYER, REBMANN, MAXWELL & HIPPEL, LLP
    BY:  WILLIAM J. LEONARD
24

    BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO
25       Attorneys for Plaintiff Fresno
    BY:  JOSEPH J. TABACCO, JR.

```
1    GOLD, BENNETT, CERA & SIDENER, LLP
          Attorneys for Plaintiffs Prudent Forex Fund I, LLC,
2    Prudent Capital Management, LLC, United Food and Commercial
     Workers Union and Participating Food Industry Employers
3    Tri-State Pension Fund and Five Star Forex, LP
     BY:  PAMELA A. MARKERT
4         SOLOMON B. CERA
          THOMAS C. BRIGHT
5             -and-
     COHEN, MILSTEIN, SELLERS & TOLL, LLP
6    BY:  J. DOUGLAS RICHARDS
          DANIEL H. SILVERMAN
7         MANUEL JUAN DOMINGUEZ
          MICHAEL B. EISENKRAFT
8             -and-
     LOWEY, DANNENBERG, COHEN & HART, P.C.
9    BY:  GEOFFREY M. HORN
          RAYMOND P. GIRNYS
10        GERALD LAWRENCE
          PETER D. ST. PHILLIP, JR.
11        VINCENT BRIGANTI
              -and-
12   SHEPHERD, FINKELMAN, MILLER & SHAH, LLC
     BY:  KAREN M. LESER-GRENON
13
     FINE, KAPLAN & BLACK, RPC
14        Attorneys for Plaintiff State - Boston Retirement System
     BY:  ADAM J. PESSIN
15        ROBERTA D. LIEBENBERG
              -and-
16   BERGER & MONTAGUE
     BY:  BART D. COHEN
17        H. LADDIE MONTAGUE, JR.
          MERRILL G. DAVIDOFF
18            -and-
     LABATON & SUCHAROW, LLP (NYC)
19   BY:  CHRISTOPHER J. KELLER
          ERIC J. BELFI
20        GREGORY S.  ASCIOLLA
          JAY L. HIMES
21        LAWRENCE A. SUCHAROW
          MATTHEW J. PEREZ
22        MICHAEL W. STOCKER
          ROBIN ANN VAN DER MEULEN
23            -and-
     QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
24   BY:  DANIEL LAWRENCE BROCKETT
          STEIG OLSON
25        MANISHA M. SHETH
```

```
E2D5havA                      argument
```

```
 1   SULLIVAN & CROMWELL, LLP (NYC)
          Attorneys for Defendants Barclays Bank, PLC and Barclays
 2   Capital, Inc.
     BY:  DAVID H. BRAFF
 3        JEFFREY T. SCOTT
          QIAN ALLISON GAO
 4        YVONNE SUSAN QUINN

 5   COVINGTON & BURLING, LLP (NYC)
          Attorneys for Defendants Citigroup, Inc., and Citigroup,
 6   N.A.
     BY:  ALAN M. WISEMAN
 7        ANDREW A. RUFFINO

 8   CAHILL, GORDON & REINDEL, LLP
          Attorneys for Defendants Credit Suisse Group, AG and
 9   Credit Suisse Securities, (USA) LLC
     BY:  DAVID G. JANUSZEWSKI
10        ELAI E. KATZ
          HERBERT S. WASHER
11        JASON M. HALL

12   KIRKLAND & ELLIS, LLP
          Attorneys for Defendant Deutsche Bank AG
13   BY:  JOSEPH SERINO, JR.
          ERIC F. LEON
14        GEORGE M. MONTGOMERY
          ROBERT S. KHUZAMI
15
     SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
16        Attorneys for Defendants JP Morgan Chase & Co. and JP
     Morgan Chase Bank National Association
17   BY:  PETER E. GREENE
          BORIS BERSHTEYN
18        PATRICK J. FITZGERALD
          PETER S. JULIAN
19
     DAVIS, POLK & WARDWELL
20        Attorneys for Defendant Royal Bank of Scotland Group, PLC
     BY:  ARTHUR J. BURKE
21        GREG D. ANDRES
          LEWIS C. SHIOLENO
22

23

24

25
```

E2D5havA                          argument

```
 1   GIBSON, DUNN & CRUTCHER, LLP
          Attorneys  for Defendants UBS G and UBS Securities, LLC
 2   BY:  PETER SULLIVAN
          JOEL S. SANDERS
 3        JOSHUA H. SOVEN
          RACHEL ALDEN LAVERY
 4
     CLEARY GOTTLIEB
 5        Attorneys for Defendants Goldman Sachs Group, Inc. and
     Goldman Sachs & Co.
 6   BY:  THOMAS J. MOLONEY
          ANDREW M. DARCY
 7        ELIZABETH VICENS
          GEORGE S. CARY
 8        LEAH BRANNON
          VICTOR L. HOU
 9
     LOCKE, LIDDELL & SAPP, LLP
10        Attorneys for Defendants HSBC, Holdings, PLC, HSBC Bank,
     PLC, HSBC North America Holdings, Inc. and HSBC Bank USA, N.A.
11   BY:  EDWIN R. DEYOUNG
          GREGORY T. CASAMENTO
12        ROGER B. COWIE

13   WACHTELL, LIPTON, ROSEN & KATZ
          Attorneys for Defendant Morgan Stanley
14   BY:  JONATHAN M. MOSES
          KEIA D. COLE
15
     HOGAN LOVELLS, US, LLP (NYC)
16        Attorneys for Defendant Lloyds Banking Group, PLC
     BY:  MARC J. GOTTRIDGE
17        LISA J. FRIED

18

19

20

21

22

23

24

25
```

E2D5havA                         argument

 1        (Case called)

 2        THE COURT:  Good morning, counsel.

 3        ALL COUNSEL:  Good morning, your Honor.

 4        THE COURT:  Thank you for coming out in the snow.  My

 5   apologies.  And, just by way of explanation, the court house

 6   was closed yesterday so there was really no way for me to get

 7   anything onto the docket any later than close of business on

 8   Tuesday which is why you saw the order that if the court house

 9   was open, we would be here.  And I realize that if I had

10   scheduled the conference for 10:50 we would not be here.  But,

11   in any event, I very much appreciate your coming and I also

12   realize it is a real testament to those of you who want to be

13   interim lead counsel of your commitment to be here and serve

14   the class.  So, thank you for that.

15        Let me tell you what I hope to accomplish today.

16   First, I want to talk just a little bit about what cases remain

17   in the cue and if you know whether there are additional

18   defendants that are contemplated.  Then I would like to talk

19   about a few housekeeping matters.  Then we will turn to

20   appointment of interim lead counsel to represent the putative

21   U.S. class.  I will attempt to rule on that today, that's my

22   intention.  We will also discuss whether or not we need

23   appointment of interim lead counsel to represent the putative

24   Korean class.  Then we will talk a little bit about the March

25   3rd conference, the agenda, whether we really should have it on

E2D5havA                          argument

1   March 3rd, and then some more miscellaneous and housekeeping

2   matters.  Obviously, if there is anything that counsel want to

3   raise that's not on my agenda there will be ample opportunity

4   to do that.

5           So, the first issue is that we have many cases here,

6   some that have been assigned to me officially, a couple that

7   are in the cue to be assigned to me officially, and a couple

8   without docket numbers.  I understand that there is a

9   Philadelphia case that Quinn plans to file.  Has that been

10  filed?

11          MR. BROCKETT:  Yes.  It was filed on Monday, your

12  Honor, afternoon.

13          THE COURT:  But it doesn't have a docket number on

14  ECF.

15          MR. BROCKETT:  I think that is the case.  Actually, I

16  believe on Tuesday it was filed.

17          MR. OLSON:  Judge, Steig Olson from Quinn Emanuel.

18          Actually, we did receive a docket number, I don't

19  think it is on ECF yet but it is 14 civil 876.

20          THE COURT:  Okay.  There is one housekeeping matter I

21  should mention.  I think just in the interest of time we are

22  not going to call the roll of every attorney who is here.  My

23  deputy has taken your appearances.  If he has not taken your

24  appearance, in other words if you have come in and haven't told

25  either Mr. Lewis or my deputy that you are here, please be sure

 1    and see him after the proceedings so that it is on the record

 2    that you have appeared.  But, I'm not going to call names.

 3              So, there is another case called Fresno that I think

 4    was referenced by the Berman DeValerio firm.  We have

 5    Mr. Tabacco on the phone.  I had given him permission, since

 6    his flight was cancelled, to appear telephonically.

 7    Mr. Tabacco, can you give us an update on that case?

 8              MR. TABACCO:  Good morning, your Honor, and thank you

 9    very much.  I am working on getting a new travel agent at the

10    same time.

11              Your Honor, our case was filed on Tuesday morning and

12    the civil number is 14 civil 09021.  So, that is on file.

13              THE COURT:  Okay.  Thank you very much.

14              So now this is a question to all plaintiff's counsel:

15    Are there any additional filings or defendants who are

16    contemplated who are not yet appearing on the docket apart from

17    what we have discussed?  Mr. Coughlin?

18              So, the acoustics are terrible in this room and I

19    apologize for that.  The way to be here is to stand, put the

20    mic at the very edge of the desk, point it straight up and

21    everyone will hear you.

22              And you don't even need to bend over.

23              MR. COUGHLIN:  Good morning, your Honor.  Patrick

24    Coughlin from Robbins Geller.

25              THE COURT:  Good morning, Mr. Coughlin.

E2D5havA                         argument

1           MR. COUGHLIN:  A number of state funds have contacted

2   us so there may be additional filings from at least two state

3   funds -- pension funds.

4           THE COURT:  Thank you.

5           Anyone else?  Yes, Mr. Asciolla?

6           MR. ASCIOLLA:  Good morning, your Honor.

7           we are aware of counsel filing another case, it should

8   be this week.  I don't think they're here in the courtroom but

9   I am aware that at least one other case will be filed as well.

10          THE COURT:  One other case and one other additional

11  plaintiff's firm?

12          MR. ASCIOLLA:   I don't know if any other plaintiff's

13  firms will be on that complaint but one firm called us and said

14  they would be filing.

15          THE COURT:  Okay, a firm that is not here.

16          MR. ASCIOLLA:  A firm that is not here, correct.

17          THE COURT:  So, the next question I have is I have not

18  read all of the complaints, I confess, but I have read at least

19  a couple of them and have a general idea of what the case is

20  about.  We are obviously very far from the merits in this case

21  but one of the things that I think is relevant is to talk a

22  little bit about what discovery is contemplated and what kind

23  of discovery and where it will occur.  I notice that Scott &

24  Scott filed the first case.  I don't think I need to hear from

25  all of you to answer the questions so I will ask Mr. Burke if

E2D5havA                         argument

1    you can tell me a little bit about what discovery is likely to

2    occur and where.

3              MR. BURKE:  Certainly.

4              Your Honor, you are no doubt aware there have been a

5    number of governmental investigations and we would think that

6    would be the starting point for discovery asking the defendants

7    to turn over to the plaintiffs what they have already produced

8    to law enforcement or other investigatory agencies.  This is a

9    cartel case, however, it is a worldwide market so there are

10   going to be witnesses and documents in Europe as well as the

11   United States, London being the largest center for foreign

12   exchange.  So, we are going to have at least a two-continent

13   discovery process.  We are going to be looking for the e-mails,

14   the instant messages, the communications between various

15   members of what has been variously called *The Dream Team, The*

16   *Cartel, The Bandits Club, One Team One Dream*, different

17   colorful names, so prosecuting it like you would prosecute a

18   cartel case so you are going to focus on communications.

19             THE COURT:  Okay.

20             MR. BURKE:  The last thing, obviously, is going to be

21   trading patterns because everybody is focused in on what is

22   known as the 4:00 p.m. fix, the London fix.  4:00 p.m. London

23   time when trading patterns seem to take some very interesting

24   turns.

25             THE COURT:  Okay.  Thank you very much.

1            So, let me ask Mr. Brockett about depositions.  I know

2    we are a long way from depositions in this case but what kind

3    of people do you think will be deposed in this case and where?

4            MR. BROCKETT:  Well, your Honor, there is going to be

5    depositions, obviously, of the plaintiffs, their trading.

6    There is going to be depositions of their trading strategies

7    and things of that kind that we would expect to have to

8    produce, certainly one or maybe more depositions of the named

9    plaintiffs in order to elicit relevant information.  I would

10   then expect that there would be significant depositions of all

11   of the banks that are named as defendant including several of

12   the senior traders about Forex.

13           Now, I should also add many of the traders who were

14   running the banks during the events in question have been fired

15   or discharged or relieved and so we are going to have to deal

16   with how we are going to secure their attendance at trial.

17           But, there is going to be significant depositions of

18   the banks and likely to be significant depositions of

19   third-parties as well.

20           THE COURT:  And where are all of these people?

21           MR. BROCKETT:  Well, the U.S. banks are obviously in

22   New York.  Some of the foreign banks will have New York

23   branches out of which some of the trading operations would have

24   been conducted but it is likely true that a number of critical

25   witnesses will be in London or in other countries in Europe.

1           THE COURT:  Okay.  Thanks very much.

2           So, this is a question for Mr. Briganti and I'm just

3     calling you at random because I need the answer from one of the

4     plaintiff's lawyers.  So, I apologize for putting you each on

5     the spot.

6           This question has to do with the class representative.

7     Obviously we have many, many, many plaintiffs here and I

8     consequently have never been involved in a case with quite so

9     many plaintiffs that was a class action at least at the outset.

10    Based on your experience, how do you at least envision the

11    evolution of who the representative plaintiff would be.

12          MR. BRIGANTI:  It is an excellent question, your

13    Honor, and you can just tell by reading the complaints that

14    have been filed that each group of lawyers had a slightly

15    different view of who should serve as a class representative in

16    the case and that's typical, Judge, when you deal with a

17    financial benchmark case like this because a manipulation of

18    that financial benchmark impacts trillions of dollars and

19    financial instruments and a wide variety of instruments, your

20    Honor.

21          So, some of the instruments in our complaint details

22    what we believe to be the most important instruments which

23    would be impacted by a manipulation of the WM/Reuters and it is

24    the London fix, your Honor, the 4:00 p.m. fix that is used to

25    settle trillions of dollars.

1          It would be F. Ex. swap contracts, your Honor, where

2    you are swapping one currency for the other where the price

3    term in the contracts is you have to look at WM/Reuters in

4    order to settle that trade.  There is also exchange traded

5    funds, your Honor, that have exposure to foreign securities and

6    the portfolio managers have the very difficult task of

7    understanding how to value those transactions, those baskets of

8    securities.

9          THE COURT:  So, I will interrupt you and ask if you

10   can just answer my question which is do you anticipate that the

11   class representatives would be most or all of the plaintiffs

12   who are currently appearing on the various dockets sheets?  Or

13   do you think that it might more likely be one or two or three?

14         MR. BRIGANTI:  I think it can be all of the above,

15   your Honor, because there is going to be some pension funds who

16   may have only traded an ETF that has exposure to F. Ex. by

17   reason of the fact that F. Ex. had to be used to settle the

18   trade.  There could be different classes of plaintiffs that

19   transacted directly with the defendant and those are going to

20   be different types of contracts as well.  But, all of them have

21   the singular commonality, if you will, that they are all priced

22   or valued to what happened at the WM fix at 4:00 p.m.

23         THE COURT:  Does anyone else want to address the

24   question of possible subclasses?  I am going to restrict my

25   question to people who are at the tables here.

1        Do you see the likelihood of subclasses or no?

2        MR. COUGHLIN:  Your Honor, Patrick Coughlin.

3        I don't think at this time that we see that.  I think

4   that right now we are trying to look at it as one class and it

5   may affect a lot of different securities or options but we

6   don't contemplate subclasses necessary at this time.

7        THE COURT:  Okay.  Thank you very much.

8        Okay.  So, I at least have some sense of what we are

9   planning for in terms of discovery and that does inform my

10  decision a little bit about the appointment of lead counsel.

11  Let me do a little bit of housekeeping first.

12       First, there are several pro hac vice motions that are

13  pending.  They will all be granted.  Some of them have not been

14  docketed yet.

15       In addition, I should mention that even though I do

16  not have a conflict like some of my predecessor judges in the

17  case, there are a few things I just want people to know about,

18  first of all, Ms. Liebenberg who has entered an appearance from

19  Fine & Kaplan is a friend of mine.  We have known each other

20  for many years from the ABA but I see that she is not seeking

21  to appear or have her firm appointed as interim lead counsel so

22  I don't believe that creates any kind of conflict.

23       Second, Cleary Gottlieb, is there anyone here from

24  Cleary Gottlieb?  Mr. Moloney, good morning.

25       MR. MOLONEY:  Good morning.

1           THE COURT:  Mr. Maloney and I once shared a secretary

2     in 1980 -- I don't know, a long time ago.  Clearly Gottlieb is

3     where I worked at my first legal job, that was about 30 years

4     ago.  I don't think that creates a conflict, but good morning.

5     Nice to see you here.

6           MR. MOLONEY:  And you, your Honor.  Nice to see you.

7           THE COURT:  More recently -- and I'm talking six years

8     ago -- JP Morgan Chase was a client of the firm that I worked

9     with on a matter that I worked on.  The matter was completely

10    unrelated to this matter, it was staffed with many lawyers

11    including three partners.  I was a partner but I was not the

12    primary client contact and I was not the lead partner on the

13    matter. I worked on it for about three to four months full-time

14    and then that was the end of my association with the client.  I

15    have had no connection with the client or anyone from the

16    client thereafter.  I did not then have nor do I have now any

17    personal relationships with anyone there.

18          As I said, I don't think any of these are grounds

19    under the ethical rules for recusal but I just wanted to make

20    sure that everybody was aware of that.

21          So, what I would like to do now is turn to appointment

22    of interim lead counsel to represent the U.S. putative class

23    and this, of course, is all premised on the assumption that

24    everyone here would like to have all of the cases consolidated

25    that have a U.S. class.  That was implicit in every letter I

E2D5havA                          argument

1    received.  I did not see anybody suggesting otherwise and so

2    I'm going to proceed on that assumption unless someone tells me

3    right now that they object.

4        Okay.  Seeing no objection, I will go on that

5    assumption.

6        I received several letters from the various

7    plaintiffs' firms proposing that they serve either alone or

8    with other firms as interim lead counsel for the U.S. class.

9    Some of those requests, it appears, have been superseded by

10   later requests, and so what I believe I am left with is a

11   proposal with four separate proposals.  I will tell you what I

12   think they are, you correct me if I am wrong.  One is a

13   proposal from Lowey Dannenberg, Mr. Briganti's firm, in a

14   letter dated January 24th and February 10th.

15       There is also the most recent letter from the Quinn

16   firm proposing for lead counsel Quinn, Labaton, Robbins Geller

17   and Cohen Milstein, and that appears in a letter dated February

18   10th and in the letter it is noted that that is supported by

19   various other of plaintiff's counsel or plaintiffs here.

20       There is a third request from the Berman DeValerio

21   firm -- Mr. Tabacco's firm -- who is on the phone dated

22   February 10th.

23       And then there is a fourth request from Scott & Scott,

24   Mr. Burke's firm, with the Hausfeld firm.

25       Do we have a representative from Hausfeld?

E2D5havA                        argument

1              THE COURT:  Mr. Hausfeld?

2              MR. HAUSFELD:  Yes, your Honor.

3              THE COURT:  Good morning.

4              MR. HAUSFELD:  Good morning.

5              THE COURT:  That is our fourth request and that is

6    also in a letter dated February 10th.

7              So, those are the four requests that I am considering.

8    Is there anything else that should be on that list that I am

9    not aware of?  Okay.  So, it looks like that is the complete

10   list.  I am looking to Federal Rule of Civil Procedure 23(g)(3)

11   which says that the Court may designate interim counsel to act

12   on behalf of a putative class and I note that the Manual for

13   Complex Litigation says it might be especially useful where

14   there are a number of overlapping duplicative or competing

15   suits that can be consolidated.  That certainly seems to be the

16   case here and I do think it would be helpful to have interim

17   lead counsel.  And that is apparently the view of virtually all

18   of the plaintiff's firms here as well.

19             So, the factors that I am considering are the ones

20   that aren't necessarily applicable because they deal with

21   appointment of counsel after certification but those are

22   factors in Rule 23(g)(1), the work that counsel has done

23   investigating the potential claims but I will say that I, like

24   some judges, don't put too much weight on that because we are

25   very, very early in the case, there is much more work to be

E2D5havA                          argument

1    done and I'm sure that any very good lead counsel that is best

2    suited to serve the interests of the class will do a job of

3    investigating potential claims.  So, I put some weight but not

4    a great deal of weight on that.

5           Also very important are counsel's experience in class

6    actions and complex antitrust cases, knowledge of the

7    applicable law and resources.  And with regard to that I am

8    interested in the size of the firm, how many offices there are,

9    also what other possibilities or resources you have available

10   to you that are not necessarily evident from looking at your

11   firm roster.

12          I also will be asking some of you about your own

13   personal commitments because I certainly know from practice

14   that even in a very large firm the senior partner has only so

15   much time and energy to go around and that's a matter of

16   interest and concern to me.

17          The fifth issue, if I ask you to speak I would like

18   you to address it, is the absence of issue conflicts or client

19   conflicts.

20          I don't need anybody to repeat what is in your

21   submissions, I have read your submissions.  I have looked at

22   your firm websites.  I have looked at Martindale and I have

23   looked at some of the cases that are referenced in your

24   submissions where you have acted as lead counsel or where you

25   are participating.  I have looked at both docket sheets and

also some of the papers in those cases.  So, I feel like I have

a very complicated chart to consult and also a lot of

information.

And so, what I'm going to do is I am going to pose

questions.  I think the way I will handle this is I will pose

questions to the Quinn firm to address the group and then I

will ask questions of the Lowey firm, the Berman DeValerio firm

and Scott & Scott.  I think none of us wants to be here all day

so, please, think about efficiency as you are speaking.  But,

let me speak to Mr. Brockett first.

Quinn is obviously a different sort of firm than the

usual plaintiff's firm and different from the other firms, even

the largest of the other firms that are here.  You tend to sit

on both sides of the table, you have over 600 lawyers, you have

vast resources.  On the other hand, having been at a big firm

myself I know that all of the resources of the firm are not

always available at all times for all matters.  So, what I

would like to hear from you is I know your firm is unique in

those respects.  What makes you and your firm most suitable for

the representation of the class in this case?  Let me ask that

one first.

MR. BROCKETT:  Your Honor, would the Court mind if I

spoke from the podium?

THE COURT:  If you speak into the mic at the podium

that would be fine.

E2D5havA                        argument

1          MR. BROCKETT:  Thank you, your Honor.

2          Quinn Emmanuel, as I believe the Court knows, is the

3   largest firm in the world devoted solely to this litigation.

4   We are not strictly a plaintiff's antitrust firm.  We come into

5   these cases for the plaintiffs when we think there is something

6   unique that we can offer.  We don't do a volume of the cases.

7   When we take in a case we devote all the resources that are

8   necessary to prosecute that case.  In this case we decided to

9   jump in because clients like the City of Philadelphia and other

10  clients ask us to but also because this case is, frankly, right

11  within our sweet spot because it combined our leading bank

12  litigation practice with our antitrust and our class action

13  practices, all of which are widely recognized as among the

14  nation's best not only among plaintiffs firms but among all

15  firms.

16          We have substantial expertise in the issues that are

17  likely to arise here as this case involves the intersection of

18  the antitrust laws, the financial industry and our class action

19  practice as well.  And we have the leading appellate practice

20  in the Second Circuit and appellate issues could be important

21  here.

22          THE COURT:  Let me just interrupt.

23          I understand that if you consider all of the

24  attributes of the firm as a whole it is very hard for any other

25  firm, especially the ones who are here, to compete with that

E2D5havA                          argument

1    but one of the things I am most interested in are what,

2    precisely, would be devoted as resources to the case?  So, for

3    example, would you be working on it as the lead partner?

4              MR. BROCKETT:  Absolutely.  Yes.

5              THE COURT:  And how many other partners, if any, do

6    you think would be assigned to work on the case as primary

7    people on the case?

8              MR. BROCKETT:  Many.  And I can give you as a

9    benchmark, your Honor, we have sued all of the same banks who

10   are defendants here for the FHFA.  In that case, for example,

11   we have 70 to 80 lawyers that are working on the case.

12             THE COURT:  How many partners?

13             MR. BROCKETT:  Ms. Sheth who is here and worked on the

14   case can perhaps answer that question more specifically.

15             MS. SHETH:  Sure.  Manisha Sheth on behalf of Quinn

16   Emmanuel.

17             THE COURT:  Now, we need a mic.

18             MS. SHETH:  It is roughly about 18 to 20 partners.

19             THE COURT:  Who of those partners spend the moist time

20   on the case?

21             MR. BROCKETT:  On the FHFA case?

22             THE COURT:  I don't need their names but three senior

23   partners, five senior partners?  Who spends most of their time

24   on the case?

25             MS. SHETH:  Out of that group I would say

1    approximately 75 percent of those partners spend over between

2    60 and 70 percent of their time on those cases.  There are

3    multiple cases, the vast majority of them are before Judge Cote

4    but we also have one pending in the Federal District Court in

5    California before Judge Pfaelzer, we have three partners on

6    that case.  We also have a case pending in the District of

7    Connecticut before Judge Thompson and we have, I believe, three

8    partners on that case.

9              THE COURT:  Okay.

10             MS. SHETH:  So, a substantial amount of our time.

11             THE COURT:  Are they the same partners who would be

12   the primary partners on this case if Quinn Emanuel were

13   appointed?

14             MR. BROCKETT:  The primary partners on this case, if

15   we were appointed, would be the three partners who are in the

16   courtroom:  Myself, Daniel Brockett, Manisha Sheth and Steig

17   Olson who is next to here.  And I might just mention that Steig

18   was recently noted as one of the rising stars under 40 in the

19   class action antitrust bar.

20             THE COURT:  Okay.

21             MR. BROCKETT:  Among others.

22             THE COURT:  Are the three of you also on this other

23   matter with the 18 to 20 partners where 75 percent of them

24   spend half their time on that matter?

25             MR. BROCKETT:  Neither myself nor Mr. Olson works on

E2D5havA                        argument

1    FHFA.  Ms. Sheth does work on that case.  Although, I would

2    comment quite a number of those cases have been settling which

3    has been freeing up the time of a lot of partners who are

4    devoted to that case.

5         THE COURT:  I don't need names, but how many other

6    substantial cases do you have substantial responsibility for?

7         MR. BROCKETT:  The CDS antitrust case before Judge

8    Cote.

9         THE COURT:  No, I mean in general, your roster of

10   cases, what you face every week or however it is you count.

11   How many substantial cases do you count among your cases?

12        MR. BROCKETT:  I have a docket of mortgage-backed

13   securities cases that I handle for Allstate and for Prudential.

14   Those cases are in various stages of discovery; some of them

15   are in motion to dismiss stages still.  Those cases have been

16   settling at a rapid clip and I can tell the Court on the

17   details but there is lots of ongoing discussions about those.

18   I think, as the Court knows, many of the banks now are settling

19   the RMBS litigation.

20        So, I have the mortgage-backed securities cases, I

21   have some LIBOR cases that right now are in a holding pattern

22   because Judge Buchwald has put all the cases -- stayed all the

23   non-class-action cases so those cases are in a holding pattern

24   at this point.

25        THE COURT:  And you don't have involvement with the

1    class action cases in the latter?

2              MR. BROCKETT:  No involvement in the LIBOR class

3    action, only in the individual investor cases.

4              THE COURT:  Okay.

5              MR. BROCKETT:  And then the CDS case with Judge Cote

6    which is, we will have a motion to dismiss teed up by the

7    summertime.

8              THE COURT:  Okay.  I'm sorry, what was your name, sir?

9              MR. OLSON:  Good morning, your Honor.  Steig Olson.

10             THE COURT:  Mr. Olson?

11             MR. OLSON:  Yes.

12             THE COURT:  Good morning.

13             Mr. Olson, what do you count among your major cases?

14             MR. OLSON:  My major cases are this case and the CDS,

15   the credit default swap antitrust which Mr. Brockett and I lead

16   for Quinn Emanuel.

17             THE COURT:  Are those the RMBS cases?

18             MR. OLSON:  No.  It is an antitrust case before Judge

19   Cote that involves collusive conduct by the banks.

20             THE COURT:  This is the one where you were appointed

21   lead counsel in December?

22             MR. OLSON:  Yes.

23             THE COURT:  Okay.

24             MR. OLSON:  So, those two cases are my primary

25   antitrust class action cases.  I do a little bit of work on a

E2D5havA                              argument

1    case that is in the late stages and there have been, again, a

2    number of settlements and that is called the processed eggs

3    antitrust case.  I represent a client that is named IMS health

4    which is a major provider of data to the health care industry

5    that was sued in a competitor antitrust case so it is a

6    nonclass action.

7              Those are my principal cases where I focus my time.

8              THE COURT:  Okay.  Thank you very much.

9              And then your colleague?  I'm sorry, I have a list of

10   too many names.

11             MS. SHETH:  No problem, your Honor.  Manisha Sheth.

12             I presently work on, from the FHFA cases, the FHFA v.

13   Merrill Lynch case, also FHFA v. Goldman action, and the FHFA

14   v. Barclays action.

15             In addition, of my three other significant matters is

16   a matter where we represent Novartis Pharmaceutical Corporation

17   pending before Judge McMahon in this court.

18             THE COURT:  Thank you very much.

19             Mr. Brockett, have you conducted a conflicts check?  I

20   certainly remember one of the banes of being in a big firm the

21   number of conflicts you encounter.  Is the firm free of both

22   issue and client conflicts.

23             MR. BROCKETT:  Yes, your Honor; with respect to the

24   defendant banks we represent.  We have and do represent Morgan

25   Stanley from time to time, however Morgan Stanley is a 2

E2D5havA                          argument

percent market share here.  There is no indication from the

public that Morgan Stanley was involved in this and so they're

not a defendant in our case and they're not a defendant on many

of the other complaints as well.  They are a defendant on some

of the cases here but I tell the Court this same issue came up

in CDS and Judge Cote dealt with it by saying, listen, there is

going to be multiple lead counsel.  If there is a conflict, if

facts come to light in this case that Morgan Stanley should be

sued, then we obviously will do it but we will have one of our

co-counsel carve that piece of the case out, will handle it

against Morgan Stanley, and we will not be adverse to Morgan

Stanley in our prosecution of the case against the other

defendants.

          Judge Cote said she had no problem with that and we

are proceeding in the CDS case under that very procedure.

          THE COURT:  Okay.

          So, just a couple of other questions.  One is how

would you normally deal with document review?  Do you have your

own associates do all of the review soup to nuts?  Or do you

use contract lawyers?  Or do you have a special category of

lawyers?  How do you deal with that?

          MR. BROCKETT:  Sure.  We use contract lawyers for big

document productions because it is efficient and less costly.

We have a whole roster of contract lawyers that work for Quinn

Emanuel.  In addition to that, we have teams of associates in

E2D5havA                          argument

the firm.  I don't have any assigned team of associates for my

cases.  It is whoever is available.  And, frankly, we work

associates in multiple offices seamlessly.  We consider

ourselves one firm and if I need an associate and can't staff

it in New York, we can go to San Francisco or go to Washington,

D.C.  And we think that's the best system.  But, we obviously

would have a team of associates, regular associates in addition

to the partners, staffed on this particular case.

          THE COURT:  Okay.

          And then one final firm and that is -- I mean Quinn is

quite a substantial firm all alone.  Why these three other very

able and, in the case of Robbins, quite a large firm to have as

part of your proposed team?

          MR. BROCKETT:  Fair question.

          There are three reasons, your Honor, but first of all

let me say these are all excellent, excellent firms with a lot

of expertise in the particular issues here that they are

bringing to the table.

          THE COURT:  You don't have to persuade me of that.  I

can sew that by their qualifications and credentials.

          MR. BROCKETT:  There are three reasons why and we had

discussions about what structure would be the best for the

class in this case.  We talked to all of the firms and put a

lot of effort and time into trying to come up with what is the

best structure for the class in this case but why we have gone

E2D5havA                         argument

 1    with the four lead in the case is for several reasons.  First

 2    of all, this case demands substantial resources.

 3           The Foreign Exchange is the largest financial market

 4    in the world with trillions of dollars of commerce transactions

 5    every day.  This conspiracy involves multiple continents and

 6    there is definitely going to be discovery needed from Europe.

 7    There are multiple investigations around the globe by

 8    investigators in various countries but most importantly, Judge,

 9    we are going up here against the world's largest banks.  These

10    are very sophisticated financial institutions that are

11    represented all by major New York Law firms.  They are going to

12    have armies of lawyers and we, on the plaintiff's side, need

13    the resources to go toe-to-toe with the resources that the

14    banks are going to put against us toe-to-toe on substance and

15    that is why we have determined, in this case, a four-firm

16    structure can operate sufficiently and is the best proposal.

17           Also, the depth of the experience that we would have

18    here among my proposed co-counsel is Doug Richards who is

19    former Deputy General Counsel of the CFTC -- the Commodities

20    Futures Trading Commission.  We also have Greg Asciolla who is

21    a former trial attorney from the DOJ antitrust division.  And

22    we have from Cohen Milstein we have a firm that is a brand name

23    in this industry and who has won the largest antitrust verdict

24    ever in the history of the western world.

25           So, that's basically it.  It is the experience, it is

E2D5havA                          argument

1    the resources that we need and it is the expertise, the

2    expertise that these four firms can bring to this case --

3    expertise in antitrust, expertise in commodities and expertise

4    in class action litigation, and we think that its necessary in

5    this case largely because of the resources that we are going to

6    be faced with by the other side and the Court should make sure

7    that there are ample resources on both sides of the v.

8                 THE COURT:  Thank you very much.

9                 Now I would like to hear from Mr. Briganti.  My basic

10   question is:  Why your firm?  And you don't have to tell me

11   what a wonderful firm it is and what an illustrious practice

12   you have or even about your great experience in these types of

13   cases because I have read about that, I think those are real

14   strengths.  But, why your firm versus these other firms or

15   versus someone like Quinn and the other firms at the front

16   table who have many larger resources?

17                MR. BRIGANTI:  Well, we have a different viewpoint,

18   Judge, number one.  We will bridge a different viewpoint to the

19   viewpoint that these four firms bring.  We don't come to court

20   and tell judges that we're the biggest but we, I can say with

21   all credibility and conviction, we are the best plaintiffs'

22   side firm in financial benchmark litigation as evident in the

23   most highly researched, best expert vetted complaint on file.

24   We didn't discover financial benchmark litigation yesterday, we

25   have been doing it since 2003.  We pioneered it.

E2D5havA                           argument

 1          In the In Re: Natural Gas case before Judge Marrero,

 2   who appointed us co-lead counsel, we litigated that case

 3   against 20 of the largest natural gas companies in North

 4   America.

 5          THE COURT:  Who was your co-counsel in that?

 6          MR. BRIGANTI:  In that there was three other

 7   co-counsel; Lovell Stewart, Labaton & Sucharow and Finkelstein

 8   Thompson.

 9          THE COURT:  Thanks.  Go ahead.

10          MR. BRIGANTI:  We worked cooperatively with many of

11   the competing applicants here, your Honor, but we feel like we

12   have a niche.  We have an independent thinking view of how

13   these cases should be litigated and we think that is best set

14   forth in the complaint that we filed and the fact that we have

15   access to specialized resources.

16          The economist we hired in this case, your Honor, she

17   has been credited with breaking the LIBOR scandal.  She has

18   been asked by global regulators to reform LIBOR.  She has been

19   asked to draft the rules and regulations that would govern all

20   financial benchmarks world wide.  She was courted by virtually

21   every firm in this courtroom but because of our long standing

22   relationship she has agreed to be retained by us.  We have

23   retained her, we work hand in hand with her.  We are just not

24   lawyers but are deeply engrained in the economics.

25          THE COURT:  So, let me ask you this.  When you get

1    your 1 terabyte of documents, what do you do with that?

2              MR. BRIGANTI:  We recently handled, as sole lead

3    counsel, a 14 million production of documents.  We do like any

4    other plaintiffs firms have done and have done for the last 40

5    years, your Honor, we look, we bring in other plaintiffs

6    counsel, we supervise the document review, we make sure it is

7    done efficiently and make sure it is done in non-duplicative

8    way.

9              THE COURT:  But who does it?

10             MR. BRIGANTI:  We have moved over to contract lawyers,

11   Judge, just like every other law firm.  But, it is important

12   when you deal with contract lawyers, and I think we act under

13   the guidance of the Court, to have the Court involved in the

14   contract lawyers from day one so there is no confusion about

15   the amount of money that could be billed out for those contract

16   lawyers.  These are very, very important issues, Judge.

17             THE COURT:  Because, obviously, one of the benefits of

18   appointing a firm like yours as lead counsel is that it is one

19   single firm, it would oversee everything alone, you could bring

20   in other people as needed, but it might have efficiencies when

21   we face fee applications that, say, having four very

22   illustrious firms at the front table would bring.

23             On the other hand, the tension is I need to satisfy

24   myself that the work would be done in the way that best serves

25   the class.  So, it sounds like what you are saying is on an

1   as-needed basis you, like every other firm, plaintiff's side or

2   defense side, would turn to contract lawyers and they would be

3   supervised by your lawyers.

4             Is that right?

5             MR. BRIGANTI:  Yes, your Honor.  And not just contract

6   lawyers, we would welcome the other plaintiffs lawyers in this

7   courtroom, Judge.  We have done it.  That's the way we have

8   operated on the plaintiffs' side.

9             THE COURT:  And let me ask this.  What about your own

10  personal commitments?

11            MR. BRIGANTI:  Yes, your Honor.

12            My personal commitments, right now I am primarily

13  responsible for a case before Judge Daniels involving a

14  manipulation of the interbank rate for the Japanese yen.  I

15  have worked that case with a team at my firm that includes

16  Ms. Hart who is chair of the New York State Bar Association

17  Antitrust Committee, that includes my partner Peter

18  St. Phillip, my partner Geoff Horn, and we have a team of

19  associates that helps us out.

20            That is my primary responsibility.  We have just

21  briefed 13 motions to dismiss, your Honor, fully briefed; we

22  are arguing it, Judge, March 5th, before Judge Daniels.

23            We have also filed --

24            THE COURT:  How did you staff the briefing?

25            MR. BRIGANTI:  I did the briefing with my partners

1    Peter St. Phillip and Geoff Horn and two associates.

2            THE COURT:  Okay.  With regard to depositions

3    overseas, how would you deal with that?

4            MR. BRIGANTI:  Judge, that is a good question.

5            We have done it in other cases.  My firm, co-lead

6    counsel in the Sumitomo Copper Case which dealt with overseas

7    depositions, we worked overseas with barristers there and

8    handled it just like any other deposition, your Honor.

9            THE COURT:  Thank you.

10           So, Mr. Tabacco, thank you for waiting patiently and

11   quietly on the phone.  I would like to hear from you about why

12   you think your firm is most able to represent this putative

13   class.

14           MR. TABACCO:  Thank you, your Honor, and thank you for

15   accommodating me and I apologize I am not there in person.

16   This is one of the first telephone conferences that I am forced

17   to do as it is.

18           I have almost 40 years experience in antitrust

19   prosecutions.  I started with the DOJ.  I spent several years

20   on the U.S. v. I.B.M. trial in the Southern District of New

21   York and my career really has taken a path of representing from

22   the Justice Department plaintiff's litigation and antitrust

23   cases and securities cases for, as I said, almost 40 years.  We

24   think we bring a couple of unique perspectives to this case.

25   In addition to that experience our compliance, Fresno County

E2D5havA                        argument

1    Employees Retirement Association is one of the larger

2    plaintiffs in the case and they have a very substantial

3    exposure to international and foreign trading and we think that

4    that would heighten the ability of the potential lead plaintiff

5    to very carefully supervise the litigation as Fresno has done

6    when we represented them and as others have represented them in

7    other litigations.

8            Our firm, as I mentioned in our letter, we have a

9    large office in Boston and I run the San Francisco office.  We

10   have approximately 40 lawyers between --

11           THE COURT:  That was something I wanted to confirm.  I

12   noticed you do not have a New York office; is that right?

13           MR. TABACCO:  That's correct.  I have been a member of

14   the bar back there since the late '70s but we do not have a New

15   York office; that is correct.

16           THE COURT:  Okay.

17           MR. TABACCO:  And, again, I think perhaps echoing what

18   Mr. Briganti said, in the cases that we have done -- and there

19   have been dozens over the years -- we do actively work with

20   other law firms.  So, I think one of the efficiencies that we

21   would bring rather than a four-firm structure would be to have

22   a firm at the top that could very easily manage this litigation

23   and then bring in resources in addition to the resources that

24   we have to bring the best talent to the field.  Obviously it

25   goes without saying that my colleagues who are there in the

E2D5havA                          argument

1    courtroom are certainly among the most experienced and the best

2    and it is pretty hard to distinguish one from the other as you

3    look around the room, but we think we would bring a unique

4    perspective to that.

5            I think, again, as Mr. Briganti said, the ability to

6    dig into these types of cases and my own personal experience, I

7    am at a good point in terms of my time commitments.  I just

8    concluded a large case before Judge Cote involving the GE

9    Securities litigation.  We are in the process of finalizing,

10   finishing up a very substantial case before Judge Kaplan in the

11   IndyMac Securities litigation a mortgage-backed securities

12   case.  And the only other major commitment that I have is one

13   of three lead counsel in the lithium batteries price fix case

14   which is similar to this case in the sense it involves large

15   international companies mostly in Korea and Japan.

16           So, again, those cases are at a point where I believe

17   that I can satisfy day-to-day management and devoting the

18   resources that obviously your Honor would expect.

19           Mr. Seaver, who is mentioned in the letter, has a

20   great deal of experience and would act, really, as a litigation

21   lieutenant and, likewise, given his calendar, has the ability

22   to dedicate resources to this case.  We would then call on one

23   or two of my Boston partners to become actively involved.  What

24   we would envision is a management team of three to four

25   partners.

1          In contrast a bit to what you heard this morning, in

2     situations were we have major document reviews we have taken a

3     different approach with respect to handling those and what we

4     have done and the Bear Stearns case is a very good

5     illustration, we worked that case successfully with the Labaton

6     firm; we actually bring in special project attorneys and

7     they're actually part of a firm that is hired for a particular

8     project.  Often times it is a year to a year and a half

9     employment.  They're on the website, they're part of the

10    organization, they're on our payroll.  So, really, we feel that

11    that gives us a much better ability to manage their time and

12    their efficiency and to provide them benefits rather than

13    simply going out and hiring contract lawyers.

14         In addition, as Mr. Briganti said, and I think

15    obviously Mr. Brockett would agree, that in the case of this

16    size we are going to need resources of a lot of the people in

17    this room and, again, because you have efficiency at the top

18    you can manage those resources, we think, by calling on the

19    firms that we know will do the job and do it efficiently and

20    can, at the end of the day, provide it the results we would

21    hope and expect would be a successful result when it comes time

22    to what compensation should be granted.  We think that when you

23    have efficient management that the class benefits because the

24    overall amount of time and energy that is expended in a

25    litigation is managed to manageable --

1          THE COURT:  I'm going to interrupt you because I

2    understand your point and I appreciate it.  It sounds like no

3    matter who is appointed here it will be necessary for people to

4    work with other firms and to manage other lawyers.

5          So, I'm going to turn to Mr. Burke now from Scott &

6    Scott and it is the same question and set of questions but the

7    first one is why are you and your firm best suited to act as

8    lead counsel in this case?

9          MR. BURKE:  First, thank you for the opportunity to

10   present today.

11         Why Scott & Scott and Hausfeld?

12         THE COURT:  Yes.

13         MR. BURKE:  The simple matter is what my firm

14   specializes in, and me in particular, is financial services

15   litigation.  Mr. Hausfeld's firm does nothing but prosecute

16   cartel cases.  That's what they do.  Between the two firms we

17   have three dozen lawyers.  Three dozen lawyers who are devoted

18   to doing nothing but prosecuting plaintiff's antitrust class

19   actions.  That's a lot of capacity not just here but in Europe.

20   And, the Hausfeld firm has an additional Hausfeld firm in

21   Europe.  Neither of our firms are being burdened with either

22   side of the v, there is no issue.  We are going in one

23   direction.

24         Our offices, you have a question about that, are in

25   San Diego, New York and Connecticut.

E2D5havA                        argument

 1              THE COURT:  Connecticut is close enough.

 2              MR. BURKE:  I'm bi-coastal; I have a place in Chelsea

 3      as well as in San Diego.  It is not an issue for me to be here

 4      and deal with matters in the case.

 5              As a practical matter I know your Honor is not placing

 6      a great deal of importance on it, but from my client's

 7      perspective it was important that they went first.  There was

 8      no guarantee anybody else was going to jump into the water.

 9      When we filed that complaint there was no model to follow.  We

10      took the closed-book exam so to speak, okay?  And before we got

11      there we consulted with experts, I sent my team to foreign

12      exchange trading school.  I really sent a team to get educated.

13      We spent nearly $100,000 working the case up before we filed

14      it, out-of-pocket costs.  We take this very seriously.

15              It is an area, financial services litigation, where I

16      personally have a great deal of experience.  In terms of my

17      dance card what I am doing right now is the private equity

18      antitrust litigation in the District of Massachusetts in front

19      of Judge Young where I am co-lead with Mr. Coughlin and as well

20      as the Robbins Kaplan firm up in Minneapolis.  Discovery is

21      closed there and we are in class certification and we have a

22      trial date in November.  I have another case that just started,

23      the aluminum case.  Other than that, I manage our competition

24      practice.  So, I'm available to run this case.

25              THE COURT:  Okay.  Thank you.

1          So, let's assume that there would be over 100

2     depositions.  How would that be staffed?

3          MR. BURKE:  Well, you staff it with the lawyers who --

4     you have to coach your lawyers up so they understand the

5     industry and the practice and we do this every single time; if

6     it is a payment cards case you have to know payment cards

7     better than Visa and MasterCard.  In Foreign Exchange we are

8     going to know Foreign Exchange better than the dealer banks do.

9     And, you break it up with the lawyers you are dealing with.  If

10    it is my firm and Mr. Hausfeld's firm we would staff up 100

11    depositions; we can deal with that.  If we would bring in other

12    firms because I do tend to work collegially, for instance, in

13    the private equity antitrust case it is my firm, Mr. Coughlin's

14    firm, Mr. Wildfang's firm, we do bring other firms in because

15    you have lawyers who have skills and if you have lawyers who

16    are particularly good at taking depositions, you use them.

17         THE COURT:  So, how exactly does that work?  If you

18    decide to use other firms and they're not appointed as co-lead

19    counsel, how do you do that in terms of anticipating fee

20    applications?

21         MR. BURKE:  Right.

22         In virtually every case I have been involved in --

23    plaintiff's antitrust class actions -- more than just lead

24    counsel work on the case.  In the Interchange case where I was

25    lead counsel with Mr. Coughlin before I left and went to Scott

E2D5havA                        argument

1     & Scott, there were three leads and there were a dozen firms in

2     the executive committee.  When I left and went to Scott & Scott

3     I took the depositions of the CEO of MasterCard, the COO of

4     MasterCard and the CFO of MasterCard.  I wasn't lead counsel.

5           What we did is we had a meeting, decided here are your

6     seniors with the capabilities to get the best evidence from the

7     class.  We give people an assignment, you manage that

8     assignment and when they're done, they're done.

9           THE COURT:  Okay.  Thank you.

10          So, I think what we will do now is take a brief

11    recess.  We have been sitting here for a long time, I'm going

12    to look at my notes and figure out how to proceed and

13    hopefully, when I come back, I will make a decision and we can

14    go.

15          MR. HAUSFELD:  Your Honor, if I may?

16          THE COURT:  Yes.

17          MR. HAUSFELD:  Mr. Hausfeld.

18          THE COURT:  Yes.

19          MR. HAUSFELD:  You asked at the beginning of this

20    morning's session what other factors not necessarily evident

21    from resumes might be influential in your opinion.

22          THE COURT:  Yes.

23          MR. HAUSFELD:  I would like to address that element,

24    if I might?

25          THE COURT:  You may very briefly but I don't want to

E2D5havA                              argument

1   open the door to everyone in the room addressing additional

2   factors.  But, go ahead.  You were first.

3            MR. HAUSFELD:  Thank you, your Honor.

4            As was stated this morning, this is a worldwide

5   offense.  This is going to need discovery and understanding of

6   laws in other jurisdictions and coordination with those

7   jurisdictions.  Discovery is not going to be that necessarily

8   simple as filing a request and/or a deposition notice.  There

9   are going to be public agencies that are going to want to

10   protect their ongoing investigations, someone is going to need

11   to work with those agencies to be able to coordinate their

12   investigations with the discovery requests in order to sequence

13   them.  You are going to need counsel who know foreign laws,

14   particularly private enforcement which, in all humility, your

15   Honor, we have pioneered international competition violations.

16   The laws outside the United States with respect to that and

17   follow-on litigations has been principally made by us.  We have

18   led the reformation of the UK private enforcement as well as

19   the EU guidelines as well as having access and influence in the

20   Asian private enforcement.

21            So, there are more factors involved in pulling

22   together a global case such as this which involves a worldwide

23   benchmark which will require knowledge of the substantive laws

24   and the knowledge of the violations, not only knowledge of the

25   institutions as in particular in this instance given the fact

E2D5havA                         argument

1    that our London office has now been retained in a LIBOR action

2    of the same types of offense business, the same institutions.

3           Those are all factors which I think will facilitate in

4    the lead structure.

5           THE COURT:  Okay.  Thank you very much.

6           We will be recessed for 10 minutes.

7           (Recess)

8           THE COURT:  I have had a chance to look at my notes

9    from the prior research I had done as well as from hearing from

10   all of you, and I also just want to make very clear that

11   although I did not hear from Cohen Milstein, Robbins Geller or

12   Labaton I did spend a fair amount of time yesterday doing

13   research about your firms.  Even though I didn't hear from you

14   I know that they are very fine firms and I want to say that I

15   think you all know I am relatively new to the bench, I'm about

16   to celebrate my one-year anniversary, and I have been uniformly

17   impressed with the roster of lawyers that have been presented

18   to me in this case.  So, thank you all very much.

19          My ruling is that I'm going to appoint Scott & Scott

20   as interim lead counsel to represent the U.S. putative class.

21   I understand that Scott & Scott's proposal is to serve with

22   Hausfeld but I have also seen sort of shifting alliances among

23   the group and so what I would like is for Mr. Burke to give me,

24   in the next couple of weeks, a letter with a proposal for how

25   you would structure the leadership of the representation of the

1  class of course including Mr. Hausfeld, if that seems most

2  appropriate to you which I assume it will.

3          Let me give my reasoning:

4          The rule actually isn't so helpful in this case

5  because, as I said, the work counsel has done I think is

6  important, but this early in the case doesn't really carry that

7  much weight.  In terms of counsel's experience, every counsel

8  at the table sitting here is very highly qualified and I don't

9  think splitting hairs about the experience of counsel is really

10 a way to decide, or knowledge of applicable law.

11         Resources, of course, is another issue under Rule

12 23(g)(1), but the tension between resources is also the issue

13 of efficiency and obviously the folks at the front table bring

14 tremendous resources but just counting the number of lawyers it

15 is about 1,000 lawyers out of the box that is being proposed as

16 lead counsel if you just look at the firms as a whole.  My

17 concern is not just, as I said resources, but also efficiency.

18 Another aspect of resources, of course, is real availability of

19 the key people and perhaps because Quinn happens to be so

20 successful at this business I can see, simply from talking to

21 the lawyers, that you are all very engaged in very important

22 and exciting and time-consuming work, as are other lawyers in

23 the courtroom -- but, I think especially so for the Quinn

24 lawyers.  And so, I think that having a smaller firm that can

25 draw on other firms as-needed will serve the class best in this

E2D5havA                          argument

1    case.  I believe that having a firm like Hausfeld with the

2    resources overseas in a case that will involve a lot of

3    discovery coming out of London will be very helpful.  And I

4    also believe that things like document productions will be done

5    apparently the way everybody does them these days is by hiring

6    people to do them in the first instance and that the

7    depositions will be handled primarily by the senior lawyers at

8    the lead counsel firms but perhaps by others as well.

9            So, Mr. Burke, if you could keep in mind my concerns

10   about efficiency in your proposal to me I would appreciate

11   that, but I will look forward to receiving that.

12           So now I think we are nearing the end of our

13   conference.  Let me quickly deal with the other issues that are

14   on my agenda.

15           I don't think it is necessary to appoint interim lead

16   counsel for a Korean putative class.  There is only one case at

17   this point and it is completely discretionary and I think

18   particularly useful where you have multiple cases which we

19   don't have in this case.  So, Kim & Bae represents the

20   plaintiffs in that case and I assume they will continue to do

21   that.

22           Are there Kim & Bae lawyers here?

23           MR. RUE:  Yes, your Honor.

24           THE COURT:  So I can meet you and say hello.

25           MR. RUE:  Good morning, your Honor.

E2D5havA                              argument

1           THE COURT:  Good afternoon.

2           MR. RUE:  Good afternoon.

3           THE COURT:  I would like a sense, if you can,

4      Mr. Burke, of timing for a filing of a consolidated complaint.

5           MR. BURKE:  Your Honor, we would like 45 days from

6      today.

7           THE COURT:  Thank you.

8           MR. BURKE:  Thank you.

9           THE COURT:  So, that gives us until around the end of

10     March.  We will put it in a written order so there is a fixed

11     date.

12          MR. BURKE:  Yes, your Honor.

13          THE COURT:  Okay.

14          The next issue to talk about is the March 3rd

15     conference.  We can go forward with it on March 3rd.  The

16     issues that I intend to deal with are the motion schedule.  I

17     presume there is likely to be a motion to dismiss.  I want to

18     put on the record I will put it in a written order that any

19     deadlines that are still out there for answers to be filed by

20     any of the defendants, I am going to vacate any orders that are

21     in place and suspend application of the rules for the filing of

22     answers or motions to dismiss until the consolidated complaint

23     is filed.  And then we will set up a schedule once we have that

24     in place.

25          I would also discuss at the March 3rd conference the

E2D5havA                        argument

1    discovery schedule as well as any applications to stay

2    discovery.  So, the question is the March 3rd date has the

3    benefit of being on everyone's calendar already.  We won't have

4    a consolidated complaint by then but I think we probably still

5    could come up with a motion schedule and consider the issue of

6    a discovery stay or a discovery schedule.  The other

7    alternative, though, is whether we want to postpone that

8    conference, just try to find a new date when everybody can show

9    up once the consolidated complaint has been filed.  It would

10   mean pushing it off for about a month.

11            So, let me hear from Mr. Burke first and then I will

12   figure out who else to hear from on that.

13            MR. BURKE:  Your Honor, it is our preference to keep

14   the March 3rd date.  The discovery issue whether to stay

15   discovery or go forward has been pending for some time as far

16   back as the Rule 16 conference in front of Judge Berman.  There

17   has been letter briefing on that and we would like that

18   resolved sooner rather than later.  It also gives us a chance

19   in the meantime to discuss with the defendants a mutually

20   agreeable briefing schedule.  Hopefully it is something we

21   could present to the Court on March 3rd.

22            THE COURT:  That would be efficient and desirable.

23   Thank you.

24            So, I have many defense firms here.  What I am going

25   to do is arbitrarily pick the one that is listed first on the

E2D5havA                          argument

1   letter I have, it is Sullivan & Cromwell.  Is there someone

2   from Sullivan here?

3       MS. QUINN:  Yes, your Honor; Yvonne Quinn with

4   Sullivan & Cromwell.

5       THE COURT:  I know that you are not an official

6   spokesperson of any kind for the defense group but let me just

7   ask, do you have any thoughts about whether to proceed on March

8   3rd?  I see a lot of benefits to it, one being it is on

9   everybody's calendar.  But, go ahead.

10      MS. QUINN:  I think that I didn't have time to consult

11  with my colleagues in the last five minutes so I am a very

12  unofficial spokesman, your Honor.

13      I am sure that the defendants would be willing to

14  accommodate the Court with either the March 3rd date or later

15  date.  The advantage, of course, in talking about issues such

16  as discovery, is we would have the consolidated complaint, if

17  we did just simply defer the date until a few days after the

18  consolidated complaint is available.  But, I am sure we would

19  accommodate either way.

20      THE COURT:  Thank you.

21      My suspicion, in any event, is that the view of many

22  on the defense side is that discovery should be stayed

23  regardless of what the complaint says, assuming that it has

24  some similarity to the ones that have been filed already.  So,

25  thank you very much.  What we will do is I am going to keep the

1   March 3rd date and we will take up at that time the schedule

2   for motions and what to do about discovery.

3           There are just a few housekeeping matters left.  I am

4   going to remove the complex case designation from all of these

5   cases.  I will vacate any existing scheduling or case

6   management orders.  I would love a volunteer from defense

7   counsel to serve as the liaison, meaning if there is some

8   message we need to get to everyone to have an e-mail list so

9   you can e-mail everyone and get the message to everyone.  It is

10  not for any substantive purpose at all, it is simply to have a

11  number for my chambers to call if we need to reach out to you

12  as a group.

13          MS. QUINN:  Ms. Quinn, your Honor, unofficial

14  spokesman.

15          Can we get back to you as soon as we consult on that?

16          THE COURT:  That's fine.  And if you would just send a

17  letter to my chambers and copy Mr. Burke?  He will figure out

18  how to get it to the relevant people on his side from there.

19          MS. QUINN:  Thank you.  We will do so, your Honor.

20          THE COURT:  Thank you.

21          Is there anything else that anyone wants or needs to

22  discuss today?

23          Okay.  Thank you.  We are adjourned until March 3rd.

24                          o0o

25