UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Foreign Exchange Benchmark Rates Antitrust Litigation | No.  13 Civ. 7789 (LGS) |

**MEMORANDUM OF LAW IN SUPPORT OF THE CITY OF PHILADELPHIA, BOARD OF PENSIONS AND RETIREMENT'S MOTION FOR RECONSIDERATION OF THE COURT'S FEBRUARY 19, 2014 ORDER**

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................2

I.  THE COURT OVERLOOKED THE CITY OF PHILADELPHIA'S INTEREST IN THIS LITIGATION AND ITS JUDGMENT IN SELECTING COUNSEL .................2

II. THE COURT OVERLOOKED THE FACTS IN THE RECORD SHOWING THAT QUINN EMANUEL WILL BEST REPRESENT THE CLASS .............................7

    A.  The Court Overlooked Key Facts in Concluding that Quinn Emanuel Would Not Afford the Class the "Real Availability of Key People" .......................7

    B.  The Court Overlooked the Inefficiencies of "Drawing on Other Firms" ................9

CONCLUSION ....................................................................................................................10

# TABLE OF AUTHORITIES

**Page**

### Cases

*In re Aluminum Warehousing Antitrust Litig.*,
   No. 13 Md. 2481 (S.D.N.Y.) ..................................................................................................10

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001)......................................................................................................7

*In re Credit Default Swaps Antitrust Litig.*,
   No. 13 Md. 2476 (S.D.N.Y.) ...............................................................................................8, 10

*In re Crude Oil Commodity Futures Litig.*,
   No. 11 Civ. 3600, 2012 WL 569195 (S.D.N.Y. Feb. 14, 2012) ..............................................10

*In re Deutsche Bank AG Sec. Litig.*,
   No. 09 Civ. 1714, 2009 WL 4277202 (S.D.N.Y. Nov. 23, 2009) .............................................2

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
   No. 11 Md. 2262, 2011 WL 5980198 (S.D.N.Y. Nov. 29, 2011) .........................................1, 7

*In re Scrap Metal Antitrust Litig.*,
   No. 02 Civ. 0844, 2002 WL 31988203 (N.D. Ohio Aug. 5, 2002) ...........................................5

*Peters v. Jinkosolar Holding Co., Ltd.*,
   No. 11 Civ. 7133, 2012 WL 946875 (S.D.N.Y. Mar. 19, 2012) ...............................................6

*Sutherland v. Ernst & Young LLP*,
   847 F. Supp. 2d 528 (S.D.N.Y. 2012).......................................................................................2

### Other Authorities

Manual for Complex Litigation § 21.272 (4th ed. 2004)...................................................................7

**INTRODUCTION**

The City of Philadelphia, through its counsel Obermayer Rebmann Maxwell & Hippel LLP, respectfully requests that the Court reconsider its February 19, 2014 Order appointing Scott + Scott LLP sole interim lead class counsel in this matter.  Specifically, the City, which is the plaintiff with the greatest economic interest in this matter, requests that the Court appoint Quinn Emanuel Urquhart & Sullivan, LLP to serve with Scott + Scott as co-lead interim class counsel.  This co-lead structure is in the class's best interests.  At the time of the February 13 conference, the Court had not reviewed the City's complaint and as a result did not afford the City's selection of counsel the substantial deference it deserves.  *See In re LIBOR-Based Financial Instruments Antitrust Litig.*, No. 11 Md. 2262, 2011 WL 5980198, at *3 (S.D.N.Y. Nov. 29, 2011) (Buchwald, J.) (finding the selection of counsel by the plaintiff with the "greatest economic interest" to be a "highly relevant" factor in selecting interim lead class counsel).

This case involves the collusive manipulation of one of the world's largest financial markets by the world's largest financial institutions, with wrongdoing on multiple continents and possibly hundreds of the defendants' employees implicated.  The damages resulting from this conspiracy may be billions of dollars, and the City alone may have millions of dollars in injuries – likely the largest injuries of any plaintiff that has filed to date by a significant margin.  Because of the seriousness of the allegations and the amount of damages suffered, the City, after evaluating its options and deciding to pursue litigation, undertook to vet the potential counsel that could best represent it and the class in this litigation.  The City selected Quinn Emanuel from among other firms because the firm demonstrated it is best equipped to prosecute this case – with over 650 lawyers, many of whom have extensive trial experience, the leading banking litigation practice, renowned antitrust and appellate practices, and offices throughout Europe – and that it would employ those resources on the class's behalf.  In making its decision, the City drew upon

sustained first-hand interaction with Quinn Emanuel attorneys.

With great respect, the City submits that the Court's decision to appoint another firm as *sole* lead counsel overlooked the City's considerable economic interest in this matter and its experience, efforts, and considered judgment in selecting counsel for this litigation.  In addition, the City submits that the Court's reasons for not choosing Quinn Emanuel as a lead counsel are inconsistent with the City's experience and the record, and certainly do not outweigh the many advantages and resources Quinn Emanuel *alone* can offer the class.  The class deserves the best possible representation to go up against the defendants in this case, which will surely be hard fought.  Accordingly, the City respectfully requests that the Court reconsider its ruling and appoint Quinn Emanuel as a co-lead interim class counsel.[1]

## ARGUMENT

### I. THE COURT OVERLOOKED THE CITY OF PHILADELPHIA'S INTEREST IN THIS LITIGATION AND ITS JUDGMENT IN SELECTING COUNSEL

The City of Philadelphia, the nation's fifth most populous, filed this case because the defendants' egregious misconduct inflicted severe economic harm on the City's pension fund for government employees.  The City's pension fund – like many public pension funds nationwide – is underfunded, and defendants' collusion not only cost the City millions of dollars, but impacted the pensions and retirement benefits of thousands of City employees.  As one of the nation's largest municipal pension funds, the City decided to take a leadership role in this litigation.

As part of the City's pre-suit diligence, the City had Quinn Emanuel analyze its

---

[1] Pursuant to Local Rule 6.3, reconsideration is warranted "where the movant demonstrates that the Court has overlooked controlling decisions or factual matters that were put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result before the court." *In re Deutsche Bank AG Sec. Litig.*, No. 09 Civ. 1714, 2009 WL 4277202, at *1 (S.D.N.Y. Nov. 23, 2009) (granting reconsideration of the appointment of lead counsel).  Reconsideration also permits a court "to correct a clear error or prevent manifest injustice." *Sutherland v. Ernst & Young LLP,* 847 F. Supp. 2d 528, 531 (S.D.N.Y. 2012).

investment data. This analysis – which was impressively done – showed that the City had made large volumes of trades that were the direct targets of defendants' collusive scheme. Based on an analysis of the transactions conducted by most but not all of the City's asset managers, the City's pension fund engaged in at least *$33 billion* in foreign exchange transactions (and likely more), and those transactions occurred with almost all defendants (which alone appears to set the City apart from virtually every other plaintiff here). Notably, the pension fund had at least $768 million of transactions tied directly to the 4 p.m. closing rate (the key benchmark in this case) and likely suffered millions of dollars in damages.[2] This volume of trades at the benchmark and the resulting damages likely greatly exceed those of any other plaintiff. Indeed, it is unclear from the public filings whether *any other plaintiff* engaged in any significant volume of trading at all with the defendants at the 4 p.m. closing rate.[3] Consequently, not only is the City the largest plaintiff, but its active participation in this action may be critical to its success.

The City could have worked with a number of law firms, but selected Quinn Emanuel because of its resources and experience and its sophisticated pre-suit investigation, which not only would benefit the class, but was a testament to the types of resources Quinn Emanuel would devote to this case. The City was particularly impressed by:

- ***Quinn Emanuel's banking practice***: Quinn Emanuel has the preeminent, award-winning banking litigation practice, which has won billions of dollars on behalf of clients, often against the very defendants here. This expertise and this experience against these defendants will

---

[2] *See* Declaration of Jo Rosenberger-Altman (a motion for leave to file this declaration was filed along with this motion), at ¶ 10. *See also* City of Philadelphia Compl., No. 14 Civ. 876 (docket entry no. 2) ¶¶ 10 (aggregate damages amount), 17 (same), 95-100 (detailing specific dates on which the City traded at the benchmark and suffered injuries).

[3] *See, e.g.*, Haverhill Compl. ¶ 60 (single paragraph under heading "Injury to Plaintiff" alleging that "Defendants' manipulation of WM/Reuters Rates affected the prices of trillions of dollars' of currency trades and other instruments that track global indexes, as well as instruments that are not specifically WM/Reuters-denominated" and making no allegation that the plaintiff traded directly with defendants at the closing rate).

3

uniquely benefit the class.

- ***Quinn Emanuel's depth of resources***: The ability of much smaller firms to sustain a commitment to a case like this for many years is uncertain.  Quinn Emanuel, on the other hand, offers deep financial resources and a roster of attorneys who are recognized as the leaders of their field.  At least five Quinn Emanuel partners have worked on this case for the City – all with expertise in antitrust, class action, or banking litigation.  Quinn Emanuel pledged to staff this case with top associates, many of whom attended top law schools and are former federal district and appellate law clerks, including former law clerks in the Southern District of New York and/or the Second Circuit.  No other firm appears to have this depth of resources.

- ***Quinn Emanuel's leading appellate practice***: Winning this case will likely require the class to win at least one and perhaps multiple appeals.  Quinn Emanuel was the only firm proposed to the Court as lead counsel that offers the class an appellate practice.  In fact, Quinn Emanuel offers one of the nation's preeminent appellate practices, led by Kathleen Sullivan, whom Quinn Emanuel has committed to make available to protect the class's interests on appeal.  This asset alone strongly supports naming Quinn Emanuel as a co-lead counsel.

- ***Quinn Emanuel's ability and credibility to take this case to trial***: Quinn Emanuel is widely acknowledged for its ability to take complex cases like this one to trial – and to win them.  Here, that credibility would be a crucial asset to the class at every step of the case.  Indeed, Quinn Emanuel's reputation and credibility may well help the class achieve settlements that it would not otherwise be able to achieve.[4]

- ***Quinn Emanuel's offices in Europe***: The City was persuaded that Quinn Emanuel's

---

[4] Quinn Emanuel has been repeatedly recognized as one of the four most feared firms in the nation – with the other firms being defense firms that will *oppose* the class in this case. *See* Andrew Strickler, *The 4 Firms In-House Counsel Fear The Most*, LAW360 (Sept. 9, 2013), http://www.law360.com/articles/469813/the-4-firms-in-house-counsel-fear-the-most.

London office was important for this case as some of defendants' wrongdoing occurred in London. While the City understands that Hausfeld LLP has an affiliate firm with a London office, the City notes that Quinn Emanuel's own London office was recently named by Legal Business as the U.S. Law Firm of the Year in London for 2014.[5] Moreover, Quinn Emanuel alone has foreign offices in numerous other locations that would also benefit the class – seven offices in Europe, including its recently-opened office in Brussels, where the European Commission's investigation of defendants' conduct is based. Again, these resources appear to be both invaluable for the class and unmatched by any other firm.

While certain other entities filed suit more quickly than the City did, this was only because the City did extensive diligence in reviewing its foreign exchange trades and selecting counsel.[6] The City discussed this case with multiple Quinn Emanuel attorneys, asking questions about how the firm would prosecute the case, what sort of resources would be devoted, who would be involved, and what involvement the City would have. The City also drew upon its experience in using the firm on another matter against major financial institutions – involving LIBOR manipulation claims – and has found the firm committed, focused, and highly skilled.[7] Reflecting the firm's expertise and commitment, the City believes Quinn Emanuel's complaint reflects the most sophisticated work done in this case. The complaint contains graphic demonstrations of the harm the City suffered on specific days. As the *Financial Times* noted:

---

[5] *See US Law Firm of the Year 2014*, LEGAL BUSINESS, http://www.legalbusiness.co.uk/index.php/winners-2014/1969-us-law-firm-of-the-year-2014.

[6] *Cf. In re Scrap Metal Antitrust Litig.*, No. 02 Civ. 0844, 2002 WL 31988203, at *1 (N.D. Ohio Aug. 5, 2002) (noting that "consideration of the 'first-to-file' status when making lead counsel determinations has been rejected by many courts").

[7] On that case, the City has worked with Steig Olson, who would be one of the primary day-to-day Quinn Emanuel partners responsible for this case, and the City has found him to be uniformly responsive and unfailingly attentive. Quinn Emanuel has devoted all the resources necessary to litigate that action effectively, and has no doubt Quinn Emanuel would devote the same level of resources here.

> While nearly a dozen similar lawsuits have been filed in the US, the damages claim filed by the City of Philadelphia Board of Pensions and Retirement ***goes much further in seeking to prove its allegations by including an analysis of daily trading around the pivotal WM/Reuters 4pm fix of currency prices***.
>
> The research compiled by [Quinn Emanuel's consulting firm] at the request of the plaintiffs alleges the anomalous price movements became rarer and less pronounced after reports about regulatory scrutiny of the forex market surfaced last summer.[8]

Despite the City's considerable economic interest in this litigation, its extensive pre-suit diligence, its thorough vetting of class counsel, and its judgment that Quinn Emanuel is best equipped to represent the class, the Court appears to have overlooked this economic interest and judgment in selecting class counsel. The City understands from the transcript of the February 13 conference that the Court was not aware that the City had filed its complaint on February 11, and as a result had not had a chance to review the complaint or appreciate the City's economic interest and considered judgment. Accordingly, the Court did not consider, and indeed overlooked, the City's judgment that Quinn Emanuel can best serve the interests of the class.[9]

Under case law from this Court, the selection of counsel by an entity like the City should be a highly relevant factor in the analysis of the lead counsel factors. In the context of securities cases governed by the Private Litigation Securities Reform Act ("PSLRA"), the selection of class counsel by an entity like the City would be *dispositive*. While this case is not governed by the PSLRA, courts recognize that the principles underlying those provisions strongly support the

---

[8] Daniel Schafer & Madison Marriage, *Seven Banks Face New Forex Market-Rigging Claims in Lawsuit*, FINANCIAL TIMES (Feb. 12, 2014), http://www.ft.com/intl/cms/s/0/1bd41d00-93f7-11e3-bf0c-00144feab7de.html#axzz2tbKSPaeH (emphasis added).

[9] The procedural posture at the time of the February 13 conference was unclear. The City understood this was a *pre*-motion conference, and believed it would have an opportunity to brief the Court fully on its pre-suit diligence and judgment in selecting counsel. As the City never had a chance to make such a submission, it requests the Court now consider these judgments. *See Peters v. Jinkosolar Holding Co., Ltd.*, No. 11 Civ. 7133, 2012 WL 946875, at *3 (S.D.N.Y. Mar. 19, 2012) (considering additional arguments on reconsideration because "given the somewhat convoluted procedural posture of the lead plaintiff appointment process in this case, the motion for reconsideration is the first time that many issues that are relevant to the Court's resolution of the lead plaintiff motions were formally briefed for the Court").

Court's appointment of the City's choice of counsel; the theory behind the Act is "that large investors would do a better job at counsel selection, retention, and monitoring than judges have traditionally done . . ." *In re Cendant Corp. Litig.*, 264 F.3d 201, 273 (3d Cir. 2001).

Applying these principles, Judge Buchwald in the *In re LIBOR-Based Financial Instruments Antitrust Litigation* selected the City of Baltimore's choice of class counsel because:

> ***the Baltimore Proposal has the support of a plaintiff with by far the greatest economic interest***. As previously referenced, the Mayor and City Council of Baltimore claim that Baltimore entered into hundreds of millions of dollars of interest rate swaps with defendants. Plaintiffs supporting the [other] Proposal do not allege to have held anywhere near this level of exposure. . . . While this case is not governed by the Private Securities Litigation Reform Act of 1995, and therefore we are not guided entirely by the magnitude of a plaintiff's economic interest, ***we nevertheless find this consideration highly relevant***.

No. 11 Md. 2262, 2011 WL 5980198, at *3 (S.D.N.Y. Nov. 29, 2011) (emphasis added).[10]

For the same reasons the City of Baltimore's choice of counsel was selected in the LIBOR litigation, the City of Philadelphia's choice should be given great weight here.

## II. THE COURT OVERLOOKED THE FACTS IN THE RECORD SHOWING THAT QUINN EMANUEL WILL BEST REPRESENT THE CLASS

In reaching its decision on lead counsel, the Court overlooked the fact that Quinn Emanuel offers the Class critical resources and assets unmatched by other firms. Depriving the class of these resources and assets puts the class at a serious disadvantage when facing the vast army of well-funded, highly-accomplished lawyers representing defendants.

### A. The Court Overlooked Key Facts in Concluding that Quinn Emanuel Would Not Afford the Class the "Real Availability of Key People"

Quinn Emanuel indisputably has the most resources to commit to the class in this case. The firm's size, number of offices, discovery tools, and banking and appellate practices are unmatched. As this Court recognized, "if you consider all of the attributes of the firm as a whole

---

[10] *See also* MANUAL FOR COMPLEX LITIGATION § 21.272 (4th ed. 2004) (noting that the PSLRA's lead counsel selection model "provides a useful analogy for similar class actions brought by sophisticated plaintiffs with large losses or sizeable claims").

7

it is very hard for any other firm, especially the ones who are here, to compete." Conf. Tr. 20, Feb. 13, 2014. Judge Cote made similar observations about the firm's unique strengths in selecting Quinn Emanuel as interim lead counsel in the *Credit Default Swaps Antitrust Litigation*.[11] Judge Cote's appointment of Quinn Emanuel is highly informative here, since both cases involve the intersection of complex banking litigation and antitrust – squarely in the firm's core strengths. At the same time, that appointment provides no reason not to appoint Quinn Emanuel in this case or to conclude that its attorneys are overstretched. In fact, we understand *Credit Default Swaps* is the ***only*** other antitrust class action in which Quinn Emanuel has even sought lead counsel appointment for several years.[12]

It appears the Court concluded that the firm "has been so successful at this business" that its "key people" would not have time to devote to this case. This conclusion, however, is erroneous and overlooked contrary facts in the record. As it did to the City, Quinn Emanuel committed to the Court to devote all resources necessary to prosecute this case. *See* Conf. Tr. at 20. Five well-respected partners have worked on this matter, and Quinn Emanuel would staff the case with top-level associates.[13] To the extent the Court had concerns about the availability of the three partners appearing at the hearing, those partners involved themselves in the case

---

[11] *See In re Credit Default Swaps Antitrust Litig.*, No. 13 Md. 2476 (docket no. 244) (Tr. of Dec. 5, 2013 Hr'g 37:9–38:12) ("[Quinn] has a track record, a knowledge of the CDS market and antitrust litigation. It's well equipped with trial lawyers who can actually go into court and try a case. It has run massive discovery cases by itself essentially. And it has extraordinary strengths with respect to appellate litigation . . . . I think its damages model that it's developed at this stage . . . is the most sophisticated one to date. It has European offices. It has a substantial New York presence. It's familiar with litigating against these very banks. It's familiar with litigating in this courthouse. Those are unique strengths.").

[12] In *Credit Default Swaps*, Judge Cote ultimately appointed the firm representing the largest client to serve as co-lead counsel with Quinn Emanuel. The same logic should lead to Quinn Emanuel's appointment as a co-lead counsel here.

[13] These associates include Justin Reinheimer, who clerked on this Court and the Second Circuit, Nick Landsman-Roos, who co-taught a seminar on complex litigation while at Stanford Law School, and Kelly Cho and David LeRay, who studied antitrust law at Harvard Law School. Mr. Landsman-Roos was part of the team that made a powerful in-person presentation to the City about the merits of the case and the City's damages.

precisely because they have time for it and commitment to it.[14]

In addition, the record demonstrates that every other attorney vying for lead counsel are busy with numerous other matters. Nothing about the Quinn Emanuel attorneys is distinctive in this regard. For instance, the website profile for Chris Burke of Scott + Scott states that, in addition to the two cases Mr. Burke mentioned at the conference, he is occupied with at least five other class actions. Similarly, Hausfeld LLP noted in its February 10th letter that it is lead or co-lead counsel in ten more class actions – 35 – than it has total lawyers – 25. To disqualify Quinn Emanuel because its attorneys are perceived to be busy thus lacks a factual basis, amounts to a double standard, and does the class a disservice.

### B.   The Court Overlooked the Inefficiencies of "Drawing on Other Firms"

The appointment of a single small firm, based on the opposite coast, to lead an antitrust case of this size may well be unprecedented. In this regard, the Court overlooked the inefficiencies that would result from requiring one such firm to oversee and coordinate the work of numerous other firms. This case may well involve tens of millions of documents and hundreds of witnesses in locations across the globe. The work to assign and coordinate all the required efforts across numerous firms, while ensuring work is done at the highest quality and avoiding duplication, could alone be a full-time job for a small firm.

To the extent the Court believes Scott + Scott offers the class something that will help the class win this case, it could have appointed that firm to serve as lead counsel *with* Quinn Emanuel. This case is certainly of a size that warrants two co-lead counsel. The defendants here

---

[14]  The City is concerned the Court may have misunderstood the significance of the many attorneys that Quinn Emanuel has devoted to prosecuting actions in this Court on behalf of the Federal Housing Finance Authority ("FHFA"). As Judge Cote recognized, the FHFA actions demonstrate Quinn Emanuel's banking litigation experience and its ability to devote whatever resources are necessary to a case, no matter how large it is. Here, the only member of the Quinn Emanuel team that has any involvement in the FHFA action is Manisha Sheth. Neither Steig Olson nor Dan Brockett has any involvement in that action. The fact that a number of *other attorneys* at Quinn Emanuel work on the FHFA action provides no basis to conclude that Quinn Emanuel cannot give adequate attention to this case.

will have, in essence, at least seven large law firms as their own co-lead counsel.  Moreover, the fact that Quinn Emanuel was originally proposed as a part of a larger lead counsel structure should not preclude its appointment.  *See, e.g.*, *In re Crude Oil Commodity Futures Litig.*, No. 11 Civ. 3600, 2012 WL 569195 (S.D.N.Y. Feb. 14, 2012) (Pauley, J.) (selecting two firms as co-lead interim class counsel from among firms proposed in three competing group applications, including one application of four firms).  Lead counsel should be selected on the merits, and the class should not be penalized if a deserving firm does not anticipate a court's preferred structure, which can vary widely.[15]  It is incumbent on the Court to ensure that leadership applications are resolved in a way that does not deprive the class of crucial experience and resources (such as the size, sophistication, banking, antitrust, and appellate practices, international offices, and trial expertise offered by Quinn Emanuel here).

## **CONCLUSION**

For the foregoing reasons, the City of Philadelphia respectfully requests that the Court reconsider its decision appointing Scott + Scott as sole interim lead class counsel and appoint Quinn Emanuel as co-lead interim counsel for the class.

---

[15] For example, at the Initial Pretrial Conference in *In re Aluminum Warehousing Antitrust Litig.*, No. 13 Md. 2481 (S.D.N.Y.) (Feb. 6, 2014), Judge Forrest recently indicated that she intends to appoint two firms as co-lead counsel and as many as seven to a steering committee, in a case likely to be substantially smaller than this one.

| | |
|---|---|
| DATED: Philadelphia, Pennsylvania<br>February 26, 2014 | OBERMAYER REBMANN MAXWELL &<br>   HIPPEL LLP |
| | By: /s/ *Angela L. Baglanzis*<br>   Angela L. Baglanzis<br>   William J. Leonard<br>   One Penn Center, 19th Floor<br>   1617 JFK Blvd.<br>   Philadelphia, PA 19103<br>   Phone: (215) 665-3000<br>   Fax: (215) 665-3165<br>   angela.baglanzis@obermayer.com<br><br>   *Attorneys for Plaintiff City of Philadelphia,*<br>   *Board of Pensions and Retirement* |