**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | **ECF CASE**<br><br>No. 1:13-cv-07789-LGS<br><br>**JURY TRIAL DEMANDED** |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

NATURE OF THE ACTION ............................................................................. 1

JURISDICTION, VENUE, AND COMMERCE ............................................. 3

PARTIES ......................................................................................................... 5

    Plaintiffs ..................................................................................................... 5

    Defendants .................................................................................................. 9

CLASS ACTION ALLEGATIONS ............................................................... 13

FACTUAL ALLEGATIONS ........................................................................ 15

    The FX Market .......................................................................................... 15

        The WM/Reuters Rates and Uses ...................................................... 20

        WM/Reuters Closing Spot Rate Is Vulnerable to Collusion .............. 22

        The FX Market Is Concentrated and Dominated by Defendants ........ 23

        The FX Market Is Unregulated and Opaque ...................................... 26

    Defendants Conspired to Fix the WM/Reuters Closing Spot Rates ............... 27

        Defendants Used Electronic Communications, Including Chat Rooms, Instant Messages, and Emails, to Conspire ...................................... 27

        Defendants Shared Confidential Customer Order Information to Manipulate the WM/Reuters Closing Spot Rates ............................. 29

        Using Shared Information, Defendants Agreed to Execute Concerted Trading Strategies to Manipulate the WM/Reuters Closing Spot Rates ........... 32

    Government Investigations ......................................................................... 38

        U.S. Department of Justice ("DOJ") ................................................. 38

        Additional United States and State Investigations ............................ 42

        United Kingdom Financial Conduct Authority ("UK-FCA") ............ 43

        European Commission ("EC") .......................................................... 45

        Switzerland ...................................................................................... 46

Germany ........................................................................................................ 47

Hong Kong Monetary Authority ("HK-MA") ......................................... 48

Monetary Authority of Singapore ("SG-MA") ....................................... 48

Australia Securities and Investment Commission ("ASIC") .................. 49

New Zealand .............................................................................................. 49

Financial Stability Board ("FSB") ........................................................... 49

Defendants' Public Filings Confirm Investigations and Cooperation ............................ 51

Terminations, Suspensions, and Departures of Defendant Employees .......................... 53

Bank of America ....................................................................................... 54

Barclays ..................................................................................................... 54

BNP Paribas .............................................................................................. 54

Citigroup ................................................................................................... 54

Credit Suisse ............................................................................................. 55

Deutsche Bank .......................................................................................... 55

Goldman Sachs ......................................................................................... 56

HSBC ........................................................................................................ 56

JP Morgan ................................................................................................. 56

Morgan Stanley ......................................................................................... 56

RBS ........................................................................................................... 57

UBS ........................................................................................................... 57

ANTITRUST INJURY TO PLAINTIFFS ........................................................................ 57

FRAUDULENT CONCEALMENT ................................................................................... 59

CLAIM FOR RELIEF ....................................................................................................... 63

REQUEST FOR RELIEF ................................................................................................... 64

DEMAND FOR JURY TRIAL .......................................................................................... 65

Plaintiffs make these allegations based on personal knowledge as to their own actions and on information and belief as to other matters.

## NATURE OF THE ACTION

1.      This is a class action brought to recover for injuries to Plaintiffs and members of the Class caused by Defendants' violations of Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§1, 3.

2.      The foreign currency or foreign exchange ("FX") market is the world's largest and most actively traded financial market.  In April 2013, trading in the global FX market averaged $5.3 trillion per day,[1] and, in the domestic market, FX trading averaged $1.263 trillion per day.[2]  Defendants are the dominant dealers in the FX market, having a combined global market share of 84%.[3]  Plaintiffs and members of the Class are Defendants' customers.

3.      The FX market revolves around spot transactions.  Defendants dominate spot trading, acting as one of the counterparties in approximately 98% of spot volume in the United States.[4]  A spot transaction involves the exchange of currencies between two counterparties on a value date that is within two bank business days' time.  Not only do spot transactions account for approximately half of daily FX turnover in the United States, roughly $620 billion,[5] but they

[1]      Bank for International Settlements, Triennial Central Bank Survey, Global foreign exchange market turnover in 2013 (February 2014) (available at https://www.bis.org/publ/rpfxf13fxt.pdf), at Table 1 [hereinafter BIS Triennial Bank Survey 2013].

[2]      Federal Reserve Bank of New York, The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2013 (available at http://nyfed.org/1dnmTlx), at 3 [hereinafter Fed Triennial Bank Survey 2013].

[3]      Euromoney FX Survey 2013:  Overall Results.

[4]      Fed Triennial Bank Survey 2013, at 6.

[5]      Fed Triennial Bank Survey 2013, at 3.

affect other instruments Defendants sell to their customers, such as outright forwards and FX swaps.   Collectively, FX spot transactions, outright forwards, and FX swaps are referred to herein as "FX Instruments."

4.      Customers can order spot transactions for immediate execution, in which case Defendants quote them the current market price.   Customers can also order spot transactions to be settled at a fixing rate, which is the exchange rate for a currency pair calculated at a single point in time.   Defendants guarantee the transactions will be settled at the fixing rate, regardless of current market price.

5.      The most widely used fixed rates are the "WM/Reuters Closing Spot Rates."   For "Trade Currencies," which include the most commonly traded currencies against the U.S. dollar and the euro, the WM/Reuters Closing Spot Rates are calculated by taking the median of a sample of bids, asks, and actual spot transactions executed in the 30 seconds before and the 30 seconds after the fix time.

6.      The WM/Reuters Closing Spot Rates are calculated at 4:00 p.m. London time (11:00 a.m. New York time).   Because the London market closes at this time, the WM/Reuters Closing Spot Rates are known as the "London fix," the "fix," or the "London close."

7.      This case involves a conspiracy by Defendants to manipulate the WM/Reuters Closing Spot Rates.   By communicating directly with one another, including in closed network chat rooms with incriminating names such as "The Cartel," "The Bandits' Club," and "The Mafia," Defendants exchanged confidential customer order information and trading positions. Defendants agreed on concerted strategies for trading in and around the setting of the WM/Reuters Closing Spot Rates.   Their collusive trading tactics included "front running/trading ahead," "banging the close," and "painting the screen."   Chat room transcripts reveal the details

of Defendants' collusion.   Through these tactics, Defendants caused injury and damage to Plaintiffs and the Class.

8.      Law enforcement and regulatory authorities around the world, including in the United States, Europe, Asia, Australia, and New Zealand are engaged in open and active investigations into Defendants' conduct in the FX market.   A number of Defendants are seeking immunity, or otherwise cooperating with authorities in these investigations, by producing voluminous documents, including chat room transcripts and other conspiratorial communications.   As a direct result of these global investigations, Defendants have terminated and suspended numerous personnel with supervisory authority over their FX operations.[6]

9.      Defendants' conspiracy to manipulate the WM/Reuters Closing Spot Rates impacted the pricing of trillions of dollars' worth of FX Instruments, inflicting severe financial harm on Plaintiffs and members of the Class.

## JURISDICTION, VENUE, AND COMMERCE

10.      This Court has jurisdiction over the subject matter of this action under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§15 and 26(a), and under 28 U.S.C. §§1331 and 1337.

---

[6]      Except as alleged in this Complaint, neither Plaintiffs nor other members of the public have access to the underlying facts relating to Defendants' improper activities.   Rather, that information lies exclusively within the possession, custody, or control of Defendants and other insiders, which prevents Plaintiffs from further detailing Defendants' misconduct.   Moreover, the numerous pending government investigations throughout the world, including by the U.S. Department of Justice, Criminal and Antitrust Divisions, concerning FX benchmark manipulation will likely yield information from Defendants' internal records or personnel that bears significantly on Plaintiffs' claims.   Further, in the absence of such records and of Defendants' internal FX trading data, Plaintiffs are unable to identify with greater specificity the exact timing of Defendants' coordinated manipulation of the WM/Reuters Closing Spot Rates. Plaintiffs thus believe further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

11.    Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.  During the Class Period, Defendants used the instrumentalities of interstate commerce to effectuate their conspiracy.

12.    This Court has personal jurisdiction over each Defendant.  Each Defendant has (1) transacted business in the United States, including in this District; (2) exchanged currency with Class members throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and/or (4) committed substantial acts in furtherance of their conspiracy in the United States, including in this District.

13.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22, and 26, and 28 U.S.C. §1391(b), (c), and (d).   One or more of the Defendants resided, transacted business, was found, or had agents in this District, a substantial part of the events giving rise to Plaintiffs' claims arose in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

14.    Defendants' collusive and manipulative acts took place in substantial part in the United States and were conducted by persons and entities subject to the laws of the United States, including its states and territories.  The connection between the alleged conduct and the United States is demonstrated herein.  Defendants' unlawful conduct occurred in the United States and had a substantial effect in the United States.

# PARTIES

## PLAINTIFFS

15.     Plaintiff Aureus Currency Fund, L.P. ("Aureus") is an investment fund based in Santa Rosa, California.  Aureus engaged in FX spot and outright forward transactions directly with Defendant Morgan Stanley during the Class Period, and has been injured in its business or property by reason of Defendants' violations of law as alleged herein.

16.     The City of Philadelphia is a municipal corporation organized under the laws of the Commonwealth of Pennsylvania and the Philadelphia Home Rule Charter and is a political subdivision of the Commonwealth of Pennsylvania.  The Board of Pensions and Retirement is an independent board of the City of Philadelphia under the Philadelphia Home Rule Charter.  The Board of Pensions and Retirement is charged with the maintenance of the retirement system for all City employees.  The City of Philadelphia Public Employees Retirement System, which is maintained by the Board of Pensions and Retirement, is funded by the City of Philadelphia and employees of the City.  Plaintiff the City of Philadelphia, Board of Pensions and Retirement ("Philadelphia Board of Pensions") engaged in FX spot and outright forward transactions directly with Defendants Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, RBS, and UBS during the Class Period, and has been injured in its business or property by reason of Defendants' violations of law as alleged herein.

17.     Plaintiff Employees' Retirement System of the Government of the Virgin Islands ("Virgin Islands") is a defined benefit pension fund plan for officials and employees of the Government of the Virgin Islands and for their dependents and beneficiaries. It is one of the oldest pension systems under the American flag.  Virgin Islands engaged in FX spot transactions

directly with Defendants Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, RBS, and UBS during the Class Period, and has been injured in its business or property by reason of Defendants' violations of law as alleged herein.

18.     Plaintiff Employees' Retirement System of Puerto Rico Electric Power Authority ("ERS-PREPA") is a defined benefit pension fund plan for officials and employees of the Puerto Rico Electric Power Authority and for their dependents and beneficiaries.  As of December 31, 2013, ERS-PREPA had $1.384 billion of assets under management for the benefit of 11,203 retirees and beneficiaries and 8,317 active employees.  ERS-PREPA engaged in FX spot and outright forward transactions directly with Defendants Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, Morgan Stanley, RBS, and UBS during the Class Period, and has been injured in its business or property by reason of Defendants' violations of law as alleged herein.

19.     Plaintiff Fresno County Employees' Retirement Association ("FCERA") has net assets of $3.5 billion and makes frequent foreign currency transactions in connection with the nearly $1 billion in foreign equities and foreign fixed income assets in its portfolio.  FCERA engaged in FX spot and outright forward transactions directly with Defendants Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, RBS, and UBS during the Class Period, and has been injured in its business or property by reason of Defendants' violations of law as alleged herein.

20.     Plaintiff Haverhill Retirement System ("Haverhill") is located in the State of Massachusetts and is a defined benefit pension fund providing retirement and disability benefits to employees of the City of Haverhill, Massachusetts.  Haverhill engaged in FX spot and outright

forward transactions directly with Defendants Bank of America, Barclays, Deutsche Bank, Goldman Sachs, HSBC, Morgan Stanley, RBS, and UBS during the Class Period, and has been injured in its business or property by reason of Defendants' violations of law as alleged herein.

21.     Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") was established in 1980 to provide retirement and other specified benefits to qualified firefighters and their beneficiaries.  Oklahoma Firefighters, headquartered in Oklahoma City, Oklahoma, oversees net assets in excess of $1 billion on behalf of more than 21,000 beneficiaries.  Oklahoma Firefighters engaged in FX spot and outright forward transactions directly with Defendants Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, and UBS during the Class Period, and has been injured in its business or property by reason of Defendants' violations of law as alleged herein.

22.     Plaintiff State-Boston Retirement System ("Boston Retirement") is a defined-benefit governmental pension plan located in Massachusetts.  As of June 2013, Boston Retirement managed more than $3.5 billion in assets on behalf of 37,000 beneficiaries associated with the City of Boston, the Boston Redevelopment Authority, the Boston Housing Authority, the Boston Water and Sewer Commission, the Boston Public Health Commission, and others. Boston Retirement engaged in FX spot, outright forward, and FX swap transactions directly with Defendants Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, RBS, and UBS during the Class Period, and has been injured in its business or property by reason of Defendants' violations of law as alleged herein.

23.     Plaintiff Syena Global Emerging Markets Fund, LP ("Syena") is a hedge fund located at 125 Greenwich Ave., Greenwich, Connecticut.  Syena engaged in FX spot transactions directly with Defendant Goldman Sachs during the Class Period, and has been injured in its business or property by reason of Defendants' violations of law as alleged herein.

24.     Plaintiff Tiberius OC Fund, Ltd. ("Tiberius") is a global investment fund with a registered address of 42 North Church Street, Grand Cayman, Cayman Islands.  Tiberius engaged in outright forward transactions directly with Defendant Morgan Stanley during the Class Period, and has been injured in its business or property by reason of Defendants' violations of law as alleged herein.

25.     Plaintiff Value Recovery Fund L.L.C. ("VRF") is a Delaware limited liability Company, with a registered address of 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808 and offices in Connecticut.  VRF has standing, by virtue of a valid assignment from Camulos Master Fund LP ("Camulos"), to assert the federal antitrust claim herein.  Camulos engaged in FX spot, outright forward, and FX swap transactions directly with Defendants Barclays, Goldman Sachs, and Morgan Stanley during the Class Period, and has been injured in its business or property by reason of Defendants' violations of law as alleged herein.

26.     Plaintiff United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund ("United Food") is a multi-employer and multi-union employee benefit plan based in Plymouth Meeting, Pennsylvania.  United Food engaged in FX spot and outright forward transactions directly with Defendants Bank of America, Barclays, Credit Suisse, Deutsche Bank, Morgan Stanley, and UBS  during the Class Period, and has been injured in its business or property by reason of Defendants' violations of law as alleged herein.

### DEFENDANTS

27.    Bank of America:   Defendant Bank of America Corporation is a Delaware corporation headquartered at 100 North Tryon Street, Charlotte, North Carolina 28255.  Bank of America Corporation is a multinational banking and financial services corporation with its investment banking division located at the Bank of America Tower, One Bryant Park, 1111 Avenue of the Americas, New York, New York 10036.  Defendant Bank of America, N.A. is a federally-charted national banking association headquartered at 101 South Tyron Street, Charlotte, North Carolina 28255, and is an indirect, wholly owned subsidiary of Bank of America Corporation.  Defendants Bank of America Corporation and Bank of America, N.A. are referenced collectively in this Complaint as "Bank of America."

28.    Barclays:   Defendant Barclays Bank PLC is a British public limited company headquartered at 1 Churchill Place, London E14 5H, England.  Barclays Bank PLC is licensed by the New York Department of Financial Services with a registered address at 745 Seventh Avenue, New York, New York 10019 and a foreign representative office at One MetLife Plaza, 27-01 Queens Plaza North, Long Island City, New York 11101.  Defendant Barclays Capital Inc. is a wholly owned subsidiary of Barclays Bank PLC and engages in investment banking, wealth management and investment management services.  It has been registered with the CFTC as a Futures Commission Merchant since 1990, an approved Exempt Foreign agent since 1992, and a Commodity Pool Operator and Commodity Trading Advisor since 2009.  Defendants Barclays Bank PLC and Barclays Capital Inc. are referenced collectively in this Complaint as "Barclays."

29.    BNP Paribas:   Defendant BNP Paribas Group is a French bank and financial services company headquartered in Paris, France, at 16 Boulevard *des Italiens*, Paris, France 75009.  BNP Paribas Group is licensed by the New York Department of Financial Services with

a registered address at 787 Seventh Avenue, New York, New York 10019.  BNP Paribas North America Inc. is a Delaware corporation headquartered at 787 7th Avenue, New York, New York 10019.  BNP Paribas North America Inc. provides corporate, investment banking, and securities brokerage activities and is an affiliate of BNP Paribas.  Defendants BNP Paribas Group and BNP Paribas North America Inc. are referenced collectively in this Complaint as "BNP Paribas."

30.   Citigroup:  Defendant Citigroup, Inc. is a Delaware corporation headquartered at 399 Park Ave, New York, New York 10022.  Defendant Citibank, N.A. is federally-chartered national banking association headquartered at 399 Park Avenue, New York, New York 10022 and is a wholly owned subsidiary of Defendant Citigroup, Inc.  Defendants Citigroup, Inc. and Citibank, N.A. are referenced collectively in this Complaint as "Citigroup."

31.   Credit Suisse:  Defendant Credit Suisse Group AG is a Swiss company headquartered in Zurich, Switzerland.  Credit Suisse Group AG is licensed by the New York Department of Financial Services with a registered address at 11 Madison Avenue, New York, NY 10010-3698.  Defendant Credit Suisse Securities (USA) LLC is a Delaware limited liability company headquartered at 11 Madison Avenue, New York, New York 10010, and is a wholly owned subsidiary of Credit Suisse Group AG.  Defendants Credit Suisse Group AG and Credit Suisse Securities (USA) LLC are referenced collectively in this Complaint as "Credit Suisse."

32.   Deutsche Bank:  Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.  Defendant Deutsche Bank is licensed by the New York Department of Financial Services with a registered address at 60 Wall Street, New York, New York 10005-2858.

33.   Goldman Sachs:  Defendant The Goldman Sachs Group, Inc. is a Delaware corporation headquartered at 200 West Street, New York, New York 10282.  The Goldman

Sachs Group Inc. is a bank holding company and a financial holding company. Defendant Goldman, Sachs & Co. is a wholly owned subsidiary of the United States financial services corporation The Goldman Sachs Group, Inc. and is its principal operating subsidiary in the United States. Goldman, Sachs & Co. is located at 200 West Street, New York, New York 10282. Defendants The Goldman Sachs Group, Inc. and Goldman, Sachs & Co. are referenced collectively in this Complaint as "Goldman Sachs."

34.     <u>HSBC</u>:  Defendant HSBC Holdings PLC is a United Kingdom public limited company headquartered in London, England. Defendant HSBC Bank PLC is a United Kingdom public limited company headquartered in London, England and is a wholly owned subsidiary of HSBC Holdings PLC. Defendant HSBC North America Holdings Inc. is a Delaware corporation headquartered in New York, and is a wholly owned subsidiary of HSBC Holdings PLC. Defendant HSBC North America Holdings, Inc. is the holding company for HSBC Holding PLC's operations in the United States. Defendant HSBC Bank USA, N.A., is a national banking association with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of HSBC North America Holdings Inc. Defendants HSBC Holdings PLC, HSBC Bank PLC, HSBC North America Holdings Inc., and HSBC Bank USA, N.A. are referenced collectively in this Complaint as "HSBC."

35.     <u>JPMorgan</u>:   Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered at 270 Park Ave., 38th Floor, New York, New York 10017. Defendant JPMorgan Chase Bank, N.A., is a federally-chartered national banking association headquartered at 270 Park Avenue, 38th Floor, New York, New York 10017, and is a wholly owned subsidiary of Defendant JP Morgan Chase & Co. Defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A., are referenced collectively in this Complaint as "JPMorgan."

11

36.    <u>Morgan Stanley</u>:    Defendant Morgan Stanley is a Delaware corporation headquartered at 1585 Broadway, New York, New York 10036.

37.    <u>RBS</u>:  Defendant Royal Bank of Scotland Group PLC is a United Kingdom public limited company headquartered in Edinburgh, Scotland.  Defendant Royal Bank of Scotland Group PLC is licensed by the New York Department of Financial Services with a registered address at 340 Madison Avenue, New York, New York 10173.  Defendant RBS Securities, Inc. is a Delaware corporation headquartered at 600 Washington Boulevard, Stamford, Connecticut 06901.  Defendants Royal Bank of Scotland Group PLC and RBS Securities, Inc., are referenced collectively in this Complaint as "RBS."

38.    <u>UBS</u>:    Defendant UBS AG is a Swiss company based in Basel and Zurich, Switzerland.    Defendant UBS Securities LLC is a Delaware limited liability company headquartered at 677 Washington Blvd, Stamford, Connecticut 06901, and is a wholly owned subsidiary of UBS AG.    Defendants UBS AG and UBS Securities LLC are referenced collectively in this Complaint as "UBS."

39.    "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including those merged with or acquired by the named Defendants and each named Defendant's wholly owned or controlled subsidiaries or affiliates that played a material role in the unlawful acts alleged in this Complaint.

40.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

41.     Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

42.     Various other persons, firms, and corporations, that are unknown and not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and/or made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

## CLASS ACTION ALLEGATIONS

43.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Class:

> All persons who, between January 1, 2003 and the present (the "Class Period"), entered into an FX Instrument directly with a Defendant at or around the time of the fixing of WM/Reuters Closing Spot Rates, or who entered into an FX Instrument directly with a Defendant settled in whole or in part on the basis of WM/Reuters Closing Spot Rates, where such persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, transacted in the United States or its territories.

> Specifically excluded from this Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant and any person acting on their behalf.

> Also excluded from this Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

13

44. <u>Ascertainability</u>:  The Class is readily ascertainable and is one for which records should exist.

45. <u>Numerosity</u>:  Due to the nature of the trade and commerce involved, Plaintiffs believe that there are thousands of geographically dispersed Class members as described above, the exact number and their identities being known to Defendants and their co-conspirators.

46. <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of federal antitrust laws as alleged herein. The damages and injuries of each member of the Class were directly caused by Defendants' wrongful conduct in violation of federal law.

47. <u>Commonality</u>: There are questions of law and fact common to the Class, including, but not limited to:

      a.      whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize foreign currency trades in interstate commerce in the United States;

      b.      whether Defendants and their co-conspirators engaged in manipulation of the WM/Reuters Closing Spot Rates in interstate commerce in the United States;

      c.      the identity of the participants of the alleged conspiracy or manipulative scheme;

      d.      the duration of the conspiracy or manipulative scheme alleged herein and the acts performed by Defendants and their co-conspirators in furtherance thereof;

      e.      whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3;

      f.      whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiffs and members of the Class;

      g.      the appropriate Class-wide measure of damages; and

   h.  the appropriate nature of Class-wide injunctive or other equitable relief.

  48. <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class, and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

  49. <u>Predominance</u>: Questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class.

  50. <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Absent a class action, it would not be feasible for the vast majority of the members of the Class to seek redress for the violations of law herein alleged.

**FACTUAL ALLEGATIONS**

**THE FX MARKET**

  51. The FX market is the market where currencies are traded.  It is the largest and most actively traded financial market in the world.  According to the most recent BIS Triennial Central Bank Survey,[7] global trading in FX averaged $5.3 trillion per day in April 2013, up from

---

[7] The BIS Triennial Central Bank Survey describes itself as "the most comprehensive source of information on the size and structure of global foreign exchange (FX) and OTC

$4.0 trillion in April 2010.[8]  U.S. trading in FX averaged $1.263 trillion per day in April 2013,

up from $864 billion in April 2010.[9]  This growth in FX trading was largely driven by growth in

market participation by "other financial institutions," which include pension funds, mutual funds,

insurance companies, and hedge funds.[10]

52.     Currencies are traded in pairs.  In April 2013, the top three currency pairs

accounted for over half of all FX market turnover globally:  EUR|USD (24.1%), USD|JPY

(18.3%), and GBP|USD (8.8%).[11]  In April 2013, the U.S. dollar was on one side of 87% of all

FX transactions globally[12] and on 89% of all FX transactions in the United States.[13]

53.     Three types of FX Instruments account for approximately 95% of transactions in

the FX market in the United States:[14]

> Spot – An agreement to exchange sums of currency at an agreed-
> on exchange rate on a value date that is within two bank business
> days' time.
>
> Outright Forward – An agreement to exchange sums of currency at
> an agreed-on exchange rate on a value date that will be in more
> than two bank business days' time.  The exchange rate for a

---

derivatives markets."  Bank for International Settlements, Triennial Central Bank Survey, Foreign exchange turnover in April 2013: preliminary global results (available at https://www.bis.org/publ/rpfx13fx.pdf) [hereinafter BIS, Triennial Bank Survey, Preliminary Results 2013], at 3.  Central banks, including the Federal Reserve Bank of New York, and other authorities in 53 jurisdictions participated in the survey, collecting data from 1,300 banks and other financial institutions throughout the world.  *Id.*

[8]     BIS Triennial Bank Survey, Preliminary Results 2013, at 3.

[9]     Fed Triennial Bank Survey 2013, at 1.

[10]    Fed Triennial Bank Survey 2013, at 3.

[11]    BIS, Triennial Bank Survey, Preliminary Results 2013, at 3.

[12]    BIS, Triennial Bank Survey, Preliminary Results 2013, at Table 2.

[13]    Fed Triennial Bank Survey 2013, at 4.

[14]    Fed Triennial Bank Survey 2013, 3-4.

forward transaction is called the forward outright.

FX Swap – A combination of a spot transaction plus an outright forward done simultaneously, but in the opposite direction.

54.     The FX market revolves around spot transactions.  Both outright forwards and FX swaps are derived from the underlying spot price.  Every time the spot price moves, outright forward and FX swap prices move.  An outright forward is the spot price plus the interest differential or "cost of carry."  The cost of carry is determined mathematically from the overall cost involved when lending one currency and borrowing another during the time period stretching from the spot date until the forward date. Outright rates are quoted in swap points, also called forward points. By adding (premium) or subtracting (discount) these swap points from the spot rate, the full outright forward rate is calculated.  Similarly, an FX swap is determined by the spot price because it is a simultaneous spot transaction and a reverse outright forward – a spot-forward swap.  An FX swap is a contract to buy an amount of the base currency at an agreed rate (spot), and simultaneously resell the same amount of the base currency for a later value date to the same counterparty (outright forward), also at an agreed rate (or vice versa).

55.     Trading in the FX market opens on Monday at 7:00 a.m. in New Zealand.  One hour later, Sydney, Australia opens.  Trading continues throughout Asia as Tokyo, Hong Kong, and Singapore begin trading.  Trading then shifts to Europe.  One hour later, London opens.  At midday London time, New York opens for trading.  New York and London (the two largest FX trading centers) are open simultaneously for several hours, including at 4:00 p.m. London time (11:00 a.m. New York time) when the WM/Reuters Closing Spot Rates are determined.  The FX trading day ends at 5:00 p.m. in New York for booking purposes.  As New York's day ends, a new trading day reopens in New Zealand.  The FX trading week closes on Friday at 5:00 p.m. in

17

New York.  With the advent of electronic trading, it is possible to do some trading over the weekends.

56.  The following chart graphically illustrates the 24-hour nature of the FX market:

| **FX MARKET HOURS** | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| New Zealand | | | | | | | | | | | | | | | | | | | | | | | |
| | Sydney | | | | | | | | | | | | | | | | | | | | | | |
| | | | Tokyo | | | | | | | | | | | | | | | | | | | | |
| | | | | Hong Kong | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | Frankfurt | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | London | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | New York | | | | | | |

57.  Approximately 98% of FX trading occurs over the counter ("OTC"),[15] meaning that it does not occur on a centralized exchange.  For example, to initiate a spot transaction in the OTC market, a customer (such as a member of the Class) contacts a dealer bank (such as one of the Defendants) for a quote, providing the currency and quantity.  The dealer quotes a "bid."  The bid is the price at which the dealer is willing to buy currency.  At the same time, the dealer quotes an "ask."  The ask is the price at which the dealer is willing to sell currency.  The customer then buys, sells, or passes.  The difference between the bid and ask is the "bid-ask spread" and is how the dealer is compensated.

58.  Customers execute FX trades either by a telephone call to a salesperson at a dealer bank or through an electronic communications network ("ECN").  An ECN is a computer system that customers can use to place orders with dealer banks over a network.  ECN platforms include

---

[15]  BIS, Triennial Bank Survey, Preliminary Results 2013, at Table 1.

single-bank proprietary platforms and multibank dealer systems. Multibank dealer systems include platforms such as Reuters, Bloomberg, EBS, KCG Hotspot, and Currenex.

59.     The following is a sample conversation between a dealer and customer placing an FX spot trade for immediate execution via an ECN.  This conversation would take place in a brief span of time, perhaps less than one minute.[16]

| | Sample Dealing Conversation (Spot) | Explanation |
|---|---|---|
| Customer | HIHI FRIENDS | |
| Dealer | HIHI | |
| Customer | EUR ON 50 PLS? | Customer requests a quote from dealer on 50 million euros.  Customer does not reveal whether it is a buyer or seller. |
| Dealer | 50 / 55 | Dealer quotes its bid-ask spread.  This spread equals 1.2350/1.2355, as 1.23 is understood by both parties. |
| Customer | I SELL | Customer agrees to sell 50 euros at the bid price of 1.2350. |
| Dealer | VALUE 03AUG2012 TO CONFIRM 50 MIO EUR AGREED AT 1.2350 BUY EUR MY EUR TO BANK LDN THANKS AND BIBI | Dealer confirms the trade and instructs customer to deliver the euros to its bank in London. |
| Customer | TO CONFIRM 50 MIO EUR I SELL EUR @1.2350 VALUE 03AUG2012 MY USD TO BANK NY THANKS AND BIBI | Customer confirms trade and instructs dealer to deliver the dollars to its bank in New York. |

60.     In the above example, the dealer buys euros from the customer at 1.2350.  The dealer would also be selling 50 million euros to another customer or group of customers at 1.2355.  The dealer buys at 1.2350 and sells at 1.2355, earning the bid-ask spread of .0005 as its compensation as a market-maker.  The wider the spread, the more money a dealer makes.  Thus,

---

[16]     David F. DeRosa, FOREIGN EXCHANGE OPERATIONS:  MASTER TRADING AGREEMENTS, SETTLEMENT, AND COLLATERAL (Wiley 2014), at 103.

dealers are incentivized to quote wider bid-ask spreads.  Competition among dealers, however, narrows bid-ask spreads.

61.     Dealers record and analyze their customers' trading histories, such as in the example above.  As a result, dealers can often predict a customer's trading patterns, even before a customer places an order.  This is particularly sensitive information.

62.     Dealers' salespeople and traders are in regular communication.  Salespeople inform the traders of incoming potential orders, confirm bid and ask prices, and ultimately convey placed orders to the trading desk.  Traders are aware of all potential and pending trades that could be processed through their desks.

**The WM/Reuters Rates and Uses**

63.     While an FX trade may be entered into and executed at any time, customers often use what are called daily fixing rates.  A fixing rate is a published exchange rate at a moment in time or over a short interval of time.  To place an order at a fixing rate, a customer gives the dealer instructions to buy or sell a quantity of currency at the fixing rate.  The dealer guarantees execution at the fixing rate.  The WM/Reuters rates are the most important fixing rates in the FX markets.  WM/Reuters publishes fixing rates for spot rates and forwards.[17]

64.     The most widely used WM/Reuters spot rates are the WM/Reuters Closing Spot Rates for Trade Currencies, which are calculated around 4:00 p.m. London time (11:00 a.m. New York time).   WM/Reuters defines Trade Currencies to include, among others, the major currencies traded against the U.S. dollar and the euro.[18]

---

[17]     The WM Company, WM/Reuters Spot & Forward Rates Methodology Guide (available at http://bit.ly/1p9jnjO), at 3 [hereinafter WM/Reuters Guide].

[18]     *See* WM/Reuters Guide, at 3.

65.    For Trade Currencies, the WM/Reuters Closing Spot Rates are calculated using the median of a snapshot of bid and ask order rates and actual spot transactions in the 30 seconds before and the 30 seconds after 4:00 p.m. London time (11:00 a.m. in New York).  Trades and rates from Currenex, Reuters Dealing 3000, and EBS are used in the validation and calculation.

66.    The process for capturing the information used to calculate the WM/Reuters Closing Spot Rates is automated and anonymous.  Because these rates are based on the median value of the transactions, the WM/Reuters Closing Spot Rates do not take the notional size of the quotes and transactions into account; all quotes and transactions are weighted equally.

67.    The WM/Reuters forward rates are published as premiums or discounts to the WM/Reuters spot rates.[19]  Thus, manipulation of the WM/Reuters spot rates (as alleged herein) will necessarily impact the WM/Reuters forward rates.

68.    Pension funds, mutual funds, insurance companies, and hedge funds are major participants in the FX market; these entities represent the segment of the FX market with the highest growth rate over the past several years.  Many of these entities, however, participate in the FX market in a way that is ancillary to their investing activities, rather than as a primary source of profits.  Such entities typically repatriate payments, such as dividends, interest, and redemptions on foreign equity and debt instruments that are paid in foreign currencies to U.S. dollars, and are continually re-balancing their portfolios to adjust their proportions of domestic and foreign holdings in response to shifting economic conditions.  The WM/Reuters Closing Spot Rates are popular with such entities.  Fund performance is often compared to rates of return benchmarked to  the WM/Reuters Closing Spot Rates.  Conducting FX trades at the WM/Reuters

---

[19]    WM/Reuters Guide, at 6.

Closing Spot Rates removes tracking error when comparing fund performance to indexed benchmarks, such as those created by FTSE Group and MSCI Inc., which track stocks and bonds in multiple countries, or to other portfolios.

69.     WM/Reuters spot rates are also customarily used to mark-to-market FX exposures.  Before WM/Reuters spot rates became the standard benchmark, portfolio managers used different methods to mark-to-market, some of which were dependent on a single dealer's quote.  WM/Reuters spot rates were rapidly adopted to mark FX exposures to market because the WM/Reuters spot rates had the advantages of universality and independence from any specific dealer.

70.     The widespread use and acceptance of WM/Reuters rates as a pricing mechanism and as the primary benchmark for currency trading globally has caused the WM/Reuters Closing Spot Rates to occupy a crucial role in the operation of financial markets.

**WM/Reuters Closing Spot Rate Is Vulnerable to Collusion**

71.     Defendants understood the methodology used to calculate the WM/Reuters Closing Spot Rates is vulnerable to manipulation.  For example, in a July 4, 2008 meeting of the Bank of England's Foreign Exchange Joint Standing Committee, Chief Dealers Sub Group,[20] the

---

[20]     The Chief Dealers Sub Group of the Bank of England's Foreign Exchange Joint Standing Committee was established in 2005 for the purpose of facilitating discussions between chief dealers at major dealer banks and Bank of England staff concerning developments in the foreign exchange markets.  The Chief Dealers Sub Group consists of 11 chief traders active in the London FX market and top Bank of England officials.  The Chief Dealers Sub Group meets three to four times per year.  Between 2005 and 2013, representatives from Defendants Barclays (2005-2012), Merrill Lynch (Bank of America) (2006-2007), HSBC (2007-2013), JPMorgan (2007-2009, 2011-2013), Morgan Stanley (2005-2008, 2010-2011), Goldman Sachs (2009-2013), BNP Paribas (2009-2013), Deutsche Bank (2005-2012), RBS (2005-2013), UBS (2005-2013), Credit Suisse (2005-2008), and Citigroup (2005-2013), participated in the Chief Dealers Sub Group.  Foreign Exchange Joint Standing Committee Chief Dealers' Sub Group Meeting

WM Company gave a presentation on the median calculation of the WM/Reuters rates to chief currency traders from RBS, HSBC, Deutsche Bank, Morgan Stanley, JPMorgan, and Citigroup. In response to this presentation, the chief dealers in attendance admitted that the methodology was susceptible to manipulation:

> It was noted that WM/Reuters do not use traded volumes data in the calculation of the spot rates. While they have access to Reuters volume data, the same is not the case for EBS data. The Chief Dealer group agreed that actual traded volumes is a key consideration in the calculation of accurate fixings and suggested that this would be a useful next step in the development of WM/Reuters' model. Furthermore it was suggested that using a snapshot of the market may be problematic, as it could be subject to manipulation. Perhaps WM could use a window of observations, and determine at what point to fix using volume data.[21]

72.     As explained below, Defendants seized on the weakness in this methodology and colluded to manipulate the WM/Reuters Closing Spot Rates.

**The FX Market Is Concentrated and Dominated by Defendants**

73.     Beginning in the late 1990s, the FX market experienced a substantial increase in concentration, with the number of banks covering 75% market share declining:

---

Minutes, 2005-2013 (available at http://bit.ly/1eMBcAq and http://bit.ly/1kDSdSj).

[21]     Foreign Exchange Joint Standing Committee Chief Dealers Sub Group, Draft Minutes of the 4 July 2008 Meeting at HSBC, 8 Canada Square, London E14 5HQ (available at http://bit.ly/1eMBcAq), at 71.



74.     Defendants now dominate the FX market.  According to the 2012 and 2013 FX Surveys by Euromoney, an industry publication, Defendants' individual and aggregate shares of the global FX market for the past two years are:

| Defendant | 2012 Market Share (Rank) | 2013 Market Share (Rank) |
|---|---|---|
| Deutsche Bank | 14.57% (1) | 15.18% (1) |
| Citigroup | 12.26% (2) | 14.90% (2) |
| Barclays | 10.95% (3) | 10.24% (3) |
| UBS | 10.48% (4) | 10.11% (4) |
| HSBC | 6.72% (5) | 6.93% (5) |
| JPMorgan | 6.60% (6) | 6.07% (6) |
| RBS | 5.86% (7) | 5.62% (7) |
| Credit Suisse | 4.68% (8) | 3.70% (8) |
| Morgan Stanley | 3.52% (9) | 3.15% (9) |
| Goldman Sachs | 3.12% (10) | 2.75% (11) |
| BNP Paribas | 2.63% (11) | 2.52% (12) |
| Bank of America | 2.41% (12) | 3.08% (10) |
| **Defendants' Aggregate Market Share:** | **83.8%** | **84.25%** |

75.     Defendants also dominate the U.S. spot market.  The Federal Reserve Bank of New York reported that as of April 2013, the top ten banks engaged in 98% of all spot volume in

the FX market, up from 91% in April 2010.  Moreover, the five largest banks by volume accounted for 80% of spot transactions in the United States in April 2013.[22]

76.     This rise of ECNs also contributed to the concentration of the FX market.  To maintain their market position, Defendants made heavy investments in software and hardware that smaller banks could not afford.  Defendants are the best-informed participants in the FX market and have created an information barrier to entry.

77.     The FX market has other high barriers to entry.  A large amount of capital is required to provide liquidity to customers.  FX dealers must provide immediate liquidity to customers based on the assumption that inventory can be offloaded within the day.

78.     The FX market is controlled by a small and close-knit group of traders employed by Defendants.  As a result of market concentration and the financial crisis, Defendants' FX trading desks have undergone staff reductions, resulting in each bank now having between eight to ten traders.  These traders have strong ties formed by working with one another in prior trading positions.  Many of these traders also live near each other, many living in the same neighborhoods in the Essex countryside just northeast of London's financial district.  They belong to the same social clubs, golf together, dine together, and sit on many of the same charity boards.  As Andre Spicer, a professor at the Cass Business School in London, said, "The foreign-exchange market has a very strong culture, in which practitioners feel more attached to each other than they do their banks.  It is also dominated by an extremely small group of individuals, often with strong social ties formed by working with each other at some point in the past."[23]

---

[22]     Fed Triennial Bank Survey 2013, at 6.

[23]     Liam Vaughan, Gavin Finch and Bob Ivry, *Secret Currency Traders' Club Devised Biggest Market's Rates*, BLOOMBERG (Dec. 19, 2013) (available at http://bloom.bg/1hA9KXj).

These social and professional ties in the FX trading community create incentives and opportunities for collusion. As one former Citigroup banker noted, "This is a market in which price fixing and collusion could actually work."[24]

**The FX Market Is Unregulated and Opaque**

79.     Notwithstanding its size, importance, and concentration, the FX market is one of the world's least regulated financial markets, with most trading taking place away from exchanges. The United States does not have any specific rules or agencies governing FX spot, outright forward, or FX swap transactions, and such transactions are exempt from the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 11-203, 124 Stat.1376 (2010).

80.     There is no centralized exchange or institution that collects and posts real-time trade information, such as order flows and volume. While Defendants' proprietary ECNs allow them to match buyers with sellers, Defendants' real-time order flow and volume data is not available to the market, such as it would be on an exchange, where the entire market knows who is buying and selling at a given moment. Defendants closely guard their real-time order flow and volume data and do not make it commercially available for purchase. What goes on inside these proprietary platforms is known only to the Defendants. Absent an agreement to collude, each bank would not share this information with one another; however, as explained here, Defendants *did* share this information with one another.

81.     Defendants enjoy informational advantages over Plaintiffs and the Class as a result of this market opacity. Knowledge of a customers' identity, trading patterns, and orders

---

[24]     Daniel Schäfer, Alice Ross, and Delphine Strauss, *Foreign exchange: The big fix*, FINANCIAL TIMES (Nov. 12, 2013) (available at http://on.ft.com/OIyUfl).

allows Defendants to predict the direction of market movements.  Defendants' ability to predict –

and manipulate – market movements grows when they share this information with one another.

82.     With relatively few firms having a large share of the FX market protected by high

barriers to entry, and with the lack of regulation and limited access to real-time pricing and

volume information, the FX market exhibits characteristics that antitrust law and economics have

identified as making a market susceptible to collusion and manipulation.

### DEFENDANTS CONSPIRED TO FIX THE WM/REUTERS CLOSING SPOT RATES

83.     Beginning at least as early as January 1, 2003, Defendants conspired to

manipulate the WM/Reuters Closing Spot Rates.  Defendants communicated with one another,

including in chat rooms, via instant messages, and by email, to carry out their conspiracy.

Through these communications, Defendants regularly exchanged their customers' confidential

order flow information before the London fix.  Based on the shared confidential information,

Defendants executed concerted trading strategies designed to manipulate, and which actually did

manipulate, the WM/Reuters Closing Spot Rates.  Defendants' collusive actions allowed them to

eliminate their risk in FX trading and to reap supra-competitive profits at the expense of

Plaintiffs and the Class.

### Defendants Used Electronic Communications, Including Chat Rooms, Instant Messages, and Emails, to Conspire

84.     Defendants' top-level traders used electronic communications to meet and

conspire for over a decade.  Defendants' top-level traders conspired by communicating directly

with one another via electronic communications, including chat rooms, instant messages, and

email.  Defendants brazenly named their chat rooms "The Cartel," "The Bandits' Club," "The

Mafia," and "One Team, One Dream."  These modern-day electronic chat rooms replaced the

classic, smoke-filled backrooms of the past.  The transcripts of these chat rooms are reportedly "peppered with allusions to drinks, drugs and women."[25]

85.    Entry into chat rooms, such as The Cartel, was coveted among traders because of the influence its members exerted in the FX market.

86.    Defendants' top-level traders ran the chat rooms.  For example, Richard Usher ran The Cartel while he was JPMorgan's chief currency dealer in London and head of spot trading for G-10 currencies from 2010-2013 and as a trader at RBS before then.

87.    The Cartel's membership numbered a half-dozen or more of Defendants' top traders.  Other members of The Cartel included:

- Rohan Ramchandani, Citigroup's head of spot trading in London;

- Matt Gardiner, Barclays' director of spot trading for EUR|USD from 2007 to 2011;

- Chris Ashton, former head of Barclays voice spot trading globally; and

- Niall O'Riordan, UBS's co-global head of G-10 and emerging market spot trading.

88.    Notably, Usher, Ramchandani, Gardiner, Ashton, and O'Riordan each have been suspended or fired from their respective institutions.

89.    Transcripts of The Cartel's communications reveal that Defendants exchanged information on customer orders and agreed to trading strategies to manipulate the WM/Reuters

---

[25]    Daniel Schäfer, Alice Ross, and Delphine Strauss, *Foreign exchange: The big fix*, FINANCIAL TIMES (Nov. 12, 2013) (available at http://on.ft.com/OIyUfl).

Closing Spot Rates.[26]  Often, after manipulating the WM/Reuters Closing Spot Rates, The Cartel members "would send written slaps on the back for a job well done."[27]

90.    The chat rooms often focused on manipulating a particular currency pair.  For instance, Defendants formed "The Sterling Lads" to manipulate the exchange rate between British pounds sterling and U.S. dollars (GBP|USD or "cable") – the world's third most-traded currency pair.

91.    As a direct result of the numerous government investigations, Defendants Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, RBS, and UBS now ban their traders from participating in multibank chat rooms.

### Defendants Shared Confidential Customer Order Information to Manipulate the WM/Reuters Closing Spot Rates

92.    Through electronic means, Defendants shared their confidential customer order information with one another.  Each Defendant aggregated its client orders to determine what its individual net position in a specific currency was going to be at the London fix.  Defendants then shared this information with one another to determine their aggregate net position in a specific currency at the fix.  By sharing and aggregating their confidential customer order flows, Defendants could determine, in advance, which way the market should move.

93.    Defendants' sharing of their confidential customer information violates the Federal Reserve Bank of New York's "Guidelines for Foreign Exchange Trading Activities," which have been in place for decades.  Specifically, the Guidelines note:

---

[26]    Liam Vaughan, Gavin Finch and Bob Ivry, *Secret Currency Traders' Club Devised Biggest Market's Rates*, BLOOMBERG (Dec. 18, 2013) (available at http://bloom.bg/1ibwUXj).

[27]    Liam Vaughan, Gavin Finch and Bob Ivry, *Secret Currency Traders' Club Devised Biggest Market's Rates*, BLOOMBERG (Dec. 18, 2013) (available at http://bloom.bg/1ibwUXj).

Confidentiality and customer anonymity are essential to the operation of a professional foreign exchange market. Market participants and their customers expect that their interests and activity will be known only by the other party to the transaction . . . and an intermediary, if one is used.

***It is inappropriate to disclose, or to request others to disclose, proprietary information relating to a customer's involvement in a transaction*** . . .[28]

\*     \*     \*

Customer anonymity should not be circumvented with the use of slang or pseudonyms. If confidentiality is broken, management must act promptly to correct the conditions that allowed the event to occur…. ***Staff should not pass on confidential and nonpublic information outside of their institution.   Such information includes discussions with unrelated parties concerning their trades, their trading positions, or the firm's position.*** It is also inappropriate to disclose, or to request others to disclose, information relating to a counterparty's involvement in a transaction . . . .

***Trading room staff should take special precautions to avoid situations involving or appearing to involve trading on nonpublic information***.[29]

94.      Defendants have already produced evidence to government investigators confirming that their traders "inappropriately share[d] market-sensitive information with rivals."[30] Evidence obtained by government investigations confirms that "[s]hortly before the fix . . . it was common for a group of senior currency traders to discuss with their competitors the

---

[28]      Federal Reserve Bank of New York, Guidelines for Foreign Exchange Trading Activities, Foreign Exchange Committee (May 2008) (available at http://bit.ly/1o5okiz), at 11 (emphasis added).

[29]      Federal Reserve Bank of New York, Guidelines for Foreign Exchange Trading Activities, Foreign Exchange Committee (May 2008) (available at http://bit.ly/1o5okiz), at 26 (emphasis added).

[30]      Chiara Albanese, Katie Martin and David Enrich, *Banks Fix on Sales in Probe*, WALL STREET JOURNAL (Nov. 19, 2013) (available at http://on.wsj.com/P2iHS8).

types and volume of trades they planned to place."[31]   A transcript provided by RBS to the UK-FCA revealed that JPMorgan's Richard Usher wrote "messages to traders at other firms [that] included details of his trading positions."[32]   Defendants' traders confirmed that "chatroom discussions between rival traders . . . allowed them to share information about pricing and order books."[33]

95.    A number of Defendants have admitted to the Bank of England that they shared their confidential customer information.   On April 23, 2012, the Foreign Exchange Joint Standing Committee, Chief Dealers Sub Group met at BNP Paribas' London office.   Citigroup's Rohan Ramchandani, who was one of The Cartel members, was present.   James Pearson (RBS), and Martin Millet (Bank of England) were also present.[34]   A person familiar with the UK-FCA's investigation disclosed to the media that a senior trader present at the meeting turned over his meeting notes.   According to the notes, the traders told Bank of England officials that they

---

[31]    Katie Martin and David Enrich, *Forex Probe Uncovers Collusion Attempts, Global Investigation Has Reportedly Found London-Based Traders Worked Together in Trying to Manipulate Currencies*, WALL STREET JOURNAL (Dec. 19, 2013) (available at http://on.wsj.com/1o1Y0Wr).

[32]    Gavin Finch, Liam Vaughan, and Suzi Ring, *Ex-RBS Trader in U.K. Probe Said to Be JPMorgan's Usher*, BLOOMBERG (Oct. 14, 2013) (available at http://bloom.bg/1ip3Yer).

[33]    Daniel Schafer, Alice Ross and Delphine Strauss, *Foreign exchange: The big fix*, FINANCIAL TIMES (November 12, 2013) (available at http://on.ft.com/OIyUfl).

[34]    Foreign Exchange Joint Standing Committee Chief Dealers Sub Group, Minutes of the 23 April 2012 12pm Meeting at BNP Paribas, 10 Hareware Avenue, London, NW1 6AA (available at http://bit.ly/1kDSdSj).

shared information about customer orders before currency benchmarks were set.[35]  The official meeting minutes concealed the admissions made at the meeting.[36]

96.     In March 2014, the Bank of England suspended a staff member as it launched an internal investigation into whether employees knew about or condoned manipulation of the WM/Reuters Closing Spot Rates.  The Bank of England's investigation included the search and review of 15,000 emails, 21,000 Bloomberg and Reuters chat room transcripts, and more than 40 hours of telephone records.

97.     At least four chief traders who participated in the Bank of England's Chief Dealers Sub Group have been suspended or terminated by their institutions.  Richard Usher (JPMorgan) was placed on leave in October 2013.  Rohan Ramchandani (Citigroup) was placed on leave in October 2013 and then terminated in January 2014.  Robert de Groot (BNP Paribas and Citigroup) was suspended in March 2014.  Niall O'Riordan (UBS) was suspended in October 2013.  As detailed herein, Usher, Ramchandani, and O'Riordan were also members of The Cartel chat room.

**Using Shared Information, Defendants Agreed to Execute Concerted Trading Strategies to Manipulate the WM/Reuters Closing Spot Rates**

98.     By sharing their individual trading positions, Defendants gained an understanding of the overall order flows across the FX market.  According to traders, banks "would share

---

[35]     Suzi Ring, Gavin Finch and Liam Vaughan, *BOE Staff Said to Have Condoned Currency Traders' Conduct*, BLOOMBERG (Feb. 7, 2014) (available at http://bloom.bg/1d5bQmn).

[36]     Foreign Exchange Joint Standing Committee Chief Dealers, Minutes of the 23 April 2012 12pm Meeting at BNP Paribas, 10 Hareware Avenue, London, NW1 6AA (available at http://bit.ly/1kDSdSj).

details of orders with brokers and counterparts at banks through instant messages to align their strategies" and "improve their chances of getting the desired move in the benchmark."[37]

99.     A Bloomberg article from June 12, 2013, reported that current and former employees of some of the world's largest banks disclosed the banks have "been front-running client orders and rigging WM/Reuters rates by pushing through trades before and during the 60-second windows when the benchmarks are set."[38]

100.     Former and current FX traders and persons familiar with the government and internal investigations have revealed some details of Defendants' collusive manipulation of the WM/Reuters Closing Spot Rates.   Defendants' tactics include "front running/trading ahead," "banging the close," and "painting the screen."

101.     Traders "front run" on customer information when they receive customer orders that could move the market and then trade their own proprietary positions prior to executing their customers' market-moving trades.   Large client orders come from, for example, tracker funds, which typically place orders as much as an hour before the WM/Reuters Closing Spot Rates are set.   Such an order gives traders information about the direction the market will move, and traders from the largest dealer banks have admitted that they use the information to take positions that benefit the bank – to the detriment of the customer.

102.     According to a former trader, even one large transaction can move the market. The trader stated:

---

[37]     Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (June 12, 2013) (available at http://bloom.bg/1qGQ3oy).

[38]     Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (June 12, 2013) (available at http://bloom.bg/1qGQ3oy).

[I]f he received an order at 3:30 p.m. to sell 1 billion Euros ($1.37 billion) in exchange for Swiss francs at the 4 p.m. fix, he would have two objectives: to sell his own euros at the highest price and also to move the rate lower so that at 4 p.m. he could buy the currency from his client at a lower price.

He would profit from the difference between the reference rate and the higher price at which he sold his own euros. A move in the benchmark rate of 2 basis points [0.02 percent], would be worth 200,000 francs ($216,000).[39]

103. Nevertheless, absent collusion, a Defendant "front running" the market would still face risk that another Defendant with a larger position could trade in the opposite direction at the same time. If this were to happen, the Defendant's strategy would backfire, and the Defendant would, in industry parlance, get "run over." For instance, if in the above example, the trader decided to sell 1 billion euros in exchange for Swiss francs, but another market participant traded the opposite direction and sold Swiss francs for 2 billion euros, the market price would move higher, not lower, as the trader had anticipated based on his client's order. If, as a consequence, the market moved 2 basis points higher, the trader would lose 200,000 francs ($216,000) on the transaction.

104. To avoid this risk, Defendants agreed to "front run" together by "improperly working as a pack" and agreeing "to a sequence for placing their own trades to their advantage."[40]

---

[39] Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients* BLOOMBERG (June 12, 2013) (available at http://bloom.bg/1qGQ3oy); Liam Vaughan, Gavin Finch and Bob Ivry, *Secret Currency Traders' Club Devised Biggest Market's Rates*, BLOOMBERG (Dec. 18, 2013) (available at http://bloom.bg/1ibwUXj).

[40] Katie Martin and David Enrich, *Forex Probe Uncovers Collusion Attempts*, WALL STREET JOURNAL (Dec. 19, 2013) (available at http://on.wsj.com/1h7x0j4); Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients* BLOOMBERG (June 12, 2013) (available at http://bloom.bg/1qGQ3oy); Liam Vaughan, Gavin

105.   The following front running example illustrates the trading mechanics of front running.



**3:45pm**   A customer calls Defendant's FX desk to convert some of its U.S. dollars into £600m of sterling.  The customer asks if the trade can be settled at the market benchmark price, the WM/Reuters Closing Spot Rate.

**3:48pm**   The trader immediately buys £50m ("front running") for Defendant bank's own trading account at the market price of 1.6000 dollars to the pound. The trader knows he has a very large amount of pounds to buy over the next 12 minutes that will move the market higher.

**3:50pm**   The £50m trade has caused the price of pounds to tick up to 1.6010, and the trader buys £100m at that price. He repeats this trade every two minutes, which drives the price higher each time. He stops when he has bought a total of £600m for his client by 4:00 p.m. at an average price of 1.6035.

**3:52pm**   The trader buys £100m at an average rate of 1.6020 moving the price higher.

**3:54pm**   The trader buys £100m at an average rate of 1.6030 moving the price higher.

**3:56pm**   The trader buys £100m at an average rate of 1.6040 moving the price higher.

**3:58pm**   The trader buys £100m at an average rate of 1.6050 moving the price higher.

Finch and Bob Ivry, *Secret Currency Traders' Club Devised Biggest Market's Rates*, BLOOMBERG (Dec. 18, 2013) (available at http://bloom.bg/1ibwUXj).

**4:00pm**     The trader buy the final £100m at an average rate of 1.6060.  The WM/Reuters Closing Spot Rate is calculated at 1.6060.  The trader fills the customer's order at the WM/Reuters Closing Spot Rate of 1.6060, thereby selling £600m to the client, leaving him with only a £50m exposure, which he sells into the market at 1.6060.

The trader filled his customer's order and sold the £50m he bought for the Defendant bank at the higher market rate.  As a result, the customer received his £600m at a cost of $963.6m (£600m x 1.6060).  However, Defendant bank has only paid $962.1m (£600m x the average price of 1.6035), meaning it made $1.5m from the customer's transaction.  In addition, the trader gained $300,000 on the £50m "front running" side bet, and in total, made $1.8m for Defendant bank in the 15 minutes preceding the WM/Reuters Closing Spot Rate.[41]

106.    Defendants also engaged in "banging the close" to manipulate the WM/Reuters Closing Spot Rates and thereby fix the prices of FX Instruments.  "Banging the close" occurs when traders break up large customer orders into small trades and concentrate the trades in the moments before and during the 60-second fixing window in order to spike the published rates up or down.  Because the WM/Reuters Closing Spot Rates are based on the median of trades during the calculation window and not weighted for the average notional amount of a transaction, the rates are susceptible to manipulation by banging the close.  That is, 100 trades of $1 will impact the WM/Reuters Closing Spot Rates to a greater degree than a single trade of $100.

107.    As explained by numerous sources, "[t]o maximize profits, dealers would buy or sell client orders in installments during the 60-second window to exert the most pressure possible

---

[41]     Simon Goodley, *Odds stacked in favour of the smart operator*, The Guardian (Mar. 13, 2014).

on the published rate. . . .  Because the benchmark is based on the median of transactions during the period, placing a number of smaller trades could have a greater impact than one big deal."[42]

108.    Defendants also manipulated the WM/Reuters Closing Spot Rates and thereby fixed the prices of FX Instruments by "painting the screen."  Painting the screen occurs when Defendants place phony orders with one another to create the illusion of trading activity in a given direction in order to move rates prior to the fixing window.  After the WM/Reuters Closing Spots Rates were calculated, Defendants reversed those trades.

109.    Thus, by agreeing in chat rooms and instant messages to "front run" the execution of customer orders, "bang the close," and "paint the screen," Defendants manipulated the WM/Reuters Closing Spot Rates and thereby fixed the prices of the FX Instruments.

110.    Absent collusion and manipulation, executing trades at the WM/Reuters Closing Spot Rates would pose more risk for Defendants than other order types.  It poses more risk because, by agreeing to trade at a rate determined sometime in the future (even the relatively near future), there would be, in the absence of collusion, an increased risk that the market will move against Defendants.  Despite this increase in risk, Defendants commonly incentivized their sales forces, through items such as increased "sales credits," to execute transactions at the WM/Reuters Closing Spot Rates.

111.    In recent testimony before the Treasury Committee of the House of Commons, Bank of England governor, Dr. Mark Carney, elaborated:

> [T]he dealers want a quiet life.  They want the ability to both promise to their clients that they will deliver the 4 pm fix and not have any risk in delivering that promise.  Other market activity

---

[42]    Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (June 12, 2013) (available at http://bloom.bg/1qGQ3oy).

around the 4 pm fix by others, whether they are hedge funds, asset managers, corporate, whatever, will make that promise riskier.

That is the dealer's job.  That is the dealer's job, in making that promise.  What they have done, which is alleged and which is being investigated around the world, is that having developed a pattern of making those promises, they decided to cheat to make their life easier, to collude across the dealers . . . .

\* \* \*

Easier and richer sometimes goes together – it does not always go together – to buy happiness.  That is what is being alleged, so you have a circumstance, and obviously, I was not present at the meeting and one reads into the minutes, where you have a circumstance where you have volatility because of the market functioning, and the dealers want to change that.  What is being investigated is whether they tried to change it by colluding, sharing client information and doing above and beyond.  That is fundamentally against the principles of fair markets.  It is unacceptable and it has to be prosecuted to the full extent of the law . . . .[43]

## GOVERNMENT INVESTIGATIONS

112.    Law enforcement and regulatory authorities in the United States, United Kingdom, European Union, Switzerland, Germany, Asia, Australia, New Zealand, and the international Financial Stability Board are actively investigating Defendants' conduct in the FX market.

### U.S. Department of Justice ("DOJ")

113.    On October 29, 2013, Acting Assistant Attorney General Mythili Raman (acting head of DOJ's Criminal Division) confirmed that DOJ's Criminal and Antitrust Divisions are actively investigating Defendants' manipulation of FX benchmark rates, including the WM/Reuters Closing Spot Rates.  The DOJ confirmed that several banks agreed to produce

---

[43]    House of Commons, Treasury Department, Oral Evidence:  The Foreign Exchange Market Review, HC 1147 (March 11, 2014) (available at http://bit.ly/1h0YSB1).

information relating to FX benchmark rates pursuant to their obligations under deferred prosecution and non-prosecution agreements reached in connection with the DOJ's LIBOR investigation:

> As part of our Libor resolutions, there have been pledges by banks to cooperate and indeed requirements by banks to cooperate not just in connection with Libor but all benchmark manipulations.[44]

> That's one of the most significant benefits that law enforcement has been able to secure as part of this [LIBOR] investigation.[45]

114.   DOJ entered into deferred prosecution and non-prosecution agreements with Defendants Barclays, UBS, and RBS in connection with LIBOR investigations.  UBS', RBS', and Barclays' non-prosecution and deferred prosecution agreements with DOJ require them to provide information relating to benchmark manipulation, including manipulation of FX benchmark rates.

> a.   On February 5, 2013, Defendant Barclays submitted to a Non-Prosecution Agreement with DOJ relating to LIBOR and EURIBOR manipulation.[46] Barclays admitted to submitting false figures for LIBOR and EURIBOR. In addition, Barclays paid $451 million in penalties to U.S. and U.K. regulators in connection with LIBOR manipulation.

> b.   On December 12, 2012, Defendant UBS submitted to a Non-Prosecution Agreement with DOJ relating to UBS's manipulation of LIBOR,

---

[44]   FT Reporters, *Day of reckoning as European banks' bill for misconduct mounts*, FINANCIAL TIMES (Oct. 29, 2013) (available at http://on.ft.com/1kIBkG4).

[45]   M. Rochan, *FX Fixing Scandal: US Justice Department Confirms Currency Investigation*, INTERNATIONAL BUSINESS TIMES (Oct. 30, 2013) (available at http://bit.ly/OBZ7fh).

[46]   Barclays Non-Prosecution Agreement, February 5, 2013, at 2 (available at http://www.justice.gov/iso/opa/resources/33720127101733546982.pdf);   Appendix   A, Statement of Facts (available at http://www.justice.gov/iso/opa/resources/93120127101734263 65941.pdf).

EURIBOR, and TIBOR.[47]  UBS agreed to pay a $1.5 billion in penalties to U.S., U.K., and Swiss regulators.

c.  On February 5, 2013, Defendant RBS submitted to a Deferred Prosecution Agreement with DOJ relating to Yen LIBOR and Swiss Franc LIBOR manipulation.[48]  RBS agreed to pay $612 million in penalties to U.S. and U.K. regulators.

115.  DOJ stated that "[t]he cooperation that we have been able to secure as part of our agreements in the Libor investigation has been very helpful to us in terms of holding banks' feet to the fire."[49]  DOJ further stated that these cooperation provisions have produced "tangible, real results."  The cooperation "expanded our investigations into the possible manipulation of foreign exchange and other benchmark rates."[50]

116.  A person familiar with DOJ's investigation stated that banks are providing the DOJ with witness lists, making employees available for interviews, and providing documents.[51]

117.  In November 2013, DOJ and FBI agents questioned Robert Wallden, a director in Deutsche Bank's foreign exchange trading unit, at his New York home.  Agents questioned Wallden about transcripts of an electronic chat where he boasted "about his ability to influence

---

[47]  UBS Non-Prosecution Agreement December 12, 2012, at 3 (available at http://www.justice.gov/iso/opa/resources/13920121219117458845757.pdf);  Appendix A, Statement of Facts, (available at http://www.justice.gov/iso/opa/resources/6942012121911725320624.pdf).

[48]  RBS Deferred Prosecution Agreement, February 5, 2013, at ¶6 (available at http://www.justice.gov/criminal/vns/docs/2013/02/2013-02-rbs-dpa.pdf).

[49]  Tom Schoenberg and David McLaughlin, *Banks Aid U.S. Forex Probe, Fulfilling Libor Accords*, BLOOMBERG (Jan. 23, 2014) (available at http://bloom.bg/1cYkwUB).

[50]  Moneynews, *Banks Aid US Forex Probe to Fulfill Duty in Libor Settlements* (Jan. 23, 2014) (available at http://nws.mx/1h6KY0G).

[51]  Moneynews, *Banks Aid US Forex Probe to Fulfill Duty in Libor Settlements* (Jan. 23, 2014) (available at http://nws.mx/1h6KY0G).

currency markets."[52]   Wallden, along with two other New York Deutsche Bank executives, Diego Moraiz and Christopher Fahy, were fired on February 14, 2014.[53]

118.    DOJ has also questioned executives at BNP Paribas as part of its investigation into FX market manipulation.[54]   As of March 6, 2014, BNP Paribas had suspended its head of FX spot trading, Robert De Groot.[55]

119.    United States Attorney General Eric Holder publicly commented on the DOJ's probe.  In November 2013, the Attorney General stated that "the manipulation we've seen so far may just be the tip of the iceberg"; that "we've recognized that this is potentially an extremely consequential investigation"; and that the DOJ's criminal and antitrust divisions are "taking a leading role" in "the truly global investigation."[56]

120.    In November 2013, Deputy Attorney General James Cole commented further on the DOJ's investigation:

> The department's criminal and antitrust divisions along with the FBI, regulators and other law enforcement agencies around the world are aggressively investigating possible manipulation of

---

[52]    David Enrich, Katie Martin and Jenny Strasburg, *FBI Tries New Tactic in Currency Probe*, WALL STREET JOURNAL (Nov. 20, 2013) (available at http://on.wsj.com/OIgEmq).

[53]    Paritosh Bansal and Emily Flitter, *Exclusive: Deutsche fires three New York forex traders – source*, REUTERS (Feb. 4, 2014) (available at http://reut.rs/1dAVufP).

[54]    Katherine Rushton, *BNP Paribas faces quiz on currency rate scandal*, THE TELEGRAPH, (Nov. 10, 2013) (available at http://bit.ly/1kSG0sT).

[55]    *BNP Paribas's head of forex spot-trading suspended: WSJ*, REUTERS (Mar. 6, 2014) (available at http://reut.rs/1hlK7x6).

[56]    Ben Protess, Landon Thomas Jr. and Chad Bray, *U.S. Investigates Currency Trades by Major Banks*, NEW YORK TIMES DEALB%K (Nov. 14, 2013) (available at http://nyti.ms/1fP5Atu).

foreign-exchange rates involving a number of financial institutions.[57]

121.    On February 7, 2014, Reuters reported that UBS approached the DOJ in September 2013 with information relating to the FX probe in hope of gaining antitrust immunity under the Antitrust Division's Leniency Program.[58]   UBS uncovered incriminating chats by traders and turned over the evidence to the DOJ as part of UBS's application for amnesty.

122.    On or around March 21, 2014, Plaintiffs' counsel contacted counsel that they believe represent UBS, seeking confirmation that the firm in question represents UBS and requesting that UBS, under section 213 of the Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA"), Pub. L. No. 108-237, 117 Stat. 661 (2004), provide Plaintiffs with "satisfactory cooperation" in this action.   That counsel declined to confirm or deny that UBS was the ACPERA amnesty applicant.

123.    Thereafter, on March 26, 2014, Plaintiffs' counsel contacted the DOJ and requested that it identify the ACPERA amnesty applicant and provide the agreement with that applicant and a description of the scope of the DOJ investigation.   The DOJ declined Plaintiffs' request on March 28, 2014.

**Additional United States and State Investigations**

124.    Other state and federal authorities in the United States are actively investigating manipulation of FX benchmark rates, including the WM/Reuters Closing Spot Rates.

---

[57]    Tom Schoenberg, *U.S. 'Aggressively' Probing Possible Currency Rigging*, BLOOMBERG, (Nov. 18, 2013) (available at http://bloom.bg/1jfAaV2).

[58]    Jamie McGeever, *UBS seeks first-mover immunity in U.S. currency probe – sources*, REUTERS (Feb. 7, 2014) (available at http://reut.rs/1fBofJl); Lindsay Fortado, Keri Geiger, and David McLaoughlin, *UBS Said to Seek Immunity in FX-Rigging Probes by EU, US*, BLOOMBERG, (Feb. 24, 2014) (available at http://bloom.bg/Q16aj9).

    a.       The U.S. Commodities Futures Trading Commission ("CFTC") asked major currency-dealing banks, including Defendants Deutsche Bank and Citigroup, to produce records as part of a probe into currency market manipulation.

    b.       The Federal Reserve Bank and Office of Comptroller of the Currency are investigating FX manipulation.  Officials visited Citigroup's Canary Wharf office in London during its preliminary stage of information gathering.

    c.       The New York Department of Financial Services opened an investigation of several banks in connection with FX rate market manipulation.  The New York Department of Financial Services subpoenaed several banks, including Defendants Credit Suisse, RBS, Citigroup, Deutsche Bank, Barclays, and Goldman Sachs, requesting emails and instant messages from currency traders.[59]

    d.       The U.S. Securities and Exchange Commission ("SEC") is investigating whether currency traders distorted prices for options and exchange-traded funds by rigging benchmark FX rates.

### United Kingdom Financial Conduct Authority ("UK-FCA")

125.    The UK-FCA is actively investigating manipulation of benchmark FX rates, including the WM/Reuters Closing Spot Rates.  UK-FCA has investigative and enforcement powers with respect to financial services providers.

126.    On October 16, 2013, the UK-FCA issued the following statement:

We can confirm that we are conducting investigations alongside several other agencies into a number of firms relating to trading on the foreign exchange (forex) market.

As part of this we are gathering information from a wide range of sources including market participants. Our investigations are at an early stage and it will be some time before we conclude whether there has been any misconduct which will lead to enforcement action.

---

[59]    The New York Department of Financial Services investigation does not include banks that maintain bank charters outside of New York's purview.  Those include Morgan Stanley, JPMorgan, Bank of America, and Citigroup, whose international bank charters place them under a different authority.

We will not comment further on our investigations.[60]

127.     On February 4, 2014, John Griffith-Jones, Chairman of the UK-FCA, and Martin Wheatley, CEO of the UK-FCA, testified before the House of Commons Treasury Committee about FX rates.   In response to numerous questions about the UK-FCA's FX investigation, Wheatley stated:

> [T]he elements [of the FX investigation] that are different than LIBOR is that it's a much deeper, much more liquid market based on real trades.  The elements that are similar to LIBOR, and this is purely on what's reported, is that the suggestions of collusion between individuals at a number of firms and the use of chat rooms and phones to collude to influence prices.  But we're still in the investigation phase, so I can't really comment too much on any findings other than to say that the allegations are every bit as bad as they have been with LIBOR.[61]

> [G]iven what's come out, no, people will not trust the way the rates are fixed.[62]

> [A]round ten banks have themselves volunteered information that said they have been asked for information.[63]

> I don't think we will get to final conclusions within 2014, I hope that we will next year, but again the nature of these sort of investigations is that it's very hard to predict.[64]

---

[60]     Financial Conduct Authority, *Statement on foreign exchange market investigation*, Oct. 16, 2013 (available at http://bit.ly/1oKO2FZ); *see also Financial Conduct Authority joins foreign exchange probe*, BBC (Oct. 17, 2013) (available at http://bbc.in/1plBfIx).

[61]     Videorecording, House of Commons Treasury Committee meeting (Feb. 4, 2014) (available at http://bit.ly/1j3Y06g), at 1:13:42 -1:14:11.

[62]     Videorecording, House of Commons Treasury Committee meeting (Feb. 4, 2014) (available at http://bit.ly/1j3Y06g), at 1:14:20-1:14:24.

[63]     Videorecording, House of Commons Treasury Committee meeting (Feb. 4, 2014) (available at http://bit.ly/1j3Y06g), at 1:15:04-1:15:10

[64]     Videorecording, House of Commons Treasury Committee meeting (Feb. 4, 2014) (available at http://bit.ly/1j3Y06g), at 1:17:13-1:17:22.

128.    Wheatley further noted that in addition to the FX investigation, "there are a number of other benchmarks that operate in London that we are investigating because of concerns that have been raised with us."[65]

129.    The UK-FCA's investigation is reportedly focused on an electronic chat room used by top traders at financial institutions.   Defendant RBS produced emails and instant messages to the UK-FCA, including The Cartel chat room activities of former RBS and JPMorgan trader Richard Usher.   Usher has been specifically identified in the UK-FCA's investigation of FX manipulation, as a result of instant messages he sent during his time at RBS. These messages reportedly included details of his trading positions.[66]  The UK-FCA has also asked Morgan Stanley to provide details in relation to its FX operations.    In addition, approximately 40 traders have individually interviewed with the UK-FCA and produced communications dating back to 2004.

**European Commission ("EC")**

130.    EC's Competition Commissioner, Joaquin Almunia, acknowledged its investigation of the FX market, and in particular, manipulation of FX benchmark rates, including the WM/Reuters Closing Spot Rates.  Almunia said EC learned of activities that "could mean violation of competition rules around the possible manipulation of types of exchange rates."[67] During a press conference in December 2013, Almunia stated that EC was "looking very

---

[65]    Videorecording, House of Commons Treasury Committee meeting (Feb. 4, 2014) (available at http://bit.ly/1j3Y06g), at 1:17:48-1:17:53.

[66]    Gavin Finch, Liam Vaughan, and Suzi Ring, *Ex-RBS Trader in U.K. Probe Said to Be JPMorgan's Usher*, BLOOMBERG (Oct. 14, 2013) (available at http://bloom.bg/1ip3Yer).

[67]    Aoife White and Gaspard Sebag, *EU Regulators Start Inquiry Into Currency Rate-Manipulation*, BLOOMBERG (Oct. 7, 2013) (available at http://bloom.bg/1plDnji).

carefully at Forex."[68]  Almunia also stated, "We have internal information regarding possible manipulation of forex benchmarks . . . . We are in the preliminary steps."[69]  A person familiar with the EC's investigation stated that banks are queuing up to provide incriminating information "of startling quality."[70]

**Switzerland**

131.    Swiss authorities are actively investigating manipulation of FX benchmark rates, including the WM/Reuters Closing Spot Rates.  On September 30, 2013, the Swiss Competition Commission ("Swiss WEKO") opened a preliminary investigation into manipulation of FX markets after learning about discussions about FX rates between banks.  Swiss WEKO stated, "Through discussions they are said to have manipulated various exchange rates."[71]  On March 31, 2014, WEKO provided additional details on its investigation, noting that it is investigating included Defendants UBS, Credit Suisse, JPMorgan, Citigroup, Barclays, and RBS, among others.  WEKO stated, "The possible actions include the following: the exchange of confidential information, the general co-ordination of transactions with other market participants at agreed price levels, co-ordinated actions to influence the WM/Reuters fix as well as the co-ordination of

---

[68]    Graeme Wearden and Nick Fletcher, *Banks fined record €1.7 billion by EC over rate-fixing cartel scandal – as it happened*, THE GUARDIAN (Dec. 4, 2013) (available at http://bit.ly/1plDAmy).

[69]    Conor Humphries, *EU Commission looking into possible forex manipulation – Almunia*, REUTERS (Dec. 5, 2013) (available at http://reut.rs/1dlaW5n).

[70]    FT reporters, *Forex in the spotlight*, FINANCIAL TIMES (Feb. 16, 2014) (available at http://on.ft.com/1kVisGt).

[71]    *Swiss anti trust watchdog probes banks over FX manipulation*, REUTERS (Oct. 4, 2013) (available at http://reut.rs/1oKSbcW).

the sale and purchase of currencies in relation to certain third parties."[72]   WEKO's statement concluded, "There are indications that these banks went into anti-competitive agreements to manipulate price rates in foreign exchange trading."[73]

132.   In addition, on October 4, 2013, Financial Market Supervisory Authority ("Swiss FINMA"), Switzerland's main market regulator, announced that it was "currently conducting investigations into several Swiss financial institutions in connection with possible manipulation of foreign exchange markets."   Swiss FINMA indicated multiple banks around the world were potentially implicated.   Swiss FINMA "is coordinating closely with authorities in other countries."[74]

**Germany**

133.   Germany's top financial regulator, the Federal Financial Supervisory Authority ("BaFin"), is actively investigating manipulation of FX benchmark rates, including the WM/Reuters Closing Spot Rates.  BaFin has made its FX investigation a top priority and moved it into a "special investigation" category.[75]  According to a BaFin spokesperson's statement on January 16, 2014, "Bafin is presently investigating the facts and has kept an eye on the currency

---

[72]     Daniel Schäfer, *Swiss watchdog launches forex investigation into eight banks*, FINANCIAL TIMES (March 31, 2014) (available at http://on.ft.com/1dKuO1P).

[73]      Daniel Schäfer, *Swiss watchdog launches forex investigation into eight banks*, FINANCIAL TIMES (March 31, 2014) (available at http://on.ft.com/1dKuO1P).

[74]     Press Release, *FINMA is investigating possible manipulation of foreign currency exchange rates* (Oct. 4, 2013) (available at http://bit.ly/1kSJ20a).

[75]     *German watchdog to visit Deutsche in London in FX probe: source*, REUTERS (Jan. 20, 2014) (available at http://reut.rs/1gJHAYP).

trading issues since the summer."[76]  That same day, BaFin's President, Elke Koenig, stated the allegations of FX manipulation are "particularly serious because such reference values are based – unlike Libor and Euribor – typically on transactions in liquid markets and not on estimates of the banks."[77]  BaFin representatives reportedly visited the London offices of Defendant Deutsche Bank.[78]

### Hong Kong Monetary Authority ("HK-MA")

134.    In October 2013, HK-MA confirmed it was in cooperating with other regulators about their ongoing FX investigations, stating:  "The Hong Kong Monetary Authority is aware of the allegations.  We have been in communications with the relevant overseas regulators and following up with individual banks."[79]

### Monetary Authority of Singapore ("SG-MA")

135.    Singapore is Asia's largest FX center and the world's third largest FX trading hub (behind London and New York), averaging $383 billion per day of FX turnover in April 2013.[80]  SG-MA confirmed that it "has been in touch with foreign regulators on the issue of alleged

---

[76]    Jeff Patterson, *Forex Scandal Deepens, Deutsche Bank Moves To Suspend Latin-Based Traders*, FOREX MAGNATES (Jan. 16, 2014) (available at http://bit.ly/1f3fZT4).

[77]    Karin Matussek and Oliver Suess, *Metals, Currency Rigging Is Worse Than Libor, Bafin Says*, BLOOMBERG (Jan. 17, 2014) (available at (http://bloom.bg/1kSKShR).

[78]    *German watchdog to visit Deutsche in London in FX probe: source*, REUTERS (Jan. 20, 2014) (available at http://reut.rs/1gJHAYP).

[79]    Rachel Armstrong and Jamie McGeever, *Hong Kong says looking into forex manipulation allegations*, REUTERS (Oct. 16, 2013) (available at http://reut.rs/1gcjTxe).

[80]    Fed Triennial Bank Survey 2013, at 14.

manipulation in the WM/Reuters foreign exchange benchmark rates. We stand ready to assist in their investigations."[81]

### Australia Securities and Investment Commission ("ASIC")

136.    ASIC announced it commenced a probe into rigging by banks in the FX markets. Greg Medcraft, chairman of ASIC stated, "We are commencing a review to ascertain whether any misconduct relating to foreign exchange trading may have occurred in Australia.   And whether from an Australian perspective ASIC has concerns about the foreign exchange market."[82]   Australia is cooperating with other regulators throughout the world.

### New Zealand

137.    New Zealand's Commerce Commission also announced an investigation into the FX market. The Commerce Commission has an "investigation in that space," according to a spokesperson from the agency.[83]

### Financial Stability Board ("FSB")

138.    The FSB is an international body that was established in April 2009 as the successor to the Financial Stability Forum ("FSF").   The FSB coordinates regulation for the Group of Twenty ("G20") leading economies, organizing the work of national financial authorities and international standard setting bodies.   The FSB includes all G20 major

---

[81]    Anjani Trivedi, *Singapore Joins Global Currency-Market Probe, Regulators Around the World Are Looking Into Whether Traders Rigged Rates*, WALL STREET JOURNAL (Oct. 24, 2013) (available at http://on.wsj.com/1dbJpmo).

[82]    Jamie Smyth, Paul Davies, and Daniel Schäfer, *Australia regulators to probe forex market*, FINANCIAL TIMES (March 19, 2014) (available at http://on.ft.com/1iOaTOY).

[83]    *Commerce Commission launches forex probe*, THE NEW ZEALAND HERALD (Mar. 31, 2014) (available at http://bit.ly/1rZBVaG).

economies, FSF members, and the EC.  The FSB set up a task force in 2013 to try to repair or

replace tarnished financial benchmarks in the wake of LIBOR manipulation.

139.    On February 14, 2014, the FSB, led by Bank of England governor Mark Carney,

said it would review the FX benchmarks.  The FSB stated:

> The [FSB] was tasked by the G20 in 2013 to co-ordinate and guide
> work on the necessary reforms to short-term interest rate
> benchmarks, to ensure that widely-used benchmarks are held to
> appropriate standards of governance, transparency and reliability.
>
> * * *
>
> Recently, a number of concerns have been raised about the
> integrity of foreign exchange (FX) rate benchmarks.  The FSB has
> consequently decided to incorporate an assessment of FX
> benchmarks into its ongoing programme of financial benchmark
> analysis.
>
> To take this work forward, a new sub-group on Foreign Exchange
> Benchmarks has been established.  The new group will be chaired
> by Guy Debelle (Assistant Governor, Financial Markets, Reserve
> Bank of Australia) and Paul Fisher (Executive Director for
> Markets, Bank of England), both members of the [Official Sector
> Steering Group] (OSSG.).
>
> The FX Benchmarks Group will undertake a review of FX
> benchmarks and will analyse market practices in relation to their
> use and the functioning of the FX market as relevant. Conclusions
> and recommendations will be transmitted by the FSB to the
> Brisbane Summit.[84]

140.    The FSB is scheduled to report on FX benchmarks at the 2014 G20 Brisbane

Summit in November 2014.  Carney has indicated that the FSB's work on reforms to FX

benchmarks will proceed more quickly than the conduct investigations being undertaken

worldwide and that the FSB hopes to issue its recommendations sooner than November 2014.

---

[84]    Press Release: *FSB to review foreign exchange benchmarks* (Feb. 14, 2014) (available at
https://www.financialstabilityboard.org/press/pr_140213.htm).

**DEFENDANTS' PUBLIC FILINGS CONFIRM INVESTIGATIONS AND COOPERATION**

141.    Numerous public filings by Defendants confirm the existence of government investigations and the cooperation of certain Defendants with those investigations.

142.    Defendant Bank of America's Form10-K disclosed:

> Government authorities in North America, Europe and Asia are conducting investigations and making inquiries of a significant number of FX market participants, including the Corporation, regarding conduct and practices in certain FX markets over multiple years. The Corporation is cooperating with these investigations and inquiries.[85]

143.    Defendant Barclays disclosed in its full-year 2013 financial results statement:

> Various regulatory and enforcement authorities, including the FCA in the UK, the CFTC and the DOJ in the US and the Hong Kong Monetary Authority have indicated that they are investigating foreign exchange trading, including possible attempts to manipulate certain benchmark currency exchange rates or engage in other activities that would benefit their trading positions. . . . BBPLC has received enquiries from certain of these authorities related to their particular investigations, and from other regulators interested in foreign exchange issues. The Group is reviewing its foreign exchange trading covering a several year period through October 2013 and is cooperating with the relevant authorities in their investigations.[86]

144.    Defendant Citigroup's Form 10-Q disclosed:

> Government agencies in the U.S. and other jurisdictions are conducting investigations or making inquiries regarding trading on the foreign exchange markets. Citigroup has received requests for information and is cooperating with the investigations and inquiries and responding to the requests.[87]

145.    Defendant Deutsche Bank's quarterly earnings report disclosed:

---

[85]    Bank of America, Annual Report (Form 10-K), at 228 (Feb. 25, 2014).

[86]    Barclays PLC, Results Announcement, at 120 (Dec. 31, 2013).

[87]    Citigroup Inc., Form 10-Q, at 242 (Nov. 1, 2013).

Deutsche Bank has received requests for information from certain regulatory authorities who are investigating trading in the foreign exchange market.   The Bank is cooperating with those investigations, which are in early stages.[88]

146.   Defendant Goldman Sachs' Form 10-Q disclosed:

[Goldman Sachs] Group Inc. and certain of its affiliates are subject to a number of other investigations and reviews by, and in some cases have received subpoenas and requests for documents and information from, various governmental and regulatory bodies and self-regulatory organizations and litigation relating to various matters relating to the firm's businesses and operations, including: . . . trading activities and communications in connection with the establishment of benchmark rates.[89]

147.   Defendant HSBC's Interim Management Statement for the third quarter disclosed:

The Financial Conduct Authority is conducting investigations alongside several other agencies in various countries into a number of firms, including HSBC, relating to trading on the foreign exchange market.   We are cooperating with the investigations which are at an early stage.[90]

148.   Defendant JP Morgan's Form 10-K disclosed:

*Foreign Exchange Investigations and Litigation*. The Firm has received information requests, document production notices and related inquiries from various U.S. and non-U.S. government authorities regarding the Firm's foreign exchange trading business. These investigations are in the early stages and the Firm is cooperating with the relevant authorities.[91]

149.   Defendant RBS's third-quarter Interim Management Statement disclosed:

---

[88]   Deutsch Bank, 2013 Third Quarter Interim Report, at 108 (Sept. 30, 2013).

[89]   Goldman Sachs Group Inc., Quarterly Report (Form 10-Q), at 108 (Nov. 7, 2013).

[90]   HSBC Holdings PLC, Interim Management Statement, at 10 (Nov. 4, 2013).

[91]   JPMorgan Chase & Co., Annual Report 2013 (Form 10-K), at 326 (Feb. 20, 2014).

In addition, various governmental and regulatory authorities have commenced investigations into foreign exchange trading activities apparently involving multiple financial institutions. [RBS] has received enquiries from certain of these authorities including the FCA. [RBS] is reviewing communications and procedures relating to certain currency exchange benchmark rates as well as foreign exchange trading activity and is cooperating with these investigations.[92]

150.    Defendant UBS's Third Quarter 2013 Report disclosed:

Following an initial media report in June 2013 of widespread irregularities in the foreign exchange markets, we immediately commenced an internal review of our foreign exchange business. Since then, various authorities reportedly have commenced investigations concerning possible manipulation of foreign exchange markets, including FINMA, WEKO, the DOJ, the CFTC and the FCA. UBS and other financial institutions have received requests from various authorities relating to their foreign exchange businesses, and UBS is cooperating with the authorities. We have taken and will take appropriate action with respect to certain personnel as a result of our review, which is ongoing.[93]

**TERMINATIONS, SUSPENSIONS, AND DEPARTURES OF DEFENDANT EMPLOYEES**

151.    Highlighting the seriousness of the global investigations into Defendants' conduct regarding FX benchmark rates, including the WM/Reuters Closing Spot Rates, Defendants have terminated, suspended, or put on leave numerous employees with responsibility for their FX operations. Defendants have terminated or suspended over 30 employees, while a number of Defendants have had longtime employees depart amidst the investigations.

---

[92]    RBS Group, Interim Management Statement Q3 2013, at 87, (Nov. 1, 2013).

[93]    UBS AG, Third Quarter 2013 Report, at 143 (Oct. 29, 2013).

**Bank of America**

152.    Bank of America has suspended or terminated at least one employee.  In March 2014, Bank of America suspended Joseph Landes, its head of spot FX trading in Europe, the Middle East, and Africa.

**Barclays**

153.    Barclays has suspended or terminated at least six employees and has hired criminal-defense lawyers to represent some of their employees.  In November 2013, Barclays suspended six traders as part of its internal inquiry into alleged rigging of the FX market, including its chief currency trader in London.  The suspended individuals include London-based Chris Ashton, who oversaw Barclays' voice-spot trading, London-based FX spot trader Mark Clark, Tokyo-based FX spot trader Jack Murray, New York-based FX spot traders Russel Katz and Jerry Urwin, and at least one unknown Barclays' employee.  Ashton was part of The Cartel chat room.

**BNP Paribas**

154.    BNP Paribas has suspended or terminated at least one employee.  In March 2014, BNP Paribas suspended its head of spot currency trading, Robert de Groot.  De Groot was a member of the Bank of England's Chief Dealers' Sub Group.

**Citigroup**

155.    Citigroup has suspended or terminated at least three employees.  Citigroup suspended Anthony John, a sterling trader in London, and Andrew Amantia, a Canadian dollar trader in New York.  Citigroup also fired Rohan Ramchandani, who was head of European spot trading, after he was put on leave in October 2013.  Ramchandani was part of The Cartel chat room and was a member of the Bank of England's Chief Dealers' Sub Group.  In addition to the aforementioned employees disciplined by the bank, on February 5, 2014, Bloomberg reported

that Citigroup's foreign-exchange head Anil Prasad will leave the bank to "pursue other interests."[94]  On March 24, 2014, Citigroup named Richard Bibbey as head of global spot FX trading, and merged its voice and electronic trading businesses for currencies. Citigroup did not have a combined global head of spot FX trading previously.

**Credit Suisse**

156.    On September 10, 2013, Todd Sandoz, head of global FX and short-term interest rate trading at Credit Suisse, left the bank after more than 17 years.  Based in London, Sandoz took on the role in May 2011 and also became co-head of the new global currencies.  Credit Suisse promoted David Tait, global head of FX trading in London, to succeed Sandoz.

**Deutsche Bank**

157.    Deutsche Bank has suspended or terminated at least five employees.  In February 2014, Deutsche Bank fired three New York-based currency traders, Diego Moraiz, Robert Wallden, and Christopher Fahy, and one Argentina-based currency trader, Ezequiel Starobinsky. Moraiz was the head of Deutsche Bank's emerging markets FX trading desk and specialized in trading the Mexican peso.  Wallden and Fahy were both directors in the FX trading unit.  In November 2013, FBI agents questioned Wallden at his New York home about transcripts of an electronic chat in which he boasted about manipulating FX markets.  On March 11, 2014, Christian Binaghi, Deutsche Bank's head of Latin America trading, left the firm. Binaghi was a New York-based managing director who oversaw all Latin America trading, including currency, debt, and equity.   In addition, on March 31, 2014, London-based Kai Lew, a director of institutional FX sales, was placed on leave following an internal investigation.

---

[94]     Amberdeen Choudhury, *Citigroup Head of Currencies Prasad to Step Down in March*, BLOOMBERG (Feb. 5, 2014) (available at http://bloom.bg/1jmunIV).

**Goldman Sachs**

158.    In February 2014, New-York based Steven Cho, global head of spot and forward foreign exchange trading for G10 currencies at Goldman Sachs left the bank.  Cho was a member of the FX committee sponsored by the Federal Reserve Bank of New York.  Leland Lim, another partner in Goldman Sachs' currency-trading business, also left.   Lim was co-head of macro trading, which includes interest-rates and currencies, for Asia ex-Japan.

**HSBC**

159.    HSBC has suspended or terminated at least two employees.   In January 2014, HSBC suspended Serge Sarramegna, the bank's chief trader for major currencies and head of HSBC's spot FX desk in London, and Edward Pinto, a Scandinavian currency trader.

**JP Morgan**

160.    JP Morgan has suspended or terminated at least one employee.  JP Morgan put its chief currency dealer, London-based Richard Usher, on leave in October.  Usher was part of The Cartel chat room and was a member of the Bank of England's Chief Dealers' Subgroup.  Usher was head of spot G10 currency trading at JP Morgan.  He joined JP Morgan from RBS in May 2010.

**Morgan Stanley**

161.    On March 21, 2014, Steve Glynn, co-head of foreign exchange and emerging markets and head of fixed income for Asia at Morgan Stanley, left the bank.  Glynn had been at Morgan Stanley for 14 years, initially in London before moving to Hong Kong in 2009.  Glynn's role is being taken over by Ben Falloon.  Falloon joined Morgan Stanley in 2008 from Credit Suisse.

**RBS**

162.    RBS has suspended or terminated at least three employees.  RBS suspended two London-based FX spot traders, Julian Munson and Paul Nash.  In addition, RBS suspended a senior spot currency trader based in London, Ian Drysdale.

**UBS**

163.    UBS has suspended or terminated at least nine employees and has hired criminal-defense lawyers to represent some of their employees.  UBS suspended Roger Boehler and Niall O'Riordan.  Both had been at UBS since the early 1990s.  Boehler was the global head of FX trading at UBS's investment bank, based in Stamford, Connecticut.  O'Riordan was the co-global head of FX G10 and emerging market spot trading at UBS, based in Zurich.  O'Riordan was part of The Cartel chat room and was a member of the Bank of England's Chief Dealers' Subgroup. On March 28, 2014, UBS suspended seven FX traders.  They include New-York based emerging markets spot trader Onur Sert, 20-year UBS currency trader Michael Velardi, and five more global traders.

164.    In addition, former UBS senior FX trader Matt Gardiner was placed on leave by his current employer, Standard Chartered PLC, where he is the assistant chief dealer in G10 foreign exchange.  Gardiner was part of The Cartel chat room.  Gardiner worked at UBS for two years prior to joining Standard Chartered and prior to UBS, Gardiner worked at Barclays from June 2007 to July 2011, where he was a director in FX spot trading responsible for EUR|USD.

## ANTITRUST INJURY TO PLAINTIFFS

165.    Defendants keep more inventory of currency than any other banks in the financial system and are therefore able to act as currency dealers, facilitating trading in various currencies. Defendants are horizontal competitors in the FX market, competing for customers by supplying

exchange rate quotations and FX Instruments.  The relationship between Defendants and their customers is the same as the relationship between any merchant selling goods to consumers in a marketplace.  In FX trading, the "goods" are money, or currency.  When a Defendant's customer accepts a quote, the Defendant sells currency from its own inventory or seeks an off-setting order at the bargained-for price.  Pricing of currency, like goods, is based on fundamental market forces of supply and demand.

166.    Defendants' manipulation of the WM/Reuters Closing Spot Rates, as alleged herein, injures competition.  WM/Reuters Closing Spot Rates are prices determined by FX spot quotes and trades during a window of time surrounding 4:00 p.m. London time, thus reflecting actual market activity.  Defendants' collusive conduct warped the interplay of supply and demand and caused the WM/Reuters Closing Spot Rate to be manipulated.

167.    Absent collusion, Defendants would have competed to offer competitive prices by quoting bids and asks to customers at the lowest cost for a given currency.  Every purchase of a quantity of currency represents demand relative to supply – forces that would, in a market free of collusion, determine the price.

168.    As alleged herein, the damage to Plaintiffs and members of the Class flows from the injury to price competition caused by Defendants.  Defendants' concerted manipulation of the WM/Reuters Closing Spot Rate directly impacted the prices of FX Instruments settled in whole or in part on the basis of the WM/Reuters Closing Spot Rates.  Defendants' concerted trading practices in FX spot transactions at or around the time of the fixing of WM/Reuters Closing Spot Rates directly impacted the prices of FX spot transactions entered into during that time period.  Defendants' collusion with respect to FX spot transactions directly impacted the pricing of outright forwards because their prices are mathematically derived from the prices of

spot transactions.  Defendants' collusion in the FX spot market directly impacted the pricing of FX swaps because FX swaps are simultaneous spot and outright forward transaction.

169.    Plaintiffs and the members of the Class suffered antitrust injury stemming from anticompetitive aspects of Defendants' conduct.

170.    Defendants' anticompetitive conduct had severe adverse consequences on competition in that Defendants artificially ensured advantageous market movements in the WM/Reuters Closing Spot Rates by exchanging confidential customer information and agreeing to concerted traded strategies, such as front running, banging the close, and painting the screen, based on aggregate customer order flow information.  Under the facts alleged herein, Plaintiffs and members of the Class could not escape such conduct because Defendants are collectively the dominant FX dealers.

171.    No one Defendant could accomplish systematic and continuing manipulation of the WM/Reuters Closing Spot Rates without coordinating with its rivals.  Absent Defendants' knowledge of one another's confidential customer information, the conduct alleged herein would be a risky strategy.  Defendants benefited from coordinating their market activities.

172.    As a direct, foreseeable, and proximate result of Defendants' unlawful conspiracy and overt acts alleged herein, Plaintiffs have been injured in their business and property, in amounts that are presently undetermined.

173.    The injury to Plaintiffs and members of the Class are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' acts unlawful.

**FRAUDULENT CONCEALMENT**

174.    During the Class Period, Defendants actively, fraudulently, and effectively concealed their collusion, as alleged herein, from Plaintiffs and members of the Class.

175.    By its very nature, the unlawful activity alleged herein was self-concealing. Defendants conspired to manipulate the WM/Reuters Closing Spot Rates to the benefit of Defendants and to the detriment of Plaintiffs and members of the Class, and they further conspired to keep their collusive and manipulative conduct secret.  As a result and as described herein, Plaintiffs could not, and thus did not, discover that they had suffered injury prior to Bloomberg's June 12, 2013 article.

176.    Defendants fraudulently concealed their anticompetitive activities by, among other things, engaging in secret communications in furtherance of their conspiracy.  These communications occurred within non-public chat rooms, instant messages, and through email, none of which was reasonably available to Plaintiffs or members of the Class.

177.    The chat rooms in question were operated by the highest-ranking traders within Defendants' operations, and Defendants strictly limited access to the chat rooms.  The substance of the conversations occurring within these chat rooms was unknown to Plaintiffs until June 12, 2013, at the earliest.

178.    When the first Defendant (Citigroup) announced its decision to bar traders from accessing chat rooms, it offered a pretextual reason for the ban, describing the decision as a "sign of concern by banks over online security issues."[95]

179.    Defendants knew that they could not subject their collusive conduct to public scrutiny.  In addition, Defendants actively and jointly concealed their collusive conduct.  For instance, Defendants agreed among themselves not to publicly discuss or otherwise reveal the

---

[95]    Alice Ross, *Citi Removes Forex Traders from Bloomberg internal chat groups*, FINANCIAL TIMES (May 16, 2013) (available at http://on.ft.com/1m4mj1g).

nature and substance of the acts and communications in furtherance of the agreements alleged herein.

180. None of the facts or information available to Plaintiffs, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracies alleged in this Complaint.

181. As a result, Plaintiffs were prevented from learning of the facts needed to commence suit against Defendants for the manipulative and anticompetitive conduct alleged in this Complaint until Defendants and regulators publicly acknowledged their investigations.

182. There are many additional reasons why these facts could not have been known. FX trades occur primarily in the private, OTC market, and Defendants' trades and trading strategies are not public information. Defendants do not publish information concerning particular trading entities, including trading between dealer entities. Defendants, acting as executing dealers, also discouraged brokers from revealing or otherwise identifying them as counterparties on the brokers' customers' transactions, in order to conceal the counterparties on those transactions. Reasonable due diligence could not have uncovered Defendants' conspiracy because the non-exchange, closed, and private nature of the trades helped to conceal Defendants' conduct.

183. To Plaintiffs' knowledge, the first report of possible manipulation in the FX market was published by Bloomberg on June 12, 2013.[96] Even that report, however, was premised on "five dealers with knowledge of the practice" who were not identified in the

---

[96] Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (June 12, 2013) (available at http://bloom.bg/1qGQ3oy).

article.[97]   The dealers specifically "declined to identify which banks engaged in manipulative practices."[98]

184.   The facts necessary for Plaintiffs to formulate the basis of a complaint and satisfy applicable pleading standards remained within the exclusive control of Defendants, their co-conspirators, and the regulatory authorities investigating the activity alleged herein.

185.   Even after the Bloomberg article indicated possible manipulation in the FX market, Defendants did not address the allegations.  It was not until October 2013 that the first traders alleged to be involved in the FX-rigging were put on leave.

186.   Nor did the Bloomberg article identify the currency pairs involved in the rigging, the parties to the rigging, or provide substantial detail as to how the rigging occurred.

187.   Defendants' success in concealing their collusion was facilitated by their tremendous control over the global financial markets. Defendants wield substantial power over market participants.   Market participants who suggest Defendants have engaged in anticompetitive behavior risk losing access to financial instruments. It is thus unsurprising that the first reports of collusion came from bankers themselves, not market participants.

188.   The first class action complaint in this action was filed November 1, 2013, just days after the first FX traders were put on leave.  Plaintiffs and the Class have acted diligently in seeking to bring their claims promptly.

---

[97]   Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (June 12, 2013) (available at http://bloom.bg/1qGQ3oy).

[98]   Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (June 12, 2013) (available at http://bloom.bg/1qGQ3oy).

189.    Because of Defendants' active steps, including fraudulent concealment of their conspiracy to prevent Plaintiffs from suing them for the anticompetitive activities alleged in this Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIM FOR RELIEF

### Violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§1, 3

190.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

191.    Beginning at least as early as January 1, 2003, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§1, 3.

192.    Section 3 of the Sherman Act, 15 U.S.C. §3, makes Section 1 applicable to "any Territory of the United States [and] the District of Columbia."

193.    Plaintiffs ERS-PREPA and Virgin Islands are domiciled in United States territories.

194.    The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, or made artificial prices, as alleged herein.

195.    Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among Defendants and other unnamed co-conspirators.  These other co-conspirators have either acted willingly or, due to coercion, unwillingly, in furtherance of the unlawful restraint of trade alleged herein

63

196.     Defendants' conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

197.     There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' unreasonable restraint of trade.   Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

198.     Defendants' conspiracy, and the resulting impact on the WM/Reuters Closing Spot Rates and FX Instruments, occurred in and affected interstate commerce and commerce in and between the Territories of the United States.

199.     The contract, combination, or conspiracy had anticompetitive effects, as alleged herein.

200.     As a direct, intended, foreseeable, and proximate result of Defendants' conspiracy and overt acts taken in furtherance thereof, Plaintiffs have suffered injury to their business or property.

201.     The injury to Plaintiffs and members of the Class are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' acts unlawful.

202.     Plaintiffs are entitled to treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of the Sherman Act alleged herein.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request relief as follows:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

B.     That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

C.     That the Court award Plaintiffs and the Class damages in an amount according to proof against Defendants for Defendants' violation of the federal antitrust laws to be trebled in accordance with those laws;

D.     That the Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect;

E.     That the Court award Plaintiffs pre- and post-judgment interest;

F.     That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses; and

G.     That the Court award such other equitable and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED:  March 31, 2014                    SCOTT+SCOTT, ATTORNEYS AT LAW, LLP

                                          s/ Christopher M. Burke
                                          CHRISTOPHER M. BURKE (*pro hac vice*)
                                          WALTER W. NOSS (*pro hac vice*)
                                          KRISTEN M. ANDERSON (*pro hac vice*)
                                          707 Broadway, Suite 1000

San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
cburke@scott-scott.com
wnoss@scott-scott.com
kanderson@scott-scott.com

-and-

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
DAVID R. SCOTT (DS-8053)
JOSEPH P. GUGLIELMO (JG-2447)
DONALD A. BROGGI (DB-9661)
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: 212-223-6444
Facsimile:  212-223-6334
jguglielmo@scott-scott.com
dbroggi@scott-scott.com

HAUSFELD LLP
MICHAEL D. HAUSFELD
WILLIAM P. BUTTERFIELD
REENA ARMILLAY GAMBHIR
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: 202-540-7143
Facsimile:  202-5407201
mhausfeld@hausfeldllp.com
wbutterfield@hausfeldllp.com
rgambhir@hausfeldllp.com

-and-

HAUSFELD LLP
MICHAEL LEHMAN
CHRISTOPHER LEBSOCK
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: 415-633-1949
Facsimile:  415-693-0770
mlehman@hausfeldllp.com
clebsock@hausfeldllp.com

*Interim Co-Lead Counsel*

GOLD BENNETT CERA & SIDENER LLP
SOLOMON B. CERA
C. ANDREW DIRKSEN
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone:  415-777-2230
Facsimile:  415-777-5189
scera@gbcslaw.com
cdirksen@gbcslaw.com

COHEN MILSTEIN SELLERS & TOLL, PLLC
MANUEL JOHN DOMINGUEZ
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone:  561-833-6575
Facsimile:  561-515-1401
dominguez@cohenmilstein.com

MICHAEL B. EISENKRAFT (ME-6974)
88 Pine Street, Fourteenth Floor
New York, NY 10005
Telephone: 212-828-7797
Facsimile: 212-828-7745
meisenkraft@cohenmilstein.com

*Counsel for Plaintiff Aureus Currency Fund L.P.*

OBERMAYER REBMANN MAXWELL &
HIPPEL LLP
WILLIAM J. LEONARD *(pro hac vice)*
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895
Telephone: 215-665-3000
Facsimile: 215-665-3165
william.leonard@obermayer.com

BONI & ZACK LLC
MICHAEL J. BONI (*pro hac vice*)
JOSHUA D. SNYDER (*pro hac vice*)
15 St. Asaphs Rd.
Bala Cynwyd, PA 19004
Telephone: 610-822-0200
Facsimile:  610-822-0206
mboni@bonizack.com
jsnyder@bonizack.com

*Counsel for Plaintiff the City of Philadelphia,*
*Board of Pensions and Retirement*

ROBBINS GELLER RUDMAN & DOWD LLP
PATRICK J. COUGHLIN
DAVID W. MITCHELL
BRIAN O. O'MARA
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619-231-1058
patc@rgrdlaw.com
davidm@rgrdlaw.com
bomara@rgrdlaw.com

*Counsel for Plaintiff Employees' Retirement System*
*of the Government of the Virgin Islands*

WOLF POPPER LLP
MARIAN R. ROSNER
PATRICIA I. AVERY
FEI-LU QIAN
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone:  212-759-4600
Facsimile:  212-486-2093
mrosner@wolfpopper.com
pavery@wolfpopper.com
fqian@wolfpopper.com

*Counsel for Plaintiff Employees' Retirement*
*System of Puerto Rico Electric Power Authority*

BERMAN DeVALERIO
JOSEPH J. TABACCO, JR. (JJT-1994)
TODD A. SEAVER (*pro hac vice*)
SARAH KHORASANEE MCGRATH (*pro hac vice*)
JESSICA MOY (*pro hac vice*)
One California Street, Suite 900
San Francisco, CA 94111
Telephone: 415-433-3200
Facsimile: 415-433-6382
jtabacco@bermandevalerio.com
tseaver@bermandevalerio.com
smcgrath@bermandevalerio.com
jmoy@bermandevalerio.com

*Counsel for Plaintiff Fresno County Employees'
Retirement Association*

THE MOGIN LAW FIRM, P.C.
DANIEL J. MOGIN
JODIE M. WILLIAMS
PHILLIP E. STEPHAN
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone:  619-687-6611
Facsimile:  619-687-6610
dmogin@moginlaw.com
jwilliams@moginlaw.com
pstephan@moginlaw.com

KOREIN TILLERY, LLC
STEPHEN M. TILLERY (*pro hac vice*)
ROBERT L. KING (*pro hac vice*)
AARON M. ZIGLER (*pro hac vice*)
STEVEN M. BEREZNEY (*pro hac vice*)
RICHARD M. ELIAS (*pro hac vice*)
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
Saint Louis, MO  63101-1612
Telephone: 314-241-4844
Facsimile: 314-241-3525
stillery@koreintillery.com
rking@koreintillery.com
azigler@koreintillery.com
sberezney@koreintillery.com
relias@koreintillery.com

69

-and-

KOREIN TILLERY, LLC
GEORGE A. ZELCS (*pro hac vice*)
205 N Michigan Ave, Ste 1950
Chicago, IL 60601-5927
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com

*Counsel for Plaintiffs Haverhill Retirement System and Oklahoma Firefighters Pension and Retirement System*

LABATON SUCHAROW LLP
LAWRENCE A. SUCHAROW
GREGORY S. ASCIOLLA
JAY L. HIMES
CHRISTOPHER KELLER
ERIC J. BELFI
MICHAEL W. STOCKER
ROBIN A. VAN DER MEULEN
MATTHEW J. PEREZ
140 Broadway
New York, NY 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477
lsucharow@labaton.com
gasciolla@labaton.com
jhimes@labaton.com
ckeller@labaton.com
ebelfi@labaton.com
mstocker@labaton.com
rvandermeulen@labaton.com
mperez@labaton.com

*Counsel for Plaintiff State-Boston Retirement System*

70

GRANT & EISENHOFER, P.A.
LINDA P. NUSSBAUM (LN-9334)
PETER A. BARILE III (PB-3354)
485 Lexington Avenue
New York, NY 10017
Telephone: 646-722-8500
Facsimile: 646-722-8501
lnussbaum@gelaw.com
pbarile@gelaw.com

*Counsel for Plaintiff Syena Global Emerging Markets Fund, LP*

ENTWISTLE & CAPPUCCI LLP
ANDREW J. ENTWISTLE
VINCENT R. CAPPUCCI
ROBERT N. CAPPUCCI
280 Park Avenue, 26th Floor West
New York, NY 10017
Telephone:  212-894-7200
Facsimile:  212-894-7272
aentwistle@entwistle-law.com
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com

*Counsel for Plaintiffs Tiberius OC Fund, Ltd. and Value Recovery Fund L.L.C.*

LOWEY DANNENBERG COHEN & HART, P.C.
VINCENT BRIGANTI
GEOFFREY M. HORN
PETER D. ST. PHILLIP
RAYMOND P. GIRNYS
One North Broadway
White Plains, NY 10601
Telephone: 914-997-0500
Facsimile: 914-997-0035
vbriganti@lowey.com
ghorn@lowey.com
pstphillip@lowey.com
rgirnys@lowey.com

LOWEY DANNENBERG COHEN & HART, P.C.
GERALD LAWRENCE, ESQ.
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA  19428
Telephone: 610-941-2760
Facsimile: 610-862-9777
glawrence@lowey.com

SHEPHERD FINKELMAN
MILLER & SHAH, LLP
ERIC. L. YOUNG
NATALIE FINKELMAN BENNETT
35 East State Street
Media, PA  19063
Telephone: 610-891-9880
Facsimile: 866-300-7367
eyoung@sfmslaw.com
nfinkelman@sfmslaw.com

SHEPHERD FINKELMAN
MILLER & SHAH, LLP
JAMES E. MILLER
65 Main Street
Chester, CT  06412
Telephone: 860-526-1100
Facsimile: 860-526-1120
jmiller@sfmslaw.com

RADICE LAW FIRM, P.C.
JOHN RADICE
34 Sunset Blvd.
Long Beach, NJ  08008
Telephone: 646-245-8502
Facsimile: 609-385-0745
jradice@radicelawfirm.com

MANDEL BHANDARI LLP
RISHI BHANDARI
EVAN MANDEL
11 Broadway, Suite 615
New York, NY  10004
Telephone: 212-269-5600
Facsimile: 646-964-6667
rb@mandelbhandari.com
em@mandelbhandari.com

*Counsel for Plaintiff United Food and Commercial
Workers Union and Participating Food Industry
Employers Tri-State Pension Fund*

BERGER & MONTAGUE
H. LADDIE MONTAGUE, JR.
MERRILL G. DAVIDOFF
BART D. COHEN
1622 Locust Street
Philadelphia, PA 19103
Telephone: 215-875-3000
Facsimile: 215-875-4604
hlmontague@bm.net
mdavidoff@bm.net
bcohen@bm.net

FINE, KAPLAN AND BLACK, R.P.C.
ROBERTA D. LIEBENBERG
ADAM PESSIN
One South Broad St., Suite 2300
Philadelphia, PA 19107
Telephone:  215-567-6565
Facsimile:  215-568-5872
rliebenberg@finekaplan.com
apessin@finekaplan.com

MOTLEY RICE LLC
WILLIAM H. NARWOLD
DONALD A. MIGLIORI
MICHAEL M. BUCHMAN
JOHN A. IOANNOU
600 Third Avenue, 21st Floor
New York, NY 10016
Telephone:  212-577-0040
Facsimile:  212-577-0054
bnarwold@motleyrice.com
dmigliori@motleyrice.com
mbuchman@motleyrice.com
jioannou@motleyrice.com

MILLER LAW LLC
MARVIN A. MILLER
MATTHEW VAN TINE
115 S. Lasalle St., Suite 2910
Chicago, IL 60603
Telephone: 312-322-3400
Facsimile:  312-676-2676
mmiller@millerlawllc.com
mvantine@millerlawllc.com

*Of Counsel for Plaintiffs*

74

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2014, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 31, 2014.

  /s/ Christopher M. Burke
CHRISTOPHER M. BURKE
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
email: cburke@scott-scott.com