# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| _____ ) | ECF CASE |
| IN RE FOREIGN EXCHANGE ) | |
| BENCHMARK RATES ANTITRUST ) | No. 1:13-cv-07789-LGS |
| LITIGATION ) | |
| _____ ) | |
| ) | |
| SIMMTECH CO., LTD., ) | |
| ) | No. 1:13-cv-07953-LGS |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| BARCLAYS BANK PLC, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |
| ) | |
| ODDVAR LARSEN, ) | |
| ) | No. 1:14-cv-01364-LGS |
| Plaintiff, ) | |
| ) | (Oral Argument Requested) |
| v. ) | |
| ) | |
| BARCLAYS BANK PLC, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' MOTION TO DISMISS</u>

## *Table of Contents*

*Page*

Table of Authorities .................................................................................................... iii

Preliminary Statement ...................................................................................................1

Background .....................................................................................................................3

    A.    The Foreign Exchange Market.............................................................3

    B.    Plaintiffs' Allegations of Wrongdoing..................................................6

    C.    Plaintiffs' Allegations of Injury .............................................................8

Summary of Argument ..................................................................................................9

Argument ......................................................................................................................11

I.      PLAINTIFFS DO NOT ADEQUATELY ALLEGE THAT DEFENDANTS
      ENTERED INTO AN AGREEMENT IN RESTRAINT OF TRADE............................11

    A.    Plaintiffs' Generalized References to Defendants Are Insufficient......................14

    B.    Plaintiffs' Allegations Are Economically Implausible ..........................................18

    C.    The Complaints' Few Factual Allegations Are Insufficient to Support a
        Plausible Inference of Conspiracy ........................................................................20

        1.    Allegations of Communications and Close Ties Among Traders
            Are Insufficient ..................................................................................21

        2.    Descriptions of Allegedly Manipulative Practices That Are
            Consistent With Unilateral Behavior Are Insufficient..............................22

        3.    Allegations of Exchanges of Net Customer Order Positions That
            Are Consistent With Unilateral Behavior Are Insufficient......................24

        4.    Allegations of Unresolved Government Investigations Are
            Insufficient ..........................................................................................25

II.     PLAINTIFFS DO NOT ADEQUATELY ALLEGE THAT THEY HAVE
      SUFFERED INJURY-IN-FACT ....................................................................................26

III.    PLAINTIFFS DO NOT ADEQUATELY ALLEGE HARM TO COMPETITION ........31

A.      Allegations of Market Manipulation Fail to State an Antitrust Claim
        Because They Fail to Tie the Alleged Misconduct to Defendants'
        Competitive Efforts to Win Business for FX Services .........................................32

B.      WM/Reuters Closing Spot Rates Are Not Prices by Which
        Defendants Compete for FX Customers ...............................................................34

C.      The Complaints Do Not Allege That Defendants' Alleged Manipulative
        Conduct Reduced Competition ...........................................................................35

IV.     PLAINTIFFS LACK ANTITRUST STANDING..................................................36

V.      PLAINTIFFS' CLAIMS THAT ACCRUED MORE THAN FOUR YEARS AGO
        ARE BARRED BY THE STATUTE OF LIMITATIONS ...............................38

Conclusion ....................................................................................................................40

## *Table of Authorities*

### *Cases*

*American Sales Co. v. AstraZeneca AB*, No. 10-cv-6062, 2011 WL 1465786 (S.D.N.Y. Apr. 14, 2011) ..................................................................................................................14

*Apple Inc. v. Motorola Mobility Inc.*, No. 11-cv-178, 2011 WL 7324582 (W.D. Wis. June 7, 2011) ......................................................................................................................12

*Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556 (S.D.N.Y. 2007) ......................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................11, 13, 16

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)..............................................37

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ......................................12

*BanxCorp v. Apax Partners, L.P.*, No. 10-cv-4769, 2011 WL 1253892 (D.N.J. Mar. 28, 2011) .........................................................................................................................17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................... *passim*

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212 (2d Cir. 2004)................................................................................................27

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979) .....................................35

*Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550 (E.D. Pa. 2002).........................18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ............................................36

*Cascades Computer Innovation LLC v. RPX Corp.*, No. 12-cv-01143, 2013 WL 316023 (N.D. Cal. Jan. 24, 2013) ...............................................................................................18

*E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961).....................31

*Eastman Kodak Co. v. Image Technical Servs. Inc.*, 504 U.S. 451 (1992) ...................................18

*Fink v. Time Warner Cable*, No. 08-cv-9628, 2009 WL 2207920 (S.D.N.Y. July 23, 2009) ............................................................................................................................27

*Gatt Commc'ns v. PMC Assocs., Inc.*, 711 F.3d 68 (2d Cir. 2013) ...................................27, 30, 37

*Hinds County, Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499 (S.D.N.Y. 2009) ........................................................................................................16, 38, 39, 40

*Hinds County, Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 248 (S.D.N.Y. 2010)..................22

*Hunt v. Crumboch*, 325 U.S. 821 (1945) ...............................................................................31

*Ice Cream Liquidation, Inc. v. Land O' Lakes, Inc.*, 253 F. Supp. 2d 262 (D. Conn. 2003).........35

*In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402 (S.D.N.Y. 2005) ...............................................12

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, No. 13-cv-1416,
    2014 WL 1243851 (2d Cir. Mar. 27, 2014) .......................................................................24

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007)...................................................*passim*

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007)..........25

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666 (S.D.N.Y.
    2013) ..............................................................................................................33, 34, 36, 37

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606 (S.D.N.Y.
    2013) .........................................................................................................................26, 29

*In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420, 2014 WL 309192 (N.D. Cal.
    Jan. 21, 2014)..................................................................................................................39

*In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56 (2d Cir. 1998)..............................................39

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487 (D. Conn.
    2008) ........................................................................................................................14, 17

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27 (D.D.C. 2008) ...............35

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896 (N.D.
    Cal. 2008)........................................................................................................................25

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896 (6th Cir. 2009)..................................22

*In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067 (D. Kan. 2009)...........................................39

*Invamed, Inc. v. Barr Labs., Inc.*, 22 F. Supp. 2d 210 (S.D.N.Y. 1998) ........................................14

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) ...................................................13, 22

*Kounitz v. Slaatten*, 901 F. Supp. 650 (S.D.N.Y. 1995) ...............................................................27

*LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136 (E.D.N.Y. 2010) .....................................22

*Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28,
    2014) .................................................................................................................27, 30, 36

iv

*Lum  v. Bank of America*, 361 F.3d 217 (3d Cir. 2004), *abrogated in part on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................12

*Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465 (S.D.N.Y. 2001) ............................................36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)....................................18

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013) ..........................................................................................................................12, 13, 14, 21

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004) ........................35

*Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*, 795 F. Supp. 639 (S.D.N.Y. 1992) ...................................................................................................................................12

*Ping He (Hai Nam) Co. Ltd. v. NonFerrous Metals (U.S.A.) Inc.*, 22 F. Supp. 2d 94 (S.D.N.Y. 1998), *vacated on other grounds*, 187 F.R.D. 121 (S.D.N.Y. 1999)...............29

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117 (2d Cir. 2007)...................27

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ........................................................................12

*Schaefer v. First Nat'l Bank of Lincolnwood*, 326 F. Supp. 1186 (N.D. Ill. 1970) ................31, 33

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88 (D.D.C. 2013) .............22

*Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112 (1st Cir. 2011) ...............................................35

*Superior Offshore Int'l, Inc. v. Bristow Group Inc.*, 738 F. Supp. 2d 505 (D. Del. 2010)...........25

*TechReserves Inc. v. Delta Controls Inc.*, No. 13-cv-752, 2014 WL 1325914 (S.D.N.Y. Mar. 31, 2014)..................................................................................................................36

*Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir. 1998) ..............................................31

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430 (6th Cir. 2008)...........................................................................................................14

*Twombly v. Bell Atl. Corp.*, 425 F.3d 99 (2d Cir. 2005), *rev'd on other grounds*, 550 U.S. 544 (2007) .............................................................................................................25

*United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 146 F. Supp. 2d 385 (S.D.N.Y. 2001), *aff'd sub nom. United Magazine Co. v. Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008) ...................................................................................18

*Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256 (2d Cir. 2001) ...........................31

v

*__Statutes__*

15 U.S.C. § 1 ............................................................................................................1

15 U.S.C. § 15 .........................................................................................................26

15 U.S.C. § 15b .......................................................................................................38

Fed. R. Civ. P. 8 .................................................................................................11, 12

Fed. R. Civ. P. 9(b) ...........................................................................................12, 38

Fed. R. Civ. P. 12(b)(6)...........................................................................................11

## *Preliminary Statement*

The Consolidated Amended Class Action Complaint ("CAC"), the *Larsen* Amended Complaint ("LAC") and the *Simmtech* Class Action Complaint ("SC") allege that foreign exchange dealer-defendants, together with certain of their affiliates, have conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to manipulate benchmark currency exchange rates (specifically, the WM/Reuters Closing Spot Rates calculated at 4:00 p.m. London time) for 159 of the world's currencies. The consolidated and *Larsen* complaints assert that this conspiracy continued for more than eleven years since January 1, 2003, and involved twelve dealer-defendants, while the *Simmtech* complaint asserts that the beginning date of the alleged conspiracy is unknown and names seven dealer-defendants.[1] Yet, despite their breathtaking scope, the complaints do not plead a single fact about a single instance in which a single defendant engaged in even one concerted act to manipulate any particular currency rate. Nor do they identify a single transaction by a plaintiff or any factual basis for a claim that any plaintiff has been injured by an alleged conspiracy to manipulate benchmark exchange rates. Plaintiffs do not—indeed, cannot—support their conspiracy theory with specific factual allegations because their underlying theory of collusion makes no economic sense, and thus is implausible.

As a threshold matter, because the complaints' allegations of conspiracy are entirely conclusory, they are entitled to no weight, and should be dismissed for that reason alone.

---

[1] The consolidated amended complaint names twelve dealer-defendants and twelve affiliated entities, including, for example, the parent corporations of some of the dealer-defendants. (CAC ¶¶ 27-38.) The *Larsen* complaint names twelve dealer-defendants and five of their affiliated entities (LAC ¶¶ 13-24), while the *Simmtech* complaint names seven dealer-defendants and five affiliated entities. (SC ¶¶ 11-18.) The *Simmtech* complaint does not name Bank of America, BNP Paribas, Goldman Sachs, HSBC or Morgan Stanley as defendants.

The complaints make the conclusory allegation, for example, that, using multi-dealer chat rooms, instant messaging and email, certain defendants exchanged information about their net currency positions with respect to customer orders.  Similarly, the complaints conclusorily assert that defendants agreed on concerted strategies for trading currencies in and around the WM/Reuters Closing Spot Rates and describe three theoretically manipulative practices referred to as "front running," "banging the close" and "painting the screen."  But the complaints lack any factual allegation of even one instance in which any defendants agreed to engage in any of these theoretical practices, contain no factual allegations about *which* defendants exchanged *what* information about *which* currencies or *when* such an exchange occurred over the eleven years covered by the complaints, and do not identify seven of the twelve dealer-defendants or their affiliates as ever even having participated in a multi-dealer chat room.  Nor do the complaints allege a single currency transaction by any plaintiff that was adversely affected by a manipulative act or practice in which any defendants supposedly agreed to engage.

Plaintiffs cannot make sufficient factual allegations to support a plausible inference that each defendant participated in the alleged conspiracy because their fundamental theory of an eleven-year global conspiracy among currency dealers supposedly comprising 84% of the market is itself economically implausible.  That conspiracy would consistently favor all of defendants' economic interests only if all defendants consistently held a similar net position (say, seeking to purchase United States dollars and to sell euros) across scores of currencies—a circumstance not alleged to have occurred on any day, let alone daily throughout eleven years.  The conspiracy is especially implausible because dealer-defendants trade with one another to fulfill their customers' orders, and cannot know in advance whether, on any given day, their net customer orders for any particular currency will require them to buy or sell that currency at the

WM/Reuters Closing Spot Rates.  Plaintiffs' conspiracy claim thus makes no economic sense, and should be dismissed.

Plaintiffs try to mask the economic implausibility of their conspiracy theory by alleging a patchwork array of purported facts, none of which identifies any wrongdoing by any defendant and all of which are fully consistent with independent, non-collusive behavior.  Accordingly, plaintiffs' few factual allegations—for example, about exchanges of net order positions or supposedly manipulative trading practices—are insufficient to support a plausible inference of conspiracy.

In short, although the complaints claim that there was a global multi-year conspiracy involving twelve currency dealer-defendants and their affiliates to manipulate global benchmark exchange rates, they fail to allege a single fact that, if proven, would establish even one instance of concerted conduct that unreasonably restrained trade and caused injury to plaintiffs.  Section 1 claims require far more than the conclusory hypotheses offered here and, accordingly, the complaints should be dismissed.

## *Background*

### A.    *The Foreign Exchange Market*

The complaints allege that, every day and throughout the day, scores of currencies are exchanged in an alleged global foreign exchange ("FX") market.  (CAC ¶ 51; LAC ¶ 38; SC ¶ 44.)  "Currencies are traded in pairs" (CAC ¶ 52; LAC ¶ 39), one currency exchanged for another.  The alleged FX market is an over-the-counter market (CAC ¶ 57), in which dealers trade with one another to fulfill their own customers' orders.  The complaints allege that the purported FX market "revolves around spot transactions," defined as "agreement(s) to exchange sums of currency at an agreed-on exchange rate on a value date that is within two bank business days'

3

time." (CAC ¶¶ 53-54; LAC ¶ 41; SC ¶ 33.)  According to plaintiffs, the alleged spot FX market is one of the most active and liquid markets in the world, with more than $5 trillion in transactions occurring twenty-four hours a day.  (CAC ¶ 51.)

Plaintiffs allege that customers may initiate spot transactions by contacting a dealer and requesting a quote for a particular quantity of a particular currency.  (CAC ¶¶ 4, 57; LAC ¶ 44; SC ¶ 33.)  The dealer quotes a "bid" (the price at which the dealer is willing to buy the currency) and a higher "ask" (the price at which the dealer is willing to sell the currency). The customer may choose to buy, sell, or do neither.  (CAC ¶ 57; LAC ¶ 44; SC ¶ 33.)  If the customer agrees to sell the currency, the dealer buys the currency from the customer at the dealer's bid price, and the customer's transaction is complete.  The dealer now bears the risk inherent in holding a position in the currency and must source that currency from its own inventory or find an off-setting transaction to balance its books by trading with either a customer that wishes to buy the currency or with other dealers in interdealer over-the-counter trading.  (CAC ¶¶ 60, 165.)  If the dealer successfully finds an off-setting transaction, the difference between the dealer's bid and ask, or the "bid-ask spread," compensates the dealer for its market-making services to its customers.  (CAC ¶¶ 4, 57-60, 165; LAC ¶¶ 44-45; SC ¶ 33.)

Plaintiffs allege that defendants compete with each other to attract customers and to receive their orders.  (CAC ¶¶ 60, 165; SC ¶ 31.)  Competition for customers' FX spot orders requires defendants to "offer competitive prices by quoting bids and asks to customers at the lowest cost for a given currency."  (CAC ¶ 167.)  The consolidated complaint alleges that "[t]he wider the spread, the more money a dealer makes," but acknowledges that "[c]ompetition among dealers . . . narrows bid-ask spreads."  (CAC ¶ 60.)

Plaintiffs further allege that FX customers also may instruct a dealer to exchange—either buy or sell—a quantity of currency at a particular "fixing rate," which plaintiffs define as "a published exchange rate at a moment in time or over a short interval of time."  (CAC ¶¶ 4, 63; LAC ¶ 46; *see also* SC ¶ 44.)  WM/Reuters intraday spot rates—which are calculated for 159 currencies every hour on the hour from 7:00 a.m. Monday in Sydney until 4:00 p.m. Friday in London[2]—are the most important benchmark rates in the alleged FX market.  (CAC ¶ 63; LAC ¶ 46; SC ¶ 45.)  WM Company, a third party, is responsible for sourcing, calculating, and publishing these intraday spot rates pursuant to its own methodology.  (CAC ¶¶ 63-70.)[3]  In a customer fix trade order, the dealer assumes risk by guaranteeing to exchange at the fixing rate, even though the dealer does not know what that rate will be until the fixing rate has been calculated, and even if the market moves adversely to the dealer's side of the exchange.  (CAC ¶¶ 63, 110; LAC ¶¶ 46, 91; SC ¶¶ 46, 48.)

The most widely used of these intraday fixing rates are the WM/Reuters Closing Spot Rates, also known as the "London fix" or the "London close," calculated around 4:00 p.m. London time (11:00 a.m. New York time), which, for "Trade Currencies" (the most frequently traded currencies), reflect the median of a sample of bid and ask quotes and actual spot transactions from the Reuters System in the thirty seconds before and the thirty seconds after 4:00 p.m. London time.  (CAC ¶¶ 5, 6, 64, 65; LAC ¶¶ 47-48; SC ¶ 42.)[4]  Defendants are not alleged to

---

[2]   WM Co., Overview, http://www.wmcompany.com/wmr/Services/Overview/index.htm.

[3]   WM Co., WM/Reuters Spot & Forward Rates Methodology Guide ("WM/Reuters Guide"), at 2-4 (2014) (*available at*  http://www.wmcompany.com/pdfs/WMReutersMethodology.pdf) (cited at CAC ¶ 63).

[4]   For Non-Trade Currencies, WM/Reuters Closing Spot Rates reflect a sample of quoted rates over sixty seconds before and sixty seconds after 4:00 p.m. London time.  WM/Reuters

*(cont'd)*

calculate, or to control the methodology for calculating, the London fix.  Nor are defendants al-
leged to compete with one another to create the fixing rates.

Plaintiffs claim that they are defendants' customers (CAC ¶ 2; LAC ¶ 44; SC ¶¶
10, 23) and consist of pension, retirement and hedge funds, a Norwegian citizen and a Korean
semi-conductor manufacturer.  They allegedly engaged directly with "one or more" defendants
(without identifying which defendants) in FX transactions that were "settled in whole or in part
on the basis of the WM/Reuters Closing Spot Rates" or, in the case of the consolidated com-
plaint, that occurred at or around the London close, although they do not allege any specific
transactions into which they entered with any defendant.  (CAC ¶¶ 15-26, 43; LAC ¶¶ 12, 26; SC
¶¶ 10, 23.)

The twelve dealer-defendants are market-makers in the FX market.  (CAC ¶¶ 2,
57-60; LAC ¶ 45; SC ¶¶ 3, 33.)  Although their individual 2013 shares of the alleged FX market
purportedly ranged from 2.5% to 15%, together they allegedly account for more than 84% of that
alleged market.  (CAC ¶¶ 2, 74; LAC ¶ 57; SC ¶ 35.)

### B.    Plaintiffs' Allegations of Wrongdoing

Plaintiffs allege that, throughout a period of more than eleven years since January
1, 2003, defendants have conspired in violation of Section 1 to manipulate the daily WM/Reuters
Closing Spot Rates for 159 different currencies, and innumerable pairs of such currencies.  Plain-
tiffs do not allege whether the agreement was intended to increase or to decrease the exchange
rate for any specific currency, and they do not plead a single example of a defendant having en-
gaged in even one manipulative act or practice with respect to a single currency pair on any day

---

*(cont'd from previous page)*
Guide, at 2-3.  For other Local Close Currencies where offshore trading is not permitted, the
Spot Rates are published consistent with local market levels.  *Id.* at 4.

within the past eleven years—let alone of any defendant having agreed with another defendant to engage in such an act or practice collectively across 159 currencies.

Instead, plaintiffs generically plead that "[e]ach Defendant aggregated its client orders to determine what its individual net position in a specific currency was going to be at the London fix." (CAC ¶ 92; LAC ¶ 74.)  Defendants then allegedly "shared this information with one another," and thereby possibly could "determine, in advance, which way the market should move." (CAC ¶ 92; LAC ¶ 74.)  At no point, however, do plaintiffs plead *what* any particular defendant allegedly did or *what* information it communicated to *whom* on *what* dates and with respect to *which* currencies.

Plaintiffs further assert, again without any specificity, that defendants "agreed on concerted strategies for trading in and around the setting of the WM/Reuters Closing Spot Rates." (CAC ¶ 7; *see also* LAC ¶ 4; SC ¶ 52.)  Plaintiffs describe three supposedly "manipulative" practices—which they label "front running," "banging the close" and "painting the screen"—but do not plead a single instance of any such practices having been employed by any individual defendant, much less as part of a concerted strategy by all defendants to manipulate all currency rates at the London close.  As described in the complaint, each of these hypothetical practices could be employed by a single currency dealer unilaterally.  For example, plaintiffs describe a hypothetical "front running" scheme, in which a single dealer that receives an order to purchase £600 million for United States dollars at the London fix—a transaction that plaintiffs assert might move the market price for British pounds—actually acquires £650 million (for United States dollars) in several smaller increments before and during the sixty seconds when the London fix is established, then sells £600 million to his customer at a higher price per pound. (CAC ¶ 105.)  Nothing about this hypothetical practice requires concerted behavior or, for that

matter, anything necessarily improper or unlawful because the trader must acquire the currency to fulfill his customer's order.  The most plaintiffs allege is that the scheme they hypothesize might be less risky if defendants pursued it in a coordinated fashion.  (CAC ¶ 104; LAC ¶ 86.)[5]

Apart from these conclusory or hypothetical claims, the complaints rely on allegations about ongoing government investigations involving certain FX dealer banks, and the fact that nine defendants have disclosed the existence of these investigations in their securities filings.  (CAC ¶¶ 112-50; LAC ¶¶ 93-99; SC ¶¶ 54-59.)  Plaintiffs also allege that nine defendants (though not the same nine defendants) have banned their currency traders from participating in multi-dealer chat rooms (CAC ¶ 91; LAC ¶ 73), and that still another group of nine defendants has terminated or suspended the employment of one or more currency traders.  (CAC ¶¶ 97, 88, 151-64; *see also* LAC ¶¶ 6, 13(b), 14(b), 18(b), 19(b), 70, 79, 100-101; SC ¶ 52.)

### C.    *Plaintiffs' Allegations of Injury*

Plaintiffs in the consolidated cases seek to represent a class of all persons who, between January 1, 2003 and the present, entered into an FX transaction in the United States with a defendant at or around the time of the London fix, or who entered into an FX transaction in the United States with a defendant that was settled in whole or in part on the basis of the London fix.

---

[5]    Like plaintiffs' hypothetical example of front running, their allegations of "banging the close" and "painting the screen" are just as consistent with unilateral conduct.  "Banging the close" allegedly involves breaking up large orders into smaller orders so that they arguably have a different effect on the calculation of the London fix, and "painting the screen" allegedly involves placing "phony" orders with another defendant that the order placer does not intend to execute.  (CAC ¶¶ 106-08; LAC ¶¶ 87-89; SC ¶¶ 49-50.)  Although plaintiffs do not allege any actual instance when such practices were employed, neither of these hypothetical practices, on its face, requires coordination; each could be employed by a dealer unilaterally.  A single trader could break up a large order into smaller trades without conspiring with another trader to do so, and a single trader could place phony orders with another dealer without the recipient dealer having any knowledge that the orders would then be cancelled or withdrawn before they could be filled.

(CAC ¶ 43.)[6]  Plaintiffs allege that defendants' "collusive conduct warped the interplay of supply and demand and caused the WM/Reuters Closing Spot Rate to be manipulated." (*Id.* ¶ 166; *see also* LAC ¶ 55; SC ¶ 32.)  But plaintiffs make that assertion without alleging that defendants' conduct in any way restricted the amount of currency traded, or that any particular act of alleged manipulation favored buyers or sellers of any particular currency, or that any plaintiff made any purchase or sale of any particular currency on any specific date at a manipulated price that was adverse to the plaintiff.  Indeed, none of the complaints identifies a single FX transaction under-taken by a single plaintiff.

### *Summary of Argument*

The complaints should be dismissed for several independent reasons.

*First*, the complaints fail to plead sufficient factual allegations, as required by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), to support a plausible inference of a conspiracy to manipulate FX rates at the London close.  The complaints' generalized allegations impermissibly lump all defendants together in an undifferentiated group, and fail for that reason alone.  Moreover, the underlying predicate of the complaints—that twelve currency dealers allegedly comprising more than 84% of the purported FX market, who buy from and sell to one another every day to fulfill their customers' orders, conspired over an eleven-year period to manipulate the daily benchmark rates for 159 different currencies—makes no economic sense and is there-fore implausible.  Because currencies are traded in pairs, any agreement artificially to inflate the

---

[6]   Plaintiff Larsen seeks to represent a class of persons and entities located in Norway who, be-tween January 1, 2003 and the present, entered into an FX transaction with a defendant that was settled in whole or in part on the basis of the WM/Reuters rates (LAC ¶ 26), and Simmtech seeks to represent a class of all persons who, between August 1, 2005 and the pre-sent, entered into an FX transaction in the Republic of Korea with a defendant that was set-tled in whole or in part on the basis of the London fix.  (SC ¶ 23.)

value of one currency will automatically depress the relative value of the currencies against which the inflated currency is traded.  Dealers, who accept customer orders throughout the day and who cannot know in advance whether any (let alone all) of them will be net buyers or sellers of any given currency at the London close, would not plausibly participate in a conspiracy that could well turn out to be adverse to their positions.  Plaintiffs' effort to obscure the economic implausibility of their conspiracy theory is unavailing because plaintiffs' few factual allegations—for example, allegations that certain defendants exchanged their net currency positions—are as consistent with unilateral behavior as with an inference of conspiracy, and thus are insufficient to plead a Section 1 conspiracy.

*Second*, the complaints fail adequately to allege that plaintiffs have suffered injury-in-fact—a mandatory element of standing—from any specific concerted act of manipulation by any particular defendant relating to any identified currency.  Plaintiffs make the general conclusory allegation that they have been injured by defendants' alleged conduct, but do not allege a single date or time at which any of them traded any particular currency at or around the London fix (or that was priced with reference to the London fix) with any defendant during the entire eleven-year period of the supposed conspiracy.  Even more importantly, in view of the fact that the alleged manipulation was purportedly multidirectional, artificially inflating some currency values and depressing others, plaintiffs do not identify any trade by a plaintiff that was *adversely* affected by any supposed manipulative act or practice in which a defendant purportedly engaged in concert with other defendants.

*Third*, the complaints do not adequately allege harm to competition, the *sine qua non* of an antitrust case.  Plaintiffs make no allegation that defendants agreed to limit their competition to win business for their FX services, the only form of competition alleged in the com-

plaints.  Moreover, the benchmark rates calculated by WM Company at the London fix are not

competitive prices by which defendants compete in offering their FX services to customers.  Ra-

ther, the WM/Reuters rates are simply index rates.  At best, plaintiffs have alleged—based on

unsubstantiated conjecture and hypotheses—that dealers may have engaged in improper trading

practices designed to take advantage of their customers who put in orders to trade at the fix—

conduct that, although allegedly manipulative, is not conduct that the antitrust laws are designed

to police.

    *Fourth*, plaintiffs lack antitrust standing.  Plaintiffs have not suffered any injury

from any supposedly competition-reducing aspects of defendants' alleged conduct, which is the

only type of injury the antitrust laws were intended to prevent.

    *Finally*, the complaints do not adequately allege the elements of fraudulent con-

cealment and, in particular, that plaintiffs were sufficiently diligent in their efforts to determine

whether defendants were conspiring to manipulate FX benchmark rates at the London close.  The

statute of limitations therefore bars plaintiffs' claims with respect to conduct occurring more than

four years before the filing of the complaints.

***Argument***

## I.  PLAINTIFFS DO NOT ADEQUATELY ALLEGE THAT DEFENDANTS ENTERED INTO AN AGREEMENT IN RESTRAINT OF TRADE

    The complaints do not plausibly allege a conspiracy in violation of Section 1.  To

survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, plain-

tiffs must plead sufficient "facts to state a claim to relief that is plausible on its face."  *Twombly*,

550 U.S. at 570; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[O]nly a complaint that

states a plausible claim for relief survives a motion to dismiss").  Federal Rule of Civil Proce-

11

dure 8 "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.[7]

The crucial question in a Section 1 case is whether the challenged conduct stems from independent decisions or from an agreement, tacit or express, that unreasonably restrains trade. *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013). "To survive a motion to dismiss under *Twombly*, it is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement; to be viable, a complaint must contain 'enough factual matter (taken as true) to suggest that an agreement to engage in anticompetitive conduct was made.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (citation omitted). "[A]verments of agreements made at some unidentified place and time . . . are

---

[7] Although the complaints are so devoid of factual allegations that they fail to satisfy the pleading standard of Rule 8, they should, in fact, be subjected to the heightened pleading standard of Federal Rule of Civil Procedure 9(b) because plaintiffs' allegations of market manipulation sound in fraud. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) ("Because a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b)."); *see also Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*, 795 F. Supp. 639, 649 (S.D.N.Y. 1992) ("Peacock's antitrust claim relies heavily on charges of fraud and therefore those allegations must be scrutinized under Fed. R. Civ. P. 9(b)"); *Lum v. Bank of Am.*, 361 F.3d 217, 220 (3d Cir. 2004) ("Although antitrust claims generally are not subject to the heightened pleading requirement of Rule 9(b), fraud must be pled with particularity in *all* claims based on fraud.") (emphasis in original), *abrogated in part on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Apple Inc. v. Motorola Mobility Inc.*, No. 11-cv-178, 2011 WL 7324582, at *12 (W.D. Wis. June 7, 2011) (requiring Apple to plead its "allegations of fraudulent conduct [within its antitrust counterclaim] with particularity, identifying the 'who, what, when, where and how' of the fraud") (citation omitted).

Because plaintiffs base their claims on a theory of market manipulation (*see, e.g.,* CAC ¶¶ 7, 9, 72, 81-83, 89-90, 100; LAC ¶¶ 1, 4-6, 35, 50, 54-55, 65, 71-72, 90; SC ¶¶ 5, 48-50), Rule 9(b) applies even if plaintiffs do not label their allegations as "fraud." *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004); *accord In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 410-12 (S.D.N.Y. 2005). Plaintiffs' claims containing only vague and conclusory assertions of actions allegedly performed by unspecified defendants are wholly insufficient to satisfy Rule 9(b), and indeed Rule 8.

insufficient to establish a plausible inference of agreement, and therefore to state a claim." *Id*. The complaint must "answer the basic questions:  who, did what, to whom (or with whom), where, and when?" *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008).

Dismissal of complaints that fail to meet these requirements promotes judicial economy and eliminates the unwarranted burden and expense of "unlock[ing] the doors of discovery." *Iqbal*, 556 U.S. at 678; *see also Mayor & City Council of Baltimore*, 709 F.3d at 137 (declining to "propel[ ] defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy").

The complaints here fail to offer enough factual allegations to support a plausible inference of conspiracy for three independent reasons. *First*, the complaints rely on general and conclusory statements that lump all defendants together without sufficiently alleging how each of those defendants participated in a conspiracy to manipulate WM/Reuters Closing Spot Rates over an eleven-year period.  Indeed, as to many defendants, the complaints make virtually no factual allegations at all.  Such "group" pleading is impermissible, and the complaints should be dismissed for this reason alone.  *See In re Elevator Antitrust Litig.*, 502 F.3d at 50-51.  *Second*, plaintiffs' theory of collusion is implausible:  the fundamental premise of the complaints—that twelve currency dealers allegedly representing more than 84% of the purported FX market conspired over an eleven-year period to manipulate the daily benchmark rates for 159 different currencies—makes no economic sense for dealer-defendants, the direction of whose net currency positions in scores of currency pairs changes from day to day and who are invariably on opposite sides of innumerable currency exchanges with one another.  Because defendants have no incentive to join a conspiracy that would frequently have adverse consequences for their own currency

13

positions, the claimed conspiracy is implausible.  *Third*, not surprisingly given the absence of any economic rationale for the alleged conspiracy, plaintiffs' few non-conclusory factual allegations are insufficient to support a plausible inference of conspiracy.  These allegations are just as consistent with independent actions, i.e., rational and competitive business strategy prompted by particular dealers' individual perceptions of the same market and then unilaterally executed. *Twombly*, 550 U.S. at 554, 556-57; *Mayor & City Council of Baltimore*, 709 F.3d at 136-37.

### A.      *Plaintiffs' Generalized References to Defendants Are Insufficient*

Conclusory allegations that rest on general assertions about defendants as a group cannot withstand a motion to dismiss.  A complaint that describes a conspiracy "in entirely general terms without any specification of any particular activities by any particular defendant . . . is nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever." *In re Elevator Antitrust Litig.*, 502 F.3d at 50-51 (citation omitted).  To survive a motion to dismiss, an antitrust plaintiff must plausibly allege that *each defendant* made a "conscious commitment to a common scheme" designed to achieve an unlawful purpose. *Invamed, Inc. v. Barr Labs., Inc.*, 22 F. Supp. 2d 210, 222 (S.D.N.Y. 1998).  The complaint must offer "specifics with respect to the acts of [each] particular defendant," *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491-92 (D. Conn. 2008), including the "specific time, place, or person involved in the alleged conspiracies." *Twombly*, 550 U.S. at 565 n.10.  "Generic pleading, alleging misconduct against defendants without specifics as to the role each played in the alleged conspiracy, was specifically rejected by *Twombly*." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d  430, 436 (6th Cir. 2008); *see also American Sales Co. v. AstraZeneca AB*, No. 10-cv-6062, 2011 WL 1465786, at *5 (S.D.N.Y. Apr. 14, 2011) (dismissing Section 2 claim because "the Complaint's lack of clarity in

14

attributing conduct traceable to [individual defendants]" failed to "comport with the basic standards of notice pleading").

The complaints here do not allege a single instance of a single defendant engaging in even one specific manipulative act or practice (let alone agreeing with others to engage in such an act or practice) with respect to a single currency pair at any time during the eleven-year period of the alleged conspiracy.  Indeed, with respect to many defendants, there are no factual allegations whatsoever linking them to any other defendant.  For some defendants, like Goldman Sachs and Credit Suisse, the only factual allegations are that they have received preliminary government inquiries relating to the establishment of benchmark currency rates and have banned their traders from participating in multi-dealer chat rooms.  (CAC ¶¶ 141-150; LAC ¶¶ 6, 73.)  For others, the complaints add the allegation that they have terminated or suspended one or more employees in response to the government investigations.  (CAC ¶¶ 151-164; LAC ¶¶ 6, 100-101; SC ¶ 52.)  The complaints do not allege that defendants terminated or suspended certain employees because of conduct that, if proven, would establish an antitrust violation.[8]

Nor do the complaints identify the majority of defendants as having participated in multi-dealer chat rooms.[9]  And with respect to the five defendants whose employees are identified as allegedly having participated in such a chat room, the complaints only generally allege

---

[8]  For some defendants, such as Credit Suisse, Goldman Sachs and Morgan Stanley, there are no allegations regarding termination or suspension of employees in response to a government investigation.  Rather, plaintiffs merely have scoured news reports for examples of foreign exchange employees who have left those firms even if those departures could have been prompted by a desire to take another job.  (CAC ¶¶ 156, 158, 161.)

[9]  Although the complaints refer to various multi-dealer chat rooms with provocative names like "The Cartel," the complaints identify the alleged participants in only one chat room; there are no allegations that identify traders from Bank of America, BNP Paribas, Credit Suisse, Deutsche Bank, HSBC, Goldman Sachs or Morgan Stanley as having participated in such chat rooms.  (CAC ¶¶ 84-91; LAC ¶¶ 66-73; SC ¶¶ 5, 6, 53.)

that some defendants exchanged their net customer order positions, but contain no factual allegations about *which* defendants exchanged *what* information, about any dates *when* any communications occurred, about any specific *currencies* discussed, about any trading *strategies* they allegedly agreed to undertake, or about the direction in which they intended to move any affected currency rates.  The complaints therefore fail to allege that any individual defendant consciously committed itself to a common unlawful scheme to manipulate FX rates at the daily London close.  Plaintiffs have simply stitched together a patchwork of purported facts, none of which specifies any wrongful conduct by any defendant, in an effort to make the whole appear greater than the sum of its parts.

In the absence of these indispensable allegations, the complaints improperly blend all twelve dealer-defendants and their affiliates together and accuse them, as an undifferentiated group, of conspiring.  The complaints are rife with generalized allegations, for example, that "Defendants exchanged confidential customer order information and trading positions" and "Defendants agreed on concerted strategies for trading in and around the setting of the WM/Reuters Closing Spot Rates."  (CAC ¶ 7; *see also* LAC ¶ 65, SC ¶ 52.)  Putting aside that such allegations are naked legal conclusions "disentitle[d] . . . to the presumption of truth," *Iqbal*, 556 U.S. at 681, those allegations also omit "any specification of any particular activities by any particular defendant" and, as such, are insufficient.  *In re Elevator Antitrust Litig.*, 502 F.3d at 50-51.

The lack of any non-conclusory factual allegations of conspiracy with respect to any defendant—let alone to all defendants who allegedly conspired for eleven years—is fatal.  Numerous courts in this district and elsewhere have held that such group pleading in an antitrust case is impermissible.  In *Hinds County, Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499 (S.D.N.Y. 2009) ("*Hinds County I*"), the court dismissed an antitrust complaint alleging an in-

16

dustry-wide conspiracy to fix prices in the municipal finance business against defendants as to which the plaintiffs made "no specific factual averment of involvement in the alleged conspiracy" to set prices.  *Id.* at  512-13, 515-16.  Likewise, in *Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556 (S.D.N.Y. 2007), the court dismissed an antitrust complaint that did not allege facts identifying which companies participated in the conspiracy.  *Id.* at 577-79; *see also In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d at 491-92 (the "lack of specifics with respect to the acts of a particular defendant or defendants renders the complaint inadequate [under *Twombly*]"); *BanxCorp v. Apax Partners, L.P.*, No. 10-cv-4769, 2011 WL 1253892, at *4 (D.N.J. Mar. 28, 2011) (use of global term "defendants" to apply to numerous parties without any specific allegations that would tie each particular defendant to the conspiracy is not sufficient under *Twombly*).

The nature of the alleged conspiracy highlights the need for specific allegations regarding each defendant's precise role.  In a traditional price-fixing conspiracy in which the manufacturers of a product agree to raise prices by, say, ten percent, the incentive of each manufacturer to participate in the alleged conspiracy is clear; all else being equal, a ten-percent price increase would benefit all manufacturers.  Here, by contrast, plaintiffs contend that defendants conspired to manipulate the daily exchange rates for 159 currencies, artificially inflating the value of some currencies, while simultaneously artificially depressing the value of others.  The incentive for a currency dealer to participate in such a conspiracy is entirely unclear, since currency dealers have different net positions in different currencies at the London close, and those net positions—whether as a net buyer or a net seller—can change daily.  In such a conspiracy, pleading that "all defendants" engaged in the conspiracy is particularly inadequate to provide each defendant with notice about what it allegedly did and the basis for that allegation.

17

In short, plaintiffs are required to put each defendant on notice about how it, in its individual capacity, consciously committed itself to a common scheme to manipulate the daily benchmark rates of 159 currencies.  Having failed to do so, the complaints cannot withstand defendants' motion to dismiss.

### B.        Plaintiffs' Allegations Are Economically Implausible

The complaints should be dismissed for the additional reason that an alleged global conspiracy supposedly lasting more than eleven years among twelve dealer-defendants purportedly comprising more than 84% of the alleged FX trading market is economically implausible.  A claim is implausible "if [it] is one that simply makes no economic sense," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and courts readily dismiss implausible Section 1 claims.  *See*, *e.g.*, *United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 146 F. Supp. 2d 385, 402 (S.D.N.Y. 2001) (dismissing Section 1 claim "[s]ince, under any theory, plaintiffs['] alleged conspiracy . . . makes no economic sense, plaintiffs fail to state a claim under section 1"), *aff'd sub nom. United Magazine Co. v. Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008).[10]

Plaintiffs' conspiracy theory could make economic sense only if the alleged effort to manipulate the London fix would benefit all defendants.  A conspiracy among defendants to depress the value of the Swiss franc at the London close, for example, would make economic sense only if all twelve dealer-defendants had net customer orders that would require defendants

---

[10]    *See also Cascades Computer Innovation LLC v. RPX Corp.*, No. 12-cv-01143, 2013 WL 316023, at *11 (N.D. Cal. Jan. 24, 2013) ("[w]here the facts alleged in the complaint demonstrate that an alleged conspiracy makes no economic sense, the claim must be dismissed") (citing *Eastman Kodak Co. v. Image Technical Servs. Inc.*, 504 U.S. 451, 468 (1992)); *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563-64 (E.D. Pa. 2002) (concluding that "the Amended Complaint fails to sufficiently allege concerted activity for the simple reason that the supposed conspiracy 'makes no economic sense'").

to purchase Swiss francs at the London fix.  If any defendant had net orders in the opposite direction—pursuant to which the defendant needed to sell francs at the close—that defendant would not have any incentive to participate in an effort to depress the franc's value.  Accordingly, if different defendants held opposing net positions in a particular currency, a conspiracy among defendants to manipulate the value of that currency at the London close would make no economic sense.

Moreover, as plaintiffs acknowledge, "[c]urrencies are traded in pairs" (CAC ¶ 52; LAC ¶ 39), and any manipulative practice that artificially depresses the value of one currency would necessarily cause a relative increase in the value of the currencies against which it is traded.  Thus, the incentive for a dealer-defendant to participate in an alleged conspiracy artificially to depress the value of the Swiss franc would depend, in addition to the defendant's net order position with respect to the franc, on its net order position with respect to other currencies against which the franc is traded.

Plaintiffs do not allege that defendants' interests were consistently aligned in this manner, nor could they make such an allegation.  With defendants allegedly constituting more than 84% of the purported global FX market (CAC ¶ 74; LAC ¶ 57; SC ¶ 35), it would be implausible for all defendants to have the same net position directionally with respect to any specific currency (let alone *all* of them) on any particular day (let alone throughout the past *eleven years*).  Some defendants will nearly always hold net order positions that are directionally opposed to the net order positions of other defendants, and therefore would not plausibly agree to participate in a manipulation scheme that would adversely affect their own interests.  Moreover, because defendants are order-takers—they accept orders for FX transactions from their customers for which they often must seek off-setting transactions (CAC ¶¶ 58-60, 165; LAC ¶ 45; SC ¶

19

33)—no defendant knows in advance on which side of the buy/sell divide it will fall for a specific currency on any given day.  There is no allegation that defendants consistently have aligned interests as net buyers or net sellers of any currency.  And any defendant's net position is likely to change constantly, as new customer orders arrive.  Defendants have no economic motive to join a conspiracy, like the one alleged here, from which they cannot definitively be financially advantaged and in which they would often be financially disadvantaged.  Plaintiffs' conspiracy claim therefore makes no economic sense, and should therefore be dismissed.[11]

### C. The Complaints' Few Factual Allegations Are Insufficient to Support a Plausible Inference of Conspiracy

Plaintiffs try to mask the economic implausibility of their underlying conspiracy theory with an array of conclusory assertions and a handful of factual allegations that do not support an inference of collusion.  When shorn of their conclusory rhetoric and assertions, which are entitled to no weight on this motion, *Iqbal*, 556 U.S. at 681, the complaints' few factual allegations are insufficient to survive this motion to dismiss.  The complaints allege that (i) defendants communicated with one another professionally, through chat rooms and trade associations, and socially, at golf clubs and on charity boards, (ii) the London close theoretically could have been

---

[11]  The non-uniform methodology used to calculate WM/Reuters Closing Spot Rates also renders this conspiracy implausible.  As noted above, the methodology used to calculate WM/Reuters Closing Spot Rates varies across the 159 currencies.  While the Spot Rates for Trade Currencies and Non-Trade Currencies reflect samples of quoted rates for one-minute and two-minute periods around the 4:00 p.m. London close, respectively, Spot Rates for Local Close Currencies reflect only the local market rates.  WM/Reuters Guide, at 3-4.  Further, WM/Reuters sources these samples from differing platforms depending on the specific currency (e.g., the Reuters Dealing System, EBS, Currenex).  *Id.* at 3.  For the alleged conspiracy to hold together, defendants would have had to cherry-pick relevant currencies and vary trading platforms for each trade and each currency to ensure that defendants' trades would be reflected in WM/Reuters' calculation of the Closing Spot Rates.  That such coordination could have been ongoing for eleven years defies reason.

manipulated by such practices as "front running," "banging the close" or "painting the screen," (iii) defendants exchanged information about their net currency positions with one another, (iv) government agencies in the United States and elsewhere have announced investigations or inquiries into the establishment of benchmark currency exchange rates, and (v) some (but not all) defendants have suspended or terminated certain of their currency traders.  These allegations are fully consistent with independent, rational and competitive business strategy unilaterally prompted by common perceptions of the market, and are therefore insufficient as a matter of law to support a plausible inference that defendants conspired in violation of Section 1.  *Twombly*, 550 U.S. at 554; *Mayor & City Council of Baltimore*, 709 F.3d at 136-37.

### 1.   *Allegations of Communications and Close Ties Among Traders Are Insufficient*

Plaintiffs' allegation that defendants' traders comprise "a small and close-knit group" (CAC ¶ 78; LAC ¶ 60) does not support a plausible inference that defendants conspired to manipulate the London fix.  According to the complaints, many of the traders "have strong ties formed by working with one another in prior trading positions."  (CAC ¶ 78; LAC ¶ 60.)  Some have allegedly communicated with one another through email, instant messaging and chat rooms. (CAC ¶ 84; LAC ¶ 66.)  Some (but not all) allegedly attended a meeting of the Chief Dealers Sub Group of the Bank of England's Foreign Exchange Joint Standing Committee, during which they provided WM Company with specific feedback on ways to restructure its model to *prevent* market manipulation.  (CAC ¶ 71; LAC ¶ 54.)  Moreover, many traders allegedly "live near each other, many living in the same neighborhoods in the Essex countryside just northeast of London's financial district.  They belong to the same social clubs, golf together, dine together, and sit on many of the same charity boards."  (CAC ¶ 78; LAC ¶ 60.)  Plaintiffs allege that these "so-

cial and professional ties in the FX trading community create incentives and opportunities for collusion."  (CAC ¶ 78; LAC ¶ 60.)

These allegations are insufficient.  The "mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement."  *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009).  A defendant's "mere presence at industry associations and meetings" will not sustain a plaintiff's pleading burden absent factual allegations that would permit the inference of an illegal agreement.  *Hinds County, Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010) ("*Hinds County II*"); *see also Twombly*, 550 U.S. at 567 n.12 (merely "belong[ing] to the same trade guild as one['s] . . . competitors" does not render conspiracy plausible).[12]  Likewise, an alleged incentive to conspire, without more, is insufficient to survive a motion to dismiss, *see, e.g.*, *Mayor & City Council of Baltimore*, 709 F.3d at 138-39, particularly where, as here, the alleged basis for the motive to conspire is the mere existence of "social and professional ties."  (CAC ¶ 78; LAC ¶ 60.)

> **2.    *Descriptions of Allegedly Manipulative Practices That Are Consistent With Unilateral Behavior Are Insufficient***

Plaintiffs describe three allegedly manipulative practices that they aver defendants undertook to artificially inflate or depress FX rates at the London close.  None of the three practices requires concerted action; each could be conceived and implemented by a solitary FX trader acting alone.  The consolidated complaint's own hypothetical "front running" example, for in-

---

[12]   *See also Kendall*, 518 F.3d at 1048 (membership in association does not establish horizontal agreement in violation of Section 1); *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 88, 102 (D.D.C. 2013) ("merely pleading that multiple entities hold positions on a board of directors does not establish a horizontal agreement for purposes of Section 1"); *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 148 (E.D.N.Y. 2010) ("membership and participation in a trade association alone does not give rise to a plausible inference of illegal agreement").

stance, contemplates a single trader acting independently, and seems to acknowledge that most of the trades that moved the fix were necessary to fulfill a customer's order. (CAC ¶ 105; *see also* LAC ¶ 84.) Similarly, as noted above, "banging the close" and "painting the screen," as plaintiffs describe those practices, could readily be realized by a single trader. (CAC ¶¶ 106-08; LAC ¶¶ 87-89; SC ¶¶ 49-50.) Nothing in the definition or description of these practices requires the participation of multiple traders or leads to the conclusion that they must be or were done collectively, and none of the allegations is sufficient to support a plausible inference that defendants conspired to manipulate WM/Reuters Closing Spot Rates. Plaintiffs speculate that these allegedly manipulative practices might have been more successful or less risky if pursued collectively, but such speculation is no substitute for an allegation of fact that, if proven, would show that specific defendants agreed to—and, pursuant to such an agreement, did—engage in these manipulative practices at the London close.[13]

Lacking such an allegation, plaintiffs simply assert, with no factual support, that "by agreeing in chat rooms and instant messages to 'front run' the execution of customer orders, 'bang the close,' and 'paint the screen,' Defendants manipulated the WM/Reuters Closing Spot Rates." (CAC ¶ 109; LAC ¶ 90; *see also* SC ¶ 52.) Plaintiffs allege no facts about which defendants so agreed, when such an agreement was made, and about which currencies. Plaintiffs'

---

[13]   In addition, "front running" bears no connection to the alleged conspiracy to manipulate FX rates at the London fix. As described by plaintiffs, "front running" allegedly alters the sequence in which trades take place, but plaintiffs do not allege that it affects the fix one way or another. Indeed, plaintiffs make no allegation that "front running" particularly occurs during the one-minute fix window rather than during other times of the day. Similarly, "painting the screen," which allegedly involves a defendant placing bogus orders that it does not intend to execute, is inconsistent with the alleged conspiracy. While the alleged conspiracy requires all defendants to have the same net position and work in concert to push the FX rates in a desired direction, "painting the screen" would require deception among traders that is inconsistent with the allegation that all defendants worked in concert to move the rates in the same direction.

23

assertion is thus wholly conclusory and insufficient to state a cognizable claim under Section 1. *See Twombly*, 550 U.S. at 565 n.10 (criticizing complaint that "furnishe[d] no clue as to which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place. . . . [A] defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin."); *see also In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, No. 13-cv-1416, 2014 WL 1243851, at *3 (2d Cir. Mar. 27, 2014) (affirming dismissal of complaint where "conclusory allegations did not identify any concerted action among the defendants").

### 3.    *Allegations of Exchanges of Net Customer Order Positions That Are Consistent With Unilateral Behavior Are Insufficient*

The complaints' lack of factual allegations about the alleged conspiracy is not cured by their general assertion that defendants exchanged net customer order positions with one another.  Plaintiffs claim that defendants "closely guard their real-time order flow and volume data," and speculate that, "[a]bsent an agreement to collude, each bank would not share this information with one another."  (CAC ¶ 80; LAC ¶ 62.)  But plaintiffs conspicuously do *not* allege that defendants shared information, such as the volume and price of individual orders, that the complaint describes as competitively sensitive.  Rather, plaintiffs allege only in general terms that defendants shared their net order position for each currency—that is, the final position a defendant holds after its customers' purchase and sales orders are aggregated and balanced against one another.  (CAC ¶ 92; LAC ¶ 74.)

Plaintiffs' allegations themselves make clear that defendants' purported disclosure of these net order positions does not support a plausible inference of conspiratorial behavior.  As plaintiffs acknowledge, whenever a dealer holds a position in a currency, it must source that currency from its own inventory or find off-setting transactions to balance its books.  (CAC ¶¶ 60,

24

165.)  Because dealers often must seek transactions with other dealers to off-set their net order position, the exchange of net position information, even if it were proven, would be fully consistent with each defendant's independent interest in seeking to engage in such off-setting transactions with another trader—an occurrence from which no conspiracy can be inferred.

### 4.    Allegations of Unresolved Government Investigations Are Insufficient

Plaintiffs identify a number of pending government investigations or inquiries, but courts have consistently held that the pendency of investigations is insufficient to support an inference that a conspiracy occurred.  *See, e.g.*, *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 118 n.14 (2d Cir. 2005) (request for investigation by the House of Representatives was "irrelevant at the pleading stage," because "[a]n allegation that someone has made a similar allegation does not, without more, add anything to the complaint's allegations of fact"), *rev'd on other grounds*, 550 U.S. 544 (2007); *LaFlamme*, 702 F. Supp. 2d at 154 (allegation of an investigation "carries no weight in pleading an antitrust conspiracy claim") (quoting *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007)).[14]

Likewise, plaintiffs' assertion that certain traders were suspended or terminated by some of the defendants, and that some traders simply left a defendant's employ, are insufficient to allege a conspiracy among all the defendants to manipulate the daily London close.[15]

---

[14]   *See also Superior Offshore Int'l, Inc. v. Bristow Group Inc.*, 738 F. Supp. 2d 505, 517 (D. Del. 2010) (dismissing the complaint and ruling that a government investigation is not probative of an antitrust violation because the existence of a government investigation "is equally consistent with Defendants' innocence"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (ruling that the existence of a DOJ investigation did not support plaintiff's antitrust claims).

[15]   For example, plaintiffs' allegations that currency trading employees of Credit Suisse, Goldman Sachs and Morgan Stanley voluntarily resigned from their positions in recent months

*(cont'd)*

Such generic, non-specific allegations do not support plaintiffs' claims of an overarching global conspiracy.  Nor do allegations that certain defendants have restricted their traders from participating in multi-dealer chat rooms suffice to support a plausible inference of conspiracy.  Such internal employment actions and policy changes, none of which are alleged to be responsive to (or to have any other connection to) any conspiracy, could have been motivated by any number of concerns wholly unrelated to a conspiracy.

*      *      *

In sum, plaintiffs' few factual allegations are fully consistent with independent behavior, unilaterally taken, and therefore do not support a plausible inference of conspiracy. For this reason, plaintiffs' Section 1 claims should be dismissed.

## II.    PLAINTIFFS DO NOT ADEQUATELY ALLEGE THAT THEY HAVE SUFFERED INJURY-IN-FACT

Like their allegations of conspiracy, plaintiffs' conclusory allegations of harm are insufficient to show that they suffered injury-in-fact—a mandatory element of standing under Section 4 of the Clayton Act, 15 U.S.C. § 15.  Plaintiffs have failed to allege facts that, if proven, would establish that they suffered *actual harm* in *real trades* in *specific currencies* on *particular days*.  Courts routinely reject claims based upon such threadbare allegations, and courts in this district have most recently done so in the LIBOR litigations.  *See*, *e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 621 (S.D.N.Y. 2013) (denying plaintiffs' motion to amend their complaint where proposed amendment's broad allegation that plaintiffs were

_____

(*cont'd from previous page*)

(CAC ¶¶ 156, 158, 161) do not support a plausible inference that defendants conspired to manipulate the daily London close.

"harmed by Defendants' manipulation" failed to allege actual injury); *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464, at *8 (S.D.N.Y. Mar. 28, 2014).

It is axiomatic that, to proceed with their Sherman Act claim, plaintiffs must plead factual allegations that, if proven, would show actual injury. *See Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007). To satisfy this pleading requirement, plaintiffs must allege the "ways in which [they are] in a 'worse position' as a consequence of the defendants' conduct." *Gatt Commc'ns, Inc. v. PMC Assocs., Inc.*, 711 F.3d 68, 76 (2d Cir. 2013) (citation omitted); *see also Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004). Reliance on conclusory allegations of harm that do nothing more than parrot the statutory injury requirement, as plaintiffs do here (CAC ¶¶ 15-26, 169; LAC ¶¶ 12, 36, 131; SC ¶¶ 10, 62, 75), is insufficient as a matter of law. *See*, *e.g.*, *Fink v. Time Warner Cable*, No. 08-cv-9628, 2009 WL 2207920, at *4 (S.D.N.Y. July 23, 2009) (dismissing damage and loss allegations as insufficiently factual where allegations merely "parrot[ed] the statutory language"); *Kounitz v. Slaatten*, 901 F. Supp. 650, 654 (S.D.N.Y. 1995) (absent "factual allegations regarding a concrete and particularized, actual or imminent injury," generalized allegations that plaintiff had been "damaged financially" were insufficient).

Here, plaintiffs allege merely that they engaged in FX transactions with one or more defendants and that they were therefore injured. (CAC ¶¶ 15-26; LAC ¶ 12; SC ¶ 10.) Such bare allegations are wholly inadequate. Plaintiffs fail to identify any currency transaction executed by a plaintiff that was adversely affected by defendants' alleged conduct. Indeed, they fail to allege a single date or time during the entire eleven-year period of the supposed conspiracy at which any plaintiff transacted in any particular currency with any defendant at or around

27

the London fix (or that was priced with reference to the London fix).  In short, plaintiffs never spell out how they believe they were injured.

Plaintiffs do not allege—for doing so would be facially implausible—that *every* foreign currency purchase *and* sale at the London fix over the course of eleven years was adversely affected by defendants' supposed conspiracy.  At most, plaintiffs describe (in the abstract) various shifting trading strategies in varying currencies.  (CAC ¶¶ 7, 100, 109, 170.)  In order to show injury, plaintiffs must establish some *connection* between particular trades in a particular currency and a particular contemporaneous episode of manipulation that was adverse to plaintiffs' trading.  This they fail to do.

Moreover, as plaintiffs acknowledge, "[c]urrencies are traded in pairs" (CAC ¶ 52; LAC ¶ 39), and any manipulative practice that artificially increased the value of one currency (e.g., the euro) would necessarily cause a relative decline in the value of currencies against which that inflated currency traded (e.g., the Norwegian krone).  On any given day, therefore, if an act of manipulation artificially inflated the value of, say, the euro, that act likely would have *benefitted* customers who, for example, traded their euros for the Norwegian krone.

Because the alleged manipulation was multidirectional and likely benefitted some FX customers, plaintiffs cannot adequately allege injury without alleging the *direction* of their trades—that is, whether they traded into or out of an allegedly affected currency.  In the absence of such an allegation, it is impossible to determine whether the direction of the alleged manipulation was *adverse* to the direction of that plaintiff's trade.  Thus, plaintiffs' failure to allege the direction in which they traded also renders their complaint inadequate.

Recent decisions in this district make clear that plaintiffs' conclusory allegations of injury fail as a matter of law—particularly where, as here, the alleged conspiracy involves

multidirectional trader-based manipulation.  In *In re LIBOR*, the plaintiffs sought to amend their complaint to add claims under the Commodity Exchange Act ("CEA") premised upon "day-to-day, trading based manipulation" of USD LIBOR.[16]  Judge Buchwald denied the plaintiffs leave to amend, holding that they had failed sufficiently to allege injury-in-fact.  962 F. Supp. 2d at 619-24.[17]  The court explained that allegations of LIBOR manipulation were fundamentally different than allegations of persistent inflation or deflation of LIBOR because they "consist[ ] of a number of discrete instances" of supposed artificiality in different directions—"at times, artificially high and, at other times, artificially low." *Id.* at 620.  The court held that, in order to plead actual injury on the basis of such alleged manipulation, the plaintiffs "would need to allege that the resulting artificiality in LIBOR caused them injury, in light of *their trading*." *Id.* (emphasis added).  The court further held that the plaintiffs had failed to allege that they transacted in instruments on specific days on which prices were artificial as a result of the defendants' alleged manipulative conduct, and that they suffered losses as a result of artificial movements in LIBOR that were adverse to those positions. *Id.* at 620-21.  The court concluded that broad allegations that the named plaintiffs "traded on-exchange based products tied to LIBOR" during the class period and "were harmed by Defendants' manipulation of LIBOR" were insufficient to allege actual injury. *Id.* at 621.  Plaintiffs' allegations here are indistinguishable and should be dismissed for the same reasons.

---

[16]  Like the Clayton Act, the CEA requires plaintiffs to allege actual injury. *See Ping He (Hai Nam) Co. Ltd. v. NonFerrous Metals (U.S.A.) Inc.*, 22 F. Supp. 2d 94, 107 (S.D.N.Y. 1998), *vacated on other grounds*, 187 F.R.D. 121 (S.D.N.Y. 1999).

[17]  As the court noted, even assuming the existence of an "artificial market" does not "mean that [plaintiffs] lost money" as a result: "Maybe they gained money." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262 (NRB), Aug. 8, 2013 Hr'g Tr. 50:19-51:4.

Another recent LIBOR-related decision applied similar reasoning to dismiss a Section 1 claim for lack of injury.  In *Laydon v. Mizuho Bank, Ltd.*, the plaintiff alleged that he "initiated short positions in [Chicago Mercantile Exchange] Euroyen TIBOR futures contracts during the Class Period and suffered net losses on such contracts due to the presence of artificial Euroyen TIBOR future prices proximately caused by Defendants' unlawful manipulation and restraint of trade."  2014 WL 1280464, at *8.  Judge Daniels held that these allegations were insufficient, explaining:

> Plaintiff fails to provide any detail about the short positions he initiated, such as when they were initiated, how long they were held, and whether he exited those positions by entering into offsetting transactions or held them until their settlement dates.  Plaintiff does not allege the prices at which he entered into these short positions, the prices of any offsetting positions he may have taken, or the prices of the futures contracts on their settlement dates.  Plaintiff does not identify or describe a single actual transaction underlying his claim, and does not indicate whether it was an increase or decrease in the price of Euroyen TIBOR futures contracts that caused his purported losses.

*Id.*

Plaintiffs here have similarly failed to allege facts from which a plausible inference can be drawn that they are in a "worse position as a consequence of the defendants' conduct."  *Gatt Commc'ns*, 711 F.3d at 76 (citation omitted).  Plaintiffs fail to provide any detail about their trades, including the date of their trades, the currency pairs involved and the direction of their trades.  Nor do plaintiffs allege the direction of the alleged manipulation with respect to any pair of currencies on a date on which plaintiffs traded that currency pair.  Without such allegations, the complaints' conclusory allegations of harm are insufficient to establish that plaintiffs suffered injury-in-fact from the alleged multidirectional conspiracy to manipulate currency values at the daily London close over eleven years.  For this reason, plaintiffs' Section 1 claim should be dismissed.

### III.   PLAINTIFFS DO NOT ADEQUATELY ALLEGE HARM TO COMPETITION

The complaints should be dismissed for the independent reason that they fail to allege harm to competition.  To state an antitrust claim, plaintiffs must allege harm to competition in a relevant product and geographic market, not merely harm to individual participants in a market.  *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) ("Sherman Act protects competition as a whole in the relevant market, not the individual competitors within that market"); *see also Virgin Atl. Airways Ltd. v. British Airways Plc*, 257 F.3d 256, 265 (2d Cir. 2001) ("Sherman Act and other antitrust laws are designed to protect competition").

The focus on harm to competition distinguishes antitrust violations from conduct that might violate some other law.  *See, e.g.*, *Hunt v. Crumboch*, 325 U.S. 821, 826 (1945) (Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce"); *Schaefer v. First Nat'l Bank of Lincolnwood*, 326 F. Supp. 1186, 1192 (N.D. Ill. 1970) (holding that "stock market manipulation schemes have never been within the coverage of the Sherman Act" because they constitute fraud, not a restraint of trade).  "[D]eception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned."  *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 145 (1961).

Plaintiffs' allegation that defendants conspired to manipulate the WM/Reuters Closing Spot Rates does not allege harm to competition for three related reasons.  First, the complaints do not tie the alleged misconduct to *any* efforts by defendants to win business for FX services, the only form of competition alleged in the complaints.  Second, the WM/Reuters Closing Spot Rates are not prices by which defendants compete in offering their FX services to customers.  They are instead calculated index rates at which no actual transaction may even have been executed.  Finally, the complaints do not plead any facts to support a plausible inference that defendants' alleged conduct reduced competition in a market for FX services.

31

A.    ***Allegations of Market Manipulation Fail to State an Antitrust Claim Because They Fail to Tie the Alleged Misconduct to Defendants' Competitive Efforts to Win Business for FX Services***

Plaintiffs do not plead that the alleged conspiracy had any adverse impact on competition in the market in which they participate—the alleged "FX Market." (CAC ¶¶ 51-53, 74; LAC ¶¶ 38-41, 57; SC ¶¶ 2, 31, 35.) Plaintiffs do not define this alleged market as a market for euros, pounds, dollars, or any other particular currency. Rather, insofar as they purport to define a market at all, it is a market for one or more types of FX services that defendants provide to their customers. (CAC ¶ 53; LAC ¶ 41; SC ¶ 34.)

According to the complaints, defendants are market-makers—they stand ready at any time to buy a currency from (or to sell a currency to) their customers—and are compensated for their services through their bid-ask spreads (the differences between the prices at which they will buy a currency and the prices at which they will sell that same currency). (CAC ¶¶ 2, 57, 60; LAC ¶ 45; SC ¶¶ 3, 33.) In an FX spot transaction for immediate execution, a customer can shop among FX dealers to find the best bid or ask price for a currency. (CAC ¶ 57; LAC ¶ 44.) Taking the plaintiffs' allegations as true for purposes of this motion, competition among defendants narrows the bid-ask spreads for currencies. (CAC ¶ 60.)

Although plaintiffs allege that defendants compete by setting bid-ask spreads, they describe allegedly manipulative conduct—"front running," "banging the close," "painting the screen" and sharing net order position information—that is unrelated to defendants' competition for customers by setting bid-ask spreads or to any reduction in that competition. Indeed, the complaints' description of each allegedly manipulative practice highlights this disconnect. As alleged, "front running" refers to trading a proprietary position before executing a customer's market-moving trade (CAC ¶¶ 101-105; LAC ¶¶ 83-86; SC ¶ 49), "banging the close" involves breaking large orders into smaller trades to alter the movement of an affected currency's value

32

(CAC ¶¶ 106-107; LAC ¶¶ 87-88; SC ¶¶ 49-51), "painting the screen" involves placing "phony" orders to create the illusion of trading activity to move rates up or down (CAC ¶ 108; LAC ¶ 89), and sharing net order position information permits FX dealers generally to have a better understanding of order flows and to predict market moves.  (CAC ¶¶ 81, 92, 98, 170; LAC ¶ 74.)

   None of these practices is alleged to reduce competition to win business from customers like plaintiffs.  (CAC ¶¶ 98-111; LAC ¶¶ 80-92; SC ¶¶ 48-52.)  In fact, the complaints do not allege that defendants ever discussed competition for customers with one another.  *See, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 688 (S.D.N.Y. 2013) (noting that "plaintiffs have not alleged that defendants' alleged fixing of LIBOR caused any harm to competition between sellers of [LIBOR-based financial] instruments or between buyers of those instruments").  Instead, the alleged practices—as described by plaintiffs—are reportedly designed to take improper advantage of anticipated movements in exchange rates at a particular moment in time.  Plaintiffs do not contend that these alleged practices affected how defendants compete to provide FX services.

   Accordingly, plaintiffs have not stated an antitrust claim.  The alleged manipulation of WM/Reuters Closing Spot Rates, as described in the complaints, even if it caused some market participants to gain or lose money, would be more akin to trader misconduct than to antitrust violations.  *See, e.g.*, *In re LIBOR*, 935 F. Supp. 2d at 691-92 (rejecting a Section 1 claim even though "defendants' alleged manipulation of the level of LIBOR might have had the distributive effect of transferring wealth between the buyers and sellers of LIBOR-based financial instruments, including between defendants and their customers"); *Schaefer*, 326 F. Supp. at 1190-91 (holding that an alleged scheme of artificial trading to inflate the price of a stock was a market manipulation that did not constitute a restraint of trade).  In short, defendants are alleged

to have gamed the WM/Reuters algorithm, not to have restricted competition, and such allega-

tions do not state a Section 1 claim.

### B.   *WM/Reuters Closing Spot Rates Are Not Prices by Which Defendants Compete for FX Customers*

Unlike a rate that a customer would pay in an FX spot transaction for immediate

execution, the WM/Reuters Closing Spot Rates are not derived from defendants quoting compet-

itive bid-ask spreads to their customers.  A customer who places an order to be filled at this fix

rate is not selecting his dealer based on the best bid or ask price that competition among defend-

ants will provide; indeed, competition for the customer's order has necessarily already been

completed when dealers trade on those orders in and around the fix and well before the index

rates are calculated based on that trading.  The customer's order will be filled at the rate pub-

lished by WM Company irrespective of the FX dealer that takes the order.  Because defendants

do not quote prices for their services on fix orders, the rate (which is calculated and published by

a third party) will be the same regardless of the dealer with which the customer transacts.

The WM/Reuters Closing Spot Rates are simply indices of currency values.  Like

any index, the benchmark rates constitute information that market participants may consider, but

do not necessarily reflect any actual prevailing rates.  *See In re LIBOR*, 935 F. Supp. 2d at 689

("LIBOR is an index intended to convey information about the interest rates prevailing in the

London interbank loan market, but it does not necessarily correspond to the interest rate charged

for any actual interbank loan.").  Just as with LIBOR, there is no antitrust violation based on the

manipulation of a rate that is not the basis of competition for customers.  Thus, whatever their

status under other laws, these allegations do not make out an antitrust claim.[18]

> **C.**     ***The Complaints Do Not Plead That Defendants'***
> ***Alleged Manipulative Conduct Reduced Competition***

Plaintiffs do not allege any facts that, if proven, would indicate that the alleged

conduct has reduced competition.  It is not enough to assert simply that the WM/Reuters bench-

marks were different than they otherwise would have been.  *See Broadcast Music, Inc. v. Co-*

*lumbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979) (explaining that the inquiry into whether con-

duct constitutes price-fixing focuses on "whether the practice facially appears to be one that

would always or almost always tend to restrict competition and decrease output"); *Sterling*

*Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011) ("Injury to competition is 'usually

measured by a *reduction in output and an increase in prices* in the relevant market.'") (citation

omitted); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004)

("lower output and the associated welfare losses" are the injuries "that matter under the federal

antitrust laws").

Plaintiffs do not allege that defendants agreed to reduce the supply of FX services

provided to their customers, and there is no factual allegation as to how defendants' alleged ma-

nipulative conduct in "front running," "banging the close," "painting the screen" and sharing net

order positions reduced competition.  Just as the plaintiffs in *Laydon* and *In re LIBOR* did not

---

[18]   Plaintiffs do not allege that defendants achieve a competitive advantage in any subsequent
transactions with plaintiffs as a result of where the fix is set.  *Cf. Ice Cream Liquidation, Inc.*
*v. Land O' Lakes, Inc.*, 253 F. Supp. 2d 262, 268-70 (D. Conn. 2003) (manipulation of butter
price on an exchange drove up the exchange price of butter to raise the price of milk); *see al-*
*so In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 30, 35-36 (D.D.C.
2008) (defendants removed fuel costs from a cost-escalation index to allow separate imposi-
tion of uniform fuel surcharges).

allege that the defendants restricted output for various TIBOR- and LIBOR-based financial instruments and interbank loans, plaintiffs here do not allege that defendants restricted output in any type of FX service. *See Laydon*, 2014 WL 1280464 at *11-12 (finding no antitrust violation where plaintiffs "allege[d] that prices may have been different" but did not allege "that trades in Euroyen TIBOR futures contracts were in any way restrained by the alleged misconduct"); *In re LIBOR*, 935 F. Supp. 2d at 688-89 (noting that plaintiffs did not allege any restraint on competition in LIBOR-based financial instruments or in the interbank loan market).  Because plaintiffs have failed to allege harm to competition, their antitrust claims fail.[19]

## IV.   PLAINTIFFS LACK ANTITRUST STANDING

Plaintiffs' claims also fail because plaintiffs have not established the elements of antitrust standing.  In addition to their failure to plead an injury-in-fact, as required for standing (*see* Part II above), plaintiffs have not shown that they suffered "antitrust injury," which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

---

[19]   To the extent that plaintiffs purport to raise a Section 1 claim under the rule of reason, that claim fails for the additional reason that plaintiffs have failed to allege a relevant market in which to measure any purported competitive harm.  "[W]ithout a proper delineation of *both* the product and geographic markets, a claim under § 1 or § 2 of the Sherman Act will be dismissed" at the pleading stage. *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 481 (S.D.N.Y. 2001) (emphasis added).  Nowhere in the complaints do plaintiffs define the relevant market at issue.  At most, plaintiffs set forth vague references to the "FX market" that provide no clarity whatsoever with regard to the bounds of either the relevant product market or the relevant geographic market, necessitating dismissal of any claims evaluated under the rule of reason. *See, e.g., TechReserves Inc. v. Delta Controls Inc.*, No. 13-cv-752, 2014 WL 1325914, at *5 (S.D.N.Y. Mar. 31, 2014) (dismissing complaint where alleged relevant market was insufficiently defined and factually unsupported).

Plaintiffs do not connect the "anticompetitive effect of the specific practice at is-sue to the actual injury" plaintiffs allege. *Gatt Commc'ns*, 711 F.3d at 76 (citations omitted). Even if, arguendo, defendants collectively engaged in the allegedly manipulative practices ("front running," "banging the close" or "painting the screen") described in the complaints, any alleged injury to plaintiffs would not flow from any reduction in competition resulting from such an agreement. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) ("*ARCO*") ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."). Each of the purportedly manipulative practices could have occurred without any agreement (that is, without any reduction of competition) among defendants—indeed, each contemplates unilateral conduct by a single trader. Therefore, any arguable injury that a plaintiff may have suffered as a result of such a manipulative act would not have been caused by reason of a reduction in competition, and thus would not constitute an antitrust injury.

In this regard, plaintiffs' allegations suffer from the same defects as the allega-tions in *In re LIBOR*, where the court held that, because the alleged manipulation scheme could have occurred with or without an agreement among the defendants, the plaintiffs had not alleged that their losses "stem[med] from the competition-*reducing* aspect or effect of the defendant's behavior." *In re LIBOR*, 935 F. Supp. 2d at 686 (citation omitted). The court explained that:

> As with the harm alleged in *Brunswick* and *ARCO*, the harm alleged here could have resulted from normal competitive conduct. Specifically, the injury plaintiffs suffered from defendants' alleged conspiracy to suppress LIBOR is the same as the injury they would have suffered had each defendant decided independently to misrepresent its borrowing costs to the BBA. Even if such independent misre-porting would have been fraudulent, it would not have been anticompetitive, and indeed would have been consistent with normal commercial incentives facing de-fendants.

*Id*. at 690.

Likewise, here, plaintiffs would have suffered the same injury from any alleged manipulation of the London fix, regardless of whether individual defendants had unilaterally engaged in such manipulation or any group of defendants had agreed to engage in that manipulation. Just as in *In re LIBOR*, any purported injury may have resulted from the allegedly manipulative nature of the misconduct, but not any *anticompetitive* aspect. Plaintiffs thus have not alleged that they suffered "antitrust injury," and therefore lack standing to bring this antitrust action.

## V.     PLAINTIFFS' CLAIMS THAT ACCRUED MORE THAN FOUR YEARS AGO ARE BARRED BY THE STATUTE OF LIMITATIONS

A four-year statute of limitations applies to private civil antitrust actions seeking treble damages. 15 U.S.C. § 15b; *Hinds County I*, 620 F. Supp. 2d at 519. To plead fraudulent concealment with sufficient particularity so as to enlarge the four-year statute of limitations, an antitrust plaintiff must allege with specificity "(1) that the defendant concealed the existence of the antitrust violation[;] (2) that plaintiff remained in ignorance of the violation until sometime within the four-year antitrust statute of limitations; and (3) that his continuing ignorance was not the result of lack of diligence." *Hinds County I*, 620 F. Supp. 2d at 520 (citation omitted). A claim of fraudulent concealment must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Id.* (citation omitted).

Plaintiffs' claims that allegedly accrued more than four years ago should be dismissed because there are no specific allegations of any conspiratorial conduct prior to that date. Plaintiffs have alleged generally that defendants have conspired since January 1, 2003, but the complaints do not include a factual basis for plaintiffs' decision to use January 1, 2003, as the starting point of the alleged conspiracy. Where, as here, plaintiffs assert an overbroad class period unsupported by any facts, courts routinely narrow the length of the purported class on a mo-

tion to dismiss.  *See, e.g.*, *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1076-77 (D. Kan. 2009) (dismissing antitrust claim prior to 1999 because "there are no allegations in these complaints that would give defendants fair notice of the basis for plaintiffs' claim of a conspiracy" between 1994 and 1999; "[u]nder *Twombly*, plaintiffs cannot simply allege a conspiracy beginning at a particular time; rather, they must allege facts to support the existence of a conspiracy during the entire period"); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420, 2014 WL 309192, at *12 (N.D. Cal. Jan. 21, 2014) (dismissing antitrust claim prior to 2002 for lack of supporting factual allegations).

Furthermore, even if plaintiffs had pleaded some factual basis for a claim accruing more than four years before they filed their complaints, they have still failed adequately to plead fraudulent concealment because their boilerplate allegations of diligence are plainly inadequate.  *See In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (affirming dismissal of claims because plaintiffs failed to adequately plead the diligence prong of fraudulent concealment where plaintiffs made "no allegation of any specific inquiries of [the defendant], let alone detail[ed] when such inquiries were made, to whom, regarding what, and with what response").  Indeed, plaintiffs allege nothing more than that "[n]one of the facts or information available to Plaintiffs, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracies alleged in this Complaint."  (CAC ¶ 180; LAC ¶ 115; SC ¶ 66.)

Under similar circumstances, in *Hinds County I*, the court held that the statute of limitations would not be tolled where plaintiffs did not allege that they had "performed any kind of due diligence, only that 'Plaintiffs and Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced, because Defendants and

39

their co-conspirators used deceptive and secret methods to avoid detection and affirmatively conceal their violations.'"  620 F. Supp. 2d at 521-22 (citation omitted).  Plaintiffs' allegation of diligence here contains precisely the type of language the court in *Hinds County I* held does not adequately plead the due diligence prong required to establish fraudulent concealment.  The FX data used in plaintiffs' complaints is publicly available and plaintiffs allege no reason they could not have used that data years ago.

Haverhill Retirement System filed the first class action complaint on November 1, 2013,  Simmtech filed its class action complaint on November 8, 2013, and Larsen filed his first class action complaint on February 28, 2014.  Accordingly, to the extent that plaintiffs' claims accrued more than four years before those dates, they should be dismissed.

### *Conclusion*

For all the foregoing reasons, the complaints in these coordinated proceedings should be dismissed in their entirety.

Dated:  May 30, 2014                              Respectfully submitted,

SHEARMAN & STERLING LLP

By: /s/ Adam S. Hakki
Adam S. Hakki
Richard F. Schwed
Jeffrey J. Resetarits
599 Lexington Avenue
New York, New York  10022
Telephone:  (212) 848-4000
ahakki@shearman.com
rschwed@shearman.com
jeffrey.resetarits@shearman.com

*Attorneys for Defendants Bank of America*
*Corporation and Bank of America, N.A.*

SULLIVAN & CROMWELL LLP

By: /s/ Yvonne S. Quinn
Yvonne S. Quinn
David H. Braff
Jeffrey T. Scott
Qian A. Gao
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
quinny@sullcrom.com
braffd@sullcrom.com
scottj@sullcrom.com
gaoq@sullcrom.com

*Attorneys for Defendants Barclays Bank PLC
and Barclays Capital Inc.*

ALLEN & OVERY LLP

By: /s/ David C. Esseks
David C. Esseks
Brian de Haan
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 610-6300
david.esseks@allenovery.com
brian.deHaan@allenovery.com

John Terzaken
1101 New York Avenue
Washington, D.C. 20005
Telephone: (202) 683-3800
john.terzaken@allenovery.com

*Attorneys for Defendants BNP Paribas and
BNP Paribas North America, Inc.*

COVINGTON & BURLING LLP

By: /s/ Andrew A. Ruffino
Andrew A. Ruffino
The New York Times Building
620 Eighth Avenue
New York, New York  10018
Telephone: (212) 841-1000
aruffino@cov.com

Alan M. Wiseman
Thomas A. Isaacson
1201 Pennsylvania Avenue N.W.
Washington, D.C.  20004
Telephone: (202) 662-6000
awiseman@cov.com
tisaacson@cov.com

*Attorneys for Defendants Citibank, N.A. and Citigroup Inc.*

CAHILL GORDON & REINDEL LLP

By: /s/ David G. Januszewski
David G. Januszewski
Herbert S. Washer
Elai Katz
Jason M. Hall
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
djanuszewski@cahill.com
ekatz@cahill.com
jhall@cahill.com

*Attorneys for Defendants Credit Suisse Securities (USA) LLC and Credit Suisse Group AG*

KIRKLAND & ELLIS LLP

By: /s/ Robert Khuzami
Robert Khuzami
Joseph Serino, Jr., P.C.
Eric F. Leon, P.C.
601 Lexington Avenue
New York, New York  10022
Telephone : (212) 446-4800
Facsimile : (212) 446-4900
robert.khuzami@kirkland.com
joseph.serino@kirkland.com
eric.leon@kirkland.com

G. Patrick Montgomery (*pro hac vice*)
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
Telephone : (202) 879-5000
Facsimile : (202) 879-5200
patrick.montgomery@kirkland.com

*Attorneys for Defendant Deutsche Bank AG*

CLEARY GOTTLIEB STEEN & HAMILTON
LLP

By: /s/ Thomas J. Moloney
Thomas J. Moloney
Victor L. Hou
Elizabeth Vicens
Andrew Darcy
One Liberty Plaza
New York, New York  10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
tmoloney@cgsh.com
vhou@cgsh.com
evicens@cgsh.com
adarcy@cgsh.com

*Attorneys for Defendants The Goldman Sachs
Group, Inc. and Goldman, Sachs & Co.*

LOCKE LORD LLP

By:  /s/Edwin R. DeYoung
Edwin R. DeYoung
Gregory T. Casamento
3 World Financial Center
New York, NY 10281
Telephone: (212) 812-8325
Facsimile: (212) 812-8385
edeyoung@lockelord.com
gcasamento@lockelord.com

Roger B. Cowie
2200 Ross Ave., Suite 2200
Dallas, TX  75201
Telephone:  (214) 740-8614
Facsimile:  (214) 740-8800

*Attorneys for Defendants HSBC Holdings plc,*
*HSBC Bank plc, HSBC North America Holdings*
*Inc., and HSBC Bank USA, N.A.*

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

By: /s/ Peter E. Greene
Peter E. Greene
Boris Bershteyn
Peter S. Julian
Four Times Square
New York, NY  10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
peter.greene@skadden.com
boris.bershteyn@skadden.com
peter.julian@skadden.com

Patrick Fitzgerald
155 N. Wacker Drive, Suite 2700
Chicago, IL  60606
Telephone:  (312) 407-0508
Facsimile:  (312) 407-0411
patrick.fitzgerald@skadden.com

*Attorneys for Defendants JPMorgan Chase &*
*Co. and JPMorgan Chase Bank, N.A.*

44

WACHTELL, LIPTON, ROSEN & KATZ

By: /s/ Jonathan M. Moses
Jonathan M. Moses
Keia D. Cole
51 West 52nd Street
New York, NY 10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000
JMMoses@wlrk.com
KDCole@wlrk.com

*Attorneys for Defendant Morgan Stanley*

DAVIS POLK & WARDWELL LLP

By: /s/ Arthur J. Burke
Arthur J. Burke
Greg D. Andres
Charles Shioleno
450 Lexington Avenue
New York, New York  10017
Telephone: (212) 450-4000
Facsimile: (212) 450-4800
arthur.burke@davispolk.com
greg.andres@davispolk.com
charles.shioleno@davispolk.com

*Attorneys for Defendant The Royal Bank of
Scotland Group plc*

45

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Joel S. Sanders
Joel S. Sanders
555 Mission Street
San Francisco, California 94105
Telephone: (415) 393-6268
Facsimile (415) 374-8439
jsanders@gibsondunn.com

Joshua H. Soven
Melanie L. Katsur
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8503
Facsimile: (202) 530-9518
jsoven@gibsondunn.com
mkatsur@gibsondunn.com

*Attorneys for Defendants UBS AG
and UBS Securities, LLC*[20]

---

[20]   UBS AG and UBS Securities, LLC, do not join in Sections III and IV of this brief.