# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | No. 1:13-cv-07789-LGS |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

FACTUAL BACKGROUND ...................................................................................................... 2

LEGAL STANDARD ................................................................................................................. 7

ARGUMENT .............................................................................................................................. 9

I.     THE COMPLAINT PLAUSIBLY ALLEGES A CONSPIRACY ................................... 9

       A.     The Standard for Pleading a Contract, Combination, or Conspiracy ................... 9

       B.     The Complaint Directly Alleges a Conspiracy in Which Each Defendant
              Participated ...................................................................................................... 10

       C.     The Conspiracy Is Economically Plausible ........................................................ 18

       D.     Plaintiffs Allege Circumstantial Evidence that Further Supports an
              Inference of a Conspiracy ................................................................................... 20

II.    PLAINTIFFS ALLEGE INJURY-IN-FACT ................................................................. 26

III.   PLAINTIFFS ALLEGE HARM TO COMPETITION .................................................. 30

       A.     Plaintiffs Allege Price Fixing, Which Inherently Harms Competition ................ 31

       B.     The Complaint Alleges that The Fix Is a Price by Which Defendants
              Compete ............................................................................................................. 32

       C.     Plaintiffs Do Not Need to Allege Supply Restriction .......................................... 34

IV.    PLAINTIFFS ALLEGE ANTITRUST STANDING ..................................................... 35

V.     DEFENDANTS ACTIVELY CONCEALED THEIR CONSPIRACY .......................... 37

CONCLUSION ......................................................................................................................... 40

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Sales Co., Inc. v. AstraZeneca AB*
  No. 10 Civ. 6062(PKC), 2011 WL 1465786 (S.D.N.Y. Apr. 14, 2011) ................................17

*Am. Tobacco Co. v. U.S.,*
  328 U.S. 781 (1946).........................................................................................................9

*Anderson News, L.L.C. v. American Media, Inc.,*
  680 F.3d 162 (2d Cir. 2012).....................................................................................*passim*

*Apex Oil Co. v. DiMauro,*
  822 F.2d 246 (2d Cir. 1987)...............................................................................9, 17, 23, 24

*Arista Records LLC v. Lime Group LLC*
  532 F. Supp. 2d 556 (S.D.N.Y. 2008).............................................................................17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*
  493 F.3d 87 (2d Cir. 2007)...........................................................................................8, 9

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)...................................................................................................*passim*

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n,*
  620 F.2d 1360 (9th Cir. 1980) .......................................................................................17

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,*
  369 F.3d 212 (2d Cir. 2004)...........................................................................................27

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
  441 U.S. 1 (1979)............................................................................................................34

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977).........................................................................................................35

*Burnson Commc'ns, Inc. v. Arbitron, Inc.,*
  239 F. Supp. 2d 550 (E.D. Pa. 2002) ..............................................................................20

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,*
  750 F.3d 227 (2d Cir. 2014)............................................................................................18

*Cascades Computer Innovation LLC v. RPX Corp.,*
  No. 12-cv-01143, 2013 WL 316023 (N.D. Cal. Jan. 24, 2013)...........................................20

*Catalano, Inc. v. Target Sales, Inc.,*
  446 U.S. 643 (1980).........................................................................................................33

*Chattanooga Foundry & Pipe Works v. City of Atlanta*,
203 U.S. 390 (1906)................................................................................27

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*,
858 F.2d 499 (9th Cir. 1988) ..............................................................39

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)................................................................7, 9, 13, 26

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007)...................................................................36

*Fears v. Wilhelmina Model Agency, Inc.*,
No. 02 Civ. 4911, 2004 WL 594396 (S.D.N.Y. Mar. 23, 2004) ..........24

*Fink v. Time Warner Cable*,
No. 08 CIV. 9628 LTS KNF, 2009 WL 2207920 (S.D.N.Y. July 23, 2009) ........28

*Gatt Commc'ns v. PMC Assocs., L.L.C.*,
711 F.3d 68 (2d Cir. 2013)........................................................27, 29, 35

*Hinds County, Miss. v. Wachovia Bank, N.A.*,
620 F. Supp. 2d 499 (S.D.N.Y. 2009)..............................................17, 39

*Hinds County, Miss. v. Wachovia Bank N.A.*,
700 F. Supp. 2d 378 (S.D.N.Y. 2010)..............................................8, 14, 26

*Hinds County, Miss. v. Wachovia Bank N.A.*,
708 F. Supp. 2d 348 (S.D.N.Y. 2010)..................................................24

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
06-MD-1775(JG)(VVP), 2009 WL 3443405 (E.D.N.Y. Aug. 21, 2009) *aff'd*, 697
F.3d 154 (2d Cir. 2012).........................................................................25

*In re Auto. Parts Antitrust Litig.*,
12-md-02311, 2014 WL 1746579 (E.D. Mich. Apr. 30, 2014)............20

*In re Blech Sec. Litig.*,
928 F. Supp. 1279 (S.D.N.Y. 1996)......................................................9

*In re Blood Reagents Antitrust Litig.*,
756 F. Supp. 2d 623 (E.D. Pa. 2010) ..................................................25

*In re Cardizem CD Antitrust Litig.*,
105 F. Supp. 2d 618 (E.D. Mich. 2000)...............................................37

*In re Crude Oil Commodity Futures Litig.*,
913 F. Supp. 2d 41 (S.D.N.Y. 2012)..............................................35, 36

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009)..............................................................36, 37

*In re Elec. Books Antitrust Litig.*,
   859 F. Supp. 2d 671 (S.D.N.Y. 2012).................................................9, 13

*In re Elevator Antitrust Litig.*
   502 F.3d 47 (2d Cir. 2007)........................................................................17

*In re Fasteners Antitrust Litig.*,
   Civ. A. 08-md-1912, 2011 WL 3563989 (E.D. Pa. Aug. 12, 2011) ......................20

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004)..............................................................21, 22, 23

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) ............................................................21, 33

*In re Insurance Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010)........................................................................10

*In re LIBOR-Based Fin. Instruments Antitrust Litigation*,
   935 F. Supp. 2d 666 (S.D.N.Y. 2013) ("*LIBOR I*")......................................... *passim*

*In re LIBOR-Based Fin. Instruments Antitrust Litigation*,
   962 F. Supp. 2d 606 (S.D.N.Y. 2013) ("*LIBOR II*") ..............................................28

*In re Linerboard Antitrust Litig.*,
   504 F. Supp. 2d 38 (E.D. Pa. 2007) ........................................................24

*In re Lithium Ion Batteries Antitrust Litigation*,
   No. 13-MD-2420, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ............................38

*In re Magnetic Audiotape Antitrust Litig.*,
   99 Civ. 1580 (LMM), 2002 WL 975678 (S.D.N.Y. May 9, 2002) ........................39

*In re Merrill Lynch Ltd. Partnerships Litig.*,
   154 F.3d 56 (2d Cir. 1998)........................................................................39

*In re Nasdaq Market-Makers Antitrust Litig.*,
   894 F. Supp. 703 (S.D.N.Y. 1995)......................................................8, 10, 13

*In re Nine West Shoes Antitrust Litig.*,
   80 F. Supp. 2d 181 (S.D.N.Y. 2000)........................................................38

*In re OSB Antitrust Litig.*,
   No. 06 Civ. 826, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007).............................14

*In re Packaged Ice Antitrust Litig.*,
  723 F. Supp. 2d 987 (E.D. Mich. 2010)......................................................................25

*In re Parcel Tanker Shipping Services Antitrust Litig.*,
  541 F. Supp. 2d 487 (D. Conn. 2008)..........................................................................17

*In re Pool Products Distribution Market Antitrust Litig.*,
  MDL No. 2328, 2013 WL 6670020 (E.D. La. Dec. 18, 2013)...................................21

*In re Southeastern Milk Antitrust Litig.*,
  555 F. Supp. 2d 934 (E.D. Tenn. 2008)......................................................................14

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp. 2d 896 (N.D. Cal. 2008).........................................................................25

*In re Tableware Antitrust Litig.*,
  363 F. Supp. 2d 1203 (N.D. Cal. 2005).......................................................................30

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ......................................................................................23

*In re Titanium Dioxide Antitrust Litig.*,
  959 F. Supp. 2d 799 (D. Md. 2013).............................................................................21

*In re Travel Agent Com'n Antitrust Litig*,
  583 F.3d 896 (6th Cir. 2009) ......................................................................................24

*In re Urethane Antitrust Litigation*,
  663 F. Supp. 2d 1067 (D. Kan. 2009)..........................................................................38

*In re Vitamins Antitrust Litig.*,
  320 F. Supp. 2d 1 (D.D.C. 2004).................................................................................20

*Invamed, Inc. v. Barr Labs, Inc.*
  22 F. Supp. 2d 210 (S.D.N.Y. 1998)...........................................................................17

*Jung v. Ass'n of Am. Medical Colleges*,
  300 F. Supp. 2d 119 (D.D.C. 2004).............................................................................14

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ......................................................................................27

*Kounitz v. Slaateen*,
  901 F. Supp. 650 (S.D.N.Y. 1990)..............................................................................28

*Laydon v. Mizuho Bank, Ltd.*,
  12-CV-3419 GBD, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ...........................28, 29, 35

*Level I Sportswear, Inc. v. Chaikin*,
    81 Civ. 7407, 1983 WL 1781 (S.D.N.Y. Jan. 25, 1983)...........................................................31

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) .......................................................................................33

*Lum v. Bank of America*
    361 F.3d 217 (3d Cir. 2004)...........................................................................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)......................................................................................................20

*Mayor and City Council of Baltimore Maryland v. Citigroup, Inc.*,
    709 F.3d 129 (2nd Cir. 2013).......................................................................................21

*Menasha Corp. v. News America Marketing In-Store, Inc.*,
    354 F.3d 661 (7th Cir. 2004) .......................................................................................34

*Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc*
    795 F. Supp. 639 (S.D.N.Y. 1992).................................................................................8

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)........................................................................................................9

*N. Pac. R.R. Co. v. U.S.*,
    356 U.S. 1 (1958)..........................................................................................................30

*New York v. Hendrickson Bros., Inc.*,
    840 F.2d 1065 (2d Cir. 1988).......................................................................................27

*Plymouth Dealers' Ass'n of N. Cal. v. United States*,
    279 F.2d 128 (9th Cir. 1960) .......................................................................................33

*Port Dock & Stone Corp. v. Oldcastle NE., Inc.*,
    507 F.3d 117 (2d Cir. 2007).........................................................................................27

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
    No. 08 Civ. 42 JG VVP, 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011), *adopted*, 2012
    WL 3307486 (E.D.N.Y. Aug. 13, 2012).................................................................14, 16

*Ross v. Am. Exp. Co.*,
    Nos. 04 Civ. 5723, 05 Civ. 7116, 2014 WL 1396492 (S.D.N.Y. Apr. 10, 2014)..........9, 17, 26

*Schaefer v. First National Bank of Lincolnwood*,
    326 F. Supp. 2d 1186 (N.D. Ill. 1970) ........................................................................32

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
    947 F. Supp. 2d 88 (D.D.C. 2013) ..............................................................................26

*Starr v. Sony BMG Music Entm't.*,
    592 F.3d 314 (2d Cir. 2010).................................................................. *passim*

*Sterling Merchandising, Inc. v. Nestle, S.A.*,
    656 F.3d 112 (1st Cir. 2011)...........................................................34

*Strobl v. New York Mercantile Exchange*,
    768 F.2d 22 (2d Cir. 1985)..............................................................32

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002)...........................................................................8

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001).............................................................23

*Total Benefits Planning Agency v. Anthem Blue Cross and Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ..........................................................17

*Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.*,
    959 F.2d 468 (3d Cir. 1992)............................................................31

*U.S. Gypsum Co. v. Indiana Gas Co., Inc.*,
    350 F.3d 623 (7th Cir. 2003) ..........................................................36

*United Magazine Co. v. Murdoch Magazines Distribution, Inc.*,
    146 F. Supp. 2d 385 (S.D.N.Y. 2001)............................................20

*United States Secs. & Exch. Comm'n v. Power*,
    525 F. Supp. 2d 415 (S.D.N.Y. 2007)............................................38

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940).........................................................................30

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).........................................................................37

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*,
    156 F.3d 535 (4th Cir. 1998) ..........................................................37

*White Motor Co. v. United States*,
    372 U.S. 253 (1963).........................................................................31

## STATUTES, RULES, AND REGULATIONS

18 U.S.C.
    §1030.................................................................................................28

15 U.S.C.
    §1........................................................................................... *passim*

Federal Rules of Civil Procedure
Rule 8 .................................................................................................................... 7, 8
Rule 9 .................................................................................................................. *passim*
Rule 12(b)(6) ...................................................................................................... 10, 35

## OTHER AUTHORITIES

7 Phillip E. Areeda and Herbert Hovenkamp, ANTITRUST LAW,
§1415b (2d ed. 2003) ............................................................................................ 22

## INTRODUCTION

On March 31, 2014, Plaintiffs,[1] on behalf of themselves and a putative Class, filed the Consolidated Amended Class Action Complaint (hereinafter "Complaint" or "CAC") (ECF No. 172) against twelve of the world's largest banks ("Defendants"[2]), alleging that these banks conspired to fix prices in the foreign exchange ("FX") market in violation of Section 1 of the Sherman Act, 15 U.S.C. §1 ("Section 1").  Despite Defendants successfully arguing for a stay of discovery, the 65-page Complaint contains 202 detailed paragraphs explaining the scope, operation, and duration of Defendants' conspiracy, as well as the publicly available evidence demonstrating each Defendant's participation in the conspiracy.

In support of their motion to dismiss, Defendants make five arguments that depend on an incorrect heightened pleading standard, ignore the well-pleaded facts in the Complaint, and raise their own facts that Plaintiffs alleged nowhere in the Complaint.  *See* Mem. of Law in Supp. of Defs.' Mot. to Dismiss (filed May 30, 2014) (ECF No. 209) ("MTD").  First, Defendants argue that Plaintiffs have not adequately alleged an agreement in restraint of trade, MTD at 11-25; this argument, however, introduces facts outside the four corners of the Complaint and seeks to impose a Rule 9 pleading standard on a traditional price-fixing claim, something no court has done.  Second, Defendants argue that Plaintiffs have not adequately alleged injury-in-fact, MTD

---

[1]     Plaintiffs are Aureus Currency Fund, L.P.; the City of Philadelphia, Board of Pensions and Retirement; Employees' Retirement System of the Government of the Virgin Islands; Employees' Retirement System of Puerto Rico Electric Power Authority; Fresno County Employees' Retirement Association; Haverhill Retirement System; Oklahoma Firefighters Pension and Retirement System; State-Boston Retirement System; Syena Global Emerging Markets Fund, LP; Tiberius OC Fund, Ltd.; Value Recovery Fund L.L.C.; and United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund.

[2]     Defendants are Bank of America Corporation; Bank of America, N.A.; Barclays, PLC; Barclays Capital, Inc.; BNP Paribas Group; BNP Paribas North America, Inc.; Citigroup, Inc.; Citibank, N.A.; Credit Suisse Group AG; Credit Suisse Securities (USA) LLC; Deutsche Bank; Goldman Sachs Group, Inc.; Goldman Sachs & Co.; HSBC Holdings PLC; HSBC Bank PLC; HSBC North America Holdings, Inc.; JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; Morgan Stanley; Royal Bank of Scotland Group PLC; RBS Securities, Inc.; UBS AG; and UBS Securities LLC.

at 26-30; this argument again ignores the Complaint's allegations, which detail the manner in which Plaintiffs were injured by Defendants' collusive conduct.  Third, Defendants argue that Plaintiffs have not adequately alleged harm to competition, MTD at 31-35; their argument ignores the fact that Plaintiffs allege horizontal price fixing, a *per se* violation for which anticompetitive effect is presumed, and, in any event, the Complaint adequately alleges such harm.  Fourth, Defendants argue that Plaintiffs lack antitrust standing because Defendants could theoretically have inflicted the same injuries unilaterally, MTD at 36-38; this argument invites the Court to improperly weigh the plausibility of Plaintiffs' allegations against alternatives that Defendants assert and ignores the fact that the antitrust laws prohibit the kinds of conspiratorial conduct pleaded, in detail, in the Complaint.  Finally, Defendants argue that Plaintiffs' claims arising more than four years before the Complaint was filed are time barred, MTD at 38-40; this argument ignores the fact that Plaintiffs were not on notice of their claims until at least June of 2013 and filed suit within months.

Notably, in making all five arguments, Defendants ask the Court to ignore the worldwide investigations, admissions of misconduct, and an extensive public record revealing that the conduct giving rise to Plaintiffs' claim is not only plausible, but actually occurred.  In short, and as explained below, each of Defendants' arguments lacks merit, and their motion to dismiss should therefore be denied.

## FACTUAL BACKGROUND

***The FX market***.  Defendants are the dominant dealers in the FX market, having a combined global market share of 84 percent.  CAC ¶¶2, 74.  During the Class Period, named Plaintiffs – pension funds, an employee benefit plan, and other institutional investors – entered into FX spot, outright forward, and FX swap transactions (collectively, "FX Instruments") directly from Defendants; Plaintiffs are Defendants' customers.  *Id*.  Defendants are horizontal competitors for Plaintiffs' business.  CAC ¶165.

Currencies are purchased and sold in the global FX market virtually 24 hours a day. CAC ¶¶51, 55, 56.  Daily global turnover in the market can reach over $5.3 trillion.  CAC ¶51.

Despite being the largest and most actively traded financial market in the world, the FX market is an opaque and unregulated over-the-counter market.  CAC ¶¶57, 79.  Because of its structure, as a former Citigroup banker noted, it is a market "in which price fixing and collusion could actually work."  CAC ¶78.

Currencies are purchased and sold in pairs. The price of one currency is expressed in relation to another as a ratio.  CAC ¶52.  For example, the Euro is frequently expressed in relation to the U.S. Dollar (*e.g.*, 1.2350).  CAC ¶¶59-60.  The number of U.S. Dollars it takes to buy Euros at any given point in time is the market price of U.S. Dollars compared to Euros.  If there is greater demand in the market for Euros compared to U.S. Dollars, the price of Euros will rise, and it will take more U.S. Dollars to buy Euros.  *Id.*

In the normal course (*i.e.*, absent collusion), Defendants seek to profit from their customers' orders by taking short-term positions of similar size to fulfill those orders.  CAC ¶165.  This allows Defendants to manage their risk so that they are generally not exposed to large swings in the price of a single currency.  *Id.*

***The WM/Reuters Closing Spot Rates ("The Fix")***.  Defendants' customers can purchase FX Instruments at any time of the day, but a large concentration of orders occurs at or around 4 p.m. London time, when the WM/Reuters Closing Spot Rates ("The Fix") are calculated.  CAC ¶63.  This case involves only that portion of the FX market: FX Instruments purchased at or around 4 p.m. London time and FX Instruments settled, in whole or in part, on the basis of The Fix.  CAC ¶43.

In calculating The Fix, the WM Company extracts actual market prices from electronic communications networks (*e.g.*, Reuters, Currenex, EBS), which Defendants use to execute orders for FX Instruments.  CAC ¶¶58-59, 65.  For the most widely traded currencies (the "Trade Currencies"), The Fix is determined by taking the median price of actually executed FX spot transactions and transactable bids and offers during a 60-second window of time between 3:59:30 and 4:00:30 p.m. London time.  CAC ¶¶65-66.

There are many reasons why Plaintiffs and members of the Class demand to execute FX Instruments at The Fix.  *See*, *e.g.*, CAC, ¶¶68-70.  For instance, The Fix is embodied in the construction of published indices used for tracking multi-country portfolios of assets.  CAC ¶68.  The Fix is popular with investors and managers aiming to replicate these indices because trading at The Fix eliminates tracking errors.  *Id.*  Prior to Defendants' collusive conduct coming to light, other investors chose to trade at The Fix because of the perception that it was a transparent and guaranteed published price.  CAC ¶¶63, 69.  Thus, The Fix is not only a benchmark used in indices, but it is also the price at which Defendants sell FX Instruments to Plaintiffs and members of the Class.  CAC ¶¶63, 68-70.

**Defendants conspired to fix The Fix.**  On June 12, 2013, a Bloomberg article revealed for the first time that Defendants had "been front-running client orders and rigging WM/Reuters rates by pushing through trades before and during the 60-second windows when the benchmarks are set."  CAC ¶99.  Shortly thereafter, Plaintiffs filed individual complaints, and their claims are now consolidated in the Complaint.

Plaintiffs allege that, before the calculation of The Fix, Defendants' senior FX traders met in chat rooms with names like "The Cartel," "The Sterling Lads," "The Bandits' Club," "The Mafia," and "One Team, One Dream."  Through chat room messages (and other direct communications), Defendants shared detailed, nonpublic price information about their customers' orders and Defendants' net trading positions.  CAC ¶¶94-95.  This allowed Defendants to know the likely direction of price movements at 4 p.m. London time, when The Fix is calculated.  CAC ¶¶81, 92, 98.  Based on their advanced knowledge, Defendants front ran their customers' orders, taking proprietary positions (*i.e.*, trades made on Defendants' own accounts) in the same direction, thus, aligning their interests.  CAC ¶¶83, 98-105.  Defendants agreed to employ other collusive trading strategies to move The Fix in a direction that would benefit those positions, including "banging the close" and "painting the screen."  CAC ¶¶99-100.  Chat room transcripts show that Defendants' collusive trading strategies worked.  Defendants'

FX traders boasted about their ability to "influence currency markets" and exchanged messages of congratulations when they succeeded in moving The Fix.  CAC ¶¶89, 117.

　　　　*Worldwide Criminal and Government Investigations*.  Following the June 12, 2013 Bloomberg article, law enforcement agencies around the world began investigating collusion in the FX market.  CAC ¶¶112-40.  In many cases, criminal divisions of these enforcement authorities are overseeing the investigations.  For example, after uncovering incriminating evidence about its own traders, UBS sought leniency from criminal prosecution under the U.S. Department of Justice ("DOJ") Antitrust Division's Leniency Program.  CAC ¶121.  This leniency application necessarily means that UBS has both admitted its own involvement in a criminal antitrust conspiracy and agreed to provide information with respect to other members' involvement in the criminal antitrust cartel.  CAC ¶121 & n.58.[3]

　　　　UBS is not the only Defendant cooperating with DOJ.  Barclays, RBS, and UBS are cooperating as a condition of deferred prosecution and non-prosecution agreements they reached in DOJ's LIBOR investigations.  CAC ¶¶113-15, 121.  DOJ and the FBI have questioned still other Defendants' employees.  CAC ¶¶117-18.[4]  Significantly, DOJ's criminal enforcement of the antitrust laws is limited to the most serious *per se* violations of the Sherman Act: price fixing,

---

[3]　　　For a corporation to enter the leniency program, it must "admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter."  Scott D. Hammond and Belinda A. Barnett, U.S. Dep't of Justice, *Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters* (Nov. 19, 2008) (available at 1.usa.gov/1lvOq7V).

[4]　　　After the Complaint was filed, Bloomberg reported that DOJ is preparing to impose fines and bring charges in its FX case before year-end.  Suzi Ring, *U.S. Said Readying to Levy Fines in FX Case as Soon as This Year*, BLOOMBERG (June 24, 2014) (available at http://bloom.bg/1reJIT1).  In several footnotes of this Opposition, Plaintiffs cite to new information in the public record after the filing of the Complaint on March 31, 2014.  If the Court grants Defendants' motion to dismiss, in whole or in part, Plaintiffs request leave to amend to include this type of information, as well as additional allegations Plaintiffs have developed.

bid rigging, and market allocation.[5]   As U.S. Attorney General, Eric Holder, explained in discussing the FX investigation, "[T]he manipulation we've seen so far may just be the tip of the iceberg."  CAC ¶119.  He elaborated that DOJ's criminal and antitrust divisions are "taking a leading role" in the "truly global investigation."  *Id*.

Other enforcement authorities participating in the global investigation include:

- The European Commission ("EC"), with Commissioner Joaquin Almunia acknowledging that EC is investigating the FX market and has learned of activities that "could mean violation of competition rules around the possible manipulation of types of exchange rates."  CAC ¶130.[6]

- The United Kingdom, in which the Financial Conduct Authority ("UK-FCA") has "confirm[ed] that we are conducting investigations alongside several other agencies into a number of firms relating to trading on the foreign exchange (forex) market."  CAC ¶126.  UK-FCA's Chairman and CEO confirmed the FX investigation is focused on "collusion between individuals at a number of firms and the use of chat rooms and phones to collude to influence prices."  Commenting on the evidence, UK-FCA's CEO added, "Given what's come out, no, people will not trust the way the rates are fixed."  CAC ¶127.[7]

- Swiss authorities, which have confirmed that they are investigating Defendants, including Barclays, Citigroup, Credit Suisse, RBS, and UBS, and that "[t]here are indications that these banks went into anti-competitive agreements to manipulate price rates in foreign exchange trading."  CAC ¶131.

- Germany's top financial regulator, which has moved its FX investigation to a "special investigation" category.  CAC ¶133.  The president of Germany's regulator stated that the allegations of FX manipulation are "particularly serious because such reference values

---

[5]     *See* Gregory J. Werden, Scott D. Hammond, and Belinda A. Barnett, Antitrust Division, U.S. Dep't of Justice, *Deterrence and Detection of Cartels: Using all the Tools and Sanctions* (March 1, 2012), at 2-3 (available at http://1.usa.gov/1l8PvSV).

[6]     After the Complaint was filed, Bloomberg reported that UBS is also applying for leniency in the EC's FX investigation. Gaspard Sebag, *UBS First to Report FX Rigging Shows EU Immunity Flaws*, BLOOMBERG (April 2, 2014) (available at http://bloom.bg/1qhoqT9).

[7]     Recently, moreover, the UK's Serious Fraud Office, an independent government department responsible for investigating and prosecuting serious and complex fraud, bribery and corruption, announced that it had opened a criminal investigation into the FX market.  Serious Fraud Office, *Forex Investigation Press Release* (July 21, 2014) (available at bit.ly/1sScn1b). Reuters quoted David Green, director of the Serious Fraud Office, as saying that he has "reasonable grounds" to suspect that a serious offense has occurred. Kirstin Ridley, *British fraud prosecutor signals possible forex charges next year*, REUTERS (July 23, 2014) (available at http://reut.rs/UqXqV9).

are based – unlike LIBOR and Euribor – typically on transactions in liquid markets and not on estimates of the banks." *Id.*[8]

- Hong Kong, Singapore, Australia, and New Zealand authorities, which have also joined the global investigation.  CAC ¶¶134-37.

## LEGAL STANDARD

A complaint must be sustained if it alleges "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In making this determination, the court must accept the complaint's factual allegations as true and draw all reasonable inferences and resolve all conflicts and ambiguities in favor of the plaintiffs. *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 168, 190 (2d Cir. 2012). Consistent with the Supreme Court's admonition in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), that the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts," the Complaint must be read "as a whole." *Anderson News*, 680 F.3d at 190.

Liberal notice pleading standards under Rule 8 apply to Section 1 claims.  *Twombly*, 550 U.S. at 554-55, 557.  *Twombly* held that pleading an antitrust conspiracy requires a complaint with enough factual matter (taken as true) to plausibly suggest that an agreement was made.  *Id.* at 556.  Having "plausible grounds to infer an agreement" means that the complaint has "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*  This requirement is consistent with Rule 8's requirement "that the 'plain statement' possess enough heft to 'show that the pleader is entitled to relief.'" *Id.* at 557.[9]

Defendants argue that Plaintiffs' allegations of conspiracy are subject to the heightened fact pleading standards of Rule 9.  MTD at 12 n.7.  But *Twombly* held that "heightened fact

---

[8]     More recently, the German regulator said it found concrete evidence that traders attempted to manipulate the global currency market.  The head of banking supervision stated that "multiple currencies" had been subject to attempted manipulation.  Alice Ross & Daniel Schäfer, *German regulator BaFin finds currency manipulation evidence*, FINANCIAL TIMES (May 20, 2014) (available at http://on.ft.com/1iSnXpU).

[9]     Unless otherwise noted, all emphasis is added and citations are omitted.

pleading of specifics" was not required to state a Section 1 claim; *Twombly* did not broaden Rule 9's scope. *Twombly*, 550 U.S. at 569 n.14, 570. And the Second Circuit has consistently applied Rule 8 standards to complaints alleging antitrust claims such as this one. *See*, *e.g.*, *Starr v. Sony BMG Music Entm't.*, 592 F.3d 314, 321 (2d Cir. 2010); *Anderson News*, 680 F.3d at 182.

Indeed, Rule 9 imposes heightened pleading requirements in only two instances: pleading fraud or mistake. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). It is for this reason that Defendants are only able to cite to cases in which allegations of fraud were central to the alleged antitrust claims. MTD at 12 n.7. For instance, in *Lum v. Bank of America*, the plaintiffs alleged that banks entered into a conspiracy "designed to ***fraudulently*** and artificially inflate" the interest rate at issue, leading the court to conclude that the defendants were alleged to have "accomplished the goal of their conspiracy through fraud." 361 F.3d 217, 228 (3d Cir. 2004) (emphasis in original). In *Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*, the plaintiffs' antitrust claim arose out of "fraudulently obtained copyright registrations" from the U.S. Copyright Office. 795 F. Supp. 639, 644 (S.D.N.Y. 1992).[10]

Here, Plaintiffs allege a standard price-fixing claim; they do not allege that Defendants achieved the goal of their conspiracy through fraud. Because this case alleges classic Section 1 conduct, Rule 8 pleading standards apply. *Hinds County, Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 385, 391 (S.D.N.Y. 2010); *see also In re Nasdaq Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 709-10 (S.D.N.Y. 1995) (collecting cases rejecting application of Rule 9 to antitrust claims). As detailed below, the Complaint more than satisfies Rule 8's pleading standard.[11]

---

[10]    Defendants' reliance on *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, is equally unavailing because, there, the plaintiff brought securities fraud claims, which are subject to the heightened pleading standards of Rule 9 and the Private Securities Litigation Reform Act. 493 F.3d 87, 93, 98 (2d Cir. 2007).

[11]    Even if a Rule 9 pleading standard were applied, Plaintiffs have more than satisfied it. Because a "claim of manipulation . . . can involve facts solely within the defendant's knowledge," at "the early stages of litigation, the plaintiff need not plead manipulation to the

**ARGUMENT**

## I.   THE COMPLAINT PLAUSIBLY ALLEGES A CONSPIRACY

### A.   The Standard for Pleading a Contract, Combination, or Conspiracy

Liability under Section 1 requires the plaintiff to allege (and eventually prove) a "contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. §1. The Supreme Court has described a contract, combination, or conspiracy under Section 1 as "'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

In considering the existence of a conspiracy, a court must take into account the "totality of the evidence," as opposed to "'dismembering it and viewing its separate parts.'" *Ross v. Am. Exp. Co.*, Nos. 04 Civ. 5723, 05 Civ. 7116, 2014 WL 1396492, at *25 (S.D.N.Y. Apr. 10, 2014) (quoting *Continental Ore*, 370 U.S. at 699). "Overall, '[c]ircumstances must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 681 (S.D.N.Y. 2012) (quoting *Monsanto*, 465 U.S. at 764). "'Once a conspiracy is shown, only slight evidence is needed to link another defendant with it.'" *Ross*, 2014 WL 1396492, at *24 (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 257 (2d Cir. 1987)).

"Because unlawful conspiracies tend to form in secret, . . . proof will rarely consist of explicit agreements." *Elec. Books*, 859 F. Supp. 2d at 681 n.3. As Defendants concede, even a tacit agreement violates Section 1. MTD at 12. Consequently, conspiracies "nearly always must be proven through 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'" *Anderson News*, 680 F.3d at 183; *see also Am. Tobacco Co. v. U.S.*, 328 U.S. 781, 809-10 (1946) (holding that a conspiracy "may be found in a course of dealings or other circumstances as well as in any exchange of words").

---

same degree of specificity as a plain misrepresentation claim." *ATSI*, 493 F.3d at 102; *see also In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1291 (S.D.N.Y. 1996).

To plead an antitrust conspiracy, "the plaintiff need not show its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment or a trial." *Anderson News*, 680 F.3d at 184 (internal citations omitted).  A plaintiff need only allege facts "plausibly suggesting" that the defendants acted pursuant to an agreement, tacit or express, as opposed to independent decision-making. *Twombly*, 550 U.S. at 557.  The standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id*. at 556.  Thus, Plaintiffs need only allege enough facts to "nudge [their] claim across the line from conceivable to plausible." *Id*. at 570.

In making this determination, *Twombly* does not authorize a court to choose among plausible inferences, as Defendants invite the Court to do.  *Compare* MTD at 14 (urging the Court to decide whether Plaintiffs' allegations are "just as consistent with independent actions") *with Nasdaq*, 894 F. Supp. at 714 (holding that the defendants' purported lawful explanations are "out of place in a motion to dismiss").  "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." *Anderson News,* 680 F.3d at 184.  "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Id*. at 185.  Thus, "[a] court ruling on [a Rule 12(b)(6) motion] may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." *Id*.; *see also Twombly*, 550 U.S. at 556.

## B.   The Complaint Directly Alleges a Conspiracy in Which Each Defendant Participated

Unlike the complaint found lacking in *Twombly*, the Complaint here does not seek to draw an inference of an agreement based merely on passive parallel behavior and inaction.  *See Twombly*, 550 U.S. at 564-65.  Rather, the Complaint directly alleges an agreement.  *See In re Insurance Brokerage Antitrust Litig*., 618 F.3d 300, 323-24 (3d Cir. 2010) (holding that

"[a]llegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate" to state a Section 1 claim).   In fact, UBS's leniency application requires it to admit its own involvement and agree to provide information as to other members of the cartel.  CAC ¶121 & n.58.   In addition, each Defendant's participation as a co-conspirator in the agreement is sufficiently detailed and plausibly alleged.

### 1.        The Complaint Directly Alleges a Conspiracy

Plaintiffs allege that Defendants' senior FX traders met in chat rooms before 4 p.m. London time and, through instant messages (and other forms of direct communications), exchanged each of their customers' order information and Defendants' net trading positions going into The Fix.  CAC ¶¶94-95.   Chat room transcripts produced to UK-FCA, for example, show that FX trader Usher (RBS and JPMorgan) wrote "messages to traders at other firms [that] included details of his trading positions."  CAC ¶94.  Usher ran The Cartel chat room with the participation of a half-dozen or more senior FX traders, including Ramchandani (Citigroup), Gardiner (Barclays), Ashton (Barclays), and O'Riordan (UBS).  CAC ¶86.  Defendants also used numerous other chat rooms – The Sterling Lads, The Bandits' Club, The Mafia, and One Team, One Dream – in furtherance of the conspiracy.   CAC ¶¶84, 90.   And these are only the chat rooms revealed to date, prior to any discovery.

Such chat room exchanges were not isolated instances of communications by rogue employees.   Rather, the practice was common among all Defendants, as demonstrated by the global investigations into Defendants' conduct in the FX market; the decisions by at least nine Defendants to ban their traders from using multibank chat rooms as a result of these investigations; and the fact that between 2013 and 2014, more than 30 of Defendants' employees have been fired, suspended, or have otherwise departed Defendants' employ, as a further result of these investigations.  CAC ¶¶91, 94, 151-64.[12]  Defendants' only response to the Complaint's

---

[12]        Since the filing of the Complaint, there have been additional suspensions and terminations by Deutsche Bank and UBS, as well as more departures from Bank of America, Barclays, Citigroup, Deutsche Bank, and UBS.

detailed allegations of these terminations, suspensions, and departures is that Plaintiffs have not shown that these employees were punished for "conduct that, if proven, would establish an antitrust violation." MTD at 15. But Plaintiffs have no obligation to prove their Section 1 claim at the pleading stage in the Complaint.[13]

The FX traders' evocative names for the chat rooms (*e.g.*, The Cartel) make the purpose of Defendants' chat room communications evident: Defendants were fixing The Fix. Defendants exchanged their customers' order information and Defendants' net trading positions so that they could know the likely direction of price movements at The Fix. CAC ¶¶81, 92, 98. Armed with information about future prices, Defendants coordinated the direction of their proprietary trades and agreed to move The Fix in a direction favorable to those trades. CAC ¶¶98-109. Notwithstanding the large volume of transactions occurring at or around 4 p.m. London time, the median methodology used to calculate The Fix made it possible for Defendants to move The Fix, and Defendants did so through collusive trading strategies to which they agreed in chat rooms before the calculation window. *Id.* Chat room transcripts show that their strategies worked – Defendants' FX traders boasted about their ability to "influence the currency markets" and exchanged messages of congratulations when they succeeded in doing so. CAC ¶¶89, 117.

These allegations are sufficient to plead an unlawful conspiracy. In *Anderson News*, for example, the Second Circuit held that the complaint plausibly alleged an actual agreement where it contained allegations that the defendants' executives met and communicated with their competitors and "that in those meetings and communications the defendants planned a concerted boycott." 680 F.3d at 187. Similarly, in *Elec. Books*, the Court held that the complaint plausibly alleged a direct agreement because it "describe[d] specific conversations from which it [was] fair

---

[13]    As to the claims of Credit Suisse, Goldman Sachs, and Morgan Stanley that they have not fired or suspended employees, MTD at 15 n.9, the Complaint alleges that each is the target of government investigations, that senior FX traders from each of these Defendants left as the government investigations intensified, and that each banned traders from participating in multibank chat rooms as a result of these investigations. CAC ¶¶91, 129, 131, 146, 156, 158, 161.

to infer that the [defendants] had agreed among themselves to adopt a joint strategy." 859 F. Supp. 2d at 682. And in *Nasdaq*, the Court found that the complaint's conspiracy allegations were sufficiently detailed, as they provided "a number of specifics with regard to the conspiracy," including the nature of the agreement and "some defendant-specific examples . . . reported in the press." 894 F. Supp. at 712.

Defendants nevertheless argue that the Complaint does not provide them adequate notice, asserting that the Complaint fails to allege the specific times, places, or persons involved in the conspiracy. MTD at 13, 16. Defendants ignore the foregoing detailed allegations and misstate the law. *Twombly* does not require that a plaintiff identify specific times, places, or persons related to each conspiracy allegation. *Starr*, 592 F.3d at 325; *see also Nasdaq*, 894 S. Supp. at 711 (holding that pleading "evidence" as to time, place, and effects of conspiracy is not required because once conspiracy is sufficiently alleged "further details may be secured by means of discovery, and related devices").

### 2. The Complaint Adequately Alleges Each Defendant's Participation in the Conspiracy

Defendants argue that the Complaint improperly uses the common convention of, at times, referring to Defendants collectively. MTD at 15. Defendants ask the Court to analyze each of their actions separately from the allegations of the overall conspiracy. MTD at 14-16. Their argument is wrong on the legal standard and suffers from a myopic reading of the Complaint's conspiracy allegations.

The Supreme Court has long rejected the approach Defendants advocate, holding that in cases alleging conspiracy among multiple actors involving multiple acts, courts should not "tightly compartmentaliz[e] the various factual components and wip[e] the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore*, 370 U.S. at 699. "Although *Continental Ore* was decided in the context of a motion for a directed verdict after trial, its maxim has been applied in a variety of contexts, including in consideration of

motions to dismiss." *Jung v. Ass'n of Am. Medical Colleges*, 300 F. Supp. 2d 119, 160 (D.D.C. 2004).   And, as numerous courts have held, it is perfectly acceptable for a complaint to make allegations that refer to defendants collectively, when such pleading refers to all of the defendants, as it does here.   *See, e.g.*, *Hinds County*, 700 F. Supp. 2d at 394 (holding that there is no requirement that a complaint "be detailed with overt acts by each defendant"); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08 Civ. 42 JG VVP, 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011), *adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012) (rejecting the defendants' objection "to the use of the term 'defendants' or to defined groups of defendants in the individual claims").[14]

Moreover, contrary to Defendants' assertion, the Complaint sets forth detailed allegations of each Defendant's involvement in the conspiracy. For example, the Complaint alleges:

- Bank of America suspended its head FX spot trader in March 2014 and is cooperating with FX investigations across "North America, Europe, and Asia." CAC ¶¶142, 152.

- Barclays, pursuant to its non-prosecution agreement with DOJ in LIBOR and Euribor matters, is cooperating with DOJ's FX investigation. CAC ¶¶113, 114. Barclays has also been specifically identified as a target of additional investigations in the United States and Switzerland and is cooperating with these and other government investigations. CAC ¶¶114, 119, 124, 143. Barclays suspended or terminated six FX traders in November 2013 following an internal inquiry. CAC ¶153. Among the suspended/terminated traders were Gardiner and Ashton, both members of The Cartel chat room. *Id.* Barclays has since banned FX traders from participating in chat rooms. CAC ¶91.

- BNP Paribas is a target of DOJ's FX investigation, and federal agents have questioned its executives. CAC ¶118. In March 2014, BNP Paribas suspended its head of FX spot trading, De Groot. CAC ¶¶97, 118. De Groot participated in the Chief Dealers Sub Group of the Bank of England's Foreign Exchange Joint Standing Committee, which met at BNP Paribas' London Office in April 2012. CAC ¶95. A senior FX trader at this meeting took notes memorializing how the chief dealers told Bank of England officials that they shared information about customer orders before FX benchmarks were set. *Id.*

---

[14]     *See also In re OSB Antitrust Litig.*, No. 06 Civ. 826, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007) ("Antitrust conspiracy allegations need not be detailed defendant by defendant."); *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 949 (E.D. Tenn. 2008) ("That they require only a few paragraphs or sentences to [plead facts as to a particular defendant] is of no consequence.").

- Citigroup has been specifically identified as a target of FX investigations in the United States and Switzerland and is cooperating with all investigations.  CAC ¶¶124, 131, 144.  In January 2014, Citigroup terminated Ramchandani, head of FX spot trading in London.  CAC ¶¶88, 155.  Ramchandani was a member of The Cartel chat room and was also present at the Chief Dealers Sub Group meeting where chief dealers told Bank of England officials that they shared information about customer orders before FX benchmarks were set.  CAC ¶¶87, 95.  Citigroup has suspended at least one other FX trader and banned traders from participating in chat rooms.  CAC ¶¶91, 155.

- Credit Suisse has been specifically identified as a target of multiple FX investigations in the United States and Switzerland.  CAC ¶¶124, 131.  The Swiss regulator collected evidence from Credit Suisse (and other Defendants) and, based on that evidence, stated that "[t]here are indications that these banks went into anti-competitive agreements to manipulate price rates in foreign exchange trading."  CAC ¶131.  Credit Suisse has since banned FX traders from participating in chat rooms.  CAC ¶91.  In addition, Credit Suisse's head of global FX left the bank in September 2013.  CAC ¶156.

- Deutsche Bank is a target of DOJ's FX probe, with DOJ and FBI agents questioning Wallden, the former director of the bank's FX trading unit, about a chat room transcript in which he boasted "about his ability to influence currency markets."  CAC ¶117.  Deutsche Bank fired Wallden and two other NY-based traders in February 2014 and put additional personnel on leave in March 2014 following an internal investigation.  CAC ¶¶117, 157.  Deutsche Bank is also a primary target of the FX investigation in Germany by BaFin, the country's top financial regulator.  BaFin agents have visited Deutsche Banks' London offices to question executives.  CAC ¶133.[15]  Deutsche Bank has been specifically identified as a target of additional investigations in the United States and is cooperating with all investigations.  CAC ¶¶124, 145.  Deutsche Bank banned traders from participating in chat rooms.  CAC ¶91.

- Goldman Sachs is the target of numerous financial investigations, including FX, and has been specifically identified as a target of the New York Department of Financial Services' FX investigation.  CAC ¶¶124, 146.  Since February 2014, two senior FX traders have left the bank.  CAC ¶158.  Goldman Sachs banned traders from participating in chat rooms.  CAC ¶91.

- HSBC is the target of the global FX investigations, including by UK-FCA, which is examining chat room communications between top traders at financial institutions.  CAC ¶¶129, 147.  HSBC suspended two FX traders in January 2014.  CAC ¶159.

- JPMorgan has been specifically identified as a target of the global FX probes, including in the United States, and is cooperating with all investigations.  CAC ¶¶131, 148.  Former FX trader, Usher, ran The Cartel chat room while he was JPMorgan's chief currency

---

[15]  After the filing of the Complaint, the German regulator stated it found concrete evidence that traders attempted to manipulate "multiple currencies."  Alice Ross & Daniel Schäfer, *German regulator BaFin finds currency manipulation evidence*, FINANCIAL TIMES (May 20, 2014) (available at http://on.ft.com/1iSnXpU).

dealer in London from 2010-2013.  CAC ¶86.  A transcript produced by RBS (Usher's employer until 2010) to the UK-FCA revealed that Usher wrote "messages to traders at other firms [that] included details of his trading positions."  CAC ¶94.  JPMorgan suspended Usher in October 2013.  CAC ¶160.  JPMorgan banned traders from participating in chat rooms.  CAC ¶91.

- Morgan Stanley has been specifically identified as a target of UK-FCA's investigation and produced information to that agency.  CAC ¶129.  UK-FCA's investigation is focusing on trader communications at leading financial institutions, including in chat rooms.  *Id*.  In March 2014, a long-time senior FX trader left the bank.  CAC ¶161.  Morgan Stanley banned traders from participating in chat rooms.  CAC ¶91.

- RBS entered into a deferred prosecution agreement with DOJ relating to Yen LIBOR and Swiss Franc LIBOR and, pursuant to the agreement, is cooperating with DOJ in its FX investigation.  CAC ¶114.  RBS has also been specifically identified as a target of other investigations in the United States, United Kingdom, and Switzerland and is cooperating with all investigations.  CAC ¶¶124, 131, 149.[16]  RBS produced chat room transcripts to UK-FCA, including a transcript that shows its former FX trader, Usher, communicating details of his trading positions to counterparts at competing banks.  CAC ¶94.  Prior to joining JPMorgan in 2010, Usher was a senior FX trader at RBS.  CAC ¶86.  RBS has also suspended or terminated three London-based traders.  CAC ¶162.  In addition, RBS senior FX trader, Pearson, attended the Chief Dealers Sub Group meeting where chief dealers informed the Bank of England that they shared customer orders before The Fix.  CAC ¶95.  RBS banned traders from participating in chat rooms.  CAC ¶91.

- UBS approached DOJ with an application to enter the Antitrust Division's Leniency Program in September of 2013.  CAC ¶121.[17]  Under the leniency program, UBS will receive immunity from antitrust charges if it provides information about other cartel members and otherwise cooperates with the investigations.  The information UBS took to authorities likely includes the chat room communications of the bank's senior FX trader, O'Riordan, who participated in The Cartel chat room.  CAC ¶87.  UBS suspended O'Riordan in October 2013 and has suspended or terminated at least eight other employees with FX responsibilities following an internal review.  CAC ¶¶97, 150, 163.  UBS also banned traders from participating in chat rooms.  CAC ¶91.

---

[16]     Reuters recently quoted RBS's chief executive as stating, "An investigation into alleged manipulation of foreign exchange markets could pose a bigger problem for banks than the LIBOR interest rate rigging scandal. . . .  The difference this time is that we haven't sat back and denied it.  We've gone into it and are doing the investigation hand-in-hand with the authorities."  Steve Slater, *FX probe could be bigger problem than LIBOR: RBS chief*, REUTERS (July 18, 2014) (available at http://reut.rs/1pbLoHd).

[17]     After the Complaint was filed, Bloomberg reported that UBS is applying for amnesty and cooperating with the EC's FX investigation.  Gaspard Sebag, *UBS First to Report FX Rigging Shows EU Immunity Flaws*, BLOOMBERG (Apr. 2, 2014) (available at http://bloom.bg/1qhoqT9).

It is well established that "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980). Indeed, "'[o]nce a conspiracy is shown, only slight evidence is needed to link another defendant with it.'" *Ross*, 2014 WL 1396492, at *24 (quoting *Apex Oil*, 822 F.2d at 257). As demonstrated above, the Complaint directly alleges a plausible agreement and provides sufficient facts to show each Defendant's participation in the conspiracy. The allegations far exceed the slight evidence standard.

Defendants cite to cases where complaints were dismissed for lack of sufficient particularity, but those cases are readily distinguishable. *See* MTD at 14, 16-17. *In re Elevator Antitrust Litig.* was dismissed because the complaint coupled a conclusory allegation of conspiracy with allegations of mere parallel conduct, irrelevant European conduct, and a list of "theoretical possibilities" as to how the conspiracy might have been carried out. 502 F.3d 47, 50-51 (2d Cir. 2007). Similarly, the complaints in *In re Parcel Tanker Shipping Services Antitrust Litig.*, 541 F. Supp. 2d 487, 492 (D. Conn. 2008), *Total Benefits Planning Agency v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008), and *Hinds County, Miss. v. Wachovia Bank, N.A.*, 620 F. Supp. 2d 499, 512-13 (S.D.N.Y. 2009), failed to allege any facts that showed how the conspiratorial activities were accomplished and simply recited the statutory language of the Section 1.[18] Here, by contrast, Plaintiffs make specific allegations showing how each Defendant contributed to and accomplished the conspiracy.

---

[18] The other cases Defendants cite are even further afield. The complaint in *Invamed, Inc. v. Barr Labs, Inc.* was dismissed because it failed to allege even a conclusory allegation of concerted action between any of the defendants. 22 F. Supp. 2d 210, 221 (S.D.N.Y. 1998). The complaint in *Am. Sales Co., Inc. v. AstraZeneca AB* was dismissed because it suffered from definitional ambiguities that rendered the allegations incoherent. No. 10 Civ. 6062(PKC), 2011 WL 1465786, at *5 (S.D.N.Y. Apr. 14, 2011). In *Arista Records LLC v. Lime Group LLC*, the complaint was dismissed because the complaint failed to allege any facts, even when the facts were within the plaintiff's knowledge. 532 F. Supp. 2d 556, 577 (S.D.N.Y. 2008).

17

### C.       The Conspiracy Is Economically Plausible

Mischaracterizing the Complaint as alleging a conspiracy to "manipulate the daily benchmark rates for 159 currencies," Defendants argue that the Complaint should be dismissed because the conspiracy does not make economic sense.  MTD at 9-10, 18-20.  But nowhere in the Complaint do Plaintiffs allege a daily, 159-currency-price-fixing conspiracy.  Given that the FX market is opaque, CAC ¶¶79, 80, and that the discovery stay prevents Plaintiffs from examining Defendants' transaction records and communications, Plaintiffs are not required to deduce, based only on the public record, which currency pairs were subject to Defendants' price-fixing conspiracy on which days at the pleading stage.  *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 230, 234-35 (2d Cir. 2014) (holding district court erred in resolving a question of fact and dismissing complaint "prior to any discovery" when a "more fully developed factual record" was required to resolve the question); *see also Anderson News*, 680 F.3d at 183 (noting that the defendants' '"conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court . . . with precision.'").

The purpose of the Complaint is to put Defendants on notice, which, as demonstrated by Defendants' offering of additional facts in an attempt to excuse their behavior, it does.  Plaintiffs do not allege mere "labels and conclusions" or a "formulaic recitation of the elements" of a Section 1 claim.  *Twombly*, 550 U.S. at 555.  In other words, unlike in *Twombly*, where the complaint "furnishe[d] no clue" as to the details of the conspiracy and the defendants, in preparing a response, "would have little idea where to begin," here, Defendants attempt to offer extensive, self-serving characterizations of facts outside the Complaint in response to Plaintiffs' well-pleaded claim.  *Id*. at 565 n.10.  Defendants have more than adequate notice to prepare their defense.

As to economic plausibility, Defendants assert an alternative fact pattern that improperly relies on facts outside the Complaint.  Defendants argue that the conspiracy is economically implausible  because  participation  in  the  conspiracy  would  "theoretically  financially

disadvantage[]" them, as Defendants hold net order positions that are directionally opposed to one another.  MTD at 20.  This allegation does not appear in the Complaint, and crediting Defendants' factual assertions would violate the legal standard.  At the pleading stage, Plaintiffs' allegations must be credited, and all reasonable inferences drawn in favor of Plaintiffs, not Defendants. *See Anderson News*, 680 F.3d at 184-85, 190.

In any event, the conspiracy alleged is economically plausible.  Plaintiffs allege that throughout most of the trading day when a customer purchases an FX Instrument, Defendants fulfill those orders by taking short-term positions of similar size and, thus, do not carry large open positions on their books.  CAC ¶165.  However, as customers placed orders to be executed at The Fix in advance of 4 p.m. London time, Defendants' conspiracy led them to do something different.  Defendants knew that a high volume of FX trading would occur at or around 4 p.m. London time.  CAC ¶¶61-62, 101.  Sharing each of their customer orders and net positions provided Defendants with an opportunity, which they collusively availed themselves of, to make money on large proprietary positions (*i.e.*, front running their customers' orders).  CAC ¶¶101, 105.  For any one Defendant acting alone, a large proprietary position going into The Fix would be extremely risky because a wrong bet could cause substantial losses; Defendants would not have taken on this risk absent collusion.  CAC ¶¶103, 110.  As detailed above, however, Defendants entered chat rooms and exchanged their customer-specific order information and net positions, which enabled them to know the likely direction of price movements at The Fix.  CAC ¶¶81, 92, 98.  The shared knowledge of customers' orders and net positions significantly reduced, if not eliminated, Defendants' risk in taking large proprietary positions.  CAC ¶¶103-04.  Through their collusive trading strategies, agreed-to through direct communications, Defendants pushed The Fix to their benefit.  Defendants contend that "multidirectional trading" renders the conspiracy implausible, but this is just another example of Defendants relying on purported facts alleged nowhere in the Complaint.  Instead, Plaintiffs allege that Defendants lined up and made proprietary trades in the same (not multiple) direction.  CAC ¶104.

Further, neither the time span nor the complexity of the conspiracy renders it implausible, as Defendants suggest.  *See* MTD at 18-19, 20 n.11.  In fact, courts have upheld price-fixing actions of similar – and even more ambitious – scope and complexity.  *See*, *e.g.*, *In re Auto. Parts Antitrust Litig.*, 12-md-02311, 2014 WL 1746579, at *2, *4-12 (E.D. Mich. Apr. 30, 2014) (denying motion to dismiss a "decade-long global conspiracy"); *In re Fasteners Antitrust Litig.*, Civ. A. 08-md-1912, 2011 WL 3563989, at *10-11 (E.D. Pa. Aug. 12, 2011) (concluding that plaintiffs plausibly alleged conspiracy covering multiple products spanning from "January 1, 1991, until September 19, 2007"); *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 15 (D.D.C. 2004) (denying defendants' summary judgment motion on international "all-vitamins" conspiracy to fix prices of 18 types of vitamins over ten years).

None of the cases Defendants cite, MTD at 18, in which economically implausible claims were dismissed, are on point.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) and *United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 146 F. Supp. 2d 385, 402 (S.D.N.Y. 2001) were predatory pricing claims, which the Supreme Court views as almost inherently implausible.  *See Matsushita*, 475 U.S. at 588-89 ("A predatory pricing conspiracy is by nature speculative," and "the success of such schemes is inherently uncertain.").  Predatory pricing cases do not apply to Plaintiffs' horizontal price-fixing claim, which is a *per se* claim condemned as a matter of law.[19]  *See* §III, *infra*.

### D.   Plaintiffs Allege Circumstantial Evidence that Further Supports an Inference of a Conspiracy

Even assuming the Complaint did not directly allege the existence of a plausible conspiracy (which it does), *see* §I.B., *supra*, it would nevertheless survive the motion to dismiss because it also sets forth a host of additional circumstantial evidence that support the inference of

---

[19]   Nor do the other cases Defendants cite apply here.  MTD at 18.  In *Cascades Computer Innovation LLC v. RPX Corp.*, No. 12-cv-01143, 2013 WL 316023, at *11 (N.D. Cal. Jan. 24, 2013), and *Burnson Comm'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563-64 (E.D. Pa. 2002), the plaintiffs' own allegations revealed their antitrust claims made no economic sense.

conspiracy.   Antitrust conspiracies are typically alleged (and proven) through "inferences that may fairly be drawn from the behavior of the alleged conspirators." *Anderson News*, 680 F.3d at 183.   In alleging conspiracy by inference, a plaintiff must show a "context," or "setting," suggesting an agreement. *Id.* at 184 (citing *Twombly*, 550 U.S. at 557).

Providing a context suggestive of agreement has been described by many courts as allegations of circumstantial evidence, or "plus factors." *Mayor and City Council of Baltimore Maryland v. Citigroup, Inc.*, 709 F.3d 129, 136 (2nd Cir. 2013).   Courts have identified numerous plus factors, but there is no finite list. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004).   The Complaint satisfies the "plus factor" standard by alleging the following: (1) Defendants operated in a market conducive to collusion; (2) Defendants acted against their independent economic self-interests; (3) Defendants shared price information; (4) Defendants shared a common motive to conspire; (5) Defendants engaged in a high level of inter-firm communications; (6) Defendants had opportunities to conspire; (7) Defendants are subject to numerous criminal and civil investigations into the very conduct the Complaint alleges; and (8) Defendants were involved in other, similar conspiracies. *See Starr*, 592 F.3d at 323 (discussing seven plus factors that prove a "context that raises a suggestion of a preceding agreement"); *In re Pool Products Distribution Market Antitrust Litig.*, MDL No. 2328, 2013 WL 6670020, at *10 (E.D. La. Dec. 18, 2013) (listing seven plus factors that are commonly identified by courts).

First, ***the FX market is conducive to collusion*** because the market is highly concentrated, dominated by Defendants, has high barriers to entry, and lacks regulatory oversight.   *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654-55 (7th Cir. 2002) (holding that "structure of the market was such as to make secret price fixing feasible"); *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 826-27 (D. Md. 2013) (finding market that is highly concentrated, dominated by cartel members, and with high barriers to entry as conducive to collusion).   Beginning in the late 1990s, the FX market experienced a substantial increase in concentration.   CAC ¶74.   Defendants are the dominant dealers in the FX market, with a

21

combined global market share of 84 percent.  CAC ¶¶2, 74.  Their market share is protected by high barriers to entry, including technological, informational, and capital barriers.  CAC ¶¶76-77. As one former Citigroup banker observed, "This is a market in which price fixing and collusion could actually work."  CAC ¶78.

Second, Defendants' placement of large proprietary trades at or around The Fix and their exchange of confidential customer order information and net positions are ***acts against each Defendant's independent economic self-interest*** had Defendants' actions not been coordinated. *See Starr*, 592 F.3d at 324 ("'Some acts, or failures to act, cannot be profitably continued unless rivals behave in parallel.'") (citing 7 Phillip E. Areeda and Herbert Hovenkamp, ANTITRUST LAW, §1415b (2d ed. 2003)); *Flat Glass*, 385 F.3d at 360-61 ("Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market.").

As detailed in §I.C., *supra*, as a result of sharing information about orders and positions, Defendants were able to know the likely direction of price movements at The Fix.  CAC ¶¶81, 92, 98.  With this information, Defendants entered into large proprietary positions, front running their customers' orders around the time of The Fix.  CAC ¶104.  Absent collusion, Defendants would not have taken positions of such size, or possibly at all, because such trades would simply be too risky.  CAC ¶¶103, 110.  However, through their collusion, Defendants were able to minimize (or even eliminate) this risk.  CAC ¶83.

Further, in a competitive market, the sharing of confidential customer information is adverse to each Defendant's individual economic self-interest.  Defendants spend effort (and therefore, time and money) analyzing their customers' trading patterns, such that they can often predict a customer's trade even before a customer places an order.  CAC ¶61.  This information is commercially sensitive and valuable to Defendants.  CAC ¶¶92-94.  Moreover, the infrastructure necessary to perform such customer analysis is so costly as to constitute a barrier to entry, and surrendering the benefit of this investment to a competitor makes no economic sense.  *See* CAC ¶¶76-77, 81-82.  The sharing of customer order information also violates the

22

Federal Reserve Bank of New York's Guidelines for Foreign Exchange Trading Activities. CAC ¶93. Thus, absent collusion, no rationally acting Defendant would share this information with its competitors.[20]

Third, ***Defendants' exchange of price information*** is itself a plus factor that indicates the existence of a price-fixing agreement. *See Todd v. Exxon Corp.*, 275 F.3d 191, 211-13 (2d Cir. 2001) (sharing of current, specific, non-aggregated, and nonpublic price information facilitates price fixing); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (finding the direct exchange of price information facilitates price fixing). The pricing information Defendants exchanged in the chat rooms was current. *See*, *e.g.*, CAC ¶94 ("[S]hortly before the fix . . . it was common for a group of senior currency traders to discuss with their competitors the types and volumes of trades they planned to place."). The information was specific. *See*, *e.g.*, CAC ¶94 ("JPMorgan's Richard Usher wrote messages to traders at other firms [that] included details of his trading positions."). And the information was not publicly disseminated. CAC ¶92 ("confidential customer order information"); *see also* CAC ¶94 ("market-sensitive information"). This information was both expensive to acquire and critically sensitive. Yet, as the Complaint details, Defendants exchanged this information with one another.

Fourth, Defendants' shared a ***common motive to conspire***. *See Apex Oil*, 822 F.2d at 254 (emphasizing that a "common motive to conspire" is indicative of conspiracy); *Flat Glass*, 385 F.3d at 360 (noting that "evidence that the defendant had a motive to enter into a price fixing conspiracy" is indicative of conspiracy.). Defendants can increase their illicit profits (at Plaintiffs' expense) by coordinating their collusive trading strategies of banging the close and

---

[20]     Defendants' argument that Plaintiffs "do ***not*** allege that defendants shared information, such as the volume and price of individual orders," MTD at 24, ignores the Complaint's plain language. *See*, *e.g.*, CAC ¶7 ("Defendants exchanged confidential customer order information and trading positions."); CAC ¶89 ("Defendants exchanged information on customer orders."); CAC ¶92 ("Defendants shared their confidential customer order information with one another."); CAC ¶95 ("A number of Defendants have admitted to the Bank of England that they shared their confidential customer information.").

painting the screen.  Because multiple Defendants could necessarily execute more transactions during the calculation window than a single Defendant could, collusion would maximize the effect that banging the close would have on The Fix.  CAC ¶¶106-07.  Similarly, painting the screen, which consists of Defendants placing orders in the market to create the illusion of trading activity in a given direction, CAC ¶¶108-09, is more effective when undertaken together.[21]

Fifth, the Complaint alleges numerous ***inter-firm communications***.  *See Apex Oil*, 822 F.2d at 254 (recognizing "a high level of interfirm communications" supports inference of a conspiracy); *Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911, 2004 WL 594396, at *7 (S.D.N.Y. Mar. 23, 2004) ("[E]vidence of discussions and agreements, even related to other pricing strategies, [has] relevance here and [bolsters] an inference that defendants colluded on commissions as well.").  The Bank of England's investigation alone included the search and review of 15,000 emails, 21,000 Bloomberg and Reuters chat room transcripts, and more than 40 hours of telephone records of inter-firm communications.  CAC ¶96.  These and other transcripts have been produced to law enforcement agencies across the world.  *See* CAC ¶¶112-50.

Sixth, Plaintiffs alleged ***opportunities to conspire***.  *See In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 53 (E.D. Pa. 2007) ("Proof of opportunity to conspire is relevant.").[22] Defendants' FX traders belonged to the same social clubs and participated in the same social activities, providing opportunities to conspire.  CAC ¶78.  As one FX market observer stated, the FX market is "dominated by an extremely small group of individuals, often with strong social ties formed by working with each other at some point in the past."  *Id.*

---

[21]    Similar to avoiding the risk of being "run over," collusion also ensures that another Defendant was not banging the close or painting the screen in the opposite direction.  *Cf.* CAC ¶103.

[22]    The cases Defendants cite, MTD at 22, refuse to infer agreement based on "a ***mere*** opportunity to conspire . . . ***standing alone***," *In re Travel Agent Com'n Antitrust Litig*, 583 F.3d 896, 911 (6th Cir. 2009), and "***mere*** presence at industry associations and meetings," *Hinds County, Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010).  While mere opportunities to conspire standing alone may be insufficient to infer agreement, Plaintiffs allege seven other plus factors that clearly distinguish this case from those on which Defendants rely.

Seventh, ***Defendants are subject to multiple investigations for the very conduct the Complaint alleges***.   Defendants argue that the myriad government investigations into their conduct in the FX market do not support an inference of conspiracy.  MTD at 25.   But the Second Circuit has made clear that it is permissible for a complaint to use the existence of government investigations to provide part of the factual context that make allegations of conspiracy plausible.  *See Starr*, 592 F.3d at 324 (holding that it is permissible for a complaint to use the existence of government investigations to support the plausibility of allegations).[23] Significantly, as described above, DOJ's criminal and antitrust investigations are proceeding with the cooperation of at least four Defendants, and UBS has applied for leniency,[24] which requires an admission of involvement in a criminal conspiracy.  CAC ¶¶113-15, 121.  Similarly, as detailed above, government authorities around the world have been quoted as saying that they are investigating the FX market and, in some cases, have already found evidence of collusion. *See* pages 5-7, *supra*.

Finally, many of the Defendants have been the target ***of criminal and regulatory probes in other cases involving conspiracies within the financial sector***.  *See In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (holding that evidence concerning a prior conspiracy is relevant to the plausibility of a similar conspiracy). For example, law enforcement authorities in the United States, Europe, and Asia have been investigating many of the same Defendants' wrongdoing in the setting of LIBOR.  *See*, *e.g.*,

---

[23]     Courts in other circuits agree.  *See*, *e.g.*, *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 632 (E.D. Pa. 2010) ("Add to this the existence of a parallel criminal investigation – an allegation demonstrating that the government believes a crime may have occurred – and the result is 'enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement.'"); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1008-09 (E.D. Mich. 2010) (holding that government investigations and guilty pleas support the plausibility of a nationwide conspiracy).

[24]     *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 06-MD-1775(JG)(VVP), 2009 WL 3443405 (E.D.N.Y. Aug. 21, 2009) *aff'd*, 697 F.3d 154 (2d Cir. 2012) (finding that it is permissible to rely on defendants' entry into DOJ's leniency program to infer an illegal agreement).

CAC ¶¶113-15 (Barclays, RBS, and UBS entered into deferred and non-prosecution agreements). DOJ also has an ongoing criminal investigation into bid-rigging and manipulation in the municipal bonds derivatives market involving many of the same Defendants. *See*, *e.g.*, *Hinds County*, 700 F. Supp. 2d at 385 (noting that Bank of America entered into DOJ's antitrust corporate leniency program).

Plaintiffs' well-pleaded allegations of these eight plus factors further support an inference of conspiracy, especially when read in conjunction with the direct allegations of agreement in the Complaint, which must be considered in its entirety. *Continental Ore*, 370 U.S. at 699.

## II.    PLAINTIFFS ALLEGE INJURY-IN-FACT

Defendants contend that Plaintiffs' allegations of injury are insufficient to demonstrate the manner in which Defendants' anticompetitive scheme harmed Plaintiffs and that Plaintiffs are required to allege the details of specific transactions that they entered into with Defendants on specific days. MTD at 26-27. Defendants' arguments that these allegations are insufficient rest on a muddled application of standing and injury principles from inapposite cases, and contrary to Defendants' arguments, antitrust claims are not subject to heightened standards of pleading for injury-in-fact. *Ross*, 524 F.3d at 225. Rather, "[i]njury in fact is a low threshold," *id.* at 222, and allegations on the amount of damage Plaintiffs have suffered are "not required in order to establish injury-in-fact at the pleading stage." *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 106 (D.D.C. 2013).

Plaintiffs have more than met their burden. Defendants' price-fixing conspiracy "impacted the pricing of trillions of dollars' worth of FX Instruments, inflicting severe financial harm on Plaintiffs and members of the Class." CAC ¶9. The Complaint alleges that Defendants' trading practices in FX spot transactions at and around 4 p.m. London time were collusive and anticompetitive; that The Fix is determined from actual orders, bids, and asks of FX spot transactions in that 4 p.m. window; that The Fix determines the price of FX Instruments; and that Plaintiffs entered into FX Instruments with Defendants at prices that were based, in whole or in part, on The Fix. CAC ¶¶3-7, 15-26, 53-54, 68-70. Thus, Defendants'

anticompetitive conduct directly impacted the prices Plaintiffs paid to Defendants, and Plaintiffs paid more or received less than they would have in the absence of Defendants' collusion. CAC ¶¶168-73. These allegations are more than sufficient to establish that Defendants' collusion resulted in Plaintiffs paying overcharges – the classic form of antitrust damages in a price-fixing case.[25] *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) ("When horizontal price fixing causes buyers to pay more, or sellers to receive less, than the prices that would prevail in a market free of the unlawful trade restraint, antitrust injury occurs."). Given these well-settled principles, it is unsurprising that Defendants do not cite a single case in which a court has held that antitrust plaintiffs failed to adequately plead injury-in-fact,[26] or that antitrust

---

[25]    As the Supreme Court has held for more than a century, the payment of overcharges is the classic form of injury in antitrust cases. *See Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 396 (1906) (noting that the plaintiff was injured "by being led to pay more than the worth of the" product at issue); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1079 (2d Cir. 1988) ("In general, the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust laws is deemed to have suffered . . . antitrust injury.").

[26]    Defendants cite cases that either involved dismissal of non-antitrust claims or dismissal of antitrust claims on other grounds, but those cases do not turn on – or even analyze – the level of specificity of the pleadings. *See Port Dock & Stone Corp. v. Oldcastle NE., Inc.*, 507 F.3d 117, 121-24 (2d Cir. 2007) (explaining that "[t]he ***danger to customers*** from monopolization of the production level is the danger that the monopolist will raise prices and restrict output" and concluding that the plaintiff, a former dealer and a ***competitor***, had failed to allege antitrust injury); *Gatt Commc'ns v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (explaining that the plaintiff had "not been forced to pay higher prices for a product, as customers who are victimized by price-fixing schemes might" and that the antitrust laws are "not concerned with injuries to ***competitors*** such as Gatt resulting from their participation in or exile from" the alleged price-fixing scheme) (emphasis in original); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 215-17, 221 (2d Cir. 2004) (declining, in a case where the plaintiffs owned seven hotels and sued a company that managed their hotels alleging that it obtained kickbacks that allegedly constituted commercial bribery from vendors in violation of Section 2(c) of the Robinson-Patman Act, to decide whether the plaintiffs had suffered an injury).

plaintiffs are required to plead the specifics of each and every (or, indeed, any) transaction that caused them injury.[27]

Defendants' focus on cases involving manipulation of LIBOR (*In re LIBOR-Based Fin. Instruments Antitrust Litigation*, 962 F. Supp. 2d 606, 624 (S.D.N.Y. 2013) ("*LIBOR II*")), and of Euroyen TIBOR (*Laydon v. Mizuho Bank, Ltd.*, 12-CV-3419 GBD, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014)), is equally misplaced. Although Defendants selectively quote from these decisions to make them appear favorable, neither opinion dismissed an antitrust claim for failure to plead injury-in-fact with specificity.

The portion of the *LIBOR II* decision Defendants cite concerns whether certain plaintiffs (*i.e.*, those plaintiffs that purchased LIBOR products over an exchange rather than directly from the defendants) could amend their complaint to include additional allegations in their claim under Section 22(a) of the Commodity Exchange Act ("CEA").[28] *See* MTD at 29. Moreover, in the Court's earlier opinion, it denied the defendants' motion to dismiss, specifically finding that the plaintiffs had sufficiently pled the injury associated with their CEA claims, even under Rule 9. *In re LIBOR-Based Fin. Instruments Antitrust Litigation*, 935 F. Supp. 2d 666, 714 (S.D.N.Y.

---

[27]    Neither *Fink v. Time Warner Cable*, No. 08 CIV. 9628 LTS KNF, 2009 WL 2207920 (S.D.N.Y. July 23, 2009) nor *Kounitz v. Slaateen*, 901 F. Supp. 650 (S.D.N.Y. 1990) support Defendants' proposition. *See* MTD at 27. In *Fink*, the Court dismissed a claim under the Computer Fraud and Abuse Act, 18 U.S.C. §1030, because the plaintiff simply ("parrot[ted] the statutory language" in its complaint. 2009 WL 2207920, at *4. In *Kounitz*, a civil rights action, the Court held that a plaintiff could "not claim relief for injury to a third party." 901 F. Supp. 2d at 654. By contrast, Plaintiffs' allegations of injury do not merely state that Plaintiffs were "injured in [their] business or property by reason of [something] forbidden in the antitrust laws," nor do Plaintiffs attempt to recover on behalf of third parties.

[28]    The exchange-based plaintiffs sought to include in this claim allegations "based on the day-to-day, trading-based manipulation at issue in the Barclays settlement, that is, manipulation wherein defendants allegedly submitted specific LIBOR quotes in order to benefit particular positions that they held in the Eurodollar futures market." *LIBOR II*, 962 F. Supp. 2d at 619-24. As to those discrete allegations at issue in the CEA claims, the Court noted that those plaintiffs could have pleaded the alleged manipulation and the harm stemming from it more specifically based on the factual detail included in the government's settlement documents with Barclays. *Id.* at 621, n.20.

2013) ("*LIBOR I*").[29]   In doing so, the Court explained that "[a]lthough plaintiffs have not

identified precisely how each LIBOR quote from each defendant on each day during the Class

Period was or was not artificial, ***they could not reasonably be expected to do so at this stage of

the litigation***."   935 F. Supp. 2d at 716.   This was because even though "this information might

be in the possession of defendants, it could not be known by plaintiffs."   *Id.* at 718-19.

Accordingly, the Court concluded that "plaintiffs ha[d] adequately alleged actual damages by

alleging that they purchased their contracts at an inflated price, that the degree of LIBOR

artificiality later changed, and that they suffered damages as a result."   *Id.* at 719.   The same is

true here, and this Court should similarly deny the motion to dismiss.

The *Laydon* Court also did not find a failure to allege injury-in-fact.   There, the Court

dismissed the antitrust claims because the plaintiff failed to sufficiently allege antitrust injury.

2014 WL 1280464, at *8.   The Court held the injury-in-fact alleged was not sufficiently

connected to any anticompetitive conduct on the part of the defendants.   *Id.*

Defendants' remaining arguments are simply unfounded or misinterpret the law.   *See*

MTD at 29-30.   First, Defendants claim that Plaintiffs have failed to allege that they are in a

"worse position as a consequence of the defendants' conduct."   *Id.* at 30 (quoting *Gatt*, 711 F.3d

at 76).   But the opposite is true, as Plaintiffs explicitly allege that they purchased directly from

Defendants and that they have been injured in the form of overcharges from Defendants' price-

fixing.   CAC ¶¶3-7, 15-26, 165-73.   Thus, the Complaint clearly pleads the nature of the injury

(a loss of price competition), the injury-in-fact (overcharges), and the manner in which

Defendants inflicted this injury on Plaintiffs.   CAC ¶¶9, 165-173.

Defendants' next contention that Plaintiffs must detail specific trades, including currency

pairs, to plead injury is wholly inconsistent with the case law governing the level of specificity

---

[29]     Here, Defendants invoke *LIBOR I* to argue that "[l]ike the Clayton Act, the CEA requires
plaintiffs to allege actual injury," MTD at 29 n.16.   Defendants fail to mention that the Court
concluded the CEA claims in *LIBOR I* were only subject to a heightened pleading standard
because those claims sounded in fraud.   *See LIBOR I*, 935 F. Supp. 2d at 714.

required at the pleading stage.  It is also premature when Plaintiffs have not yet obtained discovery.  Defendants' collusive conduct, including front running, banging the close, and painting the screen, was part of their price-fixing conspiracy, which caused injury in the form of overcharges to Plaintiffs and the Class each day that the conduct occurred.  The determination as to which Plaintiffs were injured on which days is "information [that] might be in the possession of defendants, it could not be known by plaintiffs," and is appropriately assessed after discovery. *Libor I*, 935 F. Supp. 2d at 718-19.  Without discovery, Plaintiffs cannot be expected to plead such fine details of the harm Defendants caused here.  Nor are they required to do so.  *See* §I.C., *supra*.

Defendants' additional argument that Plaintiffs must allege the direction of alleged manipulation on specific days is another attempt to impose a heightened pleading standard that the law does not support, and, in effect, asks Plaintiffs to present a damages model prior to obtaining discovery.  Defendants' hypotheticals about traders whose positions tracked Defendants', which are beyond the four corners of the Complaint, are neither ripe for consideration at this stage nor dispositive of the existence of injury.

## III.   PLAINTIFFS ALLEGE HARM TO COMPETITION

Plaintiffs allege horizontal price fixing among Defendants, resulting in anticompetitive overcharges to their customers; in other words, a *per se* violation of Section 1.  It has long been held that Plaintiffs are not required to plead or prove a relevant market or harm to competition, which is presumed in such *per se* cases.  *See*, *e.g.*, *N. Pac. R.R. Co. v. U.S.*, 356 U.S. 1, 5 (1958) (describing *per se* violations as "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220 (1940) (stating that horizontal price fixing "obviously reduced the play of the forces of supply and demand."); *In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1206 (N.D. Cal. 2005) ("[P]laintiffs [alleging *per se* violations] need not plead a relevant market . . . nor do they

30

need to plead the harm to competition, something which is presumed in a *per se* case."). It is therefore unsurprising that Defendants do not, and presumably cannot, identify a single instance where the Supreme Court or Second Circuit dismissed a horizontal price-fixing complaint by direct purchasers on the basis that they did not plead harm to competition. Instead, Defendants make three arguments in asserting that Plaintiffs have failed to allege harm to competition. As described below, each lacks merit.

### A.     Plaintiffs Allege Price Fixing, Which Inherently Harms Competition

Defendants argue that Plaintiffs have failed to allege harm to competition because they have not connected Defendants' misconduct to any effort to win business. According to Defendants, none of the collusive trading practices identified in the Complaint (front running, painting the screen, and banging the close) reduces or harms competition. MTD at 32-33.

This argument misses the mark. It is well settled that where, as here, horizontal competitors agree to restrain trade, harm to competition is presumed. As the Supreme Court explained over half a century ago in *White Motor Co. v. United States*, 372 U.S. 253, 262 (1963), the *per se* "category of antitrust violations is made up of 'agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'"[30]

This is precisely what Plaintiffs allege here. The Complaint describes how Defendants – horizontal competitors in the FX market – agreed to restrain trade: "Absent collusion,

---

[30]    *See also Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992) ("For example, naked horizontal price fixing is condemned with no inquiry at all into market structure or the activity's actual effect or possible justifications. The rationale for true *per se* rules is that the challenged conduct has so little chance of being economically beneficial and so great a likelihood of being economically harmful that inquiry into market structure and real world effect is not worth the cost."); *Level I Sportswear, Inc. v. Chaikin*, 81 Civ. 7407, 1983 WL 1781, at *3 (S.D.N.Y. Jan. 25, 1983) ("Certain types of agreements have been recognized as *per se* unreasonable because of their necessary harm to competition and the absence of countervailing benefits.").

Defendants would have competed to offer competitive prices." CAC ¶167. The Complaint further alleges that "the damage to Plaintiffs and members of the Class flows from the injury to price competition caused by Defendants. Defendants' concerted manipulation of [The Fix] directly impacted the prices of FX Instruments settled in whole or in part on the basis of [The Fix]." CAC ¶168; *see also* CAC ¶170. Front-running, banging the close, and painting the screen were the means by which the Defendants implemented their agreement to restrain trade.

Defendants primarily rely on *LIBOR I*, which is inapplicable here. The Court in *LIBOR I* held that there was no harm to competition because the setting of LIBOR was "a cooperative endeavor wherein otherwise-competing banks agreed to submit estimates of their borrowing costs . . . to facilitate the . . . calculation of an interest rate index." 935 F. Supp. 2d at 688. Unlike LIBOR, The Fix is not calculated through a "cooperative endeavor." Instead, it is based on actual transactions and transactable bids and asks in a market in which Defendants compete. *Compare id. with* CAC ¶127 (quoting UK-FCA Chairman and CEO's testimony before the House of Commons, "'[T]he elements [of the FX investigation] that are different than LIBOR is that it's a much deeper, much more liquid market based on real trades."'); *see also* CAC ¶65.[31]

### B.    The Complaint Alleges that The Fix Is a Price by Which Defendants Compete

Defendants also argue that The Fix is not a price and that their collusive conduct in the setting of The Fix, thus, does not violate Section 1. MTD at 34-35. According to Defendants, The Fix is merely an "index constitut[ing] information that market participants may consider [that] do[es] not necessarily reflect any actual prevailing rates." MTD at 34.

This argument flies in the face of the Complaint, the actual operation of the FX market, and the computation of The Fix. First, The Fix is a price at which Plaintiffs purchase FX

---

[31]    Defendants also rely on *Schaefer v. First National Bank of Lincolnwood*, 326 F. Supp. 2d 1186 (N.D. Ill. 1970), but it is readily distinguishable. As even Defendants' Brief acknowledges, *Schaefer* was a stock market manipulation case. MTD at 31. FX Instruments are not securities subject to regulation by the SEC; they are sold over-the-counter by Defendants in an opaque, unregulated market. CAC ¶57. Moreover, the Second Circuit "expressly refuse[d]" to adopt *Schaefer*'s rationale in *Strobl v. New York Mercantile Exchange*, 768 F.2d 22 (2d Cir. 1985).

Instruments from Defendants.  CAC ¶¶63, 69.  Indeed, Plaintiffs and members of the Class specifically chose to trade at The Fix because they perceived it to be a transparent and guaranteed published price.  CAC ¶69.  That some entities may have used The Fix as a benchmark with which to value their assets does not change the fact that Plaintiffs and the members of the Class actually purchased FX Instruments from Defendants that were priced, in whole or in part, on The Fix.  CAC ¶¶43, 168.[32]

Second, Defendants compete with one another in the setting of The Fix.  As outlined above, The Fix is computed by taking the median price of actually executed FX spot transactions and transactable bids and asks during The Fix's calculation window.  CAC ¶¶65, 66, 106.  As a result, The Fix reflects the actual prices of a market in which Defendants are supposed to compete.  CAC ¶166.  Because Defendants are horizontal competitors in that market, and purportedly compete with one another on the price of FX spot transactions, bids, and asks, Defendants compete in the setting of The Fix.

Defendants' reliance on *LIBOR I* is misplaced.  The case was premised on the Court's conclusion that the LIBOR rates are "a cooperative endeavor."  935 F. Supp. 2d at 688.  Here, by contrast, The Fix is a price, not a "cooperative endeavor" or an "estimate."  Defendants compete for customers based on the prices they offer for FX Instruments.  *See* CAC ¶¶166-168.  The Fix

---

[32]    As to those FX Instruments that are priced, in part, on The Fix, the Complaint sufficiently states a price-fixing claim because it is well settled that the manipulation of a component of a price is a *per se* violation of the Sherman Act.  *See, e.g., Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648 (1980) (holding that the elimination of credit for retailers' beer purchases was *per se* illegal because credit terms are an "inseparable part of the price"); *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 488 (7th Cir. 2002) (holding that a collusively manipulated copper futures contract price served as the benchmark for transactions in physical copper and thereby violated the antitrust laws).  Because The Fix served, at a minimum, as the starting point for the pricing of these FX Instruments, the Complaint adequately pleads harm to competition.  *See, e.g., High Fructose Corn Syrup*, 295 F.3d at 656 (fixing of a "list price" that was only a "guide to likely transaction purchases" would constitute *per se* antitrust violation); *Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132 (9th Cir. 1960) (holding that a trade association's circulation of list prices for automobiles was *per se* illegal even when dealers used list prices "only as a starting point").

is that price or, at a minimum, the basis for that price.  Therefore, because the Complaint alleges that the prices of FX Instruments are determined, in whole or in part, on The Fix, *LIBOR I* does not apply.  CAC ¶168.

### C.    Plaintiffs Do Not Need to Allege Supply Restriction

Finally, Defendants argue that Plaintiffs have failed to allege harm to competition because their collusive practices do not "reduce the supply of FX services."[33]  MTD at 32-33, 35-36.  Plaintiffs allege a conspiracy to fix prices of FX Instruments, which need not be subject to a supply restriction in order to accomplish price fixing.  While a court assessing competition considers "whether the practice facially appears to be one that would . . . tend to restrict competition and decrease output," the Supreme Court has stated that an alternative assessment on the legality of a practice is whether it is "one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'"  *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 20 (1979).  Here, there is no serious argument that collusion increases competition, even if Defendants' willingness to sell Plaintiffs price-fixed FX Instruments has stayed the same or increased.  Defendants' brief reveals this distinction; the cases Defendants cite involve physical goods where price-fixing would almost necessarily involve supply restrictions.  For instance, *Sterling Merchandising, Inc. v. Nestle, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011) (ice cream) and *Menasha Corp. v. News America Marketing In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) (coupon dispensers) both deal with physical merchandise, for which

---

[33]     Defendants argue that Plaintiffs have not adequately alleged that front running, banging the close, and painting the screen affected how the Defendants "compete[d] to provide FX services."  MTD at 31-32.  However, this argument creates a term and concept found nowhere in the Complaint – "FX Services" – in order to avoid the Complaint's detailed allegations of the manner in which Defendants competed with one another in the sale of FX Instruments to Plaintiffs and members of the Class and the ways in which Defendants collusively manipulated the price term of FX Instruments in violation of the antitrust laws.  CAC ¶¶105-109, 165, 168.

price-fixing would be accompanied by reduced output.[34]   Because this case does not involve supply restriction of a physical good, these cases are inapposite.

## IV.   PLAINTIFFS ALLEGE ANTITRUST STANDING

Defendants contend that Plaintiffs were not injured by any competition-reducing aspects of Defendants' conduct and, thus, have not established antitrust standing.   MTD at 36-38. Defendants argue that the Complaint fails because Defendants ***could*** have engaged in their anticompetitive acts independently.   Even if Defendants' new facts were properly before the Court, and even if those facts provided a plausible explanation for Defendants' conduct, their argument contradicts the Second Circuit's holding in *Anderson News* that the court cannot make "[t]he choice between two plausible inferences that may be drawn from factual allegations . . . on a Rule 12(b)(6) motion . . . ."   680 F.3d at 185.

To establish antitrust standing, the plaintiff must demonstrate antitrust injury, that is, "injury 'of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful.'"   *Gatt Commc'ns*, 711 F.3d at 76.   "The antitrust standing requirement weeds out claims by jilted competitors against firms that legitimately outperform them or choose not to partner with them."   *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 57 (S.D.N.Y. 2012). As such, application of antitrust injury principles typically has no bearing on claims brought by those entities that transacted directly with the cartel.   *See id.* ("Plaintiffs' alleged injury – losses from transacting in a market tainted by price manipulation – is 'of the type antitrust laws were intended to prevent.'").

Though paying lip service to the principle that antitrust injury is "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,'" MTD at 36 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)), Defendants attempt to skirt that rule by arguing that Plaintiffs lack antitrust standing

---

[34]      Moreover, the remaining case that Defendants cite, *Laydon*, does not apply because the Court, citing *LIBOR I*, concluded that "the setting of the USD LIBOR benchmark rate . . . [was] a cooperative effort."   2014 WL 1280464, at *8 (citing *LIBOR I*, 935 F. Supp. 2d at 688.).

because "[e]ach of the purportedly manipulative practices *could have occurred* without any agreement." MTD at 37. But "losses stemming from artificial prices caused by anticompetitive conduct" are "a quintessential antitrust injury." *Crude Oil*, 913 F. Supp. 2d at 57; *accord In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) ("[T]he plaintiffs are purchasers of the defendants' product who allege being forced to pay supra-competitive prices as a result of the defendants' anticompetitive conduct. Such an injury plainly is 'of the type the antitrust laws were intended to prevent.'").[35] Defendants' arguments amount to the following flawed reasoning: (1) "Each of the purportedly manipulative practices *could* have occurred without any agreement;" (2) because the practices *could* have occurred without an agreement, they could have occurred without a reduction in competition; (3) therefore, "any arguable injury that a plaintiff may have suffered as a result of such a manipulative act *would* not have been caused by reason of a reduction in competition." MTD at 36-38. Under Defendants' reasoning, the mere possibility that independent manipulation *could* have harmed Plaintiffs negates antitrust injury. *Id*.

This leap from "could" to "would" is both contrary to the Complaint's factual allegations and incorrect as a matter of law. First, the argument that unlawful conduct *could* have occurred through unilateral conduct ignores the Complaint's allegations and rests on counterfactual speculation. Plaintiffs allege that "[n]o one Defendant could accomplish systematic and continuing manipulation of [The Fix] without coordinating with its rivals. Absent Defendants' knowledge of one another's confidential customer information, the conduct alleged herein would

---

[35]     *See also Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 107 n.12 (2d Cir. 2007) ("[T]he defendants have never contended that overcharges paid to a horizontal price-fixing cartel are not antitrust injuries; nor would any such contention be persuasive in this case."); *U.S. Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 627 (7th Cir. 2003) ("USG, by contrast, is a consumer of gas; it is in the class of persons protected from reductions in output and higher prices. And USG contends that it has been required to pay higher prices. Its injury (if any) is antitrust injury.").

be a risky strategy." CAC ¶171. Instead, "Defendants benefited from coordinating their market activities." *Id.*; *see also* CAC ¶83.

Second, Defendants' argument has no support in the law. The mere possibility that Defendants **could** have engaged in the complained-of conduct unilaterally does not mean than they are immunized from antitrust liability when they collude. *See*, *e.g.*, *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 156 F.3d 535, 539-40 (4th Cir. 1998) (rejecting argument that plaintiffs did not "demonstrate a sufficient causal relationship between their alleged injury and [defendants'] alleged violation of the antitrust laws" because defendants could not challenge "causation simply on the basis that it **could** have achieved the same result through lawful means"); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 648 n.16 (E.D. Mich. 2000) ("There are many things a defendant can do unilaterally without offending the antitrust laws that it cannot do collusively."). The paradigmatic example that illustrates this point is the fact that sellers could engage in lawful parallel pricing, but Plaintiffs plainly suffer antitrust injury when Defendants collude on pricing. *Cardizem CD*, 105 F. Supp. 2d at 648 n.16. Likewise, in virtually any horizontal price-fixing case, the defendants could suggest that the conduct challenged could have been undertaken independently. But accepting such unfounded speculation as sufficient to defeat antitrust standing at the motion to dismiss stage would profoundly undermine the antitrust laws and the Supreme Court's admonition that "collusion" is the "supreme evil of antitrust." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

## V.   DEFENDANTS ACTIVELY CONCEALED THEIR CONSPIRACY

This Court should also reject Defendants' arguments for shortening the Class Period to four years. *See* MTD at 38-40. Defendants first argue that the Complaint does not adequately allege conspiratorial conduct that reaches back to January 1, 2003. MTD at 38-39. But the Complaint explains that "Defendants' top-level traders used electronic communications to meet and conspire **for over a decade**." CAC ¶84; *see also* CAC ¶83. Indeed, the market conditions that are alleged to have contributed to Defendants' ability to collude materialized "in the late

37

1990s." CAC ¶¶72-73.  This allegation is bolstered by specific facts.  *See* CAC ¶¶98, 99, 102, 104, 107, 175, 183.  In addition, the Complaint identifies the cartel's members, details the communications that occurred among them, and describes the conspiratorial acts that they took throughout the Class Period.  CAC ¶¶84-109.  These allegations, which must be taken as true, are more than sufficient to sustain the alleged Class Period.[36]

Defendants next argue that Plaintiffs' allegations of diligence are insufficient because they are "boilerplate."  MTD at 39-40.  But courts have long held that a complaint sufficiently alleges due diligence where, as here, it identifies the deceptive practices that the defendants used to prevent discovery of the conspiracy through reasonable due diligence.  *See*, *e.g.*, *United States Secs. & Exch. Comm'n v. Power*, 525 F. Supp. 2d 415, 426 (S.D.N.Y. 2007); *In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000).  For instance, the Complaint makes the following allegations:

- Defendants communicated in secret through non-public chat rooms, instant messages, and through email.  CAC ¶¶84, 92, 176.

- These chat rooms were limited to Defendants' highest-ranking traders.  CAC ¶¶85-87, 177.

- Defendants agreed not to publicly discuss or otherwise reveal the acts and communications that furthered the conspiracy.  CAC ¶179.

- FX Instruments are purchased in a private, over-the-counter market rather than on a public exchange.  CAC ¶182.

- The first report that might arguably give rise to a duty to investigate was published on June 12, 2013; however, this article did not name the dealers who were interviewed for the article, the banks that had engaged in the conspiracy, the currency pairs involved, or how the conspiracy occurred.  CAC ¶¶183, 186.

---

[36]    Defendants' reliance on *In re Urethane Antitrust Litigation*, 663 F. Supp. 2d 1067, 1076-77 (D. Kan. 2009), and *In re Lithium Ion Batteries Antitrust Litigation*, No. 13-MD-2420, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014), is misplaced.  The plaintiffs in *Urethane* sought relief stretching back to 1994 but failed to provide any factual basis for that starting date.  663 F. Supp. 2d at 1077.  Similarly, in *Lithium Ion Batteries*, the plaintiffs sought relief going back to 2000, even though "[t]he first specifically alleged meeting . . . transpired in March 2002."  2014 WL 309192, at *12.

- On November 1, 2013, within five months of this article and within days of media reports that some of Defendants' FX traders were put on leave, the first class action complaint was filed. CAC ¶188.[37]

Finally, Defendants argue in a single sentence and without legal citation that Plaintiffs cannot show due diligence because "[t]he FX data used in plaintiffs' complaints is publicly available and plaintiffs allege no reason they could not have used that data years ago." MTD at 40. Defendants do not identify the data they believe Plaintiffs should have used to uncover the conspiracy, and Plaintiffs are aware of none. To the extent Defendants are referring to economic data supposedly available to Plaintiffs, the law does not require victims of a conspiracy to ferret through economic or other data to find an antitrust claim. *See*, *e.g.*, *In re Magnetic Audiotape Antitrust Litig.*, 99 Civ. 1580 (LMM), 2002 WL 975678, at *3 (S.D.N.Y. May 9, 2002) ("Without a tip-off that a price-fixing conspiracy existed, plaintiffs had no reason to exercise due diligence."); *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 504 (9th Cir. 1988) ("The requirement of diligence is only meaningful . . . when facts exist that would excite the inquiry of a reasonable person."). Indeed, the opacity of the FX market supports the argument that Plaintiffs lacked meaningful data, let alone data sufficient to put them on notice of Defendants' wrongdoing prior to the publication of the aforementioned news reports. CAC ¶79. The transactional data that would permit Plaintiffs to understand the details of the decade-long conspiracy is within Defendants' sole possession, and they have successfully argued to stay discovery that prevents Plaintiffs from acquiring this data.

---

[37]     Defendants cite to *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) and *Hinds County*, 620 F. Supp. 2d 499, in support of their due diligence argument, but neither case involved complaints that described how the defendants prevented the discovery of the alleged conspiracy. In *Merrill Lynch*, for example, the plaintiffs failed to allege "that they exercised due diligence" at all. 154 F.3d at 60. And in *Hinds County*, the plaintiffs failed to identify a single act by the defendants to prevent discovery of the conspiracy. 620 F. Supp. 2d at 522.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.  If the Court grants Defendants' motion, in whole or in part, Plaintiffs respectfully request leave to amend.  As set forth in several footnotes of this Opposition, media reports have recently reported that government investigations have uncovered wrongdoing and provided additional facts that would further bolster the plausibility of Plaintiffs' allegations. These and other media reports, as well as additional evidence Plaintiffs have developed, are the types of material that Plaintiffs would incorporate into an amended complaint, if the Court deems it necessary.

DATED:  July 29, 2014

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP

s/ Christopher M. Burke
CHRISTOPHER M. BURKE (*pro hac vice*)
WALTER W. NOSS (*pro hac vice*)
KRISTEN M. ANDERSON (*pro hac vice*)
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
cburke@scott-scott.com
wnoss@scott-scott.com
kanderson@scott-scott.com

-and-

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
DAVID R. SCOTT (DS-8053)
JOSEPH P. GUGLIELMO (JG-2447)
DONALD A. BROGGI (DB-9661)
SYLVIA SOKOL
THOMAS K. BOARDMAN
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: 212-223-6444
Facsimile:  212-223-6334
david.scott@scott-scott.com
jguglielmo@scott-scott.com
dbroggi@scott-scott.com
ssokol@scott-scott.com
tboardman@scott-scott.com

HAUSFELD LLP
MICHAEL D. HAUSFELD
WILLIAM P. BUTTERFIELD
REENA ARMILLAY GAMBHIR
TIMOTHY S. KEARNS
NATHANIEL C. GIDDINGS
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: 202-540-7143
Facsimile:  202-5407201
mhausfeld@hausfeldllp.com
wbutterfield@hausfeldllp.com
rgambhir@hausfeldllp.com
tkearns@hausfeldllp.com
ngiddings@hausfeldllp.com

-and-

HAUSFELD LLP
MICHAEL LEHMAN
CHRISTOPHER LEBSOCK
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: 415-633-1949
Facsimile:  415-693-0770
mlehman@hausfeldllp.com
clebsock@hausfeldllp.com

*Interim Co-Lead Counsel*

GOLD BENNETT CERA & SIDENER LLP
SOLOMON B. CERA
C. ANDREW DIRKSEN
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: 415-777-2230
Facsimile:  415-777-5189
scera@gbcslaw.com
cdirksen@gbcslaw.com

COHEN MILSTEIN SELLERS & TOLL, PLLC
MANUEL JOHN DOMINGUEZ
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone: 561-833-6575
Facsimile:  561-515-1401
dominguez@cohenmilstein.com

MICHAEL B. EISENKRAFT (ME-6974)
88 Pine Street, Fourteenth Floor
New York, NY 10005
Telephone: 212-828-7797
Facsimile:  212-828-7745
meisenkraft@cohenmilstein.com

*Counsel for Plaintiff Aureus Currency Fund L.P.*

OBERMAYER REBMANN MAXWELL &
HIPPEL LLP
WILLIAM J. LEONARD
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895
Telephone: 215-665-3000
Facsimile:  215-665-3165
william.leonard@obermayer.com

BONI & ZACK LLC
MICHAEL J. BONI
JOSHUA D. SNYDER
15 St. Asaphs Rd.
Bala Cynwyd, PA 19004
Telephone: 610-822-0200
Facsimile:  610-822-0206
mboni@bonizack.com
jsnyder@bonizack.com

*Counsel for Plaintiff the City of Philadelphia,
Board of Pensions and Retirement*

ROBBINS GELLER RUDMAN & DOWD LLP
PATRICK J. COUGHLIN
DAVID W. MITCHELL
BRIAN O. O'MARA
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619-231-1058
patc@rgrdlaw.com
davidm@rgrdlaw.com
bomara@rgrdlaw.com

*Counsel for Plaintiff Employees' Retirement System
of the Government of the Virgin Islands*

WOLF POPPER LLP
MARIAN R. ROSNER
PATRICIA I. AVERY
FEI-LU QIAN
845 Third Avenue, 12th Floor
New York, NY 10022
Telephone: 212-759-4600
Facsimile:  212-486-2093
mrosner@wolfpopper.com
pavery@wolfpopper.com
fqian@wolfpopper.com

*Counsel for Plaintiff Employees' Retirement
System of Puerto Rico Electric Power Authority*

BERMAN DeVALERIO
JOSEPH J. TABACCO, JR. (JJT-1994)
TODD A. SEAVER
SARAH KHORASANEE MCGRATH
JESSICA MOY
One California Street, Suite 900
San Francisco, CA 94111
Telephone: 415-433-3200
Facsimile:  415-433-6382
jtabacco@bermandevalerio.com
tseaver@bermandevalerio.com
smcgrath@bermandevalerio.com
jmoy@bermandevalerio.com

*Counsel for Plaintiff Fresno County Employees'
Retirement Association*

THE MOGIN LAW FIRM, P.C.
DANIEL J. MOGIN
JODIE M. WILLIAMS
PHILLIP E. STEPHAN
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-687-6611
Facsimile:  619-687-6610
dmogin@moginlaw.com
jwilliams@moginlaw.com
pstephan@moginlaw.com

KOREIN TILLERY, LLC
STEPHEN M. TILLERY
ROBERT L. KING
AARON M. ZIGLER
STEVEN M. BEREZNEY
RICHARD M. ELIAS
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
Saint Louis, MO 63101-1612
Telephone: 314-241-4844
Facsimile:  314-241-3525
stillery@koreintillery.com
rking@koreintillery.com
azigler@koreintillery.com
sberezney@koreintillery.com
relias@koreintillery.com

-and-

KOREIN TILLERY, LLC
GEORGE A. ZELCS
205 N Michigan Ave, Ste 1950
Chicago, IL 60601-5927
Telephone: 312-641-9750
Facsimile:  312-641-9751
gzelcs@koreintillery.com

*Counsel for Plaintiffs Haverhill Retirement System
and Oklahoma Firefighters Pension and Retirement
System*

LABATON SUCHAROW LLP
LAWRENCE A. SUCHAROW
GREGORY S. ASCIOLLA
JAY L. HIMES
CHRISTOPHER KELLER
ERIC J. BELFI
MICHAEL W. STOCKER
ROBIN A. VAN DER MEULEN
MATTHEW J. PEREZ
140 Broadway
New York, NY 10005
Telephone: 212-907-0700
Facsimile:  212-818-0477
lsucharow@labaton.com
gasciolla@labaton.com
jhimes@labaton.com
ckeller@labaton.com
ebelfi@labaton.com
mstocker@labaton.com
rvandermeulen@labaton.com
mperez@labaton.com

*Counsel for Plaintiff State-Boston Retirement
System*

45

GRANT & EISENHOFER, P.A.
LINDA P. NUSSBAUM (LN-9334)
PETER A. BARILE III (PB-3354)
485 Lexington Avenue
New York, NY 10017
Telephone: 646-722-8500
Facsimile:  646-722-8501
lnussbaum@gelaw.com
pbarile@gelaw.com

*Counsel for Plaintiff Syena Global Emerging
Markets Fund, LP*

ENTWISTLE & CAPPUCCI LLP
ANDREW J. ENTWISTLE
VINCENT R. CAPPUCCI
ROBERT N. CAPPUCCI
280 Park Avenue, 26th Floor West
New York, NY 10017
Telephone: 212-894-7200
Facsimile:  212-894-7272
aentwistle@entwistle-law.com
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com

*Counsel for Plaintiffs Tiberius OC Fund, Ltd. and
Value Recovery Fund L.L.C.*

LOWEY DANNENBERG COHEN & HART, P.C.
VINCENT BRIGANTI
GEOFFREY M. HORN
PETER D. ST. PHILLIP
RAYMOND P. GIRNYS
One North Broadway
White Plains, NY 10601
Telephone: 914-997-0500
Facsimile:  914-997-0035
vbriganti@lowey.com
ghorn@lowey.com
pstphillip@lowey.com
rgirnys@lowey.com

-and-

46

LOWEY DANNENBERG COHEN & HART, P.C.
GERALD LAWRENCE, ESQ.
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Telephone: 610-941-2760
Facsimile:  610-862-9777
glawrence@lowey.com

SHEPHERD FINKELMAN
MILLER & SHAH, LLP
ERIC. L. YOUNG
NATALIE FINKELMAN BENNETT
35 East State Street
Media, PA 19063
Telephone: 610-891-9880
Facsimile:  866-300-7367
eyoung@sfmslaw.com
nfinkelman@sfmslaw.com

-and-

SHEPHERD FINKELMAN
MILLER & SHAH, LLP
JAMES E. MILLER
65 Main Street
Chester, CT 06412
Telephone: 860-526-1100
Facsimile:  860-526-1120
jmiller@sfmslaw.com

RADICE LAW FIRM, P.C.
JOHN RADICE
34 Sunset Blvd.
Long Beach, NJ 08008
Telephone: 646-245-8502
Facsimile:  609-385-0745
jradice@radicelawfirm.com

MANDEL BHANDARI LLP
RISHI BHANDARI
EVAN MANDEL
11 Broadway, Suite 615
New York, NY 10004
Telephone: 212-269-5600
Facsimile:  646-964-6667
rb@mandelbhandari.com
em@mandelbhandari.com

*Counsel for Plaintiff United Food and Commercial
Workers Union and Participating Food Industry
Employers Tri-State Pension Fund*

BERGER & MONTAGUE
H. LADDIE MONTAGUE, JR.
MERRILL G. DAVIDOFF
BART D. COHEN
1622 Locust Street
Philadelphia, PA 19103
Telephone: 215-875-3000
Facsimile:  215-875-4604
hlmontague@bm.net
mdavidoff@bm.net
bcohen@bm.net

FINE, KAPLAN AND BLACK, R.P.C.
ROBERTA D. LIEBENBERG
ADAM PESSIN
One South Broad St., Suite 2300
Philadelphia, PA 19107
Telephone: 215-567-6565
Facsimile:  215-568-5872
rliebenberg@finekaplan.com
apessin@finekaplan.com

MOTLEY RICE LLC
WILLIAM H. NARWOLD
DONALD A. MIGLIORI
MICHAEL M. BUCHMAN
JOHN A. IOANNOU
600 Third Avenue, 21st Floor
New York, NY 10016
Telephone:  212-577-0040
Facsimile:  212-577-0054
bnarwold@motleyrice.com
dmigliori@motleyrice.com
mbuchman@motleyrice.com
jioannou@motleyrice.com

MILLER LAW LLC
MARVIN A. MILLER
MATTHEW VAN TINE
115 S. LaSalle St., Suite 2910
Chicago, IL 60603
Telephone: 312-322-3400
Facsimile:  312-676-2676
mmiller@millerlawllc.com
mvantine@millerlawllc.com

*Of Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 29, 2014, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 29, 2014.

  /s/ Christopher M. Burke
CHRISTOPHER M. BURKE
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
email: cburke@scott-scott.com