

June 23, 2015

<u>Via ECF</u>

Honorable Lorna G. Schofield
U.S. District Court
Southern District of New York
Thurgood Marshall Courthouse
40 Foley Square
New York, NY 10007

Re:   *In re Foreign Exchange Benchmark Rates Antitrust Litigation*
      Case No. 1:13-cv-07789-LGS (S.D.N.Y.)

Dear Judge Schofield:

Pursuant to the Court's June 16, 2015 Order (ECF No. 316), Plaintiffs in the above-referenced action (the "Consolidated Action") respond to ECF Nos. 304, 306, 313, and 315, as well as ECF Nos. 318 and 319, which were submitted after the Court's June 16 Order.  Plaintiffs respectfully request leave to exceed the Court's three-page limit by two pages in order to address the key issues raised in over 100 pages of submissions in the above-referenced letters.

There are no "fundamental conflicts" that require separate representation of persons who traded FX instruments over the counter ("OTC") and on exchanges. Consolidation of all actions, except the ERISA action (*Allen*), is appropriate because the actions arise from the identical factual predicate.  Accordingly, Plaintiffs respectfully request that the Court: (i) consolidate the Consolidated Action and Exchange Actions; (ii) deny the request from Bakizada, Teel, and Taylor (collectively, the "Objecting Plaintiffs") to appoint additional interim class counsel; and (iii) allow Plaintiffs to file a Second Amended Complaint ("SAC").

A.      **Consolidation of the Consolidated Action and Exchange Actions is Appropriate**

As the decisions of this court recognize, there is no inherent fundamental conflict in representing both OTC and exchange plaintiffs in one action.  *Compare In re: Gold Fixing Antitrust and Commodity Exchange Act Litig.*, 1:14-cv-3111-VEC, ECF No. 7 at 3 (attached as Exhibit A to ECF No. 296); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 14-MD-2573, ECF No. 17 at 4 (S.D.N.Y. Nov. 25, 2014) (attached as Exhibit B to ECF No. 296); *with In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MD 2262 (NRB), 2011 WL 5007957, at *2 (S.D.N.Y. Oct. 18, 2011) (deciding, before a motion to dismiss was decided, to appoint separate counsel to address a "potential conflict").  Each case must be separately evaluated. Absent a "fundamental conflict," which "goes 'to the very heart of the litigation,'" there is no need to create subclasses or to appoint separate class counsel.  *Charron v. Weiner*, 731 F.3d 241, 250 (2d Cir. 2013) (citation omitted).  As the Second Circuit recently recognized, if every potential conflict "automatically created subclasses that required separate representation, the class action

June 23, 2015
Page 2

procedure would become even more cumbersome than it already is, and would create even more transaction costs in the form of legal fees." *Id*. at 254.

Objecting Plaintiffs claim that fundamental conflicts are "presently manifest" because (i) the settlements create conflicts and (ii) Co-Lead Counsel failed to protect the exchange claims. The facts belie Objecting Plaintiffs' arguments.

## 1.      Settlements Do Not Create Fundamental Conflicts

Objecting Plaintiffs speculate that exchange claims were swept into already negotiated settlements based on limited allegations plead in the original complaint and that the exchange claims were an "afterthought."  ECF No. 306 at 2-3 ("Bakizada I"); ECF No. 313 at 3 ("Teel"); ECF No. 315 at 3-5 ("Bakizada II"); ECF No. 319 at 3-6 ("Taylor").   This is based on a fundamental misconception of both the substance of the settlements and the procedure by which they were reached.  The value of cooperation provided by the first settlements with the class that traded FX directly with Defendants permitted Plaintiffs to fully comprehend the scope of Defendants' misconduct, including collusion with respect to spreads and fixes other than the WM/Reuters Closing Spot Rate.  Only by gaining this understanding were Plaintiffs able to plausibly put together the entirety of the wrongdoing and appropriately negotiate the full scope of the collusion.

After the conclusion of these settlements and under the supervision of mediator Kenneth Feinberg, Co-Lead Counsel undertook to negotiate on behalf of existing clients who traded only on exchanges with respect to exchange-only claims.  These negotiations resulted in a separate amount for the exchange-only FX traders and separate funds for each class.  Neither fund was compromised or can be diminished in favor of the other.

The settlements possess none of the infirmities giving rise to the fundamental conflicts present in the cases on which Objecting Plaintiffs rely.  For example, in *In re Literary Works in Electronic Databases Copyright Litigation*, 654 F.3d 242 (2d Cir. 2011), the court found a conflict between class members who held only category C claims and class members who held a combination of A, B, and C claims. The court noted that 99% of all claims were category C.  *Id*. at 246.  The court further noted that category C-only plaintiffs "are interested exclusively in maximizing the compensation for that one category of claim."  *Id*. at 252.   Nevertheless, category C-only plaintiffs "were obligated to advance the collective interests of the class, rather than those of the subset of class members who mirrored their own."  *Id*.   Unlike the separate settlement funds that Co-Lead Counsel have negotiated in this matter, the settlement fund in *Literary Works* contained a liability cap that was first enforced by reducing only category C claims.  Thus, category C-only plaintiffs could see their monetary claims extinguished, leaving the entire fund to category A and B claimants.  The court could not discern, and the proponents of the settlement could not offer, any reason why this burden should be solely shouldered by category C-only plaintiffs.  *Id*. at 253-54.  Therefore, the court expressed concern about "[t]he selling out of one category of claim for another…." *Id*. at 252.  This concern is not present here.

Likewise, both *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) are clearly distinguishable.  In *Amchem*, the Supreme Court found a fundamental conflict in "a single giant class" containing "parties with diverse medical conditions" relating to long term exposure to asbestos. *Id*. at 626.  The Court found that

June 23, 2015
Page 3

the interests of those currently injured, who wanted immediate payments, did not align with the interests of exposure-only plaintiffs, who wanted "an ample, inflation-protected fund for the future." *Id*. at 626.  In *Ortiz*, the Supreme Court reiterated that a class divided between holders of present and future claims requires subclasses.  The Court also found structural conflict based on available insurance coverage for certain claims.

    *In re Auction Houses Antitrust Litigation*, 138 F. Supp. 2d 548 (S.D.N.Y. 2001) hinged on the settlement's treatment of "Mixed Class Members" who were "entitled to receive settlement proceeds based only on their alleged overcharges in U.S. auctions, but they would lose their ability to sue in the United States for damages based on overcharges in foreign auctions if they elect to take money under the settlement." *Id*. at 550.  The Court held that the settlement could not be remedied by retroactively allocating funds to compensate Mixed Class Members for their foreign auction claims.[1]  Instead, the deal should have been structured differently, *viz*, by amending the litigation classes to include both types of claims and allocating settlement funds to both types of claims from the outset. *Id*. at 501.  This is the exact structure Plaintiffs propose in moving to file a SAC in advance of filing motions for preliminary approval of the settlements with separate funds for the two classes.

    The fundamental interclass conflicts that matter "are those that give rise to a significant potential for negotiation on behalf of an undifferentiated class to skew in some predictable way the design of class-settlement terms in favor of one or another subgroup for reasons unrelated to evaluation of the relevant claims." Samuel Issacharoff & Richard A. Nagareda, *Class Settlements Under Attack*, 156 U. Pa. L. Rev. 1649, 1684 (2008).  No such issues are present here.  Unlike the category C-only plaintiffs in *Literary Work* and the exposure-only plaintiffs in *Amchem*, the exchange-only plaintiffs have their own separately negotiated fund from which to seek compensation.  Unlike the above-cited cases, in the proposed SAC, named exchange plaintiffs will represent a separate exchange class.  Further, there is nothing to indicate that there was any reason for any representative of each class raising distinct legal claims to ignore their incentive to seek the greatest recovery available to each class.  This case does not present the fundamental conflicts identified above.

### 2.    Co-Lead Counsel Have Neither Ignored nor Downplayed Exchange Claims

    Objecting Plaintiffs argue that Co-Lead Counsel have disqualified themselves from bringing exchange claims by "ignor[ing]" and "downplay[ing]" those claims.  Teel at 2-3; Bakizada II at 3; Taylor at 1-3.  These accusations are contradicted by Co-Lead Counsel's record in this case and the results they have achieved.

    Co-Lead Counsel exercised prudent litigation judgment with respect to what claims to bring and when.  Co-Lead Counsel investigated numerous legal theories of relief, including Commodity Exchange Act claims, prior to filing a Sherman Act claim.  Co-Lead Counsel believed a Sherman Act claim (15 U.S.C. §1) stood the best chance of surviving a motion to dismiss, especially before the announcement of fines and guilty pleas. That strategy has been validated. As discussed above, the settling defendants' cooperation will enable Plaintiffs to

---

[1]    The same issue condemned the settlement in *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (1981). *See Auction Houses*, 138 F. Supp. 2d at 551.

June 23, 2015
Page 4

allege claims in a SAC for a variety of FX instruments, including exchange instruments, with greater particularity and covering a broader scope of conduct.  Moreover, Objecting Plaintiffs point to no justification for why they delayed in bringing exchange claims until ***after***: (i) the original complaint survived the motion to dismiss; (ii) regulators imposed more than $4 billion in fines; and (iii) the first settlements were disclosed in the Consolidated Action.

Objecting Plaintiff Taylor further premises his assertion for separate representation on the flawed calculations of Professor Seyhun who contends exchange-traded FX futures accounted for over 25% of the trading of all FX instruments.  Taylor at 3.  The BIS 2013 Triennial Central Bank Survey ("BIS Survey"), however, shows exchange-traded instruments having an average of all FX trading of roughly 2.5% from 2004-2013,[2] making a 10 time increase questionable. While Plaintiffs take issue with numerous aspects of Seyhun's calculations, the following significant errors skew Seyhun's results.  First, Seyhun fails to reduce the numerator in his ratio (exchange volume) consistently with his adjustments of the denominator (OTC volume). Adjusting only the denominator inflates the percentage of exchange volume. Second, Seyhun's exclusion of interdealer volume in his denominator appears to incorrectly exclude transactions in which Defendants are acting in their name as a prime broker for some other party. Third, Seyhun erroneously limits the universe of OTC volume to non-interdealer volume that took place in the United States solely between U.S. parties.  But this restriction is narrower than the class of transactions covered by Plaintiffs' class definition.  Finally, by omitting 2003-2007 data, Seyhun overstates his fraction.  In these years, a smaller percentage of overall FX volume was driven by exchange traded instruments. Adding these early class period years of data would lower the overall fraction for the entire class period.

### 3.    There Are No Factual Distinctions that Require Separate Litigation Tracks

The claims asserted by the Objecting Plaintiffs arise from the identical factual predicate as alleged in the CAC.  As Objecting Plaintiff Taylor concedes, "Plaintiffs and the members of the proposed [Exchange] Class were injured in the same manner, and as a result of the same misconduct, as were traders in the FX spot market."  *Taylor*, ECF No. 1, ¶8.  Even the "additional facts" that Taylor asserts are necessary to the exchange claims all arise from the factual predicate already pleaded in the CAC.  Taylor at 2-3.  For example, Objecting Plaintiff Taylor acknowledges that the facts necessary to plead the exchange claims reflect the reality that future prices run in parity or lock step with spot market currency prices.  That relationship demonstrates that the prices derive from the same source and the same predicate acts affecting that source.  Taylor seeks to draw other so called "distinctions" which are similarly addressed in the Amended Complaint. For instance, Plaintiffs have asserted that spot transactions drive the pricing of other instruments, *see* ECF No. 172, ¶3, Defendants dominate the FX market generally (as well as the spot market that drives the pricing of other instruments), *see id.,* ¶¶73-75, and by this virtue Defendants determine prices.  *See id.* ¶¶92-111. Moreover, Plaintiffs have stated that they intend, if granted leave to amend and based on the extensive information provided by the settling defendants, to add allegations that "Defendants conspired to fix FX prices through collusion with respect to key benchmark rates (including, but not limited to, the WM/Reuters Closing Spot Rates) and bid/ask spreads on multiple currency pairs throughout the trading day."

---

[2]    BIS Survey, Table 1 (available at: http://www.bis.org/publ/rpfx13fx.pdf) (at page 9) (last visited on June 23, 2015).

June 23, 2015
Page 5

ECF No. 297 at 2.  These allegations encompass the full scope of Defendants' misbehavior through all forms and at all times for both spot and exchange trades.  Bakizada II at 3.

**B.      The Court Should Grant Leave to File an Amended Complaint**

Objecting Plaintiffs and certain Defendants oppose Plaintiffs' motion for leave to file a SAC.  Objecting Plaintiffs advance the same "fundamental conflict" arguments addressed above. Defendants Credit Suisse, Deutsche Bank, and Morgan Stanley largely rely on futility arguments to oppose the request.  ECF No. 304, 318.  Defendants will have the opportunity to advance each of these arguments when they file a motion to dismiss.  Plaintiffs respectfully submit that allowing Plaintiffs to file a SAC and setting a briefing schedule for a motion to dismiss would be the most efficient way to proceed.  *See Netbula, LLC v. Distinct Corp.*, 212 F.R.D. 534, 539 (N.D. Cal. 2003) ("Ordinarily, courts will defer consideration of challenges to the merits of a proposed amended pleading until after leave to amend is granted and the amended pleading is filed.").

**C.      Conclusion**

Allowing the Actions to proceed in a consolidated manner in the form of a SAC under the leadership of Co-Lead Counsel in the Consolidated Action will best protect the interests of class members, avoid duplication of effort, and prevent unnecessary expense and delay.

Very truly yours,

HAUSFELD LLP                                   SCOTT+SCOTT, ATTORNEYS AT LAW, LLP

*/s/*Michael D. Hausfeld                         */s/*Christopher M. Burke
Michael D. Hausfeld                            Christopher M. Burke

1700 K Street, NW, Suite 650                    707 Broadway, Suite 1000
Washington, DC 20006                           San Diego, CA 92101
Telephone: 202-540-7143                         Telephone: 619-233-4565
mhausfeld@hausfeldllp.com                      cburke@scott-scott.com

*Interim Co-Lead Class Counsel*