**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                                         :

IN RE FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST    :   No. 1:13-cv-07789-LGS
LITIGATION                             :

                                         :
                                         :
                                         :
                                         :
------------------------------------------------------x

**CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENTS WITH BANK OF AMERICA, BARCLAYS, BNP PARIBAS, CITIGROUP, GOLDMAN SACHS, HSBC, JPMORGAN, RBS, AND UBS**

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................ 4

III. THE SETTLEMENT AGREEMENTS MEET THE CRITERIA NECESSARY FOR THIS
     COURT TO GRANT PRELIMINARY APPROVAL ........................................................ 7

   A.  Standards for Preliminary Approval ................................................................ 7

   B.  The Settlement Agreements Are Procedurally Fair ........................................... 9

   C.  The Settlement Agreements Are Substantively Fair ......................................... 9
      1.  The Complexity, Expense, and Likely Duration of the Litigation ................. 10
      2.  The Reaction of the Class to the Settlement Agreements ........................... 11
      3.  The Stage of the Proceedings ................................................................ 12
      4.  The Risks of Establishing Liability and Damages ....................................... 13
      5.  The Risks of Maintaining the Class Action Through Trial ............................ 15
      6.  The Ability of Defendants to Withstand a Greater Judgment ....................... 15
      7.  The Reasonableness of the Settlement Agreements in Light of the Best Possible
   Recovery and the Attendant Risks of Litigation ................................................ 16

IV.  CERTIFICATION OF THE SETTLEMENT CLASSES UNDER RULE 23 IS
     APPROPRIATE ................................................................................................ 20

   A.  The Settlement Classes Satisfy the Rule 23(a) Requirements ......................... 21
      1.  The Classes Are So Numerous that Joinder Is Impracticable ...................... 22
      2.  The Case Involves Questions of Law and Fact Common to the Classes ........ 22
      3.  Class Plaintiffs' Claims Are Typical of the Claims of the Classes ............... 24
      4.  Class Plaintiffs Will Fairly and Adequately Represent the Interests of the Classes .... 25

   B.  The Settlement Classes Satisfy the Rule 23(b)(3) Requirements ..................... 27
      1.  Common Questions Predominate over Individual Questions ........................ 28
      2.  A Class Action Is Superior to Other Available Methods for the Efficient Adjudication
          of This Controversy ............................................................................. 34

   C.  The Court Should Appoint Mr. Burke and Mr. Hausfeld as Counsel for the .... Settlement
   Classes ............................................................................................................ 35

V.   THE COURT SHOULD APPROVE CLASS PLAINTIFFS' SELECTION OF ESCROW
     AGENT AND CLAIMS ADMINISTRATOR AND THE SETTLING PARTIES'
     SELECTION OF MR. FEINBERG AS SETTLEMENT ADMINISTRATOR ............... 36

VI.  CLASS PLAINTIFFS' SEPARATE MOTION FOR APPROVAL OF A NOTICE PLAN
     AND THE PLAN OF DISTRIBUTION ................................................................ 37

VII. CONCLUSION ................................................................................................ 37

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*All Star Carts and Vehicles, Inc. v. BFI Canada Income Fund,*
   280 F.R.D. 78 (E.D.N.Y. 2012) ................................................................32

*Allen v. Dairy Farmers of Am., Inc.,*
   No. 5:09-CV-230, 2011 WL 1706778 (D. Vt. May 4, 2011) ....................................7

*Allen v. Dairy Farmers of Am., Inc.,*
   No. 5:09-CV-230, 2012 WL 5844871 (D. Vt. Nov. 19, 2012)..............................32

*Amchem Prods. v. Windsor,*
   521 U.S. 591 (1997)............................................................ *passim*

*Beattie v. CenturyTel, Inc.,*
   511 F.3d 554 (6th Cir. 2007) ................................................................33

*Bolanos v. Norwegian Cruise Lines Ltd.,*
   212 F.R.D. 144 (S.D.N.Y. 2002) ................................................................24

*Brown v. Kelly,*
   609 F.3d 467 (2d Cir. 2010)................................................................28

*Brown v. Pro Football, Inc.,*
   146 F.R.D. 1 (D.D.C. 1992)................................................................29

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977)................................................................32

*Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.,*
   No. 85 CIV. 3048 (JMW), 1987 WL 7030 (S.D.N.Y. Feb. 13, 1987) ....................................15

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco
   Managed Care, L.L.C.,*
   504 F.3d 229 (2d Cir. 2007)................................................................27

*Charron v. Pinnacle Grp. N.Y. LLC,*
   874 F. Supp. 2d 179 (S.D.N.Y. 2012), *aff'd sub nom.,*
   *Charron v. Wiener,* 731 F.3d 241 (2d Cir. 2013) ................................................................14

*Charron v. Wiener,*
   731 F.3d 241 (2d. Cir. 2013)................................................................26

*City of Detroit v. Grinnell Corp.*,
   209 F.3d 43 (2d Cir. 2000) *abrogated by*
   *Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000)..................................................................................10, 11

*Cohen v. J.P. Morgan Chase & Co.*,
   262 F.R.D. 153 (E.D.N.Y. 2009)...................................................................................21

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013)...................................................................................................15

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
   502 F.3d 91 (2d Cir. 2007)...............................................................................31, 32, 33

*Dziennik v. Sealift, Inc.*,
   No. 05-CV-4659 (DLI), 2007 WL 1580080 (E.D.N.Y. May 29, 2007)..................................26

*Frank v. Eastman Kodak Co.*,
   228 F.R.D. 174 (W.D.N.Y. 2005)..................................................................................15

*Gross v. Washington Mut. Bank, F.A.*,
   No. 02 CV 4135 (RML), 2006 WL 318814 (E.D.N.Y. Feb. 9, 2006)...................................10

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1988) .......................................................................................29

*Haverhill Ret. Sys. v. Barclays Bank PLC*,
   Case No. 13-cv-7789 (S.D.N.Y.).......................................................................................4

*In re "Agent Orange" Prod. Liab. Litig.*,
   597 F. Supp. 740 (E.D.N.Y. 1984), *aff'd* 818 F.2d 145 (2d Cir. 1987) ..................................16

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   No. 06-MD-1175 JG VVP, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ......................25, 28

*In re Alcoholic Beverages Litig.*,
   95 F.R.D. 321 (E.D.N.Y. 1982)......................................................................................33

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
   689 F.3d 229 (2d Cir. 2012)................................................................................21, 28, 34

*In re AOL Time Warner, Inc.*,
   No. 02 CIV. 5575 (SWK), 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ..........................12, 17

*In re Austrian and German Bank Holocaust Litig.*,
   80 F. Supp. 2d 164 (S.D.N.Y. 2000), *aff'd sub nom.*
   *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001) ..........................................................9

*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.,*
  909 F. Supp. 2d 259 (S.D.N.Y. 2012).......................................................................17

*In re Carbon Black Antitrust Litig.,*
  MDL No. 1543, 2005 WL 102966 (D. Mass. Jan. 18, 2005) .................................23

*In re Chocolate Confectionary Antitrust Litig.,*
  289 F.R.D. 200 (M.D. Pa. 2012).............................................................................23

*In re Corrugated Container Antitrust Litig.,*
  659 F.2d 1322 (5th Cir. 1981) .................................................................................16

*In re Corrugated Container Antitrust Litig.,*
  80 F.R.D. 244 (S.D. Tex. 1978)...............................................................................31

*In re Corrugated Container Antitrust Litig.,*
  No. MDL 310, 1981 WL 2093 (S.D. Tex. June 4, 1981), *aff'd,* 659 F.2d 1322 (5th
  Cir. 1981) ............................................................................................................17, 20

*In re Currency Conversion Fee Antitrust Litig.,*
  224 F.R.D. 555 (S.D.N.Y. 2004) .......................................................................34, 35

*In re Currency Conversion Fee Antitrust Litig.,*
  264 F.R.D. 100 (S.D.N.Y. 2010) .............................................................................26

*In re Currency Conversion Fee Antitrust Litig.,*
  No. 01 MDL 1409, 2006 WL 3247396 (S.D.N.Y. Nov. 8, 2006) ............................7

*In re Diet Drugs,*
  Nos. 1203, 99-20593, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000)......................34

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
  574 F.3d 29 (2d Cir. 2009).......................................................................................24

*In re Foreign Exch. Benchmark Rates Antitrust Litig.,*
  74 F. Supp. 3d 581 (S.D.N.Y. 2015).....................................................................5, 32

*In re Ins. Brokerage Antitrust Litig.,*
  282 F.R.D. 92 (D.N.J. 2012)....................................................................................29

*In re Ionosphere Clubs, Inc.,*
  156 B.R. 414 (S.D.N.Y. 1993).................................................................................16

*In re IPO Sec. Litig.,*
  226 F.R.D. 186 (S.D.N.Y. 2005) .............................................................................19

*In re Linerboard Antitrust Litig.*,
    292 F. Supp. 2d 631 (E.D. Pa. 2003) ................................................................20

*In re Master Key Antitrust Litig.*,
    70 F.R.D. 23 (D. Conn. 1975)...........................................................................31

*In re Michael Milken and Assocs. Sec. Litig.*,
    150 F.R.D. 57 (S.D.N.Y. 1993) ..........................................................................9

*In re Mid-Atl. Toyota Antitrust Litig.*,
    564 F. Supp. 1379 (D. Md. 1983).......................................................................19

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    176 F.R.D. 99 (S.D.N.Y. 1997) ("*Nasdaq II*") .................................................8, 18

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ("*Nasdaq III*")..........................................*passim*

*In re Packaged Ice Antitrust Litig.*,
    No. 08-MD-01952, 2011 WL 717519 (E.D. Mich. Feb. 22, 2011).......................19

*In re PaineWebber Ltd. Partnerships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. Mar. 20, 1997) ..........................................................9

*In re Partsearch Techs., Inc.*,
    453 B.R. 84 (Bankr. S.D.N.Y. 2011) .................................................................13

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    986 F. Supp. 2d 207 (E.D.N.Y. 2013) .................................................11, 13, 33, 34

*In re Plastic Cutlery Antitrust Litig.*,
    No. 96-CV-728, 1998 WL 135703 (E.D. Pa. Mar. 20, 1998) .............................29

*In re Platinum and Palladium Commodities Litig.*,
    10-CV-3617, 2014 WL 3500655 (S.D.N.Y. July 15, 2014).................................8

*In re Playmobil Antitrust Litig.*,
    35 F. Supp. 2d 231 (E.D.N.Y. 1998) ..................................................................25

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
    584 F. Supp. 2d 607 (M.D. Pa. 2008)..............................................................16, 19

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
    No. 3:03-MDL-1556, 2007 WL 4150666 (M.D. Pa. Nov. 19, 2007)....................25

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) .....................................................................22, 28

*In re Scrap Metal Antitrust Litig.*,
   527 F.3d 517 (6th Cir. 2008) ...................................................................30

*In re Stock Exchanges Options Trading Antitrust Litig.*,
   99-CV-00962, 2005 WL 1635158 (S.D.N.Y. July 8, 2005) ........................8

*In re Titanium Dioxide Antitrust Litig.*,
   284 F.R.D. 328 (D. Md. 2012) .................................................................33

*In re Urethane Antitrust Litig.*,
   251 F.R.D. 629 (D. Kan. 2008) ...............................................................30

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001), *overruled on other grounds by In re Initial Public
Offerings Sec. Litig.*, 471 F. 3d 24 (2d Cir. 2006) ...................................33

*In re Vitamin C Antitrust Litig.*,
   279 F.R.D. 90 (E.D.N.Y. 2012) .........................................................23, 28

*In re Vitamin C Antitrust Litig.*,
   No. 06-MD-1738 (BMC) (JO), 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ......................10

*In re Vitamins Antitrust Litig.*,
   209 F.R.D. (D.D.C. 2002) ........................................................................30

*In re Warner Chilcott Ltd. Sec. Litig.*,
   No. 06 Civ. 11515 (WHP), 2008 WL 5110904 (S.D.N.Y. Nov. 20, 2008) ..........................10

*In re Warner Commc'ns Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985) ..........................................................14

*Jennings Oil Co., Inc. v. Mobil Oil Corp.*,
   80 F.R.D. 124 (S.D.N.Y. 1978) ...............................................................31

*Kromer v. Saks & Co.*,
   No. 77 Civ. 2914, 1977 WL 1513 (S.D.N.Y. Dec. 8, 1977) ......................31

*Marisol A. v. Giuliani*,
   126 F.3d 372 (2d Cir. 1997) .....................................................................21

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
   708 F.2d 1081 (7th Cir. 1983) .................................................................15

*Menkes v. Stolt-Nielsen S.A.*,
   270 F.R.D. 80 (D. Conn. 2010) .................................................................8

*Meredith Corp. v. SESAC, LLC*,
   No. 09 Civ. 9177, 2015 WL 728026 (S.D.N.Y. Feb. 19, 2015) ...............35

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2014) ........................................................................... 29, 33

*Morris v. Affinity Health Plan, Inc.*,
  859 F. Supp. 2d 611 (S.D.N.Y. 2012) ....................................................................... 9

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972) ..................................................................................... 16

*Park v. The Thomson Corp.*,
  05-CV-02931, 2008 WL 4684232 (S.D.N.Y. Oct. 22, 2008) ..................................... 13

*Plummer v. Chemical Bank*,
  668 F.2d 654 (2d Cir. 1982) ..................................................................................... 12

*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*,
  237 F.R.D. 26 (E.D.N.Y. 2006) .......................................................................... 10, 11

*Richburg v. Palisades Collection LLC*,
  247 F.R.D. 457 (E.D. Pa. 2008) ............................................................................... 23

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993) ..................................................................................... 25

*Sanner v. Board of Trade of City of Chicago*,
  62 F.3d 918 (7th Cir. 1995) ...................................................................................... 27

*Seijas v. Republic of Arg.*,
  606 F.3d 53 (2d Cir. 2010) ....................................................................................... 35

*Southwire Co. v. J.P. Morgan Chase & Co.*,
  528 F. Supp. 2d 908 (W.D. Wis. 2007) .................................................................... 26

*Strobl v. N.Y. Mercantile Exch.*,
  768 F.2d 22 (2d Cir. 1985) ....................................................................................... 26

*Sullivan v. DB Investments, Inc.*,
  667 F.3d 273 (3d Cir. 2011) (Scirica, J., concurring) ............................................... 32

*Swack v. Credit Suisse First Boston*,
  230 F.R.D. 250 (D. Mass. 2005) .............................................................................. 22

*U.S. Football League v. Nat'l Football League*,
  644 F. Supp. 1040 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) ............. 14

*Velez v. Novartis Pharm. Corp.*,
  No. 04 Civ. 09194 CM, 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ..................... 21

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
    257 F.3d 256 (2d Cir. 2001)................................................................10

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ...............................................................22, 23

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)...........................................................7, 11

*Wallace v. IntraLinks*,
    302 F.R.D. 310 (S.D.N.Y. 2014) .......................................................22

*Weber v. Gov't Emps. Ins. Co.*,
    262 F.R.D. 431 (D.N.J. 2009)...........................................................15

*Weil v. Long Island Sav. Bank, FSB*,
    200 F.R.D. 164 (E.D.N.Y. 2001) .......................................................22

*Weseley v. Spear, Leeds & Kellogg*,
    711 F. Supp. 713 (E.D.N.Y. 1989) ....................................................10

**STATUTES, RULES, AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 23.................................................................................20, 29
    Rule 23(a)............................................................................21, 27
    Rule 23(a)(1)...............................................................................23
    Rule 23(a)(2)........................................................................22, 23
    Rule 23(a)(3)...............................................................................24
    Rule 23(a)(4)...............................................................................25
    Rule 23(b) .................................................................................21
    Rule 23(b)(3)........................................................................*passim*
    Rule 23(c).................................................................................37
    Rule 23(c)1(B)............................................................................35
    Rule 23€................................................................................2, 7
    Rule 23(f).................................................................................11
    Rule 23(g)................................................................................35
    Rule 23(g)(1)(A)(i)-(iv) .................................................................35

**OTHER AUTHORITY**

7A Wright & Miller, *Federal Practice and Procedure* (2d ed.1986)...........................29

**EXPLANATION OF DEFINED TERMS AND CITATION FORMS**

The following defined terms are used in this Memorandum.

**Parties**

- "Class Plaintiffs" are Direct Class Plaintiffs and Exchange-Only Class Plaintiffs.

- "Direct Class Plaintiffs" are Aureus Currency Fund, L.P.; the City of Philadelphia, Board of Pensions and Retirement; Employees' Retirement System of the Government of the Virgin Islands; Employees' Retirement System of Puerto Rico Electric Power Authority; Fresno County Employees' Retirement Association; Haverhill Retirement System; Oklahoma Firefighters Pension and Retirement System; State-Boston Retirement System; Syena Global Emerging Markets Fund, LP; Systrax Corporation; Tiberius OC Fund, Ltd.; United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund; and Value Recovery Fund L.L.C.

- "Exchange-Only Class Plaintiffs" are J. Paul Antonello, Marc G. Federighi, Thomas Gramatis, Doug Harvey, Izee Trading Company, John Kerstein, Michael Melissinos, Mark Miller, Robert Miller, Richard Preschern d/b/a Preschern Trading, Peter Rives, Michael J. Smith, Jeffrey Sterk, and Kimberly Sterk.

- "Parties" or "Settling Parties" are Class Plaintiffs and Settling Defendants.

- "Defendants" are Settling Defendants and Non-Settling Defendants.

- "Settling Defendants" are Bank of America, Barclays, BNP Paribas, Citigroup, Goldman Sachs, HSBC, JPMorgan, RBS, and UBS.

- "Non-Settling Defendants" are Bank of Tokyo, Credit Suisse, Deutsche Bank, Morgan Stanley, RBC, Société Générale, and Standard Chartered.

- "Bank of America" is Bank of America Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Incorporated.

- "Barclays" is Barclays Bank PLC and Barclays Capital Inc.

- "BNP Paribas" is BNP Paribas Group, BNP Paribas North America Inc., BNP Paribas Securities Corp., and BNP Prime Brokerage, Inc.

- "Citigroup" is Citigroup Inc., Citibank, N.A., Citicorp, and Citigroup Global Markets Inc.

- "Goldman Sachs" is The Goldman Sachs Group, Inc. and Goldman, Sachs & Co.

- "HSBC" is HSBC Holdings PLC, HSBC Bank PLC, HSBC North America Holdings Inc., HSBC Bank USA, N.A., and HSBC Securities (USA) Inc.

ix

- "JPMorgan" is JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A.

- "RBS" is The Royal Bank of Scotland Group PLC, The Royal Bank of Scotland PLC, and RBS Securities Inc.

- "UBS" is UBS AG, UBS Group AG, and UBS Securities LLC.

- "Bank of Tokyo" is The Bank of Tokyo Mitsubishi UFJ Ltd.

- "Credit Suisse" is Credit Suisse AG; Credit Suisse Group AG and Credit Suisse Securities (USA) LLC.

- "Deutsche Bank" is Deutsche Bank Securities Inc. and Deutsche Bank AG.

- "Morgan Stanley" is Morgan Stanley; Morgan Stanley & Co. LLC; and Morgan Stanley & Co. International PLC.

- "RBC" is RBC Capital Markets LLC.

- "Société Générale" is Société Générale S.A.

- "Standard Chartered" is Standard Chartered PLC.

**Accompanying Declarations and Settlement Agreements**

- "Lead Counsel Decl." is the Declaration of Christopher M. Burke and Michael D. Hausfeld in Support of Class Plaintiffs' Motion for Preliminary Approval of Settlement Agreements with Bank of America, Barclays, BNP Paribas, Citigroup, Goldman Sachs, HSBC, JPMorgan, RBS, and UBS.

- "Feinberg Decl." is the Declaration of Kenneth R. Feinberg in Support of Class Plaintiffs' Motion for Preliminary Approval of Settlement Agreement with Bank of America, Barclays, BNP Paribas, Citigroup, Goldman Sachs, HSBC, JPMorgan, RBS, and UBS.

- "Bank of America Stip." is the Stipulation and Agreement of Settlement with Bank of America Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Incorporated.

- "Barclays Stip." is the Stipulation and Agreement of Settlement with Barclays Bank PLC and Barclays Capital Inc.

- "BNP Paribas Stip." is the Stipulation and Agreement of Settlement with BNP Paribas Group, BNP Paribas North America Inc., BNP Paribas Securities Corp., and BNP Prime Brokerage, Inc.

- "Citigroup Stip." is the Stipulation and Agreement of Settlement with Citigroup Inc., Citibank, N.A., Citicorp, and Citigroup Global Markets Inc.

- "Goldman Sachs Stip." is the Stipulation and Agreement of Settlement with The Goldman Sachs Group, Inc. and Goldman, Sachs & Co.

- "HSBC Stip." is the Stipulation and Agreement of Settlement with HSBC Holdings PLC, HSBC Bank PLC, HSBC North America Holdings Inc., HSBC Bank USA, N.A., and HSBC Securities (USA) Inc.

- "JPMorgan Amended Stip." is the Stipulation and Amended Agreement of Settlement with JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A.

- "RBS Stip." is the Stipulation and Agreement of Settlement with The Royal Bank of Scotland Group PLC, The Royal Bank of Scotland PLC, and RBS Securities Inc.

- "UBS Amended Stip." is the Stipulation and Amended Agreement of Settlement with UBS AG, UBS Group AG, and UBS Securities LLC.

- "Settlement Agreements" are the Bank of America Stip., Barclays Stip., BNP Paribas Stip., Citigroup Stip., Goldman Sachs Stip., HSBC Stip., JPMorgan Amended Stip., RBS Stip., and UBS Amended Stip.

- "Stips." is the citation form used to cite paragraphs of the Settlement Agreements where the paragraph reference in each of the Settlement Agreements is the same.  To the extent any paragraph numbers differ between Settlement Agreements, the individual agreements are cited.

**Other Defined Terms**

Unless otherwise defined herein, all other capitalized terms have the same meaning as set forth in the Settlement Agreements.

## I.    INTRODUCTION

Class Plaintiffs and Defendants Bank of America, Barclays, BNP Paribas, Citigroup, Goldman Sachs, HSBC, JPMorgan, RBS, and UBS entered into proposed settlements providing for payment of $2,009,075,000 in total to Class Plaintiffs and members of the Settlement Classes.  These Settlement Agreements, which were reached only after extensive arm's-length negotiations between highly-experienced counsel, and with the assistance and skill of renowned mediator Kenneth Feinberg, are an excellent result for the Settlement Classes.  Although this Action has been ongoing for less than two years, this partial settlement is already the fourth largest antitrust class action settlement in the 125-year history of the Sherman Act.  Seven Non-Settling Defendants continue litigating the Action, and under the doctrine of joint and several liability, all of Class Members' transactions, including those with Settling Defendants, remain in the case for the purpose of determining damages against Non-Settling Defendants.

In addition to this outstanding monetary recovery at such an early stage in the litigation, the Settlement Agreements also obligate Settling Defendants to provide extensive cooperation to Class Plaintiffs in aid of their continued prosecution of the Action against Non-Settling Defendants.  Settling Defendants' cooperation obligations include, subject to Court orders and applicable law, producing transaction data, producing all documents previously turned over to U.S. and European governmental bodies investigating misconduct in the FX market, providing information and witnesses to authenticate documents, and providing witnesses for interviews, depositions, and trial testimony relating to the existence, scope, and implementation of the conspiracy.  The breadth of cooperation secured by the Settlement Agreements is exceptional.  Moreover, in what may be an unprecedented term of cooperation, these cooperation obligations will continue for seven years after the date of preliminary approval or until this Action concludes, whichever is later.

The cooperation from the first two Settling Defendants, JPMorgan and UBS, provided Class Plaintiffs, in large part, with the ability to expand their theories of liability as asserted in the Second Consolidated Amended Class Action Complaint ("SAC").  As a result, a great deal more commerce is in play.  Now, rather than asserting claims on behalf of a class injured solely by manipulation of the WM/Reuters Closing Spot Rates (the "Fix"), Class Plaintiffs will pursue claims related to collusion on additional FX benchmark rates and collusive manipulation of multiple currency pairs (including on bid-ask spreads) throughout the trading days during the class period.  Not only did the settlement cooperation expand the scope of Class Plaintiffs' pleadings, but it also resulted in substantially escalating returns from subsequent settlements based on these expanded theories of liability.  Further, it can be readily anticipated that cooperation from Settling Defendants will continue to prove valuable in addressing future dispositive motions.  Accordingly, Settling Defendants' cooperation has already proven valuable, and the value it will offer as the Action continues is potentially immeasurable.

That the settlement cooperation described above has even occurred is itself exceptional. To ensure that cooperation would prove beneficial to Class Members, Lead Counsel negotiated with the U.S. Department of Justice ("DOJ") to agree to a partial lift of the discovery stay, which would permit JPMorgan and UBS to provide Class Plaintiffs with attorney proffers and transaction data.  Ultimately, Lead Counsel were able to secure the DOJ's agreement that settlement cooperation could continue with certain restrictions.  In September 2015, Class Plaintiffs again conferred with DOJ, resulting in the discovery stay being lifted as to non-testimonial discovery.  These agreements are, like the cooperation secured under the Settlement Agreements, exceptional, if not unprecedented.

Pursuant to Federal Rule of Civil Procedure 23(e), Class Plaintiffs respectfully seek an order:

(1)     preliminarily approving the settlements set forth in the Settlement Agreements;

(2)     certifying the Settlement Classes for purposes of settlement only and appointing settlement class counsel and class representatives; and

(3)     approving the proposed Escrow Agent, Claims Administrator, and Settlement Administrator.

A [Proposed] Order Preliminarily Approving Settlements, Certifying the Settlement Classes, and Appointing Class Counsel and Class Representatives for the Settlement Classes is filed herewith (the "Preliminary Approval Order").  Importantly, entry of the Preliminary Approval Order, subject to Court orders and applicable law, triggers production of documents previously produced to enforcement agencies and regulators.  *See* Stips., ¶14(b).

As described to the Court at the June 19, 2015 settlement conference, Class Plaintiffs propose to file a separate Motion for Approval of the Plan of Distribution and Form and Manner of Notice of the Settlement Agreements.[1]  Class Plaintiffs anticipate filing this separate motion as soon as practicable after Settling Defendants produce lists of class members and transaction data, which are necessary for development of the Plan for Distribution and Notice Plan.  If the Court enters the Preliminary Approval Order (requested here) and enters the Notice Order (to be requested by separate motion), Class Plaintiffs will give notice of the proposed settlements to Class Members.[2]  Through this two-step process, Class Plaintiffs seek to trigger critical settlement cooperation upon entry of the Preliminary Approval Order, and to defer notice until

---

[1]     A [Proposed] Order Approving the Plan of Distribution and Form and Manner of Notice of Settlement Agreements, which would accompany the separate motion, is attached to the Stips. as Exhibit B (the "Notice Order").

[2]     Class Plaintiffs reserve the right to request an interim attorneys' fee and/or reimbursement of certain litigation costs at such time notice is sent to putative Class Members.

such time as the Plan of Distribution is fully developed and, accordingly, may be comprehensively described to Class Members.

In considering whether to grant preliminary approval of a proposed settlement, the Court need only determine whether the settlement is sufficiently fair, reasonable, and adequate to allow notice to issue. A final determination of a settlement's fairness is made at or subsequent to a fairness hearing, after class members have received notice and had the opportunity to decide whether to participate, object, opt-out, or otherwise comment. As set forth below, the Settlement Agreements amply satisfy the standards for preliminary approval.

## II.    BACKGROUND

The first complaint in this Action was filed on November 1, 2013 under the caption *Haverhill Ret. Sys. v. Barclays Bank PLC*, Case No. 13-cv-7789 (S.D.N.Y.). Several other related actions were later filed, those actions were consolidated, and the Court appointed Scott+Scott and Hausfeld (together, "Lead Counsel") as interim co-lead counsel. Lead Counsel Decl., ¶¶10, 11. Thereafter, Class Plaintiffs filed the Consolidated Amended Class Action Complaint ("CAC"). ECF No. 172. This complaint alleged a price-fixing claim under Sections 1 and 3 of the Sherman Act against 12 global investment banks arising from a long-running conspiracy to manipulate the Fix set at 4 p.m. London time. The CAC alleged that before the calculation of the Fix, Defendants' FX traders exchanged non-public price information about their customers' orders and their own net trading positions. CAC, ¶¶94-95. This allowed Defendants to ascertain the likely direction of price movements at 4 p.m. London time, when the Fix is calculated. Via their chat room communications, Defendants agreed to collusive trading strategies to move the Fix in the direction that would benefit Defendants' positions at the expense of class members. CAC, ¶¶81, 92, 98. Defendants moved to dismiss the CAC on May

30, 2014; the motion was opposed.  ECF Nos. 208, 209, 210.  The Court heard oral argument on

November 20, 2014.  *See* ECF No. 220.

As described in further detail in the accompanying Lead Counsel Decl. and Feinberg

Decl.,[3] in November 2014, Class Plaintiffs began settlement discussions with JPMorgan.  *See*

Lead Counsel Decl., ¶57; Feinberg Decl., ¶¶8, 91-94.  After extensive negotiations, and at the

urging of the mediator, Class Plaintiffs and JPMorgan agreed to an ice-breaker settlement,

executed on January 5, 2015.  Lead Counsel Decl., ¶56; Feinberg Decl., ¶¶91-95; *see also*

Stipulation and Agreement of Settlement with JPMorgan, ECF No. 247-1 (Jan. 5, 2015).  Shortly

thereafter, on January 28, 2015, the Court denied Defendants' motion to dismiss the CAC.  *In re*

*Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015).  Two days

later, Class Plaintiffs moved for preliminary approval of the JPMorgan settlement.  ECF No. 246.

The JPMorgan settlement and denial of the motion to dismiss resulted in the other

Settling Defendants seeking to discuss settlement and mediate with Class Plaintiffs, including

UBS, the DOJ's amnesty applicant in a parallel criminal investigation.  Lead Counsel Decl.,

¶¶52, 54, 65, 76, 83, 90, 97, 104, 110, 116.  UBS's settlement was conditioned on a substantial

cash payment and extensive cooperation, some of which was triggered within days of execution.

Lead Counsel Decl., ¶¶53, 58, 68, 69, 73.  As the UBS settlement was being negotiated, Lead

Counsel negotiated with the DOJ to secure its agreement that certain forms of settlement

cooperation, including production of transaction data and attorney proffers, would be permitted

under any discovery stay.  Lead Counsel Decl., ¶17.  As a result, Lead Counsel were able to

substantially advance the litigation, even in the presence of a discovery stay, by gathering

---

[3]     The Court is respectfully referred to the Lead Counsel Decl. and Feinberg Decl. for
further details regarding the procedural history of the Action, settlement negotiations, and a
summary of the terms of the Settlement Agreements.

additional information and ultimately filing the SAC, which added new facts, theories of liability, and defendants identified through settlement cooperation.  Lead Counsel Decl., ¶¶22, 26, 27, 28, 53.  The information gathered from JPMorgan and UBS equipped Class Plaintiffs to negotiate future settlements on the basis of a broader scope of conduct and substantially increased the settlement value to the Settlement Classes as a result.  Lead Counsel Decl., ¶¶34 (Table 4), 53, 54, 55.

Negotiations between Class Plaintiffs and Citigroup, Barclays, Bank of America, Goldman Sachs, RBS, BNP Paribas, and HSBC, as well as continuing negotiations with JPMorgan and UBS, occurred over the course of several months, through numerous telephone calls and in-person meetings, including mediation sessions with Mr. Feinberg.  Lead Counsel Decl., ¶¶50, 67, 76, 83, 90, 97, 104, 110, 116; Feinberg Decl., ¶¶7-11, 22-28, 34-40 , 46-50, 56-62, 68-74, 80-84, 90-97, 103-109, 115-122, 124-125.  After Class Plaintiffs reached agreements in principle and/or signed term sheets with each of the Settling Defendants, the Parties began multilateral negotiations on common issues, such that the Settlement Agreements would be harmonized on key terms, allowing for an omnibus motion for preliminary approval and a single notice.  Lead Counsel Decl., ¶122; Feinberg Decl., ¶¶29, 41, 51, 63, 75, 85, 98, 110, 123.  Settlement negotiations were contentious and hard-fought but resulted in agreements.  Feinberg Decl., ¶¶7, 26, 38, 49, 60, 72, 83, 94, 107, 119, 125, 127.  According to Mr. Feinberg, the success of these negotiations was driven in no small part by the tenacity, efficiency, and flexibility of Lead Counsel.  Feinberg Decl., ¶126.  Class Plaintiffs and the Settling Defendants executed the Settlement Agreements between September 30, 2015 and October 5, 2015.  Lead Counsel Decl., ¶125.

While settlement negotiations were in progress, Class Plaintiffs advanced the case using information learned from JPMorgan and UBS, as well as information learned in Lead Counsel's

continuing investigation and released in the guilty pleas and other regulatory settlement documents.  Lead Counsel Decl., ¶¶17, 22, 27, 53, 54, 55.  Class Plaintiffs filed the SAC under seal on July 16, 2015 (ECF No. 340), and public redacted versions were filed on July 31, 2015 (ECF No. 368) and September 21, 2015 (ECF No. 465).  The SAC added new parties, additional details regarding benchmark-fixing conduct (including the Fix and other FX benchmarks), allegations of collusive manipulation of currency pairs (including on bid-ask spreads), and claims relating to exchange-traded FX futures and options.  Significantly, the SAC alleges that Defendants' conspiracy affected dozens of currency pairs, including the seven pairs with the highest market volume.  SAC, ¶¶124-138.  This additional conduct is set forth by detailed allegations, including transcripts of chats between traders and other personnel working on Defendants' spot desks.  *See* SAC, ¶¶124-252.  Due to the importance of spot prices in the broad FX market, the SAC alleges that Defendants' conspiracy impacted other FX instruments trading both over the counter and on exchanges.  SAC, ¶¶253-286.

## III.   THE SETTLEMENT AGREEMENTS MEET THE CRITERIA NECESSARY FOR THIS COURT TO GRANT PRELIMINARY APPROVAL

### A.   Standards for Preliminary Approval

"Rule 23(e) requires court approval of a class action settlement."  *In re Currency Conversion Fee Antitrust Litig.*, No. 01 MDL 1409, 2006 WL 3247396, at *5 (S.D.N.Y. Nov. 8, 2006).   "In determining whether to grant preliminary approval, the court starts with the proposition that 'there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions.'"  *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-CV-230, 2011 WL 1706778, at *2 (D. Vt. May 4, 2011); *see also Wal-Mart Stores, Inc. v. Visa U.S.A.*,

*Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005) ("'The compromise of complex litigation is encouraged by the courts and favored by public policy.'").[4]

"Preliminary approval is generally the first step in a two-step process before a class-action settlement is approved." *In re Stock Exchanges Options Trading Antitrust Litig.*, 99-CV-00962, 2005 WL 1635158, at *4 (S.D.N.Y. July 8, 2005). "In considering preliminary approval, courts make a preliminary evaluation of the fairness of the settlement, prior to notice." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997) ("*Nasdaq II*"). "The second step is to give notice to class members and to hold a hearing to determine whether final approval of the settlement should be given."[5] *Stock Exchanges*, 2005 WL 1635158, at *5. This procedure safeguards class members' due process rights and enables the Court to fulfill its role as the guardian of class interests. *See* Newberg on Class Actions § 13:10 (5th ed.).

In conducting a preliminary approval inquiry, a court considers both the "'negotiating process leading up to the settlement, *i.e.*, procedural fairness, as well as the settlement's substantive terms, *i.e.*, substantive fairness.'" *In re Platinum and Palladium Commodities Litig.*, 10-CV-3617, 2014 WL 3500655, at *11 (S.D.N.Y. July 15, 2014). Preliminary approval is appropriate where the settlement "'is the result of serious, informed, and non-collusive negotiations, where there are no grounds to doubt its fairness and no other obvious deficiencies . . . , and where the settlement appears to fall within the range of possible approval.'" *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 101 (D. Conn. 2010). As demonstrated below, the Settlement Agreements merit preliminary approval because they are procedurally and substantively fair.

---

[4]    Unless otherwise noted, citations are omitted and emphasis is added.

[5]    For the reasons discussed in §I., *supra*, and §VI, *infra*, Class Plaintiffs propose deferring notice until after filing the separate Motion for Approval of the Plan of Distribution and Form and Manner of Notice of the Settlement Agreements.

### B.      The Settlement Agreements Are Procedurally Fair

"To determine procedural fairness, courts examine the negotiating process leading to the settlement." *Morris v. Affinity Health Plan, Inc*., 859 F. Supp. 2d 611, 618 (S.D.N.Y. 2012). Where a settlement is the "product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation," the settlement enjoys a "presumption of fairness." *In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001). Moreover, in such circumstances, "'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. Mar. 20, 1997).

As Lead Counsel attest, settlement negotiations took place over the course of many months, were hard-fought, and always at arm's-length.  Lead Counsel Decl., ¶¶50, 57, 67, 68, 76, 79, 83, 86, 90, 93, 97, 100, 104, 106, 110, 112, 116, 118.  Mr. Feinberg's involvement as mediator further weighs in favor of a finding that the Settlement Agreements are procedurally fair.  *See, e.g., Affinity Health Plan*, 859 F. Supp. 2d at 618-19 ("The involvement of . . . an experienced and well-known . . . class action mediator, is also a strong indicator of procedural fairness.").  Moreover, Mr. Feinberg confirms that the negotiation process was *bona fid*e, at times extremely contentious, and advocated by sophisticated and capable counsel all around the table.  Feinberg Decl., ¶¶7, 26, 38, 49, 60, 72, 83, 94, 107, 119, 125-127.  Under these circumstances, there is "a strong initial presumption that the compromise is fair and reasonable." *In re Michael Milken and Assocs. Sec. Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993).

### C.      The Settlement Agreements Are Substantively Fair

"In terms of the overall fairness, adequacy, and reasonableness of the settlement, a full fairness analysis is unnecessary at this stage; preliminary approval is appropriate where a

proposed settlement is merely within the range of possible approval." *Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006); *see also In re Warner Chilcott Ltd. Sec. Litig.*, No. 06 Civ. 11515 (WHP), 2008 WL 5110904, at *2 (S.D.N.Y. Nov. 20, 2008). Nevertheless, some courts have used the *Grinnell* factors in assessing whether a proposed settlement falls within the range of possible approval. *See, e.g., Reade-Alvarez*, 237 F.R.D. at 34; *Gross v. Washington Mut. Bank, F.A.*, No. 02 CV 4135 (RML), 2006 WL 318814, at *4-*5 (E.D.N.Y. Feb. 9, 2006). The *Grinnell* factors are:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). As discussed below, each of the *Grinnell* factors supports preliminary approval of the Settlement Agreements.

### 1.     The Complexity, Expense, and Likely Duration of the Litigation

Numerous courts have recognized that "'[f]ederal antitrust cases are complicated, lengthy . . . bitterly fought,' as well as costly." *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738 (BMC) (JO), 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012); *see also Virgin Atl. Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 263 (2d Cir. 2001) (noting the "factual complexities of antitrust cases"); *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989) (antitrust class actions "are notoriously complex, protracted, and bitterly fought").

This case is no different. Fact discovery will be protracted and expensive. This is especially true given the global nature of the FX market, the breadth of the conspiracy alleged in the SAC, the impact of the conspiracy with respect to different FX instruments, and Defendants'

alleged use of a variety of tactics to implement the conspiracy over a span of many years. There will also be extensive expert discovery in light of the complex subject matter of the Action. *See In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) ("*Nasdaq III*") ("The proof would involve the fixing of spreads, not on a single security for a single discrete period, but the fixing of spreads varying from hour to hour or day to day (over a period of 7 years) on 1,659 different securities."). As to class certification, the losing party will likely seek interlocutory review pursuant to Rule 23(f), which will cause delay in resolving the litigation. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 212 n.13 (E.D.N.Y. 2013) ("In the *Wal-Mart* case, twenty months elapsed between the order certifying the class and the Second Circuit's divided opinion affirming that decision."). Finally, the trial of this action after completion of discovery will be lengthy. *See Payment Card*, 986 F. Supp. 2d at 212; *Nasdaq III*, 187 F.R.D. at 477 (estimating that trial could consume over a year). "The losing parties would likely appeal any adverse jury verdicts, thereby extending the duration of litigation." *Payment Card*, 986 F. Supp. 2d at 212. In sum, "[t]here can be no doubt that this class action would be enormously expensive to continue, extraordinarily complex to try, and ultimately uncertain of result." *Nasdaq III*, 187 F.R.D. at 477. This factor plainly weighs in favor of preliminary approval.

## 2. The Reaction of the Class to the Settlement Agreements

This factor is generally inapplicable prior to the dissemination of notice. *See Reade-Alvarez*, 237 F.R.D. at 34. Class Plaintiffs have, however, approved the Settlement Agreements. In the event objections are received after notice is disseminated, Lead Counsel will address them in connection with the motion for final approval of the Settlement Agreements.

### 3.    The Stage of the Proceedings

"The relevant inquiry for this factor is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement." *In re AOL Time Warner, Inc.*, No. 02 CIV. 5575 (SWK), 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006).  Neither the lack of complete formal discovery, nor the lack of "extensive discovery" will preclude approval of a settlement.  *Id.*; *see also Plummer v. Chemical Bank*, 668 F.2d 654, 658 (2d Cir. 1982).  Rather, "the parties need not have engaged in extensive discovery as long as they have engaged in sufficient investigation of the facts to enable the Court to intelligently make . . . an appraisal of the Settlement.'"  *AOL Time Warner*, 2006 WL 903236, at *10.

Here, Lead Counsel's knowledge of the merits and potential weaknesses of Class Plaintiffs' claims support preliminary approval of the Settlement Agreements.  This knowledge is based on Lead Counsel's investigation during the initiation and prosecution of the Action, as well as extensive settlement negotiations with Settling Defendants.  *See* Lead Counsel Decl., ¶¶9, 22, 53, 54.  Even before the filing of the Action, Lead Counsel engaged in a months-long investigation, which resulted in the filing of the first complaint in this Action and the CAC.  *See* Lead Counsel Decl., ¶9.  Lead Counsel gained further understanding of the case in preparing the opposition to, and arguing, the motion to dismiss.  *See* Lead Counsel Decl., ¶13.  After the motion to dismiss was denied, Lead Counsel also negotiated with the DOJ for access to settlement cooperation while discovery was stayed.  Lead Counsel Decl., ¶¶16, 17.  This negotiation resulted in Lead Counsel gaining access to transaction data and attorney proffers, subject to certain restrictions, even in the presence of the discovery stay.  Lead Counsel Decl., ¶17.  This ultimately enabled Lead Counsel to gather additional information that would have only been available after substantial discovery.  Lead Counsel Decl., ¶¶17, 22, 27, 36, 37, 38, 53,

67, 68.  Finally, Lead Counsel engaged a roster of consultants and experts with knowledge of the FX market, FX trading, industrial organization, econometrics, FX microstructure and macrostructure, and finance.  Lead Counsel incorporated information from many of these sources into the detailed allegations set forth in the SAC.  *See* Lead Counsel Decl., ¶¶9, 22.  The accumulation of the information obtained from these sources also informed Lead Counsel about the strengths and weaknesses of the case and allowed them to engage in effective settlement discussions with the Settling Defendants.  *See, e.g., In re Partsearch Techs., Inc.*, 453 B.R. 84, 100 (Bankr. S.D.N.Y. 2011) ("The fact that the parties were represented by capable and experienced counsel further indicates that each side had sufficient opportunity to understand the underlying factual issues.").  The Court should find that this factor supports preliminary approval of the Settlement Agreements.

### 4.    The Risks of Establishing Liability and Damages

"'In assessing the Settlement, the Court should balance the benefits afforded the Class, including the ***immediacy*** and ***certainty*** of a recovery, against the continuing risks of litigation.'" *Payment Card*, 986 F. Supp. 2d at 212 (emphasis in the original).  Success through the next round of motions to dismiss, let alone, summary judgment and trial, is far from assured, although Class Plaintiffs believe that the evidence ultimately will warrant a decision in their favor.[6]

This case involves complicated issues of antitrust law, and its subject matter – FX trading – can be complex.  "The complexity of Plaintiff's claims *ipso facto* creates uncertainty . . . .  A trial on these issues would likely be confusing to a jury."  *Park v. The Thomson Corp.*, 05-CV-02931, 2008 WL 4684232, at *4 (S.D.N.Y. Oct. 22, 2008); *Nasdaq III*, 187 F.R.D. at 475 (noting

---

[6]    Since Lead Counsel may well have to litigate against the Non-Settling Defendants through trial and appeal, their duties to the Class Plaintiffs and putative classes preclude a full discussion of the potential risks in establishing liability and damages.

difficulty and uncertainty of proving liability to a jury, "especially in a case of this complexity and magnitude").

Defendants are well-financed and represented by some of the most able law firms in the world.  Had Settling Defendants not agreed to settle, they were prepared, and had the wherewithal, to vigorously contest liability and class certification.  Indeed, Settling Defendants have denied, and continue to deny, any liability to Class Plaintiffs.  *See* Stips., ¶1.  "Establishing otherwise [would] require considerable additional pre-trial effort and a lengthy trial, the outcome of which is uncertain."  *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 199 (S.D.N.Y. 2012), *aff'd sub nom.*, *Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013).

Even if liability is established, Class Plaintiffs would face the difficulties and complexities inherent in proving damages to the jury.  Class Plaintiffs' theory of damages would be hotly contested at trial, and there is no doubt that, at trial, the issue would inevitably involve a "battle of the experts."  *Nasdaq III*, 187 F.R.D. at 476.  "In this 'battle of experts,' it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors . . . ."  *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985).  Thus, there is a substantial risk that a jury might accept one or more of Defendants' damage arguments, or award far less than the total settlement amount of $2,009,075,000, or nothing at all.  "Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal."  *Nasdaq III*, 187 F.R.D. at 476.[7]

---

[7]     *See also U.S. Football League v. Nat'l Football League*, 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986) ("the jury chose to award plaintiffs only nominal damages, concluding that the

In short, "[t]here is a substantial risk that the plaintiff might not be able to establish liability at all and, even assuming a favorable jury verdict, if the matter is fully litigated and appealed, any recovery would be years away."  *Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.*, No. 85 CIV. 3048 (JMW), 1987 WL 7030, at *3 (S.D.N.Y. Feb. 13, 1987).  This factor therefore weighs in favor of preliminary approval.

### 5.      The Risks of Maintaining the Class Action Through Trial

While Class Plaintiffs believe that the Court will certify litigation classes, they are aware that Settling Defendants would advance substantial arguments in opposition.  Further, if the Court certifies the proposed litigation classes, certification can be reviewed and modified at any time.  Thus, there is always a risk that this litigation, or particular claims, might not be maintained as a class through trial.  *See Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005) (noting that "[w]hile plaintiffs might indeed prevail [on a motion for class certification], the risk that the case might be not certified is not illusory"); *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) (reversing class certification in antitrust case).  The risks associated with class certification weigh in favor of approving the Settlement Agreements.

### 6.      The Ability of Defendants to Withstand a Greater Judgment

"In any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement."  *Weber v. Gov't Emps. Ins. Co.*, 262 F.R.D. 431, 447 (D.N.J. 2009).  Moreover, "the benefit of obtaining the cooperation of the Settling Defendants tends to offset the fact that they would be able to

---

USFL had suffered only $1.00 in damages"), *aff'd*, 842 F.2d 1335, 1377 (2d Cir. 1988); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1166–69 (7th Cir. 1983) (antitrust judgment was remanded for a new trial and damages).

withstand a larger judgment." *In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 607, 702 (M.D. Pa. 2008). Given the extensive cooperation agreed to by Settling Defendants, the fact that it has been secured so early in the case, and that the settlement amounts represent significant commitments by Settling Defendants, Class Plaintiffs submit that this factor weighs in favor of preliminary approval.

> **7. The Reasonableness of the Settlement Agreements in Light of the Best Possible Recovery and the Attendant Risks of Litigation**

The range of reasonableness "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). In applying this factor, "[d]ollar amounts [in class action settlement agreements] are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd* 818 F.2d 145 (2d Cir. 1987); *see also In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 431 (S.D.N.Y. 1993) ("'The weighing of a claim against compensation cannot be . . . exact. Nor should it be, since an exact judicial determination of the values in issue would defeat the purpose of compromising the claim.'") (ellipses in original). "Ultimately, the exact amount of damages need not be adjudicated for purposes of settlement approval." *Nasdaq III*, 187 F.R.D. at 478. As noted in one prominent antitrust case, the "essence of a settlement is compromise. A just result is often no more than an arbitrary point between competing notions of reasonableness." *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1325 (5th Cir. 1981).

Prosecuting the Action against Settling Defendants would entail a lengthy and expensive legal battle involving complex legal and factual issues. For example, establishing damages would require reliance on challengeable assumptions, presenting a risk of no recovery at all. *See*

*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*, 909 F. Supp. 2d 259, 270 (S.D.N.Y. 2012) ("the propriety of a given settlement amount is a function of both (1) the size of the amount relative to the best possible recovery; and (2) the likelihood of non-recovery (or reduced recovery)").  In contrast, the Settlement Agreements provide both a significant cash component and deliver Settling Defendants' cooperation.  That the cash component will be paid in the near future weighs in favor of approval.  *See AOL Time Warner*, 2006 WL 903236, at *13 (concluding that where settlement fund is in escrow earning interest, "the benefit of the Settlement will . . . be realized far earlier than a hypothetical post-trial recovery").

By any metric, the Settlement Agreements are an outstanding result for the Settlement Classes.  The total settlement amount ($2,009,075,000), representing a partial settlement of the Action, if approved, would be the fourth largest antitrust class action settlement on record.  Lead Counsel Decl., ¶126, Table 5.  The Settlement Agreements also preserve Class Plaintiffs' right to recover the entire amount of damages against the Non-Settling Defendants based on joint and several liability (after an offset post-trebling for the settlement amounts).  *In re Corrugated Container Antitrust Litig.*, No. MDL 310, 1981 WL 2093, at *17 (S.D. Tex. June 4, 1981), *aff'd,* 659 F.2d 1322 (5th Cir. 1981) (noting that partial settlements preserved plaintiffs' ability to seek the entire amount of damages from non-settling defendants weighed in favor of settling approval).

To date, the total settlement amount represents 79.7% of the fines collected by the DOJ ($2,520,000,000).  Lead Counsel Decl., ¶127, Exhibit 12.  Even though the Settlement Agreements are in partial settlement of the Action, which remains ongoing against the seven Non-Settling Defendants, the recovery already ranks favorably in comparison to other antitrust class action cases over the last 10 years where there were both private settlements and DOJ fines.  Lead Counsel Decl., ¶127, Exhibit 12.

Individually, the settlement amounts are reasonable based on the Settling Defendants' respective global market shares.[8]  The "ice-breaker" settlement with JPMorgan equated to $18,660,714.29 per percentage point of JPMorgan's 5.60% global market share.[9]  UBS settled next at a rate of $11,795,568.56 per percentage point of UBS's 11.96% global market share, but achieved its settlement only through even more onerous cooperation (including a mini-proffer during the course of settlement negotiations) requirements.[10]  Early cooperation from JPMorgan and UBS ultimately resulted in a substantial expansion of the claims and potential value of the case, as expressed by the increase in settlement values immediately following the JPMorgan and UBS Settlements.  *See* Lead Counsel Decl., ¶34 (Table 4), 53, 54, 55.  The subsequent seven Settlement Agreements were between $34,793,814.43 and $54,182,509.51 per percentage point of market share.  Lead Counsel Decl., ¶34, Table 4.[11]

---

[8]  Class Plaintiffs' estimated market shares are global volume-weighted estimates; however, the Settlement Agreements' release provisions explicitly carve out claims based on transactions executed solely outside the United States and arising under foreign laws belonging to any Persons domiciled outside the United States.  Stips., ¶¶1, 2(nn); *accord* UBS Amended Stip., ¶2(ll).

[9]  To determine "per percentage point of market share," one takes the total settlement amount and divides it by the points of market share.  In this example, $104,500,000 divided by 5.60 is $18,660,714.29.

[10]  UBS's potential monetary exposure was also reduced because as the DOJ's amnesty applicant, Class Plaintiffs could not obtain treble damages from UBS, as they can from the other Defendants.  *See* Lead Counsel Decl., ¶66.

[11]  These recoveries surpass settlement recoveries approved in other price-fixing cases.  *See, e.g., In re NASDAQ II*, 176 F.R.D. at 102 (in this antitrust action, alleging broad collusion affecting the financial markets, the district court gave approval to settlements ranging between $4.375 million and $8.25 million per percentage point of market share), *final approval granted NASDAQ III*, 187 F.R.D. 465 (S.D.N.Y. Nov. 9, 1998).  The settlements here would dwarf that recovery, representing more than five times the recovery in *NASDAQ*.

Settling Defendants' cooperation obligations under the Settlement Agreements are likewise extremely valuable to the Settlement Classes, and indeed, as described above, settlement cooperation has already benefited Class Members.  *See, e.g., In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at *10 (E.D. Mich. Feb. 22, 2011) (noting that cooperation "has already been beneficial to the Plaintiffs in their continued prosecution of their claims against the non-settling Defendants"); *see also Pressure Sensitive Labelstock*, 584 F. Supp. 2d at 702.

Settling Defendants' cooperation obligations also began immediately after execution of the Settlement Agreements.  Lead Counsel Decl., ¶36, 37, 38, 39.  And the cooperation will benefit the Settlement Classes for years to come. Defendants' obligations continue until the later of: (1) the date when final judgment has been rendered, with no remaining rights of appeal, in the Action against all Defendants, or (2) seven (7) years.  Stips., ¶14(b).  Settling Defendants must, subject to Court orders and applicable law, provide attorney proffers, produce transaction data, produce documents produced to government bodies, produce additional data and documents as requested by Class Plaintiffs, make witnesses available for interviews,  produce witnesses at deposition, supply affidavits, and, finally, provide  witnesses at trial.  Stips., ¶14.  In short, the value of Settling Defendants' cooperation weighs in favor of preliminary approval of the Settlement Agreements.  *See In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003) ("The provision of such assistance is a substantial benefit to the classes and strongly militates toward approval of the Settlement Agreement.").[12]

---

[12]     *See also In re IPO Sec. Litig.*, 226 F.R.D. 186, 198–99 (S.D.N.Y. 2005) (approving settlement largely on the basis of intangible benefits, including cooperation against non-settling defendants); *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1386 (D. Md. 1983) (concluding that commitment to cooperate is an appropriate factor to consider in approving

The Settlement Agreements represent a historic achievement in both monetary recovery on behalf of the Settlement Classes and scope and terms of cooperation. Class Plaintiffs achieved these landmark settlements at a brisk and efficient pace, which will inure to the Settlement Classes' benefit. Given that the Settlement Agreements are both procedurally and substantively fair, Class Plaintiffs respectfully request that the Court grant them preliminary approval.

## IV.   CERTIFICATION OF THE SETTLEMENT CLASSES UNDER RULE 23 IS APPROPRIATE

Class Plaintiffs respectfully request that the Court certify the following Classes for the purposes of settlement:

Direct Settlement Class: All Persons who, between January 1, 2003 and the date of the Preliminary Approval Order, entered into an FX Instrument directly with a Defendant, a direct or indirect parent, subsidiary, or division of a Defendant, a Released Party, or co-conspirator where such Persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, transacted FX Instruments in the United States or its territories.[13] Stips., ¶3(a).

Exchange-Only Settlement Class: All Persons who, between January 1, 2003 and the date of the Preliminary Approval Order, entered into FX Exchange-Traded Instruments where such Persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, entered into

---

partial settlement); *Corrugated Container*, 1981 WL 2093, at *16 ("The cooperation clauses constituted a substantial benefit to the class.").

[13]     Specifically excluded from the Direct Settlement Class are Defendants; Released Parties; co-conspirators; the officers, directors, or employees of any Defendant, Released Party, or co-conspirator; any entity in which any Defendant, Released Party, or co-conspirator has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant, Released Party, or co-conspirator and any person acting on their behalf; provided, however, that Investment Vehicles shall not be excluded from the definition of the Direct Settlement Class. Also excluded from the Direct Settlement Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this Action. Stips., ¶3(a).

FX Exchange-Traded Instruments on a U.S. exchange.[14]  Stips., ¶3(a).

"As the initial and fundamental principle, it is important to remember that when considering certification in the context of a proposed settlement, 'courts must take a liberal rather than a restrictive approach.'  In other words, many of the restrictions or considerations that come into play in the standard certification analysis do not receive the same treatment at the settlement stage."  *Velez v. Novartis Pharm. Corp.*, No. 04 Civ. 09194 CM, 2010 WL 4877852, at *9 (S.D.N.Y. Nov. 30, 2010) (quoting *Cohen v. J.P. Morgan Chase & Co.,* 262 F.R.D. 153, 157-58 (E.D.N.Y. 2009)); *see also Marisol A. v. Giuliani,* 126 F.3d 372, 377 (2d Cir. 1997).  As demonstrated below, both Settlement Classes meet the requirements for certification.

## A.   The Settlement Classes Satisfy the Rule 23(a) Requirements

A court may certify a class for settlement purposes where the proposed settlement class meets the requirements for Rule 23(a) class certification, as well as one of the three subsections of Rule 23(b).  *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 242 (2d Cir. 2012).  In *Amchem Prods. v. Windsor,* 521 U.S. 591 (1997), the Supreme Court set forth the parameters of the Rule 23(a) inquiry:

---

[14]    Specifically excluded from the Exchange-Only Settlement Class are Defendants; Released Parties; co-conspirators; the officers, directors, or employees of any Defendant, Released Party, or co-conspirator; any entity in which any Defendant, Released Party, or co-conspirator has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant, Released Party, or co-conspirator and any person acting on their behalf; provided, however, that Investment Vehicles shall not be excluded from the definition of the Exchange-Only Settlement Class.  Also excluded from the Exchange-Only Settlement Class are: (i) any judicial officer presiding over this action and any member of his/her immediate family and judicial staff, and any juror assigned to this Action; and (ii) any Person who, between January 1, 2003 and the date of the Preliminary Approval Order, entered into an FX Instrument directly with a Defendant, a direct or indirect parent, subsidiary, or division of a Defendant, a Released Party, or co-conspirator, where such Person was either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, transacted FX Instruments in the United States or its territories.  Stips., ¶3(a).

Rule 23(a) states four threshold requirements applicable to all class actions: (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical . . . of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").

*Id*. at 613.

### 1.     The Classes Are So Numerous that Joinder Is Impracticable

Given the size of the FX market, sometimes reaching $5.3 trillion in commerce per day during the 12-year class period, there is little question that the Settlement Classes meet the Rule 23(a)(1) numerosity requirement.  The number of Class Members in each of the Settlement Classes is likely in the hundreds of thousands.  In cases involving widely-traded instruments such as here, numerosity is readily satisfied.  *See Wallace v. IntraLinks*, 302 F.R.D. 310, 315 (S.D.N.Y. 2014) ("In class actions alleging fraud in widely traded securities, common sense assumptions based on the number of outstanding shares may suffice to demonstrate numerosity.").  In addition, where, as here, the members of the classes are "dispersed throughout the country," the "difficulty that the size of the potential class poses for joinder" also supports class certification.  *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 259 (D. Mass. 2005).

### 2.     The Case Involves Questions of Law and Fact Common to the Classes

Rule 23(a)(2) requires that there are "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Rule 23(a)(2) is generally considered a "'low hurdle' easily surmounted." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 206, n.8 (S.D.N.Y. 1995). Commonality may be satisfied by the presence of only a single issue common to the class.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011); *see also Weil v. Long Island Sav. Bank, FSB*, 200 F.R.D. 164, 169 (E.D.N.Y. 2001) ("A single common issue of law will satisfy the commonality requirement.").  Commonality is met when class members' claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means

that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551. This inquiry focuses on whether a class action will "generate common ***answers*** apt to drive the resolution of the litigation." *Id.* (emphasis in original).

The nature of antitrust conspiracy cases brought under Section 1 of the Sherman Act has led courts to routinely, and almost uniformly, find that commonality exists. *Richburg v. Palisades Collection LLC*, 247 F.R.D. 457, 462 (E.D. Pa. 2008) ("'Antitrust, price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy.'").[15]

This case is no different. Proof of Defendants' conspiracy to fix prices in the FX market will be the heart of this case at trial and is crucial to the claims of all Class Members. Each Class Member has a common interest in proving the existence, scope, effectiveness, and impact of these conspiracies, as well as the appropriate monetary relief to remedy the injury caused by Defendants. Accordingly, Rule 23(a)(2) is satisfied by common questions, including:

(1)     *Liability questions under Section 1 of the Sherman Act*:  All factual and legal questions to determine whether Defendants violated Section 1 of the Sherman Act, such as:

---

[15]     *See also In re Carbon Black Antitrust Litig.,* MDL No. 1543, 2005 WL 102966, at *11 (D. Mass. Jan. 18, 2005) (collecting antitrust cases satisfying commonality requirement based on the existence and scope of conspiracies); *see, e.g., In NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 510 (S.D.N.Y. 1996) (*Nasdaq I*) (commonality satisfied based on common questions as to the existence, scope, effectiveness, and impact of conspiracy and the appropriate injunctive and monetary relief); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 99 (E.D.N.Y. 2012) (commonality satisfied based on common question of whether defendants' price-fixing agreement caused an artificial increase in the market price of vitamin C); *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 216 (M.D. Pa. 2012) (commonality satisfied based on common question of whether defendants conspired to fix prices, identities of actors in conspiracy, duration of conspiracy, and concealment of conspiracy).

<ol type="a" start="1">
<li>(a)     whether Defendants and their co-conspirators entered into an agreement to fix FX prices in interstate commerce in the United States?</li>
</ol>

     (b)     whether each Defendant entered into the agreement? and

     (c)     whether such agreement was a per se violation of Section 1 of the Sherman Act?

(2)     *Antitrust injury questions under Section 4 of the Clayton Act*:  All factual and legal questions to determine whether Class Members suffered injury in fact or impact.

(3)     *Damages questions under Section 4 of the Clayton Act*:  All factual and legal questions to determine the appropriate measure of class-wide damages.

(4)     *Liability and damages questions under Section 22 of the Commodity Exchange Act*:  All factual and legal question to determine whether Defendants violated Section 22 of the Commodity Exchange Act and the extent of the injury suffered by Class Members, such as:

     (a)     whether artificial prices for FX futures and options on FX futures existed?

     (b)     whether Defendant possessed the ability to influence prices of FX futures and options on FX futures?

     (c)     whether Defendants caused FX futures and options on FX futures to trade at artificial prices?

     (d)     whether Defendants specifically intended to cause artificial prices of FX futures and options on FX futures?

     (e)     whether Class Members were injured by Defendants' conduct? and

     (f)     what is the appropriate measure of class-wide damages?

Thus, the Settlement Classes readily satisfy the commonality requirement.

### 3.     Class Plaintiffs' Claims Are Typical of the Claims of the Classes

Rule 23(a)(3) requires that the claims of the representative parties be typical of the claims of the class.  The rule's permissive standard is satisfied when "'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'"  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002)

("'Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding.'").

In this case, Class Plaintiffs' claims are typical of the claims of Class Members because Class Plaintiffs allege the same unlawful course of conduct harmed all members of the Settlement Classes. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 JG VVP, 2014 WL 7882100, at *31 (E.D.N.Y. Oct. 15, 2014) ("Because the representative plaintiffs will seek to prove that they were harmed by the same overall course of conduct and in the same way as the remainder of the class, their claims are by all appearances typical of the class.").

Courts have rejected the argument that factual differences among individual transactions undermine typicality, so long as the damages of plaintiffs and the class arise from transactions affected by the conspiracy. *In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 3:03-MDL-1556, 2007 WL 4150666, at *10 (M.D. Pa. Nov. 19, 2007) ("Typicality is usually satisfied in a horizontal antitrust conspiracy case, even though a plaintiff may have purchased different product types or quantities or received different prices, or a plaintiff purchased from one defendant but not another."); *see also Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.").  Further, any differences that may exist in the amount of injury suffered by each class member do not preclude a finding of typicality. *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 242 (E.D.N.Y. 1998) ("Differences in the damages sustained by individual class members does not preclude a showing of typicality, nor defeat class certification.").

### 4.   Class Plaintiffs Will Fairly and Adequately Represent the Interests of the Classes

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect

the interests of the class."  Adequacy is met if plaintiff class representatives do not have interests that are antagonistic to those of the class and their chosen counsel is qualified, experienced, and generally able to conduct the litigation.[16]  *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 111-12 (S.D.N.Y. 2010).

First, the interests of Direct Class Plaintiffs and members of the Direct Settlement Class are aligned because they all suffered similar injury in the form of paying non-competitive FX prices because of Defendants' conspiracy, and they all seek the same relief.  By proving their own claims, Direct Class Plaintiffs will be proving the claims of their fellow class members.  *See Id.* ("[T]he great weight of authority in price-fixing conspiracy cases, absent special circumstances such as arbitration, holds that the victim of one alleged co-conspirator is adequate to prove liability for victims of all co-conspirators.") (collecting cases).  For the same reason, the interests of Exchange-Only Class Plaintiffs and members of the Exchange-Only Settlement Class are aligned in that they all suffered similar injury as a result of Defendants' common course of conduct and seek the same relief.  Where, as here, the essential nature of the classes' claims are identical, there is no fundamental conflict.[17]  *See Charron v. Wiener,* 731 F.3d 241 (2d. Cir. 2013); *see also, e.g., Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 29 (2d Cir. 1985) (permitting CEA and antitrust claims to be pleaded simultaneously); *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 911 (W.D. Wis. 2007) (holding that purchasers of both physical

---

[16]     Lead Counsel's qualifications are discussed at §IV.C., *infra*.

[17]     "'Only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.'"  *Dziennik v. Sealift, Inc.*, No. 05-CV-4659 (DLI), 2007 WL 1580080, at *6 (E.D.N.Y. May 29, 2007) (quoting *Martens v. Smith Barney Inc.,* 181 F.R.D. 243, 259 (S.D.N.Y. 1998) (quoting 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1768, at 639 (1972)); *see also Nasdaq I,* 169 F.R.D. at 514-15 (holding that to warrant denial of class certification, "it must be shown that any asserted 'conflict' is so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation").

copper and copper futures had antitrust standing because they were both injured by manipulation of the copper markets); *Sanner v. Board of Trade of City of Chicago,* 62 F.3d 918, 927 (7th Cir. 1995) (concluding that cash-market participants of soybeans had antitrust standing where the plaintiffs alleged manipulation in the futures market for soybeans because the cash-market purchasers were "unquestionably" affected by the market manipulation).  Because the interests of each of the Class Plaintiffs representing their respective Settlement Classes are synonymous, no fundamental conflict between the Class Plaintiffs and the Settlement Classes exist.

Since no fundamental conflicts exist, the Settlement Classes are appropriately represented by the same counsel.  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 246 (2d Cir. 2007) (separate representation of multiple classes is only required where there is a "fundamental conflict" that goes "to the very heart of the litigation").  Indeed, the Court has already given extensive consideration of this issue, and all named plaintiffs in the recently-consolidated Exchange Actions withdrew their oppositions to consolidation and appointment of Lead Counsel as interim co-lead counsel for the exchange-traded class.  *See* Lead Counsel Decl., ¶¶23, 24, 25, 26, 28.

However, as an added measure to assure adequate representation for class members, separate allocation counsel for the Direct Class and Exchange-Only Class will be advocating for their respective interests in the allocation of the settlement proceeds.  *See* Lead Counsel Decl., ¶29.  The activities of allocation counsel will be set forth in the forthcoming Motion for Approval of the Plan of Distribution and Form and Manner of Notice of the Settlement Agreements, which is further described at §VI., *infra*.

### B.    The Settlement Classes Satisfy the Rule 23(b)(3) Requirements

Once the four prerequisites of Rule 23(a) are met, as they are here, plaintiffs are entitled to proceed with a class action under Rule 23(b)(3) if "the court finds that questions of law or fact

common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### 1.    Common Questions Predominate over Individual Questions

Rule 23(b)(3)'s purpose is to ensure that a class is certified when a "'a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'"  *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010) (quoting Fed. R. Civ. P. 23(b)(3) adv. comm. n. to 1966 amend.).   "If the most substantial issues in controversy will be resolved by reliance primarily upon common proof, class certification will generally achieve the economies of litigation that Rule 23(b)(3) envisions."  *Air Cargo*, 2014 WL 7882100, at *35; *see also Brown*, 609 F.3d at 483 (To satisfy the predominance requirement, a plaintiff must show "that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof.").

Predominance is a "test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust law," unlike mass tort cases in which the "individual stakes are high and disparities among class members are great."  *Amchem*, 521 U.S. at 625; *see also Prudential*, 148 F.3d at 315 (noting that "the complexity of a case alleging physical injury . . . differs greatly from a case alleging economic injury").   Further, the "predominance inquiry will sometimes be easier to satisfy in the settlement context."   *See also Am. Int'l Grp.,* 689 F.3d at 240.   For antitrust cases, predominance is readily established because the elements of the plaintiffs' antitrust claims tend to be amenable to common proof, as liability focuses on the alleged unlawful actions of the defendants, not the actions of individual plaintiffs.   Accordingly, courts

have repeatedly found antitrust claims to be well suited for class treatment. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2014) ("[I]n antitrust cases, 'Rule 23, when applied rigorously, will frequently lead to certification.'").[18]

Unlike class certification for litigation purposes, however, the judicial economy at issue for a settlement class is obtained through the effectuation of the settlement itself, rather than through a trial of the class's claims. *See Amchem*, 521 U.S. at 620. For a settlement class, "certification pursuant to Rule 23(b)(3) . . . is appropriate 'whenever the actual interests of the parties can be best served by settling their differences in a single action.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1988) (quoting 7A Wright & Miller, *Federal Practice and Procedure,* §1777 (2d ed.1986)). Specifically, "when common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id.*; *see also NASDAQ I*, 169 F.R.D. at 517 (stating that predominance test standard is met "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless").

---

[18]      *See also, e.g.*, *In re Ins. Brokerage Antitrust Litig.,* 282 F.R.D. 92, 108 (D.N.J. 2012) ("Given that antitrust class action suits are particularly likely to contain common questions of fact and law, it is not surprising that these types of class actions are also generally found to meet the predominance requirement"); *Vitamin C*, 279 F.R.D. at 109 (stating that in horizontal price-fixing cases, "courts have frequently held that the predominance requirement is satisfied because the existence and effect of the conspiracy are the prime issues in the case and are common across the class"); *Brown v. Pro Football, Inc.,* 146 F.R.D. 1, 4 (D.D.C. 1992) (stating that "the framers of Rule 23 seemed to target cases such as this [antitrust action] as appropriate for class determination"); *In re Plastic Cutlery Antitrust Litig.,* No. 96–CV–728, 1998 WL 135703, at *2 (E.D. Pa. Mar. 20, 1998) ("Class actions are widely-recognized as being particularly appropriate for the litigation of antitrust cases alleging a price-fixing conspiracy because price-fixing schemes presumably impact all purchasers in the affected market, so that common questions on the issue of liability predominate.").

In this Action, there is a single, unifying (and for purposes of settlement under the particular facts and circumstances of this case, viable) claim asserted on behalf of members of each of the Settlement Classes.  In a price-fixing case like this one, the issues of common proof of the conspiracy is the predominant determinant for Rule 23(b)(3) purposes.  This unifying claim is, in turn, based on a single, unified theory for measuring the aggregated amount of damages and is recognized under both the Clayton Act and Commodity Exchange Act – overcharges, or the difference between the actual transactions cost (price) and the "but for" transactions cost that would have existed in a non-collusive market.  Therefore, impact (*i.e.*, the issue of the breadth of the injury across the Classes and whether substantially all Class Members were injured as a result of Defendants' violation), is subject to common proof, including expert testimony.

"Courts repeatedly have held that the existence of a conspiracy is the predominant issue in price fixing cases, warranting certification of the class even where significant individual issues are present."  *NASDAQ I*, 169 F.R.D. at 518; *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("[P]roof of the **conspiracy** is a common question that is thought to predominate over the other issues of the case.") (emphasis in original); *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 635 (D. Kan. 2008) ("'Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws' . . . because proof of the **conspiracy** is a common question that is thought to predominate over the other issues of the case.") (quoting *AmChem*, 521 U.S. at 625); *In re Vitamins Antitrust Litig.*, 209 F.R.D. at 251, 268 (D.D.C. 2002) (finding common issues will predominate with respect to the overarching vitamins conspiracy and choline

chloride conspiracy).[19]  The existence of a conspiracy is the largest-looming common question in

this case.  It predominates over any individualized questions that the case might present.  To

demonstrate that the conspiracy existed, Class Plaintiffs will necessarily focus on the conduct of

Defendants, rather than the conduct of individual Class Members.  Proof of how Defendants

implemented and enforced their conspiracy will be common for all Class Members because it

will be predicated on establishing the existence of Defendants' conspiracy to fix prices in the FX

market.  *See Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d

Cir. 2007) (in price-fixing case, "allegations of the existence of a price-fixing conspiracy are

susceptible to common proof"); *see also In re Corrugated Container Antitrust Litig.*, 80 F.R.D.

244, 250 (S.D. Tex. 1978) ("The court is persuaded that the conspiracy issue whether price

information was exchanged; if it was, with what intent; whether action was taken by the

defendants based upon such exchanges, etc. is susceptible of generalized proof, since it deals

primarily with what the defendants themselves did and said.").

Likewise, with respect to proving impact, Class Plaintiffs would advance proof common

to the Classes.  Antitrust injury "poses two distinct questions," one legal and one factual.

*Cordes*, 502 F.3d at 106.  The legal question is "whether any such injury is 'injury of the type the

antitrust laws were intended to prevent and that flows from that which makes defendants' acts

---

[19]     *See also Jennings Oil Co., Inc. v. Mobil Oil Corp.*, 80 F.R.D. 124, 130 (S.D.N.Y. 1978)
("Where an antitrust conspiracy has been at issue, the courts have tended to find that common
questions predominated despite the existence of individual questions."); *In re Master Key
Antitrust Litig.*, 70 F.R.D. 23, 26 (D. Conn. 1975) (characterizing the question of the existence of
a conspiracy as "the central and common element of these cases"); *Shelter Realty*, 75 F.R.D. at
37 (holding that despite customized services priced separately for each plaintiff, existence of a
conspiracy is a predominating issue "when allegations of anti-competitive behavior embracing
all of the various products and distribution patterns have been credibly pleaded"); *Kromer v.
Saks & Co.*, No. 77 Civ. 2914, 1977 WL 1513, at *2 (S.D.N.Y. Dec. 8, 1977) ("[O]ther questions
regarding damages and the like are subordinate to the common question of the existence of the
alleged conspiracy.").

unlawful.'" *Cordes*, 502 F.3d at 106 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).   Here, the Court has already made a legal determination regarding antitrust injury.   *Foreign Exchange*, 74 F. Supp. 3d at 595-98 (holding the CAC adequately pleaded antitrust injury).   Thus, "the legal question raised by the antitrust injury element is common to the class."   *See Cordes*, 502 F.3d at 108.

Further, "the familiar factual question" regarding impact of "whether injury-in-fact is susceptible to common proof in this case" will be shown through common proof.   *Cordes*, 502 F.3d at 106.   Predominance is regularly found where plaintiffs demonstrate "a means of establishing impact through a common body of admissible proof through common questions of law and fact which clearly predominate over individualized questions.   *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-CV-230, 2012 WL 5844871, at *16 (D. Vt. Nov. 19, 2012); *All Star Carts and Vehicles, Inc. v. BFI Canada Income Fund*, 280 F.R.D. 78, 85 (E.D.N.Y. 2012).[20]   As previously noted, proof of impact will be shown primarily through two types of evidence.   The first substantially overlaps with the proof of conspiracy and the second is expert testimony, both of which will focus on the causal effect of Defendants' conduct by examining its link to the resulting overcharges (but not the amount of overcharge).   Both types of proof are overwhelmingly common – the former for the same reasons as proof of liability and the latter because the experts will examine causation on a class-wide basis using common evidence. Moreover, the judicial economy obtained through the effectuation of the settlement applies to the issue of impact.   *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 338 (3d Cir. 2011) (Scirica,

---

[20]   Even if a court were to find that "the issue of injury-in-fact presents individual questions, it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted."   *Cordes*, 502 F.3d at 108 (reversing denial of class certification).

J., concurring) ("Issues of predominance and fairness do not undermine this settlement.  All plaintiffs here claim injury that by reason of defendants' conduct . . . has caused a common and measurable form of economic damage . . . .  All claims arise out of the same course of defendants' conduct; all share a common nucleus of operative fact, supplying the necessary cohesion.  Class members' interests are aligned . . . . shared issues of fact or law outweigh issues not common to the class and individual issues do not predominate.).

With respect to damages, essentially the same type of common evidence that would prove impact could be used to quantify the overcharge.  And of course, it is well-established that "[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."  *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001), *overruled on other grounds by In re Initial Public Offerings Sec. Litig*., 471 F. 3d 24, 42 (2d Cir. 2006); *see also Cordes*, 52 F.2d at 109; *Northshore Univ. HealthSystem*, 669 F.3d at 810 (vacating denial of class certification and noting that "all that was necessary to show predominance for purposes of Rule 23(b)(3) was that plaintiffs "suffered some antitrust injury").[21]

Finally, even if some individual differences exist among members of the Settlement Classes, those class members who "believe they may do better on their own are permitted to opt out."  *Interchange*, 986 F. Supp. 2d at 239 n.20.  As to potential individual issues among class

---

[21]     *See also Visa Check/MasterMoney,* 280 F.3d at 139 ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); *In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 327 (E.D.N.Y. 1982); *see also Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) ("Common issues may predominate … when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 348-49 (D. Md. 2012) (finding predominance satisfied despite numerous individual questions of damages because individual issues did not predominate in economic impact analysis).

members who stay in the Settlement Classes, "the fact of the settlement is 'relevant'" to the certification question, "since [the settlement] creates a single method and procedure for recovering monetary claims that might be otherwise complex and individualized." *Id*. (citing *Amchem*, 521 U.S. at 619); *see also In re Diet Drugs*, Nos. 1203, 99-20593, 2000 WL 1222042, at *43 (E.D. Pa. Aug. 28, 2000) (certifying a settlement class, stating any "individual issues relating to causation, injury and damage . . . disappear because the settlement's objective criteria provide for an objective scheme of compensation").  Here, Class Members will be afforded the opportunity to opt out, and the Plan of Distribution, which Class Plaintiffs will propose after production and investigation of Settling Defendants' transaction data, may mitigate these individual issues which bear on the opt-out decision.

### 2. A Class Action Is Superior to Other Available Methods for the Efficient Adjudication of This Controversy

The superiority prong requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The Court must balance the advantages of class action treatment against alternative available methods of adjudication.  *See* Fed. R. Civ. P. 23(b)(3) (listing four non-exclusive factors relevant to this determination).  The superiority requirement, however, is applied in a more lenient fashion in the settlement context because the Court "need not inquire whether the case, if tired, would present intractable management problems." *Amchem*, 521 U.S. at 620; *Am. Int'l Group*, 689 F.3d at 239, 240.

A class action is the superior method for the fair and efficient adjudication of the Action. First, Class Members are significant in number and geographically disbursed, making a "class action the superior method for the fair and efficient adjudication of the controversy." *In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 566 (S.D.N.Y. 2004).  Further, the majority of Class Members have neither the incentive nor the means to litigate these claims

34

individually.  Thus far, "[n]one has displayed any interest in bringing an individual lawsuit." *Meredith Corp. v. SESAC, LLC*, No. 09 Civ. 9177, 2015 WL 728026, at *8 (S.D.N.Y. Feb. 19, 2015).  Accordingly, a class action allows them to "pool claims which would be uneconomical to litigate individually," as "no individual may have recoverable damages in an amount that would induce him to commence litigation on his own behalf."  *Currency Conversion*, 224 F.R.D. at 566; *see also Seijas v. Republic of Arg.,* 606 F.3d 53, 58 (2d Cir. 2010)).  "Under such circumstances, a class action is efficient and serves the interest of justice."  *Id.*

## C.   The Court Should Appoint Mr. Burke and Mr. Hausfeld as Counsel for the Settlement Classes

"An order that certifies a class action . . . must appoint class counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B).  In appointing class counsel, the court must consider the factors identified in Rule 23(g)(1)(A)(i)-(iv).  After considering competing motions, the Court appointed Scott+Scott and Hausfeld as interim co-lead counsel, based on the firms' work in identifying and investigating the claims in the Action, experience in handling class actions and antitrust claims, knowledge of the applicable law, resources that the firms committed to the case, including overseas resources, and efficiencies presented by their leadership structure.  ECF Nos. 96, 145; Hrg. Tr. at 43-44 (Feb. 13, 2014).  Since that time, Lead Counsel have competently undertaken the responsibilities assigned to them by the Court and have directed the efforts of other plaintiffs' counsel in vigorously prosecuting the Action.  Lead Counsel's work since their appointment provides a substantial basis for the Court's earlier finding that Lead Counsel satisfy each of the Rule 23(g) factors.  Accordingly, Class Plaintiffs request that Christopher M. Burke of Scott+Scott and Michael D. Hausfeld of Hausfeld be appointed as settlement class counsel.

**V.    THE COURT SHOULD APPROVE CLASS PLAINTIFFS' SELECTION OF ESCROW AGENT AND CLAIMS ADMINISTRATOR AND THE SETTLING PARTIES' SELECTION OF MR. FEINBERG AS SETTLEMENT ADMINISTRATOR**

Class Plaintiffs respectfully request that the Court approve their selection of Huntington National Bank ("HNB") as escrow agent.  As indicated in HBN's résumé, the bank is qualified to serve as escrow agent.  *See* Lead Counsel Decl., Ex. 10.  HNB was established in 1866, holds over $60 billion in assets, and has more than 700 branches nationwide.  HNB's National Settlement Team has handled more than 1,000 settlements for law firms, claims administrators, and regulatory agencies.

Class Plaintiffs respectfully request that the Court approve their selection of Garden City Group ("GCG") as Claims Administrator.  Lead Counsel selected GCG after reviewing the available options and undertaking a rigorous bidding process consisting of two rounds of bidding and in-person interviews.  Lead Counsel Decl., ¶129.  As indicated in GCG's firm résumé, GCG has been in the business of administering class action settlements for 20 years and has administered hundreds of class action settlements, including several well-known antitrust settlements.  *See*  Lead Counsel Decl., Ex. 11.  GCG has substantial experience carrying out class action notice and payment projects, and has handled the administration of numerous complex, data-driven settlements as well as cases with international components.

The Settling Parties respectfully request that the Court approve their selection of Mr. Feinberg as the Settlement Administrator.  Mr. Feinberg is eminently qualified to serve as the Settlement Administrator.

HNB, GCG, and Mr. Feinberg have the expertise and resources to effectively and efficiently administer the settlement.  Accordingly, Class Plaintiffs respectfully request that the Court approve these selections.

## VI.    CLASS PLAINTIFFS' SEPARATE MOTION FOR APPROVAL OF A NOTICE PLAN AND THE PLAN OF DISTRIBUTION

As described to the Court at the June 19, 2015 settlement conference, Class Plaintiffs propose to file a separate Motion for Approval of the Plan of Distribution and Form and Manner of Notice of the Settlement Agreements.  At that time, Lead Counsel and Mr. Feinberg will recommend to the Court a proposed Plan of Distribution and Notice Plan (including the claim form), which will include input from both economic consultants and allocation counsel.  Class Plaintiffs anticipate filing this motion as soon as practicable after Settling Defendants produce lists of Class Members and transaction data, which are necessary for development of the Plan of Distribution and Notice Plan.  Further work on the proposed Notice (including the claim form) and Plan of Distribution await Settling Defendants' production of class member lists and transaction data.  As a practical matter, that means the notice and claim form will issue to Class Members a single time and will include a description of the case, the terms of the settlement, and the mechanism and plan of distribution, sufficient for Class Members to intelligently and meaningfully participate, object, opt-out or otherwise comment on the settlement while avoiding confusion caused by multiple rounds of notice.

## VII.   CONCLUSION

The Settlement Agreements represent a historic achievement that maximize both monetary and cooperation benefits to the Settlement Classes and were attained through months of hard-fought negotiations.  They warrant preliminary approval by this Court.

DATED:  October 22, 2015                Respectfully submitted,

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP

s/ Christopher M. Burke
CHRISTOPHER M. BURKE (CB-3648)
WALTER W. NOSS (WN-0529)
KRISTEN M. ANDERSON (*pro hac vice*)
STEPHANIE A. HACKETT (*pro hac vice*)

37

JENNIFER J. SCOTT (*pro hac vice*)
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
cburke@scott-scott.com
wnoss@scott-scott.com
kanderson@scott-scott.com
shackett@scott-scott.com
jscott@scott-scott.com

-and-

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
DAVID R. SCOTT (DS-8053)
JOSEPH P. GUGLIELMO (JG-2447)
SYLVIA M. SOKOL (SS-0317)
THOMAS K. BOARDMAN (TB-0530)
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: 212-223-6444
Facsimile:  212-223-6334
jguglielmo@scott-scott.com
ssokol@scott-scott.com
tboardman@scott-scott.com

HAUSFELD LLP
MICHAEL D. HAUSFELD
WILLIAM P. BUTTERFIELD
REENA ARMILLAY GAMBHIR
TIMOTHY S. KEARNS
NATHANIEL C. GIDDINGS
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: 202-540-7143
Facsimile:  202-5407201
mhausfeld@hausfeld.com
wbutterfield@hausfeld.com
rgambhir@hausfeld.com
tkearns@hausfeld.com
ngiddings@hausfeld.com

-and-

38

HAUSFELD LLP
MICHAEL P. LEHMANN
CHRISTOPHER L. LEBSOCK
BONNY E. SWEENEY
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1949
Facsimile:  415-693-0770
mlehmann@hausfeld.com
clebsock@hausfeld.com
bsweeney@hausfeld.com

*Interim Co-Lead Counsel*

KOREIN TILLERY, LLC
STEPHEN M. TILLERY (*pro hac vice*)
ROBERT L. KING (*pro hac vice*)
AARON M. ZIGLER (*pro hac vice*)
STEVEN M. BEREZNEY (*pro hac vice*)
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
Saint Louis, MO  63101-1612
Telephone: 314-241-4844
Facsimile: 314-241-3525
stillery@koreintillery.com
rking@koreintillery.com
azigler@koreintillery.com
sberezney@koreintillery.com

-and-

KOREIN TILLERY, LLC
GEORGE A. ZELCS (*pro hac vice*)
205 N Michigan Ave, Suite 1950
Chicago, IL 60601-5927
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com

*Counsel for Plaintiffs Haverhill Retirement System
and Oklahoma Firefighters Pension and Retirement
System, Robert Miller, Mark Miller, and Peter Rives*

OBERMAYER REBMANN MAXWELL &
HIPPEL LLP
WILLIAM J. LEONARD *(pro hac vice)*
RIGEL FARR *(pro hac vice)*
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895
Telephone: 215-665-3000
Facsimile: 215-665-3165
william.leonard@obermayer.com
rigel.farr@obermayer.com

BONI & ZACK LLC
MICHAEL J. BONI (*pro hac vice*)
JOSHUA D. SNYDER (*pro hac vice*)
15 St. Asaphs Rd.
Bala Cynwyd, PA 19004
Telephone: 610-822-0200
Facsimile:  610-822-0206
mboni@bonizack.com
jsnyder@bonizack.com

*Counsel for Plaintiff the City of Philadelphia,
Board of Pensions and Retirement*

ROBBINS GELLER RUDMAN & DOWD LLP
PATRICK J. COUGHLIN
DAVID W. MITCHELL
BRIAN O. O'MARA
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619-231-1058
patc@rgrdlaw.com
davidm@rgrdlaw.com
bomara@rgrdlaw.com

*Counsel for Plaintiff Employees' Retirement System
of the Government of the Virgin Islands*

WOLF POPPER LLP
MARIAN R. ROSNER
PATRICIA I. AVERY
FEI-LU QIAN
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone:  212-759-4600
Facsimile:  212-486-2093
mrosner@wolfpopper.com
pavery@wolfpopper.com
fqian@wolfpopper.com

*Counsel for Plaintiff Employees' Retirement
System of Puerto Rico Electric Power Authority*

BERMAN DeVALERIO
JOSEPH J. TABACCO, JR. (JJT-1994)
TODD A. SEAVER (*pro hac vice*)
SARAH KHORASANEE MCGRATH (*pro hac vice*)
JESSICA MOY (*pro hac vice*)
One California Street, Suite 900
San Francisco, CA 94111
Telephone: 415-433-3200
Facsimile: 415-433-6382
jtabacco@bermandevalerio.com
tseaver@bermandevalerio.com
smcgrath@bermandevalerio.com
jmoy@bermandevalerio.com

*Counsel for Plaintiff Fresno County Employees'
Retirement Association*

LABATON SUCHAROW LLP
GREGORY S. ASCIOLLA
JAY L. HIMES
ROBIN A. VAN DER MEULEN
MATTHEW J. PEREZ
140 Broadway
New York, NY 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477
gasciolla@labaton.com
jhimes@labaton.com
rvandermeulen@labaton.com
mperez@labaton.com

*Counsel for Plaintiff State-Boston Retirement
System, Marc G. Federighi, and Michael J. Smith*

41

CRIDEN & LOVE, P.A.
MICHAEL E. CRIDEN
LINDSEY C. GROSSMAN
7301 SW 57th Court, Suite 515
South Miami, FL 33143
Telephone: 305-357-9000
Facsimile: 305-357-9050
mcriden@cridenlove.com
lgrossman@cridenlove.com

*Counsel for Plaintiffs J. Paul Antonello, Marc G.
Federighi and Michael J. Smith*

GRANT & EISENHOFER, P.A.
PETER A. BARILE III (PB-3354)
485 Lexington Avenue
New York, NY 10017
Telephone: 646-722-8500
Facsimile: 646-722-8501
pbarile@gelaw.com

*Counsel for Plaintiff Syena Global Emerging
Markets Fund, LP*

ENTWISTLE & CAPPUCCI LLP
ANDREW J. ENTWISTLE
VINCENT R. CAPPUCCI
ROBERT N. CAPPUCCI
280 Park Avenue, 26th Floor West
New York, NY 10017
Telephone:  212-894-7200
Facsimile:  212-894-7272
aentwistle@entwistle-law.com
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com

*Counsel for Plaintiffs Tiberius OC Fund, Ltd. and
Value Recovery Fund L.L.C.*

LOWEY DANNENBERG COHEN & HART, P.C.
VINCENT BRIGANTI
GEOFFREY M. HORN
PETER D. ST. PHILLIP
RAYMOND P. GIRNYS
One North Broadway
White Plains, NY 10601
Telephone: 914-997-0500
Facsimile: 914-997-0035

42

vbriganti@lowey.com
ghorn@lowey.com
pstphillip@lowey.com
rgirnys@lowey.com

LOWEY DANNENBERG COHEN & HART, P.C.
GERALD LAWRENCE, ESQ.
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA  19428
Telephone: 610-941-2760
Facsimile: 610-862-9777
glawrence@lowey.com

SHEPHERD FINKELMAN
MILLER & SHAH, LLP
ERIC. L. YOUNG
NATALIE FINKELMAN BENNETT
35 East State Street
Media, PA  19063
Telephone: 610-891-9880
Facsimile: 866-300-7367
eyoung@sfmslaw.com
nfinkelman@sfmslaw.com

SHEPHERD FINKELMAN
MILLER & SHAH, LLP
JAMES E. MILLER
65 Main Street
Chester, CT  06412
Telephone: 860-526-1100
Facsimile: 860-526-1120
jmiller@sfmslaw.com

RADICE LAW FIRM, P.C.
JOHN RADICE
KENNETH PICKLE
34 Sunset Blvd.
Long Beach, NJ  08008
Telephone: 646-245-8502
Facsimile: 609-385-0745
jradice@radicelawfirm.com
kpickle@radicelawfirm.com

MANDEL BHANDARI LLP
RISHI BHANDARI
EVAN MANDEL
80 Pine Street, 33rd Floor
New York, NY  10005
Telephone: 212-269-5600
Facsimile: 646-964-6667
rb@mandelbhandari.com
em@mandelbhandari.com

*Counsel for Plaintiff United Food and Commercial
Workers Union and Participating Food Industry
Employers Tri-State Pension Fund*

RADICE LAW FIRM, P.C.
JOHN RADICE
KENNETH PICKLE
34 Sunset Blvd.
Long Beach, NJ  08008
Telephone: 646-245-8502
Facsimile: 609-385-0745
jradice@radicelawfirm.com
kpickle@radicelawfirm.com

*Counsel for Plaintiffs Doug Harvey, Izee Trading
Company, and Richard Preschern d/b/a Preschern
Trading*

CERA LLP
SOLOMON B. CERA
C. ANDREW DIRKSEN
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone:  415-777-2230
Facsimile:  415-777-5189
scera@cerallp.com
cdirksen@cerallp.com

*Counsel for Plaintiff Aureus Currency Fund L.P.*

FREED KANNER LONDON & MILLEN LLC
MICHAEL J. FREED
STEVEN A. KANNER
2201 Waukegan Road, Suite 130
Bannockburn, Illinois 60015
Telephone:  224-632-4500
Facsimile:  224-632-4521
mfreed@fklmlaw.com
skanner@fklmlaw.com

*Counsel for Plaintiffs Thomas Gramatis and John Kerstein*

NUSSBAUM LAW GROUP, P.C.
LINDA P NUSSBAUM
570 Lexington Ave., 19 floor
New York, NY, 10022
Telephone: 212 702 7054
lnussbaum@nussbaumpc.com

*Counsel for Plaintiffs Jeffrey Sterk, Kimberly Sterk, and Michael Melissinos*

THE MOGIN LAW FIRM, P.C.
DANIEL J. MOGIN
JODIE M. WILLIAMS
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone:  619-687-6611
Facsimile:  619-687-6610
dmogin@moginlaw.com
jwilliams@moginlaw.com

STEYER, LOWENTHAL, BOODROOKAS
ALVAREZ & SMITH LLP
ALLAN STEYER
JAYNE PEETERS
One California Street, Third Floor
San Francisco, CA 94111
Telephone: 415-421-3400
Facsimile:  415-421-2234
asteyer@steyerlaw.com
jpeeters@steyerlaw.com

*Counsel for Plaintiffs Haverhill Retirement System and Oklahoma Firefighters Pension and Retirement System*

FINE, KAPLAN AND BLACK, R.P.C.
ROBERTA D. LIEBENBERG
ADAM PESSIN
One South Broad St., Suite 2300
Philadelphia, PA 19107
Telephone:  215-567-6565
Facsimile:  215-568-5872
rliebenberg@finekaplan.com
apessin@finekaplan.com

MOTLEY RICE LLC
WILLIAM H. NARWOLD
DONALD A. MIGLIORI
MICHAEL M. BUCHMAN
JOHN A. IOANNOU
600 Third Avenue, Suite 2101
New York, NY 10016
Telephone:  212-577-0040
Facsimile:  212-577-0054
bnarwold@motleyrice.com
dmigliori@motleyrice.com
mbuchman@motleyrice.com
jioannou@motleyrice.com

MILLER LAW LLC
MARVIN A. MILLER
MATTHEW VAN TINE
115 S. LaSalle St., Suite 2101
Chicago, IL 60603
Telephone: 312-322-3400
Facsimile:  312-676-2676
mmiller@millerlawllc.com
mvantine@millerlawllc.com

*Of Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 22, 2015, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

Executed on October 22, 2015.

*/s/* Christopher M. Burke
Christopher M. Burke
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
cburke@scott-scott.com