UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
                                                       :
                                                       :
IN RE FOREIGN EXCHANGE                                 :
BENCHMARK RATES ANTITRUST                              :     No. 1:13-cv-07789-LGS
LITIGATION                                             :
                                                       :
                                                       :
                                                       :
                                                       :
                                                       :
                                                       :
------------------------------------------------------ x


**DECLARATION OF CHRISTOPHER M. BURKE AND MICHAEL D. HAUSFELD
IN SUPPORT OF CLASS PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
OF SETTLEMENT AGREEMENTS WITH BANK OF AMERICA, BARCLAYS, BNP
PARIBAS, CITIGROUP, GOLDMAN SACHS, HSBC, JPMORGAN, RBS, AND UBS**

**TABLE OF CONTENTS**

I.     SUMMARY OF THE ACTION ................................................................................. 4

       II.    SUMMARY OF THE SETTLEMENT TERMS .................................................. 11

       A.     Monetary Component ............................................................................... 12

       B.     Cooperation ............................................................................................. 14

       C.     Release of Claims ................................................................................... 16

III.   SUMMARY OF THE MEDIATIONS ..................................................................... 18

       A.     Overview .................................................................................................. 18

       B.     Bilateral Negotiations ............................................................................. 19

       1.     JPMorgan ................................................................................................ 19

       2.     UBS .......................................................................................................... 21

       3.     Citigroup .................................................................................................. 24

       4.     Barclays ................................................................................................... 25

       5.     Bank of America ...................................................................................... 27

       6.     Goldman Sachs ........................................................................................ 28

       7.     RBS .......................................................................................................... 29

       8.     BNP Paribas ............................................................................................ 30

       9.     HSBC ....................................................................................................... 32

       C.     Multilateral Negotiations ........................................................................ 33

IV.    MONETARY COMPONENT COMPARISONS ..................................................... 34

V.     SELECTION OF ESCROW AGENT, CLAIMS ADMINISTRATOR, AND
       SETTLEMENT ADMINISTRATOR ....................................................................... 37

VI.    EXHIBITS ............................................................................................................... 38

VII.   CONCLUSION ........................................................................................................ 38

Pursuant to 28 U.S.C. §1746, I, Christopher M. Burke, declare:

1.     I am a partner in the law firm of Scott+Scott, Attorneys at Law, LLP ("Scott+Scott").  By Orders dated February 13, 2014, March 4, 2014, and August 13, 2015, the Court appointed Scott+Scott and Hausfeld LLP as interim co-lead counsel for the putative U.S. class and exchange-traded class in the above-captioned action (the "Consolidated Action" or "Action").  ECF Nos. 96, 145, 412.

2.     I have been actively involved in prosecuting and resolving this Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein.  If called upon and sworn as a witness, I could competently testify thereto.

Pursuant to 28 U.S.C. §1746, I, Michael D. Hausfeld, declare:

3.     I am a partner in the law firm of Hausfeld LLP ("Hausfeld").  By Orders dated February 13, 2014, March 4, 2014, and August 13, 2015, the Court appointed Scott+Scott and Hausfeld as interim co-lead counsel for the putative U.S. class and exchange-traded class in the Action.  ECF Nos. 96, 145, 412.

4.     I have been actively involved in prosecuting and resolving this Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein.  If called upon and sworn as a witness, I could competently testify thereto.

Pursuant to 28 U.S.C. §1746, we, Christopher M. Burke and Michael D. Hausfeld, declare:

5.     Unless otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement with Bank of America Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Bank of America Stipulation"); the Stipulation and Agreement of Settlement with Barclays Bank PLC and Barclays Capital Inc. ("Barclays Stipulation"); the Stipulation and Agreement of Settlement

1

with BNP Paribas Group, BNP Paribas North America Inc., BNP Paribas Securities Corp., and BNP Prime Brokerage, Inc. ("BNP Paribas Stipulation"); the Stipulation and Agreement of Settlement with Citigroup Inc., Citibank, N.A., Citicorp, and Citigroup Global Markets Inc. ("Citigroup Stipulation"); the Stipulation and Agreement of Settlement with The Goldman Sachs Group, Inc. and Goldman, Sachs & Co. ("Goldman Sachs Stipulation"); the Stipulation and Agreement of Settlement with HSBC Holdings PLC, HSBC Bank PLC, HSBC North America Holdings Inc., HSBC Bank USA, N.A., and HSBC Securities (USA) Inc. ("HSBC Stipulation"); Stipulation and Amended Agreement of Settlement with JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. ("JPM Amended Stipulation"); the Stipulation and Agreement of Settlement with The Royal Bank of Scotland Group PLC, The Royal Bank of Scotland PLC, and RBS Securities Inc. ("RBS Stipulation"); and the Stipulation and Amended Agreement of Settlement with UBS AG, UBS Group AG, and UBS Securities LLC ("UBS Amended Stipulation") (collectively the "Settlement Agreements").[1]

6.     We submit this declaration in support of Class Plaintiffs'[2] motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for preliminary approval of the nine proposed

---

[1]     In this Declaration, citations to specific paragraphs of the Settlement Agreements will be made with the citation form "Stips.," where the paragraph numbers are the same across the agreements.  To the extent any paragraph numbers differ between Settlement Agreements, the Declaration will cite to the individual agreements.

[2]     Class Plaintiffs are Aureus Currency Fund, L.P.; the City of Philadelphia, Board of Pensions and Retirement; Employees' Retirement System of the Government of the Virgin Islands; Employees' Retirement System of Puerto Rico Electric Power Authority; Fresno County Employees' Retirement Association; Haverhill Retirement System; Oklahoma Firefighters Pension and Retirement System; State-Boston Retirement System; Syena Global Emerging Markets Fund, LP; Systrax Corporation; Tiberius OC Fund, Ltd.; United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund; Value Recovery Fund L.L.C.; J. Paul Antonello; Marc G. Federighi; Thomas Gramatis; Doug Harvey; Izee Trading Company; John Kerstein; Michael Melissinos; Mark Miller; Robert Miller; Richard

settlements between Class Plaintiffs and Bank of America Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Bank of America"); Barclays Bank PLC and Barclays Capital Inc. ("Barclays"); BNP Paribas Group, BNP Paribas North America Inc., BNP Paribas Securities Corp., and BNP Prime Brokerage, Inc. ("BNP Paribas"); Citigroup Inc., Citibank, N.A., Citicorp, and Citigroup Global Markets Inc.  (Citigroup"); The Goldman Sachs Group, Inc. and Goldman, Sachs & Co. ("Goldman Sachs"); HSBC Holdings PLC, HSBC Bank PLC, HSBC North America Holdings Inc., HSBC Bank USA, N.A., and HSBC Securities (USA) Inc.  ("HSBC"); JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. ("JPMorgan"); The Royal Bank of Scotland Group PLC, The Royal Bank of Scotland PLC, and RBS Securities, Inc. ("RBS"); and UBS AG, UBS Group AG, and UBS Securities LLC ("UBS") (collectively, "Settling Defendants," and together with Class Plaintiffs, the "Parties").

7.     If approved, the settlements, consisting of $2,009,075,000 in cash and each Settling Defendant's agreement to provide extensive cooperation, which will assist Class Plaintiffs in pursuing their claims against any remaining Defendants,[3] will resolve the Action against Settling Defendants.

8.     Because this declaration is submitted in support of settlement, it is inadmissible in any subsequent proceedings.  In the event the settlements are not approved by the Court, this

---

Preschern d/b/a Preschern Trading; Peter Rives; Michael J. Smith; Jeffrey Sterk; and Kimberly Sterk (collectively, "Class Plaintiffs").

[3]     The Non-Settling Defendants are The Bank of Tokyo Mitsubishi UFJ Ltd.; Credit Suisse AG; Credit Suisse Group AG and Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; Deutsche Bank AG; Morgan Stanley; Morgan Stanley & Co. LLC; Morgan Stanley & Co. International PLC; RBC Capital Markets LLC; Société Générale S.A.; and Standard Chartered PLC (collectively, the "Non-Settling Defendants").  Together, the Settling Defendants and Non-Settling Defendants are referred to as "Defendants."

declaration and the statements contained herein are without prejudice to Class Plaintiffs' position on the merits of this Action.

## I.    SUMMARY OF THE ACTION

9.    On November 1, 2013, Plaintiff Haverhill Retirement System filed the first case, *Haverhill Ret. Sys. v. Barclays Bank PLC*, Case No. 13-cv-7789, in what would become the Consolidated Action.  The *Haverhill* complaint was based on the investigation and research of applicable law and potential defenses conducted by Scott+Scott.  This investigation included, among other things, a review of publicly available press releases, news articles, and other media reports, as well as interviews with market participants and traders.  Scott+Scott also consulted with economic and financial experts to identify economic and statistical evidence of Defendants' manipulation of the FX market.

10.    Additional complaints alleging substantially similar conduct by Defendants were subsequently filed. Following a hearing on February 13, 2014, and pursuant to Fed. R. Civ. P. 42(a), the Court consolidated for all purposes the first-filed *Haverhill* action with Case Nos. 13-cv-9080, 13-cv-9125, 13-cv-9237, 14-cv-350, 14-cv-475, 14-cv-494, 14-cv-752, 14-cv-787, 14-cv-825, 14-cv-867, 14-cv-876, and 14-cv-902 (as member cases), directed the Clerk to close the later-filed cases, and amended the caption of the consolidated Action to "*In re Foreign Exchange Benchmark Rates Antitrust Litigation*."  ECF No. 96.

11.    After hearing contested motions for appointment of interim lead counsel, the Court appointed Scott+Scott and Hausfeld (together, "Lead Counsel") to serve as interim co-lead counsel for the putative U.S. class and ordered Class Plaintiffs to file a Consolidated Class Action Complaint no later than March 31, 2014.  ECF Nos. 96, 145.  The Court appointed Scott+Scott and Hausfeld as interim co-lead counsel based on Lead Counsel's work in

identifying and investigating the claims in the Action, their experience in handling class actions and antitrust claims, their knowledge of the applicable law, the resources that Lead Counsel committed (and would commit) to the case, including overseas resources, and the efficiencies presented by Lead Counsel prosecuting the action in conjunction with other firms on an as-needed basis. *See* Hrg. Tr. at 43-44 (Feb. 13, 2014).

12.     On March 31, 2014, certain of the Class Plaintiffs, on behalf of themselves and a putative class, filed the Consolidated Amended Class Action Complaint ("CAC"), alleging that Defendants conspired to fix prices in the foreign exchange ("FX") market in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§1, 3.  ECF No. 172.  The CAC alleged, among other things, that before the calculation of the WM/Reuters Closing Spot Rates set at 4 p.m. London time (the "Fix"), Defendants communicated in chat rooms, shared non-public price information about customers' orders and Defendants' net trading positions, and agreed to engage in collusive trading strategies in order to move the Fix.  CAC, ¶¶83-97.  The CAC further alleged that as a result, Defendants were able to move the Fix in directions favorable to Defendants' trading positions, thereby allowing Defendants to obtain profits at the expense of their customers, and resulting in harm to the putative class.  CAC, ¶¶98-111.

13.     On May 30, 2014, Defendants jointly moved to dismiss the CAC pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  ECF No. 208.  Class Plaintiffs filed their opposition to the motion to dismiss on July 29, 2014 (ECF No. 213), and on August 28, 2014, Defendants filed a reply memorandum (ECF No. 214).

14.     On November 12, 2014, the following government agencies levied fines totaling approximately $4,323,000,000 against six Defendants for unlawful conduct in the FX markets.

| Table 1: November 12, 2014 CFTC, U.K. FCA, OCC, and Swiss FINMA Fines Against Six Defendants | |
|---|---|
| U.S. Commodity Futures Trading Commission (CFTC) | |
| Citibank, N.A. | $310,000,000 |
| HSBC Bank PLC | $275,000,000 |
| JPMorgan Chase Bank, N.A. | $310,000,000 |
| Royal Bank of Scotland PLC | $290,000,000 |
| UBS AG | $290,000,000 |
| U.K. Financial Conduct Authority (U.K. FCA) | |
| Citibank, N.A. | £225,575,000 ($355,957,350) |
| HSBC Bank PLC | £216,363,000 ($341,420,814) |
| JPMorgan Chase Bank, N.A. | £222,166,000 ($350,577,948) |
| Royal Bank of Scotland PLC | £217,000,000 ($342,426,000) |
| UBS AG | £233,814,000 ($368,958,492) |
| Office of the Comptroller of the Currency (OCC) | |
| Bank of America, N.A. | $250,000,000 |
| Citibank, N.A. | $350,000,000 |
| JPMorgan Chase Bank, N.A. | $350,000,000 |
| Swiss Financial Market Supervisory Authority (Swiss FINMA) | |
| UBS AG | CHF 134,000,000 ($138,658,940) |

15.     The Court heard oral argument on Defendants' motion to dismiss on November 20, 2014.  ECF No. 220.

16.     On January 28, 2015, the Court denied Defendants' motion to dismiss the CAC. ECF No. 242.

17.     During its pendency, the Action has been subject to discovery stays.  ECF Nos. 78, 145, 274, 463.  On January 29, 2014 and March 3, 2014, the Court issued orders having the effect of staying discovery pending resolution of Defendants' motion to dismiss.  ECF Nos. 78, 145.  On February 17, 2015, the U.S. Department of Justice's ("DOJ") requested a six-month discovery stay in the Action.  ECF No. 266.  Lead Counsel responded, seeking to narrow the DOJ's request to permit certain categories of settlement cooperation.  ECF No. 268.  After discussions between the DOJ and Lead Counsel, the DOJ submitted a letter on March 9, 2015 outlining a six-month discovery stay, subject to exceptions for transaction data and limited attorney proffers and subject to possible renewal.  ECF No. 272. The Court endorsed the

proposal.   ECF No. 274.   On September 14, 2015, the discovery stay was partially lifted, allowing the parties in the Action to conduct documentary discovery only; all testamentary discovery remains stayed.   ECF No. 463.   Now that the stay as to documentary discovery has been lifted, the parties have recently begun to propound written discovery.   Class Plaintiffs served a set of data requests on Non-Settling Defendants.   Defendants Credit Suisse, Deutsche Bank, and Morgan Stanley served document requests on Class Plaintiffs.   Defendant Morgan Stanley served document requests on the Settling Defendants.

18.     On May 20, 2015, Barclays PLC, Citicorp, JPMorgan Chase & Co., and Royal Bank of Scotland PLC pleaded guilty to criminal antitrust charges under Section 1 of the Sherman Act, 15 U.S.C. §1, arising from unlawful conduct in the FX markets and agreed to pay fines totaling $2,520,000,000.

| Table 2: May 20, 2015 DOJ Fines Against Four Defendants | |
| --- | --- |
| U.S. Department of Justice (DOJ) | |
| Barclays PLC | $650,000,000 |
| Citicorp | $925,000,000 |
| JPMorgan Chase & Co. | $550,000,000 |
| Royal Bank of Scotland PLC | $395,000,000 |

19.     Also on or about May 20, 2015, the DOJ's Antitrust Division granted UBS AG conditional immunity from criminal antitrust charges for unlawful and collusive conduct in the FX market but, based in part on that conduct, the DOJ's Criminal Division found UBS AG in violation of its 2012 non-prosecution agreement with the DOJ related to UBS's submissions in connection with Yen LIBOR and other benchmark interest rates.   In May 2015, UBS AG pleaded guilty to one count of wire fraud under 18 U.S.C. §1343 relating to Yen LIBOR and other benchmark interest rates and agreed to pay a $203,000,000 fine.

20.     Also on May 20, 2015, the following government agencies levied fines against Barclays, Bank of America, Citi, JPMorgan, RBS, and UBS for unlawful conduct in the FX

market.  In addition, the Board of Governors of the Federal Reserve imposed fines against six

Defendants for misconduct in the FX markets.  These fines total approximately $3,174,000,000.

| Table 3: May 20, 2015 CFTC, U.K. FCA, NYDFS, and Fed Fines Against Six Defendants | |
|---|---|
| U.S. Commodity Futures Trading Commission (CFTC) | |
| Barclays Bank PLC | $400,000,000 |
| U.K. Financial Conduct Authority (U.K. FCA) | |
| Barclays Bank PLC | £284,432,000 ($441,666,010) |
| New York Department of Financial Services (NYDFS) | |
| Barclays Bank PLC | $485,000,000 |
| Board of Governors of the Federal Reserve System (Fed) | |
| Barclays Bank PLC | $342,000,000 |
| Bank of America Corp. | $205,000,000 |
| Citigroup Inc. | $342,000,000 |
| JPMorgan Chase & Co. | $342,000,000 |
| UBS AG[4] | $342,000,000 |
| Royal Bank of Scotland PLC | $274,000,000 |

21.     In February, April, and June of 2015, additional cases, accepted by the Court as

related to the Consolidated Action, were filed on behalf of putative classes of persons who traded

FX futures and/or options on exchanges (*Taylor v. Bank of America Corp.*, Case No. 15-cv-1350

(S.D.N.Y. Feb. 23, 2015); *Sterk v. Bank of America Corp.*, Case No. 15-cv-2705 (S.D.N.Y.

April 7, 2015); *Bakizada v. Bank of America Corp.*, Case No. 15-cv-4230 (S.D.N.Y. June 2,

2015); *Teel v. Bank of America Corp.*, Case No. 15-cv-4436 (S.D.N.Y. June 9, 2015); and *Robert

Charles Class A., L.P. v. Bank of America Corp.*, Case No. 15-cv-4926 (S.D.N.Y. June 24, 2015)

(collectively, the "Exchange Actions")) and on behalf of a putative class of ERISA plan

participants, beneficiaries, and fiduciaries (*Allen v. Bank of America Corp.*, Case No. 15-cv-4285

(S.D.N.Y. June 3, 2015)).

---

[4]     The Connecticut Department of Banking joined the cease and desist provisions of the
Federal Reserve's action against UBS AG, which has a branch in Stamford, Connecticut.

22.     On June 12, 2015, Class Plaintiffs filed a pre-motion conference letter seeking leave to file a motion to file the Second Consolidated Amended Class Action Complaint ("SAC").   ECF No. 297.   Based on cooperation obtained from certain Settling Defendants, investigation by Lead Counsel, and public disclosure of additional conduct (*e.g.*, guilty pleas obtained by the DOJ and additional disclosures by CFTC, FCA, NYDFS, and the Fed), the proposed SAC would continue to allege a conspiracy to fix FX prices with respect to FX benchmark rates (including the Fix and additional benchmarks) as well as a broader conspiracy to manipulate multiple currency pairs (including bid-ask spreads) throughout the trading days during the class period.   At that time, Class Plaintiffs indicated that the proposed SAC would add additional defendants[5] and corporate affiliates of previously-named defendants.[6]   The proposed SAC would also add named plaintiffs[7] and bring additional claims.

23.     On June 12, June 18, and June 23, 2015, Class Plaintiffs filed letters proposing that the Exchange Actions be consolidated with the Consolidated Action and that Lead Counsel be appointed to represent the exchange class.   ECF Nos. 296, 309, 310, 324.   As to the *Allen* action, Class Plaintiffs opposed consolidation.   ECF No. 309, 324.

24.     Other parties filed letters stating their positions on consolidation and Class Plaintiffs' request for leave to file the SAC.   *See* ECF Nos. 304 (Credit Suisse, Deutsche Bank,

---

[5]     The additional defendants named in the SAC are The Bank of Tokyo Mitsubishi UFJ Ltd.; RBC Capital Markets LLC; Société Générale S.A.; and Standard Chartered plc.

[6]     The additional corporate affiliates of previously-named defendants in the SAC are BNP Paribas Securities Corp.; BNP Prime Brokerage Inc.; Citicorp; Citigroup Global Markets Inc.; Credit Suisse AG; Deutsche Bank Securities Inc.; HSBC Securities (USA) LLC; Merrill Lynch, Pierce, Fenner & Smith; Morgan Stanley & Co. LLC; Morgan Stanley & Co. International plc; and UBS Group AG.

[7]     The additional named plaintiffs in the SAC are Systrax Corporation; J. Paul Antonello, Marc G. Federighi, Thomas Gramatis, Doug Harvey, Izee Trading Company, John Kerstein, Michael Melissinos, Mark Miller, Robert Miller, Richard Preschern d/b/a Preschern Trading, Peter Rives, Michael S. Smith, Jeffrey Sterk, and Kimberly Sterk.

and Morgan Stanley); ECF No. 305 (Sterk); ECF No. 306 (Bakizada); ECF No. 307 (Allen); ECF No. 308 (JPMorgan, Bank of America, Barclays, Citigroup, Goldman Sachs, HSBC, RBS, and UBS); ECF No. 311 (Taylor); ECF No. 312 (Taylor); ECF No. 314 (Teel); ECF No. 313 (Teel); ECF No. 315 (Bakizada); ECF No. 318 (Credit Suisse, Deutsche Bank, and Morgan Stanley); ECF Nos. 319 and 320 (Taylor); ECF No. 326 (Allen); ECF Nos. 323 (Bakizada); and ECF No. 325 (Bakizada).

25.    On June 19, 2015, Class Plaintiffs and Defendants in the Consolidated Action appeared before the Court for a settlement conference.  The Court also had separate discussions with Class Plaintiffs and Settling Defendants.

26.    On June 25, 2015, the Court held conferences on Class Plaintiffs' motion for leave to file the SAC and on consolidation.  The Court granted Class Plaintiffs' motion to file the SAC.  ECF No. 332.  The Court ordered consolidation of the Consolidated Action and *Allen* for discovery purposes only.  *Id*.  The Court also set a briefing schedule on Class Plaintiffs' Motion to Consolidate the Consolidated Action and Exchange Actions.  ECF No. 331.

27.    On July 16, 2015, Class Plaintiffs filed the SAC under seal.  Because the SAC contained information obtained by Class Plaintiffs from certain of the Settling Defendants, and such information might implicate the secrecy of the DOJ's ongoing grand jury investigation, Class Plaintiffs conferred with the DOJ regarding sealing portions of the SAC.  *See* ECF No. 365.  DOJ agreed to Class Plaintiffs' proposed redactions, the Court allowed the redactions, and on July 31, 2015, Class Plaintiffs filed a redacted, public version of the SAC (ECF No. 368).  Class Plaintiffs removed additional redactions in a public version of the SAC filed on September 21, 2015 (ECF No. 465).

28.     The Court held a hearing on Class Plaintiffs' Motion to Consolidate on August 13, 2015.  On the consent of all parties, the Court granted Class Plaintiffs' motion to consolidate the Consolidated Action and Exchange Actions and to appoint Lead Counsel as interim co-lead counsel for the exchange-traded class.  ECF Nos. 412, 421.

29.     As discussed at the hearing and in Class Plaintiffs' filings regarding the consolidation issue, as an added measure to assure adequate representation for Class Members, Lead Counsel have designated allocation counsel to separately advocate for the interests of the two Settlement Classes and to work with Kenneth Feinberg to achieve an equitable allocation of the settlement proceeds.  Lead Counsel, Mr. Feinberg, and allocation counsel have met to discuss the process by which allocation counsel will engage in arm's-length, adversarial negotiations to determine the allocation of the settlement proceeds between Class Members who traded on exchanges versus directly with Defendants (*i.e.*, over the counter).   Any disputes between allocation counsel will be mediated by Mr. Feinberg.  Lead Counsel will provide the Court with a report of the activities and determinations of allocation counsel in connection with their future filings in support of approval of the Settlement Agreements.

## II.     SUMMARY OF THE SETTLEMENT TERMS

30.     Class Plaintiffs move for preliminary approval of nine settlements providing for a total of $2,009,075,000 in monetary relief and extensive cooperation from the Settling Defendants, which will assist Class Plaintiffs in the prosecution of the Action against Non-Settling Defendants.  In consideration for the monetary relief and the provision of cooperation, upon the Effective Date of the Settlement, Class Plaintiffs and Releasing Parties who do not exclude themselves from the settlement classes will give up their rights to sue the Settling Defendants or any of the Released Parties for any Released Claims.

A.      **Monetary Component**

31.      In each of the nine settlements, there are two settlement amounts – the Direct Settlement Amount and the Exchange-Only Settlement Amount.  All funds are non-reversionary if there is final approval of the settlements by the Court.

32.      The "Direct Settlement Class" consists of "[a]ll Persons who, between January 1, 2003 and the date of the Preliminary Approval Order, entered into an FX Instrument directly with a Defendant, a direct or indirect parent, subsidiary, or division of a Defendant, a Released Party, or co-conspirator where such Persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, transacted FX Instruments in the United States or its territories."[8]  Stips., ¶3(a)(i).

33.      The "Exchange-Only Settlement Class" consists of "[a]ll Persons who, between January 1, 2003 and the date of the Preliminary Approval Order, entered into FX Exchange-Traded Instruments where such Persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, entered into FX Exchange-Traded Instruments on a U.S. exchange."[9]  Stips., ¶3(a)(ii).

---

[8]      Specifically excluded from the Direct Settlement Class are Defendants; Released Parties; co-conspirators; the officers, directors, or employees of any Defendant, Released Party, or co-conspirator; any entity in which any Defendant, Released Party, or co-conspirator has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant, Released Party, or co-conspirator and any person acting on their behalf; provided, however, that Investment Vehicles shall not be excluded from the definition of the Direct Settlement Class. Also excluded from the Direct Settlement Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this Action.  Stips., ¶3(a)(i).

[9]      Specifically excluded from the Exchange-Only Settlement Class are Defendants; Released Parties; co-conspirators, the officers, directors, or employees of any Defendant, Released Party, or co-conspirator; any entity in which any Defendant, Released Party, or co-conspirator has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant, Released Party, or co-conspirator and any person acting on their behalf; provided, however, that Investment Vehicles shall not be excluded from the definition of the Exchange-

34.     The monetary components of the nine settlements are set forth below:

| Table 4:  Settlement Amounts (Totals by Defendant and Per % Point of Market Share) | | |
|---|---|---|
| JPMorgan Total | $104,500,000 | Market share:[10] 5.60% |
|    Direct | $99,000,000 | Total per market share percentage point: |
|    Exchange Only | $5,000,000 | $18,660,714.29 |
|    Notice and Administration | $500,000 | |
| UBS Total | $141,075,000 | Market share: 11.96% |
|    Direct | $135,000,000 | Total per market share percentage point: |
|    Exchange Only | $6,075,000 | $11,795,568.56 |
| Citi Total | $402,000,000 | Market share: 9.97% |
|    Direct | $394,000,000 | Total per market share percentage point: |
|    Exchange Only | $8,000,000 | $40,320,962.89 |
| Barclays Total | $384,000,000 | Market share: 9.25% |
|    Direct | $375,000,000 | Total per market share percentage point: |
|    Exchange Only | $9,000,000 | $41,513,513.51 |
| Bank of America Total | $187,500,000 | Market share: 3.90% |
|    Direct | $180,000,000 | Total per market share percentage point: |
|    Exchange Only | $7,500,000 | $48,076,923.08 |
| Goldman Sachs Total | $135,000,000 | Market share: 3.88% |
|    Direct | $129,500,000 | Total per market share percentage point: |
|    Exchange Only | $5,000,000 | $34,793,814.43 |
|    Notice and Administration | $500,000 | |
| RBS Total | $255,000,000 | Market share: 6.09% |
|    Direct | $247,000,000 | Total per market share percentage point: |
|    Exchange Only | $8,000,000 | $41,871,921.18 |
| BNP Paribas Total | $115,000,000 | Market share: 2.26% |
|    Direct | $110,000,000 | Total per market share percentage point: |
|    Exchange Only | $5,000,000 | $50,884,955.75 |
| HSBC Total | $285,000,000 | Market share: 5.26% |
|    Direct | $279,000,000 | Total per market share percentage point: |
|    Exchange Only | $6,000,000 | $54,182,509.51 |

Only Settlement Class.  Also excluded from the Exchange-Only Settlement Class are: (i) any judicial officer presiding over this action and any member of his/her immediate family and judicial staff, and any juror assigned to this Action; and (ii) any Person who, between January 1, 2003 and the date of the Preliminary Approval Order, entered into an FX Instrument directly with a Defendant, a direct or indirect parent, subsidiary, or division of a Defendant, a Released Party, or co-conspirator, where such Person was either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, transacted FX Instruments in the United States or its territories.  Stips., ¶3(a)(ii).

[10]     The market share figures reported in the table are weighted average global market shares between the years 2003-2013.  The figures are based on market share data from Euromoney Surveys and global FX market volume data Bank of International Settlements (BIS) Triennial Foreign Exchange Reports covering the period 2003-2013.

| Table 4:  Settlement Amounts (Totals by Defendant and Per % Point of Market Share) | | |
|---|---|---|
| Total | $2,009,075,000 | |
|    Direct | $1,948,500,000 | 97% of Total |
|    Exchange Only | $59,575,000 | 3% of Total |
|    Notice and Administration | $1,000,000 | |

### B. Cooperation

35. Settling Defendants agreed to provide comprehensive cooperation relating to all forms and types of Released Claims.  The scope of Settling Defendants' cooperation obligations mirrors the scope of the release.

36. Settling Defendants' cooperation obligations include, subject to Court Orders and applicable law, attorney proffers, production of transaction data, production of documents produced to government bodies, production of additional data and documents as requested by Class Plaintiffs, witness interviews, depositions and affidavits, and trial testimony, all of which is subject to the Court's orders staying certain forms of cooperation until the discovery stay in the Action is lifted (ECF Nos. 274, 463).  Stips., ¶14.  These obligations are continuing until the later of: (1) the date when final judgment has been rendered, with no remaining rights of appeal, in the Action against all Defendants; or (2) seven (7) years after the Court enters the Preliminary Approval Order.  Stips., ¶14(b)(xi).

37. *Attorney Proffers:*  Beginning within ten (10) business days of the Execution Date, Settling Defendants[11] agreed to provide attorney proffers covering the following topics: (1) a general description of FX Trading; and (2) a description of facts relevant to conduct relating to all forms and types of Released Claims, including but not limited to (a) the conduct and (b) the products and instruments affected by such conduct.  Once the Court lifts the stay of certain settlement cooperation, Settling Defendants agree to identify and provide the last known

---

[11] In addition to this obligation, UBS was required to provide an initial proffer as a condition to its original stipulation.

contact information for all current and former officers, directors, and employees who have been interviewed by any United States or European country governmental body, including but not limited to the DOJ, CFTC, Fed, OCC, NYDFS, U.S. Securities and Exchange Commission ("SEC"), U.K. FCA, United Kingdom Serious Fraud Office ("SFO"), European Commission ("EC"), the Swiss Competition Commission ("Swiss WEKO"), Swiss FINMA, and the German Federal Financial Supervisory Authority ("BaFin").  Stips., ¶14(b)(ii).

38.     *Production of Transaction Data:*  As soon as possible after the Execution Date, Settling Defendants agreed to produce transaction data related to the subject matter of the Action.  Stips., ¶14(b)(iii).

39.     *Production of Documents Produced to Governmental Bodies:*  Within ten (10) business days after entry of the Preliminary Approval Order, Settling Defendants are obligated to produce documents that they have already produced or made available to any grand jury or United States or European country governmental body, including but not limited to DOJ, CFTC, OCC, NYDFS, SEC, U.K. FCA, U.K. SFO, EC, Swiss WEKO, Swiss FINMA, and BaFin.  Stips., ¶14(b)(iv).

40.     *Production of Additional Documents and Data:*  After entry of the Preliminary Approval Order, while the Action or any action related to any Released Claims remains pending, Settling Defendants will produce additional documents and transactional data, as reasonably requested by Class Plaintiffs.  Stips., ¶14(b)(v).

41.     *Additional Attorney Proffers:*  After the production of the initial transaction data and documents provided to government bodies, the Settling Defendants will provide additional attorney proffers on those documents, including, to the extent known, the specific locations, dates, and participants in all meetings or communications relating to the transactions

and conduct that are the subject matter of all forms and types of Released Claims, as well as a description of the documents prepared at or related to each such meeting or communication. Stips., ¶14(b)(vi).

42.    *Witness Interviews:*  After the entry of the Preliminary Approval Order, and upon reasonable notice, Settling Defendants are obligated to make available for interviews three (3) current employees and must meet and confer regarding possible interviews of up to five (5) additional employees.  Stips., ¶14(b)(vii).

43.    *Declarations and Affidavits:*  After the entry of the Preliminary Approval Order and upon reasonable notice, Settling Defendants are obligated to make available for the preparation of declarations and/or affidavits three (3) employees and must meet and confer regarding possible declarations and/or affidavits from up to five (5) additional employees designated by Class Lead Counsel for the preparation of declarations and/or affidavits.  Stips., ¶14(b)(viii).

44.    *Depositions:*   After the entry of the Preliminary Approval Order and upon reasonable notice, Settling Defendants are obligated to make available for deposition three (3) current employees and must meet and confer regarding possible depositions of up to five (5) additional employees for deposition.  Stips., ¶14(b)(ix).

45.    *Testimony at Trial:*  Upon reasonable notice, Settling Defendants are obligated to make available for testimony at trial, each of the then-current employees who provided interviews, declarations/affidavits, or depositions.  Stips., ¶14(b)(x).

**C.    Release of Claims**

46.    In consideration for Settling Defendants' payment of $2,009,075,000 to the Settlement Classes and their provision of cooperation and confirmatory discovery, and upon the

Effective Date of the Settlement, Class Plaintiffs and Releasing Parties who do not exclude themselves from the Settlement Classes will give up any rights to sue the Settling Defendants or any of the Released Parties for the Released Claims.  Stips., ¶¶1, 2(nn); *accord* UBS Amended Stip. ¶2 (ll).

47.    The releases are explicitly limited to only those claims that are or could have been alleged *and* arise under the factual predicate of the Action.  Stips., ¶¶1, 2(nn); *accord* UBS Amended Stip. ¶2 (ll).

48.    The release explicitly carves out claims based on transactions executed solely outside the United States arising under foreign laws that belong to any Person that is domiciled outside the United States as well as claims related to "last look" practices that may have been used with respect to electronic trading.  Stips., ¶¶1, 2(nn); *accord* UBS Amended Stip., ¶2(ll).

49.    The Settlement Agreements define Released Claims as:

[A]ny and all manner of claims, including "Unknown Claims" as defined below, causes of action, cross-claims, counter-claims, charges, liabilities, demands, judgments, suits, obligations, debts, setoffs, rights of recovery, or liabilities for any obligations of any kind whatsoever (however denominated), whether class or individual, in law or equity or arising under constitution, statute, regulation, ordinance, contract, or otherwise in nature, for fees, costs, penalties, fines, debts, expenses, attorneys' fees, and damages, whenever incurred, and liabilities of any nature whatsoever (including joint and several), known or unknown, suspected or unsuspected, asserted or unasserted, arising from or relating in any way to any conduct alleged or that could have been alleged in and arising from the factual predicate of the Action, or any amended complaint or pleading therein, from the beginning of time until the Effective Date, which shall be deemed to include but not be limited to:  (i) communications related to FX Instruments, FX Trading, or FX Benchmark Rates, between a Released Party and any other FX dealer or any other participant in the conspiracy alleged in the Action through chat rooms, instant messages, email, or other means; (ii) agreements, arrangements, or understandings related to FX Instruments, FX Trading, or FX Benchmark Rates, between a Released Party and any other FX dealer or any other participant in the conspiracy alleged in the Action through chat rooms, instant messages, email, or other means; (iii) the sharing or exchange of customer information between a Released Party and any other FX dealer or any other participant in the conspiracy alleged in the Action – including but not limited to customer identity, trading

patterns, transactions, net positions or orders, stop losses or barrier options, pricing, or spreads related to FX Instruments, FX Trading, or FX Benchmark Rates; (iv) the establishment, calculation, manipulation, or use of the WM/Reuters fixing rates, including the 4:00 p.m. London closing spot rates, and trading that may impact such rates; (v) the establishment, calculation, manipulation, or use of the European Central Bank FX reference rates, including the ECB rate set at 1:15 p.m. London time; (vi) the establishment, calculation, manipulation, or use of the CME daily settlement rates; (vii) the establishment, calculation, or use of any other FX benchmarks, including benchmark fixing rates, benchmark settlement rates, or benchmark reference rates; (viii) the establishment, calculation, communication, manipulation, or use of the price, spread, or rate of any FX Instrument or FX Exchange-Based Instrument; and (ix) the exchange of customer information or confidential information in the possession of [Defendant] between a Released Party and any other FX dealer or any other participant in the conspiracy alleged in the Action related to the establishment, calculation, manipulation, or use of any FX price, spread, or rate.  Provided, however, Released Claims do not include: (i) "last look" claims related to possible delays built into [Defendant's] algorithmic or electronic trading platforms that resulted in [Defendant's] declining spot orders or requests to trade, including trading on electronic communications networks, that were submitted based upon prices [Defendant] quoted or displayed in over-the-counter FX markets, notwithstanding anything to the contrary herein; and (ii) claims based upon transactions executed solely outside the United States and arising under foreign laws belonging to any Releasing Party or Person that is domiciled outside the United States.

Stips., ¶2(nn); *accord* UBS Amended Stip., ¶2(ll).

## III.   SUMMARY OF THE MEDIATIONS

### A.   Overview

50.   Each settlement was the product of hard-fought, arm's-length negotiations by counsel highly experienced in complex litigation and antitrust law and was reached under the guidance and with the assistance of a well-respected mediator, Kenneth R. Feinberg.

51.   The JPMorgan Stipulation was the first settlement agreement executed in the Action.  The settlement set forth in the JPM Stipulation was an "ice-breaker" settlement.

52.   After the JPMorgan settlement became public, a number of Defendants contacted Class Plaintiffs regarding the possibility of settlement.  Among those Defendants was UBS, the

amnesty applicant under the DOJ Antitrust Division's Leniency Program. The UBS Stipulation was the second settlement agreement executed in the Action.

53.     Execution of the JPMorgan Stipulation and the UBS Stipulation triggered JPMorgan's and UBS's respective cooperation duties under those agreements, including immediate attorney proffers and the production of transaction data. This cooperation led Lead Counsel to investigate not only the claims alleged in the CAC but also different conduct, which was subsequently alleged in the SAC, relating to a broader scope of collusion and impact in the FX market.

54.     As Lead Counsel investigated the scope of the collusion in the FX market and developed the SAC, Lead Counsel negotiated settlements with the other Settling Defendants based on a broader conspiracy and claims. As a result, the original settlement class stipulated to in the JPM Stipulation was broadened and a second settlement class for those trading on exchanges was added.

55.     Lead Counsel's settlement strategy was designed to achieve a maximum aggregate recovery for the Settlement Classes, and the fact that the later settlements were at significantly higher rates demonstrates that the strategy was successful. *See* Table 4, *supra*.

**B.     Bilateral Negotiations**

**1.     JPMorgan**

56.     On January 5, 2015, Class Plaintiffs and JPMorgan signed the JPMorgan Stipulation. *See* ECF No. 247-1. As the first settlement in the Action, Class Plaintiffs' settlement with JPMorgan was an "ice-breaker" settlement. The JPMorgan settlement was a significant step forward in the prosecution and settlement of this Action because it provided for

comprehensive cooperation and, for the first time, brought other Defendants to the point of serious negotiations.

57.     Negotiations that resulted in the JPMorgan Stipulation occurred over the course of several months and included numerous telephone conversations, face-to-face meetings, and mediation with Mr. Feinberg.  At a mediation session on December 1, 2014, the mediator urged resolution of various issues (*e.g.*, the extent and timing of the cooperation provisions, the settlement class definition, and the scope of the release).  Over the course of several more weeks, the mediator participated in numerous telephone conference calls regarding specific proposed terms of a settlement agreement.  As a result of these discussions and at the urging of the mediator, after hard-fought, arm's-length negotiations between highly experienced counsel, all outstanding disagreements were eventually resolved, and the JPMorgan Stipulation was executed on January 5, 2015.

58.     The JPMorgan Stipulation obligated JPMorgan to provide immediate cooperation not only as to the conduct alleged in the then-operative CAC (*i.e.*, fixing of FX benchmark rates) but also additional conduct related to the FX market.  JPMorgan has also produced transaction data pursuant to its cooperation obligations.  The fact that JPMorgan's cooperation came early in the Action greatly enhanced its value.

59.     In May 2015, Class Plaintiffs and JPMorgan, with the assistance of the mediator, began negotiating the terms of an amended stipulation.  Class Plaintiffs and JPMorgan reached an agreement in principle on the additional monetary compensation and exchange portion of the amended stipulation on or about June 10, 2015.

60.     In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of the Settling Defendants, the Parties began

multilateral negotiations on certain common issues.  Those negotiations are described in §III.C., *infra.*

61.     After hard-fought, arm's-length negotiations between highly experienced counsel, on October 1, 2015, Class Plaintiffs and JPMorgan signed an Amended Stipulation and Amended Agreement of Settlement attached hereto as Exhibit 1 ("JPMorgan Amended Stipulation").

62.     The cash portion of the JPMorgan Amended Stipulation consists of $104,500,000. JPMorgan Amended Stip., ¶10(b).  The Direct Settlement Amount is $99,000,000.  *Id*. at ¶2(o). The Exchange-Only Settlement Amount is $5,000,000.  *Id*. at ¶2(s).  JPMorgan will pay an additional $500,000 for notice and administration costs.  *Id*. at ¶10(b).  All funds are payable upon preliminary approval of the JPMorgan Amended Stipulation and are non-reversionary if there is final approval of the settlement by the Court.  *Id*. at ¶¶10(b)-11(j).

63.     JPMorgan's continuing cooperation will materially assist Class Plaintiffs in prosecuting the Action against the Non-Settling Defendants.

64.     All other terms of the JPMorgan Amended Stipulation are consistent with the stipulations reached with the other Settling Defendants, including the definition of the settlement classes, release of claims, and cooperation obligations.

**2.     UBS**

65.     Shortly after Class Plaintiffs' January 5, 2015 disclosure that the JPMorgan Stipulation had been executed (ECF No. 233), UBS requested a meeting to discuss settlement.

66.     UBS was the amnesty applicant under the DOJ's Leniency Program, under which the DOJ granted UBS conditional immunity from prosecution for EUR/USD collusion and entered into a non-prosecution agreement covering other currency pairs.  The Antitrust Criminal

Penalty Enhancement and Reform Act ("ACPERA"), Pub. L. No. 108-237, tit. II 118 Stat. 661 (2004) reduces potential damages liability for the amnesty applicant if it provides "satisfactory cooperation" to plaintiffs. *Id*. at §213. By providing "satisfactory cooperation" to plaintiffs, an amnesty applicant may reduce its civil damages from treble to single damages and may avoid joint and several liability. In contrast, non-leniency defendants still face joint and several liability and treble damages. *Id*. at §214. Given UBS's position as the amnesty applicant, UBS's damages exposure was significantly less than non-leniency defendants.

67.    Negotiations occurred over the course of several months through numerous telephone calls and in-person meetings, including meetings between counsel on January 22-23, 2015 and mediation sessions with Mr. Feinberg on February 9-10, 2015, during which UBS provided Class Plaintiffs with a pre-settlement proffer. Over the course of several more days, the mediator participated in numerous telephone conference calls, regarding specific proposed terms of a settlement agreement. As a result of these discussions, all outstanding disagreements were eventually resolved. On February 11, 2015, Class Plaintiffs and UBS reached an agreement in principle. On February 12, 2015, UBS and Class Plaintiffs signed a term sheet. In reducing the term sheet to a formal stipulation of settlement, the Parties mediated several issues with the assistance of Mr. Feinberg.

68.    After hard-fought, arm's-length negotiations between highly experienced counsel, on March 6, 2015, Class Plaintiffs and UBS reached agreement on a Stipulation and Agreement of Settlement. The JPMorgan Stipulation provided the framework for the UBS settlement agreement with two main modifications to the settlement class definition and the release. During the course of the February 9-10, 2015 meditation, UBS proffered additional collusive conduct, including manipulation of multiple currency pairs (including fixing bid-ask spreads) throughout

the day, in addition to existing allegations of fixing benchmark rates.  UBS also identified additional banks and other market participants they knew to have participated in the conspiracy, as well as additional chat rooms where some of the collusive conduct occurred.  Accordingly, the proffer resulted in a broadening of the settlement class definition, as compared with the JPMorgan Stipulation.  The definition of Released Claims was also expanded to accommodate spread-fixing conduct, which Class Plaintiffs subsequently alleged in the SAC.

69.     The UBS Stipulation obligated UBS to provide immediate cooperation not only as to the conduct alleged in the then-operative CAC (*i.e.*, fixing of FX benchmark rates), but also additional conduct related to the FX market.  The fact that UBS's cooperation came early in the case greatly enhanced its value.

70.     Class Plaintiffs and UBS, with the assistance of the mediator, negotiated the terms of an amended stipulation over the course of the next several months.  An agreement in principle on the exchange-only portion of the amended stipulation was reached on June 9, 2015.  On August 4, 2015, the Parties executed a corresponding term sheet.

71.     In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of the Settling Defendants, the Parties began multilateral negotiations on certain common issues.  Those negotiations are described in §III.C., *infra.*

72.     After hard-fought, arm's-length negotiations between highly experienced counsel, on October 5, 2015, Class Plaintiffs and UBS signed a Stipulation and Amended Agreement of Settlement attached hereto as Exhibit 2 ("UBS Amended Stipulation").

73.     The total cash portion of the UBS Amended Stipulation consists of $141,075,000.  UBS Amended Stip., ¶10(b).  The Direct Settlement Amount is $135,000,000.  *Id*. at ¶2(o).  The

Exchange-Only Settlement Amount is $6,075,000.  *Id.* at ¶2(s).  All funds are payable upon preliminary approval of the UBS Amended Stipulation and are non-reversionary if there is final approval of the settlement by the Court.  *Id.* at ¶¶10(b), 11(j).

74.    UBS's continuing cooperation will materially assist Class Plaintiffs in prosecuting the Action against the Non-Settling Defendants.

75.    All other terms of the UBS Amended Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and cooperation obligations.

### 3.    Citigroup

76.    Following the disclosure of the JPMorgan Stipulation, Citigroup contacted Class Plaintiffs to convey interest in possible resolution of the Action.  Negotiations occurred over the course of several months through numerous telephone calls and in-person meetings, including a meeting between counsel on February 9, 2015 and mediations with Mr. Feinberg on February 12, 2015 and on March 4, 2015.  On approximately March 6, 2015, Class Plaintiffs and Citigroup reached an agreement in principle to settle claims on behalf of the Direct Settlement Class. On March 27, 2015, Class Plaintiffs and Citigroup executed a corresponding term sheet.

77.    While negotiations over a formal stipulation of settlement were in progress, on approximately May 8, 2015, the parties, with the assistance of the mediator, reached an agreement in principle to settle claims on behalf of the Exchange-Only Settlement Class.  On May 14, 2015, Class Plaintiffs and Citigroup executed a corresponding term sheet.

78.    In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of the Settling Defendants, the Parties began

multilateral negotiations on certain common issues.  Those negotiations are described in §III.C., *infra.*

79.    After hard-fought, arm's-length negotiations between highly experienced counsel, on October 1, 2015, Class Plaintiffs and Citigroup signed the Stipulation and Agreement of Settlement attached hereto as Exhibit 3 ("Citigroup Stipulation").

80.    The total cash portion of the Citigroup Stipulation consists of $402,000,000. Citigroup Stip., ¶10(h).  The Direct Settlement Amount is $394,000,000, which is payable upon preliminary approval of the Citigroup Stipulation.  *Id.* at ¶10(b).  The Exchange-Only Settlement Amount is $8,000,000, which is payable upon final approval of the Citigroup Stipulation.  *Id.* at ¶10(b).  All funds are non-reversionary if there is final approval of the settlement by the Court. *Id.* at ¶11(j).

81.    Citigroup's cooperation will materially assist Class Plaintiffs in prosecuting the Action against the Non-Settling Defendants.

82.    All other terms of the Citigroup Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and cooperation obligations.

### 4.    Barclays

83.    Following the disclosure of the JPMorgan settlement, Barclays contacted Class Plaintiffs to convey interest in possible resolution of the Action.  Negotiations occurred over the course of several months, through numerous telephone calls and in-person meetings, including a meeting between counsel on January 22, 2015 and February 13, 2015 and mediation with Mr. Feinberg on March 4, 2015, during which the mediator urged resolution of various issues. On March 9, 2015, Class Plaintiffs and Barclays reached an agreement in principle to settle

claims on behalf of the Direct Settlement Class.   On March 31, 2015, Class Plaintiffs and Barclays executed a corresponding term sheet.

84.     While negotiations over a formal stipulation of settlement were in progress, on April 20, 2015, the parties, with the assistance of the mediator, reached an agreement in principle to settle claims on behalf of the Exchange-Only Settlement Class.   On June 3, 2015, Class Plaintiffs and Barclays executed a corresponding term sheet.

85.     In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of the Settling Defendants, the parties began multilateral negotiations on certain common issues.   Those negotiations are described in §III.C., *infra.*

86.     After hard-fought, arm's-length negotiations between highly experienced counsel, on September 30, 2015, Class Plaintiffs and Barclays signed the Stipulation and Agreement of Settlement attached hereto as Exhibit 4 ("Barclays Stipulation").

87.     The total cash portion of the Barclays Stipulation consists of $384,000,000. Barclays Stip., ¶10(b).   The Direct Settlement Amount is $375,000,000.   *Id*. at ¶2(q).   The Exchange-Only Settlement Amount is $9,000,000.   *Id*. at ¶2(u).   All funds are payable upon preliminary approval of the Barclays Stipulation and are non-reversionary if there is final approval of the settlement by the Court.   *Id*. at ¶11(j).

88.     Barclays' cooperation will materially assist Class Plaintiffs in prosecuting the Action against the Non-Settling Defendants.

89.     All other terms of the Barclays Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and cooperation obligations.

### 5. Bank of America

90.     Following Class Plaintiffs' submission of the motion for preliminary approval of the JPMorgan Stipulation, Bank of America contacted Class Plaintiffs to convey interest in possible resolution of the Action.   Negotiations occurred over the course of several months through numerous telephone calls and in-person meetings, including a meeting between counsel on March 6, 2015 and mediation with Mr. Feinberg on April 2, 2015, during which the mediator urged resolution of various issues.   On April 7, 2015, Class Plaintiffs and Bank of America reached an agreement in principle to settle claims on behalf of the Direct Settlement Class.   On April 9, 2015, Class Plaintiffs and Bank of America executed a corresponding term sheet.

91.     While negotiations over a formal stipulation of settlement were in progress, on approximately April 23, 2015, the Parties reached an agreement in principle to settle claims on behalf of the Exchange-Only Settlement Class.

92.     In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of the Settling Defendants, the Parties began multilateral negotiations on certain common issues.   Those negotiations are described in §III.C., *infra.*

93.     After hard-fought, arm's-length negotiations between highly experienced counsel, on October 1, 2015, Class Plaintiffs and Bank of America signed the Stipulation and Agreement of Settlement attached hereto as Exhibit 5 ("Bank of America Stipulation").

94.     The total cash portion of the Bank of America Stipulation consists of $187,500,000.   Bank of America Stip., ¶10(b).   The Direct Settlement Amount is $180,000,000. *Id*. at ¶2(q).   The Exchange-Only Settlement Amount is $7,500,000.   *Id*. at ¶2(u).   All funds are

payable upon preliminary approval of the Bank of America Stipulation and are non-reversionary if there is final approval of the settlement by the Court. *Id*. at ¶¶10(b), 11(j).

95.     Bank of America's cooperation will materially assist Class Plaintiffs in prosecuting the Action against the Non-Settling Defendants.

96.     All other terms of the Bank of America Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and cooperation obligations.

### 6.     Goldman Sachs

97.     In late February, Goldman Sachs contacted Class Plaintiffs to convey interest in possible resolution of the Action.  Negotiations occurred over the course of several months through numerous telephone calls and in-person meetings, including a meeting between counsel on March 4, 2015 and mediation during which Mr. Feinberg urged resolution of various issues. On March 12, 2015, Class Plaintiffs and Goldman Sachs reached an agreement in principle to settle claims on behalf of the Direct Settlement Class.  On April 10, 2015, Class Plaintiffs and Goldman Sachs executed a corresponding term sheet.

98.     While negotiations over a formal stipulation and agreement of settlement were in progress, on approximately April 30, 2015, the parties, with the assistance of the mediator, reached an agreement in principle to settle claims on behalf of the Exchange-Only Settlement Class.  On May 11, 2015, Class Plaintiffs and Goldman Sachs executed a corresponding term sheet.

99.     In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of the Settling Defendants, the Parties began

multilateral negotiations on certain common issues.  Those negotiations are described in §III.C., *infra*.

100.    After hard-fought, arm's-length negotiations between highly experienced counsel, on October 1, 2015, Class Plaintiffs and Goldman Sachs signed the Stipulation and Agreement of Settlement attached hereto as Exhibit 6 ("Goldman Sachs Stipulation").

101.    The total cash portion of the Goldman Sachs Stipulation consists of $135,000,000. Goldman Sachs Stip., ¶10(b).  The Direct Settlement Amount is $129,500,000.  *Id*. at ¶2(o).  The Exchange-Only Settlement Amount is $5,000,000.  *Id*. at ¶2(s).  Goldman Sachs will pay an additional $500,000 for notice and administration costs.  *Id*. at ¶10(b).  All funds are payable upon preliminary approval of the Goldman Sachs Stipulation and are non-reversionary if there is final approval of the settlement by the Court.  *Id*. at ¶¶10(b), 11(j).

102.    Goldman Sachs' cooperation will materially assist Class Plaintiffs in prosecuting the Action against the Non-Settling Defendants.

103.    All other terms of the Goldman Sachs Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and cooperation obligations.

### 7.    RBS

104.    Shortly following the disclosure of the JPM Stipulation, RBS contacted Class Plaintiffs to convey interest in possible resolution of the Action.  Negotiations occurred over the course of several months through numerous telephone calls and in-person meetings, including meetings between counsel on March 6, 2015 and April 7, 2015 and mediation with Mr. Feinberg on April 17, 2015 and April 29, 2015, during which time the mediator urged resolution of various issues.  At the April 29, 2015 mediation, Class Plaintiffs and RBS reached an agreement

in principle to settle claims on behalf of the Direct Settlement Class and the Exchange-Only Settlement Class.  On May 7, 2015, Class Plaintiffs and RBS executed a term sheet covering the Direct Settlement.

105.   In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of the Settling Defendants, the Parties began multilateral negotiations on certain common issues.  Those negotiations are described in §III.C., *infra.*

106.   After hard-fought, arm's-length negotiations between highly experienced counsel, on October 2, 2015, Class Plaintiffs and RBS signed the Stipulation and Agreement of Settlement attached hereto as Exhibit 7 ("RBS Stipulation").

107.   The total cash portion of the RBS Stipulation consists of $255,000,000.  RBS Stip., ¶10(b).  The Direct Settlement Amount is $247,000,000.  *Id*. at ¶2(o).  The Exchange-Only Settlement Amount is $8,000,000.  *Id*. at ¶2(s).  All funds are payable upon preliminary approval of the RBS Stipulation and are non-reversionary if there is final approval of the settlement by the Court.  *Id*. at ¶¶10(b), 11(j).

108.   RBS' cooperation will also materially assist Class Plaintiffs in prosecuting the Action against the Non-Settling Defendants.

109.   All other terms of the RBS Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and cooperation obligations.

### 8.   BNP Paribas

110.   In early March 2015, BNP Paribas contacted Class Plaintiffs to convey interest in possible resolution of the Action.   Negotiations occurred over the course of several months

through numerous telephone calls and in-person meetings, including a meeting between counsel on April 7, 2015 and mediation with Mr. Feinberg on May 6, 2015, during which BNP Paribas provided Class Plaintiffs with a settlement proffer.  After subsequent sessions with the mediator, on May 29, 2015, Class Plaintiffs and BNP Paribas reached an agreement in principle to settle claims on behalf of the Direct Settlement Class and the Exchange-Only Settlement Class.  On June 5, 2015, Class Plaintiffs and BNP Paribas executed two term sheets covering the Direct Settlement and Exchange-Only Settlement.

111.    In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of the Settling Defendants, the Parties began multilateral negotiations on certain common issues.  Those negotiations are described in §III.C., *infra.*

112.    After hard-fought, arm's-length negotiations between highly experienced counsel, on October 1, 2015, Class Plaintiffs and BNP Paribas signed the Stipulation and Agreement of Settlement attached hereto as Exhibit 8 ("BNP Paribas Stipulation").

113.    The total cash portion of the BNP Paribas Stipulation consists of $115,000,000. BNP Paribas Stip., ¶10(b).  The Direct Settlement Amount is $110,000,000.  *Id*. at ¶2(o).  The Exchange-Only Settlement Amount is $5,000,000.  *Id*. at ¶2(s).  All funds are payable upon preliminary approval of the BNP Paribas Stipulation and are non-reversionary if there is final approval of the settlement by the Court.  *Id*. at ¶¶10(b), 11(j).

114.    BNP Paribas' cooperation will materially assist Class Plaintiffs in prosecuting the Action against the Non-Settling Defendants.

115.    All other terms of the BNP Paribas Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and cooperation obligations.

### 9.    HSBC

116.    On April 14, 2015, HSBC contacted Class Plaintiffs to convey interest in possible resolution of the Action.  Negotiations occurred over the course of several months through numerous telephone calls and in-person meetings, including a meeting between counsel on April 30, 2015, during which HSBC provided Class Plaintiffs with a settlement proffer, and mediation with Mr. Feinberg on May 29, 2015, at which time the mediator urged resolution of various issues.  At the May 29, 2015 mediation, Class Plaintiffs and HSBC reached an agreement in principle to settle claims on behalf of the Direct Settlement Class and the Exchange-Only Settlement Class.

117.    In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of the Settling Defendants, the Parties began multilateral negotiations on certain common issues.  Those negotiations are described in §III.C., *infra.*

118.    After hard-fought, arm's-length negotiations between highly experienced counsel, on October 1, 2015, Class Plaintiffs and HSBC signed the Stipulation and Agreement of Settlement attached hereto as Exhibit 9 ("HSBC Stipulation").

119.    The total cash portion of the HSBC Stipulation consists of $285,000,000.  HSBC Stip., ¶10(b).  The Direct Settlement Amount is $279,000,000.  *Id.* at ¶2(o).  The Exchange-Only Settlement Amount $6,000,000.  *Id.* at ¶2(s).  All funds are payable upon preliminary approval of

the HSBC Stipulation and are non-reversionary if there is final approval of the settlement by the Court. *Id*. at ¶¶10(b), 11(j).

120.    HSBC's cooperation will materially assist Class Plaintiffs in prosecuting the Action against the Non-Settling Defendants.

121.    All other terms of the HSBC Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and cooperation obligations

### C.    Multilateral Negotiations

122.    In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of the Settling Defendants, the Parties began multilateral negotiations on certain common issues, such that the final Settlement Agreements could be harmonized on key terms to allow Class Plaintiffs to file an omnibus motion for preliminary approval as to all Settlement Agreements, mail a single notice to all potential Class Members, and submit a single plan of distribution for Court approval.

123.    The Parties exchanged numerous draft stipulations between June and September 2015 and negotiated terms during the course of numerous teleconferences.

124.    On August 12, 2015, with the assistance of the mediator, the Settling Parties reached resolution on the remaining terms.  On August 12, 2015, all Settling Defendants agreed to sign the Settlement Agreements, subject to technical edits and finalizing the exhibits to the Settlement Agreements.  Those negotiations took place in August and September and included the exchange of numerous drafts and participation in numerous teleconferences.

125.    All Settlement Agreements were executed between September 30, 2015 and October 5, 2015.

## IV.   MONETARY COMPONENT COMPARISONS

126.   If approved, the nine settlements will provide the Settlement Classes a total recovery of $2,009,075,000.  This partial settlement of the Action would be the fourth largest U.S. antitrust class action settlement on record:

| Table 5: Largest U.S. Antitrust Class Action Recoveries | |
|---|---|
| 1 | *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation* | $7,250,000,000[12] |
| 2 | *In re Vitamins Antitrust Litigation* | $4,197,100,000 - $5,576,100,000 (direct and indirect state settlements)[13] |
| 3 | *In re Visa Check/Mastermoney Antitrust Litigation* | $3,050,000,000[14] |
| 4 | *In re Foreign Exchange Benchmark Rates Antitrust Litigation* | $2,009,075,000 (partial settlement) |
| 5 | *In re TFT-LCD (Flat Panel) Antitrust Litigation* | $1,082,055,647 (indirect plaintiffs)[15] $473,022,242 (direct plaintiffs)[16] |

---

[12]      *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 986 F. Supp. 2d 207, 217 (E.D.N.Y. 2013) (appeal pending).  The total $7.25 billion settlement was composed of two funds: a $6.05 billion cash settlement and an estimated $1.2 billion fund based on a holdback of ten basis points in interchange fee payments by class members during an eight-month period after the opt-out period expired.  *Id.*

[13]      Connor, John M., *The Great Global Vitamins Conspiracy: Sanctions and Deterrence* (February 22, 2006).  American Antitrust Institute Working Paper No. 06-02.  Available at SSRN: http://ssrn.com/abstract=1103604; *see also In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 230 (D.D.C. 2005) (noting the recovery was "one of the largest-if not the largest-settlement amounts ever secured in a class action litigation").

[14]      *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 508 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 101 (2d Cir. 2005) (final approval order, wherein the court noted that the resulting settlement was "the largest antitrust settlement in history").

[15]      *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-MD-1827, Order Granting Final Approval of Combined Class, *Parens Patriae*, and Governmental Entity Settlement; Final Judgment of Dismissal with Prejudice (N.D. Cal. Apr. 3, 2013) (ECF No. 7697) (approving settlement with Chimei defendants, Chunghwa defendants, Epson defendants, HannStar defendants, Hitachi defendants, Samsung defendants and Sharp defendants); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-MD-1827, Second Amended Order Granting Final Approval of Combined Class, *Parens Patriae*, and Governmental Entity Settlements with AUO, LG Display, and Toshiba Defendants; Ordering Final Judgment of Dismissal with Prejudice; Award

| Table 5: Largest U.S. Antitrust Class Action Recoveries | | |
|---|---|---|
| 6 | *In re Air Cargo Shipping Services Antitrust Litigation* | $1,023,107,442[17] (partial settlement)[18] |

of Attorneys' Fees, Expenses, and Incentive Awards (N.D. Cal. Apr. 3, 2013) (ECF No. 7697) (approving settlement with LG defendants, AUO defendants, and Toshiba defendants).

[16]    *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-MD-1827, Order Granting Final Approval of Settlement and Entering Final Judgment of Dismissal with Prejudice as to Defendant Chunghwa Picture (N.D. Cal. Feb. 18, 2011) (ECF No. 2475); *In re TFT-LCD*, No. 07-MD-1827, Order Granting Final Approval of Settlement and Entering Final Judgment of Dismissal with Prejudice as to Defendant Epson Imaging Devices Corp. and Epson Electronics America, Inc. (N.D. Cal. Feb. 18, 2011) (ECF No. 2476); *In re TFT-LCD*, No. 07-MD-1827, Order Granting Final Approval of Settlement and Entering Final Judgment of Dismissal with Prejudice as to Defendants Chi Mei, *et al*. (N.D. Cal. Dec. 27, 2011) (ECF No. 4438); *In re TFT-LCD*, No. 07-MD-1827, Order Granting Final Approval of Settlement and Entering Final Judgment of Dismissal with Prejudice as to Defendants Hannstar Display Corporation (N.D. Cal. Dec. 27, 2011) (ECF No. 4438-1); *In re TFT-LCD*, No. 07-MD-1827, Order Granting Final Approval of Settlement and Entering Final Judgment of Dismissal with Prejudice as to Defendants Hitachi Displays, Ltd. (N.D. Cal. Dec. 27, 2011) (ECF No. 4438-2); *In re TFT-LCD*, No. 07-MD-1827, Order Granting Final Approval of Settlement and Entering Final Judgment of Dismissal with Prejudice as to Defendants LG Display Co., Ltd. and LG Display America, Ltd. (N.D. Cal. Dec. 27, 2011) (ECF No. 4438-3); *In re TFT-LCD*, No. 07-MD-1827, Order Granting Final Approval of Settlement and Entering Final Judgment of Dismissal with Prejudice as to Defendant Mitsui & Co. (Taiwan), Ltd. (N.D. Cal. Dec. 27, 2011) (ECF No. 4438-4); *In re TFT-LCD*, No. 07-MD-1827, Order Granting Final Approval of Settlement and Entering Final Judgment of Dismissal with Prejudice as to Defendants Samsung Electronics, *et al*. (N.D. Cal. Dec. 27, 2011) (ECF No. 4438-5); *In re TFT-LCD*, No. 07-MD-1827, Order Granting Final Approval of Settlement and Entering Final Judgment of Dismissal with Prejudice as to Defendant Sanyo Consumer Electronics Co., Ltd. (N.D. Cal. Dec. 27, 2011) (ECF No. 4438-6); *In re TFT-LCD*, No. 07-MD-1827, Order Granting Final Approval of Settlement and Entering Final Judgment of Dismissal with Prejudice as to Defendants Sharp Corporation (N.D. Cal. Dec. 27, 2011) (ECF No. 4438-7); *In re TFT-LCD*, No. 07-MD-1827, Order Granting Final Approval of Settlement and Entering Final Judgment of Dismissal with Prejudice as to Defendants Toshiba *et al*. (N.D. Cal. Dec. 18, 2012) (ECF No. 7372); *In re TFT-LCD*, No. 07-MD-1827, Order Granting Final Approval of Settlement and Entering Final Judgment of Dismissal with Prejudice as to Defendants AU Optronics Corporation and AU Optronics America (N.D. Cal. Dec. 18, 2012) (ECF No. 7373).

[17]    *In re Air Cargo Shipping Services Antitrust Litig.*, 06-MD-1775, 2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) (approving settlement with Lufthansa defendants); *In re Air Cargo*, 06-MD-1775, ECF No. 1413, Memorandum and Order (E.D.N.Y. Mar. 14, 2011) (approving settlement with American Airlines defendants); *In re Air Cargo*, 06-MD-1775, ECF No. 1414, Memorandum and Order (E.D.N.Y. Mar. 14, 2011) (approving settlement with Air France-KLM defendants); *In re Air Cargo*, 06-MD-1775, ECF No. 1416, Memorandum and Order (E.D.N.Y. Mar. 14, 2011) (approving settlement with Scandinavian Airlines defendants); *In re Air Cargo*,

| Table 5: Largest U.S. Antitrust Class Action Recoveries | |
|---|---|
| 7 | *In re NASDAQ Antitrust Litigation* | $1,027,000,000[19] |

127. The total settlement amount ($2,009,075,000) represents 79.7% of the fines collected by the DOJ ($2,520,000,000). Even though the settlements are in partial settlement of the action, which remains ongoing against the seven Non-Settling Defendants, the recovery already ranks favorably in comparison to other antitrust class action cases over the last 10 years where there were both private settlements and DOJ fines. *See* Exhibit 12, attached to this Declaration.

---

06-MD-1775, ECF No. 1417, Memorandum and Order (E.D.N.Y. Mar. 14, 2011) (approving settlement with Japan Airlines defendants); *In re Air Cargo*, 06-MD-1775, 2011 WL 2909162 (E.D.N.Y. July 15, 2011) (approving settlements with Air Nippon defendants, Cargolux defendants, Thai Airlines, and Qantas (the settlement with Qantas was held in abeyance, but ultimately approved and entered at ECF No. 1534)); *In re Air Cargo*, 06-CV-00706, ECF No. 37, Memorandum and Order (Aug. 2, 2012) (approving settlements with Lan Airlines defendants, British Airways plc, South African Airways Ltd., Malaysia Airlines, Saudia Arabian Airlines, Emirates Airline d/b/a Emirates, El Al Israel Airlines Ltd., Air Canada defendants and Air New Zealand); *In re Air Cargo*, 06-MD-1775, 2015 WL 5918273, Memorandum and Order (E.D.N.Y. Oct. 9, 2015) (approving settlements with Korean Air Lines defendants, Singapore Airlines defendants, Cathay Pacific defendants, and China Airlines defendants). There are three settlements still awaiting final approval, but have been included in the settlement total: *In re Air Cargo*, 06-MD-1775, ECF No. 2056, Order (E.D.N.Y Oct. 17, 2014) (granting preliminary approval of settlement with Asiana Airlines); *In re Air Cargo*, 06-MD-1775, ECF No. 2098, Order (E.D.N.Y Dec. 24, 2014) (granting preliminary approval of settlement with Nippon Cargo Airlines); *In re Air Cargo*, 06-MD-1775, ECF No. 2183, Order (E.D.N.Y May 5, 2015) (granting preliminary approval of settlement with EVA Airways).

[18] Four additional airline defendants remain in the case: Air China, Air India, Air New Zealand, and Polar Air Cargo and its parent Atlas Air Worldwide Holdings.

[19] *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 472-73, 487 (S.D.N.Y. 1998). ("The instant settlement is nearly 130 times larger than the average class action settlement between 1991 and 1994 [], and the largest ever in an antitrust class action.").

## V.   SELECTION OF ESCROW AGENT, CLAIMS ADMINISTRATOR, AND SETTLEMENT ADMINISTRATOR

128.   Class Plaintiffs propose Huntington National Bank ("HNB") to serve as Escrow Agent, having the duties and responsibilities as described in the Settlement Agreements.  Stips., ¶10(a).  As indicated in HNB's résumé, attached hereto as Exhibit 10, HNB was established in 1866, holds over $60 billion in assets, and has more than 700 branches nationwide.  HNB's National Settlement Team has handled more than 1,000 settlements for law firms, claims administrators, and regulatory agencies.  Lead Counsel believe HNB is qualified to serve as Escrow Agent and request that the Court approve Class Plaintiffs' selection.

129.   Class Plaintiffs propose Garden City Group ("GCG") to serve as Claims Administrator, having the duties and responsibilities as described in the Settlement Agreements.  Stips., ¶5(v).  Lead Counsel selected GCG after reviewing the available options and undertaking a rigorous bidding process consisting of two rounds of bidding and in-person interviews.  As indicated in GCG's firm résumé, attached hereto as Exhibit 11, GCG has been in the business of administering class action settlements for twenty years and has administered hundreds of class action settlements, including several well-known antitrust settlements.  GCG has substantial experience in carrying out class action notice and payment projects, and has handled the administration of numerous complex, data-driven settlements, as well as cases with international components.  Lead Counsel believe GCG is qualified to serve as Claims Administrator and request that the Court approve Class Plaintiffs' selection.

130.   The Settling Parties agreed to seek appointment of Mr. Feinberg as Settlement Administrator, having the duties and responsibilities set forth in the Settlement Agreements.  Stips., ¶7(a).  Lead Counsel believe that Mr. Feinberg is qualified to serve as the Settlement Administrator and request that the Court approve the Settling Parties' selection.

## VI.  EXHIBITS

131.  Attached hereto are true and correct copies of:

| Exhibit 1 | Stipulation and Amended Agreement of Settlement with JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. |
| Exhibit 2 | Stipulation and Amended Agreement of Settlement with UBS AG, UBS Group AG, and UBS Securities LLC |
| Exhibit 3 | Stipulation and Agreement of Settlement with Citigroup Inc., Citibank, N.A., Citicorp, and Citigroup Global Markets Inc. |
| Exhibit 4 | Stipulation and Agreement of Settlement with Barclays Bank PLC and Barclays Capital Inc. |
| Exhibit 5 | Stipulation and Agreement of Settlement with Bank of America Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Incorporated |
| Exhibit 6 | Stipulation and Agreement of Settlement with The Goldman Sachs Group, Inc. and Goldman, Sachs & Co. |
| Exhibit 7 | Stipulation and Agreement of Settlement with The Royal Bank of Scotland Group PLC, The Royal Bank of Scotland PLC, and RBS Securities Inc. |
| Exhibit 8 | Stipulation and Agreement of Settlement with BNP Paribas Group, BNP Paribas North America Inc., BNP Paribas Securities Corp., and BNP Prime Brokerage, Inc. |
| Exhibit 9 | Stipulation and Agreement of Settlement with HSBC Holdings PLC, HSBC Bank PLC, HSBC North America Holdings Inc., HSBC Bank USA, N.A., and HSBC Securities (USA) Inc. |
| Exhibit 10 | HNB Firm Resume |
| Exhibit 11 | GCG Firm Resume |

132.  Also attached hereto as Exhibit 12 is a table of cases comparing DOJ corporate fines (excluding individuals) obtained in antitrust cases between approximately 2005-2015 to recoveries in related antitrust class action cases.

## VII.  CONCLUSION

133.  For the reasons set forth herein, in Class Plaintiffs' motion for preliminary approval of the settlements, and in the documents filed in support thereof, we believe the settlements are fair, reasonable, and adequate.  As such, we believe that the Court should grant Class Plaintiffs' application for preliminary approval of the settlements and certify, for purposes of effectuating the settlements, the Settlement Classes.

I certify under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.  Executed on October 22, 2015, in San Diego, CA.

       *s*/ Christopher M. Burke
CHRISTOPHER M. BURKE
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
cburke@scott-scott.com


I certify under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.  Executed on October 22, 2015, in Washington, DC.

MICHAEL D. HAUSFELD
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: 202-540-7143
Facsimile:  202-5407201
mhausfeld@hausfeldllp.com

I certify under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.  Executed on October 22, 2015, in San Diego, CA.

     s/ Christopher M. Burke
     CHRISTOPHER M. BURKE
     SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
     707 Broadway, Suite 1000
     San Diego, CA 92101
     Telephone: 619-233-4565
     Facsimile: 619-233-0508
     cburke@scott-scott.com

I certify under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.  Executed on October 22, 2015, in Washington, DC.

     MICHAEL D. HAUSFELD
     HAUSFELD LLP
     1700 K Street, NW, Suite 650
     Washington, DC 20006
     Telephone: 202-540-7143
     Facsimile:  202-5407201
     mhausfeld@hausfeldllp.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 22, 2015, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 22, 2015.

_s/ Christopher M. Burke_
CHRISTOPHER M. BURKE
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
email: cburke@scott-scott.com