**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| _____ ) | ECF CASE |
| IN RE FOREIGN EXCHANGE ) | |
| BENCHMARK RATES ANTITRUST ) | No. 1:13-cv-07789 (LGS) |
| LITIGATION ) | |
| _____ ) | |

**MEMORANDUM OF LAW**
**IN SUPPORT OF NON-SETTLING DEFENDANTS' MOTION TO DISMISS**
**THE SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND .................................................................................................... 2

    A.    The Parties and the Putative Class ........................................................... 2

    B.    Trading in the FX Markets ........................................................................ 3

    C.    The Alleged Conspiracy ........................................................................... 4

    D.    Claims Asserted in the Complaint ........................................................... 7

ARGUMENT ......................................................................................................... 7

I.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE
    SHERMAN ACT ............................................................................................ 7

    A.    Plaintiffs Do Not Plausibly Allege a Global Conspiracy to Manipulate
    Prices in the FX Market or That Non-Settling Defendants Joined Any
    Such Conspiracy ....................................................................................... 7

        1.    Plaintiffs' Theory of a Single, Global Conspiracy to Manipulate
        Prices in the FX Market Is Implausible and Contradicted by the
        Complaint ...................................................................................... 10

        2.    Plaintiffs Fail to Plead Sufficient Facts to Create a Plausible
        Inference that Any Non-Settling Defendants Joined a Global
        Conspiracy to Manipulate FX Spreads or Benchmark Rates .......... 16

        3.    Plaintiffs' Reliance on Chats Regarding Discussions of Spreads
        Does Not Save the Action .............................................................. 20

        4.    Plaintiffs Fail to Plausibly Allege That Non-Settling Defendants
        Joined a Global Conspiracy Involving Exchange-Traded FX
        Instruments ................................................................................... 21

    B.    Plaintiffs Lack Antitrust Standing ......................................................... 21

        1.    None of the Plaintiffs Has Alleged Antitrust Injury ...................... 22

        2.    Exchange Plaintiffs Are Not Efficient Enforcers .......................... 23

C.     Claims of OTC and Exchange Plaintiffs Based on Transactions Outside the U.S. Are Barred by the FTAIA ........................................................27

D.     Plaintiffs' Pre-November 1, 2009 Claims Are Insufficiently Pleaded and Time-Barred ................................................................................................31

II.     **EXCHANGE PLAINTIFFS FAIL TO ALLEGE A CLAIM UNDER THE COMMODITY EXCHANGE ACT** ................................................33

A.     Exchange Plaintiffs' OTC Market Manipulation Claims Are Not Actionable Under the CEA .......................................................................35

B.     Plaintiffs Fail to Adequately Allege the CEA Claims .............................36

1.     Exchange Plaintiffs Fail to State a Claim for Price Manipulation ...................37

a.     Exchange Plaintiffs Fail to Allege That Each Defendant Had the Ability to Influence FX Futures Prices..................................................38

b.     Exchange Plaintiffs Fail to Allege That Artificial Prices Existed for FX Futures .............................................................................38

c.     Exchange Plaintiffs Fail to Allege That Defendants Caused Artificial Prices ...................................................................................39

d.     Exchange Plaintiffs Fail to Adequately Allege That Defendants Specifically Intended to Manipulate FX Futures Prices............................40

2.     Exchange Plaintiffs' False Reporting and Fraud-Based Manipulation Claims Fail.................................................................41

a.     Exchange Plaintiffs Do Not Adequately Allege False Reporting ..............41

b.     Exchange Plaintiffs Do Not Adequately Allege Fraud-Based Manipulation ......................................................................................42

3.     Exchange Plaintiffs Fail to Sufficiently Allege a Claim for Control Person Liability ...............................................................................42

4.     Exchange Plaintiffs Have Not Stated a Claim for Aiding and Abetting Liability .......................................................................................43

C.     The CEA Does Not Reach Transactions on Foreign-Based Exchanges...................44

D.     Exchange Plaintiffs' Commodity Exchange Act Claims Against the New Defendants Are Time-Barred.......................................................................45

CONCLUSION.................................................................................................. 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
  2014 WL 4277510 (S.D.N.Y. 2014)........................................................................24

*In re Amaranth Natural Gas Commodities Litig.*,
  587 F. Supp. 2d 513 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013)................34, 36, 43

*In re Amaranth Natural Gas Commodities Litig.*,
  730 F.3d 170 (2d Cir. 2013)........................................................ 37, 41, 43-44

*Aspire Commodities, LP* v. *GDF Suez Energy N. Am., Inc.*,
  2015 WL 500482 (S.D. Tex. Feb. 3, 2015) ...........................................................36

*Associated Gen. Contractors, Inc.* v. *California State Council of Carpenters*,
  459 U.S. 519 (1983)............................................................................ 24, 26-27

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...............................................................................33

*Bell Atl. Corp.* v. *Twombly*,
  550 U.S. 544 (2007)................................................................................ 9, 19-20

*Chapman* v. *N.Y.S. Div. for Youth*,
  546 F.3d 230 (2d Cir. 2008)...........................................................................21n

*In re Commodity Exch., Inc., Silver Futures and Options Trading Litig.*,
  2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) ................................................ 38-41

*Commodity Futures Trading Comm'n* v. *Hunter Wise Commodities, LLC*,
  21 F. Supp. 3d 1317 (S.D. Fla. 2014) ...............................................................42n

*Commodity Futures Trading Comm'n* v. *Savage*,
  611 F.2d 270 (9th Cir. 1979) .........................................................................37n

*Commodity Futures Trading Comm'n* v. *Zelener*,
  2003 WL 22284295 (N.D. Ill. Oct. 3, 2003), *aff'd*, 373 F.3d 861 (7th Cir. 2004)................35

*Concord Assocs., L.P.* v. *Entm't Props. Trust*,
  2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014)........................................................16

*In re Crude Oil Commodity Litig.*,
  2007 WL 1946553 (S.D.N.Y. June 28, 2007) ......................................................38

*DaimlerChrysler Corp.* v. *Cuno*,
  547 U.S. 332 (2006)........................................................................22n

*de Atucha* v. *Commodity Exch., Inc.*,
  608 F. Supp. 510 (S.D.N.Y. 1985) .......................................... 25-27

*DeAngelis* v. *Corzine*,
  17 F. Supp. 3d 270 (S.D.N.Y. 2014)...........................................43

*In re Digital Music Antitrust Litig.*,
  812 F. Supp. 2d 390 (S.D.N.Y. 2011)........................... 21, 23-24

*DNAML Pty, Ltd.* v. *Apple Inc.*,
  25 F. Supp. 3d 422 (S.D.N.Y. 2014)...........................................24

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  546 F.3d 981 (9th Cir. 2008) ....................................................29

*ECA & Local 134 IBEW Joint Pension Trust of Chi.* v. *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)........................................................42

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007)..........................................9, 12, 16, 18

*Empagran S.A.* v. *F. Hoffman-LaRoche, Ltd.*,
  417 F.3d 1267 (D.C. Cir. 2005) .......................................... 29-31

*F. Hoffman-La Roche Ltd.* v. *Empagran S.A.*,
  542 U.S. 155 (2004)..............................................................28, 30

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  74 F. Supp. 3d 581 (S.D.N.Y. 2015)......................................22n, 23

*Gatt Commc'ns Inc.* v. *PMC Assocs., L.L.C.*,
  711 F.3d 68 (2d Cir. 2013).............................22n, 23-24, 26-27

*Hershey* v. *Energy Transfer Partners, L.P.*,
  610 F.3d 239 (5th Cir. 2010) ....................................................40

*Hinds Cnty.* v. *Wachovia Bank N.A.*,
  620 F. Supp. 2d 499 (S.D.N.Y. 2009)........................................32

*Illinois Brick Co.* v. *Illinois*,
  431 U.S. 720 (1977)....................................................................27n

*Invamed, Inc.* v. *Barr Labs., Inc.*,
  22 F. Supp. 2d 210 (S.D.N.Y. 1998).................................... 16-17

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
    768 F. Supp. 2d 961 (N.D. Iowa 2011)................................................................15

*Jacobs* v. *Tempur-Pedic Int'l, Inc.*,
    626 F.3d 1327 (11th Cir. 2010) ......................................................................21n

*Javier* v. *Beck*,
    2014 WL 3058456 (S.D.N.Y. July 3, 2014) ......................................................38

*Korwek* v. *Hunt*,
    646 F. Supp. 953 (S.D.N.Y. 1986), *aff'd* 827 F.2d 874 (1987) ...........................37n

*Krause* v. *Forex Exch. Market, Inc.*,
    356 F. Supp. 2d 332 (S.D.N.Y. 2005)................................................................44

*Kruman* v. *Christie's Int'l PLC*,
    284 F.3d 384 (2d Cir. 2002), *abrogated on other grounds by F. Hoffman-La Roche Ltd.* v.
    *Empagran S.A.*, 542 U.S. 155 (2004) ..............................................................28

*Laydon* v. *Mizuho Bank, Ltd.*,
    2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ...........................................23, 25-26

*Levitch* v. *Columbia Broad. Sys., Inc.*,
    495 F. Supp. 649 (S.D.N.Y. 1980) *aff'd*, 697 F.2d 495 (2d Cir. 1983) ............ 14-15

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    935 F. Supp. 2d 666 (S.D.N.Y. 2013)....................................................34, 43n, 45

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    27 F. Supp. 3d 447 (S.D.N.Y. 2014)............................................................ 36-37

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ......................................................36

*In re Lithium Ion Batteries Antitrust Litig.*,
    2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ................................................. 31-32

*Loginovskaya* v. *Batratchenko*,
    764 F.3d 266 (2d Cir. 2014)..................................................................... 44-45

*Lotes Co.* v. *Hon Hai Precision Indus. Co.*,
    753 F.3d 395 (2d Cir. 2014)..................................................................... 28-31

*Marucci Sports, L.L.C.* v. *Nat'l Collegiate Athletic Ass'n*,
    751 F.3d 368 (5th Cir. 2014) ............................................................................9

*Mathias* v. *Daily News, L.P.*,
    152 F. Supp. 2d 465 (S.D.N.Y. 2001)...............................................................21n

*Mayor & City Council* v. *Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)..............................................................17

*In re Merrill Lynch Ltd. P'ships Litig.*,
154 F.3d 56 (2d Cir. 1998)...........................................................32-33

*In re Monosodium Glutamate Antitrust Litig.*,
477 F.3d 535 (8th Cir. 2007) ...........................................................29

*Monsanto Co.* v. *Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)........................................................................22

*Morrison* v. *Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010)....................................................................44-45

*Ocean View Capital, Inc.* v. *Sumitomo Corp. of Am.*,
1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) ..............................25-26

*In re Optical Disk Drive Antitrust Litig.*,
2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ...................................14

*Paycom Billing Servs, Inc.* v. *Mastercard Int'l, Inc.*,
467 F.3d 283 (2d Cir. 2006).................................................25-26, 27n

*Pitasi* v. *Stratton Corp.*,
968 F.2d 1558 (2d Cir. 1992)............................................................19

*In re Platinum and Palladium Commodities Litig.*,
828 F. Supp. 2d 588 (S.D.N.Y. 2011).........................................40, 42-43

*Port Dock & Stone Corp.* v. *Oldcastle Ne., Inc.*,
507 F.3d 117 (2d Cir. 2007)........................................................22-23

*Precision Assocs., Inc.* v. *Panalpina World Transp. (Holding) Ltd.*,
2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ................................12-14

*Precision Assocs., Inc.* v. *Panalpina World Transp. (Holding) Ltd.*,
2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013) .......................13n, 17-18

*Precision Assocs., Inc.* v. *Panalpina World Transp. (Holding) Ltd.*,
2014 WL 298594 (E.D.N.Y. Jan. 28, 2014) ...............................13n, 17

*PSKS, Inc.* v. *Leegin Creative Leather Prods., Inc.*,
615 F.3d 412 (5th Cir. 2010) ..........................................................21n

*Reading Indus.* v. *Kennecott Copper Corp.*,
631 F.2d 10 (2d Cir. 1980).........................................................24-25

*Rombach* v. *Chang*,
355 F.3d 164 (2d Cir. 2004) ....................................................................... 33-34

*In re Rough Rice Commodity Litig.*,
2012 WL 473091 (N.D. Ill. Feb. 9, 2012) .......................................................... 39-40

*Rowe Entm't, Inc.* v. *William Morris Agency, Inc.*,
1999 WL 335139 (S.D.N.Y. 1999) ................................................................... 16

*Sullivan* v. *Tagliabue*,
25 F.3d 43 (1st Cir. 1994) ........................................................................... 26

*Turicentro, S.A.* v. *American Airlines Inc.*,
303 F.3d 293 (3d Cir. 2002), *overruled on other grounds by Animal Science Prods., Inc.* v.
*China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011) .......................................... 28n

*U.S. Commodity Futures Trading Comm'n* v. *Atha*,
420 F. Supp. 2d 1373 (N.D. Ga. 2006) ............................................................ 41

*United Magazine Co.* v. *Murdoch Magazines Distrib., Inc.*,
146 F. Supp. 2d 385 (S.D.N.Y. 2001), *aff'd sub nom. United Magazine Co.* v. *Curtis
Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008) ................................................ 15

*United States* v. *U.S. Gypsum Co.*,
438 U.S. 422 (1978) ................................................................................... 20

*United States* v. *Wilshire Oil Co.*,
427 F.2d 969 (10th Cir. 1970) ...................................................................... 12

*In re Urethane Antitrust Litig.*,
663 F. Supp. 2d 1067 (D. Kan. 2009) ............................................................. 31

**Regulations**

17 C.F.R. § 180.1 (2011) ............................................................................ 34, 41-42

75 Fed. Reg. 67657 (proposed Nov. 3, 2010) ..................................................... 42

76 Fed. Reg. 41398 (July 14, 2011) ............................................................... 42n

77 Fed. Reg. 48208-01 (Aug. 13, 2012) .......................................................... 35

**Rules**

Federal Rule of Civil Procedure 9(b) ........................................................... *passim*

**Statutes**

7 U.S.C.
  § 2...................................................................................................................35
  § 6b(a) ...........................................................................................................37n
  § 6c(a) ...........................................................................................................37n
  § 9(1)......................................................................................................34, 41-42
  § 13(a)(2) .......................................................................................................34
  § 13c(a) ..........................................................................................................35
  § 25...........................................................................................................35, 45

15 U.S.C.
  § 6a.........................................................................................................27-28
  § 15b..............................................................................................................32
  § 78u-4(b)(1).................................................................................................42

Dodd-Frank Wall Street Reform and Consumer Protection Act §§ 711-814, Pub. L. 111-203, 124
  Stat. 1376 (July 21, 2010) ...........................................................................44

**Treatises**

5 C. Wright & Miller, *Federal Practice and Procedure* § 1216 (3d ed.)....................................18

**Other Authorities**

Ben King, *Banks Warned About Exchange Rate Dangers in 2009*, BBC NEWS (Dec. 23, 2013),
  http://www.bbc.com/news/business-25491945 .................................................................33

## PRELIMINARY STATEMENT[1]

Although Plaintiffs tout the Second Consolidated Amended Class Action Complaint (the "Complaint") as the culmination of their investigation into the alleged antitrust conspiracy at issue in this case and their aggressive settlement strategy, which they claim has enabled them to discover new conspirators and to unveil a new conspiracy far broader than that alleged in the First Consolidated Amended Class Action Complaint, the Complaint reveals the reasons why Plaintiffs' claims against the Non-Settling Defendants[2] should be dismissed.

Plaintiffs' new allegations about the wide-ranging scope of the alleged conspiratorial conduct finds no support in any of the charging or settlement agreements on which the Complaint relies.  The Settling Defendants' criminal pleas and regulatory settlements suggest a narrow conspiracy among certain foreign exchange ("FX") traders to manipulate FX prices on certain occasions with respect to particular currency pairs.  But the Complaint alleges a completely different and much broader conspiracy.  And indeed, the parties to the narrow conspiracy have admitted their wrongdoing in guilty pleas and confirmed that none of the Non-Settling Defendants were invited to participate in that conspiracy, but were instead expressly excluded.  We know of no case in the history of the Sherman Act upholding a claim against any defendant that was actively and intentionally excluded from an admitted conspiracy, as Non-Settling Defendants were here.  Nonetheless, Plaintiffs now allege something vastly broader—a sprawling, global, decade-long conspiracy among 16 co-conspirators—without even attempting to explain why, after years of investigation, none of the investigating agencies, including the

---

[1]      The factual allegations of the Complaint are taken as true for purposes of this motion only.

[2]      Defendants Bank of Tokyo-Mitsubishi, Credit Suisse, Deutsche Bank, Morgan Stanley, RBC Capital Markets, LLC, Société Générale, and Standard Chartered, and certain of their affiliates.

U.S. Department of Justice, the CFTC, the Federal Reserve Board, the U.K. Financial Conduct Authority, the U.K. Serious Fraud Office, and the Swiss Financial Market Supervisory Authority, has alleged the existence of such a conspiracy, or the involvement of any Non-Settling Defendant in that broader conspiracy.

The conspiracy described in the Complaint is both implausible on its face and firmly contradicted by the plea agreements and regulatory settlements upon which the Complaint relies so heavily.  For this reason, and the other reasons detailed below, the Complaint fails to allege any claim against Non-Settling Defendants, and should be dismissed in its entirety.

## BACKGROUND

### A.  The Parties and the Putative Class

Plaintiffs are individuals, institutions, funds and pension plans who claim to have suffered injury in the worldwide FX markets.  Compl. ¶¶ 18-46.  Defendants collectively are alleged to be "the dominant dealers in the FX market, having a combined global market share of over 90%." Compl. ¶ 3.

Defendants Bank of America, Barclays, BNP Paribas, Citigroup, Goldman Sachs, HSBC, JP Morgan, Royal Bank of Scotland and UBS, and certain of their affiliates, are seeking to settle this action pursuant to agreements that remain subject to Court approval (collectively, the "Settling Defendants").  Dkt. No. 479.  The remaining defendants, The Bank of Tokyo-Mitsubishi, RBC Capital Markets, LLC, Société Générale, and Standard Chartered (collectively, "New Defendants"), along with Credit Suisse, Deutsche Bank, and Morgan Stanley, have not settled. Settling and Non-Settling Defendants are collectively referred to as "Defendants."

The Complaint is brought on behalf of two putative classes—OTC Plaintiffs and Exchange Plaintiffs.  Compl. ¶¶ 67-68.  OTC Plaintiffs consist of persons (a) domiciled in the United States or its territories who entered into an FX Instrument directly with a Defendant anywhere in the

world, or (b) domiciled outside of the United States and its territories who entered into an FX Instrument directly with a Defendant in the United States or its territories.  Compl. ¶ 67.  Exchange Plaintiffs include persons (a) domiciled in the United States or its territories who entered into an FX Instrument with anyone on any exchange located anywhere in the world, or (b) domiciled outside of the United States and its territories who entered into an FX Instrument with anyone on any exchange located in the United States.[3]  Compl. ¶ 68.  The putative Class Period is 11 years: January 1, 2003, through December 31, 2013.  Compl. ¶¶ 67-68.

### B. Trading in the FX Markets

Trading in the FX markets occurs either over-the-counter or on exchanges.  Compl. ¶ 79. In OTC trading, which accounts for approximately 98% of global FX trading, counterparties transact directly with one another.  Compl. ¶ 77.  In exchange trading, parties execute transactions electronically and anonymously over centralized exchanges.  Compl. ¶ 254.

The Complaint focuses on three kinds of FX transactions—spot, benchmark, and exchange. A spot transaction is an OTC trade that involves selling one currency for a certain amount of another currency.  Compl. ¶¶ 84, 88.  For example, an FX trader may want to sell Euros ("EUR") for U.S. Dollars ("USD"), or vice versa.  In that case, the FX trader might contact an FX dealer and ask for a bid-ask quote on the EUR/USD currency pair.  The dealer would then quote rates at which it is willing to buy ("bid") and sell ("ask") EUR in exchange for USD.  *See* Compl. ¶ 7.  The difference between the rate at which a dealer is willing to buy and sell a currency pair is the bid-ask spread.  *Id.*

---

[3]      The Complaint broadly defines an FX Instrument as "any spot FX transaction, outright forward, FX swap, FX option, FX futures contract, an option on any FX futures contract, or other instrument traded in the FX market."  Compl. ¶ 67 n.15.

A benchmark transaction is an OTC spot trade that is executed on the basis of a daily fixing rate.  Compl. ¶ 94.  The most common benchmarks used in this type of transaction are provided by WM/Reuters and the European Central Bank ("ECB").  Compl. ¶ 97.  While WM/Reuters has several fixing rates, the most widely used is calculated and published daily around 4 p.m. London time (the "4 pm fix").  Compl. ¶ 103.  "[T]he 4:00 p.m. fix is based on actual trades, using bids and offers extracted from a certain electronic trading system during a one-minute window. . . ."  Compl. ¶ 104.  An exchange transaction is an FX trade made over a centralized currency exchange.  Compl. ¶ 254.  For example, an FX trader might place an order electronically on the Chicago Mercantile Exchange to buy or sell futures contracts on particular currency pairs, or options on futures contracts, at the exchange-listed rates for those futures and options.  *Id.*

### C.  *The Alleged Conspiracy*

The Complaint alleges a single worldwide conspiracy among all Defendants "target[ing] the price of over two dozen currencies, including the most heavily traded currency pairs, throughout each trading day."  Compl. ¶ 124; *see also* Compl. ¶¶ 125, 128, 137.  The Complaint alleges that this conspiracy had two objectives.

*First*, Plaintiffs allege that certain of the Settling Defendants conspired to manipulate in an apparently *ad hoc* manner various benchmark rates, including those provided by WM/Reuters and the ECB.  Compl. ¶¶ 172-73.  The Complaint asserts that these Defendants "conspired with each other to fix prices in the FX market . . . [t]hrough the use of multiple chat rooms with incriminating names such as 'The Cartel,' 'The Bandits' Club,' and 'The Mafia.'"  Compl. ¶¶ 6, 180.  Critically, these allegations are ***not*** directed at any of the Non-Settling Defendants.  To the contrary, Plaintiffs admit that the Non-Settling Defendants were ***excluded*** from this aspect of the supposed global conspiracy, alleging that "[b]eing a member of certain chat rooms was by invitation only, indicating the secret nature of this conduct," Compl. ¶ 128, and acknowledging

-4-

the UK Financial Conduct Authority's statement, which noted the "importance of keeping [the information exchanged in these chat rooms] confidential between recipients."  Compl. ¶ 137.

With regard to Plaintiffs' benchmark manipulation allegations, the Complaint alleges that regulators around the world have investigated the FX market, that four Defendants have "pled guilty to conspiring to violate the antitrust laws," that one Defendant has "sought amnesty" from the DOJ, that several Defendants have settled with and paid large fines to regulators and that certain regulators have made adverse findings with respect to certain Defendants.  Compl. ¶¶ 12, 298-300, 303-325, 334-336.  Again, these allegations do not apply to any of the Non-Settling Defendants.  Indeed, the most the Complaint alleges is that some, but not all, Non-Settling Defendants have terminated, suspended, and/or disciplined personnel with supervisory authority over their FX operations, with no factual allegations as to why that action was taken.  Compl. ¶¶ 12, 345, 352-353, 358.[4]

The Complaint also alleges in general terms that Defendants improperly shared client information, coordinated trading activity, monitored each other's conduct, used code names in interbank communications, entered into "stand down" agreements and otherwise manipulated benchmarks.  Compl. ¶¶ 124-25, 187-96.  But once again, none of these allegations is directed to any Non-Settling Defendant.  There is not a single specific factual allegation that any Non-Settling Defendant engaged, or agreed to engage, in these types of trading activities as part of any alleged effort to manipulate benchmarks.

*Second*, the Complaint alleges that as part of a unified global conspiracy targeting the

---

[4]       The Complaint contains no allegation that Bank of Tokyo-Mitsubishi, Credit Suisse, Morgan Stanley, RBC Capital Markets, LLC, or Société Générale terminated, suspended or disciplined any FX trader.  The Complaint alleges that a Standard Chartered trader was "placed on leave," Compl. ¶ 362, but it does not allege that the trader was terminated, suspended or disciplined, or that he engaged in any misconduct while at Standard Chartered.

entire FX market, Defendants also colluded to affect various spot rates in the OTC market by manipulating on an episodic basis the bid-ask spreads quoted on "dozens of currency pairs, including the seven pairs with the highest market volume."  Compl. ¶ 139.  Citing a number of chat room transcripts in which traders from different groups of banks (including banks not named as Defendants) had "discussions about FX spreads," for a variety of currency pairs, *id.*, Plaintiffs conclusorily allege that Defendants "had an explicit understanding that the spreads discussed would be the spreads quoted to customers."  Compl. ¶ 144.  But the Complaint makes no effort to tie any of the chat rooms in which FX spreads were discussed to the purported global conspiracy.

- Plaintiffs do not identify the traders involved in each chat room or otherwise allege that there was any individual (or group of individuals) who was privy to the discussions taking place in the various chat rooms (much less all of them).

- The Complaint does not allege that any Non-Settling Defendant set its spread on any currency pair at any time pursuant to an agreement with any other Defendant, or that any Non-Settling Defendant changed its spread on any currency pair after learning of the spread offered by any other Defendant.

- The Complaint does not allege when or what rates or spreads were quoted to named Plaintiffs or other putative class members, whether any putative class member actually executed a spot transaction at any affected rate or spread, or whether any putative class member who may have executed a spot transaction at any affected rate or spread was harmed or benefited.[5]

---

[5]    The Complaint also alleges that Defendants colluded to "work[]" customers' limit orders and trigger "stop loss" orders, Compl. ¶ 243, and that numerous Defendants, including Barclays, Citigroup, JP Morgan, and RBS, have admitted to such conduct in connection with plea agreements.  Compl. ¶ 244.

*Finally*, the Complaint does not allege that the supposed global conspiracy targeted any centralized exchanges.  Instead, the Complaint asserts that the alleged manipulation of both benchmark rates and bid-ask spreads on OTC transactions "*caused* exchange-traded FX futures and options contracts to be artificial during" certain times of the day.  Compl. ¶ 286 (emphasis added); *see also, e.g.*, Compl. ¶¶ 6, 266, 272-275.

### D.  Claims Asserted in the Complaint

The Complaint asserts six claims for relief, one on behalf of OTC Plaintiffs and five on behalf of Exchange Plaintiffs.  OTC Plaintiffs assert a claim against all Defendants under Sherman Act §§ 1 and 3.  Compl. ¶¶ 400-412.  Exchange Plaintiffs assert one claim against all Defendants under these same statutory sections, Compl. ¶¶ 419-427, and four claims under the CEA, Compl. ¶¶ 428-450.  The Sherman Act claims are based on alleged illegal agreements in restraint of trade.  The CEA claims are based on alleged price manipulation, fraudulent scheme or device, principal-agent liability, and aiding and abetting.

## ARGUMENT

## I.  THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE SHERMAN ACT

### A.  Plaintiffs Do Not Plausibly Allege a Global Conspiracy to Manipulate Prices in the FX Market or That Non-Settling Defendants Joined Any Such Conspiracy

Plaintiffs' theory that the Non-Settling Defendants named in the original complaints were part of a conspiracy to manipulate the WM/Reuters benchmark rates has been proven wrong:  the *actual* parties to that conspiracy have admitted their wrongdoing in guilty pleas, which have confirmed that none of the Non-Settling Defendants were co-conspirators.  But rather than drop any of the Non-Settling Defendants from the Complaint in response to those facts, Plaintiffs

---

But the Complaint does not allege that any Non-Settling Defendant has admitted to working limit orders or triggering stop loss orders or that any Non-Settling Defendant has been found to have engaged in such conduct by any regulatory authority.

(apparently emboldened by the agreements they reached with Settling Defendants) have instead dramatically broadened their theory. They *now* allege that there was a single, global conspiracy to "fix prices in the FX market on a daily basis" since "at least as early as January 1, 2003." Compl. ¶ 124. According to Plaintiffs, all 16 Defendants named in the Complaint were parties to a unified global conspiracy, which allegedly "targeted the pricing of over two dozen currencies" and involved manipulation of "various benchmark rates" as well as "bid/ask spreads." *Id.*

Plaintiffs' reasons for advancing this vastly expanded conspiracy theory are transparently tactical. Attempting to link all Defendants together in a single conspiracy maximizes the settlement pressure on the Non-Settling Defendants by threatening them with potential joint and several liability[6] for the conduct of other market participants who have admitted to conspiring to manipulate the WM/Reuters benchmark rates, even though no facts have been pleaded tying any of the Non-Settling Defendants to that conspiracy, and even though it is clear that the banks that carried out that conspiracy *excluded* the Non-Settling Defendants (and everyone else) from their illicit scheme. Claiming that there was one grand conspiracy also serves Plaintiffs' strategic interests by obscuring the obvious *ad hoc* nature of the conduct alleged (and the resulting significant problems Plaintiffs would face at the class certification stage). The pleaded facts, even if assumed true, can at most support an inference that different combinations of traders at different groups of banks sporadically carried out a series of small conspiracies involving

---

[6] Plaintiffs state in their motion for preliminary approval of the proposed settlement that class certification is justified because "there is a single, unifying" price-fixing claim, *see* Dkt. No. 480 at 30, and that the proposed settlement should be approved because it preserves Plaintiffs' "right to recover the entire amount of damages against the Non-Settling Defendants based on joint and several liability." *Id.* at 17. These arguments underscore the significance of Plaintiffs' attempts to sweep all 16 Defendants into an alleged industry-wide conspiracy: Plaintiffs' theory of joint and several liability depends entirely upon their ability to prove that the Non-Settling Defendants were part of the same overarching conspiracy, a conclusion that is completely inconsistent with the guilty pleas entered by certain of the Settling Defendants.

different rates (spot vs. benchmark), different currency pairs, and different chat rooms.

Plaintiffs' grand conspiracy theory cannot be sustained for two independent reasons.

*First*, the Complaint fails to plead facts to support a plausible inference that there was one overarching conspiracy among all 16 Defendants, representing more than 90% of the global FX market, to manipulate prices in virtually every corner of that market for more than a decade. Plaintiffs cannot meet their burden to plead facts sufficient "to state a claim to relief that is plausible on its face[,]" *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007), as to Non-Settling Defendants by reference to the guilty pleas entered by a number of the Settling Defendants. Rather than support an inference that there was a single, global conspiracy to manipulate prices throughout the FX market, these guilty pleas *preclude* that inference by confirming that the conspiracy to manipulate the WM/Reuters benchmark rates was a limited one involving a small group of banks that communicated in invitation-only chat rooms and thus excluded other market participants. Because the Complaint does not plead "enough factual matter . . . to suggest that an agreement . . . was made" to engage in a worldwide, 16-party conspiracy, dismissal is required. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (citation and internal quotation marks omitted).

*Second*, even assuming (contrary to fact) that the Complaint's allegations were sufficient to support a plausible inference that a unified global conspiracy existed, Plaintiffs have failed to adequately allege that *each* Non-Settling Defendant made a "'conscious commitment'" to join such a conspiracy. *See Marucci Sports, L.L.C.* v. *Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 374-75 (5th Cir. 2014) (quoting *Monsanto Co.* v. *Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)).  Plaintiffs fail to do so notwithstanding the fact that they have now had the benefit of guilty pleas and regulatory settlements by certain Settling Defendants, cooperation from the

-9-

Settling Defendants, and chat room transcripts obtained (presumably) from Settling Defendants. This is a fundamentally different state of affairs than the one that existed when the Court sustained Plaintiffs' original complaints, partially on the basis that they did not have access to such materials at that time.  For this additional reason, dismissal is required.

### 1.  Plaintiffs' Theory of a Single, Global Conspiracy to Manipulate Prices in the FX Market Is Implausible and Contradicted by the Complaint

Although Plaintiffs allege that "[t]he existence of a cartel to fix the prices in the FX market is now beyond dispute," Compl. ¶ 12, the price-fixing conspiracy charged by the DOJ and admitted to by Barclays, Citigroup, JP Morgan, and RBS was a limited and exclusive conspiracy in which a handful of market participants evidently manipulated the EUR/USD WM/Reuters benchmark rates unbeknownst to the Non-Settling Defendants and the rest of the market.  The problem for Plaintiffs is that the nature of the WM/Reuters benchmark manipulation conspiracy—as charged by the DOJ and admitted in the guilty pleas entered by the conspirators themselves—is entirely inconsistent with and forecloses Plaintiffs' theory that there was one all-encompassing conspiracy to manipulate prices in every segment of the global FX market.  Further, Plaintiffs do not and cannot assert that any of the allegations they do set forth are sufficiently linked so as to suggest such an overarching conspiracy as opposed to, at most, isolated instances of misconduct.

All four[7] of the banks that pleaded guilty to manipulating the WM/Reuters benchmark rates have expressly acknowledged that their now infamous chat rooms—*e.g.*, "The Cartel" and

---

[7]      The Complaint alleges that as a result of its misconduct in the FX market, UBS was found to have violated its prior non-prosecution agreement with the DOJ and pleaded guilty to charges arising out of its manipulation of LIBOR.  *See* Compl. ¶ 300; DOJ UBS Plea Agreement, May 20, 2015 (http://www.justice.gov/file/440521/download).  In exchange for its guilty plea and early cooperation in providing information related to the FX market, UBS was granted conditional immunity from prosecution for its misconduct in the FX market.  Compl. ¶¶ 296-97, 300.

"The Mafia"—were "*exclusive* electronic chat room[s]" and that "[p]articipation" in each chat

room was "*limited to specific EUR/USD traders*."  *See, e.g.*, ¶ 4(h) (emphasis added), Plea

Agreements in *U.S.A.* v. *JPMorgan Chase & Co.* (D. Conn. May 20, 2015)

(http://www.justice.gov/file/440491/download); *U.S.A.* v. *Citicorp* (D. Conn. May 20, 2015)

(http://www.justice.gov/file/440486/download); *U.S.A.* v. *Barclays PLC* (D. Conn. May 20,

2015) (http://www.justice.gov/file/440481/download); *U.S.A.* v. *The Royal Bank of Scotland*

*PLC* (D. Conn. May 20, 2015) (http://www.justice.gov/file/440496/download).  None of the

guilty pleas upon which the Complaint relies makes any mention of the broader, worldwide

conspiracy to manipulate benchmark rates for any other currency pairs alleged in the Complaint,

nor does any guilty plea mention a supposed global conspiracy to manipulate rates and spreads in

the FX OTC market.  It is implausible to infer that the WM/Reuters benchmark manipulation

conspiracy was part of a broader conspiracy involving other banks that were purposefully and

admittedly *excluded* from the infamous chat rooms.

Not only do the guilty pleas referenced in the Complaint undercut Plaintiffs' theory, but

the Complaint itself does not contain a single allegation suggesting that the Settling Defendants'

WM/Reuters benchmark manipulation conspiracy was part of a broader agreement among all 16

defendant banks to manipulate spot and benchmark rates in multiple currency pairs across the

entire global FX market.  In fact, the Complaint contradicts any such inference by alleging that

access to the online chat rooms like "The Cartel" and "The Mafia" was granted "by invitation

only, indicating the secret nature of this conduct."  Compl. ¶ 128.  The Complaint also alleges

that given the "value of the information exchanged between the traders" in specific chat rooms,

"the importance of keeping [the information] confidential between the recipients was clear to

participants."  Compl. ¶ 323 (citation omitted).  These allegations, like the guilty pleas cited in

the Complaint, do not support Plaintiffs' theory that there was a single, overarching conspiracy to manipulate prices in the global FX market; in fact, they directly refute that theory.

What is missing from the Complaint is any allegation that could support a plausible inference that the banks named as defendants agreed to join together in one grand conspiracy regarding the global FX market. *See In re Elevator*, 502 F.3d at 50 ("[A]verments of agreements made at some unidentified place and time. . . . are insufficient to establish a plausible inference of agreement, and therefore to state a claim."). Plaintiffs seemingly hope to work around this pleading deficiency by asking the Court to infer that the various isolated incidents alleged in the Complaint (many of which are alleged to have involved only Settling Defendants) must have been related to a single, global conspiracy that also included Non-Settling Defendants. But that approach is foreclosed by the case law.

Where, as here, an overarching conspiracy is alleged, courts examining whether the pleaded facts support one conspiracy or multiple conspiracies look for a "connecting link" that ties multiple, disparate conspiracies together. *See United States* v. *Wilshire Oil Co.*, 427 F.2d 969, 977 (10th Cir. 1970). Courts dismiss Section 1 claims where allegations or "evidence of each specific transaction, including [d]efendants' communications with each other. . . fails to connect to a 'larger picture' of an overarching conspiracy." *See Precision Assocs., Inc.* v. *Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *29 (E.D.N.Y. Jan. 4, 2011) (holding that even "[s]ome overlapping parties" were insufficient to show that various conspiracies were "formulated pursuant to an overarching scheme"). This "larger picture" can be demonstrated by an "'overlap of key actors, methods, and goals.'" *Id.* at *27 (quoting *United States* v. *Strickland*, 245 F.3d 368, 385 (4th Cir. 2001)).

The Eastern District's decision in *Precision Associates* is instructive. There, the court

found implausible and dismissed a claim that there was a massive global conspiracy to manipulate prices in the freight forwarding industry[8] notwithstanding allegations that the defendants had carried out more limited conspiracies involving local trade routes that were "logically, temporally, and geographically distinct."  2011 WL 7053807, at *27.  Despite the overlap of certain actors and allegations that some of the largest players in the freight forwarding industry provided "leadership, cohesion and coordination" to connect various local conspiracies, the *Precision Associates* court concluded that nothing was pleaded in the complaint that could plausibly support the plaintiffs' theory that the "various local conspiracies were formulated pursuant to an overarching scheme to raise prices generally."  *Id.* at *28-29 (internal quotation marks omitted).  Indeed, though plaintiffs there alleged common "designs and methods" such as "in person meetings, conference calls, and email communications," akin to the chat rooms allegedly used here, without some "connection" among these communications, the *Precision Associates* court found them insufficient to establish a global, overarching conspiracy as the plaintiffs claimed.[9]  *Id.* at *27.

---

[8]     Plaintiffs were given leave to amend, and in a 2013 decision, the magistrate judge sustained plaintiffs' claim of a global conspiracy as to certain defendants in light of newly added allegations that six defendants met and "entered into an agreement in October 2001 to pass future external surcharges onto their customers in a coordinated manner," and that three other defendants "joined this [global] conspiracy at a later date."  *See Precision Assocs., Inc.* v. *Panalpina World Transp., (Holding) Ltd.*, 2013 WL 6481195, at *21-22 (E.D.N.Y. Sept. 20, 2013) ("*Precision II*").  Yet despite recognizing the global conspiracy generally, the magistrate judge *still* recommended dismissal as to three other defendants, reasoning that "while the TAC adequately alleges that these defendants joined . . . individual conspiracies," they were not alleged to have "consistently imposed all of the surcharges at issue" and that this "lack of concerted action . . . undermines the inference that they joined a global conspiracy to fix all surcharges."  *Id.* at *22-23 (citation omitted).  As the magistrate judge explained, even "a culture of antitrust misconduct is not, on its own, evidence of a global conspiracy connecting different actors at different times in different parts of the world."  *Id.* at *23.  Judge Gleeson subsequently adopted the magistrate judge's recommendation in full.  *Precision Assocs., Inc.* v. *Panalpina World Transp., (Holding) Ltd.*, 2014 WL 298594, at *1 (E.D.N.Y. Jan. 28, 2014) ("*Precision III*").

[9]     While this Court previously found allegations of chat-room communications supportive of the inference of a conspiracy limited to the WM/Reuters benchmark rates, those same allegations without any connecting link *cannot* support an inference of the global conspiracy now alleged.

Here, there are no allegations that individual traders involved in any particular chat room referenced in the Complaint – whether the particular chat room involved discussions around benchmarks or spreads – were aware of the existence of any other chat room, much less that the participants in the disparate chat rooms had somehow agreed to coordinate all their activities in support of some common objective.  *See In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *9-10 (N.D. Cal. Aug. 3, 2011) (even if a "small subset of Defendants" engaged in misconduct on three occasions "and perhaps others . . . that is a far cry from establishing plausibility for a broad six year continuing agreement among all defendants").  To the contrary, the Complaint alleges that each chat room was its own exclusive conversation and that the information shared therein was understood to be confidential among the invited participants.  *See, e.g.*, Compl. ¶¶ 383, 386 (traders "strictly limited access to the chat rooms" and discussed excluding a particular trader whom they could not trust).

Moreover, Plaintiffs do not allege that there was a "ringleader" trader or group of traders with knowledge of all the chat rooms and the power to coordinate activities and enforce the supposed global agreement—a claim that was made but deemed insufficient to support a plausible inference of an overarching conspiracy in *Precision Associates*.  2011 WL 7053807, at *28.  Indeed, rather than identifying a ringleader capable of coordinating any grand conspiracy across the entire FX market, the allegations in the Complaint highlight the difficulty of coordinating FX trades on even a much smaller scale—for example, in a chat involving only two Settling Defendants and three traders, one of the traders is unaware of an alleged agreement with the other two and apologizes for making an unaligned trade.  *See* Compl. ¶ 237.

In addition to failing to allege a plausible mechanism for coordination, Plaintiffs have pleaded no facts suggesting that the individual branches of the alleged global conspiracy were

interdependent—a requirement under the case law.  *See Levitch* v. *Columbia Broad. Sys., Inc.*, 495 F. Supp. 649, 675 (S.D.N.Y. 1980) *aff'd*, 697 F.2d 495 (2d Cir. 1983).  More specifically, the Complaint makes no allegation that collusion by traders in one chat room involving a specific currency pair in any way related to, let alone depended upon, collusion in any other chat room involving a different currency pair.  To the contrary, the Complaint acknowledges that FX traders generally specialize in particular currency pairs, *see* Compl. ¶ 131 (identifying trader as the "director of spot trading for EUR/USD"), thus making it implausible that traders working for different banks and scattered all over the world joined together in a single conspiracy targeting spot and benchmark rates on dozens of currency pairs.  For all of these reasons, Plaintiffs' theory that there was a single, global conspiracy is implausible, and dismissal is required.  *See, e.g.*, *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 972 (N.D. Iowa 2011) (dismissing conspiracy claim failing to show defendants "systematically interacted with each other" and "had some mechanism to operate the alleged conspiracy . . . and police its participants").

Even putting aside the allegations in the Complaint about the exclusive nature of the chat rooms, the nature of the FX market, as pleaded, dictates that Plaintiffs' claim of one unified conspiracy to manipulate prices in the entire FX market "makes no economic sense," and the Complaint must be dismissed for this reason as well.  *See United Magazine Co.* v. *Murdoch Magazines Distrib., Inc.*, 146 F. Supp. 2d 385, 401 (S.D.N.Y. 2001), *aff'd sub nom. United Magazine Co.* v. *Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008).  As the Complaint acknowledges, currencies in the FX market are bought or sold in pairs, meaning that any manipulative practice that raises the value of one currency causes a reciprocal decrease in the value of the currency against which it is traded.  *See* Compl. ¶ 83.  Defendants are alleged to

control more than 90% of the FX market globally.  *See* Compl. ¶ 3.  They, therefore, as a matter

of logic, will frequently have opposing interests in these transactions.  And each bank's net

currency position cannot be predicted because it is contingent upon variable daily customer

orders.  Given the implausibility that the Defendants' incentives would align consistently for

over a decade and across dozens of currency pairs such that each dealer in the FX market had

economic motive to sustain the alleged global conspiracy, such an overarching conspiracy cannot

be inferred.  *See Rowe Entm't, Inc.* v. *William Morris Agency, Inc.*, 1999 WL 335139, *6

(S.D.N.Y. 1999) (dismissing plaintiff's conspiracy claim where "no reasonable inference of a

conspiracy to restrain trade can be drawn . . . because . . . no rational economic motive can be

discerned.").

### 2.     *Plaintiffs Fail to Plead Sufficient Facts to Create a Plausible Inference that Any Non-Settling Defendants Joined a Global Conspiracy to Manipulate FX Spreads or Benchmark Rates*

Even if the Complaint contained sufficient factual allegations to support a plausible

inference that a single global conspiracy existed among some banks, which, as demonstrated

above, it does not, there are no allegations tying any of the Non-Settling Defendants to *that*

conspiracy.[10]  *See Concord Assocs., L.P.* v. *Entm't Props. Trust*, 2014 WL 1396524, at *20

(S.D.N.Y. Apr. 9, 2014) (by broadly grouping defendants together, plaintiffs failed "to connect

each or any individual entity to the overarching conspiracy").

To survive a motion to dismiss, "it is not enough to make allegations of an antitrust

conspiracy that are consistent with an unlawful agreement; to be viable, a complaint must

contain 'enough factual matter (taken as true) to suggest that an agreement [to engage in

anticompetitive conduct] was made.'"  *In re Elevator*, 502 F.3d at 50 (citation omitted).   It must

---

[10]     Each of the Non-Settling Defendants has filed a separate, three-page supplemental memorandum
to elaborate on the shortcomings of the limited bank-specific allegations.

further be shown that *each* defendant is linked to *that* agreement.  *See Invamed, Inc.* v. *Barr Labs., Inc.*, 22 F. Supp. 2d 210, 222 (S.D.N.Y. 1998) (plaintiff's "bare-boned statement that [defendants] participated in a conspiracy—in the absence of any averments linking [defendants] to a conspiratorial agreement—is insufficient to state a cause of action") (citation omitted). Plaintiffs have not satisfied this burden.

Despite having the benefit of guilty pleas, regulatory settlements, proffers from Settling Defendants, and access to nonpublic documents, Plaintiffs have still pleaded no facts showing that any Non-Settling Defendant entered into an agreement to participate in a global, market-wide conspiracy.  The allegations Plaintiffs put forth certainly do not constitute a "'smoking gun[,]'" nor do they show any behavior on the part of the Non-Settling Defendants from which any inference of participation in a global conspiracy may be drawn.  *Mayor & City Council* v. *Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  Indeed, even if the cited chat room discussions did show any wrongdoing or bilateral agreements by or including any of the Non-Settling Defendants, which they do not, the Complaint, as discussed in Section I.A.1. above, still does not adequately connect those chats to the *global* conspiracy that Plaintiffs allege and thus does not tie the Non-Settling Defendants to that conspiracy.  *See Precision II*, 2013 WL 6481195, at *22.

The decision in *Precision II*—which Judge Gleeson deemed a "careful, thorough, well-reasoned report" and adopted in full—is again relevant.  *Precision III*, 2014 WL 298594, at *1. Faced with allegations of a global conspiracy, the *Precision II* court noted that, as to certain defendants, while the complaint "adequately allege[d] that these defendants joined the individual conspiracies in various claims in the [complaint], it [did] not plausibly allege any facts that would indicate that they also joined the global conspiracy alleged."  2013 WL 6481195, at *22.

-17-

As here, what was deemed missing in *Precision II* were any non-conclusory allegations "tying the [particular] defendants…to the global conspiracy," and so that claim was dismissed as to them. *Id.* at *23.  Here, there are no alternative, individual conspiracies or claims alleged; since the Non-Settling Defendants are not tied to the overarching conspiracy that Plaintiffs allege, they must be dismissed from the case entirely.

Moreover, "a statement of facts that merely creates a *suspicion*" of a right of action is not enough to survive a motion to dismiss.  5 C. Wright & Miller, *Federal Practice and Procedure* § 1216, at 235-36 (3d ed.) (emphasis added).  Plaintiffs' efforts to cast such suspicion on the Non-Settling Defendants by setting unremarkable allegations involving Non-Settling Defendants against the backdrop of admitted wrongdoing by others cannot suffice to meet their burden of tying each Non-Settling Defendant to the alleged conspiracy.  At this point, the fact that there have been multiple, multi-year investigations by antitrust authorities lends no credence to Plaintiffs' conspiracy allegations as to Non-Settling Defendants.  Indeed, now—almost two full years after the first complaint alleging collusion to manipulate the WM/Reuters benchmark rates—Plaintiffs still cannot point to any fines, settlements, or guilty pleas involving any of the Non-Settling Defendants anywhere in the world.  The fact that guilty pleas and settlements have been entered into by the Settling Defendants cannot support an inference of involvement of the Non-Settling Defendants, nor does it buttress the allegations against them.  *See In re Elevator*, 502 F.3d at 50-52 (plaintiffs relying on regulatory investigations "suggesting anticompetitive wrongdoing by certain defendants in Europe," without tying each particular defendant to the alleged worldwide conspiracy, failed to plead a plausible global conspiracy claim).  Instead, the complete absence of any allegations of similar pleas, settlements, or fines involving the Non-

Settling Defendants after years of investigations supports the opposite inference—that these remaining defendants were *not* part of any conspiracy alleged in the Complaint.

Nor is Plaintiffs' allegation that some of the Non-Settling Defendants took the prophylactic step of banning their traders from multi-bank chat rooms *after* government investigations started, *see* Compl. ¶ 138, sufficient to tie these banks to a global conspiracy.  The reasonable inference is that once it became public that other market participants had used chat rooms to engage in unlawful conduct, banning their use was nothing more than sound compliance practice.  *See Pitasi* v. *Stratton Corp.*, 968 F.2d 1558, 1560 (2d Cir. 1992) (holding that remedial measures are not evidence of culpable conduct).  Even if the Court were inclined to draw the inference that banks would not have banned the use of these chat rooms absent some wrongdoing, there could be no basis to infer that the wrongdoing related to the global conspiracy that Plaintiffs have alleged here (as opposed to isolated instances of misconduct of some sort).

Plaintiffs' allegations that certain banks terminated, suspended, or disciplined FX traders, Compl. ¶ 345, fail for similar reasons.  Merely alleging that certain traders at certain banks left their jobs or faced disciplinary action without pleading facts to show why they left or why they were disciplined, and without tying these isolated instances together, cannot support an inference that there was a global conspiracy of the scope and duration alleged.

While the case law may permit Plaintiffs to proceed if they put forth "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement," that principle should be applied far more rigidly in light of the information to which Plaintiffs have had access, and the caveat that "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive" should weigh heavily in the analysis here.  *Twombly*, 550 U.S. at

556-58 (citation omitted).  Plaintiffs have already had access to a wealth of information and have *still* been unable to plead any facts plausibly suggesting that any of the Non-Settling Defendants entered into an agreement in furtherance of the alleged global conspiracy.[11]

### 3. Plaintiffs' Reliance on Chats Regarding Discussions of Spreads Does Not Save the Action

Unable to assert any non-conclusory allegations that Non-Settling Defendants conspired to manipulate FX benchmark rates, Plaintiffs string together several disconnected chats involving discussion of bid/ask spreads in a futile effort to bolster their claim of a global conspiracy.  As set forth above, these chats about spreads in no way demonstrate any agreement involving any of the Non-Settling Defendants to set the spreads quoted to customers on any currency pair involving any of the Non-Settling Defendants at any point in time, much less a global conspiracy involving the spreads quoted to customers all day on every currency pair over the course of more than a decade.  At most, Plaintiffs' extraneous allegations amount to no more than claims of sporadic information exchanges that do not constitute *per se* antitrust violations as a matter of law.  *See United States* v. *U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects . . . . For this reason, we have held that such exchanges of information do not constitute a *per se* violation of the Sherman Act.").  Tellingly, no Plaintiff has alleged a single purchase or sale subject to an allegedly affected spread.

Plaintiffs' reliance on unrelated allegations involving disparate conduct in distant markets underscores the implausibility of their ambitious global conspiracy claim.  Although Plaintiffs

---

[11]     Indeed, sustaining Plaintiffs' global conspiracy complaint will lead Plaintiffs to seek extraordinarily far-reaching discovery that will be incredibly burdensome and expensive.  Plaintiffs have already shown their colors in this regard.  Their first document request seeks 15 years of data for every currency pair and every FX product traded by the three original Non-Settling Defendants.

concede that "[c]urrencies are bought or sold in pairs," they do not make any effort to explain which currency pairs were manipulated, or for how long.  Compl. ¶ 83.  Nor do they describe, as they must, how anticompetitive conduct involving one currency pair during a given period could possibly have affected buyers or sellers of other currencies at different times, much less all currencies at all times.  Plaintiffs' generic statements describing the FX market as the "world's largest and most actively traded financial market," Compl. ¶ 2, are insufficient to overcome this deficiency.  *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 404 (S.D.N.Y. 2011) (rejecting claims of wrongdoing in the "market for music generally" when nonconclusory "allegations involve[d] only conduct related to the Internet Music market and not the CD market").[12]

### 4.   *Plaintiffs Fail to Plausibly Allege That Non-Settling Defendants Joined a Global Conspiracy Involving Exchange-Traded FX Instruments*

Plaintiffs do not allege any actual agreement by which any of the Defendants manipulated FX rates on any centralized exchange.  Instead, Plaintiffs' theory is that the alleged global conspiracy regarding benchmark rates and widening spreads on the OTC trades discussed above affected the prices of all FX Instruments, including those traded on the exchanges.

---

[12]     To the extent Plaintiffs intended to assert a rule of reason claim, it must be dismissed for failure to properly define the relevant product and geographic market.  *Mathias* v. *Daily News, L.P.*, 152 F. Supp. 2d 465, 483 (S.D.N.Y. 2001) (granting motion to dismiss Sherman Act claims where plaintiffs "failed to allege both essential components of a viable relevant market"); *PSKS, Inc.* v. *Leegin Creative Leather Prods., Inc.*, 615 F.3d 412 (5th Cir. 2010) (dismissing complaint for failure to plausibly define the relevant market because "women's accessories" is "too broad and vague a definition to constitute a market").  The Complaint is also completely devoid of any allegations that the exchange of spread-related information had any effect on prices actually charged to Plaintiffs.  Because Plaintiffs neither define a "plausible relevant market," nor adequately allege that Defendants' purported conduct had an actual adverse effect on competition in that market, their bid/ask spread claims must be dismissed.  *Chapman* v. *N.Y.S. Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (affirming dismissal of rule of reason claim); *Jacobs* v. *Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336-39 (11th Cir. 2010) (affirming Rule 12 dismissal for failure to define relevant market).  The Court's prior finding that Plaintiffs' benchmark claims alleged a *per se* violation of the Sherman Act does not extend to Plaintiffs' new allegations regarding bid/ask spreads, which involve distinct conduct.

Plaintiffs allege in conclusory terms that FX spot rates "directly impact" various other FX

Instruments and that the exchange-traded "FX futures prices closely track spot market currency

prices." Compl. ¶¶ 253, 274. In other words, Plaintiffs' claim regarding exchange-traded

instruments is entirely derivative of their flawed theory of a global conspiracy to manipulate

spreads and benchmark rates and is thus unsupported by factual allegations sufficient to create a

plausible inference that any of the Non-Settling Defendants made a "conscious commitment" to

artificially set the price of exchange-traded instruments. *See Monsanto Co.*, 465 U.S. at 768.

### B.   Plaintiffs Lack Antitrust Standing

Plaintiffs' antitrust claims should also be dismissed for lack of antitrust standing: none of

the Plaintiffs has adequately alleged that it suffered antitrust injury, and the Exchange Plaintiffs

have not established that they are efficient enforcers of the antitrust claims at issue.[13]

#### 1.   None of the Plaintiffs Has Alleged Antitrust Injury

All Plaintiffs fail to allege antitrust injury because they do not connect the benchmark

rate and bid-ask allegations to their supposed injury.[14]   *See Port Dock & Stone Corp*. v.

*Oldcastle Ne., Inc.*, 507 F.3d 117, 122 (2d Cir. 2007) (dismissing antitrust claim for lack of

antitrust standing where injury can only be ascertained by "identifying the anticipated

---

[13]       "[A]ntitrust standing is a threshold, pleading-stage inquiry[;] when a complaint by its terms fails
to establish this requirement [a court] must dismiss it as a matter of law." *Gatt Commc'ns Inc.* v. *PMC
Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013) (first alteration in original) (citation and internal quotation
marks omitted). To establish antitrust standing, the Second Circuit requires "a private antitrust plaintiff
plausibly [] allege (a) that it suffered 'a special kind of antitrust injury,' and (b) that it is a suitable
plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws."
*Id.* at 76 (citation omitted); *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 Supp. 3d
581, 595 n.10 (S.D.N.Y. 2015). In addition, Plaintiffs' claims under both the Sherman Act and the
Commodity Exchange Act ("CEA") fail because Plaintiffs have not adequately alleged injury in fact and,
accordingly, they lack constitutional standing under Article III. *DaimlerChrysler Corp.* v. *Cuno*, 547
U.S. 332, 352 (2006).

[14]       The Court's previous ruling with regard to antitrust injury should be revisited in light of the
amended Complaint in which the claims are vastly different and expanded from the initial complaint.
Further, the prior ruling does not extend to claims advanced by the Exchange Plaintiffs.

anticompetitive effect of the specific practice at issue and comparing it to the actual injury the plaintiff alleges").  To satisfy this aspect of the antitrust standing requirement, Plaintiffs must allege that they were injured when they purchased or sold a particular currency pair, and connect that injury to an alleged anticompetitive act by some or all Defendants in the same currency pair at the relevant time.  *See In re Digital Music*, 812 F. Supp. 2d at 404.

The antitrust injury of the Exchange Plaintiffs is even more suspect because, unlike the OTC Plaintiffs, the Exchange Plaintiffs are *not* "'purchasers of the defendants' product who allege being forced to pay supra-competitive prices as a result of the defendants' anticompetitive conduct.'"  *In re Foreign Exch.*, 74 F. Supp. at 596 (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009)).  The Complaint does not allege that any Exchange Plaintiff ever bought an FX Instrument from, sold an FX Instrument to, or otherwise dealt directly with any Defendant; in fact, the Complaint does not contain a single allegation about any particular transaction involving any Exchange Plaintiff.  *See Laydon* v. *Mizuho Bank, Ltd.*, 2014 WL 1280464, at *8 (S.D.N.Y. Mar. 28, 2014) (holding plaintiff failed to plead antitrust injury because he did not allege "when [the plaintiff's positions] were initiated, how long they were held, and whether he exited those positions by entering into offsetting transactions or held them until their settlement dates").

## 2.   *Exchange Plaintiffs Are Not Efficient Enforcers*

Exchange Plaintiffs also lack antitrust standing because they are not efficient enforcers of the antitrust laws.  In the Second Circuit, courts look to four factors:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Gatt*, 711 F.3d at 78 (citation omitted).  This analysis is not a balancing test; rather, the

"directness" of the asserted injury is a threshold inquiry which must be met in every case,

*DNAML Pty, Ltd.* v. *Apple Inc.*, 25 F. Supp. 3d 422, 430 (S.D.N.Y. 2014), and it informs the

other factors, *see Associated Gen. Contractors, Inc.* v. *California State Council of Carpenters*,

459 U.S. 519, 541-542 (1983) ("*AGC*").

 **Indirectness of the Alleged Injury.**  Exchange Plaintiffs do not allege that they dealt

directly with Defendants, were directly harmed by any of Defendants' alleged conduct, or that

Defendants even targeted the centralized exchanges.  Instead, they claim they were indirectly

harmed because Defendants' alleged manipulation of benchmark rates and bid-ask spreads in the

OTC-traded market had a ripple effect on transactions conducted in the exchange-traded market.

The chain of causation alleged by the Exchange Plaintiffs, consisting of a series of "vaguely

defined links," is insufficient to establish the required directness of injury.  *See AGC*, 459 U.S. at

540; *see also Reading Indus.* v. *Kennecott Copper Corp.*, 631 F.2d 10, 12 (2d Cir. 1980)

("plaintiffs who have suffered injuries causally related to an antitrust violation lack standing if

the injury is 'indirect or incidental'" to the goals of the conspiracy) (citation omitted).  Exchange

Plaintiffs' alleged injuries are, at most, a "side-effect" of the alleged conspiracy to manipulate

the OTC market, and that is not enough to make Exchange Plaintiffs efficient enforcers.  *In re*

*Digital Music*, 812 F. Supp. 2d at 403 (denying antitrust standing for purchasers of CDs alleging

anticompetitive restrictions on digital music because "there is nothing in the [complaint] to show

how any conduct was directed at the CD market"); *see also In re Aluminum Warehousing*

*Antitrust Litig.*, 2014 WL 4277510, at *22-24 (S.D.N.Y. 2014) (dismissing claims for lack of

standing where alleged harm was "more than one level down in the supply/distribution chain").

Exchange Plaintiffs' allegation that there is a statistical link between FX rates in the OTC market and FX rates in the centralized exchange market is also insufficient to establish standing. Courts consistently have refused to allow standing based upon such an attenuated causal link. *See Reading Indus.*, 631 F.2d at 13-14 (plaintiff's alleged injury in the copper scrap market was "too remote to permit the imposition of liability" for the defendants' alleged conspiracy in the refined copper market where plaintiff's damage theory "depend[ed] upon a complicated series of market interactions" including "the actions of innumerable individual decision-makers"); *de Atucha* v. *Commodity Exch., Inc.*, 608 F. Supp. 510, 515-16 (S.D.N.Y. 1985); *Ocean View Capital, Inc.* v. *Sumitomo Corp. of Am.*, 1999 WL 1201701, at *4 (S.D.N.Y. Dec. 15, 1999); *Laydon*, 2014 WL 1280464, at *9-10.

**Speculativeness of the Alleged Injury.**  "Indirectness of damages and independent factors contributing to the effect on the Plaintiff are two considerations indicative of damages being too speculative to support antitrust standing." *Laydon*, 2014 WL 1280464, at *10.  Both of these considerations are present here.  *First*, per the class definition, Exchange Plaintiffs did *not* trade in the allegedly manipulated OTC market and did *not* transact directly with any Defendants.  Thus, quantifying their damages (if any) would require "wholesale speculation" as to the extent to which the allegedly manipulated OTC-traded rates impacted exchange-traded rates.  *Paycom Billing Servs., Inc.* v. *Mastercard Int'l, Inc.*, 467 F.3d 283, 294 (2d Cir. 2006) (no standing where "quantifying … damages would require wholesale speculation as to the extent and type" of injuries suffered).

*Second*, factors independent of Defendants' alleged conduct would necessarily have contributed to any alleged damages suffered by Exchange Plaintiffs.  In Exchange Plaintiffs' own words, OTC rates are only a "*component* of the FX futures pricing formula."  Compl. ¶ 415

(emphasis added).  Thus, assessing alleged harm suffered by Exchange Plaintiffs in trading futures and options in *exchange-traded markets* that may have flowed from manipulation of rates or spreads in the *OTC-traded markets* is speculative by nature.  *See AGC*, 459 U.S. at 542 ("Partly because it is indirect, and partly because the alleged effects on [Plaintiff] may have been produced by independent factors, [Plaintiff's] damages claim is also highly speculative."); *see also Laydon*, 2014 WL 1280464, at *10 (injury is speculative because "Plaintiff's theory of antitrust injury involves a complicated series of market transactions").

**Alternative Enforcers**.  There is an obvious class of persons whose self-interest would motivate them to vindicate the public interest in antitrust enforcement if appropriate in this context: the OTC Plaintiffs in this action.  *Gatt*, 711 F.3d at 78.  By any measure, OTC Plaintiffs, who allegedly dealt directly with Defendants in FX Instruments, *see* Compl. ¶ 67, are "more direct victims" of Defendants' alleged anticompetitive conduct, and thus are better situated to challenge that conduct.  *Ocean View*, 1999 WL 1201701, at *7 ("there are more direct victims than plaintiff, such as those who purchased . . . directly from the defendants").  The presence of these more efficient enforcers, should the Court determine they have sufficiently alleged antitrust injury, weighs heavily against granting antitrust standing to the Exchange Plaintiffs.  *See Paycom*, 467 F.3d at 294 (denying standing where more directly affected plaintiffs already "addressed the exact violation now asserted") (quoting *AGC*, 459 U.S. at 542); *Sullivan* v. *Tagliabue*, 25 F.3d 43, 51 (1st Cir. 1994) (denying standing where "the party most directly harmed by the alleged violation has pursued … his own antitrust action").  Not only are the OTC Plaintiffs "motivate[d]" to file suit vindicating antitrust enforcement, they have filed suit and did so 15 months **before** the Exchange Plaintiffs.  *See de Atucha*, 608 F. Supp. at 518 (denying standing because "scores of others have already sued these defendants in regard to the same

-26-

acts"); *Gatt*, 711 F.3d at 79 (finding more suitable plaintiffs even where those entities had not filed suit).

      **Difficulty of Apportionment.**  It would be virtually impossible to apportion damages between Exchange Plaintiffs and OTC Plaintiffs.  Exchange Plaintiffs' entire damages theory is premised upon the allegation that Defendants' purported manipulation of benchmark rates and bid-ask spreads in the OTC market "caused exchange-traded FX futures and options contracts to be artificial during" unspecified times of the day.  Compl. ¶ 286; *see also* Compl. ¶¶ 6, 266, 272-275.  So any attempt to calculate the extent to which Defendants' OTC-related conduct affected rates for exchange-traded instruments, and to apportion any alleged price inflation (or deflation) between OTC Plaintiffs and Exchange Plaintiffs, would be unwieldy and speculative.  *See AGC*, 459 U.S. at 544 n.51 ("[T]he task of disentangling overlapping damages claims is not lightly to be imposed upon potential antitrust litigants, or upon the judicial system.") (citation and internal quotation marks omitted).[15]

### C.    *Claims of OTC and Exchange Plaintiffs Based on Transactions Outside the U.S. Are Barred by the FTAIA*

      The Sherman Act claims of all OTC and Exchange Plaintiffs who executed transactions outside of the United States and its territories ("Non-US Transactions") are barred by the Foreign Trade Antitrust Improvements Act ("FTAIA"), which provides that the Sherman Act "shall not apply to conduct involving trade or commerce . . . with foreign nations," subject to two narrow

---

[15]     Moreover, as this Court previously recognized, there will likely be overlap between Plaintiffs' subclasses, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 1:13-cv-07789, June 25, 2015, Hr'g Tr. 21:17-19, which creates a risk of double recovery and, in turn, weighs heavily against finding that the Exchange Plaintiffs are efficient enforcers.  *See Illinois Brick Co.* v. *Illinois*, 431 U.S. 720, 730-31 (1977) (finding unacceptable the risk of duplicative recovery engendered by allowing both direct and indirect purchasers to claim damages resulting from a single overcharge by the antitrust defendant); *see also Paycom*, 467 F.3d at 294 ("[i]t would be virtually impossible to apportion damages between" plaintiffs directly injured and those indirectly harmed, which would also lead to a high "probability of duplicative recoveries").

exceptions.[16]  15 U.S.C. § 6a.  The first is the import trade or commerce exception; the second is the domestic injury exception.  *See id.*

Neither exception applies to Non-US Transactions of OTC and Exchange Plaintiffs.  To invoke the import trade or commerce exception, a complaint must allege facts that plausibly show that the "conduct by the defendants . . . was directed at an import market."  *Kruman* v. *Christie's Int'l PLC*, 284 F.3d 384, 395 (2d Cir. 2002), *abrogated on other grounds by F. Hoffman-La Roche Ltd.* v. *Empagran S.A.*, 542 U.S. 155 (2004) ("*Empagran I*").  The Complaint contains no such allegations.  To the contrary, the Complaint alleges multiple times that Defendants' supposed manipulative conduct was directed at OTC benchmark rates and bid-ask spreads on FX Instruments in a *worldwide* market.  Compl. ¶¶ 1-6, 80-81, 124, 172-173.  Thus, the FTAIA's import trade or commerce exception does not apply to any Non-US Transactions.  *See Kruman*, 284 F.3d at 395-96 (defendants' conduct did not involve "import trade or commerce" where defendants allegedly engaged in a conspiracy "directed at controlling the prices they charged for their services in foreign auctions").

Nor does the FTAIA's domestic injury exception apply to Non-US Transactions.  This exception has two prongs, *both* of which must be satisfied in order to bring foreign conduct within the reach of the Sherman Act.  *Empagran I*, 542 U.S. at 162; *Lotes Co.* v. *Hon Hai Precision Indus. Co.*, 753 F.3d 395, 404 (2d Cir. 2014).  The first prong requires a showing that the alleged wrongful conduct had a direct, substantial and reasonably foreseeable effect on domestic or import commerce; this prong is referred to as the "Domestic Effect."  *Lotes*, 753 F.3d at 404, 409.  The second prong requires a showing that the Domestic Effect itself—not the

---

[16]      "The phrase 'trade or commerce with foreign nations' includes transactions between foreign and domestic commercial entities, not just transactions involving a foreign sovereign."  *Turicentro, S.A.* v. *American Airlines Inc.*, 303 F.3d 293, 301-02 (3d Cir. 2002), *overruled on other grounds by Animal Science Prods., Inc.* v. *China Minmetals Corp.*, 654 F.3d 462, 467-68 (3d Cir. 2011).

foreign conduct—gives rise to the plaintiff's Sherman Act claim; this prong is known as the "Gives Rise to Element." *Id.* at 404, 414.  The Second Circuit (like every other Circuit to consider the issue) has held that the Gives Rise to Element requires a showing by plaintiff that the alleged Domestic Effect was the proximate cause—not merely a but for cause—of the plaintiff's injury.  *Id.* at 414 ("Consistent with the comity canon and general antitrust principles, these courts have held that the domestic effect must proximately cause the plaintiff's injury. . . . Agreeing with our sister circuits, we adopt that standard here."); *see also In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 987 (9th Cir. 2008); *In re Monosodium Glutamate Antitrust Litig.*, 477 F.3d 535, 538 (8th Cir. 2007); *Empagran S.A.* v. *F. Hoffman-LaRoche, Ltd.*, 417 F.3d 1267, 1271 (D.C. Cir. 2005) ("*Empagran II*").

Here, the Court need not reach the Domestic Effect prong to conclude that the Sherman Act claims as to all Non-US Transactions are barred by the FTAIA.  Instead, like the Second Circuit in *Lotes*, this Court can assume *arguendo* that the Complaint adequately pleads a Domestic Effect and still dismiss all Sherman Act claims relating to Non-US Transactions because those claims do not satisfy the Gives Rise to Element.  *See Lotes*, 753 F.3d at 413 ("[W]e need not decide the rather difficult question of whether the defendants' foreign anticompetitive conduct has a 'direct, substantial, and reasonably foreseeable effect' on U.S. domestic or import commerce . . . because even assuming that Lotes has plausibly alleged a domestic effect, that effect did not 'give[] rise to' Lotes's claims.") (citation omitted).  That is because the alleged Domestic Effect here—artificial rates on FX Instruments in OTC and exchange trades executed *in* the United States—could not possibly have been the proximate cause of injury to those Plaintiffs executing FX transactions *outside* the United States.  Instead, for the OTC and Exchange Plaintiffs who engaged in Non-US Transactions (whether US

-29-

residents or not), their alleged injuries, if any, resulted solely from artificial rates in foreign markets.  Thus, these putative class members cannot possibly show that their alleged injuries resulted from any Domestic Effect of the alleged conspiracy.  *Empagran I*, 542 U.S. at 159 ("We conclude that the [domestic injury exception] does not apply where the plaintiff's claim rests solely on the independent foreign harm").

*Lotes* is particularly instructive.  There, the plaintiff alleged he was excluded from the market for USB 3.0 connectors, in violation of the Sherman Act, and claimed that the domestic injury exception to the FTAIA was satisfied because "defendants' foreign conduct had the effect of driving up the prices of consumer electronics devices incorporating USB 3.0 connectors in the United States."  753 F.3d at 414.  Applying the Gives Rise to Element of the FTAIA's domestic injury exception, the Second Circuit rejected this argument.  *Id.*  The Court held that "those higher prices" in the United States "did not cause Lotes's injury."  *Id.*  Here, as in *Lotes*, any injury to Plaintiffs who engaged in Non-US Transactions was not proximately caused by allegedly artificial FX rates in the United States.

Similarly, in *Empagran II* plaintiffs alleged a conspiracy in the worldwide market for vitamins, which supposedly resulted in higher prices both in the United States and abroad.  417 F.3d at 1268-69.  Plaintiffs argued that defendants' conduct in the United States gave rise to plaintiffs' foreign injury because, but for the super-competitive pricing in the United States, defendants could not maintain their super-competitive pricing in foreign markets.  *Id.* at 1270.  The court held that "'but-for' causation between the domestic effects and the foreign injury claim is simply not sufficient to . . . satisfy the FTAIA's requirement that the U.S. effects of the conduct give rise to their claims."  *Id.* at 1270-71.

-30-

Like the plaintiffs in *Lotes* and *Empagran II*, the OTC and Exchange Plaintiffs have failed to allege that their supposed injuries in connection with any Non-US Transactions were proximately caused by any Domestic Effect of the alleged worldwide conspiracy. At most, these putative class members have alleged some degree of interdependence between FX currency rates in the United States and those abroad, but that is insufficient to satisfy the Gives Rise to Element of the FTAIA's domestic injury exception. *See Lotes*, 753 F.3d at 414; *Empagran II*, 417 F.3d at 1270-71. As such, the Sherman Act claims of both OTC and Exchange Plaintiffs based on Non-US Transactions should be dismissed. *See Lotes*, 753 F.3d at 404.

### D.     Plaintiffs' Pre-November 1, 2009 Claims Are Insufficiently Pleaded and Time-Barred

In the absence of any alleged overt act before 2010, Plaintiffs' proposed class period — beginning on January 1, 2003, more than ten years before the first complaint was filed—is overly broad. Courts routinely prune overly long class periods that are insufficiently pleaded. *See, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *12 (N.D. Cal. Jan. 21, 2014) (dismissing antitrust claim prior to 2002 because "the allegations of the complaints do not support a class period extending back to the years 2000 and 2001"); *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1077 (D. Kan. 2009) (finding "[u]nder *Twombly*, plaintiffs cannot simply allege a conspiracy beginning at a particular time; rather, they must allege facts to support the existence of a conspiracy during the entire period" and dismissing antitrust claim prior to 1999 because "there are no allegations in these complaints that would give defendants fair notice of the basis for plaintiffs' claim of a conspiracy" between 1994 and 1999).

Despite all the information available in the public domain, and the apparent trove of materials shared with Plaintiffs as a result of cooperation agreements with Settling Defendants, the Complaint contains *no* specific chat excerpt or other substantive allegations from prior to

-31-

2010.  Indeed, Plaintiffs fail to allege dates for the vast majority of the chat room conversations identified in the Complaint, and those conversations for which Plaintiffs do allege a date occur well within the four years prior to the filing of the first class action complaint on November 1, 2013.  Plaintiffs' proposed class period is thus overly broad, and should at a minimum be limited to claims arising within the four-year limitations period, *i.e.*, on or after November 1, 2009.[17] *See* 15 U.S.C. § 15b; *see Lithium Ion Batteries*, 2014 WL 309192, at *12 (limiting plaintiffs' alleged class period because the complaints contained a "dearth of meetings alleged" for certain portions of proposed class period).

Nor can Plaintiffs expand the relevant period based on conclusory allegations of fraudulent concealment.  To plead fraudulent concealment so as to enlarge the four-year statute of limitations, an antitrust plaintiff must allege with sufficient particularity "(1) that the defendant concealed the existence of the antitrust violation; (2) that plaintiff remained in ignorance of the violation until sometime within the four-year antitrust statute of limitations; and (3) that his continuing ignorance was not the result of lack of diligence."  *Hinds Cnty.* v. *Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009) (citation and internal quotation marks omitted).  Plaintiffs fail to plead fraudulent concealment because their boilerplate allegations of diligence are inadequate, particularly under the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  *See id.*; *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (affirming dismissal of claims because plaintiffs failed to adequately plead the diligence prong of fraudulent concealment where plaintiffs "ma[d]e no allegation of any

---

[17]     This argument was withdrawn without prejudice at the Court's request during oral argument on the prior motion to dismiss, subject to renewal as contemplated in the Court's order.  Because New Defendants were added to this action on July 31, 2015, when the operative Complaint was filed, New Defendants propose that the Class Period with respect to them be limited to claims arising within the four years prior to that date, *i.e.*, on or after July 31, 2011.

specific inquiries of [the defendant], let alone detail when such inquiries were made, to whom, regarding what, and with what response").

Plaintiffs allege only that "[n]one of the facts or information available to Plaintiffs, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracies alleged in this Complaint."  Compl. ¶ 390.  Plaintiffs' conclusory allegation is belied by the fact that the FX data referenced in the Complaint is publicly available.  And the conclusions Plaintiffs have drawn from that data have been in the public domain at least since an October 2009 analyst report, which revealed that trading around the 4 pm fix was characterized by "unusually sharp movements in exchange rates," and concluded that "anyone trading at that time is unlikely to get the best possible deal available that day."  Ben King, *Banks Warned About Exchange Rate Dangers in 2009*, BBC NEWS (Dec. 23, 2013), http://www.bbc.com/news/business-25491945.  There is no reason why Plaintiffs could not years ago have drawn the same conclusions they draw today.  To the extent that Plaintiffs' antitrust claims accrued more than four years before November 1, 2013 (or July 31, 2015, as to New Defendants), they should be dismissed.

## II.     EXCHANGE PLAINTIFFS FAIL TO ALLEGE A CLAIM UNDER THE COMMODITY EXCHANGE ACT

Exchange Plaintiffs' Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, claims allege the manipulation of commodities prices and the use of fraudulent devices, and therefore "must be pled with particularity under Rule 9(b)."[18]  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007); *see Rombach* v. *Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.' Fed.R.Civ.P. 9(b).  This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or

---

[18]     The OTC Plaintiffs do not assert a claim under the CEA.

expressed in terms of the constituent elements of a fraud cause of action.").  Exchange Plaintiffs'

CEA claims plainly sound in fraud, relying on allegations, for example, that "Defendants

delivered . . . false or misleading or inaccurate reports concerning order and trade information

that affected or tended to affect spot market prices of currency pairs, . . . knowing, or acting in

reckless disregard of the fact that such report was false, misleading or inaccurate," and

"Defendants used or employed manipulative or deceptive devices or contrivances, in connection

with a contract of sale or purchase of FX futures and options contracts . . .  [which] included the

making of untrue, inaccurate or misleading statements of material facts . . . ."  Compl. ¶¶ 444,

448; *see In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 714

(S.D.N.Y. 2013) ("*LIBOR I*") (citation and internal quotation marks) (holding that plaintiffs'

CEA claims "sound in fraud and thus must be pled with particularity" where plaintiffs alleged

that "defendants, by submitting artificial LIBOR quotes, misled the market"); *In re Amaranth*

*Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008) ("*Amaranth I*") ("a

complaint that alleges manipulation of commodities prices must satisfy Rule 9(b)"), *aff'd*, 730

F.3d 170 (2d Cir. 2013).

    In order to meet Rule 9(b)'s heightened pleading requirement, Plaintiffs must specify

"what manipulative acts were performed, which defendants performed them, when the

manipulative acts were performed, and what effect the scheme had on the market."  *LIBOR I*,

935 F. Supp. 2d at 714 (citation and internal quotation marks omitted).  They do not, and cannot,

satisfy this burden.

    Exchange Plaintiffs assert two primary liability claims under the CEA: (i) price

manipulation claims under section 9(a)(2), 7 U.S.C. § 13(a)(2), and (ii) manipulative device

claims under section 6(c), 7 U.S.C. § 9(1), and CFTC Rule 180.1, 17 C.F.R. § 180.1 (2011).

They also assert claims for principal-agent liability under section 2(a)(1) of the CEA, 7 U.S.C. §
2(a)(1); and aiding and abetting liability under sections 13 and 22(a)(1), 7 U.S.C. §§ 13c(a),
25(a)(1).  Each of these CEA claims must be dismissed because the only challenged underlying
conduct is manipulation of OTC spot rates, which is *expressly exempted* from the scope of the
CEA.  Even if this fundamental defect did not preclude the CEA claims, they should still be
dismissed as overreaching and inadequately pleaded.

    **A.**    ***Exchange Plaintiffs' OTC Market Manipulation Claims Are Not Actionable Under the CEA***

Exchange Plaintiffs make no allegations at all concerning manipulation of any exchange-
traded FX futures contracts or options on futures contracts; the challenged conduct involves only
FX spot rates in the underlying OTC market.  But manipulation of spot rates in the OTC market
cannot form the basis of a CEA claim because such rates and markets fall outside the CEA's
purview.  *See* 7 U.S.C. § 2(c)(1) ("[N]othing in this chapter . . . governs or applies to an
agreement, contract, or transaction in—(A) foreign currency. . . ."); 77 Fed. Reg. 48208-01,
48256-57 (Aug. 13, 2012) ("The CEA generally does not confer regulatory jurisdiction on the
CFTC with respect to spot transactions. . . . The Commissions do not believe that Congress
intended, solely with respect to foreign exchange transactions, to extend the reach of the CEA to
transactions that historically have been considered spot transactions."); *see also Commodity
Futures Trading Comm'n* v. *Zelener*, 2003 WL 22284295, at *5 (N.D. Ill. Oct. 3, 2003) (because
the CEA limited its coverage and the CFTC's jurisdiction to futures, the CFTC "lack[ed]
jurisdiction over the [FX spot] trading in question and . . . the trades were not subject to the
[CEA's] anti-fraud provisions."), *aff'd,* 373 F.3d 861 (7th Cir. 2004).  Plaintiffs implicitly
concede this point by not asserting any CEA claim on behalf of OTC Plaintiffs.

In asserting CEA claims exclusively on behalf of Exchange Plaintiffs, they seek to do indirectly what they cannot do directly, but they cannot bootstrap their way to a CEA claim for manipulation of FX spot rates in the OTC market on the basis of some supposed secondary effect on FX rates in the exchange-traded market.  *See Aspire Commodities, LP* v. *GDF Suez Energy N. Am., Inc.*, 2015 WL 500482, at *5 (S.D. Tex. Feb. 3, 2015) (dismissing CEA claim because even if defendant "intended to influence the [futures] market, all of the conduct that Plaintiffs challenge took place entirely within the [exempt (spot)] market").

### B.    *Plaintiffs Fail to Adequately Allege the CEA Claims*

Even if exempt spot manipulation allegations could be shoehorned into CEA claims by those indirectly affected, which they cannot, Exchange Plaintiffs still fail to state a viable claim for relief.  To state a claim under the CEA, "[a] private plaintiff must plead sufficient information to show injury from a particular incident of manipulation: Which defendant bank engaged in manipulation, of which [rate], on which date, and in which direction?  Further, did the manipulation affect the published rate?  Finally, which instrument did the plaintiff invest in, and how did manipulation of the particular [rate] affect the plaintiff's position?"  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *40 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*"); *see also Amaranth I*, 587 F. Supp. 2d at 535 (Plaintiffs were required to allege, specifically as to each Defendant, "what manipulative acts [it] performed, … when the manipulative acts were performed, and what effect the scheme had on the market.").  Exchange Plaintiffs have done none of these things, failing to identify a single day on which any of the Defendants targeted a single currency pair for manipulation.  Moreover, the Complaint lacks any allegations connecting Exchange Plaintiffs' futures trading to days on which any particular Defendant allegedly manipulated the OTC market.  Absent allegations of specific transactions,

injury to Exchange Plaintiffs is "merely 'conceivable,'–and thus insufficiently pled." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 461 (S.D.N.Y. 2014). Rule 9(b) does not permit Plaintiffs to rely on such generalized allegations of wrongdoing.

Rather than providing necessary details, the Complaint attempts to sweep into its ambit every FX Instrument in the world, relating to every currency pair in every market, while at the same time claiming that different Defendants colluded to inflate and deflate different currencies at different times. *See, e.g.*, Compl. ¶ 308 ("traders . . . attempt[ed] to manipulate certain FX benchmark rates, in some cases downward and in some cases upward." (internal quotation marks omitted)). In choosing to pursue breadth of scope over specificity, Exchange Plaintiffs fatally undermine their CEA claims.

### 1.   Exchange Plaintiffs Fail to State a Claim for Price Manipulation

The Complaint fails to plead an adequate manipulation claim against any Defendant. To allege manipulation under Sections 9(a) and 22(a) of the CEA, Exchange Plaintiffs were required to allege, with particularity, that: (a) each Defendant possessed an ability to influence FX futures prices; (b) artificial prices existed; (c) each Defendant caused an artificial price; and (d) each Defendant specifically intended to create artificial FX futures prices.[19] *See In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 183 (2d Cir. 2013) ("*Amaranth III*"). The allegations in the Complaint do not even come close to alleging these elements with the necessary specificity.

---

[19]   Although Plaintiffs cite to sections 4b and 4c of the CEA in asserting their price manipulation claim, they do not assert any allegations in support of a fraud and fictitious sale claim. Compl. ¶ 433. Regardless, any such claim must fail because Plaintiffs only allege fraud in connection with Defendants' general trading, and not in connection with any particular futures contract. *See* 7 U.S.C. §§ 6b(a), 6c(a); *Korwek* v. *Hunt*, 646 F. Supp. 953, 971-72 (S.D.N.Y. 1986), *aff'd* 827 F.2d 874 (1987). Similarly, Plaintiffs' failure to allege that Defendants engaged generally in any of the practices or transactions prohibited by section 4c, much less in connection with their futures and options trading, dooms any potential section 4c claim. *See Commodity Futures Trading Comm'n* v. *Savage*, 611 F.2d 270, 284 (9th Cir. 1979).

### a.   Exchange Plaintiffs Fail to Allege That Each Defendant Had the Ability to Influence FX Futures Prices

Because Exchange Plaintiffs concede that no Defendant had the independent ability to influence FX spot prices,[20] they were required to allege facts sufficient to establish each Defendant's specific role in the purported conspiracy.  They have not done so.  Although this Court decided that the OTC Plaintiffs adequately asserted an antitrust claim in the First Amended Complaint, similar "group pleading" by Exchange Plaintiffs in the context of their CEA claims is insufficient to satisfy Rule 9(b)'s stricter requirements.  *Javier* v. *Beck*, 2014 WL 3058456, at *12 (S.D.N.Y. July 3, 2014) ("Group pleading of Defendants does not satisfy the requirement to specifically identify the maker of an alleged misrepresentation."); *In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007) ("'lumping' all defendants together" fails to satisfy Rule 9(b)).  As set forth in section II.B above, the Complaint fails to plead what role any particular Defendant played with respect to supposed manipulation affecting any particular currency pair on any particular day, failing even to attempt to plead any relevant facts with the requisite specificity.

### b.   Exchange Plaintiffs Fail to Allege That Artificial Prices Existed for FX Futures

Exchange Plaintiffs also fail to plead the existence of artificial prices at any particular time relating to any particular currency pair that "do not reflect the forces of supply and demand in the market or do not otherwise comport with contemporaneous prices in comparable markets."  *In re Commodity Exch., Inc., Silver Futures and Options Trading Litig.*, 2012 WL 6700236, at *12 (S.D.N.Y. Dec. 21, 2012) ("*Silver Futures I*").  Their failure to sufficiently plead artificial price is not cured by vague and conclusory allegations that "FX [OTC] spot

---

[20]     The chart in paragraph 116 of the Complaint confirms that each Defendant had only a fraction of the global FX OTC market, with many Defendants having less than 5% of the market.

market prices, including benchmark rates, directly impact the prices of exchange-traded FX futures and options contracts" and "[Defendants' alleged OTC market] manipulation caused the prices [of] FX futures contracts and options to be artificial throughout the Class Period."  Compl. ¶¶ 253, 416.  Such broad allegations are insufficient to allege an artificial price.  *See Silver Futures I*, 2012 WL 6700236, at *16 ("The allegation that large unspecified and 'uneconomic' trades were taking place on the COMEX during the more than two-and-a-half year Class Period is too general to plead the existence of artificial prices."); *In re Rough Rice Commodity Litig.*, 2012 WL 473091, at *6 (N.D. Ill. Feb. 9, 2012) (noting that misconduct alone is not enough to plead an artificial price).

### c.  *Exchange Plaintiffs Fail to Allege That Defendants Caused Artificial Prices*

To meet the CEA's proximate cause requirement, Exchange Plaintiffs must plead "specific conduct that might be reasonably attributed to [each Defendant]" that caused artificial prices in each relevant futures market.  *Silver Futures I*, 2012 WL 6700236, at *17.  Exchange Plaintiffs plead no facts sufficient to demonstrate that Defendants were "the proximate cause of the [alleged] price artificiality" in the FX OTC market, much less in the indirectly affected FX futures or exchange-traded market.  *Id.* at *16.  Indeed, Exchange Plaintiffs fail to identify a single trade or specific action taken by any Defendant that caused an artificial price in any FX futures market.  Because Exchange Plaintiffs do not allege facts indicating that any trading led to an artificial price in a specific market at a specific time, their CEA manipulation claims must be dismissed.  *See id.* at *17 ("[W]ithout more specific factual allegations as to the amounts and to the timing of certain trades" plaintiffs cannot allege that the defendant caused artificial prices).

### d. *Exchange Plaintiffs Fail to Adequately Allege That Defendants Specifically Intended to Manipulate FX Futures Prices*

Exchange Plaintiffs' conclusory allegations that Defendants' alleged manipulation of spot prices affected the FX futures market are also insufficient to demonstrate that each Defendant "specifically intended" to manipulate the FX futures market, as required by the CEA.  In order to plead specific intent, Exchange Plaintiffs were required to plead facts to show that each Defendant acted "with the purpose . . . of causing . . . a price or price trend in the particular market that did not reflect the legitimate forces of supply and demand."  *In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 598 (S.D.N.Y. 2011) ("*Platinum & Palladium*") (internal quotation marks, brackets and citations omitted).  Here, Exchange Plaintiffs fail to sufficiently allege that Defendants intended to affect, much less to manipulate, the FX futures market, instead alleging only that "Defendants *knew* their manipulative and/or collusive activities in spot transactions would result in artificial price movement for exchange transactions."  Compl. ¶ 285 (emphasis added).  Generic allegations of Defendants' purported knowledge, however, are insufficient to satisfy the CEA's high specific intent standard:

> Under a specific intent standard, mere knowledge is not enough; Defendants must have specifically intended to impact the . . . futures market.  Plaintiffs here allege only that Defendants knew or should have known that their manipulative actions would depress the . . . futures prices.  Therefore, plaintiffs have not stated a claim under the CEA.

*Hershey* v. *Energy Transfer Partners, L.P.*, 610 F.3d 239, 249 (5th Cir. 2010); *see also In re Rough Rice*, 2012 WL 473091, at *7 ("Mere knowledge that certain actions might have an impact on the futures market is not sufficient to state a private claim under the CEA.").  In fact, a court in this district has rejected as inadequate allegations of specific intent that were more robust than those asserted here, where plaintiff claimed that defendant would benefit from alleged manipulation because it held large positions, and that defendant was "fully aware" that

-40-

its conduct might affect the relevant market.  *See Silver Futures I*, 2012 WL 6700236, at

*10,*12.

### 2. Exchange Plaintiffs' False Reporting and Fraud-Based Manipulation Claims Fail

Exchange Plaintiffs' false reporting and fraud-based manipulation claims under CEA

section 6(c)(1) must also be dismissed.  As a threshold matter, these claims fail insofar as they

rely on any conduct prior to August 15, 2011, the effective date of section 6(c)(1) and its

implementing rule, CFTC Rule 180.1.  *See Amaranth III*, 730 F.3d at 173 n.1 (noting Rule

180.1's "effective date of August 15, 2011").  As to claims involving conduct after August 15,

2011, Exchange Plaintiffs fail to plead the elements of false reporting or fraud-based

manipulation.

### a. Exchange Plaintiffs Do Not Adequately Allege False Reporting

A false reporting claim under the CEA requires the intentional or reckless (i) delivery for

transmission, (ii) of a "a false or misleading or inaccurate report" tending to "affect the price of

any commodity in interstate commerce," (iii) with knowledge or reckless disregard for the false,

misleading or inaccurate nature of the report.  CEA § 6(c), 7 U.S.C. § 9(1)(A); *see* CFTC Rule

180.1, 17 C.F.R. § 180.1 (2011).  Exchange Plaintiffs' failure to identify any report delivered by

any Defendant to any Plaintiff, much less a false report affecting FX futures prices, exposes their

claims as inadequate and requires dismissal.  *See U.S. Commodity Futures Trading Comm'n* v.

*Atha*, 420 F. Supp. 2d 1373, 1380 (N.D. Ga. 2006) ("To state a claim for false reporting, Plaintiff

must prove: (1) that a defendant knowingly delivered market reports or market information

through interstate commerce, (2) that the information was knowingly false or misleading; and (3)

that the information affected or tended to affect the price of a commodity in interstate

commerce.").

### b.   *Exchange Plaintiffs Do Not Adequately Allege Fraud-Based Manipulation*

Exchange Plaintiffs' fraud-based manipulation claim also fails because they do not allege that any Defendant ever communicated directly with any Plaintiff, much less communicated fraudulent information, during the relevant time period.  *See* CEA § 6(c), 7 U.S.C. § 9(1)(A); CFTC Rule 180.1, 17 C.F.R. § 180.1.[21]  To plead a violation under Rule 180.1, a "plaintiff must establish that 'the defendant . . . made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff.'"  *ECA & Local 134 IBEW Joint Pension Trust of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009); *see also* Prohibition of Market Manipulation, 75 Fed. Reg. 67657, 67660 (proposed Nov. 3, 2010) ("Reliance, loss causation and damages are elements of private claims, but not enforcement actions brought by the CFTC or SEC.").  Plaintiffs must also specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  None of this is alleged here.  In light of Exchange Plaintiffs' failure to allege any communication with Defendants, this claim must be dismissed.

### 3.   *Exchange Plaintiffs Fail to Sufficiently Allege a Claim for Control Person Liability*

Exchange Plaintiffs' inability to state a primary manipulation claim against any Defendant also defeats their claim for vicarious liability.  *See, e.g.*, *Platinum & Palladium*, 828

---

[21]   Because CEA section 6(c)(1) is modeled on Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 180.1 is based on Securities and Exchange Commission ("SEC") Rule 10b-5, the CFTC has stated that "the substantial body of judicial precedent" surrounding SEC Rule 10b-5 should guide the implementation of Rule 180.1.  *See* Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398, 41399 (July 14, 2011); *Commodity Futures Trading Comm'n* v. *Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1346 (S.D. Fla. 2014).

F. Supp. 2d at 600 (dismissing vicarious liability claim where plaintiffs failed to assert a primary

violation).  Even if they had made out the primary claim, the control person claim would still fail

because Exchange Plaintiffs have not alleged facts showing that any "principal manifested an

intent to grant [an] agent authority, the agent agreed, and the principal 'maintained control over

key aspects of the undertaking.'" *Amaranth I*, 587 F. Supp. 2d at 546 (citation omitted).

Exchange Plaintiffs cannot, as they seek to do here, paper over deficient allegations by

lumping Defendants' corporate entities, including holding companies, together in all factual

allegations.  *See, e.g.*, Compl. ¶¶ 48; 52; 53; 57; 58; 60; 61.  Indeed, the only allegation that

Exchange Plaintiffs offer in support of their vicarious liability claim is a general allegation that

each Defendant is liable for the actions of its agents.  Compl. ¶ 435.  This is insufficient to

sustain their claim.  *See Amaranth I*, 587 F. Supp. 2d at 547 (dismissing a vicarious liability

claim because "[t]he only language that would justify [finding a principal-agent] relationship is

general, vague, and conclusory"); *DeAngelis* v. *Corzine*, 17 F. Supp. 3d 270, 286 (S.D.N.Y.

2014) (finding no basis for vicarious liability where the complaint contained only "conclusory

allegations [that] fail to raise a right to relief above the speculative level") (internal quotation

marks omitted).[22]

### 4.    *Exchange Plaintiffs Have Not Stated a Claim for Aiding and Abetting Liability*

Exchange Plaintiffs have failed to allege a primary CEA violation, so "there can be no

aiding and abetting liability as a matter of law."  *Platinum & Palladium*, 828 F. Supp. 2d at 599.

Even if Exchange Plaintiffs had adequately pleaded a primary violation, they have not alleged

with particularity that each Defendant (1) associated itself with the venture, (2) participated in

---

[22]     Plaintiffs' allegations differ from those in *LIBOR I*, 935 F. Supp. 2d at 722, where plaintiffs
identified multiple individuals by name who purportedly engaged in illegal conduct and "contributed to
the alleged manipulation of LIBOR within the scope of their employment."

the venture as something it wished to bring about, and (3) sought by its action to make the

venture succeed. *See Amaranth III*, 730 F.3d at 182; *Krause* v. *Forex Exch. Market, Inc.*, 356 F.

Supp. 2d 332, 338-39 (S.D.N.Y. 2005) (dismissing an aiding and abetting claim under the CEA

where plaintiffs failed to meet the requirements of Rule 9(b)).

### C.    The CEA Does Not Reach Transactions on Foreign-Based Exchanges

Exchange Plaintiffs' CEA claims based on transactions conducted on exchanges located

outside the United States fail because Congress did not intend that the CEA apply extraterritorially.

*Morrison* v. *Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) ("It is a longstanding principle of

American law that legislation of Congress, unless a contrary intent appears, is meant to apply only

within the territorial jurisdiction of the United States.") (internal quotation marks omitted);

*Loginovskaya* v. *Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) (limiting a private right of action

under Section 22 of the CEA to claims concerning commodities transactions conducted within the

United States based on the presumption against extraterritoriality).

The fact that the 2010 Dodd-Frank legislation amended the CEA to cover certain swap

transactions and expressly provided for extraterritorial application of those new swap-related

provisions further demonstrates that the CEA does not apply to Exchange Plaintiffs' extraterritorial

CEA claims. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act §§ 711-814, Pub.

L. 111-203, 124 Stat. 1376 (July 21, 2010); *see also Loginovskaya*, 764 F.3d at 271 (before Dodd-

Frank Act the "[CEA] as a whole . . . [was] silent as to extraterritorial reach"). Exchange

Plaintiffs' CEA claims do not involve swaps—they involve FX futures contracts and options.

Moreover, the CEA's express adoption of extraterritoriality for its swap provisions indicates that

its silence on the anti-manipulation and fraud provisions invoked by Exchange Plaintiffs renders

those provisions inapplicable to transactions conducted outside the United States. *See Morrison*,

561 U.S. at 265 ("when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms").  Accordingly, Exchange Plaintiffs' CEA claims based on foreign transactions should be dismissed.  *See Loginovskaya*, 764 F.3d at 268.

### D.     *Exchange Plaintiffs' Commodity Exchange Act Claims Against the New Defendants Are Time-Barred*

The CEA requires claims to be "brought not later than two years after the date the cause of action arises."  7 U.S.C. § 25(c).  A cause of action "arises" under the CEA when a party is put on inquiry notice as to its alleged injury.  *See LIBOR I*, 935 F. Supp. 2d at 697 (holding that the CEA incorporates a "discovery accrual rule" wherein "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock") (quoting *Koch* v. *Christie's Int'l PLC*, 699 F.3d 141, 148-49 (2d Cir. 2012)).  Plaintiffs concede that they were on inquiry notice of their claims by no later than June 12, 2013, when Bloomberg published an article alleging manipulation of the FX market.  Compl. ¶ 393.  Plaintiffs also rely on several other publicly available and widely circulated articles in the Complaint.  *See, e.g.*, Compl. ¶¶ 128, 130, 383, 384.  Plaintiffs brought their first claims against the New Defendants in the Complaint on July 31, 2015.  Since Plaintiffs were on inquiry notice for more than two years before filing the Complaint, the CEA claims against the New Defendants must be dismissed as time-barred.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety.

Dated:  November 30, 2015
        New York, New York

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: /s Andrew C. Finch
Andrew C. Finch
Kenneth A. Gallo
Michael E. Gertzman
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
afinch@paulweiss.com
kgallo@paulweiss.com
mgertzman@paulweiss.com

*Attorneys for Defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd.*

CAHILL GORDON & REINDEL LLP

By: /s David G. Januszewski
David G. Januszewski
Herbert S. Washer
Elai Katz
Jason M. Hall
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
djanuszewski@cahill.com
hwasher@cahill.com
ekatz@cahill.com
jhall@cahill.com

*Attorneys for Defendants Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse Securities (USA) LLC*

KIRKLAND & ELLIS LLP

By: /s Robert Khuzami
Robert Khuzami
Joseph Serino, Jr., P.C.
Eric F. Leon, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
robert.khuzami@kirkland.com
joseph.serino@kirkland.com
eric.leon@kirkland.com

G. Patrick Montgomery (*pro hac vice*)
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
patrick.montgomery@kirkland.com

*Attorneys for Defendant Deutsche Bank AG*


MOORE AND VAN ALLEN PLLC

By: /s James P. McLoughlin, Jr.

James P. McLoughlin, Jr.
Mark A. Nebrig
Joshua D. Lanning
Moore and Van Allen PLLC
100 N. Tryon Street, Suite 4700
Charlotte, North Carolina 28202
Telephone: 704-331-1000
Facsimile: 704-331-1159
jimmcloughlin@mvalaw.com
marknebrig@mvalaw.com
joshlanning@mvalaw.com

*Attorneys for Defendant*
*RBC Capital Markets, LLC*

WACHTELL, LIPTON, ROSEN & KATZ

By: /s Jonathan Moses
Jonathan Moses
Bradley R. Wilson
51 West 52nd Street
New York, NY 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000
JMMoses@wlrk.com
BRWilson@wlrk.com

MARINO, TORTORELLA & BOYLE, P.C.
Kevin H. Marino
John D. Tortorella
437 Southern Boulevard
Chatham, NJ 07938
Telephone: (973) 824-9300
Facsimile: (973) 824-8425
kmarino@khmarino.com
jtortorella@khmarino.com

*Attorneys for Defendants Morgan Stanley and*
*Morgan Stanley & Co. LLC, and Morgan*
*Stanley & Co. International plc*


LINKLATERS LLP

By: /s James R. Warnot, Jr.

James R. Warnot, Jr.
Patrick C. Ashby
1345 Avenue of the Americas
New York, New York 10105
(212) 903-9000
(212) 903-9100 (fax)
james.warnot@linklaters.com
patrick.ashby@linklaters.com

*Counsel for Defendant Société Générale*

SIDLEY AUSTIN LLP

By: /s Andrew W. Stern
Andrew W. Stern
Alan M. Unger
Nicholas P. Crowell
787 Seventh Avenue
New York, New York 10019
astern@sidley.com
aunger@sidley.com
ncrowell@sidley.com
Telephone:  (212) 839-5300
Fax:  (212) 839-5599

*Attorneys for Defendant Standard Chartered PLC*

-48-