UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In re FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 03/31/2016

13 Civ. 7789 (LGS)

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

Defendants The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU"), Société Générale, and Standard Chartered plc (collectively, the "New Defendants") move to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). For the following reasons, the motion is granted with respect to Standard Chartered PLC but denied with respect to BTMU and Société Générale.

## I. BACKGROUND

This case involves claims by a putative class based on an alleged conspiracy among banks to fix prices in the foreign exchange ("FX") or foreign currency market in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3, and the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 et. seq. On January 28, 2015, the Court denied a motion -- made by the twelve defendants named at the time -- to dismiss under Rule 12(b)(6).[1] *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581 (2015) ("FOREX"). In July 2015, Plaintiffs served and filed a Second Consolidated Amended Class Action Complaint ("SAC"). The SAC added four new defendants: the New Defendants and RBC Capital Markets LLC.

---

1 A fuller description of Plaintiffs' allegations is found in the January 28, 2015, opinion.

## II. STANDARD

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996); *see also Troma Entm't, Inc., v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013). On a "Rule 12(b)(2) motion, the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.1990)).

Plaintiffs' factual allegations are assumed to be true for purposes of the motion, and "pleadings and affidavits [are construed] in the light most favorable to plaintiffs, resolving all doubts in their favor." *Id.* (internal quotation marks omitted). Courts will not, however, resolve "argumentative inferences in the plaintiff's favor" or "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation marks omitted). "Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial. But until such a hearing is held, a prima facie showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981); *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993).

## III. DISCUSSION

A prima facie showing of personal jurisdiction requires: (1) procedurally proper service of process, (2) "a statutory basis for personal jurisdiction that renders such service of process effective" and (3) that "the exercise of personal jurisdiction . . . comport[s] with constitutional

due process principles." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59–60 (2d Cir. 2012). The New Defendants have waived service, and do not contest that provisions of the federal antitrust laws and the CEA provide the statutory basis for personal jurisdiction. The parties' dispute therefore concerns whether or not the exercise of personal jurisdiction would violate constitutional due process.

Plaintiffs assert three alternative grounds for personal jurisdiction over each of the New Defendants: (1) consent, (2) general jurisdiction and (3) specific jurisdiction.

**A. Consent to Jurisdiction**

A court's exercise of personal jurisdiction comports with due process if a defendant has consented to appear in that forum. *See Daimler AG v. Bauman*, 134 S. Ct. 746, 755–56 (2014) (describing general jurisdiction as an alternative to a foreign corporation's "consent[] to suit in the forum"). Although the New Defendants have consented to the exercise of jurisdiction in this forum for particular claims, they have not broadly consented in a way that would encompass the claims in this case.

Plaintiffs argue that the New Defendants constructively consented to personal jurisdiction in this matter pursuant to § 200 of the New York Banking Law, which requires a foreign banking corporation, among other things, to "appoint[] the superintendent and his or her successors its true and lawful attorney, upon whom all process in any action or proceeding against it on a cause of action arising out of a transaction with its New York agency or agencies or branch or branches, may be served . . . ." N.Y. Banking Law § 200(3). This argument is incorrect. By the terms of the statute, any consent to jurisdiction by virtue of the New Defendants' registration with the NYDFS is not general jurisdiction over all claims, but instead is limited to claims arising out of transactions with the New Defendants' New York agencies or branches. *See*

*Motorola Credit Corp. v. Uzan*, No. 02 Civ. 666, 2015 WL 5613077, at *2 (S.D.N.Y. Sept. 9, 2015) (holding that N.Y. Banking Law § 200 and "mere operation of a branch in a forum—and satisfaction of any attendant licensing requirements—[are] not constitutionally sufficient to establish general jurisdiction."); *7 West 57th Street Realty Co. v. Citigroup Inc.*, No. 13 Civ. 981, 2015 WL 1514539, at *11 (S.D.N.Y. Mar. 31, 2015) ("The plain language of [§ 200] limits any consent to personal jurisdiction by registered banks to *specific* personal jurisdiction."); *see generally Brown v. Lockheed Martin Corp.*, No. 14-4083, 2016 WL 641392, at *2 (2d Cir. Feb. 18, 2016) (holding corporation did not consent to general jurisdiction under Connecticut registration statutes); *id.* at *5 ("[W]e find it prudent . . . to decline to construe the state's registration and agent-appointment statutes as embodying actual consent by every registered corporation to the state's exercise of general jurisdiction over it.").

Similarly unavailing is Plaintiffs' reliance on N.Y. Banking Law § 200-b(1), which provides that a New York resident may maintain "any cause of action" against a foreign banking corporation. First, this provision contains nothing from which consent to jurisdiction might be implied, in contrast to the appointment of an agent for service of process under § 200. Second, the statute is inapplicable, as none of the plaintiffs in this case is alleged to be a resident of New York. Finally, the New York Court of Appeals has interpreted § 200-b to confer subject matter jurisdiction and not personal jurisdiction. *See Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 744 N.E.2d 696, 98 N.Y.2d 238, 248 (2002) (discussing scope of subject matter jurisdiction under § 200-b).

Plaintiffs also incorrectly argue that two of the New Defendants (BTMU and Société Générale) contractually consented to jurisdiction in at least two ISDA agreements. The agreements include a consent "to the non-exclusive jurisdiction of the courts of the State of New

York and the United States District Court located in the Borough of Manhattan in New York City" expressly limited to "any suit, action, or proceedings relating to th[e] Agreement[s]." This consent is inapplicable here even if some of the transactions at issue are arguably related to the agreements. The ISDA agreements confer a contractual right to the counterparties to those agreements, and neither of the counterparties is a plaintiff in this action. *See Dale v. Banque All. S.A.*, No. 02 Civ. 3592, 2004 WL 2389894, at *5 (S.D.N.Y. Oct. 22, 2004) ("[T]he forum selection clause in the . . . agreement cannot be construed reasonably as blanket consent by Banque SCS to be subject to personal jurisdiction in New York in any action brought against it by a person who is not a party to the . . . agreement.").

For these reasons, the New Defendants' consent to jurisdiction is limited to claims and parties more limited than those asserted here, and therefore does not satisfy the due process requirements for the exercise of personal jurisdiction in this case.

**B. General Jurisdiction**

Plaintiffs do not make a prima facie showing to support general jurisdiction over the New Defendants. None of the New Defendants is incorporated or maintains its principal place of business in the United States, and while at least two of the three conduct substantial operations in the United States, neither is "essentially at home" in this country, as required for the exercise of general jurisdiction.

In 2011, the Supreme Court held that "[a] court may assert general jurisdiction over foreign (sister-state or foreign country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them *essentially at home* in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) (emphasis added). *Goodyear*'s "essentially at home" standard was

applied three years later in *Daimler*, where the Court held that a foreign corporation's "slim contacts with [California] hardly render it at home there," even assuming the contacts of its U.S. subsidiary were imputable to it. *Daimler*, 134 S. Ct. at 760. The Court explained that the "paradigm" forum for general jurisdiction over a corporation is "where it is incorporated or has its principal place of business." Otherwise, courts should find general jurisdiction only in "exceptional" cases. *Id*. at 760–61 & n.19. Similarly, the Second Circuit in *Gucci* held that a foreign bank with "only four branch offices in the United States and only a small portion of its worldwide business . . . conducted in New York" was not "an exceptional case." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014); *see also Brown v. Lockheed Martin, Corp.*, 2016 WL 641392 at *6 ("[I]n our view *Daimler* established that, except in a truly 'exceptional' case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business—the 'paradigm' cases.").

Under *Goodyear* and *Daimler*, Plaintiffs have failed to make a prima facie showing that the New Defendants are subject to general jurisdiction. The SAC acknowledges that BTMU "is a Japanese company headquartered in Tokyo, Japan," and a declaration from the Managing Director and Comptroller of BTMU's New York branch states that BTMU's principal place of business is Japan, and that between 2011 and 2014, BTMU's U.S. branches and offices never generated more than 6.74% of gross revenue or 7.58% of ordinary profit globally, or employed more than 6.2% of BTMU's workforce.[2] Similarly, the SAC notes that Société Générale is

---

[2] The New Defendants do not dispute that their contacts throughout the United States are considered for personal jurisdiction purposes. *See In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 298 (3d Cir. 2004) ("[P]ersonal jurisdiction in federal antitrust litigation is assessed on the basis of a defendant's aggregate contacts with the United States as a whole."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* No. 11 MDL 2262, 2015 WL 6243526, at *23 (S.D.N.Y. Oct. 20, 2015); *SEC v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) (holding that "the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state").

headquartered in Paris, France, and a declaration from the Société Générale Group's ("SG Group") General Counsel states that the company's principal place of business is in France, and that its U.S. operations represented approximately 5% of the SG Group's total net banking income in 2014.  The declaration notes that, by the end of 2014, no more than 1.2% of the SG Group's employees were in the United States.  Finally, the SAC describes Standard Chartered plc as "a United Kingdom public limited company with headquarters in London," and a declaration from Standard Chartered Bank's ("SCB") Managing Director & Head, CEO & CIB Office, Americas, states that Standard Chartered plc "does not operate in the United States and maintains no offices in the United States."  Standard Chartered plc's subsidiary, SCB, has six offices in the United States.  SCB's U.S. operations never generated more than 6% of Standard Chartered plc's worldwide operating income between the years 2003 and 2012, and Standard Chartered plc's U.S.-based subsidiaries employ no more than 2% of the worldwide total.

      Plaintiffs argue that the *Goodyear*/*Daimler* analysis does not apply because those cases addressed jurisdiction under the Fourteenth Amendment's Due Process Clause, whereas Plaintiffs' suit -- asserting claims under federal law -- should be analyzed under the Fifth Amendment's Due Process Clause.  According to Plaintiffs, any analysis under the Fifth Amendment's Due Process Clause requires consideration of "the strong federal interests in efficient enforcement of its antitrust and commodities laws against defendants that choose to inflict injury within the United States."

      Courts have, however, uniformly rejected arguments that the general jurisdiction analysis under the Fifth Amendment differs from the principles set forth by the Supreme Court in *Goodyear* and *Daimler*.  *See, e.g.*, *Schulman v. Inst. for Shipboard Educ.*, 624 F. App'x 1002, 2015 WL 4896597, at *3 (11th Cir. Aug. 18, 2015) ("Because 'the language and policy

considerations of the Due Process Clauses of the Fifth and Fourteenth Amendments are virtually identical, decisions interpreting the Fourteenth Amendment's Due Process Clause guide us in determining what due process requires in the Fifth Amendment jurisdictional context.'"); *Wilder v. News Corp.*, No. 11 Civ. 4947, 2015 WL 5853763, at *5 (S.D.N.Y. Oct. 7, 2015) (discussing the Fifth Amendment and holding that "[t]he Supreme Court has made clear . . . that general jurisdiction may only constitutionally be exercised over a defendant who is 'essentially at home' in the relevant forum").

Based on the New Defendants' averments -- which Plaintiffs do not contradict -- Plaintiffs cannot make a prima facie showing of general jurisdiction over any of the New Defendants.

**C. Specific Jurisdiction**

Plaintiffs have made a prima facie showing of specific jurisdiction over BTMU and Société Générale because the allegations in the SAC, together with evidence of the extent of these two Defendants' FX operations in the United States, give rise to the reasonable inference that they participated in the alleged conspiracy in the United States or participated elsewhere with the aim to cause harm in the United States. Plaintiffs have not made a prima facie showing of specific jurisdiction over Standard Chartered plc, which does not engage in FX activity in the United States or even operate or maintain offices here.

As opposed to general jurisdiction, "[s]pecific or conduct-linked jurisdiction . . . 'depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum state and is therefore subject to the State's regulation.'" *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014) (quoting *Goodyear*, 131 S. Ct. at 2853); *see also Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) ("The

inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'"). In other words, "to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum." *Walden*, 134 S. Ct. at 1122. Minimum contacts to support specific jurisdiction "exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being hauled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)).

Specific jurisdiction exists "when the cause of action arises out of the very activity being conducted, in part," inside the forum. *Keeton v. Hustler Magazine, Inc.*, 465 U.S 770, 780 (1984). It may also exist even if none of the relevant conduct took place inside the forum, under the "effects test." *See Licci*, 732 F.3d at 173; *see also Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007) (describing "independent, if conceptually overlapping, methods of demonstrating minimum contacts"). "The effects test is a theory of personal jurisdiction typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci*, 732 F.3d at 173. For these claims, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant *expressly aimed its conduct at the forum*." *Id.* (emphasis added) (citing *Calder v. Jones*, 465 U.S. 783, 789 (1983)). "[T]he fact that harm in the forum is foreseeable, however, is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *In re Terrorist Attacks*, 714 F.3d at 674.

The SAC's core allegation is that Defendants conspired to fix benchmark rates for their own profit. *See FOREX*, 74 F. Supp. 3d at 587. Specifically, it alleges:

> 172. Beginning at least as early as January 1, 2003, Defendants conspired to manipulate the Fixes. Defendants communicated with one another, including in chat rooms, via instant messages, and by email, to carry out their conspiracy. Through these communications, Defendants regularly exchanged their customers' confidential order flow information before the Fixes. Exploiting shared confidential information, Defendants executed concerted trading strategies designed to manipulate, and which actually did manipulate, the Fixes.
>
> 173. Defendants' collusive actions allowed them to substantially reduce their risk in FX trading and to reap supra-competitive profits at the expense of Plaintiffs and the Classes. Defendants faced less risk in their market making activity recorded in the Defendants' front book. Additionally, Defendants' traders could reap even greater profits for their proprietary (prop) trades made on behalf of their bank and recorded in their individual back books.

SAC ¶¶ 172–173. The Complaint also contains allegations about specific chatroom discussions by the New Defendants to manipulate the Fixes. Based on these descriptions of unlawful conduct, personal jurisdiction over the New Defendants turns on whether Plaintiffs sufficiently alleged conspiratorial communication or unlawful manipulation of the Fixes either taking place in, or directed into, the United States.[3]

The SAC contains the following allegations that tie the alleged unlawful conduct to the United States:

- "Defendants' collusive and manipulative acts took place, in substantial part, in New York specifically and in the United States generally. . . . Each Defendant has continuously and systematically entered into FX transactions, including spot transactions, forward contracts, futures contracts, and options contracts in this District and throughout the United States."

- "[A] substantial part of the events giving rise to Plaintiffs' claims arose in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District."

[3] As noted above, the New Defendants' contacts throughout the United States are considered for personal jurisdiction purposes. *See, e.g., Straub*, 921 F. Supp. 2d at 253.

- Defendants' conspiracy, and the resulting impact on the prices of FX Instruments, occurred in and affected interstate commerce and commerce in and between the Territories of the United States."

- "Billions of dollars in FX futures contracts were traded in the United States during the Class Period. Defendants, as dominant dealers in the FX market, knew the results of the WM/Reuters fix were disseminated in the United States, and were used to price FX futures contracts, including CME and ICE FX futures and options contracts. For these reasons, Defendants knew that manipulating the WM/Reuters fix and spot market prices of currency pairs underlying those contracts, would, and did, have direct, substantial, and reasonably foreseeable effects in the United States, including on the prices of FX futures contracts traded on the CME and ICE."

Plaintiffs supplemented the SAC's allegations with additional information about the New Defendants' extensive FX operations in the United States. Plaintiffs attached copies of "Reports of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks," filed with the U.S. Federal Reserve Bank at the end of 2013, describing substantial transactions in FX instruments by BTMU, Société Générale and Standard Chartered plc's subsidiary, SCB. These documents show that at year-end 2013:

- BTMU reported for its single New York branch gross notional outstanding spot FX contracts of $2.4 billion and FX derivatives of $69.8 billion, for a total of $72.2 billion;
- Société Générale reported for its single New York branch gross notional outstanding spot FX contracts of approximately $13 million and FX derivatives of $21.6 billion, for a total of $21.6 billion; and
- Standard Chartered plc's subsidiary, SCB, reported for its single New York branch gross notional outstanding spot FX contracts of $1.9 billion and FX derivatives of $141.4 billion, for a total of $143.3 billion.

Plaintiffs provided citations to the same publicly available documents for 2010 through 2012, and summarized the information in their submission. Based on these public filings, Plaintiffs state -- and one can reasonably infer -- that BTMU, Société Générale and SCB "each had, within

the United States, tens of billions of dollars' worth of FX Instruments outstanding each day, including, undoubtedly, transactions with members of the proposed Classes during the Class Period." Pls.' Br. 3–4 (emphasis omitted).

The New Defendants label the SAC's jurisdictional allegations as "conclusory" and argue that its "generalized allegations are joined by no facts that would support a conclusion that the New Foreign Defendants undertook suit-related conduct—*i.e.*, participated in a conspiracy to manipulate FX spreads or FX benchmark rates—in the forum, or did so elsewhere with the express intent to cause harm in the forum." New Defs.' Br. 14, 15. The New Defendants "do not dispute that they (or their affiliates) have traded currency in New York or do business in New York," but assert that "Plaintiffs have not identified a *single* 'trade at issue in this litigation' that links any of the NFDs to this forum."

This argument is unavailing, and amounts to "a demand for specifics that are not required, and that Plaintiffs could not be reasonably expected to know, at the pleading stage." *FOREX*, 74 F. Supp. 3d at 595. What is sufficient is a "plausible inference" based on factual allegations that a defendant acted illegally in the United States or "intended his [actions] to cause injury in the United States." *See In re Terrorist Attacks*, 714 F.3d at 679. "The plausibility standard is not akin to a 'probability requirement,'" and an allegation passes muster so long as what it alleges is "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Ultimately, every plausibility determination is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Turkmen v. Hasty*, 789 F.3d 218, 233 (2d Cir. 2015) (internal quotation marks omitted).

Here, Plaintiffs plead collusive conduct within the United States, give examples of each New Defendants' participation in the alleged conspiracy (albeit in chatrooms whose participants'

locations are presently unknown), and provide undisputed averments concerning the New Defendants' extensive U.S.-based FX operations. Taken as a whole, the SAC plausibly alleges suit-related conduct that either took place in the United States, or had effects expressly aimed inside the country due to the New Defendants' substantial FX businesses here. Construing the pleadings and declarations in the light most favorable to Plaintiffs, *Dorchester*, 722 F.3d at 85, the New Defendants' suit-related conduct created a substantial connection with this forum, *Walden*, 134 S. Ct. at 1121, and Plaintiffs have made a prima facie showing of specific jurisdiction over BTMU and Société Générale.

Plaintiffs have not, however, made a prima facie showing of specific jurisdiction over Standard Chartered plc. As opposed to BTMU and Société Générale, Standard Chartered plc does not operate or maintain offices in the United States. Plaintiffs' jurisdictional allegations refer to Standard Chartered plc's indirect subsidiary, SCB, but neither the SAC nor Plaintiffs' brief explains why SCB's contacts should be imputed on its parent company. Indeed, the SAC's allegation describing Standard Chartered plc suggests that Plaintiffs have inadvertently named the wrong corporate entity. Standard Chartered plc avers that it "has no employees" and "does not participate in the trading of FX instruments," and Plaintiffs' allegations as to collusive conduct and U.S.-based business likely describe SCB only.

"It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks omitted), and Plaintiffs do not provide sufficient facts or argument in support of a veil-piercing or alter ego analysis. In a footnote, Plaintiffs' brief argues that there is no basis for distinguishing between the businesses of the two entities. Plaintiffs cite only (1) a 2013 news article that reports (without mentioning

SCB) that Standard Chartered plc placed one of its FX dealers on leave, (2) text from a website reporting that the Standard Chartered "Group" was engaging with U.S. authorities and (3) an Annual Report for 2014 referring to an "integrated approach to governance" applicable to the Group's "subsidiaries and . . . branches."  Plaintiffs cannot avoid SCB's corporate form based on these allegations alone.  *See Balintulo v. Ford Motor Co.*, 796 F.3d 160, 168 (2d Cir. 2015) ("While courts occasionally 'pierce the corporate veil' and ignore a subsidiary's separate legal status, they will do so only in extraordinary circumstances . . . .").

In light of the foregoing, Plaintiffs' allegations concerning SCB do not make a prima facie showing of specific jurisdiction over Standard Chartered plc.  As Plaintiffs have not made a prima facie showing for personal jurisdiction over Standard Chartered plc under any theory, their claims against that entity are dismissed.

## IV. CONCLUSION

For the foregoing reasons, (i) the motions of BTMU and Société Générale to dismiss for lack of personal jurisdiction are DENIED; and (ii) the motion of Standard Chartered plc to dismiss for lack of personal jurisdiction is GRANTED.  Any application to substitute Standard Chartered Bank as a defendant shall be filed as a letter motion within seven days of this order.  Any response shall be filed within seven days of Plaintiffs' application.  The parties' submissions shall not exceed three pages in length.

The Clerk of Court is directed to close the motion at Docket No. 501.

Dated:  March 31, 2016
         New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE