USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/20/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                     :
                                     :

In re FOREIGN EXCHANGE BENCHMARK  :
RATES ANTITRUST LITIGATION        :        13 Civ. 7789 (LGS)
                                     :
                                     :        **OPINION AND ORDER**
                                     :
                                     :
-------------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

Defendants The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU"), Credit Suisse Group

AG, Credit Suisse AG, Credit Suisse Securities (USA) LLC ("Credit Suisse"), Deutsche Bank

AG, Morgan Stanley, Morgan Stanley & Co., Morgan Stanley & Co. International plc ("Morgan

Stanley"), RBC Capital Markets, LLC, Société Générale, and Standard Chartered Bank

(collectively, the "Non-Settling Defendants" or "NSDs")[1] move to dismiss Plaintiffs' claims

against them pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  For the following

reasons, the motion is granted in part and denied in part.

I.     **BACKGROUND**

This case involves claims based on an alleged conspiracy among banks to fix prices in

the foreign exchange ("FX") or foreign currency market in violation of the Sherman Antitrust

Act, 15 U.S.C. §§ 1, 3, and the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 et. seq.  On

---

[1]     By order dated December 15, 2015, the Court preliminarily approved settlement agreements between Plaintiffs and Defendants Bank of America Corporation; Bank of America, N.A.; Merrill Lynch, Pierce, Fenner & Smith Inc.; Barclays Bank PLC; Barclays Capital Inc.; BNP Paribas Group; BNP Paribas North America Inc.; BNP Paribas Securities Corp.; BNP Prime Brokerage, Inc.; Citigroup Inc.; Citibank, N.A.; Citicorp; Citigroup Global Markets Inc.; The Goldman Sachs Group, Inc.; Goldman, Sachs & Co.; HSBC Holdings PLC; HSBC Bank PLC; HSBC North America Holdings Inc.; HSBC Bank USA, N.A.; HSBC Securities (USA) Inc.; JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; The Royal Bank of Scotland Group PLC; The Royal Bank of Scotland PLC; RBS Securities, Inc.; UBS AG; UBS Group AG and UBS Securities LLC (collectively, the "Settling Defendants").

January 28, 2015, the Court denied a motion -- made by the twelve defendants named at the time -- to dismiss under Rule 12(b)(6) a previous version of Plaintiffs' complaint (the "CAC") that alleged antitrust claims based on Defendants' conspiracy to manipulate WM/Reuters Closing Spot Rates, which impacted the pricing of Plaintiffs' FX Instruments. *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581 (S.D.N.Y 2015) ("*FOREX*"). The January 28 Opinion dismissed, however, two separate "Foreign Complaints" that alleged Section 1 violations and corresponding violations of New York state law. *Id.* at 589, 598.

In July 2015, Plaintiffs served and filed a Second Consolidated Amended Class Action Complaint ("SAC"), which added four new defendants,[2] allegations expanding the breadth of the alleged conspiracy and claims under the CEA on behalf of an "Exchange Class" of "[a]ll persons who, between January 1, 2003 and December 31, 2013 (inclusive) entered into an FX Instrument on an exchange where such persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, entered into one or more FX Instruments on a U.S. exchange." The putative class in the CAC was restyled the "Over-the-Counter" or "OTC Class," representing "[a]ll persons who, between January 1, 2003 and December 31, 2013 (inclusive) entered into an FX Instrument directly with a Defendant, where such persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, transacted one or more FX instruments in the United States or its territories." The SAC's definition of the OTC Class is more expansive than the CAC's, which restricted class members to those who "traded foreign currency directly with a Defendant in the United States between August 1, 2005 and the present which transaction was settled on the basis of WM/Reuters Rates."

---

[2]    BTMU, RBC Capital Markets, LLC, Société Générale, and Standard Chartered (collectively, the "New Defendants"). Each of the New Defendants is also a Non-Settling Defendant.

The NSDs filed the instant motion to dismiss on November 30, 2015.  During the
pendency of this motion, a separate motion to dismiss for lack of personal jurisdiction was
granted with respect to Standard Chartered plc.  *In re Foreign Exch. Benchmark Rates Antitrust
Litig.*, No. 13 Civ. 7789, 2016 WL 1268267, at *1 (S.D.N.Y. Mar. 31, 2016).  On June 3, 2016,
Plaintiffs filed a Third Amended Class Action Complaint ("TAC") to substitute Standard
Chartered Bank as a defendant in place of Standard Chartered plc.  There is no functional
difference between the SAC and the TAC other than the Standard Chartered entity named, and
Standard Chartered Bank adopts the arguments made in the briefs previously submitted by
Standard Chartered plc.

## II.   <u>STANDARD</u>

"On a motion to dismiss, all factual allegations in the complaint are accepted as true and
all inferences are drawn in the plaintiff's favor."  *Littlejohn v. City of New York*, 795 F.3d 297,
306 (2d Cir. 2015) (citation omitted).  "In determining the adequacy of the complaint, the court
may consider any written instrument attached to the complaint as an exhibit or incorporated in
the complaint by reference, as well as documents upon which the complaint relies and which are
integral to the complaint."  *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d
Cir. 2015) (citation omitted); *see also Beauvoir v. Israel*, 794 F.3d 244, 248 n.4 (2d Cir. 2015).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
"Threadbare recitals of the elements of a cause of action, supported by mere conclusory
statements, do not suffice."  *Id.*  "[W]hatever documents may properly be considered in
connection with the Rule 12(b)(6) motion, the bottom-line principle is that 'once a claim has

been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.'" *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 563).

## III.   DISCUSSION

As explained below, the NSDs' motion to dismiss the TAC's claims is granted with respect to antitrust claims arising out of certain transactions executed outside the United States, and as to transactions executed before December 1, 2007, but denied in all other respects. As to the CEA claims, the NSDs' motion is granted as to the Exchange Plaintiffs' CEA false reporting claims and claims based on transactions conducted on foreign exchanges, but denied as to the Exchange Plaintiffs' other claims under the CEA.

### A.  Antitrust Claims

The NSDs raise four arguments in favor of dismissal of all or part of the TAC's antitrust claims. First, the NSDs argue that the TAC fails to plausibly allege a global conspiracy to manipulate prices in the FX market or that any of the NSDs joined such a conspiracy. Second, the NSDs argue that members of both the OTC and Exchange Classes lack antitrust standing. Third, the NSDs argue that the Foreign Trade Antitrust Improvements Act ("FTAIA") bars any claims based on transactions outside of the United States. Finally, the NSDs argue that claims based on transactions pre-dating November 1, 2009, are time-barred.

#### 1. *The Complaint Sufficiently Pleads a Conspiracy.*

The TAC sufficiently pleads both the existence of a conspiracy to fix benchmark rates and bid/ask spreads, and the NSD's participation in that conspiracy.

"The Sherman Act bans '[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." *Mayor and City*

*Council of Balt. v. Citigoup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (alteration in original) (quoting 15 U.S.C. § 1).  A complaint asserting a claim under Section 1 "must allege enough facts to support the inference that a conspiracy actually existed by either direct or circumstantial evidence, because in many antitrust cases a smoking gun can be hard to come by, especially at the pleading stage." *FOREX*, 74 F. Supp. 3d at 591 (internal quotation marks omitted).  "The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (internal quotation marks omitted) *superseded by statute on other grounds*, Pub. L. No. 97–290, 15 U.S.C. § 6(a); *accord United States v. Apple, Inc.*. 791 F.3d 290, 319 (2d Cir. 2015).

In denying the prior Rule 12(b)(6) motion, the *FOREX* opinion held that the CAC sufficiently alleged an antitrust conspiracy because it "offer[ed] direct evidence akin to the recorded phone call in which two competitors agreed to fix prices at a certain level -- the Second Circuit's paradigmatic example of direct proof of a Section 1 violation."  74 F. Supp. 3d at 591 (citation and internal quotation marks omitted).  Specifically, the CAC had alleged that FX traders across the then-Defendant banks used chat rooms and instant messaging to share market-sensitive price and customer information and trading positions before the WM/Reuters Closing Spot Rates (the "Fix") were determined.  *Id.*  The CAC also alleged agreements in chat rooms and through instant messages to manipulate the Fix, and the existence of certain chat rooms called "The Cartel," "The Bandits' Club" and "The Mafia" that were comprised of traders from different Defendant banks.  *Id.* at 592.  Based on these allegations, the CAC pleaded "a price-fixing conspiracy among horizontal competitors," which is a per se Section 1 violation.  *Id.*

As noted above, the CAC was amended to add the New Defendants and an Exchange Class of those who are either domiciled in the United States or entered into FX Instruments through a U.S. exchange.  The SAC also expanded the scope of the conspiracy.  Beyond the conspiracy to manipulate the Fix, the SAC (and now the TAC) also alleges that Defendants conspired throughout the trading day to fix spot prices[3] and other benchmark rates such as the European Central Bank's Fixing Rates and those published by the Russian ruble/U.S. dollar CME/Emerging Markets Traders Association, the Association of Banks in Singapore, major banks in Tokyo and the Treasury Markets Association in Hong Kong.

The NSDs argue that Plaintiffs' allegations (1) at most support "a series of small conspiracies" that cannot sustain a "grand conspiracy theory"; (2) do not create a plausible inference that any NSD joined a global conspiracy that *other* banks may have participated in; (3) misrepresent chat transcripts discussing spreads and (4) fail to allege any agreement by which any Defendant manipulated FX rates on a centralized exchange.  None of the NSDs' arguments merits dismissal.

First, the NSDs assert that "[t]he pleaded facts . . . can at most support an inference that different combinations of traders at different groups of banks sporadically carried out a series of small conspiracies involving different rates (spot vs. benchmark), different currency pairs, and different chat rooms."  This argument is incorrect.  The TAC contains each of the allegations of the prior complaint that survived the motion to dismiss.  The TAC adequately alleges a Section 1 conspiracy among Defendants in the FX market based on, among other things, the sharing of market-sensitive, nonpublic information in chat rooms and instant messages, and a series of penalties and fines imposed against a number of Defendants by regulators worldwide.  *FOREX*,

---

[3]     According to the TAC, "spot transactions . . . involve the outright exchange of currencies between two counterparties on a value date that is within two bank business days' time."

74 F. Supp. 3d at 591–93.  In support of its allegation of a broader "overarching" conspiracy encompassing both spot prices and benchmark rates, the TAC alleges that each Defendant (including each of the NSDs) participated in chat rooms discussing multiple currencies. "Defendants' top-level traders" used chat rooms, instant messages and emails to coordinate their conspiracy.  "Like playing multiple bingo cards, Defendants' FX traders participated in multiple chat rooms, allowing them to simultaneously communicate with numerous other Defendants on a global basis."  The TAC further alleges that "[o]ver time, various chat rooms, in furtherance of the conspiracy, evolved to discuss numerous currency pairs beyond those for which they were originally established."

Second, the NSDs' argument that they were excluded from any antitrust conspiracy by other Defendant banks is also rejected.  The NSDs claim that the guilty pleas of some of the Settling Defendants[4] "forecloses Plaintiffs' theory that there was one all-encompassing conspiracy to manipulate prices in every segment of the global FX market."  This assertion is apparently based on language included in the various guilty pleas that certain "infamous" chat rooms such as "The Cartel" or "The Mafia" were "exclusive."  For example, the factual basis for the JPMorgan plea agreement stated that "[p]articipation in this electronic chat room [The Cartel or The Mafia] was limited to specific EUR/USD traders, each of whom was employed, at certain times, by a co-conspirator dealer in the FX Spot Market."

Nothing in the plea agreements themselves, however, suggests that the only participants in the conspiracy were the entities that eventually entered guilty pleas.  At most, the NSDs ask

---

[4]     According to the TAC, four Defendants (Barclays, Citi, JPMorgan and RBS) have pleaded guilty to conspiring to violate the antitrust laws.  A fifth, UBS, pleaded guilty to a count of wire fraud for its involvement in manipulating LIBOR and other benchmark rates.  Included in that plea's statement of facts are admissions that UBS had engaged in deceptive FX trading and sales practices after it signed a LIBOR Non-Prosecution Agreement from December 2012.  Each of these Defendants is a Settling Defendant.

the Court to infer from the lack of guilty pleas from other Defendants that the investigations by

the DOJ or other government regulators did not unearth any improper conduct by those entities.

Such an inference is inappropriate, however, as the DOJ investigation is continuing, and in any

event, "the scope and nature of . . . criminal guilty pleas are not determinative of the plaintiffs'

potential claims in a civil antitrust suit."  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D.

583, 607 (N.D. Cal. 2010); *see also In re Lithium Ion Batteries Antitrust Litig.*, No. 13 MD 2420,

2014 WL 309192, at * 14 (N.D. Cal. Jan. 21, 2014) (citation omitted) ("The reasonable doubt

standard faced by the government makes criminal guilty pleas in antitrust cases like this one at

once a strong indicator of the existence of a conspiracy but a weak indicator of the scope of that

conspiracy."); *In re Vitamins Antitrust Litig.*, No. Misc. 99-197, 2000 WL 1475705, at *18

(D.D.C. May 9, 2000) ("[T]he criminal guilty pleas do not establish boundaries for this civil

litigation . . . .").

     While it is true that not every chat transcript contained in the TAC includes each

individual Defendant or a discussion of each possible currency pair or benchmark rate, every

NSD is alleged as a participant in at least one illegal communication.  Taken as a whole, the

TAC sufficiently pleads an antitrust conspiracy to fix spot prices and benchmark rates in the FX

market.  Questions as to each Defendant's participation in the conspiracy and the conspiracy's

scope may be raised later in litigation, but do not merit dismissal at this phase.  *See In re Lithium*

*Ion Batteries*, 2014 WL 309192 at *2 ("The complaints contain voluminous, specific allegations

of not only opportunities to collude, but certain defendants' actual agreements to refrain from

competing on price. . . .  The question in this case is not whether any conspiracy existed, only

how far it reached.  That question is ultimately one of fact, and cannot be resolved in the present

procedural posture, where the Court tests only the sufficiency of the pleadings.").

Third, the NSDs' characterization of the chats cited in the TAC is equally unpersuasive. According to the NSDs, the TAC's allegations concerning the NSDs' participation in the conspiracy "amount to no more than claims of sporadic information exchanges that do not constitute *per se* antitrust violations as a matter of law."  As an initial matter, a fair reading of the chats quoted in the TAC as to each NSD suggests that more than a harmless exchange of information was occurring.  For example, a chat where a NSD trader asks others what they believe a spread should be plausibly suggests that the traders in the room are colluding to fix the spread of the currency pair they are discussing.  That each participant concludes at the end of the discussion that a certain spread is the "right" spread weighs against the NSDs' suggested interpretation that the conversation as a whole was nothing more than an exchange of information.

Even if these conversations themselves did not set spreads or fixes, the sharing of information between competitors constitutes circumstantial evidence of an antitrust conspiracy and is sufficient at the pleading stage.  The TAC alleges that sharing of confidential customer information violates the Federal Reserve Bank of New York's "Guidelines for Foreign Exchange Trading Activities" and, in any event, is against each bank's economic self-interest as a competitor absent collusion.  Although the NSDs may present some legitimate reason to share information with competitors at a later stage of the litigation, the TAC plausibly alleges that these conversations were meant to execute or at least facilitate coordinated trading.  *See Mayor and City Council of Baltimore*, 709 F.3d at 136 (identifying as "plus factors" "a common motive to conspire, evidence that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications" (citation omitted)).

Finally, the NSDs argue that the TAC fails to plead that any Defendant joined a global conspiracy involving exchange-traded FX Instruments.  Essentially, their argument is that because "Plaintiffs' claim regarding exchange-traded instruments is entirely derivative of their flawed theory of a global conspiracy to manipulate spreads and benchmark rates," it also fails.

As discussed above, the TAC sufficiently pleads an antitrust conspiracy to manipulate spreads and benchmark rates.  The TAC further alleges that this same conspiracy resulted in artificial prices for exchange-traded instruments because "FX spot market prices, including benchmark rates, directly impact the prices of exchange-traded FX futures and options contracts."  According to Plaintiffs, "there is a direct relationship between currency prices in the spot market and the value of each FX futures contract" and "futures prices are based on and derived arithmetically from spot prices."  "Given the direct relationship between FX futures prices and spot market prices for the underlying currency pairs . . . , Defendants knew their manipulative and/or collusive activities in spot transactions would result in artificial price movements for exchange transactions."  Artificial price movements in FX exchanges further benefited Defendants in the form of "ill-gotten trading profits . . . from FX derivative contracts, including futures contracts."  Based on these allegations, the TAC plausibly alleges that the conspiracy to fix FX products involved exchange-traded FX Instruments.

### 2.  *The Complaint Sufficiently Pleads Antitrust Standing*

Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . and shall recover threefold the damages by him sustained."  15 U.S.C. § 15(a).  Similarly, Clayton Act § 26 provides in part that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust

laws. . . ."  15 U.S.C. § 26.  Both the Supreme Court and the Second Circuit have found this language to require plaintiffs bringing an antitrust claim to establish not only constitutional standing, but also antitrust standing.  *See Cargill, Inc. v. Monfort of Colo., Inc*., 479 U.S. 104, 110–11 (1986); *Assoc. Gen. Contractors of Calif., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) ("*AGC*") (discussing antitrust standing in regard to federal claims for damages); *Gelboim v. Bank of Am. Corp*., 823 F.3d 759, 770 (2d Cir. 2016) (same).  The issue of antitrust standing is evaluated at the pleading stage based on the allegations in the complaint.  *In re Aluminum Warehousing Antitrust Litig*., ___ F.3d ___, Nos. 14-3574, 14-3581, 2016 WL 4191132, at *4 (2d Cir. Aug. 9, 2016).  To plead antitrust standing, a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust injury, meaning injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 489 (1977), and (ii) that it is a suitable plaintiff in that it satisfies the so-called "efficient enforcer" factors, *AGC*, 459 U.S. at 538–45; *Aluminum Warehousing*, 2016 WL 4191132 at *4; *Gelboim*, 823 F.3d at 772.

The NSDs argue that both the OTC and Exchange Classes lack antitrust standing.  As explained below, the TAC sufficiently pleads antitrust standing as to both classes.

### a.  The Complaint Pleads Antitrust Injury

The Complaint plausibly alleges that the defendants engaged in horizontal price fixing resulting in Plaintiffs' paying higher prices in the FX market.  "Such an injury [being forced to pay supra-competitive prices as a result of the defendants' anticompetitive conduct] plainly is 'of the type the antitrust laws were intended to prevent.'"  *In re DDAVP Direct Purchaser Antitrust Litig*., 585 F.3d 677, 688 (2d Cir. 2009) (quoting *Brunswick Corp.*, 429 U.S. at 489); *accord Gelboim*, 823 F.3d at 772.  The Complaint therefore pleads antitrust injury.  This was also the

11

Court's holding on the prior motion to dismiss the CAC.  *FOREX*, 74 F. Supp. 3d at 598.

Although the conspiracy alleged in the TAC is broader, the nature of Plaintiffs' injury -- paying a

higher price, or selling at a lower price, as a result of Defendants' alleged collusion -- remains

unchanged.

The NSDs challenge antitrust injury with respect to both the OTC Class and the

Exchange Class, arguing that "Plaintiffs must allege that they were injured when they purchased

or sold a particular currency pair, and connect that injury to an alleged anticompetitive act by

some or all Defendants in the same currency pair at the relevant time."  In essence, this argument

repeats the "demand for specifics" that the *FOREX* opinion held was not required at the pleading

stage.  *Id.* at 595.

The NSDs further argue that any antitrust injury suffered by the Exchange Class is "even

more suspect" because, unlike the OTC Class, these plaintiffs were not purchasers of

Defendants' products.  The potential to suffer antitrust injury is not limited to "purchasers" of a

conspirator's products.  "Section 4 of the Clayton Act . . . provides a treble-damages remedy to

'[a]*ny person* who shall be injured in his business or property *by reason of anything* forbidden in

the antitrust laws.'"  *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982) (alteration in

original) (quoting 15 U.S.C. § 15).  "'[T]he statute does not confine its protections to consumers,

or to purchasers, or to competitors, or to sellers . . . .'"  *Id.* (quoting *Mandeville Island Farms,*

*Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948)).  However, "[g]enerally, only those that

are participants in the defendants' market can be said to have suffered antitrust injury."

*Aluminum Warehousing*, 2016 WL 4191132 at *4 (citation omitted).  The Second Circuit in

*Gelboim* recently held that four groups of plaintiffs had pleaded antitrust injury, including not

only the OTC plaintiffs there who purchased directly from at least one defendant, but also the

"Exchange-based plaintiffs" (like the Exchange Plaintiffs here) who did not purchase from the bank defendants. *Gelboim*, 823 F.3d at 767–68, 772.

Here, the TAC alleges that FX benchmark rates "directly impact the prices of FX futures contracts" traded on exchanges, and that prices for currency futures "move in virtual lockstep to the spot price." "Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Gelboim*, 823 F.3d at 772 (citation omitted). The manner in which the alleged conspiracy affected the prices paid by the Exchange Class is not meaningfully different from how the conspiracy affected the prices paid by the OTC Class. The TAC also pleads that Defendants participated in the market for FX products traded on an exchange, and that the conspiracy was intended in part to earn Defendants "ill-gotten trading profits" on those products. Consequently, the Exchange Class has pleaded antitrust injury even though its members may not have transacted directly with any Defendant.

### b. Plaintiffs Are Efficient Enforcers

Both classes of Plaintiffs are efficient enforcers for antitrust standing purposes. When assessing whether a private antitrust plaintiff satisfies the "efficient enforcer" requirement for antitrust standing, courts must consider (i) the "directness or indirectness of the asserted injury," viewed in light of the "chain of causation" linking a plaintiff's alleged injury and the defendant's anticompetitive conduct; (ii) the "existence of more direct victims of the alleged conspiracy"; (iii) whether damages are "highly speculative" and (iv) whether allowing the claim would pose "either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *AGC*, 459 U.S. at 538–45.

### (i)  The OTC Class Plaintiffs Are Efficient Enforcers

The TAC sufficiently pleads that the OTC Plaintiffs are efficient enforcers because (i) their alleged injury necessarily flows directly from Defendant's collusive conduct because the OTC Class by definition is limited to persons who dealt directly with a Defendant; (ii) there are no victims whose injury is more direct; (iii) the damages are not highly speculative because they arise from identifiable transactions in which plaintiffs suffered greater losses or earned lower profits because the price was the product of manipulation; and (iv) there is no danger of duplicate recoveries or complex apportionment because the claims are tied to specific transactions.  The NSDs previously conceded that the OTC Class is the "obvious class of persons whose self-interest would motivate them to vindicate the public interest in antitrust enforcement."

The NSDs challenged the OTC Plaintiffs as efficient enforcers only after the Second Circuit's recent decision in *Gelboim*, which considered the efficient enforcer factors in a case involving the alleged manipulation of LIBOR.  Although *Gelboim* discussed the efficient enforcer factors, it did not resolve the issue, as the district court had not reached it.  The Second Circuit remanded for the district court to address the question first.  *Id*. at 778; *see also id.* at 777 n.17.  Nevertheless, *Gelboim*'s analysis of the efficient enforcer factors may be particularly salient here because the plaintiffs in *Gelboim* and in this case both allege that large banks manipulated benchmark rates that affected the prices of financial instruments.  As explained below, because of the factual differences between the two cases, the efficient enforcer analysis here is less challenging than in *Gelboim*.

The NSDs argue that "the sheer scope of the OTC Plaintiffs' claims raise concerns about damages disproportionate to wrongdoing."  Under the heading "causation," and the "directness or indirectness" of the alleged injury, *Gelboim* observed that damages might be disproportionate

based on the defendants' limited control of a very large potential market.  *Id.* at 779 ("[I]f the Banks control only a small percentage of the ultimate identified market, . . . [potentially] 'trillions of dollars' worth of financial transactions' . . . , this case may raise the very concern of damages disproportionate to wrongdoing.") (citation omitted).  The *Gelboim* court expressed concern about the scope and impact of the U.S. antitrust laws in those circumstances.  Unlike the plaintiffs in *Gelboim*, however, the OTC Plaintiffs here are a class of persons "who entered into an FX Instrument directly with a Defendant," and therefore do not pose the same threat of indirect and therefore disproportionate liability.

The NSDs next argue that their potential aggregate liability is disproportionate to any alleged wrongdoing because nine (of sixteen) Defendants have already agreed to settlements, leaving the NSDs potentially liable under principles of joint and several liability for any harm caused by any of the sixteen.  *See In re Uranium Antitrust Litig.*, 617 F. 2d 1248, 1257 (7th Cir. 1980) ("Anti-trust liability under Section 1 of the Sherman Act is joint and several."); *In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 508 (S.D.N.Y. 1996) (same), *abrogated on other grounds by Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011); *see generally Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981); *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 144 (1968) (White, J., concurring) ("[D]amages normally may be had from either or both defendants without regard to their relative responsibility for originating the combination or their different roles in effectuating its ends."), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 472 U.S. 752, 765 (1984).  This argument has nothing to do with the efficient enforcer analysis, particularly the directness of injury factor that prompted *Gelboim*'s concern with disproportionate damages.  In any event, the argument is unpersuasive.  The NSDs essentially argue that the antitrust laws'

imposition of treble damages and the provision for joint and several liability are themselves "disproportionate." The NSDs do not cite any authority for this line of reasoning nor does it seem likely that they could.

The NSDs also argue that the OTC Plaintiffs are inefficient enforcers because their claim for damages is speculative. In *Gelboim*, the Second Circuit noted that although "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created," the presence of "highly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement." *Gelboim*, 823 F.3d at 779. The *Gelboim* court described the LIBOR actions as "present[ing] some unusual challenges" for damages calculations because "[t]he disputed transactions were done at rates that were negotiated, notwithstanding that the negotiated component was the increment above LIBOR." *Id.* at 780. The Second Circuit also noted that damages calculations for LIBOR-based financial instruments would be further complicated by the fact that "the market for money is worldwide, with competitors offering various increments above LIBOR, or rates pegged to other benchmarks, or rates set without reference to any benchmark at all." *Id.*

Unlike in *Gelboim*, where LIBOR may have been only a component of price or where counterparties negotiated rates in reference to LIBOR, the alleged conduct in this case is more straightforward. As alleged in the TAC, the FX market does not entail the same level of "negotiation" between parties in selecting the ultimate rates for their transactions. "In a spot transaction, a Defendant quotes its customer a 'bid' (the price it will buy currency) and an 'ask' (the price it will sell currency). . . . Defendants conspired to fix spot prices by agreeing to artificially widen spreads quoted to customers." For spot transactions -- which account for approximately half of the FX volume in the United States according to the TAC -- the prices for OTC Plaintiffs would directly result from the manipulation of spreads. The TAC also alleges

that the prices of OTC transactions -- spot, outright forwards and FX swaps -- are based on the spot price plus, in the case of forwards and swaps, a "mathematically determined" (i.e., not negotiated) component.  Consequently, any damages calculation would look principally (if not exclusively) to the difference between the collusively set rates and what the rates would have been but for the manipulation.

The NSDs note that Plaintiffs allege "that the defendants engaged in a price-fixing conspiracy spanning more than a decade and involving innumerable combinations of currency pairs for almost every country in the world."  The breadth of the alleged conspiracy, however, does not render damages in this case speculative, as any harm from the alleged conspiracy can be shown on a transaction-by-transaction basis.  *See Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14 Civ. 7126, 2016 WL 1241533, at *8 (S.D.N.Y. Mar. 28, 2016) ("Plaintiffs have alleged that they were directly harmed by Defendants' anticompetitive conduct by having to pay higher prices (or earning lower profits) from instruments tied to ISDAfix, there is nothing particularly speculative about the injury alleged, and the damages at issue are tied to particular transactions and contracts, obviating the danger of duplicative recovery.").

Finally, the NSDs focus on *Gelboim*'s observation of "many other enforcement mechanisms at work," and their bearing upon the need for private enforcement in the LIBOR cases.  *Gelboim*, 823 F.3d at 778.  *Gelboim*, where the court noted that the alleged conduct is "under scrutiny by government organs, bank regulators and financial regulators in a considerable number of countries," made this observation in the context of its discussion of whether damages in the *Gelboim* action would lead to duplicative recovery and complex damages apportionment. *Id.*  The OTC Plaintiffs do not present a danger of "duplicate recovery" and complex damage apportionment.  First, none of the regulatory investigations in the United States appear to be

aimed at providing restitution to any injured parties, and the NSDs have not shown otherwise. The TAC references an investigation by the Commodity Futures Trading Commission and settlements with the same five banks "resulting in adverse findings of facts and billions of dollars in fines" with no reference to restitution.  The TAC similarly describes an investigation by the Office of the Comptroller of the Currency and its assessment of $950 million in fines against three U.S. banks relating to foreign exchange trading.  The TAC also references related fines assessed by New York State Department of Financial Services.  Neither the Complaint nor the NSDs suggest that any of these regulators has ordered restitution as a part of any penalty or settlement.  As for the Department of Justice criminal investigation, which the TAC alleges is still ongoing, four banks have pleaded guilty and one has sought amnesty; the same five have settled with Plaintiffs in this civil action.  Based on the timing and terms of the settlements, there is no indication that the penalties imposed will include restitution for any private individual injured by these entities' conduct, and Plaintiffs' recovery in this action would therefore not lead to duplicative recovery.  As to foreign investigations, duplicative recovery is highly unlikely as the OTC Class is defined to include only "persons" that are either domiciled or transacted in the United States.  Because public enforcement does not provide redress to victims of the conspiracy, the OTC Class is an efficient and necessary enforcer.

Having pleaded facts sufficient to establish both antitrust injury and their status as efficient enforcers, the OTC Plaintiffs have sufficiently alleged antitrust standing for purposes of this motion.

### (ii)  The Exchange Class Plaintiffs Are Efficient Enforcers

The Exchange Plaintiffs traded in FX futures and FX futures options, which are traded on exchanges.  The TAC sufficiently pleads that these plaintiffs are efficient enforcers by alleging

facts that, if proven, show that (i) the Exchange Plaintiffs' injury -- paying a non-competitive exchange price -- flows directly from Defendants' manipulation of the FX spot prices, since the two prices move virtually in tandem; (ii) with respect to the FX futures market, there are no victims whose injury is more direct; (iii) the damages are not highly speculative because they are based on a specifically alleged relationship between the exchange prices and spot prices, and arise from identifiable transactions in which plaintiffs suffered greater losses or earned lower profits because the price was the product of manipulation; and (iv) there is no danger of duplicate recoveries or complex apportionment because the claims are tied to specific transactions.

As to the Exchange Class, the NSDs argue that these plaintiffs are not efficient enforcers because (1) their injuries are indirect and speculative, (2) the OTC Plaintiffs are alternative (and superior) enforcers and (3) their damages would be difficult to apportion. As explained below, these arguments are rejected.

The NSDs argue that, because the Exchange Plaintiffs purchased FX Instruments on an exchange rather than directly from a Defendant, they were not "directly harmed" by the alleged conduct and that their "injuries are, at most, a 'side-effect' of the alleged conspiracy to manipulate the OTC market." This argument is incorrect because of the direct relationship between the price at which Exchange Plaintiffs purchased FX futures and FX options (i.e., FX products purchased on an exchange) and the spot price that Defendants allegedly manipulated. In contrast to the "vaguely defined links" described in *AGC*, *see* 459 U.S. at 540, the TAC quotes from settlements that Barclays, Citigroup, HSBC, JPMorgan, RBS and UBS entered into with the U.S. Commodity Futures Trading Commission's ("CFTC"), finding that "[e]xchange rates in many actively traded CME foreign exchange futures contracts . . . track rates in foreign exchange markets at near parity." The TAC alleges, "Since currency futures are a derivative of the spot

cash currency market and are deliverable in the physical currency, their prices move in virtual lockstep to the spot price." Based on the standard pricing formula for futures contracts and empirical data, the TAC illustrates how the prices of FX futures contract track spot rates at near parity. The TAC's detailed allegations of the spot market's effects on the FX futures market undermine the NSDs' arguments concerning the "indirectness" of the Exchange Plaintiffs' injury.

The antitrust laws do not require a plaintiff to have purchased directly from a defendant in order to have antitrust standing. *See Blue Shield of Va.*, 457 U.S. at 472 (protection of antitrust laws not confined to "consumers, or to purchasers, or to competitors, or to sellers"). In *Gelboim's* efficient enforcer discussion, the Second Circuit observed that "at first glance . . . there appears to be no difference in the injury alleged by those who dealt in LIBOR-denominated instruments, whether their transactions were conducted directly or indirectly with the Banks." The court then expressed concern, as discussed above, with the possibility of damages disproportionate to wrongdoing "if the Banks control only a small percentage of the ultimate identified market." *Gelboim*, 823 F.3d at 779. Here in contrast, the TAC alleges that Defendants "dominated the FX market with a combined market share of over 90% . . . [as] significant participants in both OTC and exchange transactions . . . ." Consequently, there is little difference regarding the proportionality of damages suffered by the OTC Class, which dealt directly with Defendants, and the Exchange Class, which did not. In both cases, the damages allegedly occurred in markets Defendants controlled and as a direct result of their collusive activities in spot transactions.

The cases cited by the NSDs do not alter the conclusion that the injury to the Exchange Class is sufficiently direct for efficient enforcer status. In *In re Digital Music Antitrust*

*Litigation*, the court denied antitrust standing to purchasers of CDs alleging an antitrust conspiracy to set prices on digital music.  812 F. Supp. 2d 390, 402–04 (S.D.N.Y. 2011).  Central to the court's holding, however, was the fact that the operative complaint "contain[ed] no nonconclusory allegations about how the pricing of Internet Music affected CD pricing, how the CD market operated generally, . . . or any kind of tie . . . between CD pricing and Internet Music pricing."  *Id*. at 402.  The opinion recognized numerous cases where antitrust standing was allowed where the plaintiff alleged a "closer link" or "causal link" between the prices in two markets.  *See id.* at 402 & n.4 (citing, inter alia, *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 476 (7th Cir. 2002); *Sanner v. Bd. of Trade*, 62 F.3d 918, 929 (7th Cir. 1995); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 274 (D. Conn. 2003)).  In light of the TAC's detailed allegations linking the FX spot market and futures market, *In re Digital Music*'s holding is inapposite.

Similarly, in *Aluminum Warehousing*, the district court held that plaintiffs were not efficient enforcers where each plaintiff occupied "roles which are more than one level down in the supply/distribution chain" from the alleged conspiracy to restrain the output of aluminum.  No. 13 MD 2481, 2014 WL 4277510, at *1, 22 (S.D.N.Y. Aug. 29, 2014), *aff'd* 2016 WL 4191132 (2d Cir. 2016).  Plaintiffs in that case did not purchase aluminum directly, and instead claimed to have been injured because their own purchases included an inflated premium "several layers down the supply/distribution" chain."  *Id.* at *22.  The court held that "[t]he injury suffered by these plaintiffs [was] therefore indirect" because "isolating their particular damage from other potential causal factors would present a highly complex task."  The court further observed that labor costs, transportation costs and bottling could have led to the increase in prices.  *Id*.

The district court opinion in *Aluminum Warehousing* is distinguishable for two reasons. First, unlike the plaintiffs in *Aluminum Warehousing*, the Exchange Plaintiffs here are not more than one level removed from the alleged conspiracy in the spot market, and their claims are not derivative of the OTC Plaintiffs' claims. Instead, the TAC alleges that Defendants acted with "specific intent and motive in the manipulation of spot market prices of various currency pairs" in order to "obtain ill-gotten trading profits from transactions in the spot market and from FX derivative contracts, including the FX futures contracts, held by them or other co-conspirators." Moreover, the harm to the Exchange Class "form[s] a separate and compensable injury." *Loeb*, 306 F.3d at 483; *see also id.* at 481 ("[D]ifferent injuries in distinct markets may be inflicted by a single antitrust conspiracy, and thus . . . differently situated plaintiffs might be able to raise claims."); *id.* at 482 ("[P]laintiffs are not indirect purchasers along a supply chain. . . . Instead, the alleged conspiracy operated in the separate but related futures market, through which it sought directly to manipulate the price of copper the plaintiffs were buying."). Second, whereas the *Aluminum Warehousing* court readily identified other "potential causal factors" of any injury suffered by the plaintiffs in that case, Plaintiffs here plead a more direct (and nearly mechanical) relationship viewed in light of the "chain of causation" between the prices in the FX spot and futures markets. *See AGC*, 459 U.S. at 538–45 (identifying as the first efficient enforcer factor the "directness or indirectness of the asserted injury," viewed in light of the "chain of causation" linking a plaintiff's alleged injury and the defendant's anticompetitive conduct).

The NSDs argue that the Exchange Plaintiffs do not satisfy the second efficient enforcer factor because the OTC Plaintiffs are more direct victims and better situated to challenge the collusive conduct alleged in the TAC. As noted above, however, "different injuries in distinct markets may be inflicted by a single antitrust conspiracy." *Loeb*, 306 F.3d at 481. With respect

to the FX futures market, there are no other alternative enforcers.  To preclude Exchange

Plaintiffs from proceeding in this case would leave any person who paid supra-competitive

prices in FX exchanges as a result of Defendants' conduct without a legal remedy.  *See In re*

*DDAVP Direct Purchaser*, 585 F.3d at 689 ("The second [*AGC*] factor simply looks for a class

of persons naturally motivated to enforce the antitrust laws.  'Inferiority' to other potential

plaintiffs can be relevant, but it is not dispositive." (citation omitted)).

The NSDs also argue that any calculation of the Exchange Plaintiffs' damages would be

too speculative to support antitrust standing because "quantifying their damages . . .  would

require 'wholesale speculation' as to the extent to which the allegedly manipulated OTC-traded

rates impacted exchange-traded rates" and because independent factors contributed to any

alleged damages suffered.  Neither of the NSDs' arguments renders the Exchange Class's claim

for damages "speculative."

First, quantifying damages for the Exchange Class would not involve wholesale

speculation according to the allegations in the TAC.  As discussed above, the TAC explains and

illustrates in a non-conclusory fashion a highly correlated relationship between the FX futures

markets and the spot prices that Defendants allegedly manipulated.  If such a linkage is proven,

Plaintiffs will seek to prove damages by comparing the prices an Exchange Plaintiff paid in

identifiable transactions with what the price would have been but for collusion.  At the motion to

dismiss stage, any holding that these damages would be speculative is premature.  *See Sanner*, 62

F.3d at 929 ("Damages will be neither speculative nor difficult to apportion . . . .  A damages

calculation for a market manipulation scheme, though it may require expert testimony, is hardly

beyond the ken of the federal courts.").[5]

---

[5]  This holding also dispenses with the NSDs' separate argument that it would be "virtually
impossible to apportion damages between Exchange Plaintiffs and OTC Plaintiffs."

Second, as discussed above, the TAC alleges a direct causal link between the prices in the FX spot and futures markets. Because the NSDs have not identified any other confounding factor that would complicate or render speculative a damages calculation, their motion to dismiss the Exchange Class's antitrust claim on this ground is denied.

### 3. *Foreign Trade Antitrust Improvements Act*

The OTC Class is limited to persons who "[1] were either domiciled in the United States or its territories or . . . [2] transacted one or more FX instrument in the United States or its territories." The Exchange Class is similarly limited. The NSDs argue that Plaintiffs' claims based on transactions executed outside of the United States and its territories are barred by the FTAIA. The NSDs do not challenge the Sherman Act's reach over transactions in the United States or on a U.S. exchange. Their FTAIA arguments therefore apply only to claims by U.S. domiciliaries for transactions "executed" outside the United States, although those same entities may have other, qualifying transactions that took place within the United States. The NSDs' motion to dismiss in part on this ground is granted, because the FTAIA bars Plaintiffs' claims arising from OTC transactions where the Plaintiff was operating abroad and transacted with a foreign desk of a defendant, and bars claims arising from transactions conducted on a foreign exchange.

The FTAIA provides:

Sections 1 to 7 of this title [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless — (1) such conduct has a direct, substantial, and reasonably foreseeable effect (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a.

This statute "lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach," but then brings back certain conduct so long as its "'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain export commerce)" gives rise to a Sherman Act claim. *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004) ("*Empagran I*") (citation omitted). The Supreme Court has interpreted the phrase "trade or commerce (other than import trade or import commerce)" as "includ[ing] commerce that did not involve American exports but which was wholly foreign." *Id*. at 163; *see also id.* ("[T]he FTAIA's general rule applies where the anticompetitive conduct at issue is foreign."); *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 301–02 (3d Cir. 2002) ("The phrase 'trade or commerce with foreign nations' includes transactions between foreign and domestic commercial entities, not just transactions involving a foreign sovereign."), *overruled on other grounds by Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011). "The FTAIA seeks to make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements (say, joint-selling arrangements), however anticompetitive, as long as those arrangements adversely affect only foreign markets." *Empagran I*, 542 U.S. at 161.

As an initial matter, it is not clear what the NSDs define as "Non-US Transactions," which they argue are barred by the FTAIA; their brief defines the term as transactions "executed outside of the United States." Where a transaction is "executed" (within or outside the United States) is ambiguous. The TAC alleges that "[c]ustomers execute FX spot transactions either by a telephone call or electronic message to a salesperson at a dealer bank through an electronic communications network," and execute exchange-based transactions on the exchanges themselves. Plaintiffs' opposition brief offers the example of a "U.S. entity trading FX with a

foreign desk," and the NSDs' reply brief argues that "[a]ny transactions executed outside the United States, even trades with domestic counterparties," are barred by the FTAIA. Rather than attempt to resolve the semantics of where a transaction is executed, the analysis below addresses the FTAIA's application to several situations the NSDs would likely consider "Non-US Transactions."

In a situation where a U.S. entity operating in the United States[6] trades FX with a foreign desk of a Defendant, the FTAIA does not apply and the claim is not barred because of the statute's import commerce exclusion (or exception). "Import trade and commerce are excluded at the outset from the coverage of the FTAIA . . . ." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 854 (7th Cir. 2012) (en banc). Because the OTC Class is defined to include only persons who transacted directly with a Defendant, a transaction between a Plaintiff in the United States and a foreign desk of a Defendant bank falls squarely within the FTAIA's import commerce exclusion, and claims based on these transactions are not barred. As the Seventh Circuit concluded on similar facts,

> There can be no question that the import commerce exclusion puts some of the conduct alleged in the Complaint outside the special rules created in the FTAIA for Sherman Act claims. The plaintiffs are U.S. entities that have purchased potash directly from members of the alleged cartel. The defendant members of the cartel are all located outside the United States. Those transactions that are directly between the plaintiff purchasers and the defendant cartel members *are* the import commerce of the United States in this sector.

*Id.* at 855.

The NSDs argue that Plaintiffs cannot avail themselves of the import commerce exception because the Court has already held in dismissing the Foreign Complaints that, to fall within the foreign commerce exception, a complaint "must allege facts that plausibly show that

---

[6]     The opinion assumes that a Plaintiff who is "domiciled" in the United States may conduct transactions both in the United States and abroad.

'the conduct by the defendants . . . was directed at an import market.'" *FOREX*, 74 F. Supp. 3d at 599 (quoting *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 395 (2d Cir. 2002)). *FOREX*'s holding with respect to the FTAIA's application as to the Foreign Complaints does not apply here, as the instant case presents wholly different facts.

In *FOREX*, the Foreign Complaints were dismissed because those actions sought "to apply American antitrust laws to Defendants' foreign conduct for harm suffered outside the United States by Foreign Plaintiffs and their putative classes." *Id*. at 599. Each of the Foreign Complaints either expressly excluded "United States persons and transactions occurring in the United States" or confined its claims to those arising out of foreign FX transactions. *Id.* at 599–600. The Foreign Complaints therefore could not possibly allege that Defendants' alleged conduct involved import trade or commerce. In contrast to the Foreign Complaints, any collusive conduct in this case that affected the price of a transaction between a U.S.-based Plaintiff and a foreign desk sufficiently alleges conduct that "involves import trade or commerce." *Kruman*, 284 F.3d at 395.

The import commerce exclusion does not apply, however, to transactions where a U.S.-domiciled Exchange Plaintiff transacted on a foreign exchange, or where a U.S.-domiciled OTC Plaintiff operating abroad transacted with a foreign desk of a Defendant. In such situations, the transactions occurred exclusively abroad, with no "importation" of interests in FX Instruments into the United States. *See Minn-Chem, Inc.*, 683 F.3d at 855 (explaining that "trade involving only foreign sellers and domestic buyers (i.e., import trade) is not subject to the FTAIA's extra layer of protection against Sherman Act claims implicating foreign activities"). Because these transactions are between foreign and domestic commercial entities and "wholly foreign," *see*

*Empagran*, 542 U.S. at 163, the FTAIA bars any claims arising out of them absent one of the exceptions identified in 15 U.S.C. § 6a.

Plaintiffs argue that such transactions fall within the FTAIA's "domestic effects" exception, but fail to plead that any domestic effect of Defendants' conduct proximately caused their foreign injuries. The domestic effects exception consequently does not apply.  To satisfy the FTAIA's domestic effects exception a plaintiff must "plausibly plead: (1) that Defendants' anticompetitive conduct had a 'domestic effect,' i.e., a 'direct, substantial and reasonably foreseeable effect' on U.S. domestic commerce; and (2) that such a domestic effect 'gives rise to' Plaintiffs' injuries."  *FOREX*, 74 F. Supp. 3d at 600 (internal citations omitted); *see also Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 414 (2d Cir. 2014) (describing FTAIA's "two distinct causation inquiries").  Because both prongs are required for the exception to apply, courts need not analyze both if one is not met.  *See Lotes*, 753 F.3d at 413 ("[W]e need not decide . . . whether the defendants' foreign anticompetitive conduct has a 'direct, substantial, and reasonably foreseeable effect' on U.S. domestic or import commerce . . . because even assuming that Lotes has plausibly alleged a domestic effect, that effect did not 'give[ ] rise to' Lotes's claims." (citation omitted; alteration in original)).

Plaintiffs argue that the domestic effect of Defendants' conduct was a proximate cause of Plaintiffs' injuries because "there is a single FX market" and "price fixing FX prices in the U.S. directly impacts foreign prices."  According to Plaintiffs, "[t]he injury felt by U.S. entities that traded currency with a party abroad is caused by the exact same anticompetitive conduct that injured entities that transacted entirely within the United States."  This argument is similar to those raised by the Foreign Plaintiffs whose claims were dismissed under the FTAIA in *FOREX*. There, the Foreign Plaintiffs argued that the effects on U.S. commerce somehow caused

plaintiffs in Norway and South Korea to "pay the same identical supra-competitive prices that American consumers paid" and that "*without the domestic effects*, there would be *no* foreign injury." *FOREX*, 74 F. Supp. 3d at 600 (internal quotation marks omitted).  In *FOREX*, the Foreign Plaintiffs' domestic effects argument was rejected because "by conceding that all FX purchasers across the world paid the same supra-competitive prices, this argument provides further support for the Foreign Complaints' allegations of a global conspiracy that *independently* caused Foreign Plaintiffs harm in their home countries." *Id*. (emphasis added).

Plaintiffs' contentions that there is a "single" FX market and that prices in the United States directly impact foreign prices show at best but-for causation, but not proximate causation. *See Lotes*, 753 F.3d at 398 (identifying "a reasonably proximate causal nexus between the conduct and the effect").  On remand from the Supreme Court, the D.C. Circuit in *Empagran II* rejected a similar argument that foreign prices were proximately caused by domestic effects because the goods in question were "fungible and globally marketed."  *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1270–71 (D.C. Cir. 2005) ("*Empagran II*").  In *Empagran II*, the appellants/plaintiffs argued that "[appellees/defendants] were able to sustain super-competitive prices abroad only by maintaining super-competitive prices in the United States as well." *Id.* at 1270.  The *Empagran II* appellants asserted that because any price differences between the U.S. and foreign markets would lead to "arbitrageurs selling vitamins imported from the United States," the U.S. prices were what "gave rise" to the foreign prices.  *Id*. The D.C. Circuit rejected this argument, holding that "[w]hile maintaining super-competitive prices in the United States may have facilitated the appellees' scheme to charge comparable prices abroad, this fact demonstrates at most but-for causation."  *Id*. at 1271; *see also In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 988 (9th Cir. 2008)

("[T]hat the conspiracy had effects in the United States and abroad does not show that the effect in the United States, rather than the overall price-fixing conspiracy itself, proximately caused the effect abroad."); *In re Monosodium Glutamate Antitrust Litig.*, 477 F.3d 535, 539–40 (8th Cir. 2007) ("The domestic effects of the price fixing scheme (increased U.S. prices) were not the direct cause of the appellants' injuries.  Rather, it was the foreign effects of the price fixing scheme (increased prices abroad).").  Plaintiffs' arguments concerning a "single" market and "direct impacts" are essentially the same as those rejected by the D.C. Circuit in *Empagran II*.

Because Plaintiffs do not establish that either the import commerce exclusion or the domestic effects exception applies, the FTAIA bars Plaintiffs' claims arising from OTC transactions where the plaintiff was operating abroad and transacted with a foreign desk of a defendant, and bars claims arising from transactions conducted on a foreign exchange.

### 4.  *Statute of Limitations and Adequacy of Allegations Pre-2009*

The NSDs argue that Plaintiffs' proposed class period (January 1, 2003, to December 31, 2013) is overly broad because the TAC lacks any allegations before 2010, and because the relevant statute carries a four-year limitations period.  The NSDs' statute of limitations argument is rejected as Plaintiffs have adequately pleaded fraudulent concealment sufficient to toll the statute, but the period for actionable claims is curtailed to begin on December 1, 2007, as the TAC does not plausibly allege conspiratorial activity prior to that date.

### a.  Statute of Limitations

Plaintiffs first filed antitrust claims in their CAC on November 1, 2013.  The New Defendants were not named as parties until the SAC was filed on July 31, 2015.  Absent tolling, the statute of limitations would bar Plaintiffs' claims that arise from acts before November 1, 2009 (as to all Defendants), and July 31, 2011 (as to the New Defendants).  Here the statute of

limitations was tolled and did not begin to run until at least June 12, 2013, meaning that

Plaintiffs' antitrust claims against all Defendants are timely.

On a motion to dismiss, a claim may be dismissed as time-barred "only if a complaint

clearly shows the claim is out of time." *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir.

1999); *see also Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 473 (S.D.N.Y. 2016)

(analyzing CEA claims).

> A four-year statute of limitations applies for private antitrust actions.  15 U.S.C. § 15b.
>
> Antitrust law provides that, in the case of a continuing violation, say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal quotation marks omitted).  "But

the commission of a separate new overt act generally does not permit the plaintiff to recover for

the injury caused by old overt acts outside the limitations period."  *Id.*; *see also Hinds Cnty. v.

Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 519 (S.D.N.Y. 2009) ("In short, Named Plaintiffs can

proceed with a claim against the remaining Joint Defendants if it is based on an overt act that

occurred within the statute of limitations, but they can only recover damages based on those acts,

and not based on previous acts.").

The running of the statute of limitations may be tolled if the plaintiff "establishes (1) that

the defendant concealed from him the existence of his cause of action, (2) that he remained in

ignorance of that cause of action . . . , and (3) that his continuing ignorance was not attributable

to lack of diligence on his part."  *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d

Cir. 1988).  "[G]eneralized and conclusory allegations of fraudulent concealment" are

insufficient to toll the statute of limitations. *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983).

As discussed above, the TAC alleges that the entirety of the alleged conspiracy took place in private chat rooms and private instant messages, which Plaintiffs could not reasonably have discovered on their own. The same secret communications that plead conspiracy also plead the three elements of fraudulent concealment. Accordingly, the statute of limitations was tolled at least until June 12, 2013, when the TAC alleges that Plaintiffs first heard of the possibility of manipulation in the FX market through a Bloomberg article published that day. *See* Liam Vaughan, Gavin Finch and Ambreen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, Bloomberg (June 12, 2013).

The NSDs' argument that the statute of limitations began to run as early as October 2009 is unavailing. They assert that sufficient data surrounding FX transactions became public with the publication of an analyst report in October 2009, stating that trading around the Fix was characterized by "unusually sharp movements in exchange rates" and that "anyone trading at that time is unlikely to get the best possible deal available that day." The NSDs do not produce the analyst report, but instead quote hearsay from a December 2013 BBC News article. Ben King, *Banks Warned about Exchange Rate Dangers in 2009*, BBC News (Dec. 23, 2013). The article notes only that "banks were already concerned about the London fix in 2009" because of "unusually sharp movements in exchange rates around 4pm," and "even warned their clients about trading at that time." Nothing in the article's description of the 2009 report suggests that a reasonable person would have known, based on sharp movements around the Fix, to inquire about the possibility of an interbank conspiracy to fix prices in the FX market. *See generally Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 504 (9th Cir. 1988) ("The

requirement of diligence is only meaningful . . . when facts exist that would excite the inquiry of a reasonable person."). The NSDs do not point to anything other than the availability of transaction data and the 2009 analyst report as having put Plaintiffs on notice of possible antitrust claims concerning the alleged conspiracy to fix prices in the FX market.

In light of the foregoing, the statute of limitations was tolled as a result of fraudulent concealment of the conspiracy, and did not begin to run until at least June 2013.  Plaintiffs' antitrust claims therefore are timely.

### b.  Sufficiency of Allegations

Although not barred by the antitrust laws' limitations period, the TAC fails to plead an antitrust conspiracy that pre-dates December 2007.  The TAC alleges that "beginning at a time unknown, but at least as early as January 1, 2003, Defendants conspired to fix prices in the FX market on a daily basis."

The TAC's factual allegation reaching back farthest in time states that the UK's Financial Conduct Authority's ("UK-FCA") investigation "focused on an electronic chat room used by top traders at financial institutions."  The allegation then describes inculpatory emails and instant messages without reference to their dates.  It then alleges that "approximately 40 traders have individually interviewed with the UK-FCA and produced communications dating back to 2004." Nothing in this sentence, however, suggests that the 2004 communications reflected unlawful conduct. The mere fact that traders produced communications from as far back as 2004 are insufficient to plead an antitrust conspiracy beginning in that year or in 2003.

The TAC does contain non-conclusory allegations that the alleged conspiracy existed in 2007.  As noted above, the TAC quotes numerous chat transcripts in support of its allegations of conspiratorial conduct, but does not provide the dates for those conversations. The TAC also

cites the criminal plea agreements of Citicorp, JPMorgan, Barclays PLC and RBS, which describe a Section 1 conspiracy to fix prices for the euro/U.S. dollar currency pair beginning "at least as early as December 2007."  In light of the TAC's detailed allegations describing Defendants' conspiratorial conduct, the plea agreements with these four defendants are sufficient to plausibly allege that the conspiracy began as early as December 2007.

Based on the lack of allegations that a conspiracy to fix prices in the FX market pre-dated December 1, 2007, Plaintiffs' claims based on transactions before that date are dismissed. *See In re Lithium Ion Batteries*, 2014 WL 309192 at *12 (finding complaints did not plead conspiracy before 2002 due to "dearth of meetings alleged . . . in the years 2000 and 2001, despite both pleadings having been drafted with the benefit of substantial document production"); *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1076–77 (D. Kan. 2009) (holding that "there are no allegations in these complaints that would give defendants fair notice of the basis for plaintiffs' claim of a conspiracy beginning in 1994" where "[a] review of plaintiffs' complaints fails to reveal any specifically alleged factual basis for plaintiffs' decision to use 1994 as the starting point of the conspiracy").

* * * *

Regarding the antitrust claims, the NSDs motion is granted only with respect to claims arising from (1) transactions executed on foreign exchanges, (2) transactions between U.S.-domiciled OTC Plaintiffs operating outside the United States to transact with a foreign desk of a Defendant or (3) transactions executed before December 1, 2007.

## B. CEA Claims

On behalf of the Exchange Class, the TAC asserts claims for (1) manipulation under CEA §§ 4b(a), 4c(a), 9(a) and 22(a), 7 U.S.C. §§ 6b(a), 6c(a), 13(a)(2) and 25(a); (2) principal-

agent liability under CEA § 2(a)(1), 7 U.S.C. § 2(a)(1); (3) aiding and abetting manipulation under CEA § 13c(a), 7 U.S.C. § 13; and (4) manipulation by false reporting and by fraud and deceit under CEA §§ 6(c)(1), 22, 7 U.S.C. §§ 9, 25 and CFTC Rule 180.1(a).  The NSDs raise four arguments for dismissal of all or part of the TAC's CEA claims.  First, the NSDs claim that Plaintiffs' claims are not actionable because "manipulation of spot rates in the OTC market cannot form the basis of a CEA claim because such rates and markets fall outside the CEA's purview."  Second, the NSDs argue that the TAC insufficiently pleads viable CEA claims under any theory.  Third, the NSDs argue that any claims based on transactions made on foreign-based exchanges are not actionable because Congress did not intend for the CEA to apply extraterritorially.  Finally, the NSDs argue that the CEA claims against New Defendants are time barred because Plaintiffs did not bring any claims against these entities until they filed the SAC on July 31, 2015.  For the following reasons, the NSDs' motion is granted as to the Exchange Plaintiffs' CEA false reporting claims and claims based on transactions conducted on foreign exchanges.  The motion is denied as to the Exchange Plaintiffs' other claims under the CEA.

      **1.  *CEA Exclusion of FX Spot Market Transactions***

      The NSDs argue that Exchange Plaintiffs may not assert CEA claims because the challenged conduct took place exclusively in the FX OTC market, and the CEA does not apply to FX spot transactions.  The CEA provides that "nothing in this chapter . . .  governs or applies to an agreement, contract, or transaction in . . . foreign currency."  7 U.S.C. § 2(c)(1)(A).  As explained below, the TAC sufficiently pleads CEA violations based on manipulated prices on FX exchanges.

      The NSDs do not contest that the CEA reaches FX transactions taking place on exchanges.  *See Dunn v. CFTC*, 519 U.S. 465, 473 (1997) ("Congress' broad purpose in enacting

the Treasury Amendment was to provide a general exemption from CFTC regulation for sophisticated off-exchange foreign currency trading . . . ."); *id.* (quoting Senate Committee Report stating that "the legislation 'included an amendment to clarify that the provisions are not applicable to trading in foreign currencies and certain enumerated financial instruments unless such trading is conducted on a formally organized futures exchange'"); *see also CFTC v. Paragon FX Enters., LLC*, Nos. 11 Civ. 7740, 11 Civ. 7741, 2015 WL 2250390, at *1–2 (S.D.N.Y. Feb. 2, 2015) (summarizing legislative history). Instead, the NSDs' argument is that plaintiffs may not plead manipulation of prices on exchanges solely through conduct taking place in the exempted OTC market.

Courts have allowed, however, CEA manipulation claims based on actions taking place in one market where the allegedly manipulated market was influenced by actions taken in another market. For example, in *Parnon Energy*, the court allowed manipulation claims where the defendants' position in the physical market for West Texas Intermediate crude oil gave them the ability to affect prices, and their "sell-off" in that market affected futures. *U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 236 (S.D.N.Y. 2012). Similarly, in *Natural Gas*, the court held that plaintiffs could allege that defendants' wash trading of natural gas was a "means of manipulating the natural gas futures market." *In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 511 (S.D.N.Y. 2004). The court in *Natural Gas* rejected the defendants' argument that the plaintiffs were attempting to re-cast what was essentially a wash-trading claim as a futures manipulation claim because they could not successfully bring CEA wash-trading claims. *Id.* The court held that:

> [E]ven if Plaintiffs might be unable to maintain a stand-alone wash trading claim . . . because the alleged wash trades occurred in the physical market, it does not mean that Plaintiffs should be prevented from presenting evidence of wash trades in the physical market to prove their theory of manipulation in the futures market.

*Id*.; *see also Parnon Energy*, 875 F. Supp. 2d at 243 ("Defendants' interpretation excludes from the CEA any course of conduct that happens to involve transactions covered by [a statutory exemption].  But such a broad reading frustrates the CEA's primary purpose of preventing and deterring price manipulations.").

Accepting that 7 U.S.C. § 2(c)(1) prevents the OTC Plaintiffs from bringing CEA claims, the Exchange Plaintiffs may still rely on Defendants' alleged conduct in the FX spot market as evidence of manipulation on FX exchanges where Defendants' activity in the OTC market was the "means of manipulating" prices on FX exchanges.

The NSDs cite a decision from the Southern District of Texas for the proposition that plaintiffs cannot assert viable CEA claims based on effects in a futures market where the entirety of the defendant's conduct took place within an exempt market.  *Aspire Commodities, LP v. GDF Suez Energy N. Am., Inc.*, No. H-14-1111, 2015 WL 500482, at *5 (S.D. Tex. Feb. 3, 2015).  In *Aspire*, plaintiffs claimed that the defendants engaged in "manipulative behavior among generators of electricity within Texas's energy market" ("ERCOT"), and harmed plaintiffs through their "manipulation of prices in the derivative commodities markets."  *Id.* at *1.  Plaintiffs alleged that one defendant, GDF, "manipulated the market by intentionally withholding electricity generation during times of tight supply, in order to drive up prices in the Real-Time Market and to manipulate contract prices in the derivative commodities market."  *Id.* at *2.  Plaintiffs further alleged that GDF traded in secondary futures markets, such as the Intercontinental Exchange ("ICE"), and that GDF's control over electricity generation allowed it to benefit from trades on commodities markets because of the linkages between prices in these markets.  *Id.*

The *Aspire* court dismissed the plaintiffs' claims because "even assuming *arguendo* that GDF intended to influence the ICE market, all of the conduct that Plaintiffs challenge took place entirely within" an energy market that the CFTC exempted from CEA coverage. *Id.* at *5; *see also id.* ("Because GDF's allegedly improper conduct consisted solely of transactions within ERCOT that are covered by the CFTC's Final Order and thus exempted from the CEA, the private right of action in 7 U.S.C. § 25 of the CEA is unavailable to Plaintiffs . . . .").

The district court's decision in *Aspire* was affirmed in an unpublished per curiam decision from the Fifth Circuit. 640 F. App'x 358 (5th Cir. 2016). In relevant part, the Fifth Circuit panel held:

> Aspire also re-urges on appeal the argument it presented to the district court. Aspire claims that the Final Order cannot exempt manipulation occurring on the ICE market from private lawsuits because the Final Order only exempts ERCOT transactions. The district court reasoned that Aspire's entire lawsuit was solely founded on allegedly improper conduct by GDF Suez that occurred on ERCOT markets. Accordingly, the Final Order applied to GDF Suez's activities. We agree. While Aspire complains that the effects of GDF Suez's manipulation occurred in the ICE market, all of GDF Suez's allegedly improper activity occurred in the ERCOT market.

*Id.* at 362–63.

The NSDs' argument that this case should be resolved on the same grounds as *Aspire* is rejected for three reasons. First, the *Aspire* opinions are not binding authority, and Defendants have not cited decisions from either the Second Circuit or district courts in the Second Circuit that have applied the same reasoning. The Fifth Circuit's per curiam opinion itself provides that "the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4," *id.* at 359 n. *, which provides that "[u]npublished opinions . . . are not precedent, except under the doctrine of res judicata, collateral estoppel or law of the case." Second, as described above, the two cases are factually

38

distinguishable both in the manner of alleged manipulation and the types of markets.  Finally, the

Court does not read in the *Aspire* opinion an intent to create a blanket rule that manipulation

claims cannot lie where the manipulative acts took place entirely in exempt markets.  Such a rule

would be overbroad, and would "frustrate[] the CEA's primary purpose of preventing and

deterring price manipulations."  *Parnon Energy*, 875 F. Supp. 2d at 243.

The Exchange Class's CEA claims are not barred by 7 U.S.C. § 2(c)(1).

## 2.  *Pleading Requirements for CEA Claims*

The NSDs argue that each of Plaintiffs' CEA claims is insufficiently pleaded because the

TAC fails to meet the requirements set forth in Federal Rule of Civil Procedure 9(b), and

because the TAC's manipulation claims do not allege the specific Defendant, rate, date and

direction of the alleged manipulation.  As explained below, the TAC's factual allegations are

sufficient to plead claims under the CEA even under Rule 9(b).

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake," but "[m]alice, intent, knowledge,

and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Instead

of adopting a per se rule that Rule 9(b) applies to all CEA manipulation claims, "[m]ost courts in

this district apply [a] case-by-case approach to determine whether Rule 9(b) applies to claims of

manipulation under the CEA."  *Parnon Energy*, 875 F. Supp. 2d at 244 (collecting cases).  For

example, in *Parnon Energy*, the court held that because the alleged scheme of manipulation was

based on the abuse of market power rather than fraud, only Rule 8 applied.  *Id.* at 244–45.  Other

courts, however, have held that Rule 9(b) should apply generally in CEA manipulation cases

because "market manipulation is inherently deceptive."  *In re Amaranth Nat. Gas Commodities

Litig.*, 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008); *see also id.* (holding that "a complaint that

alleges manipulation of commodities prices must satisfy Rule 9(b)'s [particularity] requirement").

Regardless of which view is adopted, Rule 9(b) is applicable here because the TAC's allegations clearly sound in fraud, notwithstanding Plaintiffs' attempt to cast its claims as alleging abuse of market power.  While the TAC alleges that Defendants collectively occupied a dominant position in the relevant FX markets, its allegations describe collusive acts committed in secret chat rooms and other private electronic communications where traders acted with the intent to mislead Defendants' customers and profit at others' expense.  *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.' This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." (citation omitted)); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 713–14 (S.D.N.Y. 2013) ("*LIBOR I*") (holding that plaintiffs' allegations "sound[ed] in fraud and thus must be pled with particularity" where "the claim [was] that defendants, by submitting artificial LIBOR quotes, misled the market with regard to future levels of LIBOR, and by extension future prices of Eurodollar contracts, and thus caused Eurodollar contracts to trade at artificial prices."), *vacated on other grounds by Gelboim*, 823 F.3d 759.

The TAC meets Rule 9(b)'s particularity requirement as it alleges sufficient facts to support "a strong inference of fraud."  *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990).  "Despite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge."  *Id.*; *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir 2007) ("A [securities law] claim of manipulation . . . can involve facts solely within the

defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim."); *LIBOR I*, 935 F. Supp. 2d at 714 (noting that "courts generally relax Rule 9(b)'s requirements in the context of manipulation claims, as such claims often 'involve facts solely within the defendant's knowledge'" (citation omitted)).  Here, the identity of the traders involved in the chats quoted in the TAC, the specific trades allegedly discussed or manipulated in those communications, and which rates were targeted are all "peculiarly" within Defendants' knowledge.  The TAC's allegations, pieced together from available information, support a strong inference of fraud. Dismissal of the CEA claims is not warranted based on the lack of detail that Plaintiffs cannot be expected to know at the pleading stage.

The NSDs suggest that, because the cases are similar to this case, the Court should follow the holdings in the LIBOR cases that "[a] private plaintiff must plead sufficient information to show injury from a particular incident of manipulation."  *See, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MD 2262, 2015 WL 6243526, at *40 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*").  Contrary to the NSDs' suggestion, the *LIBOR* opinions support this Court's conclusion that, because Plaintiffs lack information to identify the specific transactions on which they were injured, they need not plead them in order to state a CEA claim.  In *LIBOR II*, the court explained that:

> In evaluating the persistent suppression allegations in plaintiffs' first amended complaint, we did not require plaintiffs to allege the specific days on which they traded because LIBOR, and consequently Eurodollar futures prices, was allegedly artificial throughout the Class Period.  Here, by contrast, the proposed trader-based claims, even if accepted, would entail only that LIBOR was artificial for certain discrete days during the Class Period, and thus the allegation that plaintiffs traded during the Class Period is insufficient to show that plaintiffs suffered actual damages.  With regard to alleging plaintiffs' positions, we relaxed the requirement in the persistent suppression context because plaintiffs *could not be expected to know* how LIBOR compared to 'true LIBOR' on any given day (as

41

opposed to whether LIBOR was artificial on average over a period of time). In
the trader-based manipulation context, however, the Barclays allegations suggest,
for at least some of the days on which manipulation occurred, in which direction
LIBOR deviated from 'true LIBOR.' Thus, whereas we could not expect
plaintiffs to allege how their specific positions were negatively affected by
persistent suppression of LIBOR, we can expect plaintiffs to allege how their
positions were negatively affected by trader-based manipulation.

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 621–622 (S.D.N.Y.

2013) ("*LIBOR II*") (emphasis added); *see also LIBOR I*, 935 F. Supp. 2d at 716 ("Although

plaintiffs have not identified precisely how each LIBOR quote from each defendant on each day

during the Class Period was or was not artificial, they could not reasonably be expected to do so

at this stage of the litigation. . . . If anyone currently possesses this information for each day

during the Class Period, it is defendants, and in such a situation, Rule 9(b)'s requirements are

relaxed.").

While the TAC identifies specific chat transcripts between Defendants' traders,

information concerning the specific dates, times, currency pairs and customers discussed in those

chats remains exclusively in Defendants' control. The TAC -- which pleads as many factual

allegations as can be known at this early stage in litigation -- sufficiently pleads CEA claims.

### 3. *CEA Manipulation*

The TAC adequately pleads a claim for manipulation under CEA §§ 9(a) and 22(a).

"[A] court will find manipulation where '(1) Defendants possessed an ability to influence

market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4)

Defendants specifically intended to cause the artificial price.'" *In re Amaranth Nat. Gas*

*Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (quoting *Hershey v. Energy Transfer*

*Partners, L.P.*, 610 F.3d 239, 247 (5th Cir. 2010)). As explained below, the TAC sufficiently

pleads each of these elements.

First, the TAC adequately pleads Defendants' ability to influence market prices for FX futures and options by alleging that Defendants collectively controlled over 90% of the FX spot market.  *See Parnon Energy*, 875 F. Supp. 2d at 245 ("[T]he ability to influence prices can manifest itself in various ways, including the exercise of market power . . . .").  As held above, the TAC plausibly alleges a conspiracy to fix prices in that market.  Because the TAC alleges "a direct relationship between currency prices in the spot market and the value of each FX futures contract" and that "futures prices [and options prices] are based on and derived arithmetically from spot prices," the TAC adequately pleads Defendants' ability to influence FX futures and options prices for CEA manipulation purposes.  *See generally LIBOR I*, 935 F. Supp. 2d at 715 ("Because each defendant had the ability to influence LIBOR and LIBOR affected the price of Eurodollar contracts, each defendant had the ability to influence the price of Eurodollar contracts.").

As to the second and third elements of the claim, for the same reasons, the TAC plausibly pleads both that artificial prices existed on FX exchanges and that this artificiality was caused by Defendants' actions.  "To successfully plead a manipulation claim, Plaintiffs must . . . allege an artificial price of the relevant commodity—that is 'a price that does not reflect basic forces of supply and demand.'"  *In re Term Commodities Cotton Futures Litig.*, No. 12 Civ. 5126, 2013 WL 9815198, at *17 (S.D.N.Y. Dec. 20, 2013) (quoting *Parnon Energy*, 875 F. Supp. 2d at 246), *reconsideration granted on other grounds*, 2014 WL 5014235 (S.D.N.Y. Sept. 30, 2014).  Causation under the CEA "requires that a defendant be the proximate cause of the price artificiality."  *Id.* at *19 (quoting *In re Commodity Exchange, Inc., Silver Futures and Options Trading Litig.*, No. 11 MD 2213, 2012 WL 6700236, at *16 (S.D.N.Y. Dec. 21, 2012)).

Because of the direct relationship between the prices in the FX spot and futures/options markets, the TAC sufficiently pleads that Defendants' manipulation of the spot markets resulted in artificial prices for the Exchange Plaintiffs.  Based on the TAC's description of how FX futures and options are priced, Defendants' collusive conduct was the proximate cause of the artificial prices.

Fourth, the TAC pleads that Defendants specifically intended to cause artificial prices on FX exchanges.  The TAC alleges that "Defendants' specific intent and motive in the manipulation of spot market prices of various currency pairs was to obtain ill-gotten trading profits from transactions" not only in the spot market, but also "from FX derivative contracts, including the FX futures contracts, held by them or other co-conspirators."  Based on the allegations of Defendants' participation in the futures and options markets and their ability to influence the prices in those markets through detailed allegations of manipulative conduct in the spot market, the TAC adequately pleads both motive and opportunity.  *See Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419, 2014 WL 1280464, at *5 (S.D.N.Y. Mar. 28, 2014) (manipulative intent may be established by alleging motive and opportunity or "strong circumstantial evidence of conscious misbehavior or recklessness" (internal quotation marks and citation omitted)); *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007) (same).

The NSDs argue that the Complaint does not plead a viable CEA manipulation claim because it fails to allege that "each Defendant" had the ability to influence FX futures prices.  According to the NSDs, because no Defendant could independently influence FX spot prices, "[Plaintiffs] were required to allege facts sufficient to establish each Defendant's specific role in the purported conspiracy."  This argument is rejected.

The TAC describes in detail numerous chats during which Defendants' traders allegedly engaged in price manipulation in the FX markets, and each Defendant is identified as a participant in at least one allegedly illegal conversation.  Because Plaintiffs' case is premised on Defendants' conspiratorial conduct, the fact that each Defendant had only a fraction of the FX OTC market (and therefore may not have been able to influence prices individually) is irrelevant given the TAC's allegation that, as a group, they controlled over 90% of that market.

The NSDs next argue that the TAC fails to plead that artificial prices existed, or that any artificial prices were caused by Defendants' conduct because, "Exchange Plaintiffs . . . fail to plead the existence of artificial prices at any particular time relating to any particular currency pair" and do not "identify a single trade or specific action taken by any Defendant that caused an artificial price in any FX futures market."

This argument repeats the "demand for specifics that are not required, and that Plaintiffs could not be reasonably expected to know, at the pleading stage."  *FOREX*, 74 F. Supp. 3d at 595.  Plaintiffs' ability to allege specific dates, times and prices for any given transaction is limited by their access to information solely within Defendants' control.  Nonetheless, the TAC's allegations, which include transcripts from Defendants' chat rooms, are sufficient to plead artificial prices.  For example, the TAC quotes communications between traders from Barclays, Citigroup and UBS in "The Cartel" chat room where they are alleged to have agreed to fix spread matrices offered to clients for the EUR/USD currency pair.  To the extent any of their clients transacted at prices based on those matrices, the prices would have been artificial.  The same would be true of other oral agreements alleged in the TAC to manipulate the spread for particular currency pairs.

For the foregoing reasons, the NSDs' motion is denied insofar as it seeks to dismiss Plaintiffs' manipulation claims under the CEA.

### 4. *Manipulation by False Reporting and Fraud and Deceit*

The Exchange Plaintiffs assert a separate claim of manipulation by false reporting and fraud and deceit in violation of CEA §§ 6(c)(1) and 22, 7 U.S.C. §§ 9 and 25, and CFTC Rule 180.1(a), 17 C.F.R. § 180.1(a).  The NSDs argue that the claim should be dismissed because (1) the TAC does not identify any "report" that affected FX futures prices and (2) the Exchange Plaintiffs "do not allege that any Defendant ever communicated directly with any Plaintiff, much less communicated fraudulent information, during the relevant time period."  As explained below, the NSDs' motion to dismiss is granted with respect to the Exchange Plaintiffs' false reporting claims but denied as to the fraud-based manipulation claims.

Addressing the false reporting claims first, Plaintiffs have not identified any market report or market information concerning the FX markets.  Under the CEA,

> [u]nlawful manipulation . . . shall include, but not be limited to, delivering, or causing to be delivered for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

7 U.S.C. § 9(1)(A); *see also* 17 C.F.R. § 180.1(a)(4).

The TAC alleges that Defendants transmitted through "multiple means of communication, including communications to electronic trading platforms, false or misleading or inaccurate reports concerning order and trade information that affected or tended to affect spot market prices of currency pairs . . . ."  Because the TAC contains no further illustration of a "report" concerning order and trade information, the Court assumes that the Exchange Plaintiffs are attempting to characterize the spreads quoted to customers in the FX spot markets as

"reports" for the purposes of this claim.  In their opposition brief, Plaintiffs elaborate that "Defendants' false reports included engaging in sham trades and wash sales known as 'painting the screen,' which occur when Defendants place phony orders with one another to create the illusion of trading activity in a given direction in order to move rates prior to the fixing window." The Exchange Plaintiffs argue further that Defendants "submitted false reports to the CME . . . in order to affect the CME/EMTA rates in a direction more favorable to the banks," and that their actions constituted false reporting because they knew that service providers such as Thomson Reuters and Bloomberg would publish benchmark rates based on the spreads they quoted. Although these allegations support the TAC's claims of manipulation generally (as explained above and below), the Exchange Plaintiffs cannot shoehorn Defendants' alleged conduct concerning the prices they quoted to customers into claims under the CEA provisions specifically governing "reports."

In *United States v. Brooks*, the Fifth Circuit noted that "[t]he term 'reports' is not defined in the CEA or CFTC regulations."  681 F.3d 678, 691 (5th Cir. 2012) (citation omitted).  Noting that the plain meaning of "report" is "a detailed statement of fact," the *Brooks* court held that, as opposed to "expressions of opinion[] or casual communications, . . . lengthy documents outlining detailed information about natural gas trades, sent to established industry publications with the intent to inform those publications about the state of the natural gas markets" fit the CEA's definition of "report."  *Id.; see U.S. Commodity Futures Trading Comm'n v. Atha,* 420 F. Supp. 2d 1373, 1376 (N.D. Ga. 2006).

As opposed to the lengthy and detailed reports of trades that were submitted for publication in *Brooks* and *Atha*, Defendants here allegedly manipulated the FX markets by furtively coordinating the prices they showed to their customers.  Although these prices may

ultimately have affected the prices of FX Instruments traded on exchanges, they are not "reports" under the CEA. They are not lengthy written accounts describing historical fact that courts have found to be within the plain meaning of the term "report."

Although its allegations of Defendants' manipulative conduct do not give rise to a false reporting claim, the TAC adequately pleads claims for fraud-based manipulation. CFTC Rule 180.1 provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly . . . [u]se or employ, or attempt to employ, any manipulative device, scheme, or artifice to defraud.

17 C.F.R. § 180.1(a)(1).

As held above, the TAC adequately pleads Defendants' conspiracy to manipulate prices in the FX markets by sharing market-sensitive information between competitors in secretive chat rooms, "front-running," "banging the close" and "painting the screen" in order to reap ill-gotten profits based on trades executed both in the FX OTC market and on FX exchanges. These same allegations suffice to plead Defendants' intentional or reckless use of a "manipulative device, scheme, or artifice to defraud."

Defendants' argument that Plaintiffs must identify specific false statements or omissions that were directly communicated from a given Defendant to a given Plaintiff misses the mark, as the TAC specifies that its fraud-based manipulation claims are based on Defendants' use or employment of manipulative devices or contrivances. Because CFTC Rule § 180.1(a)(1) provides a separate (and independent) theory of liability for the Exchange Plaintiffs' fraud-based manipulation claims, this opinion need not reach whether Defendants' alleged conduct

constituted actionable "untrue or misleading statement[s] of material fact" or omissions under Rule § 180.1(a)(2).

The NSDs' motion to dismiss is granted as to the Exchange Class's CEA false reporting claims but denied as to their fraud-based manipulation claims.

### 5. *Principal-Agent Liability*

The TAC asserts a claim for principal-agent liability under CEA § 2(a)(1), 7 U.S.C. § 2(a)(1), against all Defendants "for the manipulative acts of their agents, representatives and/or other persons acting for them in the scope of their employment." The NSDs argue that this claim should be dismissed because (1) the TAC fails to plead primary violations of the CEA and (2) the TAC's allegations of control are insufficiently detailed. The NSDs' arguments are rejected.

CEA § 2(a)(1)(B) governs "[t]he liability of a principal for the acts or conduct of its agents." *See In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 599 (S.D.N.Y. 2011) (citing *Guttman v. U.S. Commodity Futures Trading Comm'n*, 197 F.3d 33, 39 (2d Cir. 1999)). In relevant part, the statute provides:

> The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

7 U.S.C. § 2(a)(1)(B). "Such liability may be imposed where (1) the agent participated in the alleged unlawful activity and (2) his actions were within the scope of his employment or office." *In re Platinum and Palladium*, 828 F. Supp. 2d at 599. "It is enough if [the agent] was 'acting for [the principal] in executing the illegal trades." *Guttman*, 197 F.3d at 39.

The argument that the Exchange Plaintiffs' vicarious liability claims should be dismissed because they have failed to plead a primary violation is rejected for the reasons discussed at

length above.  The NSDs' argument that the principal-agent liability claim is insufficiently

detailed is equally unavailing.  The TAC alleges that Defendants' top-level traders conspired via

electronic communications for over a decade, and contains numerous chats involving traders

from the Defendant banks.  For example, the TAC identifies Citigroup's head of spot trading in

London, Barclays's director of spot trading, and UBS's co-global head of "emerging market spot

trading" as participants in "The Cartel" chat room.

Nothing in the TAC suggests that any trader was operating outside the scope of his

employment when engaging in the alleged conduct.  To the contrary, the TAC alleges conduct by

traders "acting for" the benefit of their respective employers/banks.  Nothing more is required to

plead a claim for principal-agent liability.  *See, e.g.*, *In re Platinum & Palladium*, 828 F. Supp.

2d at 599–600 (allegation that a "head of the execution desk" entered into manipulative orders

for defendants sufficient to plead principal-agent liability); *In re Amaranth*, 587 F. Supp. 2d at

546 (allegations that individuals acted within scope of employment "suffices to state a claim for

vicarious liability").

The NSDs' motion to dismiss is denied as to the Exchange Class's principal-agent

liability claims.

### 6.  *Aiding and Abetting Liability*

The TAC also asserts a claim for "aiding and abetting manipulation" in violation of the

CEA.  The NSDs argue that the TAC fails to state claims for aiding and abetting liability because

it does not allege with particularity that each Defendant (1) associated itself with the venture, (2)

participated in the venture as something it wished to bring about and (3) sought by its action to

make the venture succeed.  The NSDs' arguments concerning aiding and abetting liability are

rejected.

"Section 22 of the CEA provides a private right of action against any person . . . who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter."  *In re Amaranth*, 730 F.3d at 181 (internal quotation marks and alterations omitted); *see also* 7 U.S.C. 13c(a) (providing for aiding and abetting liability under the CEA).  "[B]oth the CFTC and courts have determined that the standard for aiding and abetting liability under the CEA is the same as that for aiding and abetting under federal criminal law."  *In re Amaranth*, 730 F.3d at 181; *see also In re MF Global Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 177 (S.D.N.Y. 2014).  "[A]iding and abetting requires the defendant to in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, [and] that he seek by his action to make it succeed."  *In re Amaranth*, 730 F.3d at 182 (internal quotation marks and citation omitted).

As discussed above, the TAC adequately pleads each Defendant's participation in a conspiracy to manipulate prices in both the FX spot and futures markets.  The same allegations adequately plead the TAC's alternative claim that, if an individual Defendant did not commit a primary CEA violation, it aided and abetted others' market manipulation by sharing market-sensitive information such as pricing and spread information, customer information and net trading positions.  The TAC alleges a quid pro quo conspiracy in which Defendants facilitated each other's ability to move prices for their mutual benefit.  The TAC includes chat transcripts where Defendants' traders allegedly coordinated trading ahead of fixes and later congratulated each other for successfully influencing the fix.  For example, after traders from Barclays, UBS, RBS and HSBC allegedly manipulated a fix, the traders wrote:  "nice job gents," "what a job," "welld one [sic] lads," "bravo" and "worked ok that one."  In such a situation, the TAC adequately pleads that each Defendant, through its employee chat participants, knowingly

associated with (and participated in) a venture to manipulate prices with the desire that the venture would succeed.

The motion to dismiss the TAC's aiding and abetting claims under the CEA is therefore denied.

### 7. *Transactions on Foreign Exchanges*

The NSDs argue that Plaintiffs' claims arising out of transactions on foreign-based exchanges should be dismissed because the CEA does not apply extraterritorially.  This argument is correct, and the surviving CEA claims are limited to exclude such transactions.

In *Morrison*, the Supreme Court held that Exchange Act § 10(b) applied only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities."  *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267 (2010).  This result is consistent with the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."  *Id*. at 255 (internal quotation marks and citation omitted).

In *Loginovskaya*, the Second Circuit held that because "[t]he CEA as a whole . . . is silent as to extraterritorial reach," courts must "presume it is primarily concerned with domestic conditions."  *Loginovskaya v. Batratchenko*, 764 F.3d 266, 270 (2d Cir. 2014).  Interpreting CEA § 22, which provides for private rights of action, the Second Circuit held that § 22's focus is "domestic conduct, domestic transactions, or some other phenomenon localized to the United States."  *Id*. at 272.  In other words, Congress's focus was "clearly transactional."  *Id*.  The court concluded that "the CEA creates a private right of action for persons anywhere in the world who transact business in the United States, and does not open our courts to people who choose to do business elsewhere."  *Id.* at 273.

The TAC defines the Exchange Class as all persons who, during the Class Period, "entered into an FX Instrument on an exchange where such persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, entered into one or more FX Instruments on a U.S. Exchange." The NSDs do not challenge the transactions on U.S. exchanges, and instead argue that the CEA does not reach transactions by a U.S. domiciliary who transacted on a foreign exchange.

Plaintiffs argue that although the CEA does not apply extraterritorially, "[e]xchanges that are accessible in the United States via express permission from the U.S. Commodity Futures Trading Commission ('CFTC') are domestic transactions within the protection of the CEA." Plaintiffs explain that certain foreign exchanges make their futures contracts available for direct trading in the United States, and that the CFTC has expressly permitted these foreign exchanges to do so.

Because Congress's focus in § 22 was "clearly transactional," the issue here is whether a transaction entered into by an Exchange Plaintiff on a foreign exchange through an electronic trading platform or terminal accessed within the United States is a transaction that "occurred in the United States." *Id.* at 272, 274. Plaintiffs essentially describe foreign exchanges that are made available to American investors through electronic trading platforms accessible on the Internet.

In the securities context, the Second Circuit in *City of Pontiac* held that "the mere placement of a buy order in the United States for the purchase of foreign securities on a foreign exchange" did not place the transaction outside *Morrison*'s bar on the extraterritorial application of the federal securities laws. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014). In relevant part, the court noted that "a purchaser's citizenship

or residency does not affect where a transaction occurs.'"  *Id*. (quoting *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012)).

Similarly, in Plaintiffs' described scenario, an American investor is essentially submitting buy or sell orders on foreign exchanges, and that investor's location at the time of placing his order does not disturb the conclusion that the transaction "occurred" on the foreign exchange. These types of transactions fall within *Loginovskaya*'s holding that the CEA does not apply to transactions conducted outside of the United States.

The surviving CEA claims are therefore limited to exclude transactions conducted on foreign exchanges.

### 8. *Timeliness of Claims against the New Defendants*

Finally, the New Defendants argue that the CEA claims against them are time barred under the CEA's limitations period, which provides that private actions under the CEA "shall be brought not later than two years after the date the cause of action arises."  7 U.S.C. § 25(c).  This argument is rejected.

"Under the CEA, the two-year statute of limitations begins to run upon discovery of the injury, not discovery of the other elements of a claim."  *Shak*, 156 F. Supp. 3d at 473 (internal quotation marks and citation omitted).  "The duty of inquiry arises when circumstances would have suggested to a person of ordinary intelligence the probability that he had been defrauded." *Id.* at 473–74 (internal quotation marks and citation omitted).

As with Plaintiffs' antitrust claims, the statute of limitations for the CEA claims was tolled as a result of Defendants' fraudulent concealment of the conspiracy.  For the reasons stated above, the statute of limitations did not begin to run until at least June 12, 2013, the date of the Bloomberg report alleging manipulation in the FX market.  The New Defendants argue that

Plaintiffs "concede" in the TAC that they were on inquiry notice of their claims as of the Bloomberg report, and that the claims filed against the New Defendants on July 31, 2015, are therefore time barred.  Plaintiffs made no such concession, and were not on inquiry notice based solely on the contents of the June 12, 2013, article.

The Bloomberg article reported that "[t]raders at some of the world's biggest banks manipulated benchmark foreign-exchange rates used to set the value of trillions of dollars of investments . . . ."  The article did not, however, identify the traders that served as sources for the article or the banks that were involved.  The only banks the article mentioned by name were the four banks with the largest market share.  None of the New Defendants was one of the "Big Four" banks the article mentioned by name.

The TAC identifies articles that mention Standard Chartered and Société Générale, but those articles were published on November 13 and December 4, 2013, and within two years of the SAC's filing.  Plaintiffs assert that they remained unaware of BOTM's and RBC's involvement until discovery exchanged in this litigation revealed those entities' participation.  Assuming that Plaintiffs were on inquiry notice as to claims against Standard Chartered and Société Générale in late 2013, and as to claims of BOTM and RBC even later, the claims against them are timely as the SAC (which first named them) was filed on July 31, 2015.  Given the dearth of specific information in the Bloomberg article, it cannot be said that a person of ordinary intelligence would have understood on June 12, 2013, the probability that she was defrauded by any of the New Defendants.

The TAC's claims against the New Defendants are therefore not time-barred.  The Exchange Plaintiffs' claims based on conduct pre-dating December 1, 2007, are, however,

dismissed as insufficiently pleaded for the reasons set forth in the section discussing the TAC's antitrust claims.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the NSDs' motion is GRANTED with respect to

-   Plaintiffs' antitrust claims based on transactions executed on foreign exchanges;

-   Plaintiffs' antitrust claims based on transactions between U.S.-domiciled OTC Plaintiffs (operating outside the United States) and a foreign desk of a Defendant;

-   Plaintiffs' claims (antitrust and CEA) based on transactions executed before December 1, 2007;

-   Exchange Plaintiffs' CEA false reporting claims; and

-   Exchange Plaintiffs' CEA claims arising out of transactions conducted on foreign exchanges.

The motion is DENIED as to all other claims.

The Clerk of Court is directed to close the motion at Docket No. 507.

Dated:  September 20, 2016
         New York, New York


LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE