```
H658FORC
```

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In re:   FOREIGN EXCHANGE
         BENCHMARK RATES
         ANTITRUST LITIGATION           13 Cv. 7789 (LGS)

------------------------------x
                                        June 5, 2017
                                        10:30 a.m.
Before:

                  HON. LORNA G. SCHOFIELD

                                        District Judge

                        APPEARANCES

SCOTT & SCOTT LLP
     Attorneys for Haverhill Plaintiffs
BY:  CHRISTOPHER M. BURKE
     KRISTEN M. ANDERSON

HAUSFELD LLP
     Attorneys for Haverhill Plaintiffs
BY:  MICHAEL D. HAUSFELD

QUINN EMANUEL URQUHART & SULLIVAN LLP
     Attorneys for Third Party Plaintiffs
BY:  RICHARD I. WERDER, JR.
     DANIEL L. BROCKETT

BERNSTEIN LIEBHARD LLP
     Attorneys for Third Party Plaintiffs
BY:  STANLEY D. BERNSTEIN
```

1                (Case called)

2                THE DEPUTY CLERK:  Everyone can be seated.

3                Counsel at the table, please state your name for the

4     record.

5                MR. BURKE:  Good morning, your Honor.  Chris Burke

6     from Scott & Scott.

7                THE COURT:  Good morning.

8                MS. ANDERSON:  Good morning, your Honor.  Kristen

9     Anderson from Scott & Scott.

10               THE COURT:  Good morning.

11               If you would please speak into the microphone.

12               MR. HAUSFELD:  Good morning, your Honor.  Michael

13    Hausfeld from Hausfeld LLP.

14               THE COURT:  Good morning.

15               MR. WERDER:  Good morning, your Honor.  Richard Werder

16    from Quinn Emanuel.

17               THE COURT:  Good morning.

18               MR. BROCKETT:  Good morning, your Honor.  Dan Brockett

19    from Quinn Emanuel.

20               THE COURT:  Good morning.

21               MR. BERNSTEIN:  Good morning, your Honor.  Stanley

22    Bernstein from Bernstein Liebhard.

23               THE COURT:  Good morning.

24               I wanted to have a conference to discuss the

25    plaintiffs' application for certain materials as well as the

1    identities of what I gather are potential clients of both Quinn
2    and Bernstein.
3              I have read the materials that you have submitted.  I
4    thought perhaps a recap from Mr. Burke or Mr. Hausfeld of where
5    we are would be appropriate.  I actually checked the docket
6    sheet to make sure I knew where we are in terms of a notice
7    date, but if you could just put that on the record so that we
8    are all starting in the same place.
9              You might also tell me how many defendants you settled
10   with, to what extent the settlements are public, what the
11   status of any remaining settlement discussions is, to the
12   extent you can discuss it, and then the notice date that has
13   been ordered.
14             MR. BURKE:  Yes, your Honor.
15             In terms of the defendants in this case, there were 16
16   defendants.  We settled with nine.  Those are public.  We
17   planned on coming to the Court with a motion for preliminary
18   approval as to five additional settlements.  That will leave
19   two defendants outstanding, and it's my belief we are going to
20   litigate into the future with those two defendants.
21             THE COURT:  Then as to the five, do you have a date
22   when you're planning to make the motion?
23             MR. BURKE:  July 28 we plan on bringing the motion for
24   preliminary approval as well as presenting the Court with some
25   additional papers, such as an updated notice, updated material

1    with respect to the plan of distribution, that type of thing.

2    THE COURT: And that would have a proposed schedule
3    of -- let's assume it were approved relatively promptly, to the
4    extent it is approved, what kind of actual notice date are we
5    looking at and when would you be prepared to give that notice?

6    MR. BURKE: We would be prepared to provide notice by
7    October 23rd.

8    THE COURT: The reason we are in this situation to
9    some extent, I know, is because of the massive size of the
10   materials that are relevant to your settlement discussions.
11   But at bottom, we are also here just because it has taken so
12   long, and if notice had gone out, the situation would not be as
13   serious or concerning to me as the supervisor of communications
14   with the class if it hadn't been so long.

15   So I guess my first question is, October 23rd seems
16   like a long way out. If I can get you a decision pretty
17   promptly on a July 28 motion, is it possible that you can move
18   the notice date up just so that we are not in this kind of
19   limbo for so long?

20   MR. BURKE: The reason we set the notice date out to
21   October 23rd is the data issue, and it's obtaining sufficient
22   counterparty information so that notice is complete and
23   accurate as to all class members, and it's class members who
24   are domiciled both here and outside the United States.

25   THE COURT: Are you ready to go with notice as to the

1   nine?
2           MR. BURKE:  We are.
3           THE COURT:  So it's just a matter of collecting the
4   data as to the others.
5           MR. BURKE:  Yes.
6           THE COURT:  I am going to ask you to be prepared to do
7   your notice the beginning of October, by October 1, and that,
8   of course, is subject to any approval or nonapproval.  My
9   reason is that I don't want to put all of us in a position we
10  are in right now for any longer than necessary.
11          MR. BURKE:  Yes, your Honor.
12          THE COURT:  Thank you.
13          So I know what your application is, and I guess my
14  next question is, have there been any further discussions with
15  the folks from Quinn and Bernstein to try to resolve or narrow
16  the issues?
17          MR. BURKE:  Beyond what has been submitted to the
18  Court in terms of an opening, an opposition, a reply, and the
19  application for surreply and our opposition, there has been no
20  further discussions, your Honor.
21          THE COURT:  Thank you.  You may be seated.
22          What I would like to do now is talk to the second
23  table, and I'm not sure who is speaking, but what I would like
24  to know are what communications there were.  I know there is
25  the initial memo that we have all talked about, and that I have

1   seen and plaintiffs' counsel has seen in confidence.  I know

2   there was an updated memorandum.  I know there were cover

3   e-mails, the substance of which have been summarized in your

4   papers.  What other communications have there been since that

5   initial e-mail?

6               MR. WERDER:  Your Honor, Richard Werder from Quinn

7   Emanuel.

8               I think, other than what your Honor summarized in

9   terms of written communications, the only additional set of

10  communications that I am aware of is a set of communications

11  that we sent to the recipients of both the original and the

12  revised memorandum that enclosed a copy of Professor Evans'

13  declaration, and there was a cover memo that went along with

14  that.  But the Evans declaration was sent to all of the

15  recipients of the original and revised memorandum.

16              THE COURT:  When we are talking about the recipients

17  of the original and revised memorandum, we are still talking

18  about the eight entities that Quinn sent the initial memorandum

19  to and the 13 entities that Bernstein sent it to?

20              MR. WERDER:  That's correct, your Honor.  I believe

21  that the cover memo that accompanied the Evans declaration was

22  also sent to the two additional contacts that are referenced in

23  the materials that you have before you that we discussed.

24              THE COURT:  Can you remind me who those are?

25              MR. WERDER:  In addition to the eight that Quinn sent

1  the original memorandum to, our papers indicate that we also
2  discussed the 6,000 trillion estimate with two additional
3  clients, and I believe that those are potential clients, and
4  those two additional contacts also received the Evans
5  declaration in addition to the 21 who actually have received
6  the memorandum.
7            THE COURT:  So the two additional contacts did not see
8  the memorandum or updated memorandum?
9            MR. WERDER:  That is correct, your Honor.
10           THE COURT:  So we are really talking about contacts
11 with 23 entities, is that right?
12           MR. WERDER:  That's my count, your Honor, yes.
13           THE COURT:  My next question is, is there an
14 attorney-client relationship with any of those 23 entities
15 currently with regard to Forex matters?
16           MR. WERDER:  I don't believe so, your Honor, other
17 than to the extent that there is a privilege attached to the
18 potential preliminary discussions, but I don't believe that any
19 of those clients have formally engaged either our firm or the
20 Bernstein firm for purposes of the FX litigation.
21           THE COURT:  Just so you understand where I am coming
22 from, as I ask you the questions and as we discuss this, my
23 principal concern -- and it seems to be the concern of counsel
24 at both tables as well -- is to assure that potential class
25 members have fair and accurate information about the proposed

1    settlement.

2       MR. WERDER:  We certainly share that concern, your
3    Honor.

4       THE COURT:  To that end, I feel an obligation, and I
5    think have legal authority, to assure that the communications
6    have been and to the extent there are any future are accurate.

7       I will also say that -- we can talk about it in
8    greater detail -- I don't think these communications are
9    privileged because they don't seem to have been made in the
10   context of a confidential attorney-client relationship for the
11   purpose of giving legal advice.  Notwithstanding that, I don't
12   think that necessarily means that class counsel have the right
13   to any and all information you might have about these entities,
14   because it's not only not privilege but relevant here, and I
15   think you pointed some of that out in the papers.

16      My next question is, have you made inquiries whether,
17   I guess, these 23 recipients have passed on the writings that
18   you have provided to them and talked about to any other
19   entities?

20      MR. WERDER:  Yes, your Honor.  I believe that we have
21   made inquiries of all or most of them to determine that they
22   have not done so, and to the extent that I am aware of the
23   communications, the indications have been that they have not
24   passed them on to third parties.

25      THE COURT:  So you have made affirmative inquiries of

1  all 23 and you have responses back from all 23 that they have
2  not passed it on?
3           MR. WERDER:  Let me just consult for one second, your
4  Honor.
5           THE COURT:  OK.
6           MR. WERDER:  Your Honor, I don't believe we have
7  responses from all 23.  I think what we did is when we
8  communicated the updated memo, we asked the clients to advise
9  us if they had passed it on, and I don't think all of them have
10 responded to that, but the ones that have responded have
11 indicated that they have not done so.
12          THE COURT:  All right.  And do you intend to send out
13 any similar communications between now and the beginning of
14 October?
15          MR. WERDER:  I don't believe that that was our plan,
16 your Honor, other than to the extent that your Honor requests
17 that we send out some additional information relating to what
18 has already been sent.
19          THE COURT:  OK.  So were there any attachments to the
20 communications to the 23 entitites?
21          MR. WERDER:  Well, I think the attachments were the
22 original memo, and that had a data sheet attached to it, which
23 I believe was in a filing that perhaps your Honor rejected, but
24 it was in the court file, a one-page data sheet.
25          THE COURT:  What do you mean by a one-page data sheet?

H658FORC

          MR. WERDER:  There was a sheet that was attached to the original memo that allowed the clients to provide us with information concerning their Forex trades so that we could further advise them on whether they had a sufficiently large claim that an opt out might be worth further consideration.

          THE COURT:  I have seen at least reference to the data sheet.  I think I have also seen the data sheet even with your original filings.  In any event, what I am trying to find out is, apart from the documents that we know about -- namely, the initial memorandum, the updated memorandum, and the e-mails that we are going to talk about in a minute, and the expert report, the Evans expert report -- are there any other written materials that have been sent to the 23 entities about the proposed settlement?

          MR. WERDER:  I think that most of the follow-up, your Honor, was oral, but there may have been some e-mail communication that involved assessment of preliminary data that the potential clients provided with respect to the volume of their trading.  But in terms of a presentation-type document, like a memorandum, no.

          THE COURT:  How many potential clients are we talking about with whom you had a further e-mail exchange?

          MR. WERDER:  I am not sure that I have the exact number of that.  I would like to consult with Mr. Brockett briefly.

1     THE COURT:  Sure.
2     MR. WERDER:  Mr. Brockett advises me that it's three
3  to five, at most, that there was any follow-up with along the
4  lines that I have just described.
5     THE COURT:  Would you have any objection to providing
6  to the Court and to class counsel -- let's sort of begin with
7  the least objectionable and then make our way through the
8  list -- the cover e-mails with the original memorandum and the
9  updated memorandum redacting the identities?
10    MR. WERDER:  We certainly have no objection to
11 providing it to the Court, your Honor, and with the
12 qualification of the identities redacted, we could probably
13 wrap our heads around also providing it to the class counsel.
14 But I think our preference would be, in the first instance, to
15 provide it to the Court for the court's review so that the
16 Court can determine whether there are any concerns that justify
17 also providing it to class counsel even in a redacted form.
18    THE COURT:  The concern, of course, is that class
19 counsel is much closer to the settlement and much more attuned
20 to anything that might potentially be mistaken or misleading
21 than I would be.  So what I would order then with respect to
22 those e-mails is that you provide them to me, that you provide
23 them to class counsel, and you may redact any references that
24 you think could reveal the identity of the recipients.  Please
25 give me both the redacted and unredacted copy just so I can see

1   both versions.

2       MR. WERDER:  Certainly, your Honor.  When you refer to
3   redaction to any information relating to potential identifying
4   information, that includes, I assume, not only the identity of
5   the recipients, but anything that might be in the text of the
6   correspondence that could tend to have that same effect.

7       THE COURT:  Yes.  But as I said, give it to me, and I
8   will make a determination whether I think it really warrants
9   redaction.

10      MR. WERDER:  Thank you, your Honor.

11      THE COURT:  So the next thing is cover e-mails with
12  the Evans opinion.  I guess those were sent to the two plus the
13  21.  Is there any objection to doing the same with those?

14      MR. WERDER:  Subject to the same parameters that your
15  Honor just indicated, we are happy to provide those.

16      THE COURT:  And then talk to me about the e-mail
17  follow-up with the three to five entities concerning the
18  settlement.

19      MR. WERDER:  I'm not sure that I have looked at all of
20  it, your Honor, but the ones that I looked at were -- the way
21  that I would describe it would be communication with the
22  potential client, after receiving some preliminary information
23  about what they might have at stake, along with a
24  recommendation.  I think there were, as I said before, just a
25  handful of those.

1    THE COURT:  So what I will ask you to do is give them
2 to me in the first instance, and I will take a look at them,
3 and if I decide that you need to distribute them any more
4 broadly, I will make that decision or we will have a discussion
5 about it.
6    MR. WERDER:  Understood, your Honor.
7    THE COURT:  So is there anything else in writing that
8 has gone to these various entities?
9    MR. WERDER:  Not to this group, but we do, as our
10 papers revealed, your Honor, have some clients that have
11 actually retained us, and obviously we have had significant
12 communications with those entities.  But as far as the group
13 that we are here today discussing, I don't believe there is
14 anything else.
15    THE COURT:  So let me make sure I understand.
16    There is a separate group of clients who retained you
17 in connection with Forex.  And I presume that these client
18 relationships are longer standing than the few months we are
19 talking about since the original memorandum went out September
20 2016, is that right?
21    MR. WERDER:  Yes, your Honor.  I think our activity in
22 this area goes back to 2013.  So there have been a number of
23 clients that over the period of time from 2013 through, I
24 think, sometime last year engaged us to represent them with
25 respect to Forex matters, but none of the clients that we are

H658FORC

1  talking about today did so.

2      THE COURT:  The clients who retained you previously,
3  did they have copies of the memorandum and updated memorandum?

4      MR. WERDER:  No, they did not, your Honor.

5      THE COURT: All right.  You may be seated.  Let me
6  just talk to the class counsel.

7      MR. WERDER:  Thank you, your Honor.

8      THE COURT:  As you can see, I am tending in the
9  direction of not requiring any disclosure of the identity of
10  these potential clients, not because they are privileged,
11  because I don't think they are privileged, but because I don't
12  know that you have a need for them in your representation of
13  the class, and I don't think that I do either, but let me hear
14  from you before I finally decide that.

15      MR. BURKE:  As the cases we have presented to the
16  Court make clear, the Court's authority, especially in this
17  type of situation, is to consider whether or not
18  representations have been made to threaten confusion among
19  class members as to the threshold issue of whether or not to
20  participate in the class, object, opt out, and otherwise
21  compromise their rights.

22      Before the Court can take any further action, *Gulf Oil*
23  tells us let's make sure the factual record is complete.  And
24  as I understand what the Court has endeavored to do today is to
25  complete that factual record, and then analyze what has been

1  said, and then determine whether additional communications,
2  curative relief, need to be made.  I think that's exactly the
3  right step to take, and we don't need the identities of the
4  class members at this point.  It may come to pass, in order to
5  craft appropriate curative relief, that the identities or types
6  of class members need to be known, but at this point we don't
7  need it.
8         THE COURT:  So it sounds like the dispute is resolved
9  for the moment.
10        Is there anything else you need to address from your
11 point of view as long as you're standing?
12        MR. BURKE:  No, your Honor.  Thank you.
13        THE COURT:  Let me ask the back table, Mr. Bernstein
14 and the Quinn folks, is there anything else?
15        MR. WERDER:  We have nothing else, your Honor.
16        THE COURT:  Thank you very much.
17        I will issue an order that briefly summarizes what I
18 ruled today.
19        (Adjourned)