H958HAVC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In re:  FOREIGN EXCHANGE
        BENCHMARK RATES
        ANTITRUST LITIGATION            13 Cv. 7789 (LGS)

------------------------------x

                                        September 5, 2017
                                        11:30 a.m.

Before:

                    HON. LORNA G. SCHOFIELD

                                        District Judge

                         APPEARANCES

HAUSFELD LLP
     Attorneys for Haverhill Plaintiffs
BY:  MICHAEL D. HAUSFELD
     CHRISTOPHER M. BURKE
     KRISTEN ANDERSON

SULLIVAN & CROMWELL, LLP
     Attorneys for Barclays Bank PLC
BY:  MATTHEW SCHWARTZ
     MATTHEW PELLER

COVINGTON & BURLING
     Attorneys for Citigroup, Inc.
BY:  ANDREW A. RUFFINO

CAHILL GORDON & REINDEL LLP
     Attorneys for Credit Suisse Group
BY:  JASON M. HALL

KIRKLAND & ELLIS LLP
     Attorneys for Deutsche Bank AG
BY:  JOSEPH SERINO, JR.
     ROBERT S. KHUZAMI

H958HAVC

1                         *APPEARANCES* (Cont'd)

2     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
            Attorneys for JPMorgan Chase & Co.
3     BY:  BORIS BERSHTEYN

4     DAVIS POLK & WARDWELL
            Attorneys for Royal Bank of Scotland
5     BY:  MELISSA C. KING

6     GIBSON, DUNN & CRUTCHER, LLP
            Attorneys for UBS AG
7     BY:  DAVID J. ARP

8     CLEARY GOTTLIEB
            Attorneys for Goldman Sachs
9     BY:  ROBERT LAWNER

10    LOCKE, LIDDELL & SAPP, L.L.P.
            Attorneys for HSBC Holdings
11    BY:  GREGORY T. CASSAMENTO

12    WACHTELL LIPTON ROSEN & KATZ
            Attorneys for Morgan Stanley
13    BY:  JONATHAN M. MOSES

14    SHEARMAN & STERLING LLP
            Attorneys for Bank of America Corporation
15    BY:  JEFFREY J. RESETARITS

16    ALLEN & OVERY LLP
            Attorneys for BNP Paribas Group
17    BY:  LAURA HALL

18    LINKLATERS, LLP
            Attorneys for Societe Generale S.A.
19    BY:  PATRICK C. ASHBY

20

21

22

23

24

25

H958HAVC

1                           *APPEARANCES* (Cont'd)

2    PAUL WEISS RIFKIND WHARTON & GARRISON LLP
          Attorneys for Bank of Tokyo-Mitsubishi
3    BY:  MAXWELL A.H. KOSMAN

4    MOORE & VAN ALLEN, PLLC
          Attorneys for RBC Capital Markets
5    BY:  MARK A. NEBRIG

6    SIDLEY AUSTIN LLP
          Attorneys for Standard Chartered PLC
7    BY:  ANDREW W. STERN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H958HAVC

1          (Case called)

2          THE COURT:  Good morning.  You may be seated.

3          So we are here for a preliminary approval hearing for

4    what is essentially phase two of the settlements in the Foreign

5    Exchange cases, and the motions before me are for preliminary

6    approval of five proposed settlements, conditional

7    certification of two classes for settlement, appointment of

8    class counsel for those settlement classes, appointment of

9    plaintiffs as class representatives, appointment of

10   Mr. Feinberg as the settlement administrator, appointment of

11   Garden City Group as the claims administrator, approval of

12   Huntington National Bank as escrow agent, and a stay of all

13   proceedings with regard to the new settling defendants.

14         As I think everybody here knows, we are covering a lot

15   of the same ground that we did in the original settlements.

16         I also know that the plan of distribution has been

17   somewhat revised and the proposed notice has been somewhat

18   revised, and there are motions for approval of those as well.

19         So let me leave those aside for just a moment.

20   Turning first to the proposed settlements and related motions,

21   there is no opposition filed to any motion.  As we all know,

22   that is not necessarily unusual, particularly at the

23   preliminary approval stage.  And I see that there are five

24   settling parties, for a total of approximately 111.2 million,

25   and I had a few questions.  And Mr. Burke is nodding his head

H958HAVC

1    so perhaps that means he is going to speak.

2            So my first question is about the amounts of these

3    individual five settlements, and I was wondering if you could

4    put them in the context of the other settlements.  You had said

5    in your motion papers that the total amounts on average of the

6    five are within the same range as the prior approved

7    settlements based on approximately 17 million per point of

8    global market share.

9            I looked at the other nine settlements, and I see that

10   that's very close to the first two settlements, JP Morgan Chase

11   and UBS, which were both a little bit exceptional because of

12   varied circumstances, but the average per point for these five

13   settlements is quite a bit lower than the 35 to 54 million per

14   point for the other seven original settlements.  So my question

15   is, what makes that amount fair for these five?

16           MR. BURKE:  Thank you, your Honor.

17           A couple of different reasons.  The first of which is

18   the reduced class period that plaintiffs could possibly recover

19   from.  The class period has been reduced now from December 1,

20   2007 through December 2013.  The original class period went

21   back to 2003.

22           The additional reasons are:  Smaller market share

23   piece.  These particular entities were, in our estimation, and

24   our economist's estimation, unable to as easily move the price

25   for particular currency pairs as some of the banks with larger

H958HAVC

1    market shares could.

2          Differences in liability.  The relatively smaller

3    amounts per market share reflect class counsel's view of the

4    chat evidence, and we have over a million and a half documents,

5    approximately 24 million pages.  We have reviewed 1.7 million

6    of them or 97 percent of the total.  We have a good sense of

7    what the chats look like.  The evidence was not as strong for

8    these particular defendants.  To use kind of a well-worn

9    phrase, they were not the ringleaders.  And that's reflected in

10   the fact that none of those banks were indicted or pled guilty

11   to price-fixing.  In fact, only two of the banks even had a

12   regulatory production.

13         No traders were fired for bank conduct in these banks.

14   We felt if we had to go forward, we could hold them in, but it

15   would be a challenge to hold them in on a conspiracy.

16         Those are, in sum, the reasons that drove the numbers

17   down for these particular settling defendants.

18         THE COURT:  Thank you.

19         MR. BURKE:  Your Honor, I don't mean to interrupt the

20   flow, but we have some handouts that might assist the Court as

21   well.

22         THE COURT:  Relating to the settlements?

23         MR. BURKE:  Related to the settlements.

24         THE COURT:  If you have two copies, that would be

25   great.

H958HAVC

1              Would you like to be heard with respect to your

2     handouts?

3              MR. BURKE:  Yes, your Honor.

4              What I have handed up to the Court is a grid or a

5     scorecard listing the total settlements today alphabetically by

6     defendant.  We have highlighted the new settling defendants and

7     the settling amounts and have given the grand total.

8              The next document reflects the --

9              THE COURT:  Do you have these available on slides if

10    you want to display them?

11             MR. BURKE:  I don't have these on slides.

12             THE COURT:  We do have an overhead projector if you're

13    interested.  But if not, that's fine.

14             MR. BURKE:  I think we can talk through these.

15             THE COURT:  OK.

16             MR. BURKE:  The next document describes the settlement

17    fund as a percentage of estimated damages, and this would be

18    the total settlement fund.

19             This was a question the Court had during the first or

20    during the prior preliminary approval hearing, how many cents

21    on the dollar a class member is getting.  And with the

22    additional settlements for the entire class period, class

23    members are now looking at 21 to 27 cents on the dollar.

24    That's assuming a 100 percent claims rate.

25             If you were to use the take rate and the *BARX Last*

H958HAVC

1   *Look* case, class members would be looking at 52-and-a-half

2   cents to 67 cents on the dollar.

3          I think this is also an important comparison.  If you

4   looked only at the litigation period, which is December 1, 2007

5   through December 31, 2013, class members at 100 percent take

6   rate would be getting 30 to 39 cents on the dollar.  And using

7   the 40 percent take rate of the *Last Look* case, you would be

8   looking at 75 cents to 97.5 cents on the dollar.

9          THE COURT:  Just say those last numbers again.

10         MR. BURKE:  75 cents to 97.5 cents on the dollar.

11         THE COURT:  So that is all settlements together

12  class-wide.

13         MR. BURKE:  All settlements together class-wide.

14         THE COURT:  Do you have the numbers for these five,

15  either together or individually?

16         I mean, the problem is I am trying to assess these

17  five settlements and their fairness.  So while it is

18  interesting to hear what the total return on the dollar would

19  be for the class as a whole, it would also be helpful for me to

20  hear those numbers for these settlements.

21         MR. BURKE:  I didn't do the arithmetic, but I can do

22  them quickly if you would like.

23         THE COURT:  Sure.  Or maybe you can have somebody else

24  do the arithmetic while you're telling me about the plan of

25  distribution.

H958HAVC

1          MR. BURKE:  The third handout would be the proposed

2    timeline for the notice and claims process.

3          THE COURT:  Is this the same as the timeline that you

4    gave me with your papers?

5          MR. BURKE:  The exact same one.

6          THE COURT:  OK.

7          MR. BURKE:  The final handout is the plan of

8    distribution presentation.

9          THE COURT:  So let me just ask a couple more questions

10   about the settlement.

11         I didn't compare the releases word for word.  Are they

12   the same in these five settlements with each other and are they

13   the same as the prior nine?

14         MR. BURKE:  The releases are the same as the prior

15   nine and the same with respect to each other.

16         THE COURT:  All right.

17         So that's really all the questions I had with respect

18   to the settlements.  Thank you for addressing the issues that I

19   had raised at the prior hearing, and I appreciate your

20   anticipating that so we don't have to go back and forth.

21         I would like to turn now to the motion to approve the

22   revised notice for all the settlements, meaning all 14.  It

23   looked to me like the proposed manner of notice was unchanged

24   since my approval on December 20, 2016.  And it looked like the

25   changes to the form of the mail notice, the summary notice, and

H958HAVC

1      the claim form are modest and sensible.  Thank you very much

2      for the red-line versions because otherwise I would not have

3      been able to conclude that.

4              The one thing I would like to add is that since the

5      notices are being translated into various languages, and now

6      even now more languages, if you can file certifications by the

7      translators of those notices by the notice date, and I will try

8      to add that to my order.

9              MR. BURKE:  We will do so.

10             THE COURT:  OK.

11             So I will approve the revised form of notice and

12     manner of notice.

13             So I would like to turn now to the motion to approve

14     the revised plan of distribution.  So if you would like to

15     explain that, that would be great.

16             MR. BURKE:  Your Honor, my partner, Kristen Anderson,

17     has been the lawyer working most closely with the experts, and

18     I think it's appropriate for her to present that.

19             THE COURT:  Thank you.

20             You can pull the mic all the way up.

21             MS. ANDERSON:  Thank you, your Honor.  Good morning.

22             The plan of distribution is the same as the Court

23     previously approved, but it takes into account some new

24     information.  And that new information includes the Court's

25     September 20, 2016 opinion on the motion to dismiss, as well as

H958HAVC

1    additional transaction data analysis, and continuing review of

2    the discovery record, including review of the chat evidence.

3            So if we turn to slide 2, this discusses the claim

4    form and the claimant options when they receive the claim form.

5            THE COURT:  Could you just please keep your voice up a

6    little bit.

7            MS. ANDERSON:  Sure.

8            THE COURT:  Thank you.

9            MR. BURKE:  So when a class member receives their

10   claim form, they are going to be presented with two options.

11   And this is a little bit of a review from the last

12   presentation, this part hasn't changed.

13           Option 1 allows the claimant to check a box and the

14   claims administrator will calculate their claim amount based on

15   the settling defendant's data.  And under Option 2, the

16   claimant has to submit their own transaction data to the claims

17   administrator.

18           Now, whether a claimant submits Option 1 or Option 2,

19   the same formula for the plan of distribution is applied.  The

20   only difference is the source of the data.

21           On the next slide --

22           THE COURT:  Slide 3?

23           MS. ANDERSON:  Slide 3.

24           On the next slide, this goes over the claimant

25   options.  Most claimants will have the choice between

H958HAVC

1    submitting Option 1 and 2.  There are two exceptions to that.

2           The first exception is for claimants who traded only

3    with nonsettling defendants.  In the far column on the right,

4    you will see that they can submit Option 2 only.  And that is

5    because we don't have data in the claims database for the

6    nonsettling defendants.  And so if they traded exclusively with

7    the nonsettling defendants, then --

8           THE COURT:  How are they part of the settlement if

9    they traded exclusively with the nonsettling defendants?

10          MS. ANDERSON:  The settlement class consists of anyone

11   who traded with any defendant; it's not just the settling

12   defendants.

13          THE COURT:  OK.  So if there were more settling

14   defendants, it would just increase the amount, it wouldn't

15   change anybody's claim.

16          MS. ANDERSON:  Correct.

17          THE COURT:  OK.  That's perhaps why Mr. Burke was

18   giving me the numbers class-wide as well.  Thank you.

19          MS. ANDERSON:  The second exception is for claimants

20   who are claiming on exchange traded FX instruments.  Those

21   types of trades are not in the claims database because the

22   settling defendants are not a source of data for those trades

23   because the trades are actually with an exchange.  So if class

24   members want to submit a claim for exchange trades, then they

25   have to submit their own data or have to run the calculations

H958HAVC

1   for that.

2          Then on the next slide, we are going to over the

3   factors that are built into the plan of distribution formula.

4   The formula takes into account and weighs five different

5   factors.

6          THE COURT:  And these are the same?

7          MS. ANDERSON:  These are the same.  The first four are

8   the same and the fifth one is legal discounts.

9          So the five factors are notional volume, type of

10  instrument, currency pair, trade size, and legal discounts.

11         So on the next slide, we are going to go through the

12  notional volume and type of instrument traded.

13         So the first step in applying the plan of distribution

14  formula is going to be using a combination of the notional

15  volume of the trade and the type of instrument traded.

16         The claimants will have traded many different types of

17  FX instruments throughout the class period.  Most commonly,

18  spot, forwards, swaps, options, futures, and options on

19  futures.

20         The pricing of each of these is based on the spot

21  price.  But there are some differences in the pricing, and the

22  instruments are weighted differently, because some of them have

23  more or less sensitivity to the spot price, which is the price

24  that plaintiffs allege was manipulated.

25         So the notional volume times the conversion ratio,

H958HAVC

which you see in the right-hand column, the multiplication of
those two factors puts all the instruments into a spot
equivalent volume, and we call this the settlement transaction
volume.  And on the next slide, we have an example of that
calculation.

         The top example is a spot trade for $25 million USD.
The spot has a 1.0 conversion ratio.  So the settlement
transaction volume for that trade would be 25 million.

         If we just go down to the third example there for
options, we have an example of a $40 million USD
over-the-counter traded option.  The conversion ratio for
options is .2.  So the settlement transaction volume is 8
million.

         Then on the next slide, after settlement transaction
volume is determined, the next step is to adjust that volume
according to currency pair and trade size.  And this step of
the formula we call the relative damage factors.

         So as you can see from the table, less liquid currency
pairs are assigned a greater weighting in the formula than more
liquid currency pairs, and that's because they are more
susceptible to price movements than more liquid currency pairs.

         Similarly, large trades are assigned a greater
weighting than small trades because they are also more
susceptible to price movement than smaller trades.

         In addition, the chat evidence, as far as we have

H958HAVC

reviewed so far, shows that the defendants targeted the larger

trades.

THE COURT:  How do you actually review the chat

evidence and keep track of it?

MS. ANDERSON:  The chat evidence was produced by the

defendants and we put it into a document review software, and

we have different coding forms set up for different types of

evidence that we are looking for.

So we have attorneys who review the chat evidence and

mark it for types of trades and types of conversations that we

are looking for.  And we review the evidence and we share the

evidence with our experts who assist us in helping us

understand what is being said.  That's how we take it into

account in the plan of distribution.

THE COURT:  OK.

MS. ANDERSON:  On the next slide, the final factor

that the plan of distribution takes into account are legal

discounts.  And this is, I would say, the main revision to the

plan of distribution since the last time we presented it.

So there are two types of legal discounts.  There is a

discount for time period and there is a discount for exchange

geography.  And these discounts are based largely on the

September 20, 2016 opinion on the motion to dismiss, as well as

ongoing review of the discovery record and analysis of the

transaction data.

H958HAVC

1          So taking the time period discount first, trades made

2     between January 1, 2003 and November 30, 2007 are discounted by

3     40 percent.  And claims made based on trades during this time

4     period were dismissed for failure to state a claim in the

5     Court's order.

6          The discount is also reflective of our review of the

7     discovery record.  We found that chat technology that was used

8     in the now litigation period, that type of chat technology

9     would be introduced in the early class period years.  So the

10    evidentiary record with respect to chats for this time period

11    is not as strong as the non-discounted time period, which is

12    the second line there, December 1, 2007 through December 31,

13    2013.

14         Then we have a second discount time period for trades

15    made between January 1, 2014 and December 15, 2015.  And these

16    trades are discounted by 90 percent.  This discount is also

17    based on the strength of the evidentiary record with respect to

18    the chat evidence.  After the existence of the DOJ's

19    investigation and other regulatory investigations were made

20    public in 2003, and also some dismissals and suspensions of

21    some of the traders, we see in the evidence that the interbank

22    chat room conversations about price are beginning to dissipate

23    during this period.

24         So we weighted the middle period to account for the

25    fact that the middle period claims are more likely to succeed

H958HAVC

1    than the claims during the two discounted time periods.

2              THE COURT:  OK.

3              MS. ANDERSON:  Then on the next slide, we have the

4    legal discount for exchange location.  So in the September 20,

5    2016 opinion, there was a small segment of trades dismissed as

6    outside of the reach of the Sherman Act and Commodities

7    Exchange Act.  And those trades are trades by U.S. domiciled

8    class members when the exchange is located outside of the

9    United States.  So we have discounted those trades by 75

10   percent to account for the dismissal.

11             The impact of this discount is going to be very small

12   because the exchange trades, they are already a small

13   percentage of the overall FX market.  We estimate less than 5

14   percent.  And the vast majority of the exchange trades occur on

15   the CME and on ICE, which are located in the United States.  So

16   it's only a few exotic currency pairs that might be traded in

17   local exchanges outside of the United States.  So we are

18   talking about a small fraction of a small percent of impacted

19   trades by this discount.

20             THE COURT:  OK.

21             MS. ANDERSON:  Then on the next slide, we have a

22   simplified example calculation of the plan of distribution

23   formula.  So we will see how the plan of distribution takes

24   into account the five factors that we discussed:  Notional

25   amount, instrument type, currency pair, trade size, and legal

H958HAVC

discount.  The outcome of this formula, we call that the

eligible participation amount.  And these calculations are

going to be performed for each claimant on a trade-by-trade

basis, but it's all done through formulas in databases.

So the example trade here, we have an $8 million spot

trade USD against the Hungarian Forint, and the trade occurred

in 2006.  So the spot trades get a 1.0 conversion ratio.  So 8

million times 1.0 is $8 million in settlement transaction

volume.

So next we apply the relevant damage factors that take

into account currency pair and trade size.  The USD/Hungarian

Forint is an illiquid currency pair, and the $8 million trade

size falls within one of the middle buckets of trade size back

on the slide we had, slide 7, with the relative damage factors.

So if you go to slide 7 and look at the table, the relative

damage factor for a trade like this will be 4.0.

So we take the $8 million times 4.0 to give us 32

million.  Then we apply the legal discount because the trade

occurred in 2006.  So we times 32 by .6, and we get an eligible

participation amount on this trade of 19.2 million.

Then on the next slide, we have a list of payment

categories.  The payment categories are also going to be a

review of our last presentation, but we have updated the

payment amounts for de minimis and automatic payment based on

transaction data review.

H958HAVC

1            So the de minimis payment is 15 and the automatic will

2       be 150.  And these types of payments are intended to preserve

3       the settlement fund against administration costs.

4            THE COURT:  Are there a lot of trades in that size?

5            MS. ANDERSON:  We estimate it will be, roughly, 40 to

6       50 percent of the claims that fall within one of those two

7       categories.

8            THE COURT:  OK.

9            MS. ANDERSON:  If the payment exceeds 150, then the

10      claimant will be paid a pro rata share of the settlement fund

11      based on its eligible participation amount compared to the

12      overall total eligible participation amount from authorized

13      claimants.

14            THE COURT:  OK.

15            MS. ANDERSON:  Then on the last slide, slide 12, we

16      have an outline of the timing of communications with claimants.

17            So notice will commence on October 1st, class members

18      will begin receiving their claim forms in their notice packets.

19      And when claim forms start to come back to the claims

20      administrator, the claims administrator is going to immediately

21      provide them with an acknowledgement of receipt of their claim.

22      And we have the deadline to file claims proposed as March 22,

23      2018.

24            Then on April 1st, the claims administrator will begin

25      distributing what we call claim assessment notifications.

H958HAVC

1    These are really reports that are going back to the claimant to

2    provide them information about their claims so that they can

3    decide whether or not they want to switch to the other type of

4    claim.  So this report is going to tell the class member their

5    payment resolution category -- de minimis, automatic or pro

6    rata.  It will provide them with calculations of their

7    settlement transaction volume and their eligible participation

8    amount.  And they will get a file of their transactions and

9    instructions on how to convert to the other option and the

10   timing for doing that should they decide to do so.

11           THE COURT:  OK.

12           MS. ANDERSON:  That's the end of the presentation on

13   the plan of distribution.

14           THE COURT:  Thank you.

15           So the schedule seems fine to me.  I am going to

16   schedule the final fairness hearing for May 23rd at 4 p.m.  And

17   I plan to approve all of the motions that are before me.  I

18   appreciate the proposed orders that you have submitted to me.

19           I was wondering if I could trouble you for a red-line

20   comparing my prior preliminary order and your proposed

21   preliminary order as well as my prior order approving the

22   notice and plan of distribution and the current one.  I think

23   that I had sent you both in Word format, but if not, you can

24   e-mail my chambers and I am happy to supply them.

25           MR. BURKE:  We will do so, your Honor.

H958HAVC

1               THE COURT:  Thank you.

2               I know we are here for the preliminary approval

3    hearing on the settlements.  I know there are two defendants

4    who haven't settled.  Do you want to update me on the status of

5    the litigation, but we don't need to go into the whole

6    Department of Justice dispute, which I have many submissions

7    on.

8               MR. BURKE:  I'd be happy to, your Honor.  Thank you.

9               We are proceeding in the normal course of discovery

10   against now, I believe, just one nonsettling defendant.  There

11   is one holdout left.

12              THE COURT:  So does that mean 30(b)(6) depositions?

13              MR. BURKE:  We have a 30(b)(6) deposition coming up on

14   corporate organizational structure, but nothing that is

15   touching the actual substance of the litigation at this point

16   until we get things resolved at the Department of Justice.

17              THE COURT:  OK.

18              MR. BURKE:  With respect to the other bank, who I

19   believe we reached terms with, we hope to be able to get

20   another motion for preliminary approval to the Court by the

21   middle of this month.  And we are working with them on what is

22   necessary in terms of data and names and addresses so as to

23   effect notice on the same schedule as everyone else.

24              THE COURT:  Thank you.

25              I am trying to think of the most efficient way for you

H958HAVC

```
 1     to present that information to me, because I presume, for
 2     example, your memo of law will largely repeat a lot of what is
 3     in the memo of law that you have already given me but with
 4     perhaps a few different facts.
 5                MR. BURKE:  Yes, your Honor.  The primary difference
 6     is going to be the amount of monetary compensation.  But the
 7     release will be the same -- everything else that we are seeking
 8     will be essentially the same except for the monetary.
 9                THE COURT:  If you could just make that clear in your
10     papers so that I can deal with it expeditiously, and I will
11     deal with it as soon as I get it.
12                MR. BURKE:  Yes, your Honor.
13                THE COURT:  We, of course, will have to leave some
14     time for objections, but I think ten days should be fine.
15                MR. BURKE:  Yes, your Honor.
16                THE COURT:  Although ten days won't work if notice is
17     going out October 1 and you're getting it to me mid-month.
18                MR. BURKE:  We will work with the other party to get
19     it to you as quickly as possible, and we are on a separate
20     track working with them to get the information we need so that
21     the notice can go to the printer with the expectation that they
22     will be part of this group.
23                THE COURT:  Thank you.  Anything else?
24                MR. BURKE:  No, your Honor.  Thank you.
25                THE COURT:  We are adjourned.
```