March 26, 2018

**<u>Via ECF</u>**

The Honorable Lorna G. Schofield
United States District Court
Thurgood Marshall Courthouse
40 Foley Square
New York, New York 10007

      Re:    *In re Foreign Exchange Benchmark Rates Antitrust Litigation*
                Case No. 1:13-cv-07789-LGS

Dear Judge Schofield:

      The Credit Suisse Defendants submit this letter in response to Plaintiffs' pre-motion letter regarding their anticipated class certification motion (ECF No. 1000).

      Plaintiffs' letter fails to provide the most basic information about their class certification proposal and, instead, cryptically references "one or more classes" of plaintiffs who traded any FX instruments between December 1, 2007 and December 31, 2013.  They do not even specify the currencies at issue, suggesting unhelpfully that "[t]he classes will encompass G-10 currencies and additional non-G10 currencies."  Despite these failings, it is nevertheless apparent that Plaintiffs will not be able to meet their burden of satisfying the Rule 23 requirements.  The hurdles Plaintiffs face are particularly high as to Credit Suisse, a minor player in these markets that did not even participate in much of the conduct alleged.

      Plaintiffs would have the Court view this as a typical antitrust case, where Defendants allegedly conspired to raise prices, and all Plaintiffs suffered harm as purchasers at those higher prices.  But this case is entirely different, and those differences present insurmountable obstacles to certification of any class.  One critical distinction is that in this case—unlike a typical antitrust case—not all class members are "purchasers" of the allegedly manipulated product.  Rather, at any given moment, there will be both purchasers and sellers within the class.  As a consequence, Defendants' conduct will not have any consistent impact on each class member.  For example, in a circumstance where certain Defendants allegedly agreed to manipulate a benchmark rate upward, class members who purchased the affected currency at the benchmark rate could be harmed, but class members who sold at that rate would profit, while the vast majority of the class (those who did not transact in the affected currency, at that benchmark rate, at that specific moment) would be unaffected.

      For Plaintiffs to demonstrate, as they must, that each member of the class suffered harm as a result of Defendants' conduct, they will be required to undertake countless individualized inquiries regarding the timing and nature of each class member's FX-related transactions over a six-year period.  A class cannot be certified where, as here, certification would permit persons without valid claims to recover and prevent Credit Suisse from litigating individual defenses. *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 367 (2011); *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 725 F.3d 244, 252 (D.C. Cir. 2013) ("The plaintiffs must also show that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy. . . . Otherwise, individual trials are necessary to establish whether a particular shipper suffered harm from the price-fixing scheme.").  The individualized inquiries necessary in this action would overwhelm any common issues, rendering any proposed class unworkable.

    **I.**    **At Best, Plaintiffs Can Hope to Prove Only Episodic,** ***Ad-Hoc*** **Agreements, Not a Class-wide Global Conspiracy**

The obstacles to class certification go beyond the complexities of the FX markets. Although Plaintiffs promised at the outset of the case to prove a single, sweeping, global conspiracy involving 16 banks, millions of transactions and dozens of currencies, they do not and cannot offer a single piece of evidence establishing such a conspiracy, much less Credit Suisse's participation. Rather, Plaintiffs' motion will suggest—*at most*—that some employees of some banks engaged in episodic, *ad hoc*, and inconsistent discussions about prices for some currency pairs at certain moments during the relevant period. The vast majority of these discussions did not involve Credit Suisse at all. Indeed, of the dozens of chats Plaintiffs use to support their allegations of agreements,[1] only two involved Credit Suisse. This is unsurprising given that Credit Suisse was a minor player in the FX markets with only three percent market share, and was intentionally excluded from chatrooms such as the "Cartel" that have drawn the DOJ's focus.

Excerpts in the Complaint from the "Cartel" chatroom illustrate the challenges Plaintiffs face in seeking class certification. Plaintiffs allege, for example, an agreement among traders from three banks (Citi, JP Morgan, and UBS) to manipulate the 12:00 p.m. WM/Reuters Fix for the Euro-U.S. Dollar currency pair on February 15, 2012. Complaint at ¶ 217. As discussed above, some class members will benefit from such conduct, some will lose, and most will be unaffected. But even more significant is what these allegations, even if true, do not prove. Because there is no overarching conspiracy, this incident relates solely to a few banks and a single currency pair during a brief moment in time—it tells the fact-finder *nothing* about other conduct or impact, other currencies, or any other point in time over the purported six-year class period. And it says nothing at all about a non-participating bank, such as Credit Suisse, which was never even a participant in the "Cartel" chatroom.

Therefore, as to *each and every one of the millions of transactions on which class members seek to recover*, Plaintiffs will have to prove several key facts, including: (i) the existence of an agreement to manipulate the relevant currency at that time; (ii) Credit Suisse's conscious participation in such agreement; and (iii) the impact of the conduct on the price achieved by each class member. The analysis will require examining all communications and trading data relating to the particular currency pair and transactions at the relevant date and time.[2] Not one of these issues is suitable for class treatment, raising serious issues of manageability, commonality, predominance and superiority.

These arguments apply with even greater force in a case against Credit Suisse alone. Absent proof of a single overarching conspiracy, Credit Suisse can only be liable for conduct in which it participated directly. Because such incidents, if any, will be few and far between, the vast majority of class members will have suffered no harm from Credit's Suisse alleged conduct. In a case where Credit Suisse is the sole defendant, it would be improper to certify a litigated class that includes such market participants.

**II.    Allegations of Conspiracy to Affect Spreads or Market Prices Present Additional Individualized Issues That Are Not Suitable for Class Action Treatment**

---

[1] *See* Complaint ¶¶ 134, 136, 145, 146, 148, 150, 151-58, 164, 165, 168, 170, 199, 201, 202, 206, 212, 214, 215, 217, 224, 226-29, 234, 241, 385.

[2] Plaintiffs suggest that they will seek to demonstrate that "information sharing" caused increased costs for all class members. To determine whether any such information sharing was a Sherman Act violation, however, would require substantial individual inquiry into each communication as well as evidence of anticompetitive effects in each properly defined relevant market because it is well settled that information sharing may be procompetitive and must be evaluated under the rule of reason.

The preceding discussion addresses the simplest of Plaintiffs' claims – that Defendants conspired to impact a benchmark fixing price which, by definition, sets the price that each purchasing class member would pay (but only for that particular currency at that particular moment). Plaintiffs' Complaint, however, also alleges that Defendants conspired to affect ordinary market prices or spreads, which are the prices that a specific class member would pay at a specific point in time in the context of a privately negotiated transaction. In these very individualized situations, even if an actionable agreement were proven, each class member's actual trading, bargaining power and dealer relationships, among other things, would still have to be evaluated to determine how, if at all, that particular class member was impacted. This "but-for" analysis of the price a particular Plaintiff would have paid absent the alleged wrongdoing adds an additional layer of individualized inquiries that impedes class certification.

Fact discovery has shown that this would be much more than a theoretical exercise. The evidence demonstrates that Defendants offered different prices and/or spreads (or no spread) to clients based on the currency pair at issue, trade size, importance of the trading relationship, creditworthiness, the dealer's fluctuating market exposure, negotiations, and time of day, among other factors.[3] Credit Suisse's experts will also show that Plaintiffs can offer no reliable methodology to establish common harm or quantify damages from the alleged manipulation.[4]

Even if Plaintiffs could somehow account for all relevant factors with respect to a particular transaction, they would still be required to then examine all FX-related transactions by each class member and make that same calculation to demonstrate that, on a net basis, each class member was harmed by Credit Suisse's conduct. *See In re LIBOR-Based Financial Instruments Antitrust Litigation,* 2018 WL 1229761, at *74 (S.D.N.Y. Feb. 28, 2018) ("*LIBOR VII*"); *Los Angeles Memorial Coliseum Commission* v. *NFL*, 791 F.2d 1356, 1366–75 (9th Cir.1986) (benefits from defendant's antitrust violation must be deducted from the plaintiff's recovery). Class members cannot cherry-pick a few losses and ignore windfall profits they received on account of the same alleged misconduct. The analysis that would be required for calculating each class member's net losses, for both allegedly manipulated fixes and spreads, would be extraordinarily complex and would necessitate multiple individualized inquiries relating to each class member's transactions.

Finally, the unique nature of the FX markets and the breadth of the class(es) envisioned by Plaintiffs will inevitably lead to irreconcilable class conflicts, which further preclude class certification. There is a fundamental conflict between the interests of named Plaintiffs who claim they were harmed by a particular agreement and the interests of absent class members who traded in the opposite direction (and thus benefited) during a time of the same alleged agreement. Here, such conflicts will arise in respect of every alleged instance of wrongdoing, creating substantial conflicts among class members and raising concomitant adequacy issues. *See, e.g.*, *LIBOR VII*, 2018 WL 1229761, at *71 ("[N]amed plaintiffs with opposite net trading positions will have directly conflicting incentives to establish not only the existence but also the magnitude of any manipulation that occurred on those dates.").

---

[3] The transaction-specific nature of spread determinations also demonstrates a lack of linkage, or transmission, of any inflation of spreads from one currency pair to another, or one transaction to another.

[4] Modeling "but-for" spreads and establishing injury and damages using common evidence is impossible because of fundamental limitations of the data available, including, for example, the exact time that a trade was executed. As a result, it is impossible to develop a reliable methodology to identify transactions that were allegedly impacted (i.e., transacted at a price outside the competitive market price at the time of execution) or to establish a reference time for an appropriate "but-for" price calculation.

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

 /s/ David G. Januszewski
David G. Januszewski
Herbert S. Washer
Elai Katz
Jason M. Hall
80 Pine Street
New York, NY 10005
Telephone: 212-701-3000
djanuszewski@cahill.com
hwasher@cahill.com
ekatz@cahill.com
jhall@cahill.com

*Attorneys for Defendants Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse Securities (USA) LLC*