UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

IN RE FOREIGN EXCHANGE BENCHMARK                No. 1:13-cv-07789 [LGS]
RATES ANTITRUST LITIG.

-----------------------------------------------------------------------X

## MOTION FOR APPOINTMENT OF (1) ADEQUATE REPRESENTATIVE and (2) INDEPENDENT SUBCLASS COUNSEL FOR EXCHANGE SUBCLASS, AND FOR AMENDMENT OF THE PLAN OF DISTRIBUTION

Objector Keith Kornell hereby files this motion for appointment of an adequate representative, as well as independent counsel for the Exchange Subclass, whose damages account for $70 million of the $2.3 billion settlement of this action, according to Class Counsel.[1] As far as it appears in the record, no separate, independent, adequate lead plaintiff or counsel was ever appointed to represent the interests of the Exchange-Only Subclass, which resulted in a plan of distribution heavily stacked against them. The failure to ensure adequate representation of the Exchange-Only Subclass at all stages of this litigation prejudiced the Exchange Subclass and requires rejection of a settlement that is heavily skewed in favor of the Direct Subclass. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 234 (2nd Cir. 2016).[2]

The Plan of Distribution is heavily stacked in favor of the Direct Settlement Subclass. First, Direct Subclass members have the option of electing Option 1 and

---

[1] See Memorandum in Opposition to Motion to Quash Deposition Subpoenas, attached hereto as Exhibit A, at p. 4.

[2] While this matter was not raised by the February 9, 2018 objection deadline, the problems with the Plan of Distribution did not become apparent until Objector Kornell completed his claim form and submitted it to the Claims Administrator. It is being raised by motion six weeks prior to the fairness hearing, and before Class Counsel must file its response to objections. Furthermore, this Court has an independent duty to ensure that all subclasses are adequately represented independent of any objections or motions. Therefore, the filing of this motion at this time does not prejudice any party, and will assist the Court in discharging its fiduciary duty to ensure that all subclasses are treated fairly.

having the Claims Administrator estimate the amount of each claimant's eligible transaction volume. This will result in automatic payment without submitting any trading records, or any other information, and without having to navigate the clunky, unfamiliar claim form. Exchange Subclass members do not have that option, and instead must collect all of their trading statements from their brokers, enter them into a byzantine electronic data template, and then hope that they did not commit some technical error that results in the wholesale rejection of the claim.

Second, any amounts not claimed by the Exchange Subclass spill over to the Direct Subclass, which will share in the unearned windfall from the Exchange Subclass damages despite the fact that their claims are based on a rough estimate. While there is no insistence on an exact calculation of damages for the Direct Subclass, the Exchange Subclass is limited to an exact calculation of their damages, based on whatever brokerage statements they can assemble by the deadline.

Keith Kornell submitted his claim for his business Crown & Kornell on February 21, 2018. *See Exhibit B*. On March 29, 2018, he was informed that his claim had been denied for an unspecified reason. *See Exhibit C*. Following this notification, both Mr. Kornell and his counsel left messages with the Claims Administrator in an effort to determine what needed to be changed to make the Claim Form conform to their requirements. Having been through the gut-wrenching experience of trying to comport his trading records with the overly technical electronic data template, Mr. Kornell fears that (1) most class members will be dissuaded from filing a claim, and (2) the Exchange Subclass members who do submit claim forms will receive a similar denial and no further guidance or assistance, resulting in a very low claims rate for the Exchange Subclass.

Furthermore, Mr. Kornell submitted all of his documentation with his claim form, as is required. *See Exhibit D*. Despite the fact that the Claims Administrator was in possession of this documentation, and could easily have calculated Mr. Kornell's damages for his 14 transactions, involving 52 contracts, they elected to reject his claim entirely, while the Direct Subclass is being paid an estimated claim automatically.[3]

To make matters worse, Class Counsel represented to Mr. Kornell at his deposition that, based upon their review of his documentation, his claim would be limited to no more than $150. If Class Counsel was able to perform this calculation based upon Mr. Kornell's documents, there is no reason why the Claims Administrator could not have done so. Given the alleged modest amount of the claim, what purpose is possibly served by the requirement that Exchange Subclass members complete an obscure form that merely summarizes the information on the documents that are in the Claims Adminstrator's possession? Why are Exchange Subclass members required to expend hours of effort for a mere $150, when the Direct Subclass members are having million-dollar claims paid automatically based on mere estimates? This injustice is magnified by the fact that there was no direct notice to members of the Exchange Subclass.

It is clear that the Plan of Distribution was designed to maximize the amount of the settlement received by the Direct Subclass, and to minimize payments to the Exchange Subclass. In order to make the Plan of Distribution fair to the Exchange customers, the following changes should be required.

---

[3] Subsequently the Claims Administrator rejected Mr. Kornell's personal claim as well. Documents submitted in support of Mr, Kornell's personal claim are attached hereto as *Exhibit E*. His personal claim involved 137 contracts.

First, the Court should segregate the roughly $70 million that represents the damages suffered by the Exchange Subclass. This amount should be distributed exclusively to the Subclass that created it, either directly or indirectly. and no amount should spill over to the Direct Subclass that is receiving the benefit of automatic claim calculation.

Second, the amount of minimum claim should be raised to at least $1000, to adequately incentivize Exchange Subclass members to spend the time to assemble their account statements and submit them to the Claims Administrator. The current $150 amount is hardly worth the investment of time necessary to submit a valid claim, including the repeated follow-ups with the Claims Administrator seeking guidance in navigation of the numerous pitfalls that have been set for the Exchange Subclass. As long as a class member submits any documentation that establishes that they purchased FX futures during the Class Period, they should automatically qualify for the minimum claim amount.[4]

In the alternative, the $70 million in damages suffered by the Exchange Subclass could be paid to an appropriate cy pres organization that is designed to assist the small commodity buyer.

Courts have rejected settlements because the complexity of the claim form made it unlikely that many class members would bother to submit claims. *See Eubank v. Pella,* 753 F.3d 718, 725 (7th Cir. 2014) (criticizing claim forms for requiring "a slew of arcane data." "The claim forms are so complicated that Pella could reject many of them on the

---

[4] This minimum payment amount should increase depending upon the number of claims submitted, to ensure that at least half of the $70 million is paid to the Exchange Subclass. For example, if only 17,000 claims are filed, the minimum payment should be increased to $2000, to ensure that at least $34 million is paid out to claimants.

ground that the claimant had not filled out the form completely and correctly."); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 783 (7th Cir. 2014) ("As experienced class action lawyers, class counsel in the present case must have known that the notice and claim forms, and the very modest monetary award that the average claimant would receive, were bound to discourage filings.").

The Seventh Circuit also criticized an extremely low claims rate, which is almost certain to be the case here. "Considering the modesty of the settlement, the length and complexity of the forms … we're not surprised that only 1276 claims … had been filed as of February 2013, out of the more than 225,000 notices that had been sent to class members." *Eubank, supra* at 726. "One would have thought, given the low ceiling on the amount of money that a member of the class could claim, that a sworn statement would have been sufficient, without requiring receipts or other business records likely to have been discarded." *Pearson, supra* at 783. The claims numbers are almost certain to be even more disappointing here, especially in light of the fact that the Exchange Subclass did not receive direct notice of this settlement, but were notified indirectly through their brokers, if at all.

The Federal Judicial Center publication "Managing Class Action Litigation: A Pocket Guide for Judges," Third Edition (2010), admonishes judges to closely scrutinize claims processes in order to determine whether a settlement is likely to deliver sufficient value to the class. "Avoid imposing unnecessary hurdles on potential claimants." Pocket Guide at p. 30. "Necessary claim forms should be a simple and clear as possible and should avoid redundancy. Be careful to avoid claim forms that scare class members away with confusing questions and onerous proof requirements." *Id*. The requirement

that class members enter their trade data into specific forms without any assistance from the Claims Administrator would seem to constitute the type of claims process that should be avoided by federal judges.

"If you anticipate or find evidence of a low claims rate, ask counsel whether they have considered alternatives that might enhance the reach of the claims process and tailor it to the characteristics of class members…" *Id.* Here, Mr. Kornell anticipates that the number of approved Exchange Subclass claims may be fewer than 1000, based upon his experience, resulting in less than $150,000 of claims paid out (assuming $150 per claim), out of a potential $70 million.

Mr. Kornell's experience with the claims process in this case has served to uncover and highlight the extreme unfairness of the proposed Plan of Distribution to the Exchange-Only Subclass, and the lack of procedural protections that led to their interests being sacrificed in order to increase the recoveries of the Direct Subclass. The Plan of Distribution must be amended to ensure that the Exchange Subclass receives the entire $70 million to which they are entitled, and that no portion of that amount spills over to give the Direct Subclass a windfall to which they are not entitled.

> Respectfully submitted,
> Keith Kornell,
> By his attorney,
>
> */s/ John J Pentz*
> John J. Pentz, Esq.
> 19 Widow Rites Lane
> Sudbury, MA  01776
> Phone: (978) 261-5715
> jjpentz3@gmail.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed via the ECF filing system of the USDC for the EDNY on April 12, 2018, and that as a result electronic notice of the filing was served upon all attorneys of record.

*/s/ John J. Pentz*
John J. Pentz