**EXHIBIT 4**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | Case No. 1:13-cv-07789-LGS |

---

Deposition of

KEITH KORNELL

March 30, 2018

1:52 P.M.

Taken at:

Landskroner Grieco & Merriman, LC

1360 West 9th Street

Cleveland, Ohio

Wendy L. Klauss, RPR

1      A.    Yes.
2      Q.    And who are you represented by in
3  this case?
4      A.    Ed Cochran.
5      Q.    Is Mr. Pentz serving as your
6  attorney as well, or just Mr. Cochran?
7      A.    My understanding is that Mr. Pentz
8  is co-counsel with Mr. Cochran.
9      Q.    So to be clear, you consider both
10 of them to be your attorneys in this case?
11     A.    I do.
12     Q.    Now, I understand you sat in this
13 morning's deposition with Mr. Galan, correct?
14     A.    Yes.
15     Q.    So you heard me go through the
16 ground rules, correct?
17     A.    Yes.
18     Q.    Did all those ground rules make
19 sense?
20     A.    Yes, they did.
21     Q.    We will apply all of those that we
22 did this morning to your deposition today to
23 you.
24     A.    Okay.
25     Q.    Before going forward, are you on

```
 1        Q.   So would you agree that in
 2   assessing the reasonableness of an attorney fee
 3   for a particular class action case, that it is
 4   important to know the particulars of what
 5   happened?
 6        A.   Yes.
 7        Q.   Are there any differences that you
 8   can articulate between the platinum and
 9   palladium case and then this FX case here that
10   would make the requested fee in this case
11   inappropriate, whereas the awarded fee in
12   platinum and palladium was acceptable?
13             MR. COCHRAN:   Objection.
14        A.   I would have no way of knowing
15   that.
16        Q.   So other than the platinum and
17   palladium case that we have just been
18   discussing, have you served as a main class
19   plaintiff in any other class action?
20        A.   Not that I recall.  I may have been
21   in a small stock one, but I can't even tell you
22   what stock it was.  But no, I haven't.
23        Q.   Other than what you just told me
24   about the other stock case, do you remember
25   anything else about what that case was about,
```

1  and then the high end is maybe 3,000 during
2  that timeframe. The more volatile they become,
3  the higher they become, the more they raise the
4  margins or lower the margins.
5      Q.   What was the typical margin range
6  for the U.S. dollar index that you also traded?
7      A.   Again, it was very cheap at that
8  timeframe. Maybe a thousand dollars. Now it's
9  $3,000.
10     Q.   Now, going back to the 2014 to
11 today timeframe, I think you said that your
12 trading has been insignificantly less, right?
13     A.   Right.
14     Q.   Is that because the margin
15 requirement has increased so much, or is there
16 a different reason?
17     A.   The only one I can come up with so
18 far, I have been trading since I was young, I
19 developed a trading system, which was
20 incredibly accurate during that period from
21 2007 to 2011, and basically in 2012, it stopped
22 working, but I didn't stop investing. So I
23 basically lost my working capital to make
24 further investments.
25     Q.   Do you know what this lawsuit is

```
 1  about?
 2       A.   Yes, I do.
 3       Q.   What's it about?
 4       A.   It is basically about the big banks
 5  doing another one of their things, where they
 6  screw people and they got their hand caught in
 7  the cookie jar, and they put -- the federal
 8  government penalized them, and then we have a
 9  settlement for damages to the people that were
10  involved, the victims of it.
11       Q.   Were you done?  I'm sorry.
12       A.   Yeah.  I think that's an answer.
13       Q.   I just didn't want to cut you off.
14       A.   I do it to you all the time.
15       Q.   It happens.  It's okay.
16            So just digging a little deeper in
17  that, what is your understanding, if any, as to
18  what the banks were doing to screw people, in
19  your words, not mine?
20       A.   It sounded to me like they had a
21  given amount of time that they could settle
22  trades in, and when you were buying -- when you
23  were buying a euro or a dollar or whatever,
24  when you were buying it, they juggled that
25  timeframe so you always paid the highest price,
```

when you sold it, you always got the lowest price, and the bank was working on the difference, which could be a small amount, but when you do a number of trades, it becomes a big amount of money.

    Q.    And how long have you known this is what the case was about, at least in your words?

    A.    After I heard about it from John Glase.

    Q.    So you have known about that before today?

    A.    Yes.

    Q.    Can name any of the defendants?

    A.    I know Chase Bank is in there, Bank of America is in there, Credit Suisse. Those are the few that I remember off the top of my head.

    Q.    Have you read any of the various complaints filed by the main plaintiffs in this case?

    A.    No.

    Q.    Do you have an understanding of what claims are being alleged in this lawsuit? And by claims, I mean legal theories,

1  understanding you are not an attorney, but just
2  saying at a high level, what is the legal claim
3  being made, if you know?
4          MR. COCHRAN:   Objection.
5      A.   Are you talking about the case
6  against the banks or --
7      Q.   Yes.
8      A.   -- or our case, our objection?
9      Q.   Not your objection.  I'm talking
10 about the lawsuit that's been filed by class
11 counsel.  Do you have any understanding of what
12 claims they are alleging?
13     A.   The one I described earlier.
14     Q.   Do you understand that in this
15 case, there are two different classes?
16     A.   Well, I mean, what I would call the
17 retail classes, there is the people that did
18 the futures, like myself, and then I would call
19 them the institutional side.  You call them
20 over-the-counter transactions.
21     Q.   So let's call those the exchange
22 class and then the over-the-counter class.
23     A.   Yes.
24     Q.   Do you know which class you are a
25 member of or claim to be a member of?

```
 1   settlement fund as fees or reimbursement for
 2   expenses?
 3        A.   No, I did not see that.
 4        Q.   Before filing your objection with
 5   the Court, did you contact class counsel to ask
 6   them about their efforts in representing the
 7   class?
 8        A.   No.  I never got a notice, so I
 9   wouldn't know where to even contact them or who
10   it was.
11        Q.   Sure.  Even after, it sounds like,
12   you were in touch with Mr. Cochran and
13   Mr. Pentz earlier this year.
14             After being aware of the case, from
15   Mr. Glase or from your counsel, did you ever
16   try to contact class counsel to ask them about
17   their efforts in representing the class?
18        A.   No.
19        Q.   Before filing your objections, did
20   you ever try to find out what class counsel
21   thought they did that would justify their
22   requested attorneys' fees?
23        A.   No.
24        Q.   Before filing your objection with
25   the Court, did you ever try to find out from
```

1  class counsel anything about this case?
2      A.    No.  I mean, I felt I already had
3  counsel, so I didn't need to pursue anyone
4  else.
5      Q.    Do you know if anybody on your
6  behalf contacted class counsel, before you
7  filed your objection, trying to learn anything
8  about what class counsel did in this case?
9      A.    I wouldn't know what Ed and John
10 Pentz have done or not done.
11                - - - - -
12            (Thereupon, Deposition Exhibit 1,
13            Lead Counsel's Notice of Motion for
14            an Award of Attorneys' Fees and
15            Reimbursement of Litigation
16            Expenses, was marked for purposes of
17            identification.)
18                - - - - -
19     Q.    Handing you what has been labeled
20 Exhibit 1.  It is a document filed in this
21 case, ECF number 937, Lead Counsel's Motion For
22 Attorneys' Fees and the Memo in Support of the
23 Motion For Attorneys' Fees and Reimbursement of
24 Expenses.  Have you seen this document before?
25     A.    No.

1     Q.    Okay. You can put that to the
2 side.
3
4           - - - - -
5         (Thereupon, Deposition Exhibit 2,
6         Objection to Request for Attorney's
7         Fees and Notice of Intention to
8         Appear, was marked for purposes of
9         identification.)
10           - - - - -
11     Q.    Handing you what has been labeled
12 Exhibit 2, a document filed in this case, ECF
13 963, Objection to Request For Attorneys' Fees
14 and Notice of Intention to Appear.
15         Have you seen this document before?
16     A.    Yes.
17     Q.    When was the first time you saw it?
18     A.    Probably soon after we -- somewhere
19 in the beginning to middle of February.
20     Q.    So after it was filed?
21     A.    I believe I saw it before it was
22 filed.
23     Q.    Did you have any role in either
24 drafting this or developing the arguments that
25 are contained in this objection?

1    A.    No, I didn't.
2    Q.    Do you -- strike that.
3          Did you have any objections to
4    class counsel's request for attorneys' fees
5    before talking to your counsel in this case?
6    A.    No.
7    Q.    Do you think you have a good sense
8    for what your objections are to the class
9    counsel's request for attorneys' fees?
10   A.    Yes.  Well, I do more so today,
11   after what I heard today, yes.
12   Q.    After listening to my questioning
13   of Mr. Galan?
14   A.    Yes.
15   Q.    So are you saying you didn't really
16   have a good sense to what you were objecting
17   to, until you heard me question Mr. Galan?
18   A.    No.  It is more why.  I had a clear
19   sense that Ed felt that these fees were
20   excessive.  I knew there was a lot of millions
21   of dollars of trading that I had done during
22   that time period, so I felt there was valid
23   reason for me to be involved in it.
24         What the exact particulars and
25   which cases he cited in this is his work.

1  Q. So the objection to the size of the
2  fee is your counsel's objection and not yours?
3  A. Yes.
4  Q. Do you have any idea what class
5  counsel did to litigate this case?
6  A. What class counsel did?
7  Q. Yes.
8  A. Oh, no.
9  Q. Do you have any idea how many
10 attorneys billed time to this case?
11 A. No.
12 Q. Do you know how many hours the
13 plaintiffs' attorneys worked on behalf of the
14 class in this case?
15 A. No.
16 Q. Do you know any of the risks class
17 counsel faced in this case?
18 A. No.
19 Q. Do you know what the going market
20 rate is for contingency legal counsel?
21 A. No.
22 Q. Do you recall my questioning this
23 morning of Mr. Galan, where we went through the
24 class notice and talked about how some class
25 members are entitled to only $15 de minimis

REPORTER'S CERTIFICATE

The State of Ohio,    )
                             SS:
County of Cuyahoga.  )


       I, Wendy L. Klauss, a Notary Public within and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named witness, KEITH KORNELL, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by the above-referenced witness was by me reduced to stenotypy in the presence of said witness; afterwards transcribed, and that the foregoing is a true and correct transcription of the testimony so given by the above-referenced witness.

       I do further certify that this deposition was taken at the time and place in the foregoing caption specified and was completed without adjournment.

1  I do further certify that I am not
2  a relative, counsel or attorney for either
3  party, or otherwise interested in the event of
4  this action.
5  IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 6th day of April,
8  2018.

*Wendy L. Klauss*

Wendy L. Klauss, Notary Public
within and for the State of Ohio

My commission expires July 13, 2019.