# Docket and File.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED : 5/29/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

IN RE FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST
LITIGATION

13 Civ. 7789 (LGS)

This Document Relates to:

CHAN AH WAH ET.AL. V. HSBC BANK USA N.A.
ET.AL.

15 Civ. 8974   (LGS)

------------------------------------------------------------------x

Dearest Honorable Judge Schofield,

Good day to you. Your Honor. Pursuant to the Court's order:

1. In Specific Jurisdiction is the "The plausibilty standard is not akin to a 'probability requirement,'" and allegation passes muster so long as what it alleges is "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 566 U.S.662, 678 (2009). See ECF 582, *FOREX*, dated 03/31/16, Pg.12. United States desk trader traded United States trader in multi-chat room in different bank in different zones. "This argument is..amounts to "demand for specifics that are not required, and that Plaintiffs could not be reasonably expected to know, at the pleading stage." *FOREX*, 74 F. Supp.3d at 595. *Id.* "Here, Plaintiffs plead collusive conduct within the United States, gives examples of each New defendants' participation in the alleged conspiracy (albeit in chatrooms whose particpants' location s presently unknown), and provide undisputed averments concerning the New Defendants' extensive U.S.-based FX operations. Taken as a whole, the SAC [Second Amended Complaint] plausibly alleges suit-related conduct that either took place in the United States, or had effects expressly aimed inside the country due to the New Defendants' substantial FX business here. Construing the pleadings and declarations in the light most favorable to Plaintiffs, *Dorchester*, 722 F.3d at 85. the New Defendants' su-related conduct created a substantial connection with this forum, *Walden*, 134 S.Ct. at 1121, and Plaintiffs have made a prima facie showing of specific jurisdiction over BTMU and Societe Generale." *Id.* Pg.13.para.1. "Plaintiffs have..made a prima facie showing of specific jurisdiction over Standard Chartered..does operate or maintain offices in the United States. Plaintiffs' jurisdictional allegations refer to Standard Chartered..'s indirect subsidiary, SCB [Standard Chartered Bank], ..explains..SCB's contacts should be imputed on its parent company...the allegation describing Standard Chartered..that Plaintiffs have inadvertently named the wrong corporate entity..Standard Chartered..avers that it "has no employees" and "does not participate in the trading of FX instruments," and Plaintiffs' allegations as to collusive conduct and U.S.-based business likely describe SCB only." *Id.* Pg.13.para.2. HSBC's United States desk trader in Iran [The

Memorandum and Order, *U.S. v. HSBC Bank USA N.A. et.al.* Case No:12-CR-00763-JG (EDNY), See ECF 23, dated 07/01/2013], its review is essential here at FOREX Second Consolidated Action, and had to put the review part of the presiding Judge in ECF 230, *Chan Ah Wah and Lim Cheok Kee Willy v. HSBC Bank USA N.A. et.al*, 15-cv-8974-LGS (SDNY), as our interest here with *Chan Ah Wah and Lim Cheok Kee Willy v. HSBC North America Holdings Inc.* et.al., 15-cv-8974-LGS (SDNY) to our contention we are the Class member in *FOREX*. The Iran review can tell to the Short trade as Put-options in derivatives project that United States desk trader in HSBC Bank USA National Association has put us in the united pool of Trust [Trust Issued Receipt in saving account] with Iran, Middle East so on, that HSBC Bank USA National Association worked on it as past years or so, and Iran case can tell us about our class membership in FOREX about our side is a Long trade as Call-options in derivatives at CME exchange in need for Short trade/Short ETF or Put-option in derivatives to perform legally.  HSBC Bank USA N.A.("N.A.") wrote on our cash deposit saving account statement "loan" names to finally elected on to tax return credit fraud from the U.S. desk trader in action of accounting fraud and corporate fraud they worked on in the past years and so on. This can eliminate doubts about HSBC Bank USA N.A. is modifying the derivatives in A Grades to reuse, reuse reinvented to a 6th Grades or so notorious Collateralized Debt Obligation ("CDO") exactly put us in the work [JP Morgan Chase's reuse reinvented hybrid vanilla-option in leaked tranche reference number to U.S retirement plan and pension fund in 1980s] with N.A. on the start at Iran, Middle East and IMDB, Panama list, Paradise list, so on, in the Money Laundering Act invokes United States territories' specific jurisdiction in the New York District Court, Southern District of New York, Manhattan. It is also invokes on The Patriot Act was not abided by the banking system on the work to cure the act of terrorist in parrallel to Money Laundering Act of 1956 and 1957 in various section shall apply to each defendant to on their Short trade as put-option in derivatives in multi-chat room they participated in different bank in different zones reached U.S. territories -simply tell from works in ICE-US office to United States trader act as each worked on FX spot. See ECF 100, Pls. Mem. of Law and Affirmation, *Id.* "Plaintiffs have made prima facie showing of specific jurisdiction over defendant HSBC and any of the New defendants because the allegations in the SAC, together with evidence [See ECF_____ FOREX] of the extent of the Defendants HSBC and any of the new defendants' FX operations in the United States, give rise to the reasonable inference that they participated in the alleged conspiracy in the United States or participated elsewhere with the aim to cause harm in the United States and even operate or maintain offices here. As opposed to general jurisdiction, "[s]pecifi or conduct-link jurisdiction..'depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurence that take place in the forum state and is therefore subject to the State's regulation.'"(See *Sonera Holding B.V. v. Cukurova Holding A.S.,* 750 F.3d 221,225 (2d Cir.2014)..in other words, "to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum." *Walden,* 134 S.Ct.at 1112. Minimum contacts to support specific jurisdiction "exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could

foresee being hauled into court there." *Licci ex rel.Licci v. Lebanese Canadian Bank, SAL,* 732 F.3d 161, 170 (2d Cir. 2013)(quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 127 (2d Cir. 2002)). "When the cause of action arises out of the very activity being conducted, in part," inside the forum. (See *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 780 (1984). It may also exist even if none of the relevant conduct took place inside the forum, under the "effects test." See *Licci,* 732 F.3d at 173; *see also Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 243 (2d Cir. 2007) (describing "independent, if conceptually overlapping, methods of demonstrating minimum contacts"). "The effects test is a theory of personal jurisdiction typically invoked where...the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci,* 732 F.3d at 173. For these claims, "the exercise of personal jurisdiction ... constitutionally permissible if the defendant *expressly aimed its conduct at the forum.*" *Id.* (emphasis added) (citing *Calder v. Jones,* 465 U.S. 783, 789 (1983)). "[T]he fact that harm in the forum is foreseeable, ... for the purpose of establishing specific personal jurisdiction over a defendant." *In re Terrorist Attacks,* 714 F.3d at 674." Pg.18.para.1.The Complaint/SAC sufficiently alleges the existence of a conspiracy in violation of Section 1 of Sherman Act, and that all Defendants including HSBC and New Defendants were part of that conspiracy.

2. To report HSBC Bank USA National Association make through Iran case in important part to U.S. desk trader rolled our ordinary saving account to restructure Call-option, Pu-option to edit through Iran case's review that made up each Short trade as Put-option in derivatives using an icon name as "loan" printed in our saving account book in an account made up Call-option established for criminals in minimal exposure to detection in money laundering crime in all alert in the names of unwelcomed, sanctioned entities might create many stops in allowing criminals' order for monetary settlement in CME exchange. And also made up panic attacks to its United States desk trader at derivatives modification in Put-option put for upper Long trade as Call-option in counterparties at meet as criminals is presiding in HSBC Bank USA National Association office is tending its entry from Iran, Middle East, so on, through N.A. in IMM is an important part to report directly described the potential raised ethical doubts described by N.A. put the fuduciary account destroyed in script described each derivatives is Call-option be the other to "loan" in our saving account statement in description to its Call-option in Long trade derivatives, ripped out the detection from, of ethical inscription as part described the murderer, rapist from Islamic State [IS] is possible the user using in the bank system to routing money transfer in SWIFT code electronically message to credit and debit its nostro account of the U.S. desk trader in effecting the foreign exchange in dual-currency in processing is an iconic netting settlement. The unsounding of sensitive names like Prime Minister Najib in 1MDB duration in united pool of trust/money we sat in with, will have panic triggering attacks from so called "Najib is corrupting the Malaysian State public company in 1MDB" in unsounding names in "official 1" during investigating duration. "is simply using derivatives as "loan" written on our saving account book to evade

the overall detection in Oval Office as each derivatives reached at greet in ICE-US office in only our names, and all our new members' ordinary names as options is meeting ICE-US. This is an important part in Iran case of money laundering by HSBC Bank USA National Association as said in the Judge's Order, "The Memorandum and Order, *U.S. v. HSBC Bank USA N.A. et.al.* Case No:12-CR-00763-JG (EDNY), See ECF 23, dated 07/01/2013." in such we were acting at rally a FX spot action in Futures/Options as said in TAC [Third Amended Complaint]. See "Plaintiffs make clear a prima facie showing in the Complaint/SAC to support general jurisdiction over HSBC and New Defendants. .. two of three of Defendant HSBC Banks is incorporated or maintains its principal place of business in the United States, and conduct substantial operations in business in the United States, "with 230 branches in the United States, including 145 branches in the States of New York with thousands of employees* (see footnote *19, ''HSBC and New Defendants do not dispute that their contacts throughout the United States are considered for personal jurisdiction purposes. (See *In re Auto. Refinishing Paint Antitrust Litig., 358 F.3d 288, 298 (3d Cir. 2004)* ("[P]ersonal jurisdiction in federal antitrust litigation is assessed on the basis of a defendant's aggregate contacts with the United States as a whole."); *In re Libor-Based Fin. Instruments Antitrust Litig.* No.11 MDL 2262, 2015 WL 6243526, at *23(S.D.N.Y. Oct. 20, 2015); *SEC v. Straub, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013)*(holding that "the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state")."In the U.S. For the year ended December 31, 2013, HSBC disclosed $8.8 billion in revenue and $1.221 billion in profit before tax in North America alone." (SAC ¶ 24), is "essentially at home" in this country, as required for the exercise of general jurisdiction. The Supreme Court in 2011, held that"[a] court may assert general jurisdiction over foreign (sister-state or foreign country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them *essentially at hom*e in the forum State." (See *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 131 S. Ct.2846, 2851 (2011)(emphasis added). *Goodyear's* "essentially at home" standard was applied three years later in *Daimler,* where the Court held that a foreign corporation's "slim contacts with [California] hardly render it at home there," even assuming the contacts of its U.S. subsidiary were imputable to it. *Daimler, 134 S. Ct. at 760.* The Court explained that the "paradigm" forum for general jurisdiction over a corporation is "where it is incorporated or has its principal place of business." Otherwise, courts should find general jurisdiction only in "exceptional" cases. *Id* at 760-61 & n.19. Similarly, the Second Circuit in *Gucci* held that a foreign bank with "only four branch offices in the United States and only a small portion of its worldwide business...conducted in New York" was not "an exceptional case." *Gucci Am., Inc. v. Weixing Li,* 768 F. 3d 122, 135(2d Cir. 2014); also see *Brown v. Lockheed Martin, Corp.,* 2016 WL 641392 at *6*) ("[I]n our view *Daimler* established that, except in a truly exceptional case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business –the 'paradigm' cases.") Under *Goodyear and Daimler,* Plaintiffs have made a prima facie showing defendant HSBC and New defendants

are subject to general jurisdiction. The SAC acknowledges that HSBC "is a Delaware corporation headquartered in New York, ...with its principal place of business in 452 Fifth Avenue, New York, with 230branches in the United States, including 145 branches in the States of New York." (SAC¶ 24)" Id. Pg.15. "The Court explained that the "paradigm" forum for general jurisdiction over a corporation is "where it is incorporated or has its principal place of business." Otherwise, courts should find general jurisdiction only in "exceptional" cases. _Id_ at 760-61 & n.19. Similarly, the Second Circuit in _Gucci_ held that a foreign bank with "only four branch offices in the United States and only a small portion of its worldwide business...conducted in New York" was not "an exceptional case." _Gucci Am., Inc. v. Weixing Li_, 768 F. 3d 122, 135(2d Cir. 2014); also see _Brown v. Lockheed Martin, Corp.,_ 2016 WL 641392 at *6) ("[I]n our view _Daimler_ established that, except in a truly exceptional case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business –the 'paradigm' cases.") Under _Goodyear and Daimler,_ Plaintiffs have made a prima facie showing defendant HSBC and New defendants are subject to general jurisdiction." Id. Pg.17. See Appendix A for all members' participation in internet.

3. On Iran in N.A. as entry to on Short trade as Put-option in derivatives ought to on essential Call-option entry to issue its signal in Short ETF ['Order Granting Approval of Proposed Rule Change to List and Trade Shares of Market Vectors Low Volatility Commodity ETF and Market Vectors Long/Short Commodity ETF under NYSE Arca Equities Rule 8.200' (https: //www.sec.gov/rules/sro/nysearca/2013/34-70209.pdf.) at Pg. 1.] to U.S. arrival part of our money in saving account in pool of trust/money in script and we are receiving emails to this Call-option [Long trade] confirmation in investment portfolio for wealth management as to their accounting fraud and corporate fraud in fees associated to tax return credit fraud. In Iran, Middle East so on illegal money altogether its required a managing report be happening to report, to lead, to the needs of damaging margin calls, to be finally happened. But it finally leaked a reports to pur investment portfolio showing damaging Long trade as Call-option in derivatives as JP Morgan Chase's scrape product quickly read in its final pending act shown to ordinary saving account so to manage "no stock name to show" in this project in action and to quickly margin calls to on the seizure of cash deposit/money in the saving account to clear the act to silence us and our new members. As to thousand of us to the upper trade in Long trade as Put-opton in derivatives led to added thousand, thousand and thousand visits to ICE-US in their bank's front book with Iran, Middle East so on, on allow immediate settlement on reached N.A. with us and our new members with total illegal money takes to netting FX spot restructured entries in N.A. through united participation in multi-chat room we all directly voiced each other by telephone to edit trades needed to follow execution. In this way, FX spot not sell out within two business days need to also rolled over to allow United States desk trader using this FX spot structured and restructured as needed to act in derivatives, built in entries for claims to their counterparties in multi-chat room aim in support under ill-intention for Iran, Middle East so on enable clearing settlement to ease in money laundering detection

laid at IMM, CME exchange in United States. See ECF 141, TAC, *Chan Ah Wah and Lim Cheok Kee Willy v. HSBC North America Holdings Inc.* et.al., 15-cv-8974-LGS (SDNY), No. 258, "Both the CME and ICE are designated contract markets pursuant to Section 5 of the CEA (7 U.S.C. § 7), and specify the term of trading FX futures contracts and options, including the trading unit, price quotation, trading hours, trading months, minimum and maximum price fluctuations, and margin requirements."Pg.101. *Id.* "No. 259. Like other future contracts, FX futures are secured by performance bonds that may be posted by both buyers and sellers. These performance bonds are also referred to as margin requirements, and are designed to anticipate, and secure against, the maximum anticipated one-day price movement. As set forth below, the day-to-day price movements (which determine how much margin must be posted) are calculated based on a snapshot of trading activity at a fixed time each day."Pg.101.102. *Id.* "No. 260.These "standardized" terms facilitate exchange-based trading and distinguish an FX futures contract from an outright forward transaction, which is conducted OTC between private parties and can be customized to a certain extent based on their needs. For example, while two parties to an outright forward can pick a date in the future on which currency will be exchanged, FX futures contracts are always settled on the third Wednesday of either March, June, September, and December, following the quarterly cycle of International Monetary Market or "IMM" dates. There are 20 contract months listed in the March quarterly cycle (March , June, September, December), which means the listed contracts available extend out of five years. Similarly, each FX futures contracts is for a standardized amount of currency, e.g. € 125,000, while the parties to an outright forward can choose the amount of currency that will be exchanged in the future."Pg.101.102. *Id.* "No. 261. Futures contracts generally expire, *i.e.* stop trading, on the second business day immediately preceding the third Wednesday of the contract month unless that day is a holiday. For example, the last trading day for the March 2015 EUR/USD contract was on Monday, March 16, 2015 (*i.e.*, the second business day immediately preceding the third Wednesday of the contract month)."Pg.102. *Id.* "No. 262. In all futures contracts of the major currency pairs listed at the CME, the base currencies (the one listed first in the pair) are the foreign currency. The counter currency is U.S. dollar, which means the gain or losses will be denominated in U.S. dollars."Pg.102. *Id.* "No. 263. The CME currently offers around 100 different FX futures contracts. The major currency futures pairs are EUR/USD, JPY/USD, GBP/USD, CAD/USD, CHF/USD, and AUD/USD. Each FX futures contract is "priced based on," *i.e.*, it derives its value from an underlying currency pair. For example, a CME euro FX futures contract, which represents an agreement to buy or sell €125,000 in exchange for U.S. dollars, derives its value from the price of the spot EUR/USD currency pair. Similarly, a CME Japanese yen FX futures contract, which involves an exchange of ¥12,500,000 for U.S. dollars, derives its value from the price of the spot USD/JPY currency pair."Pg.102. *Id.* " No. 264.The pricing relationship between an FX futures contract and the underlying currency pair is a product of how futures contract are structured. A futures contract represents a bilateral agreement between two parties, a buyer and a seller, who are commonly referred to as a "long" and a "short."" Pg.103.*Id.* "No. 265. A long position, or simply a long, refers to a market position in

which one has bought a future contract. In currency futures, it refers to having bought a currency pair specified for the contract, meaning one bought the base currency and sold the counter currency." Pg.103. *Id.* "No. 267. The obligation to exchange the underlying currency at some point in the future directly ties the value of an FX futures contract to the spot market price for the underlying currency pair. Prices for FX futures contracts track spot market prices adjusted for the forward differential. As FX futures contracts near expiration, their prices actually "converge" with those in the spot market, becoming equal to the current value of the underlying currency pair. The convergence between spot and futures prices only further demonstrates that the spot market value of the underlying currency pair (and the WM/Reuters spot rates) drive futures prices." Pg.103. *Id.* "No. 269. All FX futures contracts are settled following their expiration, however, in most cases, this does not result in an exchange of the physical currency. Market participants have the option to offset or "financially settle" their FX futures positions." Pg. 103.104.*Id.* "No. 272. Conversely, a put option gives the holder the right, but not the obligation, to sell an FX futures contract at the strike price prior to expiration. Similarly, one may buy or sell a put option, either paying or receiving a negotiated premium or price." Pg. 104. *Id.* "No. 275. Because the direct relationship between the prices of FX futures prices and the spot market prices of the underlying currency pairs is demonstrated below, Defendants knew their manipulative and/or collusive activities in spot transactions would result in artificial price movements for exchange transactions*      See footnote* 214, (*CFTC v. Std. Forex, Inc.*, No. 93 Civ. 0088, 1996 WL.435440, at *9 n.8 (E.D.N.Y. July 25, 1996)("Futures prices and spot prices are linked mathematically. The difference between the two is the interest or cost of carrying one currency versus another for the period from the spot settlement date to the futures delivery date. As a result, the prices of the two will converge as the futures delivery date approaches.") including coordinated submissions directly to the Chicago Mercantile Exchange ("CME") which "skewed bids and offers in a manner intended to move the CME/EMTA rates in a direction more favorable to Defendants." Pg.105. also see ECF 100 Pls. Mem. of Law and Affirmation, "..112. FX futures contracts can be traded on several public exchanges, including the CME and ICE, however, most FX futures contracts are traded on the Chicago Mercantile Exchange - CME group Inc. ("CME") and ICE Clear Credit LLC ("ICE") as the operator of the world's foremost derivatives marketplace, offered exchanges for trading in derivatives and a clearinghouse." (SAC ¶ 112.)" Pg.20. *Id.* "...117. "Both the CME and ICE are designated contract markets pursuant to Section 5 of the CEA (7 U.S.C. § 7), and specify the term of trading FX futures contracts and options,... and margin requirements." (SAC ¶ 117.) iv). The SAC's contain allegations with Plaintiffs attached additional information about the New Defendants' (See Exh. B annexed to Pls. Mem. in Opp.; *also see below chart A)* including HSBC's extensive FX operations in the United States, in SEC Form 10-K by HSBC that in the end of 2013." Pg.20. *Id.*"98. FX futures contracts are connected to FX benchmark rates... WM/Reuters relies on indicative quotes (submissions) derived from a Reuters computer feed that solicits "indications of interest" from market participants as part of its fixing methodology. WM/Reuters captures independent snapshots of indicative quotes for bids and offers, and

selects the median rate from these quotes as the 4 p.m. WM/Reuters fix. The FX market is concentrated and dominated by Defendants. (SAC ¶ 98.)" Pg.21.*Id.* "The New Defendants "do not dispute that they (or their affiliates) have traded currency in New York or do business in New York," but assert that "Plaintiffs have not identified a *single* 'trade at issue in this litigation' that links any of the NFDs to this forum."Pg.22. *Id.* also see ECF 661, FOREX, "The NSD[Non-Settling Defendants] next argue that their potential aggregate liability is disproportionate to any alleged wrongdoing because nine (of sixteen) Defendants have already agreed to settlements, leaving the NSDs potentially liable under principles of joint and several liability for any harm caused by any of the sixteen. See *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1257 (7th Cir.1980)("Anti-trust liability under Section 1 of the Sherman Act is joint and several."); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D.493, 508 (S.D.N.Y.1996)(same), *abrogated on other grounds by Wal-Mart Stores, Inc. v. Dukes, 564 U.S.338, 349-50 (2011); see generally Tex. Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 646 (1981); Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 144 (1968) (White, J., concurring)("[D]amages normally may be had from either or both defendants without regard to their relative responsibility for originating the combination or their different roles in effectuating its ends."), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 472 U.S.752, 765 (1984)." Pg.15. *Id.* "This argument has nothing to do with the efficient enforcer analysis, particularly the directness of injury factor that prompted *Gelboim's* concern with disproportionate damages...the argument is unpersuasive. The NSDs essentially argue that the antitrust laws' imposition of treble damages and the provision for joint and several liability are themselves "disproportionate." The NSDs do not cite any authority for this line of reasoning nor does it seem likely that they could." Pg.16.*Id.*"The breadth of the alleged conspiracy, however, does ... render damages in this case speculative, as any harm from the alleged conspiracy can be shown on a transaction-by-transaction basis. see Alaska Elec. Pension Fund v. Bank of Am. Corp., No. 14 Civ. 7126, 2016 WL 1241533, at *8 (S.D.N.Y. Mar. 28, 2016)("Plaintiffs have alleged that they were directly harmed by Defendants' anticompetitive conduct by having to pay higher prices (or earning lower profits) from instruments tied to ISDAfix, there is ... particularly ... about the injury alleged, and the damages at issue are tied to particular transactions and contracts, obviating the danger of duplicative recovery.")."Pg.17. *Id.* "Finally, the NSDs focus on *Gelboim's* observation of "... enforcement mechanisms at work," and their bearing upon the need for private enforcement in the LIBOR cases. *Gelboim*, 823 F.3d at 778. *Gelboim*, where the court noted that the alleged conduct is made ..in the context of its discussion of whether damages in the Gelboim action would lead to duplicative recovery and complex damages apportionment, *Id.* The OTC Plaintiffs do not present a danger of "duplicative recovery" and complex damage apportionment. First, none of the regulatory investigations in the United States appear to be aimed at providing restitution to any injured parties, and the NSDs have not shown otherwise. The TAC references an investigation by the Commodity Futures Trading Commission and settlements with the same five banks "resulting in adverse findings of facts and billions of dollars in fines" with no reference to restitution. The TAC similarly

describes an investigation by the Office of the Comptroller of the Currency and its assessment of $950 million in fines against three U.S. banks relating to foreign exchange trading. The TAC also references related fines assessed by New York State Department of Financial Services. Neither the Complaint nor the NSDs suggest that any of these regulators has ordered restitution as a part of any penalty or settlement. As for the Department of Justice criminal investigation, which the TAC alleges is still ongoing, four banks have pleaded guilty and one has sought amnesty; the same fives have settled with Plaintiffs in this civil action. Based on the timing and terms of the settlements, there is no indication that the penalties imposed will include restitution for any private individual injured by these entities' conduct,...in this action would therefore not lead to duplicative recovery. As to foreign investigation, duplicative recovery is highly unlikely as the OTC Class is defined to include only "persons" that are either domiciled or transacted in the United States. Because public enforcement does not provide redress to victims of the conspiracy, the OTC Class Plaintiffs have sufficiently alleged antitrust standing for this motion" Pg.18. *Id.* "The antitrust laws do not require a plaintiff to have purchased directly from a defendant in order to have antitrust standing. *See Blue Shield of Va.,* 457 U.S.at 472 (protection of antitrust laws..confined to "consumers, or to purchasers, or to competitors, or to sellers")...In both cases, the damages allegedly occurred in markets Defendants controlled and as a direct result of their collusive activities in spot transactions." Pg. 20. *Id.*"The cases cited by the NSDs do not alter the conclusion that the injury to the Exchange Class is sufficiently direct for efficient enforcer status... The opinion recognized numerous cases where antitrust standing was allowed where the plaintiff alleged a "closer link" or "casual link" between the prices in two markets. ..In light of the TAC's detailed allegations linking the FX spot market and futures market.."Pg. 21.*Id.* "The district court opinion in Aluminum Warehousing is distinguishable for ..the alleged conspiracy in the spot market, and their claims are..derivatives of the OTC plaintiffs' claims..the TAC alleges that Defendants acted with "specific intent and motive in the manipulation of spot market prices of various currency pairs" in order to "obtain ill-gotten trading profits from transactions in the spot market and from FX derivatives contracts, including the FX futures contracts, held by them or other co-conspirators." Moreover, the harm to the Exchange Class "form[s] a separate and compensable injury." *Loeb,* 306 F.3d at 483; see also *id.* at 481 ("[D]ifferent injuries in distinct markets may be inflicted by a single antitrust conspiracy, and thus..differently situated plaintiffs ..be able to raise claims."); *id.* at 482 ("[P]laintiffs are not indirect purchasers along a supply chain..instead, the alleged conspiracy operated in the separate but related futures market, through which ..the plaintiffs were buying."). Second, whereas the Aluminum Warehousing court readily identified other ".. causal factors" of any injury suffered by the plaintiffs..here plead a more direct (and nearly mechanical) relationship viewed in light of the "chain of causation" between the prices in the FX spot and futures markets. See *AGC,* 459 U.S. at 538-45 (identifying as the first efficient enforcer factor the "directedness or indirectness of the asserted injury," viewed in light of the "chain of causation" linking a plaintiff's alleged injury and the defendant's anticompetitive conduct)." Pg. 22. *Id.*"To preclude Exchange Plaintiffs from proceeding in this case would leave any person who

paid supra-competitive prices in FX exchanges as a result of Defendants' conduct without a legal remedy. See *In re DDAVP Direct Purchaser*, 585 F.3d at 689 ("The second [AGC] factor simply looks for a class of persons naturally motivated to enforce the antitrust laws. 'inferiority' to other potential plaintiffs can be relevant, but it is not dispositive." (citation omitted))." Pg.23. "Neither of the NSDs' arguments renders the Exchange Class's claim for damages "speculative." First, quantifying damages for the Exchange Class would not involve wholesale speculation according to the allegations in the TAC. ..TAC explains and illustrates in a non-conclusory fashion a highly correlated relationship between the FX futures markets and the spot prices that Defendants alleged manipulated..such linkage is proven, Plaintiffs ..seek..damages by comparing the prices an Exchange Plaintiff paid in identifiable transactions with what the price would have been but for collusion. See Exhibit A for CFTC application submission for plaintiffs.

4. As the payment arrangement for FOREX settlement had Wahs at content to acting in CME exchange is U.S. desk trader generated Short trade using illegal money from Iran, Middle East so on will make a gain in their front book and aimed at our money in these saving account the U.S. desk trader gained entry with taking note in utilize derivatives at writing high timing gap to actual time for hard to find out in thought, and to avoid detection by using error in indirect names to these order in derivatives.

5. As United States trader is gathered in South East Asia under ICE-US office. The booking in United States territories said right here in FOREX for United States trader traded United States desk trader in multi-chat room in different banks in different zones. See TAC, ECF 141, *Chan Ah Wah and Lim Cheok Kee Willy v. HSBC North America Holdings Inc.* et.al., 15-cv-8974-LGS (SDNY), "Plaintiffs participated in over-the-counter market and also participated in the United States Chicago Mercantile exchange ("CME") and Intercontinental exchange ("ICE") with Defendant HSBC by telephone directly to traders in the United States desk who quoted Plaintiffs a 'bid' (the price it will buy currency) and 'ask' (the price it will sell currency)on all 5,400 pieces of FX spot transactions of FX instrument* See footnote* 21A (An "FX instrument" is defined as any FX spot transactions, outright forward, FX swap, FX option, FX futures contract, an option on an FX futures contract, or other instrument traded in the FX market.)." No. 43.Pg. 14. *Id.* "..Plaintiffs participated...with Defendant HSBC by telephone directly to the HSBC traders in the United States desk* See footnote* 30 (See Opinion and Order from FOREX TAC (ECF 661), FOREX .."who is "domiciled" in the United States may conduct transactions both in the United States and abroad" whereas "the United States desk trades FX with a foreign desk of Defendant HSBC.") who quoted Plaintiffs a "bid"..and 'ask'..on all 5,400 pieces of FX spot transactions.." No.65. Pg.23. *Id.* is applied at security in America on phone had generate on one. That's really in pending action to see at each team in all, applying its Short trade as Put-option in derivatives at CME exchange. We are to send team to Singapore ahead of trial that it make its sum to united group lead to immediate issued and post "loan" in our saving account book to it is built of each defendant in

a derivatives for a Short trade as Put-option in derivatives in ICE-US gathered all important part to meet each team in derivatives end so United States desk trader able to settle and netting to united in Call-option and Put-option in National Association ahead of CME exchange as essential Short trade to add of possible Long trade had to meet it immediately before short-selling derivatives action start to bind each other accordingly. According to South East Asia, ICE-US in Singapore branch about Chan Ah Wah and Lim Cheok Kee Willy had been to saving account's telephone had dealing to United States desk trader by recording its Singapore government and seen all account recording in Call-option in ICE-US to send to initial a Short trade as Put-option in derivatives had been recorded in ICE-US, our Congress will send a team to see the use of its Wahs' had united with each firm used its option to send to our exchange in U.S. to short-selling in end derivatives at each defendant aim to take a massive profits in the CME exchange in a corporate fraud as insider trading in the event for securities fraud to each team in the entry did to ICE-US, Singapore branch of United States trader had participation in the event with United States desk trader through HSBC N.A. that eventually does meet with immediate united group of counterparties into its joint group account with United States desk trader, this invokes money laundering Act we will see in Iran case, Middle East, so on is keeping illegal money on united nation of group to impose and do a criminal charge on part in Congress through HSBC N.A.'s presiding Judge at the Iran case for the event of wire fraud and tax return credit fraud. In the joint group account, the United States desk trader use ready range in advance to pre-add a derivatives in Call-option as Long trade with ICE-US in South East Asia branches had use to a insider trading in N.A. See ECF 134, dated 12/21/16, Reply in support Pls. Mot. to Amend, *Chan Ah Wah and Lim Cheok Kee Willy v. HSBC North America Holdings Inc.* et.al., 15-cv-8974-LGS (SDNY), "Ms. Lim: Your Honor, we have the U.S. account analysis that actually analyzed for us here and stated it was 5,400. The Court: There were 5,400--. Ms. Lim: 5,400 transactions."*Id.* at 5:22-25, 5:1-6. Mr. Chan clarified that every trade was placed using English with Defendant HSBC dealer and the dealer will voice back in English to confirm trade: "Chan Ah Wah, --trade buy/sell at rate, amount done." Mr. Chan had discussed with someone in Defendant HSBC about market analysis in other languages like Cantonese and Mandarin, probably telephone transcripts can prove."Pg.3.para.1.*Id.*""Ms. Lim: ..actually, there is a few of them where it', like, he would – he would call over the phone, and directly, with a U.S. dealer* see footnote* 3, (". .where a U.S. entity operating in the United States trades FX with a foreign desk of a Defendant, the FTAIA does not apply and the claim is not barred because of the statute's import commerce exclusion (or exception).") that talked to him directly, because the dealer is there acting like broker-dealer, so they would take his order for the trade." *Id.* at 8:17-21. "Ms. Lim: They give us a Singapore number, but we believe we understand that it is the U.S. desk, because they acted as a broker-dealer." *Id.* at 8:24-25, 9:1. "Ms. Lim: Because they have to tell us the rates, the rates, the rates that they quote for the currency, the FX, the foreign exchange currency, the rates used." See Tr. of September 28, 2016, at 9:6-8. "Ms Lim: Because they also participate in the FX, you know, products, like we do, because we participate with them in the FX over-the-counter market with them." *Id.* at 9:16-18. "Ms. Lim: He—my husband say that the

time that we – he was telling my husband on the phone that the time we have to calculate, they have to follow the New York time, trading time and calculations, and those, you know--." *Id.* at 10:3-6. "Ms. Lim: He say that he followed the New York FX transactions trading time. And in the FX currency transactions, U.S. has like 90 percent of the FX currency for most of their trading in the United States. *Id.* at 10:9-12." Pg. 3.4. *Id.*"Ms. Lim: Oh, because we participated with them, because they are also selling their own trading FX products in the CME and ICE because, obviously, a lot of – like one of the margin requirement, if you do those kind of future* see footnote 5* ("HSBC Bank USA, have provisionally registered with the CFTC and become members of the National Futures Association, subjecting them to an extensive array of corporate governance requirements, business conduct standards.." "..increase the cost associated with HSBC Bank USA's derivative business." *See* ECF 100, Plaintiffs' memo. of law in opposition to Defendants' Motion to Dismiss, at Pg. 6 footnote 8.) *also    see* https://www.sec.gov/rules/sro/nysearca/2013/34-70209.pdf.)'*Order    Granting Approval of Proposed Rule Change to List and Trade Shares of Market Vectors Low Volatility Commodity ETF and Market Vectors Long/Short Commodity ETF under NYSE Arca Equities Rule 8.200.*') and it's one of the regulations that they should meet the margin requirement and the risk capital control, discount thing. So they are also doing their own products." *Id.* at 15:24-25, 16:1-8. "Ms. Lim: Your Honor, the Defendant HSBC U.S. desk dealer acts as a broker-dealer. Broker-dealer means build his own FX transaction, or whatever transaction he has, products, and also sells for customer." *Id.* at. 18:9-12. "Ms. Lim: Because they have a clearing mechanism that do for them, and then they have a division in the IMM, International Monitoring Market, a division of CME, that has to process this account. And it is, like, 90 percent of this is FX, you know, foreign currency trading kind of things happening here --." See Tr. of September 28, 2016, at 18-15-20. Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires." Pg.4.5. *Id. also see,* ECF 661, *FOREX,* "The NSDs do not challenge the Sherman Act's reach over transactions in the United States or on a U.S. exchange." Pg.24.para.2. "This statute "lays down a general rule placing all (nonimport) activity involving foreign commerce outside the Sherman Act's reach," but then brings back certain conduct so long as its "direct,substantial, and reasonably foreseeable effect' on American domestic, import, or (certain export commerce)" gives rise to a Sherman Act claim. *F. Hoffmann-La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155, 162 (2004)...The TAC alleges that "[c]ustomers execute FX spot transactions either by a telephone call or electronic message to a salesperson at a dealer bank through an electronic communication network," and execute exchange-based transactions on the exchanges themselves. Plaintiffs' opposition brief offers the example of a "U.S. entity trading FX with a foreign desk,..where a U.S. entity operating in the United States* see footnote*6 (The opinion assumes that a Plaintiff who is "domiciled" in the United States may conduct transactions both in the United States and abroad.) trades FX with a foreign desk of a Defendant, the FTAIA does not apply and the claim is not barred because of the statute's import commerce exclusion (or exception)."Import trade and commerce are excluded at the outset from the coverage of the FTAIA..." *Minn-Chem, Inc. v. Agrium, Inc.* 683 F.3d 845, 854

(7th Cir. 2012)." Pg. 26. Id. "...to fall within the foreign commerce exception, a complaint "must allege facts that plausibly show that 'the conduct by the defendants...was directd at an import market.'" FOREX, 74 F.Supp. 3d at 599(quoting Kruman v. Christie's Int'l PLC, 284 F.3d 384, 395 (2d. Cir. 2002). FOREX's holdings with respect to the FTAIA's application as to..Complaints ..apply here, as the instant case presents wholly different facts." Pg. 27.para.1. "In contrast to ..any collusive conduct in this case that affected the price of a transaction between a U.S.-based Plaintiff and a foreign desk sufficiently alleges conduct that "involves import trades or commerce." *Kruman*, 284 F.3d at 395." *Id.* "see also, *Lotes Co., Ltd.v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 414 (2d Cir.2014)(describing FTAIA's "two distinct causation inquiries"). Because both prongs are required for the exception to apply, courts need not analyze both if one is not met. See *Lotes*, 753 F.3d at 413 ("[W]e need not decide...whether the defendants' foreign anticompetitive conduct has a 'direct, substantial, and reasonably foreseeable effect' on U.S. domestic or import commerce...because even Lotes's claims." (citation omitted; alteration in original))." Pg. 28. para.2. *Id.*"See *Lotes*, 753 F. 3d at 398 (identifying "a reasonably proximate causal nexus between the conduct and the effect")." *Id.* "The *Empagran* II appellants asserted that because any price difference between the U.S. and foreign markets would lead to "arbitrageurs selling ... imported from the United States," the U.S. prices were what "gave rise" to the foreign prices. *Id.* The D.C. Circuit...holding that "[w]hile maintaining super-competitive prices in the United States may have facilitated the appellees' scheme to charge comparable prices abroad, this fact demonstrates at most but-for causation." *Id.* at 1271, see also *In re Monosodium Glutamate Antitrust Litig.*, 477 F.3d 535, 539-40 (8th Cir. 2007)("The domestic effects of the price fixing scheme..were not the direct caue of the appellants' injuries. Rather, it was the foreign effects of the price fixing scheme(increased prices abroad).")." Pg. 30. See ECF 134, Pls. Mem. of Law and Affirmation., *Chan Ah Wah and Lim Cheok Kee Willy v. HSBC North America Holdings Inc., et.al.*,15-cv-8974-LGS (SDNY),  "

6. As Call-option act to emerge entry in ICE-US agency make every rates stated at Reuters declares a follow state of economic crisis to a emergency of every nations claimed for a safe harbor to act emerging economic crisis established a rare state of urgency, as per Bank's Term and Conditions said, to all states started to sell their claim in derivatives allowed N.A. declares for a market's emerged unstable state so as to declare margin calls to all saving account derived in Call-option, as Long trade lure to seize all cash deposit take away in scheme to act of securities fraud. See ECF 141, TAC, *Chan Ah Wah and Lim Cheok Kee Willy v. HSBC North America Holdings Inc.* et.al., 15-cv-8974-LGS (SDNY), "No.223. In the example above, from 3:50:30 p.m. to 3:59:30 p.m. RBS sold GBP 167 million and HSBC sold GBP 26 million, accounting for 28% of all sales on the Reuters platform during the period.* see footnote* 145, (Portions of this chat have been published by the CFTC and the UK-FCA. *See In the Matter of The Royal Bank of Scotland, plc.* CFTC Dkt. No. 15-05 at 6 (Nov.11,2014)(http://www.cftc.gov/ucm/groups/public/@1renforcementactions/documents/legalpleading/enfroyalbankorder111114.pdf); FCA Final Notice 2014: *The Royal Bank of*

*Scotland*                           *plc,*                                No.

121882,¶4.42(Nov.11,2014)(http://www.fca.org.uk/your-fca/documents/final-notices/2014/ro
yal-bank-of-scotland).The GBP/USD rate dropped from 1.6276 to 1.6233.* See
footnote*146 ( *Id.*) During the 60-second fixing window, RBS and HSBC accounted for 41 %
of the sales in GBP/USD on the Reuters platform during the fixing window.* see
footnote*147 ( *Id.* at ¶4.43.) During the fixing window, the GBP/USD rate fell from 1.6233
to 1.6213.* See footnote * 148 ( *Id.*) Subsequently, WM/Reuters published the 4 p.m. fix rate
for GBP/USD at 1.6218. See footnote*149 ( *See In the Matter of The Royal Bank of Scotland,*
*plc.*        CFTC          Dkt.          No.          15-05          at          6
(Nov.11,2014)(http://www.cftc.gov/ucm/groups/public/@1renforcementactions/documents/le
galpleading/enfroyalbankorder111114.pdf);) Defendants' trading in GBP/USD in this example
generated a profit for RBS of $615,000* see footnote* 150 ( *Id.*)" Pg.87. 88. *Id.* "No. 224. In
another example, RBS and two other banks conspired to fix the WM/Reuters Closing Spot
Rate for the AUD/USD and NZD/USD currency pairs. Bank T's trader announced." Pg. 88. *Id.*
"No.225. In another example, RBS and two other banks conspired to fix the WM/Reuters
Closing Spot Rate for AUD/USD and NZD/USD currency pairs. Bank T's announced to the
chat room that he was buying Australian dollars and New Zealand dollars at the fix, but that it
was not a big order.* see foonote* 151 (*Id.*) The RBS trader informed that the group that he
was buying 50 million Australian dollars at the fix and that he would execute Bank T trader's
transaction.* see footnote* 152 (*Id.*) Bank T trader agreed.* see footnote* 153 (*Id.*) Bank 's
trader expressed his order to buy 25 million and asked the RBS trader if he was interested in
taking his orders as well, because it would give him more "ammo" (a larger position) at the
fix.* see footnote* 154 (*Id.*) The RBS trader agreed. Bank T's trader also offered RBS more
"ammo" in New Zealand dollar* see footnote* 155 (*Id.*) The RBS trader informed the group
that he had built an aggregate 220 million buy order and at 3:53:20 p.m., Bank T's trader
instructed the RBS trader to "ramp it." After the fix period had closed, the traders
congratulated themselves on successfully manipulating the fix." Pg.88. *Id.* A CME exchange
stated that short-selling are allowed, See 'Order Granting Approval of Proposed Rule Change
to List and Trade Shares of Market Vectors Low Volatility Commodity ETF and Market
Vectors Long/Short Commodity ETF under NYSE Arca Equities Rule 8.200' (https:
//www.sec.gov/rules/sro/nysearca/2013/34-70209.pdf.), 'In circumstances where a market has
reached its maximum price limits imposed by the applicable exchange, the Long/Short ETF
may be unable to offset its short position until the next trading day, when prices could expand
again in rapid trading." *Id.* at * footnote 16." Appendix 2. "Pg.1..para.2.Pg.2.para.1. declares a
renewed state of their emergency state started as claimed here to normal and all bet to restart a
new expiration as all managed its risk in their portfolio investment stored at N.A. in a
derivatives needed, is to confer in getting offsetting in risk are doing in adding insane
short-selling in N.A., this is a refer to offer in eligibility approved for the tax return credit on
offering led its ill-intention in underlying accounting fraud proved tax reporting 100%
conferred in Call-option as Long trade is a N.A.'s saving account cash deposit is referring
to. See ECF 106, dated 09/12/16, "..Defendant HSBC know that many derivatives contract are

based on "Fixing" price snaps (like CME in the United States) or "Fix" at 4p.m. because of at some point it is important as it shows the uncertainty that is created when price discovery stops, Defendant HSBC dealers are forced to use "official market close" or "last traded" price which are normally published by CME exchange hosting the execution venues. Swap (governed by ISDA), Defendant HSBC used collateralization; a risk transformation technique is beneficial effect on counterparty credit risk is exchanged for a:--i). operational risk --ii). residual credit risk resulting from:--a). increase in exposure that occur between the last settled margin call prior to counterparty default, and the point that a party's final loss amount crystalized.--b). over-collaterization, including, but not limited to pledging of independent amounts." Pg.2. "

7. In ECF 102, dated 08/11/2016, *Chan Ah Wah and Lim Cheok Kee Willy v. HSBC North America Holdings Inc.* et.al., 15-cv-8974-LGS (SDNY), Opinion and Order to ECF [87] to Motion to Dismiss filed by Defendants, "..Plaintiff are warned that any application must set forth in detail what additional allegations concerning Plaintiffs' transactions in FX instruments will be added to address the deficiences described above.." It is this one conference all defendants came to attend the meeting and it acted on a result interpreted as positive outcome and now occur repeat act. See ECF 108, Memorandum endorsement to Defendants' letter in ECF [105] for a pre-motion conference set for 09/28/2016, "Plaintiffs shall be prepared to explain the basis for their allegation that they participated in FX transaction on a U.S. exchange and with a U.S. dealer desk of a defendant HSBC." and shall bring any document they have that support such allegation." Each defendant on this agreed part to entry motion to dismiss led to do on one was already done with us as the amendment of TAC was issued on June 8, 2017, See ECF 141, *Chan Ah Wah and Lim Cheok Kee Willy v. HSBC North America Holdings Inc. et.al.*, 15-cv-8974-LGS (SDNY),TAC was filed, "(3rd) Amended Complaint; re: amending [56] Amended Complaint against HSBC..." *Id.* and our required to answer to the question on "the basis for their allegation that they participated in FX transaction on a U.S. exchange and with a U.S. dealer desk of a defendant HSBC." and shall bring any document they have that support such allegation" already taken on the pre-motion conference did happened on September 28, 2016, See conference transcipt of September 28, 2016, this is a stay issued in order once as required for in the another conference in June 27, 2017, See ECF 148, *Id.* dated June 27, 2017, "Order: ordered that this case is stayed pursuant to paragraph 21 of the preliminary approval order (Dkt. 536) in *In re Foreign Exchange Benchmark Rates Antitrust Litigation* ("*FOREX*"), No. 13 Ci. 7789, which enjoin members of the FOREX settlement class from prosecuting any claims related to the alleged manipulation of the FX benchmark rates until the Court has finally determined whether the FOREX settlement should be approved. It is further **ORDERED** that Defendants shall provide Plaintiffs a copy of the "Notice of Class Action Settlements" in FOREX once that notice is distributed to class members.", these did reached each defendant as part in Garden City Group, we already submitted our claim for our payment in their claim site and will be issued payment once the Court ordered an order to initial the payment arrangement with each defendant through Mr.

Burke, the Lead Class Counsel pertaining to the <u>Schedule A, attached along with memorandum.</u> This is the amount of USD510 billion targeted in the classes settlement in FOREX.

**I declare under penalty of perjury that the foregoing is true and correct.**

Dated: May 28, 2018
Clerks for all counsel,

Cheok Kee Willy Lim
115 East Street,
New Hyde Park, NY 11040
Cell: 917-868-5218

Ah Wah Chan
115 East Street
New Hyde Park, NY 11040
Cell: 917-868-5218

APPENDIX   A

Through united participation in multi-chat room landed of divided making at derivatives of each defendant did all in the collusive moment is vision have vivid memorandum in its division. Its division limit our members and us in margin calls acted and edited decisive memorandum. Through important part to united group of each defendant slammed the rates for fixes, loaded our visit same as for all landed of derivatives made in multi-chat room.  It is a undivided memory laid in ICE-US and is a manipulation for vivid decision by, through each defendants' United States desk dealer made error in all derivatives with dead material loaded in all derivatives to our members and us meet to death with our saving account's cash deposit. Derivatives twisted to widen its edition is similar we explained in, See ECF 954,956,958,959,962,966,968,971 and 973 that led to information or documentation in evidence that they are class member, the United States desk trader's resident in HSBC Bank USA National Association took to it to share each defendant serve at an intermediaries with its totally widen edition of derivatives [as to reuse, reuse reinvented vanilla option leaked in tranche reference number from JP Morgan Chase] to book it in multi-chat room's participation in different bank in different zones. The presiding dealer in their own National Association took to share done Put-option in derivatives as Short trade tended by them through sharing a message over our confidential trade information, See ECF 141, TAC, *Chan Ah Wah and Lim Cheok Kee Willy v. HSBC Bank USA National Bank et.al.*,15-cv-8974-LGS (SDNY), 'No. 233.Traders openly coordinated their conduct with respect to the ECB fix, and acknowledged that their conduct was beyond the realm of acceptable trade practice.' *Id.* also see *FOREX*, 'No.234. Often, the traders would discuss various collusive trading strategies to employ in order to maximize their profits, which were chosen based on information only available to the Defendants." See ECF 100, Pls. Mem. of Law and Affirmation, *Id.* 'This case involves claims based on an alleged conspiracy among banks to fix prices in the foreign exchange ("FX") or foreign currency market in violation of the Sherman Antitrust Act, 15 U.S.C.§§ 1, 3, Section 1, 3 of Clayton Act, and Commodity Exchange Act ("CEA"), 7 U.S.C. §1 et.seq.' Pg.1.para.2. Id. 'The SAC's core allegation is that Defendant conspired to fix benchmark rates for their own profit. (See *FOREX, 74 F. Supp. 3d at 587*.) It specifically alleges: --69. Beginning at least as early January 1, 2003, Defendants conspired to manipulate the WM/Reuters Closing Spot Rates. Defendants communicated with one another, including in chat rooms, via instant messages, and by email, to carry out their conspiracy. Through these communications, Defendants regularly exchanged their customers' confidential order flow information before the London fix. Based on the shared confidential information, Defendants executed concerted trading strategies designed to manipulate, and which actually did manipulate, the WM/Reuters Closing Spot Rates. Defendants' collusive actions allowed them to eliminate their risk in FX trading and to reap supra-competitive profits at the expense of Plaintiffs. (SAC ¶ 69).--70. Defendants' top-level traders used electronic communications to meet and conspire for over a decade. Defendants' top-level traders conspired by communicating directly with one another via electronic

communications, including chat rooms, instant messages, and email. Defendants brazenly named their chat rooms "The Cartel," "The Bandits' Club," "The Mafia," and "One Team, One Dream." These modern-day electronic chat rooms replaced the classic, smoke-filled backrooms of the past. The transcripts of these chat rooms are reportedly "peppered with allusions to drinks, drugs and women." (SAC ¶ 70.) SAC ¶¶ 69-70.' Pg.19. Id. 'ii). The Complaint also contains allegations about specific chatroom discussions by HSBC and New defendants to manipulate the Fixes. Based on these descriptions of unlawful conduct, personal jurisdiction over the New defendants and HSBC turns on whether Plaintiffs sufficiently alleged conspiratorial communication or unlawful manipulation of the Fixes either taking place in, directed into, the United States.* see footnote* 20, (As noted above, the New Defendants' contacts throughout the United States are considered for personal jurisdiction purposes. (See, e.g., _Straub_, 921 F. Supp. 2d at 253.) --iii). The SAC contains the following allegations that tie the alleged unlawful conduct to the United States and additional information about the defendants' extensive FX operations in the United States that allegedly injured Plaintiffs:..22. "Defendants' collusive and manipulative acts took place in substantial part in the United States and were conducted by persons and entities subject to the laws of the United States, including its states and territories. The connection between the alleged conduct and the United States is demonstrated herein. Defendants' unlawful conduct occurred in the United States and had a substantial effect in the United States." (SAC ¶ 22.)" _Id._  Pg.  20.para.3. _See_ ECF  661, _FOREX_, 'The  NSDs ' statute  of  limitations argument is rejected as Plaintiffs have adequately pleaded fraudulent concealment sufficient to toll the statute..' Pg. 30. Id. 'Here the statute of  limitations was tolled and did not begin to run until at least June 12, 2013, meaning that Plaintiffs' antitrust claims against all Defendants are timely.' _Id._ 'On a motion to dismiss, a claim may be dismissed as time-barred "only if a complaint clearly shows the claim is out of time." _Harris v. City of NewYork,_ 186 F.3d 243, 250 (2d Cir.1999); see also Shak v. _JPMorgan Chase & Co.,_ 156 F. Supp.3d 562, 473 (S.D.N.Y.2016)(analyzing CEA claims). 'A four-year statute of limitations applies for private antitrust actions. 15 U.S.C.Section 15b. "Antitrust law provides that, in  the  case  of  a continuing violation, say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff...startts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." _Klehr v. A.O. Smith Corp.,_ 521 U.S. 179, 189 (1997)(internal quotation marks omitted).' Pg. 31._Id._'But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." _Id._ 'The running of the statute of limitations may be tolled if the plaintiffs "establish (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action..., and (3) that his continuing ignorance was ..attributable to lack of diligence on his part." _New York v. Hendrickson Bros., Inc.,_ 840 F.2d 1065, 1083 (2d Cir. 1988). 'As discussed above, the TAC alleges that the entirety of the alleged conspiracy took place in private chat rooms and private instant messages, which Plaintiffs could not reasonably have discovered

on their own. The same secret communications that plead conspiracy also plead the three elements of fraudulent concealment. Accordingly, the statute of limitations was tolled at least until June 12, 2013, when the TAC alleges that Plaintiffs first heard of the possibility of manipulation in the FX market through a Bloomberg article published that day. See Liam Vaughan, Gavin Finch and Ambreen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, Bloomberg (June 12, 2013).' Pg.32.*Id.* 'Based on the.. allegations that a conspiracy to fix prices in the FX market pre-dated December 1, 2007, Plaintiffs' claims based on transactions..' See *In Lithium Ion Batteries*, 2014 WL 309192 at *12 (finding complaints did..plead conspiracy before 2002 due to "dearth of meeting alleged..in the years 2000 and 2001, despite both pleadings having been drafted with the benefit of substantial document production")' Pg. 34.para.2. *Id.* '..The motion is denied as to the Exchange Plaintiffs' other claims under the CEA...The TAC sufficiently pleads CEA violations based on manipulated prices on FX exchanges. The NSDs do not contest that the CEA reaches FX transactions taking place on exchanges. See *Dunn v. CFTC*, 519 U.S. 465, 473 (1997)("Congress' broad purpose in enacting the Treasury Amendment was to provide a general exemption from CFTC regulation for sophisticated off-exchange foreign currency trading..."); id. (quoting Senate Committee Report stating that "the legislation 'included an amendment to clarify that the provisions are not applicable to trading in foreign currencies and certain enumerated financial instruments unless such trading is conducted on a formally organized futures exchange'"); see also *CFTC v. Paragon FX Enters., LLC*, Nos. 11 Civ.7740, 11 Civ.7741, 2015 WL 2250390, at *1-2 (S.D.N.Y. Feb.2, 2015)(summarizing legislative history)...Courts have allowed, however, CEA manipulation claims based on actions taking place in one market where the allegedly manipulated market was influenced by actions taken in another market. For example, in Parnon Energy, the court allowed manipulation claims where the defendants' position in the physical market for West Texas Intermediate crude oil gave them the ability to affect prices, and their "sell-off" in that market affected futures. *U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 236 (S.D. N.Y.2012). Similarly, in Natural Gas, the court held that plaintiffs could allege that defendants' wash trading of natural gas was a "means of manipulating the natural gas futures market." *In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 511 (S.D.N.Y. 2004). The court in Natural Gas rejected the defendants' argument that the plaintiffs were attempting to re-cast what was essentially a wash-trading claim as a futures manipulation claim because they could not successfully bring CEA wash-trading claims. *Id.* The court held that: [E]ven if Plaintiffs ... to maintain a stand-alone wash trading claim...because the alleged wash trades occurred in the physical market, it does not mean that Plaintiffs should be prevented from presenting evidence of wash trades in the physical market to prove their theory of manipulation in the futures market. *Id.* see also Parnon Energy, 875 F. Supp. 2d at 243 ("Defendants' interpretation excludes from the CEA any course of conduct that happens to involve transactions covered by [a statutory exemption]. But such a broad reading frustrates the CEA's primary purpose of preventing and deterring price manipulations.")'Pg. 36.37.*Id.*'Accepting that 7 U.S.C. section 2(c)(1) prevents the OTC Plaintiffs from bringing CEA

claims, the Exchange Plaintiffs may ..rely on Defendants' alleged conduct in the FX spot market as evidence of manipulation on FX exchanges where Defendants' activity in the OTC market was the "means of manipulation" prices on FX exchanges.'In Aspire, plaintiffs claimed that the defendants engaged in "manipulative behavior among generators of electricity within Texas's energy market ("ERCOT"), and harmed plaintiffs through their "manipulation of prices in the derivatives commodities markets." See *Aspire Commodities , LP v. GDF Suez Energy N.Am., Inc*. No. H-14-1111, 2015 WL 500482, at *5 (S.D. Tex. Feb.3, 2015).id. at *1. Plaintiffs alleged that one defendant, GDF, "manipulated the market by intentionally withholding electricity generation during times of tight supply, in order to drive up prices in the Real-Time Market and to manipulate contract prices in the derivative commodities market." *Id*. at *2. Plaintiffs further alleged that GDF traded in secondary futures markets, such as the Intercontinental Exchange ("ICE"), and that GDF's control over electricity generation allowed it to benefit from trades on commodities market because of the linkages between prices in these markets.*Id*. 'see also id.("Because GDF's allegedly improper conduct consisted solely of transactions within..that are covered by the CFTC's Final Order..")' Pg.38. *Id*.'The district court's decision in Aspire was affirmed in an unpublished per curiam decision from the Fifth Circuit. 640 F.App'x 358 (5th Cir.2016). In relevant part, the Fifth Circuit panel held: Aspire also re-urges on appeal the argument it presented to the district court.*Id*

'The Exchange Class's CEA claims are not barred by 7 U.S.C. section 2(c)(1).' Pg.39.*Id*..laid at end derivatives entry we hold the Call-option in derivatives as Long trade. Each defendant shared with each other in the mess-up passage over the death derivative used. This important part led to our member with structured product used with reuse, reuse reinvented option in end part in same version like us, clashed our value to zero, lost our cash deposit in saving account each defendant hold. Accordingly reached in their own massive profits, each defendant restructured and restructured the same option in a version again and again, with their own option and other option actually derived to structured options in financial product meet our member with ill-intention and harmed all of us including in South East Asia's their bank branches. See ECF 230, *Chan Ah Wah et.al. v. HSBC Bank USA National Association,* 15-cv-8974-LGS for full details : (Declarations and Riders),Each defendant loaded in their own massive profit with our option in derivatives making theirs, as a tax return credit mounted their monthly bank front book as their incomes to a tax return credit fraud on their corporate fraud and accounting fraud is acted in the Money Laundering Act lit the Patriot Act is about monitor the out bound money that is not legal money. See ECF 661, *FOREX,* 'As explained below, the TAC's factual allegations are sufficient to plead claims under the CEA even under Rule 9(b)..provides that "[i]n alleging fraud and mistake, ...particularly the circumstances constituting fraud and mistake,"' Pg.39.para.2. *Id*. '..apply generally..because "market manipulation is inherently deceptive." *In re Amaranth Nat. Gas Commodities Litig*., 587 F. Supp. 2d 513, 535 (S.D.N.Y.2008)..Rule 9(b) is applicable here because the TAC's allegations clearly sound in fraud, ..that Defendants collectively occupied a dominant position in the relevant FX markets, its allegations describe collusive acts committed in

secret chat rooms and other private electronic communications where traders acted with the intent to mislead Defendant's customers and profit at others' expenses. See *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir.2004)("By its terms, Rule 9(b) applies to 'all averments of fraud.' This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud ir expressed in terms of the constituent elements of a fraud cause of action." (citation omitted); *In re LIBOR-Based Fin.Instruments Antitrust Litig.*, 935 F.Supp.2d 666, 713-14 (S.D.N.Y. 2013)("LIBOR I") (holding that plaintiffs' allegations "sound[ed] in fraud and thus must be pled with particularity" where "the claim [was] that defendants, by submitting artifical LIBOR quotes, misled the market with regard to future levels of LIBOR, and by extension futures prices of Eurodollar contracts, and thus caused Eurodollar contract to trade at artificial prices."), *vacated on other grounds by Gelboim*, 823 F.3d 759.' Pg.40. para.2. *Id.* 'The TAC meets Rule 9(b)'s particularity requirement as it .. sufficient facts to support "a strong inference of fraud." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990). "Despite the generally rigid requirement that fraud be pleaded with particularity, allegation may be based on information and belief when facts are peculiarly within the opposing party's knowledge."' Pg. 41.*Id.* '*LIBOR I*, 935 F.Supp.2d at 714 (noting that "courts generally relax Rule 9(b)'s requirements in the context of manipulation claims, as such claims often 'involve facts solely within the defendant's knowledge."' (citation omitted)). Here, the identity of the traders involved in the chats quoted in the TAC, the specific trades allegedly discussed or manipulated in those communications, and allegations, pieced together from available information, support a strong inference of fraud...''*Id.* '..the LIBOR opinions support this Court's conclusion that, because Plaintiffs lack information to identify the specific transactions on which they were injured, they need not plead them in order to state a CEA claims.' Pg.41. *Id.* '<u>see</u> also *LIBOR I*, 935 F.Supp. 2d at 716 ("Although plaintiffs have not identified precisely how each LIBOR quote from each defendant on each day during the Class Period was ..artificial, they could not reasonably be expected to do so at this stage of the litigation...if anyone currently possesses this information for each day during the Class Period, it is defendants, and in such a situation, Rule 9(b)'s requirements are relaxed."). While the TAC identifies specific chat transcripts between Defendants' traders, information concerning the specific dates, times, currency pairs and customers discussed in those chats remains exclusively in Defendants' control. The TAC--which pleads as many factual allegations as can be known at this early stage in litigation--sufficiently pleads CEA claims.' Pg.42.para.2. *Id.* 'The TAC adequately pleads a claim for manipulation under CEA sections 9(a) and 22(a). "[A] court will find manipulation where '(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price. "' *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir.2013)(quoting *Hershey v. Energy Transfer Partners*, L.P., 610 F.3d 239, 247 (5th Cir. 2010)). As explained below, the TAC sufficiently pleads each of these elements.' Pg. 42.para.3 *Id.*'First, the TAC adequately pleads Defendants' ability to influence market prices for FX futures and options by alleging that Defendants collectively controlled over 90% of the FX spot market. See *Parnon Energy*, 875 F.

Supp.2d at 245 ("[T]he ability to influence prices can manifest itself in various ways, including the exercise of market power..."). As held above, the TAC plausibly alleges a conspiracy to fix prices in that market. Because the TAC alleges "a direct relationship between currency prices in the spot market and the value of each FX futures contract" and that "futures prices [and options prices] are based on and derived arithmetically from spot prices," the TAC adequately pleads Defendants' ability to influence FX futures and options prices for CEA manipulation purposes. See generally *LIBOR I*, 935 F. Supp.2d at 715 ("Because each defendant had the ability to influence LIBOR and LIBOR affected the price of Eurodollar contracts, each defendant had the ability to influence the price of Eurodollar contracts.").*Id.* 'As to the second and third elements of the claim, for the same reasons, the TAC plausibly pleads both that artificial prices existed on FX exchanges and that this artificiality was caused by Defendants' actions. "To successfully plead a manipulation claim, Plaintiffs must...allege an artificial price of the relevant commodity--that is 'a price that does .. reflect basic forces of supply and demand.'" *In re Term Commodities Cotton Futures Litig.*, No. 12 Civ. 5126, 2013 WL 981598, at *17 (S.D.N.Y. Dec.20, 2013)(quoting *Parnon Energy*, 875 F.Supp.2d at 246), *reconsideration granted on other grounds,* 2014 WL 5014235 (S.D.N.Y.Sept.30, 2014). Because of the direct relationship between the prices in the FX spot and futures[meet] options market, the TAC sufficiently pleads that Defendants' manipulation of the spot markets resulted in artificial prices for the Exchange Plaintiffs. Based on the TAC's description of how FX futures and[meet]options are priced, Defendants' collusive conduct was the proximate cause of the artificial prices.' Pg.44.para.1.*Id.* '..the TAC pleads that Defendants specifically intended to cause artificial prices on FX exchanges. The TAC alleges that "Defendants' specific intent and motive in the manipulation of spot market prices of various currency pairs was to obtain ill-gotten trading profits from transactions" not only in the spot markId.et, but also from FX derivatives contracts, including the FX futures contacts, held by them or other co-conspirators." Based on the allegations of Defendants' participation in the futures and [meet]options markets and their ability to influence the prices in those markets through detailed allegations of manipulative conduct in the spot market, the TAC adequately pleads both motive and opportunity. See *Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ.3419,2014 WL 1280464, at *5 (S.D.N.Y. Mar.28,2014)(manipulative intent may be established by alleging motive and opportunity or "strong circumstantial evidence of conscious misbehavior or recklessness" (internal quotation marks and citation omitted));" *Id.* 'The TAC describe in detail numerous chats during which Defendants' trader allegedly engaged in price manipulation in the FX markets, and each Defendant is identified as a participant in at least one alledgedly illegal conversation. Because Plaintiffs' case is premised on Defendant's conspirational conduct, the fact that each Defendant had only a fraction of the FX OTC market (and therefore may not have been able to inflence prices individually) is irrelevant given the TAC's allegation that, as a group, they controlled over 90% of that market.' Pg.45.para.1. *Id.*'This argument repeats the 'demand for specifics that are not required, and that Plaintiffs could not be reasonably expected to know, at the pleading stage." *FOREX*, 74 F. Supp.3d at 595. Plaintiffs' ability to allege specific dates, times and

prices for any given transaction is limited by their access to information solely within Defendants' control. Nonetheless, the TAC's allegations, which include transcripts from Defendants' chat rooms, are sufficient to plead artificial prices. For example, the TAC quotes communications between traders from Barclays, Citigroup and UBS in "The Cartel" chat room where they are alleged to have agreed to fix spread matrice offered to clients for the EUR/USD currency pair. To the extent any of their client transacted at prices based on those matrices, the prices would have been artificial. The same would be true of other oral agreements alleged in the TAC to manipulate the spread for particular currency pairs.' Pg. 45.para.3. *Id.* 'For the foregoing reasons, the NSDs' motion is denied insofar as it seeks to dismiss plaintiffs' manipulation claims under the CEA.' *Id.* 'As explained below, the NSDs' motion to dismiss is..denied as to the fraud-based manipulation claims.' Pg.46.para.1.

**I declare under penalty of perjury that the foregoing is true and correct.**

Dated: May 29, 2018
Clerks for all counsel,

Cheok Kee Willy Lim
115 East Street,
New Hyde Park, NY 11040
Cell: 917-868-5218

Ah Wah Chan
115 East Street
New Hyde Park, NY 11040
Cell: 917-868-5218

# APPENDIX B

Cont.... *Id.* '*In United States v. Brooks*, the Fifth Circuit noted that "[t]he terms 'reports' is not defined in the CEA or CFTC regulations." 681 F.3d 678, 691 (5th Cir. 2012)(citation omitted). Noting that the plain meaning of "report" is "a detailed statement of fact,"..'*Id.* 'Although its allegations of Defendants' manipulative conduct do not give rise to a false reporting claim, the TAC adequately pleads claims for fraud-based manipulation.' *Id.* 'As held above, the TAC adequately pleads Defendants' conspiracy to manipulate prices in the FX markets by sharing market-sensitive information between competitors in secretive chat rooms, "front-running," "banging the close" and "painting the screen" in order to reap ill-gotton profits based on trades executed both in the FX OTC market and on FX exchanges. These same allegations suffice to plead Defendants' intentional or reckless use of a "manipulative device, scheme, or artifice to defraud."' Pg.48. para.3. *Id.* 'Because CFTC Rule section 180.1(a)(1) provides a separate (and independent) theory of liability for the Exchange Plaintiffs' fraud-based manipulation claims, this opinion need not reach whether Defendants' alleged conduct constituted actionable "untrue or misleading statement[s] of material fact" or omissions under Rule section 180.1(a)(2).' Pg.48.49. *Id.* 'See *In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d 588,599 (S.D.N.Y.2011)(citing *Guttman v. U.S. Commodity Futures Trading Comm'n*, 197 F.3d 33, 39 (2d Cir.1999)). .."Such liability may be imposed where (1) the agent participated in the alleged unlawful activity and (2) his actions were within the scope of his employment or office." In *re Platinum and Palladium Commodities Litig,* 828 F. Supp.2d at 599. "It is enough if [the agent] was 'acting for [the principal] in executing the illegal trades." *Guttman*, 197 F.3d at 39.' Pg.49.para.3.*Id.* '..the TAC alleges conduct by traders "acting for" the benefit of their respective employers/banks. Nothing more is required to plead a claim for principal-agent liability. See e.g., *In re Platinum and Palladium Commodities Litig,* 828 F. Supp. 2d at 599-600 (allegation that a "head of the execution desk" entered into manipulation orders for defendants sufficient to plead principal-agent liability); *In re Amaranth,* 587 F. Supp.2d at 546 (allegations that individuals acted within scope of employment "suffices to state a claim for vicarious liability")' Pg. 50.para.2. *Id.* 'Section 22 of the CEA provides a private right of action against any person..who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter." *In re Amaranth*, 730 F.3d at 181(internal quotation marks and alternations omitted); <u>see</u> also 7 U.S.C. 13c(a)(providing for aiding and abetting liability under the CEA). "[B]oth the CFTC and courts have determined that the standard for aiding and abetting liability under the CEA is the same as that for aiding and abetting under federal criminal law." *In re Amaranth*, 730 F.3d at 181; see also *In re MF Global Holdings Ltd. Inv. Litig.,* 998 F. Supp.2d 157, 177(S.D.N.Y.2014). "[A]iding and abetting requires the defendant to in some sort associate himself with the venture, that he participate in it as in something he wishes to bring about, [and] that he seek by his action to make it succeed." *In re Amaranth*, 730 F.3d at 182 (internal quotation marks and citation omitted).' *Id.* 'As discussed above, the TAC adequately pleads each Defendant's participation in a conspiracy to manipulate prices in

both the FX spot and futures markets. The same allegations adequately plead the TAC's alternative claim that, if an individual Defendant did not commit a primary CEA violation, it aided and abetted others' market manipulation by sharing market-sensitive information such as pricing and spread information, customer information and net trading positions. The TAC alleges a quid pro quo conspiracy in which Defendants facilitated each other's ability to move prices for their mutual benefit. The TAC includes chat transcripts where Defendants' traders allegedly coordinated trading ahead of fixes and later congratulated each other for successfully influencing the fix. For example, after traders from Barclays, UBS, RBS and HSBC allegedly manipulated a fix, the traders wrote: "nice job gents," "what a job," "welld one [sic] lads," "bravo" and "worked ok that one." In such a situation, the TAC adequately pleads that each Defendant, through its employee chat participants, knowingly associated with (and participation in) a venture to manipulate prices with the desire that the venture would succeed.' Pg. 51.52. *Id.* 'In *Morrison*, the Supreme Court held that Exchange Act section 10(b) applied only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S.247, 267 (2010). This result is consistent with the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Id.* at 255 (internal quotation marks and citation omitted).'Pg.52.*Id.* 'In Loginovskaya, the Second Circuit held that because "[t]he CEA as a whole..is silent as to extraterritorial reach," courts must "presume it is primarily concerned with domestic conditions." *Loginovskaya v. Batratchenko*, 764 F.3d 266, 270 (2d Cir.2014). Interpreting CEA section 22, which provides for private rights of action,the Second Circuit held that section 22's focus is "domestic conduct, domestic transactions, or some other phenomenon localized to the United States." *Id* at 272. In other words, Congress's focus was 'clearly transactional." *Id.* The court concluded that "the CEA create a private right of action for persons anywhere in the world who transact business in the United States, and does not open our courts to people who choose to do business elsewhere." at 273.' Pg.52.para.4. *Id.* 'Plaintiffs argue that although the CEA does not apply extraterritorially, "[e]xchanges that are accessible in the United States via express permission from the U.S. Commodity Futures Trading Commission ('CFTC') are domestic transactions within the protection of the CEA." Plaintiffs explain that certain foreign exchanges make their futures contracts available for direct trading in the United States, and the CFTC has expressly permitted these foreign exchanges to do so.' Pg.53.*Id.* 'Because Congress's focus in section 22 was "clearly transactional," the issue here is... a transaction entered into by an Exchange Plaintiff on a foreign exchange through an eletronic trading platform or terminal accessed within the United States is a transaction that "ocurred in the United States." *Id.* at 272,274. Plaintiffs essentially describe foreign exchange that are made available to American investors through electronic trading platforms accessible on the Internet.' *Id.* 'In the securities context, the Second Circuit in City of Pontiac held that "the mere placement of a buy order in the United States for the purchase of foreign securities on a foreign exchange" did not place the transaction outside *Morrison*'s bar on the extraterritorial application of the federal securities

laws. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 92d Cir. 2014). In relevant part, the court noted that "a purchase's citizenship or residency does not affect where a transaction occurs.'" *Id.* (quoting *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir.2012)).'Pg. 54. *Id.*'Similarly, in Plaintiffs' described scenario, an American investor is essentially submitting buy or sell orders on foreign exchanges, and that investor's location at the time of placing his order does not disturb the conclusion that the transaction "occurred" on the foreign exchange. These types of transactions fall within *Loginovskaya*'s holding that CEA does ..apply to transactions conducted ..of the United States.' *Id.* 'Under the CEA, the two-year statute of limitations begins to run upon discovery of the injury, not discovery of the other elements of a claim." *Shak,* 156 F. Supp.3d at 473 (internal quotation marks and citation omitted)."The duty of inquiry arises when circumstances would have suggested to a person of ordinary intelligences the probability that he had been defrauded." *Id.* at 473-74 (internal quoation marks and citation omitted.)"Pg. 54. *Id.* 'Plaintiffs made no such.concession, and were not on inquiry notice based solely on the contents of the June 12, 2013 article.' Pg. 55. 'Given the dearth of specific information in the Bloomberg article, it cannot be said that a person of ordinary intelligence would have understood on June 12, 2013, the probability that she was defrauded by any of the New Defendants.' *Id.* 'The TAC's claims against the New Defendants are therefore not time-barred.' Pg.55. *Id.*.Terrorist like Islamic State ('IS') in politic put American in concern for their public interest at risk, take painful experience from Sept 11, Twin Tower attack for not able to aim about the combat effort United States needed stop its attack the country again and again. Money Laundering Act save the threat its part used by terrorist to buy arms and weapons to launch terror attacks at civilians, the interest is excessively in the United States for safety protection for all people and it is a common interest in the United Nations. The complicating way to transfer money from one city to another city to one city in different participating entities used is like Iran case, Middle East so on, including corrupted officials like 1MDB using nation's money to hide the sources of money generated from and easily for their illegitimate use for personal gains. Today is not only about cash deposit saving account's idea, the first priority is to stop harmful ideas. The verged option being structured and restructed to use as a vehicle for money making and did harm our members and us for in CDO cubed is notorious and will clash its principal value to zero if known by excessive counterparties' knowledge of its sources. Our member and us were harmed, very seriously harmed, this put our life in total danger of not able to live longer, we could not take care of our children in education, in food, in lodging, in expenses etc., everything was gone. It is the same to the harm IS were to able to buy arms and weapons to slaughter civilian's head, bomb normal housing, even send a plane again to raid the country's high rise tower again to repeat Sept. 11 incident, this put our life in total danger of not able to live longer, our future is living in seriousness worrying. It is the same to the harm in Iran case, Middle East for reputable official for example like Mr. Najib the former Prime Minister of Malaysia told the press he got his massive 'wealth' from Middle East - a secret source that given him gifts' as so massive in over billions of dollar, this put our life in

danger of not able to tell the future as to whose money is that, to sponsor a government in South East Asia for a 'unknown' source of we could not take care of our children in education, in food, in lodging, in expenses etc., led to Malaysian suffered terribly under the direction of him. The Money Laundering Act was not utilized on Mr. Najib's explanation of his massive wealth in proper source of income, the banks involved cooperate with illegal personnel doing illegal matter to gain the wealth. The banks  have spying on another country's main target for information through him. This relaxed action from the banks helped the chores of money transferring using SWIFT electronically messaging is so easy and concealed that Iran, Middle East used the ways for their own interest. The Money Laundering Act is trying to stop the resources the terrorist used to effectuating their motives in hidden name is similar to our member and us in ordinary name being used by each defendant to hide their sensitive name of the entities with bad reputation and their purpose is to evade tax, to evade detection to their offensive purpose to harm the United States, people, and to use our cash deposit to make illicit use for their tax reporting purposes for more massive profits in U.S. territories, at our member and our's expense. The HSBC Bank USA National Association is acting a dishonoring in old derivatives sold their supplement part again and again to on for lack of catching in their flock of United States desk trader in participation with their broker-dealer through multi-chat room reaching counterparties' part to ignite in Short trade in Put-option as derivatives in ICE-US is to put U.S. supremacy on sacrifice called for suppressing the illegal money laundering act, read on our Memorandum, See ECF 230, *Chan Ah Wah and Lim Cheok Kee Willy v. HSBC Bank USA N.A. et.al*, 15-cv-8974-LGS (SDNY), with a boost led to great profit to book ahead of our saving account have sit to allowed derivatives each defendant has arrived to the nation's CME exchange to arch at all nations gotton on its national debts in Call-option togetherly onto CME exchange, the derivatives flight of a real double, triple of the reuse, reuse waste in these structured product derived from securities' waste. The National Association of each defendants' United States desk trader fix of -insisting to give to South East Asia bank branches who graves is their country would be counted with its National Association's discrepancies and thrilled their country for the United States desk trader applied a all died track for their payday in incentives of our great country will be doing very well today to that each defendant through HSBC Bank USA National Association's participation in multi-chat room with needed derivatives' end  in unity part. But countless died conditions did through to our country through their thoughtful, old, waste in similar example in JP Morgan Chase 's linked to 1980s U.S. retirement plan and pension fund in leaked tranche number in reuse, reinvented vanilla option found in our investment portfolio in HSBC Bank USA National Association's private banking. See ECF 230, *Chan Ah Wah and Lim Cheok Kee Willy v. HSBC Bank USA N.A. et.al*, 15-cv-8974-LGS (SDNY), for full details in illicit use of our cash deposit for rounding to their profit unto their tax account to do well today with our cash deposit with added in derivatives in decades, established with employment to numbers of act and panic in stock market, Forex market (and we all suffered for 18 years each defendant is responsible for Chans' panic attack and lack of confidence as being broke and every family member in the household are ever worry in work, food

necessity and we all are in torment.) See Id. for more details. All defendants have Call-option as derivatives in Long trade in CME exchange, an excessive generated derivatives entirely acted as general, they need to lay in CME exchange by the United States desk trader on time to generate needed as a head in National Association each defendant will need to meet in their multi-chat room in electronic communication to meet derivatives as option made in response to International Swap and Derivatives Agreement ('ISDA') of two master agreement in also reply to margin requirement by CME exchange in requirement on general, orderly market regarding general work on time is a have our member and us entered in counterparties with each defendant in CME exchange. *See* ECF 100, Plaintiffs' memo. of law in opposition to Defendants', *Chan Ah Wah and Lim Cheok Kee Willy v. HSBC North America Holdings Inc.* et.al., 15-cv-8974-LGS (SDNY), 'Plaintiffs make clear a prima facie showing in the Complaint/SAC to support general jurisdiction over HSBC and New Defendants. At least two of three of Defendant HSBC Banks is incorporated or maintains its principal place of business in the United States, and conduct substantial operations in business in the United States, "with 230 branches in the United States, including 145 branches in the States of New York with thousands of employees* see footnote* 19, (HSBC and New Defendants do not dispute that their contacts throughout the United States are considered for personal jurisdiction purposes. (See *In re Auto. Refinishing Paint Antitrust Litig., 358 F.3d 288, 298 (3d Cir. 2004)* ("[P]ersonal jurisdiction in federal antitrust litigation is assessed on the basis of a defendant's aggregate contacts with the United States as a whole."); *In re Libor-Based Fin. Instruments Antitrust Litig.* No.11 MDL 2262, 2015 WL 6243526, at *23(S.D.N.Y. Oct. 20, 2015); *SEC v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013)(holding that "the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state").) in the U.S. For the year ended December 31, 2013, HSBC disclosed $8.8 billion in revenue and $1.221 billion in profit before tax in North America alone." (SAC ¶ 24), is "essentially at home" in this country, as required for the exercise of general jurisdiction. The Supreme Court in 2011, held that"[a] court may assert general jurisdiction over foreign (sister-state or foreign country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them *essentially at home* in the forum State." (See *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct.2846, 2851 (2011)(emphasis added)...*Daimler, 134 S. Ct. at 760*. The Court explained that the "paradigm" forum for general jurisdiction over a corporation is "where it is incorporated or has its principal place of business." Otherwise, courts should find general jurisdiction only in "exceptional" cases. *Id* at 760-61 & n.19. Similarly, the Second Circuit in*Gucci* held that a foreign bank with "only four branch offices in the United States and only a small portion of its worldwide business...conducted in New York" was not "an exceptional case."*Gucci Am., Inc. v. Weixing Li, 768 F. 3d 122, 135(2d Cir. 2014)*; also see *Brown v. Lockheed Martin, Corp.*, 2016 WL 641392 at *6) ("[I]n our view *Daimler* established that, except in a truly exceptional case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business –the 'paradigm' cases.") Under *Goodyear and*

(5)B

_Daimler,_ Plaintiffs have made a prima facie showing defendant HSBC and New defendants are subject to general jurisdiction. The SAC acknowledges that HSBC "is a Delaware corporation headquartered in New York, ...with its principal place of business in 452 Fifth Avenue, New York, with 230 branches in the United States, including 145 branches in the States of New York." (SAC¶ 24) The SAC also acknowledges that the New Defendants are subject to general jurisdiction....(See e.g. _Schulman v. Inst. for Shipboard Educ.,_ 624 F. App'x 1002, 2015 WL 4896597, at *3 (11th Cir. Aug. 18, 2015) ("Because 'the language and policy considerations of the Due Process Clauses of the Fifth and Fourteenth Amendments are virtually identical, decisions interpreting the Fourteenth Amendment's Due Process Clause guide us in determining what due process requires in the Fifth Amendment jurisdictional context.'"); (See _Wilder v. News Corp.,_ No.11 Civ. 4947, 2015 WL 5853763, at *5 (S.D.N.Y. Oct 7, 2015)(discussing the Fifth Amendment and holding that "[t]he Supreme Court has make clear...that general jurisdiction may only constitutionally be exercised over a defendant who is 'essentially at home' in the relevant forum"). Based on the defendants' averments, which Plaintiffs do not contradict, Plaintiff make a prima facie showing of general jurisdiction over Defendant HSBC and all of the new defendants.' Pg. 13.14.Id. 'Plaintiffs have made a prima facie showing of specific jurisdiction over defendant HSBC and any of the new defendants because the allegations in the SAC, together with evidence of the extent of the Defendants HSBC and any of the new defendants' FX operations in the United States, give rise to the reasonable inference that they participated in the alleged conspiracy in the United States or participated elsewhere with the aim to cause harm in the United States and even operate or maintain offices here. As opposed to general jurisdiction, "[s]pecific or conduct-linked jurisdiction... 'depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that take place in the forum state and is therefore subject to the State's regulation.'" (See _Sonera Holding B.V. v. Cukurova Holding A.S.,_ 750 F.3d 221, 225 (2d Cir. 2014)(quoting_Goodyear,_ 131 S.Ct. at 2853); see also _Walden v. Fiore,_ 134 S.Ct. 1115, 1121 (2014)("The inquiry whether a forum state may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'"). In other words, "to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum." _Walden,_ 134 S. Ct. at 1112. Minimum contacts to support specific jurisdiction "exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being hauled into court there." _Licci ex rel.Licci v. Lebanese Canadian Bank, SAL,_ 732 F.3d 161, 170 (2d Cir. 2013)(quoting _Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,_ 305 F.3d 120, 127 (2d Cir. 2002)). "When the cause of action arises out of the very activity being conducted, in part," inside the forum. (See _Keeton v. Hustler Magazine, Inc,._ 465 U.S. 770, 780 (1984). It may also exist even if none of the relevant conduct took place inside the forum, under the "effects test." See _Licci,_ 732 F.3d at 173; see also _Best Van Lines, Inc. v. Walker,_ 490 F.3d 239, 243 (2d Cir. 2007) (describing "independent, if conceptually overlapping, methods of demonstrating minimum contacts"). "The effects test is a theory of personal jurisdiction typically invoked where...the conduct

that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." _Licci, 732 F.3d at 173._ For these claims, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant _expressly aimed its conduct at the forum._" _Id._ (emphasis added) (citing _Calder v. Jones, 465 U.S. 783, 789 (1983)_). "[T]he fact that harm in the forum is foreseeable, however, is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." _In re Terrorist Attacks, 714 F.3d at 674._ The Complaint/SAC sufficiently alleges the existence of a conspiracy in violation of Section 1 of Sherman Act, and that all Defendants including HSBC and New Defendants were part of that conspiracy.' Pg.15.16.17. _Id._ 'Similarly is Plaintiffs' reliance on N.Y. Banking Law § 200-b (1), which provides that a New York resident may maintain "any cause of action* see footnote * 17 (Plaintiffs claim arise out of the United States contacts is not time barred in 28 U.S.C. 2462 requires "by its plain terms, that an offender must be physically present in the United States" for the statute to run.(_SEC v. Straub, 921 F. Supp. 2d 244, 260 (S.D.N.Y. 2013)_). "And the Court of Appeals' clear ruling that neither Russian law nor a Russian forum would be appropriately utilized in litigating the parties' underlying dispute." (See _Indosuez Int'l. Fin., B.V. v. Natl. Reserve Bank, 98 N.Y.2d 238, 245, 248, 744 N.E.2d 696 (May 7, 2002)_)(hold that New York law applies, quoting ..the parties' foreign currency exchange agreements, and a permanent injunction enforcing such clause, is not barred by plaintiffs failure to seek the relief now sought in the prior action.)) against a foreign banking corporation. First, this provision contains nothing from which consent to jurisdiction might be implied, in contrast to the appointment of an agent for service of process under § 200. Second, the statute is applicable as the Plaintiffs in this case alleged to be a resident of New York. Finally, the New York Court of Appeals has interpreted § 200-b to confer subject matter jurisdiction and not personal jurisdiction. (See_Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank, 744 N.E. 2d 696, 98 N.Y.2d 238, 248 (2002)_ (discussing scope of subject matter jurisdiction under § 200-b).' Pg.14 _Id._ 'The Defendants contractually consented to jurisdiction in at least two ISDA agreements. The Agreements include a consent "to the non-exclusive jurisdiction of the courts of the States of New York and the United States District Court located in the Borough of Manhattan in New York City" expressly limited to "any suit, action, or proceedings relating to th[e] Agreement[s]." This consent is applicable to Plaintiffs here even if some of the transactions at issue are arguably related to the agreements. The ISDA agreements confer a contractual right to the counterparties* see footnote* 18, (All payments are exchanged through the aforementioned nostro accounts. These accounts are denominated in the currency of the country where they were located. When a FX Dealer enter into contract to buy dollars and sell yen, for example, it will credit its yen nostro account and debit its dollar nostra account in U.S. The counterparty credits its dollar nostro account and debits its yen nostro account in Japan. Both FX Dealers initiate a money transfer to pay their respective counterparties, which is done by a funs movement between the two FX Dealers using the local payment system." (See _Foreign Currency Committee, "Settlement and Settlement Netting,"_ May 29, 2013 at Pg. 29)) to those agreements, the counterparties are Plaintiffs in this action. (See _Dale_

(7)B

*v. Banque All. S.A.*, N. 02 Civ. 3592, 2004 WL 2389894 at *5 (S.D.N.Y. Oct. 22, 2004) ("[T]he forum selection clause in the … agreement cannot be construed reasonably as blanket consent by Banque SCS to be subject to personal jurisdiction in New York in any action brought against it by a person who is not party to the…agreement."). Therefore, Plaintiffs satisfy the due process requirements for the exercise of personal jurisdiction in this case.' Pg.14.15.*Id.* 'Based on Form 10-K public filings by HSBC for 2010 through 2012 (Plaintiffs again supplemented the SAC's allegations about Defendant' extensive FX operations in the United States) and one can reasonably infer HSBC and New Defendants "each had, within the United States, tens of billions of dollars' worth of FX instruments outstanding each day, including, undoubtedly, transactions with members of the proposed Classes during the Class Period." Pls' Br. 3-4 (emphasis omitted). v). The New Defendants label the SAC's jurisdictional allegations as "conclusory" and argue that its "generalized allegations are joined by no facts that would support a conclusion that the defendants undertook suit-related conduct ---i.e., participated in a conspiracy to manipulate FX spreads or FX benchmark rates---in the forum, or did so elsewhere with the express intent to cause harm in the forum." New Defs.' Br. 14, 15. The New Defendants "do not dispute that they (or their affiliates) have traded currency in New York or do business in New York," but assert that "Plaintiffs have not identified a *single* 'trade at issue in this litigation' that links any of the NFDs to this forum." Defendant's argument is unavailing, and amounts to "a demand for specifics that are not required, and that Plaintiffs could not be reasonably expected to know, at the pleading stage." *FOREX*, 74 F. Supp. 3d at 595.' "The plausibility standard is not akin to a 'probability requirement,'".. Here, Plaintiffs plead collusive conduct within the United States, give examples of each New defendants' participation in the alleged conspiracy (albeit in chatrooms whose participants' location are presently unknown), and provide undisputed averments concerning the New Defendants' extensive U.S.-based FX operations. Taken as a whole, the SAC plausibly alleges suit-related conduct that either took place in the United States, or had effects expressly aimed inside the country due to the New Defendants' substantial FX businesses here. Construing the pleadings and declarations in the light most favorable to Plaintiffs, *Dorchester*, 722 F. 3d at 85, the New Defendants' suit-related conduct created a substantial connection with this forum, *Walden*, 134 S. Ct. at 1121, and Plaintiffs have made a prima facie showing of specific jurisdiction over HSBC.' Pg. 21.22. *Id.* 'Plaintiffs' jurisdictional allegations refer to HSBC Holdings' indirect subsidiary, "The Hong Kong and Shanghai Banking Corporation" should be imputed on its parent company(See footnote at 8-11, Pls. Mem In Opp.; for Plaintiffs' brief argues that there is no basis for distinguishing between the businesses of the two entities of "HSBC Private Bank" and "The Hong Kong and Shanghai Banking Corp. and "integrated approach to governance" applicable to the Group's "subsidiaries and …branches.") Indeed, the SAC's allegations describing "HSBC Private Bank" suggests that Plaintiffs have inadvertently named the wrong corporate entity. HSBC avert "among other minor changes" and "successor-in-interest to HSBC Private Bank..."(Def. Mem. Pg. 4 ¶ 1., footnote at 4) and Plaintiffs' allegations as to collusive conduct and U.S.-based business likely describe HSBC.' Pg.23.*Id.* 'No.154.The CFTC also states in the

order that Defendants, by and through certain foreign exchange desk traders, at times, sought to benefit its own trading positions or those of certain FX traders at other banks by attempting to manipulate, and aiding and abetting other banks in their attempts to manipulate certain benchmark rates principally in WM/Reuters Closing Spot Rates. (SAC ¶ 154.) No. 155. Defendants'[HSBC] traders, in London G10 trading desk had and/or developed relationships with certain FX traders at other banks, and they increasingly used private chat rooms to communicate and share information with each other. Defendants FX trader routinely participated in the chat rooms. Often, these FX traders had multiple chat rooms open simultaneously on their trading terminals, and within a chat, the trader often focused on a particular currency pair. Certain chat room participant used code words to attempt to detection. The traders used this information to enable one or more traders to attempt to manipulate the FX benchmark rates, particularly the 4 p.m. WM/Reuters fix, prior to and during the relevant period. This conduct at Defendants[HSBC] involved two traders' London G10 trading desk. (SAC ¶ 155.) No. 156. For example, on one day during the Relevant Period, in a chat room in which a trader on Defendant's London G10 FX trading desk ("HSBC Trader") and three traders at other banks or investment firm participated, the traders engaged in the following series of chats. (SAC ¶ 156.) No.169. The Defendants agreed to pay criminal fines totaling more than $2.5 billion." (SAC ¶ 169.)" Pg.24. *Id.*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 28, 2018
Clerks for all counsel,

Cheok Kee Willy Lim
115 East Street,
New Hyde Park, NY 11040
Cell: 917-868-5218

Ah Wah Chan
115 East Street
New Hyde Park, NY 11040
Cell: 917-868-5218

EXHIBIT A

**FORM WB-APP**

# Submission Confirmation

Your submission has been successful. **Please print this Confirmation Page for your records.**

**Submission:**
Form WB-APP

**Confirmation Number:**
1804-2521-3047-52

**Submission Date and Time:**
4/25/2018 9:30:47 PM Eastern Standard Time

Download PDF

**FORM WB-APP**

# Submission Confirmation

Your submission has been successful. Please print this Confirmation Page for your records.

**Submission:**
Form WB-APP

**Confirmation Number:**
1804-2521-3047-5

**Submission Date and Time:**
4/25/2018 9:30:47 PM Eastern Standard Time

CONFIDENTIAL

## UNITED STATES
## COMMODITY FUTURES TRADING COMMISSION
### Washington, DC 20581

| OMB APPROVAL |
| OMB Number:   3038-0082 |

### FORM WB-APP
## APPLICATION FOR AWARD FOR ORIGINAL INFORMATION PROVIDED
## PURSUANT TO SECTION 23 OF THE COMMODITY EXCHANGE ACT

## A. TELL US ABOUT YOURSELF (Required for All Submissions)

1. Last Name
CHAN

First Name
AH WAH

M.I.

SSN Last Four Digits
5320

2. Street Address
115 EAST STREET

Apartment/Unit #

City
NEW HYDE PARK

State/Province
New York

ZIP/Postal Code
11040

Country
United States

3. Telephone
+1 917-868-5218

Alt. Phone
+1 917-868-5213

E-mail Address
cheokkeewilly@gmail.com

## B. YOUR ATTORNEY'S INFORMATION (If Applicable – See Instructions)

1. Attorney's Name

2. Firm Name

3. Street Address

City

State/Province

ZIP/Postal Code

Country

4. Telephone

Fax

E-mail Address

## C. TELL US ABOUT YOUR TIP OR COMPLAINT

1a. How did you submit original information to the CFTC?

Website     Mail     Fax     Other

1b. Date that you submitted the information (mm/dd/yyyy)
04/25/2018

2a. Did you file a CFTC Form TCR?   YES        NO

2b.  Form TCR Number

2c. Date that you filed your Form TCR (mm/dd/yyyy)

3. Name(s) of the individual(s) and/or entity(s) to which your tip or complaint relates
CFTC DOCKET 15-07.IN THE MATTER OF: HSBC BANK PLC, RESPONDENT.

## D. NOTICE OF COVERED ACTION

1. Date of relevant Notice of Covered Action (mm/dd/yyyy)
04/25/2018

2. Notice Number
CFTC DOCKET 15-07

3a. Case Name
13-CV-7789-LGS (SDNY)

3b. Case Number
15-CV-8974-LGS (SDNY)

## E. CLAIMS PERTAINING TO RELATED ACTIONS

1. Name of other agency or organization to which you provided your information
SEE FILE ATTACHED SECTION G.  SCOTT & SCOTT LLC, ATTORNEY AT LAW THE HELMSLEY BUILDING 230
PARK AVE, 17 FLOOR NEW YORK, NY 10169 TEL:212-223-6444  RE: IN RE FOREIGN EXCHANGE BENCHMARK
RATES ANTITRUST LITIGATION, 13-CV-7789-LGS (2016) (SDNY)  RE: CHAN AH WAH ET.AL. V.HSBC BANK USA
NATIONAL ASSOCIATION. ET AL., 15-CV-8974-LGS (2016) (SDNY)  RE: AH WAH CHAN AND CHEOK KEE WILLY
LIM V. HSBC, 17-CV-6863-LGS (SDNY)  RE: CHAN AH WAH V. NORTHERN FOOD I/E. INC, 17-CV-6002-CM (SDNY)
RE: CHAN AH WAH V. NORTHERN FOOD I/E.INC. AND DOES 1-25, 17-CV-6002:2:17-CV-5813-CM (JFB)

2. Name and contact information for point of contact at the agency or organization, if known
SEE FILE ATTACHED SECTION G.  MR. CHRIS BURKE AND MS. ANDERSON SCOTT & SCOTT LLC, ATTORNEY AT
LAW. THE HELMSLEY BUILDING 230 PARK AVE, 17 FLOOR NEW YORK NY 10169 TEL: 212-223-6444

3a. Date that you provided the information (mm/dd/yyyy)
04/25/2018

3b. Date of action by the agency or organization (mm/dd/yyyy)
04/25/2018

4a. Case Name
17-CV-6863-LGS (SDNY)

4b. Case Number
17-CV-6002-CM (SDNY), 17-CV-6002:2:17-CV-5813-CM (JFB)
(SDNY)

2

## F. ELIGIBILITY REQUIREMENTS AND OTHER INFORMATION

1. Are you currently, or were you at the time that you acquired the original information that you submitted to the CFTC, a member, officer or employee of: the CFTC; the Board of Governors of the Federal Reserve System; the Office of the Comptroller of the Currency; the Board of Directors of the Federal Deposit Insurance Corporation; the Director of the Office of Thrift Supervision; the National Credit Union Administration Board; the Securities and Exchange Commission; the Department of Justice; a registered entity; a registered futures association; a self-regulatory organization; a law enforcement organization; or a foreign regulatory authority or law enforcement organization?

YES        NO

2. Did you provide the information identified in Section C above pursuant to a cooperation agreement with the CFTC or another agency or organization?

YES        NO

3. Before you provided the information identified in Section C above, did you (or anyone representing you) receive any request, inquiry or demand that relates to the subject matter of your submission (i) from the CFTC, (ii) in connection with an investigation, inspection or examination by any registered entity, registered futures association or self-regulatory organization, or (iii) in connection with an investigation by the Congress, or any other federal or state authority?

YES        NO

4. Are you currently a subject or target of a criminal investigation, or have you been convicted of a criminal violation, in  connection with the information identified in Section C above and upon which your application for an award is based?

YES        NO

5. Did you acquire the information that you provided to the CFTC from any person described in Questions 1 through 4 above?

YES        NO

6. If you answered "Yes" to any of Questions 1 through 5 above, please provide details. Use additional sheets, if necessary.

## G. ENTITLEMENT TO AWARD

Explain the basis for your belief that you are entitled to an award in connection with your submission of information to the CFTC, or to another agency or organization in a related action. Provide any additional information that you think may be relevant in light of the criteria for determining the amount of an award set forth in Section 23 of the Commodity Exchange Act and Part 165 of the CFTC's regulations. Include any supporting documents in your possession or control, and use additional sheets, if necessary.

FINDING ON "FX SPOT ACTION TO FUTURES MEET OPTIONS" IN ACCOUNTING FRAUD AND CORPORATE FRAUD FEES ASSOCIATED WITH TAX RETURN CREDIT FRAUD, TWO LEAKED TRANCHE REFERENCE NUMBER LINKED TO 1980S US RETIREMENT PLAN AND PENSION FUND REUSE REINVENTED TO HYBRID VANILLA OPTION/SWAP OPTION IN HSBC PRIVATE BANK, SINGAPORE BRANCH OR SWISS BRANCH, US TRADER IN FOREIGN DESK OF HSBC PRIVATE BANK TRADED US DESK TRADER/BROKER-DEALER PRODUCED CONSOLIDATED MONTHLY STATEMENT FOR OUR CASH DEPOSIT IN ARREAR USD900,000 IS DIFFERENT WITH THEIR MARGIN CALLS TO STOP LOSS,LIMIT ORDER RESULTED IN BALANCE CHECK OF USD200,000 APPROX. GIVEN BY THE BANK VICE PRESIDENT/PORTFOLIO MANAGER, AMY LOW AND TEAMS WHO ALSO PRODUCED CALL OPTION, PUT OPTION,

3

AS HSBC CODE NAME "ALPHAS PLUS" HAS MISREPRESENTED AND MISLED THEIR CUSTOMER US IN EMAIL DISCLOSURE FOR FINANCIAL STRUCTURE PRODUCTS, THE BANK MADE PROFITABLE CHART IN CURRENCY PAIRS IN CHEAT FOR THEIR SWEEPSTAKES FROM OUR CASH DEPOSIT SAVING ACCOUNT IN HSBC BANK USA NATIONAL ASSOCIATION'S HSBC PRIVATE BANK AT SINGAPORE BRANCH OR SWISS BRANCH TO WIRE TRANSFER OUR CASH DEPOSIT TO THEIR ESCROW BANK ACCOUNT NUMBER TO POOL WITH THEIR GROUP ACCOUNT WITHOUT OUR CONSENT AND DID NOT SEND US THEIR CUSTOMER A LETTER OF HOLD FOR OUR CASH DEPOSIT FOR AS LONG THEY HOLD OUR CASH DEPOSIT FOR THEIR BENEFITS. SEE COMPLAINT AT COURT SITE AND ATTACHED FILE SECTION G FOR MORE DETAILS.

## H. CLAIMANT'S DECLARATION

I declare under penalty of perjury under the laws of the United States that the information contained herein is true, correct and complete to the best of my knowledge, information and belief. I fully understand that I may be subject to prosecution and ineligible for a whistleblower award if, in my submission of information, my other dealings with the Commodity Futures Trading Commission, or my dealings with another agency or organization in connection with a related action, I knowingly and willfully make any false, fictitious or fraudulent statements or representations, or use any false writing or document knowing that the writing or document contains any false, fictitious or fraudulent statement or entry.

Print Name
LIM CHEOK KEE WILLY

Signature                                          Date
LIM CHEOK KEE WILLY                                4/25/2018

## I. COUNSEL CERTIFICATION

I certify that I have reviewed this form for completeness and accuracy and that the information contained herein is true, correct and complete to the best of my knowledge, information and belief. I further certify that I have verified the identity of the whistleblower award claimant on whose behalf this form is being submitted by viewing the claimant's valid, unexpired government issued identification (*e.g.*, driver's license, passport) and will retain an original, signed copy of this form, with Section H signed by the claimant, in my records. I further certify that I have obtained the claimant's non-waivable consent to provide the Commodity Futures Trading Commission with his or her original signed Form WB-APP upon request, and that I consent to be legally obligated to do so within seven (7) calendar days of receiving such a request from the Commodity Futures Trading Commission.

Print Name of Attorney and Law Firm, if Applicable
LIM CHEOK KEE WILLY AND CHAN AH WAH  CHEOK KEE WILLY LIM AND AH WAH CHAN

Signature                                          Date
LIM CHEOK KEE WILLY AND CHAN AH WAH                4/25/2018

## SUPPORTING DOCUMENTS

FX Spot Action to Future Meet Options (1).docx
FX Spot Action to Future Meet Options (2).docx
FX Spot Action to Future Meet Options (3).docx
FX Spot Action to Future Meet Options (4).docx
FX Spot Action to Future Meet Options (5).docx
FX Spot Action to Future Meet Options (6).docx
FX Spot Action to Future Meet Options (7).docx
FX Spot Action to Future Meet Options (8).docx
FX Spot Action to Future Meet Options (9).docx
FX Spot Action to Future Meet Options.docx

## Privacy Act Statement

This notice is given under the Privacy Act of 1974. The Privacy Act requires that the Commodity Futures Trading Commission (CFTC) inform individuals of the following when asking for information. The solicitation of this information is authorized under the Commodity Exchange Act, 7 U.S.C. 1 *et seq.* The information provided will enable the CFTC to determine the whistleblower award claimant's eligibility for payment of an award pursuant to Section 23 of the Commodity Exchange Act and Part 165 of the CFTC's regulations. This information will be used to investigate and prosecute violations of the Commodity Exchange Act and the CFTC's regulations. This information may be disclosed to federal, state, local or foreign agencies or other authorities responsible for investigating, prosecuting, enforcing or implementing laws, rules or regulations implicated by the information consistent with the confidentiality requirements set forth in Section 23 of the Commodity Exchange Act and Part 165 of the CFTC's regulations. The information will be maintained and additional disclosures may be made in accordance with System of Records Notices CFTC-49, "Whistleblower Records" (exempted), CFTC-10, "Investigatory Records" (exempted), and CFTC-16, "Enforcement Case Files." The CFTC requests the last four digits of the claimant's Social Security Number for use as an individual identifier to administer and manage the whistleblower award program. Executive Order 9397 (November 22, 1943) allows federal agencies to use the Social Security Number as an individual identifier. Furnishing the information is voluntary. However, if an individual is providing information for the whistleblower award program, not providing required information may result in the individual not being eligible for award consideration.

Questions concerning this form may be directed to Commodity Futures Trading Commission, Whistleblower Office, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581.

## Submission Procedures

- This form *must* be used by persons making a claim for a whistleblower award in connection with information provided to the CFTC, or to another agency or organization in a related action. In order to be deemed eligible for an award, you must meet all the requirements set forth in Section 23 of the Commodity Exchange Act and Part 165 of the CFTC's regulations.

6

WB-APP Number: 1804-2521-3047-52                CONFIDENTIAL                Submitted: 4/25/2018 9:30:47 PM

- You must sign the Form WB-APP as the claimant. If you wish to submit the Form WB-APP anonymously, you must do so through an attorney, your attorney must sign the Counsel Certification Section of the Form WB-APP that is submitted to the CFTC, and you must give your attorney your original signed Form WB-APP so that it can be produced to the CFTC upon request.

- During the whistleblower award claim process, your identity must be verified in a form and manner that is acceptable to the CFTC prior to the payment of any award.

  o If you are filing your claim in connection with information that you provided to the CFTC, then your Form WB-APP, and any attachments thereto, must be received by the CFTC within ninety (90) days of the date of the Notice of Covered Action, or the date of a final judgment in a related action to which the claim relates.

  o If you are filing your claim in connection with information that you provided to another agency or organization in a related action, then your Form WB-APP, and any attachments thereto, must be received by the CFTC as follows:

    ▪ If a final order imposing monetary sanctions has been entered in a related action at the time that you submit your claim for an award in connection with a CFTC action, you may submit your claim for an award in that related action on the same Form WB-APP that you use for the CFTC action.

    ▪ If a final order imposing monetary sanctions in a related action has not been entered at the time that you submit your claim for an award in connection with a CFTC action, you must submit your claim on Form WB-APP within ninety (90) days of the issuance of a final order imposing sanctions in the related action.

    ▪ If a final order imposing monetary sanctions in a related action relates to a judicial or administrative action brought by the Commission under the Commodity Exchange Act that is not a covered judicial or administrative action, and therefore there would not be a Notice of Covered Action, you must submit your claim on Form WB-APP for an award in connection with the related action within ninety

7

(90) calendar days following either (1) the date of issuance of a final order in the related action, if that date is after the date of issuance of the final judgment in the related Commission judicial or administrative action; or (2) the date of issuance of the final judgment in the related Commission judicial or administrative action, *i.e.,* the date the related action becomes a related action, if the date of issuance of the final order in the related action precedes the final judgment in the related Commission judicial or administrative action.

- To submit your Form WB-APP, you may print it and either submit it by mail to Commodity Futures Trading Commission, Whistleblower Office, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581, or by facsimile to (202) 418-5975. You also may submit this form electronically, through the web portal found on the CFTC's website at *http://www.cftc.gov*, which is also accessible from the CFTC Whistleblower Program website at *www.whistleblower.gov*.

### Instructions for Completing Form WB-APP

#### General

All references to "you" and "your" are intended to mean the whistleblower award claimant.

#### Section A: Tell Us About Yourself

Questions 1-3: Please provide the following information about yourself:

- last name, first name, middle initial and the last four digits of your Social Security Number;
- complete address, including city, state and zip code;
- telephone number and, if available, an alternate number where you can be reached; and
- your e-mail address (to facilitate communications, we strongly encourage you to provide an email address, especially if you are making your claim anonymously).

#### Section B: Your Attorney's Information

Complete this section only if you are represented by an attorney in this matter.

Questions 1-4: Provide the following information about your attorney:

8

· CONFIDENTIAL

- attorney's name;

- firm name;

- complete address, including city, state and zip code;

- telephone number and fax number; and

- e-mail address.

## Section C: Tell Us About Your Tip or Complaint

| | |
|---|---|
| Question 1a: | Indicate the manner in which you submitted your original information to the CFTC. |
| Question 1b: | Provide the date on which you submitted your original information to the CFTC. |
| Question 2a: | State whether you filed a CFTC Form TCR. |
| Question 2b: | If you filed a CFTC Form TCR, provide the Form's number. |
| Question 2c: | If you filed a CFTC Form TCR, provide the date on which you filed the Form. |
| Question 3: | Provide the name(s) of the individual(s) and/or entity(s) to which your tip or complaint relates. |

## Section D: Notice of Covered Action

The process for making a claim for a whistleblower award for a CFTC action begins with the publication of a "Notice of Covered Action" on the CFTC's website. This Notice is published whenever a judicial or administrative action brought by the CFTC results in the imposition of monetary sanctions exceeding $1,000,000. The Notice is published on the CFTC's website subsequent to the entry of a final judgment or order in the action that by itself, or collectively with other judgments or orders previously entered in the action, exceeds the $1,000,000 threshold required for a whistleblower to be potentially eligible for an award. The CFTC will not contact whistleblower claimants directly as to Notices of Covered Actions; prospective claimants should monitor the CFTC website for such Notices.

| | |
|---|---|
| Question 1: | Provide the date of the Notice of Covered Action to which this claim relates. |
| Question 2: | Provide the notice number of the Notice of Covered Action. |
| Question 3a: | Provide the case name referenced in the Notice of Covered Action. |
| Question 3b: | Provide the case number referenced in the Notice of Covered Action. |

WB-APP Number: 1804-2521-3047-52          CONFIDENTIAL          Submitted: 4/25/2018 9:30:47 PM

## Section E: Claims Pertaining to Related Actions

Question 1:       Provide the name of the agency or organization to which you provided your information.

Question 2:       Provide the name and contact information for your point of contact at the agency or organization, if known.

Question 3a:      Provide the date on which you provided your information to the agency or organization referenced in Question 1 of this section.

Question 3b:      Provide the date on which the agency or organization referenced in Question 1 of this section filed the related action that was based upon the information that you provided.

Question 4a:      Provide the case name of the related action.

Question 4b:      Provide the case number of the related action.

## Section F: Eligibility Requirements and Other Information

Question 1:       State whether you are currently, or were at the time that you acquired the original information that you submitted to the CFTC, a member, officer or employee of: the CFTC; the Board of Governors of the Federal Reserve System; the Office of the Comptroller of the Currency; the Board of Directors of the Federal Deposit Insurance Corporation; the Director of the Office of Thrift Supervision; the National Credit Union Administration Board; the Securities and Exchange Commission; the Department of Justice; a registered entity; a registered futures association; a self-regulatory organization; a law enforcement organization; or a foreign regulatory authority or law enforcement organization.

Question 2:       State whether you provided the information that you submitted to the CFTC pursuant to a cooperation agreement with the CFTC, or with any other agency or organization.

Question 3:       State whether you provided this information before you (or anyone representing you) received any request, inquiry or demand that relates to the subject matter of your submission (i) from the CFTC, (ii) in connection with an investigation, inspection or examination by any registered entity,

10

registered futures association or self-regulatory organization, or (iii) in connection with an investigation by the Congress, or any other federal or state authority.

Question 4:    State whether you are currently a subject or target of a criminal investigation, or whether you have been convicted of a criminal violation, in connection with the information that you submitted to the CFTC and upon which your application for an award is based.

Question 5:    State whether you acquired the information that you provided to the CFTC from any individual described in Questions 1 through 4 of this section.

Question 6:    If you answered yes to any of Questions 1 through 5 of this section, please provide details.


**Section G: Entitlement to Award**

**This section is optional.** Use this section to explain the basis for your belief that you are entitled to an award in connection with your submission of information to the CFTC, or to another agency in connection with a related action. Specifically, address why you believe that you voluntarily provided the CFTC with original information that led to the successful enforcement of a judicial or administrative action filed by the CFTC, or a related action. Refer to § 165.9 of the CFTC's regulations for further information concerning the relevant award criteria.

Section 23(c)(1)(B) of the Commodity Exchange Act and § 165.9(a) of the CFTC's regulations require the CFTC to consider the following factors in determining the amount of an award: (1) the significance of the information provided by a whistleblower to the success of the CFTC action or related action; (2) the degree of assistance provided by the whistleblower and any legal representative of the whistleblower in the CFTC action or related action; (3) the programmatic interest of the CFTC in deterring violations of the Commodity Exchange Act (including regulations under the Act) by making awards to whistleblowers who provide information that leads to the successful enforcement of such laws; (4) whether the award otherwise enhances the CFTC's ability to enforce the Commodity Exchange Act, protect customers, and encourage the submission of high quality information from whistleblowers; and (5) potential adverse incentives from oversize awards. Address these factors in your response as well.

### Section H: Claimant's Declaration

You must sign this Declaration if you are submitting this claim pursuant to the CFTC whistleblower program and wish to be considered for an award. If you are submitting your claim anonymously, you must do so through an attorney, and you must provide your attorney with your original signed Form WB-APP.

### Section I: Counsel Certification

If you are submitting this claim pursuant to the CFTC whistleblower program anonymously, you must do so through an attorney, and your attorney must sign the Counsel Certification Section.

# JACKIE CHAN

## 115 EAST STREET
## NEW HYDE PARK NY 11040 USA

May 29, 2018

The Honorable Judge Schofield,
United States District Court, Southern District of New York c/o Pro Se Intake Unit
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 200
New York, NY 10007

**RE:** JACKIE CHAN ET.AL. ECF 230, PLEASE SEE BELOW AND PLEASE SEE EMAIL
ATTACHED
**Important Email**

Dearest Honorable Judge Schofield,

Good day to you, Your Honor.
**Please take notice** that the enclosed filings were filed in *IN RE FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST LITIG.*13-CV-7789-LGS; ("*FOREX*") and this is a
courtesy copy for your information.

Thank you for your review and anticipation in above captioned cases.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
May 29, 2018,

Jackie Chan, Lim                         Jackie Chan
115 East Street,                         115 East Street
New Hyde Park, NY 11040                   New Hyde Park, NY 11040
Cell: <u>917-868-5218</u>                Cell: <u>917-868-5218</u>
<u>Chanjac5@aol.com</u>                   <u>Chanjac5@aol.com</u>

## JACKIE CHAN
### 115 EAST STREET
### NEW HYDE PARK NY 11040 USA

May 29, 2018

The Honorable Judge Schofield,
United States District Court, Southern District of New York c/o Pro Se Intake Unit
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 200
New York, NY 10007

**RE:** JACKIE CHAN ET.AL. ECF 230, PLEASE SEE BELOW AND PLEASE SEE EMAIL
ATTACHED
**Important Email**

Dearest Honorable Judge Schofield,
Good day to you, Your Honor.

Plaintiffs respectfully file memorandum and declarations in excess of the limits set out in
Rule III.B.3 of Your Honor's individual Rules and Procedures for Civil Cases in support of:
Specifically, Plaintiffs file:
(i) Memorandum address the first meet and confer meeting as Rider for ECF 230, please see
below and please see attached email for full details : (Declarations and Riders), also see
attached Exhibit B, The Memorandum and Order, U.S. v. HSBC Bank USA N.A. et.al., Case
No.:12-CR-00763-JG (EDNY), See ECF 23, dated 07/01/2013, as Rider ECF 230, please see
below and please see attached email for full details : (Declarations and Riders), also see the
latest detail for Declaration and Rider as Attachment 2, as Rider for, ECF 230, please see
below and please see attached email.

(ii) Memorandum address the CFTC Order docket 15-7 in matter of HSBC filed by plaintiff
in, please see below and please see attached email, separate action the Court dismissed on
August 11, 2016 as Rider for, ECF 230, please See below and please see attached email for
full details : (Declarations and Riders).

(iii) Memorandum address the Award of Attorneys' fees USD9490 million (pay $0 Tax in this
amount) for Lead Class Counsel/Lead Manager –Scott & Scott, USD9290 million (pay $0
Tax in this amount) for Community City Manager/Lawyer –Legal Aid, USD1990 million (pay
$0 Tax in this amount) for Jackie Chan et.al., ECF 230, please see below and attached email
for full details and Reimbursement of

Litigation Expense USD2299 million (pay $0 Tax in this amount) for Jackie Chan et.al, ECF 230, please see below and please see attached email (USD3799 million in total (pay $0 tax in this amount)) and in USD2299 million (pay $0 Tax in this amount) is payable to Jackie Chan et.al., ECF 230, please see below and please see attached email, upon the class amount top up amount of (upon USD510 billion) together with payment to the Award of Attorneys' fees USD9490 million (pay $0 Tax in this amount) for Lead Class Counsel/Lead Manager –Scott & Scott, USD9290 million (upon USD510 billion) (pay $0 Tax in this amount) for Community City Manager/Lawyer –Legal Aid (upon USD510 billion), USD3799 million in total (pay $0 tax in this amount), by the Court handling valid in FOREX Settlement Fund direct electronic fund transfer by using the bank information as follows in combination offers with new members' USD510 billion at USD30 billion each seventeen (17) defendants pay upfront (amount subject to change without notice), top up the amount in Deposit of USD80 billion (Defendant Equifax to deposit USD20 billion, Defendant Northern Food I/E. Inc. (to deposit USD20 billion) and DOES 1-25 (to deposit USD30 billion) update as necessary as new members entered claim to net payment in U.S. postal money order, on daily basis with Federal or States Driver License with Photo Identification and International Passport with Photo: each payment in Schedule A for specifying and gave the check out at an account in the Court so that an access at them any time for payment- **See Schedule A, attached along to this memorandum,** Jackie Chan et.al., ECF 230, please see below and please see attached email, for full details in Meeting Minutes 04/18/17, for itemized instructions and latest information in distribution list.

(iv) Memorandum address the Final Approval of Class Action Settlements (USD340 billion (Each entities of 17 to Pay 20 billion top up amount) and USD80.3 billion to update as necessary) and Plan of Distribution as Rider for latest details, Jackie Chan et. al., ECF 230, please see below and please see attached email for latest details : (Declarations and Riders).

(v) Declaration from Jackie Chan et.al., ECF 230, please see below and please see attached emails for notice of medicine prescription records, See ECF 238, 237, please see below and please see attached email in Attachment A. also see ECF 1046, FOREX, in Attachment A. Community City Lawyers that handled portions of the notice themselves. The declarations attest to the implementation of the class action notice program.

Accordingly, Plaintiffs respectfully file in the FOREX case state the above listed email in *In re Foreign Exchange Benchmark Rates Antitrust Litigation,* 13-cv-7789 (2016) Consolidated Action for the important part of the relevant correspondence we emailed to you in reference to Memorandum of Meeting Minutes 04/18/17 *In re Foreign Exchange Benchmark Rates Antitrust Litigation,* 13-cv-7789 (2016) Consolidated Action for above captioned cases, see attachment A in medicine prescription for full details : (Declarations and Riders) of memorandum and declarations in excess of the limits set out in Rule III.B.3., See

Jackie Chan et.al., ECF 230, please see below and please see attached email for full details : (Declarations and Riders).

The Justice Department in its brief frequently cited a 2016 decision by a U.S. appeals court to uphold a deferred prosecution agreement with Fokker Services, a Dutch company accused of illegally shipping aircraft parts to Iran and other countries. The appeals court ruled that a Washington-based District Court judge lacked the authority to reject an agreement reached by U.S. prosecutors and the company. In an earlier court filing, the government said that while each defendant, HSBC has made significant progress since the agreement, it is still not doing enough to thwart money laundering. The case is U.S. v. HSBC Bank USA NA et al, 2nd U.S. Circuit Court of Appeals, No. 16-308, **this included a failure to monitor billions of dollars in purchases of physical U.S. dollars, or "banknotes," from these affiliates.** See Department of Justice, Press release number: 12-1478 (https://www.justice.gov/opa/pr/hsbc-holdings-plc-and-hsbc-bank-usa-na-admit-anti-money-laundering-and-sanctions-violations), Tuesday, December 11, 2012.

A Stay to all claims for the reason above.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
May 29, 2018,
Clerks for all counsels,

Jackie Chan, Lim
115 East Street,
New Hyde Park, NY 11040
Cell: 917-868-5218
Chanjac5@aol.com

Jackie Chan
115 East Street
New Hyde Park, NY 11040
Cell: 917-868-5218
Chanjac5@aol.com

RIDER

# JACKIE CHAN

### 115 EAST STREET
### NEW HYDE PARK NY 11040 USA

May 29, 2018

The Honorable Judge Schofield
United States District Court, Southern District of New York c/o Pro Se Intake Unit
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 200
New York, NY 10007

RE: JACKIE CHAN ET.AL. ECF 230, PLEASE SEE BELOW AND PLEASE SEE EMAIL ATTACHED

IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIG.
13-CV-7789-LGS;
**Important Email**

Dearest Honorable Judge Schofield,

Good day to you, Your Honor.
Pursuant to you Honor's request, **At the request of such Settling Defendant's Counsel, the Escrow Agent shall apply for any tax refund owed on the Settlement Fund and pay the proceeds** [THIS order does include process above latest refund in is **payable in USD1990 million (** pay $0 Tax in this amount) **upon Stay of Discovery** to JACKIE CHAN ET.AL., ECF 230, see below and please see attached email,(USD3799 million in total (pay $0 tax in this amount)) and in USD2299 million (pay $0 Tax in this amount) is payable to JACKIE CHAN ET. AL., ECF 230, see below and please see attached email upon the class amount top up amount of (upon USD510 billion) together with payment to the Award of Attorneys' fees USD9490 million (pay $0 Tax in this amount) for Lead Class Counsel/Lead Manager –Scott & Scott, USD9290 million (upon USD510 billion) (pay $0 Tax in this amount) for Community City Manager/Lawyer –Legal Aid (upon USD510 billion), USD3799 million in total (pay $0 tax in this amount) JACKIE CHAN ET. AL., ECF 230, see below and please see attached email, by the Court handling valid in FOREX Settlement Fund direct electronic fund transfer by using the bank information as follows in combination offers with new members' USD510 billion at USD30 billion each seventeen (17) defendants pay upfront (amount subject to change without notice), top up the amount in Deposit of USD80 billion (Defendant Equifax to deposit USD20 billion, Defendant Northern Food I/E. Inc. (to deposit USD20 billion) and DOES 1-25 (to deposit USD30 billion) update as necessary as new members entered claim to net payment in

(1)

<u>Identification and International Passport with Photo: each payment in Schedule A for specifying and gave the check out at an account in the Court so that an access at them any time for payment- See Schedule A, attached along to this memorandum, JACKIE CHAN ET.AL., ECF 230, see below and please see attached email for full details i</u>n Meeting Minutes 04/18/17, for itemized instructions and latest information in distribution list.] to such Settling Defendant.

Accordingly, we respectfully request You Honor "So Order" this letter granting a stay of this action.

Thank you for your kindness and attention

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
May 29, 2018,
Respectfully Submitted,

Jackie Chan, Lim
115 East Street,
New Hyde Park, NY 11040
Cell: <u>917-868-5218</u>
<u>Chanjac5@aol.com</u>

Jackie Chan
115 East Street
New Hyde Park, NY 11040
Cell: <u>917-868-5218</u>
<u>Chanjac5@aol.com</u>

**Schedule A, Part of a memorandum,** for itemized instructions and latest information in distribution list:

In re Foreign Exchange Benchmark Rates Antitrust Litigation

Month –January through December 2017

31-Dec-2017

| Professional Payroll: | In USD This Period: | In USD Balance: |
|---|---|---|
| M1_001 Lead Manager – Scott & Scott | 9490 million | 510 billion |
| M1_002 Lead Manager - | | |
| M1_003 Lead Manager - | | |
| M2_001 Managers – Community Program | 9290 million | |
| M2_002 Manager: | | |
| M2_003 Manager: | | |
| M2_004 Manager: | | |
| M2_005 Manager: | | |
| R3_001 Clergy – Fees, Dues & Events - | 2299 million | |
| RE_01 Other Administrative Expenses- | 1990 million | |
| Reimbursement: | | 510 billion |
| | | |
| New Membership Total Expenses/Claims: | 23.06 billion | |
| Total: | 23.06 billion | -23.06 billion |
| Net Income: Projected Amount | | 567.24 billion |

Prepared by:

Book Keeper – Forex Class Action

04/17/2018

(3)

**Schedule A, Part of a memorandum, for itemized instructions and latest information in distribution list:**

In re Foreign Exchange Benchmark Rates Antitrust Litigation

**Payroll Sheet 2017**

31-Dec-2017

| Income and Payment: | In USD This Period: | In USD Balance: |
|---|---|---|
| R1_Deposit Credit: Forex Fund | 2 billion | 1.7 billion |
| R1_M2_001: Manager | 9490 million | 9490 million |
| R2_Income and Expense | 510 billion ( Each entities to Pay 30 billion top up amount) | -510 billion |
| RE_01: Clerk - | 1990 million | -1990 million |
| R3_001: Other Expense: Fees - | 2299 million | -2299 million |
| R1_M1_001: Lead Manager | 9290 million | -9290 million |
| R4_Capital Improvement (NET Income And Expenses: | 80.3 billion (Equifax to pay 20 billion) (Northern Food I/E. Inc. to pay 20 billion) (Northern Food I/E. Inc. and DOES 1-25 to pay 40 billion) | 80.3 billion |
| Total Resources: | 590.3 billion | 590.3 billion |
| Profit/Loss This Period: | 23.06 billion | -23.06 billion |
| Reimbursable Expense: | -23.06 billion | |
| Surplus (Deficit) Per This Statement: | 567.24 billion | 567.24 billion |

Prepared by:

Book Keeper – Forex Class Action, 04/26/18