I5NJFORH                    Hearing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE:  FOREIGN EXCHANGE BENCHMARK      13 Civ. 7789 LGS
    RATES ANTITRUST LITIGATION
4
    ------------------------------x
5

6

7                                          May 23, 2018
                                           4:00 p.m.
8

9

10

11  Before:

12                 HON. LORNA G. SCHOFIELD,

13                                         District Judge

14

15

16

17

18

19

20

21

22

23

24

25

I5NJFORH                          Hearing

1              (In open court)

2              (Case called)

3              THE COURT:  Good afternoon.

4              We are here at long last for a final approval hearing

5    for the 15 proposed settlement agreements and for the plan of

6    distribution and for final certification of the two settlement

7    classes.

8              So, Mr. Burke and Ms. Anderson or somebody at the

9    first table, who would like to speak?

10             MR. BURKE:  Your Honor, Chris Burke for the class.

11             I'll be handling the issue of final approval of the

12   settlements generally.  Ms. Anderson will be speaking to notice

13   and plan of distribution, and Mr. Hausfeld will be speaking to

14   issues arising concerning ERISA, and I'll handle attorney's

15   fees.

16             THE COURT:  All right.  Let's do just the settlement

17   first and not the objections.

18             MR. BURKE:  We are here for final approval of 15

19   settlements, and I will read each of the defendants with whom

20   we settled:  JP Morgan, UBS, Barclays, Citigroup, Bank of

21   America, Goldman Sachs, HSBC, BNP Paribas, RBS, Bank of Tokyo

22   Mitsubishi, Royal Bank of Canada, Soc. Gen., Standard

23   Chartered, Morgan Stanley and Deutsche Bank.

24             The total consideration for the settlement monetary

25   consideration was two billion 310,275.  In addition, there was

I5NJFORH                    Hearing

1    substantial cooperation in foreign production of documents,

2    attorney proffers, date of production and agreements to produce

3    individuals for deposition.

4           The reaction to the class, your Honor, has been, in

5    our view, overwhelmingly positive.  Of a class of 200,000, 51

6    entities opted out.  Only 40 of those, we believe, are actual

7    class members, so a miniscule percentage for a class this

8    large.  We had one timely objection to the substance of the

9    settlement.

10          The participation rate in terms of the number of class

11   members of the 200,000 we estimate is 30 percent.  It could

12   draft a little higher.  Participation rate by volume, meaning

13   the volume of transactions that those individuals participated

14   in, the settlement accounts for between 32 and 37 percent.

15   Again that we view as extremely positive.

16          I have been doing class actions now for 18 years, and

17   for a notice program of this size and worldwide in scope, if

18   you do over 20 percent, you're doing well.  If you do over 30

19   percent, in my view, you're doing extraordinarily well.

20          THE COURT:  How does this compare to the Axiom claims

21   rate?

22          MR. BURKE:  Axiom was at 39.  Axiom was a much smaller

23   class, about 1500.

24          THE COURT:  Right.

25          MR. BURKE:  In terms of what the class is likely to

I5NJFORH                    Hearing

1    see in terms of cents on the dollar, we estimated the

2    settlement class period, damages for that was 8 to $10 billion,

3    at a 37 percent take rate.  That is on the higher end of the

4    take rate.  Class members will be between 62 and 78 cents on

5    the dollar.

6            If one were to consider -- and I believe this is a

7    more accurate benchmark -- one were to consider what class

8    members would do if they were litigating in the operative class

9    period, which is shorter, they would see between 89 cents to

10   116 cents on the dollar, meaning class members are likely to

11   see, if they participate in the settlement, 100 percent of

12   single damages.

13           In an antitrust case involving financial services

14   benchmark litigation in today's climate of prospective class

15   actions and some of the decisions we have seen coming down,

16   that is kicking the ball to the goal post at 70 yards.  That is

17   an extraordinary result.

18           In terms of what is likely to be distributed to class

19   members, we provided to the court a letter yesterday with some

20   exhibits.  Exhibit 2 was entitled, "Net Settlement Fund."  That

21   described, basically gave an accounting of the settlement fund

22   and then backed out the current request for attorney's fees and

23   added in interest net of taxes, assuming a payment of what we

24   have requested class members are likely to see once

25   distribution occurs, almost $2 billion, $1.95 billion.

I5NJFORH                          Hearing

1          We, of course, still are litigating with Credit

2     Suisse.  There is no guarantee we'll see anything from Credit

3     Suisse, but class members may, but at this point they're

4     already getting 100 percent on the dollar.

5          Your Honor, I will be happy to walk through the

6     Grinnell factors or answer the court's questions.

7          THE COURT:  I don't think we need to walk through the

8     Grinnell factors.  I received and reviewed all of your papers,

9     all of the various papers, and although they were voluminous,

10    they were extremely well organized, and so not completely

11    unmanageable.  So thank you and thanks to whoever else

12    participated in preparing those.

13         So I did have a few questions.  You said there are

14    approximately 200,000 class members.  Do you know how many of

15    those, approximately, might have ERISA claims?

16         I know you're not the ERISA person and these are data

17    questions.

18         MR. BURKE:  We tried to tease that out.  It would be

19    in the low, low single digits, probably below 5 percent.

20    Whether it would be below 2 percent, I am not sure.  We have

21    not teased out an exact number.

22         THE COURT:  Do you know how many of those have

23    excluded themselves?

24         MR. BURKE:  Zero.

25         THE COURT:  So none of the opt-outs are plans or other

I5NJFORH                        Hearing

1    entities governed by ERISA?

2            MR. BURKE:  No, your Honor.

3            THE COURT:  How many would you say of those have filed

4    claims?  What percentage of the 2 to 5 percent?

5            MR. BURKE:  I don't know of any reason to view the

6    ERISA filing rate to be any different than the rate of the

7    general class.

8            THE COURT:  You don't know, but you don't have any

9    reason to think it is anomalous?

10           MR. BURKE:  Correct.

11           THE COURT:  I know we had a preliminary approval

12   hearing where we -- actually, several -- where we talked about

13   various of the agreements, and my recollection is that they are

14   virtually identical as to their substantive terms, and I just

15   wanted you to confirm that for me.

16           MR. BURKE:  The agreements are, in fact, identical in

17   their substantive terms, your Honor.

18           THE COURT:  Did that make it harder or easier to

19   negotiate?

20           MR. BURKE:  It made it much harder to negotiate

21   because a one-off issue that we were asked to accommodate, and

22   that is not to say there weren't, there wasn't a bell here or

23   whistle there, but at the end of the day when you're sending

24   out a notice to class members, and they have to understand what

25   rights they are releasing if they're going to participate in a

1    settlement, you can't send out 15 different releases, for

2    example.

3            There can't be 15 different strings attached to how

4    they would get compensation for their losses.  It took us the

5    better part of the year to coordinate at least with the first

6    round of settlements, to coordinate and marry the different

7    settlement agreements so that they were uniform.

8            THE COURT:  Okay.  Thank you.  Then will I hear

9    separately from Ms. Anderson on notice.

10           MR. BURKE:  She is prepared to speak about that

11   exhaustively.

12           THE COURT:  I am not sure I want to hear exhaustively,

13   but hold that for a moment.

14           MR. BURKE:  At least in detail.

15           THE COURT:  Don't exhaust me.

16           You said as far as opt-outs, there were I noticed in

17   the papers and perhaps, this is Ms. Anderson's question, that

18   there were three untimely requests.  How untimely were they?

19           MR. BURKE:  They were several weeks, a month to more

20   than a month.

21           THE COURT:  Were there any that were slightly untimely

22   that you honored?

23           MR. BURKE:  Yes.

24           THE COURT:  Any idea of that number?

25           MR. BURKE:  One or two.  There is also like tax day,

I5NJFORH                          Hearing

1    so exclusion day was February 7th, so if things came in on the

2    9th or 10th, they were honored.

3              THE COURT:  Were those class members able -- well,

4    were the class members who were not able to opt out but who

5    wanted to, were they able to submit claims?

6              MR. BURKE:  There is still time for them to submit

7    claims if they choose to.  We'll make an exception for them.

8              THE COURT:  Do they know that?

9              MR. BURKE:  We communicated with them.  We haven't

10   heard back.

11             THE COURT:  I just ask that you make it clear to them,

12   those who tried to exclude themselves and couldn't, that they

13   still have time to submit a claim because they may think that

14   the deadline that is in the notice is a real deadline.

15             MR. BURKE:  Yes, your Honor.

16             THE COURT:  Regarding the plan of distribution, I know

17   we had a long, separate hearing about that, and I don't need to

18   go into the details again particularly if you tell me that

19   there were no changes to the plan after it was approved.

20             MR. BURKE:  There were no changes to the plan after it

21   was approved.

22             THE COURT:  Let me hear from Ms. Anderson.  Thank you.

23             MS. ANDERSON:  So just briefly then on the plan of

24   distribution, since we have presented it to the court in some

25   detail on at least two prior occasions, we're now in the

I5NJFORH                         Hearing

1    process of implementing the plan of distribution in the claims

2    process, and like Mr. Burke said, there have been no changes or

3    amendments to the plan.

4           Briefly to review, the analysis undertaken to develop

5    the plan of distribution, the plan of distribution was the

6    result of a rigorous analysis of the discovery record,

7    including analysis of transaction data produced by defendants

8    and by third parties.  We developed the plan of distribution in

9    consultation with numerous experts and specialists in plan of

10   distribution.  We had teams of experts who specialized in

11   effects markets as well as in economists in class action

12   distribution plans specifically.  They reviewed the transaction

13   data and assisted us in formulating the allocation approach.

14          We were also --

15          THE COURT:  Then who actually implemented it?

16          MS. ANDERSON:  The plan of distribution is implemented

17   by a team consisting of the claims administrator, which

18   receives the claims from the claimants, and then the claims

19   administrator, in conjunction with our expert teams who

20   actually reviewed the transaction data to come up with a plan

21   of distribution, they assist in the difficult or more

22   complicated claims, in reviewing the transaction data that we

23   received from claimants and also compiling the transaction data

24   for claimants who submit under Option 1 of the plan of

25   distribution, which is the option that allows them to rely on

1    the defendant's' data for their claims calculations.

2              THE COURT:  As I understand it, most of the claims

3    calculation is done, that there is a little bit more going on,

4    or is that wrong?

5              Is there still a lot more work to be done?

6              MS. ANDERSON:  The claims deadline was I think one

7    week ago today, and we are in the process of analyzing both

8    claims under Option 1 and under Option 2.

9              With respect to Option 1 claims, we have been

10   preparing for Option 1 claims for some time, so we're able to

11   get notifications out to class members.

12             THE COURT:  And just remind me, Option 1 claims are

13   the ones based on the bank's data and not clients' date?

14             MS. ANDERSON:  Correct.  We are able to get back to

15   people who submit under Option 1 a little bit more quickly

16   because of the time we had to work with the transaction data.

17             So for the first tranche of Option 1 claims, we will

18   be getting back to claimants with assessment notifications that

19   give them summaries of what transactions we see in the database

20   for them as well as estimated claim amounts, and we are

21   starting to do that next week, on May 31st.

22             There is a second -- we bucketed the claimants so

23   people would have an idea of when they filed their claim, would

24   have an idea when they would hear back from us -- the second

25   bucket is people who filed Option 1 by the deadline.  We are

I5NJFORH                          Hearing

1    going to start getting back to them I believe it is in mid-June

2    with the claim assessment notification.

3              THE COURT:  How is Mr. Burke able to give me estimates

4    of the amount of participation rates if they're still very much

5    in the middle of all of this?

6              MS. ANDERSON:  We have calculated them to provide the

7    statistics, but we have to provide reporting and actually

8    create data files to provide back to the claimants because they

9    have the ability to switch to Option 2 and submit their own

10   transaction data after having reviewed the results of Option 1.

11             THE COURT:  Okay.  So talk to me about the notice a

12   little bit.

13             MS. ANDERSON:  So the notice was the best practical

14   notice under the circumstances, and we believe that is

15   reflected in the participation rate of 32 to 37 percent by

16   volume and 30 percent by account claimants.  We attribute our

17   participation rate to the excellent results we achieved in the

18   settlements but also the reach of our notice program.  We

19   believe we reached the vast majority of class members.  We sent

20   out approximately 650,000 total notices.

21             THE COURT:  I was a little curious about that.  If

22   there are 200,000 class members, who are the other 4,000

23   recipients of the notices?

24             MS. ANDERSON:  On average, class members would have

25   received, since we sent out 650,000, there is approximately

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I5NJFORH                           Hearing

1    200,000 class members.  Class members receive multiple notices,

2    and that is because of the way that the class members appear in

3    the defendant databases.  They appeared, their names are

4    sometimes the same, but oftentimes slightly different in the 16

5    datasets that we used from the settling defendants to provide

6    notice as well as the 16 datasets because we also provided

7    notice to customers of Credit Suisse.

8            So we undertook a De-Duplication process where we --

9            THE COURT:  I am sorry to interrupt just a second.

10   How did that work?  You gave notice to customers of Credit

11   Suisse.  Credit Suisse is the only non-settling defendant.

12           What did they do?

13           MS. ANDERSON:  They have the ability to file claims,

14   and the antitrust laws provide for joint and several liability.

15   So anyone who traded with the defendant or traded FX

16   instruments on the exchanges can submit a claim.

17           THE COURT:  Because of the joint and several

18   liability, they can recover against the other defendants, but

19   they still retain their claims against Credit Suisse?

20           MS. ANDERSON:  That's correct.

21           THE COURT:  Go ahead.

22           MS. ANDERSON:  So we obtained the customer lists from

23   the 16 different defendants, and we undertook a De-Duplication

24   process across the datasets, but we were deliberately

25   conservative in how we De-Duplicated across the datasets.

1    We only aggregated class members if they had the same

2    tax ID, the same address and very close to the same name, and

3    we also provided notice to all the addresses that were present

4    in the data.  Sometimes there were more than, there was more

5    than one address we made out to.

6         THE COURT:  I will fast forward past the mailing

7    notice, and I would like you to talk about the publication

8    notice.

9         MS. ANDERSON:  The publication notice, we published

10   the publication notice in newspapers and periodicals of special

11   interest to class members.  We published in major newspapers in

12   both the U.S. market, European markets and the Asian markets.

13        THE COURT:  Is there any way of knowing amongst the

14   claimants how many were sent notices directly and how many were

15   contacted indirectly via publication notice or internet or

16   worth of mouth, or something else?

17        MS. ANDERSON:  Well, I do believe that we reached the

18   vast majority of class members through direct notice.  I

19   believe that they would have received notice of the settlement

20   in multiple ways as well.  We had the publication notice

21   program.  We had an internet presence.  We have a settlement

22   website that has had a lot of hits.

23        THE COURT:  And people can file their claims via the

24   website, too, right?

25        MS. ANDERSON:  That's correct, yes.

1          THE COURT:  Have most class members filed via the

2     website or manually?

3          MS. ANDERSON:  I would say the majority have been

4     filed online via the website, but we have received paper claims

5     as well.

6          THE COURT:  Okay.  All right.  Thank you.  I don't

7     have any more question about the notice or plan of

8     distribution.

9          So there were two objections to the terms of the

10    settlement.  As Mr. Burke noted, only one of those was timely.

11    The objection regarding the exchange-only subclass was two

12    months' late, and so that objection and the request to speak at

13    the hearing are untimely and I won't be hearing that objection.

14          The other objection to the merits is an objection by

15    the so-called Allen plaintiffs, and so I'd like to talk about

16    that now.  I think the best way to go about that is let me hear

17    first from the objectors, and I believe we have Ms. Markey and

18    Mr. McTigue.  Is that right?  So let me hear from you first and

19    then I will hear from class counsel or whoever else wants to

20    be -- I know Mr. Hausfeld will address some of it.

21          MR. McTIGUE:  Your Honor, this is Brian McTigue.  I

22    represent the ERISA objectors.  I have with me Virginia Markey

23    who assisted me on the objections.

24          We requested oral argument because we thought your

25    Honor might have questions.  Our papers, we believe, were more

1    or less exhaustive of our thoughts, but several points I think

2    might be made subsequent to our papers.

3            THE COURT:  Thank you for not just repeating your

4    papers.  I really appreciate them.

5            MR. McTIGUE:  Yes.  We would be willing to if you

6    wanted us to.

7            THE COURT:  No.

8            MR. McTIGUE:  I think it would save everybody's time.

9            I make a point that this is not a global resolution of

10   this litigation.  I believe ERISA class members are exempted

11   from the regulation if their fiduciary investment manager was

12   one of the defendant banks or banking groups.  Therefore, I

13   think this litigation will continue even if you approve the

14   settlement as proposed because there are exceptions in the

15   releases for certain but not all ERISA claimants.

16           I also would make the observation that your Honor can

17   do away with our objection by merely finding that the releases

18   proffered to you do not cover ERISA claims.  If you would do

19   that, the ERISA plans who have antitrust claims -- and,

20   apparently, all do -- would have their antitrust claims settled

21   in the litigation.  Their antitrust claims would be released,

22   and their ERISA claims, if any, would go forward and be

23   litigated by unconflicted, independent counsel.

24           THE COURT:  Well, in a sense then you're asking me to

25   reconsider and change essentially what was a prior ruling about

1    the scope of the injunction which mirrors the scope of the

2    release.

3         MR. McTIGUE:  It is not clear to us that the releases,

4    in fact, cover ERISA claims, and there has been ambiguous

5    argument on that subject, but I think if your Honor would find

6    they do not cover ERISA claims, then the settlement would go

7    forward essentially unchanged.  We want to try to find a way

8    for your Honor to accept our objection or obviate it with our

9    claims being released or no consideration, which we argued they

10   aren't.

11        THE COURT:  No consideration may be an unfair

12   characterization even given your position, but we can hear more

13   about that.  I did have a question for you.

14        So let's assume that your clients have ERISA claims,

15   and in light of my dismissal, that is not entirely clear, but I

16   accept it is on appeal, and I am sure you have arguments you

17   have presented there as well as before me, so to what extent,

18   if your clients collected in full on the antitrust claims in a

19   litigation, for example, would they be able to collect anything

20   on their ERISA claims?

21        In other words, there is a quantum of damage or injury

22   for which a party can be compensated and beyond that they

23   can't.  There may be treble damages or single damages or

24   whatever, but the injury, the quantum of the injury is finite

25   and typically you recover that and that's it.  Is there more to

1    ERISA damages than the antitrust damages?

2                MR. McTIGUE:  I believe there is, your Honor, but it

3    would take further litigation to ascertain that.

4                THE COURT:  When you say you believe there is, what do

5    you mean?  I presume what we're talking about is the

6    manipulation of benchmark in various transactions, and your

7    clients would assert that they incurred a loss in those

8    transactions, and that loss is the same, I presume, whether you

9    state your claim under ERISA or you state your claim under the

10   antitrust laws?

11               MR. McTIGUE:  Not necessarily, your Honor.

12               We could seek disgorgement of profit that defendants

13   earned on the transaction with ERISA plans, and whether that is

14   greater or equal to or lesser than the antitrust remedy that is

15   being proposed here today, we do not know.  Those are factual

16   questions.

17               THE COURT:  All right.  I don't have any other

18   questions for you.  I have looked carefully at your papers, so

19   if you don't have anything else, I will hear --

20               MR. McTIGUE:  I have one other point.

21               We have argued that the identical factual predicate is

22   not met in this litigation with regard to ERISA claims.  I

23   think your Honor's holding dismissing our claims proves that

24   point because your Honor dismissed our claims because we did

25   not plead an additional factual predicate in agreement with the

1    defendants.

2            THE COURT:  As I recall, I said the claims based on

3    joint action were enjoined by virtue of the settlement

4    agreements, but that the individual claims were dismissed for

5    two reasons, one of which was that the defendants were not

6    ERISA fiduciaries.  So I am not sure I understand your

7    argument.

8            MR. McTIGUE:  All of our claims were dismissed but,

9    nonetheless, I'll rest.

10           THE COURT:  Thank you.

11           Mr. Hausfeld, would you like to be heard?

12           MR. HAUSFELD:  Yes, your Honor.

13           I believe your Honor really focused on the essence of

14   the alleged objection to the fairness on behalf of the ERISA

15   plans to the extent there are valid ERISA plans that made

16   objections, that is, in determining the fairness of the

17   settlement with regard to an ERISA claim.

18           What evidence or corroboration have the ERISA plans

19   made as to the unreasonableness of the damage amount to which

20   an ERISA plan may except from the settlement in terms of an

21   alleged premium to which they're entitled because of the

22   strength of an ERISA claim.

23           In the questions and answers that I just heard, the

24   answer is well, the objector believes that there may be a

25   greater ERISA damage.  There is nothing in the record to

I5NJFORH                          Hearing

indicate what that greater damage is or isn't.  They believe

that the profits may be more, less or equal to the damage, but

there is nothing in the record to indicate where on that

continuum this falls.  So there is no basis to determine or

argue that at this point there is any degree of certainty or

reasonableness in an assessment that the damages that an ERISA

plan can except from the settlement are unfair or unreasonable.

          THE COURT:  So here is the thing that I struggle with

a little bit.  I read with some interest the back-and-forth

about the Gallagher opinion and the exemption and so forth, and

it seems to me that there are really two inquiries that are

going on here:

          One is the inquiry of the ERISA fiduciary, which is

whether to participate in the settlement, and we heard I think

no plan or I presume ERISA fiduciary behind the plan that

decided to opt out of the settlement, so that is of some

interest.  That in the end is not my problem or my question.

          My question is whether the settlement is fair and

reasonable to what I will call the ERISA claimants, and the

question then is in light of the fact they have this additional

claim which in theory could yield some additional recovery, why

is a settlement that doesn't acknowledge that fair and

reasonable as to them?

          MR. HAUSFELD:  It does acknowledge their ability to

participate in the settlement that was reached, and as the

I5NJFORH                    Hearing

1   affidavits by the allocation counsel and the fiduciary that was

2   alluded to by the ERISA counsel, allocation counsel demonstrate

3   that the fiduciaries within the plans had the ability to assess

4   exactly the very issues that are raised without substantiation

5   by the Allen objectors.  What is the risk to me?  What is it

6   that I may get more --

7        THE COURT:  Sorry.  I am going to interrupt you

8   because I want to have a conversation.

9        MR. HAUSFELD:  Please.

10       THE COURT:  That seems to me to relate more to the

11  first question because -- I am not speaking as a Judge now,

12  pre-tender ERISA fiduciaries.  I am trying to decide whether to

13  participate in the settlement and which is a done deal or get

14  me close to 100 percent or start litigation on claims that

15  sound like a no-brainer, but that isn't necessarily the

16  question.

17       The question is whether the settlement, as it is, is

18  fair and reasonable, not given the circumstances as they are,

19  whether the fiduciaries should participate or not.

20       MR. HAUSFELD:  In a way they are really interrelated

21  because the fiduciary has to determine whether or not there is

22  this possibility, undetermined at this point, as to whether or

23  not whatever it takes is a fair and reasonable amount for it to

24  relinquish or release all of its claims.

25       There is sufficient information for the plan's

fiduciary to make that assessment, but more importantly, there

is no evidence in the record that the amount that is available

to the fiduciary is anything less than fair and reasonable

given all the circumstances and risks and benefits by either

proceeding with litigation, or whether or not there may be a

premium available over and above, as your Honor said, the

compensation that is available to the settlement.

          That is the trick.  We're not looking at the issue of

fairness in a vacuum.  We are looking at fairness at this point

in time.  Is there anything to say that the failure to provide

for a premium for ERISA plans, when there is no basis to

determine what that premium is or whether or not there would be

a premium in any way renders the overall settlement unfair or

unreasonable as to those plans.

          THE COURT:  Okay.  Thank you.  Is there anyone else

who would like to be heard on this issue?

          MR. BERSHTEYN:  Good afternoon, your Honor.

          Your Honor, I, too, will resist the temptation to

restate what is in our papers and note a couple of brief

points.

          First, your Honor, the Allen objectors' presentation,

it harkens a bit to that opening joke of Annie Hall, the food

is so terrible and in such small portions.  Their Point 2 is we

cannot as a matter of law release ERISA claims and we're

getting so little for releasing them.

1      Mr. Hausfeld, I think, covered the latter point that

2 they're not getting too little.  Because it is a defendant

3 issue, we'll focus on the permissibility of the scope of the

4 release.  Your Honor, has voluminous briefing on that, so I

5 will make two observations:

6      The first relates to the question your Honor just

7 posed to Mr. Burke and then Mr. Hausfeld concerning the opt-out

8 ERISA plans.  I simply want to mirror the same point for the

9 objector ERISA plans.  The Allen complaints, every form of

10 them, have been a matter of public record for two years at

11 least.  So has the version of a similar objection during

12 preliminary approval process, and yet not a single ERISA plan

13 nor even a beneficiary of ERISA plan like Ms. Allen has come

14 forward to object to the scope of the release in these

15 proceedings.  I am not suggesting that is dispositive.  As your

16 Honor just said, it is of some interest.

17      Second, as to the legal question, the scope of the

18 release, the transactions in which the ERISA plans and the

19 Allen proceeding participated are entirely subsumed in the

20 class here.  I think there is no dispute about that.

21      We respectfully submit, and your Honor has seen

22 briefing on this a number of times, that the nature of the

23 conduct, the practices of which they complain are the same as

24 well.  In our respectful submission, under Second Circuit

25 identical predicate law, when those two things are true, the

1    identical factual predicate is satisfied.

2              Unless your Honor has any questions?

3              THE COURT:  Because it is of interest to me, I am

4    going to pursue the same line of questions that I've asked

5    everyone else, which is why is it fair and reasonable not to

6    pay a premium to the ERISA claimants?

7              And so it seems to me there are a couple of ways that

8    that ERISA claim would have value which would require more

9    money.  One is if there were additional damages that could be

10   obtained, and I haven't heard anything about that.  The other

11   is if the claims somehow were more valuable because it were

12   easier to prove or it had a longer statute of limitations or

13   something that made it intrinsically more valuable.

14             I haven't really seen or heard anything about that.

15   Do you have any comments about that or any other ways to look

16   at the issue of fair and reasonable?

17             MR. BERSHTEYN:  Your Honor, I would offer one

18   observation which is just trying to think about it from a

19   practical perspective of the alleged conduct involved.

20             I was looking at some of the briefing in 2016, and

21   there it was pretty specific to particular practices.  Let's

22   look at one of the letters, one of the practices is banging the

23   close, an alleged manipulative practice.  Just like a member,

24   non-ERISA member of the class here, or a member, they're

25   counter-party to a transaction that was somehow affected by

I5NJFORH                         Hearing

1   banging the close.  The same is true of the ERISA plans if they

2   happen to be the counter-party.

3            There is nothing special about their ERISA nature that

4   would make the damages they recover from that transaction

5   different.  The antitrust laws provide for compensation of the

6   injury, to the extent that injury can be established, and they

7   provide for something besides treble damages, joint and several

8   liability which, as you know, benefited the class here.

9            We see no reason, at least I can come up with none,

10  why the ERISA claimant would recover more than the injury they

11  suffer, and just from a practical perspective looking at these

12  practices, it is as simple as that.

13           THE COURT:  I would like to make a couple of small

14  requests.  If one of you would just save me some time, and

15  perhaps a paralegal can do it, which is to go back and look at

16  the old briefing and submissions on the scope of the

17  release/scope of the injunction, and if you could just put that

18  in a letter to me with docket numbers so I can go back and

19  easily see them.

20           MR. BERSHTEYN:  Yes.

21           THE COURT:  Mr. Burke, if I could ask you, I had asked

22  you some questions about the class members who are subject to

23  ERISA, and you gave if me estimates, but if you could give me

24  something a little more precise about the number and percentage

25  of plan members who are subject to ERISA, the number that

I5NJFORH                        Hearing

1    excluded themselves and the number that have filed claims, that

2    would be useful to me.

3            MR. BURKE:  Yes, your Honor.

4            THE COURT:  Thank you.

5            Let's see if I have anything else on the objections.

6    I don't.  So let's talk about the fee issue.  Mr. Burke, would

7    you like to be -- no.  Let me just tell you first what I would

8    like to do.  First, I would like to hear from Mr. Burke.  Then

9    Mr. Pentz is here?

10           MR. PENTZ:  Yes, I am.

11           THE COURT:  There is a timely objection from Mr.

12   Pentz.  I would like to hear briefly from Mr. Pentz, and I

13   would like to hear a response, and then I have questions, all

14   right?

15           MR. BURKE:  In a prior case, the Axiom case, you asked

16   how we came up with that number, so I thought I would try to

17   address a similar question here, how do we come up with 18

18   percent all-in, and the first issue is certainty.  That way the

19   class knows for certain --

20           THE COURT:  Let me just interrupt already.  18 percent

21   all-in?  I am thinking 16 and change.  For fees I think of

22   expenses as separate.  Is that where you get the 18?

23           MR. BURKE:  16.5 plus 1.5, 18.  The 1.5 is claims

24   administration plus expenses.

25           THE COURT:  Go ahead.

1              MR. BURKE:  We provided the court again an accounting

2      yesterday on Exhibit 2 to the letter that breaks down, assuming

3      a 16.51 award, where the money would go with a distribution of

4      roughly a year from now, and that's how long it takes in these

5      types of cases.

6              The class would see, of the gross settlement fund that

7      we settled for the 2.31 billion, they would see 84.3 percent of

8      that because the fund grows at about two million a month net of

9      taxes.  We are, as we did in Axiom, assuming the attorney's

10     fees would not grow with any interest, that they would simply

11     be set at the amount that we requested, so that would all be

12     going to the class.

13             In terms of how to justify it, in the last case I said

14     it is as much of an art as it is a science.  Let me run through

15     some of the issues that we considered, and they are risk,

16     outcome, data and market rate.

17             In terms of risk, risk is appropriately calculated on

18     an ex-ante basis, meaning how risky was this case when we were

19     looking at in 2013 and how risky are antitrust cases in

20     general.  They are quite risky.

21             Class cases are even riskier then and financial

22     benchmark cases are even riskier especially back in 2013 when

23     the leading benchmark case was LIBOR, and the court had tossed

24     the antitrust claims.

25             When myself and Ms. Anderson and Mr. Selick, who is

1    behind me, were investigating the case and going over and

2    talking to market participants, they were aware of the

3    Bloomberg article that had come out about banging the close.

4              THE COURT:  Let me interrupt for just a second.

5              I don't think I have any doubt there was risk and I

6    frankly don't have any doubt that you assessed it at the time

7    of the litigation brought, but part of the question is what is

8    the dollar amount you assigned to the risk, and to say 100

9    million or 200 million in fees, every lawyer who takes cases on

10   a contingency faces risk, whether the case is large or small,

11   and the amounts here are extraordinarily large, as we all know.

12             It is an extraordinarily large settlement, but still I

13   think it is hard to get to this kind of dollar amount by

14   talking about risk.

15             MR. BURKE:  Let me address your Honor's point.

16             When we first looked at the case, it was focused on

17   the world market Reuters 4:00 pm fix.  On a busy day, that is 2

18   percent of volume.  The government, both in the U.K. and U.S.,

19   were looking at major currencies, Dollar, Euro, Yen, Pound, and

20   those account for maybe 50 percent, 60 percent of daily volume,

21   depending.  60 percent of 2 percent, so looking at 1.2 percent

22   of daily volume, this case initially had a settlement value, if

23   we hit a home run, of 100 to $200 million.  That is what I

24   figured.

25             We managed to broaden the case and obtain an

I5NJFORH                       Hearing

extraordinary outcome for the class, and I would assert the

outcome was increased by 10X, not 10 percent, but 10 times

because of something we did strategically, and that was settle

with JPM and UBS, and they got ice breaker settlements, JPM

because they were out.  UBS was an amnesty applicant.  We

couldn't get treble damages from them.

        They enabled us to broaden the case and asserted

beyond the 4:00 pm fix to trading throughout the day to more

than just benchmark fixing, but the case involved spreads, and

in most of the volume in the FX market there is a bid and ask.

If you increase the cost of the bid and the ask, you widen the

bid and ask, you increase the cost of FX trading.

        We expanded it beyond the major currency pairs.  We

expanded it beyond spot trading to include forward swaps

options and options option futures.  In essence, what was a 1

to 2 percent case became a 100 percent of the market case.

        Then we had to convince my formidable adversaries

behind me to pay to release that case, and that was not a done

deal.  We sat down and we had to convince them that this wasn't

just a benchmark case where we heard you've got winners and

losers, problems.  Don't worry, guys, we have a better case now

and this is spreads, and we don't have a winners and losers

issue there.

        We convinced them to pay, and this is before the

guilty pleas came out, we convinced them to pay top dollar.

1    Even when the guilty pleas came out, they were narrower than
2    the case we were prosecuting and, in fact, none of the
3    government pleas or orders is as broad as the case we were
4    prosecuting here, and we know, I am a former government lawyer,
5    you do not need to prove impact or damages when you're a
6    government lawyer.  That is a wonderful thing.  You need to
7    prove the agreement.
8            So the outcome was extraordinary because of some
9    strategic decisions we made early on and leveraged that
10   throughout the case.  We also devoted the resources on behalf
11   of the class.  We looked at over 20 million pages, we had a
12   small army of document reviewers getting ready to, and still
13   getting ready to try this case if necessary.  There were 500
14   different chat rooms we have created, and we have said it many
15   times, this is probably the largest useable database of
16   litigation that we're aware of, and I have been involved in
17   Interchange and Enron, it is bigger than those databases.
18           That was the value we brought to the class, and this
19   is a hard one for me to say.  I don't think just any lawyers
20   can do that.
21           THE COURT:  You're saying there is a relationship, a
22   direct relationship between the size of the recovery here and
23   the lawyering that was involved in a concrete way?
24           MR. BURKE:  Absolutely, your Honor.
25           We could have gone ahead with our blinders on and

1   settled the easiest case in terms of liability and taken a

2   discount because there were damages issues, and we would have

3   been in and out of this case, we would have been done three

4   years ago and it would have settled for 1 or $200 million, but

5   we didn't do that.

6           In terms of the market explanation, the market

7   justification, Professor Silver makes this, what would a

8   sophisticated purchaser of legal services pay to attorneys?

9   What would attorneys be charging?  I think that bears keeping

10  in mind as well because these cases, antitrust cases are sui

11  generis, you have to learn an industry.

12          THE COURT:  I am going to interrupt for a second

13  again.  How many antitrust plaintiffs contemplate paying their

14  lawyers pursuant to a fee agreement an hourly rate?

15          Don't antitrust plaintiffs expect either some

16  settlement and piece fees to be paid out of the settlement or

17  statutory fees at the end of the day?

18          How meaningful is it?

19          MR. BURKE:  Silver's analysis focuses on the percent

20  that a contingent fee lawyer would be able to charge a client.

21          THE COURT:  You're talking then about contingent fee

22  lawyers in all kinds of cases.  The fact that the personal

23  injury lawyer is going to get a third of the personal injury

24  recovery is a very different animal.

25          I guess, just so you understand where I stand, of all

I5NJFORH                        Hearing

1    of the arguments you make, I find this one one of the least

2    persuasive, perhaps just because of my background.  Plaintiff

3    lawyers always get paid on a contingency.  It is only the

4    defense lawyers who charge by the hour.  It is all sort of

5    hypothetical.

6              MR. BURKE:  If this is the least persuasive, I will

7    get out of it pretty quickly.

8              THE COURT:  Good.  That is good judgment.  Okay.

9              MR. BURKE:  There is one more argument, and this --

10             THE COURT:  You know, I am a lover of data.  I assume

11   you will get there eventually.

12             MR. BURKE:  That is my next point.

13             THE COURT:  Okay.

14             MR. BURKE:  Picking up on your Honor's direction order

15   in I guess, in re: Colgate Palmolive ERISA litigation, we have

16   submitted to the court an updated list of attorney's fee awards

17   in mega-fund cases, antitrust class actions so it is

18   apples-to-apples.  I know we already submitted the Miller

19   report that has its chart and the Fitzpatrick report that has

20   its chart.  Those were somewhat dated.  Miller ends in 2013.

21   Fitzpatrick ends in 2009, I believe.  This goes up to the

22   present from a statistical standpoint.

23             THE COURT:  You're talking about Exhibit 3 now?

24             MR. BURKE:  Exhibit 3 of the letter.  That would be

25   ECF 1058.  There are six billion dollar antitrust cases.  The

1   mean fee is 15.93 percent.  The average multiplier is 3.6.  Our

2   multiplier here, obviously, is under that.

3          THE COURT:  Could I make a request?

4          MR. BURKE:  Yes.

5          THE COURT:  These charts I find interesting and

6   helpful.  Could I have them on an Excel spreadsheet so I can

7   sort them how I'd like?

8          MR. BURKE:  Of course.

9          THE COURT:  Could you also include a column with the

10  actual dollar amount of the fees?

11         MR. BURKE:  Yes.

12         THE COURT:  Do you know where your fee request falls

13  in terms of dollars awarded in other antitrust cases?

14         MR. BURKE:  Ours would fall on No. 3 after Payment

15  Card and Visa Check.

16         THE COURT:  Okay.

17         MR. BURKE:  It wasn't too long ago a hundred million

18  dollar case caused people to lose consciousness because they

19  were so large.  There are a number of them now, and as a

20  result, I think the fee awards that courts have been willing to

21  give have increased over time for $100 million fees.

22         We looked at the average fee award for 100 million on

23  the Payment Card case, which was 5.7 billion, and there the

24  average award was 24.69, with an average lodestar multiplier of

25  2.81.  One thing your Honor might find interesting about this

1    chart is the presence of three cases that were decided by the

2    same judge in the Eastern District.  Payment Card, Visa Check

3    and Air Cargo.  In all candor, Air Cargo is Mr. Hausfeld's

4    case, and I was in Payment Card.

5              THE COURT:  That was judge Gleason?

6              MR. BURKE:  Judge Gleason.  He used a sliding scale in

7    Payment Card.  In Visa Check, he famously was not happy with

8    the plaintiff's request for a 10 multiplier.

9              THE COURT:  I remember he had a fixed sliding scale in

10   one opinion he wrote with amounts and percentages.

11             MR. BURKE:  Yes.  Had he applied the same scale to

12   Visa Check, the Visa Check lawyers would have made

13   substantially more money, but he changed.

14             In Air Cargo he did something quite different, which

15   is, and I am not sure if this is conscious or not, because the

16   settlements in Air Cargo were brought to him seriatim, the

17   awards were, except in one instance, 20 to 25 percent.  If you

18   look at them as a whole, it is 1.18 billion.  Had they waited

19   until the end, they probably would have received 10 percent

20   under his scale, but instead they received 23.3 percent, and I

21   would just submit that I don't think that is necessarily the

22   right message to be giving the Plaintiff's Bar because we'll

23   learn from that and game the system, in all frankness.

24             THE COURT:  I understand.

25             MR. BURKE:  I wanted to bring that to the court's

1    attention because it resulted in such a different result.  I

2    think our strongest outcome, argument is the outcome that we

3    took what was a small case and made it a much larger case.

4           On prodigal lawyering, this is what Mr. Hausfeld and

5    his team and my team were able to do.  We also recognized that

6    we're asking for an extraordinarily large fee.  We understand

7    we are asking for a fee that is slightly higher than the mean,

8    and also recognizing from the statistical standpoint the number

9    of cases above $1 billion isn't that great.  If there are any

10   specific questions, I am happy to answer them.

11          THE COURT:  Let's hear from Mr. Pentz.

12          MR. PENTZ:  On behalf of Keith Kornell.

13          I wanted to add initially another data point, and that

14   is Petrobras, the case currently pending before Judge Rakoff in

15   this Court, is the settlement in Petrobras is $3 billion.  The

16   fee request is 9.5 percent, and Judge Rakoff has already

17   indicated that he is not going to award that much.  He is

18   scrutinizing lodestar.

19          THE COURT:  Is that an antitrust case?

20          MR. PENTZ:  No.  That is a securities case, your

21   Honor.  It does have a lot of unique factors, a foreign

22   defendant.  A lot of foreign attorneys were necessary in that

23   case.  There are always unique circumstances in every case, and

24   I don't think you can make an across-the-board conclusion that

25   every antitrust case is more difficult than every securities

1    case.  I think those cases are relevant.

2              While it is true risk is evaluated ex-ante, it is

3    equally true at some point risk ends; namely, that is when the

4    case settles.  When the case settles, there is no more, no

5    longer any risk that the plaintiffs' attorneys won't at least

6    get paid for their attorney's fees.  In this case, that was

7    especially true in 2015 when 9 defendants settled for a total

8    amount of $2 billion, which was more than enough to pay a very

9    handsome multiplier of class counsels fees up to that time.

10             After that time, while certainly class counsel did

11   important work, they worked out the plan of distribution, they

12   gathered the data necessary to do that.  That time should not

13   be increased by any multiplier because it was risk free,

14   essentially.  Class counsel was guaranteed they were going to

15   get paid, compensated for every hour they spent on this case

16   after 2015.  Therefore, I think your Honor needs to do a two

17   step analysis:

18             First, determine how much time class counsel put into

19   this case before they achieved those $2 billion in settlements

20   in 2015, decide what kind of multiplier they deserve for that

21   time which was risky based on an ex-ante process of that case,

22   and then for all the time between 2015 and today, award them

23   that time but with no multiplier.

24             I believe there really needs to be a two-stage

25   analysis here, and I think that to apply the same multiplier to

1    time prior to 2015, which may have been very risky, and time,

2    and enormous amount of time between that date and now would

3    just be greater because it wasn't the same amount of risk.

4              THE COURT:   Thank you.   Mr. Burke, I cut you off when

5    you were talking about risk.   If you would like to respond to

6    the specific suggestion that Mr. Pentz just made, now would be

7    a good time.

8              MR. BURKE:   Well, we are facing enormous risk now

9    going forward.   We just had a premotion conference on class

10   certification, and your Honor expressed doubts as to whether or

11   not we were able to certify this class on a litigation basis.

12             The risk didn't end when we had agreements in

13   principle that were not yet approved, by the way, with the

14   initial defendants, and we had to keep our foot to the pedal,

15   and at any point in time things can happen in litigation.   I

16   once lost a $780 million judgment as a result of a referendum

17   in California a year after the case.

18             There is risk.   There is always risk in this case.

19   Because there is risk, generally you get a multiplier if you're

20   a contingent fee lawyer.   You can be cheeky and say I'll take a

21   2.   That is what we are asking for essentially is a 2.   That is

22   not a big ask in most cases except for the fact the number of

23   hours here are extraordinary.   Risk continues in this case

24   until we have final approval and until the appeals process has

25   run its course.

I5NJFORH                         Hearing

1          There have just been too many strange things that have

2     happened in many cases where I was involved in where I thought

3     things were bulletproof.  I have been involved, for instance,

4     in the Payment Card case in 2005.  It is now 2018.  We thought

5     we had that settled.  It went up to the Second Circuit, and it

6     came back down and they put more time in since it came back

7     down since they did in the first crack.  Don't tell me there is

8     no risk.  There is risk when you're risking $22 million of your

9     own money on behalf of the class with no promise that that's

10    going to be repaid in a time certain.

11         THE COURT:  You're talking about expenses that were

12    fronted by the plaintiffs' lawyers in this case?

13         MR. BURKE:  Correct, correct.

14         THE COURT:  Except that some of that, some small

15    amount of that, I think you got orders authorizing payment for

16    some of that.

17         MR. BURKE:  A small amount, right.  We continue to

18    incur additional costs.

19         This is a percentage of the fund case.  It is not a

20    lodestar case.  Your Honor isn't expected to undergo some type

21    of exhaustive analysis and hire Ernst & Young to go through

22    every single --

23         THE COURT:  I did have a question about that.  I agree

24    with you, I don't feel the same compunction in a case like this

25    to review time sheets since the lodestar under Second Circuit

1    law is supposed to be a check.

2            Credit Suisse is still out there, and I presume a lot

3    of this work was co-mingled, so how did you carve-out, if you

4    did, Credit Suisse from the usual lodestar and how did you

5    think about the Credit Suisse time with respect to the

6    percentage?

7            MR. BURKE:  Courts who have looked at this squarely

8    have declined to require plaintiffs' counsel to tease out or

9    back out what was clearly Credit Suisse from something else.

10   This is a joint and several liability case and in for one and

11   in for all.

12           THE COURT:  Does that mean at some point in the future

13   if you were to settle with Credit Suisse, you wouldn't be

14   asking --

15           MR. BURKE:  Asking additional fees and have submitted

16   lodestar from January 1, 2018 going forward, and courts that

17   considered that question previously looked at cumulative

18   lodestar and did separate lodestar cross-check for the study

19   period and cumulative period.  That is what Judge Gleason did

20   in the Air Cargo and Freight Forward case and what the judge

21   did in Auto Parts in the Eastern District of Michigan.

22           THE COURT:  Let me ask another question.

23           You've acknowledged what you're asking for is somewhat

24   higher than the median and whatever that is, the median of

25   what, the charts, and I took statistics in college, and I

1   haven't seen any of it since then.

2           The charts, regression analysis, the line shows a

3   relationship between the percentage of the fund that the fees

4   represent and the size of the fund honestly have what I think

5   Professor Miller calls a scaling effect; in other words, the

6   percentage goes down as the amount of the settlement gets

7   higher.

8           The charts, for example, that Miller has in his study

9   and Fitzpatrick have, they all end long before you get to the

10  size of this settlement, and the line is going down gradually.

11  There is every reason to think it would keep going down if you

12  worked your way to a $3 billion, $2 billion settlement.

13          Is it possible to take the data that you have given me

14  and put it together in some way to show me where that line

15  goes?

16          MR. BURKE:  We can do so using the data we presented

17  to the court in Exhibit 3 and we can contact our experts Miller

18  and Fitzpatrick to see if they can do it for their charts.

19          THE COURT:  That would be really interesting and

20  helpful to me.

21          MR. BURKE:  Certainly.

22          THE COURT:  Thank you.  So for the hourly rate charts,

23  I don't want billing statements or billing detail, but I would

24  like to know -- just so I can sort of test the hourly rates

25  against who's billing them -- I would like to know the

1     partnership year or the associate year or some designation that

2     the firms use to peg the various hourly rates, and so if I

3     could just -- I think there are already charts that I have with

4     the various billing lawyers' names, if I could just get years

5     with hourly rates next to them.  I have the hourly rates.  I

6     just don't know --

7                 MR. BURKE:  We'll get you years out and anything else

8     that would indicate their seniority or lack thereof with the

9     firm.

10                THE COURT:  Okay.  Also we haven't talked about

11    expenses.  You described in your affidavit, and I know at least

12    some of the other lawyers' affidavits talked about caps on

13    various types of travel expenses.  Did those caps apply to

14    everyone's expenses?

15                MR. BURKE:  Yes, and if the expenses were greater than

16    those caps, we are not seeking reimbursement.

17                THE COURT:  I understood that.  I thought that was a

18    marvelous way to present that information because it makes it

19    easy for me to consider, and I just wasn't clear it was true of

20    everyone.  So it is true of all of the expenses?

21                MR. BURKE:  Yes.

22                THE COURT:  All of the travel expenses, okay.

23                So the other thing, you gave me your Exhibit 2 in the

24    most recent letter which is something I was very interested in

25    which is sort of an accounting of what happens to the gross

I5NJFORH                          Hearing

1    settlement fund and how you get to the net settlement fund.

2    What I'd like is some more detail.

3           For example, litigation expenses, I would like a

4    breakdown by, for example, your various consultants, various

5    experts, what each of those was paid and on what basis.

6           For example, was it hourly, X number of hours at Y

7    rate?  Was it a fixed rate or annual rate or monthly retainer

8    or whatever it was?  If I could get that and then without, you

9    don't have to share with me percentages, but if you could tell

10   me right now how the plaintiffs will share whatever fees are

11   awarded, plaintiffs' lawyers.

12          MR. BURKE:  Certainly.  We're happy to provide that

13   information, your Honor.  One question, though, on expenses

14   having to do with experts, some of them are non-disclosed

15   consultants, so would it be possible to redact the names?

16          THE COURT:  Yes.  If you could do both, if you could

17   file the redacted version and email to me and file under seal

18   the unredacted version.

19          MR. BURKE:  In terms of how the money is going to get

20   split up, some of it has to do with what the award is.  So we

21   can give you a general framework that Mr. Hausfeld and I will

22   follow, but it is a decision made by Mr. Hausfeld and myself,

23   we'll get that to your Honor.

24          THE COURT:  Would you want to put that in a letter or

25   tell me about it or what do you want to do?

1          MR. BURKE:  That is something we would like to put in

2     a letter, but not necessarily make that public.

3          THE COURT:  I understand.  That is fine, too, at least

4     in the first instance.

5          So for litigation expenses, I will see a breakdown

6     basically of either all the payees or some more precise

7     explanation of where the money went?

8          MR. BURKE:  Right.  I think as I was envisioning it,

9     we well keep general categories such as travel and experts, and

10    then for certain of those categories like the experts that make

11    up the bulk, we'll break those out individually and provide

12    some description.

13          I don't think your Honor wants --

14          THE COURT:  You're right, I don't want all of your

15    travel expenses.  There may be places, I don't know, where

16    money is going that I haven't thought of, and I would like to

17    see those so I basically know where all the money is going.

18          MR. BURKE:  Yes, your Honor.

19          THE COURT:  So this is a question for anyone who knows

20    the answer, and it doesn't pertain to this case.  It is just

21    out of curiosity.  On this fee data, do you know whether there

22    is similar data for litigated cases in antitrust cases?

23          MR. BURKE:  Litigated cases?

24          THE COURT:  In other words, where there is a verdict?

25          MR. BURKE:  That goes to judgment?

1          THE COURT:  Right, and there is statutory fees and I

2     know it is probably lodestar, but there is a lot of discretion

3     involved.

4          MR. BURKE:  For instance, Urethane, on Page 3 of

5     Exhibit 3, No. 1, the 835 resulted from a trial.  Plaintiffs

6     prevailed, and the number was trebled by law.

7          THE COURT:  The 835 is from a trial?

8          MR. BURKE:  Yes.

9          THE COURT:  Okay.

10         MR. BURKE:  I'm not aware of a separate chart breaking

11    out cases that went to judgment as opposed to those who didn't.

12         THE COURT:  Do you know if any of the others on your

13    chart are trials?

14         (Off-the-record discussion)

15         MR. BURKE:  I think what we'll do, we'll take a look

16    at this and we'll note any of the others.  The Vitamins case,

17    in re:  Vitamins.

18         THE COURT:  And then in terms of a similar breakdown

19    to the one you have already provided me for the claims, you

20    suggested July 11th as a proposed deadline to submit proposed

21    orders and updated statistics?

22         MR. BURKE:  Yes.

23         THE COURT:  Is that still a good date?

24         MR. BURKE:  That date works for us, your Honor, yes.

25         THE COURT:  So I will so order that.

I5NJFORH                          Hearing

1          Is there anything else anyone else wants to talk

2      about?

3          MR. McTIGUE:  I would like to add a brief comment.

4          THE COURT:  Yes.

5          MR. McTIGUE:  We have heard argument here there is no

6      evidence in the record regarding deferential --

7          THE COURT:  I am having trouble hearing you.

8          MR. McTIGUE:  -- we have heard argument here about the

9      lack of record evidence of various damages and recoveries.  I

10     would argue that that is the result of what we call in our

11     briefing papers structural unfairness.

12         The ERISA claimants were not represented adequately

13     and independently in the litigation and in the negotiations

14     over the settlement.  I have made allusion to another example

15     of that lack of adequate representation, for the defendants and

16     the plaintiffs wrote out certain ERISA entities from the

17     releases.

18         For example, ECF 481, Page 7, which is --

19         THE COURT:  Just repeat that.

20         MR. McTIGUE:  ECF 481, at Page 7.

21         THE COURT:  ECF 481?

22         MR. McTIGUE:  Page 7.

23         THE COURT:  And that's ECF 481 in this case?

24         MR. McTIGUE:  Yes.  I believe that's the JP Morgan

25     settlement agreement, but there are settlement agreements

1    similar, 4899-9, 822-1, 822-5, 877-1.

2            THE COURT:  What is it these agreements do?

3            MR. McTIGUE:  What they do is they exempt from the

4    settlement any investment manager or investment adviser in

5    which the defendants hold a majority interest which is not a

6    well-defined majority interest.  Therefore, I don't know how

7    anybody would know in the class what is really going on here

8    and who is being exempted and who is not.

9            I would posit that those are cases in which the

10   defendant is also the ERISA plaintiff and the defendants very

11   assiduously exempt them from the release, which meant they knew

12   how to protect the ERISA claimants when it affected themselves

13   and plaintiffs and defendant in some cases.  Thank you.

14           THE COURT:  Can I hear from some of the defendants on

15   those, if you know anything about it?  If not, you can give me

16   something in writing?

17           MR. BERSHTEYN:  We may be able to say more in writing,

18   but I think -- and Mr. Burke and Mr. Hausfeld will surely

19   correct me if I am wrong -- I think the origin of those

20   provisions of the settlement is that the defendants are

21   excluded from the class, excluded from Mr. BUrke's class, and

22   there may be entities that are -- (inaudible) -- that engaged

23   in those actions that would otherwise be subject to the class

24   and so the --

25           THE COURT:  They basically can't participate in the

I5NJFORH                          Hearing

1   settlement.

2          MR. BERSHTEYN:  That I understand to be the origin of

3   those provisions, and Mr. Burke will correct me if I am wrong.

4          MR. BURKE:  That's correct.

5          THE COURT:  Okay.  Is there anything else?  All right.

6   I'll take all of this under advisement.  I know I am expecting

7   a few more submissions.  We're adjourned.

8          (Court adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25