June 14, 2018

<u>**Via ECF**</u>

Honorable Lorna G. Schofield
U.S. District Court
Southern District of New York
Thurgood Marshall Courthouse
40 Foley Square
New York, NY 10007

Re:    *In re Foreign Exchange Benchmark Rates Antitrust Litigation*
         Case No. 1:13-cv-07789-LGS (S.D.N.Y.)

Dear Judge Schofield:

Plaintiffs respectfully request an Order amending *nunc pro tunc* the January 30, 2018 deposition deadline contained in Paragraph 13 of the Letter of Request to take the deposition of Mitesh Parikh issued by the Court on March 12, 2018.

Following an unsuccessful attempt to negotiate the voluntary deposition of U.K. resident and former Goldman Sachs FX trader Mitesh Parikh, on November 17, 2017, Plaintiffs filed the Letter of Request with the Court. Due to the then operative schedule and, perhaps, overly optimistic view of how long it would take to prosecute the Letter of Request, Plaintiffs set a deposition deadline of January 30, 2018.

On March 12, 2018, the Court issued the Letter of Request, which included the expired January 30, 2018 deadline. At the time, no person raised the issue of the deposition deadline. Plaintiffs respectfully submit that the Court would not have issued and Plaintiffs would not have sought a Letter of Request that was immediately void upon issuance. This fact demonstrates that inclusion of an expired deadline was an inadvertent oversight and not an effort to prejudice any party or Mr. Parikh.

Following the issuance of the Letter of Request, Plaintiffs once again requested that Mr. Parikh voluntarily appear for a deposition. He refused. On May 4, 2018, Plaintiffs filed an application with the English Court for an order to take Mr. Parikh's deposition. The English Court set a briefing schedule and a July 2, 2018 hearing to decide the issue.

On June 13, 2018, Mr. Parikh's solicitor filed the First Witness Statement of Adam Richard Brown in opposition to Plaintiffs' application for a deposition order. *See* Ex. A. Although Mr. Parikh's statement recognizes that this Court issued the Letter of Request well after the January 30, 2018 deadline, his first grounds for opposition is now that the Letter of Request is untimely. Specifically, Mr. Parikh argues that:

> Paragraph 13 of the Letter of Request stipulates that the examination must be conducted before the long-stop date of 30 January 2018 (unless Mr. Parikh agrees otherwise, which he does not). This is a clear and important limit on the Request. The existence of the long-stop date no doubt reflects the need to protect Mr. Parikh against oppression arising from the substantial delay and lapse of time since the relevant events (the Applicants wish to question Mr. Parikh on matters

that occurred as long ago as 2007).  Mr. Parikh's position is that it would not be appropriate for the English Court to override such a safeguard put in place by a foreign court, or to grant an order for examination that is even wider than requested by the foreign court.  That is so irrespective of the fact that a delay in the processing of the Letter of Request application by the New York Court appears to have resulted in the position that the Letter of Request was in fact issued after the expiry of the long-stop date.  The fact is that a long-stop date was provided for.  If the Applicants wished to seek a different date in light of the further delay, they should have done so before the New York Court.  They have not.

Ex. A, ¶6.1; *see also id.*, ¶¶28, 30, 32.

Plaintiffs respectfully submit that they will suffer prejudice to the prosecution of their case if they are unable to obtain Mr. Parikh's testimony for trial.  Based on the Letter of Request, the Court has already determined that Mr. Parikh possesses relevant testimony directly relating to Plaintiffs claims, including his participation in multi-bank chat rooms with FX traders with other Defendants, including, specifically, Credit Suisse.

On the other hand, neither Mr. Parikh nor any other party will suffer any prejudice from an order amending the deposition deadline in the Letter of Request.  Mr. Parikh has been aware since September 2017 of Plaintiffs' desire to depose him.  Mr. Parikh can point to no prejudice arising from the mere passage of a few additional months.  And, notably, Plaintiffs will, upon final approval, have released all their claims against Mr. Parikh in the Goldman Sachs settlement; that approval is currently pending before the Court.

For these reasons, Plaintiffs respectfully request that the Court enter an Order *nunc pro tunc* amending the deposition deadline in Paragraph 13 of the Letter of Request from January 30, 2018 to December 31, 2018.

Respectfully submitted,

SCOTT+SCOTT ATTORNEYS AT LAW LLP        HAUSFELD LLP

 s/ Christopher M. Burke                              s/ Michael D. Hausfeld
Christopher M. Burke                             Michael D. Hausfeld
600 W. Broadway, Suite 3300                 1700 K Street NW, Suite 650
San Diego, CA 92101                              Washington, DC 20006
619-233-4565                                         202-540-7200
cburke@scott-scott.com                          mhausfeld@hausfeld.com

*Interim Co-Lead Counsel*

# EXHIBIT A

First Witness Statement of Adam Richard
Brown
Filed on behalf of the Respondent
Dated 13 June 2018
Exhibit ARB1

<u>Claim No. CR2018-409</u>

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>QUEEN'S BENCH DIVISION</u>

**IN THE MATTER OF THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS) ACT 1975**

**AND IN THE MATTER OF THE HAGUE CONVENTION OF 18TH MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

**AND IN THE MATTER OF A CIVIL PROCEEDING NOW PENDING BEFORE THE UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

**IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION (No: 1:13-cv-07789-LGS)**

---

**FIRST WITNESS STATEMENT OF
ADAM RICHARD BROWN**

---

I, **ADAM RICHARD BROWN** of Jones Day, 21 Tudor Street, London EC4Y 0DJ, **WILL STATE** as follows:

1. I am a Partner in the firm of Jones Day of the above address and have conduct of this matter on behalf of Mr Parikh. I make this Witness Statement on behalf of and with the authority of Mr Parikh in response to the Applicants' application for the examination of Mr Parikh pursuant to s 2 of the Evidence (Proceedings in Other Jurisdictions) Act 1975 (the **"Application"**).

2.      Save where otherwise stated, the matters set out in this Witness Statement are within my own personal knowledge and are true.  Where they are not within my personal knowledge, I confirm that they are true to the best of my knowledge, information and belief and the source of that information is set out below.  Where matters relate to the background and working practices of Mr Parikh, that information has been provided to me by him and I can confirm that Mr Parikh has read this Witness Statement and confirmed the accuracy of all matters that relate to him.

3.      Attached to this Witness Statement is a paginated exhibit marked **"ARB1"**, containing the relevant documents to which I refer below.  Where I have made reference to documents contained in the Exhibits to the First Witness Statement of S F Loble filed in support of the Application (**"Loble 1"**), I have used the following references **"SFL1/[page number]"** and **"SFL2/[page number]"**.

## I.      Summary

4.      US class action plaintiffs (the **"Applicants"**) have brought a consolidated claim before the United States District Court Southern District of New York (the **"New York Court"**) against 16 financial institutions referenced as "Re Foreign Exchange Benchmark Rates Antitrust Litigation" (the **"Class Action"**).  I understand that 15 of the defendants to the Class Action have settled proceedings, and Credit Suisse is the only remaining Defendant.

5.      The Applicants have sought an order for the examination of Mr Parikh in support of the trial of the Class Action against the remaining defendant.  As set out in more detail below, the Application was issued on 4 May 2018 without notice to him, despite my firm being engaged in correspondence with the Applicants' representatives at the time and requesting them to provide appropriate notice. The Application has since been listed for a hearing on notice before the Senior Master on 2 July 2018.

6.      The application is opposed on three grounds. In summary:

6.1     **First**, the examination sought is not supported by the letter of request as issued by the New York Court (the **"Letter of Request"**). Paragraph 13 of the Letter of Request stipulates that the examination must be conducted before the long-stop date of 30 January 2018 (unless Mr Parikh agrees otherwise, which he does not). This is a clear and important limit on the Request.  The existence of the long-stop date no doubt reflects the need to protect Mr Parikh against oppression arising from the substantial delay and lapse of time since the relevant events (the Applicants wish to question Mr Parikh on matters that occurred as long ago as 2007). Mr Parikh's position is that it

would not be appropriate for the English Court to override such a safeguard put in place by a foreign court, or to grant an order for examination that is even wider than requested by the foreign court. That is so irrespective of the fact that a delay in the processing the Letter of Request application by the New York Court appears to have resulted in the position that the Letter of Request was in fact issued after the expiry of the long-stop date. The fact is that a long-stop date was provided for. If the Applicants wished to seek a different later date in light of the further delay, they should have done so before the New York Court. They have not.

6.2 **Second**, the examination sought by the Applicants is in the nature of general discovery through exploratory deposition, rather than being properly limited to the evidence that would be relevant at a trial before an English Court. There has been no attempt to link the very broad topics to the factual issues in dispute at trial. Tellingly, the Application has been issued at an early stage in the Class Action, long before the New York Court has even set a trial date.

6.3 **Third**, and in any event, the Application is oppressive. Regulatory and criminal investigations are ongoing in the USA and elsewhere. The lack of focus in the proposed topics makes it impossible for Mr Parikh to properly seek advice and to consider, in those circumstances, whether to answer the questions or to invoke his rights under the Fifth Amendment of the US Constitution.

## II.   Background

*Relevant employment*

7. Mr Parikh has worked in the financial services industry for approximately 15 years. He joined the Goldman Sachs graduate scheme in or around 2002 following a summer internship. He moved on to become a Foreign Exchange ("**Forex**") trader on its G10 Spot and Forward Trading Desk (G10 referring to the 10 major currency pairs traded on the international markets). He was primarily responsible for trading the GPBUSD (Sterling/US dollar) currency pair otherwise known as "cable". Mr Parikh was also responsible for trading Scandinavian (Swedish and Norwegian) and Commonwealth (New Zealand and Australian) currency pairs. Separate teams within Goldman Sachs (of which Mr Parikh did not form part) managed emerging market currency transactions, options and electronic trading (including trades using computer algorithms).

8. On 2 October 2014, Mr Parikh voluntarily resigned from Goldman Sachs to pursue a role as a portfolio manager at Balyasny Asset Management L.P. ("**Balyasny**"), a Chicago based

investment manager. By that time Mr Parikh was one of two Managing Directors on the desk of five traders. He joined the London office of Balyasny in early 2015 after the expiry of a three-month period of gardening leave.

9.   Earlier this year and following a general restructuring at Balyasny, Mr Parikh (along with a number of colleagues in the London office) left the firm. He is currently on six months' gardening leave whilst he considers his next career move.

*Regulatory and other investigations*

10.  Since at least early 2014, it has been widely reported that a number of regulatory bodies and law enforcement agencies in various jurisdictions (including the United Kingdom, the United States at both federal and State level, and Australia) have instigated and pursued investigations into the operation of the Forex markets with a focus on alleged collusive behaviour and manipulation.  In parallel with those inquiries, several banks have conducted internal reviews of their Forex market activity.

11.  One focus of both the internal and regulatory reviews appears to have been communications between traders at banks through "chat rooms" (online messaging multi-party forums). Mr Parikh has explained to me that the use of chat rooms developed (in his experience at least) in the early 2000s. The vast majority of Forex traders would use numerous chat rooms simultaneously and continuously every day alongside their other trading functions, e.g. to exchange macro-economic ideas and information about market trends, and to match trades.

12.  Mr Parikh used chat rooms as a function of the Bloomberg terminals which he and his fellow traders made use of to access market data, information and other processes.  Some of these chat rooms were used for internal communications at the bank, i.e. to communicate with Goldman Sachs colleagues in London or other desks around the world.  Other chat rooms involved participants including inter-bank counterparties or, on occasion, customers.  Mr Parikh would sometimes have several of these chat rooms open across the six screens he used at his trading desk.

13.  No criminal prosecutions have yet been brought in the UK. On 16 October 2013, the Financial Conduct Authority (the "**FCA**") announced that it was conducting investigations into a number of firms' Forex trading (ARB1/1). On 21 July 2014, the Serious Fraud Office (the "**SFO**") launched a criminal investigation into allegations of fraudulent conduct in the Forex market (ARB1/3).  On 15 March 2016, the SFO closed its inquiry without bringing any charges, on the basis that:

> *there is insufficient evidence for a realistic prospect of conviction. Whilst there were reasonable grounds to suspect the commission of offences involving serious or complex fraud, a detailed review of the available evidence led us to the conclusion that the alleged conduct, even if proven and taken at its highest, would not meet the evidential test required to mount a prosecution for an offence contrary to English law.*[1]

14.    In contrast, criminal proceedings are underway in the United States.  On 10 January 2017, a one-count indictment was filed in the New York Court against three UK nationals alleging that from at least December 2007 to at least January 2013, those individuals (along with nine unnamed co-conspirators) conspired to fix prices and rig bids for the EURUSD pair (Euro/US Dollar).  It is alleged that much of this activity was undertaken through the use of chat rooms:[2]

> *... this group of traders carried out their conspiracy by participating in telephone calls and near daily conversations in a private electronic chat room. Their anticompetitive behaviour included colluding around the time of certain benchmark rates known as fixes, such as by coordinating their bidding/offering and trading to manipulate the price of the currency pair by the time of the fix or otherwise profit as a result of the fix price. The conspirators also coordinated their trading activities outside of fix times, such as by refraining from entering bids/offers or trading at certain times as a means of stabilizing or controlling price.*

15.    On 1 May 2018, Goldman Sachs reached an agreed resolution with the New York State Department of Financial Services (the **"DFS"**) pursuant to which the bank agreed to pay a civil monetary penalty in the amount of $54,750,000 (the **"Consent Order"**).[3]  On the same day, Goldman Sachs was subject to an order to Cease and Desist by the US Federal Reserve System, which imposed the civil penalty against the bank in that amount (ARB1/2).

16.    I also understand from general information in the market that a number of other regulators, including the European Commission, the Competition and Markets Authorities (CMA) and the US Commodities Futures Trading Commission (CFTC) are continuing their investigations into the alleged manipulation of the Forex markets.

## III.    Procedural History

*Initial Contact by the Applicants*

---

[1]    (ARB1/3).  "SFO closes Forex investigation – Serious Fraud Office – Article.pdf" from the SFO website https://www.sfo.gov.uk/2016/03/15/sfo-closes-forex-investigation/

[2]    (ARB1/4)

[3]    (SFL2/217)

17.     The Class Action plaintiffs' US-based lawyer Mr Steve Berezney first contacted me to indicate the Applicants' desire to depose Mr Parikh by email on 12 September 2017: see Loble 1 §20. I responded to confirm that Mr Parikh was not prepared to assist with the Applicants' Class Action. Other considerations apart, Mr Parikh was bound by obligations of confidentiality to his former employer (ARB1/7). In response to further queries, on 3 October 2017, I explained that the Applicants should provide my firm with due notice of any application under the Hague Convention (but indicated that my firm was not authorised to accept service) (ARB1/6).

18.     It now appears that it was not until over a month later on 17 November 2017 that the Applicants filed their application with the New York Court (see W Legal letter of 1 May 2018) (SFL2/23).

19.     Despite my request for notice of such an application, my firm did not receive any contact from the Applicants until Mr Loble emailed me on 16 April 2018,[4] asking for dates in May and June when it would be convenient for Mr Parikh to give evidence (ARB1/11). In my response on 20 April 2018, I explained that Mr Parikh could not consider his request without being properly informed what was being sought. I again emphasised that my firm was not instructed to accept service but asked Mr Loble to provide notice of any application, or to bring our request to the attention of the Court should the Applicants nonetheless proceed without notice (ARB1/11).

*Mr Parikh's requests for further information*

20.     Given that some seven months elapsed without any contact from the Applicants, it is unfair of Mr Loble to suggest (at §20 of his witness statement) that Mr Parikh has unambiguously refused to engage over the last six months. When the Applicants eventually provided a copy of the Letter of Request (albeit in draft)[5] on 23 April 2018 (ARB1/13) and (SFL1/1-19), my firm responded on 27 April 2018 seeking further information and documentation so that Mr Parikh could properly consider the nature of the request being made of him (SFL2/20-22). Specifically, my firm:

   20.1    Requested that the Applicants provide (i) the application issued on behalf of the plaintiffs in New York, (ii) the final form of the Letter of Request and its exhibits, (iii) the Order made by the New York Court issuing the Letter of Request, (iv) the

---

[4]     The reference to 23 April 2018 at §20 of Loble 1 appears to be in error.

[5]     (ARB1/16-34)

application that the Applicants planned to file with the English Court, and (v) any supporting evidence they planned to put before the English Court.

20.2 Asked the Applicants to explain why they sought to examine Mr Parikh some months after the deadline set out in the Letter of Request itself (30 January 2018) had passed.

20.3 Sought clarification as to (i) how the proposed topics were relevant to the matters to be determined at trial, in view of the superficial nature of the explanations in the draft Letter of Request, and (ii) the extent to which the New York Court specifically considered the relevance of the topics to the pleaded issues. In this regard, we also noted particular examples of topics that were obviously overly broad; and explained that Mr Parikh was not best placed to answer questions in relation to several of the topics, since he no longer had access to the relevant Goldman Sachs documentation, and was in no position to comment on some topics as he was never even part of the relevant team.

20.4 Asked the Applicants to confirm certain procedural matters: (i) whether Mr Parikh would be treated as the Applicants' witness, given the reference to cross-examination in the draft Letter of Request, (ii) how the plaintiffs intended to deploy the evidence secured as a result of the request, given that it did not appear to be restricted to that necessary for the trial of the claims against Credit Suisse, the sole remaining defendant in the Class Action, and (iii) when the trial of the Class Action was to be heard.

21. My firm reiterated that Mr Parikh was taking the matter extremely seriously and that it would be premature to file the Application the following week, before giving him an opportunity to consider that documentation — especially in view of the substantial delay by the Applicants in providing the draft Letter of Request.

22. Regrettably, the Applicants have refused to engage with this request for information and documentation. In their letter dated 1 May 2018 (but not received until 2 May 2018) (SFL2/23-25), the Applicants:

22.1 Refused even to provide a copy of the Letter of Request or the proposed application to the English court in their final form, instead simply indicating that the Letter of Request would be in the same form as the draft provided, and that the application to the English court would be in the "*usual format*" (SFL2/23).

22.2     Declined to explain the relevance of the topics, merely reciting paragraphs of the Complaint (e.g. §125 at SFL2/77, recited at SFL2/24) and asserting that the relevant test for relevance was "*very broad*" (SFL2/24).

22.3     Refused to engage with my firm's observation that Mr Parikh is not well placed to answer questions on many of the topics, simply asserting that they need not narrow the topics since if Mr Parikh "*does not know the answer to a question asked, he can simply say so*". They have, however, conceded that one topic should be withdrawn (that relating to algorithmic trading, since Mr Parikh did not even sit in the relevant team) (SFL2/25).

22.4     Indicated that, despite my firm's suggestion that given the parties' correspondence the Application should be made on notice, they intended to proceed to make the Application without notice (SFL2/25).

23.     My firm renewed Mr Parikh's requests for information, and that the Application be issued on notice, in our letter of 3 May 2018 (SFL2/26-28). In their response of the same date, the Applicants indicated that they did "*not propose to respond to all the points*" in my firm's letter, suggesting that "*some of the issues*" could be better addressed by telephone (SFL2/29-31). Instead, the Applicants:

23.1     Made thinly-veiled threats to publicise certain evidence not disclosed to Mr Parikh: They asserted that they "*know[] for a fact*" that Mr Parikh was the "*primary Goldman Sachs trader*", and said they "*ha[ve] the documents to prove it*" (SFL2/31). They further asserted that although they had attempted to secure Mr Parikh's attendance "*without publicly airing his key role in the conspiracy*", they had a "*mountain of evidence*" concerning him and a voluntary deposition would be the "*best course for everyone*" (SFL2/31). It is surprising that the Applicants would make such statements given that the purpose of their Application is said to be to obtain evidence for use at the trial of their civil claim against Credit Suisse.

23.2     Indicated that the Applicants would return to the English Court to seek costs if Mr Parikh relied on his rights under the Fifth Amendment to the US Constitution after opposing the Application.

23.3     Provided a copy of the Consent Order (in entirely different proceedings involving Goldman Sachs), but still failed to provide the materials in this Application requested in my firm's letter of 27 April 2018.

24.     On 4 May 2018, my firm again sought an explanation as to the basis upon which the English court was being asked to enforce a US request that, on its face, did not permit a deposition to be taken after 30 January 2018 (ARB1/35).  The letter again explained that Mr Parikh could not decide whether to rely on his constitutional rights to privilege against self-incrimination without the opportunity to review and seek advice on an appropriately focused Letter of Request setting out what might be sought from him.

25.     On the same day, 4 May 2018, the Applicants proceeded to issue the Application without notice, despite my firm's repeated requests that it be made on notice.  In parallel, and without informing my firm that the Application had already been issued, the Applicants continued to engage in correspondence and to urge Mr Parikh to appear voluntarily in order not to "*use up court resources unnecessarily in accordance with the Overriding Objective*" (ARB1/37).

26.     I have since become aware that on 10 May 2018, the Senior Master directed that the hearing be listed on notice to Mr Parikh, as had been specifically and repeatedly requested by my firm.  It is only because of that direction that Mr Parikh has had the opportunity to adduce witness evidence to the Court to address a number of fundamental issues which had not (and still have not) been addressed by the Applicants.

## IV.     Grounds of Opposition

27.     As set out above, the Application is opposed on three bases: (i) it seeks an order for an examination after the long-stop date, and which is thus not permitted by the Letter of Request itself, (ii) it is a fishing expedition rather than focussed on the matters relevant to the trial of the Class Action, and (iii) it is oppressive in view of the ongoing criminal and regulatory investigations.

### (1)     The Long-Stop Date

28.     It now appears that the Applicants' application to the New York Court was filed on 17 November 2017 (SFL2/23), some two months after Mr Parikh indicated that he would not voluntarily assist. The application has never been provided, and the final Letter of Request was not provided until Loble 1 was provided in accordance with the Senior Master's direction that the application be heard on notice. That Letter of Request on that application identifies the "*Special methods or procedure to be followed*" in section 13.  In particular, it provides that the examination is to be conducted "*in any event prior to January 30, 2018, unless otherwise agreed to by the parties*" (SFL1/15).

29.     Given the nature of the examination proposed in this case (which seeks to explore matters dating back more than 10 years), it is not surprising that the Letter of Request imposed a long-

stop date for any examination.   Some such limitation was no doubt necessary in view of the prejudice caused to Mr Parikh by the effluxion of time, given that the matters on which the Applicants wish to examine Mr Parikh occurred up to and over a decade ago, and that Mr Parikh has not even been employed by Goldman Sachs for almost four years. The fact that a trial date has not even been set in the Class Action suggests that the long-stop date is for the witness' protection rather than linked to some pressing procedural timetable in the US: see W Legal's letter of 1 May 2018 (SFL2/25).

30. I note that the final Letter of Request itself is dated 12 March 2018, i.e. after the long-stop date that it prescribes.  Since the Applicants have not explained the process by which the final Letter of Request was procured, it is unclear how this happened.   In the absence of such an explanation, the implication must be that there was some further delay in progressing the application before the New York Court and that the Applicants failed to raise the impact of this further delay with the New York Court on the specified long-stop date (a point to which I return below).    Be this as it may, the fact is that the terms of the Letter of Request make plain that the Request was only sanctioned on the basis of a long-stop date for the examination; that long-stop date has now expired; and there has been no attempt by the Applicants to seek to persuade the New York Court to sanction the Request on the basis for some later long-stop date.

31. My firm raised this important issue with the Applicants in correspondence on 3 and 4 May 2018 (SFL2/26-28) and (ARB1/35-36).  However, the Applicants provided no response to it, and instead issued a without notice application that same day (4 May 2018). On 8 May 2018, the Applicants merely asserted that the correspondence was "*not productive*" (ARB1/37). To date, the Applicants have still failed to explain or provide the underlying application materials that would explain the New York Court's reasons for limiting the time period for the examination to take place, or the reasons why the Applicants failed to progress the matter within that time period.  Nor have they explained why it is now said that the English Court should disregard the express qualification made by the New York Court and permit an examination that is out with the express terms of the Letter of Request.

32. In summary, it is plain that (1) the Letter of Request was issued on the express condition that any examination would be conducted before the long-stop date; (2) the long-stop date set out in the Letter of Request and prescribed by the New York Court has passed; (3) no attempt has been made to persuade the New York Court to re-issue the Request on the basis of an alternative later long-stop date (for reasons known only to the Applicants and which they have failed to disclose).   In these circumstances, Mr Parikh's position is that it would not be appropriate for this Court to override or ignore the expiry of the specified long-stop date and

order an examination which has not in fact been requested in the Letter of Request. The Application should be refused accordingly.

> (2)    *The Application seeks discovery, not trial evidence*

33.    There are a number of clear indicators that the intended examination is calculated to obtain general oral disclosure rather than focussed on evidence for trial.

34.    **First**, the Applicants have confirmed that there is no trial date set in the Class Action. This suggests that Mr Parikh's evidence is not sought in respect of settled factual issues to be determined at trial, but is instead more a general attempt by the plaintiffs at an early stage of the Class Action to undertake a wide-ranging exercise in general discovery. While such an exercise might be permitted in New York proceedings, it is a procedure unknown to English civil procedure and not a permissible basis to invoke the powers of the English Court.

35.    **Second**, there has been no meaningful attempt by the Applicants to explain how the evidence sought relates to the pleaded factual issues. In their letter of 1 May 2018, W Legal simply assert that the Class Action is founded in conspiracy and assert (without any evidence) that:

> *over the course of many years during the relevant period, Mr Parikh actively participated in such multibank chat rooms with FX traders from both settling and non-settling competing banks. In these chat rooms, [Mr Parikh] shared confidential information, discussed FX prices, and discussed coordinated trading around fixes with FX traders from other Defendants. This evidence is relevant to prove conspiracy, and our client's US Counsel intend to explore it with your client at his deposition. Approximately 20 examples of Mr Parikh's participation in these chat rooms were attached as exhibits to the application for letters of request with the New York court. In issuing the letters of request, the court presumably relied at least in part on these examples and found them relevant ... given that the US Court took some time to issue the letter of request, this is clearly not a case in which the foreign court merely "rubber-stamped" the issue of the letter of request (SFL2/24).*

36.    This explanation is entirely imprecise and inadequate. In particular:

36.1    The general allegation of conspiracy "*over the course of many years*" does nothing to explain what Mr Parikh's evidence on the particular topics would contribute to proving aspects of that conspiracy against Credit Suisse.

36.2    The fact that the New York Court "*took some time to issue the letter of request*" does not, as the Applicants suggest, say anything about the level of scrutiny it underwent, or whether it simply "*rubber-stamped*" the Letter of Request. Without any criticism of the New York Court, as mentioned above I note that notwithstanding the lapse of time between the making of the Application and the issuance of the Letter of Request,

the Court issued the Letter of Request which included a long-stop date some six weeks before the date on was it was finally issued.

36.3    Indeed, although W Legal has indicated that 20 chat room extracts were put before the New York Court to demonstrate the evidence which Mr Parikh may give, no such documents have been produced to Mr Parikh and the Letter of Request is not confined to those documents (or the issues to which they relate). Instead, what is sought possibly ranges to hundreds of thousands of pages of documentation (if not more) stretching over a period of up to seven years and involving many hundreds of counterparties to those communications.

37.    Remarkably, and despite my firm having raised various objections to the breadth of the proposed topics, Loble 1 at §§8-15 simply replicates verbatim and without any further elaboration the single-sentence justifications for each of the topics at pp11-14 of the Letter of Request (SFL1/11-14). Loble 1 was of course signed on 4 May 2018, when the Applicants envisaged that the Application would be heard without notice to Mr Parikh.

38.    **Third**, the topics themselves are far broader than could possibly be necessary in order to obtain relevant evidence for the trial of the Class Action against Credit Suisse. In many cases, their relevance is not apparent at all. Indeed, following my firm's objections the Applicants agreed to withdraw topic 1. The fact that the Applicants have conceded that there is no basis to examine Mr Parikh on one of the topics that had been approved by the New York Court is all the more reason for this Court to approach the relevance and breadth of the remaining topics with caution.

39.    Each of the topics set out in the Letter of Request is addressed in turn below.

A        Mr. Parikh's general education, background, and employment at Goldman Sachs.

40.    Whilst I accept that questions relating to the general background may be an appropriate introduction to Mr Parikh's evidence, I disagree with the assertion made at §8 of Loble 1 that "*testimony regarding Mr Parikh's background and employment at Goldman Sachs is necessary groundwork in his testimony and is relevant to establishing conspiracy because Plaintiffs allege that traders had strong social and professional ties with traders at co-conspirator banks, which created incentives and opportunities for collusion*".

41.    The category of "*general education, background and employment*" allows the usual background questions necessary to give Mr Parikh's evidence sufficient context. It does not extend to wide-ranging questioning Mr Parikh on his "*social and professional ties*" with

traders at 15 other banks, spanning his twelve years at Goldman Sachs. Nor could such information be relevant to a trial of the Class Action against Credit Suisse. The Applicants' attempt to stretch this usually uncontroversial topic to cover such breadth should inform the Court's approach to the various other topics that follow.

B    Mr. Parikh's knowledge of the foreign exchange market, including but not limited to the currencies he was responsible for trading from 2007 through 2013.

42.    This topic appears to be designed to establish Mr Parikh's expertise in a particular area. That could not be relevant to Mr Parikh's evidence in a trial against Credit Suisse, where he is a witness of fact, not an expert. The topic goes further than his general background, which is in any case sufficiently covered by topic A.

43.    My firm raised this issue with the Applicants by our letter of 27 April 2018 (SFL2/22 §2). In response, the Applicants asserted that that Mr Parikh's general knowledge about how the Forex market worked might "*establish Mr Parikh as someone greatly knowledgeable about the industry as a whole*" and that as a consequence "*a jury could reasonably conclude that this experience put him in a position to do the things alleged*" (SFL2/25). I find that explanation surprising, since Mr Parikh is not the defendant to the Class Action (or party to any proceedings at all), but simply a witness in a claim against a bank at which he never worked.

44.    As an example of the factual evidence sought under this topic, the Applicants said they would seek information about "*the specific currencies that Mr Parikh traded in*" (SFL2/25). Of course, should the Applicants require such a list, that can be easily provided, it is not controversial, and could either be sought from Goldman Sachs or from Mr Parikh directly. But it is not clear that there would be any necessary examination on the point.

45.    Further, the topic is expressly "*not limited to the currencies he was responsible for trading*". It could not be relevant to seek Mr Parikh's evidence on his knowledge of the foreign exchange market for currencies which he never even traded.

C    Mr Parikh's knowledge of communications with each co-defendant from 2007 through to 2013 regarding any of matters a-e below (but Mr Parikh shall not be required to state what documents, other than any shown to him during the deposition, are or have been in his possession, custody or power, the term documents including without limitation chat room discussions on a screen):

    (a)    imparting to or receiving from another defendant bank confidential client information;

    (b)    front running client orders;

<ol type="a" start="3">
<li>triggering of contingent FX contracts;</li>
<li>coordinating of manipulating bid-ask spreads quoted to customers; and</li>
<li>manipulating FX benchmark rates such as the WM/Reuters Fix, the CME Fix, and the ECB rate.</li>
</ol>

46.     This topic is unjustifiably broad in a number of respects:

46.1    It extends to <u>all</u> communications (and not just the use of chat rooms). As Loble 1 makes clear, it also includes other means of communication, including "*through other media for which written evidence does not exist, such as text messages and phone calls*" (Loble 1, §12).

46.2    It covers a period of up to seven years from 2007.

46.3    It is not confined to Credit Suisse, the only remaining defendant in the Class Action, but extends to each of the 16 original defendants.

46.4    It is not confined to particular chat rooms alleged to have been used in furtherance of the alleged conspiracy.

46.5    It is not confined to any particular representative of Credit Suisse (or any other co-defendant) who is actually alleged to have formed part of the conspiracy, but apparently extends to all traders whether said to be involved or not.

46.6    It is not even limited to Mr Parikh's own communications, or to communications or chat rooms in which he participated.

47.     As a result of this lack of discipline, the quantity of communications to which the topic extends is vast. As I have explained, there may have been numerous chats for each day over the course of those years representing thousands of chats for the period, each of which may have extended to hundreds of pages of communications. Mr Parikh used six screens which were connected to a Bloomberg terminal allowing various chats to be open on each screen simultaneously. He may have been in a number of chat rooms without even participating actively or even reviewing the fast-moving scrolling content.

48.     An examination should not be a memory test. Still less should it be an exercise which is impossible or unrealistic. It is unfair and oppressive to expect Mr Parikh to be examined or to prepare to be examined on a category of communications which is so ill-defined that it must extend to hundreds of thousands of different communications. This is all the more so given

that Mr Parikh has not worked at Goldman Sachs for almost four years, and so has none of the access to Goldman Sachs documentation that he would have if he were still an employee.

49.     The failure to define the communications on which examination is sought also makes it impossible for Mr Parikh to take advice and decide whether to assert privilege against self-incrimination in advance of his examination.   Nor could he realistically do so during a live examination.  Mr Parikh would need to take US legal advice in respect of each question and any new document which may be put to him.  The practical difficulties in such a course are self-evident and would be insuperable. Such a course would also prejudice the effective exercise of his due process rights since it would require numerous instant judgments under time pressure.

50.     The only justification for this topic in Loble 1 is that it "*is relevant to prove conspiracy*" (§10). That extraordinarily vague assertion takes the Applicants no further towards identifying the particular factual allegations relied upon to support that allegation against Credit Suisse and how Mr Parikh's evidence will be relevant to those allegations.

D.      <u>Mr Parikh's knowledge regarding the use of chat rooms to trade foreign exchange and/or communicate with other competing banks (but Mr Parikh shall not be required to state what documents, other than any shown to him during the deposition, are or have been in his possession, custody or power, the term documents including without limitation chat room discussions on a screen).</u>

51.     This topic is completely open-ended and would allow questions relating to the use of chat rooms generally. In particular, and in addition to the matters set out above in relation to topics B and C:

51.1    It is not limited to chat rooms with employees of the last remaining defendant to the Class Action, Credit Suisse. Indeed, it is not even limited to the banks that were originally co-defendants to the Class Action, but rather extends to all "*other competing banks*".

51.2    It is not limited by reference to any particular activities, as is the case with the subparagraphs in topic C.

51.3    In practical terms, the topic appears entirely to swallow topic C, by allowing any questions about chat rooms that fall outside those enumerated topics, or relate to 'competing banks' that were not 'co-defendants'; thereby rendering each of those limitations in topic C meaningless.

52.     Loble 1 indicates that this topic is required in order to explain the use by traders of "*unique jargon that is difficult to interpret*" (§12).  If that is the true purpose of this topic, then it should be circumscribed accordingly and any questions thereunder should be limited to 'jargon' used in Mr Parikh's communications which can be identified as relevant to the trial of the Class Action and which cannot be understood without explanation.  As it stands, it is a great deal broader than that.

E       Mr Parikh's knowledge regarding documents shown to him during the deposition, including (i) chat room discussions in 2007-2013 which he participated in or observed concerning matters set out in C(a)-(e) above, ethics of such discussions or behaviour or possible regulator's interest in such discussions or behaviour with employees of Defendant banks; and (ii) communications in 2007-2013 within Goldman Sachs to which he was party concerning matters set out at (i).

53.     Each of the objections I have set out in respect of topic C and D apply with equal force to topic E. Although topic E (unlike topics C and D) is limited to documents shown to Mr Parikh in the deposition, it is still extremely broad:

        53.1    It is difficult to see the relevance of Mr Parikh's own view on the "*ethics of such discussions or behaviour*" in the chat rooms, including the discussions or behaviour of other traders in chat rooms he was observing.

        53.2    Likewise, Mr Parikh's view of "*possible regulators' interest in such discussions or behaviour*" is of no relevance to the Class Action. It would serve no purpose to invite him to speculate about such a "*possible interest*".

        53.3    As with topics C and D, the chat room discussions are not confined to discussions with Credit Suisse, or even the co-defendant Banks, or to any particular employee. Rather, it covers all chat room discussions over a seven-year period which, as explained above, would be very substantial.

        53.4    Further, item (ii) relates to internal Goldman Sachs communications, to which employees of Credit Suisse were by definition not party. Such communications could not be relevant to establishing a claim in conspiracy against Credit Suisse.

54.     Loble 1 does not explain the need for this breadth of inquiry at all.

> <u>Proviso to C–E: Documents are not to be shown to Mr. Parikh during the deposition unless either (a) provided to him or his counsel, with copies to counsel for all parties intending to attend the deposition, 14 days before his deposition, or (b) with the permission of the Examiner on application to him by the party wishing to show the documents.</u>

55.   As set out above, topics C to E are broad, overlapping topics that concern various aspects of communications and chat rooms. Such limiting factors as there are under each of these topics are undermined by the breadth of the other two.

56.   A proviso appearing in a separate paragraph below topic E then provides that documents may not be shown to Mr Parikh unless provided in advance or with the permission of the Examiner. This limits the questions that might be asked under Topic E (Mr Parikh's knowledge regarding documents shown to him); and the extent to which he may be asked whether documents were in his possession, custody or power under topics C and D.

57.   However, this proviso does not adequately mitigate the breadth of any of those topics:

57.1   It does not prevent the Applicants from asking questions about communications with each co-defendant (under topic C) or the use of chat rooms (under topic D) without providing those documents in advance or showing them to Mr Parikh in the deposition. Rather, it only prevents the Applicants from asking whether such documents were under Mr Parikh's control.

57.2   It also leaves open the possibility that the Applicants could at the unfettered discretion of the Examiner rely on new documents produced on the day of the examination.

57.3   The number of documents that might be provided under the proviso is not limited to a particular number, or to those on which questions will actually be asked, or limited in any way at all. It would permit the Applicants to provide Mr Parikh with a vast number of lengthy documents, leaving him to guess which of them will be the subject of questioning.

57.4   In any event, 14 days is plainly an insufficient amount of time for Mr Parikh to prepare and seek advice from several sets of professional advisers (in view of the multiple ongoing regulatory and criminal investigations).

58.   If Mr Parikh were to give evidence at trial in this jurisdiction, he would have the benefit of advance access to a trial bundle containing an expressly limited number of documents. He should have at least that degree of protection in any examination directed under the 1975 Act. If, despite all of the objections set out above, the Applicants are permitted to proceed with

topics in the nature of C–E (narrowed to address the concerns set out above) then at the very least, the Applicants should be required to identify and provide a strictly limited number of documents well in advance, together with a list of the particular questions to be asked. It must be possible for them to do so, since they have indicated in correspondence that 20 such documents were placed before the New York Court (SFL2/24).

F       Mr Parikh's knowledge of, training in, and compliance with Goldman Sach's corporate policies regarding (a) communications with other banks engaging in foreign exchange trading and (b) anti-trust and competition.

59.     As explained above, the process of an examination should not be a memory test.  Mr Parikh has not worked at Goldman Sachs for nearly four years and it is unlikely that he would be able to remember the particulars of the bank's various compliance policies. Any questions regarding what policies and procedures were in place at Goldman Sachs is clearly a question that should be directed towards the bank itself.

60.     Similarly, in terms of Mr Parikh's own participation in training, Goldman Sachs would be far better placed to access its records and indicate what training was conducted and when.  Mr Parikh will not be able to comment with any degree of specificity about his state of knowledge regarding unspecified policies and procedures dating back 12 years.

61.     It is also difficult to see how this topic is relevant to a claim in conspiracy against Credit Suisse.  Mr Loble suggests that this topic is relevant either to show that "*the Defendants lacked compliance measures to prevent the conspiracy*", or that they "*knew of violations of compliance policies and failed to prevent them*" (Loble 1 §13). It is impossible to see how the sufficiency or otherwise of Goldman Sachs' policies, whether they were breached, and whether Goldman Sachs knew of any such breaches, could be relevant to a claim against Credit Suisse.

62.     If Mr Parikh is to be asked about specific policies, those should be provided to him in advance, together with the questions that are to be asked in respect of the same.

G       Mr Parikh's performances reviews and communications with Goldman Sach's compliance department regarding his potential or alleged non-compliance with corporate policies from 2007 through 2013.

63.     In the same way as Mr Parikh is poorly placed to comment on what training he received over a decade ago, any documentation relating to performance reviews and any compliance issues would not be held by Mr Parikh but would be within the control of Goldman Sachs.

64. Similarly, it is difficult to see how Mr Parikh's own performance reviews or compliance could be relevant to a class action against a bank for which he never worked.  Mr Loble provides no separate justification for this topic in his witness statement: see Loble 1 §13.

65. To the extent to which the Applicants have obtained any information or documentation in relation to the same, they should be compelled to provided that information together with the specific questions which they wish to address to Mr Parikh.

H Mr Parikh's knowledge of either his own or Goldman Sach's profits and losses in foreign exchange from 2007 to 2013.

66. This topic betrays the sweeping and unfocussed nature of the Applicants' request.  Mr Loble suggests that this line of inquiry is relevant to "*show a motive to conspire and injury to Plaintiffs*" (Loble 1, §14). It is entirely unclear how Goldman Sachs's profit or loss figures could show a motive on the part of Credit Suisse to injure third parties.  Indeed it is not even clear whose motive that profit and loss is said to reveal. We do not understand the Applicants to suggest that Mr Parikh — who is not a party to the Class Action — personally had a motive to injure (or did injure) the plaintiffs. And in any case it is clear that Mr Parikh could not speak to anything relevant to the motives of Credit Suisse.

67. In any event, it is unrealistic to suggest that Mr Parikh would be in a position to comment on a global financial institution's profit and loss over a 7-year period — an institution for which he was merely an employee — and a relatively junior one for at least some of the period. Nor can Mr Parikh be expected to recall details of his own daily profit and loss figures, which would relate to hundreds if not thousands of trades a day: let alone the performance of the entire G10 Forex trading desk in London, or its global operations across all currencies.

I Mr Parikh's knowledge of any algorithms used by Goldman Sachs or its competitors for effects trading from 2007 to 2013.

68. I understand that the Applicants have accepted that Mr Parikh had no responsibility for algorithmic trading at Goldman Sachs (or any other institution at the time) and have now belatedly accepted that that this topic is unsuitable for an examination.

69. The fact that it was included in the first place indicates the lack of focus on the issues on which Mr Parikh as an individual could give evidence relevant to the matters in dispute in the trial of the Class Action.

J      <u>Mr Parikh's knowledge of any investigations, guilty pleas, and/or regulatory finds regarding Goldman Sach's participation in the foreign exchange market from 2007 through 2013.</u>

70.      Similarly, it is unrealistic to suggest that Mr Parikh could provide relevant evidence in relation to sanctions faced by Goldman Sachs over a seven-year period — especially when he was neither working in a compliance role nor had any responsibility for regulatory investigations. Mr Parikh would be no better placed to give such evidence than anyone else with an interest in the Forex market who had undertaken a search of publically available sources. Like topic I, which has been withdrawn, this topic illustrates the lack of specificity or focus on trial evidence in the application.

71.      Mr Loble simply suggests that Mr Parikh's testimony on this issue "*is relevant to establish liability at trial*" (Loble 1, §15). It is difficult to imagine a justification couched in more general terms than that. Moreover, it is not understood how such evidence could be relevant in circumstances where Goldman Sachs is not even facing trial.

72.      For the reasons set out above, the various topics are (i) irrelevant, (ii) not within the knowledge of Mr Parikh, and/or (iii) oppressively broad. Their selection shows that no serious thought has been given to the evidence that Mr Parikh could give (if any) that would be relevant to the trial of the Class Action against Credit Suisse. Taken together the topics and their purported justification reveal that the exercise is in fact one of roaming discovery rather than a considered and proportionate measure to elicit relevant evidence for the trial of the Class Action.

*(iii)*      *The examination would be oppressive*

73.      As explained above, a number of regulatory and criminal investigations into Forex trading are ongoing in the US and elsewhere. In all of the circumstances, it would be oppressive to require Mr Parikh to undergo an examination on the wide-ranging topics set out above. That is all the more so for the fact that it is unclear how most of them could be relevant to the Class Action at all.

74.      My concerns in this regard are heightened by the Applicants' letter on 1 May 2018 (SFL2/23-25), where they suggested that Mr Parikh's general knowledge about how the Forex market was to be elicited in order to establish facts from which that "*a jury could reasonably conclude that this experience put him in a position to do the things alleged*" (SFL2/25). This suggestion seems to be premised on the fact that Mr Parikh is a *target* of the litigation rather than a mere witness. W Legal's letter of 3 May 2018 (SFL2/29-31) adopts a similar line against Mr Parikh, referencing the Consent Order and suggesting that Mr Parikh's conduct

was "*egregious*" (SFL2/31) and that the Applicants have the documents to prove it, having put some of those documents before the New York Court.

75. It is apparent from the broad nature of the topics of the in the Letter of Request that the effect (if not the intention) of the examination would be to elicit information from Mr Parikh on matters that are immaterial to the Class Action against Credit Suisse but relevant to the ongoing regulatory and criminal investigations. Moreover, the breadth of the topics is such that he cannot properly consider whether to exercise his Fifth Amendment rights in respect of all or some of the questions (which, as explained in the Letter of Request at section 16, carries the risk of adverse inferences later being drawn against him in civil proceedings). Without waiving privilege in any advice received, I also understand from my New York partner, Stephen Obie, that there is a risk that various US regulators may take into account an applicant's exercise of their Fifth Amendment rights in civil proceedings when considering licensing applications and Mr Parikh, who is on gardening leave, is considering a number of financial services roles, some of which could mean that he would be working in the United States with regulatory approvals required for the functions which he would be undertaking. In all of these circumstances, it would be oppressive to allow the examination to proceed.

**F      Conclusion**

76. For these reasons I respectfully request the Court not to permit the examination, since it would occur after the long-stop date in the Letter of Request, is a fishing expedition on overly broad and/or irrelevant topics, and would be oppressive in light of the ongoing regulatory and criminal investigations. The fact that there has been no attempt to set out specific questions, confined topics or particular documentation (even though only 20 documents are said to have been put before the New York Court) indicates that this application is calculated to achieve general discovery by oral deposition rather than a genuine attempt at obtaining trial evidence from a witness of fact.

77. If, despite these matters, the Court is minded to grant some form of examination, I would respectfully suggest that:

77.1   The scope of the topics should be narrowed substantially to meet the concerns raised in relation to each of them above.

77.2   Mr Parikh should be provided with a focussed list of questions and very limited number of documents to which his examination will be confined (such as the approximately 20 chats that were provided to the New York Court in support of the application for the Letter of Request) sufficiently in advance for him to familiarise

himself with the relevant matters and seek advice from English and US counsel. Adequate time (having regard to the quantity of documents to be disclosed) should be allowed to seek advice from a number of professional advisers, given that there are potential criminal and regulatory issues relating to the same facts or matters.

77.3    Any examination should adopt English style examination in chief.  In my firm's initial letter of 27 April 2018 (SFL2/20-22), the Applicants were asked to confirm how they intended to treat the witness given that there is a reference in the draft order to cross examination (paragraph 6(d)), which would ordinarily not be permitted in England if trial evidence were being provided by a party's witness.  No explanation has yet been received.

77.4    To avoid any need for the Applicants to have any questions directed through English counsel rather than their chosen US lawyers, the relevant Examiner safeguarding the procedure should have sufficient experience to handle such an examination involving a very significant number of legal representatives.  I note that Mr Laurence Emmett is suggested by the Applicants as the relevant Examiner. Despite inquiries made by my firm to the Applicants in correspondence (ARB1/38-40), we have not to date been provided with any evidence of Mr Emmett's experience in relation to such examinations or even confirmation that he is willing to act.

**Statement of Truth**

I believe that the facts stated in this Witness Statement are true.

Signature       ..................................................................

**Adam Brown**

Dated       ..........13 June 2018..........................................

First Witness Statement of Adam Richard Brown
Filed on behalf of the Respondent
Dated 13 June 2018
Exhibit "ARB1"

Claim No. CR-2018-409

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION

IN THE MATTER OF THE EVIDENCE
(PROCEEDINGS IN OTHER
JURISDICTIONS) ACT 1975

AND IN THE MATTER OF THE
HAGUE CONVENTION OF 18TH
MARCH 1970 ON THE TAKING OF
EVIDENCE ABROAD IN CIVIL OR
COMMERCIAL MATTERS

AND IN THE MATTER OF A CIVIL
PROCEEDING NOW PENDING
BEFORE THE UNITED STATES
DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK

IN RE FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST
LITIGATION (No: 1:13-cv-07789-LGS)

---

**FIRST WITNESS STATEMENT OF
ADAM RICHARD BROWN**

---

First Witness Statement of Adam Richard
Brown
Filed on behalf of the Respondent
Dated 13 June 2018
Exhibit ARB1

Claim No. CR-2018-409

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**IN THE MATTER OF THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS) ACT 1975**

**AND IN THE MATTER OF THE HAGUE CONVENTION OF 18TH MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

**AND IN THE MATTER OF A CIVIL PROCEEDING NOW PENDING BEFORE THE UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

**IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION (No: 1:13-cv-07789-LGS)**

---

**EXHIBIT "ARB1"**

---

We use cookies to make this website work better. If you continue to use this website you are agreeing to their use. Find out more in our privacy policy.

Continue



# Statement on foreign exchange market investigation

Statements | Published: 16/10/2013 | Last updated: 16/10/2013

We can confirm that we are conducting investigations alongside several other agencies into a number of firms relating to trading on the foreign exchange (forex) market.

As part of this we are gathering information from a wide range of sources including market participants. Our investigations are at an early stage and it will be some time before we conclude whether there has been any misconduct which will lead to enforcement action.

We will not comment further on our investigations.

# Press Release

May 01, 2018

## Federal Reserve Board fines Goldman Sachs Group, Inc., $54.75 million for unsafe and unsound practices in firm's foreign exchange (FX) trading business

For release at 12:00 p.m. EDT

Share ➤

The Federal Reserve Board on Tuesday announced that it has fined The Goldman Sachs Group, Inc., $54.75 million for the firm's unsafe and unsound practices in its foreign exchange (FX) trading business.

The Board levied the fine for deficiencies in Goldman's internal controls and oversight of traders who buy and sell U.S. dollars and foreign currencies for the firm's own accounts and for customers. The firm failed to detect and address its traders' use of electronic chatrooms to communicate with competitors about trading positions, including around benchmark fixes, and failed to detect and address the disclosure of confidential client information. The Board's order requires Goldman to improve its controls and compliance risk management for the firm's FX trading.

The Board coordinated its enforcement action with the New York State Department of Financial Services.

For media inquiries, call 202-452-2955

 Attachment (PDF)

Last Update: May 01, 2018

For news, speeches or statements published before April 2012, please see our archived sites.

# SFO closes Forex investigation

15 March, 2016 | Statements

The Director of the Serious Fraud Office has today closed the SFO's investigation into allegations of fraudulent conduct in the foreign exchange market (Forex). This decision follows a thorough and independent investigation lasting over one and a half years and involving in excess of half a million  documents.

The SFO has concluded, based on the information and material we have obtained, that there is insufficient evidence for a realistic prospect of conviction. Whilst there were reasonable grounds to suspect the commission of offences involving serious or complex fraud, a detailed review of the available evidence led us to the conclusion that the alleged conduct, even if proven and taken at its highest, would not meet the evidential test required to mount a prosecution for an offence contrary to English law. It has further been concluded that this evidential position could not be remedied by continuing the   investigation.

**Notes:**

1. The investigation commenced in July 2014 following the referral of material to the SFO by the Financial Conduct Authority  (FCA).

2. The SFO continues to liaise with the US Department of Justice (DoJ) over their ongoing investigation. The SFO is grateful for the engagement of partner agencies both domestically and overseas in progressing our investigation – they include the UK's FCA, the Competition and Markets Authority and the City of London Police, as well as the DoJ and Australian Securities and Investments  Commission.

# Related Cases

Forex

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                  Monday, July 17, 2017

## Three Former Traders for Major Banks Arraigned in Foreign Currency Exchange Antitrust Conspiracy

Three United Kingdom nationals and former traders of major banks voluntarily surrendered to the FBI and were arraigned on a charge arising from their alleged roles in a conspiracy to manipulate the price of U.S. dollars and euros exchanged in the foreign currency exchange (FX) spot market, the Justice Department announced today.

A one-count indictment, filed in the U.S. District Court for the Southern District of New York on January 10, 2017, charges Richard Usher (former Head of G11 FX Trading-UK at an affiliate of The Royal Bank of Scotland plc, as well as former Managing Director at an affiliate of JPMorgan Chase & Co.), Rohan Ramchandani (former Managing Director and head of G10 FX spot trading at an affiliate of Citicorp) and Christopher Ashton (former Head of Spot FX at an affiliate of Barclays PLC) with conspiring to fix prices and rig bids for U.S. dollars and euros exchanged in the FX spot market.

The charge in the indictment carries a maximum penalty of 10 years in prison and a $1 million fine. The maximum fine may be increased to twice the gain derived from the crime or twice the loss suffered by victims if either amount is greater than $1 million.

According to the indictment, from at least December 2007 through at least January 2013, Usher, Ramchandani and Ashton (along with unnamed co-conspirators) conspired to fix prices and rig bids for the euro – U.S. dollar currency pair. Called "the Cartel" or "the Mafia," this group of traders carried out their conspiracy by participating in telephone calls and near-daily conversations in a private electronic chat room. Their anticompetitive behavior included colluding around the time of certain benchmark rates known as fixes, such as by coordinating their bidding/offering and trading to manipulate the price of the currency pair by the time of the fix or otherwise profit as a result of the fix price. The conspirators also coordinated their trading activities outside of fix times, such as by refraining from entering bids/offers or trading at certain times as a means of stabilizing or controlling price.

The charge in the indictment is merely an allegation, and the defendants are presumed innocent unless and until proven guilty.

This prosecution is being handled by the Antitrust Division's New York Office and the FBI's Washington Field Office. Anyone with information concerning price fixing or other anticompetitive conduct in the FX market should contact the Antitrust Division's Citizen Complaint Center at (888) 647-3258, visit https://www.justice.gov/atr/report-violations or call the FBI tip line at (415) 553-7400.

**Topic(s):**
Antitrust

**Component(s):**

Case 1:13-cv-07789-LGS Document 1075 Filed 06/14/18 Page 32 of 67

Antitrust Division
USAO - New York, Southern

**Press Release Number:**
17-787

*Updated July 17, 2017*

**Travers,  Daniel J.**

| | |
|---|---|
| **From:** | Adam Brown |
| **Sent:** | 03 October201715:18 |
| **To:** | Berezney, Steve |
| **Cc:** | Daniel  Travers;  'tmoloney@cgsh.com' (tmoloney@cgsh.com) |
| **Subject:** | RE: Mitesh Parikh deposition: In re Foreign Exchange Benchmarks Antitrust Litigation, No. 13-7789 (S.D.N.Y.) |

Steve

You have my address for correspondence and should provide due notice of any Hague convention application which your clients may ultimately decide to issue but, so there is no misunderstanding, I am not suggesting (and nothing should be taken as implying) that I am instructed to accept service of any such request or any other document.

I appreciate that this approach and my failure to respond to your query must appear rather unhelpful but I have explained that my client does not wish to help your clients with their case. That is why I saw no real need for further discussion and that view stands I am afraid.

Regards

Adam


Adam Brown
Partner
JONES DAY® - One  Firm  WorldwidesM
21 Tudor Street
London, EC4Y ODJ
Office: +44.(0)20. 7039.5959
Direct:  +44.(0)20. 7039.5292
Fax: +44.(0)20.7039.5999

Jones Day is a partnership authorised and regulated by the Solicitors' Regulation Authority (number 223597). A list of the partners and their professional qualifications is open to inspection at the above address. The partners are all lawyers who are also partners in the international law firm of Jones Day.


"Berezney, Steve" ---27/09/2017 18:00:33---Adam, Can I take that to mean your client resides in the UK? That matters because I need to know wh

From: "Berezney, Steve" <SBerezney@KoreinTillery.com>
To: 'Adam Brown' <abrown@JonesDay.com>
Cc: Daniel Travers <dtravers@JonesDay.com>, "'tmoloney@cgsh.com' (tmoloney@cgsh.com)" <tmoloney@cgsh.com>
Date: 27/09/2017 18:00
Subject: RE: Mitesh Parikh deposition: In re Foreign Exchange Benchmarks Antitrust Litigation, No. 13-7789  (S.D.N.Y.)


Adam,

Can I take that to mean your client resides in the UK? That matters because I need to know whether to issue a subpoena from an American court or whether I need to go through the Hague. If the latter, I also need to know which country's Hague procedures to use.

Steve

6

**From:** Adam Brown [mailto:abrown@JonesDay.com]
**Sent:** Wednesday, September 27, 2017 11:48 AM
**To:** Berezney, Steve
**Cc:** Daniel Travers; 'tmoloney@cgsh.com' (tmoloney@cgsh.com)
**Subject:** RE: Mitesh Parikh deposition: In re Foreign Exchange Benchmarks Antitrust Litigation, No. 13-7789 (S.D.N.Y.)

*Steve*

You have my address at the foot of this email as Mr Parikh's solicitor in this matter.

Regards

Adam

Adam Brown
Partner
**JONES DAY® - One Firm WorldwidesM**
21 Tudor Street
London, EC4Y ODJ
Office: +44.(0)20.7039.5959
Direct: +44.(0)20.7039.5292
Fax: +44.(0)20.7039.5999

Jones Day is a partnership authorised and regulated by the Solicitors' Regulation Authority (number 223597). A list of the partners and their professional qualifications is open to inspection at the above address. The partners are all lawyers who are also partners in the international law firm of Jones Day.

| | |
|---|---|
| From: | "Berezney, Steve" <SBerezney@KoreinTillery.com> |
| To: | 'Adam Brown' <abrown@JonesDay.com> |
| Cc: | Daniel Travers <dtravers@JonesDay.com>, "'tmoloney@cgsh.com' (tmoloney@cgsh.com)" <tmoloney@cgsh.com> |
| Date: | 27/09/2017 17:21 |
| Subject: | RE: Mitesh Parikh deposition: In re Foreign Exchange Benchmarks Antitrust Litigation, No. 13-7789 (S.D.N.Y.) |

---

Adam,

Thanks for the response, but not all further discussion is obviated. Would you please provide me with his current address so that we can serve appropriate process?

Steve

**From:** Adam Brown [mailto:abrown@JonesDay.com]
**Sent:** Wednesday, September 27, 2017 11:09 AM
**To:** Berezney, Steve
**Cc:** Daniel Travers; 'tmoloney@cgsh.com' (tmoloney@cgsh.com)
**Subject:** RE: Mitesh Parikh deposition: In re Foreign Exchange Benchmarks Antitrust Litigation, No. 13-7789 (S.D.N.Y.)

Dear Steve

Mr Parikh is not prepared to assist voluntarily with your request which obviates the need for any further discussion.

Regards

Adam

Adam Brown
Partner
JONES DAY® - One Firm Worldwides"
21 Tudor Street
London, EC4Y ODJ
Office: +44.(0)20.7039.5959
Direct:  +44.(0)20. 7039.5292
Fax: +44.(0)20.7039.5999

Jones Day is a partnership authorised and regulated by the Solicitors' Regulation Authority (number 223597). A list of the partners and their professional qualifications is open to inspection at the above address. The partners are all lawyers who are also partners in the international law firm of Jones Day.

| | |
|---|---|
| From: | "Berezney, Steve" <SBerezney@KoreinTiIlery.com> |
| To: | 'Adam Brown' <abrown@JonesDay.com>, "'pjromatowski@jonesday.com'" <pjromatowski@jonesday.com> |
| Cc: | "'tmoloney@cgsh.com' (tmoloney@cgsh.com)" <tmoloney@cgsh.com>, "Daniel Travers" <dtravers@JonesDay.com> |
| Date: | 25/09/2017 18;11 |
| Subject: | RE: Mitesh Parikh deposition: In re Foreign Exchange Benchmarks Antitrust Litigation, No. 13-7789 (S.D.N.Y.) |

Adam,

Just following up on the email below and wondering if you have an update. Thanks.

Steve

**From:** Adam Brown [mailto:abrown@JonesDay.com]
**Sent:** Wednesday, September 13, 2017 2:13 PM
**To:** Berezney, Steve <SBerezney@KoreinTillery.com>; 'pjromatowski@jonesday.com' <pjromatowski@jonesday.com>
**Cc:** 'tmoloney@cgsh.com' (tmoloney@cgsh.com) <tmoloney@cgsh.com>; Daniel Travers <dtravers@JonesDay.com>
**Subject:** RE: Mitesh Parikh deposition: In re Foreign Exchange Benchmarks Antitrust Litigation, No. 13-7789 (S.D.N.Y.)

Steve

Just emailing to acknowledge your message. We will aim to come back to you on it next week.

Regards

Adam

Adam Brown
Partner
JONES DAY® - One Firm WorldwideSM
21 Tudor Street

London, EC4Y ODJ
Office: +44.(0)20.7039.5959
Direct: +44.(0)20.7039.5292
Fax: +44.(0)20.7039.5999

Jones Day is a partnership authorised and regulated by the Solicitors' Regulation Authority (number 223597). A list of the partners and their professional qualifications is open to inspection at the above address. The partners are all lawyers who are also partners in the international law firm of Jones Day.

This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.

----- Message from "Berezney, Steve" <SBerezney@KoreinTillery.com> on Tue, 12 Sep 2017 21:59:53 GMT-----

| From: | "Berezney, Steve" <SBerezney@KoreinTillery.com> |
| To: | "abrown@jonesday.com",  "pjromatowski@jonesday.com" |
| cc: | "tmoloney@cgsh.com"    (tmoloney@cgsh.com)" |
| Subject: | Mitesh Parikh deposition: In re Foreign Exchange Benchmarks Antitrust Litigation, No. 13-7789   (S.D.N.Y.) |

Mr. Brown &  Mr. Romatowski:

We represent Class Plaintiffs in In re Foreign Exchange Benchmarks Antitrust Litigation, No. 13-7789 (S.D.N.Y.).  As part of discovery in  the action, we will be deposing FX   traders.

We intend to depose Mitesh Parikh, a former Goldman Sachs employee. We were told by Goldman Sachs's counsel that you represent him.  Is that true?

If you do represent him, we would like to speak to you regarding your client's availability for deposition. Some topics to discuss are whether your client would voluntarily appear for a deposition, whether we need to serve appropriate process, the location of the deposition, and potential dates.

Please advise when you will be available to discuss these issues with me.

Sincerely,

Steve Berezney

Steven M. Berezney
**Korein Tillery, LLC**
505  North 7th Street, Suite 3600
St. Louis, MO 63101
Office:  314-241-4844
Direct:  314-450-4063

This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.

Steven M. Berezney
**Korein Tillery, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Office: 314-241-4844
Direct: 314-450-4063

This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.

This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.

Steven M. Berezney
**Korein Tillery, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Office: 314-241-4844
Direct: 314-450-4063

This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.

This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.

Steven M. Berezney
**Korein Tillery, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Office: 314-241-4844
Direct: 314-450-4063

This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.

**Travers, Daniel J.**

| | |
|---|---|
| **From:** | Brown, Adam R. |
| **Sent:** | 20 April 2018 10:42 |
| **To:** | Steven Loble |
| **Cc:** | Travers, Daniel J.; Obie, Stephen J. |
| **Subject:** | RE: Mitesh Parikh |

Dear Steven

Could you kindly clarify who it is that you are instructed by - is it on behalf of all plaintiffs' lawyers or only a particular firm?

We had separately corresponded with one firm in the US and asked that, whilst we are not authorised to accept service, we be provided with a copy of any application that has been issued or request granted in the US. We would be grateful to receive that. It would seem slightly precipitate to ask for Mr Parikh's availability without providing a copy of what it is that is being sought. Whilst we expect notice of any application, please ensure that this request is brought to the attention of the Court if you choose to proceed without    notice.

Regards

Adam


Adam Brown
Partner
JONES DAY® - One Firm WorldwidesM
21 Tudor Street
London, EC4Y ODJ
Office:  +44.(0)20. 7039.5959
Direct:  +44.(0)20. 7039.5292
Fax: +44.(0)20.7039.5999

Jones Day is a partnership authorised and regulated by the Solicitors Regulation Authority (number 223597). A list of the partners and their professional qualifications is open to inspection at the above address. The partners are all lawyers who are also partners in the international law firm of Jones   Day.


**From:** Steven Loble <steven.loble@wlegal.co.uk>
**Sent:** 16 April 2018 10:54
**To:** Brown, Adam R.<abrown@JonesDay.com>
**Subject:** Mitesh Parikh

Dear Adam

I have been instructed by the Plaintiffs' lawyers in the US FX litigation to obtain orders for the examination of a number of witnesses in England.

One of the proposed witnesses is Mitesh Parikh, for whom I understand you act.

Please could you provide dates during May and June when it would be convenient for Mr Parikh to give evidence.

Regards

Steven

11

Steven Loble
Litigation Director

W Legal Limited
www.wlegal.co.uk
Office: +44 (O) 207 220 9130
Fax: +44 (0) 20 7112 4833
Regulated by the Solicitors Regulation Authority
Registered Address: 47 Red Lion Street, London, WCIR 4PF
Registered Company Number: 06649868



12

**Travers, Daniel J.**

| | |
|---|---|
| **From:** | Steven Loble <steven.loble@wlegal.co.uk> |
| **Sent:** | 23 April 2018 14:40 |
| **To:** | Brown, Adam R. |
| **Cc:** | Travers, Daniel J.; Obie, Stephen J. |
| **Subject:** | RE: Mitesh Parikh |
| **Attachments:** | Hague Attachment 5 - List of Topic Questions Mitesh Parikh.docx; Hague Conv Request for Assistance (Parikh-Goldman Sachs) 10-13-17.docx |

Adam

I was instructed to contact you by Steve Berezney of Korein Tillery, the person you spoke with initially about this. He will likely take the deposition and is copied here. He is one of many Class Counsel, and I am serving as Class Counsel's local counsel for the various London depositions we are taking of relevant witnesses.

Attached are the letters rogatory issued by the federal court in New York regarding this deposition and our application for the same. I will file our application with the U.K. court next week. We'd prefer that your client appear voluntarily so that we wouldn't have to involve the U.K. court, but will do so if you require it. We'd also prefer to select a deposition date with you instead of unilaterally picking a date ourselves. We are in the process of attempting to setup a different deposition in London for the same case somewhere around June 5-8 or 11-14. Does your client have availability in this time frame? If not those dates, please provide some dates that your client would be available. The deposition will likely take all day unless your client plans to invoke a privilege against self-incrimination, in which case it would probably take about two hours. Thank you.

Steven


Steven Loble
Litigation Director

W Legal Limited
www.wlegal.co.uk
Office: +44 (0) 207 220 9130
Fax: +44 (O) 20 7112 4833
Regulated by the Solicitors Regulation Authority
Registered Address: 47 Red Lion Street, London, WC1R 4PF
Registered Company Number: 06649868



From: Brown, Adam R.<abrown@JonesDay.com>
Sent: 20 April 2018 10:42
To: Steven Loble <steven.loble@wlegal.co.uk>
Cc: Travers, Daniel J.<dtravers@JonesDay.com>; Obie, Stephen J.<sobie@jonesday.com>
Subject: RE: Mitesh Parikh

Dear Steven

13

Could you kindly clarify who it is that you are instructed by- is it on behalf of all plaintiffs' lawyers or only a particular firm?

We had separately corresponded with one firm in the US and asked that, whilst we are not authorised to accept service, we be provided with a copy of any application that has been issued or request granted in the US. We would be grateful to receive that. It would seem slightly precipitate to ask for Mr Parikh's availability without providing a copy of what it is that is being sought. Whilst we expect notice of any application, please ensure that this request is brought to the attention of the Court if you choose to    proceed without notice.

Regards

Adam


Adam Brown
Partner
**JONES DAY® - One Firm Worldwides"**
21 Tudor Street
London, EC4Y ODJ
Office: +44.(0)20.7039.5959
Direct:  +44.(0)20. 7039.5292
Fax:  +44.(0)20. 7039.5999

Jones Day is a partnership authorised and regulated by the Solicitors Regulation Authority (number 223597). A list of the partners and their professional qualifications is open to inspection at the above address. The partners are all lawyers who are also partners in the international law firm of Jones  Day.



From: Steven Loble <steven.loble@wlegal.co.uk>
Sent: 16 April 2018 10:54
To: Brown, Adam R.<abrown@JonesDay.com>
Subject: Mitesh Parikh

Dear Adam

I have been instructed by the Plaintiffs' lawyers in the US FX litigation to obtain orders for the examination of a number of witnesses in England.

One of the proposed witnesses is Mitesh Parikh, for whom I understand you act.

Please could you provide dates during May and June when it would be convenient for Mr Parikh to give evidence.

Regards

Steven

Steven Loble
Litigation Director

W Legal Limited
www.wlegal.co.uk
Office: +44 (0) 207 220 9130
Fax: +44 (O) 20 7112 4833
Regulated by the Solicitors Regulation Authority
Registered Address: 47 Red Lion Street, London, WCIR 4PF
Registered Company Number:06649868

14



L E C: /\ L

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

15

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FOREIGN EXCHANGE BENCHMARK
RATES ANTITRUST LITIGATION

No. 1:13-cv-07789-LGS

**REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE**
**HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE**
**ABROAD IN CIVIL OR COMMERCIAL MATTERS**

The United States District Court for the Southern District of New York ("the Southern District") presents its compliments to the appropriate judicial authority of England for assistance in obtaining evidence to be used at trial in the above-captioned civil proceeding before this Court. This request is made pursuant to Chapter I of the Hague Convention of 18 March 1970 on the Taking of Evidence in Civil or Commercial Matters (the "Hague Convention"). The Southern District is a court of law and equity and has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 15 U.S.C. §§15(a) and 26.

The Southern District has determined that it would further the interests of justice and that justice cannot be completely done between the parties without the testimony, under oath, of Mitesh Parikh ("Mr. Parikh"), residing within your jurisdiction. The action involves claims of a conspiracy to violate the antitrust laws of the United States. Mr. Parikh is a former employee of at least one of the Defendants to this action, Goldman Sachs. He was a Foreign Exchange ("FX") trader and Managing Director of G10 Spot and Forward Trading at Defendant Goldman Sachs. He has lmowledge relevant to this action as described more fully herein.

16

The testimony of Mr. Parikh is not available from any source within the jurisdiction of the Southern District, and cannot be obtained by any means other than pursuant to an order of appropriate judicial authority of the United Kingdom, compelling the witness to appear for examination. Mr. Parikh, a non-party to this action, resides at 62 Aldenham Avenue, Radlett, WD7 8HY, United Kingdom.

This request is made with the understanding that, and on the basis that any order made pursuant to this request: (1) will not require Mr. Parikh to commit any offense; (2) will not require Mr. Parikh to undergo a broader form of inquiry than he would have if the litigation were conducted in United Kingdom; and (3) will not violate the laws of civil procedure of any English court.

The Southern District therefore, in conformity with article 3 of the Hague Convention, respectfully requests that you, in furtherance of justice by the proper and usual process of your Court, cause Mr. Parikh to appear before an official examiner authorized to administer oaths, and to take testimony, at a precise time to be fixed by you, and answer on his oath or affirmation questions and cross-questions, and that you will direct his deposition to be transcribed and recorded by video, and the transcript and video be sent to counsel for the parties in the action, who so request a copy. The Southern District stands ready to provide similar judicial assistance to judicial authorities in the United Kingdom when required.

Finally, this Court requests from the judicial authority in England that this Letter of Request and its exhibits, and the declaration of Christopher M. Burke dated November 17, 2017, and its exhibits be closed to public inspection to the maximum extent permitted by your laws because they are subject to a Protective Order in this case and have been filed under seal with

17

this Court.    Attached as Exhibit 1 is the January 25, 2016 Stipulation and Order of

Confidentiality governing this proceeding.

THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF

NEW YORK THEREFORE MAKES THE FOLLOWING REQUEST:

**1.      Sender**

> The Honorable Lorna G. Schofield
> United States District Judge
> United States District Court for the Southern District of New York
> Thurgood Marshall United States Courthouse
> 40 Foley Square
> New York, NY 10007
> United States of America

**2.      Central Authority of the Requested State**

> The Senior Master (Queen's Bench Division)
> Royal Courts of Justice
> Strand
> London WC2A 2LL
>
> On behalf of:
> The Central Authority of the United Kingdom
> Her Majesty's Principal Secretary of State for Foreign Affairs
> Foreign and Commonwealth Office
> King Charles Street
> London SWIA 2AH, United Kingdom

**3.      Person to whom the executed request is to be returned**

> The Honorable Lorna G. Schofield
> United States District Judge
> United States District Court for the Southern District of New York
> Thurgood Marshall United States Courthouse
> 40 Foley Square
> New York, NY 10007
> United States of America
>
> and
>
> Belinda Hollway
> Scott+Scott, Europe LLP
> 25 Southampton Buildings
> London WC2A 1AL

18

4.  **Specification of the date by which the requesting authority requires receipt of the response to the Request for International Judicial Assistance ("Request for Assistance")**

The requesting authority would greatly appreciate a response to the Request for Assistance within 21 days or as soon thereafter as is practicable.

5.

    a.  **Requesting Judicial Authority**
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
United States of America

    b.  **To the competent authority of**
United Kingdom

    c.  **Name of the case and any identifying number**
*In re Foreign Exchange Benchmark Rates Antitrust Litigation,*
Case No. 1:13-cv-07789-LGS (S.D.N.Y.)

6.  **Names and addresses of the parties and their representatives**

    a.  **Plaintiffs**
J. Paul Antonello; Aureus Currency Fund, L.P.; Employees' Retirement System of Puerto Rico Electric Power Authority; Employees' Retirement System of the Government of the Virgin Islands; Marc G. Federighi; Fresno County Employees' Retirement Association; Thomas Gramatis; Doug Harvey; Haverhill Retirement System; Izee Trading Company; John Kerstein; Michael Melissinos; Mark Miller; Robert Miller; Oklahoma Firefighters Pension and Retirement System; Richard Preschern dba Preschern Trading; Peter Rives; Michael J. Smith; State-Boston Retirement System; Jeffrey Sterk; Kimberly Sterk; Syena Global Emerging Markets Fund, LP; Systrax Corporation; The City of Philadelphia, Board of Pensions and Retirement; Tiberius OC Fund, Ltd.; United Food and Commercial Workers Union and Participating Food Industry; Employers Tri-state Pension Fund, and Value Recovery Fund LLC

    b.  **Names and addresses of Plaintiffs' representatives**
Christopher M. Burke
Scott+Scott, Attorneys at Law, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
United States of America

Michael D. Hausfeld
Hausfeld LLP
1700 "K" Street, N.W.
Suite 650
Washington, DC 20006
United States of America

*Interim Class Co-Lead Counsel*

Steven M. Berezney
Korein Tillery LLC
505 N. 7th Street, Suite 3600
St. Louis, MO 6310 I
United States of America

*Counsel for Plaintiffs*

c. **Defendants**

Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse Securities (USA) LLC (together, "Credit Suisse")

In addition, this Court has preliminarily approved class settlements with the following Defendants:

Deutsche Bank AG and Deutsche Bank Securities Inc. (together, "Deutsche Bank")

The Goldman Sachs Group, Inc. and Goldman, Sachs & Co. (together, "Goldman Sachs")

Bank of America Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Incorporated (together, "Bank of America")

The Bank of Tokyo-Mitsubishi UFJ, Ltd.

Barclays Bank PLC and Barclays Capital Inc.

BNP Paribas Group, BNP Paribas North America Inc., BNP Paribas Securities Corp., and BNP Prime Brokerage, Inc. (together, "Barclays")

Citigroup Inc., Citibank, N.A., Citicorp, and Citigroup Global Markets Inc. (together, "Citibank")

HSBC Holdings PLC, HSBC Bank PLC, HSBC North America Holdings Inc., HSBC Bank USA, N.A., and HSBC Securities (USA) Inc. (together, "HSBC")

20

JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. (together, "JP Morgan")

Morgan Stanley, Morgan Stanley & Co. LLC, and Morgan Stanley & Co. International PLC. (together, "Morgan Stanley")

The Royal Bank of Scotland Group PLC, The Royal Bank of Scotland PLC, and RBS Securities Inc. (together, "RBS")

RBC Capital Markets LLC

Societe Generale

Standard Chartered Bank

UBS AG, UBS Group AG, and UBS Securities LLC (together, "UBS")

**d.  Name and address of Defendant's representatives**

David G.Januszewski
Jason M. Hall
Cahill Gordon & Reindel LLP
80 Pine Street
New Yark, NY 10005-1702

*Counsel for Credit Suisse*

Robert Khozumi
Kirkland & Ellis LLP
601 Lexington Avenue
New Yark, NY  10022

G. Patrick Montgomery
Kirkland & Ellis  LLP
655 Fifteenth Street, N.W.
Washington, DC 20005-5793

*Counsel for  Deutsche Bank*

Elizabeth Vicens
Thomas J. Moloney
Victor L. Hou
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New Yark, NY 10006

George S. Cary
Leah Brannon
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006

*Counsel for Goldman Sachs*

Adam Selim Hakki
Richard Franklin Schwed
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022

*Counsel for Bank of America*

Andrew Corydon Finch
Kenneth Anthony Gallo
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of The Americas
New York, NY 10019

*Counsel for Bank of Tokyo-Mitsubishi*

David Harold Braff
Jeffrey T. Scott
Qian Allison Gao
Yvonne Susan Quinn
Sullivan & Cromwell, LLP
125 Broad Street
New York, NY 10004

*Counsel for Barclays*

John Terzaken
Molly Anne Kelley
Allen & Overy LLP
1101 New York Avenue NW
Washington, DC 20005

*Counsel for BNP Paribas*

Alan M. Wiseman
Covington & Burling, L.L.P.
850 Tenth Street, NW
Washington, DC 20004

Andrew Arthur Ruffino
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018-1405

*Counsel for Citigroup*

Gregory Thomas Casamento
Locke Lord LLP
Brookfield Place
200 Vesey Street, 20th Floor
New York, NY 10281-2101

*Counsel for HSBC*

Peter Edward Greene
Boris Bershteyn
Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY 10036

*Counsel for JPMorgan*

Jonathan M. Moses
Keia Denise Cole
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019

*Counsel for Morgan Stanley*

Neil Thomas Bloomfield
Moore & Van Allen, PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC 28202

*Counsel for RBC Capital Markets*

Arthur J. Burke
Greg Donal Andres
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

*Counsel for Royal Bank of Scotland*

23

Patrick Coby Ashby
Linklaters, LLP
1345 Avenue of the Americas, 19th Floor
New York, NY 10105

Adam Samuel Lurie
Linklaters, LLP
601 13th St. NW
Washington, DC 20005

*Counsel for Societe Generate*

Cyrus E. Ansari
Nicholas PrimerCrowell
Sonia Marquez
Andrew W. Stem
Sidley Austin LLP (NY)
787 Seventh Avenue
New York, NY 10019

*Counsel for Standard Chartered Bank*

Peter Sullivan
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 48th Floor
New York, NY 10166

Joel Steven Sanders
Gibson, Dunn & Crutcher, LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105

Joshua H. Soven
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306

*Counsel for UBS*

7.

    **a.  Nature and purpose of the proceedings:**

This case involves claims based on an alleged conspiracy among banks, including

Goldman Sachs and Credit Suisse, to fix prices in the foreign exchange ("FX") market in

violation of the Sherman Antitrust Act, 15 U.S.C. §§1, 3, and the Commodity Exchange Act ("CEA"), 7 U.S.C. §1 *et. seq.* A copy of Plaintiffs' Redacted Third Amended Consolidated Class Action Complaint ("Complaint"), dated June 3, 2016, is attached as Exhibit 2 hereto.[1] The nature of the action is summarized at Complaint, §§1 - 13. Plaintiffs seek damages and other relief for injury caused by Defendants' wrongdoing. Complaint at pp. 158-170.

### b. Summary of complaint

Plaintiffs allege, *inter alia,* Defendants, including Goldman Sachs and Credit Suisse, conspired to fix FX prices and otherwise manipulate the FX market from a period beginning at least as early as January 1, 2003 through December 31, 2013, in violation of U.S. antitrust and commodities exchange laws. Specifically, Plaintiffs allege that Defendants' agreement encompassed: (a) improperly sharing confidential client and trading information, including prices; (b) front running client orders; (c) triggering of contingent FX contracts; (d) coordinating or manipulating bid/ask spreads quoted to customers; and (e) manipulating FX benchmark rates, such as the WM/Reuters and ECB benchmark rates. *See* Complaint, §§124-25; 144-170; 178-242; 243-251.

Plaintiffs allege that Defendants used electronic chat rooms with evocative names such as "The Cartel," "The Bandits' Club," and "The Mafia" in furtherance of the conspiracy. Complaint, §128. Plaintiffs allege that each Defendant paiiicipated in chat rooms discussing multiple currencies. Complaint, §132. Plaintiffs allege that over time, various chat rooms, in furtherance of the conspiracy, evolved to discuss numerous currency pairs beyond those for which they were originally established. Complaint, §133.

---

[1] The Complaint has been filed under seal in this Court and only a redacted version is available to the public.

### c.  Summary of defense and counterclaim

Defendants deny they entered into any agreement to fix prices or otherwise manipulate the FX market. Defendants moved to dismiss Plaintiffs' claims on various legal grounds, including failing to state a claim for relief.

### d.  Other necessary information or documents

The Court denied, in part, Defendants' motions to dismiss the allegations in Plaintiffs' complaint, finding Plaintiffs had stated viable claims against them for a period beginning at least as early as December 1, 2007. *See* Exhibits 3 & 4 hereto. While most Defendants, including Goldman Sachs have settlements with Plaintiffs that have preliminary approval of this Court, Defendant Credit Suisse continues to litigate the case. The terms of settlement with Goldman Sachs release Plaintiffs' claims against former employees, including Mr. Parikh. Although a trial date has yet to be set, this Court anticipates a trial date in 2018.

8.

### a.  Evidence to be obtained

This Court respectfully requests that appropriate judicial authority in England cause  the appropriate orders to be issued to direct the deposition, under oath, of Mr. Parikh to be used at trial in these proceedings.

### b.  Purpose of the evidence or judicial act sought

At trial, Plaintiffs must prove the existence of an agreement to fix FX prices. Plaintiffs must demonstrate that non-settling Defendants joined the agreement to fix FX prices. Plaintiffs must demonstrate that the agreement occurred in or affected commerce in the U.S. Plaintiffs must demonstrate that the agreement had anticompetitive effects that proximately caused injury to Plaintiffs. Plaintiffs may introduce evidence of conduct by settling Defendants to demonstrate

the foregoing, including, specifically, whether a non-settling Defendant participated in the conspiracy.

Mr. Burke has represented and furnished sufficient evidence to satisfy this Comi that Mr. Parikh has personal knowledge of matters material and relevant to the matters at issue in the Proceedings for the period 2007 through 2013. As set forth below, the evidence sought by Plaintiffs relates to the matters in question and Defendant Credit Suisse's defenses. Because Mr. Parikh resides outside of the subpoena power of this Court, and therefore cannot be compelled to testify at trial, Plaintiffs seek deposition testimony to prove their claims at trial.

Mr. Parikh is a former employee of Defendant Goldman Sachs. He was an FX trader in London and was responsible for trading G10 currencies at Goldman Sachs. Testimony regarding Mr. Parikh's background and employment at Goldman Sachs is necessary groundwork in his testimony and is relevant to establishing conspiracy because Plaintiffs allege that traders had strong social and professional ties with traders at co-conspirator banks, which created incentives and opportunities for collusion. (Exhibit 5, Topic A.)

Mr. Parikh's testimony regarding his knowledge of the FX market is relevant to establishing the existence of conspiracy and market manipulation because Plaintiffs alleged that the FX market was unregulated and opaque, which made it a market susceptible to collusion and manipulation. (Exhibit 5, Topic B.)

Mr. Parikh's testimony regarding his knowledge of communications with each co-defendant from 2007 through 2013, including in multi-bank chat rooms, is relevant to prove conspiracy. (Exhibit 5, Topics C-E.) Plaintiffs allege that Defendants communicated directly with each other through the daily use of multiple chat rooms to share market-sensitive information with competitors. This Court ruled that these chats are direct evidence akin to the

"recorded phone call in which two competitors agreed to fix prices at a certain level." (Exhibit 3 at 12.) Incriminating chat room names support the inference they were used for anticompetitive purposes. *(Id.* at 13.)

Beginning as early as 2007 and continuing through at least 2013, Mr. Parikh was an active participant in multibank chat rooms with PX traders from both non-settling Defendants and settling Defendants, including without limitation, Jamie Lawes (Credit Suisse), Daniel Stalker (Credit Suisse), Richard Ware (Credit Suisse), Richard Usher (JPMorgan), Rohan Ramchandani (Citibank), Julian Munson (RBS), Matthew Willis (Deutsche Bank), Stuart Dunn (Deutsche Bank), and Mike Leighton (Merrill Lynch). In these chat rooms, Mr. Parikh shared confidential information, discussed FX prices, and discussed coordinated trading around fixes with PX traders from other Defendants.

Mr. Parikh's testimony is necessary to determine at trial the meanmg of his communications and his knowledge of the conspiracy. Mr. Parikh's testimony regarding his chat room communications is relevant to explain at trial numerous multi-bank chats in which he participated because FX traders have their own unique jargon that is difficult to interpret. Mr. Parikh's testimony also is necessary to explain at trial communications through other media for which written evidence does not exist, such as text messages and phone calls.

Mr. Parikh's testimony regarding his knowledge of compliance issues is relevant for trial because Plaintiffs intend to prove either that Defendants lacked compliance measures to prevent the conspiracy and/or knew of violations of compliance policies and failed to prevent them. (Exhibit 5, Topics F and G.)

28

Mr. Parikh's testimony regarding his own or Goldman Sachs' profit and loss in foreign exchange is relevant to show a motive to conspire and injury to Plaintiffs. (Exhibit 5, Topics H and I.)

Mr. Parikh's testimony regarding investigations of Goldman Sachs' participation in the foreign exchange market from 2007 through 2013 is relevant to establish liability at trial. (Exhibit 5, Topic J.)

9. **Identity and address of any person to be examined**

Mitesh Parikh
62 Aldenham Avenue
Radlett, WD7 SHY
United Kingdom

**Name and address of witness's counsel**

Adam Brown
Jones Day
21 Tudor Street
London, EC4Y ODJ
United Kingdom
+44 (0)20 7039 5959 (telephone)

10. **Questions to be put to the persons to be examined or statement of the subject-matter about which they are to be examined**

*See* Exhibit 5 to this Letter of Request which this Court requests to be annexed to any Order of the requested Court for the examination of Mr. Parikh.

11. **Documents or other property to be inspected**

Plaintiffs and this Court are not requesting that Mr. Parikh produce any documents.

12. **Any requirement that the evidence be given on oath or affirmation and any special form to be used**

The examination of the individual identified at Paragraph 9 above will be taken under oath before: (1) a secretary of embassy, counsel general, consul, vice-consul, or consular agent of the United States of America or any officer authorized to administer oaths under the laws of the United States of America or of the United Kingdom; or (2) before a person   appointed by the

Court and empowered to administer oaths and take testimony. This Court will be content if the requested Court appoints a duly qualified and authorized Examiner.

This Court further requests that you, by your proper and usual process, require that the testimony given during the above-described deposition be given under the following oath or affamation: "I [deponent] swear that the testimony that I am about to give is the truth, the whole truth and nothing but the truth, so help me God" or "I [deponent] swear that the testimony that I am about to give is the truth, the whole truth and nothing but the truth."

**13.    Special methods or procedure to be followed**

The examination of the individual identified in Paragraph 9 above will be taken under the Federal Rules of Civil Procedure, except to the extent that any such procedure is incompatible with United Kingdom law. The examinations and cross-examinations shall be the same as though the deponent were testifying at trial. The examinations and cross-examinations will be recorded stenographically and by videotape. The examination will be conducted at such time and date to be agreed with by the witness but, in any event prior to January 30, 2018, unless otherwise agreed to by the parties.

This Court respectfully requests that the judicial authority in England permit the examination of Mr. Parikh to be conducted by attorneys for the Plaintiffs or other duly authorized representatives, qualified to practice law in United States jurisdictions and/or in England and Wales, nominated by the Plaintiffs, and that Plaintiffs be permitted to cross-examine Mr. Parikh.

**14.    Request for notification of the time and place for the execution of the Request and identity and address of any person to be notified**

Belinda Hollway
Scott+Scott, Europe LLP
25 Southampton Buildings
London WC2A lAL

Forward transmission to:

Christopher M. Burke
Scott+Scott, Attorneys at Law, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
United States of America

Counsel for Plaintiffs will promptly send notice to counsel for all parties to the action.

**15.**   **Request for attendance or participation of judicial personnel of the requesting authority at the execution of the Letter of Request**

Omitted.

**16.**   **Specification of privilege or duty to refuse to produce documents under the law of the State of origin**

Neither this request for international judicial assistance, the transmission of Documents pursuant to the Hague Convention, nor any examination, including without limitation, this request and all transcripts of Mr. Parikh's examination shall waive, or be deemed or argued to have waived, the attorney-client privilege, the work product doctrine, or any other privileges, rights, protections or prohibitions that may apply to that evidence under the laws of the United Kingdom, the United States of America, or New York, including the privilege against self-incrimination under the Fifth Amendment of the United States Constitution.

The examination of Mr. Parikh will not, in the opinion of this Court, be oppressive to Mr. Parikh in all the circumstances and bearing in mind the protections available to them. The U.K.'s Serious Fraud Office has closed its criminal investigations into allegations of fraudulent conduct in the FX market. While the U.S. Department of Justice ("DOJ") has ongoing investigations, Mr. Parikh is outside of the terms of the stay of depositions sought and received by this Court. (Exhibit 6.) Further, Mr. Parikh's deposition will proceed under the terms of the protective order and therefore, will be given confidential treatment in connection with this litigation. *(See* Exhibit 1.)   Moreover, Plaintiffs have settled with the Goldman Sachs

Defendants. That settlement, which the Court has preliminarily approved, releases Plaintiffs' claims against not only the Goldman Sachs entities, but former employees of Goldman Sachs, including Mr. Parikh.

The Fifth Amendment of the U.S. Constitution affords both criminal defendants and civil litigants a privilege against compelled testimony that may later be used against them in criminal proceedings, which is similar to the protections provided by U.K. law under Section 14(1) of the Civil Evidence Act of 1969.

This Court desires that Mr. Parikh be compelled to attend for testimony even if he should express in advance an intention to refuse to answer questions, in reliance on his Fifth Amendment rights. On attending, he may in the event give useful answers. In any event, testimony given by Mr. Parikh's refusal to answer certain questions may be of value in this action. In civil litigation in the U.S., the fact-finder may draw adverse inferences against a party based on a non-party witnesses' invocation of the Fifth Amendment. Therefore, Mr. Parikh's refusal to answer questions may be imputed to Goldman Sachs and other co-conspirators to create an inference of liability under certain circumstances. However, that refusal could not be used against him in a U.S. criminal proceeding.

**17.    The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by**
Plaintiffs.


Date of Request:_____


Signature and Seal of the Requesting Authority:

The following are the topics for deposition of Mitesh Parikh:

A.      Mr. Parikh's general education, background, and employment at Goldman Sachs.

B.      Mr. Parikh's knowledge of the foreign exchange market, including but not limited to the currencies he was responsible for trading from 2007 through 2013.

C.      Mr. Parikh's knowledge of communications with each co-defendant from 2007 through 2013 regarding any of matters a-e below (but Mr. Parikh shall not be required to state what documents, other than any shown to him during the deposition, are or have been in his possession, custody or power, the term documents including without limitation chat room discussions on a screen):

a.      imparting to or receiving from another defendant bank confidential client information;

b.      front running client orders;

c.      triggering of contingent FX contracts;

d.      coordinating or manipulating bid-ask spreads quoted to customers; and

e.      manipulating FX benchmark rates such as the WM/Reuters fix, the CME fix, and the ECB rate.

D.      Mr. Parikh's knowledge regarding the use of chat rooms to trade foreign exchange and/or communicate with other competing banks (but Mr. Parikh shall not be required to state what documents, other than any shown to him during the deposition, are or have been in his possession, custody or power, the term documents including without limitation chat room discussions on a screen).

E.      Mr. Parikh's knowledge regarding documents shown to him during the deposition, including (i) chat room discussions in 2007 - 2013 which he participated in or observed concerning matters set out at C a-e above, ethics of such discussions or behavior or possible regulators' interest in such discussions or behavior with employees of Defendant banks; and (ii) communications in 2007 - 2013 within Goldman Sachs to which he was party concerning matters set out at (i).

Documents are not to be shown to Mr. Parikh during the deposition unless either (a) provided to him or his counsel, with copies to counsel for all parties intending to attend the deposition, 14 days before his deposition, or (b) with the permission of the Examiner on application to him by the party wishing to show the documents.

F.      Mr. Parikh's knowledge of, training in, and compliance with Goldman Sachs's corporate policies regarding (a) communications with other banks engaging in foreign exchange trading and (b) antitrust and competition.

G.      Mr. Parikh's performance reviews and communications with Goldman Sachs's compliance department regarding his potential or alleged noncompliance with corporate policies from 2007 through 2013.

33

H.      Mr. Parikh's knowledge of either his own or Goldman Sachs's profits and losses in foreign exchange from 2007 to 2013.

I.      Mr. Parikh's knowledge of any algorithms used by Goldman Sachs or its competitors for FX trading from 2007 to 2013.

J.      Mr. Parikh's knowledge of any investigations, guilty pleas, and/or regulatory fines regarding Goldman Sachs's participation in the foreign exchange market from 2007 through 2013.

# JONES DAY

AUTHORISED AND REGULATED BY THE SOLICITORS REGULATION AUTHORITY
SRA NO. 223597

21 TUDOR STREET · LONDON EC4Y ODJ · DX 67 LONDON/CHANCERY
TELEPHONE: 020.7039.5959   ·   FACSIMILE: 020.7039.5999

| | |
|---|---|
| *Ref/CAM* | AJB/DJT/470716-720001 |
| *Email* | abrown@jonesday.com |
| *Direct* | 020 7039 5292 |
| *Date* | 4 May 2018 |

Steven Loble
Litigation Director
W Legal Limited
47 Red Lion Street
London, WC1R 4PF

BY POST AND BY EMAIL *(TO:* STEVEN.LOBLE@WLEGAL.CO.UK)

Dear Sirs

**Letter of Request relating to Mr Mitesh Parikh**

We refer to your letter of yesterday and subsequent email attaching the Class Action Complaint and a Consent Order dated 1 May 2018 agreed between Goldman Sachs and the New York State Department of Financial Services (**"DFS Consent Order"**).

It is remarkable that whilst you have willingly provided to us a copy of the DFS Consent Order pertaining to action taken by a regulator relating to the foreign exchange market but which is entirely different to the matter in respect of which your request of our client arises, you are still refusing to provide the documents identified at (i) to (v) of our letter dated 27 April 2018 which relate squarely to that request. That includes the final form of the Letter of Request, together with the exhibits relied upon, and the application which you plan to file with the English Court. There can be no good reason for this failure on your part other than your wish to intentionally keep relevant information from our client.

Your failure to provide us with copies of these documents is particularly astounding when one of the exhibits to the Letter of Request would appear to relate specifically to confidentiality provisions purportedly designed to protect our client. In circumstances where you have now identified our client in open cotTespondence as a trader anonymised in a regulatory order (and about which no admissions are made) and intend to provide this information to the English Court, the failure to provide this exhibit together with your general disregard for our client's (and, based on your previous correspondence, other trader's) confidentiality is entirely unsatisfactory. It also begs the question as to how our client could possibly consider your request to voluntarily appear for deposition when you have so little regard for his confidentiality.

You have also failed to address, yet again, the fact that the Letter of Request does not provide for a deposition to take place any time after 30 January 2018. Please explain the basis upon which the English Court is being asked to enforce a US request that is over three months passed its long-stop date.

A LIST OF PARTNERS AND THEIR PROFESSIONAL QUALIFICATIONS IS AVAILABLE AT
21 TUDOR STREET · LONDON EC4Y ODJ

EUI-1202064955vl

ALKHOBAR · AMSTERDAM · ATLANTA · BEIJING · BOSTON · BRISBANE · BRUSSELS · CHICAGO · CLEVELAND · COLUMBUS
DALLAS · DETROIT · DUBAI · DÜSSELDORF · FRANKFURT· HONG KONG · HOUSTON · IRVINE· JEDDAH · LONDON · LOS ANGELES
MADRID· MEXICO CITY · MIAMI · MILAN · MINNEAPOLIS · MOSCOW· MUNICH · NEW YORK· PARIS · PERTH · PITTSBURGH · RIYADH
SAN DIEGO · SAN FRANCISCO · sAo PAULO · SHANGHAI · SILICON VALLEY · SINGAPORE · SYDNEY · TAIPEI · TOKYO · WASHINGTON

Letter to W Legal Limited
Continued 2

**JONES DAY**

We are also surprised at the assertion that your client's US counsel *"repeatedly"* attempted to secure our client's voluntary attendance at a deposition. We take it you have in mind Mr Berezney's one and only approach in September 2017 which precipitated a short exchange of emails between Mr Berezney and Mr Brown of this office.

In terms of the substance of our position as regards the unreasonable scope of the List of Topics, we note your reluctance to engage on our specific concerns and instead you have simply recited certain passages of the general case law pertaining to how the English Court has historically considered Letters of Request. You seem to ignore that the case law makes clear that the evidence requested must be required for use at trial in the proceedings in which a request arises. The point that you have persistently refused to engage with is that 15 of the 16 defendants to the New York proceedings have settled. There is to be no trial of Plaintiffs' claims as against those 15 defendants. The fact you now seek to rely on the DFS Consent Order is yet further evidence there you are unable to differentiate between information that might be relevant to the foreign exchange market as a whole, including issues that might have been relevant to these proceedings at some stage (albeit no admissions are made in that regard), and the triable issues in the New York proceedings as against Credit Suisse.

Finally, you have raised a point relating to our client's right to plead the Fifth Amendment. It is of course appropriate and necessary that the Letter of Request requiring him to give oral evidence is properly compliant and focussed before he decides whether or not to avail himself of this fundamental right. We entirely disagree that this might somehow give rise to your clients recovering their costs of making an application to the English Court.

In any case, and leaving aside your failure to follow proper procedures and make material information available to our client, as you know, Mr Parikh is travelling this week and so we are currently unable to take instructions.

Yours faithfully

*Jones Day*

**Jones Day**

*Cc. Mr. Steve Berezney, Korein Tillery*



W

L E G A L

**BY EMAIL – dtravers@JonesDay.com**
Adam Brown Esq
Jones Day
21 Tudor Street
London
EC4Y 0DJ

Our ref: SL
Your ref: AJB/DJT/47076-720001

8 May 2018

Dear Sirs

**Mitesh Parikh**

Thank you for your letter of 4 May 2018.

The correspondence to date is not productive. We have already explained to you how evidence relating to the 15 settling Defendants is still relevant and have provided you with clear evidence that your client has highly relevant information. If you have a genuine question, we suggest setting up a time to discuss by telephone. We cannot have productive conversations, however, when you continue to deny that Mr. Parikh has relevant knowledge which he clearly has.

You also demand more details, but then wrongly accuse us of violating confidentiality every time we provide them in good faith.  Your counterproductive accusations make it difficult to share information with you and give us little incentive so to do. We will send you deposition exhibits, once a date has been set for Mr Parikh's examination, either voluntarily or pursuant to an order of the English Court.

We hope that Mr. Parikh will reconsider his refusal to voluntarily appear for a deposition and decide to cooperate and not use up court resources unnecessarily in accordance with the Overriding Objective.

Yours faithfully

**W Legal Limited**

37

# JONES DAY

AUTHORISED AND REGULATED SY THE SOLICITORS REGULATION AUTHORITY

SRA  NO. 223597

21 TUDOR STREET • LONDON EC4Y ODJ • DX 67 LONDON/CHANCERY

TELEPHONE: 020.7039  5959  •  FACSIMILE: 020 7039.5999

| | |
|---|---|
| *Ref/CAM* | AJB/DJT/470716-720001 |
| *Email* | abrown@jonesday.com |
| *Direct* | 020 7039 5292 |
| *Date* | 30 May 2018 |

Steven Loble
Litigation Director
W Legal  Limited
47 Red Lion  Street,
London, WC1R4PF

<u>BY POST AND BY EMAIL *(TO:* STEVEN.LOBLE@WLEGAL.CO.UK)</u>

Dear Sirs

**Letter of Request relating to Mr Mitesh Parikh**

We write further to your letter of 17 May 2018 which enclosed, by way of service, your   client's application  dated  4 May 2018 for our client, Mr Parikh, to attend for examination  pursuant to a Letter of Request sealed by the United States District Court Southern District of New    York    (the **"Application"**).

We note that paragraph 5 of the Draft Order enclosed with the Application,  stipulates  that  *"Mr Laurence Emmett shall be the 'Examiner' within the meaning of CPR Part 34 for the purposes of the Examination".*  We are not aware of the basis upon which Mr Emmett has been selected but would be grateful if you could confirm what enquiries were made by your firm of his experience of acting as an Examiner. Please also confirm, having made any relevant enquiries of Mr Emmett and by reference to The International Bar Association Guidelines 2014 (the **"IBA Guidelines"**),  whether you or he is aware of any matters which may impact upon his ability to act independently and impartially as the 'Examiner' in this case or which would otherwise fall  to be disclosed  pursuant to the IBA  Guidelines (any such matter or experience  being a **"Relevant  Disclosure"**).

If there are any such Relevant Disclosures, we would ask that this information is categorised and communicated to us in accordance with the Application Lists set out under the second part of the IBA Guidelines.

We look forward to hearing from you by return.

Yours faithfully

*Jones Day*

**Jones Day**

A LIST OF PARTNERS AND THEIR PROFESSIONAL QUALIFICATIONS IS AVAILABLE AT

21  TUDOR STREET• LONDON EC4Y  ODJ

EUI-1202103539v2

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS
DALLAS • DETROIT• DUBAI • DÜSSELDORF • FRANKFURT• HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS  ANGELES
MADRID• MEXICO CITY• MIAMI •MILAN• MINNEAPOLIS• MOSCOW• MUNICH • NEW YORK• PARIS• PERTH• PITTSBURGH• RIYADH
SAN DIEGO • SAN FRANCISCO • SAO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO •  WASHINGTON

**Travers, Daniel J.**

| | |
|---|---|
| **From:** | Steven Loble <steven.loble@wlegal.co.uk> |
| **Sent:** | 30 May 2018 18:44 |
| **To:** | Travers, Daniel J. |
| **Cc:** | Brown, Adam R. |
| **Subject:** | Re: Foreign Exchange Benchmark Rates Antitrust Litigation CR 2018-409 |

Dear Sirs

Mr Emmett has indicated that he has no conflict. We do not propose to spend any more time and costs on this.

Yours faithfully


W Legal Limited
www.wlegal.co.uk
Office: +44 (0) 207 220 9130
Fax: +44 (0) 20 7112 4833
Regulated by the Solicitors Regulation Authority Registered
Address: 47 Red Lion Street, London, WC1R 4PF Registered
Company Number: 06649868



On 30 May 2018, at 19:16, Travers, Daniel J. <dtravers@JonesDay.com> wrote:

> Dear Sirs
>
> We plan to give the proposal that Mr Emmett be the Examiner our due consideration, but in the meantime whether or not he is an appropriate person to sit will depend, at least to some extent, on the answers to the questions posed in our letter. So please respond to what are very reasonable and straightforward requests or, alternatively, confirm that you have been instructed not to answer them.
>
> We would also be grateful if you could keep Adam Brown of this office copied into correspondence. As you will know he is the Partner with conduct of this matter and yet he is consistently left *off* your emails which are responsive to emails to which he is copied.
>
> Yours faithfully
>
> Jones Day
>
> Daniel Travers
> Associate
> TONES DAY® - One Firm Worldwide•M
> 21 Tudor Street
> London, EC4Y ODJ
> Office +44.20.7039.5959
> Direct Dial +44.20.7039.5322

39

Fax +44.20.7039.5999
dtravers@jonesday.com

Jones Day is a partnership authorised and regulated by the Solicitors Regulation Authority (number 223597). A list of the partners and their professional qualifications is open to inspection at the above address. The partners are all lawyers who are also partners in the international law firm of Jones Day.

**From:** Steven Loble <steven.loble@wlegal.co.uk>
**Sent:** 30 May 2018 17:02
**To:** Travers, Daniel J.<dtravers@JonesDay.com>
**Subject:** Re: Foreign Exchange Benchmark Rates Antitrust Litigation CR 2018-409

Dear Sirs

If there is any reason why you consider Mr Emmett is not an appropriate person to sit as Examiner, please say so and provide reasons.

Yours faithfully

W Legal Limited
www.wlegal.co.uk
Office: +44 (0) 207 220 9130
Fax:  +44 (0) 20 7112 4833
Regulated by the Solicitors Regulation Authority
Registered Address: 47 Red Lion Street, London, WC1R 4PF
Registered  Company  Number: 06649868



On 30 May 2018, at 16:13, Travers, Daniel J.<dtravers@JonesDay.com> wrote:

>    Dear Sirs
>
>    Please see attached.
>
>    Yours   faithfully
>
>    Jones Day
>
>    Daniel Travers
>    Associate
>    **JONES DAY® - One Firm Worldwide•M**
>    21 Tudor Street
>    London, EC4Y ODJ
>    *Office*  +44.20.7039.5959
>    Direct Dial +44.20.7039.5322
>    Fax +44.20.7039.5999
>    dtravers@jonesday.com
>
>    Jones Day is a partnership authorised and regulated by the Solicitors Regulation Authority (number 223597). A list of the partners and their professional qualifications is open to inspection at the above address. The partners are all lawyers who are also partners in the international law firm of Jones  Day.
>
>    ***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you

40