# EXHIBIT 123

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FOREIGN EXCHANGE BENCHMARK
RATES ANTITRUST LITIGATION

No. 1:13-cv-7789-LGS

**EXPERT REPORT OF**
**GEIR HØIDAL BJØNNES AND ALEXANDER LJUNGQVIST**

May 31, 2018

**(REDACTED)**

Contains information designated as Highly Confidential

# Contents

I. INTRODUCTION AND SCOPE OF ASSIGNMENT .................................................. 1

II. EXPERIENCE AND QUALIFICATIONS ............................................................. 2

    A. Geir Høidal Bjønnes ............................................................................. 2

    B. Alexander Ljungqvist ............................................................................ 3

III. SUMMARY OF OPINIONS ....................................................................... 6

IV. OVERVIEW OF THE FX MARKET ............................................................. 9

    A. FX Instruments ................................................................................... 9

    B. FX Market Participants ....................................................................... 12

    C. FX Trade Types and Trade Venues ....................................................... 14

    D. FX Market Structure .......................................................................... 15

    E. Factors Influencing FX Pricing ............................................................ 16

V. DEFENDANTS' ALLEGED COLLUSION HAD CLASS-WIDE IMPACT .................... 20

VI. DEFENDANTS' ALLEGED COLLUSION RESULTED IN DAMAGES TO ALL OR
VIRTUALLY ALL CLASS MEMBERS .............................................................. 27

    A. Our Economic Model for Estimating Damages ........................................ 27

    B. Trade Cost Analysis ........................................................................... 28

    C. Description of the Empirical Approach ................................................... 32

    D. Formal Econometric Specification ........................................................ 36

    E. Selecting the Appropriate "Prevailing Price" .......................................... 43

    F. Continuing Refinement of Trade Database ............................................. 44

    G. Approach to Exchange-Traded Products ................................................ 47

VII. PRELIMINARY ESTIMATES OF CLASS-WIDE INJURY .................................. 47

VIII. TESTING THE EMPIRICAL MODEL ........................................................ 49

IX. PRELIMINARY ESTIMATES OF INJURY FOR NAMED PLAINTIFFS ................... 50

X. ESTIMATING AGGREGATE DAMAGES ....................................................... 51

XI. CONCLUSION .................................................................................... 51

## I. INTRODUCTION AND SCOPE OF ASSIGNMENT

1.      We are economists with expertise in both the foreign exchange ("FX") market and other financial markets and between us have substantial experience utilizing econometrics to analyze various financial markets, including the FX market.

2.      Plaintiffs' counsel is seeking certification with respect to two discrete classes:

- **OTC Class**: All persons who, between December 1, 2007 and December 31, 2013 (inclusive) entered into a total of 10 or more FX spot, forward, and/or FX swap trades directly with one or more Defendants in the 52 Affected Currency Pairs, where such persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, traded in the United States or its territories.

- **Exchange Class**: All persons who, between January 1, 2007 and December 31, 2013 (inclusive) entered into a total of 10 or more trades of FX futures contracts on a U.S. exchange.

- **Exclusions from both Classes**: Excluded from the Classes are the Defendants and their parents, subsidiaries, affiliates, directors, and employees. Also excluded from these Classes are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action. Finally, trades whose prices were set on the basis of a benchmark rate, such as the WM/Reuters closing spot rates or the ECB reference rates, are excluded.

3.      Scott+Scott, Attorneys at Law, LLP and Hausfeld LLP, Plaintiffs' counsel in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-07789 (S.D.N.Y.) have asked us whether, assuming common proof exists of a conspiracy to fix FX prices, all or virtually

all Class Members were impacted by that conspiracy and whether that impact is capable of being demonstrated through common proof.

4.      Plaintiffs' counsel have also asked us whether there is a common methodology to calculate antitrust damages to the classes in the aggregate and whether damage to each injured Class Member can likewise be calculated.

## II.    EXPERIENCE AND QUALIFICATIONS

### A.  Geir Høidal Bjønnes

5.      I am an Associate Professor at BI Norwegian Business School. I am co-author of three books that all relate to the operation of the foreign exchange ("FX") market, including FX risk management and FX speculation. I have also co-authored book chapters on FX-related topics (FX volatility).

6.      My articles on FX market microstructure[1] have been published in international journals and have been widely cited in the literature. I have published peer-reviewed articles in the *Journal of Financial Economics*, the *Journal of Scandinavian Economics*, and the *Journal of International Money and Finance*. In my most recent research project, I study price discrimination, price discovery, and arbitrage in FX markets. I have, on several occasions, served as a peer-reviewer on FX-related topics for international journals.

7.      I have been an expert witness in several lawsuits in Norway involving structural products and foreign exchange. In addition to serving as an expert witness, I have also written reports (prepared for Norway's district courts, appellate courts, and supreme court) on topics such as

---

[1] Maureen O'Hara (in "Market Microstructure Theory," Blackwell, Oxford, 1995) defines market microstructure as "[...] the study of the process and outcomes of exchanging assets under explicit trading rules. While much of economics abstracts from the mechanics of trading, microstructure literature analyzes how specific trading mechanisms affect the price formation process."

expected return, risks, and fees in structural products, and expected return, costs, and risks involved in FX loans.

8.      I have taught a large number of courses in finance to undergraduate students, executive students, and doctoral students.

9.      I have broad practical financial experience from various financial consulting assignments.

10.     I earned my PhD in Finance from the University of Oslo and BI Norwegian Business School. My curriculum vitae is provided in Appendix A.

11.     I do not receive any other compensation from any party connected to this matter, and my compensation is not contingent upon the conclusions I reach or on the outcome of this matter. My work in this case is being compensated at the rate of $750 per hour.

## B. Alexander Ljungqvist

12.     I am the Ira Rennert Professor of Finance and Entrepreneurship at New York University's Stern School of Business and the Stefan Persson Family Professor in Entrepreneurial Finance at the Stockholm School of Economics. I teach courses in finance to PhD, MBA, and Executive Education students and conduct research in corporate finance, asset pricing, entrepreneurship, accounting, and economics. My publications have won major awards in the first four of these areas. In addition to my teaching and research responsibilities, I have served as the Sidney Homer Director of the NYU Salomon Center for the Study of Financial Institutions. I am a Research Associate of the National Bureau of Economic Research, a Research Fellow of the Centre for Economic Policy Research, a Founding Senior Fellow of the Asian Bureau of Finance and Economic Research, and a Research Fellow of the Stockholm Research Institute of Industrial Economics. I have previously served on the Nominating Committee of the American Finance Association and as an Academic Director of the Financial Management Association. Until 2014, I was Editor of the *Review of Financial Studies*, one of the three 'A' journals in finance, serving

two terms. I currently serve on the editorial boards of the *Review of Finance*, the *Journal of Financial Intermediation*, and the *Journal of Corporate Finance*, three leading scholarly finance journals. Since 2015, Sweden's Royal Academy of Sciences has extended me nominating privileges for the Nobel Prize in Economic Science.

13.     Before joining the NYU faculty in 2000, I was a member of the faculty of the Oxford University Saïd Business School, where I taught undergraduate, master's level, and PhD courses in economics and finance from 1995 to 2000. I have also taught master's level courses in finance at Cambridge University, Harvard University, and London Business School and PhD level courses in finance at the University of Zurich, the Stockholm School of Economics, the Norwegian School of Economics, the University of Sydney, and the Hong Kong University of Science and Technology. I have held visiting appointments at Harvard University, Northwestern University's Kellogg School of Management, the University of Michigan Ross School of Business, Cambridge University, London Business School, Tokyo University, the National University of Singapore, the Hong Kong Institute for Advanced Study, the Stockholm School of Economics, and the University of Sydney, as well as the Federal Reserve Bank of New York and the Swedish Central Bank.

14.     I received an MSc in International Business from Lund University in 1992, an MPhil in Economics from Oxford University in 1994, and a DPhil in Economics from Oxford University in 1995.

15.     In my academic career, I have published numerous articles in peer-reviewed finance, economics, and accounting journals on investment banking, the industrial organization of financial markets, forensic finance, market microstructure, liquidity, arbitrage, taxation, corporate governance, financial constraints, capital structure, investment, hedge funds, and

venture capital. My work has been published in leading scholarly journals such as *Econometrica*, the *Journal of Political Economy*, the *Journal of Finance*, the *Journal of Financial Economics*, the *Review of Financial Studies*, and the *Journal of Accounting Research*. I am the co-author of two books on primary markets published by Oxford University Press in 1996 and 2001.

16. I have been trained in the economics of industrial organization and competition. My DPhil supervisor in Oxford University's doctoral program was Professor Sir John Vickers, who later chaired the UK Competition Commission. During the five years that I served on the faculty of Oxford University, I taught undergraduate courses in industrial organization. Many of my peer-reviewed articles have directly examined conduct and competition issues in the context of investment banking and financial markets. In addition, I have served as a referee for journals that address issues of competition, such as the *American Economic Review*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, the *Review of Economic Studies*, the *RAND Journal*, and the *Journal of Law and Economics*.

17. My curriculum vitae is attached as Appendix B to this report.

18. I also have practical experience of working in financial markets and investment banks, having spent two years creating trading strategies for and setting up an internal hedge fund at a large investment bank on Wall Street. I currently serve on the board of directors of AP6, a Swedish pension fund specializing in alternative investments. I have recently completed two terms of service as an external member of the Nasdaq Listing Council, which sets and enforces securities market regulations under the 1934 Securities Exchange Act. I have consulted on numerous matters in relation to financial markets, for example for Tradepoint Financial Network, a challenger trading platform. I have served on two finance-related projects at the World Economic Forum in Davos, one on financial innovation and another on alternative investments. I

have served on the Panel of Experts for the UK's 2013-2014 "Review of UK Equity Markets" at the request of the then-Secretary of State for Business, the Rt. Hon. Sir Vince Cable.

19.     I have served as a damages expert in one legal matter and have advised on another matter involving market participants colluding in order to manipulate securities market prices to the detriment of investors.

20.     I am being compensated at my hourly rate of $1,500. I do not receive any other compensation from any party connected to this matter, and my compensation is not contingent upon the conclusions I reach or on the outcome of this matter.

## III.    SUMMARY OF OPINIONS

21.     In preparing our report, we have been instructed to assume that Defendants conspired to fix prices in the FX market. This assumption is consistent with our review of the discovery record in this matter and of government findings and regulatory settlements reached with both Settling and Non-Settling Defendants in the Action.

22.     In assessing whether Class Members are damaged, Plaintiffs' counsel have instructed us to treat a Class Member as having been injured by Defendants' collusive conduct if at least one of its trades during the Class Period resulted in positive damages.

23.     Based on the aforementioned instructions from counsel and our review of the data and record evidence, we have reached the following conclusions.

24.     A working model exists to demonstrate antitrust impact and damages on a class-wide basis through common formulae.

25.     Our working model uses well-accepted principles from finance and economics known as market microstructure to address the questions of injury and damages. This econometric analysis compares FX pricing during the class period to FX pricing from 2014 and 2015 (the "clean period"). This clean period occurred after the collusive conduct alleged in the Complaint largely

ended, with banks prohibiting interbank chatrooms and many of the participants in the conspiracy being terminated. Conducting this clean-period analysis, our working model shows that there are identifiable common factors that influence pricing in the FX market in a statistically significant fashion, and that the conspiracy resulted in statistically significant increases in FX spreads – the difference between bid and ask (buy and sell) prices for FX transactions[2] – during the class period.

26. Using calendar years 2014 and 2015 as the clean period produces robust and conservative estimates of impact and damages. We have also estimated our model using the calendar year 2015 as the clean period. As would be expected if the harmful effects of the alleged conduct lingered into 2014, using only 2015 for the clean-period analysis yields larger damage estimates.

27. Our econometric analysis allows us to determine the extent to which specific factors such as transaction type, customer characteristics, counterparty identity, transaction size, and market conditions (including market volatility, time of day, and market liquidity) influence FX spreads and, ultimately, prices in a "but-for" world untainted by the collusion outlined in the Complaint, and then to control for the influence of those factors when analyzing trades taking place during the Class Period. That, in turn, allows us to calculate the spreads and prices that would have prevailed on trades during the Class Period "but-for" Defendants' alleged collusion.

28. Our econometric model is based on trade cost analysis ("TCA"). TCA is widely used in the investment management industry, in academic research on FX, and by financial regulators. Our TCA model follows a "bottom-up" approach where we first estimate the "but-for" trade cost that would have prevailed in the absence of collusion on each trade for which we have available

---

[2] As discussed in more detail below, *see* ¶¶ 51-52, *infra,* spreads are the effective "price" of accessing liquidity.

data from the Class Period. The difference between the actual trade cost and the "but-for" trade cost yields a damages figure for each trade. We can aggregate the trade-specific damages for each unique Class Member across the entire dataset of Defendants' trades, as well as across all Class Member trades during the Class Period.

29.     The TCA model demonstrates to a high degree of statistical certainty that all or virtually all Class Members (99%) were impacted by Defendants' alleged collusive behavior. We have confirmed the robustness of this result in various ways: through standard tests of statistical significance; by using two different clean periods; by assessing whether the magnitude of the damages varies by venue and by currency pair in a way that comports with what economic theory would suggest; and by finding that average damages per customer and per trade are greater than zero to a statistically significant extent. In addition, as outlined further below, there are a number of reasons why the results of our analysis constitute a conservative and reliable estimate of impact on the OTC Class and the damages suffered by Class Members as a result of Defendants' alleged collusive conduct.

30.     The model, as discussed more fully below, identifies impact on OTC Class Members through the widening of bid-ask spreads. Based on that model for estimating the presence and magnitude of this impact on all OTC Class Members, we also outline below a method for making similar estimates for the Exchange Class Members.

31.     This single channel of antitrust impact results in damages to Class Members by causing Class Members to pay higher prices when they buy FX instruments and receive lower prices when they sell FX instruments.

32.     Our model for estimating impact and damage to the OTC Class is constructed using data from Defendants and third parties and involved analysis of approximately 86 million transactions

over a span of eight years for which it is possible to link trades at different banks with Class Members. (This linkage process is ongoing and will be further refined at the merits phase.)

33.     For estimating impact and damages to members of the Exchange Class, we have outlined a methodology that will make use of futures trade records provided by the Chicago Mercantile Exchange, once obtained by Lead Counsel. Damage to individual Class Members can then be computed for Class Members who provide their CME identification numbers.

34.     Our opinions and the economic analyses that underpin them are based on the evidence and data productions made available to us thus far. While the data productions and processing remain incomplete, based on the data we have, it is our economic judgment that the currently available data are sufficiently representative such that our conclusions would remain unaffected when the model is applied to additional data productions. We reserve the right to amend our opinions as and when Defendants produce additional data and these are made available to us.

## IV.     OVERVIEW OF THE FX MARKET

35.     This Declaration demonstrates that common formulae exist to measure impact and damages on a class-wide basis. Should the Court certify one or both Classes, we anticipate that a merits expert report will be produced at the conclusion of merits discovery. In this Declaration, we provide an overview of the FX market to lay the basic foundation for our economic model and describe how the model could be utilized at the merits stage.

### A.     FX Instruments

36.     The FX market is the biggest financial market worldwide with a daily turnover of $5.4 trillion in April 2013 ($5.1 trillion in April 2016).[3]

---

[3] *See* "Triennial Central Bank Survey: Global foreign exchange market turnover in 2013." Monetary and Economics Department, Bank for International Settlements, February 2014 (hereafter "BIS, 2013"). *See also* "Triennial Central Bank Survey: Global foreign exchange

37.     The FX market consists of foreign exchange transactions – transactions involving, in most cases, the actual exchange of one currency for another. Accordingly, FX transactions are referred to as involving "currency pairs," with one currency being purchased and the other simultaneously sold. Each currency has a common three letter code. For instance, transactions in which British pounds are used to purchase U.S. dollars (or vice versa) are denominated GBP/USD.[4]

38.     FX trading is accomplished through several specific transaction types or instruments, most of which are traded over-the-counter ("OTC"), meaning that counterparties trade directly with each other rather than through an exchange.

39.     The FX market is dominated by OTC trades in specific financial instruments, including spot transactions, forwards, and swaps (described collectively as "OTC FX Instruments"). A smaller portion of FX trading is done through exchanges such as the Chicago Mercantile Exchange. The primary exchange-traded instrument is FX futures contracts (described collectively with OTC FX Instruments as "FX Instruments").

40.     During the Class Period, trading in OTC FX instruments accounted for approximately 97 percent of all FX trading volume.[5]

41.     A spot trade involves the exchange of one currency for another at an agreed exchange rate, to be settled on the spot value date (usually within two working days after the trade). The exchange rate in a spot trade is called the spot rate. The convention is to quote spot rates as the

---

market turnover in 2016." Monetary and Economics Department, Bank for International Settlements, December 2016 (hereafter "BIS, 2016").

[4] *See* Appendix C for a Glossary that explains the three-letter currency abbreviations.

[5] BIS Triennial Central Bank Survey: Foreign exchange turnover in April 2013: preliminary global results Monetary, September, 2013, p. 9. https://www.bis.org/publ/rpfx13fx.pdf.

number of units of the "quoted" currency required to buy one unit of the "base" currency. The U.S. dollar ("USD") serves as the base currency in most currency pairs, unless the trade involves the British pound ("GBP") or the euro ("EUR"). For example, in the EUR/USD currency pair, the euro is the base currency and the U.S. dollar is the quoted currency. The exchange rate tells us how many U.S. dollars it takes to buy one euro.

42.　　In the FX market, exchange rates are usually quoted to four decimal points (e.g., EUR/USD at 1.2026).[6] The smallest fractional move in an exchange rate is typically referred to as a "pip" (at the fourth decimal point for most currencies, and at the second decimal point where JPY is the quoted currency).[7] For example, if the EUR/USD spot rate moves from 1.3418 to 1.3419, it is said to have moved up by 1 pip.

43.　　FX forwards are over-the-counter-transactions where, typically, two currencies are exchanged for each other at a specified price at a specified time in the future.[8] The trades are settled on a value date other than the spot value date—for example "same day" or "in 90 days." The time to the value date is called the "tenor." The exchange rate in a forward trade is called the outright forward rate.

44.　　An FX swap involves the exchange of either a spot and a forward or two forwards in the

---

[6] One exception to this convention is trades where the Japanese yen ("JPY") is the quoted currency, in which case the rate is quoted to two decimal points (e.g., USD/JPY at 109.67). Some platforms have recently permitted prices to be quoted to five decimal places (or three decimal places where JPY is the quoted currency).

[7] On platforms that allow quoting to five decimal points, or three decimal points where JPY is the quoted currency, the smallest fractional movement is typically referred to as a "fractional pip."

[8] For certain forwards, called non-deliverable forwards, the currencies are not actually exchanged, because one of the currencies involved is not freely traded. For non-deliverable forwards, the profit or loss at the value date is paid out in the other currency.

same currency pair, with different maturities (or settlement dates), but in opposite directions.[9] An example of a swap is selling USD for GBP spot (value date: +2) and simultaneously buying USD with GBP forward with settlement in 90 days.

45.     FX futures contracts are essentially exchange-traded forwards with standardized terms.

46.     All FX trading – regardless of instrument – involves spot rates, which serve as the underlying "rate" for all instruments. In other words, the prices of all the FX instruments described above effectively incorporate the spot rate. The forward and futures rates for a given currency pair and settlement date equal the spot rate for that currency pair plus a set of "forward points," which capture the interest rate differential between the two currencies over the period from the spot value date to the forward or future value date. Swaps – being combinations of two outright forwards in opposite directions – are also priced off spot rates, with the addition of a set of "swap points." As a result, every change in the spot rate leads to a change in the forward or futures rates, the price of a swap, and so on.

### B.     FX Market Participants

47.     Broadly speaking, the OTC FX market can be thought of as consisting of two types of market participants: "dealers" (also referred to as "market makers" or "liquidity providers") and "buy-side" customers. The main difference between them is that dealers are in the business of providing liquidity to the broader FX market, meaning that they stand ready to enter into either side of an FX transaction (buy or sell).

---

[9] Some textbooks define an FX swap as the combination of a *spot* trade and a forward trade in the same currency pair, with different maturities (or settlement dates), and in opposite directions. However, swaps need not involve a spot trade as one of the legs of the transaction; that is, the "near date" need not be 2 days.

48.     Because there is no conventional exchange for FX and pricing is largely opaque with little to no public reporting of prices, the prices that FX dealers quote to customers effectively set the "market" prices.

49.     Buy-side customers may incidentally provide liquidity by trading directly with other buy-side customers. However, standing ready to provide liquidity is not the primary function of buy-side customers.[10]

50.     Dealers are principally large multi-national banks such as the Defendants. Buy-side customers include a broad spectrum of entities including asset managers, investors, and corporations of varying sizes.

51.     Dealers manage risk and are compensated for the service of providing FX liquidity in the form of the "bid-ask spread." Because providing liquidity involves being willing to take either side of an FX transaction, dealers typically quote two-way prices (e.g., 1.2026/30 in EUR/USD): a price at which they are willing to buy a currency pair, also called the "bid" (1.2026), and the price at which they are willing to sell that same currency pair, also called the "ask" (1.2030). The difference between the bid and the ask is the spread (here: 4 pips, or 0.0004). The half-spread (here: 2 pips) can be thought of as the effective "price" to buy-side customers of engaging in an FX transaction.

52.     Hypothetically, if a buy-side customer were to simultaneously buy and sell the same currency pair (e.g., 1 million EUR/USD at 1.2026/30), the spread (here: $400) would represent their cost for that round-trip transaction (USD to EUR back to USD), with each leg of the trip

---

[10] The growth of electronic trading has recently, to some extent, blurred the lines between traditional dealers and buy-side market participants by allowing certain entities (e.g., hedge funds) to regularly provide liquidity, including by quoting two-way prices, on multiparty electronic trading platforms.

costing half the spread (here: $200). Likewise, the spread would represent the profits earned by the dealer for the round-trip transaction, with each leg earning half the spread. Because dealers earn volume-based profits on their liquidity-provision services, in a properly functioning competitive market, they compete with each other for buy-side FX volume on the basis of the spreads they offer to buy-side customers.

53.     A dealer will generally want to maintain a desired or "neutral" inventory position notwithstanding its provision of liquidity to the market. Naturally, large customer orders tend to take a dealer away from its desired inventory position, during which time the dealer assumes the risk of unfavorable movements in exchange rates.

## C.     FX Trade Types and Trade Venues

54.     During the Class Period, there were two types of trades: "voice trades" and "electronic trades." Voice trades are trades that, traditionally, are communicated to the bank over the phone, though "voice" trades may be submitted through e-mail or other electronic communication. Electronic trades are those that are placed through electronic trading platforms.

55.     Broadly speaking, there were two types of electronic trading platforms: (1) those owned and operated by a single dealer, commonly referred to as single-bank platforms ("SBPs"); and (2) those operated by third parties, commonly referred to as multi-bank platforms or electronic communications networks ("ECNs").

56.     On an SBP, customers interact with a single dealer bank electronically. ECNs allow multiple dealers to simultaneously quote prices to all platform users and thus ostensibly to increase price transparency and competition. ECNs may also permit counterparty anonymity. Examples of ECNs are FX Connect, 360T, FX All, Currenex, and Hotspot.

57.     Not all trading platforms are readily accessible to buy-side customers, however. Historically, dealers traded with each other in what was commonly called the "interbank" or

"interdealer" market. Such transactions were completed either directly or through brokers, first by telephone but later predominantly through electronic trading platforms.

58.    During the Class Period, interdealer trading took place through two dominant ECNs: EBS and Thomson Reuters Matching ("Reuters"). EBS had the dominant position in the biggest currency pairs not involving the Commonwealth currencies (EUR/USD, USD/JPY, EUR/JPY, USD/CHF, EUR/CHF, and USD/CNH). Reuters dominated smaller currency pairs (for instance, EUR/NOK and EUR/SEK) and Commonwealth currencies (GBP/USD, AUD/USD, NZD/USD, USD/CAD).

59.    These two ECNs are primarily distinguished by the facts that trading is generally anonymous, and all pricing is firm and executable. Although access to the two platforms was at one time limited to major dealing banks, in the mid-2000s the platforms were opened to other market participants that could trade under a dealer's name using a dealer's credit lines through what is called a "prime brokerage" relationship.

60.    Over the course of the Class Period, electronic trading grew substantially, such that a majority of trading migrated away from voice and toward electronic trading. Nevertheless, voice trading accounted for a significant percentage of volume during the Class Period, particularly for non-financial clients. In part, this was because large orders, even if submitted electronically, required human intervention as they posed a greater inventory risk to dealers.

        D.    FX Market Structure

61.    The FX market has a decentralized structure and is largely unregulated. Trading is continuous and takes place through many trading channels. As in other OTC markets, the pricing of OTC FX instruments is largely opaque, with the prices of trades agreed to between two counterparties often being invisible to the broader market.

62.    Over time, the increasing capital investments necessary to keep up with technological

advances have contributed to a significant increase in market concentration (*see* Figure 1). According to *Euromoney* FX Surveys, during the 1990s, around 30 banks represented 75% of the FX market, while 15-20 banks represented 60% of the market. During the Class Period, 8-9 banks represented 75% of the market, while only 5-6 banks represented 60% of the market.

**Figure 1. Market concentration**



The top line shows the number of banks (on the vertical axis) accounting for 75% of the market, while the bottom line shows the number of banks accounting for 60% of the market. Source: *Euromoney* FX Surveys.

63.     Consistent with these trends, the 16 Defendants' share of worldwide FX volume increased from 74.2% in 2003 to 85.6% in 2015. From 2008 to 2014, Defendants' share of trading volume in the U.S. ranged between 87% and 93%.[11]

**E.     Factors Influencing FX Pricing**

64.     FX instruments can be viewed as having two price components: (1) the transaction cost associated with exchanging currencies, which is encompassed within the bid-ask spread, and (2) the exchange rate between two currencies, which is reflected in the midpoint of the bid-ask

---

[11] Calculated from *Euromoney* FX surveys (various years).

spread on a particular currency pair. This report measures impact on members of the OTC Class and, ultimately, damages resulting from defendants' widening of bid-ask spreads.

65.     Information is the lifeblood of financial markets: information moves prices and spreads. The FX market is no different.[12,13] According to generally accepted theoretical models of price setting in the FX market (known as FX microstructure models), FX dealers adjust the prices they quote based on "order flow information"—that is, information about who is buying or selling, how much customers are buying or selling, and the net balance of buys and sells. Dealers do so because customer order flow conveys pricing-relevant information[14] and has been shown to strongly predict exchange rate movements. This is particularly true of the order flow of financial customers such as hedge funds.[15] In short, order flow information is a reflection of net buying and net selling pressure for certain currencies—that is, of market demand.

66.     Order flow information also allows dealers to make their own informed trades in anticipation of price movements, with those trades themselves influencing demand for, and thus the prices of, certain currencies. Accordingly, the exchange rate component of FX pricing is

---

[12] Empirical evidence supports the central premise of FX microstructure models that FX dealers set prices based on order flow information. *See* Lyons (1995), Evans and Lyons (2002), Evans and Lyons (2005), Froot and Ramadorai (2005), and Rime, Sarno, and Sojli (2010).

[13] That knowledge of order flow information is valuable to a dealer is true not just in FX markets. The academic literature has documented that dealers can profit from information about customer order flow on the New York Stock Exchange (Madhavan and Smidt (1991)), in options markets (Easley, O'Hara, and Srinivas (1998)), and in the Canadian Treasury market (Hortaçsu and Kastl (2012)), among other settings**.** For seminal theoretical models of how prices are based on order flow information, *see* Kyle (1985), Glosten and Milgrom (1985), Admati and Pfleiderer (1988), and Easley, Kiefer, O'Hara, and Paperman (1996).

[14] *See* Lyons (1995), Covrig and Melvin (2002), Ito, Lyons, and Melvin (1998), Yao (1998a), Cheung and Wong (2000), Naranjo and Nimalendran (2000), Evans (2002), and Payne (2003).

[15] *See* Danielsson, Payne, and Luo (2011), Menkhoff, Sarno, and Schmeling (2016).

influenced primarily by sensitive competitive information that buy-side customers bring to dealers through their orders, as well as dealers' use of that information in their own trading.

67.     The transaction cost, or spread, is influenced by several factors. Conceptually, it is helpful to separate these into three categories: dealer-specific factors, market-specific factors, and customer-specific factors.

68.     **Dealer-specific factors** are primarily a function of a dealer's unique operating costs, such as the overhead associated with rent, salaries, and IT equipment. Although a dealer's extemporaneous pricing decisions may not consciously consider its unique operating costs, the dealer's spreads must nevertheless incorporate and reflect those unique costs over time. Accordingly, a statistical analysis of FX pricing should incorporate dealer identity as a variable. Our analysis has done so, as discussed below.

69.     **Market-specific factors** are primarily a function of the risks of managing currency inventory, with increased inventory risk typically resulting in increased spreads. For example, according to the academic literature,[16] inventory risk increases with the size of a transaction and with increased price volatility. In a competitive environment, executing larger trades moves a dealer's inventory position further from the dealer's desired inventory, exposing the dealer to greater risk that prices will move against the dealer before the position can be neutralized. Similarly, volatility increases the risk of adverse price movements during the period of inventory imbalance. Inventory risk also increases as the availability of liquidity in the entire market decreases, whether due to a thin market for specific currency pairs, or due to well-documented changes in liquidity during certain times of the day or certain days of the month. Given the

---

[16] *See* Ho and Stoll (1981).

significance of these factors, an appropriate statistical analysis of FX pricing should incorporate variables for trade size, volatility, and liquidity. Our analysis has done so, as discussed below.

70.     **Customer-specific factors** are primarily a function of a customer's trading activity, sophistication, and likelihood of being informed. Customers that trade frequently are potentially profitable for a dealer because such customers provide the dealer more opportunities to profit from large numbers of transactions, so dealers have an incentive to quote those customers narrower spreads to attract or keep their business.[17] Sophisticated customers may be more price sensitive and thus more likely to take business to a competitor, so dealers may have an incentive to quote such customers narrower spreads.

71.     Dealers invest substantial resources in studying the trading patterns of their customers to learn if their order flow is informed—i.e., predictive of short-term or long-term price movements. Dealers may offer informed customers narrower spreads to obtain valuable information about long-term price movements that they can use in their own trading, or they may offer such customers wider spreads to protect themselves from increased inventory costs in the short term. A statistical analysis of FX pricing should incorporate as customer-specific variables customer volume, sophistication, and likelihood of being informed. Our analysis has done so, as discussed below.

72.     Additional factors also influence transaction costs, which can be accounted for formulaically. For example, whether a trade is a voice trade or executed on an electronic trading platform may be considered an operating-cost factor (e.g., voice trades requiring human intervention have a higher marginal cost), or a market-specific factor (e.g., there is greater price

---

[17] Dealers have the power to price discriminate because OTC trading is not generally anonymous and because customers who decline to trade must subsequently search for better prices, a process that is time-consuming and risky. *See* Lagos and Rocheteau (2009).

19

transparency on electronic platforms). Regardless of how it is characterized, whether a trade is voice or electronic should be controlled for in a statistical analysis of FX pricing. Our analysis has done this, as discussed below.

## V. DEFENDANTS' ALLEGED COLLUSION HAD CLASS-WIDE IMPACT

73.    Plaintiffs allege that defendants agreed to fix FX prices in a dynamic financial market through a persistent, systematic, and interconnected conspiracy to widen spreads.[18]

74.    In our economic judgment, absent such an agreement, it would be against any of the Defendants' unilateral economic interests to share sensitive competitive information, including their customer and proprietary positions. As we will demonstrate in this section, Defendants' alleged agreement and acts in furtherance thereof resulted in spreads widening throughout the FX market. The resulting harm suffered by all or virtually all Class Members was reflected in higher prices when buying and lower prices when selling.

75.    We have reviewed the Complaint as well as the documents cited therein. We have reviewed Plaintiffs' Memorandum of Law in Support of Class Certification and the documents cited therein. We have also reviewed the Expert Report of Robin Poynder,[19] which details his review and analysis of trader chats taking place on a randomly selected, statistically representative sample of trading days during the Class Period. We have also reviewed the guilty pleas or charging documents of several Defendant banks[20] and regulatory and governmental

---

[18] *See* Compl. ¶¶ 124, 139-71.

[19] Expert Report of Robin Poynder – Bank Chats, *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 13-cv-7789-LGS (S.D.N.Y. May 31, 2018) ("Poynder Report").

[20] *See, e.g., United States v. Barclays PLC*, Plea Agreement (May 19, 2015) https://www.justice.gov/file/440481/download; *United States v. BNP Paribas USA, Inc.*, Information (Jan. 25, 2018), https://www.justice.gov/opa/press-release/file/1028886/download; *United States v. Citicorp*, Plea Agreement (May 19, 2015), http://www.justice.gov/file/440486/download; *United States v. JPMorgan Chase & Co.*, Plea

findings with respect to several other Defendant banks, including Credit Suisse.[21]

76.     Numerous examples of this price-fixing conduct are alleged in the Complaint. Spreads are alleged to have been persistently shared and, ultimately, agreed upon in various forms of "chat rooms."[22] We assume these allegations to be true for purposes of our analysis.

77.     The documents we reviewed describe how FX traders working for Defendants could have exploited the exchange of spreads to their advantage, to the disadvantage of buy-side customers, or both.[23] These descriptions are consistent with existing academic literature on FX microstructure and our own work in that field.

78.     The evidence we have reviewed shows that Defendants could, and appeared to, agree to artificially increase spreads in several ways. For example, by sharing spread information with each other, Defendants agreed (expressly or tacitly) to consistently quote higher spreads on a given volume of particular currency pairs, which would be higher than the spread the customer would pay if Defendants competed with each other. Defendants also appear to have discussed and agreed upon prices to include in spread matrices. Spread matrices were price grids that were

---

Agreement (May 19, 2015), http://www.justice.gov/file/440491/download; *United States v. The Royal Bank of Scotland, plc*, Plea Agreement (May 19, 2015), http://www.justice.gov/file/440496/download.

[21] *See, e.g., In re Goldman Sachs Group, Inc.*, Order to Cease and Desist (Bd. of Govs. of Fed. Res. May 1, 2018), https://www.federalreserve.gov/newsevents/pressreleases/files/enf20180501b1.pdf; *In re Credit Suisse AG*, Consent Order (N.Y. Dept. Fin. Servs. Nov. 13, 2017), https://www.dfs.ny.gov/about/ea/ea171113.pdf; Final Notice to UBS AG (Financial Conduct Authority Nov. 12, 2014), https://www.fca.org.uk/publication/final-notices/final-notice-ubs.pdf; *In re Bank of Am., N.A.*, AA-EC-14-99, Consent Order (OCC Nov. 7, 2014), https://www.occ.gov/news-issuances/news-releases/2014/nr-occ-2014-157b.pdf.

[22] *See* Compl. ¶¶ 145-71.

[23] *See, e.g., Credit Suisse AG*, Consent Order, ¶¶ 3, 36-37 (N.Y. Dept. Fin. Servs. Nov. 13, 2017), https://www.dfs.ny.gov/about/ea/ea171113.pdf; Compl. ¶¶ 145-71; Poynder Report ¶¶ 57-66.

sent to buy-side customers on a periodic basis.[24] In reviewing the documents underlying the Complaint, as well as the Poynder Report, we saw instances of traders working for Defendants sharing customer-specific spread information.[25] We have also reviewed examples where

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████

79.     We understand that sharing such spread information is alleged to have led to an agreement or an understanding that other Defendants should not quote narrower spreads, thus allowing members of the conspiracy to extract higher transaction fees due to a reduction in competition. Buy-side customers trading in a market in which Defendants had effectively established floors on spreads and reduced price competition among dealers would suffer injury.

80.     In our review of the evidence, including the Poynder Report, we have seen that spread information was exchanged among Defendants on a near-daily basis.[27] However, Defendants did not need to exchange information about spreads on every customer quote, or on every quote involving certain classes of customers, to inflate the transaction costs of all customer trades during the Class Period. As demonstrated in the empirical section of this Report, our analysis shows that all or virtually all customers suffered increased transaction costs on at least one of their trades during the Class Period.

---

[24] *See* Compl. ¶ 142.

[25] *See, e.g.,* Compl. ¶¶ 150-52, 155, 158.

[26] *See, e.g.,* Compl. ¶¶ 153-54, 156-57, 160-61, 163-65; Poynder report, ¶ 62 (discussing CS-FXLIT-04998568 at 581; chat reflects ███████████████████████████████
███████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

[27] *See, e.g.,* Poynder Report, at ¶ 69; Compl. ¶¶139-71.

81.     Defendants' alleged agreement to fix prices and acts in furtherance thereof would increase transaction costs market-wide. Their coordinated exploitation of shared sensitive competitive information including spreads, customer ID, volume and other information would increase what economists call "adverse selection risk," widening spreads across the FX market.

82.     Adverse selection arises from what economists have called "asymmetric information," that is, a situation in which a buyer and a seller do not have the same information. In the financial markets context, adverse selection risk arises from the risk that market makers unknowingly deal with traders who have superior information about future exchange rate movements and thus will profit at the market maker's expense. Market makers understand this risk and set their bid-ask quotes to ensure that they will make enough profit when dealing with uninformed traders to compensate for the losses they make when unknowingly dealing with informed traders. As adverse selection risk increases, spreads widen in the market. This is a core insight of academic market microstructure research: adverse selection risk causes spreads to widen, thereby increasing trading costs in the FX market.[28] Indeed, Bjønnes and Rime (2005) find that approximately 80% of the spreads in the FX interdealer market is explained by adverse selection risk.

83.     By sharing and exploiting sensitive competitive information on spreads, customer inquiries, customer trades, customer order flow, and/or customer identities, Defendants increased their own information advantage relative to other market participants, which in turn increased adverse selection risk. Greater adverse selection risk then led to wider spreads, as we demonstrate in the remainder of this section.

84.     Absent the sharing of sensitive competitive information, FX dealers at a Defendant bank

---

[28] *See* Lyons (1995), Yao (1998b), and Naranjo and Nimalendran (2000).

would have access to only their own order book and the order flow information of only their bank. Sharing each other's order flow information would have given Defendants foreknowledge of the trading intentions and the actual trades of their competitors and their competitors' buy-side customers, and thus also of the direction and magnitude of broader market order flows.

85.     Access to their competitors' order flow information would have given Defendants a significant informational advantage over both buy-side customers and other non-conspirator participants in the FX market. By trading on their superior shared information (perhaps on their bank's own account, when balancing their inventory holdings, or when front-running a customer order), Defendants increased adverse selection risk in the FX market – that is, the risk of trading against a Defendant bank that enjoyed an informational edge thanks to having access to other Defendant banks' sensitive competitive information and thereby seeing a larger share of market activity and order flow.

86.     Thus, even absent explicit agreements to widen spreads on every trade, Defendants' sharing and exploitation of shared sensitive competitive information necessarily increased information asymmetry in the FX markets, which in turn increased the adverse selection risk faced by every liquidity provider outside the conspiracy. Increased adverse selection risk in turn would cause spreads to widen market-wide, as follows:

   a)   When faced with increased adverse selection risk, some non-Defendant liquidity providers had rational incentives to drop out of the market by ceasing to offer quotes on anonymous electronic trading platforms such as EBS and Reuters.[29] This in turn

---

[29] How would a non-Defendant liquidity provider figure out that adverse selection risk has increased? In standard academic microstructure models, profit-maximizing liquidity providers continuously update their beliefs about the degree of adverse selection they are facing in the market at that time and set their spreads accordingly (*see* for example Kyle (1985) and Glosten and Milgrom (1985)). The real-world counterpart to this updating is that liquidity providers

would have reduced both competition and liquidity on electronic platforms, two factors that otherwise keep spreads tight and moderate the price impact of a trade, all else equal. (Economists refer to this as an "extensive margin" effect.)

b) Non-Defendant liquidity providers that decide to stay in the market despite increased adverse selection risk would have charged wider spreads on anonymous electronic trading platforms. They would do so to protect themselves against the increased adverse selection risk.[30] (Economists refer to this as an "intensive margin" effect.)

c) The Defendant banks understood that because of their agreement to fix FX prices through collusive exploitation of shared sensitive competitive information from their clients and their own trading books, their fellow cartel members possessed information about one another's order flow and therefore had no incentive to offer tighter spreads, ████████████████████████████████████ [31] The only reason to supply your competitor with such sensitive competitive information, and thereby increase your individual risk, is within the context of an agreement to not compete on price. Defendants are engaged in what economists call a repeated game. Any time a Defendant breaks the rules, other members of the conspiracy will learn this and the rule-breaker would be excluded from the conspiracy

---

monitor the profitability of their liquidity provision. If the informational playing field tilts against them (for instance, as a result of sharing order flow information), it can be anticipated that their profitability will fall. They will then adjust their quotes going forward.

[30] Non-Defendant liquidity providers would like to differentiate their pricing to protect against counterparties they suspect have an informational edge, but because trading on electronic trading platforms such as EBS and Reuters is anonymous, they cannot do so. As a result, they offer wider spreads to every counterparty.

[31] ████████████████████████████████████████████████
████████████████████████████████ UBS-ZINC-CIV-000112271 at 276; GS-FX-CIVIL-02033531, at 532-33.

for some period of time. Since Defendants stand to make significant profits from the sharing of private information, they have strong incentives to follow the rules.

87.     Wider spreads on anonymous electronic platforms such as EBS and Reuters would have injured Class Members on all trading venues. First, Class Members trading anonymously on such electronic platforms would have traded on these wider spreads and thus would have paid higher transaction costs. Second, spreads on anonymous platforms such as EBS and Reuters, which operate at the core of the interdealer market, would set reference prices for the FX market as a whole. Defendants would not, all else being equal, trade at narrower spreads than those that they faced to manage their own currency risk. Third, spreads charged on anonymous electronic platforms constitute a significant part of FX dealers' inventory management costs. Dealers, including Defendants, would have passed on increased inventory costs in the form of wider buy-side spreads (i.e., higher transaction fees for the service of providing liquidity to their buy-side customers).

88.     In short, even if Class Members did not trade anonymously on electronic venues such as EBS and Reuters, wider spreads on those venues resulting from the increased adverse selection risk driven by Defendants' agreement and conduct would necessarily have infected spreads on all other venues, causing injury to all Class Members trading during the Class Period. Given their extensive and ongoing trading activities, Defendants would have had reason to be aware of how their collusive conduct would have had this effect.

89.     Note that here, too, it is not essential that Defendants exchanged sensitive competitive information constantly or only intermittently throughout each trading day, so long as they did it persistently during the Class Period. It is inherent in any collusive arrangement that non-Defendant liquidity providers did not, and could not, know *exactly* when Defendants had access

to sensitive competitive information that gave them an edge. Non-Defendant liquidity providers thus experienced a sustained increase in the risk of adverse selection, which would have manifested itself in consistently wider spreads.[32]

90.     To assess this impact on Class Members, we use standard, widely-used econometric techniques, as more fully described below, to calculate whether and to what extent Defendants' agreement and conduct widened spreads relative to a world without such collusive behavior (the "but-for" world). Our econometric estimates reported in the empirical sections of this report provide confirming evidence of both the presence of increased adverse selection risk and its impact on wider spreads. Our estimates of spread widening and class-wide impact are robust and conservative, also as discussed further below.

## VI.     DEFENDANTS' ALLEGED COLLUSION RESULTED IN DAMAGES TO ALL OR VIRTUALLY ALL CLASS MEMBERS

### A.  Our Economic Model for Estimating Damages

91.     Our economic model for estimating damages flows directly from the theory of harm we have set out in Section V. The model offers common formulae to estimate individual and aggregate damages due to artificially inflated spreads resulting from Defendants' persistent, systematic, and interconnected conspiracy to fix FX prices. The model is constructed on the basis, at this writing, of approximately 86 million transactions produced by Defendants and third parties (such as the two leading interdealer ECNs, EBS and Reuters, as well as Bloomberg, and eventually the CME for futures transactions), and does not require Class Members to produce data to support the model.

92.     Our estimation approach measures damages as an "overcharge" on each Class Member

---

[32] *See* Glosten and Milgrom (1985)

trade (i.e., the difference between the actual price and a suitable but-for price), with the same economic methodology applied formulaically regardless of trade type, instrument, or trading venue. Our measure of overcharges lends itself to aggregation (i) by Class Member (i.e., across each Class Member's trades with Defendants during the Class Period), to arrive at an estimate of each Class Member's total individual damage; and (ii) across the entire class (for all Class Member trades with Defendants during the Class Period), to arrive at an estimate of aggregate class-wide damages. Our approach is rooted in standard industry practice, academic literature, and regulatory approaches.

### B. Trade Cost Analysis

93.     As noted at the outset, our model uses a common-factors analysis to demonstrate that the conspiracy resulted in significant increases in FX spreads across the class. As mentioned above, our estimation approach is based on TCA.[33] TCA is widely used in academic research on FX, in financial markets, and by regulators. Much of modern TCA goes back to Perold (1988), who proposed measuring trading costs as the performance difference of two portfolios: the actual portfolio as traded, and a hypothetical "paper" portfolio in which all trades are made at notional or reference rates. This difference is often called the "implementation shortfall," a term that captures the notion that deviations from the paper portfolio's hypothetical performance are due to implementation costs; an alternative term is "slippage cost."[34]

94.     Economically, slippage costs have two components: costs due to trading frictions and

---

[33] A standard academic reference on TCA is Collins and Fabozzi (1991).

[34] Perold (1988) originally proposed implementation shortfall as a portfolio-level measure: a summary measure of trade cost for all trades. It is still used in this sense by "transition managers" (asset managers who specialize in restructuring portfolios). Everywhere else, implementation shortfall is usually thought of as a transaction-level measure, and it is in that sense that we utilize it here.

costs due to nefarious behavior by parties involved in executing the trade.[35] Trading frictions are common factors that are always present in markets. They are a function of observable market conditions, which in turn lend themselves to economic modelling and thus can be controlled for. Nefarious behaviors, such as collusion among dealers or market makers, inflate slippage costs. The essence of our approach to estimating damages is to compare the *actual* slippage cost on a given trade to the *but-for* slippage cost that would have occurred in a but-for market in which prices were not explicitly fixed and sensitive competitive information was not shared collusively and exploited.

95.     At its simplest, a transaction-level implementation shortfall can be constructed as follows:

$$implementation\ shortfall\ on\ trade\ \tau$$

$$= \begin{cases} customer\ price\ of\ trade\ \tau - benchmark\ price & (for\ buy\ orders) \\ benchmark\ price - customer\ price\ of\ trade\ \tau & (for\ sell\ orders) \end{cases}$$

where *customer price* includes all spreads and markups the customer is charged on the trade and *reference price* will be defined next.

96.     TCA distinguishes between "pre-trade" and "post-trade" reference prices. Pre-trade reference prices are those that prevail in the market at the time an order comes in (sometimes

---

[35] More specifically, slippage costs include explicit costs and implicit costs. Explicit costs include commissions (net of any rebates), "take fees" and liquidity rebates, and transactions taxes. Implicit costs include the costs of interacting with the market (bid-ask spreads, price impact), the effects of collusive behavior, opportunity costs associated with not completing intended trades (such as failure of a limit order to execute), and costs associated with delays (failure to fill the order immediately).

called "arrival price"). Post-trade reference prices are those that prevail in the market sometime after the order is executed. For example, in the equities markets, a common pre-trade reference price is the previous day's closing price or the midpoint of the National Best Bid and Offer ("NBBO") at the time the order comes in; a common post-trade reference price is the next day's opening price or the NBBO midpoint five minutes after the trade was executed.[36]

97.     When using pre-trade reference prices, the resulting implementation shortfall measure is called the "effective cost." It is defined as follows:

$$effective\ cost\ of\ trade\ \tau$$

$$= \begin{cases} customer\ price\ of\ trade\ \tau - prevailing\ pre\text{-}trade\ midpoint & (for\ buys) \\ prevailing\ pre\text{-}trade\ midpoint - customer\ price\ of\ trade\ \tau & (for\ sells) \end{cases}$$

where "prevailing" refers to an appropriate point in time before the execution time of the trade (which we will discuss later). To illustrate the concept, suppose a customer submits a market order to buy EUR1,000,000 with USD, the prevailing midpoint at the time the order is executed is 1.1000, and the customer pays USD1,005,000. The effective cost on the trade then is $5,000 (0.0005, or 5 pips).

98.     As can be seen from these definitions, effective cost is usually (weakly) positive, except in the (relatively rare) instances where a customer transacts at a better-than-midpoint price, for example because the customer is in a position to act as a liquidity provider to a bank that is "aggressing" (i.e., initiating the trade).

99.     Effective cost is not only used by academic scholars studying financial markets generally

---

[36] The five-minute-after approach is an SEC requirement in the equities markets.

and the FX market specifically,[37] but it is also the preferred TCA measure of EU regulators.[38] Using the effective cost approach in this case offers two advantages:

a) The same approach can be used to estimate damages for spot trades and outright forward trades, by making an appropriate adjustment to the definition of the "prevailing price." Specifically, for spot trades, the prevailing price is simply the midpoint of the top-of-book bid/ask on EBS or Reuters prior to the trade,[39] which acts as a market-wide reference price.[40] For outright forwards, the prevailing price is simply the bid/ask midpoint prior to the trade adjusted up or down (as appropriate) by the forward points quoted for the same tenor (or length of the contract).[41] Swaps –

---

[37] For an application to FX, *see* Mancini, Ranaldo, and Wrampelmeyer (2013). For applications to other financial markets, *see* Keim and Madhavan (1998) and Hasbrouck (2009).

[38] This is clear from Annex VI to EU Regulation No. 1286/2014, which sets out the procedure providers of financial products are to follow when computing trade costs on their customers' orders. The regulation is based on "[t]he draft regulatory technical standards submitted to the Commission by the European Banking Authority, the European Insurance and Occupational Pensions Authority and the European Securities and Markets Authority (the 'European Supervisory Authorities')." *See* https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=uriserv:OJ.L_.2017.100.01.0001.01.ENG

[39] Arbitrage ensures that midpoints are approximately the same at a given point in time regardless of the data source used to obtain bid/ask data (i.e., whether data are obtained from EBS, Reuters, or another ECN). If they were not, an arbitrage profit could be made by trading across platforms.

[40] In financial markets, including the FX market, there are typically multiple quotes. "Top-of-the-book" quotes are the best ones (highest for bids, lowest for asks) and are likely to be executed first. We use data from EBS and Reuters to compute midpoint prices from top-of-the-book quotes. EBS and Reuters have comprehensive data for currencies that are traded directly against each other (principally, currency pairs involving the U.S. dollar or the euro), but not for what are called cross pairs (such as GBP/JPY). Cross-pair reference prices can easily be constructed using data from the relevant principal currency pairs. For example, to calculate the bid price for GBP/JPY, one multiplies the bid prices for GBP/USD and USD/JPY, and likewise for the ask price for GBP/JPY.

[41] Forward points, which are added to or subtracted from the spot rate, reflect the differential in interest rates for the two currencies in a currency pair matched to the tenor (or length of time) in the forward instrument. Generally, higher yielding currencies have negative forward points,

31

being combinations of two outright forwards in opposite directions and with different maturities – are a little different, in that only the unbalanced portion is exposed to harm: if one leg is harmed, the other leg necessarily profits. The resulting net harm (or net profit) typically would be very small, and accordingly we will ignore it in our economic model for the time being, though our model can be used to estimate it at the merits stage (by netting off the effective costs of each swap's individual legs).

b) The same approach can be used to estimate damages for trades placed on different trading venues. While different trading venues (such as voice, SBPs, and ECNs) are subject to somewhat different microstructure arrangements (which are incorporated into our econometric modelling of damages), effective cost can be estimated for any trading venue as long as data are available for the price the customer paid and the prevailing reference price.

### C. Description of the Empirical Approach

100.    It follows from the theory of harm described in Section V that the but-for world is one in which Defendants did not jointly agree to widen FX spreads or cause FX spreads to widen through the sharing of sensitive competitive information, at the expense of buy-side customers (*i.e.*, a world without the collusive conduct described earlier).

101.    Our TCA damages approach answers the question, "What would customer *i*'s actual trades have cost (in terms of effective costs) if they had been executed in a non-collusive market

---

while lower yielding currencies have positive forward points. This is because higher yielding currencies are relatively more attractive and thus are less costly than owning a low yielding currency. We obtain forward points from Bloomberg. Forward points on Bloomberg are quoted for a set of standard tenors which varies across currency pairs. To the extent possible, we interpolate forward points linearly for non-standard tenors (i.e., value dates between standard tenors, so called "broken dates").

environment instead?"

102. To estimate the but-for effective cost of a given customer trade during the Class Period (December 1, 2007 through December 31, 2013), we proceed first by identifying a "clean period" in which the effects of collusion would be more limited or non-existent.

103. Using Defendants' transaction data, we have analyzed two alternative clean periods: calendar years 2014 and 2015, and 2015 only, and present results for both. There are several rationales for starting with 2014: by the beginning of that year, the majority of Defendants had prohibited the use of inter-bank chats and closed down multi-party "chat rooms,"[42] and a number of the participants in the alleged conspiracy were suspended or terminated from their positions.[43]

---

[42] *See* Compl. ¶ 138 ("As a direct result of the numerous government investigations, Defendants Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, RBS, and UBS banned their traders from participating in multi-bank chat rooms."); Daniel Schäfer, Alice Ross and Philip Stafford, "Banks Ban Traders from Group Chat Rooms," FINANCIAL TIMES, Nov. 21, 2013, at https://www.ft.com/content/68c26cf6-52d5-11e3-a73e-00144feabdc0 ("Several banks including Barclays, Citigroup, and Royal Bank of Scotland have banned the use of most group chat rooms as global probes into alleged benchmark manipulations drive a radical reform of trading floors.")

[43] *See* Compl. ¶ 347 (noting that six Barclays traders were terminated in November 2013); ¶ 350 (noting that Rohan Ramchandani was terminated by Citi in November 2013); *see, e.g.,* Gavin Finch, "Barclays Said to Suspend Chief FX Dealer Ashton Amid Probe," BLOOMBERG, Nov. 1, 2013, https://www.bloomberg.com/news/articles/2013-11-01/barclays-said-to-suspend-chief-fx-dealer-chris-ashton-amid-probe (noting suspension of Barclays traders Christopher Ashton, Jack Murray, and Mark Clark); "'The Cartel': forex rigging probe eyes traders' instant-messaging," SYDNEY MORNING HERALD, Oct. 31, 2013, https://www.smh.com.au/business/markets/the-cartel-forex-rigging-probe-eyes-traders-instant-messaging-20131031-2wjb0.html (noting placement of Citigroup's Rohan Ramchandani, JPMorgan's Richard Usher, and Standard Chartered's Matt Gardiner on leave); Duncan Mavin and Katie Martin, "Leave for Two Who Helped Oversee U.K. Forex Trade," WALL STREET JOURNAL, Oct. 30, 2013, https://www.wsj.com/articles/citigroup-trader-on-leave-amid-currency-probe-1383167611; Sarah Butcher and Florian Hamann, "Who Are Roger Boehler and Niall O'Riordan, the two senior UBS traders allegedly dismissed in the latest scandal?," EFINANCIALCAREERS.COM, Oct. 4, 2013, https://news.efinancialcareers.com/uk-en/152405/who-are-roger-boehler-and-niall-oriordan-the-two-senior-ubs-traders-allegedly-dismissed-in-the-latest-scandal (noting termination of UBS traders Roger Boehler and Niall O'Riordan); *see generally* Compl. ¶345-66 (noting suspensions, terminations, and departures of FX trading employees from late 2013 through 2014)

However, to take account of the possibility that the effects of Defendants' conspiracy had not wholly dissipated by January 1, 2014, we have also estimated our model using a clean period which starts at the beginning of 2015. Our preliminary damage estimates are consistent with a tapering off of collusive activity in 2014: damages are greater when using 2015 as the clean period than when using 2014-15 as the clean period.[44]

104.    Trades in the clean period are used to establish but-for effective costs. To impute the but-for effective cost of a trade that was executed before the end of the conspiracy (what we will call the "collusive period"), we use the effective cost of a trade with equivalent characteristics that took place in the clean period. The term "equivalent characteristics" holds constant the salient characteristics of the trade that have a potential bearing on its effective cost, as discussed earlier. These include:

1. order characteristics (e.g., which Defendant served as the counterparty, the FX instrument involved, order size, trading platform, etc.);

2. market conditions (e.g., liquidity and volatility at the time of the trade, time of day, day of month, etc.); and

3. customer characteristics (e.g., customer trading frequency, customer sophistication, customer likelihood of being informed).

---

[44] Our methodology can easily handle other start dates, say July 1, 2014 or January 1, 2015, and there are sufficient trade data available to use such later start dates. At the merits stage, we intend to investigate which start date is most appropriate. For now, we note that even if our clean period was contaminated with some persisting collusive effects, say in 2014, that would imply our clean period TCA was overstated, so that we would be overstating the "but-for" TCA, and therefore *understating* the difference between the "true" but-for price (one free of all collusive contamination) and actual prices, or *understating both class wide impact and damages*. As noted in the text, a comparison of our preliminary damage estimates between the two clean periods is consistent with these suppositions. Accordingly, employing 2014 and 2015 as the clean period represents a conservative approach to this clean period.

105.    For example, suppose the effective cost on a EUR/USD spot trade for $1 million submitted in the clean period by an infrequent trader on a single-bank platform in average liquidity and volatility conditions at 12 noon on the last day of the month was 6 pips. This becomes the estimated but-for effective cost of a trade with equivalent characteristics executed in the collusive period.

106.    Holding equivalent characteristics constant is achieved by means of regression analysis, a method that is widely used by economists and statisticians (among others); the precise details of the regression are provided below. Intuitively, we estimate a set of predictive regressions, separately for spot and forward transactions, using data from the clean period only, in which the actual effective cost on trade $t$ by customer $i$ in currency pair $c$ is regressed on the economic drivers of effective cost, grouped into the characteristics of the trade, market conditions, and customer characteristics.

107.    The clean-period predictive regressions produce a set of regression coefficients for the variables established by the regression to have a statistically significant effect on effective costs. These clean-period regression coefficients are used to impute (that is, predict) the effective cost of each trade in the collusive period, given its particular characteristics.

108.    For example, a positive clean-period regression coefficient for volatility tells us that trades placed in more volatile market conditions have larger effective costs, and the magnitude of the coefficient tells us how much larger their effective costs are. The imputation step takes this positive relationship between volatility and effective costs into account and adjusts the predicted but-for estimate of effective costs among trades in the collusive period accordingly. This ensures that, say, collusive-period trades placed in more volatile market conditions are allowed to have higher but-for effective costs as a simple result of the higher volatility prevailing when they were

placed.

109.     As noted, we estimate separate predictive regressions (of the same specification) for effective costs on spot trades and outright forwards. Estimating separate regressions has two advantages, one economic and the other practical. The economic advantage is that we do not assume that the economic drivers of trade costs are the same across spot trades and outright forwards. The practical advantage is that computing constraints resulting from the very large number of trades in Defendants' data productions prevent us from pooling the data into a single predictive regression.

110.     Given an imputed but-for effective cost for each trade $\tau$ in the collusive period, damages on that trade are calculated as follows:

$$\text{Damages on trade } \tau = \text{actual effective cost of trade } \tau - \text{imputed but-for effective cost of a trade with } \tau\text{'s characteristics.}$$

111.     Because effective cost can be expressed in monetary units (say, U.S. dollars), they can be added up across all class-eligible trades by a given Class Member, to give an estimate of total damages for that Class Member. They can also be aggregated across all class-eligible trades by all Class Members, to give an estimate of aggregate damages for the class as a whole.

### D.     Formal Econometric Specification

112.     Formally, the procedure for estimating but-for effective costs and hence damages is as follows. Without loss of generality, consider a purchase. Let $P_{i,\tau}$ denote the price customer $i$ paid for a purchase of $X_{i,\tau}$ units of currency $c$ in trade $\tau$, placed during the collusive period, and let $P_{\tau}^{BM}$ denote the prevailing reference price for trade $\tau$. (In the data, the reference price is the EBS/Reuters mid-price just before the trade.) The effective cost of this trade is defined as the difference between the trade price and the reference price, scaled by the trade price and

expressed in basis points:[45]

$$Effective\ cost_{i,\tau} = \frac{\left(P_{i,\tau} - P_\tau^{BM}\right)}{P_{i,\tau}} * 10{,}000. \tag{1}$$

113.    Damage calculation proceeds in two steps. In the first step, we use data on all trades, labeled $t$, by all customers $i$ with Defendant banks during the clean period to regress $Effective\ cost_{i,t}$ on a set of control variables $Z_{i,t}$ (which identify the essential characteristics of the trade, market conditions, and customer characteristics, all to be listed shortly):

$$Effective\ cost_{i,t} = \alpha' Z_{i,t} + v_{i,t}, \tag{2}$$

where the vector $\alpha$ measures the sensitivity of effective cost to each component of $Z_{i,t}$ and $v_{i,t}$ is the regression error term. The "but-for" effective cost of a Class Member's collusive-period trade $\tau$ with characteristics $Z_{i,\tau}$ is given by

$$Effective\ cost_{i,\tau}^* = \hat{\alpha}' Z_{i,\tau}, \tag{3}$$

where the vector $\hat{\alpha}$ contains the Ordinary Least Squares ("OLS")[46] regression coefficient estimates obtained from the clean-period predictive regression (2), and the variables in $Z_{i,\tau}$ are set to the values associated with the Class Member's actual trade $\tau$ in the collusive period. As discussed below, the estimated coefficients from this regression are statistically significant, which allows us to reliably control for the effects of a collusive-period trade's essential

---

[45] Effective costs are scaled to be measured in basis points (100ths of one percent) rather than in pips to ensure that effective costs are comparable across currency pairs. For example, one pip is smaller by a factor of 100 in EUR/USD than in EUR/JPY. It is mathematically straightforward to convert effective costs that are measured in basis points into U.S. dollar amounts using standard industry methods.

[46] OLS regressions are the most common form of regressions used by statisticians and economists. As the term suggests, such regressions minimize the sum of the squared deviations of the observations of the dependent variable (in this case, effective cost) from their estimated values, taking into account the impacts of the independent variables (or the economic drivers of effective cost here). *See* Wooldridge (2015).

characteristics, market conditions, and customer characteristics on effective costs. The statistical precision of the predicted but-for effective cost in equation (3) can be assessed using the standard formula for predictive regressions, namely:

$$s_{i,\tau} = s\sqrt{1 + h_{i,\tau}},$$

where $s_{i,\tau}$ denotes the standard error of the forecast (i.e., of the predicted but-for effective cost), $s$ denotes the root mean square error (RMSE) of the predictive regression (2), and $h_{i,\tau} = Z_{i,\tau}(\mathbf{Z'Z})^{-1}Z'_{i,\tau}$ is the diagonal element of the projection matrix corresponding to the Class Member's collusive-period trade $\tau$. Since smaller standard errors indicate greater statistical precision, it is immediate that our predictive regression (2) will yield more precise estimates of but-for effective costs (and hence of damages) the lower is RMSE.

114.    In the second step, we compute the difference between the actual effective cost of trade $\tau$ placed during the collusive period and the but-for effective cost predicted for that trade:

$$Damage_{i,\tau} =$$

$$Effective\ cost_{i,\tau} - Effective\ cost^*_{i,\tau} = \left(\left(\frac{P_{i,\tau} - P^{BM}_{\tau}}{P_{i,\tau}} * 10{,}000\right)\right) - \hat{a}'Z_{i,\tau}. \quad (4)$$

115.    The damage in USD on the customer's collusive-period trade $\tau$ equals

$$Dollar\ damage_{i,\tau} = \frac{Damage_{i,\tau}}{10{,}000} * X^{USD}_{i,\tau}, \quad (5)$$

where $X^{USD}_{i,\tau}$ is the USD value of the trade.[47]

116.    For each Class Member $i$, total dollar damages equal the sum of the dollar damage on all its individual class-eligible trades $\tau$ completed during the collusive period:

---

[47] In a trade involving the U.S. dollar, $X^{USD}_{i,\tau}$ equals the absolute value of the U.S. dollars bought or sold. In a trade not involving the U.S. dollar, $X^{USD}_{i,\tau}$ equals the U.S. dollar equivalent value of the trade as translated for us by Plaintiffs' Counsel's industry experts, Velador.

$$Total\ dollar\ damage_i = \sum_\tau \frac{Damage_{i,\tau}}{10,000} * X_{i,\tau}^{USD}.$$

$$(6)$$

Note that *total dollar damage* in equation (6) nets off, for each individual Class Member, losses on trades that were damaged from the collusive conduct against any excesses of estimated but-for TCAs over actual TCAs. This is because $Damage_{i,\tau}$ is allowed to take on both positive and negative values in equation (6). The principal economic reason why $Damage_{i,\tau}$ would be negative is preferential treatment given by a Defendant to a customer because of the customer's size, trading volume, or importance to the bank, or because the bank is trying to attract the customer's order flow ███████████████████████████████████████ ████████████████████████.[48]

117.    Aggregate damages for the entire class equal the sum of the total dollar damage suffered by each Class Member $i$:

$$Aggregate\ dollar\ damage\ to\ the\ class =$$

$$\sum_i Total\ dollar\ damage_i = \sum_i \sum_\tau \frac{Damage_{i,\tau}}{10,000} * X_{i,\tau}^{USD}.$$

$$(7)$$

118.    Plaintiffs' counsel have instructed us to consider a customer as having suffered injury if it suffered positive damages in at least one of its trades. Formulaically, this corresponds to $Dollar\ damage_{i,\tau}$ in equation (5) being greater than zero for at least one of customer $i$'s collusive-period trades $\tau$.[49]

119.    The determinants of effective costs – the variables included in $Z_{i,t}$ in regression (2) – are

---

[48] *See* Altadonna Dep. at 122:22 to 123:23 ████████████████████████████████ ████████████.

[49] As a practical matter, this requires that individual trades be assigned to customers – a complex task since the same customer can appear in a given Defendant bank's data under multiple IDs and since the same customer will trade under different IDs at different Defendant banks. The task of assigning trades to customers is ongoing.

motivated by the academic literature on FX microstructure. The standard framework is taken from Bjønnes *et al.* (2017), who model empirically the markups customers are charged by their FX dealer. Their framework is directly relevant to the estimation of damages due to wider spreads, since the half-spread the customer pays is a direct function of the customer-specific markup added onto the interdealer half-spread.[50] Bjønnes *et al.* decompose markups into three components: compensation for the dealer's operating costs, compensation for the dealer taking inventory risk, and a customer-specific adjustment that reflects the customer's sophistication and value to the dealer. The variables capturing these components are discussed next; their precise definitions are listed in Appendix D. Our regression estimates are tabulated in Appendix E.

120.     Operating costs include rent, IT, salaries and so on. These costs are fixed at the level of a trade, meaning they do not vary with the size of the trade. As a result, larger trades are charged a proportionately smaller markup to cover fixed costs, all else equal. Trade size is hence a component of $Z_{i,t}$ in regression (2). Operating costs also include the cost of handling a trade. Costs are higher for trades handled by a human than for an electronic trade, so $Z_{i,t}$ distinguishes between human and electronic trades. Different banks have different cost structures, so $Z_{i,t}$ includes a set of indicator variables to allow for this. An important input cost to dealing banks is the cost of the financial capital they put behind their trades (what is often called "funding liquidity"). This is typically proxied for using the TED spread (the difference between the interest rates on interbank loans and on short-term U.S. government debt).[51]

121.     Inventory risk, as noted earlier, increases with market volatility and uncertainty. We

---

[50] Bjønnes *et al.* focus on customer-specific markups because their dataset had a separate data field for customer markup.

[51] *See*, for example, Garleanu and Pedersen (2011).

capture the effects of volatility and uncertainty using a range of variables:

a) the standard deviation of the width of the EBS/Reuters top-of-the-book bid-ask spread measured second-by-second over the 60 minutes before the trade (greater uncertainty will be reflected in more volatile EBS/Reuters spreads);

b) the standard deviation of the EBS/Reuters midpoint measured second-by-second over the 60 minutes before the trade (greater uncertainty will be reflected in more volatile exchange rates);

c) the order flow imbalance, measured as the net sum of the aggregate amounts bought and the aggregate amounts sold by customers in this currency pair over the 60 minutes before the trade (greater order flow imbalances indicate informed trading, which increases inventory risk);

d) three drivers of FX liquidity: a widely used index of financial-market volatility called the VIX Index, a widely used index of market sentiment constructed by Malcolm Baker at Harvard University and Jeff Wurgler at New York University, and the monthly return on the MSCI World Index in the month of the transaction; and

e) indicator variables for the currency pair in question (since liquidity varies greatly by currency pair) crossed with the hour of the day (since liquidity and hence inventory risk varies over the 24 hours of the trading day), and for the last trading day of the month (when liquidity tends to be higher).

122. In addition, larger trades pose a greater inventory risk to the dealer, resulting in larger spreads (*see* Ho and Stoll (1981)). This means that trade size has an ambiguous effect on spreads overall: a negative effect on operating-cost grounds and a positive effect on inventory-risk grounds.

123.     Customer-specific adjustments to spreads are the main focus of Bjønnes *et al.* (2017). Bjønnes *et al.* argue that dealers vary their markups with a customer's trading activity, sophistication, and likelihood of being informed.

a) Customers who trade more frequently are more profitable to a dealer, all else equal. Accordingly, $Z_{i,t}$ includes a measure of trading activity, measured as the fraction of trading days in the calendar year that the customer traded with this particular bank.

b) More sophisticated customers are offered smaller markups (or else they will take their business elsewhere). Bjønnes *et al.* argue that sophisticated customers prefer trading via multi-bank platforms rather than over the phone (or indeed via a bank's single-bank platform).[52] This suggests two proxies for sophistication. First, an indicator for whether the customer's *particular* trade $\tau$ reaches the bank via a multi-bank platform rather than the bank's own electronic trading platform or over the phone. Second, the customer's *general* tendency to trade via multi-bank platforms, measured as the fraction of the customer's trading activity that comes to the bank via multi-bank platforms rather than some other way.

c) Customers who are more likely to be informed will be offered wider markups if their information concerns near-term price moves (in which case the bank would lose money trading with them and so wants to deter them from trading) and narrower markups if their information concerns longer-term price moves (in which case the bank could make money by inferring their information from their order flow and so wants to attract their orders). Whether a customer is likely to be informed can be

---

[52] Single-bank platforms do not expose the order to competition by other banks and so will attract wider markups, all else equal, something that sophisticated customers will tend to avoid.

proxied for using the fraction of its trades after which the price moves in a profitable direction (i.e., the extent to which the customer's purchases predict future price rises and its sales predict future price falls).[53]

### E.    Selecting the Appropriate "Prevailing Price"

123.    To calculate actual and but-for effective costs, as described above, it is necessary to select the appropriate "prevailing price" (i.e, the appropriate pre-trade midpoint between the top-of-the-book bid and ask prices on EBS and Reuters). ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████

124.    A standard way to deal with such data limitations in empirical analyses is to statistically estimate the time lag between execution and booking, which we do in deriving our actual and but-for effective costs. The statistical theory underlying the booking-lag estimation procedure is summarized in Appendix F. The statistical estimation yields what statisticians call "consistent" estimates of each Defendant's booking lag for a set of currency pairs. In statistics, "consistency" refers to the following desirable property of an estimator: as the number of observations grows large, the estimate converges on the true value and thus is "unbiased" (not tilted in one direction or the other). Given that the number of trades each Defendant has made available for analysis is very large, our estimates of booking lags are hence the best unbiased estimates available.

125.    We apply the booking-lag estimation procedure to all trades that are flagged as voice trades. For electronic trades, our current assumption ████████████████████████

████████████████████████ is that trades are booked virtually instantly after they are executed. Thus, we currently measure the prevailing price as the midpoint of the top-of-the-book bid and

---

[53] *See* Anand *et al.* (2005).

ask from EBS and Reuters at the end of the full second prior to the booking time recorded in Defendants' data productions.

## F. Continuing Refinement of Trade Database

126. The data we are using to estimate damages have been provided to us by Velador Associates. We have relied on Velador's expertise in cleaning and consolidating Defendants' data and on their guidance in handling and interpreting these data. Velador have recommended a number of validation checks and filters (described in the Poynder Declaration), all of which we have adopted and implemented.

127. The Class Member IDs have been provided to us by Ankura Consulting. We have relied on Ankura's work identifying and consolidating Class Members across Defendants' disparate datasets. We understand that this work is ongoing: not all Class Members have been assigned a Class Member ID yet, and not all Class Member trades have been traced and consolidated to a single Class Member ID.

128. As instructed by counsel, we have removed transaction data at the WM/Reuters 4 P.M. fix. For purposes of the merits phase of the case, we will remove, to the extent possible, trades at other benchmark Fixes during the trading day (e.g., the 1:15 P.M. ECB Fix).

129. For the preliminary purposes of this Declaration, Plaintiffs' counsel have instructed us to restrict our estimates of damages to trades that have been associated with Ankura-assigned Class Member IDs that have a nexus to the United States. Counsel have defined a trade as having a U.S. nexus if at least one of the following three conditions is met: the customer is domiciled in the U.S., the customer traded into the United States, or the customer has a U.S. tax ID. Because Ankura's work in identifying Class Members, assigning them IDs, consolidating related legal entities, and tracing trades to them is ongoing, our estimates are preliminary.

130. Even after implementing the Velador filters, ████████████████████████████

44

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

131. To deal with such data errors, we apply the so called "Hampel (1974) filter," a commonly used method in statistics for removing data errors, to Defendants' trade data. In essence, this filter identifies outliers with reference to surrounding trades executed in a suitable window before and after the trade in question. Because currency pairs differ in the ranges within which they normally trade (i.e., they have different volatilities), we apply the Hampel filter currency pair by currency pair. We also apply it separately by spot trades and forward trades, since forward rates need to be adjusted for differences in tenors before they can be compared to each other to identify outliers.

132. The Hampel filter process proceeds as follows. Take the time series of trade prices for a given currency pair (say, EUR/USD) at all Defendant banks. For each trade, identify the 500 observations before that particular trade and the 500 observations after that particular trade. Compute the median price for these 1,000 surrounding observations (i.e., excluding the trade in question). For each of the 1,000 surrounding trades, we compute the absolute difference between the trade price and the median price and compute the median of these absolute differences, which in turn is used to calculate the Mean Absolute Deviation and obtain a robust estimate of the standard deviation of prices. For any trade in question, the Hampel index value is the ratio of the difference between its recorded price and the median price and the standard deviation (or set to zero if the standard deviation is zero). We exclude trades with a Hampel index value greater than

5. That is, we exclude trades with recorded prices that are more than 5 standard deviations away from the median price in the 1,000 surrounding trades.

133.    As noted earlier, we have estimated separate regressions of the form shown in equation (2) for spot trades and for outright forward trades. In principle, our damages model in equations (1) through (5) could be estimated jointly for these two components, but the very large data files imply that computing hardware constraints quickly become binding. Step (6), aggregating damages by customer, and step (7), aggregating damages for the entire class, can of course be performed either for each of the two components separately or for both jointly. In other words, it is possible to break out individual and aggregate damages on spot trades and on outright forwards.

134.    To date, the data productions of the following 14 Defendants have been made available to us: Barclays, BNP, Bank of America Merrill Lynch, BTMU, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBC, RBS, and UBS. These data productions have been processed and cleaned by Velador, and it is the Velador data files that we have relied upon. The data productions are of variable quality, and it is important to note that to date, ███████████████████████████████████████████████ As a result, we are at this time unable to estimate damages for Class Members on their trades with UBS. We understand that Defendants Société Générale and Standard Chartered produced data in late December 2017. The version of the trade data that we have used in our analysis does not yet include the data from Defendants Société Générale and Standard Chartered to date. We anticipate including data from these two Defendants in our analysis at the merits phase of this case. We also anticipate that the addition of the data from UBS, Société Générale, and Standard Chartered will not reduce our estimate of impact or reduce the robustness of our damages model. We do not

include data produced by BNP in the estimates reported here because ████████████ ████████████████████████████████████ and there is no way to ensure that the remaining transaction data are representative of all BNP's transactions with Class Members.

### G.   Approach to Exchange-Traded Products

135.   As of the date of this Declaration, trade data for FX exchange-traded instruments have not yet been made available to us.

136.   We understand that Plaintiffs' counsel is in negotiations with the CME to obtain pseudonymized futures trade data for most of the class period and the year following.

137.   Based on the characteristics of exchange-traded instruments and the ways they are traded, our model of how Defendants' conduct caused spreads to widen would be equally applicable to such instruments. Accordingly, once we have been given access to pseudonymized futures trade data from the CME, we will be able to opine on damages and class-wide impact on FX futures contracts using our empirical model. Our model will then be able to reliably assess the percentage of the Exchange Class that suffered injury, as well as to calculate the aggregate damages on FX futures trades, using common formulae that apply equally to all Exchange Class Members.

138.   Moreover, as long as Exchange Class Members provide their CME ID numbers when making claims, our model will permit us to calculate their individual damages.

## VII.   PRELIMINARY ESTIMATES OF CLASS-WIDE INJURY

139.   As noted at the outset, our approach to the questions of Class-Member injury and Class-Member damages is "bottom-up"—that is, our TCA model estimates damages at the level of each class-eligible trade in the Defendants' data that took place during the Class Period, after which we can aggregate trade-level damages for each unique Class Member and then across all Class Members collectively.

140.     For the purposes of applying our economic model, we have limited our analysis to spot and outright forward trades only (though we can expand it to swaps and FX futures at the merits stage, as outlined earlier).

141.     At the time of writing, and based on Ankura's mapping of customer IDs, we have identified 59,371 Class Members with at least ten trades in Defendants' data productions. Collectively, these 59,371 Class Members have 85,994,441 usable and class-eligible spot and outright forward trades during the Class Period in the 52 currency pairs listed in Appendix C. Of the 59,371 Class Members, 57,444 have trades for which we can currently estimate damages.[54]

142.     Because Ankura's and Velador's work in identifying Class Members and linking class-eligible trades to Class Member IDs is ongoing, the current dataset includes many instances where the same Class Member's trades have been assigned to different IDs or where a trade has not yet been assigned to a Class Member ID. With the benefit of additional time, Ankura and Velador should be able to assign the appropriate Class Member ID to all or virtually all trades and combine trades that currently have different IDs but actually belong to the same Class Member (e.g., because a Class Member traded under different names or through multiple affiliates, or was coded differently in Defendants' unique trade records).

143.     For the time being, however, the nature of the trade database makes it appear as if a large number of would-be Class Members traded only once or a few times during the Class Period, which is unlikely. This is confirmed by the fact that, according to Velador, some of the trades in the database are for such small volumes that they were likely test trades – in other words, trades

---

[54] As discussed earlier, we do not as yet have reliable data for transactions involving the following Defendants as counterparties: BNP, Société Générale, Standard Chartered, and UBS. In addition, have been unable to include trades in USD/CNY, as neither EBS nor Reuters could supply reference prices for this currency pair.

often sent through an electronic venue to make sure the communication works.

144.    For the purposes of this report, we have excluded from our preliminary analysis all trades linked with a Class Member ID that had fewer than 10 linked trades in the current version of the database. We have done so to be conservative, minimizing the risk of wrongly attributing trades to different identities that should in fact be consolidated. We expect that as trade data is processed further, Ankura and Velador will eventually eliminate most instances of Class Member IDs being linked with fewer than 10 class-eligible trades. Plaintiffs' counsel have instructed us to treat a Class Member as having been injured by Defendants' collusive conduct if at least one of its trades during the Class Period resulted in positive damages. We estimate that 99.7% of Class Members were injured at least once, whether we use 2014-2015 or just 2015 as the clean period.[55]

## VIII.    TESTING THE EMPIRICAL MODEL

145.    We have tested the robustness of our class-wide impact estimate in multiple ways, which individually and collectively confirm its reliability.

146.    The estimated coefficients on the variables used in the regressions of TCA during the clean period (for purposes of estimating "but-for" TCAs during the Class Period) have signs that are consistent with what one would expect from the relevant academic literature. They also exhibit high levels of statistical significance, which allows us to reliably control for the effects of a trade's essential characteristics, market conditions, and customer characteristics estimating but-for effective costs.

---

[55] Based on our preliminary analysis, among the 99.7 percent of class members who were damaged on at least one trade, it appears there may be class members who have suffered net negative damages during the Class Period. If, after we have refined our estimates further, there remain Class Members with negative damages for the Class Period, our analysis of the data will be able to determine the identities of any such entities.

147. As noted earlier, the fact that our preliminary estimate of aggregate damages using 2015 as the clean period is higher than the aggregate damages estimate using 2014-2015 as the clean period is consistent with market participants gradually revising down their estimates of adverse selection as the sharing of sensitive competitive information among Defendants ceased.

148. Consistent with economic theory, we find that damages estimates are proportionately larger for voice trades than for single-bank platform trades, which in turn have damages estimates that are proportionately larger than those for multi-bank platform trades. Also consistent with economic intuition, we find proportionately higher damages estimates in less liquid currency pairs than in more liquid currency pairs.

149. Finally, we find that average damages per customer and average damages per trade are greater than zero, with each being statistically significant, which is consistent with the propositions that prices were distorted by the price-fixing conspiracy and that Class Members suffered as a result.

## IX. PRELIMINARY ESTIMATES OF INJURY FOR NAMED PLAINTIFFS

150. At the time of writing, Ankura has linked 11 named Plaintiffs to Defendants' trade data. These eleven named Plaintiffs are:

a) Aureus Currency Fund, L.P.;

b) Employees' Retirement System of Puerto Rico Electric Power Authority ("ERS-PREPA");

c) Fresno County Employees' Retirement Association ("FCERA");

d) Haverhill Retirement System;

e) Oklahoma Firefighters Pension and Retirement System;

f) State Boston Retirement System;

g) The City of Philadelphia, Board of Pensions and Retirement;

h) Tiberius OC Fund, Ltd.;

i) UFCW;

j) Value Recovery Fund LLC; and

k) Employees' Retirement System of the Government of the Virgin Islands.

151.    We estimate that of the 11 named Plaintiffs for which the required data are available, all 11 have been damaged on at least one trade.

## X.    ESTIMATING AGGREGATE DAMAGES

152.    Based on the model outlined above, we can use the data available to us calculate aggregate damages, taking netting into account, once the data are further refined in the manner already outlined. The main steps in the algorithm used to generate individual and aggregate damages are described in Appendix G.

## XI.    CONCLUSION

153.    We are asked to determine whether, assuming common proof exists of a conspiracy to fix FX prices, all or virtually all OTC Class Members were impacted by that conspiracy; whether that impact is capable of being demonstrated through common proof; and whether there is a common methodology to calculate the aggregate antitrust damages to the classes in the aggregate and whether damage to each injured Class Member can likewise be calculated.

154.    In carrying out this assignment, we have reviewed relevant documents and data already described and listed in detail in Appendix H. We were specifically asked to assume the definitions of the two classes and that Defendants engaged in the collusive conduct summarized earlier during the Class Period defined in this matter.

155.    We have applied our collective expertise and research in financial markets and the FX market in particular, prevailing economic theories of how financial markets are structured and operate (collectively known as the study of market microstructure), and the widely accepted TCA

approach for estimating factors influencing transaction costs for spot and forward transactions in the OTC Class in two different clean periods, using standard statistical and econometric techniques.

156.    We have then applied the coefficients on the factors driving TCA during the clean period to the Class Period to estimate "but-for" effective costs for each of the approximately 86 million transactions for which we have usable data. By comparing the but-for effective costs to the actual effective costs from the transactions database separately for spot and forward transactions, we have been able to calculate which members of the OTC Class suffered injury (that is, paid higher transactions costs than the "but-for" effective costs) on at least one trade during the Class Period.

157.    The result, which is robust and conservative for the reasons stated, is that 99.7 percent of the members of the OTC Class suffered such injury.

158.    Our "bottom-up" methodology permits us to calculate damages to OTC Class Members by trade and by customer.

159.    Based on the extensive sample of spot and forward trades used, it is our economic judgment that the currently available data are sufficiently representative such that our conclusions would remain unaffected when the model is applied to additional data productions and to swap transactions.

160.    Similarly, with respect to the Exchange Class, once we have the relevant data from the CME, we will be able to apply the same common methodology to estimate class-wide impact and damages for FX futures transactions and thus for members of the Exchange Class.

Geir Høidal Bjønnes

May 31, 2018

Date

Alexander Ljungqvist

May 31, 2018

Date

# APPENDIX A

# Geir HØIDAL Bjønnes

Associate Professor
BI Norwegian Business School
Nydalsveien 37
0484 Oslo
Nationality: Norwegian
Phone: +47 46410502
e-mail: geir.bjonnes@bi.no

## EDUCATION

Dr. Polit in Economics (June 2001), The Norwegian School of Management and the University of Oslo.

Dissertation: "Four Essays on the Market Microstructure of Financial Markets".
Advisors: Arne Jon Isachsen and Kristian Rydqvist

Adjudication committee: Prof. Richard K. Lyons (UC Berkeley), Assoc. Prof. Bernt Arne Ødegaard (The Norwegian School of Management), Prof. Jan Tore Klovland (The Norwegian School of Economics and Business Administration)

The Siviløkonom HAE degree in Economics (December 1996), The Norwegian School of Economics and Business Administration.

Master of Management/Siviløkonom (December 1992), The Norwegian School of Management.

## EMPLOYMENT

Associate Professor, Finance Department, The Norwegian School of Management (2003-)

Associate Dean (2017-), Bachelor of Finance, BI Norwegian Business School.

Research Fellow, Stockholm Institute for Financial Research (2001-2003)

Lecturer, Department of Economics, The Norwegian School of Management (2001)

Research Fellow, Department of Economics, The Norwegian School of Management (1996-2000)

Research Assistant, The Norwegian School of Management (1993).

## FIELDS OF SPECIALIZATION

Market Microstructure, Asset Pricing, Fixed Income, Treasury Auctions, International Finance

**RESEARCH PAPERS**

"Price Discrimination and the Cost of Liquidity in OTC Markets", 2017 (with Neophytos Kathitziotis and Carol Osler).

"Zooming in and out: Are we capturing the whole picture when we measure arbitrage in currency markets?", 2017 (with Iñaki Rodríguez Longarela).

"Price Discovery in Two-Tier Markets", (with Carol Osler and Dagfinn Rime), 2017.

"Hva skjer med det nordiske kraftderivatmarkedet om aktørene ikke får stille sikkerhet gjennom bankgarantier?", 2015, (with Jo Saakvitne), *Magma*, no. 8.

"Price Discovery in fragmented electronic markets – The case of FX", 2017 (with Neophytos Kathitziotis).

"'Large' vs. 'Small' Players: A Closer Look on the Dynamics of Speculative Attacks", (with Steinar Holden, Dagfinn Rime and Haakon O.Aa. Solheim), 2014, *Scandinavian Journal of Economics*.

"Models of Financial Return With Time-Varying Zero-Probability", 2014 (with Sucarat and Grønneberg).

Imperfect Competition in Uniform-Price Auctions (with Kristin Rydqvist), 2012.

"Dealer Behavior and Trading Systems in Foreign Exchange Markets", (with Dagfinn Rime), *Journal of Financial Economics*, feb., 2005.

"Empirical Evidence on Algorithmic Trading: Strategies and Liquidity provision", (with Kjell Jørgensen), prel. draft, 2011.

"The impact of different players on the volume-volatility relation in the foreign exchange market", (with Dagfinn Rime and Haakon Solheim), (an earlier version was presented at EFA), 2009.

"Asymmetric information in the interbank foreign exchange market", (with Dagfinn Rime and Carol Osler, 2008) Working Paper, Norges Bank, nr. 25.

"Winner's Curse in Treasury Auctions: Evidence from Norwegian Treasury Bill Auctions", 2007.

"Electronic FX Trading – influencing dealer behaviour?" (with Dagfinn Rime), *e-FOREX*, July 2004.

"The Norwegian CO2-Infrastructure Initiative: The Economics and Socio-Economics of Using CO2 for Enhanced Oil Recovery in the North Sea Basin". *Technology*, Vol. 8, pp. 141 – 148. (Ed.) Moghissi, A.A., Cognizant Communication Corporation, NY, 2002.

"Bidder Behavior in Uniform Price Auctions: Evidence from Norwegian Treasury Bond Auctions", September 2001.

"Customer Trading and Information in Foreign Exchange Markets", (with Dagfinn Rime), September 2001.

Four Essays on the Market Microstructure of Financial Markets, Series of Ph.D. Dissertations, no. 3, Norwegian School of Management, 2001.

"Forventningsdannelse i futuresmarkeder for råolje og fyringsolje", *BETA* (*Scandinavian Journal of Business Research*), no. 2, 1999.

"Den store Gjettekonkurransen", (with Arne Jon Isachsen and Svein Stoknes), Working Paper, Statistisk sentralbyrå, 1998.

"Den store Gjettekonkurransen", (with Arne Jon Isachsen and Svein Stoknes), *Økonomiske Analyser*, no. 9, s. 34-41, 1998.

## WORK IN PROGRESS

"Frontrunning", (with Neophytos Kathitziotis and Jo Saakvitne).

## MEDIA

"Viktig valutalærepenge", (with Pål Korsvold), Dagens Næringsliv, October 6, 2017.

## BOOKS

Finansiell Risikostyring (Financial Risk Management) (with Pål Korsvold), 2nd edition, Cappelen Damm Akademisk, 2017.

Finansiell Risikostyring (with Pål Korsvold), Cappelen Damm Akademisk, 2012.

Finansiell Risikostyring – oppgavebok (with Pål Korsvold), Cappelen Damm Akademisk, 2012.

Globale Penger (Global Money), (with Arne Jon Isachsen), Gyldendal, 2004.

Hjelper til Globale Penger (with Arne Jon Isachsen), Gyldendal, 2005.

Valutamarkedet. Teknisk og fundamental analyse (The Foreign Exchange Market. Technical and Fundamental Analysis), (with Pål Haugerud), Ad Notam Gyldendal, 1994.

## BOOK CHAPTERS

"Volume and volatility in the FX market: Does it matter who you are?" (with Dagfinn Rime and Haakon O.Aa. Solheim), in Exchange Rate Modelling: Where do we Stand? (Paul De Grauwe, ed.), MIT Press, 2004. WP version (2003/7)

"The Role of Foreign Speculators in Speculative Attacks. The Case of 1998," (with Dagfinn Rime and Haakon O.Aa Solheim), in Recent Developments on Exchange Rates (Sandrine Lardic and Valérie Mignon, eds.), Palgrave, 2004.

**PRESENTATIONS**

Infiniti 2016, Dublin "Price Discovery in fragmented electronic markets – The case of FX", 2016 (with Neophytos Kathitziotis)

FIBE, January 2016 ("Price Discrimination and the Cost of Liquidity in OTC Markets")

Brandeis University, September 2015 ("Price Discrimination and the Cost of Liquidity in OTC Markets")

Infiniti 2015, Lubliana ("Sources of Information Advantage in the Foreign Exchange Market", (with Carol Osler and Dagfinn Rime)

Kiel Workshop on International Finance, Kiel Institute for the World Economy, February 26-27, 2015 ("The Cost of FX Liquidity: Empirical Tests of Competing Theories")

Kiel Institute for the World Economy, Financial Markets and Macroeconomic Activity, September 18, 2014 ("The Cost of FX Liquidity: Empirical Tests of Competing Theories")
Infiniti 2014, Prato, June, ("The Cost of FX Liquidity: Empirical Tests of Competing Theories")
Department of Business and Economics, University of Southern Denmark, March 20, 2013 ("Sources of Information Advantage in the Foreign Exchange Market")

Infiniti 2011, Dublin ("Empirical Evidence on Algorithmic Trading: Strategies and Liquidity provision")

Microstructure Workshop, University of Leicester, 2009 ("Asymmetric information in the interbank foreign exchange market").

Infiniti 2009 , Dublin ("The impact of different players on the volume-volatility relation in the foreign exchange market")

Cass Business School, 3rd EMG Workshop on Microstructure of Financial Markets (2009), London ("Asymmetric information in the interbank foreign exchange market").

European Finance Association (EFA) (2007) ("The impact of different players on the volume-volatility relation in the foreign exchange market")

Infiniti 2008, Dublin.

The Annual Market Microstructure Conference (2006) in Ottawa

Queens University, Belfast (2006)

SIFR Workshop on FX Microstructure (2003)

LMG Workshop on FX Microstructure (2003)

International Economic Association World Congress (2002) in Lisboa.

Spring Meeting of Young Economists (SMYE) (2002) in Paris.

CESifo Summer Institute (2002)

Sveriges Riksbank (Central Bank of Sweden) (2002)

Norwegian School of Economics and Business Administration (2002)

Riksgjäldskontoret (Swedish National Debt Office) (2002)

Stockholm School of Economics (2001)

Aarhus Business School (2001)

HEC Tulouse (2001)

European Finance Association (EFA) Meeting (2001) in Barcelona

European Finance Association (EFA) Meeting (2000) in London

Econometric Society European Meeting (ESEM) (1999) in Santiago de Compostela

Norwegian School of Management (1999)

Norges Bank (Central Bank of Norway) (1998)


**COURSES TAUGHT SINCE 2006**

Finans (Finance) (Bachelor), (2016 -)

Finans 1 (Finance 1), Spring 2016

Market Microstructure, doctoral course, Fall 2011

Finansiell Strategi (Corporate Financial Managament), Executive Master of Management program, (2013 – ).

Makroøkonomi og Finansielle markeder (Macroeconomics and Financial Markets), Executive Master of Management program, (2014 - ).

Introduction to Asset Pricing, Fall 2011 (Msc)

Risk Management, Spring 2012 (Msc)

Investments, Msc, (2003 – 2010)

Financial Investment Analysis (Bachelor)

Investment Analysis (Bachelor)

Finans 2 (2003 – 2010)

Finansiell Strategi/Investering og Finansiering, Executive Master of Management, (2003 – 2010)

Topics in Finance, Asset Pricing and Liquidity, doctoral course, 2009

Corporate Finance 2, MBA, 2009

Risk Management & Real Options, EMBA, 2009

Financial Management (2007)

Investment Analysis, (2006-2007)

Plasseringsrådgiving/Globale Penger

Risikostyring (KAN, seminar, with Pål Korsvold)

Before 2006: Also Macroeconomics, Microeconomics, Fixed Income, Public Economics, International Economics and Finance.


**MASTER OF MANAGEMENT PROGRAMS**

Responsible for Finansiell Strategi (Corporate Financial Management)

Responsible for Makroøkonomi og Finansielle Markeder (Macroeconomics and Financial Markets) (shared responsibility with Erling Steigum)


**REFEREE ACTIVITY**

Journal of Empirical Finance
Journal of Money Credit and Banking
Journal of Financial Markets
Journal of International Money and Finance
Journal of Banking and Finance
European Journal of Finance
European Finance Association


**PROJECT MANAGEMENT**

Project Manager: "Market Microstructure of Financial Markets (October 1, 2014 – March 31, 2017) (Finansmarkedsfondet/The Finance Market Fund).

Project Manager: "Market Microstructure of Financial Markets (July 1, 2004 – December 31, 2006) (The Finance Market Fund).

**SUPERVISION PHD STUDENTS**
Siri Valseth 2006 – 2011
Neophytos Kathitziotis (2013 - ) (University of Hamburg)

**PARTICIPATION IN DOCTORAL COMITEES**
Espen Sirnes 2008
Arash Aloosh, 2016

**PARTICIPATION IN COMITEES**
Member of the committee: FIBE best paper award (for researchers below 40 years). The prize is by Cappelen Damm Akademisk, Gyldendal Akademisk og Fagbokforlaget. (2015 - 2017 )

**PROFESSIONAL EXPERIENCE**

**Expert (Fagkyndig):**

District court:

Henjesand – Nordea: FX loan (16-208460TVI-SUMO)

Schjødt-Fokus: Senior Bank Loans Linked Note (09-071335TVI-OTIR/02) (2010-2011)

Tapper-Fokus: Senior Bank Loans Linked Note (Fokus)

Tvete Holding-Fokus: Senior Bank Loans Linked Note (Fokus)

Fund Management Group: FMG Protected Masternote (10-050925TVI-OTIR/04) (FMG, BN bank and Fokus)

The Court of Appeal:

Arntsen de Besche: Terra (Claims regarding insurance) (ADEB-LEGAL.FID566709) (2016)

Schjødt-Fokus: Senior Bank Loans Linked Note (Fokus) (2011)

Supreme Court: 2011-2012):

Longvik-Storebrand: (2011/1053) (Storebrand) (HR-2012-00436-A)

Schjødt-Fokus: Senior Bank Loans Linked Note (Fokus) (HR-2012-02382-A)

Owner and Chairman of the Board of Directors in Huser Forvaltning AS (2009-) (Social Services).

Owner and Chairman of the Board of Directors in Huser Trading AS (2014-).

Owner and Chairman of the Board of Directors in Huser Gårdsbarnehage AS (kindergarden) (2010-).

Owner and Chairman of the Board of Directors in Valutatrend AS (1993/1998-2011) (FX trading). Executive manager and member of the Board of Directors (1993-97).

Chairman of the Board of Inn På Tunet Østfold (2007-2010): As Chairman of the Board I was involved a project that should develop markets for suppliers of Social Services ("Inn På Tunet tjenester"). Among other things, we developed a quality system based on EQUASS (European Quality in Social Services). This project was in cooperation with Innovation Norway and County Governor of Østfold.

Cost of capital in the insurance industry (2006) (The Norwegian Natural Perils Pool/Naturskadefondet)

Investment strategy (2005) (Danske Capital)

Valuation of a CO2-Infrastructure (2002) (CO2 Norway)

Industrial use of natural gas in Norway, research project (1999-2000).

Valuation and raising capital for Stenerød Sjampinjong AS (agricultural company) (1997).

Valuation of Real Estate for Norske Liv AS (current name is Nordea Liv AS, insurance company, consulting) (1996-97).

Risk management (foreign exchange, interest rate and price exposure) in SAS (airline company, consulting) (1993-95).

Research Department of Norges Bank (visiting: 1998)

# APPENDIX B

# Alexander Ljungqvist

NYU Stern School of Business – Finance Department & Salomon Center
44 West Fourth Street, #9-160, New York NY 10012
Tel: (212) 998-0304. Fax: (212) 995-4220
e-mail: aljungqv@stern.nyu.edu
http://pages.stern.nyu.edu/~aljungqv/

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| 2018–present | STOCKHOLM SCHOOL OF ECONOMICS |
| | Stefan Persson Family Chair in Entrepreneurial Finance (since 2018) |
| | Professor in Financial Economics (since 2018) |
| 2000–2018 | STERN SCHOOL OF BUSINESS, NEW YORK UNIVERSITY (ON LEAVE) |
| | Ira Rennert Chair in Finance and Entrepreneurship (2009–2018) |
| | Professor of Finance (2008–2018) |
| | Sidney Homer Director, NYU Salomon Center (2015–2018) |
| | Director of Research, NYU Berkley Center for Entrepreneurship & Innovation (2005–2014) |
| | Research Professor of Finance (2007–2009) |
| | Associate Professor (with tenure, 2005–2008) |
| | Charles Schaefer Faculty Fellow (2003–2006) |
| | Assistant Professor (2000–2005) |
| 1995–2000 | SAÏD BUSINESS SCHOOL, OXFORD UNIVERSITY |
| | University Lecturer in Finance |
| | Bankers Trust Fellow, Merton College, Oxford |
| 2011–present | NATIONAL BUREAU OF ECONOMIC RESEARCH, BOSTON |
| | Research Associate |
| 1995–present | CENTRE FOR ECONOMIC POLICY RESEARCH, LONDON |
| | Research Fellow (since 2005) |
| | Research Affiliate (1995–2004) |
| 2013–present | ASIAN BUREAU OF FINANCE AND ECONOMIC RESEARCH, SINGAPORE |
| | Founding Senior Academic Fellow |
| 2012–present | RESEARCH INSTITUTE OF INDUSTRIAL ECONOMICS, STOCKHOLM |
| | Research Fellow |

## VISITING POSITIONS

| | |
|---|---|
| 2015–2018 | Swedish House of Finance & Stockholm School of Economics |
| 2015–2016 | Sveriges Riksbank |

| 2014–2016 | Jockey Club Institute for Advanced Study, Hong Kong University of Science and Technology |
| 2013 | Harvard Business School |
| 2010–2013 | National University of Singapore, Business School |
| 2010–2012 | Federal Reserve Bank of New York, Research Department |
| 2010 | Tokyo University, Department of Economics |
| 2009–2012 | Cambridge University, Judge Business School |
| 2007 | Northwestern University, Kellogg School of Management |
| | London Business School, Entrepreneurship Department |
| | University of Sydney, Finance Department |
| 2000 | London Business School, Finance Department |
| 1999 | New York University, Stern School of Business |

## EDITORIAL BOARDS

| 2008–2014 | Editor, Review of Financial Studies |
| 2016– | Associate Editor, Review of Finance |
| 2013– | Associate Editor, Journal of Financial Intermediation |
| 2007–2008 | Associate Editor, Review of Financial Studies |

## EDUCATION

| 1994–1995 | D.Phil. in Economics, Nuffield College, Oxford University (awarded in 1996) |
| 1992–1994 | M.Phil. in Economics, Nuffield College, Oxford University |
| 1989–1992 | M.Sc. in Economics and Business, Lund University, Sweden |
| 1989 | Abitur, Wilhelm-Gymnasium, Hamburg, Germany |

## HONORS AND AWARDS

| 2018 | Keynote speaker, Asian Finance Association meetings, Tokyo |
| | Keynote speaker, German Finance Association meetings, Trier |
| | Invited speaker, The Econometric Society, Shanghai |
| 2017 | Invited speaker, Asian FMA Conference, Taipei |
| | Invited speaker, 6th Annual Corporate Finance Conference, Exeter |
| 2016 | The Inaugural Henry Grunfeld Lecture, Chartered Institute of Bankers/Institute of Financial Services, London |
| | Nominated for "Professor of the Year" Award, NYU |
| | Keynote speaker, 29th Australasian Finance and Banking Conference |
| | Keynote speaker, Knut Wicksell Centre for Financial Studies |
| | Best Paper Award, MIT Asia Conference |
| 2015 | Mitsui Distinguished Visiting Scholar, University of Michigan |
| | Dean's Lecture, City University London |
| | Johan & Jakob Söderberg Visiting Professor, Swedish House of Finance & Stockholm School of Economics |
| 2014 | Distinguished Public Lecture, Jockey Club Institute for Advanced Study, Hong Kong |
| | Emerald Citations of Excellence Award |
| | 27th AFBC BlackRock Prize |
| | Award for the Best Paper in Asset Pricing, SFS Cavalcade |
| | Charles River Associates Award for the Best Paper on Corporate Finance, WFA |

| | |
|---|---|
| | Keynote speaker, Frontiers in Finance Conference, Warwick University |
| | Fung Visiting Professor, Hong Kong University of Science and Technology |
| | IAS Visiting Professor, Jockey Club Institute for Advanced Study, Hong Kong |
| | Invited speaker, Asian FMA Conference, Tokyo |
| | Invited speaker, Finance Symposium, Hong Kong University of Science and Technology |
| | Invited speaker, Corporate Finance Conference, University of Minnesota |
| 2013 | Founding Senior Academic Fellow, Asian Bureau of Finance and Economic Research |
| | Rising Star of Finance Award |
| | Glucksman Award, NYU |
| 2012 | Keynote speaker, Coller Institute's Private Equity Findings Symposium, London |
| | Keynote speaker, Singapore International Finance Conference |
| | Conference Chair, Asian Finance Association meetings, Taipei |
| | Opening keynote speaker, Asian Finance Association meetings, Taipei |
| | Dean's Distinguished Speaker, The Hong Kong Polytechnic University |
| 2011 | Ewing Marion Kauffman Prize Medal for Distinguished Research in Entrepreneurship |
| | Research Associate, NBER |
| | Emerald Citations of Excellence Award |
| | Keynote speaker, Kauffman Foundation Symposium, Denver |
| | Keynote speaker, Asian Finance Association meetings, Macau |
| | Opening keynote speaker, Finance and Accounting Forum, Brisbane |
| | Keynote speaker, New Year's Conference, WHU Otto Beisheim School of Management |
| | Sir Evelyn de Rothschild Fellow, Cambridge University |
| 2010 | Inaugural Sir Evelyn de Rothschild Lecture, Cambridge University |
| | Keynote speaker, EFM Symposium on Venture Capital, Montreal |
| | Sir Evelyn de Rothschild Fellow, Cambridge University |
| 2009 | Ira Rennert Endowed Chair in Finance and Entrepreneurship, NYU |
| | Argentum Best Paper Prize, European Finance Association meetings, Bergen |
| | Teaching Excellence Award, NYU |
| | Keynote speaker, Asian Finance Association meetings, Brisbane |
| | Keynote speaker, XVII Foro de Finanzas meetings, Madrid |
| | Sir Evelyn de Rothschild Fellow, Cambridge University |
| 2008 | Glucksman Award, NYU |
| | Best Paper Award in Financial Markets, FMA meetings, Dallas |
| 2007 | Research Professor of Finance, NYU |
| | Barclays Global Investors Prize for Best Paper, Sydney |
| | Glucksman Award, NYU |
| | FIRN Visitor, Australia |
| 2005 | Nominated for "Professor of the Year" Award, NYU |
| | Keynote speaker, Canadian Investment Review, Conference on Alternative Investments |
| | Research Fellow, CEPR |
| 2004 | Charles Schaefer Faculty Fellow, NYU |
| 2003 | Charles Schaefer Faculty Fellow, NYU |
| | Glucksman Award, NYU |

| 2002 | CDC Award for Best Paper, NYU |
| | Glucksman Award, NYU |
| 1998 | Oxford University "Best MBA Elective Teacher" Award |
| 1995 | Research Affiliate, CEPR |
| 1993 | Royal Bank of Canada Award |
| 1991 | Jubilee-Scholar of the Lund Academic Society |

## SCHOLARSHIPS

| 1994 | Nuffield College Third Year Scholarship, Oxford |
| | ESRC Research Award (for studies at Oxford) |
| 1993 | Dr. Marcus Wallenberg Scholarship (for studies at Oxford) |
| | Citibank Scholarship (for studies at Oxford) |
| 1992 | ESRC Studentship (declined) |
| | Dr. Marcus Wallenberg Scholarship (for studies at Oxford) |
| | Citibank Scholarship (for studies at Oxford) |
| 1990 | Dr. Marcus Wallenberg Scholarship (for studies at Oxford) |
| | Erik Nylander Scholarship (for studies at Lund University) |
| 1989 | Michael Hansen College Scholarship (for studies at Lund University) |
| | Erik Nylander Scholarship (for studies at Lund University) |

## SELECTED COMPETITIVE RESEARCH GRANTS

| 2017 | Riksbankens Jubileumsfond (grant no. P17-0206:1, SEK 4.399 million) |
| | Jan Wallanders & Tom Hedelius stiftelse/Tore Browaldhs stiftelse (grant no. P2017-0159:1, SEK 3.0 million) |
| | Jan Wallanders & Tom Hedelius stiftelse/Tore Browaldhs stiftelse (grant no. P2017-0075:1, SEK 1.5 million) |
| | Jan Wallanders & Tom Hedelius stiftelse/Tore Browaldhs stiftelse (grant no. F17-0046:1, SEK 0.5 million) |

## RESEARCH INTERESTS

*Corporate finance*
- capital structure
- taxes
- CEO ownership and compensation
- boards of directors
- financing constraints
- investment
- behavioral corporate finance

*Empirical asset pricing*
- testing asymmetric-information models
- liquidity
- limits to arbitrage

*Entrepreneurial finance*
- private equity
- venture capital
- social networks

*Investment banking*
- initial public offerings
- securities underwriting
- analyst behavior
- conflicts of interest
- relationship banking

*Forensic finance*

## CITATIONS

| | |
|---|---:|
| Google Scholar citations | >11,600 |
| Google Scholar h-index | 38 |
| Web of Science citations to my published papers *http://www.researcherid.com/rid/F-5568-2011* | >2,300 |
| Web of Science citations to my working papers, chapters, and books | >150 |
| Web of Science h-index | 25 |

## PUBLISHED AND FORTHCOMING ARTICLES

- Back, K., P. Collin-Dufresne, V. Fos, T. Li, and A. Ljungqvist, 2018, "Activism, strategic trading, and liquidity", *Econometrica*, forthcoming.

- Ljungqvist, A., L. Zhang, and L. Zuo, 2017, "Sharing risk with the government: How taxes affect corporate risk-taking", *Journal of Accounting Research* 55, 669-707.

  *Award for the Best Paper in Accounting, MIT Asia Conference, 2016.*

- Ljungqvist, A., and W. Qian, 2016, "How constraining are limits to arbitrage?", *Review of Financial Studies* 29, 1975-2028.

  *Award for the Best Paper in Asset Pricing, SFS Cavalcade, 2014.*

  *BlackRock Prize for the Best Paper in Capital Markets, AFBC, 2014.*

- Farre-Mensa, J., and A. Ljungqvist, 2016, "Do measures of financial constraints measure financial constraints?", *Review of Financial Studies* 29, 271-308.

  *Lead article.*

- Heider, F., and A. Ljungqvist, 2015, "As certain as debt and taxes: Estimating the tax sensitivity of leverage from state tax changes", *Journal of Financial Economics* 118, 684-712.

- Asker, J., J. Farre-Mensa, and A. Ljungqvist, 2015, "Corporate investment and stock market listing: A puzzle?", *Review of Financial Studies* 28, 342-390.

- Balakrishnan, K., M. Billings, B. Kelly, and A. Ljungqvist, 2014, "Shaping liquidity: On the causal effects of voluntary disclosure", *Journal of Finance* 69, 2237-2278.

  *Glucksman Award for "Best Working Paper in Finance", 2012/13, NYU.*

- Hochberg, Y., A. Ljungqvist, and A. Vissing-Jørgensen, 2014, "Informational hold-up and performance persistence in venture capital", *Review of Financial Studies* 27, 102-152.

  *Argentum Best Paper Prize, EFA, 2009.*

- Cornelli, F., Z. Kominek, and A. Ljungqvist, 2013, "Monitoring managers: Does it matter?", *Journal of Finance* 68, 431-481.

- Kelly, B., and A. Ljungqvist, 2012, "Testing asymmetric-information asset pricing models", *Review of Financial Studies* 25, 1366-1413.

- Asker, J., and A. Ljungqvist, 2010, "Competition and the structure of vertical relationships in capital markets", *Journal of Political Economy* 118, 599-647.

- Hochberg, Y., A. Ljungqvist, and Y. Lu, 2010, "Networking as a barrier to entry and the competitive supply of venture capital", *Journal of Finance* 65, 829-859.

- Ljungqvist, A., F. Marston, and W.J. Wilhelm, 2009, "Scaling the hierarchy: How and why investment banks compete for syndicate co-management appointments", *Review of Financial Studies* 22, 3977-4007.

- Ljungqvist, A., C. Malloy, and F. Marston, 2009, "Rewriting history", *Journal of Finance* 64, 1935-1960.

  *Glucksman Award for "Best Working Paper in Finance", 2006/7, NYU.*

- Ljungqvist, A., F. Marston, L. Starks, K. Wei, and H. Yan, 2007, "Conflicts of interest in sell-side research and the moderating role of institutional investors", *Journal of Financial Economics* 85, 420-456.

- Chemla, G., M. Habib, and A. Ljungqvist, 2007, "An analysis of shareholder agreements", *Journal of the European Economic Association* 5, 93-121.

- Hochberg, Y., A. Ljungqvist, and Y. Lu, 2007, "Whom you know matters: Venture capital networks and investment performance", *Journal of Finance* 62, 251-301.

  *2014 Emerald Citations of Excellence Award, recognizing the 35 most influential papers published in 300 management journals since 1999.*

  *2011 Emerald Citations of Excellence Award, recognizing the 50 most influential papers published in 300 management journals since 2007.*

  *Listed among the 25 most cited articles published in the Journal of Finance since 2004.*

- Ljungqvist, A., V. Nanda, and R. Singh, 2006, "Hot markets, investor sentiment, and IPO pricing", *Journal of Business* 79, 1667-1702.

  *Glucksman Runner-Up Award for "Best Working Paper in Finance", 2001/2, NYU.*

  *Lead article.*

- Cornelli, F., D. Goldreich, and A. Ljungqvist, 2006, "Investor sentiment and pre-IPO markets", *Journal of Finance* 61, 1187-1216.

- Ljungqvist, A., F. Marston, and W.J. Wilhelm, 2006, "Competing for securities underwriting mandates: Banking relationships and analyst recommendations", *Journal of Finance* 61, 301-340.

- Habib, M. and A. Ljungqvist, 2005, "Firm value and managerial incentives: A stochastic frontier approach", *Journal of Business* 78, 2053-2094.

  *Lead article.*

- Ljungqvist, A. and W.J. Wilhelm, 2005, "Does prospect theory explain IPO market behavior?", *Journal of Finance* 60, 1759-1790.

- Benveniste, L.M., A. Ljungqvist, W.J. Wilhelm, and X. Yu, 2003, "Evidence of information spillovers in the production of investment banking services", *Journal of Finance* 58, 577-608.

- Ljungqvist, A. and W.J. Wilhelm, 2003, "IPO pricing in the dot-com bubble", *Journal of Finance* 58, 723-752.

- Ljungqvist, A., T.J. Jenkinson, and W.J. Wilhelm, 2003, "Global integration of primary equity markets: The role of U.S. banks and U.S. investors", *Review of Financial Studies* 16, 63-99.

    *Reprinted in*: Ritter, J.R. (ed.), *Recent Developments in Corporate Finance*, Edward Elgar (2005).

    *Reprinted in*: Madura, J. (ed.), *Financial Markets, Vol. 1*, Sage Publishing (2004).

- Ljungqvist, A. and W.J. Wilhelm, 2002, "IPO allocations: Discriminatory or discretionary?", *Journal of Financial Economics* 65, 167-201.

    *Lead article.*

- Habib, M. and A. Ljungqvist, 2001, "Underpricing and entrepreneurial wealth losses in IPOs: Theory and evidence", *Review of Financial Studies* 14, 433-458.

    *Reprinted in*: Biais, B. and M. Pagano (eds.), *Readings in Financial Markets, Vol. 2*, OUP (2001).

- Jenkinson, T.J. and A. Ljungqvist, 2001, "The role of hostile stakes in German corporate governance", *Journal of Corporate Finance* 7, 397-446.

    *Reprinted in*: Ang, J.S, R.A.I. van Frederikslust, and S. Sudarsanam (eds.), *Corporate Governance and Corporate Finance: A European Perspective*, Routledge (2007).

- Habib, M. and A. Ljungqvist, 1998, Underpricing and IPO proceeds: A note, *Economics Letters* 61, 381-383.

- Ljungqvist, A., 1997, "The pricing of initial public offerings—Further evidence from Germany", *European Economic Review* 41, 1309-1320.


## MONOGRAPHS, CHAPTERS AND OTHER PUBLICATIONS

Ljungqvist, A., 2012, "Disruptive innovation: Are stock exchanges under threat?", in: Rethinking Financial Innovation, Geneva: World Economic Forum.

Brown, S.J., M. Kacperczyk, A. Ljungqvist, A. Lynch, L. Pedersen, and M. Richardson, 2009, "Hedge funds in the aftermath of the financial crisis", in: V. Acharya and M. Richardson (eds.), Restoring Financial Stability: How to Repair a Failed System, Wiley.

Ljungqvist, A., 2007, "IPO underpricing", in: B.E. Eckbo (ed.), Handbook of Corporate Finance, North-Holland.

Jenkinson, T.J. and A. Ljungqvist, 2001, Going public: The theory and evidence on how companies raise equity finance – Second revised edition, Oxford and New York: Oxford University Press. (Foreword by Jay Ritter)

Jenkinson, T.J. and A. Ljungqvist, 1996, Going public: The theory and evidence on how companies raise equity finance, Oxford and New York: Oxford University Press.

## ACTIVE WORKING PAPERS

- "Busy directors: Strategic interaction and monitoring synergies" (with K. Raff). (Under review.)

- "What is a patent worth? Evidence from the U.S. patent 'lottery'" (with J. Farre-Mensa and D. Hegde). NBER Working Paper No. 23268. (R&R for 2nd round.)

- "State capitalism vs. private enterprise" (with D. Chen, D. Jiang, H. Lu, and M. Zhou). NBER Working Paper No. 20930. (R&R for 2nd round.)

- "The incredible shrinking stock market: On the political economy consequences of excessive delistings" (with L. Persson and J. Tåg). NBER Working Paper No. 21909. (Under review)

- "To cut or not to cut? On the impact of corporate taxes on employment and income" (with M. Smolyansky). NBER Working Paper No. 20753.

## EARLIER WORKING PAPERS

- "The bright side of patents" (with J. Farre-Mensa and D. Hegde). NBER Working Paper No. 21959.

- "Liquidity and governance" (with K. Back and T. Li). NBER Working Paper No. 19669.
  *Charles River Associates Award for the Best Paper on Corporate Finance, WFA, 2014.*

- "Managerial labor market frictions and corporate investment" (with A. Agrawal).

- "The investment behavior of buyout funds" (with M. Richardson and D. Wolfenzon). (R&R for 2nd round.)
  *Barclays Global Investors Prize, 2007.*
  *Glucksman Honorable Mention Award for "Best Working Paper in Finance", 2007/8, NYU.*

- "The value of research" (with B. Kelly).
  *Best Paper Award in Financial Markets, FMA, 2008.*

- "The cash flow, return, and risk characteristics of private equity" (with M. Richardson). NBER Working Paper No. 9454.

- "Conflicts of interest and efficient contracting in IPOs", CEPR Discussion Paper No. 4163.
  *Glucksman Runner-Up Award for "Best Working Paper in Finance", 2002/3, NYU.*

- "On the decision to go public: Evidence from privately-held firms" (with E. Boehmer).
  *CDC Award for "Best Working Paper in Finance", 2002, NYU.*

## INVITED LECTURES AND KEYNOTES

2018    Keynote speaker, Asian Finance Association meetings, Tokyo
        Keynote speaker, German Finance Association meetings, Trier
        Invited lecture, The Econometric Society meetings, Shanghai

2017    Invited speaker, Asian FMA Conference, Taipei
        Invited speaker, 6th Annual Corporate Finance Conference, Exeter

2016    Inaugural Henry Grunfeld Lecture, Chartered Institute of Bankers/Institute of Financial Services, London
        Keynote speaker, 29th Australasian Finance and Banking conference, Sydney
        Keynote speaker, Knut Wicksell Centre for Financial Studies, Lund

2015    Dean's Lecture, City University London

2014    Distinguished Public Lecture, Jockey Club Institute for Advanced Study, Hong Kong
        Keynote speaker, Frontiers in Finance Conference, Warwick
        Invited speaker, Asian FMA Conference, Tokyo
        Invited speaker, Finance Symposium, Hong Kong University of Science and Technology
        Invited speaker, Corporate Finance Conference, University of Minnesota

2012    Keynote speaker, Coller Institute's Private Equity Findings Symposium, London
        Keynote speaker, Singapore International Finance Conference
        Opening keynote, Asian Finance Association meetings, Taipei
        Dean's Distinguished Lecture, The Hong Kong Polytechnic University

2011    Keynote speaker, Asian Finance Association meetings, Macau
        Keynote speaker, Kauffman Foundation Symposium, Denver
        Keynote speaker, Finance & Accounting Forum, Brisbane
        Keynote speaker, New Year's Conference, WHU Otto Beisheim School of Management
        Distinguished Lecture, NYUAD Institute, Abu Dhabi

2010    Inaugural Sir Evelyn de Rothschild Lecture, Cambridge University
        Keynote speaker, EFM Symposium on Entrepreneurial Finance & Venture Capital Markets, Montreal

2009    Keynote speaker, Asian Finance Association meetings, Brisbane
        Keynote speaker, XVII Foro de Finanzas, Spanish Finance Association (AEFIN) annual meetings, Madrid

2005    Keynote speaker, Canadian Investment Review (CIR) Conference on Alternative Investments, Monticello


## CONFERENCE PRESENTATIONS

2018    Econometric Society, WFA, Global Corporate Governance Conference/Harvard

2017    AFA, Asian FMA, Exeter Corporate Governance Conference

2016    WFA (x2), Stanford University/Hoover Institution IP² Conference, NBER/Universities, NBER/Productivity, SFS Cavalcade, Wharton Technology & Innovation Conference, MIT Asia Conference, China International Conference in Finance, AAA, LBS Private Equity Symposium

2015    AEA/AFE (joint session), AFA, UPenn-NYU Law & Finance Conference, NBER/China, NBER/Productivity, ABFER Conference, MIT Asia Conference, National Tax Association, NTU Accounting Research Symposium

2014    AFA, WFA (x3), NBER/Behavioral, EFA, SFS Cavalcade, FIRS Conference, UNC Tax Symposium, Minnesota Corporate Finance Conference, Asian FMA, China International Conference in Finance, ABFER Conference, 27th AFBC Conference

2013    AFA, NBER Summer Institute/Corporate, NBER Summer Institute/Entrepreneurship, NBER-JFE Conference on Capital Structure, NBER/Corporate Finance, EFA, Utah Winter Finance Conference, UNC-Duke Corporate Finance Conference, Adam Smith Conference, FIRS Conference, LBS Summer Symposium, China International Conference in Finance, University of Michigan Mitsui Finance Symposium, Rising Star Conference, Kauffman Entrepreneurship Conference, IDC Summer Finance Conference

2012    WFA, Utah Winter Conference, NBER Conference on Innovation & Entrepreneurship, 9th Corporate Finance Conference at Washington University, Five Star Conference

2011    FIRS Conference (x2)

2010    WFA, AFE, EFA, NBER/Entrepreneurship, Paris Spring Conference, 18th Mitsui Symposium at University of Michigan, LBS Private Equity Conference, 7th Corporate Finance Conference at Washington University

2009    WFA (x2), AFA, NBER/Summer Institute, EFA, Fourth CEPR-Bank of Italy Conference, National University of Singapore Corporate Governance Conference, INSEAD/Thailand Conference on Networks

2008    WFA, AFA, NBER/Private Equity, NBER/Entrepreneurship, Napa Conference, FMA, EFA

2007    AFA (x2), NBER/Private Equity, NBER/Behavioral Finance, 20th AFBC, LBS Entrepreneurship Conference

2006    NBER/Entrepreneurship, WFA, UNC-Duke/Corporate Finance Conference, Fourth EVI Conference (HBS), First RICAFE2 Conference

2005    NBER/Entrepreneurship, WFA (x2), AFA, ASSA, EFA, Third RICAFE Conference

2004    NBER/Corporate Finance, WFA (x2), AFA, Wharton-West VC Conference, FIRS Conference, Deutsche Bundesbank Spring Conference, Tuck/Corporate Finance Conference, Third EVI Conference, JFE Conference on Conflicts of Interest in Investment Banking

2003    NBER/Summer Institute, WFA (x2), NYSE/Stanford Conference (x2), EFA, First RICAFE Conference (x2)

2002    WFA, AFA, RFS Conference on Experimental Finance, Texas Finance Festival, Utah Winter Finance Conference, First EVI Conference (Yale)

2001    NYSE Conference

2000    WFA, NYSE/CEPR Conference on IPOs, CEPR/Gerzensee, EFA, ABN-Amro Conference on IPOs, EU/TMR Conference

1998    EFA, EU/TMR Conference, Wharton Conference on Raising Capital

1997 EFA, European Corporate Governance Network, EU/TMR Conference, NYU Conference on Small Business Finance

1996 CEPR/Gerzensee, MFA, German Finance Association Conference, Humboldt-University IPO Conference

1995 CEPR/Gerzensee, EFA, EFMA, Nordic Doctoral Program in Economics

1994 German NSF Conference, Royal Economic Society

1993 EFA

1992 EIASM Workshop on Corporate Finance, LBS 5th European Foundation for Entrepreneurship Conference

## ACADEMIC SEMINARS

2018 Insead; Oklahoma; LBS Accounting; Stockholm School of Economics; Lund University

2017 UT Austin; University of Mannheim; Purdue; NYU Accounting

2016 Cornell Tech; Dartmouth College; University of Amsterdam; Swedish House of Finance; University of Miami; University of Oxford; University of Exeter; University of Bristol

2015 Chicago Booth; University of Michigan; Ohio State; BI Norwegian Business School; NHH Bergen; Northeastern University; Melbourne University; ESMT; Baruch College

2014 Harvard Business School; Notre Dame; University of Vienna; NHH Bergen; Hong Kong Polytechnic University; HEC Paris; University of Queensland; Tokyo Institute of Technology; City University London; City University of Hong Kong; National Chengchi University; National Taiwan University

2013 Chicago Booth; MIT Sloan; Kellogg School; Harvard Business School (x2); University of Rochester; Board of Governors; University of North Carolina at Chapel Hill; University of Illinois, Urbana-Champaign; ESC Toulouse; Hong Kong University; National Chengchi University; National Taiwan University; Sveriges Riksbank

2012 University of Michigan; Carnegie Mellon University; Rice University; New York Fed; European Central Bank; McGill University; Shanghai Advanced Institute of Finance; SIFR; Stockholm Research Institute of Industrial Economics; Cambridge University; University of Queensland; Australian National University

2011 Wharton School; European Central Bank; Boston College; Emory University; University of Georgia; Temple University; HKUST; Toulouse University; Cambridge University; Australian National University; Singapore Management University; National Taiwan University

2010 NYU Economics; New York Fed; Indiana University; University of Texas, Dallas; Southern Methodist University; ESMT Berlin; Swedish School of Economics; Cambridge University; Tokyo University (x2); Tokyo Institute of Technology; Kyoto University; Hitotsubashi University; Nagoya University; National Taiwan University; Korean Advanced Institute of Science and Technology; Peking University; Nanyang Business School; National University of Singapore

2009 UC Berkeley; University of Zurich; Cambridge University (x2); Australian National University; National University of Singapore; Singapore Management University; Case Western Reserve University

2008 Columbia University; Cambridge University; University of Colorado; Sydney University; Monash University

2007 Stanford GSB (x2); Harvard Business School; Wharton School; University of Michigan; Washington University; University of Zurich; Tilburg University; American University; University of Queensland; Melbourne University; NYU Dean's Lunch

2006 European Central Bank; Cornell University; University of Pittsburgh; CUNY Economics; NYU/Berkley; HKUST; Australian National University; Sydney University; University of New South Wales; University of Auckland; Simon Fraser University; University of Texas, Austin

2005 Stanford GSB; UC Berkeley; London Business School; University of British Columbia; University of Southern California; University of Maryland; University of Wisconsin-Madison; DePaul University/Chicago Federal Reserve Bank; University of Amsterdam; Erasmus University Rotterdam

2004 Chicago GSB; Cornell University; Yale School of Management; London School of Economics; Carnegie-Mellon University; Vanderbilt University Law School; Michigan State University; University of Virginia; HEC Paris

2003 Harvard Business School; Kellogg School; University of Minnesota; Tulane University; New York Fed; NYU Law School; University of Lisbon; Oxford University

2002 Columbia University; INSEAD; University of Florida; Georgetown University; Notre Dame University; Indiana University; Purdue University; Penn State University; University of Virginia; Rutgers University; Stockholm School of Economics; BI Norwegian Business School; Norwegian School of Economics; Oxford University; NYU/CDC Award Seminar

2001 Columbia University Law School; University of North Carolina at Chapel Hill; University of Wisconsin-Madison; Cambridge University; Toulouse University; Goethe University Frankfurt; University of Amsterdam; Tilburg University

2000 Duke University; Dartmouth College; London School of Economics; University of Warwick

1999 Columbia University; NYU; Oxford University; University of Vienna; University of Mannheim; University of Bristol; Boston College; Oxford University; University of Hamburg

1997 Stockholm School of Economics; Lund University; Humboldt-University Berlin; London Business School; Birkbeck College

1995 London School of Economics; University of Leeds; Lancaster University; Oxford University

1994 University of Illinois, Urbana-Champaign; Oxford University; Nuffield College; Lancaster University

1993 Humboldt-University Berlin

1992 Nuffield College

INDUSTRY TALKS

2017   Agenta; SEC-NYU Dialogue on Securities Market Regulation

2016   Analysis Group

2015   SEC; Norges Bank Investment Management; ASX; Danske Capital

2013   Knut Wicksell Centre for Financial Studies/IFN Policy Forum on "The Disappearing Stock
        Market"

2011   World Economic Forum, New York; South China Morning Post/HK Treasury Markets
        Association; two leading family offices; Nasdaq DRP

2010   Society of Quantitative Analysts; Development Bank of Japan; Norinchukin Bank, Tokyo

2009   EBRD

2007   AQR; SEC; Oppenheimer Funds

2001   NYSE

2000   SEC

## TEACHING EXPERIENCE

| | |
|---|---|
| Executive | Executive MBA (NYU, 2009–2017) |
| | MS in Global Finance (NYU & HKUST, 2008–2015) |
| | Senior Management Program in Banking (Swiss Finance Institute, 2008–2013) |
| | Advanced Executive Program (Swiss Finance Institute, 2008) |
| | Open-enrolment & firm-specific courses in finance & economics (O|X|E|R|A, 1995–2000) |
| | |
| Ph.D. | Empirical Methods in Corporate Finance (NYU, 2006, 2008, 2012, 2014, 2016) |
| | Seminar in Empirical Corporate Finance (SHoF/Stockholm, 2016; NHH Bergen, 2015; HKUST, 2014; Swiss Finance Institute, 2009; FIRN/Australia, 2007) |
| | NBER PhD Boot Camp (2011) |
| | Seminar in Entrepreneurial Finance (LBS, 2007) |
| | |
| MBA | New Venture Financing (NYU, since 2002) |
| | Venture Capital Financing (NYU, since 2016) |
| | Venture Capital and Private Equity (HBS, 2013) |
| | Entrepreneurial Finance (Oxford, LBS, NYU, 1998–2001) |
| | Valuation (Oxford, 1997) |
| | |
| Undergraduate | Entrepreneurial Finance (NYU, 2001–2005); Corporate Finance, Investments, Finance for Mathematicians, Microeconomics, IO, Introduction to Management (Oxford, 1995–2000) |

## TEACHING AWARDS

| | |
|---|---|
| 2015-2016 | Nominated for "Professor of the Year" Award, NYU Stern |
| 2009 | Teaching Excellence Award, NYU Stern |
| 2004–2005 | Nominated for "Professor of the Year" Award, NYU Stern |
| 1997–1998 | Students' Award for Best Elective Teacher on the MBA Program, Oxford University |

## EXTERNAL SERVICE

| | |
|---|---|
| Sjätte AP Fonden | Board of Directors (2018–) |
| NASDAQ OMX | NASDAQ Listing Council (2011–2017) |
| mAbxience SA | Supervisory Board (2014–2016) |
| World Economic Forum | Council of Experts overseeing "Alternative Investments 2020" project (2012–2015) |
| | Working group for "Rethinking Financial Innovation" project (2011–2012) |
| UK Dept. for Business, Innovation & Skills | Panel of Experts, Review of UK Equity Markets (2013–2014) |

## PROFESSIONAL SERVICE

| | |
|---|---|
| Directorships | Academic Director, Financial Management Association (2012–2014) |
| Nominating committees | American Finance Association (2014–2015) |
| | The Economics Nobel Prize (2016–) |
| External member | Research Funding Review Committee, Swiss Finance Institute (2012–2016) |
| | Senior Promotions Review Committee, London Business School (2012–2013) |
| | Various dissertation committees in finance and accounting, Columbia University (Daniel Dorn; Jörg Rocholl, Erik Johanneson) |
| Conference chair | NYU Stern/NY Fed Conference on Financial Intermediation (annually since 2005) |
| | Riksbanken Conference on Interconnected Financial Systems (2016) |
| | IFN Conference on the Economics of Corporate Ownership (2015) |
| | EFA (Track Chair, Financial Intermediation, 2011) |
| | FMA (Track Chair, Corporate Finance, 2008, 2018) |
| | EVI Conference on Entrepreneurship, Venture Capital, and IPOs (2003) |
| Program committees | NBER CF Meeting (Spring 2012), WFA (since 2007), AFA (2009, 2006), EFA (since 2000), Utah Winter Finance Conference (2014), SFS Cavalcade (2011), EVI Conference (2006, 2004, 2003), FMA (2008, 2004), Finance Down Under (2011), ABN-Amro Conference (2000) |
| Discussant | Annual conferences: AFA, WFA, NBER/Entrepreneurship, NBER/Corporate Finance, CEPR, EFA, ABFER, European Corporate Governance Network, Global Corporate Governance Colloquia; One-off conferences: World Bank/Entrepreneurship (2009), European Central Bank/Corporate Finance and Monetary Policy (2006), Tuck/Corporate Finance (2004), RFS/Price Formation (1999), (1997), EU/TMR Conference (1997) |
| External reviewer | All major finance and economics journals; some top accounting journals; National Science Foundation; Social Sciences and Humanities Research Council of Canada; Finland Distinguished Professor Program; Kauffman Foundation |

UNIVERSITY SERVICE

| | |
|---|---|
| New York University | Sidney Homer Director, NYU Salomon Center (2015–2018) |
| | Research Director, NYU Berkley Center for Entrepreneurship (2005–2014) |
| | Program Director for Alternative Investments, NYU Salomon Center (2009–2014) |
| | Program Director for Financial Institutions, NYU Salomon Center (2003–2009) |
| | NYU Glucksman Institute prize committee (2010–2011) |
| | Co-organizer, Friday finance brown-bag (2010–2015) |
| | Co-organizer, Wednesday finance seminar (2003–2004) |
| | Founding organizer, Monday finance brown-bag (2001–2004) |
| | Seminar co-organizer, NYU Berkley Center for Entrepreneurship (2002, 2005–2014) |
| | Search Committee for Senior Faculty in Entrepreneurship (2003–2005) |
| | Entrepreneurship Curriculum Committee (2006–) |
| | Faculty Grievance Committee (2011-2014) |
| | Junior-recruitment Chair (2008–2009) |
| | PhD committees: Victoria Ivashina (HBS); David Ross (Columbia); Yang Lu (chair; AQR); Bryan Kelly (co-chair; Chicago Booth); Joan Farre-Mensa (co-chair; HBS); Michael Smolyansky (chair; Federal Reserve Board); James Albertus (Carnegie-Mellon) |
| Oxford University | Public Examiner, Final Honour School of Economics & Management (1996–2000) |
| | Organizer, finance seminar (1996–2000) |
| | Recruitment committees: Finance (1996–1999), Accounting (1995–1997) |
| | Lecture list co-ordinator (1995–1998) |
| Merton College | Committee service: Governing Body; Finance; Investments; Academic policy; Strategy; Development (1995–2000) |

# APPENDIX C

# Glossary of Currency Pair Abbreviations

| Currency Pair (Symbols) | Currency Pair |
|---|---|
| AUD/CAD | Australia Dollar/Canada Dollar |
| AUD/JPY | Australia Dollar/Japan Yen |
| AUD/NZD | Australia Dollar/New Zealand Dollar |
| AUD/USD | Australia Dollar/United States Dollar |
| CAD/CHF | Canada Dollar/Switzerland Franc |
| CAD/JPY | Canada Dollar/Japan Yen |
| CHF/JPY | Switzerland Franc/Japan Yen |
| EUR/AUD | Euro/Australia Dollar |
| EUR/CAD | Euro/Canada Dollar |
| EUR/CHF | Euro/Switzerland Franc |
| EUR/CZK | Euro/Czech Republic Koruna |
| EUR/DKK | Euro/Denmark Krone |
| EUR/GBP | Euro/Great Britain Pound |
| EUR/HUF | Euro/Hungary Forint |
| EUR/ILS | Euro/Israel Shekel |
| EUR/JPY | Euro/Japan Yen |
| EUR/NOK | Euro/Norway Kroner |
| EUR/NZD | Euro/New Zealand Dollar |
| EUR/PLN | Euro/Poland Zloty |
| EUR/RON | Euro/Romania Leu |
| EUR/RUB | Euro/Russia Ruble |
| EUR/SEK | Euro/Sweden Krona |
| EUR/TRY | Euro/Turkey Lira |
| EUR/USD | Euro/United States Dollar |
| EUR/ZAR | Euro/South Africa Rand |
| GBP/AUD | Great Britain Pound/Australia Dollar |
| GBP/CAD | Great Britain Pound/Canada Dollar |
| GBP/CHF | Great Britain Pound/Switzerland Franc |
| GBP/JPY | Great Britain Pound/Japan Yen |
| GBP/NZD | Great Britain Pound/New Zealand Dollar |
| GBP/USD | Great Britain Pound/United States Dollar |
| NZD/JPY | New Zealand Dollar/Japan Yen |
| NZD/USD | New Zealand Dollar/United States Dollar |
| USD/CAD | United States Dollar/Canada Dollar |
| USD/CHF | United States Dollar/Switzerland Franc |
| USD/CNH | United States Dollar/China Yuan |

| USD/CZK | United States Dollar/Czech Republic Koruna |
| --- | --- |
| USD/DKK | United States Dollar/Denmark Krone |
| USD/HKD | United States Dollar/Hong Kong Dollar |
| USD/HUF | United States Dollar/Hungary Forint |
| USD/ILS | United States Dollar/Israel Shekel |
| USD/INR | United States Dollar/India Rupee |
| USD/JPY | United States Dollar/Japan Yen |
| USD/MXN | United States Dollar/Mexico Peso |
| USD/NOK | United States Dollar/Norway Kroner |
| USD/PLN | United States Dollar/Poland Zloty |
| USD/RON | United States Dollar/Romania Leu |
| USD/RUB | United States Dollar/Russia Ruble |
| USD/SEK | United States Dollar/Sweden Kroner |
| USD/SGD | United States Dollar/Singapore Dollar |
| USD/TRY | United States Dollar/Turkey Lira |
| USD/ZAR | United States Dollar/South Africa Rand |

# APPENDIX D

# Variable Definitions

The variables used in the regressions are defined as follows:

| Variable | Name in Stata | Definition | Source file name | Name of file generating source file |
|---|---|---|---|---|
| ███████████ | ████████ | ██████████████ | ██████████████ | █████████████████ |
| | | ██████████████ | ████████ | ████ |
| █████████████ | ████ | ██████████████ | ██████████████ | ████████████ |
| | | █████████████ | ████ | █████ |
| | | ███████████████ | | |
| | | ███████████████ | | |
| | | ████████████ | | |
| | | ████ | | |
| █████████████ | █████████████ | ██████████████ | ██████████ | █████████████ |
| | | ██████████ | █████ | |
| █████████████ | █████████████ | █████████████ | ██████████████ | █████████████ |
| | | ████████████████ | ███████████████ | ████ |
| | | █████████████ | ██████████ | |
| | | ████████ | | |
| ████████ | █████████████ | ██████████████ | ██████████████ | ███████████████ |
| | | █████████████ | ██████████████ | █████████ |
| | | █████████████ | ████████████ | |
| ████████ | █████████████ | █████████████ | █████████████ | █████████████ |
| | | ██████████████ | ██████████████ | ██████████ |
| | | ████████████ | ████████████ | |
| | | | ██████████ | |
| ███████ | ████████ | ██████████████ | ██████████ | ███████████ |
| | | ██████████ | | |
| █████████████ | █████████ | ██████████████ | ██████████ | ███████████ |
| | | ████████ | | |

| Variable | Name in Stata | Definition | Source file name | Name of file generating source file |
|---|---|---|---|---|



# APPENDIX E

# Regression Tables for Clean Period = 2014-2015







# Regression Tables for Clean Period = 2015







# APPENDIX F

**Booking Time Lag Estimation Procedure**

Suppose we have records of $N$ trades of a particular currency pair. Buys and sells are distributed evenly among the recorded trades. Each record $i$ consists of a transaction price $v_i$ and a time stamp $t_i$. The trade is timestamped when it is entered into the electronic bookkeeping system, a process called "booking" the trade. However, the researcher suspects that some time elapses between the time a trade is executed and the time it is booked. In other words, the trades are booked with a time lag.

Suppose further that we have data for a time series $p(t)$ of market midpoint prices of the currency pair in question. Transactions take place at the market midprice plus/minus a markup. The markup may vary from trade to trade but is believed to be zero on average, as there is a roughly equal number of buys and sells in the transaction records.

We model this situation by assuming that each trade $i$ actually took place at time $t_i - \theta$, where $\theta$ is a non-negative parameter to be estimated from the data. We also assume that each transaction took place at the prevailing market price plus a Gaussian white noise component (the markup):

$$v_i = p(t_i - \theta) + \epsilon$$

$$\epsilon \sim \mathrm{N}(0, \sigma^2)$$

Further, we model the market midpoint price of the currency pair, $p(t)$, as a Brownian motion $B_t$:

$$p(t) = \sigma B_t.$$

1

To estimate $\theta$, define for each $i$ the pricing error $\Delta_i(x)$:

$$\Delta_i(x) = v_i - p(t_i - x)$$
$$= p(t_i - \theta) + \epsilon - p(t_i - x)$$
$$= \sigma\left(B_{t_i - \theta} - B_{t_i - x}\right) + \epsilon$$
$$\sim N(0, \sigma^2|\theta - x| + \sigma_\epsilon^2)$$

It is clear that $E[\Delta_i(x)] = 0$ for all $x$. It is also clear that the variance of $\Delta_i(x)$ is at a minimum when $x = \theta$, so that

$$\theta = \arg\min_x E[(\Delta_i(x))^2]$$

We approximate the expectation by the sample mean, which gives the estimator $\hat{\theta}$:

$$\hat{\theta} := \arg\min_x \frac{1}{N}\sum_{i=1}^{N}(\Delta_i(x))^2 \qquad (1)$$

The estimator $\hat{\theta}$ is an extremum estimator, a class of estimators which are known to be asymptotically consistent even under much weaker conditions than we have assumed here (Newey and McFadden, 1994).



The sum of $N$ squared standard normal random variables is known to be chi-squared distributed with $N$ degrees of freedom (Abramowitz and Stegun, 1964, p. 940). It follows that for a fixed $x$, the sum $\sum_{i=1}^{N}(\Delta_i(x))^2$ is a scaled chi-square:

$$\sum_{i=1}^{N}(\Delta_i(x))^2 = (\sigma^2|\theta - x| + \sigma_\epsilon^2)\chi_N^2 \qquad (2)$$

Equation (2) yields an analytical expression for the RMSE. This expression can be used to develop confidence intervals and hypothesis testing for $\hat{\theta}$, if desired.

To estimate the time lag in equation (1), we use only data from the clean period, when the alleged collusion is assumed to have ended. This ensures that we estimate each bank's typical booking time lag uncontaminated by the effects of the alleged collusive conduct.

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████





# APPENDIX G

**Damages Estimation Algorithm**


Step 1. Data cleaning

Step 2. Measuring effective costs on each trade

Step 3. Estimating conditional average effective costs in the but-for world

Step 4. Predicting but-for effective costs for the actual world

Step 5. Measuring damages per trade

Step 6. Aggregating damages by customer (across all her trades)

Step 7. Aggregating damages by class (across all customers), estimating class-wide impact

# APPENDIX H

## Materials Consulted

We have consulted the following materials:

- Academic literature as listed in the bibliography in Appendix I

- Data assembled by EI

- Declaration of Hal J. Singer, Ph.D., *In re Foreign Exchange Benchmark Rates Antitrust Litigation,* 13-cv-7789-LGS (S.D.N.Y. May 31, 2018)

- Declaration of Robin Poynder, *In re Foreign Exchange Benchmark Rates Antitrust Litigation,* 13-cv-7789-LGS (S.D.N.Y. May 31, 2018)

- Expert Report of Robin Poynder – Chat Report, *In re Foreign Exchange Benchmark Rates Antitrust Litigation,* 13-cv-7789-LGS (S.D.N.Y. May 31, 2018)

- Defendants' data productions

- Defendants' data production as assembled and cleaned by Velador

- Forward points data from Bloomberg

- Quotes data from EBS and Reuters

- Third Consolidated Amended Class Action Complaint, *In re Foreign Exchange Benchmark Rates Antitrust Litigation,* 13-cv-7789-LGS (S.D.N.Y. June 3, 2016)

# APPENDIX I

**Bibliography**

Abramowitz, Milton, and Irene A Stegun, 1964, *Handbook of Mathematical Functions: With Formulas, Graphs, and Mathematical Tables*, Vol. 55, Courier Corporation.

Admati, Anat, and Paul Pfleiderer, 1988, "A theory of intraday patterns: Volume and price variability", *Review of Financial Studies* 1, 3-40.

Amihud, Yakov, and Haim Mendelson, 1980, "Dealership market: Market-making with inventory," *Journal of Financial Economics* 8, 31-53.

Anand, Amber, Sugato Chakravarty, and Terrence Martel, 2005, "Empirical evidence on the evolution of liquidity: Choice of market vs. limit orders by informed and uninformed traders", *Journal of Financial Markets* 8, 289-309.

Baker, Malcolm, and Jeff Wurgler, 2007, "Investor sentiment and the stock market", *Journal of Economic Perspectives* 21, 129-151.

Bank for International Settlements, 2016, "Triennial Central Bank Survey, Foreign Exchange and Derivatives Market Activity in 2016", B.I.S., Basel.

Batten, J., and R. Bhar, 1993, "Volume and volatility in yen futures markets: within and across three different exchanges", in: T. Bos and T. A. Fetherston (eds.), *Advances in Pacific Basin Financial Markets Vol. 1*, JAI Press, Stamford.

Bernhardt, D., Vladimir Dvoracek, Eric Hughson, and Ingrid Werner, 2005, "Why do larger orders receive discounts on the London Stock Exchange?", *Review of Financial Studies* 18, 1343-1368.

Bessembinder, Hendrik, 1994, "Bid-ask spreads in the interbank foreign exchange markets", *Journal Financial Economics* 35, 317-348.

Bjønnes, Geir Høidal, and Neophytos Kathitziotis, 2016, "Price Discovery in fragmented electronic markets – The case of FX", Working Paper.

Bjønnes, Geir Høidal, Neophytos Kathitziotis, and Carol Osler, 2017, "Price discrimination in OTC markets", Working Paper.

Bjønnes, Geir Høidal, Carol Osler, and Dagfinn Rime, 2016, "Sources of information advantage in the foreign exchange market", Working Paper.

Bjønnes, Geir Høidal, and Dagfinn Rime, 2005, "Dealer behavior and trading systems in foreign exchange markets", *Journal of Financial Economics* 75, 571-605.

Bollerslev, Tim, and Michael Melvin, 1994, "Bid-ask spreads and volatility in the foreign exchange market: an empirical analysis", *Journal of International Economics* 36, 355-372.

Cheung, Yin-Wong, and Clement Yuk-Pang Wong, 2000, "A survey of market practitioners' views on exchange rate dynamics", *Journal of International Economics* 51, 401-419.

Collins, Bruce M., and Frank J. Fabozzi, 1991, "A methodology for measuring transactions costs", *Financial Analysts Journal* 47, 27-36.

Cornell, Bradford, 1981, "The relationship between volume and price variability in futures markets", *Journal of Futures Markets* 1, 303-316.

Covrig, Vincentiu, and Michael T. Melvin, 2002, "Asymmetric information and price discovery in the FX market: Does Tokyo know more about the yen?", *Journal of Empirical Finance* 9, 271-285.

Danielsson, Jon, Richard Payne, and Jinhui Luo, 2011, "Exchange rate determination and inter-market order flow effects", *European Journal of Finance* 18, 823-840.

Duffie, Darrell, Nicolae Gârleanu, and Lasse Heje Pedersen, 2005, "Over-the-counter markets", *Econometrica* 73, 1815-1847.

Easley, David, Nicholas M. Kiefer, Maureen O'Hara, and Joseph B. Paperman, 1996, "Liquidity, information, and infrequently traded stocks", *Journal of Finance* 51, 1405-1436.

Easley, David, Maureen O'Hara, and P. S. Srinivas, 1998, "Option volume and stock prices: Evidence on where informed traders trade", *Journal of Finance* 53, 431-465.

Evans, Martin D.D., 2002, "FX trading and exchange rate dynamics", *Journal of Finance* 57, 2405-2447.

Evans, Martin D.D., and Richard K. Lyons, 2002, "Order flow and exchange rate dynamics", *Journal of Political Economy* 110, 170-180.

Evans, Martin D.D., and Richard K. Lyons, 2005, "Meese-Rogoff redux: Micro-based exchange rate forecasting," *American Economic Review, Papers and Proceedings* 95, 405-414.

Evans, Martin D.D., and Richard K. Lyons, 2006, "Understanding order flow", *International Journal of Finance and Economics* 11, 2-23.

Fama, Eugene, 1965, "The behavior of stock market prices," *Journal of Business* 38, 34-105.

French, Kenneth, and Richard Roll, 1986, "Stock return variance: The Aarrival of information and the reaction of traders," *Journal of Financial Economics* 17, 99-117.

Froot, Kenneth A., and Tarum Ramadorai, 2005, "Currency returns, intrinsic value, and institutional-investor flows", *Journal of Finance* 60, 1535-1566.

Garleanu, Nicolai B., and Lasse H. Pedersen, 2011, "Margin-based asset pricing and the law of one price", Review of Financial Studies 24, 1980-2022.

Glosten, Lawrence, and Paul Milgrom, 1985, "Bid, ask, and transaction prices in a specialist

market with heterogeneously informed agents", *Journal of Financial Economics* 14, 71-100.

Grammatikos, Theoharry, and Anthony Saunders, 1986, "Futures price variability: a test of maturity and volume effects", *Journal of Business* 59, 319-330.

Green, Richard C., Burton Hollifield, and Norman Schurhoff, 2007, "Financial intermediation and the costs of trading in an opaque market", *Review of Financial Studies* 20, 275-314.

Hampel F. R., 1974, "The influence curve and its role in robust estimation," *Journal of the American Statistical Association* 69, 382–393.

Harris, Lawrence, 1986, "Cross-security tests of the mixture of distributions hypothesis", *Journal of Financial and Quantitative Analysis* 21, 39-46.

Hartmann, Philipp, 1999, "Trading volumes and transaction costs in the foreign exchange market", *Journal of Banking and Finance* 23, 801-824.

Hasbrouck, Joel, 2009, "Trading costs and returns for U.S. equities: Estimating effective costs from daily data", *Journal of Finance* 64, 1445-1477.

Ho, Thomas S.Y., and Hans R. Stoll, 1981, "Optimal dealer pricing under transactions and return uncertainty", *Journal of Financial Economics* 9, 47-73.

Ho, Thomas S.Y., and Hans R. Stoll, 1983, "The dynamics of dealer markets under competition," *Journal of Finance* 38, 1053-1074.

Hortaçsu, Ali, and Jakub Kastl, 2012, "Valuing dealers' informational advantage: A study of Canadian Treasury auctions", *Econometrica* 80, 2511-2542.

Huang, Roger D., and Ron W. Masulis, 1999, "FX spreads and dealer competition across the 24-hour trading day", *Review of Financial Studies* 12, 61-93.

Ito, Takatoshi, Richard K.Lyons, and Michael T. Melvin,, 1998, "Is there private information in the FX market? The Tokyo experiment", *Journal of Finance* 53, 1111-1130.

Jorion, Philippe, 1996, "Risk and turnover in the foreign exchange market", in: Frankel, J.A., G. Galli, and A. Giovannini (eds.), *The Microstructure of Foreign Exchange Markets*, University of Chicago Press, Chicago.

Karnaukh, Nick, Angelo Ranaldo, and Paul Söderlind, 2015, "Understanding FX liquidity", *Review of Financial Studies* 28, 3073-3108.

Karpoff, Jonathan, 1987, "The relation between price changes and trading volume: a survey", *Journal of Financial and Quantitative Analysis* 22, 109-126.

Keim, Donald B., and Ananth Madhavan, 1998, "The cost of institutional equity trades", *Financial Analysts Journal* 54, 50-69.

King, Michael R., Carol Osler, and Dagfinn Rime, 2011, "Foreign exchange market structure, players and evolution", Working Paper, Norges Bank.

Kyle, Albert, 1985, "Continuous auctions and insider trading", *Econometrica* 53, 1315-1335.

Lagos, Ricardo, and Guillame Rocheteau, 2009, "Liquidity in asset markets with search frictions", *Econometrica* 77, 403-426.

Lyons, Richard K., 1995, "Tests of microstructural hypotheses in the foreign exchange market," *Journal of Financial Economics* 39, 321-351.

Lyons, Richard K., 2001, *The Microstructure Approach to Exchange Rates*, The MIT Press.

Madhavan, Ananth, and Seymour Smidt, 1991, "A Bayesian model of intraday specialist pricing", *Journal of Financial Economics* 30, 99-134.

Mancini, Loriano, Angelo Ranaldo, and Jan Wrampelmeyer, 2013, "Liquidity in the foreign exchange market: Measurement, commonality, and risk premiums", *Journal of Finance* 68, 1805-1841.

Menkhoff, Lukas, Lucio Sarno, and Maik Schmeling, 2016, "Information flows in foreign exchange markets: Dissecting customer currency trades", *Journal of Finance* 71, 601-634.

Moore, Michael J., and Richard Payne, 2011, "On the sources of private information in FX markets", *Journal of Banking and Finance* 35, 1250-1262.

Naik, Narayan Y., Anthony Neuberger, and S. Viswanathan, 1999, "Trade disclosure regulation in markets with negotiated trades", *Review of Financial Studies* 12, 873-900.

Naranjo, Andy, and M. Nimalendran, 2000, "Government intervention and adverse selection costs in foreign exchange markets", *Review of Financial Studies* 13, 453-477.

Newey, Whitney K., and Daniel McFadden, 1994, "Large sample estimation and hypothesis testing," *Handbook of Econometrics*, Vol. 4, 2111-2245.

O'Hara, Maureen, and George S. Oldfield, 1986, "The microeconomics of market making," *Journal of Financial and Quantitative Analysis* 21, 361-76.

Oldfield, George S., and Richard J. Rogalski, 1980, "A theory of common stock returns over trading and non-trading periods," *Journal of Finance* 35, 729-751.

Payne, Richard, 2003, "Informed trade in spot foreign exchange markets: An empirical investigation", *Journal of International Economics* 61, 307-329.

Richardson, Gordon, Stephan E. Sefcik, and Rex Thompson, 1987, "A test of dividend irrelevance using volume reactions to a change in dividend policy", *Journal of Financial Economics* 17, 313-333.

Rime, Dagfinn, Lucio Sarno, and Elvira Sojli, 2010, "Exchange rates, order flow, and

macroeconomic information", *Journal of International Economics* 80, 72-88.

Stoll, Hans R., 1978, "The supply of dealer services in securities markets," *Journal of Finance* 33, 1133-51.

Wooldrige, Jeffrey, 2015, *Introductory Econometrics: A Modern Approach*, South-Western College Publishing.

Yao, Jian, 1998a, "Market making in the interbank foreign exchange market", Working Paper No. S-98-3, NYU Salomon Center.

Yao, Jian, 1998b, "Spread components and dealer profits in the interbank foreign exchange market", Working Paper No. S-98-4, NYU Salomon Center