# EXHIBIT 126

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) ) ) ) | **ECF CASE** <br> No. 1:13-cv-07789-LGS <br><br><br> **CLASS CERTIFICATION REPORT OF** <br><br> **HAL J. SINGER, PH.D** |

**(REDACTED)**

**Contains information designated as Highly Confidential**

Introduction and Assignment ................................................................................................ 3

Qualifications ....................................................................................................................... 6

I.    Industry Background and the Nature of the Challenged Conduct ................................. 8
      A.    Industry Background ........................................................................................ 8
      B.    The Nature of the Challenged Conduct ........................................................... 10

II.   Structure: Classwide Evidence That the FX Market Is Conducive to Collusion ............. 11
      A.    Defendants Have the Same Economic Incentives to Collude as Do Participants in
            Any Other Dynamic Market ............................................................................ 12
      B.    Classwide Evidence Shows That Conditions in the FX Market Are Conducive to
            Collusion ....................................................................................................... 14
            1.   Defendants Dominate FX Trading ......................................................... 15
            2.   There Are No Close Substitutes for the FX Liquidity Provided by Dealer
                 Banks ............................................................................................... 17
            3.   Foreign Currency Is a Homogeneous Commodity, and the Pricing of FX
                 Transactions Varies Predictably With Common Factors .......................... 17
            4.   Class Members Have Predictable Trading Patterns ................................. 19
            5.   Electronic Communications Facilitate Last-Minute Communications
                 Among FX Traders ............................................................................. 20
            6.   FX Traders Are Socially Connected ...................................................... 20

III.  Conduct: The Exchange of Sensitive Competitive Information Among Defendants, As
      Assessed by Mr. Poynder, Was Pervasive in a Statistical Sense ..................................... 21

IV.   Performance: Holding Other Factors Constant, Spreads Narrowed Significantly After
      The End of The Class Period .......................................................................................... 24
      A.    Interbank Spreads Narrowed Significantly After the End of the Class Period ..... 25
      B.    Interbank Spreads Are Highly Predictive of Class Member Prices ..................... 32

Conclusion ........................................................................................................................... 39

Appendix 1: Currency Pair Abbreviations ............................................................................. 40

Appendix 2: Sample Size Analysis for Mr. Poynder's Review of Electronic Communications .. 41

Appendix 3: Materials Relied Upon ....................................................................................... 44

Appendix 4: Curriculum Vitae .............................................................................................. 51

## INTRODUCTION AND ASSIGNMENT

1.      Plaintiffs allege a horizontal price-fixing conspiracy (the "Challenged Conduct") among dealer banks ("Defendants") operating in the foreign exchange ("FX") market.[1] Plaintiffs allege that Defendants agreed to fix prices for foreign exchange ("FX") in at least 52 currency pairs, resulting in antitrust injury. Specifically, Plaintiffs contend that "Defendants' persistent, systematic, and interconnected sharing of competitively sensitive information, including spreads (prices), customer identity, volume, and other order flow was intended to and did, in fact, cause bid ask spreads to widen throughout FX market."[2] Plaintiffs allege that the Challenged Conduct began at least as early as 2003 and continued through 2013; the period for actionable claims begins in late 2007.[3] Throughout this report, I use the term "Class Period" to refer to the period of the alleged conspiracy accepted by the Court: December 1, 2007 through December 31, 2013.

2.      Plaintiffs have defined a class of over-the-counter ("OTC") customers ("OTC Class"), consisting of Defendants' direct customers for certain FX instruments.[4] The OTC Class is defined as follows:

> All persons who, between December 1, 2007 and December 31, 2013 (inclusive) entered into a total of 10 or more FX spot, forward, and/or FX swap trades directly with one or more Defendants in the 52 Affected Currency Pairs, where such persons were either

---

1.  *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-07789 (S.D.N.Y.), Third Consolidated Amended Class Action Complaint (June 3, 2016) [hereafter "Complaint"]. Defendants include the following sixteen dealer banks: Bank of America (including subsidiary Merrill Lynch), Bank of Tokyo – Mitsubishi, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBC, RBS, Société Générale, Standard Chartered, and UBS. *Id.* ¶¶47-63.

2.  Memorandum of Law in Support of Plaintiffs' Motion for Class Certification at 3 [hereafter "Memorandum"].

3.  Complaint ¶6. I understand that the court has ruled, based on then-available evidence, that the period for actionable claims begins on December 1, 2007, and ends on December 31, 2013. *See In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-07789 (S.D.N.Y.), Opinion and Order (September 20, 2016).

4.  Memorandum at 2.

domiciled in the United States or its territories or, if domiciled outside the United States or its territories, traded in the United States or its territories.[5]

Plaintiffs have also defined an "Exchange Class,"[6] consisting of customers who transacted in FX Instruments through an exchange. The Exchange Class includes: "All persons who, between January 1, 2007 and December 31, 2013 (inclusive) entered into a total of 10 or more trades of FX futures contracts on a U.S. exchange."[7]

3.    I have been asked by counsel for Plaintiffs to assess the competitive nature of the FX industry using a standard framework employed by industrial organization economists known as the structure/conduct/performance ("SCP") paradigm.[8] I have not been asked to opine

---

5.    *Id.*

6.    *Id.*

7.    Certain parties are excluded from both the OTC Class and the Exchange Class. *Id.* ("Excluded from the Classes are the Defendants and their parents, subsidiaries, and affiliates, directors, and employees. Excluded from these Classes are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action. Finally, trades whose prices were set on the basis of a benchmark rates, such as the WM/Reuters FX closing spot rates or the ECB reference rates are excluded."). The OTC Class accounts for the vast majority of transaction volumes during the Class Period. For example, daily average turnover for exchange-traded derivatives came to about $145 billion in 2013, compared with approximately $5.4 trillion per day in OTC markets. *See* Bank for International Settlements, *Triennial Central Bank Survey: Foreign Exchange Turnover in April 2016* (September 2016; revised December 2016) [hereafter "BIS (2016)"], at 3 (showing OTC turnover), 9 (showing exchange-traded derivative turnover).

8.    *See, e.g.,* FREDERIC SCHERER & DAVID ROSS, INDUSTRIAL MARKET STRUCTURE AND ECONOMIC PERFORMANCE 4-7 (Houghton Mifflin 3rd ed. 1990). The U.S. Antitrust Agencies' *Merger Guidelines* focus extensively (but not exclusively) on market structure, typically measured by market shares and market concentration, to predict the likely price effects of a merger; this is sometimes referred to by antitrust experts as the "structural presumption." *See* Herbert Hovenkamp & Carl Shapiro, *Horizontal Mergers, Market Structure, and Burdens of Proof* YALE LAW JOURNAL (forthcoming 2018), *available at*: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3046224 ("Since the Supreme Court's landmark 1963 decision in *Philadelphia National Bank*, antitrust challengers have mounted *prima facie* cases against horizontal mergers that rested on the level and increase in market concentration caused by the merger, with proponents of the merger then permitted to rebut by providing evidence that the merger will not have the feared anticompetitive effects. Although the way that concentration is measured and the triggering levels have changed over the last half century, the basic approach has remained intact. This longstanding structural presumption, which is well supported by economic theory and evidence, has been critical to effective merger enforcement."). *See also* U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* (August 19, 2010) [hereafter *Merger Guidelines*], §5 ("The Agencies normally consider measures of market shares and market concentration as part of their evaluation of competitive effects. The Agencies evaluate market shares and concentration in conjunction with other reasonably available and reliable evidence for the ultimate purpose of determining whether a merger may substantially lessen competition.").

on whether collusion in fact occurred, or on whether collusion can be inferred from record documents.

4.     My principal findings are as follows:

- With respect to *structure*, I demonstrate that FX trading, in addition to being unregulated and opaque, is characterized by conditions conducive to collusion. My structural analysis is grounded in standard principles of economics and antitrust analysis, using data, evidence, and methods common to the Classes. Following the six factors outlined in the Department of Justice's *Price Fixing, Big Rigging, and Market Allocation Schemes* primer[9] as being "conditions favorable to collusion," I find that (1) Defendants dominate FX trading, accounting for the vast majority of FX trading volumes; (2) there are no close substitutes for the FX liquidity provided by dealer banks, or for foreign currency generally; (3) foreign currency is a homogeneous commodity, and the pricing of FX transactions varies predictably with common factors, such as the interbank spread, trade size, volatility, liquidity, order type, trading platform, and customer type; (4) Class Members often transact regularly and/or repeatedly with Defendants, and Defendants devote significant resources to tracking and analyzing customer trading patterns; (5) electronic chatrooms gave Defendants the ability to maintain real-time contact with one another and to exchange information instantaneously; and, (6) Defendants were socially connected.

- With respect to *conduct*, I have been asked to opine on a specific aspect of the review and analysis of electronic communications among Defendants conducted by Robin Poynder of Velador Associates ("Velador"), Plaintiffs' FX industry expert.[10] Specifically, I have been asked to determine whether the results of Mr. Poynder's review indicate that the sharing of Sensitive Competitive Information ("SCI"), as defined by Mr. Poynder's review methodology,[11] was pervasive in a statistical sense during the Class Period. Mr. Poynder found that Defendants exchanged SCI on 90 days out of a random sample of 91 trading days, drawn from the population of 1,531 trading days during the Class Period. This indicates that the sharing of SCI was pervasive, in the sense of having occurred on almost all trading days during the Class Period. Specifically, the random sample that Mr. Poynder has reviewed to date allows one to reject the null hypothesis that SCI was exchanged on less than 95 percent of the trading days during the Class Period at the 5.4 percent significance level. Put differently, if it were true that SCI was actually exchanged *on fewer* than 1,454 trading days (equal to 0.95 x 1,531) during the Class Period, then the probability that Mr. Poynder would have found evidence of the exchange of SCI on 90 out of 91 days in the random sample (as he did) is only 5.4 percent. I take no position on

---

9.   *See* Department of Justice, *Price Fixing, Bid Rigging And Market Allocation Schemes: What they Are and What to Look For* [hereafter, "DOJ Price Fixing"], *available at* https://www.justice.gov/atr/price-fixing-bid-rigging-and-market-allocation-schemes.

10.   Mr. Poynder "was asked to determine whether the communications conveyed sensitive customer, order, or pricing information to competitor banks." *See* Chat Report Prepared by Robin Poynder of Velador Associates [hereafter, "Poynder Chat Report"], ¶2.

11.   Mr. Poynder defines Sensitive Competitive Information as "pricing, order, or customer information that FX traders at other banks could plausibly exploit to their advantage, to their customers' disadvantage, or both—as distinguished from generalised commentary or 'market colour'." *Id.*

the content of these communications, nor do I make any inference as to whether such evidence constitutes evidence of collusion or the existence of an agreement. Nevertheless, from an economic standpoint, communicating to a horizontal competitor the spread that one intends to quote to a prospective customer, or the sharing of private information that would better enable a horizontal competitor to predict and exploit future price movements, would be against the unilateral self-interest of Defendants.

- With respect to *performance*, I test econometrically for differences between the bid-ask spreads quoted on an electronic interbank trading platform before and after the end of the Class Period (December 31, 2013). I find that, holding other factors constant, interbank spreads narrowed after the end of the Class Period, indicating more competitive FX pricing after the Challenged Conduct was eliminated. I also demonstrate econometrically that interbank spreads are highly predictive of the prices paid by individual Class Members. Combined, these two findings indicate that the Challenged Conduct is statistically associated with inferior performance of the FX market from the perspective of all or almost all Class Members.

5.      My conclusions in this report are based on the information available to me at this time. I reserve the right to supplement my opinions in the event that new evidence becomes available.

## QUALIFICATIONS

6.      I am a principal at Economists Incorporated, a senior fellow at the George Washington Institute of Public Policy, and an adjunct professor at Georgetown's McDonough School of Business, where I teach Strategic Pricing to MBA candidates. My expertise is in antitrust economics, and I have knowledge of and significant experience in antitrust class action litigation.[12]

7.      I am the co-author of two books, and I have published several book chapters, including one on the application of real-option theory to the valuation of insurance products.

---

[12]. Several of my publications concern the role of economists in class certification concerning antitrust. *See, e.g., Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases*, ANTITRUST SOURCE (2015), co-authored with Kevin Caves; *Econometric Tests for Analyzing Common Impact*, 26 RESEARCH IN L. & ECON. (2014), co-authored with Kevin Caves; *Life After Comcast: The Economist's Obligation to Decompose Damages Across Theories of Harm*, ANTITRUST (Spring 2014), co-authored with Kevin Caves; *Economic Evidence of Common Impact for Class Certification in Antitrust Cases: A Two-Step Analysis*, ANTITRUST (Summer 2011); *Class Certification in Antitrust Cases: An Economic Framework*, 17 GEORGE MASON L. REV. (2010), co-authored with Robert Kulick.

8.  My scholarship and testimony has been widely cited by courts and regulatory agencies. In several antitrust cases concerning class certification, including most recently in *Lidoderm Antitrust* and *Delta/AirTran Baggage Fee Antitrust*,[13] the district court's order favorably cited my testimony in certifying the class. In agency reports and orders, my writings have been cited by the Federal Communications Commission, the Federal Trade Commission, and the Department of Justice.

9.  In addition to antitrust and regulatory matters, I also have significant experience in finance. For example, I served as a senior economist at the Securities and Exchange Commission, I have taught financial economics to undergraduates at both Georgetown and Johns Hopkins, and I have published articles in the *Journal of Business and Finance* and the *Journal of Financial Transformation*.

10.  I earned M.A. and Ph.D. degrees in economics from the Johns Hopkins University and a B.S. *magna cum laude* in economics from Tulane University.

11.  My curriculum vitae is provided in the Appendix. I have no stake in the outcome of this case. I am being compensated for my work in this case at the rate of $715 per hour.

12.  The materials that I considered in forming my opinions are summarized in Appendix 3.

---

13.  Other cases in which the court favorably cited my opinions in certifying a class include *Johnson v. Ariz. Hosp. and Healthcare Ass'n*, 2009 WL 5031334, at **10-11 (D. Ariz. July 14, 2009) (common impact and damages); *Se. Missouri Hosp. v. C.R. Bard, Inc.*, 2008 WL 4372741, at **6-8 (E.D. Mo. Sept. 22, 2008) (common impact and damages); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intern., Ltd.*, 262 F.R.D. 58, 69 (D. Mass. Aug. 29, 2008) (common impact and damages); *Meijer, Inc. v. Abbot Laboratories, Inc.*, 2008 WL 4065839, at **9-10 (N.D. Cal. Aug. 27, 2008) (common impact and damages).

## I. INDUSTRY BACKGROUND AND THE NATURE OF THE CHALLENGED CONDUCT

13.     In Part I.A, I summarize relevant background facts of the FX industry. In Part II.B, I describe the Challenged Conduct as it relates to my assignment here.

### A. Industry Background

14.     FX is the largest, most liquid, and least regulated major financial marketplace in the world.[14] According to the Bank for International Settlements ("BIS"), daily trading volumes in FX averaged $5.1 trillion in April 2016 and $5.4 trillion in April 2013.[15] The U.S. dollar ("USD") is the dominant currency in FX; in April 2016, the USD was involved in 88 percent of all FX trades.[16]

15.     Defendants, sometimes referred to as "dealer banks" or "market makers," provide liquidity to customers wishing to buy or sell currency.[17] Defendants quote "bid" and "ask" prices to Class Members.[18] The bid quote indicates the price that the bank is willing to pay the customer for the base currency.[19] The ask quote indicates the price at which the bank is willing to sell the base currency to the customer. The difference between the bid and ask prices

---

14. *See* Expert Report of Professor Alexander Ljungqvist and Professor Geir Høidal Bjønnes [hereafter, "Ljungqvist & Bjønnes"], ¶36; ¶61. *See also* Michael King, Carol Osler, & Dangfin Rime, *Foreign Exchange Market Structure, Players, and Evolution, in* JESSICA JAMES, IAN MARSH, & LUCIO SARNO, EDS., HANDBOOK OF EXCHANGE RATES (Wiley 2012) §1.2.3 [hereafter, "FX HANDBOOK (2012)"]; Carol Osler & Xuhang Wang, *The Microstructure of Currency Markets, in* H. KENT BAKER AND HALIL KIYMA MARKET MICROSTRUCTURE IN EMERGING AND DEVELOPED MARKETS: PRICE DISCOVERY, INFORMATION FLOWS, AND TRANSACTION COSTS 79 (Chapter 5) (John Wiley 2013) [hereafter "Osler & Wang (2013)"] ("[T]he foreign exchange market [is] the largest financial market in the world. Average daily foreign exchange trading exceeds $4 trillion…a figure that is roughly 20 times daily U.S. equity trading volume.") (citations omitted); DB-0704291 (Deutsche Bank Foreign Exchange Trading Programme 2005), at 301 ("FX is the largest/most liquid global market.").

15. BIS 2016 at 3.

16. *Id.*

17. Ljungqvist & Bjønnes ¶47; *see also* FX HANDBOOK (2012) §1.3.

18. Ljungqvist & Bjønnes ¶51.

19. The base currency is the currency on the left-hand side of a given currency pair abbreviation. For example, the most liquid currency pair is EUR/USD, in which the Euro is the base currency. All currencies have standard abbreviations; *see* the Appendix for a comprehensive list.

is referred to as the "bid-ask spread," or simply the "spread."[20] The bid-ask spread can be thought of as capturing the hypothetical cost to a customer of a "round-trip" transaction.[21]

16.     In FX trading, spreads are typically measured in price interest points ("pips"), which is the smallest increment in which prices are quoted (typically the fourth decimal place).[22] For example, if the EUR/USD exchange rate is 1.1000, then one million Euro can be exchanged for $1,100,000.[23] If the exchange rate increases by one pip, to 1.1001, then one million Euro can be exchanged for $1,100,100.[24] Therefore, an increase in one pip corresponds to an additional $100 per million Euro traded. All else equal, Defendants' profits are higher when spreads are wider, because they can sell to their customers at a higher (ask) price and buy from their customers at a lower (bid) price. Conversely, Class Members are worse off when spreads are wider. Competition among dealer banks tends to narrow spreads.[25]

17.     The FX prices posted on electronic interbank platforms such as EBS play the role of wholesale prices or market benchmarks[26] that "serve[] as the anchor for customer

---

20. Ljungqvist & Bjønnes ¶51; *see also* FX HANDBOOK (2012) §1.3.

21. Ljungqvist & Bjønnes ¶¶51-52; *see also* RICHARD LYONS, THE MICROSTRUCTURE APPROACH TO EXCHANGE RATES 41 (MIT Press 2001) [hereafter MICROSTRUCTURE APPROACH] at 5-6. Economists sometimes analyze FX transaction volume in terms of "order flow," which gives a measure of net buying pressure. Order flow is "the sum of signed buyer-initiated and seller-initiated orders," with buys and sells receiving opposite signs. *Id.* at 6.

22. Ljungqvist & Bjønnes ¶42; *see also* FX HANDBOOK (2012) §1.3.2; *see also* http://www.investopedia.com/ask/answers/06/pipandcurrencypair.asp. Yen-based currency pairs are displayed to two decimal places, rather than four. *See, e.g.,* https://www.oanda.com/forex-trading/learn/intro-to-currency-trading/conventions/pips.

23. Equal to 1.1000 x 1,000,000.

24. Equal to 1.1001 x 1,000,000.

25. Poynder Chat Report ¶25; *see also* Deposition of Steve Yanez (March 14, 2018), [hereafter, "Yanez Dep."] at 83:9-11 ███████████████████████████ Mr. Yanez served as global head of FX for Credit Suisse. *Id.* at 30:22-31:3.

26. Carol Osler, *Foreign Exchange Microstructure: A Survey*, in ENCYCLOPEDIA OF COMPLEXITY AND SYSTEM SCIENCE, (Robert Meyers, Ed. Springer, New York: 2009), entry 00227 [hereafter, "Osler (2009)"] at 7 ("As the electronic brokerages took over, their best posted bid and offer quotes became the benchmark for market prices.").

prices."[27] Because it forms the basis for pricing in the FX industry generally, the interbank market is sometimes referred to as the "reference market."[28]

## B.  The Nature of the Challenged Conduct

18.      Plaintiffs allege that Defendants conspired to fix FX prices using electronic communications, including chatrooms, instant messages, and emails,[29] and that this price-fixing conspiracy "targeted the pricing of over two dozen currencies, including the most heavily traded currency pairs, throughout each trading day."[30] Specifically, Plaintiffs allege that the Challenged Conduct caused FX bid-ask spreads to widen; the bid-ask spread represents the price to Class Members of obtaining liquidity from market makers.[31] Plaintiffs further allege that

> Defendants' conduct in furtherance of their conspiracy included: (1) creating and participating in exclusive interbank chatrooms; (2) improperly sharing confidential client and proprietary trading information; (3) coordinating trading to influence the FX rates; (4) monitoring the conduct of co-conspirators to ensure secrecy and compliance with the conspiracy; (5) using code names and misspelled words in interbank communications to evade detection; and (6) agreeing to "stand down" by holding off buying or selling currency to benefit co-conspirators.[32]

As explained above, I have not been asked to opine on whether Defendants in fact colluded, or whether collusion can be inferred from record documents. In other words, although I do analyze

---

27. Carol Osler, Alexander Mende, & Lukas Menkhoff, *Price Discovery in Currency Markets* 30 J. INT'L MONEY & FIN. 1696-1718, (2011) [hereafter, "Osler et. al. (2011)"] at 1699. *See also* Ljungqvist & Bjønnes ¶87.

28. Jeremy Wagner, *Trading in Extremely Volatile Market Environments*, DAILYFX, June 20, 2016 ("FX pricing is derived through the interbank segment. In the interbank reference market, you have institutions trading liquidity on hard rates (not indicative quotes). As these transactions take place, their price is marked and essentially produces a 'feed' of pricing. You may have heard of the EBS feed or Reuters feed. This is referring to the interbank reference market."). *See also* Kathy Lien, *The Foreign Exchange Interbank Market*, INVESTOPEDIA, *available at:* http://www.investopedia.com/articles/forex/06/interbank.asp ("[I]t is important for individual investors to understand how the interbank segment works because it is one the best ways to understand how retail spreads are priced, and to decide whether you are getting fair pricing from your broker.").

29. Complaint, Part II.

30. *Id.* ¶124.

31. MICROSTRUCTURE APPROACH at 6 ("[i]f I labeled [order flow & spread] 'quantity' and 'price,' it would be clear that they are the old mainsprings of economics after all.").

32. Complaint ¶¶124-25.

the structure and performance of the industry, my analysis of Defendants' conduct is limited to my statistical analysis of Mr. Poynder's findings.

## II. STRUCTURE: CLASSWIDE EVIDENCE THAT THE FX MARKET IS CONDUCIVE TO COLLUSION

19.     In Part II.A below, I review the fundamental economic incentives underlying collusive behavior in any industry. Standard economic principles show how, all else equal, firms that successfully collude earn profits in excess of what would be earned under competition. For this reason, at least some incentives for collusion nearly always exist. At the same time, although collusion has been uncovered in a range of industries over the years, most industries do not operate as cartels. Whether collusion is attempted, and whether it succeeds, depends on the payoffs to collusion, the risks associated with colluding, and on whether economic agents manage to successfully coordinate with one another while also avoiding enforcement efforts by competition authorities.[33] In Part II.B, I explain that the conditions in some industries are more conducive to collusion than in others, and I show that classwide evidence demonstrates that FX trading is characterized by conditions favorable to collusion as delineated by economic principles and the Department of Justice.

---

33. Margaret Levenstein & Valerie Suslow, *What Determines Cartel Success?* 44(1) J. ECON. LIT. 43-95 (2006) [hereafter, "Levenstein & Suslow (2006)"], at 44. *See also id.* at Table 2 (showing cartel durations in case studies spanning nineteen industries). *See also* William Kolasky, "Coordinated Effects in Merger Review: From Dead Frenchmen to Beautiful Minds and Mavericks," Address to the American Bar Association Section of Antitrust Law Spring Meeting, Washington DC 2002 [hereafter, "Kolasky (2002)"], *available at* https://www.justice.gov/atr/speech/coordinated-effects-merger-review-dead-frenchmen-beautiful-minds-and-mavericks, Part III.D ("For those who may be tempted to argue that coordination is too difficult to occur in real world, I should not have to do more than to point to the large number of multinational cartels we've successfully prosecuted in last seven years to show why such arguments will fall on deaf ears.").

## A.    Defendants Have the Same Economic Incentives to Collude as Do Participants in Any Other Dynamic Market

20.    A firm or a group of firms has market power if it possesses "the power to control prices or exclude competition."[34] Monopolies, or groups of firms that behave like monopolies, such as the price-fixing cartel alleged here, are harmful to competition and impose economic costs on society in several ways, including restricting output, raising price, reducing quality or consumer choice, and inhibiting innovation relative to the levels that would have prevailed under competition.[35] Monopsony power, or buyer power, is the mirror image of monopoly power.[36] The harm to competition from monopsony is directly analogous to the harm from monopoly.[37] A monopolist harms buyers by charging them a price *above* the competitive level; a monopsonist harms sellers by paying them a price *below* the competitive level.

21.    Collusion occurs when a group of sellers forms a cartel, allowing them to act as if they were a monopoly; when a group of buyers form a cartel, it allows them to act as if they

---

34. *United States v. E. I. du Pont de Nemours & Co.* ("*Cellophane*"), 351 U.S. 377, 391 (1956). *See also* Jonathan B. Baker & Timothy F. Bresnahan, *Economic Evidence in Antitrust: Defining Markets and Measuring Market Power*, in Paulo BuSCIrossi, ed. HANDBOOK OF ANTITRUST ECONOMICS (2007) [hereafter, "Baker & Bresnahan"], at 15. *See also* Thomas Krattenmaker, Robert Lande & Steven Salop, *Monopoly Power and Market Power in Antitrust Law*, 76 GEORGETOWN L.J. 241-269 (1987). As is common practice in economics, I use the terms "market power" and "monopoly power" interchangeably. *See* DENNIS CARLTON & JEFFREY PERLOFF, MODERN INDUSTRIAL ORGANIZATION 244-282 (Pearson 2005 4th ed.) [hereafter MODERN IO].

35. MODERN IO at 93.

36. U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* (2010) [hereafter *Merger Guidelines*], §1; §12. *See also* MODERN IO at 107-110.

37. MODERN IO at 107-110; *see also* Merger Guidelines §1 ("Enhancement of market power by buyers, sometimes called "monopsony power," has adverse effects comparable to enhancement of market power by sellers. The Agencies employ an analogous framework to analyze mergers between rival purchasers that may enhance their market power as buyers"). *See also* §12. *See also Johnson v. Ariz. Hosp. & Healthcare Ass'n (AzHHA)*, No. CV 07-1292-PHXSRB, 2009 WL 5031334 (D. Ariz. July 14, 2009); *see also In Re: High-Tech Employee Antitrust Litigation*, No. 11-CV-02509 (N.D. Cal.). *See also* Vogel v. Am. Soc'y of Appraisers, 744 F.2d 598, 601 (7th Cir. 1984) (stating that monopoly and monopsony are "symmetrical distortions of competition.") (quoted in Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 322 (2007).

were a monopsony.[38] There are various strategies that cartels can employ to achieve collusive outcomes; three of the most prominent are price-fixing, bid-rigging, and market-allocation schemes.[39] The economic incentives for collusion are clear: A monopoly, by construction, maximizes the total profit available to all firms collectively. Hence, firms that agree to collude (and thus to mimic the conduct of a monopolist) can always earn higher profits than they could otherwise, by earning monopoly profits and dividing the profits among cartel members.

22.     In the real world—including in FX trading—economic agents generally interact repeatedly with each other over time. Economists refer to this as a "repeated game" or "dynamic game."[40] If a cartel operates in a repeated-game environment, it can adopt strategies to achieve sustained "collusive equilibria" or stable outcomes, such as monitoring, enforcement, and credible threats of punishment to defectors.[41] The purpose of these strategies is to deter individual firms from undercutting the cartel price to steer business toward itself and away from the other cartel members (or, in the case of a buyer's cartel, paying a price above the cartel price to achieve the same outcome).[42] In a repeated game, the incentive for an individual firm to defect from the cartel—which would generate a one-time windfall to the defector—must be weighed against the entire stream of future profits that the firm would enjoy if it did not defect.

---

38. MODERN IO at 108 ("To the degree that the teams agree not to compete for players, they gain monopsony power."). *See also Merger Guidelines* at 2 ("Enhancement of market power by buyers, sometimes called 'monopsony power,' has adverse effects comparable to enhancement of market power by sellers.").

39. *See, e.g.,* DOJ Price Fixing. *See also Merger Guidelines*.

40. MODERN IO at 279. *See also* Louis Kaplow, *An Economic Approach to Price Fixing*, 77(2) ANTITRUST L.J. 343-449, 350 (2011) ("The analysis of firms' interactions employs repeated games because they can capture the sort of strategic interaction that makes successful coordinated oligopoly pricing possible.").

41. Kaplow, *supra*, at 350-352.

42. MODERN IO at 136 ("With relatively few firms, the cartel may more easily monitor each one, and increases in one firm's share of the market (an indication of price cutting) are easier to detect.").

Unless the firm does not place much weight on its future stream of profit, the incentive to collude will be enhanced in a dynamic environment, relative to a static one.[43]

23.     For a cartel of sellers, the incentives to collude stem from sellers' ability to increase their collective profit by coordinating to increase the selling price above the competitive level.[44] Conversely, for a buyer's cartel, the incentives stem from the ability to maximize collective profit by suppressing the buying price below the competitive level.[45] Because the collusive ask price exceeds the competitive ask price, and because the collusive bid price is below the competitive bid price, the bid-ask spread under collusion is wider than the bid-ask spread under competition.

**B.     Classwide Evidence Shows That Conditions in the FX Market Are Conducive to Collusion**

24.     Collusion is more likely to occur in some industries than in others. The Department of Justice has identified the following six industry characteristics as being "conditions favorable to collusion":

- Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are "fringe" sellers who control only a small fraction of the market.

---

43. In economics, the extent to which an economic agent values future streams of income is measured by the "discount factor." *See* ROBERT GIBBONS, GAME THEORY FOR APPLIED ECONOMISTS 89 (Princeton University Press 1992). Collusion can be sustained in a dynamic environment provided that firms do not discount the future to such an extent that future profits are worth little to them in comparison with the immediate profits to be gained by defecting from the cartel. *Id.* at 106 ("That is, the gain this period from deviating must not exceed the discounted value of the loss next period from the punishment."). *See also* Margaret Levenstein & Valerie Suslow, *What Determines Cartel Success?* 44(1) J. ECON. LIT. 43-95 (2006) [hereafter, "Levenstein & Suslow (2006)"], at 46 ("Repeated interaction (over time or across markets) can, in principle, by providing the incentive of future collusive profits, deter firms from cheating and allow them to escape the Prisoners' Dilemma.")

44. A seller with market power equates marginal revenue to marginal cost, resulting in a higher price than would exist under competition. *See, e.g.*, MICHAEL KATZ & HARVEY ROSEN, MICROECONOMICS 412-419 (Irwin McGraw-Hill 3rd ed. 1998).

45. A buyer with market power purchases at the point where marginal factor cost is equal to marginal revenue product, resulting in a lower price than would exist under competition. *Id.* at 473-481.

- The probability of collusion increases if other products cannot easily be substituted for the product in question or if there are restrictive specifications for the product being procured.

- The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.

- Repetitive purchases may increase the chance of collusion, as the vendors may become familiar with other bidders and future contracts provide the opportunity for competitors to share the work.

- Collusion is more likely if the competitors know each other well through social connections, trade associations, legitimate business contacts, or shifting employment from one company to another.

- Bidders who congregate in the same building or town to submit their bids have an easy opportunity for last-minute communications.[46]

When present, these conditions indicate a higher likelihood that collusion could occur.[47] As explained below, evidence common to the Class shows that each of these conditions is satisfied in FX trading during the Class Period.

### 1. Defendants Dominate FX Trading

25. Collusion is more likely when there are few sellers, or when there is a "small group of major sellers and the rest are 'fringe' sellers who control only a small fraction of the market."[48] That is the case in the FX industry; over time, FX trading volumes have become highly concentrated among Defendants. Although electronic trading allowed new entrants to launch electronic-trading platforms, the net effect has been a significant increase in

---

46. *See* DOJ Price Fixing; *Merger Guidelines*; William Kolasky, "Coordinated Effects in Merger Review: From Dead Frenchmen to Beautiful Minds and Mavericks," Address to the American Bar Association Section of Antitrust Law Spring Meeting, Washington DC 2002 [hereafter, "Koloasky (2002)"], *available at* https://www.justice.gov/atr/speech/coordinated-effects-merger-review-dead-frenchmen-beautiful-minds-and-mavericks.

47. *See* DOJ Price Fixing ("While collusion *can* occur in almost any industry, it is *more likely* to occur in some industries than in others. An indicator of collusion *may be* more meaningful when industry conditions are already favorable to collusion.") (emphasis added). *See also* Levenstein & Suslow (2006) at 85-86.

48. *See* DOJ Price Fixing; Kolasky (2002) ("As expected, the industries in which we have detected cartels are usually highly concentrated with the largest firms acting as ringleaders and the fringe players following along.").

concentration among Defendants during the Class Period, particularly in light of the large fixed investments necessary to support electronic-trading platforms.[49]

26.     According to *Euromoney*, a market publication utilized by Defendants,[50] during the Class Period, eight to nine banks represented 75 percent of the market, and just five to six banks represented 60 percent of the market.[51] Defendants' overall share of global FX volume increased from 74.2 percent to 85.6 percent from 2002 to 2014.[52] From 2007 to 2013, Defendants' share of U.S. FX volume has fluctuated between 87 and 93 percent.[53] FX trading is also concentrated at the level of the individual currency pair. According to the New York

---

49.  Ljungqvist & Bjønnes ¶¶61-63; Figure 1. *See also* FX HANDBOOK (2012) §1.4.2. ("Customer electronic trading has prompted a striking increase in concentration among FX dealers. Because banks have been forced to invest heavily in trading technology even while quoting tighter bid-ask spreads, small banks now find it unprofitable to make markets in the major currencies."). *See also* Yanez Dep. 103:9-104:7

*Id.* 104:25-105:24

50.  *See, e.g.,* Yanez Dep. 101:13-16

*See also* CS-FXLIT-04001553

*See also* HBEU-FXLITIG-00049159

*See also* UBSCH-ZINC-CIV-000007345

51.  *Euromoney* FX survey (various years).

52.  *Id.* The *Euromoney* survey released in a given year reports market shares for the prior calendar year. The figures reported here are based on calendar years (not survey years). The volumes cited in *Euromoney* are based on volumes reported by survey respondents, and reflect only buy-side volumes because the survey methodology "aims to capture client price-taking activity only." *See* https://www.euromoney.com/article/b12kj6tfp486wn/euromoney-fx-survey-2011-methodology.

53.  *Id.*

Federal Reserve Bank's *FX Volume Survey*, as of October 2013, the top five dealers accounted for approximately 63 percent of EUR/USD trading volume in North America.[54]

### 2. There Are No Close Substitutes for the FX Liquidity Provided by Dealer Banks

27.     In the FX market, Class Members are price takers, and Defendants are price makers (also referred to as "market makers," "liquidity providers" or "dealer banks").[55] Customers wishing to buy or sell foreign currency must transact with a price-making liquidity provider that stands ready to transact in either direction.[56] There are no close substitutes to the FX liquidity provided by dealer banks: Buy-side customers (such as Class Members) "may incidentally provide liquidity by trading directly with other buy-side customers … [but] standing ready to provide liquidity is not the[ir] primary function."[57]

### 3. Foreign Currency Is a Homogeneous Commodity, and the Pricing of FX Transactions Varies Predictably With Common Factors

28.     Foreign currency is homogenous by definition—no trader's U.S. dollars are differentiated from those of any other trader.[58] This explains how it is that a single number, such as the bid-ask spread, can allow customers to compare prices quoted by different market-

---

54. *See* New York Federal Reserve Bank, FX Market Share, *available at* https://www.newyorkfed.org/fxc/volumesurvey/mshare.html. The data show similarly high concentration among the top five dealers for other currency pairs. *Id. See also* New York Federal Reserve Bank, Foreign Exchange Volume Survey, *available at* https://www.newyorkfed.org/banking/reportingforms/FXVSURVEY.html.

55. *See* Poynder Chat Report ¶17.

56. Ljungqvist & Bjønnes ¶47.

57. *Id*. ¶49. *See also* Yanez Dep. 106:18-107:2 ████████████████████████████████████████████████

████████████████████ In addition, there are no financial instruments that can be easily substituted for foreign currency. Bitcoin—a digital currency invented in 2009 by an unknown individual—is sometimes used for international transactions. But the total value of Bitcoin in circulation—about $41 billion as of mid-2017—is trivial in comparison to the multi-trillion-dollar volumes of FX that are traded daily. *See* Sue Chang, *How big is Bitcoin, really? This chart puts it all in perspective*, MARKET WATCH, June 30, 2017, *available at* http://www.marketwatch.com/story/how-big-is-bitcoin-really-this-chart-puts-it-all-in-perspective-2017-06-21. ████

58. Yanez Dep. 106:2-10 ████████████████████████

makers, including on electronic communication networks ("ECNs"), which "allow multiple dealers to simultaneously quote prices to all platform users."[59] Prominent ECNs such as EBS allow for anonymous trading between counterparties.[60]

29.    This does not imply that all FX transactions are the same, or that they are priced identically. Indeed, there is substantial variation in the markups that dealer banks charge to different types of customers, relative to the interbank spread or "anchor" or "benchmark" price.[61] One study by Professor Bjønnes, which analyzed data from a top 20 FX dealer bank in 2012, found that some types of customers (such has hedge funds) pay little or no markup (less than one pip) relative to the interbank price, while others (such as small and medium-sized enterprises) pay substantial markups (over 20 pips) relative to the interbank price.[62]

30.    Nevertheless, the pricing of FX transactions is not random: It varies predictably with common and well-understood factors. These include market-specific factors (including the interbank price,[63] trade size, volatility, liquidity, and order type), as well as factors specific to the transaction type and the type of customer (such as customer volume, sophistication, and likelihood of being informed).[64] Therefore, for a given transaction involving a given volume of a given currency pair, under a given set of market-specific factors and involving a given

---

59. Ljungqvist & Bjønnes ¶56.

60. *Id*. ¶¶ 56, 59.

61. The FX prices posted on inter-dealer platforms, such as EBS and Reuters, play the role of wholesale prices or market benchmarks. Dealer banks charge customers a price that reflects a markup relative to this benchmark. Ljungqvist & Bjønnes ¶¶87, 119. *See also* Carol Osler, Alexander Mende, & Lukas Menkhoff, *Price Discovery in Currency Markets* 30 J. INT'L MONEY & FIN. 1696–1718, 1699 (2011) [hereafter "Osler et. al. 2011"] (explaining that the interdealer prices "serve[] as the anchor for customer prices.")

62. Geir Bjønnes, Neophytos Kathitziotis, & Carol Osler, "Bid-Ask Spreads in OTC Markets," Brandeis University Working Paper 102 (March 2016) [hereafter "Bjønnes et. al. (2016)"]; *see also* Geir Bjønnes, Neophytos Kathitziotis, & Carol Osler, "The Cost of FX Liquidity: Empirical Tests of Competing Theories," Brandeis University Working Paper (2014) [hereafter "Bjønnes et. al. (2014)"].

63. For an empirical assessment of the link between interbank spreads and Class Member pricing, see Part IV.B, *infra*.

64. Ljungqvist & Bjønnes ¶¶67-72.

customer type, it is possible to estimate the price that a customer would pay (as Professor Bjønnes' research shows). For example, a hedge fund would be expected to pay only a small markup over the interbank price when trading (say) 50 million EUR/USD, while a small or medium-sized enterprise would be expected to pay much more for an otherwise identical transaction.

### 4. Class Members Have Predictable Trading Patterns

31. Class Members often transact regularly and/or repeatedly with Defendants, often at predictable intervals, such as the end of month, when portfolio managers often trade in FX to hedge their international investments.[65] More generally, Defendants devote significant resources to tracking the trading patterns of individual clients; electronic trading in particular allows Defendants to statistically analyze customer-specific trading patterns.[66] ████████████

████████████████████████████████████████

█████████████[67]████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████[68]███████████████████████████

---

65. Michael Melvin & John Prins, *The Equity Hedging Channel of Exchange Rate Adjustment*, 22 J. FIN. MARKETS 50–72 (2011). Certain financial customers, such mutual funds, pension funds, and endowments (sometimes referred to as "real-money investors"), may also transact at regular intervals to convert returns on overseas investments into the home currency of their investors. In addition, corporate customers transact in the FX industry in the regular course of business (for example, to make payments to offshore suppliers in exchange for goods or services). These customers are considered uninformed, relative to other market participants. *See* Osler & Wang (2013) at 84; *see also* FX HANDBOOK (2012) §1.3.1.

66. Ljungqvist & Bjønnes ¶71; *see also* FX HANDBOOK (2012) §1.4.3.

67. ████████████████████ *see e.g.* CS-FXLIT-06344889 ████████; *see also* CS-FXLIT-06366308 ████████████████████████; CS-FXLIT-06424822 ████████████; CS-FXLIT-06441732 ████████; CS-FXLIT-06469081 ████████████

68. DB-0938703, at 710 (presentation ████████████████████████████████████
████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████ [69] Defendants utilize

"spread matrices" to develop quotes for customers; these reflect customer-specific factors

including location, volume traded, and previous relationship with the bank.[70]

### 5. Electronic Communications Facilitate Last-Minute Communications Among FX Traders

32.     As explained in Part III below, Mr. Poynder's report indicates that Defendants

had opportunities for last-minute communications through electronic chatrooms. This evidence

indicates that Defendants maintained real-time contact with one another and exchanged

information instantaneously.

### 6. FX Traders Are Socially Connected

33.     ████████████████████████████████████████████

██████ [71] ████████████████████████████████████████████

---

69. DB-0762578.

70. *See, e.g.*, CS-FXLIT-05209294 (Credit Suisse spread matrix), BARC-FX-CIV-00185551 (Barclays spread matrix), BNP0072968 (BNP Paribas spread matrix); *See also* Yanez Dep. 162:15-20 ████████████████████████████████████████████████████

████████████████████████████████████████████████████

71. GS-FX-CIVIL-02188603, at 651 ████████████████████ ; FX0015272, at 292 ████████████████████████████ ; GS-FX-CIVIL-02172657, at 658-59 ████████████████████████████████████ , 663 ████████ ; GS-FX-CIVIL-01976079, at 088-089 ████████████████ ; GS-FX-CIVIL-03331607, at 608 ████████████████████ ; GS-FX-CIVIL-03317120, at 132-34 ████████████████████ ; UBSUK-ZINC-CIV-000002559 ████████████████████ ; UBSUK-ZINC-CIV-000001779 ████████████████ ; RBS-IN-RE-FX-LITIG-00052230, at 30-31 ████████████████████████████ ); MSFX00110167, at 172 ████████████████████ ; GS-FX-CIVIL-02522397, at 401 ████████████████ ; CS-FXLIT-06322601, at 612 ████████████████ ; CITI-FX-CIVIL-00127225, at 234 ████████████████ ; GS-FX-CIVIL-02190796, at 798 ████████████████████████ ; GS-FX-CIVIL-02191030, at 030-031 ████████████ ; CITI-FX-CIVIL-00397725, at 727-728 ████████████████



## III. CONDUCT: THE EXCHANGE OF SENSITIVE COMPETITIVE INFORMATION AMONG DEFENDANTS, AS ASSESSED BY MR. POYNDER, WAS PERVASIVE IN A STATISTICAL SENSE

34.     Mr. Poynder reviewed a "randomly selected, statistically representative sample of communications among FX traders working for Defendant banks"[80] during the Class Period. Based on a statistical analysis that I prepared (shown in the Appendix below), Mr. Poynder randomly sampled 91 trading days out of the total population of 1,531 trading days during the

---

72. CS-FXLIT-05903618, at 18.
73. RBS-IN-RE-FX-LITIG-00015019, at 024 (⬛⬛⬛); GS-FX-CIVIL-02018309, at 343 (⬛⬛⬛⬛⬛⬛⬛); GS-FX-CIVIL-02190765, at 766 (⬛⬛⬛⬛⬛⬛); GS-FX-CIVIL-03030853 (⬛⬛⬛⬛⬛⬛); GS-FX-CIVIL-02197818, at 822 (⬛⬛⬛⬛); BARC-FX-CIV-00180562, at 570 ⬛⬛⬛
74. JPMC-CIVIL-0000512388, at 400-02 ⬛⬛⬛⬛⬛⬛ BARC-FX-CIV-00025730 ⬛⬛⬛.
75. JPMC-CIVIL-0000113414, at 416 ⬛⬛⬛.
76. FX0023350, at 354 ⬛⬛⬛; BNP0065119, at 119-120 ⬛⬛⬛; RBS-IN-RE-FX-LITIG-00050749 ⬛⬛⬛.
77. JPMC-CIVIL-0000113414, at 416
78. UBS-ZINC-CIV-000006910, at 913 ⬛⬛⬛; CS-FXLIT-04114006, at 006-08 ⬛⬛⬛⬛⬛
79. CITI-FX-CIVIL-00015937.
80. Poynder Chat Report ¶1.

Class Period.[81] Mr. Poynder's team reviewed more than 37,800 communications from these 91 days.[82] Mr. Poynder then applied his market expertise to interpret the technical and slang-ridden language used by FX traders, and "conservatively flagged a total of 1,546 separate chatroom transcripts or emails where Sensitive Competitive Information was exchanged among two or more Defendants[.]"[83] Mr. Poynder found that Defendants exchanged Sensitive Competitive Information ("SCI") a total of 8,496 times covering 90 of the 91 days in the random sample.[84] He also found that Defendants exchanged SCI concerning spreads 522 times covering 77 of the 91 days in the random sample.[85]

35.     I take no position on the content of these communications, nor do I make any inference as to whether such evidence constitutes evidence of collusion or the existence of an agreement. Nevertheless, from an economic standpoint, it bears emphasis that communicating to a horizontal competitor the spread that one has quoted or intends to quote to a prospective customer would be against the unilateral self-interest of Defendants; in the absence of collusion, doing so would simply create an opportunity for a competitor to win business by charging a slightly narrower spread. More broadly, the sharing of private information that would better enable a competitor to predict and exploit price movements is not individually rational, because it creates opportunities for competitors to execute profitable trades at the expense of the information-sharing party.

36.     From a statistical standpoint, Mr. Poynder's findings are consistent with the hypothesis that the sharing of SCI was pervasive, in the sense of occurring on almost all trading

---

81.  *Id.* ¶3; ¶49.
82.  *Id.* ¶3.
83.  *Id.* ¶4
84.  *Id.*
85.  *Id.* at ¶69.

days during the Class Period. In particular, Mr. Poynder's findings allow one to reject the null hypothesis that SCI was exchanged on less than 95 percent of the trading days during the Class Period at the 5.4 percent significance level.[86] Put differently, if it were true that SCI was actually exchanged on fewer than 1,454 (equal to 0.95 x 1,531) trading days during the Class Period, then the probability that Mr. Poynder would have found evidence of the exchange of SCI on 90 out of the 91 days in the random sample (as he did) is only 5.4 percent.[87]

37.     Mr. Poynder found that SCI was exchanged 8,496 times during the 91-day random sample that he analyzed, for an average of 8,496/91 = 93.4 times per trading day, with a standard deviation of 86.3.[88] Given this information, I can construct a 95 percent confidence interval ("CI") for the number of SCI exchanges that would have been detected if Mr. Poynder had reviewed the full population of 1,531 trading days in the Class Period. The midpoint of the CI is 93.4*1,531 = 142,938. The lower end of the CI is 75.6*1,531 = 115,805. The upper end of the CI is 111.1*1,531 = 170,071. In other words, one can infer statistically with 95 percent confidence that the total number of SCI exchanges that would have been uncovered in a review of every day of the Class Period would be between 115,805 and 170,071.

38.     Mr. Poynder found that SCI specifically involving spreads was exchanged 522 times during the 91-day random sample that he analyzed, for an average of 522/91 = 5.74 times per trading day, with a standard deviation of 5.2.[89] Given this information, I can construct a 95 percent confidence interval ("CI") for the number of SCI exchanges involving spreads that would have been detected if Mr. Poynder had reviewed the full population of 1,531 trading days

---

86.  *Id.* Appendix 3.
87.  *Id.*
88.  Poynder Chat Report ¶108 (standard deviation calculated from supporting spreadsheet).
89.  *Id*. ¶69 (standard deviation calculated from supporting spreadsheet).

in the Class Period. The midpoint of the CI is 5.74*1,531 = 8,782. The lower end of the CI is 4.7*1,531 = 7,157. The upper end is of the CI is 6.8*1,531 = 10,407.  In other words, one can infer statistically with 95 percent confidence that the total number of SCI exchanges involving spreads that would have been uncovered in a review of every day of the Class Period would be between 7,157 and 10,407.

### IV. PERFORMANCE: HOLDING OTHER FACTORS CONSTANT, SPREADS NARROWED SIGNIFICANTLY AFTER THE END OF THE CLASS PERIOD

39.     Professors Bjønnes and Ljungqvist explain that the Challenged Conduct harmed every Class Member because it "resulted in spreads widening throughout the FX market," in part by increasing what economists call "adverse selection risk."[90] They explain that "it is not essential that Defendants exchanged private order flow information constantly or only intermittently throughout each trading day, so long as they did it persistently during the Class Period," because "non-Defendant liquidity providers did not, and could not, know *exactly* when Defendants had access to sensitive competitive information that gave them an edge,"[91] and thus defensively increased their spreads generally or exited the market, which increased spreads via a weakening of competition.

40.     In this section I test econometrically for differences between the bid-ask spreads quoted on the interbank electronic trading platform EBS (the "EBS Spread") before and after the end of the Class Period (December 31, 2013).[92] I find that, holding other factors constant,

---

90.  Ljungqvist & Bjønnes ¶74; ¶¶81-88. Standard economic principles show that the bid-ask spread increases with adverse selection risk, defined as the risk of transacting with a better-informed counterparty. *See* MICHAEL KATZ & HARVEY ROSEN, MICROECONOMICS 564-576 (Irwin McGraw-Hill 3rd ed. 1998); *see also* Lawrence Glosten & Paul Milgrom, *Bid, Ask and Transaction Prices in a Specialist Market with Heterogeneously Informed Traders* 14 JOURNAL OF FINANCIAL ECONOMICS 71-100 (1985). *See also* Osler & Wang (2013) at 89-91.

91.  Ljungqvist & Bjønnes ¶89. (emphasis added).

92.  Professors Ljungqvist and Bjønnes explain that "[a]rbitrage ensures that midpoints are approximately the same at a given point in time regardless of the data source used to obtain bid/ask data (i.e., whether data are

the EBS Spread narrowed after the end of the Class Period, and the effect is highly statistically significant. I also demonstrate econometrically that the components of the EBS Spread (the bid price and the ask price) are highly predictive of the prices paid by individual Class Members. This indicates that the Challenged Conduct is statistically associated with a deterioration in the performance of the FX market from the perspective of Class Members—that is, a lessening of competition. Although my empirical analysis focuses on the FX spot market, I note that Professors Ljungqvist and Bjønnes explain that pricing for other FX instruments, such as swaps, forwards, and derivatives, are a function of the spot price.[93]

## A. Interbank Spreads Narrowed Significantly After the End of the Class Period

41.     Econometric analysis, common to all Class Members, shows empirically that the EBS Spread narrowed after the Class Period, holding other factors constant, as explained in detail below. I model the EBS half-spread as a function of the Challenged Conduct, controlling for other factors that may influence spreads. My analysis spans 44 currency pairs, and incorporates second-by-second bid and ask quotes for each of these currency pairs.[94] This sample accounts for approximately 88 percent of FX trading volumes, and includes the most heavily traded currency pairs, as well as many lower-volume currency pairs.[95] The regression

---

obtained from EBS, Reuters, or another ECN). If they were not, an arbitrage profit could be made by trading across platforms." Ljungqvist & Bjønnes. n. 38.

93.  Ljungqvist & Bjønnes ¶46.  *See also* Yanez Dep. at 63:7-16 ███████████████

94.  Due to time constraints, I was unable to account for eight minor currency pairs, which collectively account for a maximum of approximately 5.6 percent of all foreign exchange volume. *See* Bank for International Settlements, "Triennial Central Bank Survey: Foreign exchange turnover in April 2016," Sept. 2016, at 11, *available at* http://www.bis.org/publ/rpfx16fx.pdf). If needed, I could expand my analysis to the 52 currency pairs analyzed by Professors Ljungqvist and Bjønnes. *See* Ljungqvist & Bjønnes, Appendix C.

95.  *See* Bank for International Settlements, "Triennial Central Bank Survey: Foreign exchange turnover in April 2016," Sept. 2016, at 9, *available at* http://www.bis.org/publ/rpfx16fx.pdf.

analysis was performed using a random sample of EBS second-by-second quote data, encompassing more than 100 million data points.[96]

42.     The econometric model can be written as follows:

*EBS Ask Quotes*:

$$\ln(P_{EBS}^{S}) - \ln(P_{EBS}^{Mid}) = \alpha_0 + \alpha_1 Conduct_t + [Controls] + \varepsilon_{it} \qquad (0.1)$$

*EBS Bid Quotes*:

$$\ln(P_{EBS}^{Mid}) - \ln(P_{EBS}^{B}) = \alpha_0 + \alpha_1 Conduct_t + [Controls] + \varepsilon_{it} \qquad (0.2)$$

Above, the term $P_{EBS}^{S}$ denotes the best (lowest) EBS ask quote, while $P_{EBS}^{B}$ denotes the best (highest) EBS bid quote. The term $P_{EBS}^{Mid}$ is the EBS midpoint, equal to $(P_{EBS}^{S} + P_{EBS}^{B})/2$. The EBS half-spread is simply the distance from the EBS ask price to the EBS midpoint $(P_{EBS}^{S} - P_{EBS}^{Mid})$; or, equivalently, the distance from the EBS midpoint to the EBS bid price $(P_{EBS}^{Mid} - P_{EBS}^{B})$.

43.     The function *ln*(.) denotes the natural logarithm, which allows the coefficients in the regression to be interpreted in percentage terms. I define the dependent variable in the regression as the "log half spread." The log half spread measures the percentage difference between either the EBS ask quote and the EBS midpoint (equation 0.1), or the EBS midpoint and the EBS bid quote (equation 0.2). Consistent with the definition of the Class Period, the variable *Conduct* is set equal to one before December 31, 2013—shortly after the Department of Justice confirmed its active investigation into Defendants' Challenged Conduct[97]—and to zero

---

96.  I used the Hampel filter to detect and eliminate outliers—that is, likely errors in the data. These discarded outliers account for less than one percent of the observations in the database. Intuitively, the Hampel filter checks for data points that represent extreme deviations from the 50th percentile of a group of data points. *See* Frank R. Hampel, *The Influence Curve and Its Role in Robust Estimation,* 69 JOURNAL OF THE AMERICAN STATISTICAL ASSOCIATION 383-393 (1974). Professors Ljungqvist and Bjønnes also used the Hampel filter.

97.  On October 29, 2013, Acting Assistant Attorney General Mythili Raman confirmed that DOJ's Criminal and Antitrust Divisions were actively investigating Defendants' manipulation of FX benchmark rates, including the

thereafter. If the coefficient $\alpha_1$ is positive and statistically significant, this means that, holding other factors constant, EBS Spreads were wider before the end of the Class Period than after, controlling for all other factors that may have influenced the EBS Spread. On the other hand, if $\alpha_1$ were found to be zero (or insignificantly different from zero), this would indicate that EBS Spreads were no different during the Class Period than after the Class Period.

44.     The term [*Controls*] denotes the control variables in the EBS regression, which include numerous factors identified in the economic literature and from industry sources. One key control variable is market volatility, measured as the variance of one-minute log returns.[98] Both participants in the FX industry and economists studying the FX industry recognize that (as in other financial sectors), increased volatility implies increased risk, leading to wider spreads.[99] I also control for order flow, which is "the sum of signed buyer-initiated and seller-initiated orders,"[100] with buys and sells receiving opposite signs. Order flow provides a measure of net buying or selling pressure, and economists have found that order flow can explain a significant portion of FX price movements over time.[101] Using data on transaction volumes, I control for

---

WM/Reuters Closing Spot Rates. *See, e.g.*, M. Rochan, *FX Fixing Scandal: US Justice Department Confirms Currency Investigation*, INTERNATIONAL BUSINESS TIMES, Oct. 30, 2013; *Day of reckoning as European banks' bill for misconduct mounts*, FINANCIAL TIMES, Oct. 29, 2013, *available at* http://on ft.com/1kIBkG4.

98.     Let $P_t$ be the price of a currency pair in minute $t$. The log return from minute $t$ to minute $(t + 1)$ is equal to $ln(P_{t+1} / P_t) = ln(P_{t+1}) - ln(P_t) \approx (P_{t+1} - P_t) / P_t$. My volatility metric is calculated as the variance of these log returns for given currency pair during a given day.

99.     *See, e.g.*, Nina Karnaukh, Angelo Ranaldo & Paul Söderlind, *Understanding FX Liquidity* 28(11) REV. FIN. STUDIES (2015) [hereafter, Karnaukh et. al. (2015)"], at 3084 ("It is well known that bid-ask spreads are positively affected by return volatility due to higher adverse selection and inventory risk.") *See also* KEVIN RODGERS, WHY AREN'T THEY SHOUTING? 14 (Random House 2016) (Kevin Rodgers, former Global Head of FX at Deutsche Bank, explains: "It mattered whether the market was relatively calm or whipping around in a frenzy. The more volatile, the more spread was needed to protect the bank.").

100.   MICROSTRUCTURE APPROACH at 5-6.

101.   For example, "[f]or euro-dollar, the basic order flow regression explains 50 percent of 10-minute returns, 46 percent of daily returns, and about 20 percent of one-month returns." Osler & Wang (2013), at 85. Note that returns are measured as the percentage increase (or decrease) in the price of the base currency over a given interval of time. In contrast, my own regression model explains variations in the Interbank Spread. Nevertheless, I include order flow as a control variable here, in light of its significance in the empirical economic literature. *See*

the cumulative order flow during the trading day.[102] The regression also controls for the depth of the order book—that is, the amount of the base currency that can be transacted at a given bid or ask price posted to EBS.[103] The depth of the order book has been found to be related to the bid-ask spread.[104]

45. Additional controls include the TED spread (a credit risk indicator equal to the difference between the three-month LIBOR rate and Treasury bill rates), the VIX index (a broad measure of market uncertainty derived from the S&P 500), the MSCI index (which captures returns to large and mid-cap stocks across international markets), and an investor sentiment index, all of which have been found to explain movements in FX prices or spreads.[105]

---



*also* Yanez Dep. at 70:2-12 ████████████████████████████████████████ *Id.* at 74:14-75:14 ████████████████████████████████████████

102. Daily order flow is measured as $\ln\left[\sum_{t=1}^{T_B}(B_t)+1\right]-\ln\left[\sum_{t=1}^{T_S}(S_t)+1\right]$, where $B$ and $S$ are buy and sell transactions executed on EBS or Reuters, measured in volume of the base currency, $T_B$ is the total number of buy transactions over the course of a trading day, and $T_S$ is the total number of sell transactions during the same day. My analysis uses transaction volume data from both EBS and Reuters, the two major interbank platforms. This ensures that currency pairs that are traded more heavily on Reuters than on EBS are not under-represented when I calculate transaction volumes.

103. Depth of order book is measured in natural logs. These data are reported in EBS, but not in Reuters. Accordingly, my empirical analysis uses primarily EBS data (except when calculating transaction volumes for purposes of assessing the order flow, as noted above).

104. *See, e.g.,* Jon Danielsson and Richard Payne, *Liquidity determination in an order driven market* LSE (2012). *See also* Albert Kyle, *Continuous Auctions and Insider Trading* 53 ECONOMETRICA (1985); Peter Gomber, Uwe Schweickert, & Erik Thiessen, *Zooming in on liquidity* Working Paper (2004).

105. Karnaukh et. al. (2015) at 3090. *See also* Loriano Mancini, Angelo Ranaldo, & Jan Wrampelmeyer, *Liquidity in the Foreign Exchange Market: Measurement, Commonality, and Risk Premiums* 68 JOURNAL OF FINANCE 1805–41, 1822 (2013) ("[T]he VIX is frequently used as a proxy for investors' fear and uncertainty in financial markets. The TED spread is a proxy for the level of credit risk and funding liquidity in the interbank market…Interestingly, the VIX as well as the TED spread are strongly negatively correlated with FX liquidity [as measured an index that incorporates by the bid-ask spread].") *See also* Harald Hau, Massimo Massa, & Joel Peress, *Do Demand Curves for Currencies Slope Down? Evidence from the MSCI Global Index Change*, 23 REVIEW OF FINANCIAL STUDIES 1681–717 (2010).

46.     I also include (1) fixed effects for the final trading day each month (when asset managers may hedge or rebalance their portfolios),[106] (2) time-period fixed effects (controlling for shifts over time in market conditions such as industry concentration and increased reliance on electronic execution methods), (3) currency-pair-specific hourly fixed effects (to account for currency-pair-specific differences in liquidity at different times of day), and (4) currency-pair-specific linear and quadratic time trends (to account for currency-pair specific changes in liquidity over the sample period).[107]

47.     The results of the regression analysis are shown in Table 1 below. In the baseline specification, reported in column (1), the Challenged Conduct is assumed to have ceased at the end of 2013. In columns (2) and (3), the end date of the conduct period is shifted to November and October of 2013, respectively. As indicated by the $R$-squared statistics, the regression model explains approximately 39 percent of the variation in the log half spread over and above that which could be predicted with knowledge of the mean log half spread alone.[108] In addition, the coefficient on *Volatility* is consistently positive and statistically significant, as expected.[109]

---

106.  Michael Melvin & John Prins, *The Equity Hedging Channel of Exchange Rate Adjustment*, 22 J. Fin. Markets 50–72 (2011). As explained above, real-money investors may also transact at regular intervals to convert returns on overseas investments into the home currency of their investors, while corporate customers transact in FX in the regular course of business, using foreign currencies as a medium of exchange, rather than a store of value. *See* Osler & Wang (2013) at 84; *see also* FX Handbook (2012) §1.3.1.

107.  In consultation with Professors Ljungqvist and Bjønnes, I have also confirmed that my regression results are robust to changes in tick size—the minimum possible distance between different price points—adopted for different currency pairs by EBS during and after the Class Period. Similarly, I have confirmed that my results are robust to adjustments that have been implemented to the "latency floor," which regulates the speed at which trading occurs and thereby places limits on the speed advantages of high-frequency trading: The latency floor groups together orders that arrive within a given timeframe into batches, and then randomizes the order in which the orders in the batch are processed. This means that the first message to hit the system is not necessarily the first message processed.

108.  In econometrics, a "high" $R$-squared is not necessarily indicative of a favorable result, nor is a "low" $R$-squared necessarily indicative of an unfavorable result. Even a regression with a seemingly low $R$-squared (e.g., below 5 percent) can generate statistically valid predictions. This is particularly true when the sample size is large, as is the case here. *See, e.g.,* Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach 199 (South-Western Cengage Learning 4th ed. 2009) [hereafter, "Wooldridge"] ("Until now, we have not focused much on the size of $R^2$ in evaluating our regression models, because beginning students tend to put too much

TABLE 1: EBS REGRESSION RESULTS

| Independent Variable | Dependent Variable: Log Half-Spread | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| | Conduct ending: 31 December 2013 | Conduct ending: 30 November 2013 | Conduct ending: 31 October 2013 |
| *Conduct* | **0.0000261*** | **0.0000287*** | **0.0000230*** |
| | (0.0000003) | (0.0000003) | (0.0000003) |
| *ln(Order Book Depth)* | 0.000008*** | 0.000007*** | 0.000006*** |
| | (0.0000001) | (0.0000001) | (0.0000001) |
| *Daily Volatility* | 0.32604*** | 0.326278*** | 0.325929*** |
| | (0.0114853) | (0.0114906) | (0.0114837) |
| *Daily Order Flow (ln(B)-ln(S))* | 0.0000003*** | 0.0000003*** | 0.0000003*** |
| | (0.00000003) | (0.00000003) | (0.00000003) |
| *TED Spread* | 0.000045*** | 0.000056*** | 0.000063*** |
| | (0.0000002) | (0.0000002) | (0.0000002) |
| *VIX Index (ln Change)* | -0.000042*** | -0.00004*** | -0.000041*** |
| | (0.0000013) | (0.0000013) | (0.0000013) |
| *MSCI Index (ln Change)* | 0.000031*** | 0.00006*** | 0.000018*** |
| | (0.0000012) | (0.0000012) | (0.0000012) |
| *Investor Sentiment Index* | 0.000037*** | -0.000027*** | -0.000018*** |
| | (0.0000005) | (0.0000006) | (0.0000005) |
| *Last Trading Day* | 0.000003*** | 0.000003*** | 0.000002*** |
| | (0.0000003) | (0.0000003) | (0.0000003) |
| **Observations** | 97,024,162 | 97,024,162 | 97,024,162 |
| R-squared | 39.37% | 39.43% | 39.45% |

*Notes:* Robust standard errors in parentheses: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Additional control variables suppressed for exposition, including currency pair-specific linear and quadratic time trends, currency pair-specific hourly fixed effects, and time fixed effects. Regressions run on two percent random sample of EBS second-by-second quote data.

Most significantly, the coefficient on *Conduct* is positive and highly statistically significant in all specifications, indicating that the EBS spread narrowed after the end of the conduct period. For example, the result in column (1) indicates that, holding all else fixed, the EBS ask price

weight on *R*-squared…choosing a set of explanatory variables based on the size of the *R*-squared can lead to nonsensical models… A small *R*-squared does imply that the error variance is large relative to the variance of *y*, which means we may have a hard time precisely estimating the [regression coefficients]. But remember…that *a large error variance can be offset by a large sample size*: if we have enough data, we may be able to precisely estimate the partial effects even though we have not controlled for many unobserved factors.") (emphasis added).

109.  Due to the sheer volume of the second-by-second EBS quote data (which exceed 4.8 billion observations, which is significantly more than the theoretical limit of what a powerful statistical software package such as STATA can handle), the analysis in Table 1 is performed using a two percent random sample, consisting of approximately 97 million observations. If a larger sample size were used, the regression coefficients would be even more statistically significant than those reported in Table 1 (because the standard errors of the regression coefficients are a decreasing function of sample size).

would have been approximately 0.0026 percent lower in the absence of the Challenged Conduct, while the EBS buy price would have been 0.0026 percent higher. To illustrate, consider a purchase of $10 million worth of Euro in the actual world. In the but-for world, the same quantity of Euro could have been purchased for $9,999,740 (equal to $10 million x [1 – 0.000026]). Thus, under this example, total expenditures are reduced by $260 in the but-for world (equal to 0.0026 percent of $10 million). Accordingly, the regression results in Table 1 indicate that the EBS spread declined significantly after the end of the Class Period, holding other factors constant.

48.     Figure 1 below plots the estimated coefficient on the *Conduct* variable for the baseline regression, with an end date of December 31, 2013, and for two alternative specifications with end dates in October 2013 and November 2013, respectively. This analysis allows me to test the sensitivity of the model to different assumptions regarding the end date of the Challenged Conduct.

FIGURE 1: ESTIMATED CONDUCT COEFFICIENT BY END DATE (SENSITIVITY ANALYSIS)



## B. Interbank Spreads Are Highly Predictive of Class Member Prices

49. As explained above, interbank prices serve as benchmark prices (or "anchor" or "reference" prices) upon which other FX prices are based.[110] In this section, I use statistical analysis to quantify this relationship. The results demonstrate that EBS prices account for more than 99 percent of the movements in prices charged by Defendants to Class Members for virtually all of the 44 currency pairs that I have analyzed. This finding implies that the Challenged Conduct is statistically associated with a decrease in market performance from Class Members' perspective.

---

110. *See* Part I.A. *supra.*

50.     For each currency pair, I constructed two time series: (1) the hourly time series of weighted-average prices charged by Defendants to Class Members[111] on spot transactions; and (2) the hourly time series of weighted-average EBS prices, matching bank buys to EBS bids and bank sells to EBS offers.[112] The resulting time series encompasses 1.7 million data points.[113]

51.     Before quantifying the statistical relationship between (1) and (2), it is necessary to test whether each of these time series are "nonstationary." A time series is said to be "stationary" if its statistical properties (such as its mean and its variance) are constant over time; in contrast, a time series is said to be "nonstationary" if these statistical properties change over time.[114] Economic research has found evidence that FX rates can be nonstationary.[115]

---

111.   My analysis employs transaction data from the following twelve Defendants: Barclays, Bank of America, BTMU, Citibank, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBC, and RBS. Transactional data from BNP Paribas and UBS were not used. ██████████████████████████████████████████████████████████████████ However, I note that my results are not sensitive to the exclusion or inclusion of these two banks. Finally, Defendants Société Générale and Standard Chartered did not produce data ██████████████ My analysis does not incorporate data from these two Defendants, although it could be incorporated at the merits phase.

The raw transaction data produced by Defendants were first reviewed by Velador. Velador's review of the raw data produced various screens, which I applied in constructing the database used for my regression analyses. I limited the data to spot trades. Trades that were internal to the bank were eliminated. Prime broker trades (which reflect another entity trading under a Defendants' name) were also eliminated. I also limited the data to trades with valid booking date-time designations, and eliminated trades that failed to pass additional validation screens. These include time- and date-stamp omissions and errors, micro-transactions, missing quantities or prices, wash trades, and missing client information. I matched electronic transactions to the EBS benchmark price database with a one-second booking delay, to avoid matching trades to benchmark prices that had not yet been offered within the same second. For voice trades, I used an algorithm that selects the optimal lag time, based on minimizing the RMSE between bank prices and EBS prices. The algorithm tests lag lengths between 1 second and 1,200 seconds. Professors Ljungqvist and Bjønnes used the same algorithm.

112.   Both the bank price and the EBS price were weighted by the volume traded by the Defendants.

113.   The bank data include over 655 million data points for the years 2007 through 2015 after all suggested screens (described in footnote 106) are applied. After collapsing the data into an hourly time series, the resulting dataset includes over 1.7 million data points. Before collapsing, I used the Hampel filter to detect and eliminate outliers—that is, likely errors in the data. These discarded outliers account for less than 2 percent of the observations in the database.

114.   WOOLDRIDGE, *supra*, at 378-81.

Nonstationary time series have special statistical properties that need to be taken into account before one can analyze the statistical relationships between them.[116]

52.    For each currency pair, I used a standard statistical method common to all Class Members, known as the "augmented Dickey-Fuller test,"[117] to determine whether each time series is stationary. Under the augmented Dickey-Fuller test, the null hypothesis of non-stationarity is tested against the alternative hypothesis of stationarity. If the Dickey-Fuller test statistic ("D-F Statistic") passes, in absolute value, a threshold given by a critical value (in this case, -3.12), then the null hypothesis of non-stationarity is rejected.[118] Table 2 shows the results.

---

115.   The economic literature generally finds that nominal foreign exchange rates are nonstationary, although some recent research provides conflicting evidence. *See* Hanno Lustig, Andreas Stathopoulos & Adrien Verdelhan, "Nominal Exchange Rate Stationarity and Long-Term Bond Returns," Stanford Graduate School of Business Working Paper No. 3411 (January 2016), at 1 ("The consensus view in the literature is that nominal exchange rates exhibit unit root behavior…While the stationarity of real exchange rates is grounded theoretically in the purchasing power parity condition and well-established empirically, the stationarity of nominal exchange rates is a more difficult question.").

116.   WOOLDRIDGE, *supra*, at 630-41.

117.   *Id.* at 630-35.

118.   *Id.* at 634.

TABLE 2: AUGMENTED DICKEY-FULLER STATIONARITY TESTS

| | Defendants' Prices to Class Members | | EBS Prices | |
|---|---|---|---|---|

53.     For each currency pair, Table 2 above displays the D-F Statistic for both the prices charged by Defendants to Class Members and the EBS price. Whenever the D-F Statistic is less (in absolute value) than the critical value of -3.12, the null hypothesis of non-stationarity cannot be rejected. As seen above, the null hypothesis of non-stationarity cannot be rejected for a majority of currency pairs. Put differently, there is strong statistical evidence that these time series are nonstationary, consistent with the economic literature.

54.     Statistical analysis of the relationship between two nonstationary time series can result in a spurious statistical finding: Two nonstationary time series may appear to have a statistical relationship, when in fact they do not.[119] However, if the two nonstationary time series are "cointegrated," this problem is avoided. Two time series are said to be cointegrated if they move together systematically over time, in the sense that they do not tend to drift apart arbitrarily, with no tendency to come back together.[120] Given the statistical evidence above, which shows that both (1) the prices charged by Defendants to Class Members and (2) the EBS prices are nonstationary, it is important to test whether (1) and (2) are cointegrated. If (1) and (2) are found to be cointegrated, then I can proceed to analyze the statistical relationship between (1) and (2) without generating spurious results.

55.     Using standard econometric methods applicable to all members of the Class, I performed just such a test for each currency pair. Specifically, I used the Engle-Granger test to determine whether the prices charged by Defendants to Class Members and the EBS prices are cointegrated. The Engle-Granger test is performed by regressing the Defendant bank prices on the EBS prices, and then testing whether the residuals of that regression are stationary.

119.    *Id.*
120.    *Id.* at 638.

Rejecting the null hypothesis of non-stationarity of the residuals indicates that the two series are cointegrated.[121] As seen in Table 3, for almost every currency pair, the test statistic is far above (in absolute value) the critical value of -3.50,[122] implying that Defendant bank prices and EBS prices are indeed cointegrated.[123]

56.     That the two time series are cointegrated provides statistical confirmation of the linkage between the EBS prices and the prices paid by Class Members to Defendants; it also means that the results of a simple regression (the "first-stage regression") can be used to reliably quantify the relationship between the two time series. As seen in the final column of Table 3, the $R$-squared in the first-stage regression is above 99 percent for 42 of 44 currency airs; even the lowest $R$-squared (for the Euro/Danish Krone) is 81 percent. Put differently, the EBS price explains the vast majority of the variation in the prices that banks charge to Class Members.

---

121. *Id.* at 639-640.
122. *Id.* at 640.
123. In principle, it is not necessary to perform this exercise for the currency pairs found to be stationary in Table 3; I do so here for completeness.

TABLE 3: ENGLE-GRANGER COINTEGRATION TESTS AND R-SQUARED STATISTICS



**CONCLUSION**

57.     For the foregoing reasons, I conclude that (1) the structure of the FX market is characterized by conditions conducive to collusion; (2) the exchange of Sensitive Competitive Information among Defendants, as defined and assessed by Mr. Poynder, was pervasive in a statistical sense, occurring on all or almost all trading days during the Class Period; and, (3) holding other factors constant, interbank spreads narrowed after the end of the Class Period, which means that the Challenged Conduct is statistically associated with inferior performance of the FX market from the perspective of all or almost all Class Members.

Hal J. Singer

Executed on May 31, 2018.

## APPENDIX 1: CURRENCY PAIR ABBREVIATIONS

| Abbreviation | Currency |
|---|---|
| AUD | Australian Dollar |
| BRL | Brazilian Real |
| CAD | Canadian Dollar |
| CHF | Swiss Franc |
| CLP | Chilean Peso |
| CNH | Chinese Yuan (offshore) |
| CNY | Chinese Yuan (onshore) |
| COP | Columbian Peso |
| CZK | Czech Koruna |
| DKK | Danish Krone |
| EUR | Euro |
| GBP | British Pound |
| HKD | Hong Kong Dollar |
| HUF | Hungarian Forint |
| IDR | Indonesian Rupiah |
| ILS | Israeli Shekel |
| INR | Indian Rupee |
| JPY | Japanese Yen |
| KRW | South Korean Won |
| MXN | Mexican Peso |
| MYR | Malaysian Ringgit |
| NOK | Norwegian Krone |
| NZD | New Zealand Dollar |
| PEN | Peruvian Sol |
| PHP | Philippine Piso |
| PLN | Polish Zloty |
| RON | Romanian Leu |
| RUB | Russian Ruble |
| SAR | Saudi Riyal |
| SEK | Swedish Krona |
| SGD | Singapore Dollar |
| THB | Thai Baht |
| TRY | Turkish Lira |
| TWD | Taiwan Dollar |
| USD | US Dollar |
| ZAR | South African Rand |

APPENDIX 2: SAMPLE SIZE ANALYSIS FOR MR. POYNDER'S REVIEW OF ELECTRONIC COMMUNICATIONS

## Introduction

This Appendix reviews statistical methods for establishing the pervasiveness of the exchange of Sensitive Competitive Information, as defined by Mr. Poynder's review methodology, based on a random sample of trading days selected from the Class Period. The hypothesis to be tested, using standard statistical sampling methods, is that the exchange of SCI among Defendants was pervasive, in the sense of occurring on all or almost all trading days during the Class Period. As explained below, a random sample of 91 days is sufficient to establish that SCI sharing occurred on at least 90 to 95 percent of the active trading days during the Class Period.

Because Mr. Poynder has uncovered evidence of the sharing of SCI on 90 days out of a random sample of 91 trading days, one can reject the null hypothesis that SCI was exchanged on less than 95 percent of the trading days during the Class Period at the 5.4 percent significance level. Put differently, if it were true that SCI was actually exchanged on fewer than 0.95*(1,531) = 1,454 trading days during the Class Period, then the probability that Mr. Poynder would have found evidence of the exchange of SCI on 90 out of 91 days in the random sample (as he did) is only 5.4 percent.

## One-Tailed Test With Binomial Distribution

Let $c_t$ denote an indicator equal to one if Mr. Poynder's review determines that SCI was exchanged on day $t$, and zero otherwise:

$$c_t = \begin{cases} 0 & \textit{No evidence of SCI exchange on day } t \\ 1 & \textit{Evidence of SCI exchange on day } t \end{cases} \tag{0.3}$$

Let $p$ denote the true proportion of days over this interval in which evidence of SCI exchange exists. (Note that there are 1,531 active trading days between 12/1/07 and 12/31/13.)

$$p = \frac{1}{1,531} \sum_{t=1}^{1,531} c_t \tag{0.4}$$

Given a random sample of size $n < 1,531$, one can estimate the true proportion using the sample mean:

$$\hat{p} = \frac{1}{n} \sum_{t=1}^{n} c_t \tag{0.5}$$

Given an estimate of $\hat{p}$, one can construct a one-sided hypothesis test of whether $p$ lies above some predetermined threshold. Suppose that we have a random sample of 91 days, and that

evidence of SCI sharing is detected about 95 percent of the time, or in 87 days. (Thus, $\hat{p} = 87 / 91 = 0.956$.)

Suppose we want to test the null hypothesis that the true probability is as low as 90 percent $(H_0 : p = 0.9)$ over the alternative hypothesis that the true probability exceeds 90 percent $(H_A : p > 0.9)$. Our null hypothesis is that SCI sharing is present in only 90 percent of the 1,531 days in the population. Our alternative hypothesis is that SCI sharing is present in more than 90 percent of the 1,531 active trading days in the population.

Assuming the null hypothesis is true, we can calculate the probability of rejecting it exactly using the binomial distribution.[124] Let $X$ be the total number of days in a random sample in which SCI sharing is detected. The cumulative probability that SCI sharing will be detected on 86 or fewer days under the null hypothesis is:

$$P(X \leq 86 \mid p = 0.9) = \sum_{k=0}^{86} \binom{91}{k} (0.9)^k (1-0.9)^{91-k} = 0.956 \qquad (0.6)$$

Therefore, under the null hypothesis, the probability that Mr. Poynder would detect SCI sharing in *more* than 86 days is equal to 1 - 0.956 = 4.4 percent. This is the probability of a Type I error, also known as the *p*-value: It is the likelihood of rejecting the null hypothesis when it is true. Therefore, if Mr. Poynder had detected SCI sharing on 87 out of 91 days, we could have rejected the null hypothesis at the five percent significance level.

In reality, Mr. Poynder's review detected evidence of SCI sharing on 90 of the 91 days, or 98.9 percent of the time. By calculations similar to those above, we can reject the null hypothesis that $(H_0 : p = 0.95)$ in favor of $(H_A : p > 0.95)$ at the 5.4 percent significance level. Under the null hypothesis, the probability that SCI sharing will be detected in 89 or fewer days out of a random sample of 91 days is:

$$P(X \leq 89 \mid p = 0.95) = \sum_{k=0}^{89} \binom{91}{k} (0.95)^k (1-0.95)^{91-k} = 0.946 \qquad (0.7)$$

Therefore, under the null hypothesis, the probability that we would detect SCI sharing in *more* than 89 of 91 trading days is equal to 1 - 0.946 = 0.054, or 5.4 percent. We therefore reject the null hypothesis at the 5.4 percent significance level. The results of the preceding calculations are summarized in Table A1 below.

---

[124] The binomial distribution yields exact probabilities in the context of a random variable that can take on one of two values, as is the case here. The normal distribution, which is often used when the sample size is sufficiently large, would provide only an approximation. *See, e.g.,* RICHARD C. CLELLAND ET AL, BASIC STATISTICS WITH BUSINESS APPLICATIONS 94, 117-120 (Wiley 1st ed. 1966) (explaining "[the binomial] applies to those random experiments having only two possible outcomes where the probability attached to each outcome does not vary" and "[t]he binomial is the true model… the normal is the limit of this distribution").

**TABLE A1**

| Sample Size | Days with SCI sharing | $\hat{p}$ | Null Hypothesis | Alternative Hypothesis | One-tailed $p$-value |
|---|---|---|---|---|---|
| 91 | 87 | 0.956 | $p = 0.90$ | $p > 0.9$ | 4.4% |
| 91 | 90 | 0.989 | $p = 0.95$ | $p > 0.95$ | 5.4% |

*Note*: All $p$-values calculated from binomial distribution.

**Conclusion**

A random sample of 91 days is sufficient to test whether SCI sharing was pervasive among Defendants. Because SCI sharing was detected in 90 out of 91 days, we can reject the null hypothesis that SCI sharing occurred in 95 percent (or less) of the total population of 1,531 active trading days, in favor of the alternative hypothesis that SCI sharing occurred more than 95 percent of the time, at the 5.4 percent significance level.

**APPENDIX 3: MATERIALS RELIED UPON**

**DEPOSITIONS**

Deposition of Steve Yanez (March 14, 2018)

**LITERATURE**

Albert Kyle, *Continuous Auctions and Insider Trading* 53 ECONOMETRICA (1985)

Carol Osler, Alexander Mende, & Lukas Menkhoff, *Price Discovery in Currency Markets* 30 J. INT'L MONEY & FIN. 1696–1718 (2011)

Carol Osler, *Foreign Exchange Microstructure: A Survey*, *in* ENCYCLOPEDIA OF COMPLEXITY AND SYSTEM SCIENCE, (Robert Meyers, Ed. Springer, New York: 2009), entry 00227

Carol Osler & Xuhang Wang, *The Microstructure of Currency Markets, in* H. KENT BAKER AND HALIL KIYMA MARKET MICROSTRUCTURE IN EMERGING AND DEVELOPED MARKETS: PRICE DISCOVERY, INFORMATION FLOWS, AND TRANSACTION COSTS (Chapter 5) (John Wiley 2013)

DENNIS CARLTON & JEFFREY PERLOFF, MODERN INDUSTRIAL ORGANIZATION (Pearson 2005 4th ed.)

*Euromoney* FX survey, 2002-2014

Frank R. Hampel, *The Influence Curve and Its Role in Robust Estimation* 69 JOURNAL OF THE AMERICAN STATISTICAL ASSOCIATION 383-393 (1974)

FREDERIC SCHERER & DAVID ROSS, INDUSTRIAL MARKET STRUCTURE AND ECONOMIC PERFORMANCE (Houghton Mifflin 3rd ed. 1990)

Geir Bjønnes, Neophytos Kathitziotis, & Carol Osler, "Bid-Ask Spreads in OTC Markets," Brandeis University Working Paper 102 (March 2016)

Geir Bjønnes, Neophytos Kathitziotis, & Carol Osler, "The Cost of FX Liquidity: Empirical Tests of Competing Theories," Brandeis University Working Paper (2014)

Hal Singer, *Economic Evidence of Common Impact for Class Certification in Antitrust Cases: A Two-Step Analysis*, ANTITRUST (Summer 2011)

Hanno Lustig, Andreas Stathopoulos & Adrien Verdelhan, "Nominal Exchange Rate Stationarity and Long-Term Bond Returns," Stanford Graduate School of Business Working Paper No. 3411 (January 2016)

Harald Hau, Massimo Massa, & Joel Peress, *Do Demand Curves for Currencies Slope Down? Evidence from the MSCI Global Index Change*, 23 REVIEW OF FINANCIAL STUDIES (2010) 1681–717

Herbert Hovenkamp & Carl Shapiro, *Horizontal Mergers, Market Structure, and Burdens of Proof* YALE LAW JOURNAL (forthcoming 2018), *available at*: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3046224

*In Re: High-Tech Employee Antitrust Litigation*, No. 11-CV-02509 (N.D. Cal.)

JEFFREY M. WOOLDRIDGE, INTRODUCTORY ECONOMETRICS: A MODERN APPROACH (South-Western Cengage Learning 4th ed. 2009)

*Johnson v. Ariz. Hosp. and Healthcare Ass'n*, 2009 WL 5031334 (D. Ariz. July 14, 2009)

*Johnson v. Ariz. Hosp. & Healthcare Ass'n (AzHHA)*, No. CV 07-1292-PHXSRB, 2009 WL 5031334 (D. Ariz. July 14, 2009)

Jon Danielsson and Richard Payne, *Liquidity determination in an order driven market* LSE (2012)

Jonathan B. Baker & Timothy F. Bresnahan, *Economic Evidence in Antitrust: Defining Markets and Measuring Market Power*, in Paulo Buccirossi, ed. HANDBOOK OF ANTITRUST ECONOMICS (2007)

Kevin Caves & Hal Singer, *Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases*," ANTITRUST SOURCE (2015)

Kevin Caves & Hal Singer, *Econometric Tests for Analyzing Common Impact,* 26 RESEARCH IN L. & ECON. (2014)

Kevin Caves & Hal Singer, *Life After Comcast: The Economist's Obligation to Decompose Damages Across Theories of Harm,* ANTITRUST (Spring 2014)

KEVIN RODGERS, WHY AREN'T THEY SHOUTING? (Random House 2016)

Lawrence Glosten & Paul Milgrom, *Bid, Ask and Transaction Prices in a Specialist Market with Heterogeneously Informed Traders* 14 JOURNAL OF FINANCIAL ECONOMICS 71-100 (1985)

Loriano Mancini, Angelo Ranaldo, & Jan Wrampelmeyer, *Liquidity in the Foreign Exchange Market: Measurement, Commonality, and Risk Premiums* 68 JOURNAL OF FINANCE (2013) 1805–41

Louis Kaplow, *An Economic Approach to Price Fixing*, 77(2) ANTITRUST L.J. 343-449 (2011)

*Meijer, Inc. v. Abbot Laboratories, Inc.*, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008)

MICHAEL KATZ & HARVEY ROSEN, MICROECONOMICS (Irwin McGraw-Hill 3rd ed. 1998)

Margaret Levenstein & Valerie Suslow, *What Determines Cartel Success?* 44(1) J. Econ. Lit. 43-95 (2006)

Michael King, Carol Osler, & Dangfin Rime, *Foreign Exchange Market Structure, Players, and Evolution, in* Jessica James, Ian Marsh, & Lucio Sarno, Eds., Handbook of Exchange Rates (Wiley 2012)

Michael Melvin & John Prins, *The Equity Hedging Channel of Exchange Rate Adjustment*, 22 J. Fin. Markets 50–72 (2011)

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intern., Ltd.*, 262 F.R.D. 58, 69 (D. Mass. Aug. 29, 2008)

Nina Karnaukh, Angelo Ranaldo &  Paul Söderlind, *Understanding FX Liquidity* 28(11) Rev. Fin. Studies (2015)

Peter Gomber, Uwe Schweickert, & Erik Thiessen, *Zooming in on liquidity* Working Paper (2004)

Richard C. Clelland et al, Basic Statistics with Business Applications (Wiley 1st ed. 1966)

Richard Lyons, The Microstructure Approach to Exchange Rates (MIT Press 2001)

Robert Gibbons, Game Theory for Applied Economists (Princeton University Press 1992)

Robert Kulick & Hal Singer, *Class Certification in Antitrust Cases: An Economic Framework*, 17 George Mason L. Rev. (2010)

*Se. Missouri Hosp. v. C.R. Bard, Inc.*, 2008 WL 4372741 (E.D. Mo. Sept. 22, 2008)

Thomas Krattenmaker, Robert Lande & Steven Salop, *Monopoly Power and Market Power in Antitrust Law*, 76 Georgetown L.J. 241-269 (1987)

*United States v. E. I. du Pont de Nemours & Co.* ("*Cellophane*"), 351 U.S. 377, 391 (1956)

Vogel v. Am. Soc'y of Appraisers, 744 F.2d 598, 601 (7th Cir. 1984)

Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 322 (2007)

**Trial Materials/Bates Documents**

BARC-FX-CIV-00025730

BARC-FX-CIV-00180562

BARC-FX-CIV-00185551

BNP0065119

BNP0072968

Chat Report Prepared by Robin Poynder of Velador Associates

CITI-FX-CIVIL-00015937

CITI-FX-CIVIL-00127225

CITI-FX-CIVIL-00397725

CS-FXLIT-04001553

CS-FXLIT-04114006

CS-FXLIT-05209294

CS-FXLIT-05903618

CS-FXLIT-06322601

CS-FXLIT-06344889

CS-FXLIT-06366308

CS-FXLIT-06424822

CS-FXLIT-06441732

CS-FXLIT-06469081

DB-0704291

DB-0762578

DB-0938703

Expert Report of Professor Alexander Ljungqvist and Professor Geir Høidal Bjønnes

FX0015272

FX0023350

GS-FX-CIVIL-01976079

GS-FX-CIVIL-02018309

GS-FX-CIVIL-02172657

GS-FX-CIVIL-02188603

GS-FX-CIVIL-02190765

GS-FX-CIVIL-02190796

GS-FX-CIVIL-02191030

GS-FX-CIVIL-02197818

GS-FX-CIVIL-02522397

GS-FX-CIVIL-03030853

GS-FX-CIVIL-03317120

GS-FX-CIVIL-03331607

HBEU-FXLITIG-00049159

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-07789 (S.D.N.Y.), Opinion and Order (September 20, 2016)

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-07789 (S.D.N.Y.), Third Consolidated Amended Class Action Complaint (June 3, 2016)

JPMC-CIVIL-0000113414

JPMC-CIVIL-0000512388

Memorandum of Law in Support of Plaintiffs' Motion for Class Certification

MSFX00110167

RBS-IN-RE-FX-LITIG-00015019

RBS-IN-RE-FX-LITIG-00050749

RBS-IN-RE-FX-LITIG-00052230

UBS-ZINC-CIV-000006910

UBSCH-ZINC-CIV-000007345

UBSUK-ZINC-CIV-000001779

UBSUK-ZINC-CIV-000002559

**PUBLICLY AVAILABLE MATERIALS**

Bank for International Settlements, *Triennial Central Bank Survey: Foreign Exchange Turnover in April 2016* (September 2016; revised December 2016) *available at* http://www.bis.org/publ/rpfx16fx.pdf

*Day of reckoning as European banks' bill for misconduct mounts*, FINANCIAL TIMES, Oct. 29, 2013, *available at* http://on.ft.com/1kIBkG4

Department of Justice, *Price Fixing, Bid Rigging And Market Allocation Schemes: What they Are and What to Look For*, *available at:* https://www.justice.gov/atr/price-fixing-bid-rigging-and-market-allocation-schemes

http://www.investopedia.com/ask/answers/06/pipandcurrencypair.asp

https://www.oanda.com/forex-trading/learn/intro-to-currency-trading/conventions/pips

Jeremy Wagner, *Trading in Extremely Volatile Market Environments*, DAILYFX, June 20, 2016

Kathy Lien, *The Foreign Exchange Interbank Market*, INVESTOPEDIA, *available at:* http://www.investopedia.com/articles/forex/06/interbank.asp

M. Rochan, *FX Fixing Scandal: US Justice Department Confirms Currency Investigation*, INTERNATIONAL BUSINESS TIMES, Oct. 30, 2013

New York Federal Reserve Bank, Foreign Exchange Volume Survey, *available at* https://www.newyorkfed.org/banking/reportingforms/FXVSURVEY.html

New York Federal Reserve Bank, FX Market Share, *available at* https://www.newyorkfed.org/fxc/volumesurvey/mshare.html

Sue Chang, *How big is Bitcoin, really? This chart puts it all in perspective*, MARKET WATCH, June 30, 2017, *available at* http://www.marketwatch.com/story/how-big-is-bitcoin-really-this-chart-puts-it-all-in-perspective-2017-06-21

U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* (August 19, 2010)

William Kolasky, "Coordinated Effects in Merger Review: From Dead Frenchmen to Beautiful Minds and Mavericks," Address to the American Bar Association Section of Antitrust Law Spring Meeting, Washington DC 2002, *available at* https://www.justice.gov/atr/speech/coordinated-effects-merger-review-dead-frenchmen-beautiful-minds-and-mavericks

## APPENDIX 4: CURRICULUM VITAE

**Office Address**

> Economists Incorporated
> 2121 K Street, NW
> Suite 1100
> Washington, DC 20037
> Phone:  (202) 747-3520
> singer.h@ei.com

**Education**

> Ph.D., The John Hopkins University, 1999; M.A. 1996, Economics.
>
> B.S., Tulane University, *magna cum laude*, 1994, Economics. Dean's Honor Scholar (full academic scholarship). Senior Scholar Prize in Economics.

**Current Position**

> ECONOMISTS INCORPORATED, Washington, D.C.: Principal 2014-present.
>
> GEORGETOWN UNIVERSITY, MCDONOUGH SCHOOL OF BUSINESS, Washington, D.C.: Adjunct Professor 2010, 2014, 2016, 2018.
>
> GEORGE WASHINGTON UNIVERSITY, SCHOOL OF PUBLIC POLICY, GEORGE WASHINGTON INSTITUTE FOR PUBLIC POLICY, Washington, D.C.: Senior Fellow 2016-present.

**Employment History**

> NAVIGANT ECONOMICS, Washington, D.C.: Managing Director, 2010-2013.
>
> EMPIRIS, L.L.C., Washington, D.C.: Managing Partner and President, 2008-2010.
>
> CRITERION ECONOMICS, L.L.C., Washington, D.C.: President, 2004-2008. Senior Vice President, 1999-2004.
>
> LECG, INC., Washington, D.C.: Senior Economist, 1998-99.

U.S. SECURITIES AND EXCHANGE COMMISSION,
OFFICE OF ECONOMIC ANALYSIS, Washington, D.C.: Staff
Economist, 1997-98.

THE JOHNS HOPKINS UNIVERSITY, ECONOMICS
DEPARTMENT, Baltimore: Teaching Assistant, 1996-98.

## Authored Books and Book Chapters

*Do Municipal Broadband Networks Stimulate or Crowd Out
Private Investment? An Empirical Analysis of Employment Effects*,
in THE IMPACT OF THE INTERNET ON JOBS (Lorenzo
Pupillo, ed. Palgrave 2018).

THE NEED FOR SPEED: A NEW FRAMEWORK FOR
TELECOMMUNICATIONS POLICY FOR THE 21ST
CENTURY, co-authored with Robert Litan (Brookings Press
2013).

*Net Neutrality Is Bad Broadband Regulation*, co-authored with
Robert Litan, in THE ECONOMISTS' VOICE 2.0: THE
FINANCIAL CRISIS, HEALTH CARE REFORM AND MORE
(Aaron Edlin and Joseph Stiglitz, eds., Columbia University Press
2012).

*Valuing Life Settlements as a Real Option*, co-authored with
Joseph R. Mason, in LONGEVITY TRADING AND LIFE
SETTLEMENTS (Vishaal Bhuyan ed., John Wiley & Sons 2009).

*An Antitrust Analysis of the World Trade Organization's Decision
in the U.S.-Mexico Arbitration on Telecommunications Services*,
co- authored with J. Gregory Sidak, in HANDBOOK OF TRANS-
ATLANTIC ANTITRUST (Philip Marsden, ed. Edward Elgar
2006).

BROADBAND IN EUROPE: HOW BRUSSELS CAN WIRE
THE INFORMATION SOCIETY, co-authored with Dan
Maldoom, Richard Marsden and J. Gregory Sidak
(Kluwer/Springer Press 2005).

*Are Vertically Integrated DSL Providers Squeezing Unaffiliated
ISPs (and Should We Care)?*, co-authored with Robert W.
Crandall, in ACCESS PRICING: THEORY, PRACTICE AND
EMPIRICAL EVIDENCE (Justus Haucap and Ralf Dewenter eds.,
Elsevier Press 2005).

**Journal Articles**

*Applied Econometrics: When Can an Omitted Variable Invalidate a Regression?,* ANTITRUST SOURCE (2017), co-authored with Kevin Caves.

*Paid Prioritization and Zero Rating: Why Antitrust Cannot Reach the Part of Net Neutrality Everyone Is Concerned About,* ANTITRUST SOURCE (2017).

*The Curious Absence of Economic Analysis at the Federal Communications Commission: An Agency in Search of a Mission,* INTERNATIONAL JOURNAL OF COMMUNICATIONS (2017), co-authored with Gerald Faulhaber and Augustus Urschel.

*On the Utility of Surrogates for Rule of Reason Cases,* COMPETITION POLICY INTERNATIONAL (2015), co-authored with Kevin Caves.

*Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,"* ANTITRUST SOURCE (2015), co-authored with Kevin Caves.

*Econometric Tests for Analyzing Common Impact,* 26 RESEARCH IN LAW AND ECONOMICS (2014), co-authored with Kevin Caves.

*Life After Comcast: The Economist's Obligation to Decompose Damages Across Theories of Harm,* ANTITRUST (Spring 2014), co-authored with Kevin Caves.

*Is the U.S. Government's Internet Policy Broken?,* 5 POLICY AND INTERNET (2013), co-authored with Robert Hahn.

*Avoiding Rent-Seeking in Secondary Market Spectrum Transactions,* 65 FEDERAL COMMUNICATIONS LAW JOURNAL (2013), co-authored with Jeffrey Eisenach.

*Vertical Integration in Multichannel Television Markets: A Study of Regional Sports Networks,* 12(1) REVIEW OF NETWORK ECONOMICS (2013), co-authored with Kevin Caves and Chris Holt.

*Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry*, 8(4) JOURNAL OF COMPETITION LAW AND ECONOMICS (2012), co-authored with Kevin Caves.

*Lessons from Kahneman's Thinking Fast and Slow: Does Behavioral Economics Have a Role in Antitrust Analysis?*, The ANTITRUST SOURCE (2012), co-authored with Andrew Card.

*Assessing Competition in U.S. Wireless Markets: Review of the FCC's Competition Reports*, 64 FEDERAL COMMUNICATIONS LAW JOURNAL (2012), co-authored with Gerald Faulhaber and Robert Hahn.

*An Empirical Analysis of Aftermarket Transactions by Hospitals*, 28 JOURNAL OF CONTEMPORARY HEALTH LAW AND POLICY (2011), co-authored with Robert Litan and Anna Birkenbach.

*Economic Evidence of Common Impact for Class Certification in Antitrust Cases: A Two-Step Analysis*, ANTITRUST (Summer 2011).

*Addressing the Next Wave of Internet Regulation: Toward a Workable Principle for Nondiscrimination*, 4 REGULATION & GOVERNANCE (2010), co-authored with Robert Hahn and Robert Litan.

*Class Certification in Antitrust Cases: An Economic Framework*, 17 GEORGE MASON LAW REVIEW (2010), co-authored with Robert Kulick.

*The Economic Impact of Eliminating Preemption of State Consumer Protection Laws*, 12 UNIVERSITY OF PENNSYLVANIA JOURNAL OF BUSINESS LAW 781 (2010), co-authored with Joseph R. Mason and Robert B. Kulick.

*Net Neutrality Is Bad Broadband Regulation*, THE ECONOMISTS' VOICE, Sept. 2010, co-authored with Robert Litan.

*Why the iPhone Won't Last Forever and What the Government Should Do to Promote its Successor*, 8 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECHNOLOGY LAW 313 (2010), co-authored with Robert W. Hahn.

*What Does an Economist Have to Say About the Calculation of Reasonable Royalties?*, 14 INTELLECTUAL PROPERTY LAW BULLETIN 7 (2010), co-authored with Kyle Smith.

*Is Greater Price Transparency Needed in the Medical Device Industry?*, HEALTH AFFAIRS (2008), co-authored with Robert W. Hahn and Keith Klovers.

*Evaluating Market Power with Two-Sided Demand and Preemptive Offers to Dissipate Monopoly Rent*, 4 JOURNAL OF COMPETITION LAW & ECONOMICS (2008), co-authored with J. Gregory Sidak.

*Assessing Bias in Patent Infringement Cases: A Review of International Trade Commission Decisions*, 21 HARVARD JOURNAL OF LAW AND TECHNOLOGY (2008), co-authored with Robert W. Hahn.

*The Effect of Incumbent Bidding in Set-Aside Auctions: An Analysis of Prices in the Closed and Open Segments of FCC Auction 35*, 32 TELECOMMUNICATIONS POLICY JOURNAL (2008), co-authored with Peter Cramton and Allan Ingraham.

*A Real-Option Approach to Valuing Life Settlement Transactions*, 23 JOURNAL OF FINANCIAL TRANSFORMATION (2008), co-authored with Joseph R. Mason.

*The Economics of Wireless Net Neutrality*, 3 JOURNAL OF COMPETITION LAW AND ECONOMICS 399 (2007), co-authored with Robert W. Hahn and Robert E Litan.

*Vertical Foreclosure in Video Programming Markets: Implication for Cable Operators*, 3 REVIEW OF NETWORK ECONOMICS 348 (2007), co-authored with J. Gregory Sidak.

*The Unintended Consequences of Net Neutrality*, 5 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECH LAW 533 (2007), co-authored with Robert E. Litan.

*Does Video Delivered Over a Telephone Network Require a Cable Franchise?*, 59 FEDERAL COMMUNICATIONS LAW JOURNAL 251 (2007), co-authored with Robert W. Crandall and J. Gregory Sidak.

*The Competitive Effects of a Cable Television Operator's Refusal to Carry DSL Advertising*, 2 JOURNAL OF COMPETITION LAW AND ECONOMICS 301 (2006).

*Uberregulation without Economics: The World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, 57 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2004), co-authored with J. Gregory Sidak.

*The Secondary Market for Life Insurance Policies: Uncovering Life Insurance's "Hidden" Value*, 6 MARQUETTE ELDER'S ADVISOR 95 (2004), co-authored with Neil A. Doherty and Brian A. O'Dea.

*Do Unbundling Policies Discourage CLEC Facilities-Based Investment?*, 4 TOPICS IN ECONOMIC ANALYSIS AND POLICY (2004), co-authored with Robert W. Crandall and Allan T. Ingraham.

*Foreign Investment Restrictions as Industrial Policy*, 3 CANADIAN JOURNAL OF LAW AND TECHNOLOGY 19 (2004), co- authored with Robert W. Crandall.

*Regulating the Secondary Market for Life Insurance Policies*, 21 JOURNAL OF INSURANCE REGULATION 63 (2003), co-authored with Neil A. Doherty.

*Interim Pricing of Local Loop Unbundling in Ireland: Epilogue*, 4 JOURNAL OF NETWORK INDUSTRIES 119 (2003), co-authored with J. Gregory Sidak.

*The Benefits of a Secondary Market for Life Insurance*, 38 REAL PROPERTY, PROBATE AND TRUST JOURNAL 449 (2003), co- authored with Neil A. Doherty.

*The Empirical Case Against Asymmetric Regulation of Broadband Internet Access*, 17 BERKELEY TECHNOLOGY LAW JOURNAL 954 (2002), co-authored with Robert W. Crandall and J. Gregory Sidak.

*How Can Regulators Set Nonarbitrary Interim Rates? The Case of Local Loop Unbundling in Ireland*, 3 JOURNAL OF NETWORK INDUSTRIES 273 (2002), co-authored with J. Gregory Sidak.

*Vertical Foreclosure in Broadband Access*, 49 JOURNAL OF INDUSTRIAL ECONOMICS (2001) 299, co-authored with Daniel L. Rubinfeld.

*Open Access to Broadband Networks: A Case Study of the AOL/Time Warner Merger*, 16 BERKELEY TECHNOLOGY LAW JOURNAL 640 (2001), co-authored with Daniel L. Rubinfeld.

*Cable Modems and DSL: Broadband Internet Access for Residential Customers*, 91 AMERICAN ECONOMICS ASSOCIATION PAPERS AND PROCEEDINGS 302 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Residential Demand for Broadband Telecommunications and Consumer Access to Unaffiliated Internet Content Providers*, 18 YALE JOURNAL ON REGULATION 1 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Determining the Source of Inter-License Synergies in Two-Way Paging Networks*, 18 JOURNAL OF REGULATORY ECONOMICS 59 (2000).

*A General Framework for Competitive Analysis in the Wireless Industry*, 50 HASTINGS LAW REVIEW 1639 (2000), co-authored with J. Gregory Sidak and David Teece.

*Capital Raising in Offshore Markets*, 23 JOURNAL OF BUSINESS AND FINANCE 1181 (1999), co-authored with Ian Gray and Reena Aggarwal.


**Expert Testimony Since 2012**

Massachusetts Technology Park Corporation v. Axia Netmedia Corporation, KCST USA, Inc. (AAA No. 01-17-0004-3049).
Cung Le et al. v. Zuffa, LLC, d/b/a Ultimate Fighting Championship ) and UFC, Case No.: 2:15-cv-01045-RFB-(PAL) (D. Nev.).
The Ohio State University v. New Par D/B/A Verizon Wireless, Case No. 2:15-cv-2866 (S.D. Oh.).
Authenticom, Inc. v. CDK Global, LLL; and The Reynolds And Reynolds Company, Case No. 17-cv-318 (W.D. Wis.).
Manmohan Dhillon et al. v. Anheuser-Busch, LLC et al. Case No. 14CECG03039 MBS (Cal. Fresno).
In re Lidoderm Antitrust Litigation, MDL Dkt. No. 14-md-02521-

WHO (N.D. Cal.).
Maxon Hyundai Mazda et al. v. Carfax Inc., Case No. CV 2680
(AJN) (RLE) (S.D. N.Y.).
Philip R. Loy and Sharon Loy v. Womble Carlyle Sandridge &
Rice, et al., Case No. 2014-cv-254012 (Ga. Super.).
In re MyFord Touch Consumer Litigation, Case No. 13-cv-3072-
EMC (N.D. Cal.).

Sun Life Assurance Company of Canada v. U.S. Bank National
Association, Case No. NO. 2:14-cv-04703-SJF-GRB (E.D. N.Y.).

Sun Life Assurance Company of Canada v. U.S. Bank National
Association and Larry Bryan, Case No. 14-CIV-62610-
BLOOM/VALLE (S.D. Fla.).

In the Matter of Flat Wireless, LLC, for and on behalf of its
Operating Subsidiaries, v. Cellco Partnership d/b/a Verizon
Wireless, and its Operating Subsidiaries, File No. EB-15-MD-005
(Federal Communications Commission).

Omni Healthcare et al. v. Health First Inc. et al, Case No. 6:13-
CV-01509-RBD-DAB (M.D. Fla.).

Schuylkill Health System et al. v. Cardinal Health 200, LLC &
Owens & Minor Distribution, Inc., Case No. 12-cv-07065-JS (E.D.
Pa.).

Meda Pharmaceuticals Inc. v. Apotex, Inc and Apotex Corp., Case
No. 01-14-0001-6315 (Am. Arbitration Ass'n).

Mark S. Wallach, et al v. Eaton Corporation, et al, Case No. 10-
260-SLR (D. Del.).

STB Ex Parte No. 722 Railroad Revenue Adequacy (Surface
Transportation Board).

In the Matter of 2014 Quadrennial Regulatory Review – Review of
the Commission's Broadcast Ownership Rules and Other Rules
Adopted Pursuant to Section 202 of the Telecommunications Act
of 1996, MB Docket No. 14-50 (Federal Communications
Commission).

Lindsay Kamakahi and Justine Levy, et al v. American Society for
Reproductive Medicine and Society for Assisted Reproductive
Technology, Case No.: 3:11-CV-1781 JCS (N.D. Cal.).

Salud Services, Inc. et al v. Caterpillar, Inc., Case No.: 1:12-cv-23927 (S.D. Fla.).

Gnanh Nora Krouch v. Wal-Mart Stores, Inc., Case No. CV-12-2217 (N.D. Cal.).

In the Matter of Petition for Rulemaking to Eliminate the Sports Blackout Rule, MB Docket No. 12-3 (Federal Communications Commission).

In the Matter of Review of Wholesale Services and Associated Policies, File No. 8663-C12-201313601 (Canadian Radio-Television and Telecommunications Commission).

Crafting a Successful Incentive Auction: Stakeholders' Perspectives (U.S. Senate, Committee on Commerce, Science, and Transportation).

Altergy Systems v. Enersys Delaware, Inc., Case No. 74-198-Y-001772-12 JMLE (American Arbitration Association).

In re New York City Bus Tour Antitrust Litigation, Master Case File No. 13-CV-07I1 (S.D. N.Y.).

SOCAN Tariff 22.A (Online Music Services, 2011-2013), CSI Online Music Services (2011-2013), SODRAC Tariff 6 - Online Music Services, Music Videos (2010-2013) (Copyright Board Canada).

Imperial Premium Finance, LLC, v. Sun Life Assurance Company of Canada (S.D. Fla.).

The Satellite Television Law: Repeal, Reauthorize, or Revise? (U.S. House of Representatives, Committee on Energy and Commerce).

Marchbanks Truck Service, et al. v. Comdata Network Inc., et al., Civil Action No. 07-1078-JKG (E.D. Pa.).

Patricia Reiter v. Mutual Credit Corporation, et al., Case No. 8:09-cv-0081 AG (RNBx) (C.D. Cal.).

In re Photochromic Lens Antitrust Litigation, MDL Docket No. 2173 (M.D. Fla.).

In the Matter of the Arbitration Between Washington Nationals Baseball Club v. TCR Sports Broadcasting Holdings, L.L.P. (Major League Baseball Revenue Sharing Definitions Committee).

Miguel V. Pro and Davis Landscape et al. v. Hertz Equipment Rental Corporation, No. 2:06-CV-3830 (DMC) (D.N.J.).

Game Show Network, LLC v. Cablevision Systems Corp., File No. CSR-8529-P (Federal Communications Commission).

Apotex, Inc., v. Cephalon, Inc., Barr Laboratories, Inc., Mylan Laboratories, Inc., Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., Ranbaxy Laboratories, Ltd., and Ranbaxy Pharmaceuticals, Inc.,. Case No. 2:06-cv-02768-MSG (E.D. Pa.).

In Re Airline Baggage Fee Antitrust Litigation, Civil Action No. 1:09-Md-2089-Tcb (N.D. Ga.).

## White Papers

"Assessing the Impact of Forbearance from 251(c)(3) on Consumers, Capital Investment, and Jobs" (prepared for USTelecom), co-authored with Ed Naef, Kevin Caves, Micah Sachs (May 4, 2018).

"Assessing the Impact of Removing Regulatory Barriers on Next Generation Wireless and Wireline Broadband Infrastructure Investment" (prepared for Corning Inc.), co-authored with Ed Naef (June 16, 2017).

"An Economic Analysis of the FCC's Eight Voices Rule" (prepared for the National Association of Broadcasters), co-authored with Kevin Caves (July 20, 2016).

"Assessing the Consequences of Additional FCC Regulations of Business Broadband: An Empirical Analysis," (prepared for USTelecom) (April 12, 2016).

The Empirical Link Between Fibre-to-the-Premises Deployment and Employment: A Case Study in Canada (prepared for Bell Canada), co-authored with Kevin Caves and Anna Koyfman (Dec. 10, 2015).

Good Intentions Gone Wrong: The Yet- To- Be- Recognized Costs of the Department Of Labor's Proposed Fiduciary Rule

(prepared for Capital Group), co-authored with Robert Litan (July 2015).

Bringing Sanity Back to the Spectrum Debate: A Response to CCA's White Paper (prepared for Mobile Future), co-authored with Allan Ingraham (June 26, 2015).

Unlocking Patents: Costs of Failure, Benefits of Success (prepared for Patent Utility) (Feb. 4, 2015).

The Consumer Benefits of Efficient Mobile Number Portability Administration (prepared for Neustar) (Mar. 8, 2013).

Economic Analysis of the Implications of Implementing EPA's Tier 3 Rules (prepared for Emissions Control Technology Association), co-authored with George Schink (June 14, 2012).

Are Google's Search Results Unfair or Deceptive Under Section 5 of the FTC Act? (prepared for Google), co- authored with Robert Litan (May 1, 2012).

Bundles in the Pharmaceutical Industry: A Case Study of Pediatric Vaccines (prepared for Novartis), co-authored with Kevin Caves (July 13, 2011).

Are U.S. Wireless Markets Effectively Competitive? A Critique of the FCC's 14th and 15th Annual Wireless Competition Reports (prepared for AT&T), co-authored with Gerald R. Faulhaber, Robert W. Hahn (July 11, 2011).

Do Group Purchasing Organizations Achieve the Best Prices for Member Hospitals? An Empirical Analysis of Aftermarket Transactions (prepared for Medical Device Manufacturers Association), co-authored with Robert Litan (Oct. 6, 2010).

The Economic Impact of Broadband Investment (prepared for Broadband for America), co-authored with Robert Crandall (Feb. 23, 2010).

Why the iPhone Won't Last Forever and What the Government Should Do to Promote Its Successor (prepared for Mobile Future), co-authored with Robert Hahn (Sept. 21, 2009).

The Economic Impact of Eliminating Preemption of State Consumer Protection Laws (prepared for the American

Bankers' Association), co-authored with Joseph R. Mason (Aug. 21, 2009).

Economic Effects of Tax Incentives for Broadband Infrastructure Deployment (prepared for the Fiber to the Home Council), co-authored with Jeffrey Eisenach and Jeffrey West (Dec. 23, 2008).

The Effect of Brokered Deposits and Asset Growth on the Likelihood of Failure (prepared for Morgan Stanley, Citigroup, and UBS), co-authored with Joseph Mason and Jeffrey West (Dec. 17, 2008).

Estimating the Benefits and Costs of M2Z's Proposal: Reply to Wilkie's *Spectrum Auctions Are Not a Panacea* (prepared for CTIA), co-authored with Robert W. Hahn, Allan T. Ingraham and J. Gregory Sidak (July 23, 2008).

Irrational Expectations: Can a Regulator Credibly Commit to Removing an Unbundling Obligation? AEI-Brookings Related Publication No. 07-28, co-authored with Jeffrey Eisenach (Dec. 30, 2007)

Is Greater Price Transparency Needed in The Medical Device Industry? (prepared for Advanced Medical Technology Association), co-authored with Robert W. Hahn (Nov. 30, 2007).

Should the FCC Depart from More than a Decade of Market-Oriented Spectrum Policy? Reply to Skrzypacz and Wilson (prepared for CTIA), co-authored with Gerald Faulhaber and Robert W. Hahn (Jun. 18, 2007).

Improving Public Safety Communications: An Analysis of Alternative Approaches (prepared for the Consumer Electronics Association and the High Tech DTV Coalition), co-authored with Peter Cramton, Thomas S. Dombrowsky, Jr., Jeffrey A. Eisenach, and Allan Ingraham (Feb. 6, 2007).

The Budgetary Impact of Eliminating the GPOs' Safe Harbor Exemption from the Anti-Kickback Statute of the Social Security Act (prepared for the Medical Device Manufacturers Association) (Dec. 20, 2005).

Reply to "The Life Settlements Market: An Actuarial Perspective on Consumer Economic Value" (prepared for Coventry First), co-authored with Eric Stallard (Nov. 15, 2005).

The Competitive Effects of Telephone Entry into Video Markets (prepared for the Internet Innovation Alliance), co-authored with Robert W. Crandall and J. Gregory Sidak (Nov. 9, 2005).

How Do Consumers and the Auto Industry Respond to Changes in Exhaust Emission and Fuel Economy Standards? A Critique of Burke, Abeles, and Chen (prepared for General Motors Corp.), co-authored with Robert W. Crandall and Allan T. Ingraham (Sept. 21, 2004).

Inter-City Competition for Retail Trade in North Texas: Can a TIF Generate Incremental Tax Receipts for the City of Dallas? (prepared for Harvest Partners), co-authored with Thomas G. Thibodeau and Allan T. Ingraham (July 16, 2004).

An Accurate Scorecard of the Telecommunications Act of 1996: Rejoinder to the Phoenix Center Study No. 7 (prepared for BellSouth), co-authored with Robert Crandall (Jan. 6, 2004).

Competition in Broadband Provision and Implications for Regulatory Policy (prepared for the Alcatel, British Telecom, Deutsche Telekom, Ericsson, France Telecom, Siemens, Telefónica de España, and Telecom Italia), co- authored with Dan Maldoom, Richard Marsden, and Gregory Sidak (Oct. 15, 2003).

The Effect of Ubiquitous Broadband Adoption on Investment, Jobs, and the U.S. Economy (prepared for Verizon), co-authored with Robert W. Crandall (Sept. 17, 2003).

The Deleterious Effect of Extending the Unbundling Regime on Telecommunications Investment (prepared for BellSouth), co-authored with Robert W. Crandall (July 10, 2003).

Letter Concerning Spectrum Auction 35 to the Honorable Michael K. Powell, Chairman, Federal Communications Commission, from Peter C. Cramton, Robert W. Crandall, Robert W. Hahn, Robert G. Harris, Jerry A. Hausman, Thomas W. Hazlett, Douglas G. Lichtman, Paul W. MacAvoy, Paul R. Milgrom, Richard Schmalensee, J. Gregory Sidak, Hal J. Singer, Vernon L. Smith, William Taylor, and David J. Teece (Aug. 16, 2002).

## Speaking Engagements

*Repeal of The Open Internet Order of 2015*, Journal of Law & Technology Spring Symposium, CATHOLIC UNIVERSITY

COLUMBUS SCHOOL OF LAW, Washington, D.C. Mar. 16, 2018.

*DOJ v. AT&T Inc., DireTV Group Holdings, LLC, and Time Warner Inc. Merger Symposium*, AMERICAN UNIVERSITY WASHINGTON COLLEGE OF LAW, Mar. 15, 2018.

*The Consumer Welfare Standard: From The Antitrust Paradox to Hipster Antitrust,* GEORGE MASON LAW REVIEW ANNUAL ANTITRUST SYMPOSIUM, Washington, D.C., Feb. 16, 2018.

Understanding Competition in Prescription Drug Markets: Entry and Supply Chain Dynamics, FEDERAL TRADE COMMISSION, Washington, D.C., Nov. 8, 2017.

*Antitrust and Telecommunications,* ABA ANTITRUST IN THE AMERICAS, Mexico City, June 1, 2017.

*Fundamentals—Economics,* ABA SECTION OF ANTITRUST LAW SPRING MEETING, Washington D.C., Mar. 29, 2017.

*DOL Rule Analysis and FSR's SIMPLE PTE Explained,* FINANCIAL SERVICES ROUNDTABLE, Washington, D.C., Aug. 6, 2015.

*New Principles for a Progressive Broadband Policy,* PROGRESSIVE POLICY INSTITUTE, Washington, D.C., Mar. 13, 2014.

*The Open Internet: Where Do We Go From Here?* PROGRESSIVE POLICY INSTITUTE, Washington, D.C., Jan. 29, 2014.

*Does Platform Competition Render Common Carriage Irrelevant in an IP world?* PROGRESSIVE POLICY INSTITUTE, Washington, D.C. Nov. 20, 2013.

*The 41st Research Conference on Communication, Information and Internet Policy*, TELECOMMUNICATIONS POLICY RESEARCH CONFERENCE, George Mason University School of Law, Arlington, VA, September 27, 2013.

*The Broadband Technology Explosion: Rethinking Communications Policy for a Mobile Broadband World*, Pepperdine School of Public Policy, Menlo Park, CA. June 20, 2013.

*Net Neutrality: Government Overreach or the Key to Innovation?*, NORTHWESTERN JOURNAL OF TECHNOLOGY AND INTELLECTUAL PROPERTY EIGHTH ANNUAL SYMPOSIUM, Chicago, IL., Mar. 8, 2013.

*Internet Everywhere: Broadband as a Catalyst for the Digital Economy*, The Brookings Institution, Washington, D.C., Nov. 27, 2012.

*Can Broadband Power an Economic Recovery?*, Advanced Communications Law & Policy Institute at New York Law School, Washington, D.C., July 10, 2012.

*Using Regression in Antitrust Cases*, UNIVERSITY OF PENNSYLVANIA LAW SCHOOL, Philadelphia, PA., April 12, 2012.

*Mergers: The Road to Duopoly or Path to Competitive Panacea?* NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, Los Angeles, CA., July 20, 2011.

*State of the Mobile Net*, CONGRESSIONAL INTERNET CAUCUS, Washington, D.C., May 27, 2011.

*Waves of Innovation: Spectrum Allocation in the Age of the Mobile Internet*, INFORMATION TECHNOLOGY & INNOVATION FOUNDATION, Washington D.C., May 17, 2011.

*With or Without Merit, Class Certification Requires Commonality*, ABA SECTION OF ANTITRUST LAW 59TH ANNUAL SPRING MEETING, Washington, D.C., Mar. 30, 2011.

*4th Annual Future of Private Antitrust Enforcement Conference*, AMERICAN ANTITRUST INSTITUTE, Washington, D.C., Dec. 7, 2010.

*Jobs and Technology*, NEW DEMOCRATIC LEADERSHIP COUNCIL, Washington, D.C., Sept. 22, 2010.

*Regulation and Broadband*, ADVANCED COMMUNICATIONS LAW & POLICY INSTITUTE, NEW YORK LAW SCHOOL, New York, N.Y., July 14, 2010.

*13th Annual Symposium on Antitrust*, GEORGE MASON LAW REVIEW, Washington, D.C., Feb. 4, 2010.

*Broadband Infrastructure and Net Neutrality*, ADVISORY COMMITTEE TO THE CONGRESSIONAL INTERNET CAUCUS' STATE OF THE NET, Washington, D.C., Jan. 22, 2010.

*The Consequences of Net Neutrality Regulations*, AMERICAN CONSUMER INSTITUTE CENTER FOR CITIZEN RESEARCH, Washington, D.C., Nov. 19, 2009.

*Wireless Innovation Luncheon*, MOBILE FUTURE, Washington, D.C., Nov. 3, 2009.

*Second Life Settlements & Longevity Summit*, INSURANCE-LINKED SECURITIES & LIFE SETTLEMENTS, New York, N.Y., Sept. 30, 2009.

*Perspectives on Investment and a National Broadband Plan*, AMERICAN CONSUMER INSTITUTE, Washington, D.C., Sept. 4, 2009.

*Markets and Regulation: How Do We Best Serve Customers?*, Wireless U. Communications Policy Seminar, UNIVERSITY OF FLORIDA PUBLIC UTILITY RESEARCH CENTER, Tampa, FL., Nov. 13, 2008.

*The Price Of Medical Technology: Are We Getting What We Pay For?* HEALTH AFFAIRS BRIEFING, Washington, D.C., Nov. 10, 2008.

*Standard Setting and Patent Pools*, LAW SEMINARS INTERNATIONAL, Arlington, VA., Oct. 3, 2008.

*The Changing Structure of the Telecommunications Industry and the New Role of Regulation*, INTERNATIONAL TELECOMMUNICATIONS SOCIETY BIENNIAL CONFERENCE, Montreal, Canada, June 26, 2008.

*The Debate Over Network Management: An Economic Perspective*, AMERICAN ENTERPRISE INSTITUTE CENTER FOR REGULATORY AND MARKET STUDIES, Washington, D.C., Apr. 2, 2008.

*Merger Policy in High-Tech Industries*, GEORGE MASON UNIVERSITY SCHOOL OF LAW, Washington, D.C., Feb. 1, 2008.

*Telecommunications Symposium*, U.S. DEPARTMENT OF
JUSTICE ANTITRUST DIVISION, Washington, D.C., Nov. 29,
2007.

*Wireless Practice Luncheon*, FEDERAL COMMUNICATIONS
BAR ASSOCIATION, Washington, D.C., Nov. 29, 2007.

*Association for Computing Machinery's Net Neutrality
Symposium*, GEORGE WASHINGTON UNIVERSITY,
Washington, D.C., Nov. 12, 2007.

*Regulators' AdvanceComm Summit*, NEW YORK LAW
SCHOOL, New York, N.Y., Oct. 14, 2007.

*Annual Conference*, CAPACITY USA 2007, New York, N.Y.,
Jun. 26, 2007.

*William Pitt Debating Union*, UNIVERSITY OF PITTSBURGH,
SCHOOL OF ARTS & SCIENCES, Pittsburgh, PA., Feb. 23,
2007.

*Annual Conference*, WIRELESS COMMUNICATIONS
ASSOCIATION INTERNATIONAL, Washington, D.C., June 27,
2006.

*Annual Conference*, MEDICAL DEVICE MANUFACTURERS
ASSOCIATION, Washington, D.C., June 14, 2006.

*Annual Conference*, ASSOCIATION FOR ADVANCED LIFE
UNDERWRITING, Washington, D.C., May 1, 2006.

*Entrepreneur Lecture Series*, LAFAYETTE COLLEGE, Easton,
PA., Nov. 14, 2005.

**Editorials and Magazine Articles**

*The Future of Net Neutrality: What Will the Court Decide,*
FOREIGN AFFAIRS, Mar. 16, 2016, co-authored with Robert
Litan.

*Obama's Big Ideas for Small Saves: 'Robo' Financial Advice,*
WALL STREET JOURNAL, July 21, 2015, co-authored with
Robert Litan.

*How the FCC Will Wreck the Internet,* WALL STREET JOURNAL, May 28, 2015

*The FCC's Incentive Auction: Getting Spectrum Right,* PROGRESSIVE POLICY INSTITUTE PAPER, Nov. 2013.

*Clash of the Titans: How the Largest Commercial Websites Got That Way*, MILKEN INSTITUTE REVIEW, Second Quarter 2013, co-authored with Robert Hahn.

*Wireless Competition: An Update*, GEORGETOWN CENTER FOR BUSINESS AND PUBLIC POLICY ECONOMIC POLICY VIGNETTES, May 3, 2012, co-authored with Robert Hahn.

*Book Review of Tim Wu's The Master Switch*, MILKEN INSTITUTE REVIEW, January 2012.

*The AT&T/T-Mobile Deal: Should We Fear Wireless Consolidation?* FORBES, June 3, 2011.

*In FCC's Report on Wireless Competition, an Agenda?,* HARVARD BUSINESS REVIEW, Apr. 15, 2011, co-authored with Gerald Faulhaber.

*Will the Proposed Banking Settlement Have Unintended Consequences?* HARVARD BUSINESS REVIEW, Mar. 29, 2010, co- authored with Joseph R. Mason.

*Should Regulators Block AT&T's Acquisition of T-Mobile?*, HARVARD BUSINESS REVIEW, Mar. 22, 2010.

*The Black Hole in America's Retirement Savings*, FORBES, Dec. 21, 2010, co-authored with Robert Litan.

*Broken Compensation Structures and Health Care Costs*, HARVARD BUSINESS REVIEW, Oct. 6, 2010, co-authored with Robert Litan.

*Why Net Neutrality Is Bad for Business*, HARVARD BUSINESS REVIEW, Aug. 13, 2010, co-authored with Robert Litan.

*Why the iPhone Won't Last Forever and What the Government Should (or Shouldn't) Do to Promote Its Successor*, MILKEN INSTITUTE REVIEW (First Quarter 2010), co-authored with Robert W. Hahn.

*Streamlining Consumer Financial Protection*, THE HILL, Oct. 13, 2009, co-authored with Joseph R. Mason.

*Foxes in the Henhouse: FCC Regulation through Merger Review*, MILKEN INSTITUTE REVIEW (First Quarter 2008), co-authored with J. Gregory Sidak.

*Don't Drink the CAFE Kool-Aid*, WALL STREET JOURNAL, Sept. 6, 2007, at A17, co-authored with Robert W. Crandall.

*The Knee-Jerk Reaction: Misunderstanding the XM/Sirius Merger*, WASHINGTON TIMES, Aug. 24, 2007, at A19, co- authored with J. Gregory Sidak.

*Net Neutrality: A Radical Form of Non-Discrimination*, REGULATION, Summer 2007.

*Telecom Time Warp*, WALL STREET JOURNAL, July 11, 2007, at A15, co-authored with Robert W. Crandall.

*Earmarked Airwaves*, WASHINGTON POST, June 27, 2007, at A19, co-authored with Robert W. Hahn.

*Not Neutrality*, NATIONAL POST, Mar. 29, 2007, at FP19.

*Should ATM Fees Be Regulated?*, NATIONAL POST, Mar. 8, 2007, at FP17, co-authored with Robert W. Crandall.

*Life Support for ISPs*, REGULATION, Fall 2005, co-authored with Robert W. Crandall.

*No Two-Tier Telecommunications*, NATIONAL POST, Mar. 7, 2003, at FP15, co-authored with Robert W. Crandall.

## Memberships

American Economics Association

American Bar Association Section of Antitrust Law

## Reviewer

Journal of Risk and Insurance

Journal of Competition Law and Economics

Journal of Risk Management and Insurance Review

Journal of Regulatory Economics

Managerial and Decision Economics

Telecommunications Policy