**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | No. 13 Civ. 7789 (LGS) |

**CREDIT SUISSE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Redacted Pursuant to February 27, 2019 Order

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ....................................................................... 4

    A.    The FX Markets Do Not Clearly Distinguish Between Buyers and Sellers ...... 5

    B.    The FX Markets Are Characterized by Information Sharing and Asymmetry ... 6

    C.    FX Prices Are Dynamic and Bespoke ............................................. 9

LEGAL STANDARDS ........................................................................ 10

ARGUMENT ................................................................................... 12

I.   PLAINTIFFS PROVIDE NO BASIS FOR CERTIFICATION OF THE EXCHANGE CLASS ........................................................................ 12

II.  PLAINTIFFS' EFFORT TO PIVOT TO A "SPREAD MANIPULATION" CASE DOES NOT AVOID THE CONFLICTS AND OTHER ISSUES THAT PRECLUDE CERTIFICATION OF AN OTC CLASS ................................ 15

    A.    Putative Class Members Often Earn the Spread, and Therefore Would Benefit From the Widening of Spreads ............................................. 16

    B.    According to Plaintiffs' Experts, Many Class Members Profited From Defendants' Conduct ............................................................... 19

III. THE OTC CLASS SHOULD NOT BE CERTIFIED BECAUSE IT WOULD REQUIRE HIGHLY INDIVIDUALIZED DETERMINATIONS OF MEMBER ELIGIBILITY ................................................................................ 21

    A.    Hundreds of Thousands of Individualized Inquiries Would be Required in Order to Determine Which Class Members Have Standing to Bring Claims Under the Sherman Act ............................................................ 22

    B.    The Court Would Need to Review Trading Records and Communications for Millions of Trades to Eliminate Benchmark Fixing Orders and Resting Orders from the Class Definition ............................................................ 24

IV. PLAINTIFFS CANNOT ESTABLISH PREDOMINANCE GIVEN THEIR FAILURE TO DEMONSTRATE THAT THEY CAN PROVE ANTITRUST INJURY AND DAMAGES ON A CLASSWIDE BASIS ............................... 25

    A.    Plaintiffs' Model Ignores the Most Significant Factors that Determine FX Prices ................................................................................... 27

    B.    Plaintiffs' Model Fails to Explain Almost All Variation in FX Prices ......... 33

    C.    Plaintiffs' Model Generates an Enormous Number of False Positives ......... 36

**Page**

V.  PLAINTIFFS LACK STANDING TO BRING CLAIMS ON BEHALF OF THE CLASS..................................................................................................................... 37

VI. PLAINTIFFS CANNOT PROVE THEIR THEORY OF A GLOBAL CONSPIRACY BY COMMON EVIDENCE ........................................................ 41

    A.    Ad Hoc Conversations Among Traders Are Not Common Evidence of a Global Conspiracy to Widen Spreads .............................................................................. 44

    B.    Settlements with Regulators Are Not Common Evidence of a Global Conspiracy ........................................................................................................ 47

CONCLUSION .................................................................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Air Cargo Shipping Services Antitrust Litig.*,
2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ..................................................................42

*Allied Orthopedic Appliances, Inc.* v. *Tyco Healthcare Group L.P.*,
247 F.R.D. 156 (C.D. Cal. 2007) ..................................................................18n, 21

*In re Aluminum Phosphide Antitrust Litig.*,
893 F. Supp. 1497 (D. Kan. 1995) ..................................................................35

*Amchem Products, Inc.* v. *Windsor*,
521 U.S. 591 (1997) ..................................................................11, 19, 21

*American Express Co.* v. *Italian Colors Restaurant*,
570 U.S. 228 (2013) ..................................................................10-11

*Amgen* v. *Connecticut Retirement Plans & Trust Funds*,
568 U.S. 455 (2013) ..................................................................19

*In re Asacol Antitrust Litig.*,
2018 WL 4958856 (1st Cir. Oct. 15, 2018) ..................................................................20

*Auto Ventures, Inc.* v. *Moran*,
1997 WL 306895 (S.D. Fla. Apr. 3, 1997) ..................................................................18n

*Axiom Investment Advisors, LLC* v. *Deutsche Bank AG*,
2018 WL 4253152 (S.D.N.Y. Sept. 6, 2018) ..................................................................9-10, 11

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) ..................................................................43n, 46n

*Blomkest Fertilizer, Inc.* v. *Potash Corp. of Saskatchewan*,
203 F.3d 1028 (8th Cir. 2000) ..................................................................32

*Blue Dane Simmental Corp.* v. *American Simmental Ass'n.*,
178 F.3d 1035 (8th Cir. 1999) ..................................................................35

*Calvo* v. *City of New York*,
2018 WL 1633565 (S.D.N.Y. Apr. 2, 2018),
*appeal filed*, No. 18-1666 (2d Cir. June 1, 2018) ..................................................................22

*In re Chocolate Confectionary Antitrust Litig.*,
999 F. Supp. 2d 777 (M.D. Pa. 2014), *amended*, 2014 WL 4104474 (M.D. Pa. Aug. 19,
2014), *aff'd*, 801 F.3d 383 (3d Cir. 2015) ..................................................................45n

**Page**

*Comcast Corp.* v. *Behrend*,
 569 U.S. 27 (2013) .................................................................................... *passim*

*In re Digital Music Antitrust Litig.*,
 321 F.R.D. 64 (S.D.N.Y. 2017) ............................................................. 19-20

*Duchardt* v. *Midland National Life Insurance Co.*,
 265 F.R.D. 436 (S.D. Iowa 2009) ...........................................................18n

*In re Elevator Antitrust Litig.*,
 502 F.3d 47 (2d Cir. 2007)..................................................................... 44-45

*Espenscheid* v. *DirectSat USA, LLC*,
 705 F.3d 770 (7th Cir. 2013) ......................................................................32

*Food Lion, LLC* v. *Dean Foods Co.*,
 312 F.R.D. 472 (E.D. Tenn. 2016)..............................................................30

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016)...............................14, 22

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
 74 F. Supp. 3d 581 (S.D.N.Y. 2015)................................................37n, 43n

*Freeland* v. *AT&T Corp.*,
 238 F.R.D. 130 (S.D.N.Y. 2006) .........................................................18, 32

*General Telephone Co. of Southwest* v. *Falcon*,
 457 U.S. 147 (1982)......................................................................................11

*In re Graphics Processing Units Antitrust Litig.*,
 253 F.R.D. 478 (N.D. Cal. 2008).................................................... 13n, 32-33

*Griffin* v. *Board of Regents of Regency Universities*,
 795 F.2d 1281 (7th Cir. 1986) ....................................................................35

*In re Hydrogen Peroxide Antitrust Litig.*,
 552 F.3d 305 (3d Cir. 2008), *as amended* (Jan. 16, 2009)................ 11-13

*Kendler* v. *Federated Department Stores, Inc.*,
 88 F.R.D. 688 (S.D.N.Y. 1981) ........................................................ 42-44, 47

*Lewis* v. *Casey*,
 518 U.S. 343 (1996)......................................................................................38

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
 2016 WL 1558504 (S.D.N.Y. Apr. 15, 2016).......................................39

iv

**Page**

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018).............................................................. *passim*

*Lipsky* v. *Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976)........................................................................47-48

*In re Literary Works in Electronic Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011)........................................................................40-41

*Mazzei* v. *Money Store*,
829 F.3d 260 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1332 (2017)............................19, 22, 24

*MCI Communications Corp.* v. *AT&T Co.*,
708 F.2d 1081 (7th Cir. 1983) ........................................................................35

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litig.*,
218 F.R.D. 76 (S.D.N.Y. 2003) ........................................................................48

*Morrow* v. *Ann, Inc.*,
2017 WL 363001 (S.D.N.Y. Jan. 24, 2017) ........................................................................37

*NECA-IBEW Health & Welfare Fund* v. *Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012)........................................................................38-39

*New Jersey Carpenters Health Fund* v. *Royal Bank of Scotland Group, PLC*,
2015 WL 539446 (S.D.N.Y. Feb. 5, 2015)........................................................................37

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008)........................................................................29-30

*In re Petrobras Securities*,
862 F.3d 250 (2d Cir. 2017)........................................................................ 19, 22-23, 25

*Pickett* v. *Iowa Beef Processors*,
209 F.3d 1276 (11th Cir. 2000) ........................................................................18n, 20

*Piggly Wiggly Clarksville, Inc.* v. *Interstate Brands Corp.*,
100 F. App'x 296 (5th Cir. 2004) ........................................................................32

*In re Plastics Additives Antitrust Litig.*,
2006 WL 6172035 (E.D. Pa. Aug. 31, 2006) ........................................................................47

*In re Platinum and Palladium Commodities Litig.*,
828 F. Supp. 2d 588 (S.D.N.Y. 2011)........................................................................48

*In re Polyurethane Foam Antitrust Litig.*,
314 F.R.D. 226 (N.D. Ohio 2014) ........................................................................36

**Page**

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) ......................................................................... *passim*

*Reed Construction Data Inc.* v. *McGraw-Hill Companies, Inc.*,
  49 F. Supp. 3d 385, 404 (S.D.N.Y. 2014),
  *aff'd*, 638 F. App'x 43 (2d Cir. 2016) .........................................................27, 32, 33n

*Reed* v. *Advocate Health Care*,
  268 F.R.D. 573 (N.D. Ill. 2009) .............................................................................27, 35

*Retirement Board of the Policemen's Annuity & Benefit Fund of the City of Chicago* v. *Bank of New York Mellon*,
  775 F.3d 154 (2d Cir. 2014) ........................................................................... 38-39, 41

*Royal Park Investments SA/NV* v. *HSBC Bank USA, N.A.*,
  2018 WL 679495 (S.D.N.Y. Feb. 1, 2018) (Schofield, J.) ................................ 21-22

*Sanchez* v. *New York Kimchi Catering*,
  320 F.R.D. 366 (S.D.N.Y. 2017) (Schofield, J.) ....................................................10

*Sykes* v. *Mel S. Harris & Assocs. LLC*,
  780 F.3d 70 (2d Cir. 2015) ..............................................................................20, 26

*Theodore D'Apuzzo, P.A.* v. *United States*,
  2018 WL 2688760 (S.D. Fla. Apr. 13, 2018) ......................................................47n

*Todd* v. *Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ................................................................................43n

*Trout* v. *Garrett*,
  1990 WL 301806 (D.D.C. Dec. 27, 1990) ........................................................ 33-34

*United States* v. *U.S. Gypsum Co.*,
  438 U.S. 422 (1978) ............................................................................................46n

*Valley Drug Co.* v. *Geneva Pharmaceuticals, Inc.*,
  350 F.3d 1181 (11th Cir. 2003) ...........................................................................18

*In re Vitamins Antitrust Litig.*,
  209 F.R.D. 251 (D.D.C. 2002) .............................................................................42

*Vogel* v. *City of New York*,
  2017 WL 4712791 (S.D.N.Y. Sept. 19, 2017) ......................................................22

*Wah* v. *HSBC North America Holdings, Inc.*,
  15-cv-8974 (LGS), Dkt. 139 (S.D.N.Y. June 5, 2017) ..........................................24

**Page**

*Wah* v. *HSBC North America Holdings, Inc.*,
    15-cv-8974 (LGS), Dkt. 261 (S.D.N.Y. June 26, 2018) .......................................................23n

*Wal-Mart Stores, Inc.* v. *Dukes*,
    564 U.S. 338 (2011) ..................................................................................... 10-11, 42n, 44

*Zenith Electronics Corp.* v. *WH-TV Broadcasting Corp.*,
    395 F.3d 416 (7th Cir. 2005) ..................................................................................32

**Rules**

Fed. R. Civ. P. 23 ................................................................................................. *passim*

Fed. R. Evid. 702 .......................................................................................................1n

**Other Authorities**

Federal Judicial Center & National Research Council of the National Academies, *Reference
    Manual on Scientific Evidence* (3d ed. 2011), *available at*
    https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf ................................................33

Foreign Exchange Disclosures (Terms and conditions of FX Dealing), DEUTSCHE BANK
    (Oct. 24, 2018), https://www.db.com/company/en/foreign-exchange-disclosures.htm ...........9

## PRELIMINARY STATEMENT

For nearly five years, Plaintiffs have pursued a case that centered on the notion that a group of banks routinely shared information and coordinated their trading activities in order to manipulate the foreign exchange ("FX") benchmark rates that impact prices for various FX products.  Plaintiffs have used this theory, and the regulatory and criminal proceedings that focused on this theory, to obtain settlements from 15 of the 16 original Defendant banks (the "Settling Defendants").

Plaintiffs saw no reason to deviate from this approach until recently, when they began to contemplate the need for certification of a litigation class.  At this point, they apparently realized that their operating theory created unavoidable and pervasive class conflicts that would preclude certification.  Put simply, Plaintiffs recognized that any class they might propose would consist of both buyers and sellers of FX.  Therefore, the alleged manipulation of a benchmark rate – either up or down – would result in injury to some class members and profit to others.

In an effort to avoid this problem, Plaintiffs' Motion for Class Certification pivots to a new theory that purportedly abandons benchmark manipulation claims and focuses exclusively on the allegation that all allegedly improper bank conduct served to artificially widen "bid-ask spreads" on FX transactions.[1]  Plaintiffs appear to contend that because Defendant banks always earned the spread and class members always paid the spread, the conflicts among class members would disappear under this new theory, along with their class certification difficulties.  But as

---

[1]    In support of their motion, Plaintiffs offer testimony from four purported experts: (i) Mr. Robin Poynder, who reviewed a sample of interdealer communications and purported to measure information sharing among Defendants ("Poynder Report"); (ii) Dr. Hal Singer, who attempts to extrapolate Poynder's conclusions to the full class period to find what he dubs "pervasive" information sharing, and that certain spreads on an interdealer platform narrowed, on average, after the class period ("Singer Report"); and (iii) Professors Bjønnes and Ljungqvist, who claim to present a model of classwide antitrust impact and damages ("BL Report").  As discussed in Credit Suisse's accompanying motion to Exclude Plaintiffs' Proposed Expert Opinions ("*Daubert* motion"), each expert's conclusions fail to satisfy the strict standards of Federal Rule of Evidence 702 and *Daubert*, and should be excluded from the Court's consideration.

explained below, and in the *Daubert* motion and expert reports that accompany this Memorandum, Plaintiffs' FX spread theory not only fails to solve their class conflict problems, but also creates many new issues that preclude class certification.

First, Plaintiffs seek certification of two classes consisting of (1) those who engaged in FX transactions on an exchange (the "Exchange Class") and (2) those who engaged in FX transactions over-the-counter (the "OTC Class"). As discussed in Section I below, Plaintiffs' Exchange Class suffers from the same buyer-seller problem that infected their benchmark manipulation theory. When purported class members trade on an exchange, they are trading with a wide variety of anonymous parties, many of whom are not Defendants. Therefore, it will frequently be the case that members of the proposed Exchange Class traded with one another, creating the exact same conflicts Plaintiffs seek to avoid – injury to some class members and profit to others. Perhaps in recognition of this fact, Plaintiffs have effectively abandoned the Exchange Class, as they have not even attempted to present the required methodology for establishing injury and damages on a classwide basis.

Second, the proposed OTC Class is not viable for many reasons, including that similar buyer-seller conflicts exist. Specifically, Plaintiffs incorrectly assume that class members always pay a spread, while Defendants always earn the spread, and therefore all class members are harmed by a widening of spreads. As discussed in Section II(A) below, however, class members routinely *earned* the spread by offering to trade on electronic platforms. This creates two forms of conflict with other class members: (1) they may have traded directly with another class member; and (2) they would have benefitted from any widening of spreads, thereby placing them in direct conflict with class members who paid the spread.

Third, as discussed in Section II(B) below, Plaintiffs' own experts have devised a regression analysis showing that more than 24% of the proposed OTC Class actually earned a net profit from Defendants' alleged conduct.  Of course, this means that Plaintiffs cannot demonstrate, as they must, that all class members were injured by Defendants' conduct.

Fourth, millions of individualized inquiries will be needed in order to determine which parties and transactions are properly included within the OTC Class.  As explained in Section III below, this Court has previously ruled that the Sherman Act only extends to those transactions where at least one party was operating from the United States.  That determination will need to be made for millions of transactions, and Plaintiffs can offer no classwide method for doing so.  Similarly, Plaintiffs have defined their classes to exclude "trades whose prices were set on the basis of benchmark rates."  But as Plaintiffs' experts concede, the available transaction data generally does not identify trades executed at benchmark rates.  Rather, one would need to examine the communications between the parties (again, for millions of transactions) to determine whether a specific benchmark was used to price the trade.  Finally, one would also need to exclude "limit orders," as class members would not pay a spread for such transactions and, therefore, could not seek damages for those trades.

Fifth, Plaintiffs' regression model, which they rely upon to establish that they can demonstrate injury and damages on a classwide basis, is fatally flawed.  In particular, as explained in Section IV below, the model: (1) ignores numerous major factors that drive FX prices; (2) is unable to explain the vast majority of variation in FX prices; and (3) generates an enormous number of false positives.  Each of these flaws, by itself, renders Plaintiffs' model inadequate.

Sixth, Plaintiffs lack standing to bring claims on behalf of the OTC Class.  As discussed in Section V below, at least five of the thirteen Named Plaintiffs suffered no injury.  The remaining Named Plaintiffs cannot represent this diverse OTC Class because they did not engage in trades in each of the 52 relevant currency pairs impacted by each allegedly improper communication over the six-year class period.

Finally, as discussed in Section VI below, Plaintiffs' spread-widening theory is premised on the notion of a single overarching conspiracy among all 16 original Defendants.  Despite a Herculean discovery effort, Plaintiffs fail to identify even a single bit of evidence that might prove such an unlikely conspiracy.  Indeed, the evidence proves that such a conspiracy did not exist, and Plaintiffs therefore will ultimately need to prove the existence of a multitude of mini-conspiracies, a task which will result in individual questions that predominate over common ones.

## STATEMENT OF FACTS

Plaintiffs' class certification arguments are premised on an inaccurate view of the FX markets.  First, Plaintiffs incorrectly characterize the FX markets as a simple supplier-to-customer marketplace, with informed Defendants acting as currency "suppliers" for uninformed putative class members.  In reality, many market participants – including putative class members – often serve as suppliers, thereby earning a spread.  Second, and contrary to Plaintiffs' assertion of information asymmetry, there is a steady stream of perfectly appropriate information sharing between and among all participants in the FX markets, which is necessary for the proper functioning of these markets.  Finally, Plaintiffs ignore the dynamic and trade-specific nature of FX prices, which cannot be captured by any classwide methodology or formula.

## A.        The FX Markets Do Not Clearly Distinguish Between Buyers and Sellers

Plaintiffs mischaracterize the FX markets as a simple supplier-to-customer marketplace, akin to a grocery store, with Defendants acting as produce sellers who agreed to overcharge for bananas, to the detriment of all shoppers.  But the FX markets are not grocery stores.  Rather, in the FX markets, all market participants can, and many putative class members did, act as "suppliers" of currency during the putative class period.  Thus, the FX markets were not a grocery store – they were eBay.

In these markets, "liquidity providers" show two-way (bid/ask) prices and make themselves available to buy or sell FX.  *See* Mem. of Law in Supp. of Pls.' Mot. for Class Certification ("Pl. Br.") at 6.  The "spread" represents the difference between the price at which a liquidity provider is willing to buy ("bid") and sell ("ask") currencies.  *See* Consolidated Third Am. Class Action Compl., Dkt. 619 ("TAC") ¶¶ 7-8.  This spread compensates the liquidity provider for the risks associated with supplying "liquidity" to the market.  *See id.*  Liquidity providers "earn the spread," and market participants who transact with a liquidity provider "pay the spread."  *See* Expert Report of Keith Underwood ("Underwood Report") ¶¶ 33, 54-55.

FX trading traditionally occurred by phone.  *Id.* ¶ 28.  But beginning in the 1990s, the FX markets experienced significant changes as FX electronic platforms were launched.  *Id.* ¶¶ 48-52; *cf.* Declaration of Herbert S. Washer ("Washer Dec.") Ex. 1 (Sept. 27, 2018 Dep. of Robin Poynder ("Poynder Tr.") 28:20-31:15.  By the time of the putative class period, over 50% of FX trading took place "electronically," and at least nineteen FX electronic trading platforms – including the most liquid and active of these, EBS and Reuters[2] – were available to non-dealers directly.  Underwood Report ¶ 52.

---

[2]        When they were first introduced in the early 1990s, EBS and Reuters were considered interdealer platforms.  *See* Underwood Report ¶¶ 48-49.  During the putative class period, however, it was common for non-

A number of these electronic platforms compete directly with "voice" dealers and post two-way prices set by algorithms, without human trader involvement.  Underwood Report ¶ 51. Others allow users to anonymously post their own two-way prices, enabling any market participant to act as an FX liquidity provider and earn the spread.  *Id.* ¶¶ 48, 55 & n.80; *see* BL Report ¶ 49 n.10 (conceding that "[t]he growth of electronic trading has . . . allow[ed] certain entities (*e.g.*, hedge funds) to regularly provide liquidity, including by quoting two-way prices, on multiparty electronic trading platforms").

Indeed, through the use of electronic trading platforms, hundreds of non-dealer putative class members acted as liquidity providers and earned the spread during the putative class period. *See* Expert Report of Janusz A. Ordover, Ph.D. ("Ordover Report") ¶¶ 23-27.  For example, in October 2013, non-dealers are estimated to have transacted over 28% of the volume done over EBS.  *Id.* ¶ 80. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

In sum, electronic trading facilitated all market participants' – including putative class members' – ability to become liquidity providers, offer FX products, and earn the spread.

**B.      The FX Markets Are Characterized by Information Sharing and Asymmetry**

In addition to consciously disregarding the impact of electronic trading on market structure, Plaintiffs falsely suggest that the sharing of information between FX traders would never occur absent an agreement to fix prices or spreads, and disingenuously suggest that chats between Defendant traders created an exclusive club comprised of those who used their

---

dealers to enter into prime brokerage arrangements with dealers that allowed the non-dealers to trade over EBS and Reuters using the dealer's name.  Underwood Report ¶¶ 54 & nn.76-77.

"information asymmetry" edge to profit at the expense of everyone else.  *See* Pl. Br. at 10-11, 41.
It is not that simple.

The FX markets are predominantly over-the-counter ("OTC") markets, meaning that
trades are not reported to a centralized exchange and the markets are not transparent such that
every participant has access to the same information.  *See* Underwood Report ¶¶ 22, 38, 40.  As a
consequence, the FX markets are characterized by information sharing and asymmetry among *all*
participants, and any determination as to whether a piece of information was appropriate to
share, much less competitively significant, requires careful examination of the nature of the
information, why it was shared, and with whom it was shared.  It will often be the case that FX
markets participants provide and seek information as part of an appropriate and benign process
of discovering market prices and negotiating trades with one another.  *See id.* ¶¶ 57-61.

The *FX Global Code*,[3] which is the definitive industry guide to appropriate behavior in
the FX markets,[4] encourages information sharing among all market participants.

> The timely dissemination of Market Colour between Market
> Participants can contribute to an efficient, open, and transparent
> FX Market through the exchange of information on the general
> state of the market, views, and anonymised and aggregated [client
> order] flow information.

Principle 22, *FX Global Code* at 26.

Information sharing is so commonplace and widespread in FX markets that, during the
putative class period, not only did it occur among FX traders employed by Defendants, it also
included putative class members such as non-Defendant dealers[5] and buy-side participants.[6]  For

---

[3]     Washer Dec. Ex. 2 (Global Foreign Exchange Committee, *FX Global Code: August 2018 Update*
(hereinafter "*FX Global Code*"), *available* at https://www.globalfxc.org/docs/fx_global.pdf).

[4]     *FX Global Code*, Forward at 1-2.

[5]     *See, e.g.*, Washer Dec. Ex. 3 ((GS-FX-CIVIL-02388935) (May 17, 2012 chat between certain Defendants
as well as non-Defendant dealers and putative class members ███████████████████

example, Plaintiffs' expert, Poynder, flagged numerous instances of information sharing among Defendants as Sensitive Competitive Information ("SCI") (which Plaintiffs presumably consider improper), but failed to note that the same information was also routinely shared with non-Defendants.[7]

Indeed, in their self-serving characterization of the FX markets, Plaintiffs fail to mention that putative class members themselves leverage their own information asymmetry advantage to trade more profitably and in fact may have more information than other market participants, including Defendants.  Underwood Report ¶ 40.  For instance, buy-side class members might have collected spread information from Defendants and other liquidity providers and given them "feedback" on how competitive their spreads were in an effort to convince them to improve their pricing.  *Id.* ¶ 45.  An example of this, compiled by a hedge fund in September 2011 shows the average, best, and worst spreads offered by eight different liquidity providers in 50 million, 100 million, and 200 million trade sizes in EUR/USD and AUD/USD:[8]



---

[6]    *See, e.g.*, Washer Dec. Ex. 4 ((JPMC-CIVIL-0000740937) (Apr. 8, 2013 chat between certain Defendants as well as non-Defendant buy-side participant and putative class member ███ .

[7]    *See* Washer Dec. Ex. 5 ((GS-FX-CIVIL-02484491 at 491 (07:37:43) (Feb. 11, 2010 chat between Goldman Sachs/Citi; flagged by Poynder as containing SCI)); Washer Dec. Ex. 6 ((GS-FX-CIVIL-03354260 at 263 (07:37:43) (Feb. 11, 2010 chat between Goldman Sachs/███████████████ Washer Dec. Ex. 7 ((GS-FX-CIVIL-02482206 at 206 (07:37:43) (Feb. 11, 2010 chat between Goldman Sachs/███████████); and Washer Dec. Ex. 8 ((GS-FX-CIVIL-02482152 at 154 (07:37:43) (Feb. 11, 2010 chat between Goldman Sachs/███████████.

[8]    *See* Washer Dec. Ex. 9 ((CITI-FX-CIVIL-MS_00357731 at 735) (Sept. 21, 2011 email and attachment in which hedge fund ██████████ provides feedback on eight banks' spreads)).

This underscores just how ubiquitous information sharing about FX pricing was among all market participants, and moreover that putative class members themselves may also participate in, and benefit from, information asymmetry by seeking better pricing.

### C.    FX Prices Are Dynamic and Bespoke

Plaintiffs' claim that Defendants' purported conspiracy caused pervasive spread widening across 52 currency pairs over six years simply ignores the speed at which the FX markets move and the many forces that impact FX prices.  Prices on electronic platforms often changed within milliseconds and prices in the "voice" markets could change within seconds.  *See* Poynder Tr. 72:12-73:2 ("the price might be good for seven seconds … [or] a couple of seconds").

These price changes occur continuously to reflect FX liquidity, volatility, and macroeconomic events, but these are not the only factors that an FX trader or algorithm considers, nor are they necessarily the most important factors.  *See* Foreign Exchange Disclosures (Terms and conditions of FX Dealing), DEUTSCHE BANK (Oct. 24, 2018), https://www.db.com/company/en/foreign-exchange-disclosures.htm (discussing factors considered in pricing voice and electronic trades); *see also* Poynder Tr. 27:17-18; Washer Dec. Ex. 10 (Sept. 21, 2018 Dep. of Geir Høidal Bjønnes ("Bjønnes Tr.") 160:25-161:14).  For example, a need to offset an existing exposure to a currency might result in a more favorable "fire sale" price.  *See* Underwood Report ¶ 39.  Similarly, a view on expected market movements, or even anticipated buy-side trading activity with the liquidity provider, might impact pricing and risk management decisions.  *Id.* ¶¶ 40-42.

The identity of the prospective FX instrument buyer might also be important, for example with respect to creditworthiness, Poynder Tr. 27:7-17, but also if a liquidity provider is seeking to avoid losses caused by a so-called "informed" buyer leveraging an information asymmetry, Underwood Report ¶¶ 40,  71 n.103; *cf. Axiom Investment Advisors, LLC* v. *Deutsche Bank AG*,

2018 WL 4253152, at *2 (S.D.N.Y. Sept. 6, 2018) (describing as "toxic flow" trades that "quickly move the price away from the market makers, causing them consistent losses").  On the other hand, a dealer might offer a discounted price to an informed buyer in order to glean market intelligence from that buyer, or for business development reasons.  Underwood Report ¶ 40.

Not only will every liquidity provider apply the above factors differently, but FX voice-trading operations are subject to the whims and risk-averse behavior of actual human beings.  For example, an FX trader's P&L position for the day or his proximity to his risk limits might impact pricing.  *Id.* ¶ 39, 41.  Or a price suggested by an FX trader may be "overruled" (and the spread tightened or narrowed) by the relevant salesperson, or negotiated down through discussion with the buyer.  *Id.* ¶¶ 28, 44.

In short, as Plaintiffs' expert Poynder acknowledged, the FX markets and their participants are sufficiently complex and dynamic such that one cannot "speculate how trader[s] will handle their pricing in the market" in response to a given set of circumstances, as at any given moment it "[d]epends on the market and the situation and many things."  Poynder Tr. 56:5-8.

## LEGAL STANDARDS

A class action is "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 348 (2011) (citation omitted).  Federal Rule of Civil Procedure 23 "'does not set forth a mere pleading standard.'"  *Sanchez* v. *New York Kimchi Catering*, 320 F.R.D. 366, 372 (S.D.N.Y. 2017) (Schofield, J.) (quoting *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013)).  Rather, the proponent of class certification must "affirmatively demonstrate" and "prove" compliance with the requirements of Rule 23, *Wal-Mart*, 564 U.S. at 350, which "impose[] stringent requirements for certification that in practice exclude most claims," *American Express Co.* v. *Italian Colors*

*Restaurant*, 570 U.S. 228, 234 (2013).  Class certification is proper only "if the trial court is satisfied, after a rigorous analysis, that the prerequisites" of Rule 23 are met.  *General Telephone Co. of Southwest* v. *Falcon*, 457 U.S. 147, 161 (1982).

Rule 23(a) provides that a class may be certified only if Plaintiffs prove by a preponderance of evidence that four prerequisites have been met: numerosity, commonality, typicality, and adequacy of representation.  Fed. R. Civ. P. 23(a); *Axiom Investment Advisors*, 2018 WL 4253152, at *3-4; *Wal-Mart*, 564 U.S. at 349.  These are "threshold requirements." *Amchem Products, Inc.* v. *Windsor*, 521 U.S. 591, 613 (1997).  In addition, Plaintiffs must establish that the class meets the prerequisites of Rule 23(b)(3), which provides that a class action may be maintained only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This predominance criterion is "far more demanding" than the commonality inquiry required under Rule 23(a).  *Amchem Products*, 521 U.S. at 623-24; *see also Comcast*, 569 U.S. at 34.  After the Supreme Court's decision in *Comcast*, "[i]t is now indisputably the role of the district court to scrutinize the evidence before granting certification, even when doing so 'requires inquiry into the merits of the claim.'"  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) ("*Rail Freight*") (quoting *Comcast*, 569 U.S. at 35).

"[T]he court's obligation to consider all relevant evidence and arguments extends to expert testimony."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008), *as amended* (Jan. 16, 2009).  Accordingly, district courts must "weigh the relative credibility" and "persua[siveness]" of the parties' experts at the class certification stage – even if a jury may

eventually be called upon to do the same.  *Id.* at 322-24.  "Rule 23 not only authorizes a hard

look at the soundness of statistical models that purport to show predominance—the rule

commands it."  *Rail Freight*, 725 F.3d at 255.  If the Plaintiffs' "model cannot withstand this

scrutiny then, that is not just a merits issue."  *Id.* at 253.  In other words, "[n]o damages model,

no predominance, no class certification."  *Id.*  A rigorous analysis of Plaintiffs' proffered

evidence demonstrates their failure to satisfy Rule 23's requirements, compelling denial of

Plaintiffs' class certification motion.

## ARGUMENT

## I.    PLAINTIFFS PROVIDE NO BASIS FOR CERTIFICATION OF THE EXCHANGE CLASS

Plaintiffs seek to certify two classes: an OTC Class (addressed in the remainder of this

brief), and an Exchange Class comprised of "[a]ll persons who, between December 1, 2007 and

December 31, 2013 (inclusive) entered into a total of 10 or more trades of FX futures contracts

on a U.S. exchange."  Pl. Br. at 2.  Plaintiffs say almost nothing in their brief about the putative

Exchange Class, presumably because class members who traded on an exchange will necessarily

often be trading with other class members, thereby creating the same conflicts between buyers

and sellers that led Plaintiffs to abandon their fix manipulation theory.  Plaintiffs' only effort to

support an Exchange Class involves a claim that their experts could devise a methodology to

establish classwide injury for the Exchange Class.  Pl. Br. at 43.  But they concede that they have

not yet done so, as they still need to "obtain futures transaction data . . . which are available from

the [Chicago Mercantile Exchange (or 'CME').]"  Pl. Br. at 43-44.[9]

---

[9]    Plaintiffs' expert Bjønnes testified at deposition that he has not tested any methodology similar to that
which he uses for the OTC Class to prove antitrust impact as to the Exchange Class.  Bjønnes Tr. 324:19-325:3
("We are saying that when we have the data, we can do the analysis.  So we have not concluded anything . . . .  And
we cannot because we do not have the data.").

The Supreme Court has made clear that Rule 23 is not satisfied by a plaintiff's mere assurance that it can produce a model capable of measuring injury. *Comcast*, 569 U.S. at 37; *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 318 ("The evidence and arguments a district court considers in the class certification decision call for rigorous analysis. A party's assurance to the court that it intends or plans to meet the requirements is insufficient." (citations omitted)). Here, rote assurances are all Plaintiffs offer in support of their motion to certify an Exchange Class.

Plaintiffs claim that "Lead Counsel is working with the CME to obtain futures transaction data to serve as inputs, along with various control variables, into the experts' model for estimating damages to the Exchange Class." Pl. Br. at 46. Plaintiffs fail to mention that they initially subpoenaed CME to produce transaction data in November 2015, nearly three years ago, and they offer no excuse for their failure to pursue the data. Plaintiffs have never brought a motion to compel before the Court, and the time to obtain the evidence needed to support their class certification motion has passed. *See In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 499 (S.D.N.Y. 2018) ("*LIBOR VII*") ("The class certification schedule for this case was established in February 2016 . . . and Exchange plaintiffs offer no explanation for why this information could not have been requested earlier. Rather, they have had more than ample time to seek additional discovery necessary for class-certification purposes, and cannot now complain of any insufficiency.").[10]

---

[10]     *See also In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 506 (N.D. Cal. 2008) ("Dr. Netz argues in her rebuttal that her methodologies will apply equally well to graphics cards sold bundled with computers but admits that she has not yet performed this analysis. . . . Such data should already be available to plaintiffs, however, given how much time they have already had for discovery. . . . If plaintiffs were having difficulty obtaining data from defendants or third parties or sorting through that data, they should have timely raised that issue. . . . In short, plaintiffs should be able to provide more than promises at this late stage of the litigation.").

Nor can the Court credit Plaintiffs' conclusory assertion that a "similar methodology" could be applicable to the Exchange Class, even if such a bare assertion were enough to satisfy the "rigorous analysis" the Court must perform.  By definition, in exchange trading, putative class members would trade directly with one another.  As a consequence, every such trade would involve one class member who benefits from alleged manipulation and another who is injured by that same conduct.  It is difficult to fathom how Plaintiffs' experts could offer a model "similar" to the one they offer for the OTC class because such model would inevitably fail to address this fundamental winner/loser aspect of exchange trading.[11]

Moreover, Plaintiffs' assurance of a "similar methodology" assumes a straightforward relationship between OTC and exchange prices.  Plaintiffs survived the motion to dismiss based on their allegations of a "direct relationship between FX futures prices and spot market prices for the underlying currency pairs" such that "manipulative and/or collusive activities in spot transactions would result in artificial price movements for exchange transactions."  TAC ¶ 285; *see also In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *5 (S.D.N.Y. Sept. 20, 2016).  But depositions of the Named Plaintiffs confirmed that no such direct relationship exists.  *See*, *e.g.*, Washer Dec. Ex. 11 (Jan. 24, 2018 Dep. of Izee Trading Co. 113:18-21 ("Q.  Were there times when prices in the over-the-counter market and the exchange market for FX products moved in opposite directions.  A.  Yes.")); Washer Dec. Ex. 12 (Dec. 4, 2017 Dep. of Michael Smith ("Smith Tr.") 71:12-15 ("Q.  Were there times when you could observe where the spread between the bid and offer and the future prices was converging while the cash market spread is diverging?  A.  Yes.  If there is a large order in the pit.")).

---

[11]     As discussed at Section II(A) herein, Plaintiffs' impact and damages model as to the OTC class also fails to consider the fact that putative class members can and frequently do earn the spread in the OTC FX markets as well.

For example, liquidity available in the OTC markets might be greater or less than liquidity available in the markets for exchange-traded instruments due to the presence or absence of significant orders in one market, as Named Plaintiffs admitted.[12]  Multiple Named Plaintiffs testified that spreads were frequently tighter in the futures markets than in the OTC markets due to larger numbers of liquidity providers.[13]  If anything, key structural differences between the OTC and exchange FX markets necessitate vastly different models, not "similar model[s]," to attempt to establish antitrust impact and damages as to the Exchange Class.

Plaintiffs' experts have utterly failed to offer any model capable of taking these considerations into account; indeed, they have failed to offer any model at all applicable to the putative Exchange Class.  Plaintiffs' failure, five years into the pendency of this case, to come forward with any facts or evidence to permit the "rigorous analysis" the Court must conduct requires that certification be denied as to the proposed Exchange Class.

## II.    PLAINTIFFS' EFFORT TO PIVOT TO A "SPREAD MANIPULATION" CASE DOES NOT AVOID THE CONFLICTS AND OTHER ISSUES THAT PRECLUDE CERTIFICATION OF AN OTC CLASS

This Court properly recognized at the April 11, 2018 pre-motion conference that there are two sides to every trade in the FX markets and, as a result, any alleged conduct by Defendants would necessarily benefit some class members, creating a "host of issues."  Washer Dec. Ex. 14 (Apr. 11, 2018 Hearing Tr. ("4/11/2018 Tr.") at 11:20-24).  Of course, this is consistent with

---

[12]     *See, e.g.*, Smith Tr. 71:20-72:7 ("Q.  Comparing the cash and the future spread, might one widen larger than the movement in the other?  A.  Yes.  Q.  And why might you see that?  A.  Oh, stops.  If, for example, a market is moving, and someone hits a stop in the cash market, you know, the cash market gets blown way out of line, and the futures market might stay more stable.  There is an arbitrage opportunity, and that is what keeps them both sort of in line.  Q.  Did you ever engage in that type of arbitrage opportunity?  A.  Yes.").

[13]     *See, e.g.*, Washer Dec. Ex. 13 (Oct. 20, 2017 30(b)(6) Dep. of Systrax Corp. ("Systrax Tr.") 63:6-17 ("[T]here's more of a tighter market in the futures of the exchange than in the spot. . . .  Because it's more participants.")); Smith Tr. 66:22-67:6 ("Q.  And the spread between the prices in the futures contracts was relevant to your trading?  A.  Yes.  Yes.  The spread – the futures contract was often a tighter spread than the cash market. That is why the people would come to the futures side.  Q.  Why would the spread be tighter in the futures market? A.  Because of locals like me.  Q.  Because you-all provided more liquidity?  A.  Correct.").

well-established law holding that a class cannot be certified where (1) there are insurmountable class conflicts and/or (2) the class includes those who benefitted from Defendants' conduct. *See, e.g.*, *Rail Freight*, 725 F.3d at 252 ("The plaintiffs must also show that they can prove, through common evidence, that *all* class members were in fact injured by the alleged conspiracy." (emphasis added) (citation omitted)); *LIBOR VII*, 299 F. Supp. 3d at 539 ("Directional differences are particularly corrosive of adequacy in that they create directly conflicting incentives.").

In a tacit acknowledgement of this insurmountable problem, Plaintiffs have redefined their proposed classes to explicitly exclude "trades whose prices were set on the basis of benchmark rates," and now purport to focus exclusively on Defendants' alleged effort to widen FX bid-ask spreads. Pl. Br. at 2. Plaintiffs appear to claim that all class members are "price takers" who pay a spread, and therefore have a common interest in proving that Defendants' conduct created wider spreads. Pl. Br. at 6 (asserting that dealers want wider spreads, while customers want narrower spreads); 4/11/2018 Tr. at 12:5-6 (characterizing Defendants as "price makers" and the class as "price takers"). Plaintiffs' effort to recharacterize this case is unavailing, as it is predicated on a fundamental misunderstanding of the FX markets and creates more problems than it solves.

## A.     Putative Class Members Often Earn the Spread, and Therefore Would Benefit From the Widening of Spreads

Plaintiffs' spread-widening theory – that all class members have a common interest in demonstrating that Defendants' conduct caused wider spreads – relies entirely on the false premise that class members always paid the spread and Defendants always earned the spread. This might be true if FX markets were like a grocery store. In that world, the store owner always earns a spread (by buying at wholesale and reselling at retail) and the customer always pays the

16

spread.  But FX markets are more akin to eBay, where class members can either buy a product (thereby paying the wholesale-retail spread) or *sell* a product, thereby *earning* the spread.

Plaintiffs' experts concede that many class members acted as "liquidity providers" during the class period, meaning that they offered to transact with counterparties at prices which would allow them to earn the spread (by offering to sell at higher prices and buy at lower prices).  *See, e.g.*, BL Report ¶ 49 n.10 (conceding that "[t]he growth of electronic trading has recently, to some extent, blurred the lines between traditional dealers and buy-side market participants by allowing certain entities (*e.g.*, hedge funds) to regularly provide liquidity, including by quoting two-way prices, on multiparty electronic trading platforms").  Similarly, Defendants routinely acted as "liquidity takers" during the class period and therefore will have paid the spread, often to class members.  *See* Washer Dec. Ex. 15 (Sept. 27, 2018 Dep. of Hal J. Singer, Ph.D. 125:9-11 ("[B]oth non-defendant banks and banks are sometimes liquidity takers.")).



Ordover Report ¶ 26.

*Id.*

*Id.* ¶ 25 & n.25.

As a result of these fluid roles, at any given moment, class members could be transacting directly with one another, which creates obvious buyer-seller conflict issues.  And even if a class member is trading with a Defendant rather than another class member, they may still be earning

the spread as a liquidity provider while, at the same time, other class members are paying the

spread as liquidity takers, thereby putting class members in perpetual conflict with one another.

Such conflicts present insurmountable issues of adequacy and typicality. *See, e.g.*, *Freeland* v.

*AT&T Corp.*, 238 F.R.D. 130, 149-51 (S.D.N.Y. 2006) (denying certification where many class

members may have benefitted from lower prices on tying product even though they may have

paid higher prices on tied product); *LIBOR VII*, 299 F. Supp. 3d at 539 (proposed class failed "to

meet Rule 23(a)(4)'s adequacy of representation requirement" where "named plaintiffs with

opposite net trading positions will have directly conflicting incentives to establish not only the

existence but also the magnitude of any manipulation that occurred on those dates"); *Valley Drug

Co.* v. *Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) ("A fundamental

conflict exists where some party members claim to have been harmed by the same conduct that

benefitted other members of the class.").[14]

    The conflict issues cannot be identified and resolved without a transaction-by-transaction

analysis of whether class members earned or paid the spread on many millions of transactions

over the class period.[15]  Such burdens also preclude a finding of predominance, as plaintiffs are

---

[14]    *See also Pickett* v. *Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (denying class certification where "the class includes those who claim harm from the very same acts from which other members of the class have benefitted"); *Allied Orthopedic Appliances, Inc.* v. *Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007) (denying class certification where "some plaintiffs claim to have been harmed by the same conduct that benefited other members of the class"); *Duchardt* v. *Midland National Life Insurance Co.*, 265 F.R.D. 436, 449-51 (S.D. Iowa 2009) (challenge to a specific method of calculating insurance claims was not amenable to classwide adjudication because certain plan-holders benefitted financially from the method); *Auto Ventures, Inc.* v. *Moran*, 1997 WL 306895, at *5 (S.D. Fla. Apr. 3, 1997) (class certification was inappropriate in light of the allegation that defendants (a group of car dealerships) had perpetuated their coercive market position "through a 'rewards and punishment system,' by which cooperating [entities] were befriended and rewarded, while resisting [entities] were penalized," giving rise to a clear divergence of interests among class members).

[15]    Most of the available transaction data does not indicate whether the counterparty earned or paid the spread. In addition, the transaction data does not always distinguish between customers' prime brokered trades over EBS and Reuters and the trades of the prime broker bank itself. *See* Poynder Tr. 79:11-81:6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Therefore, any determination as to whether a counterparty earned or paid the spread would need to be made individually for each transaction by reviewing corresponding or contemporaneous pricing data.

unable in such circumstances to demonstrate classwide impact by common proof.  *See, e.g.*, *In re Petrobras Securities*, 862 F.3d 250, 270 (2d Cir. 2017) ("Where individualized questions permeate the litigation, those 'fatal dissimilarities' among putative class members 'make use of the class-action device inefficient or unfair.'" (quoting *Amgen* v. *Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 470 (2013))); *Mazzei* v. *Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (affirming district court's decertification of class where "the fact-finder would have to look at every class member's loan documents to determine who did and who did not have a valid claim" (internal citations omitted)), *cert. denied*, 137 S. Ct. 1332 (2017).

### B.  According to Plaintiffs' Experts, Many Class Members Profited From Defendants' Conduct

A second fundamental problem is that Plaintiffs' own experts have devised a regression model that, taken on its own terms, shows that a significant percentage of the class – indeed, thousands of class members – *profited* from Defendants' conduct, both on individual transactions and on a net basis.  As discussed below in Section IV, this analysis is fatally flawed, thereby requiring denial of Plaintiffs' motion.  But even if the model were valid, it means that Plaintiffs themselves have proven that they cannot establish, as they must, that all class members were injured by Defendants' conduct.  *See, e.g.*, *Rail Freight*, 725 F.3d at 252 ("The plaintiffs must also show that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy." (citing *Amchem Products*, 521 U.S. at 623-24)); *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 93 (S.D.N.Y. 2017) (denying class certification where plaintiffs could not "prove by common evidence that all class members were injured by the alleged price-fixing conspiracy").

Here, Plaintiffs' experts concede, and their analysis confirms, that many class members benefitted from Defendants' conduct.  For example, Bjønnes and Ljungqvist note that "there may

be class members who have suffered net negative damages during the Class Period."  BL Report
¶ 144 n.55.  This appears to be a bit of an understatement.  Bjønnes's and Ljungqvist's model
(the "BL Model") shows that more than *24%* of the class would have earned a net profit on any
inflation in spreads.  Ordover Report ¶ 63.  That translates into potentially tens of thousands of
class members.

  This fact alone precludes class certification, as a proposed class simply cannot include a
significant number of purported members who suffered no injury and, in fact, earned significant
profits.  *See In re Asacol Antitrust Litig.*, 2018 WL 4958856, at *8 (1st Cir. Oct. 15, 2018)
(declining to certify class where approximately 10% of putative class members were uninjured);
*see also Sykes* v. *Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) ("[W]e do expect
the common evidence to show all class members suffered some injury." (quoting *Rail Freight*,
725 F.3d at 252))); *In re Digital Music Antitrust Litig.*, 321 F.R.D. at 92 ("Rule 23(b)(3)'s
predominance requirement requires Plaintiffs to 'show that they can prove, through common
evidence, that all class members were. . . injured by the alleged conspiracy.'" (citation omitted));
*Pickett*, 209 F.3d at 1280 ("a class cannot be certified when . . . it consists of members who
benefit from the same acts alleged to be harmful to other members of the class." (citations
omitted)).

  Like the putative class in *Asacol*, "this is not a case in which a very small absolute
number of class members might be picked off in a manageable, individualized process . . . .
Rather, this is a case in which any class member may be uninjured, and there are apparently
thousands who in fact suffered no injury."  2018 WL 4958856, at *8.  Accordingly, just as in
*Asacol*, "[t]he need to identify those individuals will predominate and render an adjudication
unmanageable."  *Id.*

Worse still, according to the BL Model, at least five of the thirteen Named Plaintiffs in the OTC Class were among the net winners.  Ordover Report ¶ 64 & App'x D (relying on BL Report and Backup Materials).  The fact that Plaintiffs' own model indicates these Named Plaintiffs benefited from the alleged conduct raises obvious issues concerning their adequacy as class representatives, given that they do not "possess the same interest[s] and suffer the same injur[ies] as the class members."  *Amchem Products*, 521 U.S. at 594-95 (citations omitted).  As the court in *Allied Orthopedics Appliances* noted, "to this Court's knowledge, no circuit approves of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class, let alone where some *named* plaintiffs derive such a benefit."  247 F.R.D. at 177 (emphasis in the original); *see LIBOR VII*, 299 F. Supp. 3d at 539 (class members' differing exposures on different trading days created "differences between class members (both named plaintiffs and absent members)" such that named plaintiffs were disincentivized to prove manipulation on days when they benefitted from the alleged conduct).

## III.   THE OTC CLASS SHOULD NOT BE CERTIFIED BECAUSE IT WOULD REQUIRE HIGHLY INDIVIDUALIZED DETERMINATIONS OF MEMBER ELIGIBILITY

Yet another impediment to class certification is that this Court would need to conduct hundreds of thousands of individualized inquiries to determine which parties and transactions are properly within the scope of the OTC class definition.  As this Court and the Second Circuit have recognized previously, if plaintiffs cannot resolve these issues on a classwide basis, individual issues will predominate over common issues and preclude class certification.  *Royal Park Investments SA/NV* v. *HSBC Bank USA, N.A.*, 2018 WL 679495, at *5 (S.D.N.Y. Feb. 1, 2018) (Schofield, J.) ("The fact-intensive individualized inquiry necessary to determine . . . class membership would undermine any economies achieved by class treatment and would fail to

establish liability as to any potential absent class member whose certificates were traded on the secondary market."); *see also In re Petrobras Securities*, 862 F.3d at 269 n.21 ("[I]ndividualized determinations of class member eligibility . . . go to the core of the predominance analysis."); *Mazzei*, 829 F.3d at 272 ("A class-wide resolution . . . was not possible" because "the fact-finder would have to look at every class member's loan documents to determine who did and who did not have a valid claim."); *Calvo* v. *City of New York*, 2018 WL 1633565, at *7 (S.D.N.Y. Apr. 2, 2018) (denying class certification due to lack of predominance of common issues where thousands of mini-trials would be required in order to determine who is properly within the class), *appeal filed*, No. 18-1666 (2d Cir. June 1, 2018); *Vogel* v. *City of New York*, 2017 WL 4712791, at *7 (S.D.N.Y. Sept. 19, 2017) (same).

### A. Hundreds of Thousands of Individualized Inquiries Would be Required in Order to Determine Which Class Members Have Standing to Bring Claims Under the Sherman Act

Plaintiffs' proposed OTC Class is limited to persons who "were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, traded in the United States or its territories."  Pl. Br. at 2.  But as this Court has already held in this case, merely being domiciled in the United States is insufficient to bring a claim within the scope of the Sherman Act.  *See In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *11 ("[T]he FTAIA bars Plaintiffs' claims arising from OTC transactions where the [U.S.-domiciled] Plaintiff was operating abroad and transacted with a foreign desk of a defendant.").

Plaintiffs' data expert testified that the transaction data he analyzed only identifies a Plaintiff's domicile, and not whether the client was operating in the United States.  *See* Washer Dec. Ex. 16 (Oct. 3, 2018 Dep. of Robin Poynder ("Poynder Data Tr.") 152:11-17 (███████

████████████████████████████████████████████████████████

███████████████████████████████████ Accordingly, *every* transaction of *every*

purported class member (whether U.S. domiciled or not) will need to be examined to determine

where the class member and the relevant Defendant were operating at the time of the transaction.

This would be a massive undertaking that would dwarf any common issues.  For each of

the thousands of potential class members, the Court would need to make individualized

determinations as to whether, for each of the millions of trades at issue, the class member and/or

the relevant Defendant was operating within the United States such that the transaction could

support recovery in the face of the FTAIA.  This analysis would simply overwhelm any common

issues.[16]  *See In re Petrobras Securities*, 862 F.3d at 272 (noting that the "investigation of

domesticity appears to be an 'individual question' requiring putative class members to 'present

evidence that varies from member to member'" (citation omitted)).

A review of just a single example – Named Plaintiff Systrax Corporation – serves to

illustrate this point.  In their brief, Plaintiffs cite Systrax account records to show that Systrax

traded over-the-counter with defendant UBS.  *See* Pl. Br. App'x F at 4 n.25 (citing

SYST00002810); Washer Dec. Ex. 17 (SYST00002810).  But these records do not evidence any

connection to the United States.  Rather, they suggest that Systrax interacted with UBS's

Switzerland office.  *See* SYST00002810 █████████████████████ Systrax Tr. 179:22-

180:8 (Systrax would call UBS Geneva to trade).  As Systrax is incorporated in the British

Virgin Islands with offices in Argentina, Mexico, and Greece, Systrax Tr. 102:16-103:8, nothing

on the face of these records indicates that Systrax executed any trade with UBS in the United

States.  Furthermore, Systrax's corporate representative testified that Systrax traded FX

---

[16]     This Court has already spent considerable time making such an inquiry in order to determine whether two
plaintiffs were members of the settlement class.  *See Wah* v. *HSBC North America Holdings, Inc.*, 15-cv-8974
(LGS), Dkt. 261 (S.D.N.Y. June 26, 2018).

instruments out of its offices in Mexico and Argentina.  Systrax Tr. 103:9-105:5.  Absent any

apparent U.S. connection, the Court would also have to consider the possibility that Systrax

conducted certain trades after hours with UBS's U.S. desk.  *See Wah* v. *HSBC North America*

*Holdings, Inc.*, 15-cv-8974 (LGS), Dkt. 139 (S.D.N.Y. June 5, 2017).

As this example illustrates, the Court would have to undertake myriad individualized

inquiries to determine if even this single trade by a single class member is within the territorial

reach of the Sherman Act, and there is no methodology under which this determination could be

made on a classwide basis.  For this reason alone, individual issues will predominate.  *See*

*Mazzei*, 829 F.3d at 272 ("A class-wide resolution . . . was not possible" because "the fact-finder

would have to look at every class member's loan documents to determine who did and who did

not have a valid claim.").

### B. The Court Would Need to Review Trading Records and Communications for Millions of Trades to Eliminate Benchmark Fixing Orders and Resting Orders from the Class Definition

In addition to the domesticity inquiries, this Court would also need to identify and

exclude from the class any trades that were entered into at a benchmark price or which resulted

from resting orders.  This is because (1) Plaintiffs explicitly exclude from the OTC Class any

"trades whose prices were set on the basis of benchmark rates," Pl. Br. at 2, and (2) Plaintiffs

must also exclude resting orders, as their own expert has acknowledged that no spread is paid on

such orders.  *See* Poynder Data Tr. 208:25-209:4.  Because clients did not pay a spread on resting

orders, they could not have been impacted by wider spreads.  *See* Underwood Report ¶ 36 &

n.34.[17]

---

[17]     This analysis would need to be undertaken in order to determine whether each proposed class member
satisfies the class definition requirement of having entered into at least ten qualifying trades.

Although Plaintiffs have attempted to identify benchmark trades included within a small portion of the transaction data, they acknowledge that they have not been able to identify and separate out all benchmark trades.  Bjønnes Tr. 317:7-15, 319:16-25 (conceding that "[t]he plan is to remove . . . fix trades" and acknowledging that "that's ongoing work to identify those trades.  And *when identified* they can be removed" but that "[s]ometimes it is difficult to identify such trades." (emphasis added)).  They also have done nothing to identify and remove any resting order trades.  *See* Poynder Data Tr. 209:11-18 (admitting that he did not take any steps in the unified dataset to identify limit orders or stop-loss orders).

Because most of the transaction data available to the parties does not specifically identify benchmark or resting orders, the only way to identify such trades is through a trade-by-trade review of the communications between the class members and the relevant bank Defendant. This would be a time-consuming and complicated analysis that would need to be completed millions of times over and, as with the domesticity issue, would present overwhelming individual issues that are not "susceptible to generalized class-wide proof."  *In re Petrobras Securities*, 862 F.3d at 270.

## IV.   PLAINTIFFS CANNOT ESTABLISH PREDOMINANCE GIVEN THEIR FAILURE TO DEMONSTRATE THAT THEY CAN PROVE ANTITRUST INJURY AND DAMAGES ON A CLASSWIDE BASIS

The many difficulties described above each constitute a stand-alone and independent basis upon which to deny class certification.  But Plaintiffs' motion suffers from other infirmities as well.  Most crucial is Plaintiffs' failure to put forward a viable classwide methodology – in this case, a regression model – for proving that each class member suffered at least some amount of injury as a direct result of Defendants' alleged violation of the Sherman Act.  In the absence of such a methodology, individualized issues predominate over common issues, and class certification must be denied.  *See, e.g.*, *Comcast*, 569 U.S. at 35-38 (reversing decision to certify

a class due to lack of predominance of common issues where plaintiffs' model fails to isolate and quantify injury flowing from defendants' wrongful conduct on a classwide basis).

In a typical Sherman Act case, plaintiffs would advance a coherent theory regarding how Defendants' conduct harmed the class, and they would then offer a model measuring the injury that flowed from that conduct.  Here, Plaintiffs can do neither.  In an effort to connect Defendants' conduct to an injury to the putative classes, Plaintiffs point to both "direct" and "indirect" efforts to widen spreads.  As to "direct" efforts, Plaintiffs rely on Mr. Poynder, who conducted an unreliable review that identified a small number of chats in which dealers discuss spreads.[18]  Pl. Br. at 17-18.  As discussed more fully in the expert report of Dr. Ordover, this modest number of communications could not have had any consistent impact on spreads across 52 currency pairs throughout the six-year period.  Ordover Report ¶¶ 13, 70-71; *see also* Underwood Report ¶¶ 62-80.

As to "indirect" efforts, Plaintiffs argue more generally that information sharing among Defendants caused a chain reaction that widened spreads across the board.  As discussed in the *Daubert* motion and in the Expert Report of Allan W. Kleidon, Ph.D. ("Kleidon Report"), this theory is illogical and, indeed, contrary to all evidence.  *Daubert* motion at Section III.A.; Kleidon Report ¶¶ 28, 81-89.  This failure to plausibly connect Defendants' conduct to classwide injury is, in and of itself, fatal to Plaintiffs' effort.  *Comcast*, 569 U.S. at 37 (holding that a model that "identifies damages that are not the result of the wrong" cannot be used to satisfy the predominance requirement); *see also Sykes*, 780 F.3d at 82 ("the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability" (internal quotation marks and citation omitted)).

---

[18]      Underwood Report ¶¶ 62-100 (analyzing  Poynder's chat review); Expert Report of Prof. Justin McCrary ¶¶ 35-71 (same).

In the absence of any logical connection between Defendants' conduct and Plaintiffs' purported injury, it should be no surprise that Plaintiffs cannot offer a model proving that Defendants caused classwide injury.  Plaintiffs attempt the impossible by relying on a model created by Bjønnes and Ljungqvist which purports to "compare prices customers actually paid for FX instruments during the Class Period to a but-for price they would have paid absent collusion." Pl. Br. at 42.  But this model suffers from at least three defects, each of which precludes its use.  Specifically, the model: (1) ignores numerous factors that have a critical impact on FX prices, (2) is therefore unable to explain the vast majority of variation in FX prices, and (3) because of those flaws, generates an enormous number of "false positives." Courts routinely reject models that suffer from even one of these flaws, and the same result should occur here.  *See, e.g.*, *Reed Construction Data Inc.* v. *McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 404 (S.D.N.Y. 2014) (regression analysis is flawed where it omits major variables), *aff'd*, 638 F. App'x 43 (2d Cir. 2016); *Reed* v. *Advocate Health Care*, 268 F.R.D. 573, 593 (N.D. Ill. 2009) (regression analysis that left "up to half of the causes of the differences in real-world wages unexplained" fell "far short of satisfying plaintiffs' legal burden"); *Rail Freight*, 725 F.3d at 252-53 (model that generates "false positives" and "detects injury where none could exist" cannot reliably prove classwide injury-in-fact).

## A.     Plaintiffs' Model Ignores the Most Significant Factors that Determine FX Prices

Bjønnes and Ljungqvist have created a model that purports to assess what FX prices would have been "but for" Defendants' conduct.  BL Report ¶¶ 146, 156.  The implication is that any deviation from these prices constitutes injury caused by Defendants' misconduct.  However, it is readily apparent, and Bjønnes and Ljungqvist concede, that the model fails to account for

many major factors that affect prices in the real world.  These omissions render the model utterly incapable of predicting but-for prices or measuring injury/damages.

Bjønnes and Ljungqvist omit a variety of critical factors, including (1) traders' personal positions or perception of current market risk and direction; (2) negotiations between dealers and clients and the impact of specific client relationships; (3) sales mark-ups; (4) individualized customer trading activity or frequency; and (5) lag times.

1.      Traders' personal risk limits, intraday losses or gains, or perception of current market risk and direction

These factors affect how eager a trader is to execute a transaction, and can have an impact on the price or spread he is willing to offer to counterparties.  Underwood Report ¶ 37 (voice traders consider a multitude of factors in pricing a trade, including their "views on the markets, the risks associated with the trade at issue, his willingness to take risk, his inventory or risk exposure, his profit or loss position, and the identity of the counterparty").  Bjønnes conceded that such factors would affect FX spreads, but testified that his model did not account for these factors because they cannot be measured on a classwide basis – in other words, they are individualized factors that affect specific pricing on specific transactions in a manner that cannot be captured by a mathematical formula.  Bjønnes Tr. 135:18-136:5 ("A.  I think you refer to information that is very hard to obtain.  Q.  Would that affect spreads, that information.  A. Occasionally, it may.  But it's – this is something that's not common to – there are no common variables in the market microstructure on FX."); *id.* at 135:13-17 ("It's, of course impossible to measure exactly the view of a dealer at a particular time.  I don't really know how you want to measure that.  It's not easy.").

2.      Individual negotiations and specific client relationships

The record is replete with real world examples of situations in which negotiations between dealers and clients resulted in material changes in the spreads and prices offered to clients.[19]  Parties are willing to make concessions on price for a variety of reasons, such as a desire to build relationships, recognition of long-standing relationships, Underwood Report ¶ 40 & n.40, efforts to offer more competitive prices, Ordover Report ¶ 30, and the need to offset FX positions taken with other parties, Ordover Report ¶ 29; Underwood Report ¶¶ 30-32.

Bjønnes acknowledged that his model does not account for the impact of negotiations and relationships, and explained that the impact of such forces was impossible to calculate.  Bjønnes Tr. 150:6–19 ("It's impossible to – you see, we cannot really – we cannot really analyze each and every trader.  I don't know how – it's impossible to calculate such a variable.").  Although Bjønnes testified that the impact of negotiations was not likely to be significant, his report suggests that many of the unusual results of his regression model may be explained by "preferential treatment given by a Defendant to a customer because of the customer's size, trading volume, or importance to the bank, or because the bank is trying to attract the customer's order flow."  BL Report ¶ 116; *see also* Underwood Report ¶ 40 ("FX dealers may be wary of trading with what they perceive to be 'informed' customers . . . and may quote wider spreads to such customers to reduce the risk of loss."  Alternatively, "FX dealers may be willing to provide more favorable prices . . . to nurture an existing trading relationship or to develop a new one.").

Moreover, as courts have previously acknowledged, individually negotiated prices may affect a plaintiff's ability to adequately measure impact.  *See, e.g.*, *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 29 (1st Cir. 2008) ("Too many factors play into an

---

[19]      Washer Dec. Ex. 18 (CS-FXLIT-13115053 at 058 ▮▮▮▮▮▮▮▮▮; Systrax Tr. 94:6-12 ("[If] we saw that the bid-ask was kind of high, we might – I might bitch and say, 'Hey, listen, this is too wide.  I mean, look at the amount of money,' blah, blah, blah.").

individual negotiation to allow an assumption."); *Food Lion, LLC* v. *Dean Foods Co.*, 312

F.R.D. 472, 485 (E.D. Tenn. 2016) ("Food Lion may have suffered no injury from the alleged

conspiracy based on its purchases pursuant to the negotiated price, apparently a majority of its

sales.").

### 3.     Sales mark-ups

The final price paid by a customer is affected not only by the spread or price quoted by an

FX trader, but potentially also by any "sales markup" charged by a dealer's sales desk.

Underwood Report ¶ 44.  The size of a sales markup, if any, will depend on a host of factors.  *Id.*

("[S]ome dealers give their salespeople discretion to widen or narrow spreads, even where such

instructions could generate losses").  The markup is not set by the traders who allegedly colluded

to widen spreads in this case, and therefore any damages model must isolate and remove

markups from its calculation of damages attributable to the alleged Sherman Act violations.  *See,*

*e.g.*, *Comcast*, 569 U.S. at 37.  But Bjønnes conceded at deposition that his model does not

consider sales markups, and such markups are impossible to measure on a classwide basis.

Bjønnes Tr. 139:9-13 (remarking that he did not think a variable reflecting potential for a

salesperson to markup price was "possible to measure").

### 4.     A particular customer's trading activity or frequency

In addition to the factors described above, Credit Suisse's experts have identified a host

of other factors that undoubtedly impact FX spreads and prices.  For example, Ordover has noted

that a customer's choice of electronic platform will affect the spread she receives.  Ordover

Report ¶ 33.  Similarly, Ordover explains that a variety of other factors affect FX prices,

including how quickly a customer wants to execute a trade, trade size, and the dynamics of the

relationship with the dealer bank.  *Id.* ¶¶ 30-31.  Plaintiffs' model accounts for none of these

factors.  *See* Bjønnes Tr.  164:12-14 ("I cannot make general predictions, because there are many

factors that may play a role."); Washer Dec. Ex. 19 (Sept. 25, 2018 Dep. of Alexander

Ljungqvist ("Ljungqvist Tr.") 215:4-7, 215:19-21 (explaining that BL's model ignores whether a

customer engaged in multiple trades in a single day or the size of those trades)).

>    5.    Lag times

Finally, Plaintiffs' model fails to account for individualized "lag-times," which are the

delays between the time when a trade is executed and the time when it is recorded in Defendants'

systems.  Kleidon Report ¶¶ 91-99.  This omission also undermines the effectiveness of the

model.  Again, the purported goal of the model is to compare actual execution prices to the but-

for price that would have existed *at that same moment* absent collusion, and then to classify the

difference, if any, as damages.  Because FX spreads and prices change so rapidly, it is important

to identify the precise time at which a potential class member's trade was executed.  *See* BL

Report ¶ 123 (conceding that "[t]o calculate actual and but-for effective costs . . . it is necessary

to select the appropriate 'prevailing price'" but that "[a] practical complication arises because

Defendants' data productions include only the times customer trades were *booked*; they do not

include the times customer orders were *executed*") (emphasis in original); Singer Report ¶ 50

n.111 (explaining that both Singer and Bjønnes & Ljungqvist used an algorithm to approximate

lag times across the transaction data).

As Kleidon explains in detail in his report, Plaintiffs' experts do not develop evidence

concerning the highly individualized booking delays among various banks and trading platforms

but, instead, assign arbitrary and unreasonable lag estimates to large groups of trades.  Kleidon

Report ¶ 93 (BL's estimate of relevant book-lags "ignore[s] the evidence that booking lags are

highly dependent on the specific circumstances of a trade" including *inter alia* trade size, time of

day, and changes in lag-times between the Clean and Class Periods); Underwood Report ¶¶ 101-

104 & nn.150-51.  Courts have routinely refused to certify a class on the basis of models that are

31

premised on such arbitrary, unreasonable and counter-factual assumptions.  *See, e.g.*,

*Espenscheid* v. *DirectSat USA, LLC*, 705 F.3d 770, 774-75 (7th Cir. 2013) (decertifying class

where plaintiffs failed to present a representative way of establishing class members' damages

and holding that a small, unrepresentative sample was insufficient to support an inference

applicable to the entire class).[20]

      Courts have consistently held that where a plaintiff's regression model omits one or more

major variables, regardless of how complex or difficult they are to measure, the model must be

considered unreliable, and therefore incapable of identifying and measuring impact and damages

on a classwide basis.  *See, e.g.*, *Reed Construction Data*, 49 F. Supp. 3d at 403-04 (regression

analysis is flawed where it omits major variables); *Freeland*, 238 F.R.D. at 148-49 (failure to

control for important variables rendered regression analysis "essentially worthless" and therefore

inadmissible); *Zenith Electronics Corp.* v. *WH-TV Broadcasting Corp.*, 395 F.3d 416, 418-19

(7th Cir. 2005) ("The supposed 'uniqueness' of a market does not justify substituting a guess for

careful analysis."); *Piggly Wiggly Clarksville, Inc.* v. *Interstate Brands Corp.*, 100 F. App'x 296,

299-300 (5th Cir. 2004) (explaining that "[m]ultiple regression analysis is not a magic formula,"

and affirming denial of class certification motion where plaintiffs' model did not control for

individual pricing); *Blomkest Fertilizer, Inc.* v. *Potash Corp. of Saskatchewan*, 203 F.3d 1028,

1038 (8th Cir. 2000) (expert's model was "fundamentally unreliable" due in part to the expert's

"failure to consider significant external forces that served to raise the price of potash"); *In re*

*Graphics Processing Units Antitrust Litig.*, 253 F.R.D. at 496 (criticizing impact and damages

model from which a variety of "factors that would likely have an impact on prices" were

---

[20]      Plaintiffs' lag estimates are not only arbitrary, but as explained in greater detail in Defendants' *Daubert* motion, these estimates are contrary to the evidence set forth by Defendants.  *Daubert* motion at pp. 45-46.

"notably absent" and explaining that "[w]ithout incorporating such variables, it is impossible to account for the diversity in products and purchasers here").

### B.    Plaintiffs' Model Fails to Explain Almost All Variation in FX Prices

Likely because it fails to account for critical factors impacting FX prices, Plaintiffs' regression model does not, as it must, explain a meaningful percentage of variation in FX prices. A regression model is an effort to measure the impact of an "independent" variable (Defendants' alleged collusion) on a "dependent" variable (FX spreads) by holding other "explanatory" variables (the ordinary factors that affect FX spreads) constant.[21]  In a robust model, the explanatory variables (normal market factors) would accurately predict movement in the dependent variable (FX spreads), thereby allowing one to accurately isolate and measure the impact of the independent variable (Defendants' alleged collusion) on FX spreads.  Because, as described above, Plaintiffs' experts have failed to include in their model many critical explanatory variables, the model's ability to measure the impact of Defendants' conduct is almost non-existent.

To determine the amount of price movement a regression model can actually explain, courts commonly look to a statistic known as R-squared.  *See* Federal Judicial Center & National Research Council of the National Academies, *Reference Manual on Scientific Evidence*, 345 (3d ed. 2011) (R-squared is "a statistic that measures the percentage of variation in the dependent variable that is accounted for by all of the explanatory variables"), *available at* https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf.  "A value for $R^2$ of 1.0 [or 100%] represents total explanation; zero indicates no explanation."  *Trout* v. *Garrett*, 1990 WL 301806,

---

[21]      *See Reed Construction Data*, 49 F. Supp. 3d at 396 (describing the "basic regression method").

at *5 n.2 (D.D.C. Dec. 27, 1990) (internal quotation marks and citations omitted); *see also* Bjønnes Tr. at 220:2-3 ("Zero would mean that you are not explaining the variance.").

Bjønnes and Ljungqvist report an R-squared of 0.4% for spot trades in the top three currency pairs, meaning that their regression is only capable of explaining **less than one half of one percent of the variation in FX spreads for the three most significant currency pairs (which collectively account for 59.2% of spot trading in Defendants' data)**. *See* BL Report App'x E; Bjønnes Tr. at 225:19-21 (admitting "[t]hat particular regression explains a small percentage of the variance"); Ordover Report ¶ 56.[22]  This inability to explain price variation applies to the analysis of both the Class Period and the ensuing Clean Period.

Bjønnes and Ljungqvist offer no meaningful excuse for the near-total inability of their model to explain FX price variation.  Instead, they note that they selected explanatory variables to include in their model based on past academic work in the field of FX microstructure literature.  *See, e.g.*, Bjønnes Tr. 99:2-5; 117:9-14; Ljungqvist Tr. 55:22-56:18; 57:17-58:3.  But these variables explain almost nothing.  Bjønnes and Ljungqvist do not apologize for this fact, but simply ascribe the 99.6% of unexplained price movement in the Clean Period to an "error term," which Ljungqvist described as "the noise of the data."  Ljungqvist Tr. 169:6-12.

But this "noise" – which is characterized as an "*error term*" during the Clean Period – conveniently disappears when Bjønnes and Ljungqvist attempt to calculate but-for spreads during the Class Period.  Without explanation, justification, or analysis, Bjønnes and Ljungqvist simply conclude that **all variation in FX spreads that they cannot explain during the Class Period equals *damages* suffered by class members (during the Clean Period, BL's model**

---

[22]     The explanatory power of BL's model for the remainder of the FX markets is also low:  BL's model can only explain 5.4% of spot trades in the remaining 49 currency pairs, and 10.6% of forwards in all currency pairs.  BL Report App'x E; Kleidon Report ¶ 33, n.22.  The model leaves the overwhelming majority of variation across the entire FX markets unaccounted for.

cannot explain 99.6% of variation in FX spot trades for the top three currency pairs).

Kleidon Report ¶¶ 33, 39; Ordover Report ¶ 56.

The regression model's complete lack of explanatory power, combined with Plaintiffs' proposal to seek damages from Credit Suisse in the amount of this "error term," render the model unacceptable as a vehicle through which to prove injury and damages on a classwide basis. *See In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1504 (D. Kan. 1995) ("[O]ne cannot properly assume that the sole cause of any price difference between the conspiracy period and the normative period is the conspiracy itself."); *see also Blue Dane Simmental Corp.* v. *American Simmental Ass'n.*, 178 F.3d 1035, 1040-41 (8th Cir. 1999) (affirming district court's rejection of analysis attributing the entire difference in market price to conspiracy as "simplistic"); *MCI Communications Corp.* v. *AT&T Co.*, 708 F.2d 1081, 1162-63 (7th Cir. 1983) (plaintiffs' improper attribution of all losses to defendant's illegal acts, despite presence of significant other factors, not sufficient to permit jury to make reasonable and principled estimate of amount of damage).

Indeed, models with more than *100 times* the explanatory power of the BL Model have been routinely rejected by the courts. *See, e.g., Griffin* v. *Board of Regents of Regency Universities*, 795 F.2d 1281, 1291-92 (7th Cir. 1986) (noting that "the explanatory power of a model is a factor that may legitimately be considered by the district court in deciding whether the model may be relied upon," and affirming district court decision that rejected a model that explained only 45% of variation); *Reed* v. *Advocate Health Care*, 268 F.R.D. at 593 (regression analysis that left "up to half of the causes of the differences in real-world wages unexplained" fell "far short of satisfying plaintiffs' legal burden to establish a means of demonstrating by common proof that the members of the putative class were injured, and if so, by how much"); *cf.*

*In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 283 (N.D. Ohio 2014) (relying on regression analysis with an R-squared of 96%).

### C.    Plaintiffs' Model Generates an Enormous Number of False Positives

Given the failure to include key explanatory variables and the consequently low predictive power of the BL Model, it is not surprising that the model is also fatally flawed in that it generates a significant volume of "false positives."  Indeed, the model appears to demonstrate that almost the exact same percentage of trades and class members were harmed in the Clean Period as were harmed in the Class Period.  This is a nonsensical result that simply evidences a model that does not predict or explain much of anything.

Specifically, Plaintiffs claim that half of all transactions in the ***Clean Period***, when the effects of any purported collusion had subsided, were damaged.  And while Plaintiffs tout their conclusion that 99.7% of customers with at least ten trades were harmed on at least one trade during the Class Period, they fail to report that the same model predicts that ***99.4% of customers were harmed during the Clean Period***:

|  | Class Period (12/1/07–12/31/13) | | Clean Period (2014–2015) | |
|---|---|---|---|---|
|  | Number | Percentage | Number | Percentage |
| Trades Harmed [2] | 36,761,312 | 49.8% | 13,466,702 | 49.7% |
| Class Members Harmed [3] | 57,292 | 99.7% | 37,396 | 99.4% |

Ordover Report ¶ 48.

Even assuming, *arguendo*, that there was wrongdoing during the Class Period, there is no conceivable explanation for why *any* transactions in the Clean Period (which purportedly is free of collusion) would be damaged, much less the same number as those purportedly injured in the Class Period.  *Id.* ¶¶ 43, 47-48.  Plainly, this conclusion and the model that generates it cannot form the basis for a finding of predominance.  For example, in *Rail Freight*, plaintiffs offered a

model that "purport[ed] to quantify the injury in fact to all class members" but also yielded "similar results" for certain legacy shippers that were not impacted by the conspiracy.  725 F.3d at 252-55.   The D.C. Circuit concluded that a model like this, which generates "false positives" and "detects injury where none could exist," cannot reliably prove classwide injury-in-fact.  *Id.* at 252-53.

Plaintiffs' model here is even more troubling, as it not only identifies impact on a group of customers that they define as unaffected by the alleged conspiracy in the Clean Period, but predicts an *identical impact* to that suffered by class members during the Class Period.  These bizarre results cannot survive the "rigorous scrutiny" required to certify a class, and confirm Plaintiffs' inability to prove classwide damages.  *See LIBOR VII*, 299 F. Supp. 3d at 478-81, 489 (excluding expert opinions due to implausibly high findings of LIBOR artificiality during periods purportedly devoid of manipulation).

## V.   PLAINTIFFS LACK STANDING TO BRING CLAIMS ON BEHALF OF THE CLASS

The Court also should refuse to certify the putative class on the separate and independent groups that no Named Plaintiff has standing to bring claims on behalf of the proposed class.  It is appropriate for the Court to consider the issue of class standing in the context of a motion for class certification, with the benefit of class discovery.  *See Morrow* v. *Ann, Inc.*, 2017 WL 363001, at *5-6 (S.D.N.Y. Jan. 24, 2017) (deferring consideration of "class standing" to the class certification stage); *New Jersey Carpenters Health Fund* v. *Royal Bank of Scotland Group, PLC*, 2015 WL 539446, at *2 (S.D.N.Y. Feb. 5, 2015) (consideration of class standing issues "properly must be reserved for the class certification stage").[23]

---

[23]      In addressing the sufficiency of Plaintiffs' "injury in fact" allegations in the context of a motion to dismiss, the Court relied on Plaintiffs' now abandoned allegations of manipulation of the Fix.  *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015).  Plaintiffs' new theory based on spreads

As described above, at least five of the thirteen Named Plaintiffs seeking to represent the OTC Class cannot demonstrate that they suffered any injury at all as a result of Defendants' conduct.  Those five Plaintiffs have no standing to bring claims even on their own behalves, much less on behalf of the alleged class.  "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'"  *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996) (internal quotation marks and citations omitted).

Similarly, the remaining eight Named Plaintiffs do not have standing to represent the putative OTC Class.  Class standing can only exist where the named plaintiff can establish: "(1) that he 'personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant,'[24] . . . and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants."[25]  *NECA-IBEW Health & Welfare Fund* v. *Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (citations omitted).

The remaining Named Plaintiffs fail the second prong of the *NECA* test because they do not have "a sufficiently personal and concrete stake in proving other, related claims against the defendant." *Retirement Board of the Policemen's Annuity & Benefit Fund of the City of Chicago* v. *Bank of New York Mellon*, 775 F.3d 154, 161-63 (2d Cir. 2014).  In *Retirement Board*, the Court found that the plaintiffs, purchasers of RMBS certificates bringing claims against the

---

warrants reexamination of the issue.

[24]      The five Named Plaintiffs who themselves have suffered no actual injury thus cannot have standing to assert class claims under the Second Circuit's *NECA* test.  Those Plaintiffs would also be unsuitable as class representatives, as they would be subject to unique defenses.

[25]      Two additional Named Plaintiffs also fail the first prong of the *NECA* test because their trades cannot be identified in Defendants' trade data.

issuers and underwriters of the certificates, failed to satisfy the second prong of the *NECA* test.
*Id.* at 163.  The Second Circuit noted that "the alleged misconduct must be proved loan-by-loan
and trust-by-trust," *id.* at 162, and that "the nature of the claims in this case unavoidably
generates significant differences in the proof that will be offered for each trust," *id*. at 163.  The
Court concluded that "[p]laintiffs' claims do not implicate the 'same set of concerns' as those of
absent class members who purchased certificates issued by trusts in which no named Plaintiff
invested."  *Id*.   Therefore, class standing was not proper.

In *LIBOR VII*, the Court denied a motion for certification of a class who alleged that they
were harmed by trader-based manipulation of LIBOR.  299 F. Supp. 3d at 532.  In so doing, the
Court followed *Retirement Board* and rejected the named plaintiffs' assertion of class standing.
The Court first found that a named plaintiff could only assert class standing with respect to a
particular day on which it held a relevant net position.  *Id.*  The Court explained that "a named
plaintiff must have a net trading position that would have been adversely affected by the
manipulation on a given day in order to have class standing to represent absent class members
with claims based on manipulation on that date."  *Id.*  The Court then adhered to a prior ruling,
which found:

> Trader-based claims are 'day-to-day' and 'episodic,' and plaintiffs
> must prove the substantive elements of each claim.  Proof that a
> bank caused an artificial price one day will not determine whether
> it did so on another day.  Therefore, claims on behalf of absent
> class members for trader-based CEA violations do not involve 'the
> same set of concerns' as the claims brought on behalf of named
> plaintiffs, and the named plaintiffs do not have class standing to
> bring claims on days on which they did not hold a relevant net
> position.

*In re LIBOR-Based Financial Instruments Antitrust Litig.*, 2016 WL 1558504, at *9 (S.D.N.Y.
Apr. 15, 2016).  The Court concluded that separate classes would be required for each of the 13
days on which a named plaintiff had standing.  *LIBOR VII*, 299 F. Supp. 3d at 547.  Based on

Second Circuit law finding seven subclasses to be unmanageable, *In re Literary Works in Electronic Databases Copyright Litig.*, 654 F.3d 242, 257 (2d Cir. 2011), the LIBOR court denied the motion for class certification.  *LIBOR VII*, 299 F. Supp. 3d at 547-48.

The same analysis applies in this case.[26]  In order to prove their claims here, the Named Plaintiffs must prove that they were injured by Credit Suisse's conduct in particular transactions that occurred at particular moments in time, over a six-year period.  Moreover, the Named Plaintiffs only engaged in certain specific currency pair transactions on specific days, yet they purport to represent a class encompassing transactions in 52 currency pairs over a six-year period.  Plaintiffs elide this distinction by assuming, without basis, that wider spreads in one currency pair on a particular day will necessarily spill-over into other currency pairs.  This claim is both illogical and contradicted by transaction data.  Kleidon Report ¶¶ 83-85.  Indeed, one of Plaintiffs' own experts conceded that he did not investigate this issue but that he simply "know[s] that it is true."  Ljungqvist Tr. 323:18-324:6.  Nor have Plaintiffs shown that the effect of any alleged manipulation on one day will implicate other trading days, particularly where spreads change rapidly and the value of purportedly sensitive information immediately grows stale.

As a result, the interests of Named Plaintiffs are limited to the circumstances of their own transactions.  They do not share the "same set of concerns" as traders who engaged in other transactions at different times, or in different currency pairs.  At best, Named Plaintiffs only have standing to seek to certify purported classes of individuals who suffered losses in particular currency pairs on the same days that Named Plaintiffs suffered net injury on transactions in those

---

[26]    The evidence put forward by Plaintiffs and their experts cannot be characterized as a single course of conduct.  At best, their claims arise from "distinct and discrete instances" of episodic communications.  *See LIBOR VII*, 299 F. Supp. 3d at 537.  A discrete chat among three traders about past trades in one currency pair on one day is not part of the same conduct as a chat among different traders about hypothetical spreads for a different, illiquid currency pair on a different day.

same currency pairs.  Even if Plaintiffs could identify at least one Named Plaintiff alleged to

have traded in each of the 52 currency pairs on hundreds of days over the six-year class period, a

multitude of separate subclasses would be required here.  *LIBOR VII*, 299 F. Supp. 3d at 547

(rejecting as unmanageable the prospect of day-by-day subclasses: "we find little appropriate

about the establishment of dozens, if not hundreds, of subclasses" (citation omitted)).  Under the

rule of *Literary Works*, that is simply not an option.

Additionally, as demonstrated above, several of the Named Plaintiffs acted not only as

liquidity takers in the FX markets, but also as liquidity providers.  That is, they were both buyers

and sellers.  When acting as sellers, those Plaintiffs would have benefitted from any increase in

spreads caused by the alleged conspiracy.  Having benefitted from the alleged misconduct on a

particular transaction on a particular day, such a plaintiff cannot claim to have the "same set of

concerns" as other class members who acted as buyers, in the same currency pair transactions.

Like the investor plaintiffs in *Retirement Board* and the trader plaintiffs in *LIBOR*, the

Named Plaintiffs here propose to prove absent class member claims relating to transactions in

which they did not participate.  Separated by time, currency pair, and even side of the

transaction, the millions of challenged transactions simply cannot inspire the "same set of

concerns" warranted to justify class standing.

## VI.  PLAINTIFFS CANNOT PROVE THEIR THEORY OF A GLOBAL CONSPIRACY BY COMMON EVIDENCE

In attempting to satisfy their burden under Rule 23(b)(3) of demonstrating that common

questions of law and fact predominate, Plaintiffs summarily assert that they will present common

evidence to prove Credit Suisse's participation in a single, global conspiracy extending over six

years.  Pl. Br. at 37-39.  Plaintiffs rely on cases supporting the general proposition that the

existence of a conspiracy has been found to be a common question.[27]

     To be sure, in some cases involving straightforward but multi-component conspiracies,

courts have rejected defendants' arguments that multiple mini-conspiracies cannot support class

certification.  But they have done so in cases where plaintiffs alleged – and offered evidence of –

a unifying course of conspiratorial conduct.  *See In re Air Cargo Shipping Services Antitrust

Litig.*, 2014 WL 7882100, at *1 (E.D.N.Y. Oct. 15, 2014) (alleging that defendant airlines

"implement[ed] an *industry-wide index* for calculating fuel and security surcharges that were

applied to thousands of routes flown worldwide" (emphasis added)); *In re Vitamins Antitrust

Litig.*, 209 F.R.D. 251, 254, 265 (D.D.C. 2002) (alleging that a "few manufacturers" through

"high level personnel" conspired to fix prices).

     But the conspiracy alleged here is no normal conspiracy.  Here, Plaintiffs do not present

evidence of any cohesive conspiracy at all.  Rather, they claim that a sprawling global conspiracy

impacting all FX trading in 52 different currency pairs over a six-year period was carried out in

over 100 different chatrooms involving over 750 traders from 16 banks.  Pl. Br. at 3, 8-10; *see

Poynder Report ¶ 111.  In so doing, Plaintiffs fail to offer a "theory of liability that is . . . capable

of classwide proof."  *Comcast*, 569 U.S. at 37.

     Unlike more traditional conspiracy cases, this case is more akin to *Kendler* v. *Federated

Department Stores, Inc.*, 88 F.R.D. 688 (S.D.N.Y. 1981).  In *Kendler*, plaintiffs alleged that

Bloomingdale's and its co-conspirators artificially inflated prices by coercing suppliers to refuse

to deal with discounters in each of the markets in which its stores were located.  *Id.* at 692.  In

---

[27]     Because Plaintiffs premise their entire case upon the existence of a single global conspiracy, *see* Pl. Br. at 32, "proof of commonality necessarily overlaps with [Plaintiffs'] merits contention" that Defendants engaged in a single global conspiracy to manipulate FX spreads.  *Wal-Mart*, 564 U.S. at 352.

denying class certification, Judge Pierce noted that plaintiffs had not "uncovered or demonstrated any policy or guideline issued by Bloomingdale's to its buyers directing or suggesting the alleged illegal conduct complained of" and, therefore, the proffered evidence was "unique to each supplier" in each market location. *Id.* at 693 ("[T]he Court cannot speculate as to what common element unites these multitudinous transactions."). Specifically, the Court found that plaintiffs would need to "demonstrate that higher prices were . . . maintained at stores in seven states comprising eleven different competitive markets." *Id.* Thus, class certification was denied because, "in the absence of a proffer of the 'generalized means' by which this will be proved, common questions of law and fact do not appear to predominate." *Id.*

There is literally no evidence to support Plaintiffs' liability theory. The parties have produced more than 2 million documents and 47 witnesses have been deposed, and not a single piece of paper or line of testimony even hints at the existence of the overarching global conspiracy that Plaintiffs allege. This is unsurprising in light of Plaintiffs' far-fetched claim that at least 750 traders from 16 different banks colluded every day to manipulate FX spreads on 52 different currency pairs over the course of six years. Instead, the information produced indicates, at best, that Plaintiffs will need to prove the existence and scope of countless mini-conspiracies. This reality, unique to the FX markets, sets this case apart from typical price-fixing cases,[28]

---

[28]   Although Plaintiffs purport to allege a *per se* price-fixing conspiracy, their experts' explanation of the "adverse risk selection" theory based on Defendants' information sharing demonstrates that their claim must be evaluated under the rule of reason. In the Second Circuit, evidence of the mere "exchange of information [by competitors] is not illegal *per se*." *Todd* v. *Exxon Corp.*, 275 F.3d 191, 198-99 (2d Cir. 2001). The rule of reason analysis applies where information sharing does not give rise to an inference of an agreement to fix prices. *See id.*; *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999) ("[E]xchanges of information are evaluated under a rule of reason analysis."). When this Court viewed Plaintiffs' case as akin to a *per se* horizontal price fixing case, it did so because it viewed the allegedly manipulated fix as the price at which currencies were purchased. *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 592. But, as discussed above, Plaintiffs have jettisoned their fix manipulation theory.

where classwide proof of a single conspiracy may be feasible.  Here it is not.  And Plaintiffs'

cursory listing of the common proof they will offer is unavailing.[29]

A.    **Ad Hoc Conversations Among Traders Are Not Common Evidence of a Global Conspiracy to Widen Spreads**

In order to support their claim of a global conspiracy, Plaintiffs point to "Defendants'

documents, including thousands of chat room communications."  Pl. Br. at 38; *see id.* at 8 ("Chat

rooms were integral to the conspiracy.").  But the requisite "rigorous analysis" of these chats

reveals that they are not common evidence of Plaintiffs' purported global conspiracy.  *See Wal-*

*Mart*, 564 U.S. at 351 ("Frequently that 'rigorous analysis' will entail some overlap with the

merits of the plaintiff's underlying claim.  That cannot be helped.").  Instead, the chats show that

resolution of Plaintiffs' claim would require countless mini-trials on issues arising from each

chatroom for each currency pair at countless points in time over the course of the six-year class

period.  *See Kendler*, 88 F.R.D. at 693.

Common membership among *some* of Defendants' traders in *some* chatrooms does not

establish that *all* chat participants in *every* chatroom agreed to a common scheme.  Although

Plaintiffs allege a single conspiracy covering all currencies throughout the class period, the chats

focused on only certain currency pairs and trade sizes[30] and involved only a handful of traders.[31]

They cannot serve as common evidence of a single worldwide conspiracy.  *See In re Elevator*

*Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (plaintiffs failed to provide a factual basis for

---

[29]    In addition to the evidence concerning chat room communications and regulatory settlements discussed in the text above, Plaintiffs also point to unspecified "testimony of Defendants' current and former employees", "Defendants' transactional data," and various expert testimony.  Pl. Br. at 38.  The insufficiency of Plaintiffs' modeling analysis of the transactional data and the expert testimony is addressed above.  The proffered expert testimony is also addressed in the accompanying *Daubert* motion.  Plaintiffs' reference to unspecified testimony of current and former employees is meaningless.

[30]    *See* Pl. Br. at 9 ("[I]ndividual chat rooms would often emphasize certain currencies.").

[31]    *See* Pl. Br. App'x D (identifying 29 "example chat rooms," 21 of which had five or fewer participants and 27 of which had fewer than ten participants).

their assertions of a worldwide conspiracy, and allegations "if it happened there, it could have happened here" were insufficient to establish liability).[32]

Moreover, even if a transcript suggested that a chat room's participants agreed to widen spreads in one currency pair on a particular day, that would not be evidence of an agreement to widen spreads in the other 51 currency pairs. Despite Plaintiffs' assertion that "[c]hat rooms were integral to the conspiracy," Pl. Br. at 8, their own expert determined that certain currency pairs were *never* inappropriately discussed on *any* day in *any* interbank chat room.[33]  *See* 2018.05.31 Poynder Daily Chat Summaries and Content ("Poynder Spreadsheet"), Tab "Sample Data Date" (failing to identify any discussions regarding Euro/Israel Shekel, Euro/Romania Leu, and Great Britain Pound/New Zealand Dollar and failing to identify any spread-related discussions regarding Euro/Israel Shekel, Euro/Romania Leu, Great Britain Pound/New Zealand Dollar, Canada Dollar/Switzerland Franc, and Euro/Denmark Krone).  Poynder also determined that nearly half the 52 currency pairs were discussed on only a handful of days.[34]  If, as Plaintiffs assert, "[c]hat rooms were integral to the conspiracy," Pl. Br. at 8, then Plaintiffs' evidence showing that many of the 52 currency pairs were never or very infrequently discussed is fatal to their claim of a single global conspiracy encompassing all 52 currency pairs.

---

[32]     *See also In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 797-801 (M.D. Pa. 2014) (finding a Canadian court holding of a Canadian conspiracy to fix chocolate prices not pertinent to the consideration of whether there was a U.S. conspiracy to fix chocolate prices, despite overlap of defendants in both cases), *amended*, 2014 WL 4104474 (M.D. Pa. Aug. 19, 2014), *aff'd*, 801 F.3d 383 (3d Cir. 2015).

[33]     Poynder purported to review all interbank chat rooms occurring on a sample of 91 trading days during the Class Period.  Poynder Report ¶¶ 1–4.

[34]     According to Poynder's measurement, Defendants inappropriately discussed the following 23 currency pairs on less than 10 of the 91 days:  CAD/CHF, CAD/JPY, CHF/JPY, EUR/CZK, EUR/DKK, EUR/HUF, EUR/ILS, EUR/NZD, EUR/RON, EUR/RUB, EUR/TRY, EUR/ZAR, GBP/AUD, GBP/CHF, GBP/NZD, USD/CZK, USD/DKK, USD/HKD, USD/HUF, USD/ILS, USD/PLN, USD/RON, USD/RUB.  Further, according to Poynder's measurement, Defendants inappropriately discussed spreads in the following 30 currency pairs on less than 10 of the 91 days: AUD/CAD, CAD/CHF, CAD/JPY, CHF/JPY, EUR/AUD, EUR/CZK, EUR/DKK, EUR/HUF, EUR/ILS, EUR/NOK, EUR/NZD, EUR/PLN, EUR/RON, EUR/RUB, EUR/TRY, EUR/ZAR, GBP/AUD, GBP/CAD, GBP/CHF, GBP/NZD, USD/CNH, USD/CZK, USD/DKK, USD/HKD, USD/HUF, USD/ILS, USD/MXN, USD/PLN, USD/RON, USD/RUB.

Take for example Plaintiffs' allegations concerning the Euro/South African Rand (EUR/ZAR). Poynder identifies just one instance of shared sensitive competitive information relating to EUR/ZAR: ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████ Such a discrete conversation cannot serve as common evidence of a six-year long conspiracy to manipulate EUR/ZAR. And there is no evidence to suggest that Credit Suisse (or the ten other Defendants not involved in that chat) joined in any such agreement.

This single example demonstrates why Plaintiffs' case cannot move forward as a class. The *ad hoc* discussions among traders, to the extent they constitute agreements at all, and to the extent they were improper (a determination that Plaintiffs' expert has not made), were limited in time, scope, and Defendant participants.[35] Trial would inevitably devolve into thousands of mini-trials in order to resolve specific issues arising from each chatroom and require presentation of evidence specific to each transaction and class member. Evidence that *might* support claims that some employees of some banks engaged in episodic, *ad hoc* discussions about some currency pairs at certain moments during the applicable period cannot serve as common evidence

---

[35] Moreover, since antitrust law has long recognized that information exchanges can render markets more competitive, evidence of information exchanges, even when labeled "pervasive," cannot form the basis for a price fixing conspiracy without individualized inquiry into the purpose and effect of each exchange. *In re Baby Food Antitrust Litig.*, 166 F.3d at 118 ("Exchanges of information are not considered a *per se* violation because 'such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive.'" (citing *United States* v. *U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978))).

46

of a global conspiracy.[36]  *See, e.g.*, *In re Plastics Additives Antitrust Litig.*, 2006 WL 6172035, at

*6 (E.D. Pa. Aug. 31, 2006); *Kendler*, 88 F.R.D. at 693.

### B.     Settlements with Regulators Are Not Common Evidence of a Global Conspiracy

Plaintiffs also rely upon charging or settlement agreements by Settling Defendants with

government agencies as common evidence of a global conspiracy.  But the criminal pleas and

regulatory settlements in fact undermine Plaintiffs' theory by instead suggesting narrow

conspiracies among certain FX traders to manipulate FX prices on certain occasions with respect

to particular currency pairs.  Plaintiffs allege a completely different and much broader

conspiracy, as Plaintiffs' counsel has acknowledged:

> Even when the guilty pleas came out, they were narrower than the case we were
> prosecuting and, in fact, none of the government pleas or orders is as broad as the
> case we were prosecuting here . . . .

Washer Dec. Ex. 20 (May 23, 2018 Final Fairness Hearing Tr. 29:1-7).  The parties to certain

narrow conspiracies have admitted wrongdoing, but in so doing have confirmed that Credit

Suisse was expressly excluded from those conspiracies.  After years of investigation, none of the

investigating agencies around the globe has alleged the existence of the global conspiracy

proposed by Plaintiffs, much less Credit Suisse's involvement in any such conspiracy.

Regardless, these types of settlements and pleas are inadmissible here, particularly as

common evidence against Credit Suisse, which is party to only one of these settlements, consent

orders, and guilty pleas.  *See Lipsky* v. *Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir.

1976) (consent judgment between a corporation and federal agency was not admissible in an

---

[36]      Furthermore, the interpretation of each relevant communication is inherently subjective, and therefore
Plaintiffs' claims are not subject to generalized proof.  *See Theodore D'Apuzzo, P.A.* v. *United States*, 2018 WL
2688760, at *3 (S.D. Fla. Apr. 13, 2018) (holding that predominance was undermined when the plaintiffs' claims
required "inherently subjective" interpretations of PACER documents and therefore were "not subject to
determination with generalized proof").

ensuing litigation between the corporation and a different party); *In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593-95 (S.D.N.Y. 2011) (barring the admission, under Federal Rule of Evidence 408, of a CFTC Order for the purpose of proving the defendants' liability); *In re Merrill Lynch & Co., Inc. Research Reports Securities Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) ("Second Circuit case law makes it clear that references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial.").

Even if the evidence were admissible, almost every plea and settlement focuses on the purported manipulation of benchmark fixing rates, conduct that Plaintiffs have now disavowed and excluded from their classes. *See, e.g.*, Washer Dec. Ex. 21 (Plea Agreement at ¶ 4(i), *United States* v. *Barclays PLC* (D. Conn. May 20, 2015) (No. 3:15-cr-00077-SRU) ("defendant . . . coordinat[ed] the trading of the EUR/USD currency pair in connection with . . . 'fixes'")).[37]

Finally, the one regulatory resolution to which Credit Suisse was a party, its November 13, 2017 Consent Order with the New York Department of Financial Services ("D.F.S."), is a red herring. First, the Consent Order did not arise from an adjudicative process and is not admissible evidence. Second, it is not common evidence of the theory that Plaintiffs now advance. Plaintiffs point to the D.F.S.'s statement that Credit Suisse "violate[d] New York State law []" over the course of many years." Pls. Br. at 25. But Plaintiffs here do not claim any violation of New York State law, they allege a violation of Sherman Act § 1. Nothing in the D.F.S.

---

[37] *See also* Washer Dec. Ex. 22 (Plea Agreement at ¶ 4(j), *United States* v. *BNP Paribas USA, Inc.* (S.D.N.Y. Feb. 2, 2018) (No. 1:18-cr-00061-JSR) ("defendant [] coordinat[ed] [] trading prior to and during fixes in a manner intended to manipulate final fix prices")); Washer Dec. Ex. 23 (*In re HSBC Bank plc*, Order Instituting Proceedings at 2, CFTC No. 15-07 (Nov. 11, 2014) (No. 15-07) ("HSBC . . . attempt[ed] to manipulate certain FX benchmark rates")); Washer Dec. Ex. 24 (*In re JPMorgan Chase Bank, N.A.*, Order Instituting Proceedings at 2, CFTC No. 15-04 (Nov. 11, 2014) (No. 15-04) ("JPMC . . . attempt[ed] to manipulate certain FX benchmark rates")).

settlement suggests that Credit Suisse participated in a single, global conspiracy with 16 other dealers for more than six years to widen spreads on 52 currency pairs.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification should be denied.

Dated:  October 25, 2018
         New York, New York

CAHILL GORDON & REINDEL LLP

By: _____

Herbert S. Washer
David G. Januszewski
Elai Katz
Jason M. Hall
Sheila C. Ramesh
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
djanuszewski@cahill.com
ekatz@cahill.com
jhall@cahill.com
sramesh@cahill.com

*Attorneys for Defendants Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse Securities (USA) LLC*