# EXHIBIT 16

# Redacted Pursuant to February 27, 2019 Order

```
                                                          Page 1
 1
 2     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
 3     Case No. 1:13-cv-00789-LGS
       ------------------------------------------x
 4
       IN RE FOREIGN EXCHANGE BENCHMARK RATES
 5     ANTITRUST LITIGATION
 6     ------------------------------------------x
 7                 October 3, 2018
                   9:37 a.m.
 8
 9
10              * HIGHLY CONFIDENTIAL *
11
12
13
14
15        VIDEOTAPED DEPOSITION of ROBIN POYNDER,
16     taken by the Defendant, pursuant to Notice,
17     held at the offices of Cahill Gordon &
18     Reindel LLP, located at 80 Pine Street, New
19     York, New York 10005, before Anthony Giarro,
20     a Registered Professional Reporter, a
21     Certified Realtime Reporter and a Notary
22     Public of the State of New York.
23
24
25
```

Page 150

```
 1      ROBIN POYNDER--HIGHLY CONFIDENTIAL
 2   A     Yes.
 3   Q     Let me know when you've had
 4  a moment to review those.
 5   A     Okay.  Yes.
 6   Q     Paragraph 51, there's a
 7  heading there, Counterparty Domicile.  Do
 8  you see that?
 9   A     I do.
10   Q     What does domicile mean in
11  this context?
12   A     In this context, we're
13  referring to the country where the
14  counterparty is situated.
15   Q     What do you mean situated?
16   A     The -- I'll take a step
17  back, actually, and say that the data
18  that this refers to is the domicile as
19  defined by the defendant bank.  So what I
20  understand it to be or what they
21  understand it to be as a domicile that's
22  defined by each bank.
23   Q     Did you during your
24  meet-and-confer process or otherwise get
25  an understanding as to each bank of what
```

Page 151

```
 1      ROBIN POYNDER--HIGHLY CONFIDENTIAL
 2  they meant by the term "domicile" for
 3  purposes of the data?
 4   A     So we explained what it was
 5  being used for.  And they marked the
 6  domicile accordingly.
 7   Q     And you say you explained
 8  what it was being used for.  What did you
 9  explain?
10   A     Well, the key difference was
11  we were identifying clients who were U.S.
12  domiciled and clients who were not U.S.
13  domiciled.  The way we received that
14  information was different.
15
```

Page 152

```
 1      ROBIN POYNDER--HIGHLY CONFIDENTIAL
 2
```

Page 153

```
 1      ROBIN POYNDER--HIGHLY CONFIDENTIAL
 2
17   Q     So slightly different
18  question.
19         What were the steps --
20  strike that.
21         Were there ever instances
22  where you had multiple addresses for a
23  particular client?
24   A     I don't recall seeing that.
25   Q     If I asked you to assume
```



39 (Pages 150 - 153)

Case 1:13-cv-07789-LGS   Document 1204-16   Filed 03/01/19   Page 4 of 4

Page 206

ROBIN POYNDER--HIGHLY CONFIDENTIAL

2  A   I would say the execution
3  time would be the time at which the trade
4  was executed.  And a booking time is the
5  time at which the trade is entered into
6  the bank system.
7  Q   Fair to say that those times
8  might differ from one another?
9  A   What we believe is that the
10 difference in time for an eCommerce
11 system is almost instantaneous.  For a
12 voice trade, there may be a lag.
13 Q   And in your experience
14 working, for instance, at HSBC, you know
15 firsthand that there can be a lag, don't
16 you?
17     MS. ANDERSON:  Object to
18 form.
19 A   I can't claim to say what
20 HSBC did.  But what I would say is that
21 if a trade has been executed on the
22 phone, then the trade will then take
23 sometime -- sorry.  The salesperson will
24 then take some time to put that into the
25 system.

Page 207

ROBIN POYNDER--HIGHLY CONFIDENTIAL

2    I would also -- I have to
3  stress that there was a huge pressure on
4  them to put it in as quickly as they
5  could because if they didn't, the traders
6  were not managing the risk as they should
7  be because they didn't know they had the
8  risk.  They would get very upset if it
9  wasn't done quickly.  So there's a
10 pressure.
11 Q   Different salespeople might
12 have different habits in terms of how
13 quickly or how slowly they enter trades;
14 is that fair?
15     MS. ANDERSON:  Object to
16 form.
17 A   I think it's fair to say
18 it's not as quick as eCommerce.
19 Q   Are you familiar with the
20 concept of standing orders in the FX
21 markets?
22 A   I want you to explain
23 exactly what you mean by that.  It might
24 be something I used another terminology
25 for.

Page 208

ROBIN POYNDER--HIGHLY CONFIDENTIAL

2  Q   We talked earlier about
3  stop-loss orders.  Do you remember that
4  testimony?
5  A   Right.  I recall resting
6  orders.
7  Q   Do you know what a limit
8  order is?
9  A   Yeah.
10 Q   What's a limit order?
11 A   So in my understanding, a
12 limit order would be an order where a
13 client, where someone wants to sell, if
14 the market goes higher, or buy if the
15 market goes low.
16 Q   You have experience on how
17 limit orders are priced, for instance?
18 A   That doesn't entirely make
19 sense to me -- sorry -- how they're
20 priced.
21 Q   Have you ever taken a limit
22 order?
23 A   Have I accepted an order
24 from a client?  Yes.
25 Q   Does a client pay a spread

Page 209

ROBIN POYNDER--HIGHLY CONFIDENTIAL

2  on a limit order?
3  A   No.  Well, they didn't with
4  me.
5  Q   Why not?
6  A   Why not?
7  Q   Why not, yes.
8  A   Because we took it as a
9  service we're offering to the client to
10 get more business.
11 Q   Did you take steps in the
12 unified data set to identify or flag
13 trades, resulting from limit orders?
14 A   I did not.
15 Q   Stop-loss orders?
16 A   I did not.
17 Q   Why not?
18 A   I hadn't been asked to.
19     THE VIDEOGRAPHER:  The time
20 is 3:34.  We're off the record.
21     (A short recess was taken.)
22     THE VIDEOGRAPHER:  The time
23 is 3:50 p.m.  We're on the record.
24     MR. HALL:  Mr. Poynder,
25 thank you for your time.  I have no

53 (Pages 206 - 209)

Veritext Legal Solutions
212-279-9424                www.veritext.com                212-490-3430