**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST
LITIGATION

No. 1:13-cv-07789-LGS

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>**

**(REDACTED)**

(Contains Materials Designated as Confidential or Highly Confidential)

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................ 1

II.  ARGUMENT ............................................................................................................... 4

   A.  Common Evidence Will Prove the Overarching Conspiracy ............................ 4

   B.  Plaintiffs Have Class Standing ........................................................................ 9

   C.  Credit Suisse's Critiques of Plaintiffs' Impact and Damages Model Are Unfounded ...................................................................................................... 10

     1.  Credit Suisse Ignores or Misconstrues the Market-Wide Effects of Defendants' Conduct ............................................................................... 10

     2.  Plaintiffs Propose a Single Theory of Antitrust Injury and Damages .......................... 12

     3.  Defendants' Experts Make Critical Errors in Claiming that the Model Generates False Positives ......................................................................... 13

     4.  Defendants' Other Criticism of the Regression Model Are Meritless ......................... 14

   D.  No Conflicts or Other Issues Preclude Certification of an OTC Class .......................... 16

     1.  Plaintiffs' Model Demonstrates Virtually All Class Members Suffered Injury and Identifies Those with Negative Net Damages ...................................................... 16

     2.  Defendants' Experts Ignore the Effects of Collusion in Suggesting Class Members Would Have Benefited from Defendants' Conduct ............................ 18

   E.  The OTC Class Does Not Require Individualized Determinations of Member Eligibility ............................................................................................. 20

     1.  Individualized Inquiries Are Not Required to Determine Standing ............................. 20

     2.  A *De Minimis* Number of Benchmark and Resting Order Trades Does Not Defeat Predominance ............................................................................... 21

   F.  Plaintiffs Provide a Basis for Certifying the Exchange Class ........................ 22

III.  CONCLUSION ......................................................................................................... 23

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Air Cargo Shipping Services Antitrust Litig.*,
  No. 06-MD-1175, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014)...........................................17

*Am. Tobacco Co. v. U.S.*,
  328 U.S. 781 (1946)......................................................................................................4, 5

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018)................................................................................................17

*Axiom Investment Advisors, LLC v. Deutsche Bank AG*,
  No. 15 Civ. 9945, 2018 WL 4253152 (S.D.N.Y. Sept. 6, 2018) (Schofield, J.) .......................7

*Bernstein v. Virgin Am., Inc.*,
  No. 15-CV-02277, 2018 WL 3349135 (N.D. Cal. July 9, 2018)...........................................20

*Castro v. Sanofi Pasteur Inc.*,
  134 F. Supp. 3d 820 (D.N.J. 2015) ......................................................................................15

*Comcast Corp. v. Behrend*
  569 U.S. 27 (2013)............................................................................................................13

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962)............................................................................................................8

*Dial Corp. v. News Corp.*
  314 F.R.D. 108 (S.D.N.Y. 2015) ........................................................................................13

*Equal Emp't Opportunity Comm'n and Bailey*,
  No. 10-C-6139, 2016 WL 5796890 (N.D. Ill. Sept. 30, 2016) ..............................................16

*Freeland v. AT&T Corp.*,
  238 F.R.D. 130 (S.D.N.Y. 2006) ........................................................................................15

*Griffin v. Bd. of Regents of Regency Univs.*
  795 F.2d 1281 (7th Cir. 1986) ............................................................................................16

*In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*,
  906 F.2d 432 (9th Cir. 1990) ...............................................................................................6

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)..................................................................................................18

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
No. 13 CIV. 7789 (LGS), 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016)................................5

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018)..................................................................................9, 10

*In re Marine Hose Antitrust Litig.*,
No. 08-MDL-1888, 2009 WL 10685187 (S.D. Fla. Aug. 11, 2009) ........................................6

*In re Mushroom Direct Purchaser Antirust Litig.*,
No. 06-0620, 2015 WL 5767415 (E.D. Pa. July 29, 2015) ....................................................22

*In re NASDAQ Market-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) ..........................................................................................19

*In re Nexium Antitrust Litig.*,
777 F.3d 9 (1st Cir. 2015)......................................................................................................17

*In re Petrobas Securities*
862 F.3d 250 (2d Cir. 2017)...........................................................................................20, 21

*In re Polyurethane Foam Antitrust Litig.*,
152 F. Supp. 3d 968 (N.D. Ohio 2015)...................................................................................5

*In re Scotts EZ Seed Litig.*,
304 F.R.D. 397 (S.D.N.Y. 2015) ..........................................................................................22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
267 F.R.D. 583 (N.D. Cal. 2010), *amended in part*, No. M 07-1827,
2011 WL 3268649 (N.D. Cal. July 28, 2011)..........................................................................8

*In re Vitamins Antitrust Litig.*,
209 F.R.D. 251 (D.D.C. 2002)............................................................................................7, 8

*Interstate Circuit, Inc. v. U.S.*,
306 U.S. 208 (1939)................................................................................................................5

*Kendler v. Federated Dep't Stores, Inc.*,
88 F.R.D. 688 (S.D.N.Y. 1981) ..............................................................................................5

*Laumann v. Nat'l Hockey League*,
105 F. Supp. 3d 384 (S.D.N.Y. 2015)...................................................................................19

*Lyman v. St. Jude Med. S.C., Inc.*,
580 F. Supp. 2d 719 (E.D. Wis. 2008)..................................................................................16

*Masters v. Wilhelmina Model Agency, Inc.*,
No. 02 Civ. 4911 (HB), 2003 WL 145556 (S.D.N.Y. Jan. 17, 2003)......................................5

*Mazzei v. Money Store*
829 F.3d 260 (2d Cir. 2016)..............................................................................20

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012)..............................................................................9

*Reed v. Advocate Health Care*,
263 F.R.D. 573 (E.D. Ill. 2009) .......................................................................16

*Ret. Fund v. J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) .....................................................................22

*Retirement Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of N.Y. Mellon*,
775 F.3d 154 (2d Cir. 2014)..............................................................................10

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015)..............................................................................16

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)..............................................................................6

*U.S. Football League v. Nat'l Football League*,
842 F.2d 1335 (2d Cir. 1988)......................................................................16, 17

*U.S. v. Katz*,
1:17-cr-00003, ECF No. 6 (S.D.N.Y. Jan. 4, 2017)..........................................7

*U.S. v. Usher*,
No. 17 Cr. 19 (RMB), 2018 WL 2424555 (S.D.N.Y. May 4, 2018) ................6

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)................................................................................13

## Statutes, Rules, and Regulations

Federal Rules of Civil Procedure
Rule 23 ..............................................................................................................22
Rule 23(a)..........................................................................................................19
Rule 23(a)(4)......................................................................................................19
Rule 23(b)(3)......................................................................................................16

## Other Authorities

Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach*
199 (Cengage Learning 4th ed. 2009).............................................................16

## EXPLANATION OF CITATION FORMS

The following citation forms are used in this memorandum:

**Parties**

- "Class Plaintiffs" are Aureus Currency Fund, L.P., The City of Philadelphia, Board of Pensions and Retirement, Employees' Retirement System of the Government of the Virgin Islands, Employees' Retirement System of Puerto Rico Electric Power Authority, Fresno County Employees' Retirement Association, Haverhill Retirement System, Oklahoma Firefighters Pension and Retirement System, State-Boston Retirement System, Syena Global Emerging Markets Fund, LP, Tiberius OC Fund, Ltd., Value Recovery Fund L.L.C., and United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund, J. Paul Antonello, Marc G. Federighi, Thomas Gramatis, Doug Harvey, Izee Trading Company, John Kerstein, Michael Melissinos, Mark Miller, Robert Miller, Richard Preschern d/b/a Preschern Trading, Peter Rives, Michael J. Smith, Casey Sterk, and Systrax Corporation.

- "Defendants" are Settling Defendants and Non-Settling Defendant.

- "Settling Defendants" are Bank of America, BTMU, Barclays, BNP Paribas, Citigroup, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, RBC, RBS, Soc Gen, Standard Chartered, and UBS.

- "Non-Settling Defendant" is Credit Suisse.

- "Bank of America" or "BofA" is Bank of America Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Incorporated.

- "BTMU" is The Bank of Tokyo-Mitsubishi UFJ, Ltd.

- "Barclays" is Barclays Bank PLC and Barclays Capital Inc.

- "BNP Paribas" or "BNP" is BNP Paribas Group, BNP Paribas North America Inc., BNP Paribas Securities Corp., and BNP Prime Brokerage, Inc.

- "Citigroup" or "Citi" is Citigroup Inc., Citibank, N.A., Citicorp, and Citigroup Global Markets Inc.

- "Credit Suisse" is Credit Suisse AG, Credit Suisse Group AG, and Credit Suisse Securities (USA) LLC.

- "Deutsche Bank" or "DB" is Deutsche Bank Securities Inc. and Deutsche Bank AG.

- "Goldman Sachs" or "GS" is The Goldman Sachs Group, Inc. and Goldman, Sachs & Co.

- "HSBC" is HSBC Holdings PLC, HSBC Bank PLC, HSBC North America Holdings Inc., HSBC Bank USA, N.A., and HSBC Securities (USA) Inc.

- "JPMorgan" or "JPM" is JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A.

- "Morgan Stanley" or "MS" is Morgan Stanley, Morgan Stanley & Co. LLC, and Morgan Stanley & Co. International PLC.

- "RBC" is RBC Capital Markets LLC.

- "RBS" is The Royal Bank of Scotland Group PLC, The Royal Bank of Scotland PLC, and RBS Securities Inc.

- "Soc Gen" is Société Générale.

- "Standard Chartered" is Standard Chartered Bank.

- "UBS" is UBS AG, UBS Group AG, and UBS Securities LLC.

**Other Defined Terms**

- "Affected Currency Pairs" means those currency pairs identified in Appendix A.

- "Benchmark Rate" is an FX rate calculated and published at a particular time of day by a third-party, such as the WM/Reuters Closing Spot Rate, and the ECB reference rate.

- "BL Rebuttal" refers to the Class Certification Rebuttal Report of Geir Høidal Bjønnes and Alexander Ljungqvist dated January 31, 2019

- "BL Report" refers to the Expert Report of Geir Høidal Bjønnes and Alexander Ljungqvist dated May 31, 2018.

- "Class Member" or "Class Members" refers to members of the "OTC Class" and/or "Exchange Class."

- "Classes" means the OTC Class and Exchange Class.

- "Class Period" means the period between December 1, 2007 and December 31, 2013, inclusive.

- "Ex. __" refers to an exhibit to the Declaration of Christopher M. Burke in Support of Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Opposition to Credit Suisse's *Daubert* Motion.

- "Kleidon Report" refers to the Expert Report of Allan W. Kleidon, Ph.D dated October 25, 2018

- "Lead Counsel" means Scott+Scott Attorneys at Law LLP and Hausfeld LLP.

- "Mot." refers to Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification.

- "Opp." refers to Credit Suisse Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification.

- "Ordover Report" refers to the Expert Report of Janusz A. Orodver, Ph.D dated October 25, 2018.

- "Poynder Data Report" refers to the Expert Report of Robin Poynder Bank Data dated May 31, 2018.

- "Poynder Reply Rep." refers to the Reply Expert Report of Robin Poynder Bank Chats dated January 31, 2019.

- "Singer Rep." refers to the Supplemental Report of Hal J. Singer, Ph.D, dated August 17, 2018.

- "Singer Reply" refers to the Class Certification Reply Report of Hal J. Singer, Ph.D. dated January 31, 2019.

## I.      INTRODUCTION

Credit Suisse protests that Plaintiffs' efforts to certify a class of persons who were injured by its conspiracy to fix prices by widening bid-ask spreads is a "pivot[] to a new theory."  Opp. at 1.   In the **summer of 2015**, Plaintiffs filed their second amended complaint alleging: "Defendants conspired to fix spot prices by **agreeing to artificially widen spreads** quoted to customers."  SAC, ¶9 (emphasis added).  The parties took discovery on this theory.  There is no pivot.  Instead, Plaintiffs focus their class certification and trial efforts on their strongest theory of relief – the conspiracy to fix FX prices.  The impact of this conspiracy on class members is market-wide, making it highly suitable for class certification and trial.

Faced with trying to defeat certification, Credit Suisse mischaracterizes Plaintiffs' alleged conspiracy and compartmentalizes proof in an attempt to distinguish this case from the numerous decisions routinely finding that common issues as to proof of conspiracy predominate.  Plaintiffs do not allege an episodic conspiracy; they allege an agreement to fix FX prices by widening spreads through exploiting sensitive competitive information ("SCI") collusively obtained in electronic chat rooms.   Plaintiffs present common evidence demonstrating Credit Suisse participated in the conspiracy to fix prices that caused injury to Plaintiffs and the Classes.

Credit Suisse's class standing argument is likewise meritless.  Named Plaintiffs and absent class members suffered injuries as a result of the same conduct.  Class standing requires no more.

Plaintiffs' experts, Profs. Bjønnes and Ljungqvist, present a model that demonstrates injury and damages can be established using common evidence on a class-wide basis.  Profs. Bjønnes and Ljungqvist use Trade Cost Analysis ("TCA") to: (1) demonstrate virtually all class members suffered injury; (2) calculate class members' net damages; and (3) aggregate class wide

damages.  Credit Suisse's critiques are based on distortions of the underlying theory and errors in application.

Credit Suisse claims Plaintiffs' theory of impact is "illogical" and "contrary to all evidence."  But information asymmetry and adverse selection risk are standard principles in finance and economics and are well-recognized features of the FX market, as Credit Suisse admits.  Relying on those principles, Profs. Bjønnes and Ljungqvist explain that Defendants' agreement to fix prices through exploiting SCI increased information asymmetry in the market. Defendants became supra-informed, as they had the benefit of not only their own SCI, but also their co-conspirators'.  Increased information asymmetry increased adverse selection risk, that is, the risk of trading with a better-informed counterparty.  Increased adverse selection risk results in wider spreads across the market.  As a result, virtually all OTC class members (98.9%) suffered injury on at least one trade.

Dr. Singer's regressions empirically demonstrate that EBS spreads were wider during the class period and that EBS prices were highly predictive of prices paid by class members. Consistent with Dr. Singer's analysis, Credit Suisse's own FX trader testified that EBS and Reuters provide a reference price for customer trades.  Plaintiffs' theory of impact is firmly grounded in recognized academic literature and supported by record evidence, including admissions by Credit Suisse's former employees.

Credit Suisse also argues that Profs. Bjønnes and Ljungqvist's regression model is fatally flawed.  It is not.  The model: (1) accounts for numerous common factors that drive FX pricing; (2) adequately explains variations in FX pricing; and (3) does not generate false positives.  At best, Credit Suisse's quibbles go to the weight of the evidence.

Credit Suisse argues that certain class members "earn the spread" on trades in which they act as a liquidity provider.  Credit Suisse manufactures conflicts among class members that do not exist.  First, trades between class members are not part of Plaintiffs' OTC class definition.  Second, even if class members actually earn the spread, they would not likely have benefited from Defendants' conspiracy because of increased liquidity costs.  In any event, Credit Suisse's argument is addressed by revising the OTC class definition to exclude trades where class members may provide liquidity as follows:

> All persons who, between December 1, 2007 and December 31, 2013 (inclusive) entered into a total of 10 or more FX spot, forward, and/or swap trades directly with one or more Defendants in the 52 Affected Currency Pairs via voice or on a single-bank platform, where Defendants provided liquidity and such persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, traded in the United States or its territories.

This narrowing of the OTC Class eliminates trades on multibank platforms, including the interdealer EBS and Reuters platforms, and otherwise removes instances where class members provide liquidity.  It fully aligns the OTC Class with the alleged wrongdoing – fixing FX prices by widening spreads on customer-facing trades.

Credit Suisse's argument that the presence of class members with net negative damages defeats class certification is unsupported by law.  The argument cleverly confuses injury and damages.  The law is clear that a single positive overcharge establishes injury, regardless of whether a class member ultimately has negative net damages.  Plaintiffs demonstrate that virtually all OTC class members (98.9%) suffered injury on at least one trade.  Plaintiffs' model uses common formulae to identify class members with negative net damages and excludes them from any recovery.

Credit Suisse's argument that determining class membership requires highly individualized determinations misapprehends the database.  The database has fields showing

3

whether: (1) the actual class member trading was domiciled in the United States (*i.e.*, it was not a related entity operating abroad); and (2) the trade was booked in the United States. It is simply a matter of sorting the data, which presents no more challenge than determining whether the trade date falls within the class period. Likewise, the presence of a *de minimis* number of benchmark and resting orders in the dataset does not require individualized scrutiny and do not affect Plaintiffs' model.

Finally, rather than "abandoning" them, Plaintiffs have conducted a proof of concept to demonstrate that the TCA model works with respect to the Exchange Class. The TCA model reflected substantial damage on futures trades on average, but cannot at this time differentiate class members individually. Further data will be needed, including data that Credit Suisse has not yet produced, to retrieve from CME a complete set of exchange data for the class period.

## II.      ARGUMENT

### A.      Common Evidence Will Prove the Overarching Conspiracy

Recognizing courts routinely find that common questions predominate as to the proof of a price-fixing conspiracy, Credit Suisse: (1) misstates what is required to prove a conspiracy; (2) mischaracterizes and improperly dismembers the alleged overarching conspiracy; and (3) misrepresents basic features of the FX market. Opp. at 41-47.

Credit Suisse advances a legally unsupported view of what is required to prove a conspiracy. It argues that a conspirator must know precisely what every other conspirator is doing and all must agree expressly (presumably in writing) to the exact price charged to each customer on every transaction. Opp. at 44; Underwood Dep. at 105:16-19 (Ex. 4).

The law requires no such showing. Plaintiffs are not required to prove a conspiracy "through the presentation of a formal written agreement;" rather, a conspiracy is most often shown through "***evidence of widespread and effective conduct*** . . . ." *Am. Tobacco Co. v. U.S.*,

328 U.S. 781, 789 (1946).[1]  It is also well settled that "the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period." *Masters v. Wilhelmina Model Agency, Inc*., No. 02 Civ. 4911 (HB), 2003 WL 145556, at *5 (S.D.N.Y. Jan. 17, 2003); *see also Interstate Circuit, Inc. v. U.S.*, 306 U.S. 208, 227 (1939) ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators.").  "***Nor does a single conspiracy fragment into multiple conspiracies*** because a member does not 'know every other member' or 'know of or become involved in all of the activities in furtherance of the conspiracy.'" *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 979 (N.D. Ohio 2015).

Credit Suisse argues that this case is analogous to *Kendler v. Federated Dep't Stores, Inc.*, 88 F.R.D. 688 (S.D.N.Y. 1981).  It is not.  In *Kendler*, the plaintiffs did not allege a "single overall conspiracy to maintain prices" – a key point omitted by Credit Suisse.  *Id.* at 693.  The plaintiffs presented "[n]o 'generalized means' of establishing the conspiracy(ies). . . ."  *Id.* Accordingly, "in the absence of a proffer of the 'generalized means' by which this will be proved, common questions of law and fact do not appear to predominate."  *Id.*

In stark contrast to *Kendler*, Plaintiffs allege an overarching conspiracy to fix FX prices. SAC, ¶¶6, 9.[2]  Plaintiffs have clearly described the "generalized means" they will use to establish the conspiracy – the persistent use of interconnected multibank chat rooms.  SAC, ¶¶6, 9; Mem. at 8-22.   The chat rooms provide ample evidence of widespread and effective conduct demonstrating Defendants' agreement.  The Poynder Chat Report demonstrates that Defendants

---

[1]      Unless otherwise noted, all emphasis is added and citations are omitted.

[2]      *See also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2016 WL 5108131, at *3 (S.D.N.Y. Sept. 20, 2016) (acknowledging that "[t]he SAC also expanded the scope of the conspiracy. Beyond the conspiracy to manipulate the Fix, the SAC (and now the TAC) also alleges that Defendants conspired throughout the trading day to fix spot prices . . . .").

used chat rooms to exchange SCI on all 91 of the 91 sample days with an average of 143.4 communications per day.  Poynder Reply Rep., ¶4; Singer Reply, ¶45 n.150.  That statistically extrapolates to between 174,130 and 253,476 chats regarding SCI during the class period. Singer Reply, ¶45 n. 150.  This is not evidence of "episodic, *ad hoc* discussions," Opp. at 46, but evidence of widespread and effective conduct.[3]

With no small irony, Credit Suisse's own trader, ███████, contradicts its claim that "[t]here is literally no evidence to support Plaintiffs' liability theory."  Opp. at 43.  ███████



necessarily represent numerous currency pairs at various volumes, further destroying Credit Suisse's argument.[5]  Mem. at 15-16.

Further, Plaintiffs can introduce evidence of guilty pleas and consent orders as common evidence of the conspiracy.  *In re Marine Hose Antitrust Litig*., No. 08-MDL-1888, 2009 WL 10685187, at *8 (S.D. Fla. Aug. 11, 2009) (finding predominance satisfied where "class members will rely on the same evidence to prove the existence of the conspiracy, including

---

[3]      Contrary to Credit Suisse's argument, use of the chat room evidence does not convert the horizontal price fixing agreement alleged by Plaintiffs into an information-sharing agreement subject to rule of reason analysis.  *See* Opp. at 43, n.28 and 46, n.35.  The pervasive and persistent exchange of price and other information in the chat rooms rather is evidence that "can help support an inference of a price fixing agreement." *Todd v. Exxon Corp*., 275 F.3d 191, 198 (2d Cir. 2001); *see, e.g., In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig*., 906 F.2d 432, 452 (9th Cir. 1990) (stating that "the evidence . . . . amply supports an inference that the exchange of price information . . . was done with the purpose and effect of allowing greater coordination and stabilization of prices."); *see also U.S. v. Usher*, No. 17 Cr. 19 (RMB), 2018 WL 2424555, at *4 (S.D.N.Y. May 4, 2018) (holding that conspiracy to rig euro-dollar by coordinating trading and thus fixing the market price was a *per se* restraint).

[4]      *See also* Mem. at 11-12 ███████████████████████████████████████████ .

[5]      *See, e.g.*, BARC-FX-CIV_00035058 at 58-59 (A Barclays ███████ a BNP Paribas █████████████ ███████ ) (Ex. 13).

without limitation, the guilty pleas to criminal charges entered into by approximately a dozen [d]efendants."). Credit Suisse argues (Mot. at 47) that such materials are inadmissible, but this Court recently cited a similar consent order signed by a defendant bank as evidence against a plaintiff class represented by the same counsel. *See Axiom Investment Advisors, LLC v. Deutsche Bank AG*, No. 15 Civ. 9945, 2018 WL 4253152, at *3, *7 (S.D.N.Y. Sept. 6, 2018) (Schofield, J.) (denying class certification, and citing Deutsche Bank's consent order with NYDFS as evidence against plaintiff class). And, at least one Defendant (Barclays) stipulated to the misconduct in its consent order, *see* https://www.dfs.ny.gov/about/ea/ea150520.pdf, putting this squarely within the case law cited by Credit Suisse that would deem such orders admissible.[6] Moreover, "the fact that the government chose to divide the conspiracy into separate parts does not in any way support the defendant's position that there could not have been a single overarching conspiracy."[7] *In re Vitamins Antitrust Litig*., 209 F.R.D. 251, 265 n.16 (D.D.C. 2002).

Faced with widespread and effective conduct demonstrating the conspiracy, Credit Suisse attempts to recast Plaintiffs' allegations as multiple mini-conspiracies. Courts have repeatedly rejected this argument. In *Vitamins*, defendants argued, similar to Credit Suisse, that the characteristics of the multiple products subject to the conspiracy were "too complex, fragmented and diverse such that common issues cannot predominate." *Id*. at 264. Noting that numerous other courts had rejected such arguments, the court stated:

---

[6]     All of the consent orders are also admissible for another purpose – to rebut Credit Suisse's experts' claims that a 16-defendant cartel would be difficult to achieve.

[7]     To the extent that Credit Suisse denies that any currency pairs involving CEEMEA currencies (HUF, PLN, CZK, RON, RUB, TRY, ILS, and ZAR) were part of the conspiracy, two traders have pled guilty to price-fixing those currencies when traded against the dollar, euro, or themselves. *See U.S. v. Katz*, 1:17-cr-00003, ECF No. 6 at 1 and 8-9 (S.D.N.Y. Jan. 4, 2017); *see U.S. v. Cummins*, 1:17-cr-00026, ECF No. 6 at 1 and 8-9 (S.D.N.Y. Jan. 12, 2017). *See also* Burke Decl., Ex. 62, *In the Matter of BNPP*, NYDFS Consent Order; BNP Paribas plea; Ex. 11, *In the Matter of Standard Chartered Bank*, NYDFS Consent Order.

The defendants' arguments are based on the assumption that there **could *not*** have been a single conspiracy. They claim that there were multiple conspiracies, if any existed at all. The defendants improperly re-characterize the plaintiffs' allegations. The plaintiffs have not alleged multiple conspiracies – they have alleged a single price fixing conspiracy. . . . As the Supreme Court stated: "[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts but only by looking at it as a whole."

*Id*. at 265 (emphasis in original) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), *superseded by statute on other grounds*, Pub. L. No. 97–290, 15 U.S.C. §6(a)). The court found plaintiffs "will introduce generalized evidence, common to the class, in attempting to prove the alleged conspiracy and that this will predominate." 209 F.R.D. at 265; *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 607 (N.D. Cal. 2010), *amended in part*, No. M 07-1827, 2011 WL 3268649 (N.D. Cal. July 28, 2011) ("The Court agrees with plaintiffs that defendants may not recast plaintiffs' allegations, and plaintiffs have consistently alleged a single, overriding conspiracy spanning the entire class period.").

Finally, Credit Suisse misrepresents basic features of the FX market. While market prices change with the flow of trades, bid-ask spreads remain generally stable. The evidence shows that FX traders ██████████████████████████████████████████████████ ████████████████████████████████████████████[8]

Credit Suisse focuses on the finding of only one piece of SCI with respect to the cross-████████████████████. To trade a cross, *e.g.*, EUR/ZAR, one would first convert Euros to dollars and then convert dollars to South African Rand (or *vice versa*). The updated Poynder chat analysis found Defendants ██████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████. Poynder Reply Rep. at App'x 8. With an agreement on the spreads that make

---

[8]     *See also* Lawes Dep. at 196:9-22 (██████████████████████████████████████) (Ex. 7).

up the cross, *e.g.*, █████████████████████████, it is mere arithmetic to figure out the

spread for the cross.  In fact, Credit Suisse's former trader, █████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████[9]  Crosses rarely required discussion, ████████

███████████████████████████████████████████████████████████████████████████████

███████.[10]

### B.    Plaintiffs Have Class Standing

To establish class standing, a named plaintiff must "plausibly allege[] (1) that he

'personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the

defendant,' and (2) that such conduct implicates the 'same set of concerns' as the conduct

alleged to have caused injury to other members of the putative class by the same defendants."

*See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir.

2012) ("*NECA*").  Plaintiffs satisfy both prongs of *NECA*.[11]

Credit Suisse draws a parallel to certain portions of *In re LIBOR-Based Fin. Instruments

Antitrust Litig.*, 299 F. Supp. 3d 430 (S.D.N.Y. 2018) ("*LIBOR VII*"), involving manipulation of

CEA claims, by analogizing the episodic nature of those claims to this case.  It, however, ignores

*LIBOR VII*'s statements that "claims grounded in allegations of trader-based manipulation are

***considerably different*** from claims rooted in allegations of persistent manipulation," *id.* at 528,

and "[p]rofit-motivated trader-based manipulation, which was sporadic and would result in both

---

[9]        ██████ Dep. at 201:17-202:10 (Ex. 8).  *See also* ██████ Dep. at 183:20-184:9 (████████
████████████████) (Ex. 12).

[10]       Footnote 5, *supra*, ████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████.

[11]       Credit Suisse does not contest that eight of the named Plaintiffs suffered an actual injury.  Opp. at 38.  As
discussed below, 12 of the 13 named Plaintiffs suffered injury as a result of Defendants' conduct.

the inflation and deflation of LIBOR submissions, ***has nothing to do with the persistent suppression conspiracy that is at issue in the antitrust claims***." *Id*. (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 11 MDL 2262 (NRB), 2016 WL 7378980, at *5 & n.8, slip op. at *11 at n.8 (S.D.N.Y. Dec. 20, 2016)).

*LIBOR VII* actually supports Plaintiffs' class standing in this case.  Regarding class standing for the antitrust claims, *LIBOR VII* concluded the plaintiffs' alleged antitrust injury was caused by defendants' LIBOR suppression.  *LIBOR VII*, 299 F. Supp. 3d at 585.  *LIBOR VII* then concluded that the LIBOR suppression conduct that caused the plaintiffs' injury was the same conduct that injured absent class members.  *Id.*  This satisfied *NECA's* second prong.  *Id.*

Despite Credit Suisse's efforts to mischaracterize the alleged conspiracy as episodic manipulation, it is not.  Plaintiffs suffered injury as a result of Defendants' conspiracy to fix FX prices by consistently widening spreads.  Like *LIBOR VII*, that same conduct caused injury to absent class members.  "Because the conduct in question is the same, *NECA's* second 'same set of concerns' prong is satisfied."  *See LIBOR VII*, 299 F. Supp. 3d at 585.[12]

### C.   Credit Suisse's Critiques of Plaintiffs' Impact and Damages Model Are Unfounded

#### 1.   Credit Suisse Ignores or Misconstrues the Market-Wide Effects of Defendants' Conduct

Credit Suisse fails to comprehend the market-wide effect of the conspiracy.  Its economic experts have almost no experience in the FX market and failed to investigate this matter beyond

---

[12]     Likewise, *Retirement Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of N.Y. Mellon*, 775 F.3d 154 (2d Cir. 2014) is inapposite.  It turned on how the defendant's duty as trustee of various residential mortgage-backed securities trusts differed depending on the terms of each trust.  *Id.* at 162.  Because the terms of each trust were different, defendant's alleged misconduct – the failure to detect and report material breaches of each agreement governing each trust – had to be "proved loan-by-loan and trust-by-trust."  *Id.* at 162-63.  As stated above, Plaintiffs' single claim requires no such compartmentalized proof.

the four corners of the complaint.[13]  Their economic critiques do not reflect market reality.  One cannot accept that information asymmetry and adverse selection risk have marketwide effect on FX prices, but nevertheless opine that the individualized nature of FX trading makes the proposed class uncertifiable.[14]

Profs. Bjønnes and Ljungqvist describe a straightforward theory, grounded in the FX market microstructure literature, which captures the market-wide impact of Defendants' conduct. SCI information is the "life blood" of an FX trader and against their individual self-interest to exchange.  BL Report, ¶65.  Defendants' exploitation of SCI increased information asymmetry in their favor.  BL Rebuttal, ¶12.  Defendants became collusively supra-informed.  *Id.*, ¶13.

Greater information asymmetry increased adverse selection risk.  BL Rebuttal, ¶15. Adverse selection risk is the risk of trading with a better-informed counterparty.  To account for this risk, dealers in the pre-trade anonymous interdealer market widen spreads.  Singer Report, ¶¶39-56.  Wider spreads represent higher costs.  The interdealer market, including EBS and Reuters, provide for liquidity for dealer-to-customer trades.  *Id.*, ¶¶22-23.  Dealers passed on these costs from the interdealer market to class members trading via voice and SBPs.[15]  *Id.*, ¶23.

Accordingly, the marketwide conspiracy did not require Defendants to agree to the spread for each trade.[16]  *Id.*, ¶¶39-47.  Rather, their agreement to fix prices through the exploitation of SCI had the result of widening spreads marketwide.  Market participants could

---

[13]     See Ordover Dep. 10:1-11:8 (Ex. 6); Kleidon Dep. 26:3-27:13 (Ex. 2).

[14]     *See* Ordover Dep. 33:9-11 ("I believe [information asymmetry]'s – I don't know how one measures critically, but – critical.  I would agree that in every transaction, there is a question of asymmetric information.") (Ex. 6); Kleidon Dep. 32:20-33:4 (describing adverse selection risk as "the risk more generally that in engaging with interactions with other economic actors, particularly because that other party knows something that you do not . . . you may enter into a transaction on terms that you would not have entered into had you known the full information.") (Ex. 2).

[15]     Dr. Singer's regressions empirically demonstrate that EBS spreads were wider during the class period and that EBS prices were highly predictive of prices paid by class members.  Singer Report, ¶¶39-56.

[16]     Even conspirators are not immune from the laws of economics.  To the extent Credit Suisse suggests Plaintiffs need to show agreement on each trade, such a conspiracy would have been remarkably inefficient.

not always know when SCI was being exchanged in chat rooms; accordingly, the risk of being less informed caused spread widening throughout the market. *Id.*, ¶40. Plaintiffs' TCA model captures the increase costs suffered by class members as a result of Defendants' conduct. *Id.*, ¶¶26-27.

### 2. Plaintiffs Propose a Single Theory of Antitrust Injury and Damages

Plaintiffs' model suffers no *Comcast* problem. *See* Opp. at 26 (discussing "direct" or "indirect" damage channels). All the damages measured by Plaintiffs' model stem from a single theory: Defendants' agreement to fix FX prices. Profs. Bjønnes and Ljungqvist's model measures impact and damages from the bottom up – by trade, by class member, and then in the aggregate. BL Rebuttal, ¶26. The model uses multiple regression analysis to compare effective costs during the clean period to effective costs during the class period. *Id.*, ¶27. Effective costs represent the price, typically the spread, customers paid on each transaction.[17] *Id.*, ¶25.

The model creates regression coefficients from data during the clean period using the common factors that influence FX pricing, such as time of day, market volatility, customer sophistication, liquidity, and currency pair. BL Report, ¶107. These common factors represent all the material variables identified in the academic market microstructure literature that cause FX prices to vary. Importantly, the common factors are held constant during the clean period and the class period. *Id.*, ¶3. Essentially, the model picks out a trade from the clean period with comparable common features during the class period, and compares the effective costs of each. *Id.*, ¶25. The difference between the two represents damages. *Id.*, ¶26.

---

[17]   As a practical matter, "effective costs" can be seen as equivalent to the "effective half-spread" faced by a customer – the difference between the reference price midpoint and the actual execution price. Because Defendants do not record quoted spreads, Profs. Bjønnes and Ljungqvist estimate spreads through the TCA approach to calculate "effective costs."

Unlike in *Comcast Corp. v. Behrend*, Plaintiffs measure damages for a single theory of liability. *See* 569 U.S. 27, 35 (2013). If anything, the matters presented here are more like those in *Dial Corp. v. News Corp.*, where plaintiffs alleged nine different types of exclusionary conduct which had the "cumulative effect" of antitrust injury. 314 F.R.D. 108, 117-18 (S.D.N.Y. 2015). *Waggoner v. Barclays PLC*, 875 F.3d 79, 105-06 (2d Cir. 2017).

### 3. Defendants' Experts Make Critical Errors in Claiming that the Model Generates False Positives

Credit Suisse disputes the reliability of Plaintiffs' model by falsely claiming that the model predicts that 99.4% of customers were harmed during the clean period. Opp. at 36. In reality, Defendants' experts each make a fundamental error to invent purported clean period "damages."

Dr. Ordover incorrectly claims that Plaintiffs' model finds almost all class members experienced damages in the clean period. Ordover Report, ¶¶43, 47-48. Plaintiffs' model uses an Ordinary Least Squares ("OLS") regression to forecast but-for effective costs during the class period using coefficients derived from the clean period. In the clean period, the distance between data points and the regression line is the "residual." Because they effectively define the prediction line, these residuals will always equal zero on average, with roughly 50% above and 50% below the line. These residuals are not, however, estimates of damage, they are the difference between but-for predicted costs in the clean period and actual clean period costs. Thus, in asserting that 50% of the residuals in the clean period are above the line, Dr. Ordover demonstrates that their OLS regression functions. An OLS regression cannot simply be inverted to "measure" damages in the way Dr. Ordover suggested, and residuals are not, in fact, damages. Dr. Ordover's conflation of the two is a significant error.

13

Dr. Kleidon committed an equally egregious error by misstating the equations underlying the TCA model.  Kleidon, ¶40, BL Rebuttal, ¶¶57-62.  Profs. Bjønnes and Ljungqvist discuss the economic consequences of his error in their Rebuttal report, but in the simplest terms, Dr. Kleidon mistakes $\alpha$ with $\hat{\alpha}$.  He misses the "hat" on the alpha in his formula, substituting a different variable.  *Id.*  In so doing, he applies the wrong formula to the model and incorrectly claims that Plaintiffs present inconsistent interpretations of the "differences between predicted costs and actual costs."  Kleidon, ¶40, BL Rebuttal, ¶¶57-62.

### 4.    Defendants' Other Criticism of the Regression Model Are Meritless

Credit Suisse raises two additional objections to Plaintiffs' regression model.  It argues that Profs. Bjønnes and Ljungqvist's model omits necessary critical factors, including: "(1) traders' personal positions or perception of current market risk and direction; (2) negotiations between dealers and clients and the impact of specific client relationships; (3) sales mark-ups; (4) individualized customer trading activity or frequency; and (5) lag times." Opp. at 28-33.  It also contends that the model is insufficiently predictive.  *Id.* at 35.

Profs. Bjønnes and Ljungqvist controlled for all material common factors.  BL Rebuttal, ¶63.  Indeed, most of the supposedly individual factors that Credit Suisse suggests are already included, or proxied for, in Plaintiffs' model.  For example, Credit Suisse says a trader's perception of market risk and direction would influence pricing.  Opp. at 28, but Profs. Bjønnes and Ljungqvist's model controls for things like order flow imbalance and volatility.   BL Rebuttal, ¶67.   Profs. Bjønnes and Ljungqvist also consider the effects of specific client relationships by controlling for things like client sophistication and trade size.  *Id.*

Having failed to identify any missing variables, Credit Suisse reverts to its unfounded theory that each of millions of FX trades has "bespoke" prices, affected by the individual whims of traders, despite the fact that huge swaths of the market never involve human traders.

14

To the extent Credit Suisse has enumerated "individualized" factors that cannot be proxied for in Plaintiffs' model because of their individuality, the absence of such factors would not result in biased damages estimates (inflated or deflated damages).  All such individualized factors would be a wash.  Further, Plaintiffs are not required to control for common factors that cannot be measured.  *Id*., ¶65.  *Freeland v. AT&T Corp*., 238 F.R.D. 130, 148 (S.D.N.Y. 2006) (citing Federal Judicial Center, *Reference Manual on Scientific Evidence* 188 (3d ed. 2011)).[18]

Citing $R^2$ statistics, Credit Suisse argues that Plaintiffs' experts failed to consider critical explanatory variables and, as a result, the model is insufficiently predictive.  Opp. at 33-34.  Credit Suisse incorrectly concludes that "the model [is] unacceptable as a vehicle through which to provide injury and damages on a classwide basis."  *Id*. at 35.  This argument misconstrues the nature of the regression model, ignores economic principles, and is inconsistent with legal authority on the matter.

Profs. Bjønnes and Ljungqvist's offer a forecasting model to predict but-for costs in the class period from trade data in the clean period.  The TCA model forecasts what trades would have cost absent Defendants' conduct.  BL Rebuttal, ¶106.  The model is not designed to ***explain*** what factors have the most significant influence on FX pricing.  Economists and even the few courts who have considered the issue overwhelmingly agree that a "low R2 means little by itself."  *Castro v. Sanofi Pasteur Inc*., 134 F. Supp. 3d 820, 834 (D.N.J. 2015).  This is particularly true in cases where an individual's behavior is involved (such as the setting of FX prices), *Reference Manual on Scientific Evidence* 345, and where there is a large number of data points, as is the case here.  *See, e.g*., Jeffrey M. Wooldridge, *Introductory Econometrics: A*

---

[18]     To argue that individual negotiations preclude certification here, Credit Suisse relies on cases involving consumers negotiating automobile prices and a grocery store which was not affected by a conspiracy because it made its purchases pursuant to a pre-arranged cost plus contract.  *See* Opp. at 29-30.  Given that the vast majority of transactions on the FX market are conducted on electronic platforms with no negotiation or electronic platforms operated solely by algorithm, these "price negotiation" scenarios are of no relevance here.

*Modern Approach* 199 (Cengage Learning 4th ed. 2009)).  As stated in their Rebuttal Report, Profs. Bjønnes and Ljungqvist's model generates an $R^2$ ranging from 23.5%-43.4%.

Credit Suisse states that "models with more than 100 times the explanatory power of the BL Model have been routinely rejected by the courts."  Opp. at 35 (citing *Griffin v. Bd. of Regents of Regency Univs.* 795 F.2d 1281, 1291 (7th Cir. 1986)).  This statement is simply untrue.  Few courts have weighed in on the importance of $R^2$ in a regression analysis, and they certainly do not reject regressions "routinely" as Credit Suisse contends.[19]  Rather, courts have noted that a low $R^2$ does not necessarily weigh on the validity of a model.  *See Equal Emp't Opportunity Comm'n and Bailey*, No. 10-C-6139, 2016 WL 5796890, at *4 (N.D. Ill. Sept. 30, 2016) (finding that *Griffin* did not alter basic principle that "'courts should be reluctant to rely solely on a statistic such as R-squared'"); *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 725 (E.D. Wis. 2008) (rejecting *Daubert* challenge based on low $R^2$).

**D.     No Conflicts or Other Issues Preclude Certification of an OTC Class**

**1.     Plaintiffs' Model Demonstrates Virtually All Class Members Suffered Injury and Identifies Those with Negative Net Damages**

It is well-established that "'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3).'"  *LIBOR*, 2016 WL 2851333, at *4 (citing *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)). Nonetheless, Credit Suisse argues that the presence of class members whom the model identifies as having net negative damages precludes certification.  Opp. at 19-20 (citing Ordover Report, ¶63).  Credit Suisse's argument conflates injury with damages.  *See generally U.S. Football*

---

[19]     As discussed in detail in Plaintiffs' Opposition to Defendants' Motion to Exclude Expert Reports, Credit Suisse's reliance on *Griffin v. Bd. of Regents of Regency Univs.*, 795 F.2d 1281, 1291 (7th Cir. 1986) and *Reed v. Advocate Health Care*, 263 F.R.D. 573, 591 (E.D. Ill. 2009) is misplaced.  *Griffin* was decided in 1986, before the court changed the standard for admission of expert evidence.  The court excluded a model proffered to prove discrimination when the model had a low $R^2$ and plaintiffs provided no evidence of actual discrimination.  *Id.* at 1292 n.23.  *Reed* is equally distinguishable, as the court found numerous other indicia of unreliability in plaintiffs' model.

*League v. Nat'l Football League*, 842 F.2d 1335, 1377–78 (2d Cir. 1988) (distinguishing between injury and damages element and respective burdens of proof).  It also fails to recognize that Plaintiffs' model has a common method to identify (and therefore exclude from recovery) any class member who has net negative damages.

Importantly, "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset."  *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) ("[E]ven if many class members were able to avoid an overcharge on some, or even many, transactions through negotiations or because of other factors, they are still victims of the alleged price-fixing conspiracy and proper class members if they paid a supra-competitive price on a single transaction.");  *In re Air Cargo Shipping Services Antitrust Litig.*, No. 06-MD-1175, 2014 WL 7882100, at *45 (E.D.N.Y. Oct. 15, 2014).

Plaintiffs' model calculates class member injury per trade.  Using the updated database and class definition, the model shows that 98.9% of class members were injured by the conspiracy on at least one trade.  BL Rebuttal, ¶140.  This demonstrates that virtually all class members suffered injury.

Next, Plaintiffs' model can identify and exclude from any recovery those class members who experienced net negative damages by a common method, rendering the issues raised in *In re Asacol Antitrust Litig.*, irrelevant.  In *Asacol*, the First Circuit decertified a class that contained an unknown number of members who suffered ***no injury*** and could not be formulaically distinguished from the rest of the class.  Because they could not be identified by a common method, "[t]he need to identify those individuals will predominate and render an adjudication unmanageable. . . ."  *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53-54 (1st Cir. 2018).  No such problem exists here.

17

### 2. Defendants' Experts Ignore the Effects of Collusion in Suggesting Class Members Would Have Benefited from Defendants' Conduct

Credit Suisse argues that there are "insurmountable class conflicts" in the OTC Class, because some class members made liquidity providing trades on electronic platforms, such as EBS and Reuters. On these electronic trades, Credit Suisse argues class members may have "earned the spread," benefiting from the trade much like itself and its co-conspirators. Plaintiffs' changes to the class definition render it moot.[20]

Credit Suisse further argues class members could be trading with each other – some earning the spread and some paying it. Of course, Plaintiffs have never defined a class that includes class members trading with each other.

The spread compensates FX dealers, such as Credit Suisse, and is a primary tool to manage the risk associated with having to transact in either direction in any volume at any time. Underwood Dep. 122:12-24. In contrast, when non-dealer class members provide liquidity to the market on an electronic platform, they are not choosing to stand ready to buy or sell at any time. Instead, they choose when to enter the market and on what terms.[21] These class members are not earning the spread, they are simply exchanging currency or attempting to profit from actual price movements.[22] In addition, when class members provide liquidity, they do not necessarily benefit, as Credit Suisse's own economist, Dr. Kleidon, acknowledged.

Given this difference, it is dubious to assert that class members, most of whom traded

---

[20]     A court may amend a class definition – either on its own or at the request of the plaintiffs, at virtually any time in the litigation. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009).

[21]     While all market makers are liquidity providers, not all liquidity providers are market makers. That a liquidity provider may be willing to sell a given volume of a particular currency pair at a specific price does not mean that it is willing to sell a different volume of that currency, buy that currency, or transact in any other currency pair. A market maker stands ready to provide liquidity throughout the trading day.

[22]     Credit Suisse's analogy to eBay is inapt. Unlike market makers, eBay is not ready at any time to either buy or sell its customers' items and, thus, bears no risk on its customers' transactions. eBay provides a platform through which its customers can transact with each other. It then takes a commission.

predominately via voice and single dealer platforms, would welcome wider spreads.  In voice and single dealer platforms, dedicated market makers, such as Credit Suisse, provide liquidity to customers, such as the named Plaintiffs and the Class.  The price of the liquidity is reflected in the spreads shown by the market maker.  Only the market maker earns the spread.

Hypothetical conflicts among class members who are buying and selling do not defeat adequacy under Rule 23(a)(4).  *See In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 513 (S.D.N.Y. 1996) ("The conflict to which Defendants refer relates only to the apportionment of the damages as between purchasers and sellers.  Such hypothetical conflicts regarding proof of damages are not sufficient to defeat class certification at this stage of the litigation.").  The named Plaintiffs have aligned interests with class members to prove Credit Suisse agreed to widen spreads.  Credit Suisse's "effort to cast the balance of economic effects as issue of adequacy under Rule 23(a)" rather than an issue of antitrust injury is unavailing. *Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 403-404 (S.D.N.Y. 2015).

Nevertheless, Plaintiffs narrow their class definition to remove all trades made on multibank platforms and remove any other liquidity providing trades made by class members.[23] The revised definition fully aligns the interests of class members who paid higher trade costs as a result of Defendants' conduct.  The new definition focuses on dealer to client trading, which moots any potential conflict and obviates the need for any individualized transaction-by-transaction analysis.[24]

---

[23]    EBS and Reuters constitute, in large part, what is known as the interdealer market.  Historically, access to the interdealer market was limited to FX dealer banks, where they would trade amongst themselves to obtain the liquidity that they would provide to the customers in the dealer to client market.  As Credit Suisse points out, a small, but not insignificant portion, of trades on EBS and Reuters are made by entities other than FX dealer banks.

[24]    The removal of multibank platform trades removes liquidity providing trades.  Plaintiffs' experts have adopted the methodology proposed by Dr. Ordover to identify liquidity providing trades and have implemented that algorithm to identify any remaining liquidity providing trades by class members.

### E.     The OTC Class Does Not Require Individualized Determinations of Member Eligibility

#### 1.     Individualized Inquiries Are Not Required to Determine Standing

Determining whether a trade is part of the class is not "a massive undertaking that would dwarf any common issues."  Opp. at 23.  Such a determination is susceptible to generalized classwide proof.  The data produced by Defendants in this case can be filtered to remove non-U.S. transactions.  It requires no more effort than determining whether a transaction date falls within the class period.  *See, e.g., Bernstein v. Virgin Am., Inc.*, No. 15-CV-02277, 2018 WL 3349135, at *4 (N.D. Cal. July 9, 2018) (holding that the residency of class members was subject to common proof because it could be determined using defendant's own business records).



. Poynder Data Rep., ¶¶50-51 & Appendix 3, lines 16, 17, 42, 43.

*Id*.

Credit Suisse relies on two inapposite cases where, unlike here, transaction data did not provide classwide proof of class membership.  In *Mazzei v. Money Store*, the database did not include fields that could distinguish between loans that were owned, versus only serviced, by the defendant.  829 F.3d 260, 273 (2d Cir. 2016).  Similarly, in *In re Petrobas Securities*, no

classwide database existed to show noteholders had acquired their debt securities, in a "domestic transaction" and were thus subject to the U.S. securities laws.  862 F.3d 250, 262 (2d Cir. 2017). In contrast, the holders of American Depository Shares had no issues because their securities traded on a domestic exchange (NYSE), and therefore, common evidence of NYSE's domestic location proved they were subject to U.S. securities laws.  *Id.*

> ## 2. A *De Minimis* Number of Benchmark and Resting Order Trades Does Not Defeat Predominance

Defendants do not quote bid-ask spreads on trades resulting from benchmark and resting orders.[25] █████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Credit Suisse's argument to the contrary assumes that Plaintiffs have almost completely failed at identifying such trades – which is simply not true – and that the standard the data must meet is perfection. Opp. at 24-25.

Plaintiffs identified the vast majority of benchmark trades. ████████████████████ ████████████████████████████. Plaintiffs used an algorithm to identify additional benchmark trades based on the two main benchmark fixes, namely, the WM/Reuters Closing Spot Rate and ECB reference rate.  Poynder Data Rep., ¶¶36(e), 314; Poynder Reply Rep., ¶118. ████████████████████████████████████████████. ████████████████████ ███████████████████████████████████ *Id.* ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ *Id.*, ¶¶119-20. ███████████████ ████████████████████████████████████████████████████████████ *Id.*

---

[25]    Resting orders include stop loss and take profit orders.

But perfect data is not a requisite for class certification.  "Economic modeling in the litigation context poses real world constraints."  *In re Mushroom Direct Purchaser Antirust Litig.*, No. 06-0620, 2015 WL 5767415, at *13 (E.D. Pa. July 29, 2015).  And courts have recognized the unfairness of penalizing a plaintiff upon a defendant's insistence that its own data are unreliable.  *Id.*, at *14.

**F.    Plaintiffs Provide a Basis for Certifying the Exchange Class**

Credit Suisse argues that the absence of futures transaction data precludes certification. Opp. at 12-13.  But at the class-certification stage, the absence of data is not fatal because the plaintiff's expert need not calculate damages under his proposed theory.  *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 414 (S.D.N.Y. 2015) ("'The point for Rule 23 purposes is to determine whether there is an acceptable class-wide [damages] approach, not to actually calculate under that approach before liability is established.'"); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014) ("Of course, no actual calculation needs to be performed at this stage.").

Contrary to Credit Suisse's claim, Plaintiffs have sufficient data to demonstrate that their TCA model can be reliably applied to exchange trades.  They have applied the TCA model to futures transaction data obtained from Goldman Sachs.  The results reflect damages on futures trades, shwoing that the average futures trade was harmed in a statistically significant fashion. The TCA model results are consistent with economic expectations and common sense, providing a strong indication that it can be reliably applied to Exchange Class trades once more data becomes available.

Finally, Credit Suisse argues that there is no direct relationship between FX futures prices and spot market prices.  Opp. at 14-15.  Its arguments, however, demonstrate only that there is not a perpetual lockstep relationship between spot and futures prices; no such argument is

necessary to prove that the prices are related.   The relationship between these markets is demonstrated by the empirical results derived by Profs. Bjønnes and Ljungqvist's analysis, refelcting significant damage to exchange trades on average.

## III.   CONCLUSION

For the foregoing reasons and for the reasons stated in the Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, Plaintiffs respectfully request the Court grant Plaintiffs' Motion for Class Certification.

Dated: January 31, 2019                    Respectfully submitted,

                                           SCOTT+SCOTT ATTORNEYS AT LAW LLP

                                           CHRISTOPHER M. BURKE (CB-3648)
                                           WALTER W. NOSS (WN-0529)
                                           KRISTEN M. ANDERSON (*pro hac vice*)
                                           STEPHANIE A. HACKETT (*pro hac vice*)
                                           KATE LV (*pro hac vice*)
                                           600 W. Broadway, Suite 3300
                                           San Diego, CA 92101
                                           Telephone: 619-233-4565
                                           Facsimile:  619-233-0508
                                           cburke@scott-scott.com
                                           wnoss@scott-scott.com
                                           kanderson@scott-scott.com
                                           shackett@scott-scott.com
                                           klv@scott-scott.com

SCOTT+SCOTT ATTORNEYS AT LAW LLP
DAVID R. SCOTT (DS-8053)
JOSEPH P. GUGLIELMO (JG-2447)
DONALD A. BROGGI (DB-9661)
PETER A. BARILE III (PB-3354)
SYLVIA M. SOKOL (SS-0317)
THOMAS K. BOARDMAN (TB-0530)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
drscott@scott-scott.com
jguglielmo@scott-scott.com
dbroggi@scott-scott.com
pbarile@scott-scott.com
ssokol@scott-scott.com
tboardman@scott-scott.com

-and-

HAUSFELD LLP
MICHAEL D. HAUSFELD
REENA ARMILLAY GAMBHIR
TIMOTHY S. KEARNS
NATHANIEL C. GIDDINGS
SARAH LAFRENIERE
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: 202-540-7143
Facsimile:  202-540-7201
mhausfeld@hausfeld.com
rgambhir@hausfeld.com
tkearns@hausfeld.com
ngiddings@hausfeld.com
slafreniere@hausfeld.com

24

HAUSFELD LLP
MICHAEL P. LEHMANN
CHRISTOPHER L. LEBSOCK
BONNY E. SWEENEY
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1949
Facsimile:  415-693-0770
mlehmann@hausfeld.com
clebsock@hausfeld.com
bsweeney@hausfeld.com

*Interim Co-Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 1, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List served on all counsel of record.

Dated: March 1, 2019                       s/ Christopher M. Burke

                                                    Christopher M. Burke