UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

IN RE FOREIGN EXCHANGE BENCHMARK
RATES ANTITRUST LITIGATION

-----------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/3/2019____
```

13 Civ. 7789 (LGS)

OPINION & ORDER

LORNA G. SCHOFIELD, District Judge:

This case concerns an alleged conspiracy among banks to fix prices in the foreign exchange ("FX") market.  Plaintiffs move to certify two classes pursuant to Federal Rule of Civil Procedure 23(b)(3) and for appointment of class counsel pursuant to Rule 23(g).[1]  Defendants Credit Suisse Group AG, Credit Suisse AG and Credit Suisse Securities (USA) LLC (the "CS Defendants") cross-move to exclude the opinions of Plaintiffs' experts Robin Poynder, Hal J. Singer, Geir Høidal Bjønnes and Alexander Ljungqvist.  For the reasons below, certification of a Rule 23(b)(3) class is denied, but certification of a Rule 23(c)(4) class is granted.  Plaintiffs' motion for appointment of class counsel is also granted.  Defendant's *Daubert* motions are granted in part and denied in part.

## I.      BACKGROUND

Familiarity with the underlying facts and procedural history is assumed.  *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ("*FOREX*").  The facts below are from the Third Consolidated Amended Class

---

[1] All references in this Opinion to Rules refer to the Federal Rules of Civil Procedure.

Action Complaint (the "Complaint") (Dkt. 619) and the parties' submissions in connection with the motions.

### A.    The FX Market

The FX market is the world's largest and most actively traded financial market, with global trading averaging $5.3 trillion per day in April 2013, according to Plaintiffs.  Currencies are purchased and sold in "currency pairs," such as EUR/USD (euro/dollar).  A person buying EUR/USD will buy euros (the "base" currency) and pay dollars (the "reference" or "quote" currency).  Certain market participants, known as "market makers" or "liquidity providers," make themselves available both to purchase and sell a given currency pair.  A liquidity provider will quote "two-way" prices -- a "bid" price (the price at which the dealer is willing to purchase a currency) and an "ask" price (the price at which the dealer is willing to sell a currency).

The difference between the bid price and ask price is known as the "bid-ask spread," or "spread."  A "half-spread" (i.e., one-half of the spread) represents the effective "price" a customer would pay either to buy from or sell to a liquidity provider.[2]  Liquidity providers generally want wider spreads, which allow them to buy lower and/or sell higher, thus increasing profits.

In a "spot transaction," the parties agree to exchange currency at a given rate on the "spot value" date -- usually within two business days.  Plaintiffs contend that "spot prices are the foundation for pricing *all* FX instruments," including "forwards," "swaps" and "futures."[3]

---

[2] If a customer simultaneously bought and sold the same currency pair, the spread would represent the liquidity provider's profits from that "round-trip" transaction.  A "half-spread" thus represents one "leg" of the trip -- either buying from or selling to the liquidity provider.

[3] Forwards are OTC transactions where the parties agree to exchange currencies at a certain rate on a specified date, other than the spot value date.  Swaps are the exchange of a forward for either a spot or another forward, with different settlement dates (for example, selling a USD/GBP

The FX market is predominantly an "over-the-counter" ("OTC") market, meaning that counterparties trade directly with each other, without an intermediating exchange. A small amount of FX trading is done over an exchange, such as the Chicago Mercantile Exchange ("CME").

### B.     The Conspiracy

The Complaint alleges that Defendants conspired to widen spreads in the spot market.[4] The alleged conspiracy involved the use of Bloomberg or Reuters-based chat rooms, which allowed FX traders from different banks to communicate with each other in real time. Plaintiffs contend that Defendants used the chat rooms to fix spreads for individual currency pairs and "spread grids" -- pricing matrices that list spreads for groups of currency pairs.

The Complaint also alleges that Defendants used the chat rooms to share sensitive information about spreads, open orders and customers. Plaintiffs' experts Geir Høidal Bjønnes and Alexander Ljungqvist contend that Defendants' sharing of sensitive information created information asymmetry in the FX market. Consequently, according to Bjønnes and Ljungqvist, market makers widened their spreads to account for the risk that they may transact with traders armed with superior information. That is, they set bid-ask quotes at a level sufficient to ensure that they would make enough profit transacting with "uninformed" traders to offset their losses from transacting with "informed" traders. This resulted in spreads widening market-wide.

---

spot while buying a USD/GBP forward with settlement in ninety days). Futures are exchange-traded forwards with standardized terms.

[4] The Complaint also alleges that Defendants coordinated to manipulate fixing rates (published exchange rates used as a benchmark and pricing mechanism) and resting orders (orders directing a bank to execute a trade when the market price for a currency pair hits a specified level). For purposes of class certification, Plaintiffs focus only on the alleged conspiracy to widen spreads in the spot market.

### C.        Class Certification

Plaintiffs seek to certify two classes: the "OTC Class" and the "Exchange Class."  The

OTC Class is defined as:

> All persons who, between December 1, 2007 and December 31, 2013 (inclusive)
> entered into a total of 10 or more FX spot, forward, and/or swap trades directly
> with one or more Defendants in the 52 Affected Currency Pairs via voice or on a
> single-bank platform, where Defendants provided liquidity and such persons were
> either domiciled in the United States or its territories or, if domiciled outside the
> United States or its territories, traded in the United States or its territories.[5]

The Exchange Class is defined as:

> All persons who, between December 1, 2007 and December 31, 2013 (inclusive)
> entered into a total of 10 or more trades of FX futures contracts on a U.S.
> exchange.

Excluded from both classes are:

> [T]he Defendants and their parents, subsidiaries, affiliates, directors, and
> employees.  Also excluded from the Classes are any judicial officer presiding
> over this action and the members of his/her immediate family and judicial staff,
> and any juror assigned to this action.  Finally, trades whose prices were set on the
> basis of benchmark rates, such as the WM/Reuters FX closing spot rates or the
> ECB reference rates, are excluded.

Plaintiffs on behalf of each putative class bring a claim alleging that the CS Defendants engaged

in an antitrust conspiracy in violation of § 1of the Sherman Act, 15 U.S.C. § 1.[6]

Bjønnes and Ljungqvist propose the use of trade cost analysis to compare the prices

customers paid for FX instruments during the class period to a "but-for" price they would have

---

[5] In their reply brief, Plaintiffs redefined the OTC Class in response to arguments made by the
CS Defendants.  The OTC Class definition set forth in the reply brief is the one analyzed in this
opinion.  *See Simmons v. Author Sols., LLC*, No. 13 Civ. 2801, 2015 WL 4002243, at *4 n.4
(S.D.N.Y. July 1, 2015) ("As there has been at least one round of adversarial briefing on the
class definitions set forth in plaintiffs' reply, those are the definitions that are analyzed here.").
[6] The Court limited the claims in its September 20, 2016, Opinion and Order.  Dkt. 661.

paid absent the alleged collusion.  Using trade data produced by Defendants,[7] Bjønnes and Ljungqvist contend that they can estimate each class member's damages trade-by-trade, without requiring individual class members to produce transaction records.

## II.    STANDARD

### A.    Class Certification

Federal Rule of Civil Procedure 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

> (1)  the class is so numerous that joinder of all members is impracticable;
>
> (2)  there are questions of law or fact common to the class;
>
> (3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Where, as here, class certification is sought pursuant to Rule 23(b)(3), a plaintiff must also show (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," (the "predominance" requirement) and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (the "superiority" requirement).  Fed. R. Civ. P. 23(b)(3).  The Second Circuit "has also recognized an implied requirement of ascertainability in Rule 23, which demands that a class be sufficiently definite so that it is administratively feasible for the court to determine

---

[7] According to Plaintiffs' expert Robin Poynder, "Defendants produced approximately 3 billion lines of raw FX data from over 30 different bank systems."  Poynder's firm assisted in processing the transaction data and creating a "unified FX cash extract" (the "Database").

whether a particular individual is a member." *In re Petrobras Sec.*, 862 F.3d 250, 260, 268-69 (2d Cir. 2017) (internal quotation marks and citation omitted).

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). Although "a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (citations and quotation marks omitted). Although factual disputes relevant to Rule 23's requirements must be resolved, a court "should not assess any aspect of the merits unrelated to a Rule 23 requirement." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006); *accord Westchester Indep. Living Ctr., Inc. v. State Univ. of N.Y., Purchase Coll.*, No. 16 Civ. 5949, 2019 WL 2474254, at *4 (S.D.N.Y. June 12, 2019).

### B.   Expert Testimony

Although "[t]he Supreme Court has not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage," it has "offered limited dicta suggesting that a *Daubert* analysis may be required at least in some circumstances." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013); *see also Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 393 (S.D.N.Y. 2018) ("[T]he Second Circuit has not resolved whether and to what extent *Daubert* applies at the class certification stage."). "[C]ourts in the Second Circuit regularly 'subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis.'" *Bowling v. Johnson & Johnson*, No. 17 Civ. 3982, 2019 WL 1760162, at *7

(S.D.N.Y. Apr. 22, 2019) (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 55

(S.D.N.Y. 2016).  Accordingly, this Opinion applies a *Daubert* analysis to the extent that

Defendant seeks to exclude testimony relevant to class certification.

The admissibility of expert testimony under *Daubert* is reflected in, and governed by,

Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help
>     the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of
>     the case.

Fed. R. Evid. 702. "While the proponent of expert testimony has the burden of establishing by a

preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, the

district court is the ultimate 'gatekeeper.'"  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir.

2007) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 n.10 (1993)); *accord In re

Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016).  "The district court has broad discretion

to carry out this gatekeeping function.  Its inquiry is necessarily a 'flexible one,' and the types of

factors that are appropriate to consider will 'depend upon the particular circumstances of the

particular case at issue.'"  *Pfizer*, 819 F.3d at 658 (quoting *Daubert*, 509 U.S. at 594, and *Kumho

Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)).

The Supreme Court has outlined four relevant factors for assessing an expert's reliability:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the
> theory or technique has been subjected to peer review and publication; (3) a
> technique's known or potential rate of error, and the existence and maintenance of
> standards controlling the technique's operation; and (4) whether a particular
> technique or theory has gained general acceptance in the relevant scientific
> community.

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (internal quotation

marks omitted) (quoting *Daubert*, 509 U.S. at 593).  These factors "do not constitute a 'definitive

checklist or test. . . .  Rather, . . . the trial judge must have considerable leeway in deciding in a

particular case how to go about determining whether particular expert testimony is reliable.'"

*Kumho Tire Co.*, 526 U.S. at 150–52; *accord United States v. Jones*, No. 15 Cr. 153, 2018 WL

2684101, at *7 (S.D.N.Y. June 5, 2018).  "A minor flaw in an expert's reasoning or a slight

modification of an otherwise reliable method will not render an expert's opinion per se

inadmissible."  *Amorgianos*, 303 F.3d at 267; *accord United States v. Morgan*, 675 F. App'x 53,

55 (2d Cir. 2017) (summary order).  "The judge should only exclude the evidence if the flaw is

large enough that the expert lacks 'good grounds' for his or her conclusions."  *Amorgianos*, 303

F.3d at 267; *accord Jones*, 2018 WL 2684101, at *7.

## III.   DISCUSSION

### A.   OTC Class

Certification of the OTC Class is denied under Rule 23(b)(3) because Plaintiffs have

failed to establish the predominance of common issues over issues affecting only individual OTC

Class Members.  *See* Fed. R. Civ. P. 23(b)(3).  The predominance requirement is satisfied where

"resolution of some of the legal or factual questions that qualify each class member's case as a

genuine controversy can be achieved through generalized proof, and if these particular issues are

more substantial than the issues subject only to individualized proof."  *Waggoner v. Barclays

PLC*, 875 F.3d 79, 93 (2d Cir. 2017).  "The requirement's purpose is to ensure that the class will

be certified only when it would achieve economies of time, effort, and expense, and promote

uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or

bringing about other undesirable results." *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (internal quotation marks omitted).

"The predominance inquiry is a core feature of the Rule 23(b)(3) class mechanism, and is not satisfied simply by showing that the class claims are framed by the common harm suffered by potential plaintiffs." *Petrobras*, 862 F.3d 270 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)). "Where individualized questions permeate the litigation, those 'fatal dissimilarities' among putative class members 'make use of the class-action device inefficient or unfair.'" *Id.* (quoting *Amgen*, 568 U.S. at 470). "The predominance inquiry mitigates this risk by 'asking whether the common, aggregation-enabling, issues in the case are *more prevalent or important* than the non-common, aggregation-defeating, individual issues.'" *Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). That is, a court must "weigh the prevalence of individual issues (i.e., those demanding evidence that varies among class members) against common issues (i.e., those susceptible to generalized class-wide proof)." *Royal Park*, 2018 WL 1831850, at *5 (quoting *Tyson Foods*, 136 S. Ct. at 1045 (quotation marks omitted)); *Petrobras*, 862 F.3d at 268 (stating that "predominance is a comparative standard" requiring "that common questions predominate over any questions affecting only individual class members." (quotation marks and alterations omitted)). "This analysis is 'more qualitative than quantitative,' and must account for the nature and significance of the material common and individual issues in the case." *Petrobras*, 862 F.3d at 271 (quoting 2 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 4:50, at 197 (5th ed. 2012)) (citing *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)).

Two predicate questions must be addressed in the predominance analysis: (1) whether a given issue is "material to Plaintiffs' class claims," and (2) whether determination of that issue is

"susceptible to generalized class-wide proof." *Petrobras*, 862 F.3d at 271. "Plaintiffs need not

prove, however, that the legal or factual issues that predominate will be answered in their favor."

*Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 317 F.R.D. 374, 385 (S.D.N.Y.

2016) (citing *Amgen*, 568 U.S. at 468).

Plaintiffs contend that common evidence will prove the existence of Defendants'

conspiracy and its class-wide effects, and that common formulae can be employed to calculate

damages. But individualized inquiries would be required to determine, for each trade: (1) the

location of the class member's trading activity, (2) the type of trade and (3) whether the class

member or the Defendant provided liquidity. As discussed below, each of these facts is

"material to Plaintiffs' class claims," and is not "susceptible to generalized class-wide proof."

*See Petrobras*, 862 F.3d at 271. These fact-intensive inquiries would far outweigh any

economies achieved through certification of the OTC Class under Rule 23(b)(3). *See Mazzei*,

829 F.3d at 272 (upholding decertification where "the fact-finder would have to look at every

class member's loan documents to determine who did and who did not have a valid claim");

*Royal Park Investments*, 2018 WL 679495, at *5 (declining to certify class where standing and

class membership would need to be determined on individual basis); *see also Petrobras*, 862

F.3d at 274 ("The predominance analysis must account for such individual questions, particularly

when they go to the viability of each class member's claims."). Accordingly, certification of a

Rule 23(b)(3) class is denied.

### 1.  Location of Trading Activity

First, an individualized inquiry would be required to determine the location of certain

class members' trading activities. The Foreign Trade Antitrust Improvements Act, 15 U.S.C. §

6a (the "FTAIA"), provides that the Sherman Act:

shall not apply to conduct involving trade or commerce (other than import trade
or import commerce) with foreign nations unless--

    (1) such conduct has a direct, substantial, and reasonably foreseeable effect--

        (A) on trade or commerce which is not trade or commerce with foreign
            nations, or on import trade or import commerce with foreign nations;
            or

        (B) on export trade or export commerce with foreign nations, of a person
            engaged in such trade or commerce in the United States; and

    (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of
        this title, other than this section.

15 U.S.C. § 6a.  Simply put, the FTAIA bars Sherman Act claims arising from conduct involving

foreign commerce, except (1) where such conduct involves *import* commerce (the "Import

Commerce Exception") or (2) where the claim arises from the conduct's "direct, substantial, and

reasonably foreseeable effect on American domestic, import, or (certain) export commerce" (the

"Domestic Effects Exception").  *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155,

162 (2004) (quotation marks and citation omitted); *accord FOREX*, 2016 WL 5108131, at *12.

      The location of Plaintiffs' trading activities is highly material to Plaintiffs' class claims.

In *FOREX*, the Court held that the FTAIA would bar claims in this action arising from

transactions between a Defendant's foreign desk and a U.S. domiciliary *operating abroad*.  *See*

*FOREX*, 2016 WL 5108131, at *13.  Such transactions would not fall within the Import

Commerce Exception because they were "wholly foreign" and did not involve the importation of

any interest into the United States.  *See id.*  Nor would such transactions be covered by the

Domestic Effects Exception, since the domestic effects of the transactions were not the

proximate cause of Plaintiffs' foreign injuries.  *See id.* at *14.  Thus, for each trade between a

class member and a Defendant's foreign desk,[8] the location of the class member at the time of

---

[8] Non-U.S. domiciliaries transacting with a Defendant's foreign desk are excluded under the
OTC Class definition.

the trade would have to be determined.[9]

The Second Circuit's decision in *Petrobras* is instructive.  In that case, the domesticity of certain securities transactions was material to the plaintiffs' class claims because the reach of U.S. securities law is presumptively limited to "transactions in securities listed on domestic exchanges" and "domestic transactions in other securities."  *See Petrobras*, 862 F.3d at 262. Thus, "a putative class member only has a viable cause of action if the specific [securities] sued upon were purchased in a qualifying domestic transaction."  *Id.* at 271 (alterations and citation omitted).[10]  Likewise, class members in this action who traded with a Defendant's foreign desk have a viable cause of action only if they transacted within the United States.

The question of class members' trading locations is not susceptible to generalized proof. Plaintiffs assert that if the Database indicates that a class member was domiciled in the United States, that class member's trading was not conducted by "a related entity operating abroad." But U.S.-domiciled corporations and partnerships can transact in foreign countries without forming related entities.[11]  The fact that a class member's transaction was not conducted through

---

[9] Even if the class definition were amended to exclude trades between a Defendant's foreign desk and a U.S. domiciliary operating abroad, this would not obviate the need for an individualized inquiry to determine class members' trading locations, which would be relevant to both whether claims were barred under the FTAIA and to determine who was in the class.  *See Mazzei*, 829 F.3d at 268 (2d Cir. 2016) ("This factual question -- whether Mazzei proved that absent class members were in privity with The Money Store -- was both relevant to the (de)certification motion *and* an element of the class's merits claim.").

[10] Although the court in *Petrobras* did not decide the predominance issue, instead remanding to the district court, *see id.* at 274–75, the court noted that resolving the question of domesticity could entail individualized inquiries that must be considered within Rule 23(b)(3)'s predominance framework.  *See id.* at 273.

[11] U.S.-domiciled corporations may open foreign offices which, depending on local law, need not be organized as separate legal entities.  *See, e.g.*, MARGARET A. NILES, 5 LAWS OF INT'L TRADE § 140:32 (2019) (discussing legal status of foreign "branches" under Chinese law); Vera Poulsen, *Going East to Seek Your Fortune?: The Pros and Cons of Using an LLC as a Business Vehicle and Related Aspects of Doing Business in Russia*, 70 UMKC L. REV. 217, 236 (2001) (discussing "representative offices" and "permanent establishments" under Russian law).  Likewise, partners

a related entity does not indicate whether the class member *itself* was operating abroad at the time of the transaction.

Moreover, there is no evidence suggesting that a class member's "domicile," as reflected in the Database, indicates whether the class member transacted FX abroad. Because certain banks did not maintain data regarding counterparties' domiciles, the Database lists some class members' "domicile" as the address where they were mailed settlement notice. Even where a Defendant's data expressly identifies a class member's domicile, there is no indication that any Defendant understood that term to refer to the exclusive location of that class member's trading activities. Thus, the available domicile data would not obviate the need for a fact-intensive individualized inquiry regarding where class members were located at the time of their trades with Defendants' foreign desks -- an issue which must be considered in the predominance analysis. *See Mazzei*, 829 F.3d at 272 (upholding decertification where "the fact-finder would have to look at every class member's [transaction] documents to determine who did and who did not have a valid claim").

### 2. Type of Trade

Second, individualized inquiries would be required to identify and exclude certain types of trades. "Benchmark trades" are trades that were entered into at a benchmark price. Such trades are expressly excluded from both the OTC Class and Exchange Class. "Resting orders" are orders that are placed in advance, directing the bank to execute a trade if and when the market price for a particular currency pair hits a specified level. Resting orders would not be impacted by a conspiracy to widen spreads in the spot market, because clients do not "pay the

---

may participate in the business of a domestic partnership from abroad. *See* WILLIS, POSTLEWAITE & ALEXANDER, PARTNERSHIP TAXATION ¶ 21.04(1) (2019).

spread" when they place resting orders.  Because benchmark trades and resting orders cannot

serve as a basis for liability in this case, the type of each transaction executed by class members

is highly material to their claims.

Identifying and excluding benchmark trades and resting orders cannot be accomplished

through generalized proof.  Rather, a fact-intensive individualized inquiry would be required --

for example, a review of the relevant communications between class members and Defendants.

This would be an enormous undertaking; Plaintiffs have identified tens of thousands of OTC

class members, and each class member, under the OTC Class definition, entered into at least ten

FX transactions.

Plaintiffs argue that unidentified benchmark trades and resting orders "constitute only a

*de minimis* number of trades in the database and therefore do not raise the specter of manually

reviewing millions of trades."  But "this is not a case in which a very small absolute number of

class members might be picked off in a manageable, individualized process at or before trial."  *In

re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018).  Rather, the fact-finder would need to

establish that *each and every* trade upon which liability is premised is not a benchmark trade or

resting order.  *See id.* at 53–54 ("[A]ny class member may be uninjured, and there are apparently

thousands who in fact suffered no injury.  The need to identify those individuals will

predominate and render an adjudication unmanageable absent [a mechanism] that can

manageably remove uninjured persons from the class in a manner that protects the parties'

rights.").  Even if it is unlikely that any given class member executed a benchmark trade or

resting order, absent an individualized examination of class members, Defendants could be held

liable for losses they did not cause.  This issue must be considered in the predominance analysis.

*See Petrobras*, 862 F.3d at 270 (noting that "fatal dissimilarities among putative class members

14

make use of the class-action device inefficient or unfair" (quoting *Amgen*, 568 U.S. at 470 (quotation marks and alterations omitted))).

Plaintiffs contend that "courts have recognized the unfairness of penalizing a plaintiff upon a defendant's insistence that its own data are unreliable." This argument is unavailing. The case cited by Plaintiffs concerned a defendant that sought to exclude an expert opinion relying on the defendant's own inaccurate or unrepresentative data. *See In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06 Civ. 620, 2015 WL 5767415, at *14 (E.D. Pa. July 29, 2015). Here, Plaintiffs do not assert that Defendants' data is inaccurate or unrepresentative -- only that Defendants failed to maintain records regarding certain trade characteristics that would be helpful to Plaintiffs in prosecuting their case. This does not render Defendants' data "unreliable" and does not justify foregoing an individualized inquiry to exclude trades that were unaffected by the alleged conspiracy.

### 3. Liquidity-Providing Party

Third, an individualized inquiry would be required to determine, for each trade, which party acted as the liquidity provider.[12] This issue is highly material -- Plaintiffs' revised OTC Class definition excludes *all* trades where class members acted as liquidity providers. Moreover, whether a class member provided liquidity determines which party paid the spread, which is relevant to damages.

Bjønnes and Ljungqvist contend that liquidity providing trades can be excluded on a class-wide basis by identifying "single- or multi-bank-platform trade[s] executed at a negative

---

[12] In their reply, Plaintiffs revised the class definition to exclude trades in which class members provided liquidity, to address the possibility of intra-class conflicts.

half-spread" in the Database.[13]  As Defendants did not maintain data regarding the spreads that

customers were quoted, Bjønnes and Ljungqvist estimate the half-spread as the difference

between a reference price and the actual execution price.[14]  Thus, if a class member's trade is

executed at a *negative* half-spread from the Defendants' perspective, that class member has

bought lower or sold higher than the reference price.  According to Bjønnes and Ljungqvist, this

indicates that a class member acted as a liquidity provider.[15]

      Generalized proof cannot resolve the question of which party acted as a liquidity provider

in each trade.  Bjønnes and Ljungqvist's proposed method of identifying liquidity providers is

rejected as unreliable due to the "technique's known or potential rate of error."  *See Amorgianos*,

303 F.3d at 266 (quoting *Daubert*, 509 U.S. at 593) (internal quotation marks omitted)).  The

transaction data produced by Barclays is unique in that it indicates whether Barclays'

counterparties acted as liquidity providers.  Over 850,000 trades in Barclays' data are marked

"maker" (indicating that Barclays provided liquidity) or "taker" (indicating that Barclays took

liquidity).  Under Bjønnes and Ljungqvist's proposed approach, "taker" trades should have a

negative estimated half-spread.  Yet Janusz Ordover, the CS Defendants' expert, demonstrates

that only 27.6 percent of "taker" trades have negative estimated half-spreads.  In other words,

Bjønnes and Ljungqvist's proposed method would fail to remove *72.4 percent* of trades where a

class member acted as a liquidity provider.  This error rate is too great to accept the method as

reliable under *Daubert*.  *See AU New Haven, LLC v. YKK Corp.*, No. 15 Civ. 3411, 2019 WL

---

[13] As discussed above, the half-spread represents the effective price a customer pays to buy from
or sell to a dealer.

[14] The reference price is the midpoint between "the top-of-book bid and ask quotes" (i.e., the best
prices offered to buy or sell a currency pair) on the EBS or Reuters interdealer platforms.

[15] The CS Defendants challenge the assertion that negative spreads necessarily indicate that a
class member has provided liquidity; for example, dealers sometimes offer customers
preferential rates in order to increase order flow.

1254763, at *23 (S.D.N.Y. Mar. 19, 2019) (stating that a 50% error rate "would be a valid basis

to exclude an expert with scientific knowledge under *Daubert*"); *Valente v. Textron, Inc.*, 931 F.

Supp. 2d 409, 429 (E.D.N.Y. 2013) (expert's testimony excluded as unreliable where his

simulation "only gets the desired outcome 25 percent of the time").  Absent a reliable method to

exclude liquidity providing trades on a class-wide basis, the Court would need to individually

determine whether class members acted as liquidity providers in their trading with Defendants.

As discussed, this would potentially require tens or hundreds of thousands of individual

determinations, which must be considered in the predominance analysis.  *See Petrobras*, 862

F.3d at 268 (citing *Mazzei*, 829 F.3d at 272, for the proposition that "classes that require highly

individualized determinations of member eligibility" must be scrutinized under the

predominance requirement).

### 4.  Weighing Analysis

Plaintiffs contend that common evidence will prove the existence of an antitrust

conspiracy, the CS Defendants' participation in the conspiracy, the class-wide injurious effects

of the conspiracy and that common formulae can be employed to calculate damages.  Each of

these issues is highly material to Plaintiffs' class claims, and in fact track the elements of an

antitrust claim.  *See Cordes & Co. Fin. Servs, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91,

105 (2d Cir. 2007) ("The three required elements of an antitrust claim are (1) a violation of

antitrust law; (2) injury and causation; and (3) damages." (alterations omitted)); *accord In re*

*LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 590 (S.D.N.Y. 2018).

Even assuming, *arguendo*, that all of these issues could be resolved through the

generalized proof proposed by Plaintiffs -- a conclusion that the CS Defendants vigorously

dispute -- class certification under Rule 23(b)(3) is not warranted given the necessity of

individualized inquiries to determine, for each trade: (1) the location of the class members'
trading activity, (2) the type of trade and (3) whether the class member or the Defendant
provided liquidity.  As discussed above, these three issues are highly material and cannot be
resolved through generalized proof.  The fact-intensive inquiries necessary to resolve these
issues would far outweigh any economies achieved through class certification.  *See Mazzei*, 829
F.3d at 272 (the predominance requirement is meant "to ensure that the class will be certified
only when it would achieve economies of time, effort, and expense, and promote uniformity of
decision as to persons similarly situated.") (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d
Cir. 2010)); *Petrobras*, 862 F.3d at 270 ("Where individualized questions permeate the litigation,
those 'fatal dissimilarities' among putative class members 'make use of the class-action device
inefficient or unfair.'" (quoting *Amgen*, 568 U.S. at 469 (alterations omitted))).

As discussed, a determination would need to be made for each trade or each class
member -- an enormous undertaking, given the tens of thousands of class members identified,
each of whom engaged in at least ten FX transactions.  Class treatment under Rule 23(b)(3) is not
warranted under these circumstances.  *See also Mazzei*, 829 F.3d at 272 (upholding
decertification where "the fact-finder would have to look at every class member's loan
documents to determine who did and who did not have a valid claim"); *Royal Park Investments*,
2018 WL 679495, at *5 (declining to certify class where standing and class membership would
need to be determined on individual basis).  *See generally Petrobras*, 862 F.3d at 274 ("The
predominance analysis must account for such individual questions, particularly when they go to
the viability of each class member's claims.").

For the same reasons, the superiority requirement of Rule 23(b)(3) is also not met.  *See*
Fed. R. Civ. P. 23(b)(3) (requiring "that a class action [be] superior to other available methods

18

for fairly and efficiently adjudicating the controversy"). Resolving the individualized inquiries described above would make this action unmanageable. *See Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010) (stating that "whether the court is likely to face difficulties managing a class action bears on whether" the superiority requirement is met); *accord Adkins v. Morgan Stanley*, 307 F.R.D. 119, 142 (S.D.N.Y. 2015) ("[M]anageability is, by far, the most critical concern in determining whether a class action is a superior means of adjudication." (quoting *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (alterations omitted))). Accordingly, certification of the OTC Class is denied under Rule 23(b)(3).

### 5. Rule 23(c)(4) Certification

Although class certification of the entire action under Rule 23(b)(3) is not warranted, class certification of the OTC Class pursuant to Rule 23(c)(4)(A) is granted with respect to two issues: (1) the existence of a conspiracy to widen spreads in the spot market and (2) the CS Defendants' participation in the conspiracy. The context of the dispute between Plaintiffs and the CS Defendants is an important consideration. In this action, fifteen of sixteen of the defendant banks have settled with Plaintiffs, paying over $2.31 billion. Many of the legal and factual issues for each defendant are similar. As Plaintiffs put it, "Credit Suisse remains the lone holdout," presumably for a reason. It therefore makes sense to address first whether the CS Defendants were a part of the alleged conspiracy, as well as whether a single conspiracy even existed, which the CS Defendants dispute. These are threshold issues capable of resolving or significantly narrowing the case against the CS Defendants. If the CS Defendants are found not to have joined any conspiracy, then all of the claims against it are resolved. If the CS Defendants are found to have been a co-conspirator, then that common issue will have been resolved in an

efficient way, paving the way for individual lawsuits.  And both issues are conveniently

susceptible to class treatment.

Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained

as a class action with respect to particular issues."  Fed. R. Civ. P. 23(c)(4).  This rule may be

employed "to certify a class on a particular issue even if the action as a whole does not satisfy

Rule 23(b)(3)'s predominance requirement."  *In re Nassau Cty. Strip Search Cases*, 461 F.3d

219, 225 (2d Cir. 2006), *accord In re Amla Litig.*, 282 F. Supp. 3d 751, 765 (S.D.N.Y. 2017).  "If

common resolution of even a single issue would further the efficient administration of justice,

then the class should be certified."  *In re Amla Litig.*, 282 F. Supp. 3d at 765.  "[C]ourts should

use Rule 23(c)(4) only where resolution of the particular common issues would materially

advance the disposition of the litigation as a whole."  *Jacob v. Duane Reade, Inc.*, 293 F.R.D.

578, 589 (S.D.N.Y. 2013).

A Rule 23(c)(4) class would satisfy all the Rule 23(a) requirements.  Given that there are

thousands of potential class members, the numerosity requirement is satisfied.  Fed. R. Civ. P.

23(a)(1) (class must be "so numerous that joinder of each member is impracticable"); *Shahriar v.

Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011); *accord Feliciano v.

CoreLogic Rental Property Sols., LLC*, No. 17 Civ. 5507, 2019 WL 3406593, at *6 (S.D.N.Y.

July 29, 2019).  The commonality requirement is also met; as discussed, whether a conspiracy

existed and whether the CS Defendants were a part of it raise common questions with common

answers.  *Wal-Mart Stores, Inc. v Dukes*, 564 U.S. 338, 350 (2011) ("What matters to class

certification is not the raising of common questions -- even in droves -- but, rather the capacity of

a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."

(some modifications and internal quotation marks omitted)).  Typicality is satisfied for purposes

of the two certified issues because "each class member's claim arises from the same course of events," the alleged conspiracy to widen spreads, and "each class member makes similar legal arguments" to prove the existence of the conspiracy and the CS Defendants' participation. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *accord In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *8 (S.D.N.Y. July 10, 2019). The adequacy requirement is satisfied -- (1) because of the class members' common interest in proving the existence of a conspiracy, the Named Plaintiffs' interests are not "antagonistic to the interest of other members of the class" as to the two certified issues, and (2) the Court finds that Class Counsel, both of whom have extensive experience litigating complex class actions, "are qualified, experienced and able to conduct the litigation." *See Flag Telecom*, 574 F.3d at 35; *accord Signet Jewelers*, 2019 WL 3001084, at *9.

The Rule 23(b)(3) requirements of predominance and superiority do not apply because a Rule 23(b)(3) class is not being certified. Even if they did apply, they are satisfied because the certification of only two common issues necessarily means that common issues predominate. *See Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 241, 244 (S.D.N.Y. 2010) (certifying, *inter alia*, a Rule 23(b)(3) liability class limited, pursuant to Rule 23(c)(4), to resolving the issues of whether the alleged scheme violated applicable law). Class treatment is also superior to the alternatives; class treatment is superior to multiple adjudications, which would be costly and inefficient. Class treatment is also superior to future Plaintiffs attempting to rely on the doctrine of offensive collateral estoppel because of the proof requirements and possible uncertainty of the outcome. *See Flood v. Just Energy Marktg. Corp.*, 904 F.3d 219, 235 (2d Cir. 2018) ("In order for a plaintiff to bar a defendant from litigating an issue on collateral estoppel grounds: (1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been

actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.")  The court must also determine that application of the doctrine is fair, and the court is accorded "broad discretion" in determining whether collateral estoppel should apply.  *See Flood*, 904 F.3d at 236.  *See generally Petrobras*, 862 F.3d at 268 (for the superiority inquiry, "courts must ask whether 'a class action is *superior to other available methods* for fairly and efficiently adjudicating the controversy.'" (quoting Fed. R. Civ. P. 23(b)(3) (emphasis in original))).

### 6.  Appointment of Class Counsel

Pursuant to Rule 23(g), Christopher M. Burke, of Scott + Scott, Attorneys at Law, LLP, and Michael D. Hausfeld, or Hausfeld LLP, are hereby appointed as Class Counsel.  The Court finds that Burke and Hausfeld and their respective firms have completed extensive work identifying and investigating potential claims in this action, have committed sufficient resources to representing the class and, as discussed above, have broad experience litigating class actions and knowledge of the applicable law.  *See* Fed. R. Civ. P. 23(g).

### B.    Exchange Class

Certification of the Exchange Class is denied because Plaintiffs have failed to establish that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Among other things, the adequacy requirement "raises concerns about . . . conflicts of interest" between class representatives and class members.  *See Wal-Mart Stores,* 564 U.S. at 349 n.5; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 231 (2d Cir. 2016) ("To assure vigorous prosecution, courts consider whether the class representative has adequate incentive to pursue the class's claim, and whether some difference

between the class representative and some class members might undermine that incentive.");

*accord In re LIBOR,* 299 F. Supp. 3d at 461 (S.D.N.Y. 2018).  "To avoid antagonistic interests, any 'fundamental' conflict that goes 'to the very heart of the litigation,' must be addressed with a 'structural assurance of fair and adequate representation for the diverse groups and individuals' among the plaintiffs."  *In re Payment Card Interchange Fee*, 827 F.3d at 231 (2d Cir. 2016) (quoting *Charron v. Wiener*, 731 F.3d 241, 249–50 (2d Cir. 2013) and *Amchem*, 521 U.S. at 627).

In exchange trading, putative class members would trade directly with each other.  The oppositional trading positions taken by the Named Plaintiffs and class members would create fundamental conflicts that preclude class certification.  For example, suppose that a class member purchased EUR/USD from Izee Trading Company ("Izee"), a market maker for EUR/USD futures operating on the CME.  The class member would have a powerful incentive to establish that EUR/USD spreads were artificially widened on the transaction date; the greater the manipulation, the better off the class member would have been in the "but-for world," resulting in higher damages.  But Izee would have the exact opposite incentive.  As the liquidity provider, Izee would have been *worse off* in the "but-for world"; establishing spread manipulation on the transaction date would *reduce* Izee's damages.  Given that the Exchange Class definition "is indeterminate not only as to the days on which . . . manipulation occurred, but also the direction of manipulation," the Named Plaintiffs and their class member counterparties "will have directly conflicting incentives to establish not only the existence but also the magnitude of any manipulation that occurred on those dates."  *In re LIBOR*, 299 F. Supp. 3d at 538–39.

Plaintiffs contend that intra-class conflicts do not defeat adequacy under Rule 23(a)(4), citing *In re NASDAQ Mkt.-Makers Antitrust Litigation*, 169 F.R.D. 493 (S.D.N.Y. 1996), and

*Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384 (S.D.N.Y. 2015).[16]  The court in

*NASDAQ* found that hypothetical conflicts relating "only to the apportionment of the damages as

between purchasers and sellers" of securities were not sufficient to defeat class certification.

*NASDAQ*, 169 F.R.D. at 513.  But the conflicts within the Exchange Class extend well beyond

the apportionment of damages.  The Named Plaintiffs and their class member counterparties

would have directly conflicting incentives to establish whether spread manipulation occurred on

certain dates and the extent to which it affected their transactions.  *Cf. NASDAQ*, 169 F.R.D. at

513 (no conflict given allegation that spread manipulation inflated prices for purchasers and

depressed prices for sellers, giving *both* an incentive to establish spread manipulation).

In *Laumann*, the court rejected the argument that the existence of class members who

benefitted from the defendants' conduct defeated adequacy, stating that the "effort to cast the

balance of economic effects as an issue of adequacy under Rule 23(a), rather than a merits issue,

is unavailing."  *Laumann*, 105 F. Supp. 3d at 403.  This makes sense -- the fact that a class

member benefitted from the defendants' conduct does not mean that there is an inherent conflict;

it simply means that the class member has not suffered an injury.  But the conflict within the

Exchange Class is fundamentally different.  The class representatives lack sufficient incentives

to prove that their counterparties were injured by Defendants' conduct -- doing so would reduce

the representatives' own damages.  *See In re LIBOR*, 299 F. Supp. 3d at 539 ("[A] named

plaintiff . . . has active disincentive to establish trader-based manipulation when the direction of

that manipulation benefited its trading positions -- even if that manipulation harmed more class

members or harmed class members in the aggregate.").  Because Plaintiffs have not established

---

[16] Plaintiffs raise this argument in the context of the OTC Class, but presumably would contend that it applies to the Exchange Class as well.

that "the representative parties will fairly and adequately protect the interests of the class," Fed.

R. Civ. P. 23(a)(4), certification of the Exchange Class is denied.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for certification of a Rule 23(b)(3) class is

DENIED, but certification of a Rule 23(c)(4) OTC Class is GRANTED for adjudication of two

issues: (1) the existence of a conspiracy to widen spreads in the spot market and (2) the CS

Defendants' participation in the conspiracy.  For this purpose, the OTC Class is defined as:

> All persons who, between December 1, 2007 and December 31, 2013 (inclusive)
> entered into a total of 10 or more FX spot, forward, and/or swap trades directly
> with one or more Defendants in the 52 Affected Currency Pairs via voice or on a
> single-bank platform, where Defendants provided liquidity and such persons were
> either domiciled in the United States or its territories or, if domiciled outside the
> United States or its territories, traded in the United States or its territories.

Plaintiffs' motion for appointment of Class Counsel is GRANTED.  Christopher M. Burke, of

Scott + Scott, Attorneys at Law, LLP, and Michael D. Hausfeld, of Hausfeld, LLP, are hereby

appointed as Class Counsel.  The CS Defendants' *Daubert* motions are GRANTED in part, as set

forth above, and are otherwise DENIED as moot.

The Clerk of Court is respectfully directed to close the motions at Docket Nos. 1218 &

1197.

Dated:  September 3, 2019
       New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

25