**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | No. 13 Civ. 7789 (LGS) |

**MEMORANDUM OF LAW IN SUPPORT OF THE CREDIT SUISSE DEFENDANTS'**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 3

LEGAL STANDARDS .......................................................................................................... 8

ARGUMENT ......................................................................................................................... 11

I.    THERE IS NO EVIDENCE OF A SINGLE, VAST CONSPIRACY AMONG THE HUNDREDS OF FX TRADERS AT ALL 16 DEFENDANTS TO WIDEN SPREADS IN 52 CURRENCY PAIRS ....................................................................................... 11

II.   THE EVIDENCE AFFIRMATIVELY REFUTES PLAINTIFFS' ALLEGATION OF A SINGLE CONSPIRACY ........................................................................................ 18

    A.   Every Fact Witness Who Testified About a Single Conspiracy Denied Its Existence and Traders Denied Its Plausibility........................................................................... 18

    B.   There Was Fierce Competition Among Traders, Which Undermines the Notion of a Global Conspiracy in Which All Traders Participated ..................................................... 20

    C.   The Chat Rooms on Which Plaintiffs Rely Were Limited to a Few Known Participants, Again Undercutting the Notion That All Traders Were Cooperating with One Another.................................................................................................. 22

CONCLUSION....................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson News, L.L.C.* v. *American Media, Inc.*,
 123 F. Supp. 3d 478 (S.D.N.Y. 2015)......................................................16

*Anderson News, L.L.C.* v. *American Media, Inc.*,
 899 F.3d 87 (2d Cir. 2018)..................................................10, 20–21

*Apex Oil Co.* v. *DiMauro*,
 822 F.2d 246 (2d Cir. 1987)..................................................1, 10, 15

*In re Baby Food Antitrust Litig.*,
 166 F.3d 112 (3d Cir. 1999)..................................................20, 21

*Celotex Corp.* v. *Catrett*,
 477 U.S. 317 (1986)..................................................2, 9

*Dahl* v. *Bain Capital Partners, LLC*,
 937 F. Supp. 2d 119 (D. Mass. 2013)..................................................10, 14, 16

*In re K-Dur Antitrust Litig.*,
 2016 WL 755623 (D.N.J. Feb. 25, 2016)..................................................14–15

*Kotteakos* v. *United States*,
 328 U.S. 750 (1946)..................................................14

*Lipsky* v. *Commonwealth United Corp.*,
 551 F.2d 887 (2d Cir. 1976)..................................................13n

*Matsushita Electric Industrial Co., Ltd.* v. *Zenith Radio Corp.*,
 475 U.S. 574 (1986)..................................................1, 9, 24

*Meredith Corp.* v. *SESAC LLC*,
 1 F. Supp. 3d 180 (S.D.N.Y. 2014)..................................................10, 12, 14, 16

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litig.*,
 218 F.R.D. 76 (S.D.N.Y. 2003)..................................................13n

*Monsanto Co.* v. *Spray-Rite Service Corp.*,
 465 U.S. 752 (1984)..................................................*passim*

*In re Nexium (Esomeprazole) Antitrust Litig.*,
 842 F.3d 34 (1st Cir. 2016)..................................................14

*In re Platinum and Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011)..................................................................13n

*Staley* v. *Gilead Sciences, Inc.*,
    2020 WL 5507555 (N.D. Cal. July 29, 2020).....................................................9, 5

*Staley* v. *Gilead Sciences, Inc.*,
    446 F. Supp. 3d 578 (N.D. Cal. 2020) ..................................................................13

*United States* v. *Johansen*,
    56 F.3d 347 (2d Cir. 1995)..............................................................................9, 14

*Valspar Corp.* v. *E.I. du Pont de Nemours*,
    152 F. Supp. 3d 234 (D. Del. 2016)......................................................................22

*In re Vitamins Antitrust Litig.*,
    320 F. Supp. 2d 1 (D.D.C. 2004)............................................................... *passim*

## PRELIMINARY STATEMENT

For seven years, Plaintiffs have insisted that hundreds of foreign exchange ("FX") traders at 16 market-making banks joined a single, vast, six-year long conspiracy to manipulate the worldwide trading of 52 currency pairs.  As part of their effort to pursue this claim, Plaintiffs sought certification of damages classes, which this Court denied.  But the Court did certify a Rule 23(c)(4)(A) class to resolve two issues:  (1) "whether a single conspiracy" to "widen spreads in the [FX] spot market" existed; and (2) if such a conspiracy existed, whether the Credit Suisse Defendants participated in it.  Sept. 3, 2019 Opinion and Order (ECF No. 1331) at 19.

With fact discovery now nearly complete, we have the answers to these questions.  Despite an evidentiary record that includes millions of pages of documents and more than 70 depositions, there is not a single piece of evidence suggesting that a vast, global conspiracy ever existed, or that the Credit Suisse Defendants participated in such a conspiracy.  On that basis, the Credit Suisse Defendants now move for summary judgment.

To successfully oppose summary judgment, Plaintiffs must present "strong direct or strong circumstantial evidence," *Apex Oil Co.* v. *DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987), that each alleged co-conspirator (1) knew of the alleged single conspiracy and understood the nature of the conspiracy and its scope; (2) intended to join the single conspiracy to further its unlawful objective; and (3) became interdependent upon the other members of the single conspiracy, *see In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 15–16 (D.D.C. 2004).  Contrary to Plaintiffs' reimagining of decades of established case law, it is *their* burden, not Credit Suisse's, to "come forward with specific facts showing that there is a *genuine issue for trial*" on the issue of the existence of their alleged global conspiracy.  *Matsushita Electric Industrial Co., Ltd.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (internal quotation marks omitted); *see Celotex Corp.*

v. *Catrett*, 477 U.S. 317, 325 (1986) (the moving party need not "produce evidence showing the absence of a genuine issue of material fact," but need only "point[] out to the district court [] that there is an absence of evidence to support the nonmoving party's case").

As explained below in Section I, Plaintiffs cannot meet their burden because not a single fact witness has testified to the existence of the alleged global conspiracy and not a single document even hints at it. If a global agreement existed, presumably there would have been *some* written reference to it in the millions of communications exchanged over the six years of the conspiracy's supposed existence, or at least one of the hundreds of alleged co-conspirators would have acknowledged it. Instead, even witnesses who cooperated with government investigators, or admitted to participating in smaller conspiracies, denied the existence of Plaintiffs' alleged global conspiracy. In short, Plaintiffs are seeking to prove a conspiracy among individuals who, based on the evidence, never believed such a conspiracy existed, which is something the law does not allow.

Plaintiffs have repeatedly attempted to divert attention from this fatal flaw by pointing to interbank Bloomberg chats among small groups of traders. But it is black letter law that one cannot take a number of small and separate "mini-conspiracies" and compress them into a single unified conspiracy, unless all alleged participants are aware of, have agreed to join, and have become dependent on one another as part of the larger endeavor. Although Plaintiffs will contend that each chat room participant engaged in some wrongful act through one or more of these small chat rooms, there is no evidence suggesting that anyone was aware of, or committed any act in knowing furtherance of, some enormous worldwide scheme. Without this, Plaintiffs' claims fail as a matter of law. *See, e.g.*, *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984) (a

conspiracy must be supported by evidence that the defendants "had a conscious commitment to a common scheme" (citations omitted)).

Moreover, as explained in Section II below, although the Credit Suisse Defendants are not required to affirmatively disprove the existence of a global conspiracy, the evidence does precisely that. In chat after chat, small groups of traders refused to allow others to join their chat room, warned each other against sharing information with those outside their chat room, and aggressively competed on price with traders outside their chat room (and, on many occasions, even with other traders in the chat room). All of these behaviors are utterly inconsistent with Plaintiffs' vision of a vast conspiracy, which would necessarily require continuous and broad sharing of information, as well as rigorous coordination on prices shown to potential customers. In these circumstances, it is simply impossible for Plaintiffs to credibly suggest that hundreds of traders across the FX marketplace all possessed the "conscious commitment to a common scheme" that the Supreme Court requires. With all evidence affirmatively refuting the notion of a common scheme, Plaintiffs cannot be permitted to move forward with their case.

## STATEMENT OF FACTS

Plaintiffs have alleged the existence of a conspiracy entered into by 16 banks that participate in the global trading marketplace for 52 different "currency pairs" (referred to as the "FX markets").[1] The alleged goal of the conspiracy was to enhance the banks' profits by widening the "bid-ask spread" – the difference between the price at which they buy (the "bid") and sell (the "ask") currencies[2] – over the period from December 1, 2007 to December 31, 2013 (the "Class

---

[1]    The history of proceedings is set forth at ¶¶ 1–34 in the accompanying Local Rule 56.1 Statement in Support of the Credit Suisse Defendants' Motion for Summary Judgment ("Credit Suisse 56.1 Statement"). All facts necessary to this motion are also contained in the Credit Suisse 56.1 Statement.

[2]    Declaration of Herbert S. Washer Ex. ("DE") 1 (Jan. 23, 2020 Expert Report of Eric Robin ("Robin Report")) ¶ 38.

Period").  *See* DE 2 (Pls.' Responses and Objections to the Credit Suisse Defs.' First Set of Interrog. ("Pls.' Responses and Objections")) at p. 6.

The allegedly manipulated FX markets are vast, with more than $5 trillion worth of currencies traded each day on average by the end of the Class Period.[3]  Consolidated Third Am. Class Action Compl. ("TAC") (ECF No. 619) ¶ 2.  And there are thousands of participants in these markets, including retail and institutional investors who trade FX to access foreign currencies, hedge their exposure to fluctuations in currency values, and/or engage in speculative trading in order to profit on price movements.  *See* DE 1 (Robin Report) ¶¶ 18, 37.

Despite the enormous size of the FX markets, currencies are generally not traded on public exchanges, which means that there is no single unified marketplace, and the prices at which currencies trade are not transparent to all.  *See* DE 1 (Robin Report) ¶ 17.  Rather, currencies are predominantly traded "over-the-counter" or "OTC," and a market participant has the option to either trade on an electronic platform or contact a potential counterparty directly.  *Id.*  Transactions executed directly require a customer to contact a potential counterparty, inquire about pricing, negotiate terms, and agree to execute with that specific counterparty.  Credit Suisse 56.1 Statement ¶¶ 65–66, 68.

Moreover, FX spreads and prices are dynamic and bespoke.  Credit Suisse 56.1 Statement ¶ 69.  Trader after trader testified that prices and spreads in the voice markets could change within minutes or seconds.  DE 3 (May 31, 2019 Dep. of ▇▇▇▇▇▇ ("▇▇▇▇ Tr.")) 258:8–9 (testifying that FX spot "markets fluctuate every second"); DE 4 (July 19, 2019 Dep. of ▇▇ ▇▇▇▇▇ ("▇▇▇▇ Tr.")) 242:1–5 ("[I]f I was asked to quote a client via my sales desk, . . . you

---

[3]     The triennial global surveys by the Bank for International Settlements reported that for the period 2007 and 2013 the average trading in global FX markets reached between $3 trillion and $5.3 trillion per day during the Class Period.  DE 1 (Robin Report) ¶ 26.

would have seconds to reply, and then most likely my quote would be valid for seconds afterwards."); DE 5 (July 12, 2019 Dep. of ███████████ ("███ Tr.")) 27:2–14 ("[T]he spread you would give to customers would be for that 10 seconds or 5 seconds, something like that . . . . the price is changing all the time, so I don't see how the spread could possibly be the same. It would change constantly with the conditions of market."). The price changes and spread fluctuations occur continuously to reflect liquidity and volatility in the markets, as well as idiosyncratic factors that impact prices and spreads on any given trade, such as macroeconomic events, the trader's current position at the time of the price quote, risk management decisions, the identity of the client, and the trade size. *See* DE 1 (Robin Report) ¶¶ 40–41, 43–45.

Due to the OTC, opaque, and fast-moving nature of the FX markets, participants constantly communicate in order to collect information on the markets and execute trades. Credit Suisse 56.1 Statement ¶¶ 74–82. Customers (including class members) contact salespeople to request quotes or seek FX-related information which they can use to trade more profitably. TAC ¶ 90.[4] Salespeople obtain quotes from traders. DE 1 (Robin Report) ¶ 19. Traders communicate with their counterparts elsewhere to source currency, obtain market color, or simply remain in touch with clients, friends, and former coworkers.[5] Not surprisingly, the record is replete with examples

---

[4] *See also, e.g.*, DE 6 (BARC-FX-CIV_00389946) at 948 (July 5, 2012 chat in which customer ████████████ requests a quote for a GBPAUD option); DE 7 (Feb. 27, 2020 Dep. of Eric Robin) 71:20–72:10 ("Q. Did you ever have the experience that a client called not wanting to trade particularly but wanting information from you about market events? A. I mean, it would occur quite often after a release of big economic data, we would have a call, a follow-up call, taking into account what our internal economists or strategists would think about the release of a number. And we would make sure that, you know, the more important clients, the bigger clients of the bank would effectively have that analysis in front of them. And we would discuss it with them."); DE 8 (Aug. 23, 2019 Dep. of ████████ ("██████ Tr.")) 95:2–17 (testifying that market color learned in chat rooms was helpful to the sales desk because "[t]hey've got customers asking them what's happening in the market and if as a bank, we're not seeing the business, then they've got something to talk about and equally, I guess, it gives them a reason to pick up a phone and speak to a customer"); DE 9 (CITI-FX-CIVIL-MS_00357717) at 717–18, 721 (Sept. 21, 2011 email in which hedge fund ████████ provides feedback on eight banks' spreads).

[5] *E.g.*, DE 4 (██████ Tr.) 84:1–6 ("There are a number of reasons why we would use electronic

of information exchange among Defendants and class members, including non-Defendant dealers[6] and buy-side participants.[7]  There is nothing inherently wrong with these kinds of communications, even among traders employed by different Defendant Banks, as they are part of an appropriate and benign process of discovering market prices and negotiating trades with one another.  *See* Footnote 4, *supra*.  Indeed, the *FX Global Code*,[8] a key industry guide to appropriate behavior in the FX markets,[9] encourages information sharing among all market participants.

> The timely dissemination of Market Colour between Market Participants can contribute to an efficient, open, and transparent FX Market through the exchange of information on the general state of the market, views, and anonymised and aggregated [client order] flow information.

DE 16 (Principle 22, *FX Global Code*) at 26.

FX market participants engage in this constant stream of communications via telephone and various forms of electronic communications.  *See* TAC ¶ 90.  One of the most common forms of communication is the Bloomberg Chat platform, which is widely used throughout the financial markets and allows users to send instant messages to one another.  *See* Credit Suisse 56.1 Statement ¶ 66.  Users can send individual messages, or they can establish what are known as persistent chat

---

chats: as a form of communication when looking to offset risk with another counterparty in the market; there were other instances, to discuss our market views, which is also known as exchanging market color; and then sometimes personal conversations."); DE 10 (Nov. 27, 2018 Dep. of ██████████ ("██████ Tr.")) 52:7–14.

[6]     *See, e.g.*, DE 11 (GS-FX-CIVIL-02388935) at 936–37 (May 17, 2012 chat between certain Defendants as well as non-Defendant dealers ██████, █, ██████, and ██████████).

[7]     *See, e.g.*, DE 12 (JPMC-CIVIL-0000740937) at 947 (Apr. 9, 2013 chat between certain Defendants as well as non-Defendant buy-side participant █████); DE 13 (GS-FX-CIVIL-03354260) at 263 (Feb. 11, 2010 chat between Goldman Sachs personnel and hedge fund ██████████); DE 14 (GS-FX-CIVIL-02482206) at 206–08 (Feb. 11, 2010 chat between Goldman Sachs personnel and hedge fund ██████████████); and DE 15 (GS-FX-CIVIL-02482152) at 154–55 (Feb. 11, 2010 chat between Goldman Sachs personnel and hedge fund ██████████).

[8]     DE 16 (Global Foreign Exchange Committee, *FX Global Code: August 2018 Update* (hereinafter, "*FX Global Code*"), *available at* https://www.globalfxc.org/docs/fx_global.pdf).

[9]     DE 16 (*FX Global Code*), 1–2.

rooms, which are "by invitation only" spaces, open on a constant basis and which allow participants to jump in and out over extended periods of time.[10] During the Class Period, thousands of FX market participants participated in tens of thousands of Bloomberg chat rooms, generating millions of Bloomberg messages. *See* Oct. 29, 2020 Pls.' Pre-Mot. Letter (ECF No. 1518) at 2.

Within this vast marketplace and this ocean of communications, Plaintiffs allege that the 16 Defendants formed a single global conspiracy designed to control the prices of 52 currency pairs at all times. Given the number of currencies, the global 24/7 nature of trading, TAC ¶ 80, and the speed at which liquidity conditions in the FX markets changed, such an endeavor, if it were even possible, would have required an extraordinary level of coordination and monitoring among all of the hundreds of traders at the 16 Defendant Banks. *See, e.g.*, DE 17 (███████ Tr.) 300:4–8 (testifying that information exchanged in a chat room could become stale in "[l]ess than a minute"); DE 19 (June 6, 2018 Dep. of ████████ ("████ Tr.")) 135:8–19 ("You have no idea what could happen even in that next second."). But Plaintiffs do not, and cannot, cite to even a single communication in which anyone even mentions, much less facilitates, some global conspiracy.

Instead, Plaintiffs' only "evidence" consists of the Bloomberg chats of a few small groups of traders, who allegedly formed private chat rooms to share information and trading strategies among themselves, to the exclusion of the rest of the FX marketplace. These chats represent no more than a drop in the ocean of marketplace communications, and are the exact same chats that formed the basis of actions taken by various regulators against some of the Defendant Banks. In bringing those enforcement proceedings, however, regulators *never once* described the alleged wrongdoing as a single global conspiracy. Credit Suisse 56.1 Statement ¶¶ 115–26, 135–36.

---

[10]     *See, e.g.*, DE 17 (July 19, 2019 Dep. of ██████████ ("████ Tr.")) 93:2–14; DE 18 (Apr. 5, 2018 Dep. of ████████) 85:6–20, 83:24–84:2.

Instead, they described mini-conspiracies in which a small group of traders shared information among themselves, allegedly to the detriment of other Defendant Banks and other market participants.  *See* TAC ¶¶ 298–325; Oct. 29, 2020 Pls.' Pre-Mot. Letter (ECF No. 1518); July 15, 2020 Pls.' Letter re Judicial Notice (ECF No. 1478); July 22, 2020 Credit Suisse's Letter Response (ECF No. 1481).

At earlier stages of this litigation, Plaintiffs have admitted – indeed touted – the fact that the cases brought by regulators did not prove a global conspiracy and that Plaintiffs' claims of a global conspiracy were far more ambitious than the regulators' allegations.  Jan. 12, 2018 Pls.' Mem. of Law in Supp. of Mot. for Final Approval of Fifteen Settlement Agreements (ECF No. 925) at 14 ("[T]he governmental findings and allegations were all narrower in scope than [this] Action"); Jan. 12, 2018 Pls.' Mem. of Law in Supp. of Lead Counsel's Mot. for Att'ys' Fees (ECF No. 938) at 17–18 (governmental findings "do not suffice to prove the more expansive allegations in this Action").  But Plaintiffs now suggest the opposite – that the evidence of these mini-conspiracies can somehow suffice to prove an all-encompassing global conspiracy.  As discussed below, this position is inconsistent with both the facts and the law, which require the parties and the courts to rigorously distinguish between several, small conspiracies of a similar sort, and one overarching conspiracy in which all participants agree on, and work together towards, a common goal.

**LEGAL STANDARDS**

To avoid summary judgment, Plaintiffs must raise a genuine dispute of material fact as to the existence of the single global conspiracy they allege.  Contrary to Plaintiffs' misreading of the case law, Credit Suisse has no factual burden here, not even an "initial burden of production" as Plaintiffs argue.  Nov. 5, 2020 Pls.' Reply Letter (ECF No. 1534) at 1.  The Supreme Court has

made clear that, at the summary judgment stage, the nonmoving party who bears the burden at trial – here Plaintiffs – must "come forward with specific facts showing that there is a *genuine issue for trial*," and this means "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586–87 (emphasis in original) (citation and internal quotation marks omitted).

Although factual inferences are drawn in the nonmoving party's favor, the moving party need not "produce evidence showing the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 325. Rather, it is sufficient to "point[] out to the district court [] that there is an absence of evidence to support the nonmoving party's case." *Id.* Credit Suisse has done that here, and it is now Plaintiffs' burden to come forward with specific facts supporting their allegation of a single global conspiracy encompassing 52 currency pairs and hundreds of traders.

To do so, Plaintiffs must demonstrate that each alleged participant: (1) knew of the single conspiracy and understood the nature of the conspiracy and its scope; (2) intended to join the single conspiracy to further its unlawful objective; and (3) became interdependent upon the other members of the single conspiracy. *See, e.g.*, *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d at 15–16 ("Plaintiffs must prove that each Defendant was united in a common unlawful goal or purpose," "intended to join the [alleged] conspiracy," and made a conscious commitment "to advance the [alleged conspiracy's] unlawful purpose"); *United States* v. *Johansen*, 56 F.3d 347, 351 (2d Cir. 1995) (determining whether a single or multiple conspiracies have been proven by looking at "whether a jury could reasonably infer that [an alleged conspirator] participated in the alleged enterprise with a consciousness of its general nature and extent"); *Staley* v. *Gilead Sciences, Inc.*, 2020 WL 5507555, at *7–8 (N.D. Cal. July 29, 2020) (to find single conspiracy, alleged conspirators "must each have had an understanding about the nature of the conspiracy and its

scope" and "[t]he coconspirators must have knowingly embraced a common criminal objective" (citation omitted)).   At summary judgment, courts routinely determine whether the evidence supports the scope of conspiracy alleged and dismiss unsupported claims of a large overarching conspiracy.  *E.g.*, *Meredith Corp.* v. *SESAC LLC*, 1 F. Supp. 3d 180, 224 (S.D.N.Y. 2014); *Dahl* v. *Bain Capital Partners, LLC*, 937 F. Supp. 2d 119, 135 (D. Mass. 2013).

Plaintiffs must provide "strong direct or strong circumstantial evidence" on these points, *see Apex Oil*, 822 F.2d at 253, and the evidence must also "tend[] to exclude the possibility" that the defendants, or subgroups of them, acted independently, *Monsanto*, 465 U.S. at 764. "[E]vidence of parallel conduct alone cannot suffice to prove an antitrust conspiracy."  *Apex Oil*, 822 F.2d at 252.   Moreover, evidence of "varying courses of action [among co-conspirators]…undermines [the plaintiff's] assertion that defendants' 'parallel' conduct supports an inference of a conspiracy." *Anderson News, L.L.C.* v. *American Media, Inc.*, 899 F.3d 87, 105–06 (2d Cir. 2018) ("[C]ourts have rejected arguments that an antitrust claim can survive summary judgment based on evidence that defendants . . . engaged in conscious parallelism" (citations omitted)).  If the evidence would not allow the finder of fact to conclude that, more likely than not, each conspirator made a conscious commitment to the alleged single conspiracy, or "if the evidence is in equipoise, then summary judgment must be granted against the plaintiff."  *Id.* at 98.

As discussed below, the evidence provides no support for the six-year, 52-currency pair, conspiracy involving hundreds of traders and 16 Defendant Banks that Plaintiffs allege, and in fact belies the existence of such a conspiracy.  Because there is no triable issue of fact on this threshold issue, summary judgment against Plaintiffs is warranted.

10

**ARGUMENT**

Plaintiffs have always been free to allege that certain Defendants engaged in a series of small conspiracies involving a handful of traders in various chat rooms, as several regulators have in connection with the regulatory resolutions on which Plaintiffs rely so heavily.  But, presumably to maximize their potential recovery and their leverage in settlement discussions, Plaintiffs overreach to recast these unrelated chat rooms as a single global conspiracy among all FX traders at all 16 Defendant Banks.  The strategy has been successful for Plaintiffs up to this point. Plaintiffs have benefited from an initial presumption in favor of their allegations to defer having to produce evidence of the supposed global conspiracy, and on this basis they were able to extract large settlements from all Defendants except Credit Suisse.  *See* Credit Suisse 56.1 Statement ¶¶ 9, 12–14.  But Plaintiffs can no longer delay scrutiny of the substance behind their claims.  They must now produce evidence of the global conspiracy they allege, or their claims cannot proceed beyond summary judgment.  As discussed below, not only does the evidence utterly fail to support Plaintiffs' claim of a single, vast conspiracy among hundreds of traders employed at 16 Defendant Banks to widen spreads, it directly refutes it.

I.   **THERE IS NO EVIDENCE OF A SINGLE, VAST CONSPIRACY AMONG THE HUNDREDS OF FX TRADERS AT ALL 16 DEFENDANTS TO WIDEN SPREADS IN 52 CURRENCY PAIRS**

After years of discovery, there is not a shred of evidence with which Plaintiffs could make the required showing of a triable issue as to the existence of a single, vast conspiracy among Defendants who, as Plaintiffs allege, "hav[e] a combined global market share of over 90%," TAC ¶ 3; *see also* Jan. 31, 2019 Pls.' Reply Mem. of Law in Supp. of Pls.' Mot. for Class Cert. (ECF No. 1213) at 11 (describing the conspiracy as "marketwide").  There is no evidence of any in-person or online gathering where all 16 Defendant Banks met to discuss the alleged conspiracy. Nor is there anything to suggest that the 16 Defendant Banks somehow, without speaking, reached

11

a "meeting of the minds" regarding a conspiracy.  Perhaps most telling, there is nothing to indicate that any FX trader (much less the hundreds who would have needed to sign on) believed that he or she was part of a vast conspiracy.  At the risk of stating the obvious, the law is clear that without some evidence of a conspiratorial agreement, one cannot prove a conspiracy.  *See, e.g.*, *Monsanto*, 465 U.S. at 764 (each alleged coconspirator must have "had a conscious commitment to a common scheme" (citations omitted)).

In the millions of pages of chat transcripts, and reams of deposition testimony, not one of the traders – the supposed participants in the global conspiracy – made any reference to such a broad agreement.  If there were even a remote possibility, let alone a triable issue of material fact, that a global conspiracy existed, *someone* would have referenced it in the six years of its supposed existence, or in the dozens of depositions in this case.  No one did.  In fact, as discussed below in Section II, every trader who addressed this issue at deposition testified that they knew nothing about such an all-Defendants price manipulation agreement, and they uniformly denied being part of any such conspiracy.  Without any proof that even one trader believed the conspiracy existed, Plaintiffs cannot begin to satisfy their burden of demonstrating that each of the hundreds of alleged co-conspirators "knew of the [alleged] conspiracy's general scope and purpose."  *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d at 15–16.

Nor is it availing for Plaintiffs to retreat to the oft-cited axiom that one need not have "full knowledge of all the details of the conspiracy . . . or its scope in order to be a member."  Oct. 29, 2020 Pls.' Pre-Mot. Letter (ECF No. 1518) (quoting *Meredith*, 1 F. Supp. 3d at 213) at 2.  While one may not need to be aware of every aspect of a conspiracy to be held liable, one does need to be aware that the purported conspiracy exists.  Because even that most basic showing cannot be made here, Plaintiffs have no prospect of establishing the conspiracy they allege.  *See Monsanto*,

465 U.S. at 764; *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d at 15 (plaintiffs "must show that each Defendant had knowledge of an agreement as to the overall conspiracy" and "was united in a common unlawful goal or purpose"); *Staley* v. *Gilead Sciences, Inc.*, 446 F. Supp. 3d 578, 593–94 (N.D. Cal. 2020) (each conspirator must know "of his connection to the charged conspiracy – *i.e.*, that the defendant was aware of the unlawful object toward which the agreement [was] directed" (internal quotation marks omitted)).

As a substitute for actual proof of a single conspiracy, Plaintiffs collect a series of disconnected chats and regulatory settlements (the latter of which are plainly inadmissible)[11] showing, at most, that small groups of traders reached *ad hoc* agreements among themselves to manipulate spreads in particular currencies.  Oct. 29, 2020 Pls.' Pre-Mot. Letter (ECF No. 1518) at 2 (alleging, for example, improper agreements in a chat involving traders from Goldman Sachs, RBS, and Credit Suisse, and a separate chat involving traders from Credit Suisse, Morgan Stanley, and JPMorgan).

This is just a distraction, since there is no evidence uniting these small groups in a common purpose:  nothing ties the chat rooms together, and nothing suggests the separate chat rooms were coordinated in any way, much less that they were all interdependent.  Without such evidence, the small group chat rooms evidence nothing more than, at most, a series of separate, "mini-

---

[11]     The vast majority of the regulatory findings, including the one regulatory settlement to which Credit Suisse was a party, contain no factual admission of guilt (Credit Suisse 56.1 Statement ¶¶ 115–18, 124–29, 135, 138–39) and accordingly are inadmissible.  *Lipsky* v. *Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (holding consent judgment inadmissible); *see, e.g.*, *In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593-95 (S.D.N.Y. 2011) (barring admission of a CFTC Order for the purpose of proving liability); *In re Merrill Lynch & Co., Inc. Research Reports Securities Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) ("Second Circuit case law makes it clear that references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial.").  *See also* July 22, 2020 Credit Suisse's Letter re Judicial Notice (ECF No. 1481).  And the five regulatory findings containing a factual admission of guilt do not involve Credit Suisse (Credit Suisse 56.1 Statement ¶¶ 115–17, 124–29, 135, 138–39) and are thus similarly inadmissible against Credit Suisse.

conspiracies," not a single conspiracy. *See In re K-Dur Antitrust Litig.*, 2016 WL 755623, at *22 (D.N.J. Feb. 25, 2016) (evidence of single conspiracy insufficient because plaintiffs did not demonstrate that "rim" connected the "spokes" of alleged conspirators); *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 56–57 (1st Cir. 2016) (upholding judgment for defendants on single conspiracy issue where plaintiffs failed to prove "the existence of a rim to the wheel" of alleged conspirators (citation and internal quotation marks omitted)).

Courts have routinely rejected at summary judgment efforts to mischaracterize evidence of a more limited conspiracy as support for something greater. *See, e.g.*, *Meredith*, 1 F. Supp. 3d at 224 (dismissing at summary judgment claim of single copyright infringement conspiracy among defendant and more than 20,000 music composers even though evidence supported a narrower conspiracy); *Dahl*, 937 F. Supp. 2d at 135–38 (narrowing at summary judgment claim of single price-fixing conspiracy among private equity firms); *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d at 20 (at summary judgment, evidence offered linking defendant to certain conspirators "[did] not indicate even an inference of [the defendant's] knowledge of or participation in" the alleged "all-vitamins" conspiracy).

Yet Plaintiffs attempt to induce that very mistake in this case. For example, it is not proper to suggest that, simply by virtue of the fact that all traders prefer wider spreads, they must be viewed as members of a single conspiratorial effort. The Supreme Court has cautioned against "confus[ing] the common purpose of a single enterprise," which indicates a single conspiracy, "with the several, though similar, purposes of numerous separate adventures of like character," which fails to establish a single conspiracy. *Kotteakos* v. *United States*, 328 U.S. 750, 769 (1946) (multiple groups were not part of the same conspiracy merely because they all engaged in fraudulently procuring loans); *see also Johansen*, 56 F.3d at 351 (single conspiracy not established

by evidence of "several credit card fraud conspiracies" because there was "no evidence . . . linking them together in a single overall conspiracy"); *Staley*, 2020 WL 5507555, at *7–8 (allegation of single antitrust conspiracy not supported by evidence that three companies were simultaneously developing similar antiretroviral drugs used in treatment of HIV).  Applying that principle here, although it may be true that most traders prefer greater profitability, that does not prove a conspiracy, as traders may be pursuing that goal independently, rather than in concert with one another.  Unless Plaintiffs can exclude that possibility, their claim cannot stand.  *See Monsanto*, 465 U.S. at 764 ("There must be evidence that tends to exclude the possibility that the [alleged co-conspirators] were acting independently.").

Nor would it be sufficient for Plaintiffs to argue that certain discrete groups of traders acting together knew that other small groups were doing the same.  "[M]ere knowledge of another similarly motivated conspiracy . . . do[es] not prove one overall agreement." *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d at 16; *see also Apex Oil*, 822 F.2d at 253 ("[P]arallel conduct alone will not suffice as evidence of such a conspiracy, even if the defendants knew the other defendant companies were doing likewise." (citation and internal quotation marks omitted)); *In re K-Dur Antitrust Litig.*, 2016 WL 755623, at *24 ("Plaintiffs have not satisfied their burden . . . by stating that [one defendant] knew about the alleged conspiracy between" two other defendants).  This is only common sense.  A driver speeding on a highway knows, and in fact can see, that other drivers are also speeding, but the fact that drivers in separate cars know they are violating the law in similar ways does not make them co-conspirators.  This is equally true of small groups of traders operating in separate, exclusive interbank chat rooms.

It is similarly unavailing for Plaintiffs to assert, as they have, that members of different interbank chat rooms had "frequent communications" or "personal relationships" with one

15

another,[12] since this does nothing to "suggest[] that any single interaction was the result of a larger scheme." *Dahl*, 937 F. Supp. 2d at 136–37 ("frequent communications," "friendly relationships" and a "kaleidoscope of interactions among an ever-rotating, overlapping cast of Defendants" did not establish a single conspiracy); *Anderson News, L.L.C.* v. *American Media, Inc.*, 123 F. Supp. 3d 478, 507–08 (S.D.N.Y. 2015) (holding that evidence of "close relations or frequent meetings" among competitors could not support finding of a single conspiracy (citation omitted)).

Plaintiffs' citation in their pre-motion letter (ECF No. 1518) to Judge Engelmayer's decision in *Meredith*, 1 F. Supp. 3d 180, is curious, since it makes clear that Plaintiffs cannot establish the single conspiracy they have alleged, and that summary judgment in favor of the Credit Suisse Defendants is appropriate. In *Meredith*, plaintiffs claimed that the defendant, SESAC, and more than 20,000 music composers whose copyrights SESAC licensed, were engaged in a vast, single conspiracy to raise the prices of licenses. *Id.* at 186. At summary judgment, the court found that there was sufficient "evidence of concerted action" to support a price-fixing charge as to SESAC and a small subset of the composers. *Id.* at 207–09. But the court also recognized the absence of proof that the large majority of the 20,000 composers "expected SESAC to act illegally, knew either generally or specifically" of SESAC's anti-competitive conduct, "or agreed, even tacitly, to any such course." *Id.* at 210. The court noted that there was "no competent evidence as to what any of these musicians or composers knew or assumed" SESAC's practices to be, and without such proof, plaintiffs' claim that they were all involved in a broad conspiracy "rests on sheer speculation," and "to permit the claim of such a vast illegal agreement to go to trial would

---

[12]   DE 2 (Pls.' Responses and Objections) at p. 20 ("The hundreds of traders participated in, collectively, thousands of chatrooms, with many traders participating in up to dozens of chatrooms at one time. . . . Traders were also connected socially, they formed personal relationships with traders at other banks through social engagements.").

indulge sloppy conspiracy theories and unfairly demean" many of the composers. *Id.* at 210–11. Judge Engelmayer therefore granted summary judgment to the defendants to the extent that their alleged liability was based "on a claim of a sweeping pact" among all the composers. *Id.*

Plaintiffs' claims in this case suffer from the same fatal defect. They ask the Court to simply assume a vast conspiracy among hundreds of traders employed by 16 Defendant Banks from nothing more than a series of at most smaller agreements among limited and exclusive groups of FX traders employed by Defendant Banks. Inferring such a pervasive conspiracy on this basis would be no more than "sheer speculation," *id.*, since there is no evidence at all concerning the vast majority of the supposed participants, and no evidence that even a single supposed participant understood he or she was part of such a global conspiracy.

The absence of a global conspiracy is also confirmed by the regulators around the globe who spent years investigating this matter. *See* Credit Suisse 56.1 Statement ¶¶ 115–41. These regulators – including the U.S. Department of Justice, the Federal Reserve Board, the Commodity Futures Trading Commission, the New York State Department of Financial Services, the United Kingdom's Financial Conduct Authority and many others – used their formidable combined resources to conduct exhaustive multiyear investigations of the FX markets. *Id.* Despite having every incentive to charge the broadest possible conduct, access to the same chat room evidence available in this litigation, and the assistance of the cooperating banks, none of the regulators charged anything approaching the global conspiracy alleged by Plaintiffs. *Id.*

Instead, the regulators charged conspiracies involving small groups of traders and small numbers of currency pairs, and none even alluded to a global conspiracy. *Id.* Plaintiffs' counsel admit as much when it serves their purposes. When they sought the Court's approval of their settlements with other defendants, and for their hundreds of millions of dollars in fees, Plaintiffs'

counsel acknowledged that "the governmental findings and allegations were all narrower in scope than [this] Action," Jan. 12, 2018 Pls.' Mem. of Law in Supp. of Mot. for Final Approval of Fifteen Settlement Agreements (ECF No. 925) at 14, and "do not suffice to prove the more expansive allegations in this Action. . . ."  Jan. 12, 2018 Pls.' Mem. of Law in Supp. of Lead Counsel's Mot. for Att'ys' Fees (ECF No. 938) at 17.  On this, Plaintiffs and Credit Suisse are in agreement.

In other words, Plaintiffs have effectively acknowledged what everyone else who has comprehensively reviewed the evidence already knows – that there was no global conspiracy, and that it would be an inordinate waste of judicial and party resources to present this case to a jury.

## II.   THE EVIDENCE AFFIRMATIVELY REFUTES PLAINTIFFS' ALLEGATION OF A SINGLE CONSPIRACY

Plaintiffs' inability to provide any evidentiary support for the alleged global conspiracy should spell the end of this matter – Credit Suisse respectfully submits that its summary judgment motion can and should be granted on that basis alone.  But it is also worth noting that the validity of this outcome is confirmed by the evidence, which affirmatively disproves the existence of any global conspiracy.

### A. Every Fact Witness Who Testified About a Single Conspiracy Denied Its Existence and Traders Denied Its Plausibility.

Each of the more than one dozen traders who testified about the alleged global conspiracy expressly denied its existence.[13]  Those traders included several who previously *admitted* their

---

[13]     DE 20 (Aug. 1, 2019 Dep. of ██████████) 94:17–95:2; DE 21 (Aug. 13, 2019 Dep. of ██████████) 200:7–18; DE 22 (Nov. 29, 2018 Dep. of ██████ ("██ Tr.")) 258:11–22; DE 23 (Sept. 24, 2019 Dep. of ██████████) 187:6–10; DE 24 (Aug. 21, 2019 Dep. of ██ ("██ Tr.")) 175:10–25; DE 4 (██████ Tr.) 251:16–21; DE 25 (Aug. 24, 2020 Dep. of ██████████) 279:24–280:5; DE 8 (██████ Tr.) 260:6–12, 279:16–20; DE 26 (Oct. 27, 2020 Dep. of ██████████) 149:17–24; DE 27 (Nov. 6, 2019 Dep. of ████████) 214:10–20; DE 3 (██████ Tr.) 262:7–12; DE 28 (Dec. 15, 2020 Dep. of ████████) 224:1–5; DE 29 (Dec. 16, 2020 Dep. of ████████) 307:5–21; DE 30 (Jan. 14, 2021 Dep. of ████████) 327:9–15; 331:4–12; DE 17 (██████ Tr.) 282:20–285:13; DE 31 (Dec. 16, 2020 Dep. of ████████ ("██ Tr.")) 218:21–25; DE 32 (Jan. 15, 2021 Dep. of ████████ ("██████ Tr.")) 135:7–10.

18

participation in smaller "mini-conspiracies" as part of a guilty plea or in connection with their service as a cooperating witness for the government in criminal trials concerning the manipulation of certain currency pairs among small groups of traders.  DE 17 (███████ Tr.) 282:20–285:25, 320:1–4; DE 31 (███████ Tr.) 200:12–201:2, 202:7–203:3, 218:21–25; DE 32 (███████ Tr.) 11:14–12:16, 135:7–10.

Traders not only denied the existence of a global conspiracy, but explained why it was implausible and how traders routinely acted in ways that were plainly inconsistent with the notion of a global conspiracy.  More specifically, Plaintiffs acknowledge that "the FX market is the largest financial market in the world, trading 24 hours per day over 252 trading days per year,"  DE 1 (Robin Report) ¶ 26 (footnote omitted), and traders have emphasized that this depth and breadth make it essentially impossible to form and operate a global conspiracy.  Former trader ███████ ███████, a cooperating witness for the government, explained how unworkable such a conspiracy would be:  "To dominate a market with such high volumes in any currency pair for any significant amount of time . . . I would argue that that is relatively impossible, for any single entity to do that, or small group of people."  DE 17 (███████ Tr.) 319:13–19.  Another trader confirmed that the FX markets are "far too big for anyone to pre-determine" spreads across the markets.  DE 22 (███████ Tr.) 258:23–259:5.  Still another trader testified that "[i]t's an almost impossibility" "to coordinate giving out spreads in coordination with many banks."  DE 19 (███████ Tr.) 89:25–90:19.[14]  Such evidence directly undermines Plaintiffs' allegations.

Traders also routinely testified about the impossibility of coordinating with 16 other banks on prices and spreads in light of the fast-moving nature of the FX markets and the fact that traders

---

[14]    *See also* DE 10 (███████ Tr.) 245:11–14 (testifying that participants in a chat room would not have the power to affect spreads "[b]ecause I think there's a lot of people that provide FX and if . . . four or five of us decide to widen spread, they're going to deal somewhere else").

often only had seconds to quote prices or spreads in response to client requests.  DE 3 (███████ Tr.) 258:8–9; DE 4 (███████ Tr.) 242:1–5; DE 5 (███████ Tr.) 27:2–14.  As one trader put it,

> There was no agreement on spread that was going to be shown, because the spread would change with volatility.  So even, you know, I am not talking day on day or week on week, I am talking minute on minute.  The spreads were so fluid, certainly about the time period we are talking around, 2007 to 2013, the market was . . . extremely volatile.  So spreads were changing all of the time.

DE 24 (███████ Tr.) 69:12–19.  Accordingly, Plaintiffs' theory that hundreds of FX traders at 16 banks agreed on spreads/prices for each transaction in 52 currency pairs over six years is implausible, at best.  Indeed, as discussed below, contemporaneous communications prove that this did not occur.

**B.  There Was Fierce Competition Among Traders, Which Undermines the Notion of a Global Conspiracy in Which All Traders Participated.**

The evidence demonstrates that competition in the FX markets was fierce and that traders at different banks (indeed, even within the same bank) did not quote uniform prices to potential customers.  *See* Credit Suisse 56.1 Statement ¶¶ 142–49.  Such behavior is the very opposite of the broad, pervasive cooperation that Plaintiffs must prove to support their theory.  *See Anderson News,* , 899 F.3d at 98; *see also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999) ("The defendants' prices were neither uniform nor within any agreed upon price range of each other . . .  which negates the Plaintiffs' inference of conscious parallelism.").  For example, in a September 2008 chat, traders discussed "a battle royal" among several of the largest banks over a benchmark fixing rate, which is completely inconsistent with the notion that all of the banks were cooperating in a common objective.  DE 33 (RBS_IN_RE_FX _LITIG_00088179) at 182.

Similarly, there are numerous examples of traders attempting to undercut other traders' pricing and *narrow* spreads in order to wrest business away from competing traders.  *E.g.*, DE 34 (CITI-FX-CIVIL-MS_00239592) at 593 (May 2011 internal Citi email chain in which Citi traders

discuss narrowing indicative spreads to win business from a client).  As one HSBC trader said in a chat, "its been a drive mate over the past 6mths really / to *bring spreads in* and win business."  DE 35 (HBEU-FXLITIG-00043803) at 804 (emphasis added).

Even within the same chat room, traders undercut one another.  As the traders themselves explained, it was not uncommon for traders to discuss specific spreads within a chat room, and then later quote narrower spreads to customers in order to take business from their "friends."  DE 8 ( █████ Tr.) 105:5–10 ("Q.  If you learned that a participant in a chat room in which you were a participant was quoting a particular spread to a customer, would you ever quote a narrower spread than the one that you had seen in the chat room?  A. Yes.").[15]

Whether or not traders were actively deceiving one another, and whether or not they were even communicating, it is a simple fact that there were many occasions on which traders at different banks quoted different prices to the same customer.[16]  This is unsurprising given the vastness of the FX markets and the number of traders involved.  But such "varying courses of conduct" affirmatively disprove Plaintiffs' allegation that hundreds of traders at 16 banks all agreed to work together as part of a single, vast conspiracy.  *See Anderson News*, 899 F.3d at 105; *see also In re Baby Food*, 166 F.3d at 132 ("The defendants' prices were neither uniform nor within any agreed upon price range of each other. . . .  [W]hich negates the Plaintiffs' inference of

---

[15]     *See also* DE 36 (Feb. 14, 2019 Dep. of █████████) 75:13–80:10 (" █████████ says: 'how wide 75 eur' . . . at 10:08:21 █████████ says: '4?' . . . █████████ then responds at 10:08:32 with: 'I would try 5' . . . . At 10:09:20 █████████ says 'ok' . . . . Q. Would you expect him to quote a spread of 5 based on your conversation? . . . A. . . . . No, because he may just say 'ok' and then quote a client 4 or even 3 points.").

[16]     *Compare* DE 37 (CITI-FX-CIVIL-MS_00295025) at 028 *with* DE 38 (CS-FXLIT-12196565) at 566 (Citi and Credit Suisse spread matrices from Q2 2012 showing different spreads in the same currencies).  Similarly, *compare* DE 39 (DB-0009895) at 899 (Jan. 23, 2009 chat involving traders from Defendants Deutsche Bank and JPMorgan discussing spread of 100 in 500M NZDUSD) *with* DE 40 (CITI-FX-CIVIL-MS_00015251) at 252 (Jan. 23, 2009 chat involving traders from RBS and Citi discussing spread of 70 or 120 in 500M NZDUSD).

conscious parallelism."); *Valspar Corp.* v. *E.I. du Pont de Nemours*, 152 F. Supp. 3d 234, 250 (D. Del. 2016) (emails expressing uncertainty about supposed conspirators' plans "actually suggest[ed] the absence of an agreement").

### C. The Chat Rooms on Which Plaintiffs Rely Were Limited to a Few Known Participants, Again Undercutting the Notion That All Traders Were Cooperating with One Another.

Finally, the evidence makes clear that interbank chat rooms were not industry-wide, but instead were by invitation only, and were typically limited to small groups of traders who knew one another. Credit Suisse 56.1 Statement ¶¶ 150–64. Indeed, Plaintiffs concede as much in their pre-motion letter, when they emphasize that "chat room membership was limited to people whose ideas could be trusted and could be trusted not to disclose information to others." Oct. 29, 2020 Pls.' Pre-Mot. Letter (ECF No. 1518) at 3. Importantly, the formation of insular and exclusive chat rooms, involving just a few of the hundreds of traders in the FX market, is the very opposite of what one would expect if all Defendant Banks' trading operations were in cooperation.

For example, in one chat room the members made a conscious and explicit decision to exclude a Credit Suisse trader (saying "less is more"), making clear beyond any doubt that the traders in particular chat rooms did *not* believe they were a part of some broader, nearly market-wide undertaking. DE 41 (GS-FX-CIVIL-03317256) at 262, 265–66; *see Monsanto*, 465 U.S. at 764 (defendants must have "had a conscious commitment to a common scheme" (citations omitted)). The record is replete with other examples of small groups of participants in an exclusive chat room deciding to exclude another trader from the chat room.[17]

---

[17]    *See also, e.g.*, DE 42 (CITI-FX-CIVIL-MS_00003175) at 177 (one trader asked a member of the so-called Cartel chat "what do I have to do to get in that ███████████████ chat??," and the "Cartel" chat member responded "ull never get in").

In their deposition testimony, traders repeatedly confirmed that interbank chat rooms were generally limited to a few known participants.  Credit Suisse 56.1 Statement ¶¶ 150–58.  As one trader explained, traders typically only participated in interbank chats with "friends or people [the trader] had worked beside before."  DE 8 (████ Tr.) 90:22–91:4.[18]  Outside of that small group, it was "every man for himself (outside this chat)."  DE 43 (CITI-FX-CIVIL-MS_00165506) at 528 (Citi trader rejecting request for spread information from a UBS trader who was not a member of the chat room).  Perhaps stating the obvious, another member of the chat room testified that this meant "I'm not helping [the UBS trader] because he's not one of us."  DE 32 (████ Tr.) 166:8–21; 168:11–16 ("Meaning he's not in the chat.  He's not part of this ZAR implicit agreement.").

These exclusive chat room groups also often agreed among themselves that information discussed in the chat room should not be shared with those outside the chat room.  DE 44 (BARC-FX-CIV_00607512) at 514 ("ntg leaves this forum").[19]  This is again an aspect of their operation which refutes any notion of vast cooperation.

In sum, there is no plausible argument that Plaintiffs' claims can survive summary judgment on this record.  The evidence not only fails to provide any support for Plaintiffs'

---

[18]     *See also* DE 17 (████ Tr.) 289:6–291:3 (testifying that the "Cartel" chat room was exclusive to its four participants and never included a Credit Suisse trader); DE 31 (████ Tr.) 203:22–204:19, 217:8–218:14 (testifying that the chat room leading to guilty pleas of two traders and one conviction of another trader was exclusive to four traders, did not include traders from Credit Suisse, and that the members of that chat room did not conspire with members of the "Cartel" chat room); DE 32 (████ Tr.) 138:9–25, 152:19–155:18 (same).

[19]     *E.g.*, DE 45 (BARC-FX-CIV_00019697) at 699 (Jan. 15, 2010 chat between traders at Defendants Citi and Barclays in which one trader states, "for your eyes only . . . dont be long cable for a bit."); DE 46 (AO 035679-DOJ) at 680 (May 17, 2012 chat between traders at Defendants BNP Paribas and Morgan Stanley in which one trader states "we on bid eur / keep it low."); DE 47 (GS-FX-CIVIL-04979832) at 837–38 (Nov. 29, 2012 chat between traders at Defendants HSBC and Goldman Sachs in which one trader states "sold chunky usdjpy, literally did not move . . . .  btwn us pls" and a second trader responds "of course / everything stays here.").

allegation of a single, vast conspiracy among hundreds of traders at 16 banks; it clearly and convincingly disproves this allegation.  Thus, Plaintiffs are simply unable to present "specific facts showing that there is a *genuine issue for trial*," and the Supreme Court has made clear that in such circumstances summary judgment should be granted in the defendant's favor.  *Matsushita*, 475 U.S. at 586–87 (emphasis in original) (internal quotation marks omitted).

<u>**CONCLUSION**</u>

For the foregoing reasons, the Credit Suisse Defendants' motion for summary judgment should be granted.

Dated:  January 29, 2020        **CAHILL GORDON & REINDEL LLP**
   New York, New York

By:  <u>/s/Herbert S. Washer</u>
  Herbert S. Washer
  David G. Januszewski
  Elai Katz
  Jason M. Hall
  Sheila C. Ramesh
  32 Old Slip
  New York, New York 10005
  Telephone: (212) 701–3000
  Facsimile: (212) 269–5420
  hwasher@cahill.com
  djanuszewski@cahill.com
  ekatz@cahill.com
  jhall@cahill.com
  sramesh@cahill.com

  *Attorneys for Defendants Credit Suisse*
  *Group AG, Credit Suisse AG, and Credit*
  *Suisse Securities (USA) LLC*