**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST
LITIGATION

No. 1:13-cv-07789-LGS

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF**
**PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**(Contains Materials Designated as Confidential or Highly Confidential)**

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF MATERIAL FACTS ........................................................... 4

   A.  The FX Market.............................................................................................. 4

   B.  FX Dealers' Trading Operations.................................................................. 4

   C.  Spreads Were Important Revenue to Dealers and Wider Spreads Therefore
       Provided the Motive to Conspire ................................................................ 6

   D.  The Conspiracy to Widen Spreads............................................................... 7

       1.  Chat Rooms Provided the Opportunity and Means to Effectuate the
           Conspiracy to Widen Spreads ........................................................... 8

       2.  Traders Engaged in Pervasive Spread Collusion ............................ 11

       3.  The Conspiracy Was Effective Because Traders Could Rely on Well-Known
           Aspects of the FX Market that Facilitated Spread Collusion ........ 18

       4.  Chat Rooms Allowed Traders to Conceal, Monitor, and Enforce the
           Conspiracy ........................................................................................ 21

       5.  Credit Suisse's Experts Confirm that FX Traders Sharing Spreads with
           Competitors Was Collusive ............................................................. 22

       6.  Economic Expert Analysis Reflects the FX Market's Susceptibility to
           Collusion and Economic Analysis of Defendants' Trades Confirms the
           Conspiracy to Widen Spreads ........................................................... 23

   E.  The Conspiracy Ends ................................................................................ 24

       1.  Banks Ban Multi-Bank Chat Rooms and Terminate Traders ........ 24

       2.  Guilty Pleas and Government Actions Relating to FX Misconduct
           Demonstrate the Existence of a Conspiracy ................................... 24

       3.  Credit Suisse's Consent Order Admits FX Gross Misconduct, Including
           Spread Collusion............................................................................... 25

III. ARGUMENT ................................................................................................. 26

   A.  Legal Standard for Summary Judgment .................................................... 26

B.  There Is No Genuine Dispute that a Single Conspiracy to Widen Spreads in
the Spot Market Existed and that Credit Suisse Participated............................................ 27

1.  Overlapping Participants........................................................................... 30

2.  Common Goal........................................................................................... 31

3.  Common Methods..................................................................................... 32

4.  Knowledge ............................................................................................... 35

5.  Interdependence ....................................................................................... 39

IV. CONCLUSION............................................................................................................ 41

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Tobacco Co. v. United States,*
    328 U.S. 781 (1946)..................................................................................................39

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)............................................................................................26, 27

*Apex Oil Co. v. DiMauro,*
    822 F.2d 246 (2d Cir. 1987)....................................................................................27

*Axiom Inv. Advisors, LLC v. Deutsche Bank AG,*
    No. 15-cv-9945, 2018 WL 4253152 (S.D.N.Y. Sept. 6, 2018) ..............................25

*Blumenthal v. United States,*
    332 U.S. 539 (1947)...............................................................................29, 30, 35, 39

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)................................................................................................26

*Coleman v. City of Niagara Falls,*
    No. 09-cv-157S, 2015 WL 4208602 (W.D.N.Y. July 10, 2015)............................25

*Dahl v. Bain Capital Partners, LLC,*
    937 F. Supp. 2d 119 (D. Mass. 2013) .................................................29, 30, 34, 39

*H. L. Moore Drug Exch. v. Eli Lilly & Co.,*
    662 F.2d 935 (2d Cir. 1981)....................................................................................27

*Hicks v. Baines,*
    593 F.3d 159 (2d Cir. 2010)....................................................................................27

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
    No. 06-MD-1175 JG VVP, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014),
    *report and recommendation adopted*, No. 06-MD-1775 JG VVP, 2015 WL
    5093503 (E.D.N.Y. July 10, 2015) ........................................................................33

*In re Auto. Parts Antitrust Litig.,*
    No. 12-md-02311, 2018 WL 2181100 (E.D. Mich. Jan. 31, 2018)...........30, 33, 34

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
    MDL No. 1917, 2016 WL 5848702 (N.D. Cal. Oct. 6, 2016)................................39

*In re High Fructose Corn Syrup Antitrust Litig.,*
    295 F.3d 651 (7th Cir. 2002) ..................................................................................28

*In re High-Tech Emp. Antitrust Litig.*,
    856 F. Supp. 2d 1103 (N.D. Cal. 2012) ...................................................................34

*In re K-Dur Antitrust Litig.*,
    MDL No. 1419, 2016 WL 755623 (D.N.J. Feb. 25, 2016 ........................................41

*In re Polyurethane Foam Antitrust Litig.*,
    152 F. Supp. 3d 968 (N.D. Ohio 2015) ...............................................29, 31, 33, 35

*In re Publ'n Paper Antitrust Litig.*,
    690 F.3d 51 (2d Cir. 2012) .....................................................................................28

*In re Vitamins Antitrust Litig.*,
    320 F. Supp. 2d 1 (D.D.C. 2004) ..............................................................29, 39, 40

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................................26

*Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013) ....................................................................................33

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) ................................................................................................27

*Scott v. Harris*,
    550 U.S. 372 (2007) ................................................................................................27

*Sitts v. Dairy Farmers of Am., Inc.*,
    417 F. Supp. 3d 433 (D. Vt. 2019) ..........................................................................41

*U.S. v. Amato*,
    15 F.3d 230 (2d Cir. 1994) ......................................................................................31

*U.S. v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ....................................................................................28

*U.S. v. Berger*,
    224 F.3d 107 (2d Cir. 2000) ....................................................................................41

*U.S. v. Christie*,
    No. 08 CR. 1244 RWS, 2011 WL 382923 (S.D.N.Y. Feb. 4, 2011) .......................32

*U.S. v. Downing*,
    297 F.3d 52 (2d Cir. 2002) ......................................................................................35

*U.S. v. Eppolito*,
    543 F.3d 25 (2d Cir. 2008) ......................................................................................31

*U.S. v. Johansen*,
    56 F.3d 347 (2d Cir. 1995)............................................................................30

*U.S. v. Maldonado-Rivera*,
    922 F.2d 934 (2d Cir. 1990)..............................................................29, 30, 31

*U.S. v. Martino*,
    664 F.2d 860 (2d Cir. 1981)........................................................................29

*U.S. v. Nat'l Ass'n of Real Estate Bds.*,
    339 U.S. 485 (1950)....................................................................................31

*U.S. v. Portela*,
    167 F.3d 687 (1st Cir. 1999)......................................................................39

*U.S. v. Reid*,
    475 Fed. Appx. 385 (2d Cir. 2012)............................................................32

*U.S. v. Schlussel*,
    No. 08-CR-694, 2008 WL 5329969 (S.D.N.Y. Dec. 15, 2008) ...................26

*U.S. v. Vanwort*,
    887 F.2d 375 (2d Cir. 1989)......................................................................39

*U.S. v. Williams*,
    205 F.3d 23 (2d Cir. 2000).........................................................................39

*U.S. v. Yonkers Contracting Co., Inc.*,
    706 F. Supp. 296 (S.D.N.Y. 1989) .............................................................30

## Statutes, Rules, and Regulations

15 U.S.C.
    §1.............................................................................................................24, 25

Federal Rules of Civil Procedure
    Rule 23(c)(4) ...............................................................................................1
    Rule 56(a)...................................................................................................26

11/16/2009 12:57:49 ███████ . . . :  all seriousness tho can never be a bad thing
                                       colluding spreads. . . .
11/16/2009 12:58:08 ███████ . . .:   14 25 50
11/16/2009 13:01:43 ███████ . . . :  ok thx matey

## I.   INTRODUCTION

On September 3, 2019, the Court certified an issue class pursuant to Rule 23(c)(4) around two questions: (1) whether there existed a conspiracy to widen spreads in the spot market; and (2) whether Credit Suisse participated in the conspiracy.  The answer to both questions is unequivocally yes.  Contemporaneous evidence of Credit Suisse's conduct and that of its conspirators in the form of electronically recorded chat transcripts demonstrates the pervasive existence and use of multi-bank chat rooms to widen spreads in the spot market.

Credit Suisse's conduct in the chat rooms, and that of its 15 conspirators, widened spreads globally across G10 and emerging market currencies alike.  Plaintiffs' "Spread Chat Evidence" summary shows that it became common market practice among the conspirators to "agree" or "get on the same page" with respect to the "right spread," the "correct spread," and the "proper spread." The "right spread" was the "widest you can get away with."  It was axiomatic that "If we all consistent they [customers] hae to except it."  Traders did not exhibit surprise when asked what the right spread was because it reflected the "customs, norms and the practice of the [FX] industry" to "get on the same page," and was encouraged by their supervisors.  As a result, customers paid the price in higher spreads.  As one conspirator put it: there would be "no friends" and "no special prices, etc . . . no stepping up or any of that garbage."

Language like this reflected and embodied the "gentlemen's agreement" or "standard market procedure" that forbade any trader to take advantage of another – that is, to compete by offering narrower spreads.  It would be "daft" to take advantage of a competitor and trade and undercut their spread.

1

The agreement to widen spreads in the FX market operated as a classic cartel where one finds motive, opportunity, mechanism, monitoring and enforcement.  The clear motive was to increase profitability at the expense of the customers.  In the words of a Credit Suisse trader, "just both quote them wide and same that way they [customer] have no tight price."  Instead of competing on price, the cartelists foreswore price competition as well as competition over volume and market share.  There was opportunity due to the opaque nature of the OTC FX market and invitation-only chat rooms.  The mechanism of the cartel was the multi-bank chat rooms which offered a ready means for competitors to widen and/or stabilize spreads.  Monitoring and enforcement took place in these chat rooms which traders logged into each morning.  Traders were in a dozen chats or more, each usually covering numerous currency pairs.  As the image on page 10 shows, Credit Suisse and its 15 conspirators were interconnected through just eight interlocking chat rooms.  Enforcement took the shape of a reciprocity requirement.  If a trader did not "give a little, to get a little" they could be drummed out of the chat room.  Exchanging spreads with your competitors was not a "one way street."  Traders even apologized if they took too long to respond to a competitor's "sanity check" on the "right spread."

Spreads, once established in the multi-bank chat rooms, also were set forth in "spread grids" – price lists that denoted the spreads for a number of currencies over ascending trade sizes – which traders mutually created and exchanged.  Customers "expect[ed] spreads to hold."  Accordingly, the spreads in these grids or "matrices" tended to be durable.  As a result, traders did not need to check in with competitors on every trade.  Spreads could hold for weeks or months so long as "normal market conditions" prevailed.  Moreover, spreads correlated by trade size so that if the cartel established a spread in 100 million, it was easy to work out the spread in 50 million or 200 million.  Spreads also correlated across currency pairs; fixing EUR/USD spreads affected G10

2

and emerging market currencies since trading virtually any currency requires passing through a "leg" of USD or EUR.

Traders bragged about how much money they made in their chat rooms and spoke about how profitable it was to agree on spreads. It was "cartell gold." And the more money the bank made, the more the banks' traders made as well. The chat rooms were a "den of thieves." Fixing spreads made the banks and their traders rich to the detriment of their customers.

The conspiratorial party started to end in late 2012 and 2013 because of regulatory investigations. The conspirators started banning multi-bank chat rooms. The traders knew why: "collusion." One trader bemoaned that with the multi-bank chat rooms shutting down it was not "fun" anymore. Another even joked they would not know how to do their jobs without chat rooms. And, in frank recognition of how profitable the cartel had been, a trader remarked it was going to cost the banks "millions." This observation vindicates Plaintiffs' expert, Professor Singer's econometric analysis that when the party ended, after the lights flickered off in the multi-bank chat rooms, competition broke out and spreads narrowed market wide. The felony guilty pleas and convictions of the conspirators and their traders for violating the antitrust laws, along with the Consent Order Credit Suisse agreed to with the NYDFS which found "Spread Collusion," merely corroborate what the contemporaneous evidence and economic analysis demonstrate: the existence of a market wide conspiracy to widen spreads.

## II.     STATEMENT OF MATERIAL FACTS

### A.     The FX Market

The FX market, where currencies are bought and sold, trades 24 hours a day and around the world.[1]  The FX market is predominantly over-the-counter.[2]  FX trades in currency pairs, *e.g.*, euro / dollar (EUR/USD)[3] with each trade the simultaneous purchase of one currency and the sale of another.[4]  The spot trade, where two parties exchange currencies with settlement within two days, underlies pricing of all FX instruments.[5]

The FX market is divided into two segments: (1) the dealer to customer segment and (2) the interdealer segment.[6]  In the dealer to customer segment, which is the focus of this case, banks, such as Credit Suisse, acted as a "market makers" or "dealers."[7]  Market makers quoted prices at which they are willing to buy or sell a designated volume of a given currency pair.[8]  In the interdealer segment, FX dealers transacted with each other (and other large institutions) to, among other things, access liquidity to fill customer orders.[9]

### B.     FX Dealers' Trading Operations

FX dealers organized their business around trading desks located in financial centers with most trading conducted through London and New York.[10]  The trading desks consisted of traders

---

[1]      *See* Plaintiff's Responses to Defendants' Local 56.1 Statement of Facts and Plaintiffs' Local 56.1 Statement of Additional Material Facts (hereinafter, "Ps' 56.1 Stmt."), ¶¶39, 41.
[2]      Ps' 56.1 Stmt., ¶44.
[3]      Ps' 56.1 Stmt., ¶45.
[4]      *Id.*
[5]      Ps' 56.1 Stmt., ¶47, DE 1, Robin Report, ¶32.
[6]      Ps' 56.1 Stmt., ¶50.
[7]      Ps' 56.1 Stmt., ¶55.
[8]      Ps' 56.1 Stmt., ¶184.
[9]      DE 1, Robin Report, ¶33.
[10]     Ps' 56.1 Stmt., ¶173.

and sales.[11]   Spot traders' desks were clustered to facilitate easy communications,[12] as the following images of Credit Suisse's New York and London desks illustrate.[13]

NEW YORK TRADING DESK    LONDON TRADING DESK



Furthermore, dealers' trading desks located in various regions were linked through intercoms, telephones, Bloomberg or Reuters chats, and emails, again facilitating easy communications.[14]

Spot traders were responsible for making the prices shown to the dealer's customers and managing the dealer's risk.[15]   The larger currency pairs (by volume), such as "euro dollar" (EUR/USD), "dollar yen" (USD/JPY), and "Cable" (GBP/USD), had dedicated spot traders.[16] Smaller currency pairs, such as the Scandinavian currencies or emerging market currencies, were often grouped together and assigned to a single spot trader.[17]   Spot traders routinely covered each other's currencies when the usual trader was out, assuring seamless coverage for the desk.[18]   Spot traders reported to a trading desk head.[19]

---

[11]     Ps' 56.1 Stmt., ¶174.
[12]     Ps' 56.1 Stmt., ¶175.
[13]     PE 22 (CS-FXLIT-05041024(LONDON)); PE 23 (CS-FXLIT-11226761 (New York)).
[14]     Ps' 56.1 Stmt., ¶176.
[15]     Ps' 56.1 Stmt., ¶178.
[16]     Ps' 56.1 Stmt., ¶180.
[17]     Ps' 56.1 Stmt., ¶181.
[18]     Ps' 56.1 Stmt., ¶182.
[19]     Ps' 56.1 Stmt., ¶183.

In a typical spot trade, the customer contacted a bank's FX salesperson for a quote on a given volume of a particular currency pair.[20]  The salesperson relayed the order to the spot trader, who then made a price, typically consisting of a "bid" (the price at which a bank offers to purchase a currency) and an "ask" (the price at which a bank offers to sell a currency).[21]  The difference between the bid and ask is the "bid-ask spread" or the "spread."[22]  The trader relayed the price to the salesperson, who then communicated it to the customer.  The customer either transacted or declined.[23]

### C.   Spreads Were Important Revenue to Dealers and Wider Spreads Therefore Provided the Motive to Conspire

Spreads were important to both dealers and customers.  For dealers, the spread was effectively the price they charged for serving as a market maker.[24]  It was an important source of revenue.[25]  Accordingly, dealers wanted wider spreads.[26]  Wider bid-ask spreads allowed them to buy lower (on the bid) and sell higher (on the ask), increasing the likelihood for profits on a trade.[27]

Furthermore, dealers compensated their spot traders on the profitability of their trading activity.  Wider spreads increased bank profits which resulted in larger bonuses.[28]  Dealers thus incentivized traders to show wider spreads to customers with more than one trader remarking the "right spread is the widest the custy deals on."[29]

---

[20]   Ps' 56.1 Stmt., ¶68.
[21]   *Id*.
[22]   *Id*.
[23]   *Id*.
[24]   Ps' 56.1 Stmt., ¶185.
[25]   *Id.*
[26]   Ps' 56.1 Stmt., ¶186.
[27]   *Id*. (quoting, among other things, ███████ Dep. at 93:5-16 (testifying that a wider spread would potentially enable Credit Suisse to buy lower and sell higher)).
[28]   Ps' 56.1 Stmt., ¶188.
[29]   *See, e.g*., PE 1-250; PE 1-274 ("the right spread is the widest custy deals on").

Conversely, because spreads reflect the price customers pay to transact in FX, customers wanted narrower spreads.[30]  As spreads narrow, prices become more competitive, and the costs of trading decrease.[31]  Accordingly, spreads played a central role in the customers' decision to place any order with a particular dealer.[32]

As a result, FX dealers, such as Credit Suisse, should have competed with other dealers on the basis of the spreads they showed to their customers.[33]  If a dealer showed a spread that was too wide, a customer could have chosen to trade with another dealer offering tighter spreads, *i.e.*, lower trade costs.[34]  The Office of Comptroller of the Currency acknowledged the bid-ask spread's significance to competition by characterizing the spread that an FX dealer shows to its customers as proprietary bank information.[35]

### D.     The Conspiracy to Widen Spreads

Beginning at least as early as December 1, 2007, Credit Suisse and its conspirators conspired to widen and/or stabilize spreads, *i.e.*, prices, across the FX market, including both G-10 and emerging market currency pairs.[36]  Through the pervasive use of multi-bank chat rooms, the conspirators agreed to widen and/or stabilize spreads quoted to customers, enabling Credit Suisse and its competitors to restrain competition on spreads with the goal of increasing their profits.[37]  As set forth below, the evidence from contemporaneous chat room transcripts (direct evidence akin to a recorded phone call), deposition testimony, trial testimony, guilty pleas, a guilty

---

[30]     Ps' 56.1 Stmt., ¶189.
[31]     Ps' 56.1 Stmt., ¶190.
[32]     Ps' 56.1 Stmt., ¶191.
[33]     Ps' 56.1 Stmt., ¶192.
[34]     Ps' 56.1 Stmt., ¶191.
[35]     Ps' 56.1 Stmt., ¶195.
[36]     Conspirators included Credit Suisse and all 15 settling defendants.
[37]     *See generally* PE 1 (Chat Summary).

verdict, and other regulatory findings and consent orders prove the existence of the conspiracy to widen spreads and Credit Suisse's participation.[38]

### 1.    Chat Rooms Provided the Opportunity and Means to Effectuate the Conspiracy to Widen Spreads

In late 2006 and early 2007, FX traders began using permanent Bloomberg and Reuters chat rooms to communicate with each other in the ordinary course of their employment on a daily basis.[39]   Chat rooms allowed traders who worked at competing market makers to communicate instantaneously with each other as if they were on the same trading desk.[40]   Once formed, chat rooms could, and did, exist for years.[41]   By the beginning of the Class Period, Credit Suisse and its conspirators' pervasive use of Bloomberg or Reuters-based chat rooms had become ubiquitous.[42]   For the dealers' traders, the first task of the day was logging into multi-bank chat rooms and their participation in these chats throughout the trading day became essential.[43]

The conspirator banks encouraged their traders to participate in multi-bank chat rooms and coordinate spreads shown to customers with their competitors.[44]   Former Credit Suisse trader, ███,  ███ testified that Credit Suisse, "encouraged . . . us to use interbank chat rooms.  During those chats we were asked to talk about what spreads were out there in the market at the time."[45]   He

---

[38]      The evidence offered in support of Plaintiffs' motion and in opposition set forth below are but examples chosen by the constraints of space.  *See* ECF No. 1555 at 2.  Plaintiffs could easily triple or quadruple the size of their "Chat Summary."

[39]      Ps' 56.1 Stmt., ¶196 (citing, PE 1-2, CS-FXLIT-10017196 at 96 (On February 20, 2007, ███ (Credit Suisse), ███ (RBS), and ███ (Goldman Sachs) formed a chat room, indicating that it was a new way for the traders to communicate. ███ "hello . . . testing testing." ███ "ah hello." ███ "the[y] wil[l], let anyone have bbg [Bloomberg] these days." ███ "times are a changung ███"); PE 1-1, BARC-FX-CIV_00501847 at 1847-48 (forming the "Horras" chatroom on December 18, 2016).

[40]      Ps' 56.1 Stmt., ¶198 (citing, among other things, PE 10, ███ Dep. at 116:4-12 (testifying that FX traders at Credit Suisse used chat rooms every day in the normal course of business).

[41]      Ps' 56.1 Stmt., ¶197.

[42]      *See generally*, Summary of Chat.

[43]      Ps' 56.1 Stmt., ¶199.

[44]      Ps' 56.1 Stmt., ¶201.

[45]      PE 11, ███ Dep. at 108:11-18.

testified Barclays and HSBC did the same.[46] ███ ███ (BNP, Deutsche Bank), testified that in response to customers complaining about spreads offered, his supervisors would tell him:

> 'What is wrong with you?  Go figure out what is someone else showing and why you're off, because you need to know your business.' . . .  So you kind of begin talking to, you know, these traders you met on the street around the same age, a lot of the time, and you say, oh, this is – I showed this. . . . it was . . . a mutual respect for each other.[47]

Citi's former London desk head, ███ ███ described this chat conduct among traders working at competing banks as "pervasive," reflecting "the customs, norms, and practice of the industry."[48]

Chat rooms were an efficient network to coordinate and agree on spreads.  Traders agreed on the proper or "right" spreads to show customers, including currencies for which they had primary trading responsibility and for currencies for which they did not.[49]  Traders shared spreads being quoted by other members of their trading desks who were not participants in a particular chat room, for example, if the currency pair was outside the expertise of the chat room participants.[50]  Traders also fixed spreads across chat rooms, by copying and pasting their text of one chat into another chat room.[51]

Traders participated in multiple multi-bank chat rooms on a daily basis, thereby forming an extensive, interconnected communication network with would-be competitors.[52]  For example, former Barclays trader, ███ ███ was a member of The Cartel, a founder of The Sterling Lads, a founder of Horras, a member of Slaaaaggggsssss 2, a member of Essex Express, and a participant

---

[46]      PE 11, ███ Dep. at 109:10-20.
[47]      Ps' 56.1 Stmt., ¶201 (PE 30, ███ Dep. at 93:7-94:6).
[48]      Ps' 56.1 Stmt., ¶202.
[49]      Ps' 56.1 Stmt., ¶¶204, 224.
[50]      Ps' 56.1 Stmt., ¶205.
[51]      Ps' 56.1 Stmt., ¶206.
[52]      Ps' 56.1 Stmt., ¶199.

in numerous other chat rooms.[53]  These five above-named chats, among others, provided ████

with continuous access to traders from Credit Suisse and nine other conspirator banks.[54]   A

pervasive interconnected network of chat rooms quickly formed, as shown by the following image

which connects all 16 conspirator banks.



These chat rooms formed just a small segment of the conspirators' interconnected network of

interbank communications about FX spreads.  And, of course, any trader could directly contact

any other trader for a "one-off" chat on Bloomberg and Reuters, as needed.[55]

---

[53]      Ps' 56.1 Stmt., ¶200.
[54]      *See* PE 1-133; PE 1-267; PE 1-268; PE 1-309; PE 1-360.
[55]      PE 1-130; PE 1-454.

Finally, chat rooms enabled traders to maintain and extend their collusion even as they decamped to another bank.[56]  Once ensconced at a new bank, an FX trader simply had to rejoin the chat room.[57]  For example, Credit Suisse trader ███ ████ remained a member of "The Dream Team" chat room even as he moved from Bank of America to Credit Suisse.[58]  Credit Suisse trader ███ █████ admitted that he continued to chat with traders whom he had previously worked with at Bank of America and continued to chat with traders after they moved to other dealers' trading desks.[59]  Former RBS traders, including ████ █████ who worked at Credit Suisse, used multiple chat rooms to coordinate and agree on spreads as if they were still sitting on the same desk, including "RBS Reunion."[60]

## 2.    Traders Engaged in Pervasive Spread Collusion

FX traders used multi-bank chat rooms to agree on spreads that they showed to customers.[61]  Sometimes traders were explicit in their agreement and purpose.  In March 2007, in response to a customer request for spreads, Goldman Sachs FX trader, ████ █████ wrote in a chat room to Credit Suisse trader ████ ████ and RBS trader ████ █████ "*we should all agree on the same spreads it pointless otherwise and we keep cutting spreads more and more* . . . ."[62]  Later, in the same chat room, █████ stated, "***Let's sign a pact on spreads***." █████ responded, "***Agree***." █████ asked █████ "u in." █████ then signified his assent by sharing his spread with the group.[63]

---

[56]    Ps' 56.1 Stmt., ¶207.
[57]    Ps' 56.1 Stmt., ¶207 (PE1-162 (On October 5, 2009, ████ ████ is invited back into The Dream Team chat room after leaving Credit Suisse for Société Générale.)).
[58]    Ps' 56.1 Stmt., ¶207 (PE1-317 (On August 16, 2011, members of The Dream Team welcome ████ █████ back to the chat room.)).
[59]    Ps' 56.1 Stmt., ¶207 (PE 32, ████ Dep. at 91:20–92:11).
[60]    PE 1-252 (11/12/10 chat includes spread discussions by current (████ and former RBS traders now working at Morgan Stanley (████ Credit Suisse (████ Standard Chartered (████ and Credit Agricole (████
[61]    Ps' 56.1 Stmt., ¶220.  *See generally*, PE 1 (Chat Summary).
[62]    Ps' 56.1 Stmt., ¶211 (PE 1-3).
[63]    Ps' 56.1 Stmt., ¶212 (PE 1-22).  The New York Department of Financial Services described the conduct in this chat as "Spread Collusion."  PE 17, *In the Matter of Credit Suisse AG*, NYDFS Consent Order, ¶37.

The pact on spreads was not limited to three traders in one chat room.  Given the traders' social connections, the interconnected and overlapping membership across chat rooms, and their supervisors' insistence that traders participate in multi-bank chat rooms, it soon became "common market practice" among Credit Suisse and its conspirators to coordinate and agree with competitors on the spreads to show customers.[64]  ████ ███ was Deutsche Bank's Chief Dealer on its London desk for nearly a decade (2002-2012).  He testified:[65]

> Q.  ██████ during the relevant time period, was it common market practice in the FX market for traders to discuss what spreads they were actually showing to customers?
>
> A.  I think that is a fair assessment, that we would share information around what we thought were fair spreads.

████ ███ who worked at Credit Suisse for a decade until 2006 and then at Deutsche Bank and Société Générale during the Class Period, testified it was common that "People would discuss the spreads."[66]  Chris Cummins, a Citibank trader who pleaded guilty to price-fixing charges, testified: "a client would call up and ask a number of us in the chat room for the same thing all at the same time, so we would convey to the others what we were being asked, as far as what currency and what size, and then indicate what price we were showing to the client."[67]  ████ testified that traders used chat rooms as a reality check on pricing and that was a common element for any chat room.[68]

████ ███ traded FX at BNP and Barclays during the Class Period and pled guilty to price-fixing.  He testified that asking competitors for spreads was a common practice.[69]  He testified that

---

[64]   Ps' 56.1 Stmt., ¶202 (PE 31, ████ Ex. 1, ████ Witness Statement, ¶98 (████ noted that his conduct in chats, including agreeing on spreads, was the FX traders' "custom, norm and practice.")).
[65]   Ps' 56.1 Stmt., ¶214 (PE 18, █ Dep. at 172:21-173:1).
[66]   Ps' 56.1 Stmt., ¶214 (PE 4, █ Dep. at 148:3-14).
[67]   Ps' 56.1 Stmt., ¶220 (PE 14, ████ Ex. 3, Cummins Testimony in Aiyer Tr. 11/01/19 165:7-15).
[68]   Ps' 56.1 Stmt., ¶209 (DE 32, █ Dep. at 100:6-19).
[69]   Ps' 56.1 Stmt., ¶214 (PE 3, █ Dep. at 178:5-11).

the traders knew "[t]hat if we all set our spreads the same, that the customers are going to have a lot less options, and they'll have to, you know, potentially deal on those wider spreads."[70] ▮▮▮ put it bluntly: with respect to spreads shown to customers, the conspiring banks were "supposed to be independent" but everybody is working together to come up with the right answer.[71]

▮▮▮ ▮▮▮ who cooperated with the DOJ, and worked at Barclays, UBS, and Standard Chartered during the Class Period, admitted he exchanged spreads on a regular basis.[72] ▮▮▮ admitted that traders got on "the same page" with their competitors as to what spreads to show their customers.[73]  He affirmed that these spreads "Would very, very likely would be shown to a wide variety of customers."[74] ▮▮▮ testified that the conspiracy allowed the banks to "mak[e] profits and avoid[] losses" by cooperating with competitors.[75]

While Credit Suisse's former New York desk head ▮▮ ▮▮ admitted that traders should not coordinate on spreads,[76] he testified that his traders were in chat rooms discussing spreads with competitors.[77] ▮▮▮ (Credit Suisse) testified that he used the spreads shared with him by competitors in his own pricing to customers.[78] ▮▮▮ also aided Credit Suisse's competitors on spreads they quoted to their customers.[79]  Credit Suisse trader ▮▮ ▮▮ who sat next to ▮▮ on the New York desk, advised competitors, "just both quote them wide and same that way they [customers] have no tight price."[80]  Three former Credit Suisse traders asserted their Fifth Amendment rights when asked whether Credit Suisse conspired on spreads with its

---

70   Ps' 56.1 Stmt., ¶228 (PE 3, ▮▮ Dep. at 114:7-11).
71   Ps' 56.1 Stmt., ¶238 (PE 3, ▮▮ Dep. at 119:3-16).
72   Ps' 56.1 Stmt., ¶214 (PE 6, ▮▮ Dep. at 178:4-8).
73   Ps' 56.1 Stmt., ¶220 (PE 6, ▮▮ Dep.at 178:22-179:5).
74   Id.
75   Ps' 56.1 Stmt., ¶217 (PE 6, ▮▮ Dep.at 243:13-16).
76   Ps' 56.1 Stmt., ¶234 (PE 10, ▮▮ Dep. at 150:23-151:6).
77   Ps' 56.1 Stmt., ¶201 (PE 10, ▮▮ Dep. 114:1-115:14).
78   Ps' 56.1 Stmt., ¶220 (PE 32, ▮▮ Dep. at 198:12-22).
79   Ps' 56.1 Stmt., ¶220 (PE 32, ▮▮ Dep. at 294:10–20).
80   Ps' 56.1 Stmt., ¶220 (PE 1-286).

13

competitors.[81]  In fact, two dozen traders who were given an opportunity to dispute their conspiracy asserted their Fifth Amendment rights.[82]

The contemporaneous evidence from chat rooms confirms the above testimony and demonstrates a conspiracy to widen and/or stabilize spreads.  Chat transcripts demonstrate that Credit Suisse and its conspirators regularly shared and agreed on spreads for their internal spread matrices or grids.[83]  A spread "grid" or "matrix" is the FX market's equivalent of a price list. It lists various currency pairs along one axis and notional amounts, *e.g.*, 50, 100, 200 million, along another axis.[84]  The grid then lists the spread the dealer is willing to show for that currency pair and amount in normal market conditions.[85]  The following image shows a spread grid produced by Credit Suisse:[86]

| | ASIAN | | LONDON | | NEW YORK | |
|---|---|---|---|---|---|---|
| **AMOUNT(MM)** | **100** | **200** | **100** | **200** | **100** | **200** |
| EUR/USD | 4 | 8 | 3 | 6 | 3 | 6 |
| USD/JPY | 4 | 8 | 3 | 7 | 3 | 7 |
| **AMOUNT(MM)** | **50** | **100** | **50** | **100** | **50** | **100** |
| GBP/USD | 7 | 10 | 4 | 8 | 5 | 10 |
| AUD/USD | 3 | 6 | 3 | 6 | 3 | 6 |
| NZD/USD | 5 | 10 | 6 | 12 | 6 | 12 |
| USD/CAD | 5 | 10 | 5 | 8 | 5 | 8 |
| USD/SEK | 85 | 150 | 50 | 100 | 50 | 100 |
| USD/NOK | 85 | 150 | 50 | 100 | 50 | 100 |
| USD/CHF | 5 | 8 | 4 | 7 | 4 | 7 |
| USD/DKK | 15 | 25 | 10 | 20 | 10 | 20 |

\* spread is required to be exact number, pls do not fill it with a range.

Customers requested spread grids from dealers on a regular basis (typically, updated quarterly) to compare spreads between dealers.[87]  While spread grids were not binding contractual prices, customers expected dealers to trade on spreads listed in the spread grids so long as market

---

[81]     Declaration of Christopher M. Burke ("Burke Decl."), filed concurrently herewith, ¶2.
[82]     *Id.*
[83]     Ps' 56.1 Stmt., ¶233.
[84]     Ps' 56.1 Stmt., ¶230.
[85]     *Id.*
[86]     PE 35, CS-FXLIT-05209291.
[87]     Ps' 56.1 Stmt., ¶232.

conditions were normal, *e.g.*, at least 90% of the time.[88]  Spread grids were written signals to competitors as to what spreads they should use when responding to customers.  They provided a starting point for any price quotes.

Rather than provide their customers with their bank's independent view of what spreads should be, however, the conspirators' traders agreed with each other on the spreads to show in their respective price lists.[89]  In July 2011, ████ (Credit Suisse) and ███ (Barclays), agreed on spreads that ████ inputted into his spread matrix.  ████ asked, "what is the spread in 500 eur usd?"[90] ███ responded, "20 I reckon . . . maybe 18 . . . what were u thinking?" ████ responded "20." ███ responded, "yep it s the right rate mate."  Reflecting an understanding not just of the specific spread to show but the process of collaborating on spreads grids, ████ wrote, "it for a grid . . . *u know the drill*."

Having agreed on what spreads would be quoted in spread matrices, Credit Suisse also colluded with its competitors in the ordinary course to fix spreads as customers sought quotes in the FX spot market.  The language used in the chats clearly proves they were acting in concert in furtherance of a market-wide conspiracy.  When discussing spreads to show customers, traders wrote, "what we showing," "having polled the crowd," "consensus is," and "we always check spreads," what's the "right" spread, and what's the "correct" spreads as the following chats demonstrate:

- In June 2011, ████ ████ (RBS) asked ██████ ███ (Barclays), ███ ██ (UBS), ████ ████ (BTMU), and ████ █ ████ (Barclays) "usdjpy 500 and yard what we showing boys?"[91]

---

[88]     Ps' 56.1 Stmt., ¶231.
[89]     Ps' 56.1 Stmt., ¶233.
[90]     Ps' 56.1 Stmt., ¶233 (PE 1-313).
[91]     Ps' 56.1 Stmt., ¶221 (PE 1-307).

- In October 2008, ▮▮▮ ▮▮ (Barclays) and ▮▮▮ ▮▮ (BNP) discussed the spread in 100 million USD/CAD. ▮▮▮ ▮▮ (Barclays) then wrote "cool yeah having polled the crowd most have said 20-30 area."[92]

- In October 2008, ▮▮▮ ▮▮ (Barclays) told ▮▮▮ ▮▮▮ (Citi) as to spread in 100 million USD/JPY "12-15 [pips] is consensus."[93]

- In March 2010, when discussing spread in GBP/USD with ▮▮▮ ▮ (UBS), ▮▮▮▮ ▮ (Barclays) wrote "its only cos we on chat - we always check spreads."[94]

- In April 2013, ▮▮▮ (Credit Suisse), ▮▮▮ (Standard Chartered), and ▮▮▮ (BNP Paribas) discusses the "right" spread in 200 million EUR/USD.[95]

- In a March 8, 2012 chat, ▮ (Citi) asks whether a 12-pip spread in 200 million AUD is "correct," and ▮▮ (Credit Suisse) responded that the spread should be a "bit wider.  14."[96]

The above examples are in Exhibit 1 ("Chat Summary"), which is a spreadsheet of over 400 representative chats compiled by counsel.  This is a small subset of the universe of chats regarding spread coordination in the discovery record.  But even in its limited form, the Chat Summary illustrates how traders conspired in multi-bank chat rooms to arrive at the "right spread."  As ▮▮▮ (Morgan Stanley) wrote to ▮▮▮ ▮ (HSBC), "all seriousness tho can never be a bad thing colluding spreads . . . ."[97]

As part of their scheme, Credit Suisse and its conspirators agreed that they would not undercut each other's spreads.  When shown a chat where he wrote to a competitor that he did not want to be inside (narrower than) a competitor's spread, ▮▮ testified that it would be "daft" to ask a competitor for his spread and then use it to undercut him.[98]  Traders chided one another to

---

[92]   Ps' 56.1 Stmt., ¶221 (PE 1-59).
[93]   Ps' 56.1 Stmt., ¶221 (PE 1-55).
[94]   Ps' 56.1 Stmt., ¶221 (PE 1-187).
[95]   Ps' 56.1 Stmt., ¶221 (PE 1-447).
[96]   Ps' 56.1 Stmt., ¶221 (PE 1-386).
[97]   Ps' 56.1 Stmt., ¶222 (PE 1-168).
[98]   Ps' 56.1 Stmt., ¶237 (PE 18, ▮▮ Dep. at 163:11-22).

not narrow spreads to win business as one would do in a competitive market.[99]  Traders described

such behavior as "silly" or "suicidal."[100]

Traders became aware that their repeated spread chats constituted price fixing.  In May

2009, BNP trader, ███ ████ asked in a chat room with traders from Barclays, Bank of America,

and Citi, "what guys make in 250 500 750 and yard if aud."[101]  In response, ████ (Bank of

America) wrote, ████ ill tell u what we ahve on my sheet but they a littlew old."  About 90

seconds later, ████ wrote, "ohhh im told we are not allowed to talk about spreads anymore how

retarded price fixing but that is compliance I cant do it."  Undeterred, ████ continued, ████

if u want to call me on reuters on the amount i can show u a price and u know the spread."  Despite

the admonition against price fixing, ████ and his fellow chat room members continued to show

and receive spreads from chat members for years after that date.[102]

Numerous other examples underscore Credit Suisse and its conspirators understood their

conduct was wrong.  In June 2009, ████ (Goldman Sachs) asked his colleague ████ "The

question stands: 'Why do the people that you talk to seem to give you so much clearly improper

information week after week, month after month, and year after year?  Are they stupid?  Are they

getting something from you by keeping you engaged?"[103]  Despite ████ concerns, ████

continued to coordinate and agree on spreads with competitors throughout the Class Period.[104]  In

February 2011, after ████ (JPMorgan) told ████ (Credit Suisse) his spread in "100 quid,"

████ (BofA) warned, "fyi . . . per the Fed not allowed to ask what you make . . . fear of

collusion and px fixing." ████ responded, "wow . . . what a narc." ████ calls ████

---

[99]     PE 1-372 (1/31/12 chat, in which ████ (UBS) wrote, "sales clown here saying he [customer] wants 3 [pips] as that;s what he gets away" and ████ (Barclays) replied, "i dont show god 3").
[100]    PE 1- 3.
[101]    Ps' 56.1 Stmt., ¶238 (PE 1-120).
[102]    *See, e.g.*, PE 1-210; PE 1-245.
[103]    Ps' 56.1 Stmt., ¶239 (PE 37, ████ Ex. 8, GS-FX-CIVIL-02911022 at 1023).
[104]    *See, e.g.*, PE 1-261; PE 1-390.

"fx police."[105]   Nevertheless, those traders continued to share their spreads with each other. Finally, in September 2012, over three years after ▮▮▮▮ raised the issue of price-fixing with respect to spreads, ▮▮ ▮▮ (Credit Suisse) bemoaned the heightened attention applied to multibank chats, writing to ▮▮ (Bank of America), ▮▮▮ (Citigroup), and ▮▮ ▮▮ (Barclays), "u can't even ask for spreads??" ▮▮▮ responded, "No that is bad[,]" and lamented "that's nuts . . . *makes your job tough* . . . fak."[106]

### 3. The Conspiracy Was Effective Because Traders Could Rely on Well-Known Aspects of the FX Market that Facilitated Spread Collusion

Traders understood the aspects of the FX market that made it unnecessary for them to coordinate spreads each time they showed a price to a customer.  First, spreads are durable during normal market conditions.[107]   Second, spreads in one amount correlated vertically with other amounts (greater and lesser), such that every spread gave a trader key information for smaller/larger trades.[108]   Third, spreads correlated horizontally in a predictable fashion.[109]   Finally, G-10 currency pairs account for 75% of all trades with three currency pairs (EUR/USD, USD/JPY, and GBP/USD) making up a majority of trades during the Class Period.[110]   As a result, an agreement on the spread in a particular currency pair – and particularly in those heavily-traded pairs – had a predictable and durable influence on spreads going forward in that pair as well as on other currency pairs with which it correlated.[111]

Unlike bid and ask prices, which change by the milliseconds on ECNs, spreads exhibit durability.[112]   Under normal market conditions, the spreads shown to customers can remain stable

---

[105]   Ps' 56.1 Stmt., ¶238 (PE 1-272).
[106]   PE 1-419.
[107]   Ps' 56.1 Stmt., ¶¶242-43.
[108]   Ps' 56.1 Stmt., ¶¶244-46.
[109]   Ps' 56.1 Stmt., ¶248.
[110]   Ps' 56.1 Stmt., ¶249.
[111]   Ps' 56.1 Stmt., ¶250.
[112]   Ps' 56.1 Stmt., ¶242.

for days, weeks, or even months so long as the market conditions were normal.[113]  Traders' own statements in chat rooms reveal that traders understood this fact.  For example, Credit Suisse trader, ███ ███ asked traders at Deutsche Bank, Goldman Sachs, Bank of America, and others "whats the normal spread on 100 usdsek and 100 usdnok?"[114]  Similarly, Credit Suisse trader, ███ ███ asked traders at Deutsche Bank "whats normal morning spread in 25 eursek"?[115]  Likewise, Credit Suisse trader, ███ ███ asked traders at Barclays, HSBC, and RBS "whats cable spreads these days 50 100 and 200 have they changed at all?"  After receiving the answer, ███ determined that the spread had "not changed."[116]  And of course, the entire purpose of a spread grid is to list spreads a dealer will show its customers in normal market conditions for at least three months, if not longer.  If spreads were not durable, compiling and showing spread grids would have been a pointless exercise for dealers and customers.

Another important fact is that spreads also correlate across trade sizes.[117]  Larger trade sizes carry greater risks and, accordingly, received wider spreads.[118]  FX traders understood trade size correlations and routinely used them to calculate spreads at different notional sizes to manage risk.  For example, ███ ███ (Credit Suisse) asked in one chat room "how wide would you make in 20usdnok?  [20 million U.S. dollar / Norwegian krone]"[119] ███ ███ replied by referring to the spread for a greater notional volume, "well on 50 [million] I would be about 400-450 [pips] . . . soo about 200 [pips]."[120]  In another chat, ███ (Citibank) told ███

---

| | |
|---|---|
| 113 | Ps' 56.1 Stmt., ¶242. |
| 114 | Ps' 56.1 Stmt., ¶243 (PE 1-132). |
| 115 | Ps' 56.1 Stmt., ¶243 (PE 1-271). |
| 116 | Ps' 56.1 Stmt., ¶242 (PE 1-377). |
| 117 | Ps' 56.1 Stmt., ¶¶244-45. |
| 118 | Ps' 56.1 Stmt., ¶245. |
| 119 | Ps' 56.1 Stmt., ¶246 (PE 1-88). |
| 120 | *Id.* |

(Goldman Sachs) that the spread for 500 million EUR/JPY should be 50 pips by referencing a smaller notional volume, stating "10 [pips] per 100 [million] for 500 is g[oo]d spread."[121]

Finally, spreads also correlated across different currency pairs.[122] Spot traders understood this fact when making spreads to show customers, which is evident in the "crosses." [123] For many currency pairs, a trader must "cross" through another currency, usually the dollar, but sometimes the euro. To sell AUD/NZD, for instance, a trader needs to go through the "legs."[124] The trader first sells AUD and buys USD before selling USD and buying NZD. Therefore, widening of either leg (AUD/USD or NZD/USD) will widen the cross.[125] For example, in response to a question regarding the spread in 100 million AUD/NZD, ▮▮▮▮ ▮▮▮▮ (Barclays) stated "sounds stupid but 40-35 pips, that's 12 [pips] in aud and 18 [pips] in nzd."[126]

During the Class Period, G-10 currencies traded against themselves accounted for 75% of all trades.[127] The top three currency pairs (EUR/USD, USD/JPY, and GBP/USD) accounted for over half of all FX market turnover by notional volume.[128] When EUR/GBP, EUR/JPY, and GBP/JPY are added in, the number exceeds 60% of all volume.[129] EUR/USD trades alone represent more than 25% of all trades.[130] Due to the horizontal correlations between currency pairs, spread widening, especially in EUR/USD, would lead to a spread widening in other currency pairs.[131]

---

[121]     Ps' 56.1 Stmt., ¶246 (PE 1-207).
[122]     Ps' 56.1 Stmt., ¶¶247-48.
[123]     Ps' 56.1 Stmt., ¶248.
[124]     Id.
[125]     Ps' 56.1 Stmt., ¶248 (PE 39).
[126]     Ps' 56.1 Stmt., ¶248 (PE 1-176).
[127]     Ps' 56.1 Stmt., ¶249 (DE 1); *see also* Ps' 56.1 Stmt., ¶250 (PE 39).
[128]     Id.
[129]     Id.
[130]     Id.
[131]     Ps' 56.1 Stmt., ¶250 (DE 1; PE 39).

4.     **Chat Rooms Allowed Traders to Conceal, Monitor, and Enforce the Conspiracy**

A key feature in traditional cartel behavior is monitoring the conduct of one's conspirators. Because of their widespread use of chat rooms, the conspirator banks could quickly monitor and enforce their conspiracy.  For example, ███ ███ (Barclays) asked, "what are u guys quoting in a quoting in 100 AUD [Australian/USD] now.  8? . . . someone saying hsbc showing 6."[132]  JPM trader, ███ ███ responded 7-8, but that customers "can go swivel" as he is not quoting 6. RBS trader ███ likewise replies 7-8.  ███ asked ███ to check with HSBC trader, ███ ███ who is not a member of the chat room, what HSBC is quoting.  ███ likewise asked ███ to "ask him."  ███ states "if he is . . . tell him to stop it . . . its not big or clever." ███ then posted to the chat room the text from a separate chat he had with ███ ███ ███ ███ are you showing 6 pips in 100 aud now?  11:40:26 ███ ███ no7.[133]

As another example, ███ ███ (HSBC) complained to traders at Standard Chartered, Bank of America, and Citi in the Old Gits chat room that one customer alleged to get 7 pips in 50 million USD/SGD and 6-7 pips in 100 million USD/SGD.[134]  ███ then warned his conspirators in the chat, "if any of you show 6-7 [pips] in 100 [million USD/SGD] . . . im going to kick the sht out of you." [135]  ███ ███ (BoA) then replied, "showed him 00-12 . . . so he saw 12 pips."[136] Traders also routinely provided the spreads they had just made.

The conspirators understood that customers must not discover the dealers were coordinating and agreeing on spreads.  A Citi salesperson emailed ███ ███ asking him to

---

[132]   Ps' 56.1 Stmt., ¶251 (PE 1-357).
[133]   *Id*.
[134]   Ps' 56.1 Stmt., ¶251 (PE 1-193).
[135]   *Id*.
[136]   *Id*.

upgrade the spread matrix because a client claimed that banks "have tightened" their spreads.[137] To assure the salesperson that there was no need to tighten Citi's spread, ███████ replied "I have pretty good relationships in the market," and listed the spreads a number of competing dealers were quoting customers. ███████ reminded the salesperson that "Obviously we don't want [client] to know we are aware of what our competitors are showing them, so can we keep this email for internal use only."

### 5. Credit Suisse's Experts Confirm that FX Traders Sharing Spreads with Competitors Was Collusive

Keith Underwood, Credit Suisse's first industry expert, on multiple occasions found that FX traders discussing spreads in chat rooms with competing dealers was "collusive."[138] Underwood submitted a report on behalf of UBS in an arbitration between UBS and its former chief FX dealer, ███████ (the ███ Report"). In that report, Underwood concluded, "In my experience, the sharing of [spreads] with competitors *would be viewed as collusive and would contribute to reduced price competition to the detriment of clients*."[139] Underwood also opined that the chats he reviewed "indicate that ███ knew or believed that traders under his supervision were trading based on confidential pricing information (such as spreads) shared in chatrooms with traders at competitor banks and colluding with traders at competitor banks."[140]

Credit Suisse replaced Mr. Underwood with Professor Michael Melvin. Professor Melvin similarly acknowledged that FX spot traders at Defendant banks were competitors who engaged in "reality checks" in terms of what spreads to show customers.[141] Professor Melvin admitted

---

[137]    Ps' 56.1 Stmt., ¶250 (PE 40).
[138]    Ps' 56.1 Stmt., ¶255 (PE 41).
[139]    Ps' 56.1 Stmt., ¶256 (PE 41).
[140]    Ps' 56.1 Stmt., ¶257 (PE 41).
[141]    Ps' 56.1 Stmt., ¶258 (PE 21).

under oath the purpose of the chat rooms was for competitors to get the "right pricing" for customers.[142]

###### 6. Economic Expert Analysis Reflects the FX Market's Susceptibility to Collusion and Economic Analysis of Defendants' Trades Confirms the Conspiracy to Widen Spreads

On behalf of Plaintiffs, Dr. Hal Singer conducted an analysis of the FX market using a standard framework used by industrial organization economists known as the structure/conduct/performance paradigm.[143]  Dr. Singer found that, with regard to structure, the FX market was conducive to collusion, when considered under the factors set forth by the DOJ's Price Fixing guidelines.[144]  With respect to conduct, Dr. Singer opined that the conspirators' use of chat rooms to coordinate on price driving information was pervasive.[145]  Finally, with respect to performance, Dr. Singer provided a detailed statistical analysis of conspirators' trades throughout the Class Period that provides strong circumstantial evidence that a conspiracy existed to widen spreads.[146]  Using a database of over 655 million Defendant FX trades with customers and corresponding trades in the FX interdealer market, Singer established through a widely accepted, standard statistical technique, multiple regression analysis, that FX customer spreads widened to a statistically significant degree during the Class Period relative to the years 2014-15, after conspirator banks largely banned interbank chat rooms in 2012 and 2013.[147]

---

[142]   Ps' 56.1 Stmt., ¶259 (PE 7).
[143]   Ps' 56.1 Stmt., ¶260.
[144]   Ps' 56.1 Stmt., ¶261.
[145]   Ps' 56.1 Stmt., ¶262.
[146]   Ps' 56.1 Stmt., ¶¶260-64.
[147]   Ps' 56.1 Stmt., ¶263.

### E.    The Conspiracy Ends

#### 1.    Banks Ban Multi-Bank Chat Rooms and Terminate Traders

As a result of government investigations, in late 2012 and early 2013, conspirator banks banned their traders from participating in multibank chat rooms with traders from competing banks.[148]  In October 2012, ███████  ███████ (Barclays) informed his friends in the "ZAR Chat," "so the bad news is that this chats days are numbered . . . think emails going out that all chats with interbank traders need to be non persistent and 1 on 1 . . . need to discuss tonight . . . brain storm." ███████ also complained "so once again cl*nts [clients] can skew us." ███ (BNP Paribas) replied "you should tell them that . . . it will cost banks millions."[149]  In February 2013, ███████ (UBS) pulled out of the Slaaaggggsssss 2 chat room, saying, "sad day, but gotta pull out of group lads . . . ."[1] ███ responded, "slagszzzzzzzzz . . . oh dear another one bites the dust." ███ (now at GS) replied, "So no group chats?  No permanent chats?" ███ questioned, "why they sayin no group chats?" ███ responded, "Collusion."[150] ███ wrote, "aint fun anymore is it."[151] When asked about this chat in deposition, Mr. ███ pled the Fifth.[152]

In addition to shuttering multibank chats, beginning in 2013, Credit Suisse and its conspirators terminated, suspended, or oversaw the departure of dozens of FX traders whose collusive activities animated the chat rooms.[153]

#### 2.    Guilty Pleas and Government Actions Relating to FX Misconduct Demonstrate the Existence of a Conspiracy

Guilty pleas establish and corroborate the existence of a conspiracy to fix FX prices. Barclays, Citigroup, JPMorgan, RBS, and BNP Paribas pleaded guilty to violating Section 1 of the

---

[148]    Ps' 56.1 Stmt., ¶264.
[149]    PE 1-428 (10/24/12 chat with ███ saying banning multi-bank chats "will cost banks millions").
[150]    Ps' 56.1 Stmt., ¶264 (PE 1-444).
[151]    *Id.*
[152]    Burke Decl., ¶2.
[153]    Ps' 56.1 Stmt., ¶265.

Sherman Act, 15 U.S.C. §1, for conspiring to fix FX prices from December 2007 to January 2013, by using electronic chat rooms on a near-daily basis.[154]  UBS had its ACPERA immunity with respect to LIBOR revoked in response to its FX misconduct.[155]  DOJ fined these banks more than $2.6 billion.  Separately, traders from Barclays, BNP Paribas, Citibank, HSBC, Standard Chartered Bank, and UBS pled guilty to conspiring to fix FX prices or entered into a non-prosecution agreement.[156]  Akshay Aiyer, a former spot trader at JPMorgan, was convicted of violating Section 1 of the Sherman Act for conspiring with FX traders at competitors across a range of currencies.[157]

In addition to these felony convictions, conspirator banks' misconduct in the FX market has resulted in numerous consent orders, regulatory fines, and investigations that have resulted in banks facing heavy fines, and numerous traders being permanently barred from employment in the financial industry or at specific banks.[158]

### 3.    Credit Suisse's Consent Order Admits FX Gross Misconduct, Including Spread Collusion

On November 13, 2017, NYDFS announced a $135 million fine against Credit Suisse for, among other things, engaging in "spread collusion" with other banks.[159]  NYDFS found Credit Suisse and its conspirators "[c]oordinated efforts to agree on prices may result in wider spreads, which limits competition, boosting the banks' profitability at customer expense."[160]  NYDFS

---

[154]    Ps' 56.1 Stmt., ¶¶273, 274, 280, 289, 191.
[155]    Ps' 56.1 Stmt., ¶293.
[156]    Ps' 56.1 Stmt., ¶¶277, 281-82.
[157]    Ps' 56.1 Stmt., ¶137.
[158]    Ps' 56.1 Stmt., ¶¶270-94.
[159]    Ps' 56.1 Stmt., ¶¶266-69.
[160]    Ps' 56.1 Stmt., ¶269.  Credit Suisse's argument that the NYDFS Consent Order and other guilty pleas are inadmissible is unavailing.  The Court has already granted in part Plaintiffs' motion to take judicial notice of the consent orders and guilty pleas "for the fact of their existence but not necessarily for the truth of the facts asserted therein unless a hearsay exception applies."  ECF No. 1482.  Several hearsay exceptions are applicable to the NYDFS consent order and the guilty pleas.  As this Court has held in similar circumstances, the "[f]indings in the NYDFS Consent Order are admissible under Federal Rule of Evidence 803(8)(A)(iii) as 'a record or statement of a public office . . . in a civil case . . . [that includes] factual findings from a legally authorized investigation.'"  *Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, No. 15-cv-9945, 2018 WL 4253152, at *7 (S.D.N.Y. Sept. 6, 2018) (citing *Coleman v. City of Niagara Falls*, No. 09-cv-157S, 2015 WL 4208602, at *3-4 (W.D.N.Y. July 10, 2015)).  Moreover,

determined that, from at least 2008 to 2015, Credit Suisse FX traders "participated in multi-party electronic chat rooms . . . and attempted to manipulate currency prices."[161]  The Consent Order, which Defendant Credit Suisse AG signed, does not speak of *ad hoc* and inconsistent and sporadic conduct, but rather of participation in multi-bank chat ***rooms***, a corrupt ***culture***, lack of controls over its FX ***trading business***, and manipulation of ***prices***, resulting in the lifetime employment ban of seven of its former FX traders.  The details of Credit Suisse's and its conspirators' enthusiastic participation in the multi-bank chat rooms mirror and amplify the conduct described by NYDFS and are set out in the Chat Summary.

## III.   ARGUMENT

### A.   Legal Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact issue is material only if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

---

the consent order and guilty pleas are admissible as an opposing-party statement under Federal Rule of Evidence 801(d)(2).  *See U.S. v. Schlussel*, No. 08-CR-694, 2008 WL 5329969, at *3 (S.D.N.Y. Dec. 15, 2008).
[161]        Ps' 56.1 Stmt., ¶268.

574, 586 (1986).  Rather, summary judgment is appropriate even if "'*some* alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247-48) (emphasis in original); *see also Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("'Mere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist'").  In assessing the totality of the evidence, the Second Circuit has instructed district courts not to consider each piece of evidence in a vacuum, because "[s]eemingly innocent or ambiguous behavior can give rise to a reasonable inference of conspiracy in light of the background against which the behavior takes place."  *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254-55 (2d Cir. 1987).[162]

### B.     There Is No Genuine Dispute that a Single Conspiracy to Widen Spreads in the Spot Market Existed and that Credit Suisse Participated

To prove the existence of a conspiracy, Plaintiffs must show that Credit Suisse and its conspirators shared a "'conscious commitment to a common scheme designed to achieve an unlawful objective.'"  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).  *See also H. L. Moore Drug Exch. v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir. 1981) (conspirators "'had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement'").  Thousands of chat transcripts, along with emails, audio files, guilty pleas, and consent orders arising from government investigations demonstrate that Credit Suisse and its conspirators consciously committed to "get on the same page" with respect to spreads across the FX market.  Motivated by profits from wider spreads, they exploited the opportunities presented by their pervasive, interconnected network of Bloomberg and Reuters chats to agree on

---

[162]     Credit Suisse cites *Apex* as holding that "a conspiracy must be proved by strong direct or strong circumstantial evidence."  CS Br. at 1.  In fact, *Apex* states that that standard applies only "[i]f the scheme alleged is implausible" 822 F.2d at 253.  Here the alleged scheme is not only plausible but has been established by guilty pleas, as well as strong direct and circumstantial evidence.

spreads to show their customers.  They did not compete.  They fixed prices.  They monitored and enforced their market-wide agreement using the same chat networks that connected their conspiracy.  Credit Suisse does not – and cannot – dispute the contents, volume, or frequency of these chats nor the testimony of traders admitting to the scheme.  Because there is no genuine dispute of material fact with respect to (1) the conspiracy's existence, and (2) Credit Suisse's participation in it, Plaintiffs are entitled to summary judgment on each of these issues.  *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012).

Given the abundant evidence of collusion on spreads, Credit Suisse argues that this clearly unlawful conduct reflects merely a series of "mini-conspiracies."  CS Br. at 2, 7-8, 18-19.  Credit Suisse encouraged its traders to participate in the multibank chats with competitors to share spreads and the voluminous chat evidence shows its traders coordinating with conspirator banks across G-10 and emerging market currency pairs to get to the "right" or "correct" spread to show customers.  Its former trader, ███ ███ actively sought a "pact on spreads" with Credit Suisse's competitors.  Nevertheless, Credit Suisse faults Plaintiffs for failing to come forward with a "single gathering where all 16 Defendant Banks met to discuss the alleged conspiracy."  *Id*. at 11.  Proof of conspiracy has never required a *Magna Carta*.  *U.S. v. Apple, Inc.*, 791 F.3d 290, 314-18 (2d Cir. 2015); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655-56 (7th Cir. 2002) (rejecting the defendant's argument that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment).  Instead, the evidence must be considered in its totality.  *See Apple*, 791 F.3d at 318 ("Apple's Contracts with the publishers 'must be considered in the context of the entire record.'").  The abundance of evidence in this case clearly demonstrates a single conspiracy.[163]

---

[163]   At a minimum, Credit Suisse's motion for summary judgment must be denied.

To prove a single conspiracy, the plaintiff "must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *U.S. v. Martino*, 664 F.2d 860, 876 (2d Cir. 1981). "The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan." *U.S. v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990). "The goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes." *Id*. "Nor do lapses of time, changes in membership, or shifting emphases in the locale of operations necessarily convert a single conspiracy into multiple conspiracies." *Id.* "Indeed, it is not necessary that the conspirators know the identities of all the other conspirators in order for a single conspiracy to be found." *Blumenthal v. United States*, 332 U.S. 539, 557 (1947). Finally, a single conspiracy requires "sufficient proof of mutual dependence and assistance." *Maldonado*, 922 F.2d at 963.

Along these lines, district courts deciding antitrust cases at summary judgment have identified several factors that support the existence of a global conspiracy. Chief among these factors are: (1) an overlap of participants; (2) a common goal; (3) common methods; (4) knowledge of the conspiracy; and (5) interdependence among conspirators. *See. e.g.*, *Dahl v. Bain Capital Partners*, *LLC*, 937 F. Supp. 2d 119, 135-37 (D. Mass. 2013) ("'(1) a common goal, (2) interdependence among the participants, and (3) overlap among the participants'"); *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 996 (N.D. Ohio 2015) ("'The principal considerations in determining the number of conspiracies are the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings.'"); *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 15 (D.D.C. 2004) ("(1) Defendants must have had knowledge of an 'all-vitamins' conspiracy, (2) Defendants must have intended to join the 'all-vitamins' conspiracy, and (3) by joining the 'all-vitamins' conspiracy, Defendants were interdependent upon

one another in that their respective benefit depended on the success of the 'all-vitamins' venture."); *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2018 WL 2181100, at *3, *6 (E.D. Mich. Jan. 31, 2018) (discussing *Vitamins* and stating "the multiple/single conspiracy issue is determined by applying a 'totality of the circumstances' test").

As set forth below, Plaintiffs' proof demonstrates each of these factors.  While these factors need not all be satisfied for a single conspiracy to be inferred, when assessing the undisputed evidence, each factor supports the finding of a single conspiracy here.  Ultimately, there is no genuine dispute Credit Suisse and its conspirators "became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal." *Blumenthal*, 332 U.S. at 558.

### 1.    Overlapping Participants

The presence of substantially overlapping participants sharing a common goal is reflective of a single conspiracy.  *See Maldonado-Rivera*, 922 F.2d at 963-64 (conspiracy with "several interdependent phases" involving overlapping participants sharing a single common goal constitutes a single conspiracy); *U.S. v. Yonkers Contracting Co., Inc.*, 706 F. Supp. 296, 298-99 (S.D.N.Y. 1989) (finding a single conspiracy to rig bids with respect to asphalt supply and asphalt resurfacing existed even when only four of the six defendants engaged in both business lines).  The cases Credit Suisse relies upon also recognize that a substantial overlap in participants is indicative of a single conspiracy.  *See U.S. v. Johansen*, 56 F.3d 347, 351 (2d Cir. 1995) (In determining whether there is a single conspiracy, "Courts, in other contexts, have looked for '(1) a common goal, (2) interdependence among the participants, and (3) overlap among the participants."') *Dahl*, 937 F. Supp. 2d 119.

In this case, there is a complete overlap of the participants in the conspiracy.  This is not a case where some Defendants only operated in certain product markets, such that banks would gain

no benefit from participating in the broader conspiracy.  Instead, each conspirator was an FX market maker offering to buy or sell the same currency pairs to many of the same customers in the same market.  While certain banks may have traded some currency pairs more than others, they all stood ready to deal in any of the affected currencies when a customer called.  The complete overlap of participants, as thoroughly documented by the Chat Summary, reflects a single conspiracy to widen and/or stabilize spreads here.[164]

## 2.  Common Goal

A single conspiracy may exist even where the goals of its participants are not all congruent, "so long as their goals are not at cross-purposes."  *Maldonado–Rivera*, 922 F.2d at 963.[165]  Courts have accepted broadly defined shared goals for the purpose of establishing a single overarching conspiracy.  For instance, in *U.S. v. Eppolito*, 543 F.3d 25, 55-56 (2d Cir. 2008), the Second Circuit held that a single conspiracy could be inferred where the "'principal purpose of the enterprise was to generate money for its members and associates by means of *various* legal and illegal activities.'" (emphasis in original).  *See also Polyurethane Foam*, 152 F. Supp. 3d at 996 (finding a "common goal" to "coordinate the percentage increase and timing of slabstock and underlay PIAs, with the purpose and effect of inflating the baseline from which customer-by-customer negotiations would proceed").

The Court does not even need to consider whether the conspirators had diverging goals.  Credit Suisse and its competitors had the same goal:  to widen and/or stabilize spreads in order to increase the profits of the dealers at the expense of their customers.  As the NYDFS Consent Order

---

[164]  At a minimum, a jury could conclude that this evidence of such a single conspiracy would require that Credit Suisse's motion for summary judgment be denied.

[165]  Nor does it matter that Defendants' traders occasionally undercut or deceived their conspirators.  *See* CS Br. at 20–22.  "An internal dispute among members of a conspiracy can itself be compelling evidence that the conspiracy is ongoing and that the rivals are members of it."  *U.S. v. Amato*, 15 F.3d 230, 234 (2d Cir. 1994); *see also U.S. v. Nat'l Ass'n of Real Estate Bds.*, 339 U.S. 485, 489 (1950) ("[T]he fact that no penalties are imposed for deviations from the price schedules is not material.").

signed by Credit Suisse admits, wider spreads benefit the dealers, to the detriment of customers. Thus, Credit Suisse and its conspirators benefited from the global conspiracy, because wider spreads meant greater profit.   The evidence shows that Defendants, including Credit Suisse, demonstrated a conscious commitment to increasing profitability (and/or reducing risk of loss) by coordinating and agreeing upon the "right spreads" in the FX market.   For the dealers, as ▇▇▇ ▇▇▇▇▇▇ succinctly stated, the "right spread is the widest the custy will deal on."[166]

### 3.      Common Methods

The conspirators' use of the same means and methods during the life of the alleged conspiracy also reflects a single conspiracy.  *U.S. v. Christie*, No. 08 CR. 1244 RWS, 2011 WL 382923, at *3 (S.D.N.Y. Feb. 4, 2011) ("The evidence of the organization's use of the same means and methods (namely, commercial airplanes) during the life of the charged criminal activity supports the existence of a single conspiracy."); *see also U.S. v. Reid*, 475 Fed. Appx. 385, 388 (2d Cir. 2012) (single conspiracy where "[t]he evidence at trial established an 'ongoing connection between transactions' where the same participants used the same methods and the same means to import drugs by plane into the United States over a course of four years").

The evidence shows that traders operated according to a "gentleman's agreement" across the market, regardless of chat room, currency pair, or day, and founded on a common understanding that traders would provide spreads and, in response, receive spreads from other traders.[167]   Traders understood that their would-be competitors would not try to undercut the spreads agreed upon in chat rooms.[168]   ▇▇▇ testified that the traders knew that "[i]f we all keep

---

[166]      PE 1-250, 274.
[167]      Ps' 56.1 Stmt., ¶215 (DE 17, ▇▇▇ Tr. 194:7-21); PE 6, ▇▇▇ Dep. at ▇▇▇ Tr. 196:20-197:5.
[168]      Ps' 56.1 Stmt., ¶237 (PE 18, ▇▇ Dep. at 163:11-22).

the same spread, that will become the norm."[169]   Conspirator banks' mutual exchanges in chat rooms allowed traders to "get on the same page," ensuring that their on spreads met a "sanity check" where the "right" or "correct" spreads would be widened and/or stabilized across would-be competitors.[170]   Traders' conversations here are tantamount to "a recorded phone call in which two competitors agreed to fix prices at a certain level."   *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).   It became a strong market convention and ultimately was an antitrust conspiracy.

The existence of a conspiracy is unambiguously established by reams of chat transcripts, trader testimony, and guilty pleas.  As the *Auto. Parts* decision demonstrates, while Credit Suisse's co-defendants' guilty pleas do not establish Credit Suisse's guilt, they do establish the existence of a conspiracy as whole.  *See* 2018 WL 2181100, at *5; *see also In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 JG VVP, 2014 WL 7882100, at *39 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, No. 06-MD-1775 JG VVP, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) ("Though the plea agreements and resulting pleas are not dispositive proof of a global conspiracy, their sheer number and scope – involving price-fixing on numerous routes in numerous regions throughout the world – certainly permit some inference of global misconduct.").  And Credit Suisse's participation in the conspiracy is indisputably established by the overwhelming, undisputed chat evidence that Credit Suisse worked with other banks to widen and/or stabilize spreads quoted to customers with the goal of increasing their profits.

The conspirators' common course of conduct is equivalent to that which courts have found could constitute a single conspiracy.  For instance, in *Polyurethane Foam*, 152 F. Supp. 3d at 996,

---

[169]     Ps' 56.1 Stmt., ¶228 (PE 1-385 (█████ "if we all in ny keep the same spread that will be come the norm"); PE 3, █████ Dep. at 114:7-11 (testifying that the traders knew "[t]hat if we all set our spreads the same, that the customers are going to have a lot less options, and they'll have to, you know, potentially deal on those wider spreads").
[170]     Ps' 56.1 Stmt., ¶¶224, 225.

the court found that the jury could reasonably find a single conspiracy where a "common goal was pursued by common means."  In *Dahl*, the court denied defendants' motion for summary judgment on a single conspiracy among defendants to not "'jump' each other's proprietary deals" based, in part, just as in this case, on evidence of "an accepted code of conduct between the Defendants" or "club etiquette."   The court found that such "evidence tends to exclude the possibility of independent action."  937 F. Supp. 2d at 138.  Similarly, in *Auto. Parts*, the court found that the evidence supported a global conspiracy where (1) "Defendants acted in conformity with their co-conspirators and that all Defendants' conduct demonstrates a 'way of doing business' engaged in across the board."; (2) "There is ample evidence that Defendants' communications to negotiate price adjustments and coordinate responses to RFQs lasted many years, and viewed generally, supports an inference that such communication formed a routine part of their business"; and (3) "Supervisors were kept informed of communication and also directed subordinates to engage in coordination communications with competitors."  2018 WL 2181100, at *5.

The undisputed evidence shows that Credits Suisse's and its conspirators' shared conduct spanning a global network of banks with common motives and goals "resulted from collusion, and not from coincidence."  *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1120 (N.D. Cal. 2012).  The conspirators' shared goals were clear: by coordinating to "get[]on the same page" with respect to spreads, Defendants could stabilize and/or widen spreads quoted to customers and, through narrowing the range of competition, increase their profits.  The Chat Summary lays bare: Credit Suisse and its co-conspirators used the same means and methods, primarily multi-bank chat rooms to coordinate and agree on spreads to show customers; these common methods support the existence of a single conspiracy.[171]

---

[171]   At a minimum, a jury could conclude that this evidence is reflective of such an overarching conspiracy, which would require that Credit Suisse's motion for summary judgment be denied.

### 4.      Knowledge

The Supreme Court has established a defendant's participation in a conspiracy can be shown through evidence of general knowledge of the conspiracy; knowledge of the detailed scope of the entire scheme is not required.  *Blumenthal*, 332 U.S. at 557 (knowledge of the "essential nature" of the conspiracy but not "all its details or of the participation of others" sufficient); *see also U.S. v. Downing*, 297 F.3d 52, 57 (2d Cir. 2002).  The government need not prove that the defendants knew the details of the conspiratorial scheme or the identities of all of the conspirators.").  Nor is Credit Suisse correct in suggesting that the conspirators' inability to identify every participant fractures a single conspiracy into mini-conspiracies.  *See Polyurethane Foam*, 152 F. Supp. 3d at 979 (single conspiracy does not "fragment" . . . "because a member does not 'know every other member' or 'know of or become involved in all of the activities in furtherance of the conspiracy'").

Credit Suisse and its conspirators were aware that their conduct was part of a single market-wide conspiracy among the 16 conspirator banks to widen and/or stabilize spreads.  This is ***not*** a case where the Court must weigh whether isolated parties that never interacted were part of the same conspiracy.  Rather, there is direct evidence of Credit Suisse coordinating and fixing spreads with each of its 15 conspirator banks.[172]  The evidence is undisputed that the conspirators knew their traders were in chat rooms to discuss spreads and encouraged them to do so.  While traders did not necessarily know the specific details of every other chat room, they understood the purposes for which those chat rooms were being used.  They understood their success in widening

---

[172]      Deutsche Bank (*e.g.*, PE 1-160; PE 1-271); Goldman Sachs (*e.g.*, PE 1-3; PE 1-450); Bank of America (*e.g.*, PE 1-455; PE 1-128); Bank of Tokyo-Mitsubishi (*e.g.*, PE 1-430; PE 1-432); Barclays (*e.g.*, PE 1-406; PE 1-210); BNP Paribas (*e.g.*, PE 1-169; PE 1-446); Citigroup (*e.g.*, PE 1-201; PE 1-379); HSBC (*e.g.*, PE 1-335; PE 1-260); JPMorgan (*e.g.*, PE 1-185; PE 1-432); Morgan Stanley (*e.g.*, PE 1-130; PE 1-411); Royal Bank of Scotland (PE 1-2; PE 1-423); Royal Bank of Canada (*e.g.*, PE 1-25; PE 1-409); Société Générale (*e.g.*, PE 1-338; PE 1-409); Standard Chartered (*e.g.*, PE 1-286; PE 1-264); and UBS (*e.g.*, PE 1-232; PE 1-374).

or stabilizing spreads depended on the complicit conduct of traders at the other conspirator banks, even if they never directly communicated with them.[173]   The traders' language in the chats demonstrates their awareness of the breadth of conspiracy: "what are we showing," "consensus is," and "having polled the crowd."   That is the language of concerted action, not independent competition.   The Chat Summary underscores the co-conspirators' knowledge of the breadth of conspiracy – traders regularly coordinated and agreed on spreads.   Their action was not limited by chat room, currency pair, or trader – dozens of each are reflected in the Chat Summary.   This totality of evidence leaves no meaningful doubt as to Defendants' knowledge of the scope of the conspiracy.

Credit Suisse's involvement in, and awareness of, the broader global conspiracy is further supported by the testimony of Christopher Cummins, a Citibank trader who pleaded guilty for his involvement in the conspiracy and testified that he engaged in conspiratorial conduct in the Old Gits chat room with Credit Suisse trader ██ ██ along with traders from Barclays, BNP, Bank of America, HSBC, and others.[174]   Cummins testified that the conspiracy followed a pattern: "we would convey to the others what we were being asked, as far as what currency and what size, and then indicate what price we were showing to the client, and in that way we could kind of coordinate what we would show and whether or not we wanted to win the trade and kind of denote who might be the winner of the trade but still maintain the look of a competition in the eyes of the client."[175] ██ testified that, as members of the Old Gits chat room, he and Credit Suisse trader ██ ██ "would help each other out to determine what was the right spread to quote customers" and were actively "sharing information about what we thought the correct spread

---

[173]      Ps' 56.1 Stmt., ¶226 (PE 1-411 (08/09/12 ██ ██ chat with ██ noting group could "all decide to make it wider.  we have the power.")).
[174]      Ps' 56.1 Stmt., ¶223 (PE 9, ██ Dep. at 173:23-174:16).
[175]      Ps' 56.1 Stmt., ¶220 (PE 14, ██ Ex. 3, Cummins Testimony in Aiyer Tr. 11/01/19 165:7-15).

was."[176] ██ testified that the members of the Old Gits chat room "coordinated" spreads to make sure they were "on the same page."[177] ██ (then at HSBC), upon compassing its roster, announced to the Old Gits chat room, "this is a den of thieves."[178] This agreement to fix spreads allowed the traders and their banks to "make more money" and prevent losses.[179]

As the Chat Summary reflects, the spread conduct in the Old Gits chat room that ██ and ██ testified to was the rule, not the exception. Credit Suisse acknowledges as much, but seeks to spin this fact by arguing that conversations among competitors, including those about the confidential spreads to show customers, were part of a "process of discovering market prices." CS Br. at 6.[180] Credit Suisse imagines that such discussions would lead to *better* prices for customers.

Beyond ignoring a long list of cases that reject such arguments in *per se* price fixing cases, the FX traders themselves during the Class Period found Credit Suisse's "collude to help the customer" argument risible. In a May 30, 2012 chat between traders at Credit Suisse, Bank of America, JPMorgan, Citi, and Goldman Sachs, ██ (JPMorgan) asks "what the hell are u two planning . . . this chat is compliance dream." ██ (Credit Suisse) responds, "we are mearly sharing market information to get the best possible rates for our custys [customers] and . . . our banks." ██ comment elicits a laugh from ██ (BofA) ("hahahah") and ██ sarcastically responds "ya sure."[181]

Chat room evidence shows that while traders were aware that their conduct was improper and possibly unlawful, they continued to coordinate spreads – affirming their conscious commitment to the conspiracy. In 2009, ██ (Bank of America) wrote that he could not share

---

[176]   PE 3, ██ Dep. at 234:14-235:14.
[177]   PE 3, ██ Dep. at 235:15-236:19.
[178]   PE 1-10.
[179]   PE 3, ██ Dep. at 234:20-25.
[180]   CS Br. at 6.
[181]   PE 1-456.

his spreads on a grid because of collusion.  Yet, he persevered and found a way to continue coordinating spreads with his competitors.[182]  In 2011, ███████ (Credit Suisse) was informed in an interbank chat "fyi . . . per the Fed not allowed to ask what you make . . . fear of collusion and px fixing," to which ███████ responded "fx police."  Another trader, ███████ (JPMorgan) laughed, what a "narc."  They continued to exchange and coordinate spreads in chat rooms.[183]  In another 2013 chat, ███████ (Credit Suisse) stated, "this chat is illegal by all accts" and "we shud start a consulting firm for the doos and donts of bbrg chats."[184]  ███████ (Standard Chartered) remarked, ███ [███████ (Credit Suisse) u never gave me a manual to what can be said on blbg chat you were my first manager to approve me on blbg 2005."[185]  ███████ answered, "have that m(anual it says let r rip," and to which ███████ responded, "i always told u . . . there is absolutely nothing to be gained by speaking to someone at another bank" and "yet u chose to have 25 chat rooms open every day so let chips fall where tyhey [sic] may.  u sleeping ok at night" and finally "so let me tell you what you can do with that manual."[186]

As chat rooms closed, traders acknowledged their understanding of the massive breadth of chat room misconduct and its significance to the banks.  When a trader announced he had to leave the Old Gits chat room in which ███████ ███████ (Credit Suisse) was a participant because of his bank banning permanent interbank chats, ███████ ███████ (Standard Chartered) commented "Game is about up."[187]  ███████ commented in a connected chat room (Zar Chat) that closing

---

182   Ps' 56.1 Stmt., ¶238 (PE 1-120).
183   Ps' 56.1 Stmt., ¶238 (PE 1-272).
184   Ps' 56.1 Stmt., ¶238 (PE 1-454).
185   Ps' 56.1 Stmt., ¶238 (PE 1-454).
186   *Id*.
187   PE 1-443.

chats would cost banks millions.[188]  When ███ (Credit Suisse) learned that chats were being closed due to collusion, he remarked to ███ ███ (Goldman Sachs), "ain't fun anymore is it."[189]

Credit Suisse's knowledge of the conspiracy's "general scope, if not its exact limits, [and that Credit Suisse] sought a common end" with its conspirators, *Blumenthal,* 332 U.S. at 559, suffices to show that the conspirators "had a unity of purpose or a common design and understanding" with their conspirators.  *Am. Tobacco Co. v. United States,* 328 U.S. 781, 810 (1946).

### 5.    Interdependence

In determining whether a single conspiracy exists, the court may consider whether there was "mutual dependence among the participants."  *U.S. v. Williams,* 205 F.3d 23, 33 (2d Cir. 2000) (quoting *U.S. v. Vanwort,* 887 F.2d 375, 383 (2d Cir. 1989)).  Interdependence "can be established where 'the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme.'"  *Dahl,* 937 F. Supp. 2d at 136 (quoting *U.S. v. Portela,* 167 F.3d 687, 695 (1st Cir. 1999)).  Only "'[f]airly minimal' evidence is needed in order to establish interdependency between various branches of a common conspiracy."  *Vitamins,* 320 F. Supp. 2d at 16-17.  Applying this lenient standard, courts have found interdependence indicative of a single conspiracy based on "minimal factors such as an overlap in participation and timing," even where conspirators' assistance was sporadic and "not significant to the success of each clique."  *Id.* at 17.

In *In re Cathode Ray Tube (CRT) Antitrust Litig.,* MDL No. 1917, 2016 WL 5848702, at *3 (N.D. Cal. Oct. 6, 2016), the court found interdependence because both CDT and CPT makers needed to source glass for their products and therefore had a common interdependent interest in glass supply.  *Id.,* at *4 ("reducing the production of [CDTs] would free up glass for use in the

---

[188]    Ps' 56.1 Stmt., ¶208 (PE 1-428).
[189]    Ps' 56.1 Stmt., ¶264 (PE 1-444).

CPT market" and obtaining confidential about glass from one market for use in the other was "evidence of knowledge, intent, and interdependence"). In *Vitamins*, the court ruled that there was sufficient evidence that all members of the conspiracy were interdependent because each defendant's benefit depended on the success of the "all-vitamins" conspiracy, even though not all the conspirators sold all the vitamins involved in the conspiracy.  320 F. Supp. 2d at 15.  The record evidence to support that ruling with respect to one defendant consisted of two faxes: one fax which listed separate agenda item for a meeting regarding the "overall market review" and the choline chloride market sent by a vitamin cartel participant. *Id*. at 20. The second fax showed an agenda for a meeting where there might be an opportunity to share plans. *Id*. at 21-22.

The record evidence supporting interdependence of Credit Suisse and its conspirators is far more extensive than in *Vitamins*.  First, of course, there is complete overlap of the conspirators and timing; they all served as market makers in the dealer to customer segment.  Given the fungibility of a currency – a dollar is a dollar –customers could and did source FX from multiple conspirators.  Second, the chat rooms demonstrate the traders coordinated on spreads to quote customers whether or not the spreads concerned currency pairs that were the focus of the chat room or the primary responsibility of the traders in the chat room.  Traders were expected to share their spreads with their competitors, and even apologized for delayed responses.[190]  Traders asked members of their desks for the right spreads if they were in currencies where they lacked knowledge and relayed those spreads to conspirators in their chat networks.

Third, the conspirators understood not to use the spreads shared by their competitors to undercut each other on price, or to compete for volume and market share, as would be expected in

---

[190]      PE 6, ███████ Dep. at 193:7-16 (agreeing that to get information in the chat rooms, a trader had to give information); 193:11-16; PE 1-33 (07/03/08 chat with ███████ apologizing for waiting over an hour to respond to ███████ question as to the spread in EUR/JPY and EUR/USD).

a competitive market.  In a competitive market, if one or more market makers narrowed their spreads in a currency pair, then the others would have to follow as customers played them off each other or risk losing business.  Because the conspirators fixed spreads, that did not happen in the FX market during the conspiracy.  Fourth, the horizontal correlations between spreads in different currency pairs show interdependence.  If the spreads widen in one currency pair, *e.g.*, the leg of a cross, then the spreads in the cross widen.  If EUR/USD widens, other currency pairs will follow.  Finally, interdependence is also shown by the fact that if one or more conspirators narrow the spread in one currency pair, their conspirators could retaliate by narrowing the spreads in different currency pairs, causing the whole conspiracy to unravel.

Each conspirator was mutually dependent on the others for the success of the whole conspiracy.  Accordingly, this factor weighs in support of finding a single conspiracy versus multiple conspiracies.[191]

## IV.    CONCLUSION

In sum, the undisputed evidence reflects a global conspiracy to widen spreads in the FX market to increase the profits of the dealers, including Credit Suisse, at the expense of their customers.  Accordingly, the Court should grant Plaintiffs' motion for summary judgment, deny Credit Suisse's motion for summary judgment and enter judgment for Plaintiffs as to Credit

---

[191]    To support its argument that there is "no evidence uniting" Credit Suisse's purported "mini-conspiracies," Credit Suisse cites to a series of "rimless" hub-and-spoke cases.  *See* CS Brief at 13-14 (citing *In re K-Dur Antitrust Litig.*, MDL No. 1419, 2016 WL 755623, at *22 (D.N.J. Feb. 25, 2016); *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 56–57 (1st Cir. 2016); *Kotteakos* v. *United States*, 328 U.S. 750, 769 (1946)).  But, contrary to Credit Suisse's argument that an ostensibly "rimless wheel" "precludes [plaintiffs] from establishing a single conspiracy, antitrust jurisprudence is neither so rigid, nor so formulaic."  *Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 468 (D. Vt. 2019).  The conspiracy here involved horizontal competitors, all of whom colluded with all of the others, not a series of vertical agreements connected through a single hub.  Credit Suisse's "attempt to fit this case into that box by portraying the charged conduct as multiple, separate" conspiracies, "linked only by the happenstance of common methods of operation . . . ignore[s] other features linking these schemes, such as their common purpose, overlapping participants, and mutual dependence."  *U.S. v. Berger*, 224 F.3d 107, 115 (2d Cir. 2000).

Suisse's participation in a conspiracy to widen spreads.  At a minimum, the undisputed evidence reflects that Credit Suisse's summary judgment motion must be denied.

Dated:  March 5, 2021                    Respectfully submitted,

                                         SCOTT+SCOTT ATTORNEYS AT LAW LLP

                                          s/ Christopher M. Burke
                                         CHRISTOPHER M. BURKE (CB-3648)
                                         WALTER W. NOSS (WN-0529)
                                         KRISTEN M. ANDERSON (*pro hac vice*)
                                         KATE LV (*pro hac vice*)
                                         600 W. Broadway, Suite 3300
                                         San Diego, CA 92101
                                         Telephone: 619-233-4565
                                         Facsimile:  619-233-0508
                                         cburke@scott-scott.com
                                         wnoss@scott-scott.com
                                         kanderson@scott-scott.com
                                         klv@scott-scott.com

                                         SCOTT+SCOTT ATTORNEYS AT LAW LLP
                                         DAVID R. SCOTT (DS-8053)
                                         JOSEPH P. GUGLIELMO (JG-2447)
                                         DONALD A. BROGGI (DB-9661)
                                         SYLVIA M. SOKOL (SS-0317)
                                         THOMAS K. BOARDMAN (TB-0530)
                                         The Helmsley Building
                                         230 Park Avenue, 17th Floor
                                         New York, NY 10169
                                         Telephone: 212-223-6444
                                         Facsimile:  212-223-6334
                                         drscott@scott-scott.com
                                         jguglielmo@scott-scott.com
                                         dbroggi@scott-scott.com
                                         ssokol@scott-scott.com
                                         tboardman@scott-scott.com

                                         -and-

HAUSFELD LLP
MICHAEL D. HAUSFELD
REENA ARMILLAY GAMBHIR
TIMOTHY S. KEARNS
NATHANIEL C. GIDDINGS
SARAH LAFRENIERE
888 16th Street NW, Suite 300
Washington, DC 20006
Telephone: 202-540-7143
Facsimile:  202-540-7201
mhausfeld@hausfeld.com
rgambhir@hausfeld.com
tkearns@hausfeld.com
ngiddings@hausfeld.com
slafreniere@hausfeld.com

HAUSFELD LLP
MICHAEL P. LEHMANN
CHRISTOPHER L. LEBSOCK
BONNY E. SWEENEY
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1949
Facsimile:  415-693-0770
mlehmann@hausfeld.com
clebsock@hausfeld.com
bsweeney@hausfeld.com

*Class Counsel*