**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | No. 13 Civ. 7789 (LGS) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF THE CREDIT SUISSE
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ..................................................................................................................... 4

  I.   THE PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROVING A SINGLE
      MARKET-WIDE CONSPIRACY .......................................................................... 4

    A. There is No Direct Evidence to Support Plaintiffs' Allegation of a Single Global
       Conspiracy .................................................................................................... 5

    B. The Circumstantial Evidence Affirmatively Disproves the Existence of a Single Global
       Conspiracy .................................................................................................... 7

  II.  PLAINTIFFS CANNOT TRANSFORM "MINI-CONSPIRACIES" INTO EVIDENCE
      OF A SINGLE GLOBAL CONSPIRACY ............................................................ 13

    A. Chats Involving a Small Number of Traders Do Not Constitute Evidence of a Global
       Conspiracy .................................................................................................. 14

    B. Plaintiffs' Discussion of Factors to Be Considered in Evaluating the Scope of a
       Conspiracy Does Not Change the Fact that There is No Evidence that Defendants
       Believed and Understood that They Were Parties to a Single Global Conspiracy ...... 17

    CONCLUSION.................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apex Oil Co.* v. *DiMauro*,
  822 F.2d 246 (2d Cir. 1987)..................................................................19

*In re Auto. Parts Antitrust Litigation*,
  2018 WL 2181100 (E.D. Mich. Jan. 31, 2018)..................................5n

*In re Baby Food Antitrust Litigation*,
  166 F.3d 112 (3d Cir. 1999).................................................................13

*Burtch* v. *Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011)..................................................................5

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
  2016 WL 5848702 (N.D. Cal. Oct. 6, 2016)......................................5n

*Dahl* v. *Bain Cap. Partners, LLC*,
  937 F. Supp. 2d 119 (D. Mass. 2013) ................................................21

*In re High Fructose Corn Syrup Antitrust Litigation*,
  295 F.3d 651 (7th Cir. 2002) ..............................................................5n

*In re Insurance Brokerage Antitrust Litigation*,
  618 F.3d 300 (3d Cir. 2010).................................................................21

*In re K-Dur Antitrust Litigation*,
  2016 WL 755623 (D.N.J. Feb. 25, 2016) ...............................19–20, 23

*Lipsky* v. *Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976)...............................................................15n

*Matsushita Electric Industrial Co., Ltd.* v. *Zenith Radio Corp.*,
  475 U.S. 574 (1986)................................................................................4

*Meredith Corp.* v. *SESAC LLC*,
  1 F. Supp. 3d 180 (S.D.N.Y. 2014) .....................................................18

*Monsanto Co.* v. *Spray-Rite Service Corp.*,
  465 U.S. 752 (1984)................................................................................4

*In re Nexium (Esomeprazole) Antitrust Litigation*,
  842 F.3d 34 (1st Cir. 2016)...................................................................23

*In re Platinum and Palladium Commodities Litigation*,
  828 F. Supp. 2d 588 (S.D.N.Y. 2011)..................................................................15n

*In re Polyurethane Foam Antitrust Litigation*,
  152 F. Supp. 3d 968 (N.D. Ohio 2015)...............................................................19

*Tose* v. *First Pennsylvania Bank, N.A.*,
  648 F. 2d 879 (3d Cir. 1981), *abrogated on other grounds by Griggs* v.
  *Provident Consumer Disc. Co.*, 459 U.S. 56 (1982)...........................................21

*United States* v. *Chandler*,
  388 F.3d 796 (11th Cir. 2004) .............................................................................22

*United States* v. *Johansen*,
  56 F.3d 347 (2d Cir. 1995)...............................................................................4, 17

*United States* v. *Maldonado-Rivera*,
  922 F.2d 934 (2d Cir. 1990).................................................................................22

*United States* v. *Martino*,
  664 F.2d 860 (2d Cir. 1981).................................................................................17

*United States* v. *McDermott*,
  245 F.3d 133 (2d Cir. 2001).................................................................................20

*United States* v. *Ulbricht*,
  31 F. Supp. 3d 540 (S.D.N.Y. 2014)................................................................23n

*Valspar Corp.* v. *E.I. du Pont de Nemours & Co.*,
  152 F. Supp. 3d 234 (D. Del. 2016)....................................................................13

*In re Vitamins Antitrust Litigation*,
  320 F. Supp. 2d 1 (D.D.C. 2004) ...............................................................4, 17, 19

## PRELIMINARY STATEMENT

Plaintiffs' vision of a single global conspiracy to widen spreads in the FX markets suffers from a fatal flaw – it did not exist.  The many regulators around the globe who have investigated the FX markets for years could not find such a global conspiracy.  Every FX trader who was asked the question stated that it did not exist.  Not a single piece of paper or scrap of testimony even hints at its existence.  Plaintiffs should have recognized years ago that the facts do not support, and flatly refute, their allegation of a market-wide agreement among hundreds of traders at 16 banks.  Like the regulatory settlements on which they rely so heavily, Plaintiffs could have alleged discrete conspiracies among small handfuls of traders in particular chatrooms.  But they are looking for a windfall, and so they have remained steadfast, insisting that the 16 bank Defendants knowingly and intentionally joined a single global conspiracy in which they freely and openly discussed, and agreed to coordinate on, the bid-ask spreads quoted to customers.  It is sheer fantasy – Plaintiffs have no actual evidence.

Like a good magician, Plaintiffs seek to hide this flaw through misdirection.  They do this first by misstating the question before the Court.  In the first sentence of the introduction to their opposition brief, Plaintiffs claim – without quotation from this Court's order – that this Court certified an issue class to address "whether there existed *a conspiracy* to widen spreads in the spot market."[1]  But this Court did not ask the parties to address whether *any* conspiracy existed.  Instead, the Court certified an issue class on the basis of Plaintiffs' representation that there was a *single market-wide* conspiracy, and therefore ordered that this litigation resolve the question of "whether a *single* conspiracy" to "widen spreads in the spot market" in fact existed.  Sept. 3, 2019 Opinion

---

[1] Mar. 5, 2021 Pls.' Mem. in Opp. to Defs.' Mot. for Summ. J. and in Supp. of Pls.' Cross-Mot. for Summ. J. ("Opp. Br.") at 1 (emphasis added).

and Order (ECF No. 1331) at 19 (emphasis added).  Thus, the *only* question before this Court on summary judgment is whether Plaintiffs have evidence of that *single market-wide* conspiracy (rather than "mini-conspiracies").  As discussed below, the inescapable answer is "no," and Plaintiffs' case must be dismissed.

Plaintiffs' second sleight-of-hand is to repeatedly quote from Bloomberg chat room texts in which spreads are discussed, and either (1) ignore the critical distinction between a single global conspiracy and multiple "mini-conspiracies" or (2) disingenuously suggest that these chats somehow evidence a global conspiracy.  In fact, the chats do the opposite.  In unguarded moments, Plaintiffs concede that these chat rooms were not open forums in which all traders discussed spreads, but were by "invitation-only" and designed to benefit their small group of members and exclude others.  For example, Plaintiffs admitted this without reservation at the outset of summary judgment briefing, when they stated that "chat room membership was limited to people whose ideas could be trusted and *could be trusted not to disclose information to others*."  Oct. 29, 2020 Pls.' Pre-Mot. Letter (ECF No. 1518) at 3 (emphasis added).

Plaintiffs are correct about this.  As Credit Suisse sets out in more detail in its moving brief,[2] and in Section I.B below, these chat rooms were not created or used to facilitate some global conspiracy.  To the contrary, and as Plaintiffs largely concede, they were used for the exclusive benefit of their small number of participants, and often only included those who (1) knew and trusted one another, (2) refused to include other FX traders in their chat rooms, and (3) refused to share information with, and agreed to work against the economic interests of, those outside their chat room.  These behaviors are the *opposite* of what one would expect to see if all FX traders had

---

[2] Jan. 29, 2021 Credit Suisse Defs.' Mem. in Supp. of Mot. for Summ. J. ("CS Opening Br.") at 22–23.

agreed to freely share information and trade in each other's best interests, as would be expected in a single global conspiracy.

Although Plaintiffs brazenly contend that citations to "gentlemen's agreements" and "pacts" in these chat rooms somehow evidence a global conspiracy, an examination of the actual text in *each* instance makes clear that all such references involve only the small number of traders in the chat rooms, and those traders' behaviors do nothing to support, and in many instances directly contradict, Plaintiffs' vision of a single global conspiracy. *See* Section I *infra*. Every chat and deposition excerpt cited by Plaintiffs is similarly unavailing – all involve just a few traders, and none suggest that any of these traders knew about or intended to join some mythical global conspiracy.

Plaintiffs' apparent work-around is to cite a large number of chats in which spreads are discussed, (*see* Plaintiffs' Exhibit 1), and suggest that because such discussions were "common market practice" in the FX industry, and because traders shared a common desire to increase their profits, a single global conspiracy may be inferred. But that is akin to saying that many drivers have exceeded the speed limit over the years, and because they all used cars and were motivated by a desire to arrive at their destination more quickly, they participated in (and were jointly and severally liable for) a single global conspiracy.

The law does not permit such an absurd result because, as Plaintiffs themselves acknowledge, a plaintiff "must show that each alleged member agreed to participate in what he knew to be a collective venture directed towards a common goal." Opp. Br. at 29. There is no collective venture here. Just like the speeding drivers, the small groups of traders who participated in each Bloomberg chat room were not aware of, or attempting to further, some larger collective

agreement.  Plaintiffs cannot point to a single piece of evidence to suggest otherwise, and their effort to hold Credit Suisse liable for the alleged sins of an entire industry should be rejected.

## ARGUMENT

### I.   THE PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROVING A SINGLE MARKET-WIDE CONSPIRACY

Having committed themselves to a single, market-wide conspiracy to manipulate spreads, Plaintiffs have the burden of proving it with "specific facts."  *Matsushita Electric Industrial Co., Ltd.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  This means that "Plaintiffs must prove that each Defendant was united in a common unlawful goal or purpose," "intended to join the [alleged] conspiracy," and made a conscious commitment "to advance the [alleged conspiracy's] unlawful purpose."  *In re Vitamins Antitrust Litigation*, 320 F. Supp. 2d 1, 15–16 (D.D.C. 2004); *see Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984) ("[T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective'"); *United States* v. *Johansen*, 56 F.3d 347, 351 (2d Cir. 1995) (single/multiple conspiracies question determined by "whether a jury could reasonably infer that [an alleged conspirator] participated in the alleged enterprise with a consciousness of its general nature and extent").

In other words, there is only one relevant question that needs to be answered in order to resolve the parties' summary judgment motions: whether Defendants *believed* and *understood* that they were part of a common, overarching agreement to widen FX spreads, and *intended* to further that agreement.  Plaintiffs have produced no evidence, direct or circumstantial, that comes close to carrying this burden.

4

A.      **There is No Direct Evidence to Support Plaintiffs' Allegation of a Single Global Conspiracy**

Despite having ample opportunity to do so, Plaintiffs have not identified a single document or testimony excerpt in which anyone acknowledges the existence of a single global conspiracy. Plaintiffs seek to distract from this failure by citing various chats as "direct" evidence. But every one of these chats involved only a handful of traders, and there is not the faintest indication that they had any knowledge of some larger global conspiracy. As a consequence, these chats support nothing more than the mini-conspiracies charged by the regulators. *See Burtch* v. *Milberg Factors, Inc.*, 662 F.3d 212, 225–26 (3d Cir. 2011) (direct evidence "requires no inferences to establish the proposition or conclusion being asserted," such as "[a] document or conversation explicitly manifesting the existence of the agreement *in question*" (emphasis added)). Presumably, if a global conspiracy had existed, then certainly *one* of its hundreds of supposed participants, in millions of unguarded communications over a six-year period, would have said *something* about it. But no one did, not even once, because there was no such agreement.[3]

In fact, the only *direct* evidence concerning a market-wide conspiracy – the testimony of witnesses who were asked whether such a conspiracy existed – directly refutes Plaintiffs' case. Each and every one of the 17 supposed co-conspirators who was asked about it (including traders

---

[3] Accordingly, this case stands in stark contrast to those relied on by Plaintiffs, in which a document or statement by itself evidenced the overarching plan – in other words, where there actually was direct evidence of the conspiracy alleged. *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 662 (7th Cir. 2002) (defendant's employee stated, "[w]e have an understanding *within the industry* not to undercut each other's prices" (emphasis added)); *In re Auto. Parts Antitrust Litigation*, 2018 WL 2181100, at *4–5 (E.D. Mich. Jan. 31, 2018) (scope of alleged co-conspirators' guilty pleas matched scope of alleged conspiracy); *In re Cathode Ray Tube (CRT) Antitrust Litigation*, 2016 WL 5848702, at *5–6 (N.D. Cal. Oct. 6, 2016) (evidence of "all-[cathode ray tube]" conspiracy included a document explicitly discussing a conspiracy consistent with the scope alleged).

who had already pled guilty to collusion and had no incentive to minimize the scope of the conspiracy) gave sworn testimony flatly denying any involvement in a market-wide conspiracy. [4]

Notably, sworn testimony also makes clear that Credit Suisse did not participate in either of the two alleged conspiracies (the "Cartel" chat room and the "ZAR Chat" chat room) which served as the basis for the guilty pleas on which Plaintiffs so heavily rely.  Opp. Br. at 24–25.  For example, Plaintiffs repeatedly cite the testimony of ████████████ (formerly of Barclays, UBS, and Standard Chartered) regarding a "gentlemen's agreement" supposedly entered into in the Cartel chat room, and attempt to cast that agreement as a market-wide conspiracy.  Opp. Br. at 1, 13, 32, 40.  But when ██████████ was asked, "[i]t is not the case that every trader across the FX markets at every bank was a participant in that gentlemen's agreement, is it?" he answered unequivocally, "[n]o, it is not."  Declaration of Herbert S. Washer Ex. ("DE") 17 (██████████) 284:24–285:2.  ██████████ further testified that this "gentlemen's agreement" never included any trader from Credit Suisse.  DE 17 (████████) 289:22–24 ("Q Did anyone from Credit Suisse ever participate in the [Cartel] chat room?  A No, I don't believe so.").

With respect to the second chat room, dubbed "ZAR Chat," Plaintiffs rely on the testimony of ██████████ (formerly of Barclays and BNP) as proof of their global conspiracy.  However, when ████████ was asked, "did you participate in a global conspiracy among all FX traders to manipulate spreads in 52 currency pairs?" he responded, "[n]o."  DE 31 (████████) 218:21–25.  ████████

---

[4] DE 32 (██████ Tr.) 135:7–10 ("Q. Did you participate in a global conspiracy among all FX traders to manipulate spreads in 52 currency pairs?  A. No."); DE 8 (██████ Tr.) 260:6–12, 279:16–20 (same); DE 27 (██████ Tr.) 214:10–20 (same); DE 3 (██████ Tr.) 262:7–12 (same); DE 23 (██████ Tr.) 187:6–10 (same); DE 21 (██████ Tr.) 200:7–18 (same); DE 17 (██████ Tr.) 282:20–285:13 (same); DE 26 (██████ Tr.) 149:17–24 (same); DE 24 (██████ Tr.) 175:10–25 (same); DE 31 (██████ Tr.) 218:21–25 (same); DE 20 (██████ Tr.) 94:17–95:2 (same); DE 22 (██████ Tr.) 258:11–22 (same); DE 29 (██████ Tr.) 307:5–21 (same); DE 4 (██████ Tr.) 251:16–21 (same); DE 30 (██████ Tr.) 327:9–15, 331:4–12 (same); DE 25 (██████ Tr.) 279:24–280:5 (same); DE 28 (██████ Tr.) 224:1–5 (same).

also testified that Credit Suisse did not participate in the ZAR Chat and did not otherwise agree to join any conspiracy involving the members of the ZAR Chat.  DE 31 (██████) 203:13–204:19 (testifying that the chat room was limited to participants who worked for Barclays, BNP, Citi, and JPMorgan and that no trader from any other bank participated); *see also* DE 32 (██████) 140:10–12 ("Q. So no one from Credit Suisse participated in the [ZAR Chat] chat room?  A. Not in ZAR chat.").  It is worth noting that ██████ had already pled guilty to conspiring with the other members of his chat room, and so had absolutely no reason to minimize the scope of the conspiracy.

### B.    The Circumstantial Evidence Affirmatively Disproves the Existence of a Single Global Conspiracy

Since the direct evidence actually disproves, rather than supports, Plaintiffs' market-wide conspiracy claim, they must rely on circumstantial evidence to try to connect the discrete chat rooms into a single global agreement.  Plaintiffs look to the chats themselves for this, but as discussed more fully in Credit Suisse's moving brief, CS Opening Br. at 20–23, the chats only further disprove Plaintiffs' theory.  Far from showing that all FX traders worked together as part of a single conspiracy, the chats show the small groups actively excluding and *competing* with other traders.  For example:

- In a January 6, 2011 chat, ██████████ (HSBC) told another FX trader that HSBC had been *narrowing* spreads to win more business.  DE 35 (HBEU-FXLITIG-00043803) at 804 ("its been a drive mate over the past 6mths really / to bring spreads in and win business / and we just had volume stats, inr [our] volumes tripled from Q1 to Q4 last yr").

- Similarly, in May 2011 emails, Citi FX traders discussed narrowing indicative spreads to win business from ████.  DE 34 (CITI-FX-CIVIL-MS_00239592) at 593 ("Would be grateful if you could have a look at the below and see if there are any currencies where you think we could match or beat to be in the top rank, which would result in being asking [sic] for the large trades.").

- In a May 18, 2011 chat, ███████████ (Goldman Sachs) rejected adding a Credit Suisse trader to a chat room, because "less is more."  DE 41 (GS-FX-CIVIL-03317256) at 262, 265–66.

- Similarly, in a January 26, 2011 chat, ███████████ (Bank of America) rejected the suggestion of adding a BNP trader to a chat room, saying his small group should "not expand members."  DE 51 (CS-FXLIT-03219327) at 337.  Likewise, in a November 25, 2011 chat, ███████████ (Bank of America) argued against adding a member to his chat room because, "I think the current line up is very strong and I wud [sic] favour leaving the truth a very exclusive club."  DE 52 (CS-FXLIT-06211866) at 869.

- And in a September 12, 2008 chat, ███████████ (RBS) said "a battle royal [was] coming on" among several market-making banks over benchmark fixing rates.  DE 33 (RBS_IN_RE_FX _LITIG_00088179) at 182.

Traders also testified under oath that they would *undercut* one another by discussing one spread in a chat, and then quoting a narrower spread to customers, which completely belies the notion of market-wide cooperation.  *See* DE 8 (███████) 105:5–10 ("Q. If you learned that a participant in a chat room in which you were a participant was quoting a particular spread to a customer, would you ever quote a narrower spread than the one that you had seen in the chat room? A. Yes."); DE 36 (███████) 80:3–8 ("Q. Would you expect him to quote a spread of 5 based on your conversation? . . . [A.] No, because he may just say 'ok' and then quote a client 4 or even 3 points.").

The record is replete with examples of similar anti-cooperative behavior.  For instance, Plaintiffs claim that once spreads were agreed to by traders in a chat room, those spreads would be memorialized in "spread grids" that were provided to customers and other competing banks. Opp. Br. at 2.  The suggestion is that these spread grids allowed the banks to communicate their proposed spreads to all conspiring banks and ensure that everyone charged the same spreads. Plaintiffs cite no evidence to support this statement, and it is demonstrably false.

Routinely, the spreads that a bank included in its spread grid were *different* from what was discussed in the chat rooms, and *different* from what appeared in the spread grids of other banks that had participated in the same chat. This is clear from the following charts comparing several supposedly collusive chats with the spread grids that were prepared by banks that had participated in the chats. The charts below are merely illustrative, and many additional examples could be provided, but each unequivocally disproves Plaintiffs' contention that spread discussions in chats resulted in lockstep spread quotes by banks to their customers.[5]

---

[5] *See* DE 53-01 to 53-09 (excerpts of BR00072228 and BR00072229, ██████ Spread Compilations, for the relevant quarters, currency pairs, banks, and volumes in the chart set forth below).



Customers recognized these differences and routinely commented on them, often in an effort to obtain better pricing.  *See* DE 54 (CS-FXLIT-10036473) at 473–74 (May 2007 email chain in which Credit Suisse distributes revised spread matrices with narrowed spreads after an in-person meeting with the customer); DE 55 (UBSCH_ZINC_CIV_000000849) at 849 (Jan. 15, 2008 internal UBS email chain noting that a customer "gave [UBS]  spreads he got from his top counterparties" and that UBS "committed to matching the spreads [that the customer] gets elsewhere").

For example, one customer commented on the "wide differentiation across banks" in the spread grids.  DE 9 (CITI-FX-CIVIL-MS_00357717) at 717 (Sept. 21, 2011 email from ███ ███ (███████) to ███████████ (Citi) and ██████████ (Citi)).  Another customer, ████████, solicited spread matrices from numerous dealers on a quarterly basis and compiled the results in spreadsheets that enabled them to easily compare dealer spreads. ███████ compilations show significant variation in the spreads submitted by different Defendants. ██████████████████████████████████████████████ ███████████████████████ DE 56 (excerpt of BR00072228, ███████ Spread Compilation). █████████████████████████████████████████ ████████████████████████. *Id.*  Similarly, ████████████████████ ██████████████████████ DE 57 (excerpt of BR00072228, ███████ Spread Compilation). █████████████████████████████████████████ ███████████████████████ *Id.*  These differences were the norm, not the exception,[6] and

---

[6] *See, e.g.*, DE 58-01 (excerpt of BR00072228, ████████ Spread Compilation) (████████████████ ████████████████████████████████████); DE 58-02 (excerpt of BR00072228, ████ Spread Compilation) (████████████); DE 58-03 (excerpt of BR00072228, ████████ Spread Compilation) (███████████████); DE 58-04 (excerpt of BR00072228, ████████ Spread Compilation) (████

affirmatively refute Plaintiffs' suggestion that the spread grids are the product of, and somehow prove, market-wide collusion.  They plainly do the opposite.

Plaintiffs' case is further undermined by the actual prices charged to customers.  The spread grids reflect spreads that a dealer might (or might not) quote to customers, but they do not necessarily reflect the actual spread quoted or the actual price charged.  Indeed, it was common for customers to request and receive a narrower spread (a better price) before agreeing to trade, a fact which also negates Plaintiffs' suggestion that spread grids operated to control spreads in a uniform manner.  DE 48 (CS-FXLIT-12108538) at 555 (June 8, 2012 chat in which a client asks Credit Suisse to narrow its spread in 15 million EUR/NOK, Credit Suisse provides a new quote with a narrowed spread, and the client then sells EUR); DE 22 (          ) 260:13–21 ("Q. How common was it that a customer would want to negotiate on spreads?  Can you estimate that?  A. I couldn't put a number on it.  It was very common.  Q. And did customers who did negotiate on spreads sometimes succeed in getting the bank to narrow spreads?  A. Pretty much always, yes.").

Perhaps because this evidence affirmatively disproves that all (or even many) of the 16 Defendants typically quoted the same spreads to all customers as part of some global conspiracy, Plaintiffs are rather vague about the import of their expert's spread analysis, saying only that it provides "strong circumstantial evidence that *a conspiracy* existed" — not that the *market-wide* conspiracy alleged by the Plaintiffs existed.  Opp. Br. at 23 (emphasis added).  Dr. Singer's opinion that spreads widened on average during the class period is equally consistent with multiple mini-

___

); DE 58-05 (excerpt of BR00072228,           Spread Compilation) (                                                    ); DE 58-06 (excerpt of BR00072229,           Spread Compilation) (                          ).

conspiracies, and therefore does nothing to support Plaintiffs' argument of a single global conspiracy.

Nor is it even accurate to state, as Plaintiffs do, that Dr. Singer found that "FX customer spreads widened to a statistically significant degree during the Class Period." *Id*.   As Dr. Singer conceded in his report, he found that for *half of the currency pairs at issue,* spreads actually *narrowed* during the Class Period.  *See* DE 59 (Merits Rebuttal Report of Hal J. Singer, Ph.D.) at 105–06, Table A2.  Thus, Dr. Singer's report does not demonstrate a consistent widening of spreads, and even if it did, it would not address the question of whether spreads widened due to multiple conspiracies, or a single conspiracy.

Accordingly, far from supporting Plaintiffs' theory of market-wide coordination, the chats, the spread grids, and real-world transaction pricing actually disprove it.  *See In re Baby Food Antitrust Litigation*, 166 F.3d 112,  132 (3d Cir. 1999) ("The defendants' prices were neither uniform nor within any agreed upon price range of each other . . . which negates the plaintiffs' inference of conscious parallelism."); *Valspar Corp.* v. *E.I. du Pont de Nemours & Co.*, 152 F. Supp. 3d 234, 250 (D. Del. 2016) (emails expressing uncertainty about supposed conspirators' plans "actually suggest[ed] the absence of an agreement").   Thus, the evidence is utterly irreconcilable with the notion of a unified effort to widen spreads.  Nothing in Plaintiffs' brief proves otherwise.

## II. PLAINTIFFS CANNOT TRANSFORM "MINI-CONSPIRACIES" INTO EVIDENCE OF A SINGLE GLOBAL CONSPIRACY

Plaintiffs spend most of their opposition brief ignoring the only question at hand: whether there was a single global conspiracy, or several mini-conspiracies.  When they do eventually address it, they again cite to "invitation-only" chat rooms involving a small number of traders, and

13

then half-heartedly address several "factors" that they contend would allow this Court to infer a single global conspiracy, despite all of the direct evidence to the contrary.

### A.     Chats Involving a Small Number of Traders Do Not Constitute Evidence of a Global Conspiracy

First and foremost, the inflammatory chat excerpts cited by Plaintiffs do *not* support their market-wide conspiracy claim.  This much is clear from the fact that many of the chats used by Plaintiffs are the same chats cited by the regulators in their cases, where no such market-wide conspiracy was even alleged.  Despite the cooperation of all the banks and several traders, extensive investigative power and virtually unlimited resources, and every incentive to charge the broadest possible conduct, not a single regulator alleged the market-wide conspiracy that Plaintiffs do.  Plaintiffs have explicitly conceded this.  *See* May 23, 2018 Final Fairness Hearing Tr. (ECF No. 1066) 29:1–7 ("Even when the guilty pleas came out, they were narrower than the case we were prosecuting and, in fact, none of the government pleas or orders is as broad as the case we were prosecuting here.").

In fact, among all of the guilty pleas and regulatory settlements Plaintiffs cite, the broadest conspiracy alleged involved only four traders at four banks and a handful of currency pairs.  *See* Mar. 5, 2021 Pls.' Resps. to Credit Suisse Defs.' Local Rule 56.1 Statement ("Pls.' 56.1 Statement") ¶¶ 135–41.  And the New York State Department of Financial Services' "spread collusion" allegation against Credit Suisse – which Plaintiffs mischaracterize as an "admi[ssion]" by Credit Suisse (Opp. Br. at 31–32) – involved only three traders discussing two currency pairs in a single chat room.  *See* Pls.' 56.1 Statement ¶¶ 266–69.  The regulators and prosecutors could

not string together the chats cited by Plaintiffs into a global spread-widening agreement, and neither can Plaintiffs.[7]

Therefore, it is not surprising that on closer inspection, none of the chats on which Plaintiffs rely actually support their theory of a market-wide conspiracy, and it is apparent that Plaintiffs have blatantly mischaracterized many of these chats in an effort to manufacture a global spread-widening agreement.  Just a few of the more glaring examples make the point.

For instance, Plaintiffs open their brief by dramatically quoting from a chat between ████ (Morgan Stanley) and ████ (HSBC), in which Cass says, "all seriousness tho [sic] can never be a bad thing colluding spreads."  Opp. Br. at 1.  But *none* of the 14 other Defendant banks (including Credit Suisse) participated or were even referenced in this chat.  It is therefore highly misleading to offer this chat as evidence of a global conspiracy.  DE 60 (HBEU-FXLITIG-00035363).

Similarly, Plaintiffs cite a February 2012 chat as "direct evidence of Credit Suisse coordinating and fixing spreads with each of its 15 conspirator banks."  Opp. Br. at 35 n.172.  In fact, *no Credit Suisse trader was in the chat room* when the alleged spread-fixing activity occurred, or at any time until *three days later*.  DE 61 (CITI-FX-CIVIL_00240251) at 263, 268–69, 275.

Plaintiffs also cite excerpts from a three-trader chat room in which former Credit Suisse trader ████ said "[l]et's sign a pact on spreads," and then Plaintiffs inexplicably proclaim that "[t]he pact on spreads was not limited to three traders in one chatroom."  Opp. Br. at 11–12 (citing Plaintiffs' Exhibit ("PE") 1-3 and PE 1-22).  But there is absolutely no evidence in the chat

---

[7] Nor are the regulatory settlements, on which Plaintiffs' case rests so heavily, even admissible. *See Lipsky* v. *Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (consent judgment inadmissible); *In re Platinum and Palladium Commodities Litigation*, 828 F. Supp. 2d 588, 593–95 (S.D.N.Y. 2011) (CFTC Order inadmissible to prove liability).

or anywhere else in the record to support this bald assertion – there is no suggestion that other traders should be involved, or were even informed of the discussion.  It is simply false to assert, as Plaintiffs do, that this chat is in any sense indicative of some broader agreement extending beyond its three participants.

Plaintiffs also contend that Defendants incentivized their traders to show wider spreads to customers, and cite a chat in which a Citi trader said, "the right spread / is the widest they deal on."  Opp. Br. at 6 (citing PE 1-274).  Again, however, there is absolutely no indication that this approach was taken by any of the other Defendants' traders (including Credit Suisse, which was never in this chat room).  And Plaintiffs fail to mention that this was a discussion in which the same trader recounted *narrowing his spread* after negotiations with the customer.  DE 62 (CITI-FX-CIVIL_00554868) at 869–70 (Trader 1: "what did u show in the 250 eurjpy"; Trader 2: "hahahah / 32"; Trader 1: "hahah / well"; Trader 2: "luckily wnet back and said / im too wide . . . show him 25"; Trader 1: "the right spread / is the widest they deal on").

Ultimately, stripped of Plaintiffs' mischaracterizations, all of the evidence they cite – the "contemporaneous chat room transcripts, . . . deposition testimony, trial testimony, guilty pleas, a guilty verdict, and other regulatory findings and consent orders," Opp. Br. at 7–8 – supports nothing more than the discrete, smaller conspiracies alleged by the regulators.  There are simply no legal gymnastics that can transform these mini-conspiracies into a single, unified agreement to widen spreads across all FX markets for a six-year period.

**B.    Plaintiffs' Discussion of Factors to Be Considered in Evaluating the Scope of a Conspiracy Does Not Change the Fact that There is No Evidence that Defendants Believed and Understood that They Were Parties to a Single Global Conspiracy**

In a final effort to avoid the summary dismissal of their claims, Plaintiffs engage in a drawn-out discussion of the various factors a court may consider when determining whether the conduct at issue reflects a single overarching conspiracy, or a series of smaller conspiracies.  In doing so, Plaintiffs once again attempt to distract the Court from the ultimate question that these factors are designed to address: whether the Defendants *believed and understood* that they were part of a common, overarching agreement to widen FX spreads, and *intended* to further that agreement.  *See In re Vitamins Antitrust Litigation*, 320 F. Supp. 2d at 15–16 ("Plaintiffs must prove that each Defendant was united in a common unlawful goal or purpose," "intended to join the [alleged] conspiracy," and made a conscious commitment "to advance the [alleged conspiracy's] unlawful purpose."); *Johansen*, 56 F.3d at 351 (single/multiple conspiracies question determined by "whether a jury could reasonably infer that [an alleged conspirator] participated in the alleged enterprise with a consciousness of its general nature and extent").

**1.    Plaintiffs Cannot Demonstrate that Credit Suisse or any Other Defendant Had Knowledge of a Global Conspiracy**

While Plaintiffs characterize "knowledge of the conspiracy" as a "factor" that courts consider, Opp. Br. at 29, it is in fact a required *element*, since an agreement is at the core of every conspiracy, and a conspiracy's scope is entirely dependent on the understanding of the supposed participants.  *See, e.g.*, *United States* v. *Martino*, 664 F.2d 860, 876 (2d Cir. 1981) ("The essence of conspiracy, of course, is agreement, and in order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal.").  It is understandable that Plaintiffs would want to

17

downplay the importance of this requirement, since there is absolutely no evidence that Defendants, or even a single trader, believed or understood that they were part of the market-wide conspiracy Plaintiffs allege.

On this point, it is notable that after citing *Meredith Corp.* v. *SESAC LLC*, 1 F. Supp. 3d 180, 224 (S.D.N.Y. 2014), in their pre-motion letter, Plaintiffs have carefully avoided even mentioning this decision in their opposition brief.  Perhaps that is because Judge Engelmayer's careful analysis of the knowledge element in *Meredith* is fatal to Plaintiffs' claim.  In *Meredith*, Judge Engelmayer rejected the plaintiffs' claim of a broad conspiracy among a copyright licensor – SESAC – and 20,000 musicians and composers, because there was no proof that the majority of the composers "agreed, even tacitly" to SESAC's anti-competitive conduct.  *Id.* at 210.  Judge Engelmayer concluded that in the absence of any "competent evidence as to what any of these musicians or composers knew or assumed" about SESAC's conduct, the plaintiffs' broad conspiracy claim "rest[ed] on sheer speculation," and allowing it to go to trial would have just "indulge[d] sloppy conspiracy theories."  *Id.* at 210–11.

Here, as in *Meredith*, Plaintiffs cannot point to a single piece of competent evidence that even *one* trader knew, understood, or even assumed that they were a part of the single, market-wide conspiracy that Plaintiffs allege.  In fact, the evidence here is even more damning to Plaintiffs' theory than in *Meredith*, since every trader who provided direct evidence on the issue flatly denied the existence of Plaintiffs' market-wide conspiracy, and the chats themselves evidence competitive and exclusive conduct by the traders that utterly disproves such a broad agreement.

Plaintiffs' only solution to this problem when discussing Credit Suisse's "knowledge" is to trot out the axiom that not all participants must know about all aspects of the conspiracy, and to

18

again point to language in discrete chat rooms in which small groups of traders discuss spreads. Opp. Br. at 35–39. Once again, however, Plaintiffs do not and cannot explain how an alleged discussion or agreement among a few traders confirms the existence of a global conspiracy.

Contrary to Plaintiffs' suggestion, the scope of a conspiracy is "not a mere detail" to be worked out later. *In re Polyurethane Foam Antitrust Litigation*, 152 F. Supp. 3d 968, 998 (N.D. Ohio 2015) (The scope of a conspiracy "is not a mere 'detail,' of which [Defendants] could be ignorant while still showing knowing involvement in the conspiracy as alleged."). Plaintiffs are effectively asking this Court to waive the knowledge requirement. With no evidence that even a single supposed participant knew or understood that they were part of a market-wide agreement to widen spreads, Plaintiffs' claim fails as a matter of law. *See, e.g.*, *In re Vitamins Antitrust Litigation*, 320 F. Supp. 2d at 15 (plaintiffs "must show that each Defendant had knowledge of an agreement as to the overall conspiracy" and "was united in a common unlawful goal or purpose").

### 2. Plaintiffs Cannot Demonstrate that Credit Suisse or any Other Defendant Intended to Join a Global Conspiracy

Even if Plaintiffs could meet the knowledge requirement – which they cannot – it would not be sufficient to prove their market-wide conspiracy claim, since mere knowledge of broader misconduct, without the intent to join and further it, is insufficient. *See id*. at 16 ("[M]ere knowledge of another similarly motivated conspiracy . . . do[es] not prove one overall agreement"); *Apex Oil Co.* v. *DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987) ("[P]arallel conduct alone will not suffice as evidence of such a conspiracy, even if the defendants knew the other defendant companies were doing likewise." (internal quotation marks and citation omitted)); *In re K-Dur Antitrust Litigation*, 2016 WL 755623, at *24 (D.N.J. Feb. 25, 2016) ("Plaintiffs have not satisfied their burden . . . by stating that [one defendant] knew about the alleged conspiracy between" two other defendants.). Again, there is absolutely no evidence that the discrete groups of traders in

separate chat rooms intended to join with and assist other groups of traders in widening spreads to their collective benefit.  In fact, the evidence shows quite the opposite – groups of traders actively excluding one another, undercutting one another, and competing to *take* business from one another. In light of the complete absence of proof that even a single trader intended to join and further a market-wide agreement to widen spreads, Plaintiffs cannot meet their burden.

### 3. None of the Other Factors Support an Inference of a Global Conspiracy

Nor is it a substitute for actual evidence of a market-wide agreement for Plaintiffs to point to obvious facts that apply to any over-the-counter market, like that traders used chat rooms to communicate, and that they would all prefer wider spreads.  Plaintiffs' attempts to cast these utterly unremarkable features of the FX market as "opportunity" and a "common motive," Opp. Br. at 34, 40, are meaningless, since the case law makes clear that common motives or incentives, and the opportunity to conspire, are not sufficient to establish a conspiracy.

In particular, the Second Circuit has made clear that individual actors pursuing the same purpose – here wider spreads, according to Plaintiffs – does not establish a single conspiracy, since it is not a common purpose that defines a conspiracy, but rather "the agreement of its members to that purpose."  *United States* v. *McDermott*, 245 F.3d 133, 137 (2d Cir. 2001) (bankers were not part of the same conspiracy merely because they had the same purpose of trading on inside information); *see In re K-Dur Antitrust Litigation*, 2016 WL 755623, at *21 ("It is not sufficient that Plaintiffs demonstrate that Schering, Upsher, and ESI had the same goal, however.  To demonstrate a single conspiracy . . . Plaintiffs must demonstrate that the parties had a *common* goal." (emphasis in original)).

It is equally unavailing for Plaintiffs to suggest that the traders' common use of chat rooms provided them with an opportunity to come to a market-wide agreement, since as the Third Circuit

has noted, "[h]uman experience does not support the inference of actual conspiracy from proof of the basic fact of opportunity to conspire." *Tose* v. *First Pennsylvania Bank, N.A.*, 648 F. 2d 879, 894 (3d Cir. 1981), *abrogated on other grounds by Griggs* v. *Provident Consumer Disc. Co.*, 459 U.S. 56 (1982); *see In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 349 (3d Cir. 2010) ("Proof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place."). In fact, under Plaintiffs' theory, every trader in every over-the-counter market is conspiring together to widen spreads, since by Plaintiffs' account they all have a "common motive" and the opportunity to conspire.

Apart from missing the point, Plaintiffs' factor-by-factor analysis is in many respects simply wrong. Plaintiffs note that some chat rooms had overlapping participants, which is only to be expected in an over-the-counter market so reliant on chat communications. But Plaintiffs can point to no evidence of actual widespread cross-pollination of information between chat rooms, as would be expected if the chat rooms were working together as part of a single agreement. In fact, the evidence shows quite the opposite, with individual chat rooms jealously guarding the information exchanged in them. *See, e.g.*, DE 47 (GS-FX-CIVIL-04979832) at 837–38 (FX trader █████████ (then of Goldman Sachs) advised FX trader ██████████ (then of HSBC) that █ "sold chunky usdjpy, literally did not move . . . . *btwn us pls*" and █████████ responds "of course / *everything stays here*." (emphasis added)). Without any evidence that the traders in the various chat rooms were consciously and intentionally working toward a common goal across chat rooms, the routine overlap in chat room participants does nothing to prove Plaintiffs' global conspiracy. *See Dahl* v. *Bain Cap. Partners*, *LLC*, 937 F. Supp. 2d 119, 135, 137 (D. Mass. 2013) ("kaleidoscope of interactions among an ever-rotating, overlapping cast of [market participants] as they reacted to spontaneous events of the market" did not establish a single conspiracy; "the

21

mere overlap of some defendants in some of the [allegedly collusive behavior] is, on its own, insufficient to establish an overarching agreement").

Nor is there any evidentiary support for Plaintiffs' conclusory statement that "[e]ach conspirator was mutually dependent on the others for the success of the whole conspiracy." Opp. Br. at 41. Instead of offering evidence for this assertion, Plaintiffs cite simple economics: "[I]f one or more market makers narrowed their spreads in a currency pair, then the others would have to follow as customers played them off each other or risk losing business." *Id*. Again, if basic economic incentives applicable to any market were sufficient to establish conspiratorial interdependence, then every participant in every industry would be part of a single conspiracy. As the case law makes clear, a conspiracy requires much more, namely that each small group of traders was working together toward a common objective, so that each had a stake in the others' success. This was clearly not the case here, particularly since, in many cases, Defendants were actively competing for the same business by narrowing spreads, flatly contradicting the notion that one bank's success was dependent on another's.

Nor is there any way to square the exclusivity of the chat rooms with Plaintiffs' argument that they were interdependent. In fact, Plaintiffs concede that there can be no single conspiracy where the supposed participants act "at cross-purposes," Opp. Br. at 29, 31 (citing *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990)), which they clearly did here. *See United States* v. *Chandler*, 388 F.3d 796, 811 (11th Cir. 2004) (no single conspiracy where "there was no . . . interdependence of the spokes. The combined efforts of the spokes were not required to insure the success of the venture. No spoke depended upon, was aided by, or had any interest in the success of the others. Each spoke acted independently and was an end unto itself.").

In short, there is no legally cognizable theory under which hundreds of traders in dozens of exclusive chat rooms, who often undercut and competed even with other chat room members, can be connected into a single conspiracy.  Plaintiffs try to avoid the requirement of an actual, evidentiary connection between the small groups of traders by saying the traders were "horizontal competitors, all of whom colluded with all of the others," so no hub or rim is required to connect them.  Opp. Br. at 41 n.191.

It is perhaps understandable that Plaintiffs would bury this statement in the 191st footnote on the 41st page of their brief, and not address the requirement of a conspiratorial connection – the hub and rim – anywhere else in their brief, since their argument makes absolutely no sense.  The law is clear that for individual groups of alleged conspirators to be viewed as one conspiracy, there must be evidence that they were consciously working together – the rim – otherwise they are as much a part of the same agreement as loose sticks are part of a wheel.  *See In re K-Dur Antitrust Litigation*, 2016 WL 755623, at *22 (no single conspiracy because plaintiffs did not demonstrate that "rim" connected the "spokes" of alleged conspirators); *In re Nexium (Esomeprazole) Antitrust Litigation*, 842 F.3d 34, 56–57 (1st Cir. 2016) (no single conspiracy where plaintiffs failed to prove "the existence of a rim to the wheel" of alleged conspirators (internal quotation marks omitted)).  In other words, the essence of conspiracy being an agreement, there must be evidence that the different spokes agreed to work together, and here there is none.  This is not "fit[ting] this case into [a] box," Opp. Br. at 41 n.191, it is just holding Plaintiffs' claim to the same legal standard as every other conspiracy claim.[8]

---

[8] Naturally the traders are not part of a "chain" conspiracy, since that involves "a division of labor at the various functional levels."  *United States* v. *Ulbricht*, 31 F. Supp. 3d 540, 554 (S.D.N.Y. 2014).

Plaintiffs have offered no evidence to suggest that they could meet the legal requirements for proving a single conspiracy.  Their claim fails as a matter of law, and their Complaint should be dismissed now, rather than waiting for them to offer the same deficient evidence at trial, which will require a directed verdict in favor of Credit Suisse.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted in favor of Credit Suisse, Plaintiffs' summary judgment motion should be denied, and Plaintiffs' Complaint should be dismissed.

Dated:  April 9, 2021
      New York, New York

CAHILL GORDON & REINDEL LLP

By: /s/ Herbert S. Washer
    Herbert S. Washer
    David G. Januszewski
    Elai Katz
    Jason M. Hall
    Sheila C. Ramesh
    32 Old Slip
    New York, New York 10005
    Telephone: (212) 701–3000
    Facsimile: (212) 269–5420
    hwasher@cahill.com
    djanuszewski@cahill.com
    ekatz@cahill.com
    jhall@cahill.com
    sramesh@cahill.com

*Attorneys for Defendants Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse Securities (USA) LLC*