UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST
LITIGATION

No. 1:13-cv-07789-LGS

**DECLARATION OF LOREE KOVACH IN SUPPORT
OF PLAINTIFFS' MOTION FOR ENTRY OF AN ORDER APPROVING THE SECOND
DISTRIBUTION OF THE SETTLEMENT FUND**

I, Loree Kovach, declare and state as follows:

1. I am a Vice President for Epiq Class Action & Claims Solutions, Inc. ("Epiq"). Garden City Group, LLC, the Court-appointed Claims Administrator in connection with 15 Settlement Agreements approved by the Court in the above-captioned Action, was acquired by Epiq on June 15, 2018, and is now continuing operations as part of Epiq. The following statements are based upon my personal knowledge and experience, and information provided to me by other experienced Epiq employees working under my supervision, in addition to information provided to me by the experts defined in paragraph 17(a), *infra*, and if called on to do so, I could and would testify competently thereto.

2. Unless otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Stipulations and Agreements of Settlement filed with the Court at ECF Nos. 481 (Ex. 1-9), 822 (Ex. 1-5), and 877 (Ex. 1). The foregoing Stipulations are collectively referred to as the "Settlements" or the "Settlement Agreements."

   **I.    BACKGROUND**

3. As Claims Administrator, Epiq implemented the notice and administration terms of the Settlements by, among other things: (i) disseminating the Mail Notice of Class Action

Settlement ("Notice") and the proof of claim and release form ("Claim Form") (collectively with the Notice, the "Notice Packet") to potential Settlement Class Members;[1] (ii) maintaining a toll-free hotline, email address, and P.O. Box to receive Settlement Class Members' questions and requests; (iii) maintaining and updating a case-specific Settlement Website and posting case-specific documents on said website during the course of the administration; (iv) causing the Publication Notice of Class Action Settlement to be published; (v) providing, upon request, additional copies of the Notice Packet to brokers, nominees, and Settlement Class Members, including translations of the Notice Packet; (vi) receiving objections and requests for exclusion; and (vii) receiving and processing Claim Forms, transaction data, and documentation.

4. All claimants submitted their Claim Forms to Epiq. Those claimants for whom transaction data was available from Settling Defendants were able to submit their claims under either "Option 1" or "Option 2." Claimants for whom no transaction data was available from Settling Defendants could only submit their claims under Option 2. As described in the Notice, Claim Form, and Settlement Website, under Option 1 (the Estimated Claim Option), claimant payments are calculated using transaction data provided by Settling Defendants. Under Option 2 (the Documented Claim Option), claimant payments are calculated using transaction data provided by the claimant.

5. Once the calculations are complete, Epiq notifies the claimant by email that a "Claim Assessment Notification" is available for review via the claims portal page of the

---

[1] For purposes of foreign data privacy compliance, certain Settling Defendants hired Rust Consulting, Inc. ("Rust") to distribute Notice Packets to certain potential Settlement Class Members, primarily those domiciled outside of the United States. Further, certain Settling Defendants themselves distributed Notice Packets.

Settlement Website. A Claim Assessment Notification provides, among other things, the transaction volume and payment range estimate associated with a particular claim.

6. In addition, the Claim Assessment Notification informs claimants who submitted their Claim Forms under Option 1 that: (i) they can request the transaction data provided by Settling Defendants upon which their claim was calculated, and (ii) they can convert their claim to Option 2 by providing their own transaction records within 30 days.

7. The Option 2 Claim Assessment Notification likewise informs claimants that they can request the transaction data upon which their claim was calculated. These files consist of the transaction data the claimant submitted with additional columns showing, among other things, the "Settlement Transaction Volume" and "Eligible Participation Amount" calculated pursuant to the Plan of Distribution for each submitted trade. Further, Option 2 claimants are informed that if they received transaction volume and payment estimates under both Option 1 and Option 2, they will automatically receive the higher amount without any further action required.

8. In accordance with the Court's March 8, 2019, Order approving an initial distribution from the Settlement Fund (ECF No. 1230), Epiq was authorized to distribute $54,006,248.60 on 26,937 Authorized Claims ("Initial Distribution Claims"). Beginning on April 12, 2019, Epiq commenced distribution. Certain payments remain unnegotiated because checks were returned as undeliverable, checks were not cashed, wires failed, claims were withdrawn, or payments were held at the request of the claimant. To the extent these funds remain unnegotiated, the funds will return to the Settlement Fund and be available for future distributions.

9. In accordance with the terms of the Settlement Agreements and the Court-approved Plan of Distribution (ECF No. 1095), Epiq has received and completed the processing of the

additional claims listed in Exhibits 1, 2, and 3 attached hereto, and respectfully submits its administrative determinations accepting, in whole or in part, these claims.

## II.   STATISTICS

### A.   Second Distribution Claims

10.   Epiq has processed the 22,904 Authorized Claims covered by this Declaration and administratively accepts these claims, in whole or in part ("Second Distribution Claims"). The Second Distribution Claims represent 44 percent of the total number of Estimated Authorized Claims – a metric that is defined and further described in §II.B., *infra*. When combined with those claims approved in the Initial Distribution, 96 percent of the total number of Estimated Authorized Claims have been processed and administratively accepted, in whole or in part. Claims falling within the Unauthorized Claim categories described in §II.B., *infra*, are not included in the percentage calculations above.

11.   Of the Second Distribution Claims, 6,882 were submitted under Option 1 and 16,022 were submitted under Option 2. 118 of the Option 1 claimants converted their claims to Option 2, but are being paid under Option 1 because either their Option 1 volume resulted in larger payment or their Option 2 data was rejected. Those claims are included in the Option 1 distribution numbers in the following paragraph.

12.   Of the Option 1 Second Distribution Claims, 1,995 fall within the *de minimis* payment category and will receive $15 and 1,930 fall within the automatic payment category and will receive $150.  Exhibits 1 and 2. There are 2,957 Option 1 Second Distribution Claims falling within the pro rata category.  Exhibit 3.

13.   Of the Option 2 Second Distribution Claims, 3,986 fall within the *de minimis* payment category and will receive $15 and 4,361 fall within the automatic payment category and

4

will receive $150. Exhibits 1 and 2. There are 7,675 Option 2 Second Distribution Claims falling within the pro rata category. Exhibit 3.

14. Of the 16,022 Option 2 Second Distribution Claims, 4,665 were accepted in part and rejected in part but were otherwise eligible for payment ("Partially-Accepted Claims"). Exhibit 4 lists all Partially-Accepted Claims included for Payment in the Second Distribution. This is a subset of the claims listed in Exhibits 1, 2, and 3. The remaining 11,357 Option 2 Second Distribution Claims were accepted in full.

15. In total, the Second Distribution Claims will be paid $435,114,487 if the distribution is approved.

### B. Estimated Authorized Claims

16. To date, a total of 108,600 claims[2] have been submitted. Of the total submitted claims, 65,584 were postmarked or received by the May 16, 2018 claims-filing deadline ("Timely Claims"). The remaining 43,016 claims were submitted after May 16, 2018 ("Late Claims"). Class Counsel had pre-authorized late filings for certain of the Late Claims and has exercised their authority pursuant to the Settlement Agreements to accept the remaining Late Claims because no delay of distribution has resulted from their acceptance. This Declaration does not distinguish between Timely Claims and Late Claims because Class Counsel has directed Epiq to treat the Late Claims included in the Second Distribution as Timely Claims.

17. Of the total submitted claims, Epiq estimates that there will be approximately 52,032 Authorized Claims ("Estimated Authorized Claims"), which (i) received a payment in the

---

[2] Claimants that received multiple Claim Forms (as a result of, for example, being identified by multiple Settling Defendants as potential Settlement Class Members) could request consolidation of their multiple claims into one master claim for purposes of submission. The statistics presented in this Declaration count a master claim and the sub-claims consolidated under it as one Claim.

Initial Distribution, (ii) are proposed to receive a payment in the Second Distribution, (iii) or are likely to receive a payment in a future distribution based on their current status. The 2,292 pending claims likely to be included in a future distribution are not ready to be paid for the following reasons:

   a. Option 2 claims subject to audit. To date, the "Settlement Experts" (Velador Associates Ltd. ("Velador") and Ankura Consulting Group, LLC ("Ankura,")) have selected certain Option 2 claims for audit to confirm the validity of the claims. Claimants subject to the audit are required to, among other things, submit third party documentation (*e.g.*, trade confirmations or broker statements) to verify certain identified transactions in their Option 2 data submissions. Many auditees have yet to provide sufficient information to confirm the validity of their claims to date and/or have requested extensions of time to respond, and the audit review process is ongoing as to the others.

   b. Option 2 claims subject to expert review. Following an algorithmic, transaction-level review, certain Option 2 claims are undergoing further review by the experts. This is either due to their large size or, in some cases, the data submissions were improperly formatted, making the algorithms difficult to apply. Where deficiencies with the data submissions are identified, these claimants will have 30 days to cure or dispute their Option 2 results.

   c. Claims converted from Option 1 to Option 2. This category includes claims initially submitted under Option 1 and converted to Option 2. These converted claims are being processed in the same manner as the other Option 2 claims. Claimants will have 30 days to cure deficiencies or dispute their Option 2 results.

   d. Resubmitted Option 2 claims. This category includes claims where the claimant submitted amended data files and/or documentation to cure identified deficiencies in the Option 2 claim. These claims are being reviewed and reprocessed. A final claim determination will be issued.

   e. Claims with deficiency notices that are likely to be resolved. This category includes claims that have received a deficiency notification, but the time to cure has not yet expired. These claims mainly consist of Option 2 claims with transaction-level deficiencies. Once responses have been received, these claims will continue in the claims administration process. If no response is received, and a claim is uncured, it will move into the Unauthorized Claims category.

   f. Disputed claims. These are claims for which Epiq has issued a final claim determination, and the claimant has indicated they may seek Court review.

18.     Many claimants in these categories had requested and were allowed extensions of time to provide data or documentation due to difficulties related to obtaining such materials in the midst of the Covid-19 pandemic.

19.     The following paragraphs 20 to 28 describe categories of claims that have been submitted but, ultimately, are likely to be fully rejected because of their current status ("Unauthorized Claims").

20.     Certain claimants have contacted Epiq to withdraw their claim ("Withdrawn Claims"). To date, there are 20,778 Withdrawn Claims that will not receive a distribution from the Settlement Fund. The majority of the Withdrawn Claims are due to a third-party claims aggregator/filer impermissibly submitting thousands of claims under both Options 1 and 2 simultaneously and subsequently curing by electing to proceed with each claim under either Option 1 or Option 2 and withdrawing the other claim for all affected claimants.

21.     In addition, 10,043 Claim Forms have been identified as deficient, and the filers of these claims have been provided deficiency notices but have so far failed to cure the deficiency condition in the 30-day response period ("Deficient Claims"). Claim Forms have been determined to be Deficient Claims for the following reasons:

    a. *Claims that were not eligible for Option 1 but were submitted under Option 1.* For these claims, Epiq does not have transaction data provided by Settling Defendants to calculate a payment under Option 1. To cure this deficiency, claimants must provide their own transaction data under Option 2. Epiq has given notice of this deficiency to 5,901 Deficient Claims that remain uncured.

    b. *Claims filed under Option 2 without accompanying transaction data.* For these claims, Epiq does not have transaction data provided by the claimant (or Settling Defendants) to calculate a payment under Option 2 (or Option 1).[3] To cure this deficiency, claimants must provide their own transaction data. Epiq has given notice of this deficiency to 1,375 Deficient Claims that remain uncured.

---

[3]     Epiq is processing Option 2 claims that did not include Claimant-provided transaction data, but have Settling Defendant-provided data available, under Option 1.

  c. *Missing signatory authorization documents plus name confirmation by Settling Defendants.* Epiq cannot process these Claim Forms until the claimant provides authorization documents demonstrating that the person or entity filing the claim is authorized to do so. Once authorization is shown, for the claim to be processed, it must then be verified for compliance with foreign data privacy law by Rust and/or Settling Defendants. Epiq has given notice of this deficiency to 1,049 Deficient Claims that remain uncured.

  d. *Missing signatory authorization documents.* Epiq cannot process these Claim Forms until the claimant provides authorization documents demonstrating that the person or entity filing the claim is authorized to do so.[4] Epiq has given 1,718 Deficient Claims notice of this deficiency, but the filers have not cured in the time allotted.

22. The above deficiency categories are listed as a hierarchy. Where a claim has been determined to have more than one of the listed deficiencies, that claim is counted only once, within the deficiency category that falls highest within the hierarchy.

23. As described in the Casey Declaration at Para. 20 (ECF No. 1216), Epiq received claims where multiple filers submitted claims for the same claimant and/or claim number ("Conflict Claims"). All such conflicts have been resolved.

24. Epiq also received Option 2 claims where duplicate transaction data files have been submitted ("Duplicate Claims"). Epiq cannot proceed to accept these claims until the data is associated with only one Claim Form. Epiq sent notices of conflict to the filers of these claims, but 54 Duplicate Claims remain unresolved because the filers have failed to respond.

25. Most Deficient and Duplicate claims have been pending as deficient for over 300 days, and all of them have been pending as deficient for longer than the allotted 30 days to cure.

26. There are 11,012 Option 1 claims and 14,401 Option 2 claims that have been determined to have no eligible transactions and will therefore not receive a payment.

---

[4] Claims in this category do not require further foreign data privacy verification by Rust and/or Settling Defendants.

27.     In addition, there are 236 claims that Epiq cannot process because they have not yet passed foreign data privacy compliance being performed by Rust and certain Settling Defendants. All of these claims are beyond the deadline to respond to the compliance-related outreach performed by Rust or the Settling Defendants.

28.     Finally, Epiq reviewed all Second Distribution Claims to ensure that they were not submitted by, or on behalf of, "Excluded Persons," to the extent the identities of such persons or entities were known to Epiq through the Settlement Agreements, the Notice, and through claimants' certifications on the Claim Forms. Epiq also reviewed all Claim Forms against the list of persons and/or entities who submitted valid requests for exclusion from the Settlement Classes as set forth in Exhibit 1 to each of the orders granting final approval to the Settlement Agreements (ECF Nos. 1096-1110). Epiq identified 44 Second Distribution Claims submitted on behalf of Excluded Persons.

29.     To the extent that Unauthorized Claims remain unresolved, such claims would not receive a distribution from the Settlement Fund. While Epiq will continue to work to try to resolve such claims, as appropriate, based on our experience, we expect that only a small percentage of such claims are likely be resolved under the circumstances.

30.     In all deficiency notifications that are issued, claimants are notified of their right to request Court review of Epiq's administrative determinations and the process for doing so. In order to seek Court review, a claimant is directed to submit to Epiq a "Dispute Letter" that must: (1) list the claim number(s) that are covered by the Dispute Letter; (2) state the reasons for requesting Court review of the administrative rejection of the claim; (3) state the argument(s) for why the claim should be accepted; (4) attach any supporting documents to support those argument(s); (5) be signed; and (6) include a copy of the deficiency notification. Claimants are directed to submit

their Dispute Letters to Epiq via email within 20 days of the deficiency notification. To date, Epiq has received five Dispute Letters concerning the claims being included in the Unauthorized Claims category for purposes of the statistics presented in this declaration, which will be presented to the Court for review with a subsequent distribution motion if they are not resolved. As to all Second Distribution Claims, the period for claimants to submit amended information or seek Court review of final determinations has expired.

### III.   CLAIMS PROCESSING AND VALUATION

31.     Paragraphs 25 through 31 of the Casey Declaration (ECF 1216) describe Epiq's procedures for processing claims as they were received.

32.     Processing Option 2 claims (and claims converted from Option 1 to Option 2) requires several steps. First, the Settlement Experts perform an algorithmic, trade-by-trade review of the claimant's transaction data and calculate claim value. The algorithms flag ineligible or erroneous transactions for further review and/or auditing. If there are no transaction-level deficiencies flagged by the algorithms, the claim is considered an "Authorized Claim" eligible for payment.

33.     Claims with deficient or ineligible conditions are subject to rejection in whole or in part. Prior to rejecting a claim, in whole or in part, Epiq sends a deficiency notification to the claimant. The deficiency notification informs claimants that the Claims Administrator intends to reject their claims, in whole or in part, and sets forth the reasons for the rejection so that claimants may respond to and cure issues within 30 days. Each deficiency notification includes a conspicuous notation that failure to respond and cure the deficiency within 30 days of its issued date will result in the rejection, in whole or in part, of the claim. The deficiency notification also provided the Claims Administrator's email address, P.O. Box, and telephone numbers for claimants to consult with the Claims Administrator regarding any questions. Claimants are also informed of their ability

to seek Court review of the Claims Administrator's determinations (as further described in paragraph 30, *supra*). If the claimant submits additional information in response to the deficiency notification, then the claim is reprocessed. Epiq then issues a final administrative determination, accepting the claim in full (if cured), in part (if partially cured), or rejecting the claim in its entirety (if uncured). After a final administrative determination, claimants are not permitted to resubmit their claims but may, within 20 days, request Court review of the administrative determination.

34. As discussed in paragraphs 20-27, *supra*, certain Unauthorized Claims cannot be processed unless or until the claimant cures the deficiency, and these claims will be rejected in full unless cured. For example, if a claimant did not sign the Claim Form or if the claimant did not submit data and is otherwise ineligible under Option 1, the claim will be rejected in full unless cured.

35. Partially-Accepted Claims, however, require only the rejection of certain transactions, and not the claim as a whole. Of the Option 2 Second Distribution Claims, 4,665 fall into this category. Exhibit 4. For these Partially-Accepted Claims, Epiq sent a notification that included the sum total "Settlement Transaction Volume" and "Eligible Participation Amount" calculated pursuant to the Plan of Distribution for accepted trades and which also stated the reasons for the partial rejection, and provided information about how to cure the partial-rejection  As described in paragraph 7, *infra*, copies of the processed data are available upon request, and when trades within that data are rejected, the processed data includes columns indicating the reason(s) for the rejection when available. The notification also indicated conspicuously that failure to respond would result in partial rejection of the claim. Responsive submissions were reviewed by Epiq with assistance from Velador and Ankura. Claimants who submitted responses received a final notification once such review was complete, with an updated Settlement Transaction Volume

and Eligible Participation Amount if applicable. If the claimant failed to respond at all but the claim is still otherwise payable on the accepted transactions, the claim is submitted for payment based on the accepted transactions only. All of the 4,665 Partially-Accepted Claims included in the Second Distribution Claims have been given at least 30 days to respond to the deficiencies identified in their claim submissions and no response was received, or the response did not fully resolve the issue(s).

36. As discussed above in paragraph 30, claimants receiving deficiency notifications are advised to submit a Dispute Letter if they wish to seek Court review of Epiq's administrative determination. Epiq has not received Dispute Letters concerning any of the Partially-Accepted Claims.

37. The common reasons for a claim being partially rejected include:

a. Inclusion of trades that are ineligible under the Settlements, including trades with non-defendants, outside the class period, in non-FX products (*e.g.*, precious metals or interest rates), on ineligible venues, or outside of the United States (*i.e.*, non-U.S. domiciled claimant trading with non-U.S. desk of a defendant).

b. Submission of trades with invalid or missing mandatory fields, including ISO codes (standardized currency pair codes), contract codes (for futures), product type, base amounts, contra amounts, value dates, and/or trade rates. These are mandatory fields because the Plan of Distribution requires these data points to calculate claim value. Trades missing these fields are therefore rejected.

c. Where the trade rate supplied is materially different from the prevailing daily rate and the claimant has not substantiated the trade with third party documentation showing the trade is genuine.

    d. Where the trade size supplied is unusual or implausible and the claimant has not substantiated the trade size with third party documentation showing the trade is genuine.

## IV. DISTRIBUTION PLAN FOR SECOND DISTRIBUTION CLAIMS

38. Should the Court concur with Epiq's administrative determinations concerning the Second Distribution Claims, Epiq recommends the following distribution plan:

    a. The Authorized Claimants, identified in Exhibit 1 attached to this Declaration, whose Claim Forms fall within the *de minimis* payment category, will be paid $15. Such claims will be paid in full.

    b. The Authorized Claimants, identified in Exhibit 2 attached to this Declaration, whose Claim Forms fall within the automatic payment category, will be paid $150. Such claims will be paid in full.

    c. The Authorized Claimants, identified in Exhibit 3 attached to this Declaration, whose Claim Forms fall within the pro rata payment category, will be paid their respective pro rata shares subject to a 40% percent holdback.

    d. The Authorized Claimants, identified in Exhibits 2 and 3 attached to this Declaration, will have the ability to receive their payment via wire transfer or check. Because there is usually some percentage of wire payments that are returned resulting in a fee for returned/rejected wires, Authorized Claimants identified in Exhibit 1 as entitled to a single $15 payment, a single $150 payment, or a single pro rata payment under $1,000 (*i.e.*, not part of a bulk submission or multiple payments going to a single filer) will be excluded from the wire payment population and default to a check. For those Authorized Claimants who meet the criteria to have the option to receive a wire transfer and have elected to have their payment

sent via wire transfer and subsequently the wire is rejected or returned, the payment will be reissued in the form of a check.

e. In order to encourage Authorized Claimants to promptly deposit their distribution checks, and to avoid or reduce future expenses relating to unpaid distribution checks, all distribution checks will bear a notation "CASH PROMPTLY; VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT CASHED BY [DATE 90 DAYS AFTER ISSUE DATE]."

f. In an effort to have as many Authorized Claimants as possible timely negotiate their payments, Epiq will perform extensive follow-up with those Authorized Claimants whose wires failed or checks are initially uncashed, either because they are returned to Epiq as undeliverable or because they simply did not cash the check after a period of time elapses. For Authorized Claimants whose checks are returned as undeliverable, Epiq will endeavor to locate new addresses by running the undeliverable addresses through the USPS National Change of Address database and, where appropriate, via Internet search techniques and by calling or emailing the Authorized Claimants. Where a new address is located, Epiq will update the database accordingly and re-issue a distribution check to the Authorized Claimant at the new address. For any Authorized Claimants whose distributions are not returned, but who simply do not cash their checks, Epiq will use a mix of automated and personalized telephone calls and emails to urge such Authorized Claimants to cash their distribution checks. Authorized Claimants will be informed that, if they do not cash their checks within 90 days from the issue date, their entitlement to

     recovery is subject to being irrevocably forfeited and the funds re-allocated to other Authorized Claimants in a subsequent distribution.

g. In the event an Authorized Claimant loses or damages his, her, or its check, or otherwise requires a new check, Epiq will issue replacements. Check re-issues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the first check, where appropriate. If a check is deemed lost, Epiq will void the initial payment check prior to re-issuing a payment.

h. In addition, and to maximize efforts to have all wires completed and checks cashed, Epiq has trained the staff at our Call Center as well as the team monitoring the case email inbox to handle the various issues that likely will arise during the Second Distribution. Typically, the Call Center and inbox receive inquiries with respect to the calculation of payments and the timing of any future distributions. We expect a high call and email volume during the weeks immediately following dissemination of the payments.

i. Authorized Claimants who do not negotiate their funds within the time allotted will be presumed to forfeit any recovery for their respective Claim Forms from the Settlement Fund, unless otherwise determined by Class Counsel. Any forfeited recoveries will become available for re-distribution as part of subsequent distributions.

  I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

  Executed in Seattle, WA on November 23rd, 2021.

_____
Loree Kovach

**CERTIFICATE OF SERVICE**

I hereby certify that on November 23, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

      *s/* Christopher M. Burke
      Christopher M. Burke