UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                           :

                                           :

                                           :

In re FOREIGN EXCHANGE BENCHMARK   :        13 Civ. 7789 (LGS)
RATES ANTITRUST LITIGATION         :

                                           :       OPINION AND ORDER

                                           :

                                           :
----------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

     This case concerns an alleged conspiracy, or conspiracies, among banks to fix prices in the foreign exchange ("FX") market.  On September 3, 2019, a Rule 23(c)(4) class was certified on two issues:  (1) the existence of a conspiracy to widen spreads in the FX spot market and (2) participation in the conspiracy by Defendants Credit Suisse Group AG, Credit Suisse AG and Credit Suisse Securities (USA) LLC (collectively, the "CS Defendants" or "Credit Suisse").  The CS Defendants move for summary judgment on the basis that there is no single conspiracy or that the CS Defendants did not participate in such a conspiracy.  Plaintiffs cross-move for summary judgment on the basis that there is a conspiracy and the CS Defendants participated in it.  For the reasons set forth below, both motions are denied.

     In this action, Plaintiffs sued sixteen defendant banks, which are among the world's largest banks engaged in trading in the FX market.  Fifteen of the sixteen banks have settled with Plaintiffs, paying over $2.31 billion, one of the largest antitrust settlements in the Sherman Antitrust Act's 125-year history.  The fifteen banks settled after filing motions to dismiss.  In the case of each bank, the final order approving the settlement included a term barring claims for contribution or indemnification against the settling banks for any amounts awarded in this or any other action by way of settlement, judgment or otherwise.

With only Credit Suisse remaining, Plaintiffs moved to certify two Rule 23(b)(3) classes. Plaintiffs' motion was denied -- one class because of the lack of predominance, and the other class because of the absence of adequacy. *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 430, 438 (S.D.N.Y. Sept. 3, 2019). Instead, a Rule 23(c)(4) class was certified. *Id.* at 436. The two issues certified, and the only issues that remain on a class basis, are: (1) the existence of a conspiracy to widen spreads in the FX spot market and (2) Credit Suisse's participation in the conspiracy. *Id.* The decision certifying the issues noted that "if the CS Defendants are found not to have joined any conspiracy, then all of the claims against it are resolved." *Id.* at 437.

The two certified issues have great financial significance because an adverse finding on both of these issues would mean that Credit Suisse is potentially liable for all of the wrongful conduct of the conspiracy, and thus Credit Suisse could be liable for all of the damages that have not already been paid through the settlements with the other banks. *See New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1086 (2d Cir. 1988) ("An amount recovered by a plaintiff from a coconspirator in settlement of the former's antitrust claims is not deductible from the amount of damages determined by the jury, though it may be deductible from the damages award after it has been trebled."); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789, 2016 WL 5108131, at *7 (S.D.N.Y. Sept. 20, 2016) (collecting cases discussing joint and several liability in the antitrust context).

Credit Suisse moves for summary judgment on the basis that there was no "single conspiracy" to widen spreads in the FX spot market. Tellingly, it does not directly argue that no conspiracy existed.

## I.       BACKGROUND

The following facts are drawn from the parties' submissions, including their Local Civil Rule 56.1 statements, are undisputed and provide an overview of the context of the parties' dispute.

Plaintiffs are over-the-counter ("OTC") purchasers of foreign exchange ("FX") spot, forward and/or swap trades who transacted directly with Defendants. Over-the-counter transactions involve counterparties who trade directly with each other without an intermediate exchange. CS Defendants participate in the FX market as dealers, market-makers or liquidity providers.

The FX market[1] is the largest and most actively traded financial market in the world. Between December 1, 2007, and December 31, 2013 (the "Class Period"), as much as $5.3 trillion per day was traded in the FX market worldwide. Trading occurs twenty-four hours per day and over 252 trading days per year. During the Class Period, FX trading by volume was primarily conducted OTC. Currencies are bought or sold in pairs.

Trading in the FX market occurs in two tiers: (1) the interdealer or interbank tier and (2) the dealer-to-customer tier. This case concerns the dealer-to-customer tier. In that tier, Defendants, large banks, acted as market makers or dealers. Market makers quote prices to customers at which they are willing to buy or sell a certain volume of a currency pair. For

---

[1] CS Defendants frequently refer to "FX markets" instead of the FX market in their Rule 56.1 statement. [Dkt. 1594-53 ¶¶ 39, 40]. However, CS Defendants provide no basis for viewing the FX market as a series of markets. The expert report the CS Defendants cite refers to "the FX Market" and in their Answer to the Third Consolidated Amended Class Action Complaint, CS Defendants refer to the "FX market" without denying the appropriateness of referring to it as a single market. CS Defendants dispute the use of the word "market." However, in their answer to the operative complaint and in their expert report, "market" is used. As a result, "market" is adopted here.

example, a customer contacts a salesperson at a market-making bank to request a price quote in a designated volume of a specific currency pair.  The salesperson relays the request to an FX trader, who provides a two-way quote that includes the prices at which the trader is willing to buy the currency and sell the currency.  The difference between the buy or ask price and the sell or offer price is the bid-ask spread.

In late 2006 and early 2007, FX traders who worked for different Defendants began using Bloomberg and Reuters chat rooms to communicate with each other.  FX traders continued using chat rooms to communicate with traders at other banks through 2012 and 2013.  FX traders discussed bid-ask spreads for various currency pairs in the chat rooms.  Chat rooms could exist for years, and some traders communicated with other traders daily in the course of their employment.  At least one trader, from Barclays, participated in five chat rooms, which provided him access to traders from ten other banks.  Because individual traders participated in multiple chat rooms, eight chat rooms connected employees of all sixteen Defendant banks.  At least some FX traders sometimes asked about the same spread simultaneously in different chat rooms.  Some banks, including Credit Suisse, encouraged their employees to use interbank chat rooms and discuss bid-ask spreads in those chat rooms.

## II.   STANDARD

### A. Summary Judgment

Summary judgment is proper where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Electra v. 59 Murray Enters.*, 987 F.3d 233, 248 (2d Cir. 2021).  "Only disputes over facts

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby*, 477 U.S. at 248; *accord Saleem v. Corp. Transp. Grp.*, 854 F.3d 131, 148 (2d Cir. 2017).

Courts must construe the evidence and draw all reasonable inferences in the non-moving party's favor. *Electra*, 987 F.3d at 248. When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration. *Cayuga Nation v. Tanner*, No. 20 Civ. 1310, 2021 WL 3160077, at *8 (2d Cir. July 27, 2021). When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing to particular parts of materials in the record. Fed. R. Civ. P. 56(c)(1)(A).

**B. Sherman Act**

Section 1 of the Sherman Act provides, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several [s]tates, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. An antitrust plaintiff must show: (1) "a combination or some form of concerted action between at least two legally distinct economic entities" and (2) "that the agreement constitute[s] an unreasonable restraint of trade either per se or under the rule of reason." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993). "Price-fixing agreements . . . fall into the category of arrangements that are per se unlawful." *In re Vitamin C Antitrust Litig.*, 8 F.4th 136, 147 (2d Cir. 2021) (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)) (explaining that "certain types of anticompetitive conduct are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality" under the Sherman Act). "Independent action is not

proscribed." *Meredith Corp. v. Sesac, LLC*, 1 F. Supp. 3d 180, 201 (S.D.N.Y. 2014) (quoting

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)).

At the summary judgment stage, "to raise a genuine issue of material fact as to an antitrust

conspiracy, the plaintiff must present direct or circumstantial evidence that 'tends to exclude the

possibility that the alleged conspirators acted independently.'" *Anderson News, L.L.C. v. Am.

Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 588 (1986)).  A plaintiff need not "disprove all nonconspiratorial

explanations for the defendants' conduct; rather the evidence need be sufficient only to allow a

reasonable fact finder to infer that the conspiratorial explanation is more likely than not." *Id.*

(internal quotation marks omitted).

"Absent direct evidence of conspiracy, such as an admission by one of the defendants,

antitrust plaintiffs must rely on circumstantial evidence to support their conspiracy claims."

*Anderson News, L.L.C.*, 899 F.3d at 103.  "One powerful form of circumstantial evidence is

parallel action—proof that defendants took identical actions within a time period suggestive of

prearrangement." *Id.* at 104.  Parallel action is not sufficient on its own to prove the existence of

a conspiracy.  *Id.*  When parallel behavior is the basis of a Sherman Act claim, a plaintiff must

show additional circumstances, referred to as "plus factors" to permit a factfinder to infer a

conspiracy.  *Id.*  Plus factors include "traditional evidence of conspiracy," such as statements

permitting an inference that defendants entered into an agreement and indirect evidence such as

"a common motive to conspire, evidence that shows that the parallel acts were against the

apparent individual economic self-interest of the alleged conspirators, and evidence of a high

level of interfirm communications." *Id.* (internal quotation marks omitted); *see also United

States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (discussing plus factors).  "[D]efendants'

6

conduct and communications must be evaluated in context and with the overall picture in mind."

*Anderson News, L.L.C.*, 899 F.3d at 104 (internal quotation mark omitted).

To demonstrate the existence of a conspiracy, an "antitrust plaintiff should present direct

or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a

conscious commitment to a common scheme designed to achieve an unlawful objective."

*Monsanto Co.*, 465 U.S. at 764 (internal quotation marks and citation omitted); *accord Anderson*

*News L.L.C.*, 899 F.3d at 97.  "Circumstances must reveal a unity of purpose or a common design

and understanding, or a meeting of minds in an unlawful arrangement."  *Anderson News, L.L.C.*

*v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (internal quotation marks omitted); *accord*

*In re Keurig Green Mt. Single-serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 241-42

(S.D.N.Y. 2019).

"Whether the [plaintiff] has proved a single or multiple other independent conspiracies is

a question of fact for a properly instructed jury."  *United States v. Sureff*, 15 F.3d 225, 229 (2d

Cir. 1994) (internal quotation marks omitted); *accord United States v. Freedman*, No. 18 Crim.

217, 2019 WL 3296967, at *2 (S.D.N.Y. July 23, 2019).  Multiple conspiracies may be found

when "the evidence shows separate networks operating independently of each other, but it is not

warranted when the evidence shows that each alleged member agreed to participate in what he

knew to be a collective venture directed toward a common goal."  *United States v. Dawkins*, 999

F.3d 767, 797 (2d Cir. 2021) (internal quotation marks omitted) (finding no error in refusal to

give a multiple conspiracy jury instruction).  "Even schemes involving 'two or more phases or

spheres of operation' may nevertheless amount to a single conspiracy, 'so long as there is

sufficient proof of mutual dependence and assistance' among the conspirators."  *United States v.*

*Pena*, 846 Fed. App'x 49, 51 (2d Cir. 2021) (summary order) (quoting *United States v. Berger*,

224 F.3d 107, 114–15 (2d Cir. 2000) (considering overriding goal, overlap of leadership, and common participants as evidence that several schemes fell within same conspiracy)).  "In determining whether a jury could have found a single conspiracy, courts generally examine three factors: (1) whether there was a common goal, (2) the nature of the scheme, and (3) the overlapping of participants in the various dealings."  1 Modern Federal Jury Instructions-Criminal P 19.01 (2021).  Although the issue of a single versus multiple conspiracies arises more frequently in criminal cases, the same principles have been applied in civil antitrust cases to assess whether there are multiple conspiracies or a single conspiracy.  *See, e.g., Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 467 (D. Vt. 2019); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06 MD 1175, 2014 WL 7882100, at *37-38 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted,* 2015 WL 5093503 (E.D.N.Y. July 10, 2015).

In addition to showing that there is a conspiracy, a plaintiff must show that the defendant joined the conspiracy.  To show that a defendant joined a conspiracy, a plaintiff "need not show that the defendant knew all of the details of the conspiracy, so long as [the defendant] knew of its general nature and extent."  *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 460, 482 (S.D.N.Y. 2017) (quoting *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008)); *accord United States v. Khalupsky*, 5 F.4th 279, 288 (2d Cir. 2021).  A plaintiff need not show that the defendant knew the identities of all the other conspirators.  *Id.* (internal quotation marks omitted).

## III.    DISCUSSION

### A.  Existence of a Conspiracy

Construing the evidence in favor of Plaintiffs on CS Defendants' motion, a reasonable jury could find that a single conspiracy existed to fix spreads in the FX market and that the supporting evidence tends to exclude the possibility that the alleged co-conspirators acted

8

independently.  Conversely, construing the evidence in favor of CS Defendants on Plaintiffs'

motion, a reasonable jury could conclude that no single overarching conspiracy existed, and that

only multiple smaller conspiracies existed.  While significant uncontroverted evidence shows at

least some conspiratorial activity in the FX market in which Credit Suisse participated, questions

remain about the scope of the shared illegal goal and extent of the conspirators' mutual

dependence and assistance.  "If the evidence at trial supports an inference that there was more

than one conspiracy, then, whether multiple conspiracies existed is a question of fact for the

jury."  *United States v. Vazquez,* 113 F.3d 383, 386 (2d Cir. 1997); *accord Khalupsky*, 5 F.4th at

288.

### 1.  Economic Plausibility

To survive summary judgment and "raise a genuine issue of material fact as to an antitrust

conspiracy, the plaintiff must present direct or circumstantial evidence that 'tends to exclude the

possibility that the alleged conspirators acted independently.'"  *Anderson News, L.L.C.*, 899 F.3d

at 98 (quoting *Matsushita Elec. Indus. Co.,* 475 U.S. at 588); *accord DPWN Holdings Inc. v.*

*United Air Lines, Inc.*, No. 11 Civ. 564, 2019 WL 1515231, at *13 (E.D.N.Y. Feb. 21, 2019).

The quality of evidence required to satisfy the "tends to exclude" standard "varies with the

economic 'plausibility' of the alleged agreement."  *Id.* at 99.  "[W]here context reveals that the

alleged agreement is one that simply makes no economic sense, the plaintiff must come forward

with more persuasive evidence to support its claim than would otherwise be necessary."  *Id.*

(internal quotation marks omitted).  "In a case where the alleged scheme is short-term and

relatively simple in operation," a plaintiff's burden is lighter.  *Apex Oil Co v. DiMauro*, 822 F.2d

246, 253 (2d Cir. 1987).

Because "the quality of evidence required to satisfy *Matsushita's* 'tends to exclude' standard varies with the economic 'plausibility'" of an alleged agreement, it is important to analyze the alleged agreement at issue before weighing the evidence. *Anderson News L.L.C.*, 899 F.3d at 99. For the reasons explained below, the alleged agreement makes economic sense, even though the concerted action took place over a nearly five-year period and involved a significant number of actors at sixteen banks.

Plaintiffs allege a horizontal price fixing scheme in which Defendants, who are frequently competing dealers in the FX spot market, conspired to fix the bid-ask spreads for fifty-two currency pairs in the foreign exchange market. By fixing the spreads, Defendants could keep the spread wide while buying low and selling high. Most dealers want wider spreads because wide spreads increase their probability of making money.

Plaintiffs' theory makes economic sense. Defendants had an incentive to fix spreads and keep them as wide as possible because wider spreads would enable them, as market makers, to increase the profitability of their trading activity in the FX market. Because spreads could remain stable for lengthy periods of time in normal market conditions and can correlate across trade size and sometimes across certain currency pairs, the wide spreads could have a lasting and reinforcing impact on the market.

CS Defendants do not specifically contest the economic plausibility of Plaintiffs' theory. CS Defendants argue that the number of currencies, the global 24/7 nature of trading and the speed at which liquidity conditions changed would require "an extraordinary level of coordination and monitoring" among traders at the sixteen Defendant banks. The number of currencies and the global 24/7 nature of trading are elements that add to the complexity of the agreement alleged by Plaintiff, but they do not directly make Plaintiffs' theory less economically

plausible because Defendants' rational economic motive is the same regardless of the number of currencies impacted or the amount of time in which trading occurs. *See Anderson News, L.L.C.*, 899 F.3d at 102 (considering economic plausibility through the lens of defendants' "rational economic motive" to join the alleged conspiracy). The parties disagree about the speed at which the market changes. Plaintiffs offer chat transcripts in which traders point to spreads that remained stable for more than twelve months. CS Defendants offer testimony that pricing information could be stale some of the time and the market could be unpredictable "even in [the] next second." CS Defendants' evidence that prices sometimes changed rapidly does not preclude that, at other times, prices remained stable over months-long periods.

Because Plaintiffs advance a plausible economic theory behind the alleged conspiracy, this is not a situation where they must come forward with more persuasive evidence to support their claim than would otherwise be necessary. Plaintiffs' overall burden is not low, however, because the conspiracy alleged is vast and its impact is complex.

### 2. Evidence of a Conspiracy

#### a. Direct Evidence of a Conspiracy to Achieve a Common Goal

Chat transcripts between Credit Suisse and the other Defendants provide direct evidence of an agreement and common goal to widen spreads. This evidence also shows cooperative and parallel conduct to achieve that goal.

Plaintiffs identify a chat room in which traders from Goldman Sachs, Credit Suisse and RBS agreed, at the Credit Suisse trader's suggestion, to "sign a pact on spreads." The RBS trader previously suggested "agree[ing] on the same spreads [because] it [is] pointless otherwise and we keep cutting spreads more and more." The Credit Suisse trader later testified at a deposition that he had been joking about the pact in March 2007, but the record shows not only that the traders

11

continued exchanging spread information after suggesting a pact, but also that he prodded the RBS trader to confirm his participation in the pact by asking "u in." Plaintiffs offer multiple examples of traders in that chat room encouraging each other to widen spreads and avoid tight spreads. So even if the pact was a joke, the evidence still shows the traders endeavoring to widen spreads with competing banks. The Credit Suisse trader asked a trader at Goldman Sachs for the "spread in 500 usdjpy." The Goldman Sachs trader responded that 25 is good but suggested showing a wider spread of 30. The Credit Suisse trader responded "ok." In another instance involving the New Zealand Dollar and U.S. Dollar, the RBS trader asked what the spread should be. The Credit Suisse trader said, "in [a] normal [market] 20" but, "at the mo" 28. The RBS trader responded, "ok ta."

Plaintiffs point to at least fourteen instances in chat transcripts of Credit Suisse traders encouraging others to use wider spreads or acceding to wider spreads at the request of other traders. (1) In March 2008, a trader from RBC asked about the spread for "200 eursek," a trader from Deutsche Bank suggested 175 to 200 pips and a Credit Suisse trader suggested it should be 200. (2) Later in the same chat room in September 2008, a Credit Suisse trader asked for the spread in "50 eurjpy," and when traders at other banks told him that it should be 8 or 8 to 10, he responded that 10 is fair. (3) A Bank of America trader in the same chat room in January 2009, when told that the spread in "30 usd nok" is 200, responded that "[you] know [I] am not going to be narrower" although he had worked it out as 115. (4) Also in January 2009, a trader from Credit Suisse told a trader from another bank that he showed the Euro-U.S. Dollar spread in 200 as 18, but he would actually be 20. On that same day in the same chat room, a trader from Goldman Sachs proclaimed, "the day of customers holding us to ransom over spreads is over." (5) In a different chat room in May 2010, a Credit Suisse trader asked, "how wide you guys make

in 100usdmxn" because "all our mxn traders out we're clueless."  (6) In another chat room in June 2010, a trader from Bank of America shared that he widened the British Pound U.S. dollar spread he offered, and a trader from Credit Suisse confirmed that the wider spread "is good."  (7) In that same month, in response to suggested spreads for Euros to Swedish Krona and Norsk Krone, a Credit Suisse trader responded that he thought the spreads on his chart "were too tight" so he was "widening [them] now."  (8) In September 2010, a Credit Suisse trader asked a Deutsche Bank trader if 50 and 100 "gbpnok prices" are "125 and 225," the Deutsche Bank trader said "its wider than u think" and the Credit Suisse trader responded that he'll "say 130 and 250." (9) In a discussion about the spread for "100 noksek" in December 2010, a Credit Suisse trader responded to a suggestion that the spread is 10 with "no chance" it is like "10-12 in 100."  (10) In February 2011, when a Credit Suisse trader asked for a "normal morning spread in 25 eursek" and a trader from Deutsche Bank said "3040 . . . i'd show 40 then come in if u need," the Credit Suisse trader responded that he said 40.  (11) In October 2011, a Credit Suisse trader asked, "how wide 75 eur, 4?" and was encouraged by traders from Société Générale and Bank of America to go with 5, to which he responded, "ok."  (12) In March 2012, when asked if the spread in 200 Australian Dollars to U.S. Dollars is 12, a Credit Suisse trader responded it is a "bit wider, 14." (13) In April 2012 the "Yen Cartel" chat room, when asked if "400 usdjpy" is 14, a Credit Suisse trader responded it is "15 I think."  (14)  In August 2012, during a discussion about the Euro to Japanese Yen spread, a Credit Suisse trader said the spread is "too tight but it[']s what [customers] expect . . . unless we all decide to make wider, we have the power."  A Morgan Stanley trader responded with a wider spread and the Credit Suisse trader responded "done," and a JP Morgan trader responded "[I] agree."  Plaintiffs also identify numerous examples of traders at other banks encouraging traders to use wider spreads.

In 2012, as some banks began instructing their traders to close their permanent chat rooms that included traders from other banks, a trader from JP Morgan in the "Yen Cartel" chat room messaged a Credit Suisse and Bank of America trader, "what the hell are u two planning, this chat is a compliance dream." The Credit Suisse trader wrote, "we are mearly [sic] sharing market information to get the best possible rates for our [customers] and the our [sic] banks," to which the Bank of America trader responded, "hahahah," and the JP Morgan trader responded, "ya sure."

A trader who pleaded guilty to a conspiracy for conduct in one chat room testified that he participated in similar conduct in a separate chat room called "Old Gits." He testified that his conduct in the chat room for which he pleaded guilty was "extremely explicit" in comparison. "Old Gits" included traders from HSBC, Barclays, Citi, Bank of America, Standard Chartered and Credit Suisse at various points in time. In the "Old Gits" chat room, the Credit Suisse trader told the other traders to "just both quote them wide and same that way they have no tight price." CS Defendants do not dispute that this is evidence of an FX trader encouraging others to exchange spreads to get on the same page with competitors.

Plaintiffs identify traders who testified to the practice of inquiring about spreads from competitors directly in response to requests for quotes from clients. For example, a Citibank trader who pleaded guilty to price-fixing charges testified that when clients called for a quote from multiple banks, participants in a chat room would convey what they were being asked and indicate the price they were showing to the client. A trader who worked at BNP and Barclays testified that the exchange of prices in chat rooms should not happen because banks are supposed to be independent and that exchanging spreads among competitors can affect the prices shown to

14

clients.  A trader from Morgan Stanley, immediately after discussing spreads, wrote, "can never be a bad thing colluding spreads."

Plaintiffs offer evidence that traders took action to enforce parallel conduct.  For example, when a trader at Barclays heard that someone at HSBC was quoting a narrower spread than the Barclays trader, he reached out to traders at JP Morgan and RBS to check their spreads.  The Barclays trader asked the RBS trader to check with someone at HSBC and, if the HSBC trader was quoting a narrower spread, tell them to stop.  The RBS trader messaged the HSBC trader, who responded that he was not quoting the narrower spread.  In another chat room, a different trader from HSBC warned traders from Standard Chartered, Bank of America and Citi not to show a certain narrow spread.  Plaintiffs also present multiple examples of traders inquiring about spreads with competitors while stating that they need the spreads to come up with values for grids, which could be shown to customers as indicative spreads for normal market conditions.

CS Defendants' only suggestion that the sharing of pricing information is not part of a conspiracy is that traders shared "market color."  CS Defendants do not submit a definition of market color but suggest that traders were not agreeing to fix spreads but merely talking about them.  CS Defendants cite in their memorandum of law in support of their motion for Summary Judgment a "key industry guide to appropriate behavior in the FX markets."  The portion of the guide they quote states, "The timely dissemination of Market Colour between Market Participants can contribute to an efficient, open, and transparent FX Market through the exchange of information on the general state of the market, views, and anonymised and aggregated [client order] flow information."  Nothing in that guide suggests that real-time price spreads are considered market color to be shared.  The guide refers to market color as information on "the general state of the market, views, and . . . aggregated flow information."  Even if traders thought

15

they were just sharing "market color" when they provided pricing information in exclusive chat rooms, CS Defendants, in their memoranda of law, do not point to any evidence suggesting that exchange was pro-competitive or consistent with any sort of independent action.

### b. Circumstantial Evidence of a Conspiracy

Plaintiffs offer significant evidence of "plus factors" in support of finding a conspiracy (i.e., agreement) to widen spreads, including a high level of communication among the conspirators, conduct that was sometimes against the conspirators' economic self-interest, and invoking the Fifth Amendment privilege against self-incrimination.

One important plus factor is "evidence of a high level of interfirm communications." *Anderson News, L.L.C.*, 899 F.3d at 104. Plaintiffs present a chart, based on chat logs, that displays more than 400 instances of interfirm communication regarding spreads for a variety of currency pairs. As discussed above, while many of these instances involved direct discussions of widening spreads, in hundreds of other conversations, traders at competing banks exchanged data about various currency bid-ask spreads. Plaintiffs also demonstrate that Credit Suisse was connected to all of the other Defendants through just four overlapping chat rooms in which traders exchanged information about spreads.

Plaintiffs point to significant evidence that permit an inference that Defendants entered into an agreement. Two chat rooms, including one with a Credit Suisse trader, had the word cartel in their names. Traders in multiple chat rooms discussed collusion and regulators' concerns that sharing spreads is collusion. A Credit Suisse trader testified that Credit Suisse encouraged him to use interbank chat rooms and talk about spreads in the FX market. The same trader worked at HSBC and Barclays, which also encouraged him to participate in chat rooms.

16

Multiple traders testified that it was their belief that the exchange of spreads in chat rooms was a common practice in the FX market.

Plaintiffs provide evidence of traders' motives to widen spreads even though it is not always in their economic self-interest to do so. Wider spreads increase the likelihood that a trade will be profitable for dealers, like Defendants. One Credit Suisse trader encouraged traders from other banks to "just both quote them wide and same that way they have no tight price." Credit Suisse does not dispute that this motive exists and instead emphasizes that a common motive is insufficient on its own to establish a conspiracy. But a common motive does support a finding of a single conspiracy rather than multiple conspiracies. To undercut Plaintiffs' motive argument, CS Defendants point to evidence that widening spreads is against the economic self-interest of the banks, and that sometimes traders prefer a narrower spread, which would make a customer more likely to deal with them as opposed to a competitor. However, this argument concedes that efforts to widen spreads are not in the economic self-interest of Defendants, which is a plus factor that contributes to evidence that a conspiracy existed, *see Anderson News, L.L.C.*, 899 F.3d at 104. Wider spreads may decrease the likelihood of making a single trade in one instance, but maintaining wider spreads with competitors could increase the likelihood of dealers profiting on each trade.

That three former Credit Suisse employees, as well as many other of the other Defendants' employees, asserted their Fifth Amendment privilege against self-incrimination contributes to the circumstantial evidence of a conspiracy. *See Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them . . . ."); *LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) (holding that trial court

did not abuse its discretion in drawing and relying on an adverse inference where other evidence also supported the inference); *Sausa v. Vill. of W. Hampton Dunes*, No. 18 Civ. 3802, 2021 WL 4443712, at *4 (E.D.N.Y. Sept. 28, 2021); *Amusement Indus., Inc. v. Stern*, No. 7 Civ. 11586, 2016 WL 4249965, at *7 (S.D.N.Y. Aug. 11, 2016), *report and recommendation adopted*, 2016 WL 6820744 (S.D.N.Y. Nov. 10, 2016), *aff'd*, 721 F. App'x 9 (2d Cir. 2018) (summary order). Three former Credit Suisse traders asserted their Fifth Amendment rights when asked whether Credit Suisse conspired on spreads with its competitors.  CS Defendants challenge the admissibility of traders' invocations of the Fifth Amendment privilege but offer no argument in support of their challenge.

### c. Single Versus Multiple Conspiracies

Plaintiffs provide sufficient evidence of a single conspiracy to survive the CS Defendants' motion for summary judgment, but facts in dispute preclude Plaintiffs from prevailing on their motion for summary judgment.  In other words, a reasonable jury could find for either Plaintiffs or Defendants on the issue of whether there existed a single conspiracy, as Plaintiffs allege, or multiple conspiracies, as Defendants' argue, depending on the inferences that are drawn and the evidence that is credited.

To determine whether there was one overarching conspiracy to widen spreads, or multiple smaller conspiracies (for example, each chat room representing a separate conspiracy), the inquiry is what binds the alleged conspirators and their conduct together.  As Defendants point out, parallel action is insufficient.  *See Apex Oil*, 822 F.2d at 252 ("[E]vidence of parallel conduct alone cannot suffice to prove an antitrust conspiracy.").  Tweaking Defendants' example, it would be wrong to say that many drivers exceed the speed limit, use common means to do so and have a common goal for traffic to move more quickly and therefore are engaged in a single global

18

conspiracy.  Although a common goal is essential, and parallel conduct is probative, the evidence must provide something more to bind the participants and their conduct together to show a collective venture -- and hence an illegal conspiracy -- rather than independent unlawful conduct.

### i.    Overlapping Participants

Overlapping participants support a finding of a single conspiracy rather than multiple conspiracies.  *See Berger*, 224 F.3d at 114–15.  Here, the sixteen alleged co-conspirator banks all, through their agents, participated with each other in an interconnected network of chat rooms where they exchanged information related to spreads in the FX markets.  Individual traders participated in multiple chat rooms, so that eight chat rooms connected employees of all sixteen Defendant banks.  Credit Suisse overlapped with the fifteen other banks in just four multi-bank chat rooms.  A single trader, from Barclays, participated in five chat rooms, which provided him access to traders from ten other banks.  Some FX traders asked about the same spread simultaneously in different chat rooms.  The participants shared information regarding different currency pairs at different times, but the record shows that each Defendant participated in the soliciting and provisioning of spreads in the FX market.

CS Defendants argue that there "is no legally cognizable theory under which hundreds of traders in dozens of exclusive chat rooms, who often undercut and competed even with other chat room members, can be connected into a single conspiracy."  The argument is unpersuasive for three reasons.  First, CS Defendants base this argument largely on the theory of hub-and-spoke conspiracies, which is not applicable to this case.  Hub-and-spoke conspiracies involve "an entity at one level of the market structure, the 'hub,' coordinat[ing] an agreement among competitors at a different level, the 'spokes.'"  *Apple, Inc.*, 791 F.3d at 314.  Plaintiffs do not allege a hub-and-spoke conspiracy.  Instead, Plaintiffs contend that the co-conspirator banks all acted at the same

level of the market structure and participated in a single horizontal conspiracy.  Second, CS
Defendants' argument ignores that the hundreds of FX traders each worked for one of sixteen
Defendants and were agents of a Defendant when they entered chat rooms and shared information
with traders at other banks.  That all hundreds of FX traders did not convene or further the
conspiracy and that no single chat room involved all Defendants does not preclude the existence
of a single conspiracy.  *See Khalupsky*, 5 F.4th at 288; *In re Interest Rate Swaps Antitrust Litig.*,
261 F. Supp. at 482; *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 690 (S.D.N.Y. 2012)
(holding that a defendant's involvement "in only a portion" of a conspiracy "does not undermine
the existence of the conspiracy itself or [the defendant's] role as a participant").  Third, instances
of price competition and examples of offered spreads narrower than the spreads discussed in chat
rooms does not undermine the existence of an agreement and conduct aimed at widening spreads.
*See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 776 (2d Cir. 2016) (recognizing a difference
between the existence of a conspiracy and its efficacy and that an antitrust claim may be "based
on the influence that a conspiracy exerts on the starting point for prices").

CS Defendants' contention that the invitation-only nature of chat rooms "refutes any
notion of vast cooperation" is unavailing.  That the Defendants shared pricing information only in
small subgroups does not negate the scale of the information sharing among the Defendants or the
number of connections between each of the Defendants.  The venture is no less a collective one
because actions were carried out in small part by different participants in the conspiracy.  *See
Khalupsky*, 5 F.4th at 288 (recognizing that a defendant need not know all of the details of a
conspiracy); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. at 690 (holding that a defendant's
involvement "in only a portion" of a conspiracy "does not undermine the existence of the
conspiracy itself or [the defendant's] role as a participant").

20

ii.     **Cooperation in a Collective Venture**

Plaintiffs have provided strong evidence to show that the sixteen co-conspirators cooperated in a collective venture directed to a common goal.  The cooperative and collective nature of the scheme is shown through chat transcripts, in which traders working for Defendants referred to their activity as based on a "pact" and as a "cartel."  Traders also frequently spoke about keeping the same spread, making the "cartel gold," getting on the "same page" and maintaining the "right" spread.  Traders, including those at Credit Suisse, frequently encouraged other traders to adopt wider spreads.  A few traders understood that there existed a "gentleman's agreement" not to undercut spreads agreed upon in chat rooms.  At least some FX traders sometimes asked about the same spread simultaneously in different chat rooms.  Here, the collective nature of the venture is apparent; CS Defendants and the alleged co-conspirators could not widen or stabilize spreads without mutual assistance and cooperation.

CS Defendants' argument about the implausibility of a global conspiracy rests on testimony that misconstrues the alleged conspiracy.  CS Defendants point to testimony about the size of the market, the frequency of pricing changes and the volume of trading to contend the conspiracy alleged by Plaintiffs is implausible.  But much of that testimony rests on a belief that Plaintiffs allege Defendants "pre-determined" spreads or "dominat[ed]" the market.  The conspiracy alleged by Plaintiffs is more subtle than a venture to preset all prices and maintain them through complete market domination.

CS Defendants' contention that evidence in the chat rooms of traders competing to take business from one another prevents Plaintiffs from showing that Defendants knew they were engaged in a common venture directed at a common goal is unavailing.  Competition may be evidence that the conspiracy existed but did not achieve its goal, or that there was no conspiracy;

but evidence of competition does not preclude the existence of a conspiracy.  *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940) ("It is the 'contract, combination . . . or conspiracy in restraint of trade or commerce' which § 1 of the [Sherman] Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other."); *Gelboim*, 823 F.3d at 776 ("*Socony-Vacuum* allows an antitrust claim based on the influence that a conspiracy exerts on the starting point for prices."); *Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 320 (S.D.N.Y. 2018) ("[T]he presence of some divergent conduct does not negate the allegations of other, parallel conduct.").

### iii.    Interdependence

Plaintiffs have provided strong evidence of mutual dependence, or interdependence between co-conspirators and their agents, though not necessarily between chatrooms.  The strongest evidence of interdependence is that each Defendant relied on other Defendants to provide pricing information when asked in chat rooms and Defendants furnished such information in return when requested.  *See United States v. Container Corp. of Am.*, 393 U.S. 333, 335 (1969) (holding that requests by a defendant from its competitor for information on pricing and competitors providing that information with the expectation that it would receive reciprocal information when it wanted was "sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act").  In other words, sharing information to fix spreads, like sharing information to fix prices, is by its nature interdependent. Interdependence is also shown by traders' efforts to ensure that information regarding spreads is not used against the bank providing the information and traders' apologies for being slow to provide spread information when asked.

CS Defendants advance two unconvincing arguments against Plaintiffs' theory of interdependence.  First, CS Defendants argue that it is not possible to square exclusivity of membership in chat rooms with interdependence.  But, here, exclusivity was used to monitor the use of the information provided particularly because information about spreads could be used to undercut competitors and grow market share.  Second, CS Defendants argue that Plaintiffs' theory of interdependence is overbroad because every participant in every industry would be interdependent if Plaintiffs' theory is credited.  CS Defendants misconstrue Plaintiffs' theory to make this argument.  Plaintiffs' theory of interdependence is that sharing nonpublic pricing information and expecting it in return creates an interdependence because of the risk that competitors will use the information to undercut the information provider.  CS Defendants refer to the risk of being undercut as "simple economics," but ignore that Plaintiffs' theory rests on the initial step of trusting competitors with nonpublic information -- that mutual trust creates interdependence.

A more difficult question is whether and to what extent there was interdependence between or among chat rooms to support the inference of one global conspiracy versus multiple conspiracies comprised of each chat room.  It is unclear from the parties' briefing what the relevant evidence shows, and it is not the Court's responsibility to go searching for this evidence.  *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002); *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 456 (S.D.N.Y. 2019).  Nevertheless, mutual dependence is just one factor suggesting a single conspiracy, and the parallels and interconnections among the chatrooms discussed above may be sufficient to prove a single conspiracy, raising a question of fact for the jury.

#### d. Evidence as a Whole

Viewing the overall picture, Plaintiffs' evidence tends to exclude the possibility that the Defendant banks acted independently, but the parties dispute the material facts of the scope of the purported conspiracy. As Defendants argue, parallel conduct in the abstract is not enough to prove a conspiracy. But as Plaintiffs argue, the chatrooms and their participants here were all engaged in illegal conduct, unrestricted to any particular chatroom, currency pairs or traders. Those facts plus the others discussed above could support the inference of a global conspiracy or may be found to support only independent conspiracies. Ultimately, the weighing of inferences and conclusions to be drawn are for the finder of fact, precluding summary judgment for either Plaintiffs or Defendants.

CS Defendants argue that there was no participation in a single conspiracy because there was no "single document or testimony excerpt in which anyone acknowledges the existence of a single global conspiracy." They argue that "if a global conspiracy had existed, then certainly *one* of its hundreds of supposed participants, in millions of unguarded communications over a six-year period, would have said *something* about it." This argument is incorrect as a matter of law. "[I]t has long been settled that explicit agreement is not a necessary part of a Sherman Act conspiracy." *United States v. Gen. Motors Corp.*, 384 U.S. 127, 142-43 (1966); *see also Brown v. Pro Football*, 518 U.S. 231, 241 (1996) ("Antitrust law also sometimes permits judges or juries to premise antitrust liability upon little more than uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable . . . ."). An agreement can be "tacit or express" and in most antitrust cases a "'smoking gun' can be hard to come by." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019).

CS Defendants rely heavily on the decision in *Meredith Corp. v. Sesac, LLC*, 1 F. Supp. 3d 180 (S.D.N.Y. 2014), to argue that Plaintiffs' claims are defective.  CS Defendants' comparison of Plaintiffs' case to *Meredith* is misplaced.  The plaintiffs in *Meredith* alleged a conspiracy between the defendant, a performing rights organization, and its 20,000 affiliates, individual musicians.  *Meredith*, 1 F Supp. 3d at 210.  There, the plaintiffs did not depose any of the 20,000 affiliates.  *Id.*  Here, Plaintiffs' claims are much more circumscribed, and Plaintiffs have offered strong evidence as to each of the purported co-conspirators.

### B.  Credit Suisse's Participation

Neither party is entitled to summary judgment on the issue of Credit Suisse's participation in the purported conspiracy because the scope of the conspiracy or conspiracies is disputed.  The question of whether or not there was a single conspiracy or multiple conspiracies needs to be resolved before asking whether and what Credit Suisse joined.  However, as discussed in detail above, there is uncontroverted evidence that Credit Suisse participated in at least some conspiratorial conduct in the FX market, and CS Defendants do not argue that, even if there was a conspiracy, they did not participate in it.

Credit Suisse erroneously argues that they could not have participated in a single global conspiracy because "there is no evidence suggesting that anyone was aware of . . . some enormous worldwide scheme."  This argument attempts to inject a new requirement for the proof of a conspiracy -- that a conspirator understood the full scope of the conspiracy.  The law of this Circuit is not so exacting.  Instead, a conspirator need only know of a conspiracy's "general nature and extent" to have joined it.  *Huezo*, 546 F.3d at 180.  One need not have full knowledge of all the details of a conspiracy or its scope to be a member.  *See Blumenthal v. United States*, 332 U.S. 539, 557 (1947) (recognizing that "[s]ecrecy and concealment are essential features of

successful conspiracy" and that, as a result, "the law rightly gives room for allowing the

conviction of those discovered . . . without requiring evidence of knowledge of all its details or of

the participation of others"); *United States v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008) ("It is

well-settled that a conspirator need not be fully informed about his co-conspirators' specific

criminal acts provided that he agreed to participate in the broader criminal conspiracy . . . .");

*Meredith*, 1 F. Supp. 3d at 213 ("To be held a part of a conspiracy, a conspirator need not know

all dimensions of the wrongful conduct taken in its furtherance.").  Defendants cite *Monsanto Co.*

*v. Spray-Rite Services Corporation*, 465 U.S. 752 (1984), in support of their argument, but

*Monsanto* provides that there must be a "conscious commitment to a common scheme," not that

each conspirator must know the full scope of the conspiracy.  *Id.* at 764.

## IV.   CONCLUSION

For the reasons stated above, CS Defendants' motion for summary judgment is DENIED

and Plaintiffs' motion for summary judgment is DENIED.  The Clerk of Court is respectfully

directed to close the motions at Dkt. Nos. 1574 and 1580.

Dated: February 1, 2022
      New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

26