**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FOREIGN EXCHANGE BENCHMARK RATES
ANTITRUST LITIGATION

No. 13 Civ. 7789 (LGS)

**MEMORANDUM OF LAW IN SUPPORT OF THE CREDIT SUISSE**
**DEFENDANTS' MOTION FOR DECERTIFICATION**

Herbert S. Washer
Jason M. Hall
Tammy L. Roy
Miles Wiley
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
Telephone: (212) 701–3000
Facsimile: (212) 269–5420
hwasher@cahill.com
jhall@cahill.com
troy@cahill.com
mwiley@cahill.com

*Attorneys for Defendants Credit Suisse*
*Group AG, Credit Suisse AG, and Credit*
*Suisse Securities (USA) LLC*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

LEGAL STANDARDS ......................................................................................................... 3

ARGUMENT ..................................................................................................................... 4

I.  A RULE 23(c)(4) ISSUE CLASS MUST SATISFY THE PREDOMINANCE AND
    SUPERIORITY REQUIREMENTS OF RULE 23(b)(3)................................................... 4

II. PLAINTIFFS HAVE NO MEANS TO PROVE CLASS MEMBERSHIP WITHOUT
    THOUSANDS OF MINI-TRIALS, DEFEATING PREDOMINANCE........................... 7

    A.  The Court Must Analyze Whether Individual Issues Predominate as to Class
        Membership ........................................................................................................ 7

    B.  Individual Issues Predominate as to Membership in the OTC Class................... 10

III. PLAINTIFFS HAVE NO MEANS TO EXCLUDE UNINJURED CLASS MEMBERS,
     DEFEATING PREDOMINANCE .................................................................................. 13

IV. AN ISSUE CLASS IS NOT THE SUPERIOR METHOD OF ADJUDICATION ........ 16

    A.  Uncertainty as to Class Membership Raises Serious Due Process Issues ............ 16

    B.  The Trial Plan Raises a Substantial Risk of Reexamination................................. 19

        1.  The Seventh Amendment Prohibits the Reexamination of Facts and Issues
            Decided by a Prior Jury.............................................................................. 19

        2.  The Risk of Reexamination Here Precludes a Finding of Superiority...... 21

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allianz Global Investors GMBH* v. *Bank of America Co.*,
  463 F. Supp. 3d 409 (S.D.N.Y 2020) .................................................................... 15n

*Avritt* v. *Reliastar Life Insurance Co.*,
  615 F.3d 1023 (8th Cir. 2010) ............................................................................... 13

*Bakalar* v. *Vavra*,
  237 F.R.D. 59 (S.D.N.Y. 2006) ................................................................................ 9

*Blyden v. Mancusi*,
  186 F.3d 252 (2d Cir. 1999).............................................................................. 23-25

*Boucher* v. *Syracuse University*,
  164 F.3d 113 (2d Cir. 1999)..................................................................................... 3

*Brecher* v. *Republic of Argentina*,
  806 F.3d 22 (2d Cir. 2015)....................................................................................... 9

*Calvo* v. *City of New York*,
  2018 WL 1633565 (S.D.N.Y. Apr. 2, 2018)..................................................... 10, 14

*Castano* v. *Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) ............................................................................. 19, 25

*Charron* v. *Pinnacle Group N.Y. LLC*,
  269 F.R.D. 221 (S.D.N.Y. 2010) .............................................................................. 9

*Coopers & Lybrand* v. *Livesay*,
  437 U.S. 463 (1978)................................................................................................. 3

*Decastro* v. *City of New York*,
  2019 WL 4509027 (S.D.N.Y. Sept. 19, 2019)......................................................... 6

*Denney* v. *Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006)............................................................................. 13-14

*Diverse Partners, LP* v. *AgriBank, FCB*,
  2019 WL 4305008 (S.D.N.Y. Sept. 11, 2019)......................................................... 8

*Gasoline Products Co.* v. *Champlin Refining Co.*,
    283 U.S. 494 (1931) .................................................................................................... 20

*Gates* v. *Rohm & Haas Co.*,
    655 F.3d 255 (3d Cir. 2011) ......................................................................................... 20

*General Motors Corp.* v. *City of New York*,
    501 F.2d 639 (2d Cir. 1974) ........................................................................................... 3

*Hohider* v. *United Parcel Service, Inc.*,
    574 F.3d 169 (3d Cir. 2009) ........................................................................................... 4

*Hunter* v. *Time Warner Cable Inc.*,
    2019 WL 3812063 (S.D.N.Y. Aug. 14, 2019) ............................................................... 8

*In re Aluminum Warehousing Antitrust Litig.*,
    336 F.R.D. 5 (S.D.N.Y. 2020) ................................................................................ 8, 11

*In re Amla Litig.*,
    282 F. Supp. 3d 751 (S.D.N.Y. 2017) ......................................................................... 25

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018) ......................................................................................... 14

*In re Methyl Tertiary Butyl Ether Products Liability Litig.*,
    209 F.R.D. 323 (S.D.N.Y. 2002) ............................................................................ 20-21

*In re Nassau County Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006) ......................................................................................... 5

*In re Nissan Motor Corp. Antitrust Litig.*,
    552 F.2d 1088 (5th Cir. 1977) ................................................................................ 16-17

*In re Petrobras Securities*,
    862 F.3d 250, 271 (2d Cir. 2017) ....................................................................... 7-9, 11

*In re Rhone-Poulenc Rorer, Inc.*,
    51 F.3d 1293 (7th Cir. 1995) ....................................................................................... 20

*Jin* v. *Shanghai Original, Inc.*,
    990 F.3d 251 (2d Cir. 2021) ..................................................................................... 3-4

*Kempner* v. *Town of Greenwich*,
    249 F.R.D. 15 (D. Conn. 2008) .................................................................................. 14

*Marcus* v. *BMW of North America, LLC*,
    687 F.3d 583 (3d Cir. 2012)................................................................................ 18

*Mazzei* v. *Money Store*,
    829 F.3d 260 (2d Cir. 2016)........................................................1, 3-4, 7-8

*Millman* v. *United Technologies Corp.*,
    2019 WL 6112559 (N.D. Ind. Nov. 18, 2019).................................................24-25

*Nnebe* v. *Daus*,
    2022 WL 615039 (S.D.N.Y. 2022) ................................................................. 6

*Nypl* v. *JP Morgan Chase & Co.*,
    2022 WL 819771 (S.D.N.Y. Mar. 18, 2022) ................................... 8, 14, 16

*Price* v. *L'Oreal USA, Inc.*,
    2021 WL 4459115 (S.D.N.Y. Sept. 29, 2021)............................................. 4

*Royal Park Investments SA/NV* v. *HSBC Bank USA, N.A.*,
    2018 WL 679495 (S.D.N.Y. Feb. 1, 2018) ......................................... 4, 8

*Royal Park Investments SA/NV* v. *Wells Fargo Bank, N.A.*,
    2018 WL 1831850 (S.D.N.Y. Apr. 17, 2018).......................................... 6

*Royal Park Investments SA/NV* v. *Wells Fargo Bank, N.A.*,
    2018 WL 739580 (S.D.N.Y. Jan. 10, 2018) ........................................... 6

*Russell* v. *Educational Commission for Foreign Medical Graduates*,
    15 F.4th 259 (3d Cir. 2021) .................................................................. 5

*Steimel* v. *Wernert*,
    823 F.3d 902 (7th Cir. 2016) ............................................................... 9

*TransUnion LLC* v. *Ramirez*,
    141 S. Ct. 2190 (2021)........................................................................ 13

*Twigg* v. *Sears, Roebuck & Co.*,
    153 F.3d 1222 (11th Cir. 1998) ........................................................... 17

*Valentino* v. *Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) .......................................................... 5, 17

*Vogel* v. *City of New York*,
    2017 WL 4712791 (S.D.N.Y. Sept. 19, 2017)...................................... 8

*Wu* v. *Pearson Education Inc.*,
    2012 WL 6681701 (S.D.N.Y. Dec. 21, 2012) ........................................................ 3

**Statutes**

15 U.S.C. § 1 ........................................................................................................ 21

15 U.S.C. § 15(a) .................................................................................................. 21

**Constitutional Provisions**

U.S. Const. amend. VII. ........................................................................................ 19

**Other Authorities**

1 McLaughlin on Class Actions (18th ed. Oct. 2021) ........................................ 18-19

## PRELIMINARY STATEMENT

In its 2019 order, this Court denied Plaintiffs' motion for the certification of a damages class pursuant to Rule 23(b)(3), but instead ordered the certification of a Rule 23(c)(4) issue class (the "OTC Class") to address two threshold questions: "(1) the existence of a conspiracy to widen spreads in the spot market and (2) the CS Defendants' participation in the conspiracy."[1]  Although these questions may be common to the certified class, subsequent developments have made clear that an overwhelming number of individualized questions and constitutional issues remain.  In light of those challenges, the issue class does not satisfy the predominance and superiority requirements of Rule 23(b)(3).

Plaintiffs are not relieved of the obligation to demonstrate predominance and superiority merely because they are pursuing a Rule 23(c)(4) class rather than a Rule 23(b)(3) class.  Rather, the Second Circuit has made clear that the predominance and superiority requirements of Rule 23(b)(3) apply with equal force to Rule 23(c)(4) issue classes.  *See* Section I, *infra*.  Plaintiffs concede this point, as they must.[2]

With that understanding in mind, this Court "has the affirmative 'duty of monitoring its class decisions in light of the evidentiary development of the case.'"  *Mazzei* v. *Money Store*, 829 F.3d 260, 266 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1332 (2017).  Here, with fact and expert discovery now concluded, it is apparent that the OTC Class should be decertified for three primary reasons.

First, the OTC Class fails the predominance requirement because thousands of

---

[1] Sept. 3, 2019 Opinion and Order (ECF No. 1331) (the "2019 Order") at 19-20.

[2] *See* Apr. 6, 2022 Conf. Tr. (ECF No. 1673) at 7:5-6 ("[T]he (b)(3) predominance factors do need to be satisfied in a (c)(4) class.").

individualized inquiries are required to determine who is a member of the class and thus bound by any class verdict.  This threshold issue of class membership cannot be ignored or deferred until some later stage or subsequent proceeding, and the Second Circuit and other courts routinely hold that <u>no</u> class can be certified for <u>any</u> purpose where the determination of class membership requires extensive individualized inquires.  This Court has already recognized in its 2019 Order, and again during the recent pre-motion conference, that class membership here cannot be adjudicated on a class-wide basis.[3]  That very issue led this Court to conclude that no damages class could be certified, and the same reasoning should now preclude the continued certification of the OTC issue class.  *See* Section II, *infra*.

Second, even if there were a class-wide methodology for determining who falls within the class definition, the OTC Class also fails the predominance requirement because an enormous number of individualized inquiries are required to exclude unharmed class members.  No class may be certified, or continue as a class action, where the class has been defined in a manner that includes those who have suffered no injury and therefore have no Article III standing.  Here, the OTC Class definition captures millions of transactions that could not have been affected by an alleged conspiracy to widen spreads in the FX spot market.  Plaintiffs concede that they have no class-wide method to identify and remove such transactions.  Therefore, countless additional individualized inquiries would be required to identify and exclude putative class members who fail to satisfy threshold Article III standing requirements.  This also defeats predominance, and is an independent and additional basis for decertification.  *See* Section III, *infra*.

---

[3] *See* Apr. 6, 2022 Conf. Tr. (ECF No. 1673) at 3:12-16 ("As you know, I did not certify the class as a whole, as a (b)(3) class.  And that is because there are certainly issues having to do with who are members of the class and damages that would be very difficult to adjudicate on a class-wide basis.").

Third, a class action is not the superior method of adjudication.  The inability to identify on a class-wide basis who would be bound by any class ruling threatens both the due process rights of potential class members and the Credit Suisse Defendants' right to a final and enforceable judgment.  *See* Section IV.A, *infra*.  In addition, the bifurcation of two liability issues for resolution on a class-wide basis, with remaining liability and damages issues to be tried (if necessary) in individual follow-on litigations, raises substantial Seventh Amendment re-examination concerns. Where the risk and consequences of a potential constitutional violation are so great, class treatment cannot be said to be the superior method of adjudication.  *See* Section IV.B, *infra*.

## LEGAL STANDARDS

"[A] district court's order denying or granting class status is inherently tentative." *Coopers & Lybrand* v. *Livesay*, 437 U.S. 463, 469 n.11 (1978).  "[B]ecause the results of class proceedings are binding on absent class members, . . . the district court has the affirmative 'duty of monitoring its class decisions in light of the evidentiary development of the case.'"  *Mazzei*, 829 F.3d at 266; *see also Boucher* v. *Syracuse University*, 164 F.3d 113, 118 (2d Cir. 1999) ("[U]nder Rule 23(c)(1), courts are 'required to reassess their class rulings as the case develops.'"); *General Motors Corp.* v. *City of New York*, 501 F.2d 639, 646-47 (2d Cir. 1974) (certification is "subject always to reconsideration as the cause of action unfolds").

If the Court determines that class status is no longer appropriate, it must decertify the class.  *See Mazzei*, 829 F.3d at 266 ("[A] district court may decertify a class if it appears that the requirements of Rule 23 are not in fact met."); *Jin* v. *Shanghai Original, Inc.*, 990 F.3d 251, 261-62 (2d Cir. 2021) (same); *Wu* v. *Pearson Education Inc.*, 2012 WL 6681701, at *5 (S.D.N.Y. Dec. 21, 2012) (Forrest, J.) ("A district court may—and should—decertify a class" when Rule 23 is not met.).

3

Contrary to the assertion in Plaintiffs' pre-motion letter (ECF No. 1668 at 1), the Second Circuit has "never held that a significant intervening event is necessary" to decertify a class "and such a requirement does not exist in the text of Rule 23." *Jin*, 990 F.3d at 262.  Rather, it is always Plaintiffs' burden to "establish by a preponderance of the evidence that each of Rule 23's requirements is met." *Royal Park Investments SA/NV* v. *HSBC Bank USA, N.A.*, 2018 WL 679495, at *3 (S.D.N.Y. Feb. 1, 2018) (Schofield, J.) (citation omitted); *see also Mazzei*, 829 F.3d at 270 ("In opposing [a] decertification motion, [Plaintiffs] retain[] the burden to demonstrate that [Rule 23] requirements [are] satisfied."); *Price* v. *L'Oreal USA, Inc.*, 2021 WL 4459115, at *3 (S.D.N.Y. Sept. 29, 2021) (Schofield, J.) ("Even at decertification, the plaintiff bears the burden of proof" and "must establish by a preponderance of the evidence" that Rule 23 is met.).

Moreover, "a court's decision to exercise its discretion under Rule 23(c)(4), like any other certification determination under Rule 23, must be supported by rigorous analysis."  *Hohider* v. *United Parcel Service, Inc.*, 574 F.3d 169, 200-01 (3d Cir. 2009).

## <u>ARGUMENT</u>

## I.  **A RULE 23(c)(4) ISSUE CLASS MUST SATISFY THE PREDOMINANCE AND SUPERIORITY REQUIREMENTS OF RULE 23(b)(3)**

In its 2019 Order, the Court stated that "[t]he Rule 23(b)(3) requirements of predominance and superiority do not apply because a Rule 23(b)(3) class is not being certified."  2019 Order at 21.  However, the Second Circuit has squarely held that the predominance and superiority requirements of Rule 23(b)(3) apply with equal force to issue classes certified under Rule 23(c)(4): "As [Rule 23(c)(4)'s] plain language and structure establish, a court must first identify the issues potentially appropriate for certification 'and . . . then' apply the other provisions of the rule, *i.e.*, subsection (b)(3) and its predominance analysis."  *In re Nassau County Strip Search Cases*, 461

4

F.3d 219, 226 (2d Cir. 2006).

Other circuit courts around the country have held the same. *See, e.g., Russell* v. *Educational Commission for Foreign Medical Graduates*, 15 F.4th 259, 274 (3d Cir. 2021) ("[C]ourts apply the Rule 23(b)(3) predominance and superiority prongs after common issues have been identified for class treatment under Rule 23(c)(4)[.]"); *Valentino* v. *Carter-Wallace, Inc.*, 97 F.3d 1227, 1230, 1234-35 (9th Cir. 1996) (vacating certification of issue class where there was "no demonstration of how this [issue] class satisfies important Rule 23 requirements, including the predominance of common issues over individual issues and the superiority of class adjudication over other litigation alternatives").

At the pre-motion conference, the Court suggested that even if a predominance analysis were required, individualized inquiries relating to class membership would not need to be considered in the context of an issue class.[4]   However, the Second Circuit has also squarely addressed this issue.  In *Nassau County*, the court confirmed that, even with respect to a Rule 23(c)(4) issue class, it is necessary to conduct a predominance analysis and, in doing so, consider whether individualized inquiries regarding class membership will outweigh any common issues. 461 F.3d at 229-30.  The Second Circuit did not simply look past the issue of class membership because it was assessing the propriety of an issue class.  Instead, it expressly considered the issue and determined that an issue class was permissible because plaintiffs had redefined their proposed issue class to "obviate[] the need for individualized proceedings to determine class membership" and records existed that made "determining class membership . . . simple." *Id.* at 229.  With the

---

[4] *See, e.g.,* Apr. 6, 2022 Conf. Tr. (ECF No. 1673) at 7:22-8:1 ("So Credit Suisse is saying that we can't identify who is in the class without conducting individualized inquiries.  And I thought that I essentially eliminated those issues by certifying an issue class so that we don't necessarily have to identify every person in the class.").

class redefined to make class membership "simple," common issues then predominated.  Here, by contrast, determining class membership remains far from "simple" and would—as this Court has already held—require thousands of individualized inquiries.  *See* Section II, *infra.*

Following *Nassau County*, district courts in this Circuit consistently apply the Rule 23(b)(3) requirements of predominance and superiority in considering the certification of an issue class and, in doing so, will weigh any individualized inquiries necessary to determine class membership.  *See, e.g.*, *Nnebe* v. *Daus*, 2022 WL 615039, at *7 (S.D.N.Y. 2022) (Sullivan, J.) (considering class membership in predominance analysis for an issue class and finding common issues predominated only where "there would be no need for 'individualized proceedings to determine class membership'"); *Decastro* v. *City of New York*, 2019 WL 4509027, at *13, *16 & n.19 (S.D.N.Y. Sept. 19, 2019) (Abrams, J.) (denying certification where "[a]ssessing membership eligibility" in proposed class entailed individualized inquiry and court was "not convinced" that "liability only" issue class would "save the fundamental predominance problems" with the class); *Royal Park Investments SA/NV* v. *Wells Fargo Bank, N.A.*, 2018 WL 739580, at *12-14, *17 (S.D.N.Y. Jan. 10, 2018) (recommending denial of Rule 23(b)(3) certification where individualized issues relating to, *inter alia*, class membership predominated and proposal for issue class left the Court "with many of the same problems . . . to determine who could benefit from such a finding"), *report and recommendation adopted*, 2018 WL 1831850, at *10 (S.D.N.Y. Apr. 17, 2018) (Failla, J.).

As demonstrated below, a rigorous analysis of the predominance and superiority requirements of Rule 23(b)(3) as applied to the OTC Class now requires decertification.

## II.   PLAINTIFFS HAVE NO MEANS TO PROVE CLASS MEMBERSHIP WITHOUT THOUSANDS OF MINI-TRIALS, DEFEATING PREDOMINANCE

### A.   The Court Must Analyze Whether Individual Issues Predominate as to Class Membership

In its 2019 Order, this Court stated that, even if the predominance requirements of Rule 23(b)(3) applied, they were "satisfied because the certification of only two common issues necessarily means that common issues predominate."  2019 Order at 21 (citation omitted).  This analysis, however, did not address a fundamental requirement of all class actions:  the ability to determine who is a member of the class and will be bound by the outcome of class proceedings.

The law in this Circuit is clear.  The need for complex individualized inquiries to determine class membership defeats predominance, and prevents any class from being certified for any purpose.  The Second Circuit has ruled explicitly that courts must give "careful scrutiny" to whether individual inquiries are necessary to determine class membership as part of the predominance analysis.  *In re Petrobras Securities*, 862 F.3d 250, 271-72 (2d Cir. 2017).  As the Second Circuit has explained, "individualized determinations of class member eligibility . . . go to the core of the predominance analysis."  *Id.* at 269 n.21.

In *Petrobras*, the Second Circuit vacated a class certification order because the district court had failed to give the required "careful scrutiny" to the individual inquiries necessary to determine whether particular transactions had occurred "domestic[ally]" and thus fell within the class definition.  *Id*. at 271-74.  Similarly, in *Mazzei*, the Second Circuit affirmed a post-verdict decertification order where plaintiffs had failed to prove through class-wide evidence that all class members were in contractual privity with the defendant as required for class membership.  829 F.3d at 272-73.  In *Mazzei*, because the fact-finder would have been required to "look at every class member's loan documents to determine who did and who did not have a valid claim," the

7

Second Circuit found that individual questions predominated over common issues. *Id*.

Based on this controlling authority, district courts in this Circuit routinely deny class certification on predominance grounds where individualized inquiries are necessary to determine class membership. *See, e.g., Nypl* v. *JP Morgan Chase & Co*., 2022 WL 819771, at *10 (S.D.N.Y. Mar. 18, 2022) (Schofield, J.) (denying class certification on predominance grounds where plaintiff "offered no means to determine class membership based on common evidence or in some other administratively feasible way"); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 65 (S.D.N.Y. 2020) (Engelmayer, J.) (denying class certification on predominance grounds where "individual analysis of each class member's transactions would be required to determine whether the purchaser qualified for class membership"); *Diverse Partners, LP* v. *AgriBank, FCB*, 2019 WL 4305008, at *3 (S.D.N.Y. Sept. 11, 2019) (Caproni, J.) (denying class certification where determining class membership would "be a fact-intensive, individualized inquiry that overwhelms common questions" and where plaintiffs had failed "even after extensive fact discovery" to identify class members or "to offer a source of generalized proof that can accomplish the task reliably") (citation and internal quotation marks omitted); *Hunter* v. *Time Warner Cable Inc.*, 2019 WL 3812063, at *17 (S.D.N.Y. Aug. 14, 2019) (Oetken, J.) (denying class certification where common issues were "overshadowed by the individual inquiries that would be required to determine whether [purported class members] were eligible for class membership"); *Vogel* v. *City of New York*, 2017 WL 4712791, at *6 (S.D.N.Y. Sept. 19, 2017) (Berman, J.) (denying class certification where "thousands of mini-trials" would be necessary to determine class membership); *see also Royal Park Investments*, 2018 WL 679495, at *5 ("The fact-intensive individualized inquiry necessary to determine standing and class membership would undermine any economies achieved by class treatment[.]").

8

Plaintiffs dismiss this argument in their pre-motion response letter (ECF No. 1668 at 2), asserting that all that is required at this stage is "'objective criteria that establish a membership with definitive boundaries.'"  Plaintiffs' argument confuses the requirements of ascertainability and predominance.  As *Petrobras* makes clear, even where "objective criteria would permit the identification of class members," if mini-trials are required to determine whether each class member meets that objective criteria, the class nonetheless fails under the predominance requirement.  862 F.3d at 269-71.

Nor can questions of class membership simply be left unanswered or deferred to follow-on litigations, as Plaintiffs seem to imply.  It is a bedrock requirement in class actions that the court, the parties, and absent class members know who is bound by the outcome of class proceedings in advance, without the need for manifold individualized inquiries.  *See, e.g., Brecher* v. *Republic of Argentina*, 806 F.3d 22, 25 (2d Cir. 2015) (requirement of "definite boundaries of a readily identifiable class" is rooted in the need for the "ready identification of the class or the persons who will be bound by the judgment"); *Steimel* v. *Wernert*, 823 F.3d 902, 917-18 (7th Cir. 2016) (affirming denial of class certification where, *inter alia*, the class definition made it impossible for court to determine who would "be bound by the judgment"); *Bakalar* v. *Vavra*, 237 F.R.D. 59, 64 (S.D.N.Y. 2006) ("Class membership must be readily identifiable such that a court can determine who is in the class and bound by its ruling without engaging in numerous fact-intensive inquiries."); *Charron* v. *Pinnacle Group N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) (McMahon, J.) (holding that "the class must be 'readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling'").  This requirement is no less important in the context of an issue class that would bind absent class members than it would be in the context of a damages class that would bind absent class members.

**B.      Individual Issues Predominate as to Membership in the OTC Class**

In light of these well-established requirements, this litigation cannot move forward as a Rule 23(c)(4) issue class.  Where, as here, "potentially thousands of individualized and elaborate inquiries would be required to identify who is part of the class, 'predominance' is not satisfied." *Calvo* v. *City of New York*, 2018 WL 1633565, at *7 (S.D.N.Y. Apr. 2, 2018) (Caproni, J.) (citation omitted).

The OTC Class is defined as:

> All persons who, between December 1, 2007 and December 31, 2013 (inclusive) entered into a total of 10 or more FX spot, forward, and/or swap trades directly with one or more Defendants in the 52 Affected Currency Pairs via voice or on a single-bank platform, where Defendants provided liquidity and such persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, traded in the United States or its territories.

2019 Order at 25.  Class membership thus requires a determination as to whether each individual or entity claiming to be part of the class engaged in 10 or more transactions allegedly affected by the purported conspiracy—a determination which in turn requires individualized inquiries into, *inter alia*, (1) the location of each trade, (2) the type of each trade, and (3) the identity of the liquidity provider for each trade.

This Court has already determined that these very questions would inevitably require thousands of complex individualized inquiries, thereby defeating predominance and precluding certification of a damages class.  *Id.* at 10.  As to the first question—regarding trade location—the Court previously found that this would require "a fact-intensive individualized inquiry regarding where class members were located at the time of their trades" and was "not susceptible to generalized proof." *Id.* at 12-13.

As to the second question—regarding the type of trade—the Court found that

10

"individualized inquiries would be required to identify and exclude certain types of trades" that would not have been impacted by a conspiracy to widen spreads. *Id*. at 13. This too, the Court found, could not be "accomplished through generalized proof." *Id.* at 14.

As to the third question—regarding which party served as the liquidity provider—the Court found that "an individualized inquiry would be required to determine, for each trade, which party acted as the liquidity provider" and that "[g]eneralized proof" could not resolve this question. *Id.* at 15-16. The Court also rejected as "unreliable" the only method Plaintiffs have ever proposed for attempting to identify liquidity-provider trades. *Id.* at 16-17. Moreover, in certain instances, it may not be possible to determine at all, even with the benefit of individualized inquires, who served as the liquidity provider, since reliable contemporaneous information may not be available. This problem goes beyond the predominance requirement and implicates fundamental questions as to the ascertainability and definiteness of the class definition itself, raising further due process concerns as discussed in Section IV.A, *infra. See Aluminum*, 336 F.R.D. at 37 (citing *Petrobras*, 862 F.3d at 260).

The Second Circuit's ruling in *Petrobras* addresses this exact circumstance, and compels decertification. There, the Second Circuit denied class certification where individualized inquiries as to trade location—whether each trade occurred domestically—were necessary to determine class membership. Here, as this Court has already ruled, trade location (the exact question that was at issue in *Petrobras*) is just one of at least three distinct individualized inquiries necessary to determine membership in the OTC Class. *See Petrobras*, 862 F.3d at 273. *Petrobras* makes clear that the Court cannot, as Plaintiffs request, simply "sidestep[]" these class membership issues when conducting its predominance analysis. *Id.* at 272.

With the benefit of this Court's careful analysis identifying each of these individualized

11

inquiries, one would have expected Plaintiffs to use the extensive fact and expert discovery period that followed this Court's 2019 ruling to develop an approach to resolving these inquiries on a class-wide basis. But Plaintiffs have not done so. In fact, when asked in discovery to articulate their approach to identifying class members, Plaintiffs offered no response at all. The Credit Suisse Defendants asked Plaintiffs to "[i]dentify each member of the Rule 23(c)(4) OTC Class" and to "describe[e] in detail how [Plaintiffs] determined whether the person or entity entered into ten or more Eligible Transactions with a Defendant"—a prerequisite to class membership.[5] Defendants also asked Plaintiffs to identify "[f]or each transaction reflected in [the dataset relied upon by their experts] . . . whether you contend that the transaction is an Eligible Transaction."[6] Plaintiffs declined to respond to each of these interrogatories, taking the position that these questions were "beyond the scope of the issues that must be proven at this stage of the litigation and outside the scope of the issues certified by the Court under Rule 23(c)(4)."[7]

Plaintiffs' experts also failed at the merits stage to offer any proposed method to address the complexities of identifying class members by class-wide proof. Nothing in any of Plaintiffs' merits expert reports purports to provide a class-wide framework for addressing any of the open issues inherent in the class definition, much less all of them. Indeed, Plaintiffs' experts conceded that they did not even attempt to exclude from their merits analysis those transactions that fall outside the class definition.[8] Plaintiffs' experts did not do so because they cannot do so.

---

[5] Declaration of Herbert S. Washer ("Washer Dec.") Ex. 1 (CS Defs.' First Set of Interrogatories) at 8. "Eligible Transaction" refers to FX transactions falling within the scope of the OTC Class. *Id.* at 4.

[6] *Id.* at 8.

[7] *See* Washer Dec. Ex. 2 (Pls.' Res. and Obj. to CS Defs.' First Set of Interrogatories) at 33-36.

[8] *See, e.g.*, Washer Dec. Ex. 3 (Feb. 20, 2020 Dep. of Dr. Hal Singer) at 510:16-525:16 (testifying that he did not attempt to exclude benchmark transactions, resting orders, trades outside the United States, and other transactions that are excluded from the class from his analysis comparing interbank prices to customer

It is now clear that Plaintiffs lack class-wide evidence to prove class membership, and that individualized inquiries are necessary to determine who will be bound by any class verdict. As such, the OTC Class fails to satisfy the predominance requirement and decertification is now required.

### III.   PLAINTIFFS HAVE NO MEANS TO EXCLUDE UNINJURED CLASS MEMBERS, DEFEATING PREDOMINANCE

Plaintiffs also face a second, and equally disabling, predominance issue. Even if Plaintiffs had developed a class-wide means of determining who met the OTC Class definition (and they have not), the class as now defined includes many who suffered no damages from the alleged conspiracy, and thus have no Article III standing. The difficulty is that Plaintiffs cannot offer any class-wide method of identifying and excluding such individuals. Rather, it would require many thousands of additional individualized inquiries to ensure that the OTC Class includes only those who have Article III standing. Such inquiries also defeat predominance and provide another basis for decertification.

Though each class member need not submit evidence of personal standing at the class certification stage, it is black letter law that "no class may be certified that contains members lacking Article III standing." *Denney* v. *Deutsche Bank AG*, 443 F.3d 253, 263-64 (2d Cir. 2006); *see also TransUnion LLC* v. *Ramirez*, 141 S. Ct. 2190, 2214 (2021) (remanding so Circuit Court "may consider in the first instance whether class certification is appropriate" in light of the Court's conclusion that many class members lacked Article III standing); *Avritt* v. *Reliastar Life Insurance Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) ("The constitutional requirement of standing is equally applicable to class actions.").

_____

segment prices).

Thus, a class must "be defined in such a way that anyone within it would have standing." *Denney*, 443 F.3d at 264; *see also Calvo*, 2018 WL 1633565, at *2 ("Ultimately, the Article III standing inquiry must be examined through the prism of the class definition; in this Circuit, a class cannot be certified if any person captured within the class definition lacks Article III standing.") (citation omitted).   If a class is not defined such that all members would have standing, individualized inquiries become necessary to exclude uninjured class members, rendering class certification inappropriate.

The Court acknowledged this principle in *Nypl*, where plaintiffs sought to certify a "fail-safe" class which was defined to include members who purchased "supracompetitive foreign currency."   2022 WL 819771, at *9.   Rejecting plaintiffs' assertions that the term "supracompetitive" was superfluous and could be omitted from the class definition, this Court explained that such an omission would have rendered the class "impermissibly overbroad because Plaintiffs have not offered any evidence to suggest that every purchaser of foreign currency from 2007 to 2013 experienced an injury or harm."   *Id.* at *9-10; *see also In re Asacol Antitrust Litig.*, 907 F.3d 42, 45, 47, 58 (1st Cir. 2018) (reversing class certification order where 10% of putative class members were uninjured); *Kempner* v. *Town of Greenwich*, 249 F.R.D. 15, 17 (D. Conn. 2008) (denying certification of class that "contains members who do not have standing under Article III").

Here, as in *Nypl*, there will be many individuals who fall within the class definition despite suffering no harm.   The OTC Class definition includes those who entered into 10 or more qualifying trades during the class period ("Eligible Trades").   Many Eligible Trades, however, would have been entirely unaffected by a conspiracy to widen spreads.

For example, Eligible Trades include those made on the basis of "one-way quotes," where

14

no spread was provided.[9]  Eligible Trades also include transactions made on the basis of "at-best" orders, where an order is made to complete a transaction at the best market price available.[10]  These two types of trades—where no spread was provided—would not have been affected by an alleged conspiracy to widen spreads.  Therefore, individuals who traded exclusively in these types of trades fall within the OTC Class definition, but paid no spread and suffered no harm from the alleged conspiracy.[11]  Thus, Plaintiffs are incorrect when they argue that "[e]very single person within that class, according to the terms of the class that Your Honor certified would have traded with one or more of the defendants and would have paid the spread."[12]

Similarly, as the Court recognized in its 2019 Order, trades based on resting orders or benchmarks "would not be impacted" by the alleged conspiracy to widen spreads.  *See* 2019 Order at 13.  While resting orders were excluded in the Notice to the OTC Class,[13] Plaintiffs now insist they are part of the OTC Class.  *See* Plaintiffs' 56.1 Statement (ECF No. 1600) ¶ 29 ("Contingent orders are not excluded from the OTC Issue Class . . . .").  Class members who traded exclusively through resting or contingent orders are also uninjured class members.[14]

---

[9] A "one-way" quote is provided where a customer indicates whether it would like to buy or sell before the market maker provides a quotation and therefore no spread is provided.  *E.g.,* Washer Dec. Ex. 4 (CS-FXLIT-07188795 at 98 (showing one-way quotes and transactions between CS and a customer who purchased Mexican Pesos (MXN at rate of 11.6930) and Polish Zlotys (PLN at rate of 2.8013))).

[10] *E.g.,* Washer Dec. Ex. 5 (CS-FXLIT-07070979 at 80 (showing at-best orders and transactions between CS and a customer who purchased Euros (EUR at rate of 1.5552), sold Norwegian Kroner (NOK at rate of 5.0500), and purchased Japanese Yen (YEN at rate of 104.00))).

[11] Eligible Trades also include transactions made on single-dealer platforms that were priced algorithmically.  As this Court held in *Allianz Global Investors GmbH* v. *Bank of America Corp.*, such algorithmically-priced transactions are insufficiently close in the chain of causation to support a valid Sherman Act claim.  463 F.Supp.3d 409, 419-21 (S.D.N.Y. 2020).

[12] *See* Apr. 6, 2022 Conf. Tr. (ECF No. 1673) at 8:16-19.

[13] *See* Summary Notice of Certified Litigation Class (ECF No. 1509-1) (Sept. 30, 2020).

[14] The OTC Class also likely includes class members who suffered no injury on a net basis.  For example, class members who served as liquidity providers on certain trades (where they would benefit from allegedly

Notwithstanding the inevitability of uninjured individuals and entities falling within the class definition, Plaintiffs have provided "no means of screening out these [uninjured] class members." *Nypl*, 2022 WL 819771, at *8. The individualized inquiries that would be required to ensure that all class members have standing would overwhelm the common questions, defeating predominance.

## IV.   AN ISSUE CLASS IS NOT THE SUPERIOR METHOD OF ADJUDICATION

An issue class must also meet the requirement of superiority. *See* Section I, *supra*. In its 2019 Order, the Court ruled that an issue class was superior because (1) "multiple adjudications . . . would be costly and inefficient"; and (2) "future Plaintiffs attempting to rely on the doctrine of offensive collateral estoppel" faced "proof requirements and possible uncertainty of the outcome." 2019 Order at 21. The Court, however, did not have the benefit of briefing on this issue and did not consider two substantial constitutional concerns inherent in the OTC Class and the current trial plan. A rigorous analysis of these issues demonstrates that the OTC Class is not the superior method of adjudication.

### A.   Uncertainty as to Class Membership Raises Serious Due Process Issues

The complex individualized inquiries necessary to determine class membership not only present insurmountable predominance issues (*see* Section II, *supra*), but also threaten the due process rights of both the Credit Suisse Defendants and of potential class members. For a class judgment to have preclusive effect, due process requires, *inter alia*, that putative class members be given sufficient information to determine whether or not they are part of the certified class and/or wish to opt out. *See In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th

---

wider spreads) may have earned more than they allegedly lost as a liquidity taker.

16

Cir. 1977) (holding that a class action notice must "contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment or opt out of the action"); *Valentino*, 97 F.3d at 1234 (district court abused discretion in certifying issue class where class definition was such that "many potential members . . . cannot yet know if they are part of the class" resulting in "serious due process concerns" as to whether they could "make an intelligent choice" to opt out).

Without certainty on the issue of class membership, a judgment in Defendants' favor will be vulnerable to due process challenges by absent class members who might claim that it was insufficiently clear to them that they were part of the OTC Class. *See, e.g., Twigg* v. *Sears, Roebuck & Co.*, 153 F.3d 1222, 1228-29 (11th Cir. 1998) (holding that deficiencies in class notice, including a class definition that was "susceptible to debate," precluded the court from "allowing the judgment in the prior [class] action to bar [absent class member's] claims because invocation of the bar would not be consistent with due process"). To the extent any class member were successful on such a challenge, the issues of the existence of a global conspiracy and Credit Suisse's alleged participation in it would need to be retried, depriving the Credit Suisse Defendants of the finality and enforceability of a verdict in their favor and negating any efficiencies in proceeding with a class trial of these issues.

Here, determining class membership requires complicated individualized inquiries that potential class members cannot reasonably be expected to navigate. For example, putative class members would need to determine on their own: (1) whether their trading qualifies as having been conducted "in the United States or its territories"; (2) whether they provided or took liquidity for a given trade; and (3) whether their trades were of the type that could have been impacted by an alleged conspiracy to widen spreads. Without the benefit of personal legal counsel, an individual

17

who resides outside the U.S. may have great difficulty in determining whether their trading activity involved sufficient contact with the U.S. so as to qualify as a "domestic" transaction under U.S. law.  They may also not have the sophistication, recall, or documentation to know whether they have "taken" or "received" liquidity, or executed FX transactions pursuant to one-way quotes or "at best" orders.  And they will undoubtedly struggle to know whether their "resting orders" are or are not within the definition of Eligible Trades, in light of the conflict between the class notice (which says they are excluded) and Plaintiffs' recent contention (which says they are included). *See* p. 15, *supra*.

Moreover, even if Plaintiffs in this case could offer an objective means for applying terms like "liquidity provider" or "traded in the United States," this does not remedy the real risk that a potential class member might later argue that, in reviewing the class definition, it simply did not understand these terms to indicate that such class member fell within the OTC Class.  Nor is there any certainty that courts or juries in follow-on individual trials—who, pursuant to the current trial plan, would be left with the task of actually determining class membership—would interpret these terms in any consistent manner.

These ambiguities, and the complicated, individualized inquiries necessary to determine class membership, increase the risk of a due process challenge by an absent class member.  This could lead to the impermissible situation where the Credit Suisse Defendants would be bound by any judgment against them, yet unable to enforce a judgment in their favor—a clear violation of the Credit Suisse Defendants' due process rights.  *See, e.g., Marcus* v. *BMW of North America, LLC*, 687 F.3d 583, 593 (3d Cir. 2012) (holding that a "currently and readily ascertainable" class "protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable"); 1 McLaughlin on Class Actions § 4:2 (18th ed. Oct. 2021) ("[I]t would

18

violate a defendant's due process rights to proceed with an unascertainable class if absent class members would not be bound by a judgment adverse to the plaintiffs while the defendant would be bound by a judgment adverse to the defendant.").

In short, the uncertainty as to class membership raises substantial due process concerns. It thus cannot be said that proceeding to a class trial—without the requisite clarity as to the class of persons who would be bound by any class judgment—is the superior method of adjudication.

### B.      The Trial Plan Raises a Substantial Risk of Reexamination

The Reexamination Clause of the Seventh Amendment provides that "no fact tried by a jury, shall be otherwise reexamined in any court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. This constitutional protection "entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues." *Castano* v. *Am. Tobacco Co.*, 84 F.3d 734, 750 (5th Cir. 1996). Although separate issues may be bifurcated for trial, where such issues require the determination of overlapping factual questions, the Seventh Amendment will be implicated. *See* Section IV.B.1, *infra*.

As explained below, if Plaintiffs were to prevail at trial, it is inevitable that factual findings about the scope, extent, and operation of the alleged conspiracy made by the jury would have to be re-examined by subsequent juries considering whether, for example, any given plaintiff in a follow-on litigation has suffered an injury that directly flows from the conspiratorial acts found by the first jury. Where the "risk of such reevaluation is so great," class treatment is not "superior to individual adjudication." *Castano*, 84 F.3d at 751. *See* Section IV.B.2, *infra*.

### 1.      The Seventh Amendment Prohibits the Reexamination of Facts and Issues Decided by a Prior Jury

Although it is appropriate, in certain circumstances, to create an issue class to address some

elements of a claim, while leaving other elements for subsequent individual proceedings, the Seventh Amendment requires that this bifurcated process be structured so as to ensure that the "findings of one jury are not . . . reexamined by a second, or third, or *n*th jury." *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995) (granting a writ of mandamus and directing the decertification of an issue class where it found the district court's trial plan would result in the presentation to different juries of the separate but overlapping issues of whether a defendant acted negligently and whether the alleged "harm to the plaintiff followed in some sense naturally, uninterruptedly, and with reasonable probability from the negligent act").

To accomplish this, the issue to be tried separately must be "so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Products Co.* v. *Champlin Refining Co.*, 283 U.S. 494, 500 (1931) (holding that "the question of damages on [breach of contract] counterclaim [was] so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial"); *Gates* v. *Rohm & Haas Co.*, 655 F.3d 255, 273-74 (3d Cir. 2011) (affirming denial of liability-only issue class where "[t]he claims and issues here are complex" and the liability issue was "inseverable from other issues that would be left for follow-up proceedings").

Courts have further explained that in dividing issues for adjudication, "the district judge must carve at the joint" and "must not divide issues between separate trials in such a way that the same issue is reexamined by different juries." *Rhone-Poulenc Rorer, Inc.*, 51 F.3d at 1302-03; *see also In re Methyl Tertiary Butyl Ether Products Liability Litig.*, 209 F.R.D. 323, 352 n.54 (S.D.N.Y. 2002) ("It is well-settled that bifurcation of trial is authorized in federal court, but such division must 'carve at the joint' between liability and damages.") (citation omitted). "While a

court may instruct a jury to try only certain issues, it is constitutionally limited by concerns over juror confusion and uncertainty." *Id.* at 352 (denying certification of issue class on Seventh Amendment grounds where it was proposed that the first jury would decide the issue of general liability and "juries in follow-on suits would be charged with the impermissible task of sorting out" the remaining issues, including "whether defendants were liable to a particular individual given the first jury's finding of general liability") (citation omitted).

## 2. The Risk of Reexamination Here Precludes a Finding of Superiority

As the Court explained during the recent pre-motion conference, the anticipated trial of this case would be held to resolve only two questions: whether there was a conspiracy to widen spreads in the FX spot market and whether the Credit Suisse Defendants joined that conspiracy.[15] That would leave for subsequent individual trials the remaining elements of a Sherman Act violation, including: (1) that the conspiracy restrained or affected interstate or foreign commerce; and (2) that each plaintiff has antitrust standing.  15 U.S.C. §§ 1, 15(a).

As this Court held on the motion to dismiss, this latter element of antitrust standing in turn requires findings:  (1) of "an antitrust injury, meaning injury 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful'"[16]; and (2) that the plaintiff is an efficient enforcer, an inquiry that requires the consideration of "(i) the 'directness or indirectness of the asserted injury,' viewed in light of the 'chain of causation' linking a plaintiff's injury and the defendant's anticompetitive conduct; (ii) the 'existence of more direct victims of the alleged conspiracy'; (iii) whether damages are 'highly speculative' and (iv) whether

---

[15] *See* Apr. 6, 2022 Conf. Tr. (ECF No. 1673) at 3:7-12.

[16] Sept. 20, 2016 Opinion & Order (ECF No. 661) at 11 (citation omitted)

allowing the claim would pose 'either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.'"[17]

Although it may at first appear that these issues can be neatly bifurcated, with subsequent juries simply accepting the OTC Class jury's findings on the two issues this Court has certified for class resolution, the reality is much more complicated.  Indeed, it will inevitably be the case that, in order to address the issues inherent in antitrust standing and other deferred questions, subsequent juries will need to re-examine many of the factual questions resolved by the first jury in deciding whether a global conspiracy existed and whether the Credit Suisse Defendants participated in that alleged conspiracy.  This Court itself recognized the existence of the many underlying factual questions that need to be resolved and that precluded this Court from deciding the issue of the existence of a global conspiracy on summary judgment as a matter of law.[18]  Juries will now need to answer those many factual questions.

For example, in determining whether there was a conspiracy and the scope of any such conspiracy, the OTC Class jury will need to decide which (if any) banks, currencies and time-periods were involved.  To do that, the jury will also necessarily need to resolve questions as to what acts (or chatroom discussions) it believes were part of the conspiracy and which were not.  In subsequent trials of any individual follow-on cases, new juries will need to figure out whether the conspiracy that the OTC Class jury found to exist actually had an impact on the prices paid by specific plaintiffs in specific trades.  In doing so, those new juries will also need to resolve the

---

[17] ECF No. 661 at 13 (citation omitted).

[18] Feb. 1, 2022 Opinion (ECF No. 1650) at 9 (declining to resolve the issue of the existence of a global conspiracy on summary judgment because factual "questions remain about the scope of the [allegedly] shared illegal goal and extent of the [alleged] conspirators' mutual dependence and assistance").

same factual questions as to what acts (or chatroom discussions) were part of the alleged conspiracy and whether each plaintiff's purported injuries directly flow from such wrongful acts.

Similarly, there are many potential class members who participated in one or more of the interbank chatrooms side-by-side with the alleged conspirator-banks.  The Credit Suisse Defendants will be entitled to assert as a defense in any follow-on litigation by such individuals that those individuals were part of or otherwise acquiesced in the alleged conspiracy and thus are not entitled to damages.  Any subsequent jury considering that defense would have to revisit the same factual questions as to scope, extent, and operation of the conspiracy that the first jury resolved.  Indeed, it would be inconsistent for the first jury to determine that the Credit Suisse Defendants' participation in a chatroom constitutes participation in the alleged conspiracy and subsequent juries to determine that the same conduct by other participants in the same chatroom does not constitute participation in the conspiracy.

Plaintiffs also proffer theories that information sharing generally, and sharing information about spreads specifically, were in furtherance of the alleged conspiracy.  It is entirely possible that the first jury could accept the latter and reject the former, but that a second jury nonetheless accepts the argument of a plaintiff in a follow-on litigation who purports to connect its injury to general information sharing that falls far short of the exchange of information about specific spreads.  Plaintiffs also proffer theories of horizontal and vertical correlation to argue that the alleged fixing of a spread at a particular trade size in a particular currency pair affected spreads in other trade sizes and currency pairs.  Again, it is entirely possible that the first jury could reject one or both of these theories, while subsequent juries rely on them as a basis to award damages.

The Seventh Amendment forbids this sort of reexamination.  In *Blyden* v. *Mancusi*, for example, the Second Circuit considered the propriety of a class action that was bifurcated into two

stages where the first trial would resolve each defendant's liability to the class and subsequent trials would determine the issue of the damages allegedly suffered by each individual plaintiff. 186 F.3d 252, 268 (2d Cir. 1999).  The class claims arose out of an alleged retaliatory course of conduct, in violation of 42 U.S.C. § 1983, by state officials and corrections officers following a prison riot.  In the liability trial, the jury was asked to decide whether an officer had "engaged in reprisals constituting cruel and unusual punishment against the plaintiffs or any of them by using unnecessary or excessive force," a question to which the jury answered "yes."  *Id.* at 259-60.  In subsequent damages trials, the court instructed the new juries that acts of "reprisal" already had been found:  "Accepting, as you must, that there were acts of reprisals, you must determine whether this plaintiff, Mr. Smith, suffered and/or suffers and/or will suffer the effects of such."  *Id.* at 261.

Significantly, however, the first jury was not asked "to specify which acts were found to be 'reprisals' and which were not."  *Id.* at 268.  In highlighting the problem with this approach, the Second Circuit explained:

> As the cases were actually tried, the liability jury determined a 'reprisal(s)' occurred and that [a defendant] was liable for 'such reprisal(s).'  The damages juries were then asked to determine what award to make for particular injuries to particular plaintiffs ***without a clue*** as to whether those injuries were caused by acts that the liability jury deemed to be the 'reprisals' for which [the defendant] was liable.

*Id.* at 271 (emphasis added).  The Second Circuit found that such a "procedure clearly violated the Seventh Amendment" due to the "real possibility" that "acts found to be 'reprisals' by the liability jury were different from the acts found to be 'reprisals' by the damages juries."  *Id.* at 269.  This required reversal of the liability and two damages verdicts.

In short, "[i]n certifying a given issue for class treatment, a court must thus ensure that the issue is severable from the remaining issues and will not need to be re-examined in the subsequent trials."  *Millman* v. *United Technologies Corp*., 2019 WL 6112559, at *6 (N.D. Ind. Nov. 18, 2019)

24

(denying issue class certification where "Plaintiffs' proposed issues can only demonstrate there is the *potential* for a Defendant to be liable to any particular class member" and "[a]ctual liability, along with damages, would have to resolved later") (emphasis in original).

Although some Seventh Amendment issues can be addressed through careful case management and/or detailed special verdict forms, the risks of a violation in this case are simply too great to conclude that the OTC Class provides a superior method of adjudication.  It is impossible to anticipate how all class members could seek to present the remaining elements of their claims to subsequent juries in follow-on cases in courts across the country.  As such, this Court cannot ensure that the issues it has certified for class treatment, and the factual findings they require, will not be reexamined in subsequent individual trials.  Where, as here, the risk of reexamination is "so great," "class treatment can hardly be said to be superior to individual adjudication."  *Castano*, 84 F.3d at 751; *In re Amla Litig.*, 282 F.Supp.3d 751, 766 (S.D.N.Y. 2017) (Rakoff, J.) (denying certification of issue class where the "marginal efficiency gains" of class were "minimal" and the "risk of a second jury deciding the same issue [was] high").

As the Second Circuit explained in *Blyden*, while careful case management might permit a proper liability trial, "[o]ne may question, however, whether the complexity of such a trial and the special verdict it would entail" would "outweigh[] any benefits."  *Blyden*, 186 F.3d at 271.  The same is true here and provides yet another basis for decertification.

## CONCLUSION

For the foregoing reasons, the OTC Class should be decertified.

Dated:  April 22, 2022
       New York, New York

                    **CAHILL GORDON & REINDEL LLP**

                    By: /s/ Herbert S. Washer
                          Herbert S. Washer
                          Jason M. Hall
                          Tammy L. Roy
                          Miles Wiley

                          32 Old Slip
                          New York, New York 10005
                          Telephone: (212) 701–3000
                          Facsimile: (212) 269–5420
                          hwasher@cahill.com
                          jhall@cahill.com
                          troy@cahill.com
                          mwiley@cahill.com

                          *Attorneys for Defendants Credit Suisse*
                          *Group AG, Credit Suisse AG, and Credit*
                          *Suisse Securities (USA) LLC*