**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST
LITIGATION

No. 1:13-cv-07789-LGS

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE CREDIT SUISSE
<u>DEFENDANTS' MOTION FOR DECERTIFICATION</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

ARGUMENT .................................................................................................................... 3

I.      NO CHANGE IN LAW OR FACT HAS UNDERMINED THE COURT'S
ORDER CERTIFYING AN ISSUE CLASS PURSUANT TO
RULE 23(c)(4) ................................................................................... 3

II.     THE COURT CORRECTLY CONCLUDED THAT COMMON
QUESTIONS PREDOMINATE AS TO THE CERTIFIED ISSUES ................... 6

        A.    Plaintiffs Do Not Need to Prove Class Membership on a Common
Basis Prior to Resolving Whether Credit Suisse Committed an
Antitrust Violation ............................................................................ 9

        B.    Credit Suisse's Uninjured Class Member Argument Is an Improper
Attempt to Collapse Standing into the Merits ............................................ 13

III.    CERTIFYING THE ISSUE CLASS TO DETERMINE FACTUAL ISSUES
UNDERLYING AN ANTITRUST VIOLATION IS SUPERIOR TO
MULTIPLE TRIALS DETERMINING THE EXACT SAME
QUESTIONS ................................................................................... 16

        A.    There Are No Due Process Concerns ...................................................... 16

        B.    Trying Facts Underlying the First Element (Unlawful Violation)
Will Not Require Re-Examination by Subsequent Juries ......................... 18

CONCLUSION ................................................................................................................ 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allianz Global Investors GmbH v. Bank of America Corp.*,
  463 F. Supp. 3d 409 (S.D.N.Y. 2020) ..................................................................15

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ..........................................................................................20

*Blyden v. Mancusi*,
  186 F.3d 252 (2d Cir. 1999) ..............................................................................22

*Brecher v. Republic of Argentina*,
  806 F.3d 22 (2d Cir. 2015) ................................................................................10

*Charron v. Pinnacle Grp. N.Y. LLC*,
  269 F.R.D. 221 (S.D.N.Y. 2010) .........................................................................3

*Chen-Oster v. Goldman, Sachs & Co.*,
  10 Civ. 6950 (AT), 2022 WL 814074 (S.D.N.Y. Mar. 17, 2022) ..........................3, 11, 13, 14

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007) ..................................................................................6

*Decastro v. City of New York*,
  No. 16-cv-3850 (RA), 2019 WL 4509027 (S.D.N.Y. Sept. 19, 2019) ....................10

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) ..............................................................................13

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
  711 F.3d 68 (2d Cir. 2013) ................................................................................23

*Gortat v. Capala Bros., Inc.*,
  No. 07 civ. 3629 (ILG), 2012 WL 1116495 (E.D.N.Y. Apr. 3, 2012),
  *aff'd*, 568 F. App'x 78 (2d Cir. 2014) ...................................................................5

*In re Amla Litig.*,
  328 F.R.D. 127 (S.D.N.Y. 2018) .........................................................................15

*In re Electronic Books Antitrust Litig.*,
  No. 11 MD 2293 (DLC), 2014 WL 1641699 (S.D.N.Y. April 24, 2014) ...............14

*In re Flint Water Cases*,
  21-0103, ECF No. 31-2 (6th Cir. Jan. 24, 2022) ...............................................12

*In re Flint Water Cases,*
    558 F. Supp. 3d 459 (E.D. Mich. 2021)................................................................18

*In re Flint Water Cases,*
    No. 16-cv-10444, 2021 WL 3887687 (E.D. Mich. Aug. 31, 2021)...................................12, 21

*In re Foreign Exch. Benchmark Rates Antitrust Litig.,*
    No. 13 Civ. 7789 (LGS), 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016)...............................18

*In re Motor Fuel Temperature Sales Practices Litig.,*
    292 F.R.D. 652 (D. Kan. 2013)............................................................................12

*In re Namenda Indirect Purchaser Antitrust Litig.,*
    338 F.R.D. 527 (S.D.N.Y. 2021) ........................................................................11

*In re NASDAQ Mkt.-Makers Antitrust Litig.,*
    169 F.R.D. 493 (S.D.N.Y. 1996) ..........................................................................8

*In re Nassau County Strip Search Cases,*
    461 F.3d 219 (2d Cir. 2006)........................................................................6, 7, 8

*In re Nexium Antitrust Litig.,*
    777 F.3d 9 (1st Cir. 2015) ..............................................................................11

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
    330 F.R.D. 11 (E.D.N.Y. 2019) ..........................................................................8

*In re Petrobras Sec.,*
    862 F.3d 250 (2d Cir. 2017)..................................................................... *passim*

*In re Prograf Antitrust Litig.,*
    No. 11-2242, 2014 WL 4745954 (D. Mass. June 10, 2014)..............................................8, 21

*In re Steel Antitrust Litig.,*
    No. 08 C 5214, 2015 WL 5304629 (N.D. Ill. Sept. 9, 2015)...............................................8, 21

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.,*
    421 F. Supp. 3d 12 (E.D. Pa. 2019), *aff'd sub nom. In re Suboxone (Buprenorphine*
    *Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020).........................8, 21

*Jacob v. Duane Reade, Inc.,*
    No. 11-cv-0160 (JPO), 2016 WL 3221148 (S.D.N.Y. June 9, 2016).......................................5

*Jermyn v. Best Buy Stores, L.P.,*
    276 F. 167 (S.D.N.Y. 2011)..............................................................................4

*Jin v. Shanghai Original, Inc.,*
    990 F.3d 251 (2d Cir. 2021)..............................................................................4

*Marcus v. BMW of North America, LLC*,
   687 F.3d 583 (3rd Cir. 2012) ............................................................18

*Martin v. Behr Dayton Thermal Prods. LLC*,
   896 F.3d 405 (6th Cir. 2018) .....................................................6, 12, 21

*Matter of Rhone-Poulenc Rorer, Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ...........................................................20

*Messner v. Northshore University HealthSystem*,
   699 F.3d 802 (7th Cir. 2012) ..................................................13, 14, 15

*Navelski v. Int'l Paper Co.*,
   261 F. Supp. 3d 1212 (N.D. Fla. 2017)...............................................23

*Nypl v. JP Morgan Chase & Co.*,
   No. 15 civ. 9300 (LGS), 2022 WL 819771 (S.D.N.Y. March 18, 2022) ...............14

*Olden v. LaFarge Corp.*,
   383 F.3d 495 (6th Cir. 2004) ............................................................21

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) .............................................................13

*Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   587 F. Supp. 1112 (D. Del. 1984).........................................................23

*Robinson v. Metro-N. Commuter R.R. Co.*,
   267 F.3d 147 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart Stores,*
   *Inc. v. Dukes*, 564 U.S. 338 (2011)............................................19, 20, 23

*Simon v. Philip Morris Inc.*,
   200 F.R.D. 21 (E.D.N.Y. 2001)......................................................19, 20

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021)....................................................................13

*Twigg v. Sears, Roebuck & Co.*,
   153 F.3d 1222 (11th Cir. 1998) .........................................................17

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ...........................................................17

*Wal-Mart Stores v. Dukes*,
   564 U.S. 338 (2011)..........................................................................2

**Statutes, Rules, and Regulations**

Sherman Act

§1 ...................................................................................................................6, 19, 20

Federal Rules of Civil Procedure

Rule 23 ...........................................................................................................................9

Rule 23(a) ......................................................................................................................3

Rule 23(b)(3) ......................................................................................................... *passim*

Rule 23(c)(1)(C) ...........................................................................................................3

Rule 23(c)(4) ......................................................................................................... *passim*

Rule 23(c)(4)(A) ...........................................................................................................6

Rule 23(f) ..............................................................................................................4, 16

Rule 49(a) ....................................................................................................................20

**Other Authorities**

1 NEWBERG ON CLASS ACTIONS (4th ed. 2002)

§2.7 .............................................................................................................................13

1 NEWBERG ON CLASS ACTIONS (5th ed. 2010)

§2.3 .......................................................................................................................13, 15

2 NEWBERG ON CLASS ACTIONS (5th ed. 2010)

§4:92 .....................................................................................................................20, 21

Areeda & Hovenkamp, ANTITRUST LAW, (1989 Supp.)

¶334.2c .......................................................................................................................20

Steven S. Gensler, Bifurcation Unbound, 75 WASH. L. REV. 705 (2000) ..................................20

## <u>INTRODUCTION</u>

More than two years ago, this Court certified a Rule 23(c)(4) Issue Class to determine two class-wide issues: (1) the existence of a conspiracy to widen spreads in the spot market; and (2) the Credit Suisse Defendants' participation in that conspiracy.  Since then, Credit Suisse neither argued that this Issue Class was too uncertain to receive notice, nor that it was too uncertain to be the subject of its failed summary judgment motion.  Only now, on the eve of trial, Credit Suisse asserts that this Issue Class, defined by determinable objective criteria, has never been certifiable.

The Court's Certification Order correctly determined that the two certified issues satisfied predominance.  Predominance requires that any material legal or factual questions be resolved through generalized proof and these common issues are more substantial than the issues requiring individualized proof.  The certified issues focus on Credit Suisse's and its conspirators' conduct – not that of class members.  Those common issues are material to the first element of each class members' claim.  At trial, Plaintiffs and Credit Suisse will litigate whether there was a conspiracy to widen spreads and Credit Suisse's participation in the conspiracy *solely* through common evidence, just as they did during summary judgment.

Credit Suisse raises *no* individualized issues relevant to the certified issues.  While Credit Suisse makes much of whether there is common proof to identify particular trades of a given class member that satisfy the class definition or experienced harm, those individualized inquiries are not relevant to the certified issues.  Credit Suisse's assertions of individual issues are exclusively questions that the Court has already determined will be resolved by subsequent individual trials for damages.  Credit Suisse presents arguments relating to ascertainability (class membership) and standing (uninjured class members) as questions of predominance.  Their arguments, however, are contrary to Second Circuit precedent and would nullify Rule 23(c)(4).  Credit Suisse elides the

point of issue certification, which is designed to allow courts to cleave common issues (which can be tried on a class-wide basis) from individualized issues (which must be tried individually).

The Court also correctly determined that resolving the certified issues on a class-wide basis is superior to multiple individual adjudications.  Should Plaintiffs prevail on these issues at trial, future individual trials as to individual plaintiffs' injury and damages would be vastly streamlined by the Court having adjudicated the two certified issues in "one stroke."  *See Wal-Mart Stores v. Dukes*, 564 U.S. 338, 349 (2011).

Credit Suisse's due process and Seventh Amendment concerns are wholly speculative.  The objectively defined Issue Class already provided sufficient notice for class members to determine if they are members.  Moreover, the Court has the necessary tools to manage any Seventh Amendment concerns.

To decertify, Credit Suisse must show a compelling reason.  But it does not assert changed facts or law.  Instead, Credit Suisse's arguments appear to rest on the Court having made a clear error in its original Class Certification Order.  Credit Suisse's opposition sidesteps the Court's prior findings as to predominance and superiority for the certified issues.  The reason for this evasion is evident.  The Court's findings and legal conclusions remain valid and are undisturbed by any developments in the litigation.

This Court has already concluded that the Issue Class has two global questions that predominate and that a class action is a superior mechanism for determining, for all at once, whether Credit Suisse participated in a conspiracy to widen spreads.  Credit Suisse's arguments, if adopted, would threaten, if not nullify, ***any*** issue class under 23(c)(4); they do not, however, upset the Court's prior conclusions.

<u>**ARGUMENT**</u>

**I.      NO CHANGE IN LAW OR FACT HAS UNDERMINED THE COURT'S ORDER CERTIFYING AN ISSUE CLASS PURSUANT TO RULE 23(c)(4)**

Before certifying the Issue Class pursuant to Rule 23(c)(4), the Court determined that this case satisfied the requirements of Rule 23(a) and the predominance and superiority requirements of 23(b)(3) as to the certified issues.  ECF No. 1331 at 19-22.  The Court stated:

> It therefore makes sense to address first whether the CS Defendants were a part of the alleged conspiracy, as well as whether a single conspiracy even existed, which the CS Defendants dispute.  These are threshold issues capable of resolving or significantly narrowing the case against the CS Defendants.  If the CS Defendants are found not to have joined any conspiracy, then all of the claims against it are resolved.  If the CS Defendants are found to have been a co-conspirator, then that common issue will have been resolved in an efficient way, paving the way for individual lawsuits.   And both issues are conveniently susceptible to class treatment.

*Id*. at 19-20.  Based on that sound reasoning, the Court concluded that predominance was satisfied as to the certified issues, citing *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 241, 244 (S.D.N.Y. 2010).  The Court also found that "class treatment is superior to multiple adjudications, which would be costly and inefficient" and class treatment was superior for purposes of applying collateral estoppel to future cases.  ECF No. 1331 at 21-22.

To decertify, Credit Suisse must show a compelling reason, such as "'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'"  *Chen-Oster v. Goldman, Sachs & Co*., 10 Civ. 6950 (AT), 2022 WL 814074, at *19 (S.D.N.Y. Mar. 17, 2022).  "'[A]bsent some significant intervening event or a showing of compelling reasons to reexamine the question,'" the "'factual underpinnings of a court's prior certification order are deemed to be law of the case.'"  *Id*., at *21.[1]  While Rule 23(c)(1)(C) acknowledges that a district court's order certifying a class is subject to revision,

---

[1]      Unless otherwise noted, citations are omitted and emphasis is added.

Credit Suisse's eleventh-hour arguments unsupported by new facts or new law do not warrant this Court overturning its previous conclusions.

Credit Suisse's own conduct indicates at much.  Credit Suisse did not challenge the Court's decision by seeking reconsideration or appeal pursuant to Rule 23(f).  Instead, ***relying*** on the certified Issue Class, Credit Suisse sought summary judgment against the entire Issue Class in January 2021.  With that strategy foiled, Credit Suisse now contends the Issue Class was void *ab initio*.  Credit Suisse now argues that it would violate ***its*** rights to due process to have to litigate against the Issue Class that Credit Suisse sought to bind at summary judgment.

Credit Suisse offers ***no*** case granting a defendant's motion to decertify in the absence of any significant post-certification factual or legal developments.  Credit Suisse quotes *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 262 (2d Cir. 2021), to assert that the Second Circuit has never held that an intervening event is required for decertification.  In *Jin*, the Second Circuit distinguished the scenario before it (a *sua sponte* decertification by the Court) and the scenario before the Court here (a defendant's motion for decertification).  *See id*. at 262 nn.17, 18.  The Second Circuit noted that district courts within the Circuit have required such an event in the latter scenario.  *Id*. at 262 n.17 (citing *Jermyn v. Best Buy Stores, L.P.*, 276 F. 167, 169 (S.D.N.Y. 2011)).  The Court ultimately noted that "[b]ecause the issue of whether a significant intervening event or a similar type of showing might be appropriate when a defendant moves to decertify is not before us, we do not address this issue."  *Jin*, 990 F.3d at n.18.  However, in *Jin*, such an event did occur.  The Court noted that class counsel's post-certification litigation decisions, such as failing to subpoena witnesses to testify at trial, caused it to reconsider whether they were adequate class counsel.  *Id*. at 262.  Credit Suisse has identified no such issue here, nor does any exist.

Credit Suisse scarcely tries to argue that an intervening event has occurred. That is no surprise – the idea that issues with the class certified by the Court more than two years ago have only ***now*** become apparent because of developments in the evidentiary record is risible. The only post-certification "developments" Credit Suisse identifies are, respectively, an October 2020 interrogatory response stating that the method of identifying all class members was outside of the scope of the Issue Class trial and a February 2020 statement by expert Hal Singer that he had not sought to exclude certain types of trades from an econometric model meant to demonstrate impact – a model disclosed to Credit Suisse when Plaintiffs moved for class certification on May 31, 2018.

In other words, Credit Suisse possessed all of this information before it sought summary judgment against the Issue Class. Credit Suisse was apparently comfortable with the criteria for inclusion in the Issue Class ***before*** it lost its gamble for an Issue Class-wide judgment. The late stage of the litigation weighs ***against*** granting any such motion, particularly where the information underlying Credit Suisse's motion was known to it long ago. *See Jacob v. Duane Reade, Inc.*, No. 11-cv-0160 (JPO), 2016 WL 3221148, at *7 (S.D.N.Y. June 9, 2016); *Gortat v. Capala Bros., Inc.*, No. 07 civ. 3629 (ILG), 2012 WL 1116495, at *4 (E.D.N.Y. Apr. 3, 2012), *aff'd*, 568 F. App'x 78 (2d Cir. 2014) ("Such an 11th hour motion is of the sort that, if granted, would prejudice members of the class who have not taken independent steps to protect their rights precisely because they were members of the class.").

Credit Suisse falls well short of demonstrating that the Court's previous factual findings have become incorrect or were incorrect when made. They have not and were not. The Court's decision to certify the Issue Class is consistent with Second Circuit precedent and is rooted in accurate factual findings.

## II.   THE COURT CORRECTLY CONCLUDED THAT COMMON QUESTIONS PREDOMINATE AS TO THE CERTIFIED ISSUES

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance is satisfied if: (1) resolution of any material legal or factual questions can be achieved through generalized proof; and (2) these common issues are more substantial than the issues subject only to individualized proof. *In re Petrobras Sec.*, 862 F.3d 250, 270 (2d Cir. 2017).

When a court assesses predominance with respect to a Rule 23(c)(4) issue class, the court need only consider whether common questions predominate as to those issues certified by the court. *See In re Nassau County Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006) ("***[D]istrict courts may employ Rule 23(c)(4)(A) to certify a class on a designated issue regardless of whether the claim as a whole satisfies the predominance test. . . .***"). This "broad view" of Rule 23(c)(4) has been adopted by the Second, Fourth, Sixth, Seventh, and Ninth Circuits. *See Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 411-12 (6th Cir. 2018) (collecting cases).

In this case, the Court certified for class-wide treatment two issues that bear directly on whether Credit Suisse committed an antitrust violation – the existence of a conspiracy and Credit Suisse's participation. As to the first part of the predominance test, these questions are clearly material to each class member as they are effectively the first element of a Section 1 claim. *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc*., 502 F.3d 91, 105 (2d Cir. 2007) ("'[T]he three required elements of an antitrust claim [are] (1) a violation of antitrust law; (2) injury and causation; and (3) damages. . . .'"). As the summary judgment record reflects, both Plaintiffs and Credit Suisse relied solely upon class-wide evidence (generalized proof) at summary judgment. The Issue Class satisfies the first part of the predominance test.

As to the second part, Credit Suisse argues that individualized inquiries relating to class membership and class member harm defeat predominance.  Credit Suisse fails, however, to explain how any of these inquiries would inform – ***at all*** – the two specific issues for which the Court certified the Issue Class.  In *Nassau County*, the Second Circuit noted "[t]he only countervailing, individualized liability issue was whether, regardless of the policy, some plaintiffs were strip searched based upon "'reasonable and contemporaneously held suspicion.'"  461 F.3d at 230.  But even the existence of that defense, which bears directly on liability, did not foreclose certification. *Id.*

Contrary to Credit Suisse's contention, *Nassau County **does not*** require a "class-wide" means of determining class membership in all certified 23(c)(4) classes.  In *Nassau County*, the original class definition clearly created individual issues relating to the certified issue:  "[A]ll persons arrested for or charged with non-felony offenses who have been admitted to the Nassau County Correctional Center and strip searched without ***particularized*** reasonable suspicion."  *Id.* at 222.  The revised class definition removed the particularized language and covered "all persons . . . strip-searched at the NCCC pursuant to defendants' blanket policy . . . upon admission to the facility." *Id.* at 223.  In *Nassau County*, the revised class definition obviated the need for individual merit determinations, such as whether class members were strip searched pursuant to probable cause, that were directly relevant to the certified issue.  *Id.* at 229.  Likewise, the Issue Class definition does not require individualized merits determinations that bear on whether Credit Suisse participated in a conspiracy.[2]

---

[2]      The Second Circuit's factual determination that determining class membership in *Nassau County* "would be simple" was dicta and does not undermine the key point that the class definition did not raise individual merits determinations that relate to the certified issue.  461 F.3d at 229.

Credit Suisse's argument is that any individualized issues can defeat predominance.  But that is whole claim predominance, a position rejected by the Second Circuit in *Nassau County*.  Its argument ignores binding precedent and, if adopted, would threaten to undermine virtually any issue certification pursuant to Rule 23(c)(4).  *See Nassau County*, 461 F.3d at 226 (finding that requiring predominance for the entire claim "renders subsection (c)(4) virtually null").

The Court's determination that common issues predominate with respect to the conspiracy and Credit Suisse's participation therein is well-founded considering the conduct at issue and relevant case law.  The existence of a conspiracy "is the predominant issue in price fixing cases, warranting certification of the class even where significant individual issues are present."  *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 518 (S.D.N.Y. 1996) (collecting cases); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 57 (E.D.N.Y. 2019) ("The common questions in this action appear to predominate over individual questions regarding the individual effect of such a conspiracy because the general proof needed to answer those questions – for example, the existence of the alleged conspiracy – is far more essential than the individualized proof necessary to determine individual harm.").

Even where, as here, individualized issues preclude a Rule 23(b)(3) damages class, the issue of whether there is a violation of the antitrust laws has been certified under Rule 23(c)(4) by numerous district courts.  *See In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 77 (E.D. Pa. 2019) (certifying resolution of antitrust violation under Rule 23(c)(4)), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine & Nalaxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020); *In re Prograf Antitrust Litig.*, No. 11-2242, 2014 WL 4745954, at *4 (D. Mass. June 10, 2014) (same); *In re Steel Antitrust Litig.*, No. 08 C 5214, 2015 WL 5304629, at *6 (N.D. Ill. Sept. 9, 2015) (same).

The Court's determination that the questions of fact raised by the certified issues predominate over any individual issues relevant to the certified issues was a faithful application of binding Second Circuit precedent and remains so.

### A.    Plaintiffs Do Not Need to Prove Class Membership on a Common Basis Prior to Resolving Whether Credit Suisse Committed an Antitrust Violation

Credit Suisse argues that, prior to resolving the questions of conspiracy and its participation, Plaintiffs must definitively prove class membership for each class member on a common basis.  That argument asks the Court to impose a heightened ascertainability requirement, which has been expressly rejected by the Second Circuit.  *See Petrobras*, 862 F.3d at 264 ("We conclude that a freestanding administrative feasibility requirement is neither compelled by precedent nor consistent with Rule 23.").  Credit Suisse also argues that predominance is required for every aspect of each class member's claim including injury.  Credit Suisse, however, relies on cases denying certification to Rule 23(b)(3) ***damages*** classes in the presence of individual issues relating to class membership, injury, and damages.  This is another iteration of whole claim predominance, which is not required for 23(c)(4) certification.

Credit Suisse contends that lacking common proof of class membership would prevent "***any class*** from being certified for ***any purpose.***"  This argument is not about predominance, which is a "comparative standard."  *Petrobras*, 862 F.3d at 268.  Instead, by treating class membership as a threshold issue for every class, Credit Suisse advances precisely the heightened ascertainability argument rejected by the Second Circuit.  At this stage of the proceedings, it is sufficient that the class is objectively defined with definitive boundaries.  *Id.* at 257, 269 (class only needs to be "defined using objective criteria that establish a membership with definite boundaries").  The Court objectively defined the Class to include persons who traded directly with

Credit Suisse and its conspirators in specified instruments during the conspiracy. That is sufficient to provide notice to those who will be bound by the trial. *See infra*, §III.A.

Credit Suisse relies on *Brecher v. Republic of Argentina*, 806 F.3d 22, 25 (2d Cir. 2015) and cases in this Circuit that predate *Brecher* to assert that class membership must be "readily identifiable" *in advance* of any class certification. But the Second Circuit established that "'identifiable' does not mean 'identified'; ascertainability does not require a complete list of class members at the certification stage." *Petrobras*, 862 F.3d at 266 n.16 (citing *Brecher*, 806 F.3d at 25 n.2). By arguing Plaintiffs must present common proof of class membership at this stage, Credit Suisse is inviting this Court to adopt the "administrative feasibility" requirement repudiated by the Second Circuit in *Petrobras*, 862 F.3d at 269 ("Our decision in *Brecher* did not create an administrative feasibility requirement, and we decline to adopt one now.").

The Court previously recognized that class membership will require individualized proof, but it is not an individualized issue that relates to the common issues being certified. Credit Suisse relies on *Petrobras* to assert that "courts must give 'careful scrutiny' to whether individual inquiries are necessary to determine class membership as part of the predominance analysis." CS Br. at 7. But in *Petrobras*, the Second Circuit reversed the decision to certify a damages class.[3] Unlike *Petrobras*, this Court certified a Rule 23(c)(4) class on questions only relating to Credit

---

[3]     Credit Suisse's citation to *Nnebe v. Daus* similarly exaggerates the purported holding. Credit Suisse characterizes the case in a parenthetical as "considering class membership in predominance analysis for an issue class and *finding common issues predominated only where 'there would be no need for individualized proceedings to determine class membership*.'" ECF No. 1680 at 6. In fact, while the opinion acknowledges that "[f]inally, there would be no need for 'individualized proceedings to determine class membership,' as all drivers were subject to the same post-suspension process and TLC maintained records of drivers who received a pre-hearing notice (and those who requested a hearing)," No. 06-CV-4991 (RJS), 2022 WL 615039, at *7 (S.D.N.Y. Mar. 1, 2022), it does not, as Credit Suisse suggests, indicate that it was able to sustain the class *only* where no such proceedings would occur. In *Decastro v. City of New York*, No. 16-cv-3850 (RA), 2019 WL 4509027 (S.D.N.Y. Sept. 19, 2019), where the Court declined to certify a "liability only" class, the opinion makes no reference to whether other factual issues, not co-extensive with liability, were considered.

Suisse's antitrust violation. The two certified issues focus solely on Credit Suisse and its conspirators' conduct, demonstrating there is no need to precisely identify each and every class member. The identity of class members does not bear on the question of whether Credit Suisse conspired to widen spreads.[4] *See Chen-Oster*, 2022 WL 814074, at *23 ("[i]ssues relating to damages and the possible need for individualized findings are not relevant at this stage of the case where common questions of liability predominate").

*Petrobras* supports this Court's Rule 23(c)(4) certification. In *Petrobras*, the Second Circuit specifically endorsed the ability of a district court to do as this Court did to address such matters. 862 F.3d at 274 ("In addition to modifying class definitions and issuing class-wide rulings, district courts can, for example, bifurcate the proceedings to home in on threshold class-wide inquiries; sever claims not properly adjudicated on a class-wide basis to isolate key common issues . . . ."). The Court in *Petrobras* highlighted that its opinion did not foreclose the possibility that a class could be certified as "one or more classes that capture some or all of the Securities holders who fall within the Classes as currently defined." *Id.*; *see also id.* at 274 n.27 (noting "Class plaintiffs may propose a mechanism for assembling a representative sample of the manner in which a given security will trade . . . . A district court could also carefully weigh the relationship between common and individual questions in the case and determine that any variation across plaintiffs is, on balance, insufficient to defeat predominance.").

These case management principles have guided courts assessing issue classes outside of the Second Circuit as well, including in cases lacking common proof of class membership. In an

---

[4]      In reality, given the repeat players in the FX market, the question is not so much who is a class member, but rather, for which trades could a class member recover damages, assuming Credit Suisse conspired to widen spreads. *See In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 561 (S.D.N.Y. 2021) ("[o]ne overcharge is sufficient to demonstrate antitrust injury") (citing *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015)).

action alleging that gas stations sold motor fuel for a price based on the volume without disclosing or adjusting for the effects of temperature on the fuel's volume, a federal district court in *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652 (D. Kan. 2013), certified numerous liability classes over the defendants' objection that certain purchasers may have purchased fuel at a contract price rather than "at retail." *Id.* at 672. The district court noted that "it is not clear whether individuals . . . that purchased fuel at negotiated prices under fleet contracts would even qualify [under the "at retail" class definition]" but certified the issue classes. *Id.*

The court in *In re Flint Water Cases*, while denying Rule 23(b)(3) damages classes, nonetheless certified numerous issue classes of persons and entities who had purchased Flint water, been exposed to Flint water, owned real property in Flint, or owned or operated a business in Flint. *See In re Flint Water Cases*, No. 16-cv-10444, 2021 WL 3887687, at *41 (E.D. Mich. Aug. 31, 2021). These classes were certified not as to liability, but as to factual issues that substantially advanced trials toward liability, including whether defendants owed a duty to the classes, the role defendants played with respect to the contamination of Flint's water supply, and the precautions defendants should have taken. *Id.* In denying a defendant's interlocutory appeal, the Sixth Circuit emphasized that "although it may be difficult or even impossible to proactively identify every potential plaintiff," a "'class properly could be certified without . . . 100% accuracy.'" *In re Flint Water Cases*, 21-0103, ECF No. 31-2 at 10 (6th Cir. Jan. 24, 2022).

While the Court previously concluded that individualized issues predominated as to damages, that predominance problem does not affect the certified Issue Class. *See Martin*, 896 F.3d at 415 ("[P]redominance problems within a liability-only class do not automatically translate into predominance problems within an issue class."). Here, as in *Motor Fuel* and *Flint Water*, the

Court certified a class as to defined issues of fact.  Credit Suisse's "individualized issues" speak

to damages determinations that are neither essential nor relevant for assessing the certified issues.

### B.    Credit Suisse's Uninjured Class Member Argument Is an Improper Attempt to Collapse Standing into the Merits

Credit Suisse argues the Issue Class requires decertification because it "includes many who

suffered ***no damages*** from the alleged conspiracy, thus have no Article III Standing."  CS Br. at

13.  Credit Suisse's argument is fatally flawed.

Credit Suisse's argument relies on a misreading of the Second Circuit's statement in

*Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006), that "no class may be certified

that contains members lacking Article III standing."  As NEWBERG ON CLASS ACTIONS points out,

to focus solely on that one sentence is to misread *Denney*.  Under *Denney*, only the named plaintiffs

need demonstrate standing for class certification.  443 F.3d at 263.[5]  Indeed, *Denney* emphasizes

that "'[p]assive members need not make ***any*** individual showing of standing, because the standing

issue focuses on whether the plaintiff is properly before the court, not whether represented parties

or absent class members are properly before the court.'"  *Denney*, 443 F.3d at 264 (quoting

1 NEWBERG ON CLASS ACTIONS §2.7 (4th ed. 2002)).

Credit Suisse improperly seeks to convert the rule that classes must not be defined "so

broadly as to include a great number of members who for some reasons ***could not have been***

***harmed*** by the defendant's allegedly unlawful conduct" into a merits inquiry.  *See* 1 NEWBERG ON

CLASS ACTIONS §2.3 (5th ed. 2010) (quoting *Messner v. Northshore University HealthSystem*, 699

---

[5]    *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021), does not change the result, because the Supreme Court's decision dealt with the necessity of Article III standing to recover individual damages and not "the 'distinct question' of whether each member of the class must demonstrate standing during class certification."  *Chen-Oster*, 2022 WL 814074, at *19; *see also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022).  Here, the named Plaintiffs have demonstrated standing, which is all that is required.

F.3d 802, 825 (7th Cir. 2012)).  This Court rejected an equivalent argument in *Nypl v. JP Morgan Chase & Co.*, No. 15 civ. 9300 (LGS), 2022 WL 819771, at *5 (S.D.N.Y. March 18, 2022) ("To require more granular evidence of injury at this stage of the litigation, as Defendants urge, would collapse the standing inquiry into the merits inquiry, a practice disfavored in this Circuit."); *see also Chen-Oster*, 2022 WL 814074, at *19 (holding that defendants' argument that "each class member must demonstrate standing to maintain certification for a Rule 23(b)(3) damages class action . . . has been foreclosed by the law of the Circuit").

Credit Suisse's reliance upon *Nypl*, a case alleging a multi-directional conspiracy, to contend that the Issue Class contains class members that "would have been entirely unaffected by a conspiracy to widen spreads" (CS Br. at 14), is particularly misplaced.  In *Nypl*, the plaintiffs did not allege a consistent direction of manipulation, therefore, this Court found "some purchasers experienced no economic harm and may ***have benefitted*** from the alleged manipulation."  *Nypl*, 2022 WL 819771, at *10.

Unlike *Nypl,* there is no winners and losers issue in this case.  Here, Plaintiffs allege a conspiracy to widen spreads.  The Issue Class is objectively defined to include only customers who traded a specific FX Instrument with a Defendant during the period Defendants, including Credit Suisse, were engaged in a conspiracy to widen spreads.  In each eligible trade, no matter whether they bought or sold, Issue Class members paid widened spreads directly to Credit Suisse or its alleged conspirators.  And, therefore, "[t]here can be no serious argument that those consumers lack Article III standing to bring a Sherman Act claim for price fixing." *In re Electronic Books Antitrust Litig.*, No. 11 MD 2293 (DLC), 2014 WL 1641699, at *8 (S.D.N.Y. April 24, 2014).  Thus, the Issue Class is not defined to include class members who "could not have been

harmed by defendants' . . . unlawful conduct." 1 NEWBERG ON CLASS ACTIONS §2.3 (5th ed.) (quoting *Messner*, 699 F.3d at 825).

Credit Suisse falsely contends that the Issue Class includes class members who traded exclusively in certain types of trades that "would have been entirely unaffected by a conspiracy to widen spreads." CS Br. at 14-15. As an initial matte, the ***effect*** of any conspiracy is not an issue to be tried on behalf of the Issue Class. Contrary to Credit Suisse's arguments, benchmark trades and resting orders are excluded from the eligible trades in determining class membership.[6] *See* Summary Notice of Certified Litigation Class, ECF No. 1509-1.

Finally, while Credit Suisse could have raised these factual arguments in its summary judgment motion, it did not. Credit Suisse's false contention attempts to create a factual dispute that cannot be resolved in a decertification motion. *See In re Amla Litig*., 328 F.R.D. 127, 135 (S.D.N.Y. 2018) (holding that "factual dispute does not mandate decertification").[7]

---

[6]      Relying on no expert opinion or trader testimony, Credit Suisse offers factual disputes inappropriate at this stage, falsely contending that transactions made on the basis of "one-way quotes" and "at-best" orders would not have been affected by the alleged spread-widening conspiracy. This argument is rebutted by Credit Suisse's own subject matter expert, Dr. Melvin, who formerly worked for buy-side entity BlackRock. Dr. Melvin clearly understood that every quote (one-way or two-way) from a market-maker contains an embedded (half) spread, which represents the customer's trading cost. *See* Burke Decl., Ex. 1, Melvin Depo Tr. at 63:10-18 ("You pay – what you actually pay is what is known as the effective spread . . . So we're looking at – everyone is looking at, say, EBS to see what the mid-price is. You give us an ask price, we can then infer, okay, the spread to us is that ask price less the mid-price. That's like half spread, effectively.). Further, Dr. Melvin also acknowledged that clients still pay a spread when transacting on the basis of "at-best" orders. *See* Burke Decl. Ex. 2, Melvin Report, at n.160 ("The only situation in which front-running a live market order by other traders would harm the client and not the trader filling the client's order would be when the client agreed to buy or sell at a price based on the cost to fill the order, where the dealer works on a "best effort" basis. My understanding is that these types of trades were not common, and that even if that were to happen, it would not have had an effect on ***spreads*** quoted to customers.").

[7]      Credit Suisse's reliance on this Court's ruling on motion to dismiss in *Allianz Global Investors GmbH v. Bank of America Corp.*, 463 F. Supp. 3d 409, 419-21 (S.D.N.Y. 2020) regarding trades on single bank platforms ("SBPs") is misplaced. As Plaintiffs' expert Eric Robin's reply merits report demonstrates, voice traders' pricing can affect the prices and spreads on the SBPs. *See* Burke Decl., Ex. 3, Robin Reply Report at 36-37. For example, banks embed spread matrices generated by voice traders in their pricing algorithms to generate supra-competitive spreads on their SBPs. *Id*. Spreads and spread matrices were the subject of regular and repeated collusion among Credit Suisse and its conspirators as chat transcripts

III.   **CERTIFYING THE ISSUE CLASS TO DETERMINE FACTUAL ISSUES UNDERLYING AN ANTITRUST VIOLATION IS SUPERIOR TO MULTIPLE TRIALS DETERMINING THE EXACT SAME QUESTIONS**

This Court correctly ruled that an issue class was superior because (1) "multiple adjudications . . . would be costly and inefficient"; and (2) class adjudication will allow future Plaintiffs to bar Credit Suisse Defendants from relitigating the certified issues relying on the "doctrine of offensive collateral estoppel." ECF No. 1331 at 21. Credit Suisse did not move for reconsideration, nor did it appeal pursuant to Rule 23(f). It instead actively participated in formulating the notice that was ultimately disseminated to the Issue Class and then sought to bind the class by its motion for summary judgment. The Court should reject such gamesmanship, especially where the Court has the tools to properly manage Credit Suisse's highly speculative Seventh Amendment concerns. As shown below, the Court did not err.

A.   **There Are No Due Process Concerns**

Credit Suisse's due process argument posits hypotheticals and layers speculation to arrive at the conclusion that "class members cannot reasonably be expected to navigate" (CS Br. at 17) whether they are members of the Issue Class. Credit Suisse's argument is meritless and requires suspension of disbelief.

In November 2020, the Court approved notice to the objectively defined Issue Class. *See* ECF No. 1546. The notice went to entities participating in the FX spot market – the largest wholesale over-the-counter financial market in the world. As the representative spread chats presented by Plaintiffs at summary judgment demonstrate, individual trade size regularly occurs in notional amounts of 10, 25, 50, and 100 million dollars. *See generally*, ECF No. 1601-1. The entities conducting trades in the FX spot market are sophisticated. Unlike the out-of-circuit cases

---

demonstrate. *See, e.g.*, ECF No. 1601-1 (Chat Summary), PE1-109, 313, 330, 359. Credit Suisse failed to dispute this in its summary judgement motion.

Credit Suisse cites, the Issue Class notice clearly provides sufficient information for recipients to presently determine class membership.[8]  In fact, after the Court-approved Issue Class Notice was distributed to class members, none complained that they had trouble determining whether they were class members.

Credit Suisse should hardly be surprised that class members have not expressed confusion over class membership.  Credit Suisse actively participated in the Issue Class notice process, raising concerns and proposing edits to the notice, including the class definition, that bear directly on their belated due process argument.  *See* Burke Decl., Ex. 4.  Notably, Credit Suisse proposed changes, which Plaintiffs accepted, to "the litigation class descriptions and definitions to more clearly articulate transactions that are excluded from the action."  *Id.* at 2.  Credit Suisse added "language to the section which describes the consequences of opting-out in order to clarify that opt-outs will not be entitled to free-ride on any favorable decisions won by the class without being bound by any adverse judgments."  *Id.*  Credit Suisse also reserved its rights to object to any class member's exercise of their opt-out right, such was its lack of concern for absent class members' due process rights.  *Id.*

Credit Suisse's further arguments concerning its own rights of due process are also meritless.  As this Court determined, "[i]f the CS Defendants are found not to have joined in any conspiracy, then all of the claims against it are resolved."  ECF No. 1331 at 19.  Anyone who

---

[8]      In *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1228-29 (11th Cir. 1998), the final notice of the prior settled class action describe the gravamen of that action as "Sears . . . violated [laws] . . . by ***making unnecessary and/or improper repairs*** to its customers" (emphasis in original).  *Twigg* held that the language of the class action notice was insufficient to notify present plaintiff, Twigg, that his claims were being litigated because Twigg sued Sears for being billed for services ***never performed***.  In *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1229 (9th Cir. 1996), the district court certified a class to include "'all persons . . . who have developed or will develop aplastic anemia or liver failure.'"  The Ninth Circuit court reversed the certification and held the district court abused discretion in certifying the class where the class definition was such that "many potential members . . . cannot yet know if they are part of the class."  *Id.* at 1234.

wants to avoid a favorable jury determination for Credit Suisse will need to demonstrate that they were not a class member.  Practically speaking, non-class members do not benefit from class tolling, such that they face serious statute of limitations risks.  *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789 (LGS), 2016 WL 5108131, at *16 (S.D.N.Y. Sept. 20, 2016) (finding the four-year statute of limitations started to run in June 2013).  Conversely, if the jury finds that Credit Suisse conspired to widen spreads, then any class member who wants to rely on that trial verdict and seek damages from Credit Suisse will need to demonstrate they are a class member and put forth their individualized trades for which they seek damages.  *See In re Flint Water Cases*, 558 F. Supp. 3d 459, 511 (E.D. Mich. 2021) ("[S]hould subsequent proceedings in this case determine that Defendants owed a duty to entities or individuals who consumed or otherwise were impacted by Flint's municipal water supply, class members would need to ***individually establish*** that they were members of that impacted group.").  Either way, Credit Suisse will have its day in court to raise its individual defenses relating to a class member's claim for damages in any follow-on lawsuit.

Ultimately, Credit Suisse's due process argument is nothing more than a reiteration of its failed ascertainability argument.  *See supra*, §II.A.  Indeed, Credit Suisse supports its argument by citing *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 593 (3rd Cir. 2012).  The Second Circuit expressly rejected *Marcus* in *Petrobras*, 862 F.3d at 265 ("With all due respect to our colleagues on the Third Circuit, we decline to adopt a heightened ascertainability theory. . . .").

### B.    Trying Facts Underlying the First Element (Unlawful Violation) Will Not Require Re-Examination by Subsequent Juries

In certifying the Issue Class under Rule 23(c)(4), the Court severed for class treatment the first element of Plaintiffs' claim: whether Defendants conspired to widen spreads and whether Credit Suisse participated, correctly recognizing that these issues could be efficiently tried once

for all class members.  ECF No. 1331 at 19-20 ("If the CS Defendants are found to have been a co-conspirator, then that common issue will have been resolved in an efficient way, paving the way for individual lawsuits.").  At the pre-motion conference, the Court repeated this point.  *See* April 6, 2022 Conf. Tr. (ECF No. 1673) at 11: 20-24 ("I don't think we would litigate it again and again, because I think you are bound by whatever happens at trial.  If you prevail at trial, I think you have the benefit of that needing to be the class.  If you don't prevail at trial, then you are stuck with that result.").

The Court's decision to sever this first element of the Section 1 claim for a class trial creates no Seventh Amendment problems.  The Seventh Amendment merely prohibits a given factual issue being tried by different, successive juries.  *Robinson v. Metro-N. Commuter R.R. Co*., 267 F.3d 147, 169 n.13 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).  "Trying a bifurcated claim before separate juries does not run afoul of the Seventh Amendment" so long as there is "sound case management."  *Id*.

Particularly instructive is Judge Weinstein's extensive analysis of the Reexamination Clause of the Seventh Amendment in *Simon v. Philip Morris Inc.*, 200 F.R.D. 21 (E.D.N.Y. 2001), which rebuts Credit Suisse's hypothetical and speculative parade of horribles.  Judge Weinstein found that "a trial judge's decision severing issues for trial is compatible with the Seventh Amendment" so long as the different issues presented to different juries "are not presented in a way that causes juror confusion or uncertainty."  *Id*. at 36.  Judge Weinstein thoroughly analyzed the history of the Seventh Amendment, finding that its purpose was to limit the ability of appellate courts, not constrain district court judges in resolving complex cases.  *Id*. at 33–34.  He found a position similar to the one advanced by Credit Suisse here to be a "perverse reading of the Constitution."  *Id*. at 24.  He also described the tools available to this Court to anticipate and avoid

any Seventh Amendment objections, including special verdicts and detailed jury instructions. *Id.* at 38–39.

Plaintiffs fully anticipate the Court adopting "[p]rocedural safeguards such as the special verdict and carefully crafted jury instructions" to address any Seventh Amendment concerns Credit Suisse may have. *Simon*, 200 F.R.D. at 51. For example, the Court may request the jury deciding the existence of a conspiracy to return a special verdict form under Rule 49(a) specifying the issues identified by Credit Suisse. *Id.* The special verdict form would then be read as a binding finding to juries deciding the second and third elements of the Section 1 Sherman Act claim – injury and damages.[9]

Citing *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995), Credit Suisse complains that the Court did not "carve at the joint" in severing the first element of the Section 1 claim. Not only has that case been roundly criticized,[10] but proof of an antitrust violation is a distinct matter. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) ("'[P]roof of [an antitrust] violation and of antitrust injury are distinct matters that must be shown independently.'") (quoting Areeda & Hovenkamp, ANTITRUST LAW, ¶334.2c (1989 Supp.)). Thus, Courts have "carved" the question of proof of antitrust violation off from the remaining two elements of the claim (antitrust impact and damages) for class-wide issue treatment under Rule

---

[9]     The Second Circuit cited *Simon v. Philip Morris* and also offered the following guidance: "First, the court needs to carefully define the roles of the two juries so that the first jury does not decide issues within the prerogative of the second jury. Second, the court must carefully craft the verdict form for the first jury so that the second jury knows what has been decided already. If the first jury makes sufficiently detailed findings, those findings are then akin to instructions for the second jury to follow." *Robinson*, 267 F.3d at 169 n.13 (quoting Steven S. Gensler, *Bifurcation Unbound*, 75 WASH. L. REV. 705, 736–37 (2000)).

[10]     "Many courts . . . have argued that the *Rhone-Poulenc* court's concerns were overstated, and that proper case management can easily allay Seventh Amendment concerns and ensure that only one jury passes on each distinct issue." 2 NEWBERG ON CLASS ACTIONS §4:92 (5th ed. 2010). Judge Weinstein in *Simon* dismantled *Rhone-Poulenc*'s rationale and cited many cases disagreeing with that case. *Simon*, 200 F.R.D. at 43–49.

23(c)(4).  *See Suboxone*, 421 F. Supp. 3d at 77 ("Indeed, the issue of antitrust violation is '***so distinct and separable***' from the issue of antitrust impact that these issues '***can be cleanly divided amongst separate trials without injustice***.'"); *Prograf*, 2014 WL 4745954, at *4 (noting that litigation of an antitrust violation would focus entirely on the defendant's conduct and state of the product market, whereas, assuming such violation, a trial of antitrust impact and damages would involve fact-finding regarding whether a particular plaintiff made a purchase of the drug at a supracompetitive price and the amount of any overcharges incurred); *Steel*, 2015 WL 5304629, at *12 ("I find that certifying the class on the issue of conspiracy and leaving resolution on the question of impact and damages on an individual basis to be the most efficient and appropriate course of action in this matter.").  Notably, Credit Suisse does not cite an antitrust case finding a Seventh Amendment violation in similar circumstances.

Likewise, courts certifying common questions under Rule 23(c)(4) in non-antitrust matters have regularly managed any Seventh Amendment concerns.  *See, e.g.*, *Martin*, 896 F.3d at 415 ("if done properly, bifurcation will not raise any constitutional issues"); *Olden v. LaFarge Corp.*, 383 F.3d 495, 509 n.6 (6th Cir. 2004); *Flint Water Cases*, 2021 WL 3887687, at *41 ("the Seventh Amendment does not bar Rule 23(c)(4) issues certification. . . .  [C]areful trial management can allay Seventh Amendment reexamination concerns"); *see also* 2 NEWBERG ON CLASS ACTIONS §4:92 (5th ed. 2010) ("[T]he Seventh Amendment does not seem to pose a significant obstacle to the use of issue classes, even in the mass tort context, so long as courts are careful to certify only those issues for class treatment that are sufficiently separable from individual issues so that trial of them alone may be had without injustice.  This may be readily accomplished through the myriad case management tools at trial courts' disposal.").

Credit Suisse's reliance on *Blyden v. Mancusi*, 186 F.3d 252 (2d Cir. 1999), is misplaced. The Seventh Amendment violation in *Blyden* was caused by the nature of the case, a mass tort class action against individual prison officials alleging they committed reprisal. "'Reprisals' . . . were defined as 'any act of retaliation ***undertaken by officers or officials*** that met the standards for Eighth Amendment liability as cruel and unusual punishment." *Id*. at 259. The district court certified a class allowing a class-wide trial of liability for the "reprisals" by officers. The nature of the claim requires any individual plaintiffs who wanted to seek damages to establish each incident in which they suffered reprisal. But the jury verdict sheet in the liability trial "did not ask the jury to specify ***which acts*** of excessive force ***toward which prisoners*** were 'reprisals.'" *Id*. at 267. As a result, the Second Circuit found a Seventh Amendment violation in *Blyden* because "both the liability . . . and the damages juries were asked to determine whether the same acts constituted 'reprisals.'" *Id.* at 268–69.

This case bears no similarity to *Blyden*. Plaintiffs allege a single conspiracy existed among defendant banks, not traders, to fix spreads in the FX spot market. Contrary to Credit Suisse's arguments, in the subsequent damage trials, individual plaintiffs do not need to show what chatroom discussions (spread sharing or not) were part of the conspiracy, because the alleged overarching conspiracy carried out by Credit Suisse and its conspirators harmed all class members in a similar fashion – paying wider spreads. Credit Suisse's argument is nothing more than a reinstatement of the "multiple-conspiracies" argument with respect to which the Court denied Credit Suisse's motion for summary judgment. As the Court found, Credit Suisse's argument "misconstrues the alleged conspiracy" and "ignores that the hundreds of FX traders each worked for one of sixteen Defendants and were agents of a Defendant when they entered chat rooms and

shared information with traders at other banks."  Summary Judgment Opinion, ECF No. 1650 at 20, 21.

In this action, the jury in any subsequent individual damages trial will not reexamine whether a conspiracy to widen spreads in the spot market existed or whether Credit Suisse participated in that conspiracy.  Having been instructed as to the existence of the unlawful conspiracy and Credit Suisse's participation, subsequent juries will only determine the facts of injury and damages caused by the conspiracy.  While Credit Suisse may defend itself in the subsequent damage trials by using chats involving certain class members, that defense only goes to whether such class members are entitled to damages.[11]  The answer will not affect whether Credit Suisse participated in a conspiracy to widen spreads.  It is well-settled law that the Seventh Amendment reexamination prohibition "'is not against having two juries review the same evidence, but rather [it is] against having two juries decide the same essential issues.'"  *Navelski v. Int'l Paper Co.*, 261 F. Supp. 3d 1212, 1219 (N.D. Fla. 2017) (quoting *Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 587 F. Supp. 1112, 1117 (D. Del. 1984)); *see also Robinson*, 267 F.3d at 169 n.13.  No Seventh Amendment problems arise from this Court's bifurcation.

Finally, *Petrobras* provided guidance to the district court in complex class actions:

[W]e emphasize that district courts are authorized to implement **management strategies tailored to the particularities of each case**.  In addition to modifying class definitions and issuing class-wide rulings, district courts can, for example, **bifurcate the proceedings to home in on threshold class-wide inquiries; sever claims not properly adjudicated on a class-wide basis to isolate key common**

---

[11]     Credit Suisse appears to suggest it possesses an *in pari delicto* defense to certain class members. Such a defense has not yet been recognized in the Second Circuit.  *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 80 (2d Cir. 2013).  Nevertheless, that defense focuses on the **class members' conduct**, such that a subsequent jury does not need to reexamine the question of whether Credit Suisse participated in a conspiracy.

*issues*; or certify subclasses that separate class members into smaller, more homogenous groups defined by common legal or factual questions. . . .

862 F.3d at 274.  By certifying the 23(c)(4) class, the Court has soundly and efficiently managed this piece of complex litigation.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should deny Credit Suisse's motion to decertify.

Dated:  May 13, 2022

Respectfully submitted,

SCOTT+SCOTT ATTORNEYS AT LAW LLP

_s/_ Christopher M. Burke
CHRISTOPHER M. BURKE (CB-3648)
WALTER W. NOSS (WN-0529)
KRISTEN M. ANDERSON (*pro hac vice*)
KATE LV (*pro hac vice*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
cburke@scott-scott.com
wnoss@scott-scott.com
kanderson@scott-scott.com
klv@scott-scott.com

SCOTT+SCOTT ATTORNEYS AT LAW LLP
DAVID R. SCOTT (DS-8053)
JOSEPH P. GUGLIELMO (JG-2447)
DONALD A. BROGGI (DB-9661)
SYLVIA M. SOKOL (SS-0317)
THOMAS K. BOARDMAN (TB-0530)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
david.scott@scott-scott.com
jguglielmo@scott-scott.com
dbroggi@scott-scott.com
ssokol@scott-scott.com
tboardman@scott-scott.com

-and-

24

HAUSFELD LLP
MICHAEL D. HAUSFELD
REENA ARMILLAY GAMBHIR
TIMOTHY S. KEARNS
NATHANIEL C. GIDDINGS
SARAH LAFRENIERE
888 16th Street NW, Suite 300
Washington, DC 20006
Telephone: 202-540-7143
Facsimile:  202-540-7201
mhausfeld@hausfeld.com
rgambhir@hausfeld.com
tkearns@hausfeld.com
ngiddings@hausfeld.com
slafreniere@hausfeld.com

HAUSFELD LLP
MICHAEL P. LEHMANN
CHRISTOPHER L. LEBSOCK
BONNY E. SWEENEY
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1949
Facsimile:  415-693-0770
mlehmann@hausfeld.com
clebsock@hausfeld.com
bsweeney@hausfeld.com

*Class Counsel*

25

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 13, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*s/* Christopher M. Burke
Christopher M. Burke