UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | No. 13 Civ. 7789 (LGS) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF THE CREDIT SUISSE
DEFENDANTS' MOTION FOR DECERTIFICATION**

Herbert S. Washer
Jason M. Hall
Tammy L. Roy
Miles Wiley
**CAHILL GORDON & REINDEL LLP**
32 Old Slip
New York, New York 10005
Telephone: (212) 701–3000
Facsimile: (212) 269–5420
hwasher@cahill.com
jhall@cahill.com
troy@cahill.com
mwiley@cahill.com

*Attorneys for Defendants Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse Securities (USA) LLC*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...................................................................................................................................1

I. PLAINTIFFS RETAIN THE BURDEN ON A DECERTIFICATION MOTION .............1

II. THE NEED FOR INDIVIDUALIZED INQUIRIES DEFEATS PREDOMINANCE .......2

    A. The Court Cannot Ignore Individualized Issues as to Class Membership ...............2

    B. The Class Contains Uninjured Members Who Lack Article III Standing ...............5

III. AN ISSUE CLASS IS NOT THE SUPERIOR METHOD OF ADJUDICATION .............6

    A. Uncertainty as to Class Membership Raises Serious Due Process Issues................6

    B. The High Risk of Seventh Amendment Violations Also Negates Superiority ........7

CONCLUSION................................................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allianz Glob. Invs. GmbH* v. *Bank of Am. Corp.*,
    463 F. Supp. 3d 409 (S.D.N.Y. 2020) ................................................................................... 6n

*Atlantic Richfield Co.* v. *USA Petroleum Co.*,
    495 U.S. 328 (1990) ............................................................................................................. 9n

*Blyden* v. *Mancusi*,
    186 F.3d 252 (2d Cir. 1999) ................................................................................................... 8

*Calvo* v. *City of New York*,
    2017 WL 4231431 (S.D.N.Y. Sept. 21, 2017) ....................................................................... 5

*Chen-Oster* v. *Goldman, Sachs & Co.*,
    2022 WL 814074 (S.D.N.Y. Mar. 17, 2022) .......................................................................... 2

*Denney* v. *Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ................................................................................................... 5

*In re Flint Water Cases*,
    21-0103 (ECF No. 31-2) (6th Cir. Jan. 24, 2022) ................................................................ 4n

*In re Industrial Gas Antitrust Litig.*,
    100 F.R.D. 280 (N.D. Ill. 1983) ........................................................................................... 10

*In re Initial Public Offerings Securities Litig.*,
    471 F.3d 24 (2d Cir. 2006) ..................................................................................................... 5

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    998 F.2d 1144 (3d Cir. 1993), *cert. denied*, 510 U.S. 1091 (1994) .................................... 10

*In re Motor Fuel Temperature Sales Practices Litig.*,
    292 F.R.D. 652 (D. Kan. 2013) ............................................................................................ 4n

*In re Nassau County Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006) ............................................................................................... 3-4

*In re Petrobras Securities*,
    862 F.3d 250 (2d Cir. 2017) ................................................................................................... 5

*In re Prograf Antitrust Litig.*,
    2014 WL 4745954 (D. Mass. June 10, 2014) ..................................................................... 8-9

*In re Steel Antitrust Litig.*,
   2015 WL 5304629 (N.D. Ill. Sept. 9, 2015) ............................................................................ 9n

*In re Suboxone Antitrust Litig.*,
   421 F. Supp. 3d 12 (E.D. Pa. 2019) ....................................................................................... 8

*Jin* v. *Shanghai Original, Inc.*,
   990 F.3d 251 (2d Cir. 2021) ............................................................................................ 2, 2n

*Mazzei* v. *Money Store*,
   829 F.3d 260 (2d Cir. 2016) ................................................................................................. 2

*Moreno* v. *Deutsche Bank Americas Holding Corp.*,
   2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017) ........................................................................ 5

*Nypl* v. *JPMorgan Chase & Co.*,
   2022 WL 819771 (S.D.N.Y. Mar. 18, 2022) ........................................................................ 6

**Other Authorities**

1 NEWBERG ON CLASS ACTIONS § 2.3 (5th ed. 2010) ................................................................. 6n

**PRELIMINARY STATEMENT**

In its moving brief, Credit Suisse established that, under well-settled Second Circuit law, the Rule 23(c)(4) class here cannot satisfy the applicable predominance and superiority requirements. Plaintiffs' opposition does nothing to effectively counter these points.

With respect to predominance, the Second Circuit is clear that class membership and Article III standing are threshold issues in *every* class action, including Rule 23(c)(4) issue classes. Plaintiffs cite no authority to the contrary, and they effectively concede that if these issues must be examined, individualized inquiries will overwhelm any common ones. In the absence of helpful precedent, Plaintiffs attempt to distort the clear and binding precedent to which Credit Suisse has directed the Court. A simple review of that precedent, however, reveals the flaws in Plaintiffs' position and compels the conclusion that this class should be decertified on predominance grounds.

This case also raises superiority issues. The fact-bound class definition, which has morphed over time to avoid other class issues, raises due process concerns. Bifurcation also raises Seventh Amendment problems. Plaintiffs do not dispute that these constitutional issues—which have never been addressed—do exist. Instead, they argue that class membership, and any related due process issues, can be decided by courts in future litigations and that Seventh Amendment issues can be managed (but offer no specifics as to how). Plaintiffs are not entitled to litigate as a class action. Where the class and trial plan present insurmountable problems—and where the class admittedly consists of "sophisticated" investors who traded "in notional amounts of 10, 25, 50, and 100 million dollars" (Opp. at 16)—class treatment is not superior to individual actions.

**ARGUMENT**

**I.    PLAINTIFFS RETAIN THE BURDEN ON A DECERTIFICATION MOTION**

The Second Circuit has definitively held that the burden on decertification remains with

plaintiffs. *Mazzei* v. *Money Store*, 829 F.3d 260, 270 (2d Cir. 2016). Nonetheless, Plaintiffs argue that absent a "'significant intervening event or . . . compelling reasons to **reexamine the question**,' the '***factual underpinnings*** of a court's prior certification order are deemed to be law of the case.'" Opp. at 3 (quoting *Chen-Oster* v. *Goldman, Sachs & Co.*, 2022 WL 814074, at *18 (S.D.N.Y. Mar. 17, 2022) (emphasis added)). Plaintiffs ignore that this Court has never previously "examined" (or received briefing on) the Rule 23(c)(4) issues raised by this motion, nor does Credit Suisse challenge the "factual underpinnings" of the Court's prior order. Thus, *Chen-Oster* is inapposite.

Moreover, the Second Circuit has "never held that a significant intervening event is necessary" to decertify a class. *Jin* v. *Shanghai Original, Inc.,* 990 F.3d 251, 262 (2d Cir. 2021).[1] And even if an intervening event were required (and it is not), Plaintiffs' failure in the years since the 2019 certification order to develop a class-wide method to resolve the fundamental issue of class membership ***is*** a significant intervening event.

Plaintiffs' assertions of potential prejudice (Opp. at 5) also are not an answer to the non-waivable issues raised on this motion, which must be resolved at some point. Any prejudice class members might face would only increase if these issues are deferred, as Plaintiffs propose.

## II. THE NEED FOR INDIVIDUALIZED INQUIRIES DEFEATS PREDOMINANCE

### A. The Court Cannot Ignore Individualized Issues as to Class Membership

As explained in detail in Credit Suisse's opening brief, the law in the Second Circuit is well-settled that: (1) predominance must be satisfied, even as to a Rule 23(c)(4) issue class; (2) the need for individualized inquiries regarding class membership must be factored into this

---

[1] *Jin* held that an intervening event is not required before a court decertifies a class *sua sponte*. 990 F.3d at 262. Plaintiffs suggest this issue would be decided differently in the context of a defendant's motion. Yet, the Second Circuit's reasoning in *Jin*—that no such requirement "exist[s] in the text of Rule 23"—remains true in both scenarios. *Id.* Such a requirement would also be inconsistent with the affirmative duty of courts to monitor and potentially revisit class certification. Opening Br. (ECF No. 1680, "CS Br.") at 3-4.

predominance analysis; and (3) given the very specific nature of the class definition in this case, class membership cannot be determined without substantial individualized inquiries.

Plaintiffs do not and cannot disagree with the first and third of these principles. Their sole objection is to the second. On this point, they insist that inquiries regarding class membership are "not relevant to the certified issues" and should be ignored. Opp. at 1. But Plaintiffs do not cite to a single case in which a court ruled that class membership can be ignored at this stage. Instead, Plaintiffs attempt to distract and distort.

Plaintiffs first do this by misrepresenting *In re Nassau County Strip Search Cases*. In that case, the district court had rejected a request for certification of a Rule 23(c)(4) class because the class was defined to include all those who were strip searched "without particularized reasonable suspicion," and the district court observed that this would require "mini-trials just to determine class membership," which would predominate over common issues. 461 F.3d 219, 222-23 (2d Cir. 2006). To correct this issue, plaintiffs modified their class definition to include all who were strip searched pursuant to a blanket policy. The Second Circuit noted that the revised class definition "obviated the need for individualized proceedings to determine class membership" and, on that basis, ruled that the predominance requirement was satisfied. *Id*. at 229-30.

Yet Plaintiffs assert that the Second Circuit in *Nassau County* somehow relieved courts of their obligation to weigh class membership in their Rule 23(c)(4) predominance analysis. The court did no such thing. Plaintiffs pretend that there was no class membership analysis undertaken in *Nassau County* by inaccurately summarizing what the Second Circuit said. Specifically, they state that the Second Circuit found that the modified class definition "obviated the need for individual ***merit determinations***" (emphasis added), and that individual merit determinations are not relevant to the issue class certified here. Opp. at 7. In fact, however, the Second Circuit stated that the modified class definition "obviated the need for individualized proceedings ***to determine***

3

*class membership*." *Nassau County*, 461 F.3d at 229 (emphasis added).  Thus, the Second Circuit clearly addressed class membership in the context of a Rule 23(c)(4) class, as have other courts within the Second Circuit, and this Court is required to do the same.

Plaintiffs next attempt to bolster their unsupportable position by suggesting that if courts were required to consider individual issues of class membership, a Rule 23(c)(4) class could never be certified.  Opp. at 2, 8.  This position is baseless; many courts have certified Rule 23(c)(4) classes, despite the requirement that class membership must be considered.  As the Second Circuit instructs, where "determining class membership would be simple," issue classes may be permissible.  *Nassau County*, 461 F.3d at 229.  Plaintiffs' own case citations prove this.  In each of those cases, unlike the present case, class members were readily identifiable without the need for individualized inquiries.  The class definitions in those cases were far simpler than the OTC Class definition here.  And none of those courts found, as this Court has already found, that class membership could only be determined through countless individualized inquiries.[2]

Plaintiffs also incorrectly label the need for individualized inquiries as an "ascertainability" issue, which they argue is addressed by the use of objective criteria in the class definition.[3]  Opp. at 1.  But the Second Circuit was clear in *Petrobras* that one must examine **both** ascertainability and predominance.  With regard to ascertainability, the court agreed that "objective criteria would permit the identification of class members," and that the proposed class definition contained

---

[2] Plaintiffs offer two out-of-circuit authorities in support of their argument that an issue class can be certified without common proof of class membership.  Opp. at 11-12.  In one of these cases, a district court in Kansas rejected defendants' arguments against certification because, unlike the OTC Class here, class membership in that case could be determined without the need for individualized inquiries.  *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 661 (D. Kan. 2013).  Similarly, in the *Flint Water Cases*, the Sixth Circuit upheld Rule 23(c)(4) issue certification where class members were "in large part, readily identifiable" without the need for individualized inquiries.  *In re Flint Water Cases*, 21-0103 (ECF No. 31-2) at 10 (6th Cir. Jan. 24, 2022).

[3] Plaintiffs do not address Credit Suisse's argument that the term "liquidity provider" is not subject to objective determination such that the class definition fails even the ascertainability standard.  CS Br. at 11.

sufficiently objective criteria. *In re Petrobras Securities*, 862 F.3d 250, 269 (2d Cir. 2017). But the court then found that the class nevertheless failed the predominance requirement because individualized inquiries were needed to answer "predicate questions" fundamental to the issue of class membership, including the domesticity of the disputed transactions. *Id.* at 271-72. The same "predicate questions" as to "domesticity"—as well as other predicate questions as to trade type and liquidity provider status—exist here. CS Br. at 10-11. And none of these questions can be resolved without individualized inquiries, as the Court has already held (and as Plaintiffs concede).

Finally, Plaintiffs attempt to address the wealth of authority cited in Credit Suisse's opening brief by arguing that class membership can simply be deferred to future proceedings, arguing that Plaintiffs need not "definitively prove class membership on a common basis" "prior to" the class trial. Opp. at 9-10. But the point is not that they must prove class membership before trial; the point is that they must be able to prove it at some point during this class proceeding. *In re Initial Public Offerings Securities Litig.*, 471 F.3d 24, 45 (2d Cir. 2006) (in a class action, class members must be identifiable "at some point in the case"). Here, Plaintiffs openly admit that they cannot prove class membership by common evidence **at any point in time**.

Where, as here, countless individualized inquiries are needed to identify the class who will be bound by the class verdict, the predominance requirement is not satisfied.

B. **The Class Contains Uninjured Members Who Lack Article III Standing**

Defendants have not "misread" *Denney* v. *Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006). Opp. at 13. *Denney* holds that a class cannot include members who were not harmed by the alleged wrongdoing, as district courts in this Circuit have recognized. *See, e.g.*, *Calvo* v. *City of New York*, 2017 WL 4231431, at *3 n.3 (S.D.N.Y. Sept. 21, 2017) ("*Denney* quite clearly requires all class members to have standing."); *Moreno* v. *Deutsche Bank Americas Holding Corp.*, 2017 WL 3868803, at *10-11 (S.D.N.Y. Sept. 5, 2017) (Schofield, J.) (amending class definition to conform

5

to *Denney* requirement that all class members have Article III standing).[4]

Plaintiffs attempt to distinguish this Court's holding in *Nypl* v. *JPMorgan Chase & Co.*, 2022 WL 819771 (S.D.N.Y. Mar. 18, 2022) by arguing that there is "no winners and losers issue in this case." Opp. at 14. But there is no dispute that liquidity providers would be "winners" in any alleged spread-widening; this was the basis for excluding them from the class definition. Yet, as this Court previously found, "[g]eneralized proof cannot resolve the question of which party acted as a liquidity provider." 2019 Order at 16. Even now, Plaintiffs offer no common method to identify and exclude these uninjured individuals from the class, and that fact alone precludes continued certification of the class.

Furthermore, the class definition, like the "impermissibly overbroad" class in *Nypl*, sweeps in members who could not have been harmed by the alleged conspiracy. 2022 WL 819771, at *10. The defined class indisputably includes members who traded in one-way, at-best, and algorithmically-priced quotes, which could not have been impacted by alleged spread widening.[5] CS Br. at 15-16. Again, Plaintiffs offer no means to exclude these uninjured class members without more individualized inquiries. This is an additional basis for decertification.

### III. AN ISSUE CLASS IS NOT THE SUPERIOR METHOD OF ADJUDICATION

#### A. Uncertainty as to Class Membership Raises Serious Due Process Issues

In their opposition, Plaintiffs downplay due process concerns as to the class they represent

---

[4] Plaintiffs cite the Newberg treatise (Opp. at 13) which merely states that each absent class member need not bring forth proof of standing. 1 NEWBERG ON CLASS ACTIONS § 2.3 (5th ed. 2010). It also recognizes the very point that Credit Suisse makes: at class certification, a court must "ensure that the class is not 'defined so broadly as to include a great number of members who . . . could not have been harmed by the defendant's allegedly unlawful conduct.'" *Id.* That is precisely the problem here.

[5] Plaintiffs resort to raising the irrelevant concept of "effective spreads" and mischaracterizing Dr. Melvin's report. Opp. at 15 n.6. Dr. Melvin explains that certain "front running" conduct affected only at-best trades, but that in no way supports Plaintiffs' argument. And any theory that the alleged conspiracy led to indirect effects on trades that did not involve spread quotations (Opp. at 15 n.7) is far too attenuated. *See Allianz Glob. Invs. GmbH* v. *Bank of Am. Corp.*, 463 F. Supp. 3d 409, 419-21 (S.D.N.Y. 2020).

6

because: (1) Credit Suisse reviewed the class notice; and (2) no potential class member has complained. Opp. at 16-17. Neither of these arguments addresses the issues identified.

The fact that Credit Suisse suggested edits to the notice to comply with the Court's existing orders did not and could not waive due process rights of potential class members. And the fact that no potential class member has complained—yet—says nothing about whether a plaintiff in a future case would attempt to use the fact-bound class definition and attendant ambiguities to avoid the enforcement of any verdict in Credit Suisse's favor. If a future court were to accept such an argument, the verdict would lose its binding effect, threatening Credit Suisse's due process rights.

Plaintiffs have no answer for this issue. Their only argument—that "Credit Suisse will have its day in court" because class membership can be litigated in later actions **no matter how** the first jury resolves the issues before it (Opp. at 17-18)—only further highlights the due process problem. This issue class proceeding offers no finality; it is not superior to individual actions.

**B.     The High Risk of Seventh Amendment Violations Also Negates Superiority**

Plaintiffs do not dispute that splitting liability issues into two trials implicates the Seventh Amendment. But Plaintiffs argue that any constitutional violations can be preempted through "sound case management," including a "special verdict form" which could then be "read as a binding finding to juries" in subsequent trials. Opp. at 19-20. Plaintiffs provide no specifics as to what a sufficiently detailed special verdict form might look like that could permit the Court to conclude this offers a workable solution to ensure that the Seventh Amendment is not violated.

Plaintiffs' silence on this point is unsurprising. The complexity of the conspiracy alleged—purportedly operating through thousands of chatrooms across 16 banks over six years—makes it impossible to anticipate and avoid every overlapping factual question that might confront a second jury determining whether, *inter alia*, a given plaintiff's purported injury flows from the wrongful conduct found by the first jury. At the very least, a special verdict form would need to inform

7

subsequent juries of the first jury's findings as to the scope of the alleged conspiracy, including its participants, the currency pairs and time periods involved, and the specific chatrooms—of the thousands involved in this case—through which the "conspiracy" operated. As the Second Circuit has cautioned, "[o]ne may question . . . whether the complexity of such a . . . special verdict" would "outweigh[] any benefits." *Blyden* v. *Mancusi*, 186 F.3d 252, 271 (2d Cir. 1999).

Plaintiffs dismiss this issue by pointing to two out-of-circuit cases finding that the existence of an antitrust violation could be tried separately without violating the Seventh Amendment. But in both of those cases, given the nature of the specific antitrust violations alleged, the defendants' conduct would not have to be examined at all in the subsequent trials.

In *In re Suboxone Antitrust Litig*. (Opp. at 21), the court held that the alleged antitrust violation—that defendant raised false safety concerns in an effort to delay competition from generic versions of the defendant's drug—was "completely separable" from the question of whether any class member relied on the deceptive conduct. 421 F. Supp. 3d 12, 76 (E.D. Pa. 2019). The defendant also "fail[ed] to identify any common issues that would have to [be] reexamined and/or relitigated" in subsequent proceedings. *Id.* at 76 n.32. That is not the case here.

*In re Prograf Antitrust Litig.* (Opp. at 21) also involved an alleged effort to delay competition from generic pharmaceuticals. 2014 WL 4745954 (D. Mass. June 10, 2014). There too, the court decided that whether an antitrust violation had occurred—which required proof of "monopoly power" and improper maintenance of that power—could be tried separately from whether a particular plaintiff had paid a higher price. *Id.* at *2, *4. The court further found that the single "overlap[ping]" issue as to when generics could have been introduced "but for" the defendant's conduct was "easily resolved" by having the first jury make this determination. *Id.* at *4 n.6. "The second jury could then, using that finding, evaluate a plaintiff's injury without having

to reexamine [the defendant's] conduct and its effect on generic market entry." *Id.*[6]

Here, by contrast, it is inevitable that subsequent juries deciding whether each trade at issue was affected by the alleged conspiracy would need to reexamine the defendants' conduct. CS Br. at 22-23. There is simply no other way to determine whether and to what extent an individual plaintiff's purported injury flowed from the conduct.

The issue here is not that subsequent juries would be asked to revisit "whether a conspiracy to widen spreads in the spot market existed or whether Credit Suisse participated in that conspiracy." Opp. at 23. Rather, the Seventh Amendment violation arises from the fact that subsequent juries would inevitably have to answer the same ***underlying factual questions*** as the first jury about the scope, extent, and operation of the conspiracy. Addressing only one of these overlapping factual issues, Plaintiffs argue that individual plaintiffs will "not need to show what chatroom discussions . . . were part of the conspiracy, because the alleged overarching conspiracy carried out by Credit Suisse and its conspirators ***harmed all class members in a similar fashion*** – paying wider spreads." Opp. at 22 (emphasis added). This reasoning fails on multiple levels.

First, while Plaintiffs argue that some common "harm" resulted from the conspiracy they allege, that is a disputed issue and it is not one of the two certified questions. *See* Opp. at 15. Second, Plaintiffs' claim that, if they prevail in the first trial, subsequent trials would require plaintiffs to demonstrate ***only*** that "they are a class member and put forth their individualized trades for which they seek damages" (Opp. at 18) impermissibly seeks to erase the required element of antitrust injury, including its causation requirements. Third, Plaintiffs' experts have

---

[6] *Atlantic Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328 (1990) and *In re Steel Antitrust Litig.*, 2015 WL 5304629 (N.D. Ill. Sept. 9, 2015) are inapposite. *In re Steel* says nothing about the Seventh Amendment; *Atlantic Richfield* says nothing about either the Seventh Amendment or whether issues can be properly bifurcated in antitrust cases.

acknowledged that spreads are affected by myriad factors;[7] one cannot just assume that the alleged "wider spread" quoted to a plaintiff is attributable to the conspiracy (even if one is found).

Plaintiffs do not and could not reasonably take the position that the alleged conspiracy extended to every chat in every chat room visited by any employee of the 16 banks. At some point, some jury will need to determine whether a sufficient connection exists between conspiratorial conduct (if such is proved) and a particular plaintiff's purported injury. That subsequent jury could not possibly evaluate any "connection" without (1) delving into the same factual questions considered by the first jury as to the scope, extent, and operation of the alleged conspiracy; or (2) having the first jury identify every particular on these issues including, *inter alia,* which of the thousands of distinct chatrooms were part of the "conspiracy." Neither is a viable option.

Plaintiffs largely ignore Credit Suisse's authorities, arguing instead that no antitrust cases are cited. Opp. at 21. But the authorities make clear it is not the cause of action but the overlapping nature of the factual questions that raises the Seventh Amendment issue. CS Br. at IV.B.

In any event, antitrust cases have identified Seventh Amendment violations. *See, e.g., In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1182, 1184 (3d Cir. 1993) (Seventh Amendment was violated in bifurcated trial of antitrust claim where "liability-type evidence" during damages trial "could have easily" led second jury to consider questions decided by first jury), *cert. denied*, 510 U.S. 1091 (1994); *In re Industrial Gas Antitrust Litig.*, 100 F.R.D. 280, 304 (N.D. Ill. 1983) (denying bifurcation that would "limit[] the common phase of the trial to the question of [an antitrust] violation" because the question of damages "may become relevant to, and even to some degree intertwined with, issues of violation" and "Seventh Amendment concerns might thus require a retrial of nearly all issues litigated in the initial phase").

---

[7] *See, e.g.,* Declaration of Herbert S. Washer Ex. 6 (Jan. 23, 2020 Expert Report of Eric Robin) ¶ 23.

Dated: May 25, 2022                **CAHILL GORDON & REINDEL LLP**
       New York, New York

                                               By: /s/ Herbert S. Washer
                                                     Herbert S. Washer
                                                     Jason M. Hall
                                                     Tammy L. Roy
                                                     Miles Wiley

                                                     32 Old Slip
                                                     New York, New York 10005
                                                     Telephone: (212) 701–3000
                                                     Facsimile: (212) 269–5420
                                                     hwasher@cahill.com
                                                     jhall@cahill.com
                                                     troy@cahill.com
                                                     mwiley@cahill.com

                                                     *Attorneys for Defendants Credit Suisse*
                                                     *Group AG, Credit Suisse AG, and Credit*
                                                     *Suisse Securities (USA) LLC*