**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | No. 13 Civ. 7789 (LGS) |

**CREDIT SUISSE DEFENDANTS' PRETRIAL MEMORANDUM OF LAW**
**IN SUPPORT OF PROPOSED VERDICT FORM**

Herbert S. Washer
Anirudh Bansal
Jason M. Hall
Edward Moss
Tammy L. Roy
Miles Wiley
**CAHILL GORDON & REINDEL LLP**
32 Old Slip
New York, New York 10005
Telephone: (212) 701–3000
Facsimile: (212) 269–5420
hwasher@cahill.com
abansal@cahill.com
jhall@cahill.com
emoss@cahill.com
troy@cahill.com
mwiley@cahill.com

*Attorneys for Defendants Credit Suisse*
*Group AG, Credit Suisse AG, and Credit*
*Suisse Securities (USA) LLC*

# **TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| PRELIMINARY STATEMENT | | 1 |
| STATEMENT OF FACTS | | 4 |
| ARGUMENT | | 10 |
| I. | THE COURT SHOULD USE CREDIT SUISSE'S PROPOSED VERDICT FORM | 10 |
| II. | THE COURT SHOULD REJECT PLAINTIFFS' PROPOSED VERDICT FORM. | 14 |
| CONCLUSION | | 23 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ajax Hardware Mfg. Corp.* v. *Industrial Plants Corp.*,
  569 F.2d 181 (2d Cir. 1977)........................................................................................................20

*Atkins* v. *New York City*,
  143 F.3d 100 (2d Cir. 1998).................................................................................................20, 22

*B & R Supermarket, Inc.* v. *MasterCard Int'l Inc.*,
  2018 WL 1335355 (E.D.N.Y. Mar. 14, 2018).........................................................................16

*Bates* v. *Long Island R .R. Co.*,
  997 F.2d 1028 (2d Cir.1993)....................................................................................................11

*Cabral* v. *City of New York*,
  2015 WL 4750675 (S.D.N.Y. Aug. 11, 2015).........................................................................11

*Cann* v. *Ford Motor Co.*,
  658 F.2d 54 (2d Cir. 1981).....................................................................................................20n

*In re Domestic Air Transp. Antitrust Litigation*,
  137 F.R.D. 677 (N.D. Ga. 1991)..............................................................................................16

*Elder-Beerman Stores Corp.* v. *Federated Department Stores, Inc.*,
  459 F.2d 138 (6th Cir. 1972) ...................................................................................................13

*Ellis* v. *Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ...................................................................................................17

*Finnegan* v. *Fountain*,
  915 F.2d 817 (2d Cir. 1990).....................................................................................................22

*In re Fosamax Prods. Liab. Litig.*,
  248 F.R.D. 389 (S.D.N.Y. 2008) .............................................................................................15

*Ginns* v. *Towle*,
  361 F.2d 798 (2d Cir. 1966).....................................................................................................18

*Harkabi* v. *SanDisk Corp.*,
  2012 WL 826892 (S.D.N.Y. Mar. 12, 2012) ...........................................................................19

*Intellivision* v. *Microsoft Corp.*,
  484 F. App'x 616 (2d Cir. 2012) ........................................................................................ 11-12

*Joint Stock Co. "Channel One Russia Worldwide"* v. *Infomir LLC*,
  022 WL 2530456 (S.D.N.Y. Mar. 9, 2022) ...........................................................................11n

*Kendler* v. *Federated Dep't Stores, Inc*.,
  88 F.R.D. 688 (S.D.N.Y. 1981) .................................................................................................6

*Kosmynka* v. *Polaris Indus., Inc*.,
  462 F.3d 74 (2d Cir. 2006).....................................................................................................22

*In re LIBOR-Based Fin. Instruments Antitrust Litig*.,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018).............................................................................. 16-17n

*In re Literary Works in Elec. Database Copyright Litig*.,
  654 F.3d 242 (2d Cir. 2011)................................................................................................ 15-16

*LNC Investments, Inc.* v. *First Fidelity Bank*,
  2000 WL 1093012 (S.D.N.Y. Aug. 4, 2000).........................................................................20

*MKB Constructors* v. *American Zurich Insurance Co*.,
  711 Fed. Appx 834 (9th Cir. 2017)......................................................................................20n

*Molecular Dynamics Ltd.* v. *Spectrum Dynamics Med. Ltd.*,
  2022 WL 2901559 (S.D.N.Y. July 22, 2022) .........................................................................11

*Monsanto Co.* v. *Spray-Rite Serv. Corp*.,
  465 U.S. 752 (1984).......................................................................................................... 21-22

*NECA-IBEW Health & Welfare Fund* v. *Goldman Sachs & Co*.,
  693 F.3d 145 (2d Cir. 2012)..................................................................................................17n

*New Hampshire* v. *Maine*,
  532 U.S. 742 (2001)................................................................................................................11

*Point Productions A.G.* v. *Sony Music Entertainment, Inc.*,
  2002 WL 31856951 (S.D.N.Y. 2002)...............................................................................18, 20

*In re Processed Egg Products Antitrust Litig.*,
  962 F.3d 719 (3d Cir. 2020)............................................................................................. 12-13

*Roberts* v. *Ground Handling, Inc.*,
  2007 WL 2753862 (S.D.N.Y. Sept. 20, 2007)................................................................. 19-20

*Sewell* v. *1199 Nat'l Ben. Fund for Health & Human Servs*.,
  187 Fed.Appx. 36 (2d Cir. 2006)...........................................................................................11

*Stephenson* v. *Doe*,
  332 F.3d 68 (2d Cir. 2003).............................................................................................. 20-21

*Wal-Mart Stores, Inc.* v. *Dukes*,
564 U.S. 338 (2011)..............................................................................................................17

*Wal-Mart Stores, Inc*. v. *Visa U.S.A., Inc*.,
396 F.3d 96 (2d Cir. 2005)...................................................................................................18

*Young* v. *Group Health Coop*.,
85 Wn.2d 332 (Wash. 1975)................................................................................................22

**Constitutional Provisions**

U.S. Const. amend. VII........................................................................................................*passim*

**Rules**

Fed. R. Civ. P. 23(a) .......................................................................................................15, 17

Fed. R. Civ. P. 23(c)(4)............................................................................................................6

**Statutes**

Sherman Antitrust Act Sections 1 and 3, 15 U.S.C. §§ 1, 3 ...........................................................7

**Other Authorities**

Annotated Manual for Complex Litigation § 12.451 (4th ed.)....................................................20n

*In re Capacitors Antitrust Litig.*,
No. 14-cv-03264 (N.D. Cal. Dec. 13, 2021) (ECF No. 1645)................................................13

*In re Processed Egg Prod. Antitrust Litig.*,
No. 19-1088 (3d Cir.) (June 5, 2018 Trial Transcript) ........................................................13n

*In re Tableware Antitrust Litig.*,
No. 04-cv-3514 (N.D. Cal. June 29, 2007) (ECF No. 384)....................................................13

*US Airways, Inc*. v. *Sabre Holdings Corp*.
(S.D.N.Y.) (ECF No. 789) ..................................................................................................20n

## PRELIMINARY STATEMENT[1]

Plaintiffs have alleged—and repeatedly have represented to the Court that they will prove—a single conspiracy among 16 banks to widen spreads across 52 currency pairs in the FX spot market from 2007 through 2013.  Credit Suisse has defended this case based on those representations.  And the Court has relied on them, too—to certify an issue class, to approve the class notice, and to deny Credit Suisse's motion for summary judgment.

But now, faced with the Seventh Amendment issues raised by Credit Suisse's motion for decertification, and with having to actually prove their case to a jury in October, Plaintiffs have made the strategic decision to change course, proposing a check-the-box verdict form that would allow the jury to find, for example, a two-bank conspiracy involving one currency pair in one year, a 15-bank conspiracy involving 51 currency pairs from 2007 through 2012, or anything in between. Plaintiffs' convoluted form spans nine pages and includes eight questions, and it gives the jury literally thousands of potential permutations—each of which would have serious, and completely different, implications for each absent class member (and each Lead Plaintiff).

By contrast, Credit Suisse has proposed a one-question verdict form that is both easy to understand and consistent with the case the parties have been litigating:

> Have plaintiffs proven by a preponderance of the evidence that Credit Suisse and 15 other banks knowingly participated in a single conspiracy to widen spreads in the FX spot market in 52 currency pairs, that lasted from December 1, 2007 until December 31, 2013?

In the event the case goes forward as a class action, the Court should adopt Credit Suisse's verdict form and reject Plaintiffs' for several reasons.

---

[1] Unless otherwise noted, all emphasis is added and all internal citations and quotations are omitted.

***First***, the Court should use Credit Suisse's verdict form because Plaintiffs are judicially estopped from changing their position at the eleventh hour.  Plaintiffs repeatedly have represented to this Court that they will prove a single, market-wide conspiracy, and they have benefitted from the Court's reliance on those representations.  It would be fundamentally unfair to allow them to backtrack now, on the doorstep of trial, for tactical reasons.  Indeed, this is the precise type of about-face that judicial estoppel is intended to prevent.  Moreover, Credit Suisse's verdict form is consistent with forms used in other antitrust conspiracy cases, including those where there is a question about whether disparate conduct is part of the same conspiracy.  Courts routinely ask the jury whether the plaintiffs have proven "the alleged conspiracy," rather than some different one.

***Second***, the Court should reject Plaintiffs' form because it raises serious procedural, class conflict and class notice, and trial-by-ambush concerns.  It also fails to solve the Seventh Amendment problems that will inevitably arise if this case proceeds to trial.[2]

To begin, Plaintiffs' verdict form raises intra-class conflicts and other issues that implicate Rule 23's adequacy, typicality, and commonality requirements.  Lead Plaintiffs' decisions about which evidence to feature at trial will have a direct impact on which banks and which currency pairs (if any) the jury finds to be part of the conspiracy.  And a finding of any conspiracy short of a 16-bank, 52-currency-pair conspiracy would create winners and losers among the class members and would mean that the alleged misconduct did not affect the class as a whole (the touchstone of commonality).  These problems are exacerbated because the class notice does not disclose the possibility that Plaintiffs could prevail by proving something less than a market-wide conspiracy.

---

[2] Credit Suisse respectfully submits that no verdict sheet could.  Nevertheless, without waiving any rights or arguments, Credit Suisse has proposed an easy-to-understand verdict sheet that attempts to mitigate, to the extent possible, the problems discussed in Section II.

That could result in, for example, absent class members that traded exclusively with one bank that is not found to be part of the conspiracy claiming after trial that they would have opted out had they known such a verdict was possible, and that they therefore should not be bound by the verdict.

Plaintiffs' verdict form is also tantamount to trial by ambush. Credit Suisse has been litigating for years, and preparing for trial, based on the premise that Plaintiffs would be required to prove the conspiracy they have alleged. If Credit Suisse had known otherwise, it may well have tailored its discovery efforts and trial preparation differently. For example, Credit Suisse could have decided to develop its evidence, and prepare to try the case, based on a strategy of trying to reduce overall damages by demonstrating that the most-traded currency pairs, or the banks with the largest market shares, were not part of the conspiracy. It is too late for that now, and so Credit Suisse would suffer extreme prejudice if Plaintiffs' verdict form were adopted.

Moreover, Plaintiffs' verdict form raises the possibility of a compromise verdict that is inconsistent with the evidence. That may even be part of Plaintiffs' strategy. Plaintiffs' jury instructions, for example, urge the jury to find that five banks that have pleaded guilty to antitrust violations were part of one conspiracy, even though the pleas related to two separate conspiracies that had nothing to do with each other.

Finally, Plaintiffs' proposed form does not overcome the significant Seventh Amendment problems that support decertification. To the contrary, the form all but guarantees that any jury in any subsequent case would be required to reexamine factual findings made in the class trial.

For these and the other reasons below, the Court should adopt Credit Suisse's verdict form.

3

## STATEMENT OF FACTS

Plaintiffs' proposed verdict sheet—which would allow the jury to find an extremely narrow conspiracy, including, for example, one involving only two banks and one currency pair—flies in the face of their repeated representations to this Court and Credit Suisse. The history is as follows:

**Complaints and Motion to Dismiss Briefing**. In the operative complaint, Plaintiffs allege an "overarching conspiracy." *See* Third Consolidated Amended Class Action Complaint (ECF No. 619) (June 3, 2016) ¶ 136 ("Defendants monitored each other's activity to ensure compliance with *the overarching conspiracy* and threatened to punish traders whose conduct didn't conform to the agreement."); *see also* Second Consolidated Amended Class Action Complaint (ECF No. 465) (July 31, 2015) ¶ 136 (same). And in their opposition to several banks' motions to dismiss, Plaintiffs argued that the case should proceed because "[t]he complaint plausibly alleges *an overarching conspiracy*." Opp. to Defs.' Mot. to Dismiss (ECF No. 558) (Feb. 5, 2016) at 6. Plaintiffs represented that they had alleged "one conspiracy" as opposed to "separate conspiracies [that] added up to a global conspiracy." *Id.* at 9-10. The Court denied the banks' dismissal motion. *See* Opinion & Order (ECF No. 661) (Sept. 20, 2016) at 56.

**Discovery and Expert Discovery.** Similarly, Plaintiffs represented throughout discovery that this case is about a single overarching conspiracy. For example, in objecting to Credit Suisse's interrogatories, Plaintiffs made it crystal clear that they were alleging an overarching conspiracy by traders at 16 banks to widen spreads in at least 52 currency pairs:

> Plaintiffs allege that Credit Suisse and its co-conspirators engaged in a conspiracy to fix prices customers paid to trade FX or otherwise increase customers' trading costs by artificially widening spreads they charged through the exchange and exploitation of price-driving competitive[ly] sensitive information ("CSI") in chatrooms, as well as other means of communication. *Defendants engaged in a single overarching combination, agreement, and/or understanding* to fix FX prices *by artificially widening spreads* on FX spot, forward, and swap transactions *in at least 52 currency pairs*, from at least December 1, 2007 until December 31,

4

2013.  The conspiracy was effectuated by a widespread scheme *amongst FX trader employees of Defendants* ("FX traders") to exchange and exploit CSI for their own benefit and to the detriment of class members in electronic chatrooms and by other means ("collusive conduct").  Defendants' conspiracy was effectuated through their FX traders, whose myriad chats over the course of several years evidence a conscious commitment to a common course of price fixing.

Declaration of Jason M. Hall ("Hall Decl.") Ex. 1 (Pls.' Res. and Obj. to CS Defs.' First Set of Interrogatories) at 6-7.  On this basis, Plaintiffs (i) "object[ed] to any request that seeks to improperly compartmentalize or isolate the allegations and supporting evidence of an *overarching conspiracy* among Defendants to fix prices by artificially widening spreads on FX instruments"; and (ii) "objected[ed] to any Interrogatory that ask[ed] Plaintiffs to parse out *any evidence they have supporting any 'agreement' between less than all Defendants* on any specific aspect of the *overarching conspiracy*."  *Id.* at 2-3.  In other words, Plaintiffs refused to provide discovery on any conspiracy that involved fewer than 16 banks (and now want to give the jury the opportunity to find Credit Suisse liable for any such conspiracy).

Plaintiffs' expert disclosures are similar.  For example, Dr. Hal Singer explained in his 2018 expert report that "Plaintiffs allege that Defendants agreed to fix prices for foreign exchange . . . in at least 52 currency pairs, resulting in antitrust injury."  Hall Decl. Ex. 2 (May 31, 2019 Class Certification Report of Hal J. Singer, Ph.D.) ¶ 1.  And Dr. Singer's most recent report, served on July 31, 2022, repeatedly references the "alleged 16-bank cartel" in this case.  Hall Decl. Ex. 3 (July 31, 2022 Rebuttal Report of Hal J. Singer, Ph.D.) ¶ 21.

**Class Certification**.  Plaintiffs moved to certify a class "focused on Defendants' conspiracy to widen FX bid-ask spreads," which Plaintiffs characterized as an "expansive" conspiracy, "encompassing FX traders around the globe from each of the 16 Defendants," who "agreed to fix FX prices by widening bid-ask spreads in at least 52 currency pairs."  Mem. of Law in Supp. of Pls.' Mot. for Class Cert. (ECF No. 1198) (May 31, 2018) ("Pls.' Class Cert Br.") at

1, 2.  Plaintiffs claimed they "[would] demonstrate" that this "*single* conspiracy existed" through common evidence.  *Id.* at 39; *see also* Reply Mem. of Law in Supp. of Pls.' Mot. for Class Cert. (ECF No. 1213) (Jan. 31, 2019) ("Pls.' Class Cert Reply") at 1 ("Plaintiffs do not allege an episodic conspiracy . . . .").[3]  Plaintiffs distinguished Credit Suisse's authority on commonality on the basis that the plaintiffs in those cases "did not allege *a single overall conspiracy* to maintain prices." Pls.' Class Cert Reply at 5 (citing *Kendler* v. *Federated Dep't Stores, Inc*., 88 F.R.D. 688 (S.D.N.Y. 1981)).  And they argued that "[t]he named Plaintiffs' claims are typical of the Classes['] because Defendants' conspiracy affected *all members* of the Classes."  Pls.' Class Cert Br. at 3.

Credit Suisse opposed class certification, including by arguing that Plaintiffs could not prove their theory of a global conspiracy by common evidence because they really had alleged (at best) only a series of mini-conspiracies.  Defs.' Mot. in Opp. to Pls.' Mot. for Class Cert. (ECF No. 1203) (Oct. 25, 2018) ("Defs. Class Cert Opp.") at 41-44.  On reply, Plaintiffs argued that because Credit Suisse was (supposedly) "[f]aced with widespread and effective conduct demonstrating *the conspiracy*," it "attempts to *recast Plaintiffs' allegations as multiple mini-conspiracies*," but failed because "*a single conspiracy [does not] fragment into multiple conspiracies* because a member does not 'know every other member' or 'know of or become involved in all of the activities in furtherance of the conspiracy.'"  Pls.' Class Cert Reply at 5, 7.

Although the Court denied Plaintiffs' motion, it allowed Plaintiffs to proceed as a class when it certified a Rule 23(c)(4) class and granted Plaintiffs' motion for appointment of class

---

[3] Plaintiffs made similar representations to the Court outside of formal motions.  For example, in an August 2, 2021 letter, Plaintiffs represented that "[their] submissions throughout this proceeding, including in recent summary judgment filings, *demonstrate an overarching conspiracy among 16 defendant banks* to fix spreads to show customers."  *See* Pls.' Ltr. (ECF No. 1612) (Aug. 2, 2021) at 2.

counsel.  Opinion & Order (ECF No. 1331) (Sept. 3, 2019) ("Class Cert Order") at 1.  In certifying the issue class, the Court allowed Plaintiffs the opportunity to prove by common evidence what they had claimed they could prove all along—the existence of a "single conspiracy."  *Id.* at 19.  The Court explained that it "[made] sense to address first whether the CS Defendants were a part of the alleged conspiracy, ***as well as whether a single conspiracy even existed***, which the CS Defendants dispute."  *Id.*

    **Class Notice**.  Consistent with the class certification briefing and decision, Plaintiffs sent Court-approved notices informing potential class members that the action alleges a 16-bank conspiracy to widen spreads in 52 currency pairs.  The summary notice informed potential class members that "[t]his Action alleges that ***15 Settling Defendants and Credit Suisse*** . . . conspired to fix prices in the foreign exchange ('FX') market in violation of Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3."  *See* Summary Notice of Certified Litigation Class (ECF No. 1509-1) (Sept. 30, 2020) ("Summary Notice") at 1.  And the detailed notice included a chart with 52 entries that listed each allegedly "Affected Currency Pair."  Notice of Certified Litigation Class (ECF No. 1509-2) (Sept. 30, 2020) at 4-5.

    **Summary Judgment**.  Plaintiffs continued to feature their "single global conspiracy" theory in opposing Credit Suisse's motion for summary judgment.  In response to Credit Suisse's argument that the evidence at most reflected a series of mini-conspiracies, Plaintiffs repeatedly and unequivocally reaffirmed their intention to try to prove a single conspiracy among 16 banks:

- "The abundance of evidence in this case ***clearly demonstrates a single conspiracy***."  Pls.' Mem. in Opp. to Defs.' Mot. For Summary Judgment and in Supp. of Pls.' Cross Mot. For Summary Judgment (ECF No. 1581) (Mar. 5, 2021) ("MSJ Opp.") at 28.

- "The complete overlap of participants, as thoroughly documented by the Chat Summary, ***reflects a single conspiracy*** to widen and/or stabilize spreads here."  *Id.* at 31.

- "Credit Suisse and its conspirators were aware that their conduct was part of a *single market-wide conspiracy among the 16 conspirator banks* to widen and/or stabilize spreads." *Id*. at 35.

- "*Credit Suisse's* conduct in the chat rooms, *and that of its 15 conspirators*, widened spreads *globally across G10 and emerging market currencies alike*." *Id*. at 1.

- "The conspiracy here involved horizontal competitors, *all of whom colluded with all of the others* . . . ." *Id*. at 41 n. 191.

- "[A] jury could conclude that this evidence is reflective of such *an overarching conspiracy*, which would require that Credit Suisse's motion for summary judgment be denied." *Id*. at 34 n. 171.

In denying Credit Suisse's motion, the Court rejected Credit Suisse's argument that it was entitled to summary judgment because "there is no single conspiracy" and accepted Plaintiffs' argument that a jury could decide whether there was. Opinion & Order (ECF No. 1650) (Feb. 1, 2022) at 1, 8-9. The Court analyzed the question of single versus multiple conspiracies extensively and denied Credit Suisse's motion based on the conclusion that "a reasonable jury could find that a single conspiracy existed to fix spreads in the FX market . . . ." *Id.* at 8-9. Nowhere in the opinion did the Court suggest that even if no reasonable jury could find an overarching conspiracy, Plaintiffs could nevertheless survive summary judgment and take the matter to trial if they could potentially prove *any* narrower conspiracy.

**Pre-Trial Exchanges**. On July 21, 2022, less than three months before trial in this nine-year-old case, Plaintiffs sent Credit Suisse a proposed verdict sheet, spanning nine pages, that did not even mention a single, global conspiracy among 16 banks to widen spreads across 52 currency pairs. Rather, Plaintiffs propose to ask the jury whether they have proven the existence of "a conspiracy" in the FX market and, if so, to specify which of the 16 banks participated, which of the 52 currency pairs were affected, and the dates during the six-year class period that the

8

conspiracy operated.  Hall Decl. Ex. 4.  The verdict sheet allows the jury to find one of literally thousands of possible conspiracies.  *Id*.

On August 5, 2022, Credit Suisse responded with a one-question verdict sheet that is consistent with the single-conspiracy theory of the case that Plaintiffs have been advancing all along.  It asks the jury whether Plaintiffs have "proven by a preponderance of the evidence that Credit Suisse and 15 other banks knowingly participated in a single conspiracy to widen spreads in the FX spot market in 52 currency pairs, that lasted from December 1, 2007 until December 31, 2013."  Hall Decl. Ex. 5.  Despite the undeniable consistency between Credit Suisse's verdict sheet and the questions the Court certified for trial, Plaintiffs rejected Credit Suisse's verdict sheet without explanation.

Plaintiffs' about-face appears to be either a trial strategy or a reaction to Credit Suisse's April 22, 2022 motion for decertification, which demonstrated that the Court should decertify the class for several reasons, including serious Seventh Amendment concerns.  In response, Plaintiffs argued that these concerns could be alleviated through "[p]rocedural safeguards such as [a] special verdict and carefully crafted jury instructions."  *See* Pls.' Ltr. (ECF No. 1668) (Apr. 1, 2022) at 3; Pls.' Mem. in Opp. to the Credit Suisse Defs.' Mot. for Decert. (ECF No. 1685) (May 13, 2022) at 19-20.[4]  For the reasons discussed in Section II below, however, Plaintiffs are wrong.

---

[4] On reply, Credit Suisse argued that any second jury inevitably would need to reexamine the scope of the conspiracy, and any special verdict form that tried to fully identify the conspiracy's contours would be hopelessly complex.  *See* Reply Mem. of Law in Supp. of the Credit Suisse Defs.' Mot. for Decert. (ECF No. 1687) (May 25, 2022) at 7-8.  Credit Suisse argued that at a minimum, such a form "would need to inform subsequent juries of the first jury's findings as to the scope of the alleged conspiracy, including its participants, the currency pairs and time periods involved, and the specific chatrooms."  *Id*.  Plaintiffs' verdict form does not include the traders and chatrooms, an omission that ensures the Seventh Amendment problems would persist.  *See* infra p. 22-23 (illustrating why the failure of the first jury to identify which traders are part of the conspiracy implicates the Seventh Amendment).

The parties are continuing to discuss witnesses and exhibits, but at the present time, Plaintiffs' "will call" list includes former traders from 14 of the 16 banks, Hall Decl. ¶ 3,  meaning that Plaintiffs have chosen to not present a live witness from two of the banks that they allege engaged in the single conspiracy.  And Plaintiffs' current exhibit list includes more than 2,900 documents, Hall Decl. ¶ 2, which means that Credit Suisse has very little visibility into which banks, which currency pairs, and which years Plaintiffs intend to focus on at trial.

## ARGUMENT

## I.     THE COURT SHOULD USE CREDIT SUISSE'S PROPOSED VERDICT FORM

Credit Suisse's proposed verdict form directly addresses the single conspiracy that Plaintiffs have alleged and consistently have represented to the Court that they will prove.  If the case proceeds to trial, the Court should adopt that form for two reasons.

***First***, Plaintiffs should be judicially estopped from pivoting at this late stage.[5]  Plaintiffs have litigated this case based on the premise that they would prove a single, global conspiracy among 16 banks to widen spreads in 52 currency pairs.  Credit Suisse has taken discovery and prepared for trial based on this premise.  Plaintiffs have objected to discovery based on this premise.  And importantly, Plaintiffs have convinced the Court to certify an issue class, and to deny Credit Suisse's motion for summary judgment, based on this premise.  But now, faced with the prospect of decertification or having to actually prove up their case at trial, Plaintiffs are trying to change the game.  This is precisely the type of maneuvering that the equitable doctrine of judicial estoppel is designed to prevent.

---

[5] Plaintiffs recognize this equitable principle.  *See* Memorandum of Law in Support of Plaintiffs' Motion *In Limine* No. 6 To Exclude Testimony and Argument that this Case Involves Multiple Markets (ECF No. 1742) (Aug. 12, 2022) at 1-2 (arguing that "Credit Suisse is bound by the judicial admissions in its Answer" and that "Credit Suisse's judicial admission of a single FX market binds Credit Suisse throughout this litigation including trial").

This Court has discretion to invoke judicial estoppel to "protect the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire* v. *Maine*, 532 U.S. 742, 749-50 (2001). Judicial estoppel "'prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *Intellivision* v. *Microsoft Corp*., 484 F. App'x 616, 621 (2d Cir. 2012) (quoting *Sewell* v. *1199 Nat'l Ben. Fund for Health & Human Servs*., 187 Fed.Appx. 36, 40 (2d Cir. 2006)); *New Hampshire*, 532 U.S. at 749 (same). In determining whether to apply this equitable doctrine, courts look to whether the prior inconsistent position gave the party an "unfair advantage" or whether the "balance of equities" tips in favor of estoppel. *Molecular Dynamics Ltd.* v. *Spectrum Dynamics Med. Ltd.*, 2022 WL 2901559, at *5 (S.D.N.Y. July 22, 2022). For example, in *Cabral* v. *City of New York*, 2015 WL 4750675, at *6 (S.D.N.Y. Aug. 11, 2015) (Schofield, J.), this Court applied judicial estoppel to deny a defendant's post-trial motions based on his trial testimony that differed from his deposition testimony upon which the Court had relied in its summary judgment ruling.[6]  *See also id*. ("[J]udicial estoppel 'seeks to preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions.'") (quoting *Bates* v. *Long Island R .R. Co*., 997 F.2d 1028, 1038 (2d Cir.1993)).

Judicial estoppel applies here. First, Plaintiffs' position that they can prevail at trial even if they prove a narrow conspiracy is "clearly inconsistent" with their earlier position that they would prove a single, overarching conspiracy among 16 banks to widen spreads across 52 currency pairs. *Intellivision*, 484 Fed. App'x at 619. Second, Plaintiffs have benefitted from the Court's

---

[6] Similarly, in *Joint Stock Co. "Channel One Russia Worldwide"* v. *Infomir LLC*, the court applied judicial estoppel to recommend denial of the plaintiffs' summary judgment motion because it was based on a position that directly contradicted an earlier position that the plaintiffs had taken in opposing a motion to compel.  2022 WL 2530456, at *18 (S.D.N.Y. Mar. 9, 2022).

adoption of their position in certifying an issue class and in denying Credit Suisse's motion for summary judgment. *Compare* Pls.' Class Cert Br. at 3 ("The named Plaintiffs' claims are typical of the Classes['] because Defendants' conspiracy affected all members of the Classes"), *with* Class Cert Order at 20-21 ("Typicality is satisfied for purposes of the two certified issues because 'each class member's claim arises from the same course of events,' the alleged conspiracy to widen spreads, and 'each class member makes similar legal arguments' to prove the existence of the conspiracy and the CS Defendants' participation.").[7] And finally, Plaintiffs would "derive an unfair advantage" and "impose an unfair detriment" on Credit Suisse, *Intellivision*, 484 Fed. App'x at 619, if not estopped from using their proposed verdict form. Plaintiffs' proposed verdict form—especially in view of the more-than-2,900 exhibits on their list—hides the ball on the case that they will actually try, leaving Credit Suisse guessing about how to defend itself.

**Second**, Credit Suisse's simple verdict sheet is consistent with those used in cases alleging a single antitrust conspiracy that was composed of several parts. *In re Processed Egg Products Antitrust Litigation* provides a useful model. 962 F.3d 719 (3d Cir. 2020). There, a class of egg purchasers claimed that egg producers had engaged in a single conspiracy to inflate prices that operated through three different mechanisms to reduce egg supply: (i) supply-reducing steps such as early slaughtering of hens; (ii) creation of programs that reduced the egg supply; and (iii) coordinated exports of eggs. *Id*. at 721-722. The verdict form's first question asked the jurors:

> Do you find, by a preponderance of the evidence, that there was ***a single overarching conspiracy*** to reduce supply ***comprised of all three*** of (1) short term

---

[7] *See also* MSJ Opp. at 34 n.171 (argument that a "jury could conclude that this evidence is reflective of such an overarching conspiracy, ***which would require that Credit Suisse's motion for summary judgment be denied***."); Opinion & Order (ECF No. 1650) (Feb. 1, 2022) at 1, 8-9 (denying Credit Suisse's motion because "a reasonable jury could find that a single conspiracy existed to fix spreads in the FX market . . . .")

supply recommendations, (2) the United Egg Producers (UEP) Certifi[cation] Program, and (3) United States Egg Marketers (USEM) exports?

*Id*. at 725 (emphasis added).[8]  Credit Suisse's proposed verdict form is similar.  Each is easy to understand and accurately reflects the conspiracy alleged in the case.

Other courts similarly have required the plaintiffs to prove the conspiracy that they had alleged.  *See, e.g.,* Final Verdict Form, *In re Capacitors Antitrust Litig*., No. 14-cv-03264 (N.D. Cal. Dec. 13, 2021) (ECF No. 1645) at 2-3 ("Did [plaintiffs] prove, by a preponderance of the evidence and in accordance with the instructions given to you, that [defendant] knowingly participated in ***the alleged conspiracy*** to fix, raise, maintain, or stabilize the prices of aluminum, film and/or tantalum capacitors?"); *see also* Final Jury Instructions, *In re Tableware Antitrust Litig.*, No. 04-cv-3514 (N.D. Cal. June 29, 2007) (ECF No. 384) at 9 (jury instructions stating that "Plaintiffs must prove both of the following elements by a preponderance of the evidence that (1) ***the alleged conspiracy*** existed; and (2) the defendant knowingly became a member of ***that conspiracy***"); *Elder-Beerman Stores Corp.* v. *Federated Department Stores, Inc.,* 459 F.2d 138, 146-47 (6th Cir. 1972) (reversing jury verdict for plaintiff, where it "failed to offer sufficient probative evidence to establish the alleged single conspiracy upon which it bases its claim for damages" because "the evidence of the exclusive arrangements between [defendant department store] and the named suppliers . . . was insufficient to establish ***the conspiracy to restrain trade upon which [plaintiff] based a right to recover***").

---

[8] Consistent with the verdict form, the Court instructed the jury that to find liability, "[t]hese three programs must all be part of ***a single overarching conspiracy as opposed to, for example, three different conspiracies that were each independent of each other.***"  *See* Deferred Joint Appendix Vol. 3, *In re Processed Egg Prod. Antitrust Litig.*, No. 19-1088 (3d Cir.) at JA1022 (June 5, 2018 Trial Transcript) (emphasis added).

## II.     THE COURT SHOULD REJECT PLAINTIFFS' PROPOSED VERDICT FORM.

Plaintiffs' proposed verdict form raises serious procedural, class conflict and class notice, and fairness concerns.  It also fails to solve the Seventh Amendment problems that will inevitably arise if this case proceeds to trial.

*First*, allowing Plaintiffs to prove any narrow conspiracy they wish raises serious intra-class conflicts that raise or exacerbate several of the class-certification problems, including adequacy, typicality, and commonality.

As the Court knows, if Plaintiffs were to prevail at the upcoming trial, each individual class member would have an opportunity to try to prove the remaining elements of its claim, including damages, in a subsequent lawsuit.  As part of that attempt, presumably, each class member would need to identify its trades that it claims were affected by the conspiracy.  The problem, however, is that each class member's trades are different, and each has a strong interest in tailoring Lead Plaintiffs' trial presentation in this case to the evidence that would allow it (and it alone) to obtain a jury verdict that would maximize its own potential damages in any subsequent case.  For example, one class member may have made the bulk of its trades with only three banks, while another may have traded mostly in a dozen of the 52 currency pairs.

Given that there were hundreds of millions of trades during the alleged conspiracy period, the permutations—and thus the number of different and irreconcilable conflicts between and among class members—are countless.  This is not theoretical.  Even the records we have from just the 11 Lead Plaintiffs demonstrate the point:

- None of the Lead Plaintiffs made a single trade with two of the banks alleged to be in the conspiracy.  Thus, none of the 11 Lead Plaintiffs would be harmed *in any way* if the trial presentation did not even mention those two banks.  Absent class members that may have traded frequently (or even exclusively) with one or more of those two banks, on the other hand, would be tremendously disadvantaged if those banks were found to not be in the conspiracy.  Pls.' Class Cert Br. at App. F.

14

- Nearly one quarter of the currency pairs (12 of 52) account *for only .07%* of the Lead Plaintiffs' trading volume. Hall Decl. ¶ 4. They have little incentive to take up trial time by putting on evidence about these currency pairs. Other absent class members that traded exclusively or extensively in those pairs, however, would have vastly different incentives.

- Only one Lead Plaintiff traded in GBP/NZD, a currency pair that accounted for only 0.006% of that Lead Plaintiff's trading value. Hall Decl. ¶ 4. Thus, *only one Lead Plaintiff* would have any interest in putting forth evidence related to GBP/NZD, and even that Lead Plaintiff's interest would be negligible given its trading volume. Absent members who traded primarily or heavily in that currency pair, however, would have quite different incentives.

If the Court were to adopt Plaintiffs' verdict form and the jury were to find some sort of narrower-than-market-wide conspiracy, there would be winners and losers among the class members. And whether a class member won or lost would be a direct result of which evidence Lead Plaintiffs and their counsel decided to put on at trial. This raises significant typicality and adequacy issues under Rule 23. *See In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 398-99 (S.D.N.Y. 2008) (explaining that to demonstrate Rule 23(a) typicality, named plaintiffs must show that "what is needed to prove [their] claim[s]" closely tracks "proofs needed for those [claims] of the proposed class. . . . [A]s the class representative's claims go, so [too must] go the claims of the class."); *In re Literary Works in Elec. Database Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) (adequacy requires that class representative "have no interests antagonistic to the interests of other class members").

The Second Circuit's reasoning in *Literary Works* illustrates the problem. 654 F.3d at 251-52. There, the plaintiff authors fell into three categories (A, B, and C) depending on when they registered their works with the U.S. Copyright Office. The court explained that "[a]lthough all affected members of the plaintiff class are interested in maximizing their individual compensation, severally they accomplish that goal in different ways." *Id*. at 251. Class members who owned

15

works in all three categories, for example, did not care how their compensation was allocated among their claims, while class members in only one category had a strong interest in maximizing the compensation for only that category of claim. *Id*. at 251-52. As a consequence, the court explained, "[w]hereas the former group could choose to sacrifice their Category C claims in exchange for more favorable compensation on their Category A and B claims, no such option is available to the latter." *Id*. at 252. And even though the named plaintiffs held claims in all three categories, the Second Circuit still found that each could not adequately represent the class and, therefore, reversed the district court's grant of class certification. *Id*.

In contrast, the court found that there were no class conflicts in *B & R Supermarket, Inc.* v. *MasterCard Int'l Inc.*, where "[t]he success of the claims by the two groups of Plaintiffs is dependent on the same finding of liability against all Defendants." 2018 WL 1335355, at \*10 (E.D.N.Y. Mar. 14, 2018). There, because the plaintiffs had asserted claims of joint and several liability based on a single conspiracy in which all the defendants were alleged to have participated (much like the conspiracy Plaintiffs here have asserted for years), the named plaintiffs adequately represented the class. *Id*. Similarly, in *In re Domestic Air Transp. Antitrust Litigation*, the court found that class certification was appropriate because the plaintiffs had proposed to submit proof of "a common conspiracy by all defendants at all [airline] hubs," and "[t]here is no indication that plaintiffs plan to proceed hub by hub in an effort to present evidence of many different conspiracies."[9] 137 F.R.D. 677, 688-89 (N.D. Ga. 1991).

---

[9] Given the vast number of permutations here, subclasses could not cure the problem. Although conflicts between class members can sometimes be cured by dividing the class into subclasses, "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate, and the creation of a number of subclasses may make the case unmanageable and may defeat the superiority requirement." *In re LIBOR-Based Fin. Instruments Antitrust Litig*., 299 F. Supp. 3d 430, 464-65 (S.D.N.Y. 2018).

Plaintiffs' proposed verdict sheet also implicates commonality under Rule 23(a)(2), which requires alleged conduct "that could affect the class *as a whole*." *See Ellis* v. *Costco Wholesale Corp.*, 657 F.3d 970, 983-84 (9th Cir. 2011); *see also Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 349–50 (2011) ("Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury"). Here, a class was certified based on Plaintiffs' argument that they had alleged a "single overall conspiracy" that affected all class members. Pls.' Class Cert Reply at 5. But now, faced with having to actually prove it, Plaintiffs want the opportunity to prevail by showing something far less—one of thousands of possible smaller conspiracies that, by definition, did *not* "affect the class as a whole."

Allowing Plaintiffs to walk back their prior representations now would not only be unfair, it would require the Court to (once again) re-analyze these and other class-certification issues.[10]

Moreover, the discussion above about which evidence different class members might wish to focus on assumes that those absent class members know that this case could result in a jury verdict finding something less than a market-wide conspiracy. They do not. The class notice informed class members that Lead Plaintiffs would be prosecuting a conspiracy case against "15 Settling Defendants and Credit Suisse" and that there were "52 [a]ffected [c]urrency [p]airs." *See* Summary Notice at 1.

This lack of fair notice could create serious post-trial issues. Suppose, for example, that Plaintiffs put on relatively little evidence as to one bank, and the jury finds that bank was not part of the conspiracy. Absent class members who traded primarily or exclusively with that bank could,

---

[10] These include class standing, which requires that Lead Plaintiffs suffer injury as a result of "conduct [that] implicates the 'same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." Defs. Class Cert Opp. at 38 (citing *NECA-IBEW Health & Welfare Fund* v. *Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012)).

after seeing the verdict, claim that they should not be bound by it because they would have opted out (or tried the case very differently) had they known that it was possible that the bank might be found to be outside the conspiracy. *See Wal-Mart Stores, Inc.* v. *Visa U.S.A., Inc.*, 396 F.3d 96, 115 (2d Cir. 2005) (class action notice must provide "information reasonably necessary to make a decision whether to remain a class member and be bound by the final judgment or opt out of the action"). In that event, the trial would provide far less certainty going forward than the Court intended.

Credit Suisse's proposed verdict sheet would mitigate these inherent conflicts (as well as the notice concerns). Different trial strategies would not harm some class members but help others. Rather, Lead Plaintiffs and ***all*** absent class members would have the same goal at trial—to present whatever evidence would give Plaintiffs the best chance to prove a single, market-wide conspiracy.

***Second***, Plaintiffs' proposed verdict sheet presents the risk of trial by ambush, which is not permitted. *See Ginns* v. *Towle*, 361 F.2d 798, 801 (2d Cir. 1966) ("The basic purpose of the federal rules . . . is to eliminate trial by ambush . . . ."); *see also Point Productions A.G.* v. *Sony Music Entertainment, Inc.*, 2002 WL 31856951, at *5 (S.D.N.Y. 2002) ("With the enactment of the Federal Rules in 1938, the policy of full disclosure became fundamental to federal litigation. 'Trial by ambush' was no longer acceptable . . . . Disclosure of factual information and commitment to legal theory became the norm. . . . . If the goals of economy and early resolution of cases are to be achieved, and a judicial officer's supervision of a case not to be a wasted effort, a party must be held to its pretrial commitments in the absence of events beyond its control.").

Plaintiffs have insisted for years that they will attempt to prove a single, market-wide conspiracy among 16 banks that affected 52 currency pairs (and have even refused to provide certain discovery on this basis). If given the opportunity to try to prove something less, however,

Lead Plaintiffs and their counsel may well determine that it is in the class's best interests to do so. Especially in the event of a timed trial, Lead Plaintiffs necessarily will have to make choices about how to try their case. They may, for example, decide that it is not in the class's best interest as a whole to put on evidence about the 12 currency pairs that Lead Plaintiffs traded at the lowest volume, because those pairs make up only .07% of their total trading volume. Or Lead Plaintiffs may decide not to feature certain banks in their trial presentation. That may already be happening. At present, for example, Lead Plaintiffs' "will call" witness list does not include any traders from two of the 16 alleged conspirator banks. Hall Decl. ¶ 3.

Credit Suisse, on the other hand, plans to use part of its allotted trial time to defend against those 12 currency pairs and three banks (and all the rest) because, as far as it knows, Plaintiffs have committed to trying to prove a 16-bank, 52-currency-pair conspiracy. Credit Suisse has no way of knowing whether Plaintiffs might now attempt to try a very different case than the one they have alleged and repeatedly have asserted they will prove—especially since Plaintiffs still have more than 2,900 documents on their proposed exhibit list—or what that different case might look like. And if Credit Suisse had known that Plaintiffs would present the jury with a choose-your-own conspiracy verdict form, it may well have chosen to prioritize its own discovery efforts differently—for example, to focus on the most frequently traded currency pairs or the banks with the largest market shares.

This is precisely the type of situation that courts in this Circuit routinely try to prevent, especially on the eve of trial. *See, e.g.*, *Harkabi* v. *SanDisk Corp.*, 2012 WL 826892, at *8 (S.D.N.Y. Mar. 12, 2012) (denying plaintiffs' request to add a new damages theory "several weeks before trial" because defendant had "reasonably constructed its defense strategy and tailored discovery based on the allegations in the complaint"); *Roberts* v. *Ground Handling, Inc.*, 2007 WL

19

2753862, at *5 (S.D.N.Y. Sept. 20, 2007) ("To require defendant to incur additional costs and to change its strategy on the eve of trial because plaintiff has concocted a new theory three years into the litigation is simply not fair and would, in a real sense, unduly prejudice defendant."); *Point Productions A.G.*, 2002 WL 31856951, at *5 (precluding plaintiff "from changing its damage theory nine years into this litigation after [it had] adopted another theory that it could not support in fact" because such a change would require additional discovery and "undermine the philosophy of the Federal Rules of Civil Procedure"); *LNC Investments, Inc.* v. *First Fidelity Bank*, 2000 WL 1093012, at *1-3 (S.D.N.Y. Aug. 4, 2000) (precluding plaintiff from asserting new theory of liability that was not set forth in complaint, interrogatory responses, or expert opinions).

*Third*, Plaintiffs' verdict sheet is not only complicated and confusing,[11] but if the jury were given the opportunity to pick and choose among 16 banks and 52 currency pairs, it could well reach a compromise verdict. That, too, is impermissible under Second Circuit law. *See, e.g.*, *Ajax Hardware Mfg. Corp.* v. *Industrial Plants Corp.*, 569 F.2d 181, 184-85 (2d Cir. 1977) (granting new trial because of "reasonable possibility of a compromise verdict" that was inconsistent with "the facts adduced at trial"); *see also Atkins* v. *New York City,* 143 F.3d 100, 104 (2d Cir. 1998) (ordering new trial on all issues because of possible compromise verdict).

In *Stephenson* v. *Doe*, for example, the Second Circuit remanded for a new trial because the jury had returned a "legally inconsistent" verdict. 332 F.3d 68, 79-80 (2d Cir. 2003).

---

[11] *See, e.g.*, Jan. 9, 2017 Trial Transcript, *US Airways, Inc*. v. *Sabre Holdings Corp*. (S.D.N.Y.) (ECF No. 789) at 5434:21-23 ("I also think that there is a danger, in an overly long and complicated verdict form, in confusing the jury, and so I've tried to avoid that."); Annotated Manual for Complex Litigation § 12.451 (4th ed.) ("The verdict form should be concise, clear, and comprehensive"); *Cann* v. *Ford Motor Co*., 658 F.2d 54, 58 (2d Cir. 1981) ("We will reverse a judgment entered upon answers to questions which mislead and confuse the jury or which inaccurately frame the issues to be resolved by the jury."); *MKB Constructors* v. *American Zurich Insurance Co*., 711 Fed. Appx 834, 837 (9th Cir. 2017) (finding that the district court did not abuse its discretion in rejecting a proposed jury verdict that "spanned 11 pages, including 30 questions with differing answer formats and forms that could have easily misled the jury")

Specifically, the jury found that the defendant police officer was entitled to qualified immunity (which equated to a finding, based on the jury instructions, that he had acted in an "objectively reasonable" way), but at the same time that he had used excessive force (which equated to the opposite finding, also based on the jury instructions, that he had not acted in an "objectively reasonable" way). *Id*. at 79.

Particularly when read in conjunction with Plaintiffs' jury instructions, Plaintiffs' verdict form could give rise to (and may even be intended to give rise to) a similarly inconsistent compromise verdict. For example, Plaintiffs propose that the Court instruct the jury as follows:

> Barclays, BNP Paribas, Citi, JPMorgan Chase, and Royal Bank of Scotland (RBS), pleaded guilty to anticompetitive conduct in the FX spot market. . . . You may consider the guilty pleas by those I have listed for you as prima facie evidence that, during the various periods of time identified in the indictments discussed, ***all those who pleaded guilty in fact conspired*** to violate the antitrust laws in the manner so admitted in their guilty pleas.[12]

But four of the banks pleaded guilty to one conspiracy involving certain traders in one chatroom relating to one currency pair, and the fifth bank (BNP Paribas) pleaded guilty to a separate (and totally unrelated) conspiracy composed of traders from a different chatroom relating to several other currency pairs.[13] Based only on the guilty pleas, these five banks thus did not have a "conscious commitment to a scheme," *Monsanto Co.* v. *Spray-Rite Serv. Corp.*, 465 U.S. 752, 764

---

[12] Hall Decl. Ex. 6 (Plaintiffs' Proposed Jury Instructions) at 4, 9. Credit Suisse has filed a motion *in limine* to exclude the guilty pleas and opposes this proposed instruction. *See* Memorandum of Law in Support of Plaintiffs' Motion *In Limine* No. 4 To Exclude Factual Admissions Contained in Guilty Pleas and Plea Allocutions of Non-Credit Suisse Persons and Entities (ECF No. 1738) (Aug. 12, 2022).

[13] *Compare United States* v. *Barclays PLC*, 3:15-cr-0077 (D. Conn. May 20, 2015) (ECF No. 6) ¶ 2, *United States of America* v. *Citicorp*, 3:15-cr-0078 (D. Conn. May 20, 2015) (ECF No. 8) ¶ 2, *United States* v. *JPMorgan Chase & Co*., 3:15-cr-0079 (D. Conn. May 20, 2015) (ECF No. 13) ¶ 2, *United States* v. *The Royal Bank of Scotland*, 3:15-cr-00080 (S.D.N.Y. May 20, 2015) (ECF No. 9) ¶ 2, *with United States* v. *BNP Paribas*, 18-cr-0061 (S.D.N.Y. Feb. 2, 2018) (ECF No. 4) ¶ 2. What is more, the vast majority of this conduct had nothing to do with spreads.

(1984), but rather participated in two separate conspiracies. Yet Plaintiffs' verdict form does not permit the jury to find multiple conspiracies, but instead implicitly encourages it to lump any mini-conspiracies it might find (*e.g.*, the two separate conspiracies underlying the guilty pleas) together into one.[14]  Such a verdict would be legally incorrect and unsupported by the evidence. *See, e.g.*, *Atkins*, 143 F.3d at 103-04 (ordering new trial due to possibility of compromise verdict because award of nominal damages was inconsistent with both "the theory of liability offered at trial" and the undisputed "facts adduced at trial"); *Finnegan* v. *Fountain*, 915 F.2d 817, 821 (2d Cir. 1990) (ordering new trial because of "irreconcilable" special verdicts where jury found that defendant had acted maliciously and simultaneously found that defendant had acted in good faith); *Kosmynka* v. *Polaris Indus., Inc*., 462 F.3d 74, 79 (2d Cir. 2006) (setting aside verdict where "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture"); *Young* v. *Group Health Coop*., 85 Wn.2d 332, 339 (Wash. 1975) ("Verdict forms, like jury instructions, can encompass only those theories of liability which are supported by substantial evidence.").

*Finally*, although Plaintiffs' last-minute strategy change appears to be an attempt to defeat Credit Suisse's motion for decertification through supposed "[p]rocedural safeguards such as [a] special verdict and carefully crafted jury instructions,"[15] it does not actually solve the Seventh Amendment problems that will result if this trial proceeds as a class action.[16]

---

[14] By asking the jury only whether it finds a "single conspiracy" among Credit Suisse and 15 other banks, Credit Suisse's verdict form avoids this problem.

[15] *See* Pls.' Ltr. (ECF No. 1668) (Apr. 1, 2022) at 3; Pls.' Mem. in Opp. to the Credit Suisse Defs.' Mot. for Decert. (ECF No. 1685) (May 13, 2022) at 19-20.

[16] *See* Mem. of Law in Supp. of the Credit Suisse Defs.' Mot. for Decert. (ECF No. 1680) (Apr. 22, 2022) at 19-25.

To illustrate just some of the potential problems, consider the following scenarios based on the hypothetical verdict in which the jury finds a conspiracy (i) among Barclays, Citi, and Credit Suisse, (ii) involving three currency pairs (including AUD/CAD), (iii) from 2008 through 2010. Suppose further that in subsequent litigation, a class member tries to prove causation and damages for a September 2009 AUD/CAD trade with Citi.  Here are just some potential scenarios that would require the second jury to reexamine the scope of the conspiracy that the first jury found:

- **Scenario 1**:  The class member points to a September 2009 spread chat about AUD/CAD involving one trader from Citi.  Credit Suisse argues in the second trial that neither the chat, nor any other chat including that trader, was in evidence in the first trial, and so the first jury could not have found that trader to be part of the conspiracy.  The mere fact that the first jury found that certain Citi traders were in evidence in the conspiracy (*i.e.*, those whose chats were in evidence in the first trial) ***does not mean*** that it found ***all Citi traders*** (even those who were not mentioned and whose chats were not in evidence in the first trial) to be in the conspiracy.[17]

- **Scenario 2**:  The class member points to a September 2009 spread chat about AUD/CAD involving traders from Citi, Barclays, and Morgan Stanley.  Credit Suisse argues in the second trial that the chat was not part of the conspiracy because the first jury found that Morgan Stanley was not part of the conspiracy.

- **Scenario 3**:  In the second trial, Credit Suisse argues that the class member cannot establish causation because the class member cannot point to a single Citi spread chat about AUD/CAD in 2009.  In returning a verdict on causation, the jury reevaluates the scope of the conspiracy itself.

These scenarios are merely illustrative, but they show some of the inherent problems that make reexamination in violation of the Seventh Amendment a virtual certainty.

## CONCLUSION

For the reasons above, if the Court denies Credit Suisse's motion for decertification and a trial of the two class issues proceeds, the Court should adopt Credit Suisse's proposed verdict form.

---

[17] *See supra* n.4.

Dated: August 19, 2022
New York, New York

**CAHILL GORDON & REINDEL LLP**

By: /s/ Herbert S. Washer
Herbert S. Washer
Anirudh Bansal
Jason M. Hall
Edward Moss
Tammy L. Roy
Miles Wiley

32 Old Slip
New York, New York 10005
Telephone: (212) 701–3000
Facsimile: (212) 269–5420
hwasher@cahill.com
abansal@cahill.com
jhall@cahill.com
emoss@cahill.com
troy@cahill.com
mwiley@cahill.com

*Attorneys for Defendants Credit Suisse
Group AG, Credit Suisse AG, and Credit
Suisse Securities (USA) LLC*