# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | No. 13 Civ. 7789 (LGS) |

## JOINT PRE-TRIAL ORDER
### (August 26, 2022)

### A.  CASE CAPTION

The full caption of this action is set forth above.

### B.  APPEARANCES:

The names, law firms, addresses, telephone numbers, and email addresses of trial counsel

are as follows:

<u>For Plaintiffs:</u>

SCOTT+SCOTT ATTORNEYS AT LAW LLP
Christopher M. Burke
Walter W. Noss
Kate Lv
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
cburke@scott-scott.com
wnoss@scott-scott.com
kanderson@scott-scott.com
klv@scott-scott.com

HAUSFELD LLP
Michael D. Hausfeld
Reena Armillay Gambhir
Timothy S. Kearns
Ian Engdahl
Jose Roman Lavergne
888 16th Street NW, Suite 300
Washington, DC 20006
Telephone: 202-540-7143
Facsimile:  202-540-7201
mhausfeld@hausfeld.com
rgambhir@hausfeld.com
tkearns@hausfeld.com
iengdahl@hausfeld.com
jlavergne@hausfeld.com

KOREIN TILLERY, LLC
Stephen M. Tillery
Steven M. Berezney
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
Saint Louis, MO  63101-1612
Telephone: 314-241-4844
Facsimile: 314-241-3525
stillery@koreintillery.com
sberezney@koreintillery.com

ROBBINS GELLER RUDMAN & DOWD LLP
Patrick J. Coughlin
Alexandra S. Bernay
Carmen A. Medici
655 West Broadway
Suite 1900
San Diego, CA 92101
Telephone: (619)-231-1058
Fax: (619)-231-7423
patc@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com


For Defendants:

Herbert S. Washer (hwasher@cahill.com)
Anirudh Bansal (absansal@cahill.com)
Jason M. Hall (jhall@cahill.com)

Edward Moss (emoss@cahill.com)
Tammy L. Roy (troy@cahill.com)
Miles Wiley (mwiley@cahill.com)
Margaret A. Barone (mbarone@cahill.com)
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
Telephone: (212) 701–3000
Facsimile: (212) 269–5420

## C.  SUBJECT MATTER JURISDICTION

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 4 of the Clayton Act, 15 U.S.C. § 15.

## D.  SUMMARY OF CLAIMS TO BE TRIED:

**Claims to be tried:**

This is a class action.  The class is represented by named Plaintiffs Aureus Currency Fund, L.P., The City of Philadelphia, Board of Pensions and Retirement, Employees' Retirement System of the Government of the Virgin Islands, Employees' Retirement System of Puerto Rico Electric Power Authority, Fresno County Employees Retirement Association, Haverhill Retirement System, Oklahoma Firefighters Pension and Retirement System, State-Boston Retirement System, Syena Global Emerging Markets Fund, LP, Systrax Corporation, Tiberius OC Fund, Ltd., Value Recovery Fund L.L.C., and United Food and Commercial Workers Union and Participating Food Industry Employers Tri-state Pension Fund.  The Defendants in this trial are Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse Securities (USA) LLC (collectively "Credit Suisse" or the "CS Defendants").

Plaintiffs allege that between December 1, 2007 and December 31, 2013 (the "Class Period"), Credit Suisse and its conspirators entered into and engaged in a conspiracy to widen, fix, stabilize, or maintain spreads in the foreign exchange ("FX") market in violation of Sections

1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§1, 3.  The Court has certified an issue class

pursuant to F.R.C.P. 23(c)(4) to adjudicate two elements of that claim: "(1) the existence of a

conspiracy to widen spreads in the spot market and (2) the CS Defendants' participation in the

conspiracy," on behalf of an "OTC Class" consisting of:

> All persons who, between December 1, 2007 and December 31, 2013
> (inclusive) entered into a total of 10 or more FX spot, forward, and/or
> swap trades directly with one or more Defendants[1] in the 52 Affected
> Currency Pairs[2] via voice or on a single-bank platform, where Defendants
> provided liquidity and such persons were either domiciled in the United
> States or its territories or, if domiciled outside the United States or its
> territories, traded in the United States or its territories.[3]

**<u>Claims that are not to be tried:</u>**

The remaining elements of Plaintiffs' Sherman Act Section 1 claim (including impact and

damages) are not to be tried.[4]  Plaintiffs' claim that the spread widening conspiracy in the FX spot

market manipulated the prices of FX futures contracts and options, in violation of Sections 1 and

3 of the Sherman Act, 15 U.S.C. §1, 3, and the Commodity Exchange Act, 7 U.S.C. §§1 et. seq.,

is not to be tried.

---

[1] The CS Defendants and Bank of America Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Inc.; Bank of Tokyo Mitsubishi UFJ Ltd.; Barclays Bank PLC, Barclays Capital Inc.; BNP Paribas Group, BNP Paribas North America, Inc., BNP Paribas Securities Corp., BNP Prime Brokerage, Inc.; Citigroup Inc., Citibank, N.A., Citicorp, Citigroup Global Markets Inc.; Deutsche Bank AG, Deutsche Bank Securities Inc.; Goldman Sachs Group, Inc., Goldman, Sachs & Co.; HSBC Holdings PLC, HSBC Bank PLC, HSBC North America Holdings, Inc., HSBC Bank USA, N.A., HSBC Securities (USA) Inc.; JPMorgan Chase & Co., JPMorgan Chase Bank, N.A.; Morgan Stanley, Morgan Stanley & Co., LLC, and Morgan Stanley & Co. International plc; RBC Capital Markets LLC; Royal Bank of Scotland Group PLC, RBS Securities, Inc.; Société Générale S.A.; Standard Chartered Bank; UBS AG, UBS Group AG, and UBS Securities LLC.

[2] *See* Notice of Certified Litigation Class (ECF No. 1509-2) (Sept. 30, 2020) at 4-5.

[3] *Id*. at 1.

[4] The parties continue to confer regarding whether the interstate commerce element will be tried in the October trial and may seek the Court's guidance.

**E.  TRIAL OF THE CASE**

Plaintiffs and Credit Suisse demand a jury trial.

Pursuant to the Court Order dated August 24, 2022 ("Trial Management Order"), a jury trial of this case is scheduled to begin on October 11, 2022.  ECF No. 1840.[5] The parties will have 16 hours each for opening statements, and direct and cross examination. The parties estimate that the trial will take two weeks.

**F.  CONSENT TO MAGISTRATE:**

The parties do not consent to trial by a magistrate judge.

**G.  WITNESS LISTS**

<u>For Plaintiffs</u>:

The following charts contain Plaintiffs' current good faith list of witnesses they will and may call at trial. The chart also includes a brief description of each witness and their expected testimony along with an estimate of the expected length of time Plaintiffs will need to question that witness in their case-in-chief (i.e., an estimate of time for direct examination of live witnesses or affirmative designations for deposition witnesses).

Plaintiffs have not included certain witnesses whom Credit Suisse have indicated they intend to call in their case-in-chief. Plaintiffs will conduct their examination of those witnesses

---

[5] The parties are in receipt of the Court's Trial Management Order dated August 24, 2022 and are evaluating how it will affect their trial presentations and reserve rights to supplement or change the components of this Joint Proposed Pretrial Order in response to that Order.  Credit Suisse states that it has not had adequate time since the Trial Management Order to implement the major changes to its witness list, exhibit list, and deposition designations that the Trial Management Order would require, particularly as Credit Suisse's defense is necessarily responsive to the case Plaintiffs will present.  Credit Suisse reserves the right to seek an adjournment of the trial date and/or to seek reconsideration of the Trial Management Order.

when Credit Suisse call them. Plaintiffs reserve the right to add such witnesses to their case-in-chief if Credit Suisse do not call them as witnesses.

Pursuant to the Court's Trial Management Order, Plaintiffs estimate they will need roughly 16 hours of trial time.

**Plaintiffs' Will Call List**

| Witness Name | Summary | Anticipated Length of Examination (in hours) |
|---|---|---|
| Eric Robin (Live) | Eric Robin is an expert on the FX industry. Mr. Robin will testify about (1) the basics of the FX market and FX trading, with primary emphasis on FX spot transactions; and (2) what a "spread" is in FX trading and how spreads constitute market makers' source of profit and customers' cost of trading; (3) the durability of and correlations across spreads. | 1.5 |
| Hal Singer (Live) | Hal Singer is an expert in antitrust economics. Mr. Singer will testify about (1) his structure analysis of the FX market which shows FX market is characterized by conditions conducive to collusion; (2) his conduct analysis of electronic communications among Defendant banks which shows Defendant banks routinely communicated customer spreads and Credit Suisse participated in such communications; and (3) his performance analysis which shows that the bid-ask spreads widened during the Class Period and narrowed once multibank chatrooms closed. | 2.5 |

| Witness Name | Summary | Anticipated Length of Examination (in hours) |
|---|---|---|
| Jason Katz (Live) | Jason Katz traded FX at BNP Paribas and Barclays during the Class Period. Mr. Katz participated in multiple chat rooms with FX traders from competitor banks and pleaded guilty to price fixing. He will testify about (1) his knowledge of the FX market; (2) his chat room communications with FX traders from competitor banks; and (3) guilty pleas and his knowledge of other FX traders' conduct in the FX market during the Class Period. | 1 |
| Keith Underwood (Live) | Keith Underwood was Credit Suisse's FX industry expert at the class certification stage. Mr. Underwood was also the Head of FX trading at Standard Chartered during the Class Period. He will testify about his knowledge of the FX market and the conduct of FX traders in multibank chat rooms during the Class Period. | 1 |
| Peter Little (Live) | Peter Little traded FX at Credit Suisse, HSBC, and Barclays during the Class Period. Mr. Little served as Barclays' Head of G10 FX Spot trading in New York; HSBC's Head of G10 FX Trading, and Credit Suisse' Director of FX Spot Trading. Mr. Little and the traders under Mr. Little's supervision participated in multiple chat rooms with FX traders from competitor banks. He will testify about (1) his knowledge of the FX market; (2) his chat room communications with FX traders from competitor banks; and (3) his knowledge about the conduct and chat room communications of traders under his supervision. | 0.75 |

| Witness Name | Summary | Anticipated Length of Examination (in hours) |
|---|---|---|
| Angus Greig (Deposition Designation) | Angus Greig traded FX at Deutsche Bank and HSBC during the Class Period. Angus Greig was Deutsche Bank's former FX Chief Dealer. Mr. Greig and the traders under Mr. Greig's supervision participated in multiple chat rooms with FX traders from competitor banks. He will testify about (1) his knowledge of the FX market; (2) his chat room communications with FX traders from competitor banks; and (3) his knowledge about the conduct and chat room communications of the traders under his supervision. | 0.5 |
| Daniel Wise (Deposition Designation) | Daniel Wise traded FX at Credit Suisse and Barclays during the Class Period. Mr. Wise was the former Managing Director of FX spot trading for Barclays in London and the former Global Head FX Spot GCEM trading for Credit Suisse. Mr. Wise and the traders under Mr. Wise's supervision participated in multiple chat rooms with FX traders from competitor banks. Plaintiffs will ask Mr. Wise about (1) his knowledge of the FX market; (2) his chat room communications with FX traders from competitor banks; (3) his knowledge about the conduct and chat room communications of the traders under his supervision.  Mr. Wise will invoke his Fifth Amendment privilege against self-incrimination in response to Plaintiffs' questions. | 0.3 |
| Edward Pinto (Deposition Designation) | Edward Pinto traded FX at HSBC during the Class Period. Mr. Pinto participated in multiple chat rooms with FX traders from competitor banks. Plaintiffs will ask Mr. Pinto about (1) his knowledge of the FX market; and (2) his chat room communications with FX traders from competitor banks. Mr. Pinto will invoke his Fifth Amendment privilege against self-incrimination in response to Plaintiffs' questions. | 0.2 |

| Witness Name | Summary | Anticipated Length of Examination (in hours) |
|---|---|---|
| Jamie Lawes (Deposition Designation) | Jamie Lawes traded FX at Credit Suisse and Bank of America during the Class Period. Mr. Lawes participated in multiple chat rooms with FX traders from competitor banks. He will testify about (1) his knowledge of the FX market; and (2) his chat room communications with FX traders from competitor banks. | 0.5 |
| John Erratt (Deposition Designation) | John Erratt traded FX at Barclays and Credit Suisse during the Class Period. Mr. Erratt participated in multiple chat rooms with FX traders from competitor banks. Plaintiffs will ask Mr. Erratt about (1) his knowledge of the FX market; and (2) his chat room communications with FX traders from competitor banks. Mr. Erratt will invoke his Fifth Amendment privilege against self-incrimination in response to Plaintiffs' questions. | 0.3 |
| Matthew Gardiner (Deposition Designation) | Matthew Gardiner traded FX at Barclays, UBS, and Standard Chartered during the Class Period. Mr. Gardiner participated in multiple chat rooms with FX traders from competitor banks. He will testify about (1) his knowledge of the FX market; (2) his chat room communications with FX traders from competitor banks; and (3) his knowledge of the guilty pleas entered by Barclays and UBS. | 1 |

| Witness Name | Summary | Anticipated Length of Examination (in hours) |
|---|---|---|
| Mitesh Parikh (Deposition Designation) | Mitesh Parikh traded FX at Goldman Sachs during the Class Period. Mr. Parikh participated in multiple chat rooms with FX traders from competitor banks. Plaintiffs will ask Mr. Parikh about (1) his knowledge of the FX market; and (2) his chat room communications with FX traders from competitor banks. Mr. Parikh will invoke his Fifth Amendment privilege against self-incrimination in response to Plaintiffs' questions. | 0.2 |
| Rohan Ramchandani (Deposition Designation) | Rohan Ramchandani traded FX at Citi during the Class Period. Mr. Ramchandani participated in multiple chat rooms with FX traders from competitor banks. Plaintiffs will ask Mr. Ramchandani about (1) his knowledge of the FX market; and (2) his chat room communications with FX traders from competitor banks. Mr. Ramchandani will invoke his Fifth Amendment privilege against self-incrimination in response to Plaintiffs' questions. | 0.5 |
| Stuart Dunn (Deposition Designation) | Stuart Dunn traded FX at Deutsche Bank, Société Générale, and RBC during the Class Period. Mr. Dunn participated in multiple chat rooms with FX traders from competitor banks. He will testify about (1) his knowledge of the FX market; and (2) his chat room communications with FX traders from competitor banks. | 0.5 |
| A Representative for Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") (Live) | Oklahoma Firefighters is a class representative of the OTC class.  A corporate representative of Oklahoma Firefighters will testify about Oklahoma Firefighters' responsibilities as the class representative and Oklahoma Firefighters' FX trading with Defendant banks, including Credit Suisse. | 0.2 |

| Witness Name | Summary | Anticipated Length of Examination (in hours) |
|---|---|---|
| Witness to Attest to FRE 1006 Summary Exhibit(s) (Live) | Plaintiffs' FRE 1006 Witness will testify regarding the accuracy of the data and information compiled in the FRE 1006 Summary Exhibit(s). | 0.3 |
| Summary of Fifth Amendment Depositions | Plaintiffs will ask permission to present to the jury a one paragraph summary for the following Fifth Amendment depositions: David Bowen, Eduardo Hargreaves, James Mullaney, Michael Keogh, Julian Munson, James Wynne, Paul Nash, Christopher Ashton, Richard Usher, Russell Katz, Mark Clark, Luxshan Thiagarajah, Michael Weston, Fr, Akshay Aiyer Fank Cahill, Roger Boehler, Clark Read, Robert DeGroot, Carly McWilliams Hosler, and Niall O'Riordan.[6] <br><br> *See- Oostendorp v. Khanna*, 937 F.2d 1177, 1179 (7th Cir. 1991 | .25 |
| **TOTAL WILL CALL TIME** | | **11.5** |

**Plaintiffs' May Call List**

| Witness Name | Summary | Anticipated Length of Examination (in hours) |
|---|---|---|
| A Representative of Board of Pensions and Retirement, Employees' Retirement System of the Government of the Virgin Islands ("Virgin Islands") (Live) | Virgin Islands is a class representative of the OTC class. A corporate representative of Virgin Islands will testify about Virgin Islands' responsibilities as the class representative and UFCW's FX trading with Defendant banks, including Credit Suisse. | 0.2 |

---

[6] Credit Suisse objects to this Request for the reasons set forth in the Credit Suisse Defendants' Motion *in Limine* No. 2 to Exclude the Testimony of Persons Invoking their Fifth Amendment Protection Against Self-Incrimination (ECF 1714)

| Witness Name | Summary | Anticipated Length of Examination (in hours) |
|---|---|---|
| Joseph Landes (Live) | Joseph Landes traded FX at Bank of America during the Class Period. Mr. Landes participated in multiple chat rooms with FX traders from competitor banks. Plaintiffs will ask Mr. Landes about (1) his knowledge of the FX market; and (2) his chat room communications with FX traders from competitor banks. Plaintiffs expect Mr. Landes to invoke his Fifth Amendment privilege against self-incrimination in response to Plaintiffs' questions. | 0.5 |
| Christopher Hatton (Live) | Christopher Hatton traded FX at HSBC and Credit Suisse during the Class Period. Mr. Hatton participated in multiple chat rooms with FX traders from competitor banks. He will testify about (1) his knowledge of the FX market; and (2) his chat room communications with FX traders from competitor banks. | 1 |
| Christopher Cummins (Live) | Christopher Cummins traded FX at Citibank during the Class Period. Mr. Cummins participated in multiple chat rooms with FX traders from competitor banks and pleaded guilty to price fixing. He will testify about (1) his knowledge of the FX market; (2) his chat room communications with FX traders from competitor banks; and (3) his guilty plea and his knowledge of other FX traders' conduct in the FX market during the Class Period. | 1 |
| Natalie Williams (Deposition Designation) | Natalie Williams traded FX at Credit Suisse during the Class Period. Ms. Williams participated in multiple chat rooms with FX traders from competitor banks. She will testify about (1) her knowledge of the FX market; and (2) her chat room communications with FX traders from competitor banks. | 0.3 |
| **TOTAL MAY CALL TIME** | | **3** |

For Credit Suisse: [7]

The following charts contain Credit Suisse's current good faith lists of witnesses Credit Suisse will call and may call at trial. The charts also include (1) brief descriptions of each witness's expected testimony, and (2) an estimate of the amount of time Credit Suisse will need to question that witness in its affirmative case (*i.e.*, an estimate of time for direct examination of live witnesses or affirmative designations for deposition witnesses, not cross-examination or cross-designations).

Credit Suisse has not included certain witnesses that Plaintiffs have indicated they intend to call in their case-in-chief. Credit Suisse reserves the right to add such witnesses to its lists if Plaintiffs do not call them.

| Credit Suisse Will Call List | | |
|---|---|---|
| **Witness Name / Manner of Appearance** | **Description of Testimony** | **Time Estimate (Direct + Redirect)** |
| Witness re: FRE 1006 Summary | Testimony regarding FRE 1006 summary of evidence. | 1 hour |
| Altadonna, John (Live) | Testimony regarding his role as a trader in FX marketplace at market-making bank. | 1 hour |
| Condie, Niall (Live) | Testimony regarding his FX supervisory/ management role at Credit Suisse during relevant period. | 2 hours |

---

[7] Credit Suisse's exhibit list, deposition designations, and witness list were developed prior to receiving the Trial Management Order and are based on the parties' meet and confer discussions over the past few months as to the exhibits, witnesses, and deposition designations Plaintiffs indicated they would seek to present at trial.  Credit Suisse is working to revise its expected trial presentation consistent with the Trial Management Order, and Plaintiffs' recent revisions to their intended presentation following that Order, and Credit Suisse will provide revised lists, including revised time estimates, as soon as practical.

| Credit Suisse Will Call List | | |
|---|---|---|
| Kleidon, Allan (Live) | Expert testimony regarding flaws in Plaintiffs' expert analyses, and empirical analysis of trading in the FX marketplace. | 2 hours |
| Mathur, Divya (Live) | Expert testimony regarding the non-susceptibility of the FX marketplace to collusion, information sharing in the FX marketplace, spread matrix submissions by Defendants, flaws in Dr. Singer's analyses, and economic rationales behind decisions to settle litigation. | 4 hours |
| Melvin, Michael (Live) | Expert testimony regarding FX trading, the structure of the FX marketplace and relevant features, flaws in Plaintiffs' expert analyses, and information sharing in the FX marketplace. | 4 hours |
| BlackRock representative (Live) | Testimony regarding authentication of materials produced by Blackrock. | .5 hours |
| Walker, Brian (Live) | Testimony regarding his role as a trader in FX marketplace at market-making bank. | 2 hours |
| Yanez, Steve (Live) | Testimony regarding his FX supervisory/ management role at Credit Suisse during relevant period. | 2 hours |
| Andrew, Gordon (Designation) | Testimony regarding roles of trader in FX marketplace at market-making bank. | 0:38:01 |
| Connors, Kevin (Designation) | Testimony regarding roles of trader in FX marketplace at market-making bank. | 0:08:09 |
| Dunn, Stuart (Designation) | Testimony regarding roles of trader in FX marketplace at market-making bank. | 0:49:01 |
| Drysdale, Ian (Designation) | Testimony regarding roles of trader in FX marketplace at market-making bank. | 0:21:21 |
| Gardiner, Matthew (Designation) | Testimony regarding roles of trader in FX marketplace at market-making bank. | 1:17:20 |

| Credit Suisse Will Call List | | |
|---|---|---|
| Gibbons, Richard (Designation) | Testimony regarding roles of trader in FX marketplace at market-making bank. | 0:41:53 |
| Greig, Angus (Designation) | Testimony regarding roles of trader in FX marketplace at market-making bank. | 0:36:39 |
| Katz, Andre (Designation) | Testimony regarding roles of trader in FX marketplace at market-making bank. | 0:27:10 |
| King, Graeme (Designation) | Testimony regarding roles of trader in FX marketplace at market-making bank. | 0:53:03 |
| Lawes, Jamie (Designation) | Testimony regarding roles of trader in FX marketplace at market-making bank. | 01:13:17 |
| Leighton, Mike (Designation) | Testimony regarding roles of trader in FX marketplace at market-making bank. | 0:55:33 |
| Williams, Natalie (Designation) | Testimony regarding roles of trader in FX marketplace at market-making bank. | 0:36:17 |
| Witt, James (Designation) | Testimony regarding roles of trader in FX marketplace at market-making bank. | 1:56:49 |
| | **TOTAL WILL CALL TIME:** | **29.1 hours** |

| Credit Suisse May Call List | | |
|---|---|---|
| **Witness Name / Manner of Appearance** | **Description of Testimony** | **Time Estimate (Direct + Redirect)** |
| | Credit Suisse reserves the right to call any witness listed on Plaintiffs' Will or May call Witness Lists. | |
| Brunner, Simon (Live) | Testimony regarding his role as an FX salesperson at market-making bank. | 1 hour |
| Callaghan, John (Live) | Testimony regarding his role as a trader in FX marketplace at market-making bank. | 1 hour |

| Credit Suisse May Call List | | |
|---|---|---|
| Dima, Brett (Live) | Testimony regarding his role as an FX salesperson at market-making bank. | 1 hour |
| Hatton, Christopher (Live) | Testimony regarding his role as a trader in FX marketplace at market-making bank. | 1 hour |
| Howarth, Braden (Live) | Testimony regarding his role as an FX salesperson at market-making bank. | 1 hour |
| Jones, Robert (Live) | Testimony regarding trading as buy-side FX marketplace participant and role as class representative. | 1 hour |
| Krupkin, Michael (Live) | Testimony regarding his role as a trader in FX marketplace at market-making bank. | 1 hour |
| McCrary, Justin (Live) | Expert testimony regarding errors in Dr. Singer's regression analysis. | 1 hour |
| Munley, John (Live) | Testimony regarding his role as a trader in FX marketplace at market-making bank. | 1 hour |
| Napoli, Anthony (Live) | Testimony regarding his role as an FX salesperson at market-making bank. | 1 hour |
| Reardon, Regina (Live) | Testimony regarding trading as buy-side FX marketplace participant and role as class representative. | 1 hour |
| Sirowich, Paula (Live) | Testimony regarding her role as an FX salesperson at market-making bank. | 1 hour |
| Custodian(s) of Records/Corporate Representative(s) of Bank of America (Live) | | .5 hours |
| Custodian(s) of Records/Corporate Representative(s) of Bank of Tokyo-Mitsubishi (Live) | | .5 hours |
| Custodian(s) of Records/Corporate | | .5 hours |

| Credit Suisse May Call List | | |
|---|---|---|
| Representative(s) of Barclays<br><br>(Live) | | |
| Custodian(s) of Records/Corporate Representative(s) of BNP Paribas<br><br>(Live) | | .5 hours |
| Custodian(s) of Records/Corporate Representative(s) of Citi<br><br>(Live) | | .5 hours |
| Custodian(s) of Records/Corporate Representative(s) of Credit Suisse<br><br>(Live) | | .5 hours |
| Custodian(s) of Records/Corporate Representative(s) of Deutsche Bank<br><br>(Live) | | .5 hours |
| Custodian of Records/Corporate Representative of Goldman Sachs<br><br>(Live) | | .5 hours |
| Custodian(s) of Records/Corporate Representative(s) of HSBC<br><br>(Live) | | .5 hours |
| Custodian of Records/Corporate Representative of J.P. Morgan | | .5 hours |

| Credit Suisse May Call List | | |
|---|---|---|
| (Live) | | |
| Custodian(s) of Records/Corporate Representative(s) of Morgan Stanley<br><br>(Live) | | .5 hours |
| Custodian(s) of Records/Corporate Representative(s) of Royal Bank of Canada<br><br>(Live) | | .5 hours |
| Custodian(s) of Records/Corporate Representative(s) of Scotland/ Natwest<br><br>(Live) | | .5 hours |
| Custodian(s) of Records/Corporate Representative(s) of Societe Generale<br><br>(Live) | | .5 hours |
| Custodian(s) of Records/Corporate Representative(s) of Standard Chartered<br><br>(Live) | | .5 hours |
| Custodian(s) of Records/Corporate Representative(s) of UBS<br><br>(Live) | | .5 hours |
| **TOTAL MAY CALL TIME:** | | **19.5 hours** |

## H.  DEPOSITION DESIGNATIONS

The parties have jointly requested permission to provide the following deposition materials to the Court via FTP link:

- **Exhibit A**: A PDF file containing the designations for each witness affirmatively designated by Plaintiffs along with the related counter-designations and objections from  Credit Suisse.  This PDF is organized by witness in alphabetical order with a slip sheet between the designations for each witness.  Plaintiffs' designations and  objections are identified in <mark>yellow</mark>; Credit Suisse's designations and objections are identified in <mark>blue</mark>.

- **Exhibit B**: A PDF file containing the designations for each witness affirmatively designated by Credit Suisse along with the related counter-designations and objections from Plaintiffs.  This PDF is organized by witness in alphabetical order with a slip sheet between the designations for each witness.  Plaintiffs' designations and  objections are identified in <mark>yellow</mark>; Credit Suisse's designations and objections are identified in <mark>blue</mark>.

- **Deposition Excerpts Folder**: A folder with separate PDF files for each witness transcript designated by one or both parties.  Within the folder, and consistent with Individual Rule IV.b.2(g), the Court will find a PDF file containing a highlighted and excerpted transcript for each witness with relevant parts marked to show the dispute.  Plaintiffs' designations and objections are identified in <mark>yellow</mark>; Credit Suisse's designations and objections are identified in <mark>blue</mark>.

The parties reserve the right to modify, withdraw, amend, or add to their deposition designations prior to and during trial.

In light of the Court's Trial Management Order, the parties are working to narrow the designations and the objections that the Court will need to resolve before or at trial.

## I. PROPOSED EXHIBITS AND DEMONSTRATIVE AIDS; OBJECTIONS TO PROPOSED EXHIBITS

Plaintiffs' Exhibit List, including Credit Suisse's objections thereto, is attached as Tab 1 hereto.  Credit Suisse's Exhibit List, including Plaintiffs' objections thereto, is attached as Tab 2 hereto.  As set forth in ECF No. 1837, the parties anticipate using FRE 1006 summaries and demonstratives in support of their respective cases in chief and propose to submit a joint trial procedures stipulation to the Court two weeks before the final pre-trial conference.

Subject to the documents being admitted into evidence, the parties reserve the right to use affirmatively the documents identified on either party's exhibit list.

## J. WRITTEN DISCOVERY RESPONSES AND OBJECTIONS

For Plaintiffs:

Plaintiffs do not intend to offer any written discovery responses into evidence.

For Credit Suisse:

| Defendants' Interrogatory | Plaintiffs' Response | Plaintiffs' Objections |
|---|---|---|
| 1) Do You contend that Defendants entered into an unlawful agreement with each other to fix bid-ask spreads? If Your response is anything other than an unqualified "no:" (a) identify every entity and person whom you believe participated in the alleged unlawful agreement and the specific date (day, month, year) | Plaintiffs allege that Credit Suisse and its co-conspirators engaged in a conspiracy to fix prices customers paid to trade FX or otherwise increase customers' trading costs by artificially widening spreads they charged through the exchange and exploitation of price-driving competitive sensitive information ("CSI") in chatrooms, as well as other means of communication. Defendants engaged in a single overarching combination, agreement, and/or understanding to fix FX prices by artificially widening spreads on FX spot, forward, and swap transactions in at least 52 | Partial designation (FRE 106); Irrelevant (FRE 401 & 402); Unfair prejudicial, confusing the issues, (FRE 403). |

| Defendants' Interrogatory | Plaintiffs' Response | Plaintiffs' Objections |
|---|---|---|
| when that entity or person became a participant in the alleged unlawful agreement, (b) describe in detail every act that each such entity and person took to manifest its decision to join the alleged unlawful agreement, (c) state every alleged object or result of the alleged unlawful agreement, and (d) state with particularity the precise terms of the alleged unlawful agreement, including any changes therein during the Class Period. | currency pairs, from at least December 1, 2007 until December 31, 2013. The conspiracy was effectuated by a widespread scheme amongst FX trader employees of Defendants ("FX traders") to exchange and exploit CSI for their own benefit and to the detriment of class members in electronic chatrooms and by other means ("collusive conduct"). Defendants' conspiracy was effectuated through their FX traders, whose myriad chats over the course of several years evidence a conscious commitment to a common course of price fixing. | |
| 2) State whether You contend that the alleged unlawful agreement included a specific agreement regarding the percentage, pips, or other quantitative measure by which to fix spreads, and identify the facts and evidence that form the basis for Your contention, including identifying the percentage, pips or other quantitative measures that Defendants agreed upon for each currency pair, FX instrument type, and size transaction that you contend was part of the unlawful agreement. | Plaintiffs allege that Credit Suisse and its co-conspirators engaged in a conspiracy to fix prices customers paid to trade FX or otherwise increase customers' trading costs by artificially widening spreads they charged through the exchange and exploitation of price-driving competitive sensitive information ("CSI") in chatrooms, as well as other means of communication. Defendants engaged in a single overarching combination, agreement, and/or understanding to fix FX prices by artificially widening spreads on FX spot, forward, and swap transactions in at least 52 currency pairs, from at least December 1, 2007 until December 31, 2013. The conspiracy was effectuated by a widespread scheme amongst FX trader employees of Defendants ("FX traders") to exchange and exploit CSI for their own benefit and to the detriment of class members in electronic chatrooms and by other means ("collusive conduct"). Defendants' conspiracy was effectuated through their FX traders, whose myriad chats over the course of several years evidence a conscious commitment to a common course of price fixing. | Partial designation (FRE 106); Irrelevant (FRE 401 & 402); Unfair prejudicial, confusing the issues, (FRE 403). |

21

| Defendants' Interrogatory | Plaintiffs' Response | Plaintiffs' Objections |
|---|---|---|
| | Although they sometimes did, Defendants did not need to agree on a specific amount for each transaction, currency pair, FX instrument type, or size of transaction in order to fix prices by artificially widening spreads. Instead, Defendants' conspiracy, and acts in furtherance thereof, had a market-wide effect of widening and/or stabilizing FX spreads on virtually all transactions within the market. In some instances, Defendants explicitly agreed upon the "right spread" to quote their customers.  But Defendants' price fixing was effectuated and reinforced by more than  individualized discussions and agreements about specific spreads to quote. Rather, as discussed in the Response to Defendants' Interrogatory No. 4 and in the expert reports of Eric Robin and Robin Poynder, spreads are relatively stable over time. Merits Report of Eric Robin (January 23, 2020) ("Robin Merits Report") at ¶¶ 24, 47; Reply Report of Robin Poynder (August 13, 2020) ("Poynder Reply Report") at ¶ 26. Therefore traders agreed upon an acceptable range of spreads through their collusive conduct, and once acceptable spreads were established, traders did not need to continually communicate to know what spread to quote for each and every client transaction. Rather, traders could simply "check in" with each other intermittently to ensure they were quoting similar spreads. Moreover, as discussed in the Response to Defendants' Interrogatory No. 4 and in the expert reports of Eric Robin and Robin Poynder, the spreads quoted by traders in one  currency pair correlated with other currencies pairs such that, e.g., fixing the spread in EUR/USD also had the effect of stabilizing or widening spreads in EUR/GBP and GBP/USD. Merits Report of Robin Poynder (January 23, 2020) ("Poynder Merits Report") at ¶ 74; Robin Merits Report ¶ at 74. Also, fixing the spreads in 50 million EUR/USD would result in stabilizing or widening spreads | |

| Defendants' Interrogatory | Plaintiffs' Response | Plaintiffs' Objections |
|---|---|---|
| | in 10 million, 100 million, and 200 million EUR/USD. Because of these horizontal correlations among currency pairs and vertical correlations by trade size, Defendants' traders did not need to fix the spread of every trade to stabilize or widen spreads across the market.<br><br>Further, Defendants, including Credit Suisse, regularly shared and agreed on spreads for their internal spread matrices or grids—a pricing matrix typically prepared upon a customer's request or provided to the customer on a scheduled basis that lists what spread, in normal market conditions, a dealer bank would anticipate quoting in a specified quantity of a specified currency pair. Spread matrices generally covered a number of currency pairs at different amounts. Spread matrices often lasted several months before being updated. Spread matrices were built by dealer banks in such a way that although indicative, customer spreads remain valid—or executable—the vast majority of the time. Defendants used the matrices as a price floor for customers. By agreeing on prices to include in spread matrices, Defendants did not need to communicate about what spread to quote on each transaction, but were instead able to refer to their agreed-upon matrices to reference the price-fixed spread to quote. | |
| 4) Identify all means or mechanisms by which Defendants coordinated and maintained the alleged unlawful agreement across all relevant dimensions during the Class Period, including but not limited to the FX instruments, currency pairs, trade sizes, customer types, and trade venues included in the alleged unlawful agreement. | Traders generally operated under a discreet "gentleman's agreement," under which traders understood that if they provided one another with information in chatrooms, in response, they would receive information from other traders. Traders also explicitly agreed to collude on spreads. The mutual exchange of information allowed them to coordinate behavior and fix prices.<br><br>Among the means and mechanisms Defendants used to fix prices by artificially widening spreads, traders: (a) coordinated trading; (b) shared customer order flow information, including  customer identities; (c) explicitly | Partial designation (FRE 106); Irrelevant (FRE 401 & 402); Unfair prejudicial, confusing the issues, (FRE 403). |

| Defendants' Interrogatory | Plaintiffs' Response | Plaintiffs' Objections |
|---|---|---|
| | agreed on spreads to quote to customers; (d) threated to and removed traders from chatrooms who did not participate in the conspiracy; (e) maintained close personal relationships with traders from other Defendant banks; and (f) actively concealed their activities. The examples cited above are not exhaustive but merely illustrative, and Plaintiffs will introduce into evidence additional examples at trial. Traders engaged in chatroom conversations on a near daily basis, which allowed them to not only coordinate on individual transactions, but create an environment in which all FX transactions were affected by the conspiracy. This conduct, as a whole, had the effect of fixing prices by artificially widening spreads on FX instruments.<br><br>The conspiracy was self-reinforcing. As stated in the Merits Reports of Eric Robin, Robin Poynder, and Hal J. Singer, Ph.D. (January 23, 2020) ("Singer Merits Report"), spreads tend to be durable over time so long as underlying market conditions remain stable. Therefore, traders agreed upon an acceptable range of spreads through their collusive conduct, and once acceptable spreads were established, traders did not need to continually communicate to know what spread to quote for each and every client transaction. Rather, traders could simply "check in" with each other intermittently to ensure they were quoting similar spreads. Moreover, the spreads quoted by traders in one currency pair correlated with other currencies pairs such that, e. g., fixing the spread in EUR/USD also had the effect of stabilizing or widening spreads in EUR/GBP and GBP/USD. Also, fixing the spreads in 50 million EUR/USD would result in stabilizing or widening spreads in 10 million, 100 million and 200 million EUR/USD. Because of these horizontal correlations among currency pairs and vertical correlations by trade size, FX traders' widening the spread for one currency | |

| Defendants' Interrogatory | Plaintiffs' Response | Plaintiffs' Objections |
|---|---|---|
| | pair and notional amount caused a market-wide impact.<br><br>Beyond self-reinforcement of individual spreads in individual chatrooms, traders were aware that the collusive conduct was pervasive throughout the FX market. Traders did not need to participate in, or even know about every chatroom or every conversation that was part of the conspiracy; instead, traders had general knowledge of the "gentleman's agreement" that pervaded throughout the market. Although traders could have determined the appropriate spreads to quote to customers through iterative quotes with customers themselves, traders instead determined the spreads to quote customers by asking competitors in chatrooms.<br><br>Traders were not siloed in separate chatrooms, hermetically sealed from other traders in other chats. Rather, the hundreds of traders participated in, collectively, thousands of chatrooms, with many traders participating in up to dozens of chatrooms at one time. They could and did blast information from one chat room into numerous other chatrooms. Traders were also connected socially, they formed personal relationships with traders at other banks through social engagements. They commuted, celebrated, vacationed, played, ate and drank with one another. Traders frequently moved between competitor banks, while generally maintaining their personal and professional relationships. In short, traders trusted one another, such that they did not need to constantly communicate in order to maintain and enforce the conspiracy. They were "mates" who did not see one another as competitors. There is a "strong market convention" among FX traders that they do not disadvantage the person who is sharing information. Together, all of these mechanisms created an efficient network through which the Defendants maintained the conspiracy. | |

| Defendants' Interrogatory | Plaintiffs' Response | Plaintiffs' Objections |
|---|---|---|
| | Defendants' traders also worked to the conceal the conspiracy, thereby allowing it to continue undetected. They used code words and other methods to conceal their conspiracy and evade surveillance. Traders also used phone calls, text messages, and in-person meetings to avoid surveillance. Finally, traders punished participants who did not share enough information. Defendants' efforts to coordinate trading, share market-critical information, explicitly agree upon spreads, threaten to and remove traders from chatrooms who did not sufficiently participate in the conspiracy, maintain contact with traders from other banks and actively conceal their activities, had the artificially widening spreads on FX instruments.<br><br>The effects of Defendants' collusive conduct was to raise and stabilize prices at least on FX spot, forward, and swap transactions, in at least 52 currency pairs, on trades of all sizes, for all customers who received liquidity, traded through single bank platforms or as voice trades. | |
| 6) Do You contend that the alleged unlawful agreement led to increased adverse selection risk that lead to wider spreads for Class members, as set forth in Dr. Hal Singer's Merits Report at ¶ 50? If Your response is anything other than an unqualified "no:" explain in detail what acts generated such increased adverse selection risk, how such increased adverse selection risk influenced transaction prices in the FX markets, and the effect of such increased adverse selection | As stated in the Singer Merits Report and the Reply Report of Hal J. Singer, Ph.D. (August 13, 2020) ("Singer Reply") Defendants' conspiracy, collusive conduct, and acts in furtherance of the conspiracy, directly widened Defendants' bid-ask spreads and had the effect of increasing adverse selection risk, causing wider spreads on FX transactions. As Dr. Singer explains, "adverse-selection risk . . . is a standard economic principle, according to which spreads will be widened when market participants are obliged to transact with better-informed counterparties such as the Defendant dealers here." Singer Merits Report at ¶ 50. Additionally, as explained by Professors Bjonnes and Ljungqvist, "market makers understand this risk and set their bid-ask quotes to ensure that they will make enough profit when dealing with uninformed traders to | Partial designation (FRE 106); Irrelevant (FRE 401 & 402); Unfair prejudicial, confusing the issues, (FRE 403). |

| Defendants' Interrogatory | Plaintiffs' Response | Plaintiffs' Objections |
|---|---|---|
| risk on spreads quoted by Defendants to Class members on all FX-Related transactions. | compensate for the losses they make when unknowingly dealing with informed traders. As adverse selection risk increases, spreads widen in the market." Expert Report of Bjonnes and Ljungqvist (May 31, 2018)at ¶ 82. Defendants' coordinated exploitation of shared CSI increased adverse selection risk, therefore widened spreads across the FX market.<br><br>FX prices are strongly affected by information asymmetries—that is, the risk of trading with a better informed counterparty. Singer Reply at ¶ 92; Callaghan Dep. at 122:24-123:5, 128:21-129:11; E. Robin Dep. at 59:11-23. Defendants' conspiracy, and acts in furtherance of that conspiracy, "exacerbated informal asymmetries in the interbank segment of the market." Singer Reply at ¶ 92. As better-informed Defendants exchanged and exploited valuable CSI, non-Defendants were at a greater informational disadvantage. *Id.*<br><br>Trading in the interbank segment is anonymous. Participants in the interbank segment, whether or not they were a member of the conspiracy, did not know whether a potential counterparty to a transaction was better-informed. *Id.* ¶ 93. This would result in wider bid-ask spreads, as participants in the interbank segment widened spreads to protect themselves from greater adverse selection risk. Because of the tight linkages between the interbank and dealer-to-customer segments, wider spreads in the interbank segment would necessarily have caused wider spreads in the dealer-to-customer segment, and vice-versa. *Id.* | |
| 14) Do You contend that Defendants that the alleged unlawful agreement led to wider bid-ask spreads for Class members' FX forwards, FX swaps, and FX options transactions? If Your response is anything | Trading for FX forwards and FX swaps are based on the spot rate. The rate for a forward transaction is the spot rate for that currency pair plus "forward points" representing the interest rate differential between the two currencies over the period from the spot value date to the forward value date. As such, if the spot rate has widened, so too will the forward rate have | Partial designation (FRE 106); Irrelevant (FRE 401 & 402); Unfair prejudicial, confusing the issues, (FRE 403). |

| Defendants' Interrogatory | Plaintiffs' Response | Plaintiffs' Objections |
|---|---|---|
| other than an unqualified "no:" identify the mechanisms or processes leading to such changes in the markets for FX forwards, FX swaps, and FX options. | widened. *See, e.g.*, Robin Merits Report at ¶ 32; Yanez Dep. at 63:7-16 (testifying that spot transaction is a foundation for other instruments and the prices of other FX instruments are derived from underlying FX spot transactions). Therefore, Plaintiffs contend that just as the Defendants' conspiracy fixed FX prices by artificially widening spreads on FX spot transactions so too did Defendants' conspiracy fix prices by artificially widening spreads on forwards transactions. Likewise, swaps are combinations of two outright forwards in opposite directions. Swaps are priced from spot rates with the addition of "swap points." Any change in the spot rate will result in a change to the swap rate. Swaps are damaged only to the extent that they are unbalanced, because if one leg is damaged the other leg profits.. *See* Report of Geir Bjønnes and Alexander Ljungqvist in Support of Class Certification at ¶ 46. | |

## K.  LIST OF *IN LIMINE* MOTIONS

| Motion *in Limine* | ECF No. | Status | ECF No. of Order |
|---|---|---|---|
| Plaintiffs' Motion *in Limine* No. 1 to Exclude Percipient Witnesses from the Courtroom Unless They Are Testifying | 1712 | Resolved via Court-Ordered stipulation | 1790 |
| Plaintiffs' Motion *in Limine* No. 2 to Exclude Evidence and Argument Regarding Purported Pro-Competitive Justifications and Absence of Anticompetitive Effects | 1719 | Fully briefed | |
| Plaintiffs' Motion *in Limine* No. 3 to Exclude Evidence and Testimony About Existence of the Conspiracy and Anticompetitive Conduct Through Defense Expert Witnesses | 1722 | Fully briefed | |

| Motion *in Limine* | ECF No. | Status | ECF No. of Order |
|---|---|---|---|
| Plaintiffs' Motion *in Limine* No. 4 to Exclude Mention of Treble Damages or Attorneys' Fees | 1728 | Resolved via Court-Ordered Stipulation | 1789 |
| Plaintiffs' Motion *in Limine* No. 5 for Order that Co-Conspirator Statements Are Within the Fed. R. Evid. 801(d)(2)(E) | 1733 | Fully briefed | |
| Plaintiffs' Motion *in Limine* No. 6 to Exclude Testimony and Argument that This Case Involves Multiple Markets | 1740 | Fully briefed | |
| Plaintiffs' Motion *in Limine* No. 7 to Exclude Argument and Evidence Conflating Spread Pricing Information with "Market Color" | 1747 | Fully briefed | |
| Plaintiffs' Motion *in Limine* No. 8 to Exclude Expert Testimony Regarding Intent, State of Mind or Motive | 1754 | Fully briefed | |
| Credit Suisse Defendants' Motion *in Limine* No. 1 to Exclude Evidence of Consent Order with the New York State Department of Financial Services | 1710 | Fully briefed | |
| Credit Suisse Defendants' Motion *in Limine* No. 2 to Exclude the Testimony of Persons Invoking their Fifth Amendment Protection Against Self-Incrimination | 1714 | Fully briefed | |
| Credit Suisse Defendants' Motion *in Limine* No. 3 to Exclude Evidence of Criminal Prosecutions of Non-Credit Suisse Persons and Entities | 1726 | Fully briefed | |
| Credit Suisse Defendants' Motion *in Limine* No. 4 to Exclude Factual Admissions Contained in Guilty Pleas and Plea Allocutions of Non-Credit Suisse Persons and Entities | 1736 | Fully briefed | |
| Credit Suisse Defendants' Motion *in Limine* No. 5 to Exclude Evidence of Non-Credit Suisse Consent Orders and Regulatory Settlements | 1744 | Fully briefed | |

| Motion *in Limine* | ECF No. | Status | ECF No. of Order |
|---|---|---|---|
| Credit Suisse Defendants' Motion *in Limine* No. 6 to Exclude Evidence Concerning the Board of Governors of the Federal Reserve Systems Investigations of and Findings Concerning Peter Little and Michael Weston | 1750 | Fully briefed | |
| Credit Suisse Defendants' Motion *in Limine* No. 7 to Exclude Internal Bank Policies Evidence | 1758 | Fully briefed | |
| Credit Suisse Defendants' Motion *in Limine* No. 8 to Exclude Evidence Concerning Subsequent Remedial Measures | 1764 | Fully briefed | |
| Credit Suisse Defendants' Motion *in Limine* No. 9 to Exclude Communications Without a Direct Connection to United States Commerce | 1770 | Fully briefed | |
| Credit Suisse Defendants' Motion *in Limine* No. 10 to Exclude Other Bad Acts Evidence | 1775 | Fully briefed | |
| Credit Suisse Defendants' Motion *in Limine* No. 11 to Preclude Keith Underwood From Testimony and to Exclude Reports and Statements Authored by Keith Underwood in Separate Proceedings Involving UBS AG | 1779 | Fully briefed | |

## L.  STIPULATIONS OF UNCONTESTED FACTS

The parties stipulate to the following facts.  In light of the Court's Trial Management Order, the parties are working to identify additional uncontested facts and will submit a stipulation by September 9, 2022.

1.      During the Class Period, between $3 trillion and $5.3 trillion USD per day was traded in the FX market for all FX instruments worldwide, with up to $1.3 trillion of that total per

day traded in the United States in some years.  Daily FX spot transactions volume alone doubled

between 2007 and 2013, from approximately $1 trillion to $2 trillion. *See* 03/05/21 Pls.' Response

to Rule 56.1 at ¶ 42.

      2.      Trading in the FX market occurs 24 hours per day and over 252 trading days per

year.  The following chart illustrates the 24-hour nature of the OTC market:

| **FX MARKET HOURS** | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| New Zealand | | | | | | | | | | | | | | | | | | | | | | | |
| | Sydney | | | | | | | | | | | | | | | | | | | | | | |
| | | Tokyo | | | | | | | | | | | | | | | | | | | | | |
| | | | | Hong Kong | | | | | | | | | | | | | | | | | | | |

| **FX MARKET HOURS** | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Frankfurt | | | | | | | | | | | | | | |
| | | | | | | | | | | | London | | | | | | | | | | | | |
| New York | | | | | | | | | | | | | | | | | | New York | | | | | |

*See* 03/05/21 Pls.' Response to Rule 56.1 at ¶ 43.

      3.      During the Class Period, FX trading by volume is primarily done over-the-counter

("OTC") in that counterparties trade with each other without a formalized exchange. *See* 03/05/21

Pls.' Response to Rule 56.1 at ¶ 44.

      4.      Currencies are bought or sold in pairs.  *See* 03/05/21 Pls.' Response to Rule 56.1 at

¶ 45; CS Answer to Third Consolidated Amended Complaint (ECF No. 682) at ¶ 83.

      5.      Trading in the FX marketplace generally occurs in two different "tiers" or

segments: the interdealer or interbank segment and the dealer-to-customer segment.

      6.      In the interdealer segment, market makers and other liquidity providers trade

currencies with each other to lay off risk from buy-side orders, access liquidity to fill customer

orders for currencies that they do not have in their own inventories, and to manage risk profitability. *See* 03/05/21 Pls.' Response to Rule 56.1 at ¶ 51.

7.    The difference between the bid price and the ask price is the bid-ask spread or spread. *See* 04/09/21 CS Response to Rule 56.1 at ¶ 185.

8.    A spread matrix is sometimes referred to as a spread grid. *See* 04/09/21 CS Response to Rule 56.1 at ¶ 230.

## M. DAMAGES STATEMENT

Plaintiffs do not seek damages in this trial.

## N.  OTHER REQUESTED RELIEF

Plaintiffs request that they be awarded their costs, expenses incurred since January 1, 2018 and attorneys' fees to the extent allowed by law.

Credit Suisse objects that Plaintiffs are not entitled to costs, expenses, or attorneys' fees, for which they have provided no basis and would oppose any request for fees to be awarded at this stage, particularly because Plaintiffs are not trying (and cannot prevail in this trial on) all the elements of their Sherman Act claim.  Credit Suisse reserves all rights.

## O.  UNANIMOUS VERDICT

The parties do not consent to less than a unanimous verdict.


August 26, 2022                                    Respectfully Submitted,

/s/ Christopher M. Burke
Christopher M. Burke (CB-3648)
Walter W. Noss (WN-0529)
Kristen M. Anderson (*pro hac vice*)
Kate LV (*pro hac vice*)
SCOTT+ SCOTT ATTORNEYS AT LAW
LLP
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619/233-4565
619/233-0508 (fax)
cburke@scott-scott.com
wnoss@scott-scott.com
kanderson@scott-scott.com
klv@scott-scott.com

SCOTT+ SCOTT ATTORNEYS AT LAW
LLP
David R. Scott (DS-8053)
Joseph P. Guglielmo (JG-2447)
Donald A. Broggi (DB-9661)
Sylvia M. Sokol (SS-0317)
Thomas K. Boardman (TB-0530)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212/223-6444
212/223-6334 (fax)
david.scott@scott-scott.com
jguglielmo@scott-scott.com
dbroggi@scott-scott.com
ssokol@scott-scott.com
tboardman@scott-scott.com

HAUSFELD LLP
Michael D. Hausfeld
Reena A. Gambhir (*pro hac vice*)
Timothy S. Kearns (*pro hac vice*)
Nathaniel C. Giddings (*pro hac vice*)
Sarah R. Lafreniere (*pro hac vice*)
888 16th Street NW, Suite 300
Washington, DC 20006
Telephone: 202/540-7200
202/540-7201 (fax)
mhausfeld@hausfeld.com
rgambhir@hausfeld.com

/s/   Herbert S. Washer
Herbert S. Washer
Anirudh Bansal
Jason M. Hall
Edward Moss
Tammy L. Roy
Miles Wiley
Margaret A. Barone
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
Telephone: (212) 701–3000
Facsimile: (212) 269–5420
hwasher@cahill.com
abansal@cahill.com
jhall@cahill.com
emoss@cahill.com
troy@cahill.com
mwiley@cahill.com
mbarone@cahill.com

*Attorneys for Defendants Credit Suisse
Group AG, Credit Suisse AG, and Credit
Suisse Securities (USA) LLC*

tkearns@hausfeld.com
ngiddings@hausfeld.com
slafreniere@hausfeld.com

HAUSFELD LLP
Michael P. Lehmann
Christopher L. Lebsock (*pro hac vice*)
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415/633-1908
415/358-4980 (fax)
mlehmann@hausfeld.com
clebsock@hausfeld.com

ROBBINS GELLER RUDMAN & DOWD
LLP
Patrick J. Coughlin (PC-5116)
David W. Mitchell (*pro hac vice*)
Randi D. Bandman (RB-7278)
ALEXANDRA S. BERNAY (*pro hac vice*
pending)
CARMEN A. MEDICI (*pro hac vice*
pending)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com
davidm@rgrdlaw.com
randib@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com

KOREIN TILLERY
George A. Zelcs
205 N. Michigan Avenue, Suite 1950
Chicago, IL 60601-4269
Telephone: 312/641-9760
312/641-9751 (fax)
gzelcs@koreintillery.com

KOREIN TILLERY, LLC
Stephen M. Tillery
Steven M. Berezney
505 North 7th Street, Suite 3600
St. Louis, MO 63101

Telephone: 314/241-4844
314/241-3525 (fax)
stillery@koreintillery.com
sberezney@koreintillery.com

*Class Counsel*