# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | No. 1:13-cv-07789 (LGS) |

## MEMORANDUM OF LAW IN SUPPORT OF CREDIT SUISSE DEFENDANTS' _DAUBERT_ MOTION TO EXCLUDE PLAINTIFFS' PROPOSED EXPERT OPINIONS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

LEGAL STANDARDS ...............................................................................................................1

ARGUMENT ..............................................................................................................................3

    I.    PLAINTIFFS' EXPERTS SHOULD BE PRECLUDED FROM PRESENTING FACTUAL NARRATIVE OR OPINIONS OUTSIDE THEIR EXPERTISE ...........................................................................................3

    II.    SINGER'S CONCLUSIONS REGARDING THE ALLEGED NARROWING OF SPREADS SHOULD BE EXCLUDED AS UNRELIABLE AND UNHELPFUL ........................................................................6

        A.    Singer's EBS Regression Is Fundamentally Flawed ....................................6

        B.    Singer's Cointegration Regressions Are Fundamentally Flawed .............11

    III.    PLAINTIFFS' EXPERTS' OPINIONS ABOUT TRANSMISSION AND ADVERSE SELECTION SHOULD BE EXCLUDED ..............................13

        A.    Plaintiffs' Transmission Theories Are Too Indirect to Support Liability, Rendering Them Irrelevant and Inadmissible ...........................14

        B.    Plaintiffs' Feedback Loop Opinions Are Based on Mere *Ipse Dixit* ........................................................................................................16

    IV.    PLAINTIFFS' EXPERTS' CLAIMS OF SPREAD STABILITY ARE UNRELIABLE AND SHOULD BE EXCLUDED................................................17

    V.    SINGER'S OPINIONS ABOUT THE FREQUENCY OF INFORMATION SHARING SHOULD BE EXCLUDED ...................................19

CONCLUSION........................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Agent Orange Prod. Liab. Litig.*,
   611 F. Supp. 1267 (E.D.N.Y. 1985), *aff'd sub nom.*, 818 F.2d 187 (2d Cir. 1987)................19

*Allianz Global Investors GMBH* v. *Bank of America Co.*,
   463 F. Supp. 3d 409 (S.D.N.Y. 2020) ..................................................................15–16

*Amorgianos* v. *National Rail Road Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) ..................................................................................1, 18

*Bank of America, N.A.* v. *Bear Stearns Asset Management*,
   969 F. Supp. 2d 339 (S.D.N.Y. 2013) ...........................................................................2

*Bobcar Media, LLC* v. *Aardvark Event Logistics, Inc.*,
   554 F. Supp. 3d 606 (S.D.N.Y. 2020), *aff'd*, 839 F. App'x 545 (Fed. Cir. 2021), *cert. denied*,
   142 S. Ct. 235 (2021) .................................................................................................6n

*Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse Sec. (USA) LLC*,
   752 F.3d 82 (1st Cir. 2014)........................................................................................18

*Conrad* v. *Jimmy John's Franchise*,
   LLC, 2021 WL 718320 (S.D. Ill. Feb. 24, 2021) ....................................................13n

*Crown Cork & Seal Co. Master Retirement Trust* v. *Credit Suisse First Boston Corp.*,
   2013 WL 978980 (S.D.N.Y. Mar. 12, 2013) .............................................................17

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) .............................................................................................2, 15

*Davis* v. *Carroll*,
   937 F. Supp. 2d 390 (S.D.N.Y. 2013) ..........................................................................4

*In re Elec. Books Antitrust Litig.*,
   2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) ...........................................................10

*General Electric Co.* v. *Joiner*,
   522 U.S. 136 (1997) ........................................................................................2, 12–13

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) ...................................................................................11n

*Highland Capital Mgmt., L.P.* v. *Schneider*,
   379 F. Supp. 2d 461 (S.D.N.Y. 2005).................................................................5–6, 20

*Kamakahi* v. *American Society for Reproductive Medicine*,
305 F.R.D. 164 (N.D. Cal. 2015) ........................................ 13n

*Kempner Mobile Elecs., Inc.* v. *Sw. Bell Mobile Sys.*,
428 F.3d 706 (7th Cir. 2005) ........................................ 15

*Kumho Tire Co.* v. *Carmichael*,
526 U.S. 137 (1999) ........................................ 2

*Laumann* v. *Nat'l Hockey League*,
117 F. Supp. 3d 299 (S.D.N.Y. 2015) ........................................ 13

*LinkCo, Inc.* v. *Fujitsu Ltd.*,
2002 WL 1585551 (S.D.N.Y. July 16, 2002) ........................................ 5

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
32 F. Supp. 3d 453 (S.D.N.Y. 2014) ........................................ 5n

*Malletier* v. *Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) ........................................ 20n

*Maxon Hyundai Mazda* v. *Carfax, Inc.*,
726 F. App'x 66 (2d Cir. 2018) ........................................ 13n

*Nypl* v. *JP Morgan Chase & Co.*,
2022 WL 819771 (S.D.N.Y. Mar. 18, 2022) ........................................ 12–13

*Reed Construction Data Inc.* v. *McGraw-Hill Companies, Inc.*,
49 F. Supp. 3d 385 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) ........................................ 11

*Scentsational Techs., LLC* v. *Pepsi, Inc.*,
2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018), *aff'd sub nom. ScentSational Techs. LLC* v.
*PepsiCo, Inc.*, 773 F. App'x 607 (Fed. Cir. 2019) ........................................ 4

*SEC* v. *Lek Sec. Corp.*,
370 F. Supp. 3d 384 (S.D.N.Y. 2019) ........................................ 18

*Syntel Sterling Best Shores Mauritius Ltd.* v. *TriZetto Grp.*,
2020 WL 5822058 (S.D.N.Y. Sept. 30, 2020) ........................................ 6n, 20

*Taylor* v. *Evans*,
1997 WL 154010 (S.D.N.Y. Apr. 1, 1997) ........................................ 5n

*United States* v. *Castillo*,
924 F.2d 1227 (2d Cir. 1991) ........................................ 20

*United States* v. *Ray*,
2022 WL 292800 (S.D.N.Y. Feb. 1, 2022) ........................................ 16–17

*United States* v. *Tin Yat Chin*,
   371 F.3d 31 (2d Cir. 2004)............................................................................................ 16

*US Airways, Inc.* v. *Sabre Holdings Corp.*,
   No. 11-cv-02725 (S.D.N.Y.) ...........................................................................................5n

**Rules**

Fed. R. Evid. 702 ...............................................................................................................2, 18

Fed. R. Evid. 706 .................................................................................................................11n

The Credit Suisse Defendants ("CS") respectfully submit this memorandum of law in support of their motion to exclude certain expert testimony of Dr. Hal Singer and Mr. Eric Robin.

## PRELIMINARY STATEMENT

Having identified only episodic chats that each involve, at most, a few currency pairs and a handful of traders, Plaintiffs rely on two experts to try to conjure proof of a global conspiracy across 16 banks and involving 52 currency pairs.  The first, Dr. Hal Singer, an economist, is a professional expert, who has been deposed approximately 100 times (and whose opinions have been excluded by several courts).  The second, Mr. Eric Robin, a former FX industry participant, has never been qualified as an expert.  Both experts' testimony should be excluded for several reasons.

First, Singer and Robin both offer opinions that are not expert opinions at all, but merely narrate facts (Section I).  Second, Singer's regression analysis is fatally flawed and unreliable (Section II).  Third, in opining that sporadic chats had effects beyond the currency pairs discussed in those chats, both experts rely on their own say-so rather than reliable methodologies (Section III).  Fourth, Singer and Robin both seek to bolster Plaintiffs' speculation that episodic chats concerning spreads were evidence of a market-wide conspiracy by offering unreliable opinions that spreads are stable over time (Section IV).  Finally, Singer's conclusions about the frequency of information exchanges among banks are based on abandoned and inadmissible expert testimony and are otherwise unreliable (Section V).

## LEGAL STANDARDS

District courts play a critical "gatekeeper" role with respect to expert testimony, and must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Amorgianos* v. *National Rail Road Passenger Corp.*, 303 F.3d 256, 259, 265 (2d Cir.

2002).[1]  The proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that the admissibility standards are satisfied.  *Bank of America, N.A.* v. *Bear Stearns Asset Management*, 969 F. Supp. 2d 339, 349 (S.D.N.Y. 2013).  In order to be admissible, expert testimony must be:  (1) reliable, (2) relevant, and (3) within the proper scope of expert testimony.  *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

In evaluating reliability, *Daubert* sets forth a non-exhaustive list of factors to consider, including whether the theory or technique:  (1) is testable; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; (4) is guided by standards controlling its operation; and (5) has gained general acceptance in the relevant scientific community.  *Daubert*, 509 U.S. at 593–95.  However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by *ipse dixit* of the expert."  *General Electric Co.* v. *Joiner*, 522 U.S. 136, 146 (1997).  The goal is to ensure that the expert "employ[ed] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 152 (1999).

As to relevance, the court must determine whether the expert's opinions "fit" the case at hand and thereby "assist the trier of fact to understand or determine a fact in issue."  *Daubert*, 509 U.S. at 591–92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").  Where "there is simply too great an analytical gap between the data and the opinion proffered," the testimony is neither helpful nor reliable.  *General Electric*, 522 U.S. at 136; *see also* Fed. R. Evid. 702.

---

[1] Unless otherwise noted here, internal quotation marks and citations are omitted.

## ARGUMENT

### I.  PLAINTIFFS' EXPERTS SHOULD BE PRECLUDED FROM PRESENTING FACTUAL NARRATIVE OR OPINIONS OUTSIDE THEIR EXPERTISE

In January 2020, Plaintiffs served the merits expert report of former FX trader and supposed "chat expert" Robin Poynder.  Poynder purported to analyze whether and how often interbank chatroom participants shared so-called "Competitively Sensitive Information" ("CSI") or information about spreads.[2]  Poynder claimed to offer an "empirical analysis" of the chats by reviewing a "random sample" of thousands of chats that occurred on 91 sample days and presenting the number of sample days on which he found information was improperly shared.  This analysis served as the backbone of Plaintiffs' case because it provided the factual underpinning for further statistical work by Singer that caused him to conclude that the sharing of CSI was "pervasive" during the class period.[3]

But in June 2022, for reasons unknown, and only after CS had served the report of its replacement antitrust economist, Dr. Divya Mathur,[4] Plaintiffs informed CS that they would not call Poynder at trial.  In so doing, Plaintiffs upended the entirety of the parties' collective expert discovery work and abandoned Poynder's "empirical analysis" of the chats.  Without that analysis, Plaintiffs were left with no support for Singer's conclusion that sharing of CSI among the 16 defendant banks was "pervasive," which they have now also abandoned.  DE 4.

Without Singer's conclusion that information sharing was "pervasive," Plaintiffs scrambled to find a way to tell the jury that there are "lots of spread chats."  This led Plaintiffs to

---

[2] August 26, 2022 Declaration of Herbert S. Washer ("DE") 1 (Jan. 23, 2020 Expert Report of Robin Poynder Bank Chats) ("Poynder Report") ¶ 2.

[3] DE 2 (Jan. 23, 2020 Merits Report of Dr. Hal J. Singer, Ph.D.) ("SMR") ¶ 4; DE 3 (Feb. 20, 2020 Dep. of Hal Singer) ("Singer Merits Tr.") at 491:2–492:16 (Poynder's analysis underlies Singer's opinions).  As set forth *infra* Section V, Singer may not rely on abandoned expert analysis and his opinions that do so are inadmissible.

[4] Dr. Mathur replaced Dr. Janusz Ordover, who recently died.

a new approach to Singer's testimony, which surfaced for the first time only in his rebuttal expert report to Dr. Mathur, served less than a month ago on July 31, 2022.

Singer's rebuttal report for the first time cites 2,290 chats (which overlap substantially with those on Plaintiffs' exhibit list) and claims that these chats evidence "monitoring" of the alleged conspiracy.[5] *See* DE 5 (July 31, 2022 Rebuttal Report of Hal J. Singer, Ph.D.) ("Singer Rebuttal") ¶ 10, n.39, Appendix 1.  Singer offers no empirical or any other reliable analysis to determine how many chats are necessary to monitor a conspiracy.  Instead, he simply points to chats identified by Plaintiffs' counsel, although he admits that he does not understand their import.[6]  Singer should not be permitted to testify about the number of chats, and should not be permitted to read chats into the record or put his gloss on them.[7]  *See Davis* v. *Carroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013) (experts must "stay within the reasonable confines of their subject area" and cannot opine "on an entirely different field or discipline"); *Scentsational Techs., LLC* v. *Pepsi, Inc.*, 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018), *aff'd sub nom. ScentSational Techs. LLC* v. *PepsiCo, Inc.*, 773 F. App'x 607 (Fed. Cir. 2019) (experts cannot "act as a vehicle to present a factual narrative of interesting or useful documents").

Similarly, Singer does not apply any expertise in describing regulatory settlements and

---

[5] In parallel, Plaintiffs asked the Court to declare that the ~2,600 chats on their exhibit list are non-hearsay co-conspirator statements (with the hope that they will just be bulk-admitted into evidence).  As set forth in CS's Opposition to Plaintiffs' MIL No. 5, ECF No. 1799, this request should be denied.

[6] DE 3 (Singer Merits Tr.) at 355:15–16, 356:7–11 ("There are limits to my ability to comprehend some of these chats" and "I will readily admit to the limitations that I have in understanding certain chats."); Singer Merits Tr. at 466:17–467:4 ("First of all, I'm relying on Mr. Poynder to interpret the chats or the defendants' employees to interpret their own chats.  So . . . I'm not even having to interpret a chat, which is the good news.").

[7] *See, e.g.*, SMR at ¶¶ 4 n.18, 24, 35, 45–46; Aug. 13, 2020 Merits Rebuttal Report of Hal J. Singer ("Singer Reply") at ¶¶ 11, 13–15, 79 n.210, 107, 111 n.297, 121 n.312; Singer Rebuttal at ¶¶ 4 n.10, n.12, n.14, 5 n.16, 6, 16, 18 & n.71, 20 n.80, 27, 33 n. 126, 34, 46  n.170; *see also* SMR ¶ 24 (claiming that the chats allowed Defendants to engage in monitoring and enforcement activity because the chats allowed efficient monitoring by "signaling one's pricing intentions to a rival" and enforcement took the form of "suspending chat relationships with non-cooperative participants.").

guilty pleas entered into by certain banks.  *E.g.*, DE 5 (Singer Rebuttal) ¶ 7.  He should be precluded from being a mere conduit for Plaintiffs to publish this evidence (which is inadmissible in any event) to the jury.  *See Highland Capital Mgmt., L.P.* v. *Schneider*, 379 F. Supp. 2d 461, 468–69 (S.D.N.Y. 2005) (an expert "cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence").[8]

Robin also seeks to offer his spin on the record evidence, for example, that guilty pleas and other regulatory settlements are unlikely to have occurred if "the information being shared in these chat rooms been considered proper market color."  DE 6 (Aug. 13, 2020 Merits Reply Report of Eric Robin) ("Robin Reply") ¶ 9.[9]  But Robin has no idea why the Defendants entered into guilty pleas or other regulatory settlements.  He was not involved in their negotiation, and he has no expertise relevant to evaluating the Defendants' decisions.  Exclusion of such unsupported expert opinions is particularly appropriate where, as here, testimony by individuals "familiar with those documents would be far more appropriate . . . and renders [the expert's] secondhand knowledge unnecessary for the edification of the jury."  *LinkCo, Inc.* v. *Fujitsu Ltd.*, 2002 WL 1585551, at

---

[8] *See also In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453, 462 (S.D.N.Y. 2014) (excluding expert's testimony that merely summarized findings of audit opinions, facts provided by the defendant, and the contents of other documents on the record); *Taylor* v. *Evans*, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) (rejecting portions of expert report that comprised "a narrative of the case which a lay juror is equally capable of constructing"); *US Airways, Inc.* v. *Sabre Holdings Corp.*, Order, No. 11-cv-02725 (ECF No. 468) (July 13, 2016) at 1 (barring the defendant's experts from "'sum[ming] up' the evidence to conclude that US Airways extracted pricing concessions from Sabre" because that was "factual argument based on [the expert's] opinion"); *Id.*, Order (ECF No. 470) (July 20, 2016) at 1 ("[Expert's] proposed direct testimony in paragraphs 25 to 30 is no more than improper summation and argument about the testimony of travel agencies").

[9] Robin's opinions relating to market color (*e.g.*, DE 6 (Robin Reply) ¶¶ 8, 9) should also be excluded because he admitted in his February 2020 deposition that he's never heard the term market color used in the context of FX markets. DE 7 (Feb. 27, 2020 Dep. of Eric Robin) ("Robin Tr.") at 128:13–17 ("Q. Have you ever heard the term market color used in the context of FX markets?  A. No.  I never – never heard about that term, market color."). However Mr. Robin came to obtain an understanding of the meaning of "market color" in the months after his deposition, it plainly is not the product of specialized knowledge or expertise.  His opinion is unsupported speculation and should be excluded. Robin's opinion that certain conduct "would have violated the compliance policies at the market makers where I worked and appear to violate many of Defendants' policies that have been produced in this case," DE 6 (Robin Reply) ¶ 10, should be excluded on the same grounds. Mr. Robin never worked at, and has no experience with the compliance policies of, CS or 12 of the other Defendants and he never worked in a compliance role at any bank.

*1–3 (S.D.N.Y. July 16, 2002); *see also Highland*, 379 F. Supp. 2d at 468–69 ("To the extent that [the expert] is simply rehashing otherwise admissible evidence about which he has no personal knowledge, such evidence—taken on its own—is inadmissible.").[10]

## II.   SINGER'S CONCLUSIONS REGARDING THE ALLEGED NARROWING OF SPREADS SHOULD BE EXCLUDED AS UNRELIABLE AND UNHELPFUL

Singer set out to establish that the Challenged Conduct (the alleged conspiracy) affected spreads Defendants showed to their customers (*i.e.*, the purported class members). But Singer had no data on what spreads were actually shown to customers because such data were not cataloged in any systematic way. Undeterred, Singer cobbled together a multi-step approach to try to make inferences about customer spreads. First, he used statistical analysis to determine that dealer-to-dealer spreads widened during the class period (the "EBS Regression"). He then used a separate statistical analysis to determine that EBS **prices** (not spreads) are correlated with **prices** paid by purported class members in the dealer-to-customer market (the "Cointegration Regressions"). Singer then concludes, based on these regressions, that the Challenged Conduct must have caused **spreads** in the dealer-to-customer market to widen for purported class members. DE 2 (SMR) ¶¶ 4, 55; SMR ¶¶ 57, 65. The Court should exclude this flawed analysis for several reasons.

### A.   Singer's EBS Regression Is Fundamentally Flawed

Singer should not be permitted to testify that EBS spreads were wider during the class period than they were after the class period. As set forth in the accompanying declarations from Credit Suisse's experts, Professors Allan Kleidon and Justin McCrary,[11] Singer's analysis has

---

[10] *See Bobcar Media, LLC* v. *Aardvark Event Logistics, Inc.*, 554 F. Supp. 3d 606, 612 (S.D.N.Y. 2020), *aff'd*, 839 F. App'x 545 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 235 (2021) ("[E]xpert testimony must be more than subjective belief or unsupported speculation."); *Syntel Sterling Best Shores Mauritius Ltd.* v. *TriZetto Grp.*, 2020 WL 5822058, at *3 (S.D.N.Y. Sept. 30, 2020) (expert opinion restating plaintiff's claims and providing no analysis "does not meet the standards of Rule 702, as it is not based on . . . specialized knowledge").

[11] August 26, 2022 Declaration of Allan Kleidon ("Kleidon Decl."); August 26, 2022 Declaration of Prof. Justin McCrary ("McCrary Decl.").

fundamental flaws that render it unreliable and misleading.

In his EBS Regression, Singer purports to compare EBS spreads (*i.e.*, spreads in the dealer-to-dealer market) during the class period with EBS spreads after the class period and concludes that (1) average spreads were wider during the class period and (2) after controlling for other variables, that widening could be attributed to the Challenged Conduct.  DE 2 (SMR) ¶ 55.  But Singer's effort to isolate the effects of the Challenged Conduct is based on a fundamental error.

Singer used a so-called "Dummy" variable called "Conduct" that had a value of "1" during the class period (when the conduct was allegedly occurring) and a value of "0" after the class period (when it was not).  In his attempt to control for other factors, Singer also used a series of other "Dummy" variables called "Time Fixed Effects" to represent factors that are constant within a given year but vary from year-to-year and which may influence spreads, such as the prevalence of eFX trading.  DE 2 (SMR) ¶ 54.  These "Dummy" variables also had a value of "1" and "0" depending on the year.  The following chart illustrates these variables:

*Figure 1*



| | | Dec. 2007 | 1H 2008 | 2H 2008 | 1H 2009 | 2H 2009 | 1H 2010 | 2H 2010 | 1H 2011 | 2H 2011 | 1H 2012 | 2H 2012 | 1H 2013 | 2H 2013 | 1H 2014 | 2H 2014 | 1H 2015 | 2H 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Conduct | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 |
| Singer's Year Fixed Effects | Dec. 2007–1H 2008 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2H 2008–1H 2009 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2H 2009–1H 2010 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2H 2010–1H 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2H 2011–1H 2012 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2H 2012–1H 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| | 2H 2013–1H 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| | 2H 2014–1H 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 2H 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

Corresponding Calendar Year

Source: Singer Merits Report and Production, Singer Merits Reply Report and Production; Kleidon Merits Report

Although there is nothing wrong with using "year-fixed effects" variables in general, Singer's misuse of them here is infected by key mistakes.

To begin, Singer uses July 1, 2012 through June 30, 2013 as his "year."  As McCrary explains, the standard approach for "year-fixed effects" variables is to run them by calendar year (*i.e.*, January 1 through December 31), and he is not aware of any publication in the economics

literature that uses a year-fixed effects variable with anything other than a calendar year.[12]  Singer does not explain his use of this random 12-month period, nor does he cite to any academic literature or other precedent for using anything other than a calendar year.  The reason he has used it, however, is obvious:  as Credit Suisse's experts discovered when they tried to replicate the analysis, ***statistical software would not have permitted Singer's regression to run had he used a standard calendar year***.  McCrary Decl. ¶¶ 4, 9, 24–28; Kleidon Decl. ¶ 16 n.7.

Singer's regression would not run with an appropriate (*i.e.*, calendar year) year fixed effects dummy variable because it overlaps with the conduct variable.  The technical term for this is "perfect collinearity."  McCrary Decl. ¶ 15.  Singer's use of a random 12-month period that somehow causes the regression to run simply builds a work-around to get his regression to get the result he wanted.  That is the opposite of reliable and, as Professor McCrary explains, he "cannot conceive of a Ph.D. candidate who would graduate if they submitted econometric work" with an error like Singer's.  McCrary Decl. ¶ 3.

Singer also misrepresents what effect his "Dummy" variables have on the Conduct variable he seeks to measure.  Singer's use of overlapping "Dummy" variables, as shown in Figure 1 above (*i.e.*, multiple variables capturing the same explanatory factor—changes over time), should require him to carefully consider and explain what each variable is measuring.[13]  For example, Figure 1

---

[12] McCrary Decl. ¶¶ 6, 24 ("Ordinarily one would expect that these would be based on the calendar year, rather than mid-year to mid-year. . . . I am not aware of any publication in the econometrics literatures that uses year dummy variables defined in the manner that Dr. Singer does.").

[13] McCrary Decl. ¶¶ 12–17; Kleidon Decl. ¶¶ 8–13.  If two dummy variables overlap, this affects what the regression coefficients for those variables measure.  Suppose, for example, that a researcher would like to measure the effect different factors have on daily subway ridership.  Whether it is a weekday or weekend might play a role and dummy variables for these categories in a regression would measure average ridership on weekdays and weekends, respectively.  If the model also included a dummy variable for Sundays, the "weekend" coefficient would now measure average ridership on Saturdays only (not weekends), and the Sunday dummy would measure the difference in ridership between Sundays and Saturdays.  The inclusion of the Sunday dummy means that the weekend dummy now measures something different than it did when the overlapping Sunday variable was not included.  Here, the overlap of Singer's dummy variables requires him to consider what that overlap implies for what his Conduct variable is truly measuring.  He does not.  Thus, he misinterpret his regression.  McCrary Decl. ¶¶ 28–30; Kleidon Decl. ¶¶ 8–13.

above shows that both the Conduct variable and the dummy variable for 2H 2009–1H 2010 are equal to 1 in 2H 2009 and 1H 2010.  In essence, they are both trying to capture any change in average spreads in that 12 month period.  However, because the 2H 2009–1H 2010 variable "turns on" (is 1) only during that period, and is 0 otherwise, no variation in average spread can be found in that period.  This is also the case for the similar periods shown in Figure 1.  This means that these periods can have no effect on the estimation of the Conduct variable coefficient.  It was therefore critical for Singer to revise his interpretation of what the Conduct variable coefficient actually measures.  But Singer completely fails to address it and instead draws the unsupported conclusion that the Conduct variable is a measure of average spread inflation during the entire class period.  This is simply wrong and entirely unsupported by any reliable statistical analysis.

What Singer's Conduct coefficient actually explains is variation in spreads between the last six months of 2013 and the first six months of 2014 (*i.e.*, H2 2013 and H1 2014, the only two time periods in which the Conduct Variable changes and the Year-Fixed Effects variable does not).  *See* Figure 1, *supra*.  The Conduct variable changes from 1 to 0 between H2 2013 and H1 2014.  At the same time, Singer's annual fixed effect for 12 months from H2 2013 to H1 2014 (the Year 6 variable) remains equal to 1.  Thus, those are the only two time periods in which Singer's regression can measure any change in average EBS spreads.  The bottom line is that ***even though Singer says his model measures the difference in spreads between the class period and the period after the class period (and attributes that difference to the Challenged Conduct), he is really only measuring the difference between the last six months of the class period and the first six months after the class period***.

Singer denies this, but Kleidon and McCrary offer irrefutable empirical proof.  Singer's model estimates the coefficient on the "Conduct" variable as 0.0000408, which he says is the

increase in spreads caused by the Challenged Conduct during the class period as opposed to after it.  But Kleidon ran Singer's regression to compare the last six months of the class period to the first six months after it, and he got the identical coefficient:  0.0000408.  ***Using Singer's own regression model, Kleidon showed that Singer's approach only analyzes spreads for the last six months of the Class Period and the first six months of the post-Class Period.***  *Compare* DE 2 (SMR) ¶ 55 tbl.1 (Singer's coefficient estimate on the "Conduct" variable of 0.0000408), *with* Kleidon Decl. fig. 3 & n.11 (reporting an identical value of 0.0000408 for an estimate of 2H 2013 average adjusted half-spreads minus 1H 2014 average adjusted half-spreads).[14]  This is irrefutable proof that Singer's model provides no support for his conclusion that spreads were wider during the entire class period than they were after the class period.  Kleidon Decl. ¶¶ 8–13.[15]  Singer's analysis is not only unreliable, but the errors that make it unreliable actually mean he is not measuring what he says he is measuring.

Plaintiffs will argue that these fundamental errors should go to weight not admissibility, and they will point to the fact that Singer denies all this.  But the Court cannot, consistent with the *Daubert* standard, permit such unreliable evidence to be put before the jury.  Even if CS had enough time at trial to lay this all out, it would be impenetrable for most jurors.  It is precisely such concerns that make the Court's gatekeeping function under *Daubert* so critical.  Courts routinely refuse to admit flawed statistical and expert testimony.  *See In re Elec. Books Antitrust Litig.*, 2014

---

[14] *See also* McCrary Decl. ¶ 29. To make the same point, McCrary estimates Singer's regression model while redefining Singer's "Conduct" variable to be equal to one only during the last six months of the Class Period rather than during the entire Class Period.  The estimated coefficient on this modified "Conduct" variable is also exactly the same as that estimated by Singer and Kleidon.

[15] Indeed, if the year fixed effects variables are dropped, such that the Conduct variable actually measures the difference between average spreads in the Class Period versus the clean period (controlling for other variables), the coefficient becomes negative, suggesting that the Challenged Conduct caused spreads to narrow.  The same is true if year fixed effect variables from December to November are used: the regression finds spreads narrowed due to the Conduct.  Kleidon Decl. ¶¶ 14–16.

WL 1282298, at *7 (S.D.N.Y. Mar. 28, 2014) (expert's analysis was so fundamentally flawed it was inadmissible); *Reed Construction Data Inc.* v. *McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 400 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) ("When constructing a benchmark statistic, the regression analyst may not 'cherry-pick' the time-frame or data points so as to make her ultimate conclusion stronger").

For all of these reasons, Singer should not be permitted to testify that EBS spreads were wider during the class period than they were after the class period.[16]

### B.  Singer's Cointegration Regressions Are Fundamentally Flawed

Even if the Court were to admit Singer's fundamentally flawed opinion that spreads in the *interdealer segment* were wider during the class period as a result of the Challenged Conduct, the Court should not permit Singer to extrapolate from that flawed opinion that *class members'* spreads were also wider.  Singer reaches that conclusion by using his Cointegration Regressions to tie the interdealer segment to the customer segment, but the Cointegration Regressions provide no support for this conclusion and are also fatally flawed.

*First*, the Cointegration Regressions find only that bid and ask *prices* in the dealer-to-dealer market are correlated with bid and ask *prices* on dealer-to-customer trades.  DE 2 (SMR) ¶ 4; SMR ¶¶ 57–64; DE 3 (Singer Merits Tr.) at 510:13–15 ("I'm telling you, in the second stage [Cointegration Regressions], I'm doing prices on prices.").  But the fact that *prices* between the two segments are correlated does not mean that *spreads* widened in one segment just because they

---

[16] To the extent the Court has any hesitation in excluding this analysis (and as set forth in the declarations of McCrary and Kleidon it should not), the Court should set a *Daubert* hearing to hear the experts on the question of this statistical defect in Singer's testimony.  The Court could also "use the power that [Fed. R. Evid. 706] expressly confers upon [the court] to appoint [its] own expert witness, rather leave [the court] and the jury completely at the mercy of the parties' warring experts."  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660, 665 (7th Cir. 2002) (examining competing claims regarding the "problem of multicollinearity" and remarking that the dispute "requires a knowledge of statistics that judges do not possess").

widened in the other.  Singer fails to provide any reliable methodology or academic literature to support this analytical leap, and his conclusions based on the Cointegration Regressions should be excluded on this basis alone.[17]  *See General Electric*, 522 U.S. at 146 (courts should exclude "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" and when "there is simply too great an analytical gap between the data and the opinion proffered").

*Second*, the Cointegration Regressions are unreliable because they do not do what Singer says they do.  Singer claims that he found "interbank prices are highly predictive of class member prices," DE 2 (SMR) ¶ 4; SMR at 43, but he does not actually analyze prices paid by class members.  To the contrary, Singer analyzes prices paid in dealer-to-customer trades without regard to whether the customers involved are actually in the defined class.  Indeed, he did not even attempt to exclude from his analysis the data for transactions that are expressly excluded from the class— such as transactions between a Defendant's foreign desk and a U.S. domiciliary operating abroad, resting orders, benchmark trades, and trades where a class member provided liquidity.[18]  Singer conceded at deposition that he took no steps to limit his analysis to class member trades and also took no steps to analyze whether excluding such non-class member trades would change his results.[19]

This Court's analysis in *Nypl* v. *JP Morgan Chase & Co.* is instructive.  2022 WL 819771, at *3 (S.D.N.Y. Mar. 18, 2022).  There, the plaintiffs' expert offered a causation opinion based on regression analyses finding that FX Spot Market prices correlated with end-user prices that class members paid for foreign currency.  *Id.*  But because the *Nypl* expert's regression failed to exclude

---

[17] DE 8 (Sept. 27, 2018 Dep. of Hal Singer) ("Singer Class Tr.") 248:2–20 (conceding that he did not test the relationship between interbank spreads and interbank prices); DE 9 (Mar. 12, 2020 Merits Report of Allan W. Kleidon, Ph.D.) ("Kleidon Merits Report") ¶¶ 118–21.

[18] Summary Notice of Certified Litigation Class (ECF No. 1509-1) (Sept. 30, 2020) at 1.

[19] *See* DE 3 (Singer Merits Tr.) at 510:16–525:16 (Singer did not exclude from his analysis benchmark transactions, resting orders, trades outside the U.S., and other transactions excluded from the class).

transactions that were irrelevant to the case, this Court rejected the analysis.  *Id.*  Singer's mistake is no different: his Cointegration Regressions include transactions that are excluded from the class and his results are therefore "based on data untethered to the facts of this case."  *Id.*  The analyses must be excluded.  *See id.*; *see also General Electric*, 522 U.S. at 144 (excluding expert whose conclusions regarding cancer development in adult humans were untethered from data relied upon in a study of infant mice); *Laumann* v. *Nat'l Hockey League*, 117 F. Supp. 3d 299, 315–16 (S.D.N.Y. 2015) (excluding expert whose use of average monthly prices and failure to account for price variation amounted to mathematical assumptions that rendered overall model unreliable).[20]

## III.   PLAINTIFFS' EXPERTS' OPINIONS ABOUT TRANSMISSION AND ADVERSE SELECTION SHOULD BE EXCLUDED

Plaintiffs cannot offer evidence that Defendants' traders discussed spreads in each currency pair, notional amount, and in each market segment that Plaintiffs allege was part of the conspiracy. To try to fill this evidentiary gap, Plaintiffs offer three "Transmission Theories" that they claim, without evidence, would allow a supposed agreement in one chat about one spread to affect other spreads.  But these Transmission Theories (so-called "adverse selection," "vertical and horizontal correlations," and "feedback loops") relate to harm that, as a matter of law, is too indirect to support Plaintiffs' claims and are thus irrelevant to the issues to be tried.  Moreover, Robin's and Singer's opinions about feedback loops are based on the mere say-so of Robin, who lacks any reliable methodology or expertise to opine on the topic.  These opinions should be excluded.

---

[20] Singer has been excluded for relying on insufficient data many times before.  For example, in *Maxon Hyundai Mazda* v. *Carfax, Inc.*, the Second Circuit affirmed the exclusion of Singer, explaining that a reasonable jury could not adopt Singer's conclusion which followed an analysis that omitted key data and was thus based on an underlying "methodological flaw" that "should have [been] recognized." 726 F. App'x 66, 68-69 (2d Cir. 2018). Similarly, the Northern District of California excluded Singer's testimony because he relied in part upon an unrepresentative sample of data. *Kamakahi* v. *American Society for Reproductive Medicine*, 305 F.R.D. 164, 180 (N.D. Cal. 2015). And just last year, the Southern District of Illinois excluded Singer's testimony for his "fail[ure] to adjust" his analysis to exclude irrelevant data that led "to inflated results." *Conrad* v. *Jimmy John's Franchise, LLC*, 2021 WL 718320, at *17 (S.D. Ill. Feb. 24, 2021). This Court should reject Singer's Cointegration Regressions for the same reasons.

### A. Plaintiffs' Transmission Theories Are Too Indirect to Support Liability, Rendering Them Irrelevant and Inadmissible

Plaintiffs' Transmission Theories are premised on several faulty assumptions and are untethered to the issues in this case. First, Singer opines that Defendants' conduct inflated spreads market-wide through so-called "adverse selection." *See* DE 3 (Singer Merits Tr.) at 306:12–20. Without any empirical basis,[21] Singer opines that adverse selection operated as follows: (1) Defendants' conduct increased "information asymmetries" in the FX marketplace; (2) to protect themselves from transacting with better-informed counterparties such as Defendants, non-Defendant dealer banks "defensively" widened their spreads in the interdealer segment; (3) the Defendants in turn widened their own spreads in the interdealer segment in response to the non-Defendant dealers alleged widening spreads; and (4) wider spreads in the interdealer segment somehow worked their way "into the customer segment." *See* DE 3 (Singer Merits Tr.) at 306:12–20; 479:7–14; 484:6–17; DE 2 (SMR) ¶ 50.

As additional "transmission mechanisms," Singer asserts that artificially widened spreads were transmitted throughout the customer and interbank segments, the voice and eFX segments, and across all 52 purportedly affected currency pairs and all volumes through: (1) vertical correlation (*i.e.*, as the notional volume of currency traded increased, spreads increased) and horizontal correlation (*i.e.*, as spreads in one currency pair increased, spreads in other currency pairs increased); and (2) feedback loops between the voice and electronic segments. DE 2 (SMR) ¶¶ 4, 49 & n.134 (citing DE 10 (Jan. 23, 2020 Excerpts of Merits Report of Eric Robin) ("Robin Report") ¶¶ 69, 75). Singer lacks any methodology or empirical support for these opinions and instead bases these Transmission Theories in large part on the opinions of Robin.

---

[21] Indeed, Singer confirmed that he made no efforts to quantify or measure the alleged increased "adverse selection risk" he claims resulted from Defendants' conduct. DE 3 (Singer Merits Tr.) 481:3–9, 484:6–485:12, 488:1–11.

Robin opines on a so-called "feedback loop" between voice trades on the dealer desk and quotes on electronic platforms. *See* DE 10 (Robin Report) ¶¶ 25, 69. He asserts that once a voice trade occurs, the price of that trade is incorporated in banks' algorithmic electronic pricing models, such that each voice trade affects prices offered both on the banks' electronic platforms and by voice traders. *Id.* at ¶¶ 69, 75; DE 6 (Robin Reply) ¶ 93; DE 2 (SMR) ¶ 49 n.134. Robin also opines that, based on his experience, there exist in the market horizontal correlations across spreads in different currency pairs and vertical correlations of spreads in different amounts of the same currency. DE 6 (Robin Reply) ¶¶ 46–56.

Each of these Transmission Theories must be excluded because they are not "relevant to the task at hand," *Daubert*, 509 U.S. at 597, and cannot support Plaintiffs' theory of liability. *See Kempner Mobile Elecs., Inc.* v. *Sw. Bell Mobile Sys.*, 428 F.3d 706, 713 (7th Cir. 2005) (affirming exclusion of expert evidence as "irrelevant and inapplicable to its theory of liability"). As this Court recognized in *Allianz Global Investors GMBH* v. *Bank of America Co.*, a Sherman Act plaintiff may only recover for transactions as to which the plaintiff is an efficient enforcer. 463 F. Supp. 3d 409 (S.D.N.Y. 2020). In *Allianz*, the Court dismissed plaintiffs' claims relating to algorithmically priced FX trades where the algorithm was not directly manipulated by the alleged conspiracy among voice FX traders. *Id.* at 421. As the Court explained, such transactions are "one step removed [in the chain of causation] because the purported injury is caused only by way of injuries suffered by other parties – i.e. the algorithm was not directly manipulated, but instead was affected because its inputs included data from transactions manipulated by Defendants." *Id.* "This is too indirect to meet the standard necessary for efficient enforcers." *Id.*

The same is true here. Any spread widening that allegedly resulted indirectly from the effects of increased adverse selection risk, vertical and horizontal correlations, and/or feedback

loops between the voice and eFX market segments are far too distant from the voice traders' alleged conduct to meet the efficient enforcer standard. *See id.* Any spread widening in putative class members' transactions resulting from such forces (if they even exist) would be caused only by indirect impacts stemming from one or more layers of "injuries suffered by other parties." *Id.* Because such effects cannot be the basis for liability, Plaintiffs' experts' opinions on these issues are irrelevant and thus, should be excluded.

### B. Plaintiffs' Feedback Loop Opinions Are Based on Mere *Ipse Dixit*

Robin's and Singer's feedback loop opinions should be excluded for the additional reason that they are based on the mere *ipse dixit* of Robin. Anecdotal evidence and "generalized assumptions" are inadequate grounds for expert testimony. *United States* v. *Tin Yat Chin*, 371 F.3d 31, 37, 40–41 (2d Cir. 2004); *see also United States* v. *Ray*, 2022 WL 292800, at *8 (S.D.N.Y. Feb. 1, 2022) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by *ipse dixit* of the expert."). But generalized assumptions are all Robin offers. Robin does not provide *any* evidentiary support for his theory that so-called "feedback loops" existed between voice and electronic FX trading existed—he has neither conducted a study nor cited any study to support his theory.[22]

Lacking any empirical support, Robin instead asserts that his feedback loop opinion is "based on [his] real world experience in the FX marketplace . . . and in [his] work helping to develop the trading engines at three of the leading FX market makers: Deutsche Bank, JPMorgan, and RBS." DE 6 (Robin Reply) ¶ 91. But this limited experience at three banks is insufficient to

---

[22] Indeed, Robin's testimony confirms that he commissioned no study of any kind to discover the existence of his theoretical "feedback loop." The lone authority Robin uses to support his untested theory is a discussion paper published by the Board of Governors of the Federal Reserve System on algorithmic trading. *See* DE 6 (Robin Reply) ¶ 93 & n.87. Robin selects an irrelevant quote from the paper regarding "computers trad[ing] on prices posted by humans." *Id*. This provides no support for the proposition that changes in spreads in voice transactions would lead to changes in spreads in electronic transactions.

support his opinion.[23]  Moreover, Robin never worked at and has no experience with the trading engines of CS or 12 other Defendants.  Robin's opinions are, at best, speculative.  Accordingly, Robin's so-called feedback loop and Singer's assertion that the feedback loop transmitted the wider spreads throughout the customer and interdealer segments should be excluded because they are "connected to existing data only by *ipse dixit*."  *Ray*, 2022 WL 292800, at \*8; *see also Crown Cork & Seal Co. Master Retirement Trust* v. *Credit Suisse First Boston Corp.*, 2013 WL 978980, at \*3 (S.D.N.Y. Mar. 12, 2013) ("[Expert] opinion based on unfounded extrapolation, insufficient facts or data, or unsupported suppositions should be rejected.").[24]

## IV.   PLAINTIFFS' EXPERTS' CLAIMS OF SPREAD STABILITY ARE UNRELIABLE AND SHOULD BE EXCLUDED

Singer and Robin also opine that spreads are generally "durable" or "stable" and do not change over time.  DE 10 (Robin Report) ¶¶ 24, 39, 47; DE 2 (SMR) ¶ 4 n.17.  Plaintiffs' ability to show a market-wide conspiracy that lasted six years, as opposed to isolated instances of episodic misconduct, largely depends on this baseless assumption.  Singer concedes that "if spread information became obsolete with each second-to-second movement in the EBS midpoint" it would render "the alleged conspiracy impossible to monitor and economically unviable."  DE 11

---

[23] *See* DE 7 (Robin Tr.) at 123:4–14 ("[Q.] did you have detailed knowledge of the inputs that went into pricing in the Autobahn system and how those inputs were weighted to generate a customer price?  A. No. I was not part of the quant team designing these individual algos. . . . [A]s far as putting different weights on different factors, would have been more of a risk management decision in the hands of the traders."); *id*. at 126:15–127:4 ("Q. Did you understand that the algorithms' inputs and weights changed over time?  A. Well, I was not privy to this kind of conversation or information at the bank. . . . But I was not aware of these relative weights and how these relative weights would or . . . would not have evolved over time."); *id*. at 124:25–125:4 ("I would not have the exhaustive lists of factors which would be effectively taking into account for the ultimate price formation.").

[24] Robin's feedback loop theory (and Singer's reliance thereon) is also logically flawed.  Robin's description of algorithmic pricing engines makes clear that he is not addressing the transmission of artificially widened spreads. Instead, Robin addresses a risk management process where a dealer's inventory is updated in real time to optimize overall inventory position.  DE 9 (Kleidon Merits Report) ¶ 69; DE 10 (Robin Report) ¶ 69.  Nothing in Robin's opinion on feedback loops links quoted bid-ask spreads on voice trades to spreads on other venues, or purports to quantify how spreads on voice trades might affect spreads on electronic trades.  The link Robin describes, if it exists at all, would relate to prices, not spreads.

(Aug. 13, 2020 Merits Rebuttal Report of Hal J. Singer, Ph.D.) ("Singer Merits Reply") ¶ 87.  But neither expert applies a reliable methodology to reach his opinion; instead, both rely on cherry-picked, anecdotal data that cannot support this conclusion.

Expert opinions must be based on sufficient facts or data and be the product of reliable principles and methods.  Fed. R. Evid. 702.  In determining whether an expert's analysis is reliable, the court must undertake a rigorous examination of the facts upon which the expert relied and the method by which the expert draws an opinion from those facts.  *See Amorgianos*, 303 F.3d at 267.  Courts routinely reject as unreliable expert evidence, like the spread stability opinions proffered by Plaintiffs' experts, that are based on a few cherry-picked samples.  *See SEC* v. *Lek Sec. Corp.*, 370 F. Supp. 3d 384, 419 (S.D.N.Y. 2019) (finding that "three examples d[id] not provide any adequate basis for an expert's" conclusions); *Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014) (affirming exclusion of expert who had "cherry-picked unusually volatile days").

Robin's assertion that spreads are stable is based almost entirely on a brief, hypothetical discussion in the memoir of a former Deutsche Bank trader who left that bank in 2002, years before the class period.[25]  DE 10 (Robin Report) ¶ 24 n.14.  Even that source does not  characterize spreads as stable over time.  The relevant portion of the memoir merely uses 3 pips in USD/EUR as a hypothetical spread to explain the significance of Barclays's mid-2005 decision to add an extra decimal place to its quotes.[26]  To say that this opinion falls far short of *Daubert*'s standards is an

---

[25] In his reply report, Mr. Robin also points to spreads for three currency pairs over nine days in December 2012 to attempt to support his broad conclusion that FX spreads are stable.  DE 6 (Robin Reply) ¶ 31.  But Robin fails to explain why he analyzed only nine days out of the six year class period or only three currency pairs out of the 52 currency pairs at issue.

[26] *See* DE 15 (Kevin Rodgers, *Why Aren't They Shouting: A Banker's Tale of Change, Computers and Perpetual Crisis* (2017)) 64 ("***In our imaginations*** we could hear the feedback from customers already: 'You lot are quoting 3 pips wide; Barclays are quoting 2.9 pips'") (emphasis added).

understatement.  An expert relying upon, and misstating, a hypothetical opinion in the memoir of a former market participant is the antithesis of reliable expert testimony.  *See In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1267, 1281 (E.D.N.Y. 1985), *aff'd sub nom.*, 818 F.2d 187 (2d Cir. 1987) (excluding expert testimony, in part, because reliance on another person's recollection of certain events was "insufficiently trustworthy to form the basis of an expert opinion").  Plaintiffs are free to try to call the trader to testify about his book, but they cannot use Robin as a conduit.

Second, Singer, citing Robin, also concludes that "[s]preads are relatively stable over time."[27]  DE 2 (SMR) ¶ 4 & n.17.  He bases his conclusion on anecdotal instances of chats where traders discussed similar spreads in two currency pairs at different points in time.  *Id.*  But this "analysis" does not even claim to account for every chat discussion of spreads, much less every actual spread quote (as to which Singer has no data).[28]  It is plainly cherry-picked to support Singer's desired conclusion and as such is far from the sort of reliable evidence Rule 702 requires.

Singer's and Robin's spread stability opinions should be excluded as unreliable.

## V.   SINGER'S OPINIONS ABOUT THE FREQUENCY OF INFORMATION SHARING SHOULD BE EXCLUDED

As discussed above, Singer previously opined that sharing of CSI and spreads was "pervasive" based on Poynder's sample.  Now that Plaintiffs have jettisoned Poynder, their counsel has simply selected and given to Singer 2,290 chats.  On that basis, Singer now opines that, "Defendants routinely shared customer spreads."  DE 5 (Singer Rebuttal) ¶ 7.  In other words,

---

[27] Singer ignores that his own EBS regression analysis includes assumptions that indicate spreads are not stable. Specifically, Singer acknowledges that the market is subject to many variables, including volatility and liquidity. Singer's analysis controls for volatility, "measured as the variance of *one-minute* log returns," DE 2 (SMR) ¶ 52 (emphasis added), as well as for "currency-pair-specific *hourly* fixed effects" to "account for currency-pair-specific differences in liquidity at different times of day," *id.* at ¶ 54 (emphasis added).  DE 12 (May 20, 2022 Merits Report of Divya Mathur, Ph.D.) ¶ 54 n.112.  These additions to Singer's model suggest that he not only agrees that volatility and liquidity levels affect spreads, but also that their impact on spreads may vary by the hour or even by the minute.

[28] Singer's conclusion also ignores other evidence indicating that spreads "constantly change by the second." DE 13 (June 6, 2018 Dep. of ▮▮▮▮▮▮▮) at 93:13–17; *see also, e.g.*, DE 14 (CS-FXLIT-10242496) at 496–97 ("liquidity . . . changes every hour minute second").

Singer has abandoned his conclusion that information sharing was "pervasive" because Plaintiffs concede it rested on Poynder's conclusions, which they have abandoned.  But Singer would like to replace the word "pervasive" with the word "routine" and claims that this is somehow supported by his own analysis.  This testimony is inadmissible.[29]

Expert testimony must be excluded if it is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help."  *United States* v. *Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991).  It is also inadmissible if it "is simply rehashing otherwise admissible evidence" or is "presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence."  *Highland*, 379 F. Supp. 2d at 468–69.

Singer's opinion that Defendants "routinely" shared spread information does not rely on any skill or expertise at all and is nothing more than a characterization of fact evidence that the jury is more than capable of understanding and evaluating on its own.  Nor is it based on any reliable analysis.  Singer concedes that "routinely" and "pervasively" are not technical economics terms, that he did not perform statistical analysis to reach these conclusions, and that he "was relying instead on Poynder's empiricism on that point."  *See* DE 3 (Singer Merits Tr.) at 491:14–492:4.  Thus, Singer's "routinely" standard is subjective, has no basis in statistical or economic practice, and must be excluded.  *See Syntel*, 2020 WL 5822058, at *3 (expert opinion restating plaintiff's claims was not based on scientific or specialized knowledge and was inadmissible).

## CONCLUSION

CS respectfully requests that the Court exclude certain Singer and Robin expert opinions.

---

[29] Credit Suisse understands from Plaintiffs that Singer will no longer be offering his "pervasiveness" opinion because it was based on Poynder's abandoned analysis, and so we assume he is likewise not basing his conclusion that spread sharing was "routine" on Poynder's analysis.  That, of course, would be inadmissible, because an expert "cannot simply be a conduit for the opinion of an unproduced expert."  *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007) (barring an expert from testifying about work completed by another expert who was not made available for deposition because it was "conduit testimony" outside his expertise).

Dated:  August 26, 2022
       New York, New York

**CAHILL GORDON & REINDEL LLP**

By:  /s/ Herbert S. Washer
     Herbert S. Washer
     Anirudh Bansal
     Jason M. Hall
     Edward Moss
     Tammy L. Roy
     32 Old Slip
     New York, New York 10005
     Telephone: (212) 701-3000
     Facsimile: (212) 269-5420
     hwasher@cahill.com
     abansal@cahill.com
     jhall@cahill.com
     emoss@cahill.com
     troy@cahill.com

     *Attorneys for Defendants Credit Suisse*
     *Group AG, Credit Suisse AG, and Credit*
     *Suisse Securities (USA) LLC*