```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :      13 Civ. 7789 (LGS)
IN RE FOREIGN EXCHANGE BENCHMARK                             :
RATES ANTITRUST LITIGATION                                   :      OPINION AND ORDER
                                                             :
------------------------------------------------------------ X
```

LORNA G. SCHOFIELD, District Judge:

This case concerns an alleged conspiracy among banks to fix prices in the foreign exchange ("FX") market. On September 3, 2019, a so-called issue class was certified under Federal Rule of Civil Procedure 23(c)(4) with respect to two issues: (1) the existence of a conspiracy to widen spreads in the FX spot market and (2) participation in the conspiracy by Defendants Credit Suisse Group AG, Credit Suisse AG and Credit Suisse Securities (USA) LLC (collectively, "Credit Suisse"). *In re Foreign Exch. Benchmark Rates Antitrust Litig.* ("*Forex*"), 407 F. Supp. 3d 422 (S.D.N.Y. 2019). Credit Suisse moves to decertify the class. For the reasons below, the motion is denied.

I.   BACKGROUND

Familiarity with the underlying facts and procedural history is assumed. *See, e.g.*, *Forex*, No. 13 Civ. 7789, 2022 WL 294118 (S.D.N.Y. Feb. 1, 2022) (denying cross-motions for summary judgment); *Forex*, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) (granting in part and denying in part motion to dismiss); *Forex*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015) (same).

Most of the relevant facts are recounted in detail in the Opinion and Order granting class certification. *Forex*, 407 F. Supp. 3d at 426-28. In brief, the Complaint alleges that Defendants conspired to widen spreads in the FX spot market. In the FX market, certain participants called "market makers" or "liquidity providers" make themselves available both to buy and sell a given currency pair (such as euro/dollar, a/k/a "EUR/USD"). A liquidity provider quotes a "bid" price

at which it is willing to buy and an "ask" price at which it is willing to sell. The difference between those prices is the "bid-ask spread," or simply the "spread." In general, a wider spread results in greater profit for the liquidity provider, as it buys lower and sells higher. Defendant banks, including Credit Suisse, allegedly used chat rooms to fix spreads for certain currency pairs. Fifteen of the sixteen Defendant banks have settled for over $2.3 billion, leaving Credit Suisse as the sole non-settling Defendant.

On March 1, 2019, Plaintiffs moved to certify two classes. On September 3, 2019, the Court denied certification of the "Exchange Class" for all purposes and certified the "OTC Class" for adjudication of only two issues under Rule 23(b)(3) and 23(c)(4). *Id*. at 440.

The "OTC Class" was not certified for all issues because individualized inquiries were found to be necessary to determine, for each trade, (1) whether it took place "in the United States" for purposes of the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a, (2) whether it was a "resting order" or "benchmark trade" excluded from the class; and (3) whether a Defendant provided liquidity. *Id*. at 431-35. Plaintiffs argued that the existence of a conspiracy and its class-wide effect could be established with common proof, and damages could be calculated with common formulae. *Id.* at 435-36. Rule 23(b)(3) certification was denied because those common issues did not predominate over the above individual issues. *Id*. at 436.

Two issues were certified for resolution on a class-wide basis: (1) the existence of a conspiracy to widen spreads and (2) participation in the conspiracy by Credit Suisse. *Id.* The Court found that class-wide resolution of those issues could resolve or significantly narrow the case for individual claimants. If Credit Suisse proved it did not join such a conspiracy, all claims against it would be resolved. If Plaintiffs proved that Credit Suisse did conspire, that issue would be resolved efficiently in advance of individual lawsuits. *Id.* at 437. Common issues

were found to predominate because class-wide adjudication of only the two certified issues does not require addressing individual issues. An issue class was found to be superior to requiring future individual claimants to present the same proof or to persuade courts to apply non-mutual collateral estoppel. *See id*. at 438. Credit Suisse now moves to decertify the OTC issue class.

**II.   STANDARD**

A class may be certified only if it satisfies the prerequisites of Rule 23(a), which are not at issue on this motion. The class also must be ascertainable, or capable of definition "by objective criteria." *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017); *de Lacour v. Colgate-Palmolive Co.*, No. 16 Civ. 8364, 2021 WL 1590208, at *4 (S.D.N.Y. Apr. 23, 2021). And a class must satisfy at least one of the provisions of Rule 23(b). Rule 23(b)(3) permits certification if (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Pursuant to Rule 23(c)(4), a class action also may be maintained "with respect to particular issues."

A district court's "order denying or granting class status is inherently tentative" and is "subject to revision." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.11 (1978); *see Mazzei v. Money Store*, 829 F.3d 260, 266 (2d Cir. 2016). A "district court has the affirmative 'duty of monitoring its class decisions in light of evidentiary development of the case'" and "may decertify a class if it appears that the requirements of Rule 23 are not in fact met." *Mazzei*, 829 F.3d at 266; *accord Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 262 (2d Cir. 2021). The plaintiff bears the burden of proof, *Mazzei*, 829 F.3d at 270, and must establish the Rule 23 requirements by a preponderance of the evidence, *Petrobras*, 862 F.3d at 260.

### III. DISCUSSION

#### A. Timeliness

Credit Suisse's motion is an untimely request for reconsideration, not a timely motion for decertification. Credit Suisse does not argue that a "previously satisfied requirement of Rule 23 is now lacking." *Jin*, 990 F.3d at 262. Credit Suisse instead argues that Rule 23 was never satisfied and that the class certification decision was wrong, but Credit Suisse did not move for reconsideration within fourteen days or seek leave to appeal. *See* Local Civil Rule 6.3; Fed. R. Civ. P. 23(f). While an intervening event is not required to decertify a class, Credit Suisse has not pointed to any relevant changed circumstances that would affect the previous certification. *See Jin*, 990 F.3d at 262. Credit Suisse cites interrogatories that were not answered and expert opinions not proffered and relies on legal arguments that have been available to it for years. Even in the context of class actions, "interests of finality and conservation of scarce judicial resources" place some limits on motions for reconsideration. *Cates v. Trustees of Columbia Univ.*, No. 16 Civ. 6524, 2021 WL 964417, at *1 (S.D.N.Y. Mar. 15, 2021).

Despite the untimeliness of Credit Suisse's motion, in light of a court's special duty when a proceeding will bind absent class members, the motion is addressed on the merits below.

#### B. Ascertainability

The OTC Class is ascertainable because it is "defined using objective criteria that establish a membership with definite boundaries." *Petrobras*, 862 F.3d at 264. The criteria for class membership are: (1) "10 or more FX spot, forward, and/or swap trades," (2) "directly with one or more Defendants," (3) "in the 52 Affected Currency Pairs," (4) "via voice or on a single-bank platform," (5) "where Defendants provided liquidity," (6) where "such persons [i.e. class members] were either domiciled in the United States or its territories or, if domiciled outside the

4

United States or its territories, traded in the United States or its territories," (7) during the class period, "December 1, 2007 and December 31, 2013." *Forex*, 407 F. Supp. 3d at 440 (certifying the class). Each criterion is objective, and together they form definite boundaries of a class.

Contrary to Credit Suisse's argument, the need for individual inquiries to determine class membership is irrelevant to ascertainability. *Petrobras*, 862 F.3d at 264 ("[A] freestanding administrative feasibility requirement is neither compelled by precedent nor consistent with Rule 23 . . . ."). In *Petrobras*, the class was limited to purchasers of certain securities "in domestic transactions." 862 F.3d at 259. The court held that the class was ascertainable because the "domesticity" criterion was objective and definite, even though it also found that domesticity was "an 'individual question' requiring putative class members to 'present evidence that varies from member to member,'" in "mini-hearings." *Id.* at 269-70, 272 ("Appellants vigorously challenge the *practicality* of making the domesticity determination for each putative class member, but as we explain above, the ascertainability analysis is limited to narrower question of whether those determinations are objectively *possible*."); *see In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 66 n.51 (S.D.N.Y. 2020) (discussing individual inquiries in the predominance analysis, not ascertainability) (citing *Forex*, 407 F. Supp. 3d at 431-35).[1]

Similarly, the difficulty of proof does not prevent a class from being ascertainable, as Credit Suisse argues. For example, a class of consumers who purchased a particular product is ascertainable, even though they may need to produce a receipt or testify about a years-old transaction to prove class membership. *See, e.g.*, *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014); *accord Petrobras*, 862 F.3d at 267.

---

[1] *Marcus v. BMW of N. Am, LLC*, 687 F.3d 583, 593 (3d Cir. 2012) is inapposite. The Second Circuit rejected the "heightened ascertainability test" that requires an "administratively feasible mechanism for determining" class membership. *Petrobras*, 862 F.3d at 267-69 (cleaned up).

5

This case is easily distinguished from the cases that Credit Suisse cites that found class definitions insufficiently objective or definite.  In *Brecher v. Republic of Argentina*, for example, the class was defined by the "objective" criterion of beneficial ownership of certain bonds, but was not limited to any "defined class period," leaving the class open-ended and literally indefinite.  806 F.3d 22, 25 (2d Cir. 2015); *see Petrobras*, 862 F.3d at 266 (quoting *Brecher*).  In *Bakalar v. Vavra*, the putative defendant class was unascertainable because class was defined by the objective fact of class members' relationship to certain works of art, but the set of works was indefinite because they were "not described by title" and apparently were incapable of being identified.  237 F.R.D. 59, 65 (S.D.N.Y. 2006).

C. **Predominance**

The two common issues certified for class-wide treatment predominate because no individual issues will be adjudicated as to absent class members.  "[A] court may employ Rule 23(c)(4)[] to certify a class on a particular issue even if the action as a whole does not satisfy Rule 23(b)(3)'s predominance requirement."  *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006); *accord Nnebe v. Daus*, Nos. 06 Civ. 4991, No. 17 Civ. 7119, 2022 WL 615039, at *6 (S.D.N.Y. Mar. 1, 2022); *see also Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 411-12 (6th Cir. 2018) (collecting cases from other circuits).  Credit Suisse argues that, despite the limited certification, individual issues of standing and class membership predominate over the common certified issues.  Those arguments are unpersuasive.

1. **Standing**

Article III standing does not present a barrier to certification because the OTC Class is "defined in such a way that anyone within it would have standing."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006).  Although each class member is "not require[d to] submit

evidence of personal standing," the class must be defined so that anyone within it has Article III standing. *Id.* at 263-64.[2] Article III standing requires that the class member has "suffered an injury in fact that is 'concrete and particularized,'" that is fairly traceable to the challenged action and likely redressable by a favorable decision. *See Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 381 (2d Cir. 2021). To support standing, an injury "need not be capable of sustaining a valid cause of action under applicable . . . law." *Denney*, 443 F.3d at 264; *accord Dubuisson v. Stonebridge Life Ins. Co.*, 887 F.3d 567, 574 (2d Cir. 2018).

Every class member suffered an injury in fact because the class includes only customers who conducted FX trades in an affected currency pair with a Defendant during the period when Defendants were allegedly conspiring to widen FX spreads. Every class member suffered the harm of paying more or receiving less than they should have in those trades. *In re Elec. Books Antitrust Litig.*, No. 12 Civ. 3394, 2014 WL 1641699, at *8 (S.D.N.Y. Apr. 24, 2014) ("The class, by definition, is composed solely of consumers who purchased an e-book from a Publisher Defendant during the period of time in which those Publisher Defendants were engaged in a conspiracy with Apple to fix e-book prices. There can be no serious argument that those consumers lack Article III standing to bring a Sherman Act claim for price fixing.").

Credit Suisse claims that four types of trades would not be affected by the alleged conspiracy, so class members who exclusively made those kinds of trades would lack Article III standing: (1) trades based on "one-way quotes," (2) "at-best" orders, (3) "resting orders" and (4) benchmark trades. This argument is unpersuasive.

---

[2] Credit Suisse does not dispute that the jurisdictional requirement of standing is met because "at least one plaintiff has standing." *See Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 84 n.2 (2d Cir. 2012); *accord Nnebe*, 2022 WL 1204700, at *2.

Credit Suisse argues now for the first time that in "one-way quotes" and "at-best" orders "no spread was provided" -- i.e., no spread was conveyed or reported to the customer. What the customer was told is irrelevant. What the customer paid or was paid is relevant; if the spread was widened due to the conspiracy, the quoted bid price would be lower and the ask price higher than if the spread were narrower. The customer would have paid too much or received not enough on account of the alleged conspiracy. The class member would still be harmed, even if no spread was provided. As for "resting orders" and benchmark trades, they are expressly excluded from the class. The class notice states: "Transactions that resulted from resting orders are not included. Transactions at benchmark rates are not included."

### 2. Class Membership

Contrary to Credit Suisse's argument, individual issues that bear on class membership do not preclude certification of an issue class where those individual issues are not certified for class treatment. Only two issues are certified: the existence of a conspiracy, and Credit Suisse's participation in it. The class is not certified on the issue of "liability" generally. Rather, the certified issues comprise part of the first liability element of an antitrust claim: "a violation of the antitrust laws." *See In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 550 (S.D.N.Y. 2021) (citing *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007)). Issues relating to the second element -- "injury caused by that violation," *id.* -- will not be adjudicated class-wide, so they are not weighed in the predominance analysis. *In re Nassau Cnty.*, 461 F.3d at 226. Rule 23(c)(4) permits the Court to specify which issues will be certified (and thus part of the predominance analysis) and which will not be. Credit Suisse's arguments for disturbing the limited issue certification here are unpersuasive.

First, Credit Suisse conflates the role of class-membership issues in the predominance and ascertainability analyses. What Credit Suisse calls a "bedrock requirement" -- "definite boundaries of a readily identifiable class" "to allow ready identification of . . . who will be bound by the judgment" -- is the requirement for ascertainability, not predominance. *See Brecher*, 806 F.3d at 25 (denying class certification on ascertainability grounds while noting that that "requirement is distinct from predominance").

Second, Credit Suisse misconstrues *Petrobras*. After addressing ascertainability, the *Petrobras* court found that individual inquiries on the domesticity issue defeated predominance. *Id.* In *Petrobras*, however, the class was certified on all issues, including domesticity. *Id.* at 271-75. That is distinguishable from this case, where the individual questions bound up with class membership have not been certified for class treatment. *Petrobras* concluded by inviting courts to "implement management strategies tailored to the particularities of each case," including to "bifurcate the proceedings to home in on threshold class-wide inquiries; [or] sever claims not properly adjudicated on a class-wide basis to isolate key common issues." *Id.* 274.

Third, cases addressing "liability classes" are inapposite. A "liability class" may be certified only if liability to every class member can be established class-wide, leaving only damages for individual determination. In *Royal Park Invs., SA/NV v. Wells Fargo Bank, N.A.*, the court denied certification of a liability class because the common issue of "Wells Fargo's *breach*" "would not establish Wells Fargo's *liability*." No. 14 Civ. 9764, 2018 WL 1831850, at *10 (S.D.N.Y. April 17, 2018), *adopting report and recommendation*, 2018 WL 739580 (S.D.N.Y. Jan. 10, 2018). Similarly, in two cases challenging practices of New York City's Taxi and Limousine Commission, courts wrestled with how to determine who was harmed in deciding whether to certify liability classes. *Decastro v. City of New York*, No. 16 Civ. 3850, 2019 WL

4509027, at *16 & n.19 (S.D.N.Y. Sept. 19, 2019); *Nnebe*, 2022 WL 615039, at *8-9.  Those courts did not hold that they could not certify a narrower set of issues and exclude the individual issues if it would sufficiently advance the litigation.  *See, e.g.*, *Royal Park*, 2018 WL 739580, at *17-18 (noting that "in its discretion, the Court could certify a liability class solely on the question of whether Wells Fargo breached its duties," but recommending against it).[3]

Courts have authority to certify issues narrower than "liability" as a whole in order to "home in on threshold class-wide inquiries."  *Petrobras*, 862 F.3d at 274; *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 270 (3d Cir. 2021) ("[D]istrict courts may certify 'particular issues' for class treatment even if those issues, once resolved, do not resolve a defendant's liability.").  Classes on sub-issues within liability are familiar to antitrust cases.  *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 77 (E.D. Pa. 2019) (certifying "the issue of anticompetitive conduct" because it is "severable from the issues of antitrust impact and damages"); *In re Prograf Antitrust Litig.*, No. 11-md-02242, 2014 WL 4745954, at *1 (D. Mass. 2014) ("Certification can also be of more limited scope, covering specific common issues short of completely resolving liability.").  Liability will not be established class wide.  So individual liability issues do not defeat predominance.

D.  **Superiority**

Class treatment of the two common issues certified for class-wide adjudication is superior to requiring individual claimants repeatedly either to prove Credit Suisse's role in a conspiracy

---

[3] Cases addressing certification for *all* issues are inapposite for the same reason and *a fortiori*. *See Nypl v. JP Morgan Chase & Co.*, No. 15 Civ. 9300, 2022 WL 819771, at *10 (S.D.N.Y. Mar. 18, 2022); *Aluminum Warehousing*, 336 F.R.D. at 65; *Diverse Partners, LP v. AgriBank, FCB*, No. 16 Civ. 9526, 2019 WL 4305008, at *3 (S.D.N.Y. Sept. 11, 2019); *Hunter v. Time Warner Cable Inc.*, No. 15 Civ. 6445, 2019 WL 3812063, at *17 (S.D.N.Y. Aug. 14, 2019); *Vogel v. City of New York*, No. 14 Civ. 9171, 2017 WL 4712791, at *6 (S.D.N.Y. Sept. 19, 2017).

or to litigate offensive non-mutual collateral estoppel.  Classwide resolution of the two certified issues would materially advance the litigation, despite the existence of some non-certified, individual issues.  The "due process" concerns Credit Suisse raises are speculative and baseless, and Credit Suisse's reexamination concerns can be addressed with sound case management.

### 1. Material Advancement of the Litigation

As discussed above, issue class certification under Rule 23(c)(4) may be appropriate even where resolution of the non-certified issues requires individual inquiries that would otherwise defeat predominance.  However, issue certification is appropriate "only where resolution of the particular common issues would materially advance the disposition of the litigation as a whole." *Forex*, 407 F. Supp. 3d at 437 (quoting *Jacob v. Duane Reade, Inc.*, 293 F.3d 578, 589 (S.D.N.Y. 2013)); *see also Houser v. Pritzker*, 28 F. Supp. 3d 222, 254 (S.D.N.Y. 2014); 1 McLaughlin on Class Actions § 4:43 (18th ed.); Manual for Complex Litigation, Fourth, § 21.24.  Certification must "reduce the range of issues in dispute and promote judicial economy." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 234 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) (internal quotation marks omitted).  As with any Rule 23 certification issue, this conclusion "must be supported by . . . rigorous analysis." *Id.*

Resolution of Credit Suisse's participation in a conspiracy will materially advance the resolution of the litigation as a whole.  If Plaintiffs succeed at trial, defining the timeline and membership of the conspiracy on a class-wide basis will be more efficient than requiring each class member to do so in later litigation, either starting from scratch or via collateral estoppel. *See Forex*, 407 F. Supp. 3d at 438.  If Credit Suisse prevails, "the question of whether it [participated in an antitrust conspiracy] would be completely and finally determined, thereby eliminating entirely the need for a remedial stage inquiry on behalf of each class member."

*Robinson v. Metro-N. Commuter R.R.*, 267 F.3d 147, 168 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)).

Issue certification makes class members' claims more manageable even though certain individual liability issues are excluded from class treatment.  The most complex and consequential issue in this case is whether Credit Suisse joined a global, multi-year price-fixing conspiracy, and the individual issues surrounding class membership are minor by comparison. This case is unlike *McLaughlin* in which the common issue of "defendants' scheme" paled in comparison to "larger issues such as reliance, injury, and damages," which required fact-intensive inquiries into individual behavior and state of mind.  *McLaughlin*, 522 F.3d at 223, 234.  Follow-on individual proceedings here will be more straightforward.  The location, type and liquidity provider of each trade likely can be established with documentary evidence. These determinations are currently made by a claims administrator processing the other Defendants' settlements.  If a class member establishes eligible trades through a similar mechanical process, the only remaining issues would be causation and damages.  Even if some individual damages inquiries are required, that is often not enough to defeat certification even when a class is certified for all purposes.  *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015); *accord In re Namenda*, 338 F.R.D. at 551-52.

### 2.  Due Process

Credit Suisse's due process argument is speculative and unsupported.  Credit Suisse argues that "uncertainty as to class membership raises substantial due process concerns" for class members who need to decide whether they are part of the class and whether to opt out.  But Credit Suisse does not point to any necessary information that was omitted from the class notice in this case.  Credit Suisse concedes that the class notice spells out each condition of class

membership but speculates that class members might have difficulty "determin[ing] on their own" whether they meet each condition.  Credit Suisse does not point to any ambiguity that would prevent FX market participants from understanding what type of trade they made, with whom or whether trades were made in the United States.  Some may have lost the documentation needed to make a claim, but that is less likely in a case involving sophisticated financial transactions than, for example, in a consumer class action that may require saved receipts.

The cases Credit Suisse cites are inapposite.  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996), is a toxic tort case in which, due to the lag time between exposure and injury, "many potential members of the classes *cannot* yet know if they are part of the class" (emphasis added).  *See also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 611 (1997).  In *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1228 (11th Cir. 1998), it was not merely difficult, but impossible, for the plaintiff to know he was in the class because his claims were not encompassed by the plain language of the class notice.  This case does not involve class members who literally cannot know the relevant facts or whether those facts make them a class member bound to the judgment.  Credit Suisse's speculation that some class members might make a mistake or lack documentation does not interfere with their due process rights.

### 3. Seventh Amendment

Any risk that successive juries might reexamine the same factual issues can be addressed with sound case management.  The Seventh Amendment provides that the very same factual "issue may not be tried by different, successive juries." *Robinson*, 267 F.3d at 169 n.13 (quoting *Blyden v. Mancusi*, 186 F.3d 252, 268 (2d Cir. 1999)).  Consistent with that limitation, "different issues can be submitted to different juries as long as they are not presented in a way that causes juror confusion or uncertainty," even where the two juries will "have to consider similar

evidence in deciding distinct issues." *Id.* at 169-70 n.13, 14 (quoting *Simon v. Philip Morris Inc.*, 200 F.R.D. 21, 36 (E.D.N.Y. 2001)); *accord In re Rhone-Poulenc Rhorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995) ("Bifurcation and even finer divisions of lawsuits into separate trials are authorized in federal district courts."). Trying different but related issues before different juries consistent with the Seventh Amendment "calls for sound case management," such as a special verdict form, "not [outright] avoidance of [bifurcation]." *Robinson*, 267 F.3d at 169 n.13; *accord* Manual for Complex Litigation (Fourth) §§ 21.24, 22.755.

In the leading case identifying reexamination as a concern in a bifurcated class action trial, the district court had separated the determinations of negligence and comparative negligence. *See Rhone-Poulenc*, 51 F.3d at 1303. That approach was held to violate the Seventh Amendment because the second jury necessarily would make its own determination of the defendants' negligence in order to compare it with the plaintiffs'. *Id.* In the leading Second Circuit case, the first jury had to decide whether "reprisals" had taken place in violation of the Eighth Amendment, but the verdict form did not require the jury to "specify which acts were found to be 'reprisals' and which were not." *Blyden*, 186 F.3d at 268. Because the damages juries had to make their own determinations of which alleged acts constituted "reprisals" for purposes of deciding individual liability and damages, those later verdicts violated the Seventh Amendment. The first jury might have found that a given act constituted a "reprisal," and a later jury might have found the very same act did not. *Id.* at 269. Still, rather than decertify the class, the court remanded, acknowledging that "a proper liability trial involving this particular class could have been conducted" with different case management techniques. *Id.* at 271.

The Second Circuit has since joined other courts that "have argued that the *Rhone-Poulenc* court's concerns were overstated and that proper case management can easily allay

Seventh Amendment concerns and ensure that only one jury passes on each distinct issue." 2 Newberg on Class Actions § 4:91 at n.7 (5th ed.) (collecting cases); *Robinson*, 267 F.3d at 169 n.13.  Later cases finding Seventh Amendment problems in this district have closely resembled *Rhone-Poulenc* or *Blyden*.  *See Benner v. Becton-Dickinson*, 214 F.R.D. 157, 174 (S.D.N.Y. 2003) (finding Seventh Amendment problem in "proposed separation of the issues of negligence and comparative negligence"); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 352 (S.D.N.Y. 2002) (refusing to certify class on "general liability," including "general foreseeability" and whether "warnings were given in general," prior to individual trials on foreseeability and warning as to individual plaintiffs).

  Those cases are easily distinguished.  The two certified issues here in effect ask whether, when and with whom Credit Suisse agreed to engage in a joint scheme of widening FX spreads.  Unlike in *Blyden*, the first jury will answer those discrete questions without deciding whether or how the conspiracy harmed any Plaintiff or absent class member.  The only two antitrust cases cited by Credit Suisse are distinguishable because they involved bifurcation "between fact of damage and damages" where liability "necessarily include[d] proof of injury." *In re Indus. Gas Antitrust Litig.*, 100 F.R.D. 280, 303 (N.D. Ill. 1983); *see In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1183 (3d Cir. 1993).  As certified, however, if Plaintiffs prevail on the class-wide issues at the upcoming trial, claimants in later individual proceedings will litigate whether they made eligible trades and the degree to which those trades were impacted by price-fixing and caused damages.  Later juries will not reexamine whether the price-fixing occurred in the context of a conspiracy involving Credit Suisse.

  Price-fixing cases may be particularly suitable for certification of issue classes in this manner, given that "proof of a per se violation and of antitrust injury are distinct matters that

15

must be shown independently." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).  Several courts have similarly separated conspiracy and injury.  *See, e.g.*, *In re Steel Antitrust Litig.*, No. 08 Civ. 5214, 2015 WL 5304629, at *12 (N.D. Ill. Sept. 9, 2015) (finding "that certifying the class on the issue of conspiracy and leaving resolution on the question of impact and damages on an individual basis" is "most efficient and appropriate"); *Kamakahi v. Am. Soc'y for Reproductive Med.*, 305 F.R.D. 164, 193 (N.D. Cal. 2015) ("In price-fixing cases, courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where significant individual issues are present.").

Contrary to Credit Suisse's argument, the first jury's determination of the class-wide issues will not require examining any individual claims that will be re-examined by a later jury, and vice versa.  The first jury may consider some of the same evidence in deciding class-wide issues that a later jury would use to decide distinct individual issues, but that is not a Seventh Amendment problem.  *See Robinson*, 267 F.3d at 169 n.13.  For example, the first jury might view a particular chat transcript as circumstantial evidence of the conspiratorial agreement itself.  A later jury could, consistent with the Seventh Amendment, decide the separate factual question of whether that chat is evidence of causation for an individual class member.

Similarly, Plaintiff's theories of horizontal and vertical correlation among currency pairs do not raise reexamination problems because the first jury need not address those issues.  The first jury will decide if and when Credit Suisse was part of a conspiracy to widen FX spreads.  The extent to which that conspiracy succeeded and caused harm is not at issue in the class trial.

Credit Suisse suggests that it might defend against later damages actions by arguing that class members who participated in the chatrooms at issue acquiesced in the conspiracy.  There is no re-examination of the same factual issue if the first jury decides Credit Suisse's involvement

in the conspiracy, and a later jury decides a different entity's involvement. Unlike in the comparative negligence context, the application of Credit Suisse's proffered defense to a class member would rise and fall solely on that class member's conduct, not on any comparison with Credit Suisse's conduct. *Cf. Rhone-Poulenc*, 51 F.3d at 1303.

### E.     CONCLUSION

For the foregoing reasons, Defendant's motion to decertify the issue class is DENIED. Defendant's motion for oral argument is DENIED as moot.

The Clerk of Court is respectfully directed to close the motion at Docket Numbers 1678 and 1689.

Dated:  August 31, 2022
       New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE