**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST
LITIGATION

No. 1:13-cv-07789-LGS

**PLAINTIFFS' RESPONSE TO CREDIT SUISSE DEFENDANTS'**
**PRETRIAL MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

**ARGUMENT** ........................................................................................................................... 1

    I.   Plaintiffs Are Not Estopped from Trying This Case in Accordance with Basic Principles of Antitrust and Conspiracy Law. .................................................................... 2

    II.  The Court's Detailed Special Verdict Form Is Consistent with Rule 23 and the Seventh Amendment. ......................................................................................................... 7

    III. The Court Should Adopt Its Proposed Verdict Form. .................................................... 12

**CONCLUSION** ................................................................................................................... 12

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Adelphia Recovery Trust*,
  634 F.3d 678 (2d Cir. 2011)......................................................................6

*In re Capacitors Antitrust Litig.*,
  No. 14-cv-03264 (N.D. Cal. Dec. 13, 2021)........................................4, 5

*Chen-Oster v. Goldman, Sachs & Co.*,
  No. 10-cv-6950, 2022 WL 3586460 (S.D.N.Y. Aug. 22, 2022)................11

*In re Currency Conversion Fee Antitrust Litig.*,
  264 F.R.D. 100 (S.D.N.Y. 2010) ..............................................................8

*In re Indus. Diamonds Antitrust Litig.*,
  167 F.R.D. 374 (S.D.N.Y. 1996) ....................................................8, 9, 10

*Jones v. Miles*,
  656 F.2d 103 (5th Cir. 1981) ...................................................................12

*Jones v. United States*,
  179 F. 584 (9th Cir. 1910) .........................................................................2

*In re Literary Works in Elec. Database Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011)...................................................................8, 9

*McGuire v. Russell Miller, Inc.*,
  1 F.3d 1306 (2d Cir. 1993)......................................................................12

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) .......................................................10, 11

*In re Playmobil Antitrust Litig.*,
  35 F. Supp. 2d 231 (E.D.N.Y. 1998) .......................................................10

*Robinson v. Metro-N. Commuter R.R. Co.*,
  267 F.3d 147 (2d Cir. 2001)....................................................................12

*In re Tableware Antitrust Litig.*,
  No. 04-cv-3514 (N.D. Cal. June 29, 2007)................................................4

*United States v. Benussi*,
  216 F. Supp. 2d 299 (S.D.N.Y. 2002), *aff'd sub nom.*, *United States v.
  Salmonese*, 352 F.3d 608 (2d Cir. 2003) ..................................................3

*United States v. Hong Vo*,
    978 F. Supp. 2d 49 (D.D.C. 2013) ........................................................................3

*United States v. Mobile Materials, Inc.*,
    881 F.2d 866 (10th Cir. 1989) ...........................................................................4

*United States v. Sharpe*,
    193 F.3d 852 (5th Cir. 1999) ...........................................................................3

*United States v. Upton*,
    559 F.3d 3 (1st Cir. 2009).................................................................................3

*In re: Urethane Antitrust Litig.*,
    No. 04-1616, 2013 WL 2097346 (D. Kan. May 15, 2013), *amended*, 2013 WL
    3879264 (D. Kan. July 26, 2013), *aff'd*, 768 F.3d 1245 (10th Cir. 2014)..................2, 3, 4, 11

## ARGUMENT

Facing overwhelming evidence of its participation in a massive global antitrust conspiracy, Credit Suisse centers its trial strategy on presenting the jury with a legally unfounded Hobson's choice: Either Plaintiffs have proved a conspiracy that involved exactly 16 banks, that spanned exactly December 1, 2007 through December 31, 2013, and that affected exactly 52 currency pairs, or the jury must return a verdict in favor of Credit Suisse.

But this gambit fails Antitrust 101: "To prevail on the certified issues, Plaintiffs need only prove 'a combination or some form of concerted action between at least two legally distinct economic entities' for the purpose of fixing spreads in the FX spot market, in which Credit Suisse joined." ECF No. 1842, at 2 (citing *United States v. Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016)). This basic principle of antitrust law reveals the error at the heart of Credit Suisse's estoppel argument. Plaintiffs made no representation that by pursuing the broad antitrust conspiracy case that is supported by the evidence, Plaintiffs were somehow suspending the applicable rules of law and swearing off ***any*** and ***every*** jury verdict that did not match the exact scope of the conspiracy alleged in the complaint. Credit Suisse's rehashed—and now twice rejected—Rule 23 and Seventh Amendment arguments fare no better. Courts routinely certify classes with class representatives that did not purchase every product, from every defendant, during every period of the conspiracy. Likewise, a detailed special verdict form—such as the Court's proposal—addresses any potential Seventh Amendment concerns that may arise in this bifurcated litigation.

Plaintiffs respectfully request that the Court adopt Court Draft 1 as the verdict form in this case. *See* ECF No. 1842, at 3-6. Court Draft 1 appropriately rejects Credit Suisse's binary question and allows the jury to determine whether there was a conspiracy, its timeframe, and its participants based on a preponderance of the evidence through a series of six questions.

I.      **Plaintiffs Are Not Estopped from Trying This Case in Accordance with Basic Principles of Antitrust and Conspiracy Law.**

Credit Suisse claims that it would be "fundamentally unfair" for the Court to allow the jury to determine the scope of the conspiracy. Br. at 2. But the purported "unfairness" that Credit Suisse laments is rooted in basic principles of antitrust and conspiracy law, not in any representation by Plaintiffs. Rejecting a related argument in another complex antitrust conspiracy case, the court held that:

> the jury was not required to find that a conspiracy existed for the entire period alleged by plaintiffs. Nor was it required to find that the conspiracy involved all of the alleged conspirators or products. A conspiracy to fix prices for any product involving [the defendant] and any other manufacturer for any period within the alleged conspiracy period would give rise to liability.

*In re: Urethane Antitrust Litig.*, No. 04-1616, 2013 WL 2097346, at *9 (D. Kan. May 15, 2013) ("*Urethane I*"), *amended*, 2013 WL 3879264 (D. Kan. July 26, 2013), *aff'd*, 768 F.3d 1245 (10th Cir. 2014) ("*Urethane II*").

The Court's recent articulation of this basic principle of conspiracy law, ECF No. 1842, at 2, is consistent with more than a century of precedent rejecting Credit Suisse's all-or-nothing approach. Cases evaluating the scope of conspiracies in the criminal context are instructive. In *United States v. Blackwell*, for instance, the Sixth Circuit approved as a "correct statement of law," a jury instruction that stated: "the government is not required to prove that all of the people named in the indictment were members of the scheme or the conspiracy, so long as you find that at least two persons, one of them being the defendant, were participants in the conspiracy alleged in the indictment." 459 F.3d 739, 764 (6th Cir. 2006). Likewise, in *United States v. Johnston*, the Tenth Circuit held that "the government was not required to prove that [the defendant] conspired with ***any or all*** of the named co-defendants, so long as it at least proved that he conspired 'with others' for the purpose alleged." 146 F.3d 785, 791 (10th Cir. 1998) (emphasis added); *see also Jones v.*

*United States*, 179 F. 584, 600 (9th Cir. 1910) (holding that the government was not "required to prove that all the defendants named in the indictment were engaged in the conspiracy"; rather, "[i]t was sufficient to constitute the conspiracy charged in the indictment to show that there was a combination of two or more persons . . . .").

Fundamentally, the "scope of the conspiracy and membership in it are questions of fact for the jury." *United States v. Sharpe*, 193 F.3d 852, 867 (5th Cir. 1999); *see also United States v. Upton*, 559 F.3d 3, 11 (1st Cir. 2009) ("Determining the contours of the conspiracy ordinarily is a factual matter entrusted largely to the jury."); *United States v. Hong Vo*, 978 F. Supp. 2d 49, 54 (D.D.C. 2013) ("[T]he scope of the conspiracy is a factual matter entrusted largely to the jury."); *United States v. Benussi*, 216 F. Supp. 2d 299, 311 (S.D.N.Y. 2002) ("[T]he precise scope of the conspiratorial agreement was an issue for the jury."), *aff'd sub nom.*, *United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003).

These fundamental tenets of conspiracy law apply with equal force in the antitrust context. In *Urethane I*, for instance, the court faced a situation similar to this case: A class-action price-fixing conspiracy case brought all the way to a jury verdict against a single hold-out defendant, Dow. Dow argued—as Credit Suisse argues here—that if "the jury decided that the conspiracy did not exist for even a single day within the alleged conspiracy period, or that plaintiffs otherwise failed to meet their burden of proof to show a conspiracy . . . with respect to that single day, then plaintiffs' entire claim of conspiracy would fail as a matter of law." *Urethane I*, 2013 WL 2097346, at *4.

The court noted the "absurdity of [this argument's] premise" and rejected it, holding that the plaintiffs were not "required to predict, with temporal exactness, the precise conspiracy that the jury would find." *Id.* Nor was the jury "required to find that each of the alleged co-conspirators

actually participated in the conspiracy." *Id.* (citing *ABA Model Jury Instructions in Civil Antitrust Cases* at B–4 (2005)). Rather, a "conspiracy to fix prices for **any product** involving Dow **and any other manufacturer for any period** within the alleged conspiracy period would give rise to liability." *Id.* at *9 (emphases added).[1] In rejecting Dow's appeal, the Tenth Circuit affirmed that "the plaintiffs' failure to prove a conspiracy for part of the alleged conspiracy period does not invalidate the finding of liability." *Urethane II*, 768 F.3d at 1267; *see also United States v. Mobile Materials, Inc.*, 881 F.2d 866, 874 (10th Cir. 1989) (stating in Sherman Act conspiracy case that "the government may prove a narrower scheme than alleged").

Credit Suisse points to the verdict form and jury instructions in two cases in which it claims courts "required the plaintiffs to prove the conspiracy that they had alleged," and thus did not allow the jury to decide the scope of the conspiracy. Br. at 13 (citing Final Verdict Form at 2-3, *In re Capacitors Antitrust Litig.*, No. 14-cv-03264 (N.D. Cal. Dec. 13, 2021), ECF No. 1645; Final Jury Instructions at 9, *In re Tableware Antitrust Litig.*, No. 04-cv-3514 (N.D. Cal. June 29, 2007), ECF No. 384). But a mere two pages later, those same jury instructions state:

> It is not necessary that the evidence show that all of the means or methods claimed by plaintiffs were agreed upon to carry out the alleged conspiracy; nor that all of the means or methods that were agreed upon were actually used or put into operation; nor that all the persons alleged to be members of the conspiracy actually were members.

Final Jury Instructions at 11, *In re Tableware Antitrust Litig.*, No. 04-cv-3514 (N.D. Cal. June 29, 2007), ECF No. 384; *see also* Final Jury Instructions at 25-26, *In re Capacitors Antitrust Litig.*,

---

[1] While there are many similarities between the circumstances here and in *Urethane*, one significant difference is that the trial in *Urethane* was not bifurcated and the jury there made a determination of damages. Because the jury's determination of the scope of the conspiracy was subsumed into its determination of damages, the court rejected Dow's argument that it was entitled to a new trial because the jury did not specifically identify the scope of the conspiracy through a special verdict form. *See Urethane I*, 2013 WL 2097346, at *9.

No. 14-cv-03264 (N.D. Cal. Dec. 13, 2021), ECF No. 2899 (same); Plaintiffs' Proposed Jury Instructions at 18, ECF No. 1811-1 (same).

Under the weight of these elementary principles of antitrust and conspiracy law, Credit Suisse's estoppel argument collapses. Credit Suisse claims that Plaintiffs are estopped from proceeding in accordance with the law because Plaintiffs "represented to this Court that they will prove a single, market-wide conspiracy." Br. at 2. But the fact that Plaintiffs allege and intend to prove a single, market-wide conspiracy is not in any way incompatible with the basic principle that the jury will determine the scope of that single conspiracy. *See, e.g.*, Summ. J. Op. at 8-9, ECF No. 1650 ("[A] reasonable jury could find that a single conspiracy existed to fix spreads in the FX market"); *id.* at 24 ("Plaintiffs' evidence tends to exclude the possibility that the Defendant banks acted independently, but the parties dispute the material facts of the scope of the purported conspiracy."). Nowhere in Credit Suisse's seven pages of purportedly estoppel-generating statements by Plaintiffs does Credit Suisse point to a single representation by Plaintiffs that even hints that they were disclaiming the traditional role of the jury in determining the scope of the conspiracy.

Credit Suisse claims that it is shocked to find that Plaintiffs intend to let the jury decide the scope of the conspiracy, asserting that Plaintiffs' supposed "about-face" is "either a trial strategy or a reaction to Credit Suisse's April 22, 2022 motion for decertification." Br. at 9. But Credit Suisse itself acknowledged in its brief in support of its motion for decertification that "in determining whether there was a conspiracy and the scope of any such conspiracy, the OTC Class jury will need to decide which (if any) banks, currencies and time-periods were involved." ECF No. 1680, at 22. And Credit Suisse surely was aware of the key holding from the Court's Summary Judgment Opinion well before trial: "Neither party is entitled to summary judgment on the issue

of Credit Suisse's participation in the purported conspiracy because *the scope of the conspiracy or conspiracies is disputed*." Summ. J. Op. at 25 (emphasis added); *see also id.* at 24 ("Plaintiffs' evidence tends to exclude the possibility that the Defendant banks acted independently, but the parties dispute the material facts of the scope of the purported conspiracy.").

Judicial estoppel is appropriate where "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *In re Adelphia Recovery Trust*, 634 F.3d 678, 695–96 (2d Cir. 2011). Here, Credit Suisse's argument for judicial estoppel fails on all three elements. Alleging that conduct constituted a single, market-wide conspiracy is not "clearly inconsistent" with the traditional practice of allowing the jury to determine the scope of the conspiracy. The Court has never adopted the erroneous view that the jury is not permitted to determine the scope of the conspiracy nor opined that *any* deviation from that possible scope absolves Credit Suisse of liability for any conspiratorial conduct in which it did participate. And any harm that Credit Suisse claims it would suffer from applying basic principles of antitrust and conspiracy law to this case because Credit Suisse apparently would have defended itself differently these past nine years was entirely self-inflicted for failing to timely comprehend this well-established law. Generously assuming that Credit Suisse is genuinely surprised by the application of these basic principles of antitrust law to this case, Credit Suisse's unilateral misunderstanding of the law cannot bar Plaintiffs from trying this case in accordance with fundamental principles of antitrust and conspiracy law.

The emptiness of Credit Suisse's estoppel argument is also laid bare in its first paragraph, which assures the Court that "In the operative complaint, Plaintiffs allege an 'overarching

conspiracy.'" Br. at 4 (citing Third Am. Compl. ¶ 136). What Credit Suisse elides is that the "overarching conspiracy" alleged in the complaint is not, as they would now have it, an overarching conspiracy of exactly 16 banks and 52 currency pairs from December 1, 2007 to December 31, 2013. Rather, the Third Amended Complaint's overarching conspiracy "encompassed: (1) price fixing of bid/ask spreads; (2) price fixing various benchmark rates, including, but not limited to, WM/Reuters benchmark rates and the ECB reference rate; and (3) other collusive conduct, such as triggering client stop-loss orders and limit orders." Third Am. Compl. ¶ 124. Credit Suisse has, of course, been on notice that these latter two categories of misconduct have been categorically excluded from Plaintiffs' case since Plaintiffs' motion for class certification was served upon them *more than four years ago*. *See* ECF No. 1197. Their reliance upon these representations as a basis for purported estoppel is preposterous.

Credit Suisse has no claim of prejudice based on the fact that Plaintiffs intend to litigate precisely the issues that this Court certified, which make no reference to a conspiracy of exactly 16 banks, no reference to a period of exactly December 1, 2007 to December 31, 2013, and no reference to the exact 52 currency pairs. ECF No. 1331 at 25 (certifying issues of: "(1) the existence of a conspiracy to widen spreads in the spot market and (2) the CS Defendants' participation in the conspiracy."). Plaintiffs, on the other hand, would be unfairly prejudiced if Credit Suisse were permitted to fundamentally alter Plaintiffs' burden of proof and effectively absolve itself of liability by showing, for instance, that one bank did not participate in the conspiracy with respect to a single currency pair on a single day in the class period.

## II.    The Court's Detailed Special Verdict Form Is Consistent with Rule 23 and the Seventh Amendment.

Credit Suisse argues that permitting the jury to determine the scope of the conspiracy would run afoul of Rule 23 and the Seventh Amendment because not every class representative transacted

in every currency pair, with every co-conspirator, during every period of the conspiracy. *See* Br. at 14-17. This transparent attempt to use pre-trial filings as a venue for continued argument in favor of its motion for decertification has been largely rendered moot by the Court's recent Order denying that motion. *See* ECF No. 1868. Nevertheless, Credit Suisse's baseless arguments should not go unrebutted.

Credit Suisse's Rule 23 argument cannot withstand the "great weight of authority in price-fixing conspiracy cases," which "holds that the victim of one alleged co-conspirator is adequate to prove liability for victims of all co-conspirators." *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 112 (S.D.N.Y. 2010). Likewise, "the fact that Plaintiffs purchased only a small portion of the products whose prices were anti-competitively established, and from only certain retailers and not all co-conspirator retailers, does not render the Plaintiffs inadequate representatives of the Class as a whole.'" *Id.* at 113 (quoting *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 243 (E.D.N.Y. 1998)). The class representatives here "have every incentive to expose the full scope of the conspiracy and have shown that they will zealously pursue the interests of the entire class." *Id.*; *see also In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 380–81 (S.D.N.Y. 1996) ("[A] representative plaintiff may satisfy the adequacy requirement without having purchased products from all of the defendants, having bought all of the affected products or having made purchases throughout the entire class period.").

Credit Suisse relies primarily on a single case in which intra-class conflicts precluded certification. *See* Br. at 15-16 (citing *In re Literary Works in Elec. Database Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011)). But the court in *Literary Works* stressed that a key factor in its decision was the fact that the settlement before the court "confine[d] compensation and . . . limit[ed] defendants' liability by setting an $18 million recovery and cost ceiling," and distributing that

8

recovery would require "making essential allocation decisions among categories of claims." 654 F.3d at 251 (internal citations omitted). This cap on compensation available to the class created a zero-sum game: "Any improvement in the compensation of, for example, Category C claims would result in a commensurate decrease in the recovery available for Category A and B claims." *Id.* at 252. These concerns are not present here, because the class is certified only with respect to two **liability** issues. The jury here will make no determination of damages, and thus no pie-splitting between class members will be required. Future juries will determine the damages suffered by class members in individual litigation, without any "cap" that would create the zero-sum game found in *Literary Works.* Moreover, the "categories" of claims that created an intra-class conflict in *Literary Works* were not purchases of separate products but rather separate **legal claims**, some of which were categorically "more valuable" than others since they provided, for instance, statutory damages. *See id*. at 251 n.6.

This case is more akin to *Industrial Diamonds*. There, as here, a defendant facing price-fixing-conspiracy allegations claimed that class certification was improper because each class representative ostensibly "purchased only a tiny percentage of the products that defendants sold during the proposed class period," and thus would have "no incentive to offer proof of the effect of the alleged conspiracy on those products that it did not purchase." *Indus. Diamonds*, 167 F.R.D. at 380. The court rejected this argument, holding that where "plaintiffs have alleged a single conspiracy to artificially inflate prices, a representative plaintiff may satisfy the adequacy requirement without having purchased products from all of the defendants, having bought all of the affected products or having made purchases throughout the entire class period." *Id.* at 380-81. The court reasoned that the "same proof that would demonstrate that [the defendants] conspired to raise one list price—e.g., evidence that defendants' representatives exchanged list-price

information and agreed on subsequent list prices—seems likely to establish that they conspired to set ***other*** list prices at artificially high levels as well." *Id.* at 381 (emphasis added). The court concluded that each class representative has a "strong interest in presenting evidence that will tend to prove the claims" of absent class members, "because the same evidence will most likely tend to prove its own claims." *Id.*

Likewise, in *In re Titanium Dioxide Antitrust Litigation*, another price-fixing conspiracy case, the defendants argued that class certification was improper because, among other things, one class representative ceased purchasing the price-fixed product before the end of the conspiracy period and thus had "no incentive" to prove a conspiracy for that later period. 284 F.R.D. 328, 339 (D. Md. 2012). The court rejected this argument, concluding that the "thrust of the litigation will concern the Defendants' conduct and the existence of the alleged conspiracy." *Id.* Because the class representatives and the absent class members "share common objectives and the same factual and legal positions," they therefore "have the same interest in establishing the liability" of the defendants. *Id.*

Credit Suisse's typicality and commonality arguments fail as well. Because "[t]ypicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff," typicality is satisfied where, as here, the class representative's claims are "based on the same legal theory and arise from the same practice or course of conduct as the other class members." *Playmobil*, 35 F. Supp. 2d at 241-42; *see also Titanium Dioxide*, 284 F.R.D. at 339. And in an antitrust conspiracy case such as this, the "existence, implementation and effect" of the alleged conspiracy "are the central issues" of the case, and a "common thread of evidence is admissible on these elements and will correspond to evidence which otherwise could be introduced by absent class members." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 519

(S.D.N.Y. 1996) (quoting *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 345 (E.D. Pa. 1976)). Here, commonality is clear because "proof of Defendants' conspiracy lies at the heart of this case and is common to the Class." *Id.*[2]

Credit Suisse's Seventh Amendment argument, Br. at 22-23, merely rehashes arguments from prior briefing on its now-denied motion to decertify without any clear connection to the verdict-form question at hand. This Court has already found Credit Suisse's Seventh Amendment arguments to be baseless, ECF No. 1868, at 13-17, but even if there were Seventh Amendment issues here, those concerns would be addressed by a *more detailed* verdict form, not a *less detailed* and binary one. As Credit Suisse itself noted in its decertification brief, "in determining whether there was a conspiracy and the scope of any such conspiracy, the OTC Class jury will need to decide which (if any) banks, currencies and time-periods were involved." ECF No. 1680, at 22.

As this Court has recognized, trying "different but related issues before different juries consistent with the Seventh Amendment 'calls for sound case management,' such as a special verdict form, 'not [outright] avoidance of [bifurcation].'" Order Denying Defs.' Decertification Mot., ECF No. 1868, at 14 (alterations in original) (citing *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 169 n.13 (2d Cir. 2001)). Here, the detailed special verdict form proposed by

___

[2] Even if Credit Suisse's unfounded Rule 23 arguments were valid, the appropriate response would not be to adopt a legally dubious verdict form or decertify the class. Rather, if the issues identified by Credit Suisse ever actually materialized, the appropriate response would be to modify the class definition. At this late stage of litigation, "modification is far superior to decertification." *Urethane I*, 2013 WL 2097346, at *2. Thus, for instance, after the jury rendered its verdict in *Urethane I*, the court modified the class definition to exclude the year 2004, which the jury found was outside the scope of the conspiracy. *Id.* Even the case recently submitted by Credit Suisse as supplemental authority in support of its motion for decertification favored modification of the class over decertification. *See Chen-Oster v. Goldman, Sachs & Co.*, No. 10-cv-6950, 2022 WL 3586460, at *3 (S.D.N.Y. Aug. 22, 2022) ("The Court concludes that it can easily redefine the class to address any standing concerns.").

the Court delineates the boundaries of any conspiracy found by the jury, obviating the Seventh
Amendment issues that Credit Suisse asserts.

## III.    The Court Should Adopt Its Proposed Verdict Form.

The Court should adopt its six-question proposed verdict form, ECF No. 1842, at 3-6.[3] In
stark contrast to the "inseparable and inscrutable unit" of Credit Suisse's proposed verdict form,
*Jones v. Miles*, 656 F.2d 103, 108 (5th Cir. 1981), the Court's proposal "identif[ies] the basis for
the jury's verdict, and thus . . . avoid[s] confusion, appellate uncertainty, and the need for additional
proceedings," *McGuire v. Russell Miller, Inc*., 1 F.3d 1306, 1310-11 (2d Cir. 1993). The detailed
questions regarding the identity of the co-conspirators and the time period of the conspiracy will
allow the jury to delineate the contours of any verdict that it renders, providing detailed factual
findings that are "akin to instructions" for future juries assessing damages to follow. *Robinson*,
267 F.3d at 169 n.13 (citing Steven S. Gensler, *Bifurcation Unbound*, 75 Wash. L. Rev. 705, 736-
37 (2000)).

## CONCLUSION

The Court should adopt Court Draft 1 as the special verdict form in this case.

Dated: September 2, 2022                    Respectfully submitted,

                                            */s/ Michael D. Hausfeld*

                                            **HAUSFELD LLP**
                                            MICHAEL D. HAUSFELD
                                            REENA A. GAMBHIR (*pro hac vice*)
                                            TIMOTHY S. KEARNS (*pro hac vice*)
                                            SARAH R. LAFRENIERE (*pro hac vice*)
                                            IAN ENGDAHL (*pro hac vice* pending)
                                            JOSE R. LAVERGNE (*pro hac vice* pending)
                                            888 16th Street NW, Suite 300
                                            Washington, DC 20006
                                            Telephone:  202/540-7200

---

[3] Plaintiffs suggest only that the reference to "Question 7" below Question 5 should be removed.
ECF No. 1842, at 4.

202/540-7201 (fax)
mhausfeld@hausfeld.com
rgambhir@hausfeld.com
tkearns@hausfeld.com
slafreniere@hausfeld.com
iengdahl@hausfeld.com
jlavergne@hausfeld.com

**HAUSFELD LLP**
MICHAEL P. LEHMANN
CHRISTOPHER L. LEBSOCK (*pro hac vice*)
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone:  415/633-1908
415/358-4980 (fax)
mlehmann@hausfeld.com
clebsock@hausfeld.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
CHRISTOPHER M. BURKE (CB-3648)
WALTER W. NOSS (WN-0529)
KRISTEN M. ANDERSON (*pro hac vice*)
KATE LV (*pro hac vice*)
600 West Broadway, Suite 3300
San Diego, CA  92101
Telephone:  619/233-4565
619/233-0508 (fax)
cburke@scott-scott.com
wnoss@scott-scott.com
kanderson@scott-scott.com
klv@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
DAVID R. SCOTT (DS-8053)
JOSEPH P. GUGLIELMO (JG-2447)
DONALD A. BROGGI (DB-9661)
SYLVIA M. SOKOL (SS-0317)
THOMAS K. BOARDMAN (TB-0530)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone:  212/223-6444
212/223-6334 (fax)
david.scott@scott-scott.com
jguglielmo@scott-scott.com
dbroggi@scott-scott.com
ssokol@scott-scott.com

13

tboardman@scott-scott.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
PATRICK J. COUGHLIN (PC-5116)
DAVID W. MITCHELL (*pro hac vice*)
RANDI D. BANDMAN (RB-7278)
ALEXANDRA S. BERNAY (*pro hac vice pending*)
CARMEN A. MEDICI (*pro hac vice pending*)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com
davidm@rgrdlaw.com
randib@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com

**KOREIN TILLERY**
GEORGE A. ZELCS
205 N. Michigan Avenue, Suite 1950
Chicago, IL 60601-4269
Telephone:  312/641-9760
312/641-9751 (fax)
gzelcs@koreintillery.com

**KOREIN TILLERY, LLC**
STEPHEN M. TILLERY
STEVEN M. BEREZNEY
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone:  314/241-4844
314/241-3525 (fax)
stillery@koreintillery.com
sberezney@koreintillery.com

*Counsel for Class Plaintiffs*