```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
                                                              :
IN RE FOREIGN EXCHANGE BENCHMARK                              :    13 Civ. 7789 (LGS)
RATES ANTITRUST LITIGATION.                                   :
                                                              :    OPINION AND ORDER
                                                              :
------------------------------------------------------------- X
```

LORNA G. SCHOFIELD, District Judge:

WHEREAS, on August 12, 2022, Defendants (also referred to herein as "CS") filed eleven motions in limine, which are resolved below. All references to rules are references to the Federal Rules of Evidence.

1. **Defendants' First MIL** (Dkt. 1710). Defendants' motion to exclude evidence and argument concerning a consent order and related press release (collectively the "Consent Order") between CS and the New York State Department of Financial Services ("DFS") is **GRANTED** pursuant to Rules 403 and 408.

Rule 408 bars evidence of a civil consent decree "to prove liability for the claim," which is the only conceivable purpose for this evidence. *See United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 179 n.11 (2d Cir. 2015); *City of N. Miami Beach Police Officers' & Firefighters Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19 Civ. 10825, 2021 WL 212337, at *5 n.3 (S.D.N.Y. Jan. 21, 2021).

The Consent Order is not admissible under Rule 404(b) as evidence of CS's "plan" or "opportunity." First, Rule 404(b) is inapplicable as the arguably relevant portions pertaining to price fixing do not refer to "any *other* crime, wrong, or act" (emphasis added). Second, the portions of the Consent Order that refer to conduct other than price-fixing are not evidence of a "plan" to engage in the conduct at issue. To the extent those portions of the documents would be

offered to prove "opportunity," they would be cumulative of the chats themselves, including the chat referenced in the order and in the summary judgment opinion in this case (Dkt. No. 1650).

Under Rule 403, the probative value is small because the Consent Order focuses on conduct excluded from the class definition, or conduct with no bearing on the two issues to be tried. Any small probative value would be substantially outweighed by the risk of prejudice – placing the regulator's imprimatur on Plaintiffs' view of the evidence or suggesting that CS is a generally bad actor -- and confusion of the issues by introducing extraneous FX-related conduct.

Plaintiffs' other arguments are also unpersuasive: Nothing in the excerpts of the consent order submitted to the Court suggests that CS stipulated to any of the regulator's specific "Findings," which are separate from the general findings and relief following the "stipulated and agreed" language; nothing in the excerpts addresses the economic feasibility of a 16-defendant cartel; and the order is not plausibly offered as mere "factual background," *cf. Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 454 (S.D.N.Y. 2008), nor is it offered against a "different co-defendant," *cf. Nguyen v. FXCM, Inc.*, 364 F. Supp. 3d 227, 236-37 (S.D.N.Y. 2019).

2. **Defendants' Second MIL** (Dkt. 1714). Defendants' motion to exclude the testimony of persons invoking the Fifth Amendment protection against self-incrimination in this case is **DENIED**. The four non-exclusive factors laid out in *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997), point in different directions, but the "overarching concern" that such invocations be "trustworthy under all of the circumstances and will advance the search for truth" warrants permitting Plaintiffs to call at least some of these witnesses. This ruling is without prejudice to a CS motion to limit the number of such witnesses, after Plaintiffs disclose how many they actually intend to call. Such disclosure must be made by **September 15, 2022**, in advance of the pretrial conference scheduled for September 19, 2022.

The first *LiButti* factor, the "nature of the relevant relationships," does not weigh strongly either way. Defendants allude to wrongful termination lawsuits by unnamed former employees, while Plaintiffs argue that the Court can infer that Defendants and other banks are or were paying the witnesses' attorney's fees. While an employer's relationship with a former employee may not be particularly strong, "the Second Circuit has allowed a non-party's invocation to be used against a former employer, accepting the rationale that ex-employees' refusals to testify could appropriately be conceptualized as vicarious admissions of their former employer." *SEC v. Adelphia Commc'ns Corp.*, No. 02 Civ. 5776, 2006 WL 8406833, at *12 (S.D.N.Y. Nov. 16, 2006) (cleaned up); see *Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983).

The second factor weighs in Defendants' favor because there is no indication Defendants or other banks had "control" over the witnesses at the time they invoked the Fifth Amendment.

The third and fourth factors cut against Defendant. The witnesses' interests in avoiding the full and public elucidation of their role in an antitrust conspiracy, and whatever consequences might follow, is compatible with Defendants' interest in avoiding liability for it. The witnesses also appear to be key figures in the litigation, and their testimony, or a substitute therefor, is critical to "the search for truth." *LiButti*, 107 F.3d at 123-24. As Defendants point out, the witnesses who did *not* invoke the Fifth Amendment uniformly denied involvement in a conspiracy. Innocent people may have good reason to invoke the privilege, but it stands to reason that those with the greatest distance from the alleged conspiracy would feel *most* comfortable testifying to that effect. It would not serve the search for truth if the jury heard only from those who were particularly insulated from any alleged wrongdoing and not from anyone who was sufficiently involved that they reasonably feared prosecution.

That some witnesses are former employees of alleged co-conspirators, rather than of Defendants, does not affect the conclusion. The fact that the banks were "charged with a unitary act or common scheme of misconduct, such as conspiracy . . . easily permit[s] the transference . . . of a negative inference." *Banks v. Yokemick*, 144 F. Supp. 2d 272, 290 (S.D.N.Y. 2001) (citing *Brink's*, 717 F.2d at 708).

Even assuming that the two actual DOJ prosecutions around the relevant time pertained to narrower conspiracies with different goals, that does not change the outcome. Those prosecutions may well have emerged from a wider investigation that encompassed the conduct at issue, or the witnesses might reasonably have worried that they did. The witnesses invoked the Fifth Amendment in this case in response to questions about the conduct at issue in this case, and at trial Plaintiffs will be permitted to ask questions, and potentially elicit Fifth Amendment invocations, only about the conduct at issue in this case.

3.      **Defendants' Third MIL** (Dkt. 1726). Defendants seek to exclude evidence and argument that certain other banks, and certain of those banks' FX traders, were criminally prosecuted, pleaded guilty, or were convicted of Sherman Act or other criminal violations. Defendants' motion is **DENIED**.

Contrary to Defendants' argument, that the prior proceedings focus on manipulation other than price fixing, the proceedings encompassed at least some of the conduct at issue here. The guilty pleas of JPMorgan Chase & Co., The Royal Bank of Scotland PLC, Citicorp and Barclays PLC include as part of their factual bases that "the defendant and its corporate co-conspirators, which were also financial services firms acting as dealers in the FX Spot Market, entered into and engaged in a conspiracy to fix, stabilize, maintain, increase or decrease the price of, and rig bids and offers for" certain currencies. BNP Paribas USA, Inc.'s plea cited to the "bid" and the

4

"offer" as components of "a 'two-way price' quote," and states that the "defendant and its co-conspirators carried out the conspiracy by . . . coordinating on the *price*, size, and timing of their bids and offers."  Defendants assert that "the individual traders' criminal proceedings . . . stem from the same conduct."

Defendants' argument that the guilty pleas address only narrower conspiracies, involving fewer banks or currency pairs, is unpersuasive.  Evidence of the challenged guilty pleas is highly probative of the existence of a conspiracy -- one of the two certified questions -- even if the charged criminal conspiracies were narrower than the one alleged in this case, and even if no one piece of evidence will prove the scope of the conspiracy, or whether CS joined the conspiracy.

Any prejudice Defendants might suffer does not substantially outweigh its probative value.  Defendants are right that other banks' guilty pleas to price-fixing conspiracies will be powerful evidence that a price-fixing conspiracy existed, but that is hardly unfair prejudice.  The risk of prejudice to Defendants from "guilt by association" could be mitigated, for example, with a jury instruction that the guilty pleas are offered only on the first issue, the existence of a conspiracy, and not on the second issue, whether CS joined that conspiracy.

4. **Defendants' Fourth MIL** (Dkt. 1736).  Defendants' motion to exclude evidence and argument concerning factual admissions contained in guilty pleas and plea allocutions of Non-CS persons and entities is **DENIED** for substantially the same reasons Defendants' third motion, to exclude the pleas themselves, is denied.

The Court will admit those portions of the factual admissions pertaining to the conduct at issue in this case, i.e., widening spreads, including lowering bid quotes and increasing ask quotes through an anticompetitive conspiracy.  Other related admissions may be admitted if necessary for context.  The parties shall meet and confer regarding which factual admissions Plaintiffs

intend to present to the jury and shall advise the Court by 12:00 P.M. two trial days before they intend to offer the evidence of any disputes that the parties are unable to resolve.

5. **Defendants' Fifth MIL** (Dkt. 1744).  Defendants' motion to exclude non-CS consent orders and regulatory settlements is **GRANTED in part** under Rule 408 **and DENIED in part.**

The motion is GRANTED, except as provided below, for the same reason that Defendants' first motion, to exclude the CS Consent Order, is granted.  This ruling does not bar Plaintiffs from introducing any of the underlying evidence cited by regulators in support of their findings or allegations.

The motion is DENIED with respect to factual admissions contained in the consent order between Barclays PLC and DFS that are relevant to the conduct at issue in this case.  Barclays, apparently alone among the alleged conspirators here, admitted the factual allegations in the order.  *Cf. Loreley Fin.*, 797 F.3d at 179 & n.11 (noting that "SEC orders like the one at issue [t]here [are] inadmissible to prove the facts of liability" where the findings in the order at issue "were not admitted by" the defendant).  Most consent orders are properly analogized to *nolo contendere* pleas, as in *Lipsky*, because the defendant neither admits nor denies the allegations.  *See Gilbert*, 668 F.2d at 97.  In such a case, the evidentiary value of the allegations or "findings" is inextricable from the fact of compromise itself, which cannot be introduced.  Fed. R. Evid. 408.  Where, as in the Barclays order, the factual statements are the Defendants' own admissions, made after and not "during compromise negotiations," they are probative independent of the settlement, and Rule 408 does not bar their admission.

6. **Defendants' Sixth MIL** (Dkt. 1750).  Defendants' motion to exclude evidence and argument concerning the Board of Governors of the Federal Reserve System's investigation of,

and findings concerning, Peter Little and Michael Weston (the "Federal Reserve Investigations") is **GRANTED** under Rules 408, 401, 402 and 403.

The Weston Order is a consent order that is excludable under Rule 408 for the same reasons that Defendants' first motion is granted.

It is unnecessary to decide whether the Little Order is more like a government investigation report, consent order or civil complaint, because the Little Order does not appear to contain allegations or findings concerning the conduct at issue in this case. Plaintiff has not pointed to any part of the Little Order that pertains to anything other than manipulation of benchmark "fix" rates and coordinated trading around the fixes. The Little Order is thus irrelevant, and any minimal probative value it might have is substantially outweighed by the prejudice and confusion of the issues that could be caused by introducing other kinds of FX-related misconduct. The Little Order is excluded under Rules 401, 402 and 403.

7.  **Defendants' Seventh MIL** (Dkt. 1758). Defendants' motion to exclude evidence and argument concerning internal bank policies of CS and other Non-CS Defendants is **GRANTED in part** under Rules 401, 402 and 403 **and DENIED in part**.

To the extent the policies at issue simply restate or interpret the antitrust laws, or describe the kinds of activities the antitrust laws generally prohibit (e.g., "price fixing" or "bid rigging"), those policies or portions thereof are excluded. For substantially the reasons in Defendants' memorandum and the cases cited therein, those policies are irrelevant or, in any event, substantially more prejudicial than probative, as they could confuse the jury as to the applicable law or lead the jury to believe that violation of an antitrust policy is a violation of the law.

To the extent the policies at issue specifically proscribe or limit the kind of conduct that allegedly effectuated an antitrust conspiracy (e.g., using instant messaging, sharing information

7

about non-public trades, etc.), those policies or portions thereof are admissible. That guidance is highly probative to rebut Defendants' anticipated argument that the traders' actions were innocuous or normal and not evidence of a conspiracy. Any prejudice can be mitigated by a jury instruction that the specific conduct described does not in itself violate the antitrust laws.

8. **Defendants' Eighth MIL** (Dkt. 1764). Defendants' motion to exclude evidence and argument concerning subsequent remedial measures is **GRANTED** under Rule 407.

Closing down chat rooms that allegedly created the conditions for a conspiracy is a paradigmatic measure "that would have made an earlier injury or harm less likely to occur" and are inadmissible under Rule 407 to prove culpable conduct. The same goes for strengthening corporate policies, *SEC v. Geon Indus., Inc.*, 531 F.2d 39, 52 (1976), and firing employees allegedly directly responsible for price fixing.

Contrary to Plaintiffs' argument, there is no exception to Rule 407 for antitrust claims, and *United States v. Koppers Co.* is not controlling. 652 F.2d 290, 298-99 (2d Cir. 1981). The two pieces of evidence at issue in *Koppers* were not remedial measures at all. The statement, "the deal we had is over" is simply an admission that the parties previously had a deal; it does not make a conspiracy any less likely to occur. *Id.* at 298. The fact that, after the conspiracy ended, the "bidding pattern" changed is also not a "measure" defendant took. *Id.* at 299. It is evidence that a conspiracy had distorted bidding patterns before. The analogous, admissible evidence in this case would be if, after the conspiracy ended, FX spreads became narrower. *See United States v. Alex Brown & Sons, Inc.*, No. 96 Civ. 5313, 1997 WL 314390, at *23 (S.D.N.Y. Apr. 24, 1997) (addressing evidence that "days later" after public disclosure of a potential spread-fixing conspiracy "spreads . . . began to narrow").

Plaintiffs' argument that alleged co-conspirators' remedial measures are admissible against Defendants is unpersuasive. If, as Plaintiffs argue, all of the banks took remedial measures to end the conspiracy and prevent it from recurring, each bank's remedial measures cannot be disentangled from the others'. Admitting a conspirator's remedial measures against a co-conspirator would have the same chilling effect on remediation of harmful conditions that Rule 407 guards against, because conspirators are jointly and severally liable. *See Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*, No. 08 Civ. 11315, 2011 WL 855876, at *7 (S.D.N.Y. Feb. 28, 2011).

9. **Defendants' Ninth MIL** (Dkt. 1770). Defendants' motion to exclude communications involving only participants located outside the United States unless Plaintiffs first establish the "requisite nexus" to United States commerce for each such item of evidence is **DENIED**.

Under the Foreign Trade Antitrust Improvements Act ("FTAIA"), Defendants are liable for extraterritorial conduct only if it directly, foreseeably and substantially affected domestic or import commerce. 15 U.S.C. § 6a. The statute limits what claims can go forward under the Sherman Act. Therefore, the class is restricted to persons who were domiciled in the United States or traded in the United States. Plaintiffs are seeking to prove the existence of an overarching, international conspiracy that harmed class members, who necessarily have the requisite U.S. nexus. Extraterritorial communications in furtherance of that conspiracy by definition also have the "requisite nexus." Moreover, as Plaintiffs correctly argue, the FTAIA limits what claims can be brought, not what evidence is admissible to prove those claims.

10. **Defendants' Tenth MIL** (Dkt. 1775). Defendants' motion to exclude evidence and argument related to alleged other "bad acts" purportedly committed by CS and the Settling Defendants is **GRANTED in part, and otherwise DENIED without prejudice**.

The chat at Dkt. 1777-1 is excluded under Rules 403 and 404(b). The participants in the chat state in substance that every market on Wall Street is "rigged," has been and always will be. The conversation mentions "libor.. muni bonds... the facebook ipo.. the tech/research debacle.. fx at state street," but to the extent those are references to prior bad acts, and even assuming that CS or any other defendant was involved, the evidence does not serve a permissible purpose under Rule 404(b). Plaintiffs argue that the discussion in this chat shows a common course of dealing in chatrooms, but the chat itself does not clearly support that inference. Any minimal probative value for a permissible purpose is substantially outweighed by the prejudice caused by the more obvious and impermissible propensity inference.

The chat at Dkt. 1777-2 is excluded as irrelevant under Rules 401 and 402 and is not admissible under Rule 404(b). The chat refers to one bank banning chats with other banks, and one participant says, "this libor thing getting too much," to which the response is "Not good."

The motion contains no other specific evidence to be excluded but seeks to exclude all other evidence of bad acts. This application is denied. Other bad act evidence may be admissible under Rule 404(b), to show intent, motive, preparation and knowledge, among other things. For example, if the traders discussed their own or their colleagues' use of chat rooms to facilitate past misconduct, that could be admissible under Rule 404(b) to show a *modus operandi*. Accordingly, apart from the two referenced documents, the motion is denied without prejudice to renewal during trial.[1]

---

[1] The Court understands that the parties are working to agree on a trial protocol. The Court requests that, for each trial day, the parties exchange a list of exhibits sufficiently in advance so that the Court can rule on objections and, if possible, pre-admit exhibits at the conclusion of the trial day preceding the day the exhibits will be introduced.

11. **Defendants' Eleventh MIL** (Dkt. 1779).  Defendants seek to preclude Keith Underwood from testifying and seek to exclude reports authored by Mr. Underwood in separate proceedings between UBS AG and two of its employees, to which CS was not a party.  This motion is **GRANTED** under Federal Rule of Civil Procedure 26(a)(2)(A).

A party must disclose the identity of any expert witnesses that party may use at trial.  Fed. R. Civ. P. 26(a)(2)(A).  For expert witnesses like Mr. Underwood, who are not retained by the party to provide expert testimony in the case – i.e., unretained witnesses with expertise under Evidence Rule 702 – the party must provide a summary of the facts and opinions to which the expert is expected to testify at least 90 days before the date set for trial.  Fed. R. Civ. P. 26(a)(2)(C)(ii), 26(a)(2)(D)(i).  Plaintiffs do not dispute that no such disclosures were made.  "Preclusion . . . is a drastic remedy and should be exercised with discretion and caution," but it is appropriate here in light of all of the factors courts consider.  *Olutosin v. Gunsett*, No. 14 Civ. 685, 2019 WL 5616889, at *4 (S.D.N.Y. Oct. 31, 2019) (cleaned up).

First, Plaintiffs offer no "explanation for the failure to comply with the disclosure requirement."  *Id.* (quoting *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294-96 (2d Cir. 2006)).  "[T]he importance of [Underwood's] testimony" is minimal since Plaintiffs concede the only difference between him and their other witnesses is that Underwood was once hired by Defendants, and most of the Underwood reports Plaintiffs cite simply restate the contents of chat transcripts that Plaintiffs can introduce.  *Id.*  Defendants would suffer considerable prejudice if, this close to trial, they had to prepare to meet this testimony with a side-show on the circumstances of Underwood's retention and the bases for his opinions in separate proceedings.  *Id.*  No continuance will be granted just weeks before trial.  *Id.*  Accordingly, Plaintiffs are precluded from calling Mr. Underwood as a witness.

To the extent that defense expert Dr. McCrary offers opinions at trial that he states (or has stated) are in reliance on Mr. Underwood's reports or opinions, Dr. McCrary may be questioned about that reliance and Mr. Underwood's reports he did not consider.  In sum, it is:

**ORDERED** that Defendants' application to exclude (i) the consent order between CS and DFS is GRANTED; (ii) testimony of persons invoking the Fifth Amendment is DENIED; (iii) certain other banks' and traders' criminal prosecutions, guilty pleas and convictions for Sherman Act or other criminal violations is DENIED; (iv) factual admissions contained in guilty pleas and plea allocutions of Non-CS persons and entities is DENIED; (v) non-CS consent orders and regulatory settlements is GRANTED in part and DENIED in part; (vi) the Federal Reserve Investigations of Peter Little and Michael Weston is GRANTED; (vii) internal bank policies is GRANTED in part and DENIED in part; (viii) evidence of subsequent remedial measures is GRANTED; (ix) communications between participants located outside the U.S. is DENIED; (x) "bad acts" is GRANTED in part and otherwise DENIED without prejudice and (xi) Keith Underwood's testimony and reports is GRANTED.

The Clerk of Court is respectfully directed to include on the docket only the text in the preceding "Ordered" paragraph, and to close the motions at Dkt. Nos. 1710, 1714, 1726, 1736, 1744, 1750, 1758, 1764, 1770, 1775 and 1779.

Dated: September 6, 2022
       New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**