**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | No. 13 Civ. 7789 (LGS) |

**JOINT SUBMISSION OF**
**PROPOSED CASE-SPECIFIC JURY INSTRUCTIONS**

**September 9, 2022**

SCOTT+ SCOTT ATTORNEYS AT LAW LLP
Christopher M. Burke (CB-3648)
Walter W. Noss (WN-0529)
Kate Lv (*pro hac vice*)
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619/233-4565
619/233-0508 (fax)
cburke@scott-scott.com
wnoss@scott-scott.com
klv@scott-scott.com

HAUSFELD LLP
Michael D. Hausfeld
Reena A. Gambhir (*pro hac vice*)
Timothy S. Kearns (*pro hac vice*)
Ian Engdahl (*pro hac vice*)
Jose Roman Lavergne (*pro hac vice*)
888 16th Street NW, Suite 300
Washington, DC 20006
Telephone: 202/540-7200

CAHILL GORDON & REINDEL LLP
Herbert S. Washer
Anirudh Bansal
Jason M. Hall
Edward Moss
Tammy L. Roy
Miles Wiley

32 Old Slip
New York, New York 10005
Telephone: (212) 701–3000
Facsimile: (212) 269–5420
hwasher@cahill.com
abansal@cahill.com
jhall@cahill.com
emoss@cahill.com
troy@cahill.com
mwiley@cahill.com

*Attorneys for Defendants Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse Securities (USA) LLC*

202/540-7201 (fax)
mhausfeld@hausfeld.com
rgambhir@hausfeld.com
tkearns@hausfeld.com
iengdahl@hausfeld.com
jlavergne@hausfeld.com


ROBBINS GELLER RUDMAN & DOWD
LLP
Patrick J. Coughlin (PC-5116)
Alexandra S. Bernay (*pro hac vice*)
Carmen A. Medici (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com

KOREIN TILLERY, LLC
Stephen M. Tillery
Steven M. Berezney
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: 314/241-4844
314/241-3525 (fax)
stillery@koreintillery.com
sberezney@koreintillery.com

*Class Counsel*

# **CONTENTS**

**PRE-TRIAL / GENERIC INSTRUCTIONS** ...............................................................1

   1. General Introduction – The Parties (Joint Proposed Instruction) ....................................1

   2. Class Action (Joint Proposed Instruction) ...................................................................2

   3. Claims and Defenses (Joint Proposed Instruction) .........................................................4

   4. Corporations (Joint Proposed Instruction) ...................................................................6

**PROPOSED SUBSTANTIVE INSTRUCTIONS FOR SHERMAN ACT** .............................8

   5. The Sherman Act – Purpose (Joint Proposed Instruction) ...............................................8

   6a. Definition, Existence and Evidence of a Conspiracy (Plaintiffs' Version) ..................9

   6b. Conspiracy Defined and Proof of Conspiracy (CS Version) .......................................12

   7. Evidence must be viewed as a whole (Joint Proposed Instruction) ..............................15

   8a. Single or Multiple Conspiracies (Plaintiffs' Version) ..................................................16

   8b. Multiple Conspiracies (CS Version) ............................................................................18

   9a. Withdrawal from a conspiracy (Plaintiffs' Version) (No CS Equivalent) ..................20

   10b. Parallel or Similar Conduct (CS Version) (No Plaintiffs Equivalent) ......................21

   11. Participation and Intent (Joint Proposed Instruction) .................................................24

   12a. Price Fixing as Per Se Violation: (Plaintiffs) (No CS Equivalent) ...........................26

   13. Not Necessary to Join All Conspirators (Joint Proposed Instruction) ........................27

   14a. Ignorance of Antitrust Laws Is No Defense (Plaintiffs) (No CS Equivalent)............28

   15a. Good Intent Not a Defense (Plaintiffs) (No CS Equivalent)......................................29

   16a. Reasonableness of Prices Is No Excuse (Plaintiffs) (No CS Equivalent).................30

   17a. Evidence of Competition (Plaintiffs' Version) ..........................................................31

   17b. Evidence of Competition (Credit Suisse's Version)...................................................32

18b. Trading Among Defendants (CS Version) (No Plaintiffs Equivalent)......................33

**INSTRUCTIONS RELEVANT TO *IN LIMINE* MOTIONS**.................................................**34**

19a. Criminal Convictions – Post and/or Pre-Trial (Plaintiffs' Version) ........................34

19b. Criminal Convictions – During-Trial and After Trial (CS Version) ........................36

20a. Invocation of Fifth Amendment – By a Party of a Witness Identified with a
     Party– Post and/or Pre-Trial  (Plaintiffs' Version) .................................................37

21a. Invocation of Fifth Amendment – By a Nonparty Witness– Post And/Or Pre-
     Trial   (Plaintiffs' Version) .....................................................................................38

21b. Witnesses Taking the Fifth Amendment – To Be Given During Trial and
     After Trial (CS Version) ........................................................................................41

22.  Internal Bank Policies –Post-Trial (Joint Proposed Instruction) ...............................43

23b. Information Sharing Post-Trial Instruction (CS) (No Plaintiffs Equivalent)............44

**MISCELLANEOUS** ............................................................................................................**47**

24. Unavailability of Certain Evidence (Joint Proposed Instruction)...............................47

<u>**PRE-TRIAL / GENERIC INSTRUCTIONS**</u>

<u>**1. General Introduction – The Parties (Joint Proposed Instruction)**</u>

This lawsuit has been brought as a class action. The parties who sue are called the plaintiffs. In this action, the Plaintiffs are a class of persons or entities who trade in the foreign exchange ("FX") spot market, whom I will define in a minute. The parties being sued are called the defendants. In this action, the Defendants are Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse Securities (USA) LLC. You may hear the Court or the parties refer to these three entities together as simply "Credit Suisse" or "CS."

**SOURCE: Kevin F. O'Malley, Jay E. Grenig & William C. Lee, Federal Jury Practice and Instructions - Civil, § 101.01 (5th ed. 2000)**.

## 2. Class Action (Joint Proposed Instruction)

This lawsuit has been brought as a class action. A class action is a lawsuit that has been brought by one or more persons or entities called class representatives on behalf of a larger group of people or entities who have similar legal claims. All of these people or entities together are called a class. A class action lawsuit allows discrete issues related to the claims of many persons or businesses to be resolved at the same time, rather than requiring each person or business to sue separately. Not everyone in the class will testify, but you may assume that the evidence admitted during trial applies to all class members, unless I tell you otherwise. The fact that this case is proceeding as a class action does not mean any decision has been made about the merits of the case, and you must not infer anything about the merits of this case based on the fact that it is a class action.

In this case, the Over-the-Counter or OTC Class is defined as:

All persons who, between December 1, 2007 and December 31, 2013 (inclusive) entered into a total of 10 or more FX spot, forward, and/or swap trades directly with one or more Defendants in the 52 Affected Currency Pairs via voice or on a single-bank platform, where Defendants provided liquidity and such persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, traded in the United States or its territories.

The plaintiffs representing the OTC Class are Aureus Currency Fund, L.P.; City of Philadelphia, Board of Pensions and Retirement; Employees' Retirement System of the Government of the Virgin Islands; Employees' Retirement System of Puerto Rico Electric Power Authority; Fresno County Employees' Retirement Association; Haverhill Retirement System; Oklahoma Firefighters Pension and Retirement System; State–Boston Retirement System; Syena Global Emerging Markets Fund, LP; Tiberius OC Fund, Ltd.; Value Recovery Fund L.L.C.; and United Food and Commercial Workers Union and Participating Food Industry Employers Tri–State Pension Fund; and Systrax Corporation.

**SOURCE:** *In re Capacitors Antitrust Litig.*, Case 3:14-cv-03264-JD, (N.D. Cal.), ECF No. 2899 at 3.

### 3. Claims and Defenses (Joint Proposed Instruction)

I will read to you the following statement that has been prepared by the parties.  This statement does not reflect my views about the case or the evidence you will hear.

The Plaintiffs here traded currency in the foreign exchange ("FX") market.

I will tell you briefly what this means.  In the United States, our currency that we use is dollars.  But different countries use different currencies such as the Euro or the Yen. Converting money between different currencies, such as exchanging dollars for Euros, is called trading in foreign exchange.  In that example, we would refer to dollar/Euro as a "currency pair."

The defendant, Credit Suisse, serves as a dealer in the FX spot market.  When Plaintiffs want to trade in foreign exchange, they can do so with dealers such as Credit Suisse. Sometimes a customer wants to buy a currency and sometimes a customer wants to sell it. Dealers offer themselves as willing to buy or sell currency pairs.  The difference between the price at which a dealer is willing to buy and the price at which it is willing to sell is called the "bid-ask spread" or the "spread."

Plaintiffs contend that Credit Suisse harmed competition by entering into an unlawful agreement with as many as 15 other dealer banks to widen, fix, stabilize, or maintain the bid-ask spreads for different currency pairs during a period of approximately six years. Credit Suisse contends that it was not part of such a conspiracy and that, in fact, there was no such conspiracy.

That is the end of the parties' statement.

In this case, the Court has identified specific questions for your determination. These questions are: [Describe Verdict Form]

The other banks that are alleged to have been part of a conspiracy with Credit Suisse are: Bank of America, Bank of Tokyo-Mitsubishi, Barclays, BNP Paribas, Citigroup, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Royal Bank of Canada, Royal Bank of Scotland, Société Générale, Standard Chartered, and UBS.  That those banks are not defendants in this trial should have no bearing on the decisions that you reach.  This is true even if it appears that the role of one or more of these other banks may have been greater than that of Credit Suisse.

You are not being asked to determine whether the alleged agreement or agreements, if it or they existed, caused any injury to Plaintiffs or the Class.  You are also not being asked to determine any damages that may have resulted from the alleged agreement or agreements, if any. Your task is to determine only the identified questions.

**SOURCE: Leonard B. Sand, et al., 4 Modern Federal Jury Instructions–Civil Instruction P 79.02 Instruction 79-13 ("Co-Conspirators Not Named as Defendants")** ("It is not necessary for a plaintiff to name as a defendant every person whom he claims participated in the unlawful agreement or conspiracy. . . This is true even if it appears that the role of the unnamed participant may have been greater than that of those the plaintiff did name as defendants.")

## 4. Corporations (Joint Proposed Instruction)

Credit Suisse and certain of the Plaintiffs here are corporations. Under the law, a corporation is a person, but it acts only through its agents. A corporation's agents include its directors, officers, employees, or others acting on its behalf. A corporation is not capable under the law of conspiring with its own agents, unincorporated divisions, or wholly-owned subsidiaries. Through its agents, however, a corporation is capable of conspiring with other persons or independent corporations.

A corporation is legally bound by the acts and statements of its agents or employees done or made within the scope of the agent's employment or apparent authority.

Acts done within the scope of employment are acts performed on behalf of a corporation and directly related to the performance of the duties the agent has general authority to perform. Apparent authority is the authority that persons outside the corporation could reasonably believe the agent would have, judging from his or her position with the company, the responsibilities previously entrusted to the person or the office, and the circumstances surrounding his or her past conduct. An agent can have apparent authority even when, despite these appearances, the agent is actually acting in a dishonest, fraudulent, or anticompetitive manner.

To summarize, for a corporation to be legally responsible for the acts or statements of its agents, you must find that the agent was acting within the scope of his or her employment with apparent authority.

[The fact that a corporation has instructed its agents not to violate the antitrust laws does not excuse the corporation from responsibility for the unlawful acts of its agents done within the scope of their employment or apparent authority.][1]

A corporation is entitled to the same fair trial as a private individual. The acts of a corporation are to be judged by the same standard as the acts of a private individual, and you may hold a corporation liable only if such liability is established by the preponderance of the evidence. All persons, including corporations, are equal before the law.

**SOURCE: ABA Model Jury Instructions in Civil Antitrust Cases, 2016 Edition, Section 1 of the Sherman Act – Contract, Combination, or Conspiracy - Instruction 3: Corporations, at 19.**

---

[1] Plaintiffs have proposed inclusion of the bracketed language.  Credit Suisse's position is that it is unnecessary because Credit Suisse does not presently intend to raise as a defense that employees were instructed not to violate the antitrust laws.  To the extent the evidence at trial suggests that Credit Suisse or another bank instructed its employees not to violate the antitrust laws, Credit Suisse respectfully submits that the Court and parties can revisit this instruction at that time.

## PROPOSED SUBSTANTIVE INSTRUCTIONS FOR SHERMAN ACT

### 5. The Sherman Act – Purpose (Joint Proposed Instruction)

The law that Plaintiffs allege that Credit Suisse has violated is called Section 1 of the

Sherman Antitrust Act.

The purpose of the Sherman Act is to preserve free and unfettered competition in the

marketplace. The Sherman Act rests on the central premise that competition produces the best

allocation of our economic resources, the lowest prices, the highest quality, and the greatest

material progress.

Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies that

unreasonably restrain trade.

**SOURCES:**
- **Opinion & Order (ECF No. 1650) (Feb. 1, 2022)** (Summary Judgment Opinion)
- **American Bar Association Antitrust Section, Model Jury Instructions In Civil Antitrust Cases (A.B.A., Chicago, Ill., 2016), Instruction 1: Purpose** ("The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace.")
- **Leonard B. Sand, et al., 4 Modern Federal Jury Instructions–Civil Instruction P 79.02 Instruction 79-2 (The Purpose of the Statute)** ("The purpose of the Sherman Act is to preserve and encourage free and open business competition so that the public may receive better goods and services at a lower cost.")
- ***N. Pac. Ry. Co*. v. *United States*, 356 U.S. 1, 4 (1958)** ("The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conductive to the preservation of our democratic political and social institutions.").
- **Instructions to the Jury at 6, *MM Steel, LP, et al*. v. *Reliance Steel & Alum. Co., et al*., No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014) (ECF 518)** ("In general, the law protects competition, not competitors. Hence, an act is unlawful when it constitutes an unreasonable restraint on interstate commerce.").

### 6a. Definition, Existence and Evidence of a Conspiracy (Plaintiffs' Version)

Plaintiffs allege that Credit Suisse and its conspirators participated in a conspiracy to restrain trade by widening, fixing, stabilizing, or maintaining spreads in the FX spot market. A conspiracy is an agreement or understanding between two or more persons to restrain trade.

Plaintiffs must prove both of the following elements by a preponderance of the evidence:

(1) that the alleged conspiracy existed; and

(2) that Credit Suisse knowingly became a member of that conspiracy. To act knowingly means to participate deliberately, and not because of mistake or accident or other innocent reason.

The basis of a conspiracy is an agreement or understanding between two or more persons. An agreement or understanding between two or more persons exists when they share a commitment to a common scheme.

To establish the existence of a conspiracy, the evidence does not need to show that the conspirators entered into any formal or written agreement. The agreement itself may have been entirely unspoken. A person can become a member without full knowledge of all of the details of the conspiracy, the identity of all of its members, or the parts such members played in the charged conspiracy. A person can also become a member of a conspiracy without full knowledge of the scope of the conspiracy, as long as they are aware of the general nature and extent of the conspiracy. The members of the conspiracy need not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose. An agreement that constitutes a conspiracy can be tacit or express, and an explicit agreement is not necessary.

A conspiracy may be formed without all parties coming to an agreement at the same time, such as where competitors separately accept invitations to participate in a plan to restrain trade.

Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement. It is also not necessary that all of the means or methods claimed by Plaintiffs were agreed upon to carry out the alleged conspiracy, nor that all of the means or methods that were agreed upon were actually used or put into operation, nor that all persons alleged to be members of the conspiracy were actually members. It is the agreement or understanding to restrain trade by widening, fixing, stabilizing, or maintaining spreads in the FX spot market that constitutes a conspiracy. Therefore, you may find a conspiracy existed regardless of whether it succeeded or failed.

Plaintiffs may prove the existence of the alleged conspiracy through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of the alleged conspiracy.

Direct proof of an agreement may not be available, and therefore a conspiracy also may be shown through circumstantial evidence. You may infer the existence of a conspiracy from the circumstances, including what you find the alleged members actually did and the words they used. Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together, does not by itself establish the existence of a conspiracy. If they acted similarly but independently of one another, without any agreement among them, then there would not be a conspiracy.

**SOURCES:**
- ABA Model Jury Instructions in Civil Antitrust Cases, 2016 Edition, Section 1 of the Sherman Act – Contract, Combination, or Conspiracy - Instruction 1: Definition, Existence and Evidence, at 13-14
- Opinion & Order (ECF No. 1650) (Feb. 1, 2022) at 24 (""[I]t has long been settled that explicit agreement is not a necessary part of a Sherman Act conspiracy." *United States v. Gen. Motors Corp.*, 384 U.S. 127, 142-43 (1966); *see also Brown v. Pro Football*, 518 U.S. 231, 241 (1996) ("Antitrust law also sometimes permits judges or juries to premise antitrust liability upon little more than uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable . . . ."). An agreement can

be "tacit or express" and in most antitrust cases a "smoking gun' can be hard to come by." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019).'");

- *Id.* at 25-26 ("[A] conspirator need only know of a conspiracy's "general nature and extent" to have joined it. *Huezo*, 546 F.3d at 180. One need not have full knowledge of all the details of a conspiracy or its scope to be a member. *See Blumenthal v. United States*, 332 U.S. 539, 557 (1947) (recognizing that "[s]ecrecy and concealment are essential features of successful conspiracy" and that, as a result, "the law rightly gives room for allowing the conviction of those discovered . . . without requiring evidence of knowledge of all its details or of the participation of others"); *United States v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008) ("It is well-settled that a conspirator need not be fully informed about his co-conspirators' specific criminal acts provided that he agreed to participate in the broader criminal conspiracy . . . ."); *Meredith*, 1 F. Supp. 3d at 213 ("To be held a part of a conspiracy, a conspirator need not know all dimensions of the wrongful conduct taken in its furtherance.")).

## 6b. Conspiracy Defined and Proof of Conspiracy (CS Version)

A conspiracy is an agreement by two or more persons or corporations to violate or disregard the law.  Here, the Plaintiffs allege that Credit Suisse and up to 15 other banks each knowingly participated in a conspiracy to widen, fix, stabilize, or maintain spreads in the FX spot market that lasted from December 1, 2007 until December 31, 2013.

A conspiracy is a kind of "partnership" in which each person found to be a member of the conspiracy is liable for all acts and statements of the other members made during the existence of and in furtherance of the conspiracy. To create such a relationship, two or more persons must enter into an agreement that they will act together for an unlawful purpose.  The essence of a conspiracy is an agreement between two or more people to violate or disregard the law.

You must determine whether such an agreement or agreements existed and what the purpose, or objective, of the agreement was.  If Credit Suisse and other banks pursued similar or even identical activities, but did not enter into an agreement to do so, that would be lawful, and you would answer "No" to Question 1 on the verdict form.

To establish the existence of a conspiracy, the evidence must tend to show that the alleged members of the conspiracy had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.  In other words, you must find that the evidence reasonably tends to prove that Credit Suisse and at least one other bank had a conscious commitment to a common scheme designed to achieve an unlawful objective.

The evidence need not show that the alleged conspirators entered into any formal or written agreement; that they all met together; or that they directly stated what their object or purpose was, or the details of it, or the means by which they would accomplish their purpose. The agreement itself may have been entirely unspoken. But the Plaintiffs do need to prove that

two or more banks actually entered into the alleged agreement.  It is the agreement to act together that constitutes the conspiracy.

A conspiracy may vary in its membership from time to time. It may be formed without all parties coming to an agreement at the same time, such as where competitors, without previous agreement, separately accept invitations to participate in a plan to restrain trade. The agreement may be shown if the proof establishes that the banks knowingly and intentionally worked together to accomplish the common purpose of widening or fixing spreads in the FX markets. To act knowingly means to act voluntarily and intentionally, and not because of mistake or accident or other innocent reason.  It is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement.

Direct proof of an agreement may not always be available. A conspiracy may be inferred from the circumstances or by the acts of the members. Therefore, you may infer the existence of an agreement from what you find the alleged members actually did, as well as from the words they used.

**SOURCES**:
- **Leonard B. Sand, et al., 4 Modern Federal Jury Instructions–Civil Instruction P 79.02 Instruction 79-4 (First Element—Conspiracy Defined)** ("The essence of a conspiracy is an agreement between two or more people or corporations to violate or disregard the law.")
- **Jury Instructions, *In Re: Tft-Lcd (Flat Panel) Antitrust Litigation*, 3:07-md-01827-SI (ECF No. 6036) at 10 (N.D. Cal. June 28, 2012)** ("A conspiracy is a kind of 'partnership' in which each person found to be a member of the conspiracy is liable for all acts and statements of the other members made during the existence of and in furtherance of the conspiracy.  To create such a relationship, two or more persons must enter into an agreement that they will act together for some unlawful purpose or to achieve a lawful purpose by unlawful means.")
- ***American Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)** (Circumstances must reveal "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement").
- ***Spectators' Commun. Network, Inc.* v. *Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001)** ("To prove conspiracy or 'concerted action,' the plaintiff must prove that the

conspirators had a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'") (citations omitted).

- **Jury Instructions, *In Re: Tft-Lcd (Flat Panel) Antitrust Litigation*, 3:07-md-01827-SI (N.D. Cal. June 28, 2012) (ECF No. 6036) at 10** ("To establish the existence of a conspiracy, the evidence need not show that its members entered into any formal or written agreement; that they met together; or that they directly stated what their objector purpose was, or the details of it, or the means by which they would accomplish their purpose. The agreement itself may have been entirely unspoken. What the evidence must show to prove that a conspiracy existed is that the alleged members of the conspiracy in some way came to an agreement to accomplish a common purpose. It is the agreement to act together that constitutes the conspiracy.")
- **American Bar Association Antitrust Section, Model Jury Instructions In Civil Antitrust Cases (A.B.A., Chicago, Ill., 2016), Chapter 2, Instruction 1 (Definition, Existence, And Evidence)** ("A conspiracy may be formed without all parties coming to an agreement at the same time . . . Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement. . . Direct evidence of an agreement may not be available, and therefore a conspiracy also may be shown through circumstantial evidence.")
- ***Monsanto Co.* v. *Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1989)** ("[T]here must be evidence that tends to exclude the possibility of independent action by the [parties]. That is, there must be direct or circumstantial evidence that reasonably tends to prove that [the parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective.")

## <u>7. Evidence must be viewed as a whole (Joint Proposed Instruction)</u>

In determining whether an agreement or understanding between two or more persons to widen, fix, maintain, or stabilize spreads has been proved, you must view the evidence as a whole and not piecemeal.

**SOURCE**: **ABA Model Jury Instructions in Civil Antitrust Cases, 2016 Edition, Section 1 of the Sherman Act – Contract, Combination, or Conspiracy - Instruction 1: Definition, Existence and Evidence** ("In determining whether an agreement or understanding between two or more persons has been proved, you must view the evidence as a whole and not piecemeal.")

## **8a. Single or Multiple Conspiracies (Plaintiffs' Version)**

The Plaintiffs allege that Credit Suisse and its alleged conspirators were all members of one conspiracy to widen, fix, stabilize, or maintain spreads in the FX market. Credit Suisse has denied its participation in any conspiracy and argued that, if any conspiracy existed, there were really numerous separate conspiracies. Whether a single conspiracy or multiple conspiracies existed is a question of fact that you must decide.

In deciding whether there was a single conspiracy or more than one conspiracy, you should concentrate on the nature of the agreement proved by the evidence. To prove a single conspiracy, the Plaintiffs must show by a preponderance of the evidence that each of the alleged members or conspirators agreed to participate in what they knew or should have known was a single group activity directed toward common objectives. The Plaintiffs must prove that there was an agreement on overall objective.

Multiple conspiracies are separate agreements operating independently of each other. However, a finding of a master conspiracy that includes other, sub-schemes does not constitute a finding of multiple, unrelated conspiracies. A single conspiracy may exist when there is a continuing core agreement that attracts different members at different times and which involves different sub-groups committing acts in furtherance of an overall objective.

In determining whether the evidence shows a single conspiracy or separate and unrelated conspiracies, you should consider whether there was a common goal among the alleged conspirators; whether there existed common or similar methods; whether and to what extent alleged participants overlapped in their various dealings; whether and to what extent the activities of the alleged conspirators were related and interdependent; how helpful each alleged conspirator's contributions were to the goals of the others; and whether the scheme contemplated

a continuing objective that would not be achieved without the ongoing cooperation of the conspirators.

A single conspiracy may exist even if all the members did not know each other, or never sat down together, or did not know what roles all the other members would play. A single conspiracy may exist even if different members joined at different times, or the membership of the conspiracy changed over time. Similarly, there may be a single conspiracy even though there were different sub-groups operating in different places, or many acts or transactions committed over a long period of time. You may consider these things in deciding whether there was one conspiracy or more than one conspiracy, but they are not necessarily controlling. What is controlling is whether the Plaintiffs have proved by a preponderance of the evidence that there was one overall agreement on common objectives.

If you find there were multiple conspiracies, you must determine for each conspiracy you find whether Credit Suisse knowingly participated in the conspiracy.  If you determine that Credit Suisse knowingly participated, you will be asked to indicate on the verdict form the other banks whose traders knowingly participated and the duration of each conspiracy.  If you find that a conspiracy or conspiracies existed in which Credit Suisse did not knowingly participate, you do not have to identify or describe those conspiracies on the verdict form.

**SOURCE: Third Circuit Model Criminal Jury instructions 20, Elements of Offenses, 6.18.371H Conspiracy – Single or Multiple Conspiracies (2018), https://www.ca3.uscourts.gov/sites/ca3/files/Chapter%206%20Conspiracy%202018%20Rev%20final%20for%20posting.pdf (modified for standard of proof)**

### 8b. Multiple Conspiracies (CS Version)

The Plaintiffs allege that Credit Suisse and up to 15 banks were all members of one conspiracy to widen, fix, stabilize, or maintain prices in the FX market.  You may find that the evidence tends to show that rather than one single conspiracy, there were multiple separate conspiracies.  Whether a single conspiracy or multiple conspiracies existed is a question of fact that you must decide.

Multiple conspiracies may be found when the evidence shows separate networks operating independently of each other, but it is not warranted when the evidence shows that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal. Proof that two or multiple groups of people pursued similar or even identical activities, but did not enter into an agreement to do so, does not prove that they were part of a single conspiracy together.

In addition, the fact that one trader at one bank participated in a particular conspiracy does not mean that all other traders at that bank participated in that conspiracy.  For example, a single bank may participate in separate conspiracies through the acts of different traders if those acts are not part of a single agreement.

If you find there were multiple conspiracies, you must determine for each conspiracy you find whether Credit Suisse knowingly participated in the conspiracy.  If you determine that Credit Suisse knowingly participated, you will be asked to indicate on the verdict form the other banks whose traders knowingly participated and the duration of each conspiracy.  If you find that a conspiracy or conspiracies existed in which Credit Suisse did not knowingly participate, you do not have to identify or describe those conspiracies on the verdict form.

**SOURCES:**

- **Opinion & Order (ECF No. 1650) (Feb. 1, 2022) at 8 (Summary Judgment Opinion)** ("Although the issue of a single versus multiple conspiracies arises more frequently in criminal cases, the same principles have been applied in civil antitrust cases to assess whether there are multiple conspiracies or a single conspiracy.")

-  *In re Processed Egg Prod. Antitrust Litigation* **Final Jury Instructions, No. 08-md-2002 (E.D. Pa.) (June 5, 2018 Trial Transcript at 127:1-4)** (instructing jury that to rule for plaintiffs, it had to find, "[f]irst, the existence of a contract, combination, or a conspiracy between or among at least two separate entities[, and s]econd, that the contract, combination, or conspiracy unreasonably restrains trade," and that the "three [challenged restraints] must all be part of a *single overarching conspiracy as opposed to, for example, three different conspiracies that were each independent of each other*") (emphasis added).

- *United States* **v.** *Miller***, 771 F.2d 1219, 1240 (9th Cir. 1985)** (no error where "[t]he trial court instructed the jury that it was insufficient for the government to prove that the defendant was a member of any conspiracy; the government had to prove that the defendant was a member of the single conspiracy charged in the indictment").

- *United States* **v.** *Milikowsky***, 896 F. Supp. 1285, 1293 (D. Conn. 1994), aff'd, 65 F.3d 4 (2d Cir. 1995)** (jury instruction stated: "[P]roof of several separate and independent conspiracies is not proof of the single, overall conspiracy charged in the indictment, unless one of the conspiracies proved happens to be the single conspiracy described in the indictment.")

- *United States* **v.** *Magee,* **821 F.2d 234, 241 (5th Cir. 1987)** (determining that jury charge "'[Y]ou should first determine whether or not the evidence established the existence of the single, overall conspiracy alleged in the indictment. Proof of several different conspiracies does not establish the single, overall conspiracy, unless one of the conspiracies is the conspiracy charged in the indictment. If you find that the alleged conspiracy did not exist, then you must acquit the defendants of [the conspiracy charges]'" made "clear that proof of several different conspiracies did not establish the single, overall conspiracy charged in the indictment and that the jury must find that the single conspiracy charged did exist before they could convict Magee").

**9a. Withdrawal from a conspiracy (Plaintiffs' Version) (No CS Equivalent)[2]**

If you find Credit Suisse joined a conspiracy, you should presume that Credit Suisse

remained a member of that conspiracy. Credit Suisse has the burden of convincing you by a

preponderance of the evidence that it withdrew from the conspiracy. For you to find that Credit

Suisse withdrew from a conspiracy, the evidence must show that Credit Suisse did some

affirmative act inconsistent with the object of that conspiracy and that Credit Suisse

communicated it was withdrawing in a manner reasonably designed to reach its co-conspirators.


**SOURCE: Kevin O'Malley, Jay E. Grenig & William C. Lee, Federal Jury Practice and
Instructions – Civil, § 150:84 (6th ed.)** ("If you find a defendant joined the alleged conspiracy,
you should presume that the defendant remained a member of the conspiracy. The defendant has
the burden of convincing you by a preponderance of the evidence that it withdrew from the
conspiracy. For you to find that the defendant withdrew from the conspiracy, the evidence must
show that the defendant did some affirmative act inconsistent with the object of the conspiracy
and that the defendant communicated it was withdrawing in a manner reasonably designed to
reach its co-conspirators. Even if a defendant withdraws from a conspiracy, that defendant
remains liable for any illegal acts it or any other member of the conspiracy committed while the
defendant was a member of the conspiracy up until the time of the withdrawal.")

---

[2] This instruction is unnecessary because Credit Suisse does not presently intend to argue that it
withdrew from a conspiracy but instead that it was not a member of a conspiracy.  To the extent
the evidence at trial suggests that Credit Suisse withdrew from a conspiracy, Credit Suisse
respectfully submits that the Court and parties can revisit this instruction at that time.

### 10b. Parallel or Similar Conduct (CS Version) (No Plaintiffs Equivalent)[3]

The fact that various persons engaged in similar conduct does not, in and of itself, establish the existence of a conspiracy. This is true even if they did so knowing that others were following similar practices. Similarity of business practices or even the fact that Credit Suisse and other banks may have quoted identical prices for the same spreads does not automatically establish a conspiracy because such practices may be consistent with ordinary competitive behavior in a free and open market.

On the other hand, where it is a fact that similar practices are followed by a number of persons, with each being aware that the other is doing so, that is an important piece of evidence which you should consider, along with the other evidence in the case, in determining whether an agreement existed.

In determining whether to find an agreement, you should consider whether the different persons adopting similar practices did so because of their own independent judgment as to what

---

[3] Plaintiffs object to the inclusion of an instruction as to parallel conduct here; the use of an instruction as to parallel conduct is appropriate "for a case in which plaintiff is attempting to prove the existence of a conspiracy solely through ambiguous circumstantial evidence of parallel conduct. [Such an instruction] may be inappropriate for cases where unambiguous, direct evidence of a conspiracy is present." *See* ABA Model Jury Instructions in Civil Antitrust Cases, 2016 Edition, Section 1 of the Sherman Act – Contract, Combination, or Conspiracy - Instruction 2: Parallel Conduct, Notes. This is not such a case. *See, e.g.*, Opinion & Order (ECF No. 1650) (Feb. 1, 2022) (Summary Judgment Opinion) at 16 ("CS Defendants, in their memoranda of law, do not point to any evidence suggesting that exchange [of spreads] was … consistent with any sort of independent action"); at 24 ("Plaintiffs' evidence tends to exclude the possibility that the Defendant banks acted independently, but the parties dispute the material facts of the scope of the purported conspiracy."); SJ Order at 25 ("[T]here is uncontroverted evidence that Credit Suisse participated in at least some conspiratorial conduct in the FX market, and CS Defendants do not argue that, even if there was a conspiracy, they did not participate in it."). Plaintiffs' instruction 7a includes language sufficient to address any concern, stating "Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together, does not by itself establish the existence of a conspiracy. If they acted similarly but independently of one another, without any agreement among them, then there would not be a conspiracy."

was in their own best economic interest. In deciding this, you should consider whether the

practices employed made sense in light of the industry conditions, and whether the benefits from

those practices were dependent on other persons doing the same thing.

Just because different banks quoted identical or similar spreads for certain currency pairs

at certain times, does not, without more, establish the existence of a conspiracy to widen spreads

because such conduct may be consistent with ordinary competitive behavior in a free and open

market.  In other words, Credit Suisse could lawfully quote spreads identical to those quoted by

its competitors.  Credit Suisse could even lawfully copy the spreads of a competitor or set its

spreads wide in the hope that its competitors would copy it – this is parallel conduct.

**SOURCES:**
- **Leonard B. Sand, et al., 4 Modern Federal Jury Instructions–Civil Instruction P 79.02 Instruction 79-7 (Proof of the Conspiracy—Conscious Parallelism);)** ("The fact that various persons engaged in similar conduct does not, in and of itself, establish the existence of a conspiracy. This is true even if they did so knowing that others were following similar practices. Similarity of business practices or even the fact that the defendants may have charged identical prices for the same goods and services does not automatically establish a conspiracy because such practices may be consistent with ordinary competitive behavior in a free and open market. On the other hand, where it is a fact that similar practices are followed by a number of persons, with each being aware that the other is doing so, that is an important piece of evidence which you should consider, along with the other evidence in the case, in determining whether an agreement existed. In determining whether to find an agreement, you should consider whether the different persons adopting similar practices did so because of their own independent judgment as to what was in their own best economic interest. In deciding this, you should consider whether the practices employed made sense in light of the industry conditions, and whether the benefits from those practices were dependent on other persons doing the same thing.  A business may even copy the price list of a competitor, or follow and conform exactly to the price policies and the price changes of competitors if it is not doing so pursuant to an agreement or understanding with the competitors. So the mere similarity or identity of prices charged does not, without more, establish the existence of a conspiracy to fix prices.").
- ***See also* Jury Instructions, *In Re: Tft-Lcd (Flat Panel) Antitrust Litigation*, 3:07-md-01827-SI (N.D. Cal. June 28, 2012) ECF No. 6036** ("Evidence that [Defendant] may have charged identical prices as its competitors for the same goods, or engaged in identical or similar business practices, does not alone establish an agreement to fix prices because such practices may be consistent with lawful, ordinary and proper competitive

behavior in a free and open market . . . Parallel conduct, without more, does not violate the law.")

- ***Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)** ("Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents.") (citations omitted)

- **Trial Transcript, *United States* v. *Usher*, 17 Cr. 19 (S.D.N.Y. Nov. 8, 2018) at 2460:25-2461:9** ("Independent action is the next instruction. The antitrust laws involved in this case are concerned only with joint agreements and actions among competitors, not with actions taken independently by competitors. The independent actions of a person or business do not constitute a restraint in violation of the Sherman Act. People responding to common perceptions of the market may take independent actions that are similar or parallel. But parallel conduct alone is not sufficient to prove an illegal agreement.")

- **Jury Instruction 31, *In re Vitamins Antitrust Litigation*, 99-mc-00197 (D.D.C. June 11, 2003) (ECF No. 4450)** ("However, similarity of conduct among various persons, or the fact that they may have associated with one another or may have met or assembled together and discussed common aims and interests, does not by itself necessarily establish the existence of a conspiracy.")

23

### 11. Participation and Intent (Joint Proposed Instruction)

Before you can find that Credit Suisse was a member of a conspiracy, the evidence must show that Credit Suisse knowingly joined in the unlawful plan at its inception or at some later time with knowledge of at least some of the conspiracy's unlawful purposes and with the intent to advance or further some object or purpose of the conspiracy.

To act knowingly means to act deliberately and not because of mistake, accident, or other innocent reason. A person may become a member of a conspiracy without full knowledge of all the details of the conspiracy, the identity of all its members, or the parts they played. Knowledge of the essential nature of the plan is enough. On the other hand, a person who has no knowledge of a conspiracy, but happens to act in a way that helps the conspiracy succeed, does not thereby become a conspirator.

A person who knowingly joins an existing conspiracy, or who participates only in part of a conspiracy with knowledge of the overall conspiracy, is just as responsible as if he or she had been one of those who formed or began the conspiracy and participated in every part of it.  You may not find that Credit Suisse was a member of a conspiracy based only on its knowledge of wrongdoing or association with others who are involved in wrongdoing.

Your determination whether each bank knowingly joined the conspiracy must be based solely on the actions of each particular bank. You should not consider what others may have said or done. The membership of each bank in the conspiracy, including Credit Suisse, must be established by evidence of its own conduct—by what it said or did.

24

[If you find that the alleged conspiracy existed, then the acts and statements of the

conspirators are binding on all of those whom you find were members of the conspiracy.][4]

**SOURCES:**
- **ABA Model Jury Instructions in Civil Antitrust Cases, 2016 Edition, Section 1 of the Sherman Act – Contract, Combination, or Conspiracy, Instruction 4: Participation and Intent, at 21.**
- **Final Jury Instructions,** *US Airways v. Sabre Holdings Corp*.**, No. 11-cv-2725, ECF 887-2 at 25 (Dec. 13, 2016)**.
- **Leonard B. Sand, et al., 4 Modern Federal Jury Instructions–Civil Instruction P 79.02 Instruction 79-8 (Joining the Conspiracy)** ("Your determination whether each defendant knowingly joined the conspiracy must be based solely on the actions of each particular  defendant. You should not consider what others may have said or done.  The membership of each defendant in the conspiracy must be established by evidence of its own conduct—by what it said or did.").

---

[4] Plaintiffs have proposed the inclusion of the bracketed language.  Credit Suisse objects that the language does not relate to a bank's knowing participation in a conspiracy and will likely confuse the jury.

**12a. Price Fixing as Per Se Violation: (Plaintiffs) (No CS Equivalent)[5]**

The Sherman Act makes unlawful certain agreements that, because they are harmful to competition without any redemptive value, are conclusively presumed to be an unreasonable restraint on trade and are always illegal. These kinds of acts do not require an inquiry about the precise harm they have caused or the business excuse for their use. Agreements to fix, stabilize, raise, lower, or maintain prices, or to restrict production, or to restrict capacity, or to rig bids are unlawful in and of themselves under the Sherman Act, without regard to the reasons they were entered into.

You are instructed that a conspiracy to widen, fix, stabilize, or maintain bid-ask spreads of the type alleged by Plaintiffs is treated by the law as a "per se" violation and is, in and of itself, an "unreasonable" restraint of trade. Whether the spreads agreed to be widened, fixed, stabilized, or maintained were reasonable or unreasonable does not matter. It does not matter why the spreads were widened, fixed, stabilized, or maintained or whether they were too wide or narrow, reasonable or unreasonable, fair or unfair. It is not a defense that the parties may have acted with good motives, or may have thought that what they were doing was legal, or that the conspiracy may have had some good results. If there was, in fact, a conspiracy as Plaintiffs have alleged, it was illegal.

**SOURCE:** *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 307, 315 (2d Cir. 2008); *In re Nine West Shoes Antitrust Litig.*, 80 F.Supp.2d 181, 191 (S.D.N.Y. 2000); *U.S. v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015); *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220 (1940); **Proposed Joint Instruction 5** ("Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies that unreasonably restrain trade.").

---

[5] Credit Suisse objects to this instruction as unnecessary and likely to confuse the jury, since it is outside the scope of the issues the jury will determine.

### **13. Not Necessary to Join All Conspirators (Joint Proposed Instruction)**

Plaintiffs are not required to join as Defendants in this case all persons who may have participated with Credit Suisse in the alleged conspiracy.  It is immaterial, as a matter of law, that any other members of the conspiracy may have not been joined in this suit by Plaintiffs.

**SOURCE: Kevin O'Malley, Jay E. Grenig & William C. Lee, Federal Jury Practice and Instructions – Civil, § 150.41 (5th ed. 2000).**

## 14a. Ignorance of Antitrust Laws Is No Defense (Plaintiffs) (No CS Equivalent)[6]

Plaintiffs need not show that Credit Suisse knew that a particular act is a violation of the federal antitrust laws. Every person is charged with knowing what the law forbids, and what the law requires to be done.

If you should find from a preponderance of the evidence in the case that the alleged conspiracy was knowingly formed, and that Credit Suisse knowingly became a member of the conspiracy, then the fact that Credit Suisse may have believed, in good faith, that what was being done was not unlawful would not be a defense in this case.

**SOURCE: Kevin O'Malley, Jay E. Grenig & William C. Lee, Federal Jury Practice and Instructions – Civil, § 150.03 (5th ed. 2000)**.

---

[6] Credit Suisse does not presently intend to argue that it was ignorant of the law.  In the event that such evidence is adduced at trial, Credit Suisse respectfully submits the Court and parties can revisit this instruction at that time.

## 15a. Good Intent Not a Defense (Plaintiffs) (No CS Equivalent)[7]

If you find that Credit Suisse engaged in a price-fixing conspiracy, it is not a defense that

Credit Suisse acted with good motives, thought its conduct was legal, or that the conduct may

have had some good results.

**SOURCE: ABA Model Jury Instructions in Civil Antitrust Cases, 2016 Edition, Section 1 of the Sherman Act – Horizontal Price Fixing – Instruction 3: Good Intent Not a Defense, at 29.**

---

[7] This instruction is confusing because it could mislead the jury to think that Credit Suisse's intent is not relevant to whether it knowingly joined a conspiracy.  The jury has been asked to find only whether a conspiracy existed and which banks knowingly participated.  In addition, issues related to injury or causation – such as that the conduct had "good results" – are not in scope for this trial.

### 16a. Reasonableness of Prices Is No Excuse (Plaintiffs) (No CS Equivalent)[8]

The Sherman Act prohibits agreements among competitors to fix, stabilize, raise, lower, or maintain prices, regardless of whether the agreed-upon prices are reasonable. Therefore, if you find that a price-fixing conspiracy existed, it does not matter whether the prices agreed upon were high or low or reasonable or unreasonable.

**SOURCE: ABA Model Jury Instructions in Civil Antitrust Cases, 2016 Edition, Section 1 of the Sherman Act – Horizontal Price Fixing – Instruction 4: Reasonableness of Prices No Excuse, at 30.**

---

[8] Credit Suisse objects to the inclusion of this instruction.  The jury has been asked to find only whether a conspiracy existed and which banks knowingly participated.  Issues related to injury or causation – such as whether counterparties traded at "reasonable prices" – are not in scope for this trial.

### **17a. Evidence of Competition (Plaintiffs' Version)**

Evidence that Credit Suisse and its alleged conspirators actually engaged in price competition with each other in some manner has been admitted to assist you in deciding whether they entered into the alleged conspiracy to fix, stabilize, raise, lower, or maintain prices. If you find that such a conspiracy existed, it is no defense that Credit Suisse and its alleged conspirators actually competed in some respects with each other or failed to eliminate all competition between them. Similarly, a price-fixing conspiracy is unlawful even if it did not extend to all products sold by Credit Suisse and its alleged conspirators or did not affect all of their customers or transactions.

**SOURCE: ABA Model Jury Instructions in Civil Antitrust Cases, 2016 Edition, Section 1 of the Sherman Act – Horizontal Price Fixing - Instruction 5: Evidence of Competition, at 31.**

**<u>17b. Evidence of Competition (Credit Suisse's Version)</u>**

Evidence that Credit Suisse and its alleged conspirators actually engaged in price

competition with one another in some manner has been admitted to assist you in deciding

whether they entered into a conspiracy to fix, stabilize, raise, lower, or maintain

prices.  Competition may be evidence that there was no conspiracy.  On the other hand, if you do

find there was a conspiracy but that it didn't achieve its goal because there was some

competition, that would not be a defense.  In other words, competition may be evidence of the

lack of a conspiracy, but evidence of competition, by itself, does not preclude the existence of a

conspiracy.


**SOURCE: Opinion & Order (ECF No. 1650) (Feb. 1, 2022) (Summary Judgment Opinion)**
("Competition may be evidence that the conspiracy existed but did not achieve its goal, or that
there was no conspiracy; but evidence of competition does not preclude the existence of a
conspiracy.")

## 18b. Trading Among Defendants (CS Version) (No Plaintiffs Equivalent)[9]

You have heard evidence that Credit Suisse or other banks traded with one another in the

FX spot market.  It is lawful for buyers of goods or services to discuss and decide on prices of

those goods or services with the sellers of the goods or services, even if the buyers and sellers are

otherwise competitors.  Such activities, without more, are not violations of the Sherman Act.

**SOURCE: Jury Instructions, *In Re: Tft-Lcd (Flat Panel) Antitrust Litigation*, 3:07-md-01827-SI (N.D. Cal. June 28, 2012) ECF No. 6036 at 15** ("It is lawful for buyers of goods or services to discuss and decide on prices of those goods or services with the sellers of the goods or services, even if the buyers and sellers are otherwise competitors.")

---

[9] Plaintiffs object to the inclusion of this instruction, because it is likely to introduce confusion to the jury (i.e., causing the jury to conflate banks agreeing on prices for transactions among banks and banks agreeing on prices to be quoted to customers). Plaintiffs do not intend to introduce evidence of trades between banks as evidence of price-fixing.

**INSTRUCTIONS RELEVANT TO *IN LIMINE* MOTIONS**

**19a. Criminal Convictions – Post and/or Pre-Trial (Plaintiffs' Version)**

During this trial, you have heard/will hear evidence that certain corporations and individuals in the FX spot market entered guilty pleas or were convicted at trial in connection with antitrust conspiracy indictments brought by the United States government.

In summary, former defendants in this action, Barclays, BNP Paribas, Citi, JPMorgan Chase, and Royal Bank of Scotland (RBS), pleaded guilty to violating Section 1 of the Sherman Act through its anticompetitive conduct in the FX spot market during the relevant period. Further, UBS had its deferred prosecution agreement resolving the LIBOR (London Interbank Offered Rate) investigation nullified due to its anticompetitive conduct in the FX spot market. Former Barclays and BNP Paribas FX trader Jason Katz and former Citi FX trader Christopher Cummins likewise pleaded guilty to violations of Section 1 of the Sherman Act stemming from their anticompetitive conduct in the FX spot market during the relevant period. Former JPMorgan FX spot trader Akshay Aiyer was convicted by a jury of violating Section 1 of the Sherman Act in a case stemming from his anticompetitive conduct in the FX spot market during the relevant period.

You may consider the guilty pleas by those I have listed for you as prima facie evidence that, during the various periods of time identified in the indictments discussed, all those who pleaded guilty in fact conspired to violate the antitrust laws in the manner so admitted in their guilty pleas. Likewise, Mr. Aiyer's conviction is prima facie evidence he conspired to violate the antitrust laws during the time and in the manner specified in his indictment. Prima facie evidence is evidence that is, by itself, sufficient to establish the facts alleged. Prima facie evidence may be rebutted by other evidence, but it remains for consideration throughout the case. You may consider all the foregoing guilty pleas as evidence in this civil case of the existence of a conspiracy, subject

to the above limitations.  You may not consider them as evidence of whether Credit Suisse joined

that conspiracy.

You may also consider the fact that Jason Katz, Christopher Cummins, and Akshay Aiyer

have all been convicted of felonies when you assess their credibility as witnesses in this case.

**SOURCES** *In Re Scrap Metal Antitrust Litig.*, **1:02-cv-00844-KMO, (N.D. Ohio), ECF No. 631 at 50** ("During this trial, you have heard evidence that certain corporations and individuals in the scrap metal dealer industry entered guilty pleas in connection with criminal antitrust conspiracy indictments brought by the United States government. In summary, former defendants in this action, [identifying former defendants], pleaded guilty to criminal charges involving anti-competitive conduct. Executives from [former defendants], similarly pleaded guilty. *You may consider the guilty pleas by those I have listed for you as prima facie evidence that during the various periods of time identified in connection with the conspiracies alleged in the indictments discussed, all those who pleaded guilty in fact conspired to violate the antitrust laws in the manner so admitted in their guilty pleas. Prima facie evidence is evidence that is, by itself, sufficient to establish the facts alleged. Prima facie evidence may be rebutted by other evidence, but it remains for consideration throughout the case. You may consider all the foregoing guilty pleas as evidence in this civil case, subject to the above limitations.* You may also consider the fact that [executives of former defendants] have all been convicted of felonies when you assess their credibility as witnesses in this case.") (emphasis added); **Opinion and Order on Credit Suisse's Motions** *in Limine* **(ECF 1880)**.

### 19b. Criminal Convictions – During-Trial and After Trial (CS Version)

You are about to hear evidence certain corporations and individuals in the FX spot market who were not affiliated with Credit Suisse entered guilty pleas or were convicted at trial in connection with antitrust conspiracy indictments brought by the United States government.  The corporations are Barclays, BNP Paribas, Citi, JPMorgan Chase, and Royal Bank of Scotland (RBS).  Former Barclays and BNP Paribas FX trader Jason Katz and former Citibank FX trader Christopher Cummins likewise pleaded guilty to anticompetitive conduct in the FX spot market.  Former JPMorgan FX spot trader Akshay Aiyer was convicted by a jury of anticompetitive conduct in the FX spot market.

You will also hear evidence that certain individual traders in the FX market were tried and acquitted in connection with antitrust conspiracy indictments brought by the United States government.  Richard Usher, an employee of the Royal Bank of Scotland and JP Morgan Chase, Rohan Ramchandani, an employee of Citibank, and Christopher Ashton, an employee of Barclays were acquitted.

You may consider the guilty pleas I listed above only as evidence  bearing on the existence of a conspiracy.  You may not consider them as evidence of whether Credit Suisse joined that conspiracy.

You may also consider the fact that Jason Katz, Christopher Cummins, and Akshay Aiyer have all been convicted of felonies when you assess their credibility as witnesses in this case.

**SOURCE: Opinion and Order on Credit Suisse's Motions *in Limine* (ECF 1880)**

### 20a. Invocation of Fifth Amendment – By a Party of a Witness Identified with a Party– Post and/or Pre-Trial  (Plaintiffs' Version)[10]

Any person who becomes a witness, including a party, is required to answer all proper questions unless the court rules that the witness may decline to answer.

Under the Constitution, a person has the right to refuse to answer questions which may tend to incriminate him in criminal activity.

During this case, former Credit Suisse FX spot traders Daniel Wise, John Erratt, and Clark Read have refused/will refuse to answer questions by exercising their privilege against self-incrimination. With respect to Messrs. Wise's Erratt's, and Read's refusal to answer questions, you may decide whether or not to infer that their testimony would have been unfavorable to Credit Suisse.

I caution you, moreover, that you may not find that the Plaintiffs have proven their claims against Credit Suisse based solely on the negative inference, if any, you draw from the fact that a witness or multiple witnesses did not testify in this case. Such inferences are factors you may consider, but without more, are not sufficient to prove participation in a conspiracy to restrain trade.

**SOURCE: ABA Model Jury Instructions in Civil Antitrust Cases, 2016 Edition, Miscellaneous – Invocation of the Fifth Amendment, Instructions 1, at 354 [modified as to tense]; Jury Instructions at 51, *In re Scrap Metal Antitrust Litigation* (02-cv-00844) (N.D. Ohio Feb. 8, 2006) (Dkt 8681)**.

---

[10] For the sake of simplicity, and because the Court ruled that "there is no indication that Credit Suisse 'had control over the witnesses at the time they invoked the Fifth Amendment,'" (ECF 1880), Credit Suisse proposes one Fifth Amendment instruction relevant to all witnesses who invoke the Fifth Amendment.

## 21a. Invocation of Fifth Amendment – By a Nonparty Witness– Post And/Or Pre-Trial (Plaintiffs' Version)

As I said, under the Constitution, a person has the right to refuse to answer questions which may tend to incriminate him in criminal activity.

During this case, the following witnesses have refused/will refuse to testify by exercising their privilege against self-incrimination:

| |
|---|
| Akshay Aiyer |
| Carly McWilliams Hosler |
| Christopher Ashton |
| Eduardo Hargreaves |
| Edward Pinto |
| James Mullaney |
| James Wynne |
| Joseph Landes |
| Julian Munson |
| Luxshan Thiagarajah |
| Mark Clark |
| Michael Keogh |
| Michael Weston |
| Mitesh Parikh |
| Paul Nash |
| Richard Usher |
| Robert DeGroot |
| Roger Boehler |
| Rohan Ramchandani |
| Russell Katz |

Each of these witnesses were previously affiliated with corporate entities who were defendants in this action and who are accused of being Credit Suisse's conspirators in the anticompetitive conspiracy plaintiffs alleged existed in this case.

You may, but are not required to, draw a negative inference from the failure of these witnesses to testify. The nature of the negative inference you may draw from the testimony of these witnesses is limited, however in the following ways:

(1)    you may, but are not required to, draw a negative inference against the

corporations with which those witnesses are or were affiliated as it relates to the

allegations about the conduct of those corporations in this action; and

(2)    you may, but are not required to, draw a negative inference against Credit Suisse

from the failure to testify if, and only if, you first find:

a.   there is independent (i.e., separate any apart from any negative inferences)

evidence to support the conclusion that Credit Suisse participated in a

conspiracy with a particular witness or with the particular corporation with

which that witness was affiliated; and

b.   you find that the witness was sufficiently associated with Credit Suisse during

the relevant time frame to justify such an inference.  While this does not

require formal affiliated, you must be satisfied that the connection between the

witness and Credit Suisse was substantial based on the evidence your find

relevant in this case.  For example, a conspirator may be sufficiently

associated with Credit Suisse to permit the drawing of a of an inference

adverse to the party if the conspirator refuses to testify.

If the witnesses are not sufficiently associated with Credit Suisse, or you fail to find

independent evidence of a conspiracy between Credit Suisse and the testifying witness (or his or

her affiliated corporation), you are not to infer anything adverse or unfavorable to Credit Suisse

because the witness refused to testify.  This analysis applies individually with respect to each

witness as he or she relates – or does not relate – to the Credit Suisse defendants.

I caution you, moreover, that you may not find that the Plaintiffs have proven their claims

against Credit Suisse based solely on the negative inference, if any, you draw from the fact that a

witness or multiple witnesses did not testify in this case. Such inferences are factors you may

consider, but without more, are not sufficient to prove participation in a conspiracy to restrain

trade.

**SOURCE: ABA Model Jury Instructions in Civil Antitrust Cases, 2016 Edition, Miscellaneous – Invocation of the Fifth Amendment, Instructions 2, at 356 [modified as to tense];** *In Re Scrap Metal Antitrust Litig.***, 1:02-cv-00844-KMO, (N.D. Ohio), ECF No. 631 at 51-53; Opinion and Order on Credit Suisse's Motions** *in Limine* **(ECF 1880) at 4** ("That some witnesses are former employees of alleged co-conspirators, rather than of Defendants, does not affect the conclusion. The fact that the banks were 'charged with a unitary act or common scheme of misconduct, such as conspiracy . . . easily permit[s] the transference . . . of a negative inference.' ...") (citations omitted).

## 21b. Witnesses Taking the Fifth Amendment – To Be Given During Trial and After Trial (CS Version)

Under the Fifth Amendment to the United States Constitution, a person has the right to refuse to answer questions which may tend to implicate him in criminal activity.

You are about to hear testimony from one or more witnesses who will refuse to answer questions by exercising their privilege against self-incrimination. You may decide whether or not to infer from their refusal to testify in this action that such testimony would have been unfavorable to them.

I caution you, moreover, that you may not find that the Plaintiffs have proven their claims against Credit Suisse based solely on the negative inference, if any, you draw from the fact that a witness or multiple witnesses did not testify in this case. Such inferences are factors you may consider, but without more, are not sufficient to prove participation in a conspiracy to restrain trade.

**SOURCES**:

- **Jury Instructions at 51, *In re Scrap Metal Antitrust Litigation* (02-cv-00844) (N.D. Ohio Feb. 8, 2006) (Dkt 8681)** ("I caution you, moreover, that you may not find that the plaintiffs have proven their claims against [defendants] based solely on the negative inference, if any, you draw from the fact that [witnesses] did not testify in this case. Such inferences are factors you may consider, but without more, are not sufficient to prove participation in a conspiracy to restrain trade.")
- ***Akinyemi* v. *Napolitano*, 347 F. App'x 604, 607 (2d Cir. 2009)** ("A charge allowing the jury to draw an adverse inference against [defendant] from a non-party witness's invocation of her Fifth Amendment privilege against self-incrimination was not required because (1) the witness, although an employee of [defendant], was a very low level employee; (2) the witness had no control over the key facts and issues in the litigation; (3) there was no showing that the witness was 'pragmatically a noncaptioned party in interest'; and (4) there was insufficient information to determine that an adverse inference against CBP would have been 'trustworthy under all of the circumstances.'") (quoting *LiButti* v. *United States*, 107 F.3d 110, 123–24 (2d Cir.1997))
- ***Banks* v. *Yokemick*, 144 F. Supp. 2d 272, 289 (S.D.N.Y. 2001)** ("While the Court believes that [Defendant's] assertion of the Fifth Amendment justifies a negative adverse inference against him based on his own invocation, the Court does not find the requested charge appropriate as it pertains to the assertion of privilege by [his patrol partner and the ranking officer at the scene].")

- **Opinion and Order on Credit Suisse's Motions in Limine (ECF 1880) at 3** ("[T]here is no indication Defendants or other banks had 'control' over the witnesses at the time they invoked the Fifth Amendment.")

### <u>22.  Internal Bank Policies –Post-Trial (Joint Proposed Instruction)</u>

You have heard evidence about [Bank's] internal policy about [describe].  I have

instructed you on the antitrust laws that apply in this case.  You should not look to language in

the policy to provide a statement of the antitrust laws that apply here.  You should not conclude

simply because particular conduct may violate a company policy that the conduct violates the

law; conversely, you should not conclude that conduct is lawful simply because the conduct does

not violate a company policy.


**SOURCES:**
- **J&M Distributing Health, Inc. v. Hearth & Home Technologies, Inc., 2015 WL 144797 at *4 (D. Minn. Jan. 12, 2015)** (ruling on motion *in limine* and stating that the court "will give the following limiting instruction to the jury concerning these exhibits: The evidence you are about to hear relates to Hearth & Home's antitrust policies. I will be instructing you on the antitrust laws that apply in this case. You should not look to language in the policies to provide a statement of the antitrust laws that apply here—only the instructions I give you at the conclusion of the case apply to your consideration of J & M's antitrust claim.")
- **Opinion and Order on Credit Suisse's Motions *in Limine* (ECF 1880).**

**23b. Information Sharing Post-Trial Instruction (CS) (No Plaintiffs Equivalent)[11]**

You have heard evidence concerning the exchange of price-related information such as currency prices, quantities, spreads, and customer orders and identities among Credit Suisse and other banks.  The fact that banks exchanged price-related information – or even agreed to exchange such information with other banks – does not necessarily establish an agreement to widen spreads. There may be legitimate reasons that would lead competitors to exchange price-related information, and the law recognizes that exchanges of price information may enhance competition and benefit consumers.  Thus, you may not infer the existence of the alleged conspiracy to widen spreads in the FX spot market solely from the fact that banks exchanged price-related information.

**SOURCES**:

- **Jury Instructions, *In Re: Tft-Lcd (Flat Panel) Antitrust Litigation*, 3:07-md-01827-SI at 14** (N.D. Cal. June 28, 2012) (ECF No. 6036) at 14 ("The fact that [Defendant] exchanged price information does not necessarily establish an agreement to fix prices. There may be other legitimate reasons that would lead competitors to exchange price

---

[11] Plaintiffs object to this instruction on numerous grounds, including its omission of key language from its cited sources, acknowledging that "if you find that price information was exchanged and that [Defendant] does not offer a reasonable explanation as to why it was exchanging that information, you may consider whether it was being exchanged as part of an agreement to fix prices, along with all of the other evidence bearing on whether there was an agreement to fix prices." *See* Jury Instructions, *In Re: Tft-Lcd (Flat Panel) Antitrust Litigation*, 3:07-md-01827-SI at 14 (N.D. Cal. June 28, 2012) (ECF No. 6036) at 14; Final Jury Instructions, *In re Capacitors Antitrust Litigation*, 14-cv-3264 (N.D. Cal. Dec. 13, 2021), Instruction 22 (if you find that confidential information was exchanged, and that defendants offer no reasonable explanation as to why they were exchanging that information, you may consider whether it was being exchanged as part of an agreement to fix prices, along with all of the other evidence bearing on whether there was an agreement to fix prices."); *See also* Opinion & Order (ECF No. 1650) (Feb. 1, 2022) (Summary Judgment Opinion) ("Nothing in th[e FX industry] guide suggests that real-time price spreads are considered market color to be shared. The guide refers to market color as information on "the general state of the market, views, and . . . aggregated flow information." Even if traders thought they were just sharing "market color" when they provided pricing information in exclusive chat rooms, CS Defendants, in their memoranda of law, do not point to any evidence suggesting that exchange was pro-competitive or consistent with any sort of independent action."). In light of the Court's motion *in limine* order (ECF 1888) decided this evening, , Plaintiffs intend to propose an appropriate instructionguided by that opinion..

information, and the law recognizes that exchanges of price information may enhance competition and benefit consumers.  On the other hand, if you find that price information was exchanged and that [Defendant] does not offer a reasonable explanation as to why it was exchanging that information, you may consider whether it was being exchanged as part of an agreement to fix prices, along with all of the other evidence bearing on whether there was an agreement to fix prices.")

- **Final Jury Instructions,** *In re Capacitors Antitrust Litigation*, **14-cv-3264 (N.D. Cal. Dec. 13, 2021), Instruction 22** ("The fact that defendants exchanged price information by itself is not illegal and does not necessarily establish an agreement to fix prices.  There may be other, legitimate reasons that would lead competitors to exchange price information, and the law recognizes that exchanges of pricing and other proprietary information may enhance competition and benefit consumers.  On the other hand, if you find that confidential information was exchanged, and that defendants offer no reasonable explanation as to why they were exchanging that information, you may consider whether it was being exchanged as part of an agreement to fix prices, along with all of the other evidence bearing on whether there was an agreement to fix prices.")

- **Trial Transcript,** *United States* **v.** *Usher*, **17 Cr. 19 (S.D.N.Y Nov. 8, 2018) at 2460:7-24** ("Let's talk about exchange of information.  You've heard evidence about the defendants, among other things, exchanging information about currency prices, quantities, and customer orders and identities.  You may not infer the existence of an illegal agreement to suppress and eliminate competition for the purchase and sale of Euro/United States Dollars in the United States and elsewhere as charged in the indictment, solely from the fact that the defendants exchanged information about currency prices, quantities, and customer orders and identities with each other.")

- *United States* **v.** *Andreas*, **Andreas Jury Instructions To Be Given by Court, 96-cr-762 (BMM) (N.D. Ill. Sept. 8, 1998), at 66** ("Evidence that competitors exchanged information or stated their intentions concerning the prices and quantities of a product which they have sold and produced or the prices and quantities of a product which intend to sell and produce does not by itself prove that there was a conspiracy [to fix or control prices or allocate volumes], even if the exchange of information was done by agreement. Competitors may have legitimate, lawful reasons to exchange information with each other. Thus, you may not infer the existence of a conspiracy solely from the fact that the competitors exchanged information or merely stated their intentions [to do so].")

- **Sand, Modern Federal Jury Instructions, Inst. 58-12.1** ("The exchange of information about price is not, by itself, illegal. The fact that the defendants exchanged such information does not establish an agreement to fix prices. There may be other legitimate reasons that would lead competitors to exchange information about prices, and the law recognizes that exchanges of such information may enhance competition and benefit consumers.")

- **Final Jury Instructions,** *United States* **v.** *Au Optronics Corporation*, **3:09-cr-00110-SI (N.D. Cal. Mar. 1, 2012) (ECF 829) at 8** ("Evidence has been introduced concerning the exchange of information about prices between the defendants and employees of other companies manufacturing TFT-LCDs alleged to be coconspirators.  The government claims that such exchanges are part of the evidence establishing that the defendants entered into an agreement or mutual understanding to fix prices, as alleged in the

indictment. It is not unlawful for a person to obtain information about a competitor's prices or even to exchange information about prices unless done pursuant to an agreement or mutual understanding between two or more persons to fix prices as charged in the indictment. Nevertheless, you may consider such facts and circumstances, along with other evidence, in determining whether there was an agreement or mutual understanding between two or more persons to fix prices as alleged in the indictment.")

## MISCELLANEOUS

### 24. Unavailability of Certain Evidence (Joint Proposed Instruction)

The Plaintiffs here allege that a conspiracy occurred from 2007 until 2013.  The parties or their experts have told you that certain data from that time period is unavailable because Credit Suisse or other dealer banks simply do not maintain records that old.  You should not draw inferences as to that data's contents from the fact that is absent.

**SOURCES**:
- **Opinion & Order (ECF No. 1331) (Sept. 3, 2019) (Class Certification Opinion) at 16** ("As Defendants did not maintain data regarding the spreads that customers were quoted . . .")
- ***Savard* v. *Marine Contracting Inc.*, 471 F.2d 536, 541-42 (2d Cir.1972)** (where party recorded notes on scrap of paper that was lost or tossed, no inference can be drawn from the failure to produce evidence not in a party's control)
- ***Akinyemi* v. *Napolitano*, 347 F. App'x 604, 607–08 (2d Cir. 2009)** ("Akinyemi also requested that the court instruct the jury that it could draw an adverse inference from the non-production of a document that a CBP witness believed—but was not certain— existed. Because Akinyemi offered no proof that (1) any such document was destroyed or encompassed within a discovery request that she made but not produced, or (2) CBP had a culpable state of mind with respect to any action or inaction concerning the putative document, the district court's refusal was proper.")