September 29, 2022

<u>**Via ECF**</u>

Honorable Lorna G. Schofield
U.S. District Court
Southern District of New York
Thurgood Marshall Courthouse
40 Foley Square
New York, NY  10007

      Re:    *In re Foreign Exchange Benchmark Rates Antitrust Litigation*
              Case No. 1:13-cv-07789-LGS

Dear Judge Schofield:

The parties are pleased to report that they have resolved disagreements as to every document on Credit Suisse's exhibit list and as to all but 10 documents on Plaintiffs' exhibit list.  Pursuant to the Stipulation and Order entered by the Court on September 20, 2022 (ECF 1917), this letter sets forth the parties' respective positions as to the remaining 10 exhibits subject to objections, which the parties would be pleased to discuss at the upcoming October 3 conference should the Court wish to hear argument.  Additionally, the parties will submit via FTP link to Chambers  Plaintiffs' current exhibit list as Exhibit A and Credit Suisse's current exhibit list as Exhibit B.

**PLAINTIFFS' POSITION**

**The 10 Exhibits in Dispute Should Not Be Excluded**
**Pursuant to the Court's Order on Credit Suisse's Motion *in Limine* 8**

Contrary to Credit Suisse's arguments, the disputed documents do not fall under the Court's Motion *in Limine* 8 ruling.  Plaintiffs are not seeking reconsideration.  Instead, as Plaintiffs explain, none of the documents implicate the policies undergirding Rule 407 and indeed are admissible, in whole or in part, for proper purposes.  These documents were not before the Court on Credit Suisse's original motion, which attached only a handful of chats, presumably because Credit Suisse understands they do not merit exclusion under F.R.E. 407[1].

Further, Plaintiffs have proposed redactions to address certain of Credit Suisse's concerns, which Credit Suisse accepted in part and rejected in part.

Credit Suisse's complaints as to the 10 documents are of their own making and undo the contention that Plaintiffs are seeking reconsideration.  In Credit Suisse's Motion *in Limine* 8 Credit Suisse failed to specify, beyond a handful of documents, which material it believed was subject to the motion.  *See* ECF 1765, n.1 (referring to a declaration "for examples of documents Plaintiffs

---

[1]    Plaintiffs have withdrawn a total of 24 exhibits on the basis of Federal Rule of Evidence 407 and the Court's Order.

Honorable Lorna G. Schofield
September 14, 2022
Page 2

seek to introduce and that are the subject of this motion").  Credit Suisse attached six examples to the declaration, all of which Plaintiffs have excluded from this motion.

Many of the documents at issue are not about remedial measures and none qualify as *subsequent* remedial measures.  Though the conspiracy runs until December 31, 2013, Credit Suisse asserts that documents dated as early as September 2012 are *subsequent* remedial measures. The documents do not meet the fundamental requirement of Rule 407 that the action be taken subsequent to the harms alleged.  *Figueroa v. Bos. Sci. Corp.*, 2003 WL 21488012, at \*5 (S.D.N.Y. June 27, 2003) ("Here, BSC's Rule 407 objection is overruled, for the recall occurred four months *before* the discovery and diagnosis of Figueroa's vaginal erosion and five months *before* the Sling was removed. . . .  Although some of the injury or harm to Figueroa might have occurred prior to the recall, some of the injury and harm occurred after as well.  In any event, the injury was not evident until Figueroa began to suffer vaginal bleeding in April 1999.") (emphasis in original); *see also In re: Gen. Motors LLC Ignition Switch Litig.*, 2015 WL 7769524, at \*1 (S.D.N.Y. Nov. 30, 2015) ("Rule 407 applies only to remedial measures 'that would have made an *earlier* injury or harm less likely to occur.' . . .  Accordingly, it does not apply to the Consent Order, which predates Plaintiff's accident.") (emphasis in original).[2]  The Advisory Committee Notes to Rule 407 make clear that "[e]vidence of measures taken by the defendant prior to the 'event' causing 'injury or harm' do not fall within the exclusionary scope of Rule 407 even if they occurred after the manufacture or design of the product."  Fed. R. Civ. P. 407 advisory committee's note to 1997 amendment (citing *Chase v. Gen. Motors Corp.*, 856 F.2d 17, 21-22 (4th Cir. 1988)).

Here, the conspiratorial conduct did not stop with the earliest prohibitions on interbank chats, which certain banks began implementing more than a year before the close of the Class Period.  Rather, the record reflects that the conspiratorial conduct continued well beyond those prohibitions, with Plaintiffs' spread chat exhibits continuing through December 2013.  Even the traders who announced their inability to discuss spreads in chat rooms continued to do so.[3]

**Category 1:    Chats Where Traders Acknowledge Repeatedly that Discussing Spreads Is Price Fixing and Collusion and Ignore the Admonition**

One category of exhibits Credit Suisse seeks to exclude are not about subsequent remedial measures at all, but rather show blatant disregard, or condoned insouciance, toward the Defendant banks' long-standing policies regarding sharing of confidential information, including spreads, in multibank chat rooms with competing banks.

---

[2]    Citations are omitted and emphasis is added unless otherwise stated.

[3]    Plaintiffs' Appendix A lists each disputed document as well as the number of spread chats involving each participating bank occurring after the date of the subject document.  Ex. 1A.

Honorable Lorna G. Schofield
September 14, 2022
Page 3



A September 12, 2012 chat between ▉▉▉▉▉ of Credit Suisse, ▉▉▉▉▉ of Bank of America, ▉▉▉▉ of Citi and ▉▉▉▉▉ of Barclays demonstrates this distinction.[4] In the chat, Mr. ▉▉▉ (BoA) tells the chat participants information sharing in the multibank chat rooms is allowed as long as "its vague information no amount no names no class of customers its ok." *Id.* at 282 (PE 64). He then explains that there should be "**[n]o asking for spreads**." *Id.* Mr. ▉▉▉▉ also gives an example – "Hey guys what is the spread on 300audnzd? That looks like collusion." *Id.* ▉▉▉▉▉ of Credit Suisse responded to Mr. ▉▉▉ with disbelief, "u can't even ask for spreads?? . . . wow . . . that's nuts . . . makes your job tough."[5] Similarly, Credit Suisse seeks to exclude a chat dated October 16, 2012, in which another Bank of America trader, ▉▉▉▉▉ tells his competitors "I'm not allowed to discuss sporeads [sic] on chat . . . could be seen as price fixing apparently."[6]

These examples are not remedial measures, nor can they be given Mr. ▉▉▉▉ prior conduct. Mr. ▉▉▉▉ gave a similar admonition in May, 2009. Then, Mr. ▉▉▉▉ told traders at competing banks "im told we are not allowed to talk about spreads . . . its price fixing . . . this apparently comes from the fed"[7] In 2011, ▉▉▉▉, also of Bank of America, provided guidance to competing banks similar to the one given by Mr. ▉▉▉ in 2009, "fyi . . . per the Fed not allowed to ask what you make . . . fear of collusion and px fixing." To which, ▉▉▉▉▉ of JP Morgan responded "wow . . . what a narc," and ▉▉▉▉▉ of Credit Suisse replied "fx police."[8]

Nevertheless, subsequent to the 2012 warnings given by Messrs. ▉▉▉ and ▉▉▉, Bank of America traders continued coordinating spreads in chats with their competitors, appearing in an additional 41 spread chats, including 23 with Credit Suisse, with the last occurring on December 11, 2013 between ▉▉▉▉▉ of Bank of America and ▉▉▉▉▉ of Credit Suisse.[9] This is on top of the more than 400 spread chats involving Bank of America between 2009 and 2012 that are on Plaintiffs' exhibit list. However, Credit Suisse seeks to exclude the 2012 documents where Messrs. ▉▉▉ and ▉▉▉ simply reprised previous exhortations to competing banks that spread sharing "looks like collusion."

These two 2012 chats in dispute are simply restatements of a long-standing Bank of America policy that traders ignored and the bank failed to enforce. This Court has decided that the guidance regarding "using instant messaging, sharing information about non-public trades" is "highly probative to rebut Defendants' anticipated argument that the traders' actions were

---

[4]   Ex. 2, (PE 64) BARC-FX-CIV_00022281 (▉▉▉23).

[5]   *Id.* at 282.

[6]   Ex. 3, (PE 751) CITI-FX-CIVIL_00292326 at 327.

[7]   Ex. 4, (PE 987) CITI-FX-CIVIL_00065492 at 493-494.

[8]   Ex. 5, (PE 1767) CS-FXLIT-00695321 (▉▉▉12) at 322-323.

[9]   Ex. 6, (PE 2647) CS-FXLIT-13301126 at 127.

Honorable Lorna G. Schofield
September 14, 2022
Page 4

innocuous or normal and not evidence of a conspiracy."  ECF 1872 at 7-8.  It is not a subsequent remedial measure because Bank of America's compliance policy did not change during the Class Period and **_always_** prohibited spread sharing with competing banks.[10]

Credit Suisse muddies the waters by confusing the closing of the chat rooms with Bank of America's the long-standing and unchanged policy against sharing spreads with competitors. Credit Suisse further argues that the triggering event for remedial measures being implemented was the LIBOR investigation during 2012.  Nonsense.  From 2009 – 2014 Bank of America's policy against sharing pricing information such as spreads remained unchanged. And during that period Mr. ████ simply restated what the policy always had been.

Plaintiffs are attaching a chart that provides additional context and a timeline omitted by Credit Suisse that demonstrates no change in Bank of America's policies regarding the continuing prohibition against sharing pricing information with competitors.  *See* Plaintiffs' Appendix 1B.

**Category 2:   Chats Where Remedial Measures Were Contemplated But Not Undertaken**

Four Bank of America documents that Credit Suisse seeks to exclude would eliminate evidence that reflects a bank's decision not to implement remedial measures.  On September 17, 2012, Mr. ████ sent an email to other Bank of America traders noting that two banks had closed chat rooms, but then stated:

> My interpretation from our meeting two weeks ago is that under the above circumstances we are OK to continue the bank to bank chats as long as the information shared does not influence pricing (collusion of banks). . . .[11]

Nearly two months later, on November 15, 2012, Mr. ████ informed traders from Citi in a chat room, "[h]ave meeting with legal /comp[laince [sic] later might be the end of chats" and then saying: "Sorry we have not made a final decision".[12]  It was not until **_three months_** later (**_six months_** after the first Bank of America document Credit Suisse seeks to exclude) that Mr. L████

---

[10]   The Bank of America documents "Principles of Professional Conduct" dated December 2011, September 2012 and February 2013 show no change in policy before or after the 2012 chats that Credit Suisse seeks to exclude.  Exs. 7-9, FX-BOFA-0003919 at 920, 923-924, 929, FX-BOFA-0003947 at 948, 952-953, 960, FX-BOFA-0003932 at 933, 937, 944.

[11]   Ex. 10, (PE 976) FX0005928 (████ 24) at 928-929.  In the same document Mr. ████ shares that compliance are "combing through everyone's Bloomberg's more heavily."  This demonstrates knowledge and is not evidence of a subsequent remedial measure.  Awareness of the launch of an investigation cannot be "subsequent."

[12]   Ex. 11, (PE 2686) (**_Withdrawn_**) FX0005350 (████ 25) at 350, 352.  This document is no longer disputed based on certain redactions being made, but it is the only document referred here to that Credit Suisse attached to the motion *in limine*.

Honorable Lorna G. Schofield
September 14, 2022
Page 5

indicated *any* measure has been implemented, informing Bank of America / Merrill Lynch traders in a February 7, 2013 email stating:

> Hello Gents the time has come bank chats we will not get a formal decree from compliance because mngt doesn't want it as an absolute when it comes to an audit and therefore reviews ca nbe [sic] extensive and more dangerous, but it is official . . . we must pull out of bank chats that are permanent . . . .[13]

Bank of America's Chr█████████████ then continued to chat for nearly two more weeks before informing a multibank chat room on February 20, 2013 "alright end of day im out of here," suggesting even that measure was tentative.[14]

Rule 407 does not apply to the mere contemplation of measures, but is explicitly limited to measures that "are taken."  Fed. R. Evid. 407 ("When measures *are taken* that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . .").

Moreover, Plaintiffs seek to use this to show traders understood that they may not show pricing information, *e.g.*, spreads to competitor banks in multibank chat rooms.  Plaintiffs do not seek to use the document to show that closing chat rooms demonstrates the conspiracy.

**Category 3:    Chats Where Traders Worked to Evade the Purported Policy
                Concerning Spread Sharing and Participating in Multibank Chat Rooms**

Chats demonstrating attempts to evade possible changes to  bank policy concerning discussing spreads and participation in multibank chat rooms is not evidence of subsequent remedial measures.  These chats include:

- Credit Suisse's trader, after being told in a chat room in September of 2012 that people "cant discuss spreads on chat" immediately shared her spread and commented that her sharing was "not a discussion" but "just a statement of fact."[15] The important policy considerations underlying Rule 407 are not implicated here. Rather, the chat demonstrates a conscious disregard of policy and an effort to subvert that policy by making a semantic argument.

- In February 2013 chat between traders at Deutsche Bank, Morgan Stanley, Bank of America, and Société Générale.  There, the traders came up with a

---

[13]  Ex. 12, (PE 2687) FX0005793 (████ 26) at 794.  Plaintiffs are not seeking admission of this document as it was subject specifically to the Court's order.

[14]  Ex. 13, (PE 2335) DB-0457528 (████ 23) at 560.

[15]  Ex. 14, (PE 2508) CS-FXLIT-12293619 at 620-621.

Honorable Lorna G. Schofield
September 14, 2022
Page 6

plan to ensure they could continue to collude. They discussed that they would still be allowed to "pull up everyone individually" on a chat and even talked to Bloomberg to have them "create a function" so that they would automatically still be able to chat "every morning."[16]

- In a January 2013 chat traders at Credit Suisse ,Standard Chartered, Bank of America and Citi discussed a work-around upon learning that permanent chat rooms were to close – their "3rd thursday" in person gathering would now "be even more important[]" and they would, to quote Mr. ▮▮▮▮, "need regular offsite meetings." This evidence is not of a subsequent remedial measure, rather, it demonstrates a specific attempt to ensure continuation of the scheme.[17]

- In an October 2013 chat between traders at Credit Suisse and BNP Paribas, the Credit Suisse trader immediately after sharing spreads on EUR/PLN, then states "you cant ask sporeads [sic]." The conscious disregard of the purported new policy is admissible.[18]

**Category 4:   Exhibits that Are Used to Prove Opportunity, Intent and Plan**

Lastly, Federal Rule of Evidence 407 does not bar any of these exhibits; it would, at most, render some of these exhibits (or portions of such exhibits) "not admissible to prove . . . culpable conduct." Fed. R. Evid. 407. These chats warrant individual assessment because these chats provide evidence critical to the case that do not depend upon the closure of the chat rooms as evidence of culpable conduct. Rather, the chats provide independent evidence of culpable conduct.

Another example is ▮▮▮ 27, where a Barclays trader stated, "so once again cl[ie]nts can skrew us." BNP trader ▮▮▮▮▮ then commented "you should tell them that . . . [closing multibank chat rooms] will cost banks millions."[19] This chat provides evidence that traders understood multibank chatrooms were valuable to the banks. It also clearly illustrates traders' opportunity, intent, and plan in using chat rooms against customers. This evidence is highly probative to rebut Defendants' expert, Dr. Melvin's anticipated argument that sharing spreads in multibank chat rooms "allow[ed] traders to provide more competitive quotes to customers." ECF 1896 at 2, 6, 7.

Credit Suisse also seeks to exclude HBEU-FXLITIG-00044417 (PE 2707), in which an HSBC trader announces that "seems the days of interbank chats are numbered sadly." BNP Paribas

---

[16]   Ex. 13, (PE 2335) DB-0457528 (▮▮▮ 23) at 561, 577.

[17]   Ex. 15, (PE 2370) SCB-FXLITIG-00016267 (▮▮▮ 17) at 270.

[18]   Ex. 16, (PE 2645) CS-FXLIT-13149654 at 666.

[19]   Ex. 17, (PE 1741) BARC-FX-CIV_00098338 (▮▮▮ 27) at 340.

Honorable Lorna G. Schofield
September 14, 2022
Page 7

trader ███████ then replies "guess ***they don't want any opps for collusion***."[20]  This chat is evidence showing banks understood that the multibank chat rooms provided them with opportunities to conspire.

Three additional exhibits challenged by Credit Suisse are independently relevant and admissible because they show that traders viewed the chat rooms as valuable and knew that if the chat rooms were shut down the banks would lose profits.  For instance:

- In CS-FXLIT-12511219, an HSBC trader responded to the mere suggestion that banks could ***potentially*** shut down chatrooms by saying "that would kill me . . . literal;ly [sic]."  ████████████ of Credit Suisse, responded that "the info/liquidity we would share was priceless."[21]

- Four months later, in SCB-FXLITIG-00016329 (████ 18), ████████ continued to warn that shutting down chatrooms would lead banks to "lose a fortune."  When a Standard Chartered trader responded "ya but mkt share mate," Credit Suisse's ███████████ responded that "market share is so 2009 . . . means nothing . . . and banks now know it."[22]  This exhibit is also relevant to rebut Credit Suisse's expected argument that banks sought to increase their market share over the course of the conspiracy.

As Plaintiffs demonstrate above, none of the 10 documents in dispute are rightly excluded under the Court's Order regarding subsequent remedial measures, given that they are not subsequent, do not reflect subsequent remedial measures, and also reflect admissible evidence for permissible purposes. For example, as Plaintiffs explained in relation to documents in Category 1, above, Bank of America's internal policy regarding the use of multibank chat rooms does not change until 2014.  Talking about spreads with competitors was ***never*** permitted because that is confidential pricing information.  Plaintiffs are not seeking to use the policy change to prove the existence of the conspiracy.  The fact that Mr. ██████ shared with others information relating to the wrongful conduct cannot be a subsequent remedial measure.

**Defendant's Cases Are Off Base**

The case cited by Credit Suisse for the proposition that courts "refuse to endorse exceptions not listed under Rule 407 to admit otherwise prohibited evidence," in fact states the opposite: "[T]he list of exceptions in Rule 407 is illustrative, not exhaustive."  *Werner v. Upjohn Co*., 628 F.2d 848, 857 (4th Cir. 1980).  Likewise, in *Cann v. Ford Motor Co*., 658 F.2d 54, 60 n.4 (2d Cir. 1981), the Second Circuit explicitly declined to address the exclusions on which Plaintiffs base their arguments, "leav[ing] to the trial judge the determination of whether the evidence may be

---

[20]   Ex. 18, (PE 2707) HBEU-FXLITIG-00044417 at 417.

[21]   Ex. 19, (PE 2951) CS-FXLIT-12511219 at 224.

[22]   Ex. 20, (PE 2371) SCB-FXLITIG-00016329 (████ 18) at 332.

Honorable Lorna G. Schofield
September 14, 2022
Page 8

admitted . . . under one of the exceptions to Rule 407." *In re Air Crash Disaster*, 86 F.3d 498 (6th Cir. 1996) concerned subsequent remedial measures by a non-defendant and the court found the rule did not make a distinction as to the party taking remedial measures following a plane crash. *Rostvet v. Lock City Transp. Co.*, 2014 WL 11531331 (D.N.D. Mar. 26, 2014) is a standard subsequent remedial measures case when a party sought to exclude safety improvements following an accident. *Yates v. Ford Motor Co.*, 2015 WL 2189774 (E.D.N.C. 2015) (warnings and design changes implemented after plaintiff's injury); *Grabau v. Target Corp.*, 2008 WL 616068 (D. Colo. Feb. 29, 2008) (safety measures taken after injury excluded).

**Plaintiffs Provide Proposed Redactions that
Will Solve the Dispute as to Some Documents**

With respect to Credit Suisse's chart, Plaintiffs have proposed redactions that cover the text set forth in Credit Suisse's chart for Exhibit Nos. 976, 1741, 2686 and 2371 which Credit Suisse rejected.  To the extent the Court concludes that any portion of these exhibits is inadmissible under Rule 407, the Plaintiffs respectfully suggest that any inadmissible language could be redacted while leaving intact the independently admissible and highly probative content of these exhibits. Credit Suisse has acknowledged that it does not oppose the admission of evidence that can be "disentangled from the policy change evidence excluded by the MIL Ruling," and the parties have already agreed to the admissibility of several redacted and excerpted versions of exhibits that Credit Suisse claims are excluded by the Motion *in Limine* ruling.  Plaintiffs propose redactions for PE 976 and PE 2686 which eliminate any issues regarding purported subsequent remedial measures.

**CREDIT SUISSE'S POSITION**

In its September 6, 2022 Order, the Court granted in full Credit Suisse's motion *in limine* to exclude evidence of subsequent remedial measures, including the banks' policy changes to limit interbank chats.  *See* Opinion and Order (ECF No. 1880) ("MIL Ruling") at 8–9.  The Court held that certain banks' remedial efforts to close down chatrooms and strengthen corporate policies toward the end of the relevant time period were "paradigmatic measure[s] 'that would have made an earlier injury or harm less likely to occur' and are inadmissible under Rule 407 to prove culpable conduct."  MIL Ruling at 8 (quoting *SEC* v. *Geon Indus., Inc.*, 531 F.2d 39, 52 (2d Cir. 1976)). Despite the Court's clear ruling, Plaintiffs now ask the Court to admit 10 documents that contain references to these very subsequent remedial measures.

Plaintiffs' effort to end-run the Court's MIL Ruling should be denied.  Even if Plaintiffs had timely filed a motion for reconsideration (they did not) and could meet the strict standards for reconsideration (they cannot), the documents are inadmissible.

<u>First</u>, Plaintiffs' request is an untimely and unsupported motion for reconsideration. Plaintiffs do not and could not argue that the MIL Ruling does not cover and exclude the documents they now seek to admit.  The Court granted Credit Suisse's motion to exclude all

Honorable Lorna G. Schofield
September 14, 2022
Page 9

evidence and argument that Defendants closed multi-bank chatrooms and changed their policies and training about sharing information in chatrooms.

Under Local Civil Rule 6.3, a motion for reconsideration must be submitted within fourteen days of the Court's determination of the original motion. Plaintiffs' request is well outside this strict deadline, and should be denied on this basis alone. *See United States* v. *Yousef*, 2011 WL 4424334, at *1 (S.D.N.Y. Sept. 20, 2011) (denying request for reconsideration because motion was not filed within fourteen days and the "failure to move for reconsideration within this time period is by itself a sufficient basis for denial of the motion" (internal citation and quotation marks omitted)).[23]

Even if it were timely, Plaintiffs' request for reconsideration should be denied because Plaintiffs fail to satisfy the strict standard for such motions. As this Court has recently made clear, "'[a] party may move for reconsideration and obtain relief only when the party identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" Order (ECF No. 1930) (Sept. 22, 2022) at 1 (quoting *Cho* v. *Blackberry Ltd.*, 991 F.3d 155, 170 (2d Cir. 2021); *see also Shrader* v. *CSX Transp. Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) ("The standard for granting [reconsideration] is strict . . . [and] a motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided."). Here, Plaintiffs have failed to identify any intervening change of law, new evidence, matters that the Court overlooked, or clear error.

Plaintiffs' request is merely "a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Behiry* v. *United States*, 2022 WL 1204561, at *1 (S.D.N.Y. Apr. 22, 2022) (Schofield, J.) (internal citation and quotation marks omitted). Plaintiffs now attempt to argue that certain of the documents at issue are not subsequent remedial measures because they are dated in the last months of the class period and, although they discuss the very policy changes the Court's MIL Ruling addressed, the documents could still be admitted to show that the remedial measures failed or intent. Both of these arguments fail, and both should have been raised (if at all) when Plaintiffs opposed Credit Suisse's motion *in limine*.

Plaintiffs argue that the documents do not relate to ***subsequent*** remedial measures because they are not later in time than every event at issue in the case. This ignores that the policy changes discussed in these 2012–2013 documents indisputably come after the vast bulk of the events in the 2007–2013 class period, and after the external events (including LIBOR investigations) that prompted the banks to consider remedial policy changes. Plaintiffs also argue for the first time

---

[23] *See also Cooper* v. *Lapra*, 2020 WL 7027592, at *1 (S.D.N.Y. Nov. 30, 2020) ("Courts in this Circuit have consistently held that the untimeliness of a motion for reconsideration is reason enough to deny the motion."); *McGraw-Hill Glob. Educ. Holdings, LLC* v. *Mathrani*, 293 F. Supp. 3d 394, 397 (S.D.N.Y. 2018) (same).

Honorable Lorna G. Schofield
September 14, 2022
Page 10

that certain of the documents are admissible as evidence of "intent" or to prove that participation in the multi-bank chatrooms was valuable to Defendants.

Plaintiffs' argument that documents dated as early as September 2012 cannot serve as subsequent remedial measures[24] could and should have been raised in opposition to Credit Suisse's motion *in limine*, which clearly extended to 2012 documents (one of which was appended as an exhibit). Similarly, any argument that these materials were admissible for other limited purposes should have been made in opposition to Credit Suisse's motion. Plaintiffs failed to do so.

These are simply new arguments that Plaintiffs chose not to raise in opposition to Credit Suisse's motion *in limine* and, as such, cannot support reconsideration. *See Great Am. Ins. Co.* v. *Zelik*, 439 F. Supp. 3d 284, 289 (S.D.N.Y. 2020) (refusing to review new arguments because "[a] motion for reconsideration [] is not an opportunity for a losing party to examine a decision and then plug the gaps of a lost motion with additional matters" (internal citation and quotation marks omitted)).

<u>Second</u>, as the Court has already held, the documents at issue must be excluded because they evidence "paradigmatic measures" directed at making the conduct Plaintiffs complain of less likely to occur—*i.e.*, the banks' efforts to limit traders' use of interbank chatrooms. MIL Ruling at 8. Contrary to Plaintiffs' assertions, they are not restatements of longstanding policy or remedial measures that were contemplated but not adopted.[25] Each and every one of the 10 chats at issue relates to a contemporaneous discussion of actual bank policy changes involving limiting or eliminating trader discussions in interbank chatrooms—the very remedial measures at issue in the MIL Ruling:

| PTX | Bates Number | Excerpt (emphasis added) |
|-----|--------------|--------------------------|
| 64 | BARC-FX-CIV_00022281, at 282 | 9/12/2012 07:08:24 [Credit Suisse Trader] posted: u guys got much on the downside in usdcad? any orders or levels or anything like that?<br><br>07:09:17 [Bank of America Trader] posted: Hi [CS trader] ***can't comment*** pal . . .<br><br>07:12:35 [Credit Suisse Trader] posted: fk all these ***new rules about chats*** and stuff . . . |

---

[24] Plaintiffs' assertion that actions from late 2012 cannot serve as subsequent remedial measures is particularly dubious in light of their (insufficiently pleaded) allegations that the conspiracy commenced "at least as early as January 1, 2003" and their allegations that certain Defendants closed multi-bank chatrooms around the same time the banks entered into deferred prosecution agreements in connection with various LIBOR-related investigations (beginning in late 2012). Third Consolidated Amended Class Action Complaint (ECF No. 1409) (Mar. 5, 2020) ¶¶ 289, 401.

[25] Plaintiffs' attempt to distinguish between actions taken as preliminary steps and later finalizations of policy changes falls flat. It would entirely undermine Rule 407 to admit preliminary discussions relating to a subsequent remedial measure that is later adopted.

Honorable Lorna G. Schofield
September 14, 2022
Page 11

|  |  | 07:15:57 [Bank of America Trader] posted: *No asking for spreads . . .* |
|---|---|---|
| 2508 | CS-FXLIT-12293619, at 620–621 | 9/12/2012 13:53:57 [Credit Suisse Trader] what's the spread in 40 eurcad<br><br>15:33:59 [Bank of America Trader] sorry darling *i been to a meeting*<br><br>15:34:27 [Bank of America Trader] *and unfortunately... cant discuss spreads on chat* |
| 976 | FX0005928, at 928–929 | 9/17/2012  [Internal Bank of America Email]<br><br>Hi everyone, . . .<br><br>First let's get some facts on the table. *Barclays London and RBS globally have pulled out of bank-to-bank chats*. BNP has not pulled out of chats. *Barclays London pulled out as a response to the LIBOR situation (according to my friends there) and RBS globally has pulled out because of their interpretation of competition law and feelings that oversight agencies will be looking for heads to make sure they are viewed as doing their jobs (also from a friend there).* |
| 751 | CITI-FX-CIVIL-00292326, at 327 | 10/16/2012 12:58:04 [Bank of America Trader] posted:   mate im sorry i dont want to sound like an idiot, but *I'm not allowed to discuss sopreads on chat anymore...*its a bit ridiculous but it could be seen as price fixing apparently |
| 1741 | BARC-FX-CIV_00098338, at 340 | 10/24/2012  12:07:31 [Barclays Trader] posted: so the bad news is that this chats days are numbered . . .<br><br>12:08:04 [Barclays Trader] posted: think *emails going out that all chats with interbank traders need to be non persistent and 1 on 1 . . .*<br><br>12:13:22 [Barclays Trader] posted: its so stupid, but i guess we all heading that way |
| 2686 | FX0005350, at 350–352 | 11/15/2012 08:29:29 [Citibank Trader] says:  *weird thing with barclays is*<br><br>08:29:33 [Citibank Trader] says:  *i believe*<br><br>08:29:37 [Citibank Trader] says:  *they can have chats*<br><br>08:29:43 [Citibank Trader] says:  *but no more than 1 person*<br><br>08:29:51 [Citibank Trader] says:  *so no group chats . . .* |

Honorable Lorna G. Schofield
September 14, 2022
Page 12

| 2370 | SCB-FXLITIG-00016267, at 270 | 1/31/2013 14:02:43 [Citibank Trader] posted: ***please remove me from this chat permanently*** . . .<br><br>14:03:29 [Citibank Trader] posted: ***just got the email***<br><br>14:04:39 [Bank of America Trader] posted: ***all bank chats or just groups ?*** . . .<br><br>14:05:12 [Citibank Trader] posted: ***all permanent chats*** |
|------|------|------|
| 2371 | SCB-FXLITIG-00016329, at 331–332 | 2/7/2013  13:53:08 [Bank of America Trader] posted: ***As much as it kills me to say this it appears that we are following the trend and removing all perma chats by close of business today*** . . . |
| 2335 | DB-0457528, at 560–561 | 2/20/2013  08:02:56 [Bank of America Trader] says: ***alright end of day im out of here*** . . .<br><br>08:03:43 [Morgan Stanley Trader] says: ***i was told yesterday i am out next week*** |
| 2645 | CS-FXLIT-13149654, at 665–666 | 10/16/2013  08:52:01 [Credit Suisse Trader] ***u cant ask spreads***<br>08:52:04 [Credit Suisse Trader] ***on these chats anymore***<br>08:52:14 [Credit Suisse Trader] ***don't tell me what u make***<br>08:52:20 [Credit Suisse Trader] i dont care a fk anyway do i |

Nor can any clever reframing change the fact that Plaintiffs seek to use these documents to prove culpable conduct, which is precisely what Rule 407 prohibits. Indeed, culpable conduct by the banks and their traders is the only issue before the jury at the upcoming trial.

Plaintiffs also argue that because certain traders continued to discuss spreads in chatrooms following changes in bank policies, evidence relating to the change in policy should be admissible to show the remedial measures were ineffective, or to show that the chats were valuable to traders before they were closed. Both of these arguments, if accepted, would gut Rule 407 and permit evidence of the very remedial measures Rule 407 excludes.

Rule 407 is intended to encourage corrective or preventive measures without fear that such actions will be used against them in a lawsuit. *Werner* v. *Upjohn Co., Inc.,* 628 F.2d 848, 855 (4th Cir. 1980), *cert. denied*, 449 U.S. 1080 (1981). An exception permitting Plaintiffs to introduce evidence that policy changes were supposedly ***ineffective***, or that they were frustrating to the relevant actors, would contravene the purpose of Rule 407. *See Cann* v. *Ford Motor Co.*, 658 F.2d 54, 60 (2d Cir. 1981) (explaining that the "policy underlying Rule 407 [is] not to discourage persons from taking remedial measures"); Fed. R. Evid. 407 advisory committee's note (exclusion "rests on a social policy of encouraging people to take, or at least not discouraging them from taking [subsequent remedial measures]").

Plaintiffs cite no authority to support their argument, and courts routinely refuse to endorse similar attempts to create new exceptions not listed in Rule 407 to admit otherwise prohibited evidence. *See Werner*, 628 F.2d at 856 ("[W]e should not be too quick to read new exceptions

Honorable Lorna G. Schofield
September 14, 2022
Page 13

into the rule because by so doing there is danger of subverting the policy underlying the rule."); *see also, e.g.*, *In re Air Crash Disaster*, 86 F.3d 498, 529 (6th Cir. 1996) (same); *Rostvet* v. *Lock City Transp. Co.*, 2014 WL 11531331, at *1 (D.N.D. Mar. 26, 2014) (finding evidence of subsequent remedial measures inadmissible "unless they fall within some recognized exception to the rule"); *Yates* v. *Ford Motor Co.*, 2015 WL 2189774, *at 8 (E.D.N.C. May 11, 2015) (rejecting plaintiffs' request to admit subsequent remedial measures to show knowledge); *Grabau* v. *Target Corp.*, 2008 WL 616068, at *2 (D. Colo. Feb. 29, 2008) (excluding evidence because subsequent remedial measures could not be used to prove knowledge as it would "contradict the clear language of the rule").

<u>Finally</u>, Plaintiffs can show no unique need for the 10 chats at issue.  Plaintiffs include on their exhibit list thousands of trader chats not impacted by the MIL Ruling, all of which Credit Suisse has consented to pre-admitting.  To be clear, Credit Suisse does not argue that spread discussions in chatrooms following the policy changes excluded by the MIL Ruling are inadmissible.  Nor would Credit Suisse seek to exclude post-hoc acknowledgements that relevant conduct occurred, if such evidence could be disentangled from the policy change evidence excluded by the MIL Ruling.  Indeed, Credit Suisse has consented to redacted and excerpted versions of exhibits that would otherwise be excluded by the MIL Ruling where possible.  As a careful review of the 10 chats at issue reveals, discussions of the banks' policy changes pervade and are intertwined with any otherwise admissible discussion.  On this basis, they plainly fall within the MIL Ruling and must be excluded.  Furthermore, we have reviewed Plaintiffs' proposed redactions to the documents still at issue and do not believe they fully eliminate references to the policy changes, or that the remaining portions are coherent such that they could properly be put before the jury in redacted form.

Plaintiffs' untimely request for reconsideration seeks to relitigate the Court's exclusion of subsequent remedial measure evidence using new arguments.  These arguments contravene Rule 407 and the Court should deny Plaintiffs' request.

Respectfully submitted,

SCOTT+SCOTT ATTORNEYS
  AT LAW LLP

*s*/ Christopher M. Burke
Christopher M. Burke
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
cburke@scott-scott.com

HAUSFELD LLP

*s*/ Michael D. Hausfeld
Michael D. Hausfeld
888 16th Street NW, Suite 300
Washington, DC 20006
Telephone: 202-540-7200
mhausfeld@hausfeld.com

*Attorneys for Plaintiffs*

4860-5947-9606.v1

Honorable Lorna G. Schofield
September 14, 2022
Page 14


    CAHILL GORDON & REINDEL LLP

    *s*/ Herbert S. Washer_____
    Herbert S. Washer
    Anirudh Bansal
    Jason M. Hall
    Edward Moss
    Tammy L. Roy
    32 Old Slip
    New York, NY 10005
    Telephone: 212-701-3000
    hwasher@cahill.com
    abansal@cahill.com
    jhall@cahill.com
    emoss@cahill.com
    troy@cahill.com

    *Attorneys for Defendants*
    *Credit Suisse Group AG, Credit Suisse AG,*
    *and Credit Suisse Securities (USA) LLC*