October 7, 2022

<u>Via ECF</u>

Honorable Lorna G. Schofield
U.S. District Court
Southern District of New York
Thurgood Marshall Courthouse
40 Foley Square
New York, NY 10007

      Re:   *In re Foreign Exchange Benchmark Rates Antitrust Litigation*
              Case No. 1:13-cv-07789-LGS

Dear Judge Schofield:

      The parties have a dispute regarding the application of part of the Court's Order of October 3, 2022 (ECF No. 1946, the "Order"). Specifically, the parties disagree as to whether and how Credit Suisse could "open the door" to Plaintiffs' use for "impeachment" of evidence currently excluded under Rule 407 and this Court's *in limine* rulings. Because this issue will become relevant as early as opening statements and cross-examination of Plaintiffs' first witnesses, the parties respectfully submit their respective positions herein and ask that the Court resolve the evidentiary dispute so they can conform their trial presentations to the Court's ruling.

**<u>Credit Suisse's Position</u>**

      On September 6, the Court granted Credit Suisse's motion to exclude evidence concerning, *inter alia*, evidence about the closure of multi-bank chatrooms and revisions to corporate policies about chatroom information sharing (the "Excluded Evidence"). The Court held that closing chatrooms and strengthening information sharing policies are "paradigmatic measure[s] 'that would have made an earlier injury . . . less likely to occur'" and therefore "are inadmissible under Rule 407 to prove culpable conduct." Opinion and Order, ECF No. 1880 at 8.

      On October 3, the Court reiterated its ruling, but further stated that references to policy changes and chatroom closures may become admissible for "impeachment" purposes if Credit Suisse opens the door by offering evidence that spread sharing was a routine or legitimate practice. For the last month, Credit Suisse has refined and finalized its defense presentation under the understanding that evidence and argument concerning subsequent remedial measures would be excluded for trial. Because Credit Suisse intends to present evidence that spread discussions served legitimate business purposes, *i.e.*, "non-conspiratorial alternative explanation[s]" for the chats at issue, as permitted under this Court's rulings on Plaintiffs' motions *in limine* Nos. 2 and 7, Credit Suisse respectfully requests clarification as to the evidence that the Court believes would "open the door" to the Excluded Evidence.

**I.    Credit Suisse Intends to Introduce Evidence that Spread Discussions Served Legitimate Business Purposes**

      Credit Suisse intends to introduce evidence that chatroom discussions about spreads in particular currency pairs does not reflect an alleged conspiratorial agreement to widen spreads but

rather served legitimate business purposes. This evidence goes to the heart of the dispute to be tried, as the Court recognized in its opinion denying the parties' cross-motions for summary judgment. Opinion and Order, ECF No. 1650 (Feb. 1, 2022) at 16 ("Even if traders thought they were just sharing 'market color' when they provided pricing information in exclusive chat rooms, CS Defendants, in their memoranda of law, do not point to any evidence suggesting that exchange was pro-competitive or consistent with any sort of independent action.").

As just one example, Professor Michael Melvin, an industry expert in FX with 30 years of academic experience who spent over a decade working in the FX marketplace, will explain that discussions about liquidity conditions, which are often framed around a discussion about current spreads, enabled traders to obtain visibility to market information that would otherwise be obscured due to the opacity of the FX marketplace. *See, e.g.*, Melvin Report ¶¶ 57-58. Plaintiffs themselves have designated evidence that goes to the purpose of spread discussions. For example, Plaintiffs have designated the testimony of a trader, who testified that "[s]peaking to people about spreads was again – I will go back to trying to understand liquidity. It was part of what people could use to understand how the market was functioning." Credit Suisse's live witnesses will offer similar testimony.

## II. The Subsequent Remedial Measures Do Not Impeach This Evidence

Credit Suisse recognizes that, in limited circumstances, evidence relating to subsequent remedial measures is admissible for purposes other than proving culpable conduct.[1] But when offered as impeachment, this exception to Rule 407 must be construed narrowly "to prevent the exception from swallowing the rule." *See, e.g.*, *Lidle* v. *Cirrus Design Corp.*, 278 F.R.D. 325, 332 (S.D.N.Y. 2011), *aff'd*, 505 F. App'x 72 (2d Cir. 2012).[2] To fall within the narrow exception to Rule 407, "the evidence offered for impeachment **must contradict the witness's testimony directly**." *Complaint of Consolidation Coal Co.*, 123 F.3d 126, 136 (3d Cir. 1997) (emphasis added).

---

[1] For instance, when disputed, subsequent remedial measures taken by a defendant may demonstrate that the defendant controlled the relevant premises or that the remedial measures taken were feasible earlier. Credit Suisse does not dispute that if it was making a different argument—for example that shuttering the chatrooms was impossible or that wrongful conduct could never occur in chatrooms—subsequent remedial measure evidence might be appropriate impeachment. But Credit Suisse is not advancing these arguments.

[2] *See also* Admissions by conduct: (g) Safety measures after an accident; payment of medical expenses, 2 McCormick On Evid. § 267 (8th ed.) ("The provision of the rule that permits evidence of remedial measures to be admitted for impeachment is of particular concern in that, if applied expansively, it could 'swallow up' the rule."); *Harrison* v. *Sears, Roebuck & Co.*, 981 F.2d 25, 31 (1st Cir. 1992) ("Rule 407's impeachment exception must not be used as a subterfuge to prove negligence or culpability."); *Stecyk* v. *Bell Helicopter Textron, Inc.*, 295 F.3d 408, 415–16 (3d Cir. 2002 ("While the text of Rule 407 permits admission of subsequent remedial measures for impeachment, we have cautioned against permitting the exception to 'swallow' the rule."); *United Tool Rental, Inc.* v. *Riverside Contracting, Inc.*, 260 P.3d 156, 161 (Mont. 2011); *Herzog* v. *Lexington Twp.*, 657 N.E.2d 926, 933 (Ill. 1995) (subsequent remedial measures not admissible "for impeachment where the sole value of the impeachment rests on that same impermissible inference of prior negligence").

Here, the banks' decisions to revise their information sharing policies or to require that their traders close multi-bank chatrooms do not in any way contradict evidence that spread discussions served legitimate business purposes. Spread discussions can serve legitimate business purposes and yet banks could still make a prudent decision to eliminate all such discussions to guard against any risk that they could be *perceived* as inappropriate by regulators. This is particularly true in an environment where regulatory scrutiny was increasing and LIBOR-related investigations emerged. Indeed, Plaintiffs offer no evidence that any policy change was the result of any bank determining that the sharing of spreads did not serve, or never served, a legitimate business purpose. Policy changes may merely reflect a determination that the purpose and benefits of permitting access to multi-bank chatrooms were outweighed by potential future risks. Such a revised risk assessment does not, however, mean that the practice never served a legitimate purpose. Furthermore, and contrary to Plaintiffs' assertions below, Credit Suisse is not seeking to "have its cake and eat it too." To the extent Plaintiffs believe spread discussions never served a legitimate purpose, the appropriate vehicle for such arguments is presentation of evidence in support of this position or cross-examination of Credit Suisse's witnesses. Prejudicial subsequent remedial measures should not be used as a substitute; this would gut Rule 407. *See Stecyk* v. *Bell Helicopter Textron, Inc.*, 295 F.3d 408, 415–16 (3d Cir. 2002) (affirming exclusion of subsequent remedial design change where the plaintiffs had an opportunity to impeach the defense witnesses' testimony regarding the design of the airplane/helicopter component without resorting to prejudicial post-crash evidence).

The circumstances here are readily distinguishable from *Pitasi* v. *Stratton Corp.,* 968 F.2d 1558, 1560-1561 (2d Cir. 1992) and *Hirsch* v. *Citibank, N.A.,* No. 12 Civ. 1124, 2014 WL 2745187, *16 n.21 (S.D.N.Y. June 10, 2014). In *Pitasi*, the defendant asserted an affirmative defense of contributory negligence, arguing that the risk posed by the ski trail where the plaintiff was injured was so obvious that there was no need for warning signs or ropes and that, as a result of the alleged obvious risk, plaintiff was contributorily negligent in nonetheless deciding to ski on the trail. The Second Circuit held that the defendant's subsequent decision to rope off the slope was not admissible to prove that the defendant was negligent, but it was admissible to impeach defense witnesses and rebut the defense that "the dangerous conditions . . . were so obvious and apparent that warning signs or ropes . . . were unnecessary." 968 F.2d at 1560-61. The defendant's decision to add warning signs and ropes directly contradicted its assertion that the danger was so obvious that such measures were unnecessary.

In *Hirsch*, the court was considering the defendant's claim that an arbitration clause contained in a client manual was enforceable against plaintiffs because it would have been clear to a reasonably prudent person that the manual was a contract and that it contained an arbitration clause. 2014 WL 2745187, at *15, *16. In rejecting defendant's argument, the court considered the defendant's subsequent revisions to the manual, including a revision to the cover that "now clearly indicates that it is an agreement." *Id.* at *16, n.21. Such evidence was held to be admissible to rebut the defendant's contention that the original manual was already "clearly an agreement." *Id.*

In both *Pitasi* and *Hirsch*, the defendants did more than merely defend the legitimacy of their conduct to dispute that their conduct was culpable; they asserted defenses that were directly contradicted by the subsequent remedial measures. Here, evidence of changed information-sharing policies, and the closing of chatrooms, does nothing to contradict the legitimate business

3

purposes of spread sharing. It is not proper impeachment. To hold otherwise would eviscerate Rule 407 and permit evidence of subsequent remedial measures evidence in any case where a defendant disputes that its conduct was culpable.

**Plaintiff's Position:**

I. **At a Minimum, the Documents at Issue Should Be Admissible for Purposes of Impeachment, Should Credit Suisse Open the Door**

All of the documents at issue (and potentially others dealing with chat room closures) could be admissible for impeachment purposes if Credit Suisse opens the door. As the Court noted, "[e]xcluded references to policy changes and chatroom closures may become admissible for 'impeachment' if Defendants open the door." Order, ¶3 (citing Fed. R. Evid. 407 and *Pitasi v. Stratton Corp.*, 968 F.2d 1558, 1560-1561 (2d Cir. 1992) ("[T]estimony concerning subsequent remedial measures is . . . admissible to rebut a defense . . . .") (*Hirsch v. Citibank, N.A.*, 2014 WL 2745187, *16 n.21 (S.D.N.Y June 10, 2014)).

By its very terms Rule 407 specifically provides that its proscription on a party's use of evidence of subsequent remedial measures "to prove negligence or culpable conduct" does not require the exclusion of such evidence "when offered for another purpose, such as . . . impeachment." Fed. R. Evid. 407. Credit Suisse appears to accept this fundamental premise but complains it would be unfairly punished should it open the door by claiming spread discussions were legitimate business practices, by having to then face evidence about closing the chat rooms which clearly demonstrates sharing spreads was later determined to be improper. Simply, Credit Suisse seeks to have its cake and eat it too.[3]

In this *per se* case, where pro-competitive justifications are not part of the calculus, Credit Suisse cannot claim (through experts or otherwise) that the chat rooms benefitted the banks' customers and that sharing spreads among competing dealers was a legitimate practice and then, having opened that Pandora's Box not have to face evidence that directly rebuts that defense. And Credit Suisse incorrectly attempts to place the burden on Plaintiffs to offer evidence that any policy change regarding the chatrooms was the result of any bank determining that the sharing of spreads did not serve, or never served, a legitimate business purpose. Whether the banks' change in policy was an actual subsequent remedial measure regarding the conduct at issue is Defendants' burden to establish, not Plaintiffs'. *Yates v. Ford Motor Co.*, No. 5:12-cv-752, 2015 WL 2189774, at *7 (E.D.N.C. May 11, 2015) ("Generally, an objector must show that the proffered evidence is within the scope of Rule 407." (citing Graham, 23 Fed. Prac. & Proc. Evid. § 5291) (citing Fed. R. Evid. 104)). Credit Suisse's brief suggests that closing the chat rooms might not have been related to FX at all, putting the correctness of the Court's prior ruling regarding Defendants' motion in limine No. 8 in doubt. Credit Suisse should be put to a decision and cannot straddle the fence on this

---

[3]   Credit Suisse's reliance on *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 416 (3d Cir. 2002) is not persuasive. In that case the Third Circuit acknowledged that "the trial judge should be afforded a healthy deference in preserving both the rule and the exception." *Id*. There is no basis to believe the Court will not carefully consider whether and how Credit Suisse might open the door to the admission of excluded evidence to rebut a defense. The Court's procedures will ensure that when the issue comes up, it will be outside the presence of the jury. *See* Order at ¶5.

4

issue. Moreover, evidence that banks were able to quote spreads to customers in all sizes and currency pairs before and after the existence of multibank chatrooms further undermines claims that the dealers' discussions of spread in chatrooms were necessary and served legitimate interests.

Credit Suisse's anticipated argument that banks closed chatrooms out of concern about perception ignores reality, including a number of guilty pleas by its co-conspirators and their traders for their conduct in chatrooms. Efforts to bar Plaintiffs from properly impeaching such testimony with multiple examples that the banks closed multibank chatrooms because there was actual collusion occurring and their traders understood that was the reason for the prohibition.

That Credit Suisse might have to contend with impeachment of their witness and adjust their planned expert and trader testimony based on the Court's Order is certainly not a basis to reconsider. In a complex trial such as this, both sides must contend with last-minute rulings that may affect how the parties plan to put on their case. That is the nature of complex litigation. And Credit Suisse is of course welcome to introduce the evidence it wants – just not in a vacuum.

Arguments related to Plaintiffs' Motions in Limine and the Court's Orders on those motions are also relevant here. When Plaintiffs sought to exclude testimony regarding purported pro-competitive justifications, the Court mooted much of Plaintiffs' Motion in Limine Two based on "Defendants' representation that they do not intend to argue that the alleged price-fixing conspiracy was reasonable, beneficial or a legitimate business practice. That is, Defendants will not argue that price fixing was justified by its competitive effects." Order at 1 (ECF 1887). Credit Suisse intends to argue, however, that the very conduct constituting price fixing was so justified, but seek to hamstring Plaintiffs from impeaching those claims with clear evidence contradicting that position.

The Court's provided examples demonstrate the use of evidence that could otherwise be barred by FRE 407 to impeach (should Credit Suisse open the door) are in fact being construed narrowly, which should assuage Credit Suisse's concerns[4]. Under these examples, there is no danger that the exception will swallow the rule. As the Court explained, "if Defendants offer evidence that the sharing of spreads was a routine or legitimate practice among FX dealers, such testimony could be impeached by evidence that the practice later was banned." Order, ¶3. Further, the Court held "if Defendants offer evidence that the sharing of information in chatrooms was undertaken for the benefit of customers rather than for the benefit of the participants, such testimony could be impeached by evidence that traders believed closing chatrooms would harm profitability and attempted to find workarounds." Order at ¶3.

Credit Suisse has been precluded from presenting expert opinions describing conduct as "pro- or anti-competitive" and from offering opinions similar to the opinion that traders "were likely searching for insight on market liquidity conditions and crucially, do not appear to indicate any attempt to agree to certain spreads . . . ." on the basis that these speak to traders' intent. ECF No. 1887 at 2, 3. Credit Suisse seeks to proffer opinions that are virtually identical, in their own

---

[4]  To further guard against any possible unfairness, the Court has made plain that should Plaintiffs believe that Credit Suisse has opened the door for use of "otherwise inadmissible" evidence for purposes of impeachment, Plaintiffs are instructed to seek a ruling from the Court outside the presence of the jury. Order ¶5.

words, stating that Dr. Melvin will explain that spread discussions (which they describe as "liquidity conditions") were a "legitimate business practice" and "enabled traders to obtain visibility to market information that would likely be obscured due to the opacity of the FX marketplace". These superficial revisions do nothing to address valid concerns of jury confusion. These concerns are only exacerbated by Credit Suisse's own positions with respect to those jury instructions, assuring the Court that the jury should not hear about per se price fixing, because it is "outside the scope" of this trial. That mantra permeates Credit Suisse's positions with respect to the jury instructions and would preclude instructions on:

- price fixing as a per se violation ("unnecessary and likely to confuse the jury, since it is outside the scope of the issues the jury will determine"). ECF No. 1889, at 26 n.1

- the fact that good motives are not a defense, ("The jury has been asked to find only whether a conspiracy existed and which banks knowingly participated. In addition, issues related to injury or causation – such as that the conduct had "good results" – are not in scope for this trial."), ECF No. 1889, at 29; and

- the fact that the reasonableness of prices are no defense. ("The jury has been asked to find only whether a conspiracy existed and which banks knowingly participated. Issues … such as whether counterparties traded at 'reasonable prices' – are not in scope for this trial.") ECF No. 1889 at 30, n.1.

No matter how it is phrased, Credit Suisse cannot blind the jury to the per se rule and then bury the jury in evidence that is not cognizable under it.

Respectfully submitted,

SCOTT+SCOTT ATTORNEYS  
AT LAW LLP

 *s*/ Christopher M. Burke  
Christopher M. Burke  
600 W. Broadway, Suite 3300  
San Diego, CA 92101  
Telephone: 619-233-4565  
cburke@scott-scott.com

HAUSFELD LLP

 *s*/ Michael D. Hausfeld  
Michael D. Hausfeld  
888 16th Street NW, Suite 300  
Washington, DC 20006  
Telephone: 202-540-7200  
mhausfeld@hausfeld.com

*Attorneys for Plaintiffs*

CAHILL GORDON & REINDEL LLP

 *s*/ Jason M. Hall

The Court previously held that evidence of closing or prohibiting chat rooms or barring the sharing of spreads is inadmissible to prove culpable conduct under Rule 407 as subsequent remedial measures. The Court also held that such evidence could be admissible if offered for "impeachment" as contemplated by Rule 407. Credit Suisse seeks a ruling that its intended argument -- that "spread discussions served legitimate business purposes" and not conspiratorial agreement to widen spreads -- will not open the door to such impeachment evidence. The application is GRANTED.

Evidence of subsequent measures closing or prohibiting chat rooms is precluded under Rule 407 as this evidence is too attenuated to warrant admission to impeach the Credit Suisse argument that spread discussions served legitimate business purposes.

Evidence of subsequent measures prohibiting specifically the sharing of spreads, while potentially admissible as impeachment evidence under Rule 407, *see Pitasi v. Stratton Corp.*, 968 F.2d 1558 (2d Cir. 1992), is precluded under Rule 403. Particularly in light of the Court's recent rulings concerning evidence of long-standing bank policies against spread-sharing, the incremental probative value of this subsequent-remedial-measure evidence is minimal, since plaintiffs have abundant other evidence to achieve the same end. That limited probative value is substantially outweighed by the risk of prejudice, confusing the jury and wasting time. The unspoken inference or even an explicit instruction that the evidence may not be considered to prove "culpable conduct" but may be considered "for impeachment" under Rule 407, may be too fine a distinction for a jury to make, resulting in confusion and prejudice to Credit Suisse. In addition, if the evidence were admitted, Credit Suisse would be forced to provide evidence of alternative explanations leading to wasted time on ancillary issues. *Cf. id.* at 1561 ("Because Pitasi was unable to introduce the remedial measures into evidence, it was impossible for him to rebut defendant's argument . . . . The probative value of this evidence clearly outweighed its prejudicial effect . . . .").

Dated: October 8, 2022  
New York, New York

LORNA G. SCHOFIELD  
**UNITED STATES DISTRICT JUDGE**