October 13, 2022

<u>**Via ECF**</u>

Honorable Lorna G. Schofield
U.S. District Court
Southern District of New York
Thurgood Marshall Courthouse
40 Foley Square
New York, NY 10007

      Re:   *In re Foreign Exchange Benchmark Rates Antitrust Litigation*
              Case No. 1:13-cv-07789-LGS

Dear Judge Schofield:

      Plaintiffs seek an Order addressing two matters raised by Credit Suisse's opening statement. The Parties have met and conferred and do not agree. Plaintiffs assert that Credit Suisse opened the door to evidence regarding the disposition of the cases against the other 15 co-conspirators and that it also opened the door to evidence regarding the New York Department of Financial Services Consent Order ("NYDFS Order") by telling the jury that Credit Suisse has not been prosecuted.

**I.    Credit Suisse Has Opened the Door Regarding Resolution of the Suits Against the 15 Co-Conspirator Banks**

      This Court stated that it intends to instruct the jury that "Plaintiffs are not required to join as Defendants in this case all persons who may have participated with Credit Suisse in the alleged conspiracy. It is immaterial, as a matter of law, that any other members of the conspiracy may have not been joined in this suit by Plaintiffs." (ECF No. 1889 at 31, Instruction No. 13.) Contrary to this Black-letter law, Credit Suisse espoused two contrary positions during its opening statement and, therefore, opened the door to Plaintiffs offering curative evidence.

      First, Credit Suisse told the jury that Plaintiffs "sued these 16 banks" and showed the jury a slide titled "More than 50 FX Market Makers" that highlighted Credit Suisse and the 15 former Defendant banks. ("And you heard the Court talk about Credit Suisse and up to 15 banks, an alleged 16-bank conspiracy. The plaintiffs have sued these 16 banks, right? They haven't sued Wells Fargo and TD Bank and Nomura and B of NY Mellon and all of these other large banks.") Tr. at 66:11-15. Credit Suisse then doubled-down: "Plaintiffs are going to say, well, no, ***we sued these 16*** because they control 90 percent of the market, right?" *Id*. at 20-21.

      Second, Credit Suisse showed a slide to the jury titled "Number of Spread Chats that Include Entities Other than the 16 Banks" and argued that other market makers beyond the 16 Defendant banks were participants in the same chat rooms. According to the slide, examples of these other market makers that Plaintiffs did not sue are Nomura, Wells Fargo, BNY Mellon, and others.

      "The concept of 'opening the door,' or 'curative admissibility,' gives the trial court discretion to permit a party to introduce otherwise inadmissible evidence on an issue (a) when the opposing party has introduced inadmissible evidence on the same issue, and (b) when it is needed

to rebut a false impression that may have resulted from the opposing party's evidence." *U.S. v. Rea*, 958 F.2d 1206, 1225 (2d Cir. 1992). This doctrine applies to opening statements as well. *Weyant v. Okst*, 182 F.3d 902, 1999 WL 491866, at *2 (2d Cir. 1999) (holding the rule of "opening the door" applied to opening statement and stating the fact that statements by counsel are not evidence "does not give counsel license to make improper arguments in his opening statement").

Credit Suisse opened the door in its opening statement by voluntarily injecting the fact that Credit Suisse was not the only bank Plaintiffs sued. As a result, the jury is now left to wonder and speculate what happened to the other 15 Defendant banks and why they are not co-defendants in this trial too. Making matters worse, Credit Suisse later noted during its opening statement that its market share was meager, leaving the suggestion that Plaintiffs should have been going after others, including but not limited to those with larger market share. ("The witnesses will tell you that Credit Suisse was a tiny player in the market in 2007 when this supposed conspiracy started. There is Credit Suisse, number 14 with a whopping 1.51 percent market share."). Tr. at 96:5-9. To cure the prejudice caused by Credit Suisse, Plaintiffs should be allowed to notify the jury, whether through a statement by the Court, witnesses, or on closing argument, that the other 15 banks settled or resolved their disputes with the Class. Because Plaintiffs expect Credit Suisse might continue to inject this issue into the case, handling the matter as soon as possible is requested.

## II.     Credit Suisse Opened the Door at Its Opening to Evidence from the NYDFS Order

During opening statements, counsel for Credit Suisse made repeated references to prosecutions in an effort to deflect damaging evidence regarding the guilty pleas of its fellow co-conspirators. Then, provocatively, counsel stated: "you'll hear no evidence that Credit Suisse was prosecuted." *See* Tr. at 76:25-77:1. Counsel's statement is deeply misleading to a lay jury,[1] highly prejudicial – but it also invokes plainly inadmissible evidence. There is significant precedent within the Second Circuit that evidence of acquittal is inadmissible hearsay. *U.S. v. Viserto*, 596 F.2d 531, 537 (2d. Cir. 1979) ("[A] judgment of acquittal is hearsay. The Federal Rules of Evidence except from the operation of the hearsay rule only judgments of conviction, Rule 803(22), not judgments of acquittal.").[2]

---

[1]     The word "prosecute" is not limited to criminal matters. *See Bohnen v. Harrison*, 232 F.2d 406, 409 (7th Cir. 1956) ("As most commonly used in legal language the word 'prosecute' means 'to seek to obtain, enforce, or the like, by legal process; as to prosecute a right or claim in a court of law.'") (citing WEBSTER'S NEW INT'L DICTIONARY (2d ed. 1953)); *Lesnow Bros. v. U.S.*, 78 F. Supp. 829, 831 (Ct. Cl. 1948) ("The meaning of the word 'prosecute' not only in its ordinary definitive sense but by the interpretation of many courts, includes the commencement or institution of suits.") (citing cases). Even if it were limited to criminal matters, that nuance would easily be lost on a lay jury.

[2]     The statement that Credit Suisse was never prosecuted is false for the further reason that Credit Suisse has, in fact, received a statement of objections and a supplemental statement of objections – the charging document of the European Commission – charging it for violations of competition law based on their FX conduct. The South Africa Competition Commission also refered a case for prosecution against Credit Suisse and other banks related to the FX market. While Plaintiffs do not seek admission of information regarding the European charges or action in

This principle applies with equal force to the absence of prosecution. *Duttle v. Bandler & Kass*, 82 Civ. 5084, 1990 WL 113187, at *4 (S.D.N.Y. July 30, 1990) ("Evidence of a failure to indict, like evidence of an acquittal, should not be offered for the purpose of rebutting any inference of defendants' wrongdoing. Such evidence constitutes impermissible hearsay, *see* Fed. R. Evid. 801(c), and is more prejudicial than probative."); *Johnson v. Elk Lake School Dist.*, 283 F.3d 138, 147 (3d Cir. 2002) ("There is no doubt that the mention of '[n]o arrest' by Stevens's attorney was improper, for evidence of non-arrest, like evidence of nonprosecution or acquittal of a crime, is generally inadmissible in a civil trial concerning the same incident. . . . the decision not to arrest may take into account many factors irrelevant to a civil suit, such as the allocation of law enforcement resources and other considerations of prosecutorial discretion.").

This prejudice is made greater since counsel also sought to downplay the "pact on spreads" chat just moments later in the witness' statement. That very chat, however, was a key part of the NYDFS Order's findings of spread collusion. *See* NYDFS Order, ¶¶36-37. Without admission of the consent decree (or at least the relevant background and findings related to spread collusion), the jury will be left with the false assumption that Credit Suisse's conduct was not subject to regulatory scrutiny. Not only was it subject to investigation, the very document that counsel sought to downplay was a centerpiece of the NYDFS Order's spread collusion findings.

The NYDFS Order had previously been the subject of one of Defendants' motions *in limine*. *See* Motion *in Limine* 1 and ECF No. 1880 at 1. The concerns expressed by the Court in granting Credit Suisse's motion to exclude the NYDFS Order, including concerns about unfair prejudice, now cut against Plaintiffs, not Credit Suisse. *See* ECF No. 1880 at 1. The other FX-related conduct referenced in the NYDFS Order can easily be excised out of any version shared with the jury (as proposed in Attachment A hereto). This would limit the risk of confusion and would properly put in context and rebut Credit Suisse's claim at opening regarding not being prosecuted for conduct relating to the FX market. Credit Suisse has opened the door to this evidence and in order to ensure the jury is not left with the impression that regulators found no fault with Credit Suisse, redacted or excised portions of the consent decree should be admitted for use with witnesses or at closing. This is necessary as a curative step in response to Credit Suisse's misleading and unfairly prejudicial statements at opening.

At a minimum, the Court should provide a limiting instruction to the jury that it should ignore any testimony regarding the lack of criminal prosecution of Credit Suisse or any individual trader because the burden of proof in a criminal case is significantly higher and the jury here can find agreement even if the government chose not to prosecute.

Respectfully submitted,

| SCOTT+SCOTT ATTORNEYS AT LAW LLP | HAUSFELD LLP |
|---|---|
| s/ *Christopher M. Burke* | s/ *Michael D. Hausfeld* |
| Christopher M. Burke | Michael D. Hausfeld |

---

South Africa, it is additional evidence demonstrating that Credit Suisse's statements at opening are contrary to the facts and deeply misleading. At a minimum, Plaintiffs should be entitled to bring in an excised version of the NYDFS Order.

| | |
|---|---|
| 600 W. Broadway, Suite 3300<br>San Diego, CA 92101<br>Telephone: 619-233-4565<br>cburke@scott-scott.com | 888 16th Street, NW, Suite 300<br>Washington, DC 20006<br>Telephone: 202-540-7200<br>mhausfeld@hausfeld.com |

*Attorneys for Plaintiffs*

## ATTACHMENT A

**Introduction**

1.      The Department has been investigating Credit Suisse's foreign exchange ("FX") trading business (the "DFS or Department Investigation"), including obtaining thousands of documents from Credit Suisse, taking testimony from Credit Suisse employees, and obtaining additional information from third-party sources.

2.      The DFS Investigation has determined that, from at least 2008 to 2015, Credit Suisse consistently engaged in improper, unsafe, and unsound conduct, in violation of New York laws and regulations, by failing to implement effective controls over its FX business.

3.      The Bank engaged in the inappropriate sharing of information with other global banks which may have led to coordinated trading, manipulation of exchange rates, and increased bid/ask spreads offered to customers in Credit Suisse's foreign exchange business. These efforts were directed at maximizing profits or minimizing losses in Credit Suisse's trading book, to the detriment of customers and a competitive marketplace.

*       *       *

**Credit Suisse's Unsafe, Unsound and Improper Conduct**

11.     For many years, Credit Suisse FX traders participated in multi-party electronic chat rooms, where traders shared information to support coordinated trading activity, and attempts to manipulate currency prices or benchmark rates. By improperly sharing information, some of the traders involved sought to diminish competition among banks, allowing these banks and traders to reap higher profits from the execution of FX trades at customers' expense. Certain Credit Suisse traders also engaged in improper activity by sharing of confidential customer information, again with the aim of enhancing their own profits to the detriment of customers.

12. Credit Suisse traders engaged in this activity despite the fact that both outside guidance and internal Credit Suisse policies counseled against manipulate and abusive practices such as sharing confidential customer information, front-running ahead of customer orders, and trading based on inside or proprietary information.

13. Specific information about customer identity, and the type and size of customer orders, is considered confidential and proprietary to a bank, and is not permitted to be shared outside of the financial institution. As early as 2008, guidance existed from the Federal Reserve emphasizing the need for FX dealers to protect client confidentiality and avoid situations involving (or even appearing to involve) trading on non-public information.[1] Likewise, Credit Suisse policies from 2010 that addressed fixed income trading stated, "***Confidential or Proprietary Information: Employees should assume that all information about customer orders and transactions is confidential and or proprietary***."

\*   \*   \*

36. **Spread Collusion**: Another improper strategy employed by Credit Suisse traders involved the inappropriate sharing of information regarding spreads for trading in certain currency pairs. As noted previously, competition between banks helps keep spreads tight and prices competitive. Coordinated efforts to agree on prices may result in wider spreads, which limits competition, boosting the banks' profitability at customer expense.

37. On one occasion, for example, Trader 1 explicitly asked colleagues in a chat room: "***lets sign a pact . . . on spreads***." Trader 3 quickly responded, "***agree***." Trader 1 then sought to recruit Trader 2 to this illicit "pact," saying *"[Trader 2] . . . u in [?]."*

\*   \*   \*

---

[1] *See, e.g.*, Federal Reserve Bank of New York, Guidelines for Foreign Exchange Trading Activities (Foreign Exchange Committee, May 2008).

2

## VIOLATIONS OF LAW AND REGULATIONS

83. Credit Suisse has conducted business in an unsafe and unsound manner, in violation of Banking Law §§ 10 and 44.

84. Credit Suisse failed to maintain and make available true and accurate books, accounts, and records reflecting all transactions and actions, in violation of New York Banking Law § 200-c.

85. Credit Suisse failed to make reports required by the Superintendent and failed to include within such reports certain prescribed matters, in violation of New York Banking Law § 44-a.

86. Credit Suisse failed to submit a report to the Superintendent immediately upon discovering fraud, dishonesty, making of false entries or omission of true entries, or other misconduct, whether or not a criminal offense, in violation of 3 NYCRR § 300.1.

## SETTLEMENT PROVISIONS

**Monetary Penalty**

87. Credit Suisse shall pay a civil monetary penalty pursuant to Banking Law §§ 44 and 44-a in the amount of $135,000,000. Credit Suisse shall pay the entire amount to the Department within ten days of executing this Consent Order. Credit Suisse agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any U.S. federal, state, or local tax, directly or indirectly, for any portion of the civil monetary penalty paid pursuant to this Consent Order.