October 16, 2022

Re:  *In re Foreign Exchange Benchmark Rates Antitrust*
     *Litigation*, Case No. 1:13-cv-07789-LGS

Dear Judge Schofield:

Credit Suisse respectfully submits this letter in opposition to Plaintiffs' request to preclude certain testimony from Dr. Kleidon. Plaintiffs and their expert Dr. Singer have blatantly misrepresented Dr. Singer's expert opinions in an attempt to avoid the consequences of this Court's *Daubert* ruling, which excluded the bulk of Dr. Singer's regression analysis. The reality is that Dr. Singer's excluded regression was a cornerstone of his opinion on which the other conclusions he presented to the jury rested.

When the Court largely excluded the regression, Plaintiffs could have decided not to risk putting Dr. Singer on the stand at all. Or, Plaintiffs could have accepted the Court's explicit invitation to present Dr. Singer's regression as to the six months in 2013 it actually addressed.[1] But instead they made a tactical decision to take a more aggressive approach. They decided to elicit Dr. Singer's broad conclusion that economic evidence is "consistent with" the alleged conspiracy without offering any part of the regression analysis that Dr. Singer described as the bedrock support for that conclusion. Now Plaintiffs must live with the consequences of their decision. Dr. Singer now says his regression analysis is irrelevant to whether a conspiracy exists, but this new position cannot be reconciled with his own prior sworn statements, made over many years, that the regression addresses the existence and viability of the alleged conspiracy. Defendants must be permitted to explain that Dr. Singer's conclusion now rests on very shaky ground from an economics perspective.

That is particularly true because, as a result of Dr. Singer's testimony and Plaintiffs' counsel's attempt to shut down his cross-examination, the jury is left with the deeply misleading impression that the 16 banks had "the power" to widen spreads. To make matters worse, directly contradicting his own sworn expert reports, Dr. Singer suggested in his trial testimony that the question of whether spreads actually widened is not relevant to the question of whether a conspiracy existed. Credit Suisse will suffer extreme prejudice if this misimpression is not corrected. Plaintiffs should not be permitted to benefit from Dr. Singer's misleading testimony, which is contrary to his prior statements and Plaintiffs' counsel's representations to this Court— including a witness list that they submitted to the Court at 9:32 a.m. on the day Dr. Singer was to

---

[1] ECF No. 1944 (Sept. 30, 2022) ("Dr. Singer shall not opine that the Conduct coefficient produced by his regression analysis measures the average difference in spreads between the entire conspiracy period and the post-conspiracy period he analyzed. ***Dr. Singer may, however, opine that his analysis measures the average difference in spreads between the second half of 2013 (the last six months of the alleged conspiracy period) and the first half of 2014.***") (emphasis added).

testify.  Dr. Kleidon should testify and should be permitted to respond to Dr. Singer's misleading testimony.

### Dr. Singer's Expert Reports

First, the record makes clear that the key premise of Plaintiffs' letter is false:  Dr. Singer's regression relates to the question of whether a conspiracy existed and not just to antitrust impact. Since the Court's 2019 class certification ruling, the parties have explicitly been on notice that only the conspiracy element of Plaintiffs' Sherman Act claim — and not antitrust impact or other elements — would be tried in this class proceeding.  And since 2019, Plaintiffs' expert Dr. Singer has offered three separate "merits" expert reports directed to evaluating whether economic evidence is consistent with the existence of the conspiracy Plaintiffs allege.

Specifically, the centerpiece of each of Dr. Singer's merits reports was a regression model purporting to show that FX spreads were wider during the entire class period than they were after the class period.  For example, in his January 23, 2020 merits expert report, Dr. Singer opined that "us[ing] standard multivariate regression methods . . . I find that . . . interbank spreads narrowed after the end of the class period, indicating more competitive FX pricing . . . after the Challenged Conduct was eliminated."  Ex. A ¶ 4.  Dr. Singer further opined that "the **quantitative** and qualitative evidence . . . is **consistent with the alleged price-fixing conspiracy**."  *Id.* ¶ 65 (emphasis added).

In March 2020, Defendants' experts opined that the scale of information sharing identified by Plaintiffs is miniscule relative to the volume of FX trading.  In response, Dr. Singer's August 2020 Report doubled down on the centrality of his regression analysis to his opinion that the alleged conspiracy existed or was even viable :

> "[I]t bears noting that the question of whether CSI was exchanged with sufficient frequency relative to some arbitrary threshold to make the alleged conspiracy viable is a distraction: *What matters is that spreads were, in fact, inflated by the Challenged Conduct. This is the relevant question*. . . .  [T]he empirical demonstration in my econometric analysis linking this conduct with wider spreads, [is] consistent with an affirmative answer to this question.

Ex. B ¶ 19.[2]  Dr. Singer's most recent expert report delivered in July 2022 repeated this claim: "whether spreads were discussed with sufficient frequency relative to some arbitrary threshold to make the alleged conspiracy viable is a distraction: What matters is that spreads were, in fact,

---

[2] *See also* Ex. B ¶ 73 ("My regression model provides further confirmation that the Defendants' CSI exchanges were sufficiently pervasive to have measurable effects on spreads throughout the Class Period"); *id.* ¶ 90 ("Simply, the proof is in the pudding. What matters is that spreads were, in fact, inflated by the Challenged Conduct . . . ."); *id.* ¶ 132 ("The results of the regression provide independent confirmation that CSI exchanges and exploitation were at a sufficiently high level—and cheating at a sufficiently low level— so as to successfully inflate spreads paid by Class Member").

inflated by the Challenged Conduct. This is the relevant question." Ex. C ¶ 41.

Dr. Singer confirmed again at his deposition only weeks ago that his regression is relevant to the existence and viability of the alleged conspiracy. *See* Sept. 15, 2022 Dep. Tr. (Ex. D) 77:24-78:7 ("Q. So you viewed your regression opinion in this case to be more about anticompetitive effects than about the existence of an agreement? A. I think it's both. But it's the most powerful piece of evidence in terms of effects. ***But it also supports the existence of an agreement***."); *see also* Feb. 20, 2020 Dep. Tr. (Ex. E) 344:13-18 ("Well, ***I think that my econometric model speaks to the viability of the conspiracy*** and --or of the alleged conspiracy, and so that if I --if I had found that there was no spread widening during the alleged conspiracy, that would suggest that it wasn't easy to pull this off").

Plaintiffs also relied on Dr. Singer's analysis to defeat Credit Suisse's motion for summary judgment on the issue of the existence of a conspiracy—the same issue being tried. In opposing Credit Suisse's motion, Plaintiffs argued that "Dr. Singer provided a ***detailed statistical analysis*** of conspirators' trades throughout the Class Period that provides ***strong circumstantial evidence that a conspiracy existed to widen spreads***." ECF No. 1581 at 23.

Enough has been said about the flaws and failures of Dr. Singer's regression, and we will not repeat those arguments here. Ultimately, the Court largely excluded Dr. Singer's regression because it failed the reliability standards of Rule 702 and *Daubert*. But the fact remains that Dr. Singer has repeatedly acknowledged, and admitted during his deposition mere weeks ago, that the regression was critical support for his broader conclusion that the economic evidence is "consistent with" the alleged conspiracy. The fact that Dr. Singer n o w persists in his broad conclusion that the economic evidence is "consistent with" conspiracy, even in the absence of his centerpiece economic analysis, is directly relevant to his credibility and the weight the jury should give to his testimony.

Plaintiffs continued to insist that Dr. Singer would present what remained of his regression analysis until the minute Dr. Singer testified. The night before his testimony, counsel discussed the possibility of a trade: Plaintiffs' counsel tentatively proposed that if Dr. Singer did not testify about his regression, then Credit Suisse would not call Dr. Kleidon. Credit Suisse's counsel rejected that offer later that night. And then, on ***Thursday morning*** Plaintiffs delivered to the Court their updated witness list stating that Dr. Singer would testify about "his ***performance analysis which suggests that bid-ask spreads were wider during the last six months of the Class Period*** and narrowed in the first half of 2014." Ex. F. Apparently, Plaintiffs made the tactical decision not to present that testimony at some point on Thursday. Now they must live with it.

## Dr. Singer's Trial Testimony

As the Court recalls, Plaintiffs did not elicit on direct examination of Dr. Singer any specifics of this regression analysis that had been central to his three merits expert reports and had been featured on summary judgment. This despite the fact that the Court's *Daubert* ruling permitted Dr. Singer to testify as to his regression analysis relating to the second half of 2013, and

despite that Plaintiffs told the Court and Defendants on Thursday morning that Dr. Singer would offer that very testimony. Order, ECF No. 1944. Plaintiffs' decision now appears to have been a last-minute tactical attempt to forestall cross-examination as to the importance of the regression analysis to Dr. Singer's broader conclusions.

As the Court knows, defense counsel inquired on cross-examination about just how important the regression analysis was to Dr. Singer's conclusions. Plaintiffs' counsel interjected a series of objections, insisting that this questioning was beyond the scope of the direct and arguing (in the face of the clear facts to the contrary set forth above, including that they had told the Court hours before that he would be testifying about his regression) that Dr. Singer's abandoned conclusions about spread widening were "beyond the scope of the issues in the trial." Trial Tr. 450:24-25; 454:6-9. After this series of objections, Dr. Singer was asked the following question and gave the following answer:

> Q: Dr. Singer, you've written in this case that the relevant question is what happened to spreads. That that is the relevant question to determine, whether or not the evidence is consistent or not consistent with a conspiracy. You've repeatedly taken that position, correct?
>
> A: I have taken that position **with respect to the question of proving common impact**.

As the above discussion makes clear, it is, quite frankly, difficult to understand how Dr. Singer and Plaintiffs' counsel believed this testimony to be entirely accurate. Dr. Singer's regression analysis is, by his own repeated description and Plaintiffs' repeated representations to this Court, directly relevant to his analysis of the performance of the FX marketplace, his opinion regarding the viability of the conspiracy, and his opinion regarding whether the evidence is consistent with a conspiracy.

Dr. Singer's testimony leaves the jury with the false impression that the question of whether spreads in fact widened is not relevant to the existence of the alleged conspiracy, even though Dr. Singer said the exact opposite in multiple reports and in his deposition testimony. Worse, Dr. Singer opined on direct examination that a chatroom discussion in which a Credit Suisse trader said "we have the power" to widen spreads confirms his "ultimate conclusion that when you put these 16 under one roof, **you will have the ability to raise prices over competitive levels** to the detriment of consumers." Trial Tr. 367:3-20. Dr. Singer offered no proof that prices ever did rise over competitive levels even though he performed an analysis on the subject (which he deemed "the relevant question" in a report submitted less than three months before trial). Defendants must be permitted to correct the misleading impression that the jury undoubtedly now has.

## Dr. Kleidon's Testimony Is Relevant Rebuttal to Dr. Singer's Testimony

Dr. Kleidon will not delve into the specifics of Dr. Singer's regression analysis, nor will Dr. Kleidon present his own regression. He will only discuss the significance from an economics

perspective of the fact that Dr. Singer did not support the broad conclusion he testified to on direct – that "the traditional economic indicators that I used here are consistent with the existence of a conspiracy and a price fixing conspiracy" (Trial Tr. 344:10-13) – with any econometric or statistical analysis. Defendants expect Dr. Kleidon's direct testimony to take only approximately 30 minutes.

Dr. Kleidon's merits report disclosed that he was asked to address whether Dr. Singer supported his conclusion "that the 'Challenged Conduct is statistically associated with inferior market performance.'" Ex. G ¶¶ 2, 7. Plaintiffs' tactical decision not to present Dr. Singer's regression analysis does not make Dr. Kleidon's testimony any less relevant. Indeed, the Court has already ruled that "evidence and argument that the conspiracy had no effect may be admissible as circumstantial evidence that no conspiracy existed." ECF No. 1887 at 1-2. Dr. Kleidon's testimony falls squarely within this bound.

Plaintiffs' request should also be denied as untimely and improper gamesmanship. On the morning of Thursday, October 13, Credit Suisse sent the slides attached to Plaintiffs' letter to Plaintiffs pursuant to the Trial Procedures Stipulation, confirming that Dr. Kleidon would testify the next day (*i.e.*, on Friday). That evening, Plaintiffs' counsel called counsel for Credit Suisse and requested that Credit Suisse not call Dr. Kleidon on Friday because Plaintiffs' counsel was not ready to cross-examine Dr. Kleidon. As a professional courtesy, Credit Suisse agreed to defer Dr. Kleidon's testimony to this coming week. It now appears that Plaintiffs' request simply permitted them more time to seek to exclude Dr. Kleidon from trial. The Court should not reward this type of maneuvering.

Plaintiffs' last-minute decision not to present Dr. Singer's regression analysis was their own choice. But Credit Suisse must be allowed to present its defense, and it must be allowed to point out the failure of Plaintiffs and their expert to present what they themselves have claimed was central economic evidence of conspiracy. The absence of such evidence is damning for Plaintiffs' case, but that is no reason Credit Suisse should be prevented from discussing the issue. In fact, Credit Suisse would be severely prejudiced if the jury were to continue under the false impression, created by Dr. Singer, that whether spreads widened is irrelevant to this case. Dr. Kleidon is entitled to present his previously disclosed opinions regarding the economic sufficiency of Plaintiffs' empirical evidence. Plaintiffs' request to exclude Dr. Kleidon should be denied.

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

 *s*/ Edward Moss
Herbert S. Washer
Anirudh Bansal
Jason M. Hall
Edward Moss
Tammy L. Roy
32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
abansal@cahill.com
jhall@cahill.com
emoss@cahill.com
troy@cahill.com

*Attorneys for Defendants*
*Credit Suisse Group AG, Credit Suisse AG,*
*and Credit Suisse Securities (USA) LLC*

Honorable Lorna G. Schofield
United States District Judge
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

Via ECF