**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST
LITIGATION

No. 1:13-cv-07789-LGS

**<u>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A NEW TRIAL</u>**

# **TABLE OF CONTENTS**

I.      OVERVIEW ........................................................................................................ 1

II.     LEGAL STANDARDS ...................................................................................... 5

III.    ARGUMENT ...................................................................................................... 6

     A.      The Weight of the Evidence Is Overwhelming as to Credit Suisse's Liability
           and the Verdict Does Not Make Sense in Light of the Jury's Answer to
           Question 1 ................................................................................................ 6

     B.      Actions by Credit Suisse's Counsel Caused Significant Prejudice and Unfairly
           Influenced the Jury's Verdict.................................................................. 12

          1.      Credit Suisse's Claim to Never Being "Prosecuted" and the Inability to
               Bring in the NYDFS Order Prejudiced Plaintiffs .................................... 12

          2.      Credit Suisse Improperly Questioned Plaintiffs' Expert Regarding a
               Regression and Conclusions to Be Drawn from Its Absence ................... 16

          3.      Defendants' Experts Repeatedly Violated in Limine Orders Regarding
               Pro-Competitive Justifications and Trader Intent .................................... 19

          4.      Plaintiffs Were Barred from Eliciting Testimony Regarding the Closing
               of the Multibank Chat Rooms but Defendants' Expert Testified About
               the Subject .............................................................................................. 22

          5.      Credit Suisse Misrepresented the Law on the Inference Which Jurors
               Could Reasonably Infer from the Assertion of Witnesses Asserting
               Their Fifth Amendment Rights................................................................ 23

          6.      Credit Suisse Violated a Stipulation Regarding Class Plaintiffs During
               Summation .............................................................................................. 24

IV.    CONCLUSION.................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bohnen v. Harrison*,
232 F.2d 406 (7th Cir. 1956) ................................................................13

*Byrd v. Janssen Pharm., Inc.*,
333 F. Supp. 3d 111 (N.D.N.Y. 2018)....................................................25

*Bevevino v. Saydjari*,
574 F.2d 676 (2d Cir. 1978)....................................................................5

*Finn-Verburg v. N.Y. State Dep't of Lab.*,
165 F. Supp. 2d 223 (N.D.N.Y. 2001) .....................................................5

*Greenleaf v. Garlock, Inc.*,
174 F.3d 352 (3d Cir. 1999)...................................................................12

*Hopson v. Riverbay Corp.*,
190 F.R.D. 114 (S.D.N.Y. 1999) .......................................................6, 24

*Koerner v. Club Mediterranee, S.A.*,
833 F. Supp. 327 (S.D.N.Y. 1993) ...........................................................5

*Lee v. City of Troy*,
339 F.R.D. 346 (N.D.N.Y. 2021) ......................................................6, 24

*Lesnow Bros. v. United States*,
78 F. Supp. 829 (Ct. Cl. 1948)...............................................................13

*Malmsteen v. Berdon, LLP*,
595 F. Supp. 2d 299 (S.D.N.Y. 2009),
*aff'd*, 369 F. App'x 248 (2d Cir. 2010)....................................................6

*Manley v. AmBase Corp.*,
337 F.3d 237 (2d Cir. 2003)......................................................................5

*Munafo v. Metro. Transp. Auth.*,
381 F.3d 99 (2d Cir. 2004).......................................................................6

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005).....................................................................6

*Pappas v. Middle Earth Condo. Ass'n*,
963 F.2d 534 (2d Cir. 1992).....................................................................6

ii

*Ruffin v. Fuller*,
    125 F. Supp. 2d 105 (S.D.N.Y. 2000)........................................................................5

*Song v. Ives Lab'ys, Inc.*,
    957 F.2d 1041 (2d Cir. 1992)...................................................................................5

**Statutes, Rules, and Regulations**

Federal Rules of Civil Procedure
    Rule 59..................................................................................................................1, 5

Federal Rules of Evidence
    Rule 403..............................................................................................................3, 19

**Other Authorities**

BLACK'S LAW DICTIONARY (11th ed. 2019)..............................................................13

WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1953)....................................13

## I.     OVERVIEW

Pursuant to Rule 59 of the Federal Rules of Civil Procedure, Plaintiffs respectfully move for a new trial on the grounds that the jury's verdict that Credit Suisse did not participate in the conspiracy to widen spreads is contrary to the weight of the evidence.  While the jury found that a conspiracy existed to widen, fix, stabilize, or maintain spreads (Question 1), it did not find that Credit Suisse participated in that conspiracy (Question 2).  The jury's finding regarding Credit Suisse was contrary to a mountain of evidence directly implicating Credit Suisse, including:

- Credit Suisse "encouraged . . . us [its FX traders] to use interbank chat rooms. During those chats we were asked to talk about what spreads were out there in the market at the time."  Little Tr. at CTX6-B-0005 (ECF No. 1998-6 at 12).  This is consistent with the testimony of other traders who were encouraged by their banks to be in chat room sharing spreads with competitors.  *See* testimony of James Witt, Witt Transcript ("Tr.") at CTX0006-O-0004-0005 (ECF No. 1998-6 at 68).  It was a common understanding among banks to discuss the spreads they show to customers.  *See* testimony of Angus Greig, Greig Tr. at CTX 6-G-0018 (ECF No. 1998-6 at 49); testimony of Jason Katz at Trial Tr. 306:25-307:2.

- The chat rooms were private and by invitation only; traders were in several chat rooms, participated in them on a daily basis, and communicated across chat rooms. As Messrs. Katz and Cummins testified, these chat rooms formed a network.  Katz described the Old Gits chat room, in which Credit Suisse participated, as a part of that network.  Trial Tr. at 302:3-4.  Dr. Melvin described the chat rooms as a social network.  *Id*. at 601:24-25.  The network provided Credit Suisse and its co-conspirators an edge over their customers and dealers who were not in the chat rooms.

- Plaintiffs' trial exhibits demonstrate that in the chat room network Credit Suisse and its competitors "agree" or reach "consensus" with respect to the "right spread," the "correct spread," and what spread "we" show to the customers.  These chats are materially the same as chats that do not involve Credit Suisse.  *See* §III.A., *infra*. For example, Old Gits chat room member and Credit Suisse trader Christopher Hatton stated: "just both quote them wide and same that way they [the customer] have no tight price."  PTX2919A-0003  This is the same conduct that landed Mr. Aiyer in prison and attached felonies to Messrs. Katz's and Cummins' records.  Mr. Katz testified that he coordinated spreads with Mr. Hatton and, as a result, customers did not get independent pricing.  Trial Tr. at 314:25-315:9.

- In 2007, Mr. Parikh of Goldman Sachs announced to Jamie Lawes of Credit Suisse and Julian Munson of RBS that narrowing spreads to compete for customers was

costing them money and that they needed to agree on spreads. PTX1759A.[1]  In 2008, Mr. Lawes of Credit Suisse invited Messrs.  Parikh and Munson to "sign a pact on spreads" to increase bank profitability at the expense of customers. PTX1373A-0002.

- Credit Suisse traders understood that coordinating spreads with competitors was "collusion" and "price fixing," but continued to do so throughout the Class Period. *See* PTX1767A-0002; PTX0064A-0002.

The evidence in favor of Credit Suisse's participation in the conspiracy is sufficient by itself to overturn the jury's verdict.  The anomalous, inconsistent jury verdict can be traced to Credit Suisse's unwarranted liberty, in letter and spirit, with multiple Court orders on evidence limitations, which greatly prejudiced Plaintiffs.  Credit Suisse's misconduct provides a separate ground for overturning the jury verdict and includes the following.

*First*, Credit Suisse's counsel misled the jury and abused the Court's *in limine* rulings by asserting during opening that, unlike other banks who pled guilty, "you'll hear no evidence that Credit Suisse was prosecuted."  *See* Trial Tr. at 76:25-77:1.  This statement planted the misleading impression that Credit Suisse was not prosecuted and its conduct was blessed by the regulators, when, in fact, Plaintiffs were proscribed from presenting the fact of such prosecutions to the jury. ECF No. 1983 at 2-3.  Efforts to characterize Credit Suisse as a non-participant in the conspiracy based upon the absence of evidence that was only unavailable by dint of Court order, including, but not limited to, the *in limine* Order excluding the New York Department of Financial Services' Consent Order ("NYDFS Order") gravely prejudiced Plaintiffs.  Credit Suisse amplified this prejudice by downplaying the "pact on . . . spreads" chat.  That very chat was the cornerstone of the NYDFS Order's findings of spread collusion.  *See* NYDFS Order, ¶¶36-37; *see also* §III.B.1.,

---

[1]     Exhibit 2 to the Declaration of Christopher M. Burke (the "Chat Summary") provides the relevant excerpts of the chats Plaintiffs cited in this brief.  The Chat Summary is not an exhaustive list of all the chats in the record.  It is merely representative of the chats contained in Plaintiffs' trial exhibit list.

*infra*.  Credit Suisse continued this ruse through its questioning of witnesses and during its closing argument.

*Second*, Credit Suisse unfairly exploited the Court's *Daubert* order by improperly cross-examining Dr. Singer about his regression analysis.  The Court ruled that "Any reference to the fact that Dr. Singer performed a regression analysis, that Defendants found fault with it, or that it was precluded in part by the Court, is excluded pursuant to Federal Rule of Evidence 403."  ECF No. 1991 at 6.  Dr. Singer did not testify about his regression on direct examination.  Credit Suisse caused confusion and prejudice by repeatedly raising the lack of a regression analysis and suggesting a regression was required for Plaintiffs to meet their burden of proof.  Credit Suisse also questioned Dr. Mathur about regressions in direct violation of the Court's order who also insisted that empirical or data driven evidence that spreads widened was the *sine qua non* for determining whether the evidence was consistent with the existence of an agreement.  *See* §III.B.2, *infra*.

*Third*, Credit Suisse's experts regularly violated the Court's ruling on Plaintiffs' motions *in limine* Nos. 2 and 8.  The Court denied as moot Plaintiffs' motions based on representations by Credit Suisse that they would not argue or have their experts offer opinions on (1) whether the conspiracy was "reasonable, beneficial or a legitimate business practice" (ECF No. 1887 at 1); and (2) regarding intent, state of mind, or motive (*id.* at 3).

Despite its representations to the Court, Credit Suisse's experts Drs. Melvin and Mathur repeatedly violated Credit Suisse's assurances giving rise to the Court's ruling.  They first testified that Credit Suisse shared spreads to give the customer its "best guess" on spreads, *i.e.*, conspiring to get the customer a better price, which is exactly the type of classic pro-competitive justification barred in a *per se* case.  Despite disclaiming the ability to interpret chats, Dr. Mathur nonetheless

3

characterized the chats as containing "lot[s] of bluster and bravado" (state of mind/intent) in an effort to downplay the collusive nature of the chats. Other examples are discussed below, but each was contrary to Credit Suisse's representations upon which the Court decided the motions *in limine*. *See* §III.B.3, *infra*.

*Fourth*, Credit Suisse manipulated the Court's "subsequent remedial measures" ruling regarding the closing of the chat rooms. Because Plaintiffs were barred from using certain information regarding the closing of the multibank chat rooms, Credit Suisse was able to argue the chat rooms actually benefitted customers. Had Plaintiffs been allowed to use chats regarding their closing, Plaintiffs would have shown all the co-conspirators used the private chat network as the means and mechanism of carrying out their conspiracy, and that banks shut *all* multibank chat rooms because of "collusion," not just the chat rooms that connected with the banks' guilty pleas. *See* §III.B.4, *infra*.

*Fifth*, Credit Suisse misrepresented the law on the inference which jurors could reasonably infer from the assertion of witnesses asserting their Fifth Amendment rights. Credit Suisse at closing argued that since the right was asserted to inconsequential matters such as witness background, the jury should not draw any inference of guilt. *See* §III.B.5, *infra*.

*Sixth*, during closing statements, Credit Suisse asserted that had there been evidence of Credit Suisse's participation in a conspiracy, surely Plaintiffs would have taken the stand and described how they were damaged. Credit Suisse made this argument despite a Court-ordered stipulation regarding the Plaintiffs not testifying in order to save time and streamline the trial where impact and damages were not before the jury. Counsel's statement was highly prejudicial and clearly violated the stipulation. *See* §III.B.6, *infra*.

In summary, the weight of the evidence overwhelmingly established Credit Suisse's participation in the spread conspiracy. Despite this evidence, Credit Suisse abused certain of the Court's evidentiary rulings to make misleading arguments that improperly influenced the jury's verdict and resulted in a miscarriage of justice. Accordingly, the Court should order a new trial.

## II.    LEGAL STANDARDS

A new trial should be ordered where the jury's verdict is "'against the weight of the evidence.'" *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003) (quoting *Song v. Ives Lab'ys, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992)); *see also Finn-Verburg v. N.Y. State Dep't of Lab.*, 165 F. Supp. 2d 223, 229 (N.D.N.Y. 2001) (granting plaintiff's motion for new trial where the verdict was "against the weight of the credible evidence"); *Ruffin v. Fuller*, 125 F. Supp. 2d 105, 109 (S.D.N.Y. 2000) ("a new trial is warranted because the jury's verdict was against the weight of the evidence presented at trial"). "'The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside . . . .'" *Koerner v. Club Mediterranee, S.A.*, 833 F. Supp. 327, 331 (S.D.N.Y. 1993) (quoting *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978)). Under Rule 59, the trial court is afforded substantial discretion in deciding whether to grant a new trial. *Finn-Verburg*, 165 F. Supp. 2d at 228.

"Unlike a judgment n.o.v., a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Song*, 957 F.2d at 1047 (affirming order granting motion for new trial). "In contrast to the standard applied in considering a motion for judgment n.o.v., a trial judge hearing a motion for a new trial 'is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner.'"[2] *Id.*; *see also Manley*, 337 F.3d at 244, 246 (affirming

---

[2]    All citations are omitted unless otherwise noted.

decision ordering new trial "with due regard for fairness to both sides, and a proper concern that a jury clearly understand the applicable principles of law").

"[W]hen the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict, a new trial should be granted."  *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992) (reversing denial of motion for new trial); *Lee v. City of Troy*, 339 F.R.D. 346, 363, 369 (N.D.N.Y. 2021) ("Defendants' flippant and thus far unsubstantiated allegations made repeatedly in front of the jury leave the Court no choice but to order a new trial."); *Hopson v. Riverbay Corp.*, 190 F.R.D. 114, 122 (S.D.N.Y. 1999) (granting new trial based on attorney misconduct).  When reviewing counsel's misconduct for prejudicial effect, "the Court must consider the 'totality of the circumstances' including 'the nature of the comments, their frequency, their possible relevance to the real issue before the jury, the manner in which the parties and the court treated the comments.'"  *Hopson*, 190 F.R.D. at 122; *see also Lee*, 339 F.R.D. at 363.  The Court may also consider "'the strength of the case (*e.g.* whether it is a close case), and the verdict itself.'"  *Malmsteen v. Berdon, LLP*, 595 F. Supp. 2d 299, 309 (S.D.N.Y. 2009), *aff'd*, 369 F. App'x 248 (2d Cir. 2010).

## III.   ARGUMENT

### A.   The Weight of the Evidence Is Overwhelming as to Credit Suisse's Liability and the Verdict Does Not Make Sense in Light of the Jury's Answer to Question 1

Under Second Circuit law:

[A] motion for a new trial pursuant to Fed. R. Civ. P. 59 may be granted by the district court, although there is evidence to support the jury's verdict, so long as the district court determines that, in its independent judgment "the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice."

*Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005) (quoting *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004)).  When viewed in total and considering the jury's finding

that there was a conspiracy in the foreign exchange market "to widen, fix, stabilize or maintain bid-ask spreads" (ECF No. 1997 at 1), the jury's verdict as to Question 2, whether Credit Suisse was a participant, was against the vast weight of the evidence.  By failing to find Credit Suisse's participation in a conspiracy to widen spreads, the jury reached a "'seriously erroneous result'" requiring a new trial.  Thus, the Court should order a new trial on that question.

Chat transcripts among Credit Suisse and its co-conspirator banks provide ***direct*** evidence that Credit Suisse participated in a private conspirator network, one of whose goals was to coordinate and agree on widening spreads.  In its summary judgment opinion, this Court found "there is uncontroverted evidence that Credit Suisse participated in at least some conspiratorial conduct in the FX market."  ECF No. 1650 at 25.  The Court also identified "at least fourteen instances in chat transcripts of Credit Suisse traders encouraging others to use wider spreads or acceding to wider spreads at the request of other traders" (*id.* at 12), all of which were admitted into evidence.[3]  In fact, Plaintiffs' trial exhibits contain much more than the 14 exhibits identified by the Court.  Among the 2,571 spread chats in evidence, 726 chats demonstrate that Credit Suisse traders coordinated spreads with co-conspirators.  These 726 chats comprise 101 unique chat rooms including the chat room in which traders from Credit Suisse, Goldman Sachs, and RBS agreed, at Credit Suisse trader Jamie Lawes's suggestion, to "sign a pact on spreads."  PTX1373A-0002.  In the same chat room, the Goldman Sachs trader previously suggested "agree[ing] on the same spreads [because] it [is] pointless otherwise and we keep cuttin[g] spreads more and more."  PTX1759A-0005.  Although Credit Suisse argued that Mr. Lawes was a junior trader and was simply joking about the pact on spreads, the trial exhibits in evidence contain approximately 300

---

[3]      PTX2892A; PTX2417A; PTX1897A; PTX1883A; PTX1793A; PTX979A; PTX1782A; PTX1815A; PTX2767A; PTX1794A; PTX2041A; PTX2051A; PTX2461A; PTX2650A.

example chats showing Mr. Lawes discussed spreads to show customers with traders at 11 co-conspirator dealers.

Credit Suisse trader, Christopher Hatton, participated in the Old Gits chat room with traders from Barclays, BNP, Citi, Bank of America, and Standard Chartered. *See* PTX2995. Those traders included Jason Katz and Christopher Cummins, who pleaded guilty to conspiring to fix prices of certain currency pairs in the FX market. Mr. Katz testified that the Old Gits chat room was part of the network in which traders at competing banks worked together to determine what spread to show customers. Trial Tr. at 302:3-13. Mr. Katz identified Mr. Hatton as part of the agreement to fix customer spreads.

> Q. Did you and traders at competing banks help each other to determine what was the right spread to quote to customers?
> A. Yes.
> Q. Would that have included Mr. Hatton from Credit Suisse?
> A. Yes.
> Q. Was that permissible?
> A. No.
> Q. Why not?
> A. Because we were competing banks and we were supposed to be independent on our pricing.

*Id.* at 314:25-315:9.

Similarly, Mr. Cummins testified that he engaged in misbehavior in the Old Gits chat room similar to what he did in the ZAR chat room, the chat room in which he committed the crime for which he pleaded guilty. Cummins Tr. at CTX 6-D-0019 (ECF No. 1998-6 at 31). Messrs. Katz and Cummins' testimony regarding Credit Suisse's participation in the spread widening conspiracy was confirmed by Mr. Hatton's own words to his competitors in the Old Gits chat room, "just both quote them wide and same that way they have no tight price." PTX2919A-0003.

Plaintiffs' trial exhibits contain numerous chats in which Credit Suisse and its competitors "agree" or reach "consensus" with respect to the "right spread," the "correct spread," and what

spread "we" show to the customers.  *See, e.g.*, PTX1857A-0002 (September 2008 chat where traders at Credit Suisse, Bank of America, and Goldman Sachs coordinated the "right spread" to show a specific customer in 130 million AUD/USD with the Credit Suisse stating "we showed 20 but perhasp [sic] [should be] 25"); PTX0955A-0001 (September 2009 chat with Brian Walker of Credit Suisse writing seven pips "is right in general" as regular spread in 100 million USD/JPY); PTX1860A-0002 (October 2009 chat where a Credit Suisse trader asked other members of the Dream Team chat room "whats correct spread" in 50 million GBP/NOK.  A Goldman Sachs trader suggested the spread should be 250 pips and a Bank of America trader responded, "we h[a]ve 300."  The Goldman Sachs trader then replied, "300 prob right then."); PTX2943A-0002 (July 2011 Old Gits chat where traders discussed "what we thinkin[g]" the spread in USD/CNY should be.  Credit Suisse and Bank of America agreed that "20-25 in 100 usd cny 1y is too [tight]" and it should be 50 pips.); PTX2085A-0002 (January 2012 chat with Lawes of Credit Suisse stating 20 pips was "right" spread in AUD/NZD).[4]  A spread being "right" or "correct" in a discussion between competitors would only make sense in the context of a conspiracy.  These chats clearly show that Credit Suisse engaged in virtually identical, if not worse, conspiratorial conduct as other banks.

In addition, Plaintiffs' trial exhibits demonstrate Credit Suisse traders knew discussing spreads with competing banks was "collusion" and "price fixing" but kept doing so.  For example, on February 2, 2011, Milko Campusano of Bank of America acknowledged to his competitors at Credit Suisse, JPMorgan, and Morgan Stanley, "fyi . . . per the Fed not allowed to ask what you make . . . fear of collusion and px fixing."  PTX1767A-0002.  Likewise, on September 12, 2012,

---

[4]     *Cf.* PX1384A-0002 (January 2008 chat involving Lawes of Credit Suisse discussing what the spread in NZD/USD "s[houl]d be").

Joseph Landes (Bank of America) told traders at Credit Suisse, Barclays, and Citi that there should be "[n]o asking for spreads."  PTX64A-0002.  Landes also gave an example – "Hey guys what is [the] spread on 300aud/nzd?  That looks like collusion."  *Id*.  Clark Read of Credit Suisse responded to Mr. Landes with disbelief, "u can't even ask for spreads??" . . . "wow . . . that's nuts . . . makes your job tough."  *Id*.  Nevertheless, even after the clear warnings given by Messrs. Campusano and Landes, Credit Suisse traders continued to coordinate spreads with competing banks, with the last occurring in December 2013 between Gavin Cook of Bank of America and Christopher Hatton of Credit Suisse.  *See* PTX2647A-0002.

Credit Suisse's involvement in the spread-widening conspiracy is further supported by the testimony of its own traders including Peter Little who testified that Credit Suisse, "encouraged . . . us to use interbank chat rooms.  During those chats we were asked to talk about what spreads were out there in the market at the time."  Little Tr. at CTX 6-B-0005 (ECF No. 1998-6 at 12).  Mr. Little's testimony is identical to other foreign exchange ("FX") traders who said they were encouraged by their supervisors to discuss with competitors in chat rooms spreads to show customers in chat, such that it formed a common understanding among banks.  *See* testimony of James Witt, Witt Tr. at CTX0006-O-0004-0005 (ECF No. 1998-6 at 68); testimony of Angus Greig, Greig Tr. at CTX 6-G-0018 (ECF No. 1998-6 at 49); testimony of Jason Katz at Trial Tr. 306:25-307:2.  Mr. Little's testimony is corroborated by Credit Suisse's own witness, Brian Walker, who testified that discussing spreads in multibank chat rooms did not help banks to compete.

Q. And would you agree, like you did on some of the other chats, that Mr. Little's response to you in this chat did not help Barclays compete with Credit Suisse, right?

\*  \*  \*

A. It did not help them.

*Id*. at 884:11-16.

Mr. Walker further admitted that he was not competing with the traders at competing banks in chat rooms.

> Q. And because you didn't view these 11 to 12 traders that you were communicating with as your competitors, you weren't competing with them, correct?
> A. I don't believe we were competing against each other.

*Id*. at 877:15-17.

There is uncontested evidence that Credit Suisse traders participated in at least some conspiratorial conduct. When facing a chat where traders at competing banks discussed spreads to show a specific customer (PTX1857A), Credit Suisse's expert, Dr. Melvin, admitted that Credit Suisse traders engaged in discussions about spreads in chat rooms they should not be having. Trial Tr. at 641:17-21, 642:10-15. Further, three former Credit Suisse traders, Clark Read, John Erratt, and Daniel Wise, the former Global Head of FX Spot Trading, asserted their Fifth Amendment rights against self-incrimination when questioned about the conspiracy to widen spreads.

Indeed, in opening and closing arguments, Credit Suisse's counsel conceded at least limited conspiratorial conduct by Credit Suisse, instead contesting that the conspiracy did not include ***all*** 16 banks, and that any conspiracies would be delineated by the duration of a given chat room. *See id.* at 76:11-18 ("I mean, there was misconduct in this industry. There's no getting around that, right? There were traders who did things they should not have done. . . . But the evidence will show that what they haven't done was this: They haven't engaged in a sprawling 16-bank conspiracy to fix prices."); *id.* at 1106:7-17 ("Well, remember the rules of conspiracy in this market. It would be limited to this particular chat room and limited to the traders in this particular chat room. And remember, the Court instructed you that banks can only act through their employees, their traders. So here we have one from Credit Suisse, one from RBS, and one from

Goldman Sachs.  That's it.  It would also be limited by the date range of the actual evidence that you've seen.  The first chat from this chat room was December 2007, and the last was February 2008.  So three banks, three months, that's it.").[5]

The jury rejected Credit Suisse's defense that there was no conspiracy because sharing information about spreads was mere market color by finding that there was a price-fixing conspiracy.  Given the evidence that the jury must have credited in determining that a price fixing conspiracy existed, there is no rational basis for the verdict that Credit Suisse did not participate in the conspiracy because the chats show that Credit Suisse committed the same spread-fixing conduct, in the same, private, by invitation only, chat room network, as its co-conspirators.  *See Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 367 (3d Cir. 1999) (reversing denial of new trial where jury's finding of no liability with respect to some defendants was against the weight of the evidence in light of jury's finding other defendant(s) liable on the basis of virtually identical evidence).  Here, virtually identical, if not stronger, evidence demonstrates Credit Suisse's participatory role in the conspiracy and the jury's verdict is inconsistent with these overwhelming facts.

Plaintiffs are entitled to a new trial because the jury's verdict that Credit Suisse did not participate in the conspiracy was against the weight of the evidence.

**B.  Actions by Credit Suisse's Counsel Caused Significant Prejudice and Unfairly Influenced the Jury's Verdict**

**1.  Credit Suisse's Claim to Never Being "Prosecuted" and the Inability to Bring in the NYDFS Order Prejudiced Plaintiffs**

During opening statements, Credit Suisse's counsel repeatedly referred to the guilty pleas of its fellow co-conspirators and stated: "you'll hear no evidence that Credit Suisse was

---

[5]    This anomalous result could be understood as Credit Suisse's counsel confusing the jury that the Court's instructions on the "rules of conspiracy" limited any conspiracy to the dealers in a specific chat room. Counsel's blatant misstatement of conspiracy law to the jury, in contravention of the Court's instructions, is further impropriety necessitating a new trial.

prosecuted."  Trial Tr. at 76:25-77:1.  Counsel knew that motion *in limine* rulings prevented Plaintiffs from showing their clear implication to be false.

Further, Credit Suisse elicited prejudicial testimony from Christopher Hatton (a Credit Suisse trader and long-time member of the Old Gits chat room) ("Q. Were you ever criminally prosecuted, Mr. Hatton?  A. No.").  *Id.* at 274:17-18.  That testimony was misleading.  Mr. Hatton is specifically named in documents related to a prosecution in South Africa, but the jury was led to believe that Mr. Hatton was never "prosecuted."  According to Black's Law Dictionary, the first definition of "[p]rosecute" is "to commence and carry out (a legal action)."  Prosecute, BLACK'S LAW DICTIONARY (11th ed. 2019).  Case law supports this definition.  *See Bohnen v. Harrison*, 232 F.2d 406, 409 (7th Cir. 1956) (citing WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1953)) ("As most commonly used in legal language the word 'prosecute' means 'to seek to obtain, enforce, or the like, by legal process; as to prosecute a right or claim in a court of law.'"); *Lesnow Bros. v. United States*, 78 F. Supp. 829, 831 (Ct. Cl. 1948) (citing cases) ("The meaning of the word 'prosecute' not only in its ordinary definitive sense but by the interpretation of many courts, includes the commencement or institution of suits.").

Plaintiffs immediately argued these actions opened the door to admission of the NYDFS Order to correct this blatant misstatement (ECF No. 1983), but the Court disagreed, instead cautioning Credit Suisse not to compound these misstatements.  The jury was never notified that they had been fundamentally misled.  This materially prejudiced Plaintiffs.

Compounding Credit Suisse's "no prosecution" deception, John Erratt, another Credit Suisse trader, and Credit Suisse, were prosecuted by the European Commission for his role in the Sterling Lads chat room.  The European Commission fined Credit Suisse € 83 million ($94 million)

for its part in a foreign exchange price fixing cartel with HSBC, UBS, RBS, and Barclays.[6]  Thus, Credit Suisse's trial theme that it was not prosecuted and therefore different from the banks that pleaded guilty is thrice false.  Credit Suisse used the Court's motion *in limine* ruling on the NYDFS Order as a sword and a shield, materially misleading the jury.

Credit Suisse used the *in limine* restrictions to amplify the prejudice when it distorted the "pact on spreads" chat.  For example, Steve Yanez of Credit Suisse testified that the pact on spreads chat was "pretty stupid" and that Mr. Lawes, a junior trader, was "in no way a position – he was a junior trader – to agree with anything with anybody.  It's bluster.  It's – what you'd see in a trading world is often folks talk a big game to make themselves feel, like, relevant in the industry, but it's just a stupid statement."  Trial Tr. at 476:3-8.  He further downplayed the significance of Mr. Lawes's conduct, calling him a "very, very junior trader" and a "kid."  *Id*. at 494:21-24.  Similarly, Credit Suisse salesman Braden Howarth testified that Mr. Lawes "was the joker in the pack" and that the statement to sign a pact on spreads was "bravado between a few traders in one chatroom."  *Id*. at 699:15-17.  Counsel misled the jury without fear of rebuttal because Plaintiffs were barred from showing the jury what the NYDFS found ("spread collusion") and that these "jokes" resulted in the firing of Mr. Lawes and others, and a $135 million fine.[7]

Yet, that very chat was central to the NYDFS Order's findings of spread collusion.  *See* NYDFS Order, ¶¶36-37.  As the Order states:

---

[6]      Press Release, EU COMMISSION, *Antitrust: Commission fines UBS, Barclays, RBS, HSBC and Credit Suisse € 344 million for participating in a Foreign Exchange spot trading cartel* (Dec. 2, 2021), https://ec.europa.eu/commission/presscorner/detail/cs/ip_21_6548.

[7]      Credit Suisse witnesses Mr. Steve Yanez, the Global Head of FX, testified that no one raised any legal objection to him as to Credit Suisse traders engaging in discussions with competing banks in chat rooms, Mr. Braden Howarth did not participate in multibank chat rooms with traders at competing banks, and Mr. Niall Condie never flagged a chat as problematic.  *See* Trial Tr. at 503:5-9; 718:4-720:24, 808:2-11.

Another improper strategy employed by Credit Suisse traders involved the inappropriate sharing of information regarding spreads for trading in certain currency pairs.  As noted previously, competition between banks helps keep spreads tight and prices competitive.  Coordinated efforts to agree on prices may result in wider spreads, which limits competition, boosting the banks' profitability at customer expense.

On one occasion, for example, Trader 1 explicitly asked colleagues in a chat room: "lets sign a pact . . . on spreads."  Trader 3 quickly responded, "agree."  Trader 1 then sought to recruit Trader 2 to this illicit "pact," saying "[Trader 2] . . . u in [?]."

*Id*., ¶¶36-37 (emphasis omitted).  Mr. Lawes' misconduct was so egregious that Credit Suisse agreed to never rehire him (and six additional traders), *id.*, ¶¶88-89, a fact that Plaintiffs also were prohibited from sharing with the jury.

In summary, Credit Suisse led the jury to believe from the opening statement that it was different from the guilty plea banks in that it was not subject to any regulatory scrutiny or prosecution because it did nothing wrong.  Credit Suisse even put its FX desk head, Niall Condie, on the stand to testify as to how Credit Suisse competed for business and gained market share, confident that Plaintiffs would be unable to show the jury that Mr. Condie's complicit, reckless, or negligent leadership had been found to result in unsafe and unsound banking practices and that traders working under him were barred from working at Credit Suisse.  *See id*., ¶¶2, 11, 88-89.  Credit Suisse was prosecuted (three times) and has, to date, paid fines of approximately $230 million for conduct including spread collusion, while other charges remain pending.  The concerns, including unfair prejudice, expressed by the Court in granting Credit Suisse's motion to exclude the NYDFS Order, did come to fruition, but against Plaintiffs, not Credit Suisse.  ECF No. 1880 at 1.

While the Court admonished the jury that statements of counsel are not evidence, such admonishment could not possibly have cured the prejudice Plaintiffs suffered.  The lack of rebuttal to this material misrepresentation reasonably explains how the jury could have found a conspiracy

in response to Question 1 but mistakenly concluded Credit Suisse did not participate in that conspiracy in answer to Question 2.

> 2. **Credit Suisse Improperly Questioned Plaintiffs' Expert Regarding a Regression and Conclusions to Be Drawn from Its Absence**

Credit Suisse was able to exclude a portion of Dr. Hal Singer's testimony and report. The Court's *Daubert* ruling excluded Dr. Singer's regression except for the last six months of the Class Period and the first six months after the end of that period. ECF No. 1944 at 1-2. Excluded were Dr. Singer's 12 other six-month periods. Based on this ruling and understanding that the issues before the jury did not require a finding of impact or damages, Plaintiffs' direct examination of Dr. Singer did not cover the existence of his regression analysis or the demonstration of the presence or absence of actual widening or tightening. Credit Suisse, however, repeatedly sought to elicit testimony from Dr. Singer regarding his regression and prior reports that were not in evidence. Even worse, Credit Suisse attempted to elicit this testimony by suggesting that Dr. Singer had never done a regression. Credit Suisse's counsel stated, "You have no idea if the quote was inflated, right, because you did not do any analysis to determine whether spreads were wider . . . ." Trial Tr. at 435:6-8; *see also id.* at 450:17-19 ("Just going to cover one more topic, and that's the regression. You recall we touched on that a little bit yesterday, right?"); *id.* at 450:23 ("You know what a regression is, right?"). Plaintiffs' counsel objected to this line of questioning, but Credit Suisse's counsel persisted:

> Q. Dr. Singer, you created a model in your report regarding spreads in the inter-bank segment, is that correct?
> A. Yes.
> Q. And that model is referred to as a regression model, is that correct?
> A. Yes.

*Id.* at 452:4-9. Then, although counsel objected that the questions were beyond the scope of the direct and Dr. Singer's report was not introduced as an exhibit by either party, Credit Suisse

informed the jury that "in this case, you ran a regression that tried to determine the effect on spreads

of the alleged conspiracy during the six-year alleged conspiracy period, correct, sir?" *Id*. at 453:9-

11.  Despite the Court sustaining this objection, Credit Suisse's counsel continued.  "Q. in your

opinion, what matters in this case is whether spreads were or were not inflated by the alleged

conspiracy, correct?"  *Id*. at 454:4-5.  Again, the Court sustained Plaintiffs' objection.  Credit

Suisse's counsel persisted:

> Q. Dr. Singer, you've written in this case that the relevant question is what
> happened to spreads.  That that is the relevant question to determine, whether or
> not the evidence is consistent or not consistent with a conspiracy.  You've
> repeatedly taken that position, correct?
> A. I have taken that position with respect to the question of proving common
> impact.  My first report in this case, as you are aware, was a class certification report
> where my assignment was to demonstrate that impact could be proven with
> common methods and evidence.  I believe that question is different from the
> question that is being resolved in this proceeding.

*Id*. at 454:11-21.  Then Credit Suisse's counsel turned to Dr. Singer's July 2022 rebuttal report.

> Q. And what you say in your July 2002 report is: "Finally, the question of whether
> spreads were discussed with sufficient frequency relative to some arbitrary
> threshold to make the alleged conspiracy viable is a distraction" . . . . "What
> matters is that spreads were, in fact, inflated by the challenged conduct.  This is the
> relevant question."

*Id*. at 455:12-19.  Credit Suisse's repeated questions in an area that was off limits had the desired

effect.  They misled and confused the jury, focusing their attention on evidence not in the record

and issues (impact and damages) not before the jury and repeatedly suggesting this evidence was

required.  As Dr. Singer correctly pointed out whether spreads were in fact inflated

> was the debate I was having with your expert, which is for the purpose of proving
> impact, what matters is proof that the spreads widened.  I think that the proceeding
> that we're having here is a related but different question.

*Id*. at 455:24-456:3. Credit Suisse's counsel then tried to discredit Dr. Singer by suggesting he was

avoiding the opinions he had before trial.

Q. Dr. Singer, this report was from July 2022, correct?

A. Correct.

Q. And in this proceeding, you are not offering any opinion, you didn't tell the jury anything about what happened to spreads and whether or not they were, in fact, inflated, even though you said a few months ago that that is the relevant question, right?

A. I –

Q. Yes-or-no question, Dr. Singer.

A. I did not – I did not testify in my direct on the issue of the fact of injury, that is correct.

Q. And you had prepared an analysis.  You spent four years working on an analysis to try to show that spreads were wider during the alleged conspiracy period?

MR. HAUSFELD: Objection, your Honor.

THE COURT: Sustained.

Q. And you didn't tell the jury that?

THE COURT: Sustained.

MR. MOSS: Withdrawn.

*Id*. at 456:4-23.

Counsel for Credit Suisse improperly and repeatedly sought to raise doubts concerning Dr. Singer and used the lack of testimony concerning the regression as evidence of a failure by Plaintiffs to put forth ***required*** proof.  This created substantial prejudice, and the Court's sustaining certain objections did not dissuade Credit Suisse from poisoning the well or undo the damage.

The issue also arose during Dr. Mathur's direct testimony.  Again, Credit Suisse's counsel and Dr. Mathur tried to make it appear a failing by Plaintiffs that a regression analysis was not part of Dr. Singer's testimony and that somehow Plaintiffs were ***required*** to show that spreads were widened:

A. He offered the opinion that the evidence in this matter is consistent with an alleged agreement to widen spreads, but we didn't see any empirical analyses or data-driven analysis to support those opinions.  And that's what economists do, economists analyze data, and so I was a bit surprised by that.

*Id*. at 900:15-20.  The colloquy suggested Plaintiffs needed to show widened spreads:

Q. Were there any other of Dr. Singer's opinions that you were surprised he didn't support with data?

A. Well, for example, he offered the opinion that, in his view, the evidence is not – is consistent with an alleged agreement to widen spreads.  For an economist, the

most direct evidence to assess that question would be to in fact study whether spreads were wider during this alleged period, and we didn't see any such analysis.

*Id*. at 900:21-901:3.  Credit Suisse's counsel again asked Dr. Mathur questions about the lack of a

regression suggesting this was required for Plaintiffs to meet their burden of proof:

> Q. Do you have in mind any type of an analysis that an economist would consider to analyze whether the evidence is consistent or inconsistent with a conspiracy?
> A. Well, as I explained earlier, you know, economists analyze data.  That is the cornerstone of rigorous economic analysis.  And in my view, the most direct evidence of whether the evidence is consistent or not consistent with an alleged agreement to widen spreads would be to in fact check and analyze whether spreads were wider during the alleged period.

*Id*. at 921:21-922:6.  Plaintiffs' counsel objected to the questions but was overruled.  *Id*.  This

allowed Credit Suisse's counsel to continue.

> Q. Have you seen any evidence presented to the jury – you've been sitting here – that spreads were wider during the alleged conspiracy period?
> A. We have not seen any such evidence.

*Id*. at 922:7-10.

In effect, Plaintiffs were unable, without violating a Court Order, to address Credit Suisse's

improper questioning.  And while the Court at certain points sustained Plaintiffs' objections, the

damage was done.  As presaged by the Court, the line of questioning pursued by Credit Suisse was

prejudicial under Federal Rule of Evidence 403.  *See* ECF No. 1991.

### 3.    Defendants' Experts Repeatedly Violated *in Limine* Orders Regarding Pro-Competitive Justifications and Trader Intent

Plaintiffs moved *in limine* to prevent Credit Suisse from arguing that it had procompetitive

justifications for its conduct.  *See* ECF No. 1719, Motion *in Limine* No. 2.  Plaintiffs also moved

*in limine* to prevent Credit Suisse from arguing about the intent of traders.  *See* ECF No. 1754,

Motion *in Limine* No. 8.  Based in large part on Credit Suisse's representation to the Court that it

did not intend to argue procompetitive justifications nor to argue regarding the intent of traders,

the Court denied as moot in part Plaintiffs' motions.  At trial, however, despite Plaintiffs'

objections, Drs. Melvin and Mathur repeatedly testified regarding procompetitive justifications and shared with the jury their views regarding trader intent.  This testimony greatly prejudiced Plaintiffs in this *per se* price fixing case.

Dr. Melvin blatantly violated Credit Suisse's promise to the Court where in response to Motion *in Limine* No. 2, Credit Suisse represented that it did not "intend to argue that the alleged price-fixing conspiracy was reasonable, beneficial or a legitimate business practice."  One of Dr. Melvin's primary opinions that he shared with the jury, however, was just that.  "All of these sources of information serve a legitimate business purpose, because the more you know about the market, the better prices you can make."  Trial Tr. at 602:3-7.  He went even further, claiming:

> [I]nformation sharing serves a legitimate business purpose.  The more you know about the market, the better dealer you can be, the better prices you can make to your customer.  So those chats, the information sharing in the chats are absolutely serving a legitimate business purpose because it helps inform your view of market conditions.

*Id*. at 622:12-17.

Dr. Melvin also violated Motion *in Limine* No. 8 by testifying as to the intent and meaning of traders' words regarding spreads as prices.

> Q. Mr. Robin pointed out a few Bloomberg chats where FX traders referred to spreads as prices.  Does that change your view in any way?
> A. No.  That's just loose talk, like someone will say here's my view of the spread, and someone will say nice price.
> MR. BURKE: Objection.  702, your Honor.
> THE COURT: Overruled.
>
> *          *          *
>
> A. Okay.  Yeah, so someone would say nice price.  It's just shorthand for good spread.

*Id*. at 575:23-576:11.

Dr. Melvin had no basis to know what is or is not "loose talk" or the meaning of the words "nice price," but was permitted to offer an unsubstantiated self-serving opinion as to the same. This testimony was improper and greatly prejudiced Plaintiffs.

Dr. Mathur also violated the Court's Order as to Motion *in Limine* No. 8.  On direct, Dr. Mathur was asked "To what extent, if at all, do those chats demonstrate to you as an economist that the banks were coordinating on what spreads to put into their spread grids?"  Then, despite conceding that she had trouble interpreting the chats, she did just that: "they have a lot of bluster and bravado and offensive language.  But even within what's being discussed, it's actually very hard, at least for me, to be able to follow what is intended."  *Id*. at 933:7-14.  On cross-examination she became a mind reader.

> Q. You don't find it odd that he within minutes can find out the spreads of eight other banks that are offering to customers, eight other competing banks?
> A. I don't think it's odd.  I think these are chats where they're exchange their opinions and views on market conditions as we've seen occur.  So the fact that they know each other's views on where they think the market might be or might be heading, I don't find that odd.

*Id*. at 1025:2-9.

Despite testifying several times that she did not have the ability to interpret the meaning of chats (*e.g.*, "I find it very difficult to actually understand and interpret these chats") (Trial Tr. at 1021:5-6); Dr. Mathur continued to do so "Q:  Would you agree that's wrong to collude on spreads . . .?  A: I think we've also seen a lot of bluster and bravado and words in these chats." (*id*. at 1021:19-21).  She also testified that traders were simply seeking to "understand market conditions in order to offer the best guess that they can to fill out these spread matrices" and that this was "different from [colluding]."  *Id*. at 1015:4-6.  Similarly, she stated "exchanging or sharing opinions on information in the marketplace in order to provide the best guess, I don't think that

that is a problem in this setting, given this marketplace and given everything we've heard about this market."  *Id*. at 1015:17-19.

> **4.    Plaintiffs Were Barred from Eliciting Testimony Regarding the Closing of the Multibank Chat Rooms but Defendants' Expert Testified About the Subject**

Dr. Melvin testified that the dealers closed the chat rooms because "they were just no longer viewed [as] worth the trouble and the risk of having them."  Trial Tr. at 650:5-6.  Dr. Melvin conceded he did not investigate why the dealers shut the chat rooms but testified that "it [multibank chat room discussions] was useful to exchange market color.  It resulted in better informed traders who could make better prices."[8]  *Id*. at 654:10-12.  Plaintiffs, however, were precluded from following up on why the banks closed all the chat rooms regardless of trader or currency pair.  *Id*. at 650:7-13.

During Dr. Melvin's cross, Plaintiffs were not permitted to follow up on his assertion (in response to a wholly different question)[9] without running afoul of the Court's *in limine* Order in ECF No. 1880 at 8.  As a result, Dr. Melvin was allowed to put his own uncontested gloss on the meaning of the closing of the chat rooms and assert, contrary to the Court's order on Plaintiffs' motions *in limine*, ECF No. 1887, that chat rooms benefited customers while Plaintiffs were prohibited from showing the jury the reason the chat rooms were closed was because of "collusion" to the detriment of their customers.  PTX2081-0005 (February 2013 chat where Mr. Erratt of Credit Suisse commented to Goldman Sachs trader Mr. Cahill "don[']t see the reasoning around group

---

[8]    This is a direct acknowledgement that Credit Suisse, along with dealers from competitor banks, was participating in precisely the conduct alleged – spread collusion.  Dr. Melvin contends this collusion produced, in his unverified opinion, "better prices," but better prices does not negate the fact of participation by chat room members in *per se* unlawful price coordination.

[9]    *Id*. at 649:25-650:3 ("Q: Dr. Melvin, did you investigate for what period of time traders used multibank chatrooms to discuss spreads?  A. I didn't review, but I know at one point in time they were  banned, basically, and all the banks shut them down.").

chats . . . i mean why they sayin[g] no group chats." Cahill explained "Collusion." Erratt then mused, "aint fun anymore is it," to which Cahill replied "no."). Despite being shown a chat where two traders lamented the closing of chat rooms because it would cost the dealers millions and allow the customers to screw them (PTX1741A), Credit Suisse's expert was able to present chat room discussions between competitors on price terms as beneficial to customers without being impeached with a series of documents which showed that Credit Suisse and its co-conspirators understood the chat rooms facilitated unlawful collusion.

### 5. Credit Suisse Misrepresented the Law on the Inference Which Jurors Could Reasonably Infer from the Assertion of Witnesses Asserting Their Fifth Amendment Rights

Credit Suisse, at closing argued that since the 26 traders, including three Credit Suisse traders, Clark Read, John Erratt, and Daniel Wise, asserted their Fifth Amendment rights to quotidian matters such as general background, the jury should not draw any inference of guilt from their failure to answer questions regarding the conspiracy to widen spreads. Trial Tr. at 1077:2-1078:4. In fact, these three Credit Suisse witnesses asserted their Fifth Amendment rights to withhold testimony that went to the heart of Credit Suisse's participation in the conspiracy. Daniel Wise was Credit Suisse's Global Head of FX spot trading who knew of and encouraged those traders working under him to participate in the chat room network. Credit Suisse trader Clark Read had been informed by Bank of America desk head Joseph Landes that discussing spreads with competitors was price fixing and collusion. John Erratt is being prosecuted for his part in the Sterling Lads chat that resulted in an almost $100 million dollar fine of Credit Suisse by the European Commission. Because these key witnesses were able to withhold all testimony about the conspiracy and Credit Suisse's participation therein, the jury was legally permitted to draw an inference unfavorable to Credit Suisse regarding its participation. *See* ECF No. 1998-7 at 19, Final Jury Instruction XVI. The assertion by Credit Suisse's counsel that the jury should draw no such

adverse inference because these witnesses also invoked the Fifth Amendment to withhold background information was a deeply prejudicial misstatement of the law.

### 6. Credit Suisse Violated a Stipulation Regarding Class Plaintiffs During Summation

On October 3, 2022, the Court signed a stipulation agreed to by Plaintiffs and Credit Suisse which provided that neither Party would call Oklahoma Firefighters and/or Virgin Islands (or any other named Plaintiff) as witnesses at trial. The stipulation also provided that the jury would be told that named Plaintiffs "traded FX during the Class Period with Credit Suisse and one or more of the other 15 settling Defendants." ECF No. 1948 at 2.

During summation, Credit Suisse's counsel stated that the named Plaintiffs – whose representatives attended trial every day – did not take the stand. Credit Suisse told the jury:

> And what about the customers the plaintiffs' lawyers represent? Some of them were in the courtroom for parts of the trial, but did they tell you the spreads they were quoted were wider because of the conduct of Credit Suisse or any bank? They were trading all the time with the banks. They would have had a front-row seat if the spreads were really widening during this period. How easy would it have been to take the witness stand and say that under oath if they thought it was true, but they didn't, and their silence speaks volumes about the plaintiffs' proof or, rather, the lack of it.

Trial Tr. at 1096:24-1097:8.

When reviewing counsel's misconduct for prejudicial effect, "the Court must consider the 'totality of the circumstances' including 'the nature of the comments, their frequency, their possible relevance to the real issue before the jury, the manner in which the parties and the court treated the comments.'" *Hopson*, 190 F.R.D. at 122 (granting new trial); *Lee*, 339 F.R.D. at 369 (same). Here, Credit Suisse's misconduct, when considered as a whole infected the deliberation process and unfairly influenced the jury's verdict. As Credit Suisse well knows, Plaintiffs were not obligated to prove that the conspiracy was successful or that spreads widened in a manner that damaged Plaintiffs. *See* ECF No. 1687 at 9 (Credit Suisse arguing, "[W]hile Plaintiffs argue that

some common 'harm' resulted from the conspiracy they allege, that is a disputed issue and it is **not** one of the two certified questions.").  But that is exactly what Credit Suisse told the jurors Plaintiffs needed to prove.

Credit Suisse violated the parties' stipulations and abused the Court's *in limine* Orders. Armed with those Orders, Credit Suisse was able to actively mislead jurors and cause a miscarriage of justice.  "[A]bsent the inappropriate conduct of . . . counsel, the ultimate outcome of the trial would have been different."  *Byrd v. Janssen Pharm., Inc.*, 333 F. Supp. 3d 111, 134 (N.D.N.Y. 2018).

## IV.    CONCLUSION

The Court should order a new trial because the jury's verdict that Credit Suisse did not participate in the conspiracy is against the weight of overwhelming evidence.  Additionally, the persistent misconduct of Credit Suisse permeated the entire trial, prejudiced Plaintiffs, and influenced the jury in reaching a seriously erroneous result.  Accordingly, the Court should order a new trial to prevent a miscarriage of justice.

Date:  November 10, 2022

Respectfully submitted,

SCOTT+SCOTT ATTORNEYS
AT LAW LLP

HAUSFELD LLP

 *s*/ Christopher M. Burke
Christopher M. Burke
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
cburke@scott-scott.com

 *s*/ Michael D. Hausfeld
Michael D. Hausfeld
888 16th Street NW, Suite 300
Washington, DC 20006
Telephone: 202-540-7200
mhausfeld@hausfeld.com

*Class Counsel*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 10, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

Dated: November 10, 2022

_s_/ Christopher M. Burke
CHRISTOPHER M. BURKE