**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | No. 13 Civ. 7789 (LGS) |

**MEMORANDUM OF LAW IN SUPPORT OF CREDIT SUISSE DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR A NEW TRIAL**

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ......................................................................................... 1

LEGAL STANDARD.......................................................................................................... 2

ARGUMENT ....................................................................................................................... 3

I.  PLAINTIFFS' REQUEST FOR A NEW TRIAL BASED ON THE WEIGHT OF
    THE EVIDENCE FAILS............................................................................................. 3

    A.  Extensive Testimony Rebutted the Allegations That CS Joined a Conspiracy........... 4

    B.  Substantial Evidence Showed That Spread Discussions Were Not Attempts to
        Fix Prices .............................................................................................................. 7

    C.  Unrebutted Evidence Showed That CS Aggressively Competed on Spreads ............. 8

II.  PLAINTIFFS' REQUEST FOR A NEW TRIAL BASED ON ACTIONS BY
     COUNSEL AND PURPORTED EVIDENTIARY VIOLATIONS FAILS...................... 10

    A.  CS Did Not Unduly Prejudice Plaintiffs by Accurately Distancing Itself from
        Guilty Pleas and Criminal Convictions ..................................................................... 11

    B.  CS Did Not Unduly Prejudice Plaintiffs by Questioning Dr. Singer Regarding
        His Regression Analysis ........................................................................................... 13

    C.  CS's Experts Did Not Violate in Limine Orders Regarding Pro-Competitive
        Justifications and Trader Intent ................................................................................ 17

        1.  Dr. Melvin's Testimony Was Proper ................................................................ 17

        2.  Dr. Mathur's Testimony Was Proper ................................................................ 18

    D.  Plaintiffs Were Not Prejudiced by Testimony They Elicited Regarding the
        Closing of Multibank Chat Rooms............................................................................. 20

    E.  CS's Arguments Regarding the Fifth Amendment Were Proper and Did Not
        Cause Any Undue Prejudice...................................................................................... 21

    F.  CS Did Not Violate the Stipulation Regarding Class Plaintiffs ................................. 22

III.  THE JURY'S VERDICT IS NEITHER ANOMALOUS NOR INCONSISTENT............. 23

CONCLUSION...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali* v. *Kipp*,
891 F.3d 59 (2d Cir. 2018)..............................................................................3

*Analytical Surveys, Inc.* v. *Tonga Partners, L.P.*,
684 F.3d 36 (2d Cir. 2012)..........................................................................3, 12

*Anderson* v. *Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................................6

*DLC Mgmt. Corp.* v. *Town of Hyde Park*,
163 F.3d 124 (2d Cir. 1998)............................................................................6

*Ekukpe* v. *Santiago*,
823 F. App'x 25 (2d Cir. 2020) .....................................................................22

*Hopson* v. *Riverbay Corp.*,
190 F.R.D. 114 (S.D.N.Y. 1999) ..................................................................10n

*Katt* v. *City of New York*,
151 F. Supp. 2d 313 (S.D.N.Y. 2001).............................................................16

*Laborde* v. *City of New York*,
1999 WL 38253 (S.D.N.Y. Jan. 27, 1999) ....................................................25

*Lee* v. *City of Troy*,
339 F.R.D. 346 (N.D.N.Y. 2021) .................................................................23n

*Manlapig* v. *Jupiter*,
2016 WL 4617305 (S.D.N.Y. Sept. 6, 2016).............................................12, 22

*Marcic* v. *Reinauer Transp. Companies*,
397 F.3d 120 (2d Cir. 2005).................................................................10, 13, 22

*Matthews* v. *CTI Container Transp. Int'l, Inc.*,
871 F.2d 270 (2d Cir. 1989)...........................................................................10

*Meide Zhang* v. *Liang Zhang*,
2019 WL 623879 (S.D.N.Y. Feb. 14, 2019).........................................2, 3, 10, 22

*Minpeco, S.A.* v. *Hunt*,
718 F. Supp. 168 (S.D.N.Y. 1989) .................................................................25

*Mirlis* v. *Greer*,
   952 F.3d 36 (2d Cir. 2020)..............................................................................21

*Ojeda* v. *Metro. Transportation Authority*,
   477 F. Supp. 3d 65 (S.D.N.Y. 2020).........................................................10, 21

*Raedle* v. *Credit Agricole Indosuez*,
   670 F.3d 411 (2d Cir. 2012).....................................................................2, 3, 6, 7

*Sequa Corp.* v. *GBJ Corp.*,
   156 F.3d 136 (2d Cir. 1998)............................................................................21

*U.S. Football League* v. *National Football League*,
   842 F.2d 1335 (2d Cir. 1988)..........................................................................25

*United States* v. *Gilbert*,
   668 F.2d 94 (2d Cir. 1981)..............................................................................12

*United States* v. *Rea*,
   958 F.2d 1206 (2d Cir. 1992)..........................................................................12

## Other Authorities

Fed. R. Civ. P. 59 .................................................................................... *passim*

Fed. R. Evid. 403 ..............................................................................................16

Fed. R. Evid. 407 ..............................................................................................21

Fed. R. Evid. 408 ..............................................................................................13

Charles Alan Wright et al., Federal Prac. & Proc. § 2806 ...............................3

## PRELIMINARY STATEMENT[1]

After nine years of litigation, this case culminated in a jury trial last month that spanned nearly two weeks.  The parties and the Court devoted massive amounts of time and resources to that trial.  Several third-party witnesses took the stand.  And a jury of New Yorkers undertook and fulfilled their duty under our constitutional system to serve as fact-finder, ultimately concluding that Plaintiffs could not prove that CS had participated in an antitrust conspiracy.

Now, Plaintiffs want to throw it all out and start from scratch because they believe they should have won.  But under binding Second Circuit authority, Plaintiffs are not entitled to the do-over they seek unless they establish that the trial involved "egregious" circumstances that resulted in a "miscarriage of justice."  And Plaintiffs' hodgepodge of complaints does not come close to meeting that lofty standard.  Indeed, Plaintiffs' bar is even higher here because they waived many of their new challenges by failing to object during trial, and the Court has already carefully considered, and rejected, many of their other arguments.  The simple fact is Plaintiffs failed to carry their burden of proof and lost a fair trial.

As discussed at Point I, what Plaintiffs describe as a "mountain of evidence directly implicating Credit Suisse" (Pls.' Br. at 1), consists primarily of chat excerpts and Plaintiffs' arguments about what those chats mean.  But Plaintiffs pretend that the trial never happened, and ignore all of the evidence presented by CS rebutting Plaintiffs' interpretation of those chats.  As discussed below, (1) trader after trader denied the existence of a conspiracy involving CS; (2) both fact and expert witnesses provided context for the chats, and explained that they were innocuous discussions about opinions on market liquidity, not attempts to fix prices; and (3) CS showed the

---

[1] The Credit Suisse Defendants ("CS") respectfully submit this memorandum of law in opposition to Plaintiffs' motion for a new trial ("Pls.' Br.").  Emphasis is added, and internal quotation marks and citations are omitted unless otherwise indicated.

jury contemporaneous documents demonstrating that its strategy was to narrow spreads to bring in business, and every CS witness corroborated those documents with credible testimony. The jury was entitled to accept one side's (CS's) evidence and not the other's. After all, that is what juries are supposed to do. And the verdict it reached, which rested on credibility determinations that a jury is uniquely positioned to make in our constitutional system, is entitled to a "high degree of deference." *Raedle* v. *Credit Agricole Indosuez*, 670 F.3d 411, 418–19 (2d Cir. 2012).

As discussed at <u>Point II</u>, the jury reached its verdict fairly and was not swayed by undue prejudice or evidentiary errors. The alleged "misconduct" that Plaintiffs identify consists entirely of proper statements by CS's counsel and witnesses, including statements the Court permitted in sound rulings that Plaintiffs now seek to reverse. In any event, the Court's instructions to the jury entirely eliminated any risk of unfair prejudice.

Finally, as discussed at <u>Point III</u>, the verdict was not "anomalous" or "inconsistent" as Plaintiffs now claim. Pls.' Br. at 2, 12 & n.5. The Court's 2019 class certification ruling made clear that the trial would address two separate questions: whether a conspiracy existed, and whether CS participated. Everyone understood that the jury might possibly answer the first question "yes" and the second question "no." In the extensive pre-trial briefing, Plaintiffs never raised concerns about the separate questions. Indeed, Plaintiffs proposed a verdict form with a similar formulation, never objected to the Court's proposed form before trial, never objected during trial, and never objected before the jury was discharged. It is too late to object now.

## <u>LEGAL STANDARD</u>

A court should grant a motion for a new trial under Rule 59(a) only if it is "'convinced that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Meide Zhang* v. *Liang Zhang*, 2019 WL 623879, at *3 (S.D.N.Y. Feb. 14, 2019) (Schofield, J.),

(quoting *Ali* v. *Kipp*, 891 F.3d 59, 64 (2d Cir. 2018)) *aff'd*, 816 F. App'x 525 (2d Cir. 2020); *see also id.* (Rule 59 motion should only be granted when jury's verdict is "egregious.").  "It is well-settled that Rule 59 is not a vehicle for relitigating old issues . . . securing a rehearing on the merits, or otherwise taking a second bite at the apple."  *Analytical Surveys, Inc.* v. *Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012).

A new trial may be granted only if "(1) the verdict is against the weight of the evidence, (2) misconduct by counsel so tainted the verdict as to warrant a new trial, or (3) there were substantial errors in the admission or exclusion of evidence."  *Zhang*, 2019 WL 623879, at *3. Courts "should rarely disturb a jury's evaluation of a witness's credibility," and a judge "may not freely substitute . . . her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury."  *Raedle*, 670 F.3d at 418.  "[J]ury verdicts should be disturbed with great infrequency."  *Id.*  "Indeed the more sharply the evidence conflicts, the more reluctant the judge should be to substitute his judgment for that of the jury."  11 Charles Alan Wright et al., Federal Prac. & Proc. § 2806 (3d ed. Apr. 2022 update).  Here, the jury duly considered the sharply conflicting evidence, and its verdict should not be disturbed.

## ARGUMENT

## I.   PLAINTIFFS' REQUEST FOR A NEW TRIAL BASED ON THE WEIGHT OF THE EVIDENCE FAILS

Far from the sort of "egregious" verdict that the Court could consider overturning, the verdict in this case is entirely consistent with the weight of the record evidence.  Plaintiffs failed to prove their case against CS at trial, and they fail on this motion to satisfy the high standard for a new trial.  Overwhelming evidence supports the jury's verdict that CS never knowingly participated in a conspiracy to manipulate FX spreads.

Plaintiffs make much of the fact that the Court, at summary judgment, referred to

3

"uncontroverted evidence that Credit Suisse participated in at least some conspiratorial conduct." Pls.' Br. at 7 (quoting ECF No. 1650 at 25).[2]  But the parties proceeded to trial, and one of the questions for the jury was whether CS knowingly participated in a conspiracy.  The answer to that question was not a foregone conclusion.  And Plaintiffs ignore the fact that during trial, CS presented a great deal of evidence—not in the summary judgment record—that directly and extensively ***controverted*** the evidence that this Court cited in its summary judgment ruling. Indeed, at trial CS directly attacked Plaintiffs' reliance on chats as evidence that CS joined a conspiracy.  And CS contextualized and explained the non-collusive, business purpose of the many generic spread discussions that Plaintiffs sought to paint as evidence of a conspiratorial agreement. It was entirely proper for the jury to reject Plaintiffs' view of the evidence and adopt CS's.

### A.    Extensive Testimony Rebutted the Allegations That CS Joined a Conspiracy

CS presented extensive evidence to show that Plaintiffs were misreading the cherry-picked chat transcripts they relied upon so heavily.  First, every CS trader who testified unequivocally denied participating in an agreement to widen spreads.   Tr. 274:3–21 (Hatton); 869:9–15 (Walker);[3] Tr. 794:1–4 (Condie).[4]  And trader after trader who worked for other banks denied the existence of an alleged conspiracy involving CS—even those traders who admitted to conspiracies involving other banks.[5]  This extensive testimony weighed against finding that CS joined a

---

[2] At summary judgment, CS did not engage with Plaintiffs' mischaracterizations of the evidence because such arguments would necessarily have raised questions of fact.

[3] Plaintiffs mischaracterize Mr. Walker's testimony, claiming that he "testified that discussing spreads in multibank chat rooms did not help banks compete" and admitted he was not competing with traders at other banks.  Pls.' Br. at 10–11.  But Mr. Walker's complete testimony was that he did not view himself as competing with other banks in certain situations because those banks had different customers; rather, he primarily viewed the other banks, with whom he traded, as counter-parties.  Tr. 841:21–843:10, 845:12–846:25.

[4] CTX 6-A (Lawes Tr. 258:11–22); CTX 6-B (Little Tr. 307:5–21); CTX 6-F (Williams Tr. 245:7–14).

[5] *See, e.g.*, Tr. 320:12–15 ("Q.  Mr. Katz, you never pleaded guilty to an antitrust conspiracy involving anyone other than Mr. Cummins, Mr. Aiyer, and Mr. Williams, right?  A.  Correct."); 333:20–23 (Katz);

conspiracy.  No fact witness testified to the existence of an illegal agreement involving CS.

As they did at trial, Plaintiffs now focus in their brief on chat room comments by two CS traders:  Messrs. Christopher Hatton and Jamie Lawes.  Pls.' Br. at 1–2, 7–8.  Plaintiffs seek to obscure the fact that the jury heard directly from both traders and from others in a position to observe their behavior.  CS placed before the jury ample evidence to support the jury's finding that these traders did not join any conspiracy to manipulate FX spreads.[6]

As to Mr. Hatton, Plaintiffs rely on cherry-picked statements from two witnesses—Jason Katz and Christopher Cummins—who admitted their own misconduct.  Plaintiffs argue, as they did at trial, that the conduct to which Messrs. Katz and Cummins pleaded guilty somehow implicated Mr. Hatton.[7]  Plaintiffs mischaracterize Mr. Katz's testimony, arguing that he "identified Mr. Hatton as part of the agreement to fix customer spreads."  Pls.' Br. at 8.  But Plaintiffs ignore that both Messrs. Katz and Cummins testified that they never conspired with Mr. Hatton or CS.  Tr. 329:13–15 (Katz) ("Q.  And in fact, it's your testimony that you never conspired with Mr. Hatton to violate the antitrust laws, correct, sir?  A.  Yes, I didn't believe so."); CTX 6-D (Cummins Tr. 141:14–23).  Plaintiffs also ignore that Mr. Hatton testified unequivocally that he did not participate in an agreement to widen spreads.  Tr. 274:19–21 ("Q.  Mr. Hatton, did you ever enter into an agreement with anyone to manipulate FX spreads?  A.  No.").

---

*see also* CTX 6-D (Cummins Tr. 135:7–10); CTX 6-C (Gardiner Tr. 284:13–285:2); CTX 5-O (Witt Tr. 223:25–224:10); CTX 6-L (Andrews Tr. 260:6–12); CTX 6-E (Dunn Tr. 187:6–10); CTX 6-G (Greig Tr. 175:10–25).

[6] Plaintiffs misrepresent testimony by CS's industry expert, Dr. Melvin, in which he said that certain discussions about particular customers were inappropriate.  Pl. Br. at 11.  Dr. Melvin was acknowledging a possible violation of CS policy regarding customer-identifying information; he was not opining as to a violation of the antitrust laws, as his testimony makes clear.  Tr. 641–42.

[7] Plaintiffs also refer to a chat in which Mr. Hatton stated "just both quote them wide and same that way they have no tight price."  Pl. Br. at 8.  But Plaintiffs fail to acknowledge that Mr. Hatton explained that he was not trying to win this customer's business at a wider spread but was instead trying to avoid trading with this customer because he viewed the customer's trading patterns as "unethical."  Tr. 269:10–270:20.

As to Mr. Lawes, Plaintiffs continue to press for a literal interpretation of a comment—"let's sign a pact on spreads"—which Mr. Lawes testified under oath he made in jest.  CTX 6-A (Lawes Tr. 258:1–22).  Plaintiffs contend that the jury should have given no weight to this testimony.  Pls.' Br. at 14.  But Plaintiffs do not get to dictate how a jury makes its credibility determinations.  *See DLC Mgmt. Corp.* v. *Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998) ("[A] court should rarely disturb a jury's evaluation of a witness's credibility.").

Plaintiffs also downplay the significant evidence CS presented to corroborate Mr. Lawes' testimony.  For example, CS sales employee Braden Howarth, who worked with Mr. Lawes directly, testified that Mr. Lawes was viewed as the "joker in the pack," but that he saw no evidence that Mr. Lawes was quoting artificially wide spreads, and that he would have been in a position to know.  Tr. 669:4–10; 699:15–18 (Howarth).  The jury also heard from Steve Yanez, Mr. Lawes' ultimate supervisor, who testified that the chat was just bluster and that if some group of traders actually tried to agree to widen spreads, they would simply lose business to others.  Tr. 476:1–8; 477:10–18.  Other fact and expert witnesses testified similarly.  Tr. 794:25–795:8 (Condie); Tr. 618:11–17; 618:23–619:11 (Melvin); CTX 6-F (Williams Tr. 245:3-14).[8]

Plaintiffs insist that the jury should have accepted their interpretation of the chats.  But the verdict necessarily involved credibility determinations and weighing of evidence that fall squarely within the jury's province.  *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions.").  Such determinations are entitled to the utmost deference and are not subject to wholesale second-guessing.  *See Raedle*, 670 F.3d at 418–19

---

[8] Plaintiffs also ignore later portions of the chat, which make clear that there could not have been any "pact on spreads" because the salespeople would have not have permitted it.  PTX1373A; Tr. 93:10–95:5.

(describing "the high degree of deference accorded to the jury's evaluation of witness credibility," and explaining that "jury verdicts should be disturbed with great infrequency," particularly where, as here, "a verdict is predicated almost entirely on the jury's assessments of credibility").

In *Raedle*, the Second Circuit reversed a decision granting a new trial under Rule 59, holding that the district court abused its discretion. *Id.* at 419–20. In that case, as here, the verdict turned on credibility questions, and the jury resolved the case against the plaintiff. *Id.* The Second Circuit found that none of the testimony at issue was "bizarre, far-fetched, patently incredible or defiant of physical realities." *Id.* at 420. Therefore, as here, the jury was "not compelled" to accept a particular witness's testimony, "[b]ut it was free to—and apparently did—accept all or a critical portion of it." *Id.* "The verdict, grounded in this fashion in the record, cannot be said to have been either egregious or a serious miscarriage of justice." *Id.* The same is true here.

## B. Substantial Evidence Showed That Spread Discussions Were Not Attempts to Fix Prices

Plaintiffs argue that "726 chats demonstrate that Credit Suisse traders coordinated spreads with co-conspirators." Pls.' Br. at 7. Plaintiffs sought, and still seek, to portray every chat room spread discussion as sinister. But this ignores the extensive defense evidence demonstrating that spread discussions were not attempts to fix prices, but rather served legitimate business purposes.

CS presented overwhelming evidence that most chats contained mundane discussions in which traders expressed opinions about market conditions. Specifically, multiple witnesses testified that chat rooms were used to exchange information about liquidity, and that spreads served as shorthand for liquidity conditions. *E.g.*, Tr. 265:16–22 (Hatton) ("And then the chats that I had with other banks might be for market color, what views were, things of that nature."); Tr. 756:19–24 (Condie) ("[Traders used chatrooms for] [g]eneral market color, . . . exchanging information on what they thought was going to happen . . . on a specific currency, trade ideas."); Tr. 846:9–14

(Walker); Tr. 612:6–9 (Melvin); CTX 6-B (Little Tr. 314:9-15); CTX 6-F (Williams Tr. 59:5-6).

Multiple witnesses testified that exchanging opinions about spreads did not evidence any agreement to quote particular spreads to customers. *See, e.g.*, Tr. 853:4–6, 854:22–24 (Walker) ("Q.  In this exchange, were you agreeing with Mr. Crank about what spreads you would show to customers?  A.  Absolutely not."); Tr. 481:16–482:11 (Yanez).  In fact, the chat evidence showed that traders often had vastly different opinions on spreads.  *E.g.*, PTX1822A; PTX0070A; PTX0933A.  These chats further underscore that exchanges of opinions about spreads, which constituted the bulk of Plaintiffs' trial evidence, failed to support their theory of the case.

The jury also heard other evidence and argument about why the chats did not represent an attempt to fix prices, including that (1) many of the chats showed disagreement, rather than agreement on spreads, *e.g.* PTX1822A; PTX0070A; PTX0933A; (2) there was no evidence that any spread discussed in a chat room was ever actually communicated to a customer (*i.e.*, no "follow-through"), *e.g.*, Tr. 400:12–401:9 (Singer); (3) salespeople often had discretion over the spread quoted to customers and therefore any supposed trader chat-room conspiracy would be unworkable, Tr. 679:4–22 (Howarth); and (4) the FX market, with 325,000 transactions per day, is not conducive to a market-wide conspiracy, especially one supposedly carried out through fewer than two chats per trading day, Tr. 908:3–909:2, 928:1–13 (Mathur).

### C.     Unrebutted Evidence Showed That CS Aggressively Competed on Spreads

CS also explained why it would have made no sense for it to participate in a conspiracy: CS was an upstart in 2007 that wanted to win market share by competing on spreads.  Through contemporaneous documents, credible testimony, and market share data, CS offered extensive and, in many cases, unrebutted evidence that its traders aggressively competed to win FX business by quoting narrow spreads.  This included documents showing a push by CS management during the relevant time period to quote highly competitive prices to win business from competitors.  *E.g.*,

DTX318-0009 ("Competitive landscape . . . CS believes it can take some market share from DB – DB is watching CS and its new strategy very closely."); DTX315-0002 ("Our objectives are to become one of the top five global FX banks in the next 24 months"); DTX316-0007.

CS management and every CS trader who testified confirmed this push to compete. *See, e.g.*, Tr. 775:9–12 (Condie) ("Well, in 2007, Credit Suisse . . . had decided to make a push to become a top ten player in the bank, in the foreign exchange market"); Tr. 844:6–845:1 (Walker); 264:1–7, 268:7–16 (Hatton). Mr. Howarth (CS sales) also testified that CS's sales team was part of the effort to win business and quote tight spreads.[9]

CS's effort to compete aggressively was also confirmed by customer feedback and internal data from buy-side entities showing that CS's quotes were consistently narrower than those of its competitors. *E.g.*, DTX272; DTX2026; DTX2028. Even Plaintiffs' chat evidence confirms that CS sought to increase its market share by offering tight spreads. *See, e.g.*, PTX0933A (chat in which a CS trader expresses a view of a spread far narrower than all other traders).

And the jury heard that CS's effort to increase market share by competing aggressively on pricing was successful, resulting in a four-fold market share increase during the relevant period. Tr. 469:10–21 (Yanez); DTX2011. Plaintiffs had no answer for this evidence, and it fundamentally undermined their theory that CS conspired. In fact, their own expert Dr. Singer testified that competition is the opposite of conspiracy. Tr. 417:8–25. Given CS's showing and Dr. Singer's testimony, the jury had ample evidence on which to base its finding that CS did not conspire.

---

[9] *E.g.*, Tr. 678:20–25 (Howarth) ("We were on a marketing push to increase the number of clients, grow market share. So we were trying to quote the tightest possible price all the time, because we felt that was really important to us to take market share."); *see also id.* 683:3–5 ("We would tighten probably 90 percent of the time. Because we were trying to grow the business and really expand our market share.").

## II.   PLAINTIFFS' REQUEST FOR A NEW TRIAL BASED ON ACTIONS BY COUNSEL AND PURPORTED EVIDENTIARY VIOLATIONS FAILS

Plaintiffs claim that certain actions by defense counsel and evidentiary rulings by the Court caused significant prejudice.  But a motion for a new trial based on such matters may be granted "'only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury,'" *Zhang*, 2019 WL 623879, at *4 (quoting *Matthews* v. *CTI Container Transp. Int'l, Inc.*, 871 F.2d 270, 278 (2d Cir. 1989)), or if "the court made substantial errors." *Ojeda* v. *Metro. Transportation Authority*, 477 F. Supp. 3d 65, 77 (S.D.N.Y. 2020), *aff'd*, 41 F.4th 56 (2d Cir. 2022)).  "Such relief is not to be granted unless the court finds that the introduction of . . . evidence was a clear abuse of discretion *and* was so clearly prejudicial to the outcome of the trial that we are convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Id.*

A party who did not object at trial to the admission or exclusion of evidence or to attorney conduct is held to an even higher standard.  In those instances, a motion for a new trial should be granted "only for error that was so serious and flagrant that it goes to the very integrity of the trial." *Marcic* v. *Reinauer Transp. Companies*, 397 F.3d 120, 124 (2d Cir. 2005).

Applying these standards, Plaintiffs' argument fails on many levels:  none of the points they raise come close to qualifying as attorney misconduct or evidentiary error; Plaintiffs suffered no prejudice, much less undue prejudice; and the jury's verdict was not unfairly influenced thereby.[10]  Moreover, Plaintiffs failed to object to most of the supposed errors during trial, which belies their after-the-fact claim of prejudice and makes clear that none of these matters were "so

---

[10] The cases Plaintiffs rely upon involved drastically different facts of extreme misconduct.  For example, in *Hopson* v. *Riverbay Corp.*, 190 F.R.D. 114, 122 (S.D.N.Y. 1999), a new trial was granted where counsel made "numerous misstatements of fact and law and repeated acts of misconduct," including accusations that the opposing party lied and had been subject to disciplinary proceedings, and then continued the misconduct by flouting sustained objections.

serious and flagrant that [they go] to the very integrity of the trial." *Id*.

## A.    CS Did Not Unduly Prejudice Plaintiffs by Accurately Distancing Itself from Guilty Pleas and Criminal Convictions

Rehashing an argument they briefed—and lost—at trial, Plaintiffs claim that they were prejudiced by (1) CS's statements that it had never been criminally prosecuted for engaging in the alleged conspiracy and (2) the exclusion from evidence of CS's civil consent order with the New York Department of Financial Services ("DFS Consent Order").  Pls.' Br. at 12–16.

As the Court is aware, CS moved *in limine* to exclude evidence of the other banks' and other traders' guilty pleas, based in part on the risk of jury confusion.  But Plaintiffs prevailed on that motion, and a significant component of their trial strategy was to try to suggest that the guilty pleas of a small number of market participants tainted the industry, and CS in particular.  But it is undisputed that neither CS nor any CS trader ever pleaded guilty or was ever criminally prosecuted.  CS was entitled to point this out, particularly in response to Plaintiffs' repeated efforts to conflate the guilty pleas and convictions of other Defendants and nonparties with CS's conduct.[11]

During the trial, Plaintiffs made the same arguments they do now:  that CS's opening statement was "misleading" (Pls.' Letter at 2, Oct. 13, 2022, ECF No. 1983) and that "defense counsel did elicit testimony that Mr. Hatton was not indicted[.]"  Tr. 448:19–20.  Plaintiffs then requested that the Court admit into evidence the DFS Consent Order it had excluded (Amended Op. and Order at 1–2, Sept. 6, 2022, ECF No. 1880).  The parties again briefed the issue, and the Court again denied Plaintiffs' request, ruling that Plaintiffs would be permitted to introduce the DFS Consent Order only if CS made it a "big part" of its defense that it was never charged or its

---

[11] For example, defense counsel accurately stated in the opening statement that CS was not prosecuted and that no CS trader pleaded guilty (thus clearly referring to criminal proceedings).  Tr. 76:24–77:6.  That point directly responded to Plaintiffs' own opening statement that attempted to suggest otherwise.  Tr. 29:1–8, 57:15–58:4 ("Banks and traders pleaded guilty.  One trader was in prison.  Five dealers pleaded guilty in connection with entering into and engaging in a conspiracy to fix prices of certain currencies.").

conduct was blessed by regulators.  Tr. 446:1.  CS never did so, and Plaintiffs raised no further objection or argument on this point.  Plaintiffs cannot relitigate this issue now.  "'It is well-settled that Rule 59 is not a vehicle for relitigating old issues . . . or otherwise taking a second bite at the apple[.]'"  *Manlapig* v. *Jupiter*, 2016 WL 4617305, at *2 (S.D.N.Y. Sept. 6, 2016) (Schofield, J.) (quoting *Analytical Surveys, Inc.* v. *Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012)).

In any event, CS's opening statement and testimony neither "introduced inadmissible evidence," nor created any "false impression," both of which would be necessary to give the Court the "discretion to permit [the Plaintiffs] to introduce otherwise inadmissible evidence[.]"  *United States* v. *Rea*, 958 F.2d 1206, 1225 (2d Cir. 1992).  Plaintiffs' arguments do not hold water:

- Plaintiffs argue that the jury could have misconstrued defense counsel's use of the word "prosecution" to mean civil enforcement actions.  Pls.' Br. at 13.  But defense counsel made explicit that he was referring only to "criminal prosecutions."  Tr. 76–77.  Counsel was merely pointing out the absence of evidence linking CS to the criminal guilty pleas upon which the Plaintiffs themselves so heavily relied.

- Plaintiffs repeatedly tried to link CS trader Mr. Hatton to Messrs. Katz and Cummins, who both pleaded guilty.  Plaintiffs now argue that defense counsel asking Mr. Hatton whether he was "ever criminally prosecuted" was misleading because of South African civil regulatory proceedings in which Mr. Hatton's conduct is at issue.  Pls.' Br. at 13.  But Mr. Hatton was not a defendant in that action, which is not even a criminal proceeding, and CS was entitled to distance Mr. Hatton from the Katz and Cummins criminal prosecutions to which Plaintiffs sought to link him.

- Plaintiffs also complain that they were precluded from informing the jury that, in connection with CS's settlement with the New York DFS, the DFS referred to a specific chat involving Mr. Lawes as "improper."  Pls.' Br. at 14–15.  But the introduction of such evidence, and the fact that CS settled with the DFS, would necessarily invite the jury to substitute the regulators' view of the chat for its own view.  This is a key reason such evidence is routinely excluded.  *See, e.g.*, *United States* v. *Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981); Amended Op. and Order at 1, 6, Sept. 6, 2022, ECF No. 1880.

- Plaintiffs' suggestion that the same chat "resulted in the firing of Mr. Lawes and others" is false and unsupported by evidence.  Pls.' Br. at 13–14.  Furthermore, the Court's sound evidentiary rulings would have precluded evidence relating to termination as a subsequent remedial measure.  Op. and Order, at 8, Sept. 2, 2022, ECF No. 1872.  Similarly, CS's agreement not to rehire certain traders was properly excluded as Rule 408 settlement evidence.  *Id.*

- Notwithstanding that Plaintiffs told the Court that they did "not seek admission of information regarding the European charges or action in South Africa," (Pls.' Letter at 2 n.2, Oct. 13, 2022 (ECF No. 1983),[12] Plaintiffs now argue that certain aspects of CS's defense were misleading because CS faced foreign civil investigations and fines. Pls.' Br. at 12–15. But this argument rests entirely on Plaintiffs' misunderstanding that certain regulatory proceedings are somehow criminal in nature. They are not.[13]

In sum, Plaintiffs point to no basis for the Court to revisit its clear and repeated Orders preventing admission of the DFS settlement and no basis to admit evidence of foreign regulatory proceedings that Plaintiffs never even offered. CS heeded the Court's Orders and further guidance as to conduct that could have opened the door to such evidence. CS's truthful statements about the scope of the guilty pleas and convictions in no way "infect[ed the] trial with undue prejudice or passion" that would cast serious doubts on the validity of the verdict. *Marcic*, 397 F.3d at 124.

### B.    CS Did Not Unduly Prejudice Plaintiffs by Questioning Dr. Singer Regarding His Regression Analysis

Plaintiffs argue that CS (1) improperly suggested that Plaintiffs were "required" to show that spreads widened to prevail at trial, and (2) impermissibly "made it a failing . . . that a regression analysis was not part of [Dr. Singer's] testimony." Pls.' Br. at 18. Plaintiffs are wrong.

First, far from suggesting that wider spreads were a required element of Plaintiffs' case, CS's counsel actually said the opposite during closing: "***[J]ust to be clear, not to say a conspiracy has to succeed for it to be a conspiracy***, but you would think that if there were a [conspiracy], the plaintiffs would show you some evidence that spreads actually widened . . . ." Tr. 1096. These statements were consistent with (1) the Court's ruling that "evidence and argument that the conspiracy had no effect may be admissible as circumstantial evidence that no conspiracy existed,"

---

[12] Tr. 448:21–23 ("…we don't intend ever to try to get in evidence regarding foreign regulatory actions").

[13] Moreover, Plaintiffs' October 13, 2022 letter made no reference to the European Commission investigation of John Erratt or the "Sterling Lads" chat that Plaintiffs now suggest should have been admitted at trial. Pls.' Br. at 13–14. The allegations against Mr. Erratt involved conduct far outside the scope of this litigation, related to the timing of trading decisions.

Op. and Order at 2, Sept. 9, 2022, ECF No. 1887; and (2) the Court's clear jury instructions that "plaintiffs do not need to show that . . . spreads were . . . actually widened." Tr. 1048.

Second, counsel's limited cross-examination of Dr. Singer about his regression was proper for several reasons. To begin, Dr. Singer repeatedly testified about wider spreads in the FX market on direct. For example, he testified that (1) "The evidence points in the direction that the ***common goal across defendants was to widen the spreads, to keep them wide, don't allow the spreads to get tight***, so as to increase the profitability." Tr. 358:14–17; (2) "And so, ***if firms are conspiring in the FX market they can widen the spread***, that increases their trading cost to their clients, but increases the profitability to the defendants." Tr. 357:15–18; (3) "Q: In the opening statement, defense counsel represented that the defendants' agreements to ***widen spreads were isolated and did not have a widespread effect. Do you agree?*** A: ***No***, I disagree and for at least two reasons." Tr. 358:20–23. This speculation on direct about wider spreads opened the door to cross-examination on the fact that Dr. Singer had actually performed an analysis supposedly showing that spreads were wider during a portion of the class period, yet chose not to present it to the jury.

CS was also entitled to probe Dr. Singer's testimony on direct that "performance" in the FX market was consistent with a conspiracy. Tr. 356:1–7. In several expert reports issued over the course of many years, Dr. Singer had grounded his "performance" opinion in his regression analysis that he claimed showed wider spreads during the alleged conspiracy period. [14] Even after the Court limited this opinion in its *Daubert* ruling—holding that Dr. Singer could only testify that spreads were wider during the last six months of the alleged conspiracy period, *see* Order at 1–2, Sept. 30, 2022, ECF No. 1944—Dr. Singer was still set to rely on his regression. Indeed, just

---

[14] At his deposition just weeks before trial, Dr. Singer confirmed that his regression model "supports the existence of an agreement" to widen spreads. Nov. 23, 2022 Declaration of Herbert S. Washer Ex. ("DE") 13 (Sept. 15, 2022 Singer Tr. 77:24–78:7).

14

hours before Dr. Singer testified, Plaintiffs provided an updated witness list representing to the Court that Dr. Singer's testimony would include: "his performance analysis **which suggests that bid-ask spreads were wider** during the last six months of the Class Period and narrowed in the first half of 2014." DE 14 (Excerpt from Plaintiffs' Updated Witness List (Oct. 12, 2022)). Plaintiffs apparently made a last-minute tactical decision to pull the regression, yet Dr. Singer still offered his "performance" opinion, albeit with different support. *See* Tr. 355:22–357:18. CS was within its rights to try to explore that sudden change of opinion—particularly when Dr. Singer himself repeatedly referenced supposedly wider spreads on direct.[15]

Nor did CS violate any Court Order in cross-examining Dr. Singer. In its *Daubert* ruling, the Court expressly held that "[c]ounsel may argue whatever reasonable inferences may be drawn" from Dr. Singer's opinion that spreads were wider during only six months, but "may not directly or indirectly reference the Court's ruling as the reason for Dr. Singer's opinion being revised." Order at 1–2, Sept. 30, 2022, ECF No. 1944. CS followed the Court's instructions precisely. CS never mentioned the Court's ruling on Dr. Singer's regression but, as the Court expressly permitted, did point out that Dr. Singer had not presented any evidence of spread widening, and argued the reasonable inferences that could be drawn from that failure (*i.e.*, that there was no conspiracy).

Plaintiffs also disingenuously suggest that CS's cross-examination of Dr. Singer violated the Court's October 16, 2022 Order (Pls.' Br. at 7), which provided that "[a]ny reference to the fact that Dr. Singer performed a regression analysis, that Defendants found fault with it, or that it was precluded in part by the Court, is excluded pursuant to Federal Rule of Evidence 403." Order,

---

[15] Dr. Singer also testified about the regression on cross-examination, when he referenced the "model" he had created (Tr. 412), and then confirmed that model was his regression analysis (Tr. 452:4–9).

Oct. 16, 2022, ECF No. 1991.  But that Order decided Plaintiffs' motion to exclude Dr. Kleidon's testimony, and was issued days *after* CS's October 13–14 cross-examination of Dr. Singer.

Moreover, while the Court sustained certain of Plaintiffs' objections (and CS's counsel did not belabor the point), Plaintiffs ***did not object*** to several questions about the regression, including:  "Dr. Singer, you've written in this case that the relevant question is what happened to spreads.  That that is the relevant question to determine, whether or not the evidence is consistent or not consistent with a conspiracy.  You've repeatedly taken that position, correct?"  Tr. 454:11–15.

Ultimately, Plaintiffs made a tactical decision to put on an expert witness to present conclusions that were based on (and actually contradicted by) a regression analysis he did not present.  They must live with the consequences of that strategy.  *Cf. Katt* v. *City of New York*, 151 F. Supp. 2d 313, 365 (S.D.N.Y. 2001) (denying new trial motion where party's "tactical choices" as to examination of expert witness belied claims of prejudice resulting from witness's testimony).  In any event, the Court's clear instructions leave no room for Plaintiffs' speculation that the jury could have been confused into believing that proof of spread-widening was required.  The Court explained to the jury that "plaintiffs do not need to show that . . . spreads were . . . actually widened" and that the jury "may find a conspiracy existed regardless of whether it succeeded or failed."  Tr. 1048.[16]  And in any event, because whether spreads widened could be relevant only to the existence of a conspiracy, which the jury found, not to CS's participation, Plaintiffs fail to show prejudice.

---

[16] Nor did Dr. Mathur violate any Court Orders.  Before she testified, the Court ruled "Plaintiffs elected not to offer quantitative evidence of actual effects on spreads, and Defendants have argued and may argue that Plaintiffs have not done so and that the evidence offered is insufficient to meet Plaintiffs' burden of proof."  Oct. 16, 2022 Order (Dkt. 1991).  Dr. Mathur testified, consistent with her report and as expressly permitted by the Court's Order, that she had not seen any economic evidence that spreads had actually widened, and that she would expect to see that type of evidence if there were a conspiracy.  Tr. 900.

### C.  CS's Experts Did Not Violate *in Limine* Orders Regarding Pro-Competitive Justifications and Trader Intent

Plaintiffs argue that CS's expert witnesses violated *in limine* rulings precluding evidence (1) of pro-competitive justifications for the alleged conspiracy and (2) interpreting trader intent. Pls.' Br. at 19–22.  But the testimony that Plaintiffs cite was permissible under the Court's rulings and largely given without objection.  Plaintiffs point to no counsel misconduct or undue prejudice.

### 1.  Dr. Melvin's Testimony Was Proper

The Court's ruling on Plaintiffs' motion *in limine* No. 2 stated that "[m]uch of Plaintiffs' motion is moot based on Defendants' representation that they do not intend to argue that the alleged price-fixing conspiracy was reasonable, beneficial or a legitimate business practice.  That is, Defendants will not argue that price fixing was justified by its competitive effects."  Op. and Order at 1, Sept. 9, 2022, ECF No. 1887.  Neither CS nor its experts did so, and none suggested that CS had engaged in price fixing or that price fixing was acceptable, reasonable, or appropriate.  Instead, CS and its experts took the position that there was no price fixing at all; rather, traders shared spread information for other legitimate business reasons.  The Court expressly permitted this line of argument, and CS and its experts did no more than was allowed.

For example, Dr. Melvin testified that "information sharing, for instance, in the chats, serves a legitimate business purpose."  Tr. 564:6–8; *see also* Tr. 601:5–602:7, 622:12–17.  But he never opined that a price-fixing conspiracy was justified by pro-competitive benefits.  Dr. Melvin's testimony, to which Plaintiffs did not contemporaneously object, was consistent with his expert report, consistent with the Court's instruction on the law,[17] and consistent with the Court's pre-

---

[17] The Court likewise instructed the jury:  "The fact that Credit Suisse and their alleged coconspirators may have exchanged price-related information, including spreads, does not necessarily establish that they agreed to widen, fix, stabilize, or maintain spreads.  There may be other legitimate reasons that would lead competitors to exchange such information, and the law recognizes that exchanges of price information may enhance competition and benefit customers."  Tr. 1049:16–25.

trial rulings.  Indeed, the Court made this point crystal-clear:  "Defendants may argue that certain information-sharing is legitimate. . . . [E]vidence of alternative explanations -- as opposed to justifications -- for conduct that appears to be price-fixing is ***highly probative of the central issue to be tried***."  Op. and Order at 1–2, Sept. 9, 2022, ECF No. 1887.

Plaintiffs are also incorrect that Dr. Melvin improperly testified about "the intent and meaning of traders' words regarding spreads as prices."  Pls.' Br. at 20.  First, while CS agreed that experts would not testify about traders' "intent," CS made no such agreement as to the "meaning" of words in chats.  To the contrary, CS clearly asserted:  "CS is entitled to defend itself and explain to the jury what each chat means—and what it does not mean.  These chats include jargon that the jury will need the help of an expert to understand, and they can only be properly understood within the context of industry custom and practice."  CS's Opp. to Pls.' MIL No. 8 at 3, Aug. 19, 2022, ECF No. 1807.  Nothing in the Court's pre-trial or trial rulings prevented this, and the Court denied Plaintiffs' *Daubert* challenge to Dr. Melvin's testimony on this point.  Op. and Order at 3, Sept. 9, 2022, ECF No. 1887.

The testimony Plaintiffs cite does not even relate to the "state of mind" of traders.  Pls.' Br. at 20–21.  Counsel asked Dr. Melvin if the examples of chats discussed by Plaintiffs' expert changed Dr. Melvin's view that "the spread isn't a price."  Tr. 575:15–17.  In responding, Dr. Melvin opined as to the ***meaning*** of certain chats, not the intent of any trader.  Tr. 575:18–576:2 (explaining that chats interchangeably used the terms "spread" and "price" but that the implication Plaintiffs sought to draw was unwarranted because the chats often contained "loose talk").

### 2.  Dr. Mathur's Testimony Was Proper

Nor did Dr. Mathur testify about any trader's intent.  Plaintiffs claim that Dr. Mathur opined that "traders were simply seeking to understand market conditions in order to offer the best guess that they can to fill out these spread matrices" and that this was "different from [colluding]."  Pls.'

18

Br. at 21.  But Plaintiffs misrepresent this testimony.  Dr. Mathur simply disagreed with Plaintiffs'

premise that spread discussions were inherently collusive from the perspective of an economist:

> Q.  Because they were competitors and they shouldn't have been colluding with
> each other on the matrices they submitted to customers, correct?
>
> A.  I think we want to be precise in what you mean by colluding.  If you mean by
> colluding what an economist means, which is attempting to raise prices above
> competitive levels, I completely agree.   But I think we've also heard that
> exchanging information to understand market conditions in order to offer the best
> guess that they can to fill out these spread matrices is different from that.

Tr. 1014–1015.  Dr. Mathur was not opining on any trader's state of mind, but rather she was

testifying that, based on evidence about the market, the chats were not consistent with collusion.

Similarly, Plaintiffs asked Dr. Mathur if she found it "odd" that traders knew the spreads

being offered by their competitors, a question that necessarily asked her to assume certain facts

about the knowledge of unspecified traders; she answered that she had seen chats where views on

spreads were exchanged and did not find it odd.  Tr. 1025:2–9.  There is nothing improper about

such testimony, and in any event Plaintiffs invited it and did not object to it.

Next, Dr. Mathur testified that, from an economics perspective "[e]xchanging or sharing

opinions on information in the marketplace" is not a "problem."  Again, she was not testifying to

any trader's motive or even a specific chat, but responding as an antitrust economist to Plaintiffs'

own question:  "You think it raises anticompetitive concerns if two competitors are sharing what

numbers to put in a spread matrix that goes to a customer?"  Tr. 1015:12–19.

Finally, Plaintiffs complain about Dr. Mathur's testimony that she saw "bluster" and

"bravado" and "words" in the chats.  Pls.' Br. at 21.  But in making these observations, Dr. Mathur

was not speaking to motive or intent.  Plaintiffs' attempt to portray this as testimony about intent

shows just how far they are stretching.

**D.     Plaintiffs Were Not Prejudiced by Testimony They Elicited Regarding the Closing of Multibank Chat Rooms**

Plaintiffs argue that they should not have been barred from introducing evidence about the closure of interbank chat rooms after Plaintiffs themselves elicited testimony referencing their closure.  Pls.' Br. at 22–23.  Plaintiffs failed to make this argument during trial, and the brief testimony Plaintiffs elicited did not justify revisiting the Court's *in limine* ruling in any event.

Prior to trial, the Court granted CS's motion *in limine* to exclude evidence of the closure of interbank chat rooms as a "paradigmatic" subsequent remedial measure.  Op. and Order at 8, Sept. 2, 2022, ECF No. 1880.  Consistent with that ruling, CS did not seek to introduce evidence regarding the closure of the chat rooms.  Instead, ***Plaintiffs*** elicited that fact from a CS expert.  In response to Plaintiffs' question, "did you investigate for what period of time traders used multibank chatrooms to discuss spreads," Dr. Melvin testified, "I didn't review, but I know at one point in time they were banned, basically, and all the banks shut them down."  Tr. 649–650.  Plaintiffs' counsel did not object, but instead saw an opportunity and pressed on, essentially testifying:  "Q. All the chatrooms, not just one or two, all of them?" and then:  "Q.  They didn't shut them down by currency pair.  They didn't shut them down by trader.  They shut all the chatrooms down, correct?"  Tr. 650:4–9.  The Court sustained CS's objection and struck the latter question.

Plaintiffs did not object at the time, did not seek to revisit the *in limine* ruling, and did not ask for any relief.  But they now argue that they were prejudiced because "Plaintiffs were prohibited from showing the jury the reason the chat rooms were closed was because of 'collusion' to the detriment of their customers."  Pls.' Br. at 22.  This argument fails for several reasons.  First, Dr. Melvin's testimony on cross-examination (which benefitted Plaintiffs) cannot be spun as some sort of misconduct by defense counsel.  Second, the Court already considered and rejected the same argument Plaintiffs make now.  In an evidentiary ruling before trial, the Court explained:

"Evidence of subsequent measures closing or prohibiting chat rooms is precluded under Rule 407 as this evidence is too attenuated to warrant admission to impeach the CS argument that spread discussions served legitimate business purposes." Order, Oct. 8, 2022, ECF No. 1968. Plaintiffs cannot use Rule 59 to relitigate evidentiary motions they previously lost. *See Ojeda*, 477 F. Supp. 3d at 76; *Sequa Corp*. v. *GBJ Corp*., 156 F.3d 136, 144 (2d Cir. 1998).

### E. CS's Arguments Regarding the Fifth Amendment Were Proper and Did Not Cause Any Undue Prejudice

Plaintiffs are incorrect that CS's summation "misstate[d] the law" by urging the jury not to draw an adverse inference against CS from the testimony of witnesses who invoked the Fifth Amendment (Pls.' Br. at 23–24), and Plaintiffs' brand-new objection to the summation does not hold water in light of the Court's clear instructions to the jury.

The Court instructed the jury that only the Court, and not the parties, could state the relevant law. Tr. 1035. As to witnesses invoking the Fifth Amendment, the Court correctly instructed the jury: "you are permitted, but not required, to infer that the withheld information would have been unfavorable to the witness' interest and the interest of a party who is closely associated with the witness. Any inference you may draw should be based on all of the facts and circumstances in the case." Tr. 1054; *see also Mirlis* v. *Greer*, 952 F.3d 36, 42–43 (2d Cir. 2020) (affirming a nearly identical instruction). Both sides were free to argue the inferences the jury should draw from the facts and circumstances surrounding the Fifth Amendment assertions.

In summation, consistent with the jury instructions, defense counsel urged the jury to consider carefully whether an adverse inference was warranted: "You should look at the testimony of the so-called Fifth Amendment witnesses, and you should decide for yourself why they asserted their Fifth Amendment rights. Is it because they didn't want to talk about whether they conspired to fix spreads, as the plaintiffs say, or were they taking the Fifth with respect to every single

21

question, no matter the topic" and "is the conclusion that the plaintiffs want you to draw that these folks would have incriminated themselves if they answered . . . really supported by the evidence?" Tr. 1077–1078.  Attorneys are permitted on summation to ask the jury to draw inferences.  *Marcic*, 397 F.3d at 126.  And that is all defense counsel did.  The questions defense counsel asked the jury to consider do not approach conduct that could have "created undue prejudice or passion which played upon the sympathy of the jury."  *Zhang*, 2019 WL 623879, at *4.

Plaintiffs did not object at any time.  And in any event, any supposed prejudice would have been fully cured by the Court's instruction that:  "if anyone . . . states during closing argument a legal principle different from what I tell you in my instructions, it is my instructions you must follow."  Tr. 1035.  Thus, a new trial would be warranted "only if counsel's conduct was so inflammatory or prejudicial that it was unlikely the jury could follow the Court's instruction on what constitutes evidence."  *Manlapig*, 2016 WL 4617305, at *2.  Such is far from the case here.  As in *Manlapig*, "each of the comments Plaintiffs challenge as extremely prejudicial was either proper or, if not, sufficiently addressed during trial."  *Id*; *see also Ekukpe* v. *Santiago*, 823 F. App'x 25, 33 (2d Cir. 2020) (court's instructions were "clearly sufficient to cure any prejudice caused by counsel's misstatements in summation").

### F.    CS Did Not Violate the Stipulation Regarding Class Plaintiffs

Plaintiffs' argument that CS's references to the named Plaintiffs in its summation violated the parties' stipulation and were otherwise improper is wrong.  Before trial, the parties entered into a narrow stipulation (ECF No. 1948) that did not cover all facts or arguments relating to the named Plaintiffs:

1.  Neither Party will call Oklahoma Firefighters and/or Virgin Islands (or any other named Plaintiff) as witnesses at trial; and

2. That Oklahoma Firefighters and Virgin Islands traded FX during the Class Period with Credit Suisse and one or more of the other 15 settling Defendants is an undisputed fact that will be presented to the jury before trial.

Indeed, in his opening statement, Plaintiffs' counsel raised facts about the named Plaintiffs that were never put in evidence, including that one of the class representatives was a fire captain.  Tr. 29.  And counsel did it again in summation:  "[W]e represent working people. . . . Jim Nimmo, he was here.  He had to go back.  He's a fire captain for Oklahoma.  He had other responsibilities. He sends his regards and respect.  They have a real stake in this litigation, ladies and gentlemen, and represent the other thousands of class members harmed by the conspiracy to widen spreads." Tr. 1118.  Plaintiffs cannot now argue that the stipulation barred CS from referencing the named Plaintiffs when that is precisely what they themselves (repeatedly) did.

Nor was the substance of CS's argument improper.  The Court expressly held that "evidence and argument that the conspiracy had no effect may be admissible as circumstantial evidence that no conspiracy existed."  *See* Op. and Order at 2, Sept. 9, 2022, ECF No. 1887.  CS referenced the named Plaintiffs only in making this precise point.  *See* Tr. 1096 ("[D]id they tell you the spreads they were quoted were wider because of the conduct of CS or any bank? . . . [T]heir silence speaks volumes about the plaintiffs' proof or, rather, the lack of it.").[18]  And as noted above, whether spreads widened could be relevant only to the existence of a conspiracy, which the jury found, and not to CS's participation.  Plaintiffs thus fail to show any prejudice.

III.   **THE JURY'S VERDICT IS NEITHER ANOMALOUS NOR INCONSISTENT**

Plaintiffs' claim the trial resulted in an "anomalous, inconsistent jury verdict," suggesting

---

[18] *Lee* v. *City of Troy*, 339 F.R.D. 346, 351 (N.D.N.Y. 2021), cited by Plaintiffs, is distinguishable.  The "centerpiece" of the trial there was a video of the defendant's arrest, and the plaintiffs produced a different version of the video shortly before trial.  Defense counsel, without justification, told the jury nine times that the video was fake.  The court found that the "unsupported attack on a crucial piece of evidence meant to be considered by the jury caused substantial prejudice."  *Id.* at 369.  Here, in contrast, defense counsel's argument was truthful and substantiated.

that an affirmative answer to the first question necessarily required an affirmative answer to the second, *see* Pls.' Br. at 2, is meritless. Since the class certification decision, it has been clear that trial would address two issues: whether a conspiracy existed, and, if so, whether CS participated. Op. and Order at 19, Sept. 3, 2019, ECF No. 1331. At summary judgment, the Court reiterated the separation between the two issues and denied both parties' motions. Op. and Order at 8–9, Feb. 1, 2022, ECF No. 1650; *id.* at 25 ("Neither party is entitled to summary judgment on the issue of Credit Suisse's participation in the purported conspiracy.").

As a result of prior rulings, the parties have long understood what the verdict form makes clear: the jury could find that some conspiracy existed but that CS did not participate. *Id.* at 25 ("The question of whether or not there was a single conspiracy or multiple conspiracies needs to be resolved before asking whether and what Credit Suisse joined.").[19] That is precisely what happened, and it is not difficult to postulate any number of ways the jury could have reached its verdict based on ample evidence. For example, Plaintiffs presented evidence that certain traders, including their key witness Mr. Katz, admitted to a conspiracy that did not involve CS in a chat room (ZAR Chat) in which no CS trader participated. The jury could have answered "yes" to the first question based on this evidence while still answering "no" to the second.

With 15 other banks in the alleged conspiracy and, by Plaintiffs' own design, thousands of chats and dozens of deposition videos in the record, the jury could easily have concluded that certain conduct involving certain traders constituted an illegal agreement (or agreements) while rejecting Plaintiffs' argument that the conduct involving CS traders was part of any agreement. Any number of reasonable and proper explanations could have led the jury to answer the first two verdict form questions as they did. This is more than enough to permit the verdict to stand. *E.g.*,

---

[19] DE 15 (Excerpt from Pls.' [Proposed] Special Verdict Form at 1, Aug. 19, 2022, ECF No. 1812–1).

*Minpeco, S.A.* v. *Hunt*, 718 F. Supp. 168, 181 (S.D.N.Y. 1989) ("[T]o qualify as inconsistent, . . . there must be no rational, non-speculative way to reconcile . . . two essential jury findings.").

In any event, Plaintiffs waived their argument that the jury's answers were inconsistent by failing to raise an objection before the jury was discharged.  *U.S. Football League* v. *National Football League*, 842 F.2d 1335, 1367 (2d Cir. 1988) (plaintiff's "failure to bring alleged inconsistencies in the verdict sheet to the court's attention before the jury has been discharged waives the right to have the alleged inconsistencies remedied by a new trial"); *Laborde* v. *City of New York*, 1999 WL 38253, at *7 (S.D.N.Y. Jan. 27, 1999) ("An objection to inconsistent verdicts raised for the first time in a post-trial motion is untimely and procedurally barred.").

## CONCLUSION

Plaintiffs' motion for a new trial should be denied.


Dated:  November 23, 2022
        New York, New York                          CAHILL GORDON & REINDEL LLP


                                        By: /s/ Herbert S. Washer

Herbert S. Washer
Anirudh Bansal
Jason M. Hall
Edward Moss
Tammy L. Roy
Miles Wiley

32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
abansal@cahill.com
jhall@cahill.com
emoss@cahill.com
troy@cahill.com
mwiley@cahill.com

*Attorneys for Defendants Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse Securities (USA) LLC*