# EXHIBIT 1

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST TRIAL

CORRECTED
October 11, 2022

| MAB3FOR1 | Opening - Mr. Burke | Page 29 |
|---|---|---|

1    Five banks, five banks, five of the co-conspirators,
2 pleaded guilty to felonies in connection with using the same
3 chatrooms we are going to see today to fix prices in the
4 foreign exchange market.
5    Two traders pleaded guilty to felonies in connection
6 with using the same chatrooms you are going to see today to fix
7 prices in the foreign exchange market.
8    One trader went to prison.
9    Before we go any further, I'd like to thank you for
10 your service. The right to a trial by jury dates back to the
11 passage of the Bill of Rights in 1791. So at least in the
12 federal system you are part of an almost 250-year tradition.
13 Your service is vital to the role, the rule of law, and it is a
14 solemn duty of citizenship to which you have our thanks.
15    The plaintiffs in this class case are represented
16 today by the Oklahoma Firefighters Pension & Retirement System,
17 Chase Rankin and Fire Captain Jim Nimmo are here today. If you
18 can stand up, please. Thank you, gentlemen.
19    We're also represented by the Government Employees'
20 Retirement System of the Virgin Islands represented by
21 Grenville Henderson and Cathy Smith. If you can please stand
22 as well. Thank you.
23    The lawyers for the plaintiffs include Michael
24 Hausfeld, Patrick Coughlin, Walter Noss, you'll meet others
25 throughout the trial. My name is Chris Burke. I'm very

| MAB3FOR1 | Opening - Mr. Burke | Page 30 |
|---|---|---|

1 pleased to be addressing you today.
2    Now the question you are going to be asked to answer
3 is whether and with whom Credit Suisse agreed to engage in a
4 scheme in widening spreads. This poses what's known as an
5 antitrust problem. Competitors getting together to agree to
6 widen spreads. And spread is price, price fixing. That's
7 prohibited by the antitrust laws. The antitrust laws are meant
8 to protect competition. Not competitors. Competition is
9 supposed to result in lower prices. It's supposed to enhance
10 consumer welfare.
11    When you see chats where competing banks agree on
12 spreads to show customers, that's price fixing. That's wrong.
13    We are going to show you a number of chat transcripts
14 today. The participants were Credit Suisse and its 15
15 co-conspirator banks. These banks are supposed to be competing
16 for customer business on the basis of price.
17    As you look at the chats, please ask yourself, why
18 aren't they competing?
19    The plaintiffs are a class of persons and businesses
20 who trade in foreign exchange markets such as the Oklahoma
21 Firefighters and the Virgin Islands.
22    Credit Suisse is the defendant, and the alleged
23 co-conspirators are the world's largest banks, the foreign
24 exchange dealers. You probably recognize some of them,
25 JPMorgan, Citi, Goldman Sachs, Bank of America, Morgan Stanley,

| MAB3FOR1 | Opening - Mr. Burke | Page 31 |
|---|---|---|

1 BNP Paribas.
2    Credit Suisse and the co-conspirator dealers
3 controlled over 90 percent of the part of the foreign exchange
4 market that deal with customers who want to buy and sell
5 foreign exchange. They run the store. If you want to exchange
6 pounds for dollars, you need to go to their store.
7    I'd like to take you through a couple of the basics of
8 the FX market because I think it will enable you to make sense
9 of the rest of them.
10    The FX market operates 24 hours a day. It starts in
11 New Zealand, goes to Australia, into Asia, Europe, London,
12 closes in New York. Opens back up again in New Zealand.
13 Trades 252 days a year.
14    Currencies are bought and sold in pairs. So again,
15 using pound/dollar, you buy pounds, you sell dollars. Or you
16 use dollars to buy euros or you use yen to buy euros.
17    The top three currency pairs are euro/dollar,
18 dollar/yen and pound to dollar. They account for over half of
19 all foreign exchange trading.
20    Now if you'll see to your left, my right, there is a
21 board with all different types currencies on there. Canada
22 dollars, Swiss francs, Norwegian krone, South African rand,
23 Israeli shekel, Argentinian peso.
24    87 percent of all traded volume is, again, the U.S.
25 dollar. When you monkey with the U.S. dollar, you monkey with

| MAB3FOR1 | Opening - Mr. Burke | Page 32 |
|---|---|---|

1 the market.
2    Now, on this slide, you will see three letter codes.
3 EUR, that means euro. USD, U.S. dollar. JPY, Japanese yen.
4 GBP, Great British pound.
5    Every single currency has a unique three letter code.
6 They are like airports. LAX is Los Angeles. J.F.K., New York.
7 LGA, LaGuardia. Every single currency has a three letter code.
8 As we go through the chats, you will see a bunch of three
9 letter codes. I'll stop and translate it for you.
10    FX, foreign exchange, is traded in pairs. Each pair
11 has what's known as a quote currency and a base currency. In
12 the pound to dollar currency pair, the quote currency is the
13 dollar. That tells you how many dollars it takes to buy one
14 British pound. In our example, we are using an exchange of
15 $1.3090 for one British pound. In this market you trade in
16 millions. Not just one pound to one dollar. So, how many
17 dollars would it take to buy 10 million British pounds at an
18 exchange rate of 1.390. It would take $13,090,000 to buy 10
19 million British pounds.
20    If we can go back. This currency pair is called
21 cable. Why is it called cable? The first transatlantic cable
22 connects the U.K. to the United States. So to this day,
23 pound/dollar is called cable. You'll find the traders use a
24 lot of interesting trader jargon. Cable is one of them. Cable
25 means pound dollar. If we come across jargon, I'll try to

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST TRIAL

**CORRECTED**
**October 11, 2022**

| MABHFor2 | Opening - Mr. Burke | Page 57 |
| --- | --- | --- |

1 guessing if you went through all 2,500 you'd be here to
2 Halloween, maybe closer to Thanksgiving. It would take about
3 12 and a half of these Bankers Boxes to hold the 2,500 chat
4 examples. You're going to hear Credit Suisse say that's not
5 enough. That's not enough. These exemplar chat communications
6 span the entire class period and involve every cococonspirator.
7        Fifth Amendment. We took discovery in this case.
8 Twenty-six traders -- not five, not a handful, not a dozen.
9 Twenty-six traders -- from 13 dealers asserted their Fifth
10 Amendment rights against self-incrimination when asked about
11 the conspiracy to widen spreads. This includes three former
12 Credit Suisse employees, including Mr. Daniel Wise, who was
13 formerly Credit Suisse's global head of FX spot trading. He
14 took the Fifth.
15        Guilty pleas and convictions: Banks and traders
16 pleaded guilty. One trader was in prison. Five dealers
17 pleaded guilty in connection with entering into and engaging in
18 a conspiracy to fix prices of certain currencies. The
19 conspiracy was carried out in conversations in chatrooms you
20 saw today. That includes Barclays, PNP Paribas, Citi,
21 JPMorgan, Royal Bank of Scotland. These are felonies,
22 household name banks pleaded to felonies because of what
23 happened in the chatrooms.
24        Akshay Aiyer of JPMorgan Chase conspired to fix prices
25 in part using the chatrooms. He went to prison.

| MABHFor2 | Opening - Mr. Burke | Page 58 |
| --- | --- | --- |

1        Chris Cummins and Jason Katz -- Cummins is at Citi;
2 Katz at BNP and Barclays -- they plead guilty to conspiring to
3 fix prices carried out their communications in chatrooms,
4 chatrooms that you saw today.
5        The evidence will demonstrate, the evidence will show,
6 spread is the price customers pay to the dealers for trading
7 FX. And that was the motive, right? The motive is to widen
8 the spreads, the wider the spreads, higher the price to the
9 customers, and the more money banks put in their pockets. The
10 dealers knew what they were doing was wrong. It was not market
11 color, but they did it any way. They used multibank chatrooms
12 to agree on spread. Used terms like, well, what's the
13 consensus, consensus please, let's get on the same page.
14        They didn't need to widen spreads every second, every
15 hour, every day. Spreads were durable. They monitored and
16 enforced their conspiracy. They did not take kindly to
17 somebody showing them silly spreads. They relied and trusted
18 each other not to compete. The interconnected chatrooms formed
19 a network to conspire. With the network, the dealers win;
20 customers lose.
21        When confronted and put under oath, 26 traders from 13
22 dealers took the Fifth. Dealers and traders pleaded guilty to
23 felonies in connections with using chatrooms to fix prices in
24 the foreign exchange market.
25        The questions you're going to be asked to answer is

| MABHFor2 | Opening - Mr. Burke | Page 59 |
| --- | --- | --- |

1 whether, was a conspiracy? Did it happen? If it did, when,
2 and with whom Credit Suisse agreed to engage in a joint scheme
3 of widening spreads?
4        Now, the "whether," we would submit, that's answered
5 in those 2,500 chats. That's the bulk of our evidence.
6        The "with whom," let's just use the chats we went
7 through today, which is just a small number starting with: We
8 should all agree on the same spreads; let's sign a pact on
9 spreads; day of customers holding us ransom is over; it can
10 never be a bad thing colluding spreads; just quote them wide
11 and same, that way they have no tight price; once and for all,
12 consensus please; how wide we making it, boys; what we think.
13        Just using the chats we went through today, every
14 single dealer present and accounted for. We filled up the
15 scorecard.
16        The "when," again, using the chats we went through
17 today starting with we should all agree on the same spreads, to
18 let's sign a pact on spreads, to what we think, day of
19 customers holding us ransom are over; we're not allowed to talk
20 about it, but they continue to talk about spreads; they think
21 it's price fixing and collusion, but they do it anyway; just
22 quote them wide same way, that way they have no tight price,
23 all the way through December 2013.
24        The question, whether, when, and with whom Credit
25 Suisse agreed to joint scheme of widening spreads, the

| MABHFor2 | Opening - Mr. Moss | Page 60 |
| --- | --- | --- |

1 whether's in the chats. Trust the chats. Ask yourself why
2 aren't they competing? The when, 2007-2013. The who, Credit
3 Suisse and 15 coconspirators dealers.
4        I thank you for your kind attention.
5        Your Honor.
6        THE COURT: Thank you.
7        Ladies and gentlemen, we're going to take a ten-minute
8 break. Mr. Street will tell you where to go. Please leave all
9 your papers and notes on your chairs, and don't talk about the
10 case.
11        (Jury excused)
12        THE COURT: We'll reconvene at 4:05.
13        (Recess)
14        (Jury present)
15        THE COURT: You all can sit down. We're standing for
16 you, actually, out of respect for the jury. Now, we'll all sit
17 down.
18        OK. You may proceed.
19        MR. MOSS: Good afternoon, ladies and gentlemen. My
20 name is Edward Moss, and along with my partners, Tammy Roy and
21 Jason Hall, we represent Credit Suisse.
22        I'd also like to introduce Tamara O'Flaherty, in-house
23 counsel at Credit Suisse, who will serve as the bank's
24 representative and will be with us throughout the trial.
25        Now, the plaintiff's counsel just told you some story,

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST TRIAL

---

MABHFor2          Opening - Mr. Moss          Page 73

1 Court said you don't often see direct evidence like that.  OK.
2 That's fine.  You won't see that.  But how about some level of
3 coordination among management, some senior people from
4 management to admit to this, right, to say, yeah, we
5 coordinated all of these things?  It would require a lot of
6 coordination.  You won't see that at all.
7         How about coordinating through one chatroom?
8 Mr. Burke stood up here and he said they never thought that
9 they were going to get caught.  They did whatever they wanted
10 in these chatrooms without regard to the fact that regulators
11 might be reading these years down the road.  They didn't even
12 think about that.  Well, if they didn't think about that,
13 right, if they did what they wanted and what they wanted was to
14 all enter into an agreement, the easiest thing would have been
15 just to get in a chatroom.  Different traders trade different
16 currency pairs, right?  How about this?  All the yen traders,
17 all 16 of you from your 16 banks, you're in one -- you're in
18 one chatroom, and all the Deutsche mark traders, you're in
19 another chatroom, and you guys can talk all day, exchange all
20 information all day about all these 325,000 transactions.  That
21 doesn't exist either.
22         All right.  What about a document?  You might want to
23 see a document that mentions the global conspiracy.  That would
24 be pretty good, right, one document?  You're not going to see
25 that either, ladies and gentlemen.  Think about this:  There

---

MABHFor2          Opening - Mr. Moss          Page 74

1 are millions and millions of emails and chats and
2 communications by these banks over this six-year period.
3 Wouldn't somebody have mentioned the global price fixing
4 agreement among all of them?  I mean, hey, what about the big
5 16 agreement, an email that says that, right?  Or, make sure
6 you quote the agreed-upon price because of our big agreement
7 with everyone, everyone.  You don't see any of that either,
8 right?  You won't see a single reference in a single scrap of
9 paper to a massive global conspiracy.  It does not exist.
10 There's not a meeting, there's not a document, there's not a
11 chatroom with all the traders.
12         How about testimony, right?  Surely they are going to
13 come in here and they're going to show you one trader, at least
14 one, that admits that he or she entered into an agreement with
15 16 other banks.  Surely they're going to have one trader admit
16 to that, right?  No, they will not.  Instead you're going to
17 hear trader after trader after trader testify, even the ones
18 who say they didn't bad things, testify under oath and under
19 penalty of perjury that they did not enter into an agreement
20 with all of these things, and that includes Mr. Katz.
21         Jason Katz is plaintiffs' key trader witness.  Jason
22 Katz already pleaded guilty to a crime.  You heard his
23 telephone conversation.  He pleaded guilty to a different
24 conspiracy than what the plaintiffs allege here.  He cooperated
25 with the government in the criminal case of one of his trader

---

MABHFor2          Opening - Mr. Moss          Page 75

1 buddies, and now he's going to come and testify for these
2 plaintiffs here.  Even Mr. Katz is going to concede under oath
3 that he never participated in any conspiracy outside his
4 isolated chatroom.
5         There's another thing, I mentioned this earlier, that
6 you might want to see to support the existence of an agreement,
7 right?  This was supposedly an agreement to widen spreads.
8 Mr. Burke told you, well, these guys have 90 percent market
9 share, these banks, right?  They're really powerful.  They're
10 really powerful.  How about an expert to come in here and say,
11 I've analyzed all the data from the class period, from the
12 alleged conspiracy period, and I can tell you that spreads were
13 wider in the market for six years throughout this conspiracy.
14 You won't see that either.  Plaintiffs do have a paid expert
15 who's going to come in here and offer some opinions, but he
16 will not offer that opinion.
17         And it makes sense, right?  Because if some of these
18 banks wanted to widen spreads, what would happen with TD and
19 Wells Fargo?  They would come in and take the customers.  They
20 would undercut.  Remember, those banks supposedly aren't in on
21 the conspiracy.  It makes perfect sense that spreads were not
22 wider, because the banks were competing.  There's no meeting,
23 there is no document, there's no trader testimony, there's no
24 chatroom with 16 banks.  There's no effect on spreads.
25         So what do the plaintiffs have?  What do they have to

---

MABHFor2          Opening - Mr. Moss          Page 76

1 try to prove their single 16-bank conspiracy involving Credit
2 Suisse?  You're going to hear four categories of evidence.  The
3 criminal prosecutions, we've already spent time on that; some
4 testimony; the spread grids that we heard about -- and those
5 are really important.  I'm going to spend some time on those --
6 and, finally, the chats.  As I will explain, none of these
7 things, none of them, prove the conspiracy that plaintiffs are
8 alleging in this case.  And I'd like to start with number one,
9 the criminal prosecutions, and get that out of the way up
10 front.
11         Look, ladies and gentlemen, I mean, there was
12 misconduct in this industry.  There's no getting around that,
13 right?  There were traders who did things they should not have
14 done.  You saw some of those things.  And I bet you probably
15 don't like some of those things, and you're entitled to not
16 like some of those things.  But the evidence will show that
17 what they haven't done was this:  They haven't engaged in a
18 sprawling 16-bank conspiracy to fix prices.
19         So let's be very clear and use some precise language
20 here to be clear about what these criminal prosecutions are and
21 what they aren't.  We want you to understand all of the
22 evidence.  We want to show it to you completely and correctly
23 so you can see it all and judge it all for yourselves.
24         The first point you'll hear about these criminal
25 prosecutions, you'll hear no evidence that Credit Suisse was

---

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST TRIAL

CORRECTED
October 11, 2022

1 prosecuted and no evidence that Credit Suisse pleaded guilty to
2 anything. Credit Suisse did not plead guilty to an antitrust
3 conspiracy. Credit Suisse wasn't in those two carpools, those
4 two chatrooms, those two isolated chatrooms that the government
5 prosecuted. You're going to hear a lot about the guilty pleas.
6 None of it relates to Credit Suisse.
7          What else is important about these government
8 prosecutions? Well, the government, as I said, prosecuted two
9 chatrooms, two carpools: Four traders talking about one
10 currency pair in one chatroom over here, and four different
11 traders talking about certain other currency pairs in another
12 chatroom over here. This is isolated stuff. It might be bad
13 stuff, but it's isolated stuff. There is no evidence that the
14 government even tried to mush these two conspiracies that they
15 prosecuted together into one, let alone a conspiracy involving
16 all the chatrooms.
17          Plaintiffs' case here is totally different from what
18 the government prosecuted. Plaintiffs' case is not based on
19 one chatroom. It is based on all the chatrooms, hundreds. It
20 is not based on four traders. It is based on all the traders,
21 hundreds. It is not based on one of those currencies, currency
22 pairs that Mr. Burke had up or two. It is based on all the
23 currency pairs, dozens and dozens and dozens.
24          Plaintiffs' alleged conspiracy here is based on
25 speculation that everybody was talking to everybody about

1 spreads in all the currencies. Speculation that all the
2 traders in all the chatrooms formed some sort of interconnected
3 web that actually transmit information about spreads and all
4 the currencies. It is a striking overreach that is not
5 supported by the actual evidence, and it is because of these
6 very important differences between what the government
7 prosecuted and what these plaintiffs are alleging that even the
8 traders in the two chatrooms that the government prosecuted are
9 going to deny under oath the existence of the conspiracy
10 alleged in this case. They will testify that they did not,
11 they did not, conspire with 15 other banks. Mr. Gardiner was
12 in one chatroom. You'll hear him by video. He will say that.
13 Mr. Cummins and Mr. Katz, they were in another chatroom. They
14 will say the same thing. They will all tell you that each of
15 their agreements were limited to the traders in one chatroom.
16 It's completely different.
17          Now, let's move on to the second category of evidence,
18 testimony. Plaintiffs will put on some videos from traders and
19 two paid experts and three traders live. None of them will
20 testify about any conspiracy among anything close to 16 banks.
21 None of them will testify that Credit Suisse was part of any
22 conspiracy. In fact, Mr. Katz, again, their key witness, not
23 only will he testify that he didn't engage in a conspiracy with
24 anyone outside his chatroom, but he's also going to admit that
25 one trader he chatted with at Credit Suisse often, Mr. Hatton,

1 Christopher Hatton, Mr. Katz is going to tell you, I was
2 involved with some bad stuff, but not with Mr. Hatton. He will
3 affirmatively say I did not conspire with Mr. Hatton.
4 Mr. Hatton will be here, too, and he will say the same thing.
5 He wasn't part of any conspiracy, big or small, with Mr. Katz
6 or anyone.
7          So now let's move on to this third category of
8 evidence, the spread grids. Mr. Burke kept calling them price
9 lists. He said, well, these show that spreads are durable.
10 Let me ask you a question. If these were such firm price
11 lists, why are they chatting at all? What's the point? If
12 they coordinated on the price list, just laminate a copy and
13 put it next to your phone. Look up the price when someone
14 calls. Why are they chatting at all? The story on the
15 plaintiffs' side just does not hang together, ladies and
16 gentlemen.
17          So let's talk about what a spread grid actually is.
18 OK. A spread grid actually is a chart that the customers ask
19 each bank to fill out, and they ask the bank to fill them out
20 so that they could play the banks off one another so the banks
21 will compete, right? And the Credit Suisse traders will tell
22 you that they did different spread grids for different banks,
23 for different customers, because they showed better spreads to
24 certain customers.
25          And these aren't price lists at all, the evidence will

1 show. Remember, spreads are moving all the time, minute by
2 minute, second by second. These are the prices or the spreads
3 that banks can expect to show under normal market conditions.
4          Now, again, again with the speculation, plaintiffs say
5 that the banks colluded in the chatrooms to put the same
6 numbers in their spread grids, and they showed you one or two,
7 three chats where they say, oh, we're filling out a spread
8 grid. Now, what's your number in this? What's your number in
9 that? How about the follow-through? How about looking at the
10 spread grids to see what actually happened? Plaintiffs aren't
11 going to show you that. We will.
12          We analyzed that data. You will hear evidence that
13 BlackRock is one of the most sophisticated customers in this
14 market. It's a big hedge fund. What BlackRock did is it asked
15 all the banks to provide it with these spread grids, and it
16 analyzed those spread grids so it could force the banks to
17 compete and comparison shop against them. And that is exactly
18 what the banks did. The banks competed.
19          We looked at BlackRock's spread grids, and they showed
20 something completely different, completely different than what
21 the plaintiffs are alleging based on a handful of chats. If
22 there were a conspiracy, if all of those chats, those five or
23 however many chats there were, if that was true and they were
24 all coordinating on the numbers to put in the spread grid, what
25 would you expect to see? Well, you'd expect to see that they

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST TRIAL

CORRECTED
October 11, 2022

MABHFor2          Opening - Mr. Moss          Page 93

1 spreads. Case closed. Jamie Lawes writes that, and all of a
2 sudden all of Credit Suisse, hundreds of traders, hundreds of
3 salespeople who worked at Credit Suisse, right, they all
4 entered into a single agreement with the thousands of traders
5 and salespeople at all the 16 -- 15 other banks to fix spreads
6 in the whole market, not just the currency pairs that Jamie was
7 talking about in that chatroom or that he's responsible for,
8 but all of them. That is what the plaintiffs want you to
9 believe based on the snippets they keep showing you, right?
10      They love let's sign a pact on spreads, agree. All
11 right. Well, let's break this down. There are three banks in
12 this chatroom, first of all, right? You have Credit Suisse,
13 you have RBS, and you have Goldman. How's this a 16-bank
14 conspiracy? I mean, the suggestion that this shows a 16-bank
15 conspiracy, first of all, that's just made up, but does it even
16 show a three-bank agreement on that day? Let's trust the
17 chats. Let's look at the portions that the plaintiffs don't
18 show you.
19      So Mr. Lawes asks, hey -- to Munson: Do you wish
20 you'd widen your spreads yet?
21      And does Munson say, yeah, we had a deal. I widened
22 my spread. He said: Mate, I wish I could. I totally agree
23 they are wrong.
24      Mr. Lawes says: Just tell sales, then.
25      Goldman trader says: That's what we do.

MABHFor2          Opening - Mr. Moss          Page 94

1      Lawes says: Stand your ground, man.
2      Goldman says: Trader run the place, not sales. We
3 tell them what the spread is.
4      What does Munson say at RBS? What Munson says at RBS
5 is: Not the case here.
6      So what's going on? Mr. Munson, he wishes he could
7 widen spreads. Everyone wishes they could charge higher
8 prices. I'm sure Starbucks -- Mr. Burke showed you the
9 chart -- they'd like to charge $20 for a latte, but they can't,
10 because of their customers, because of competition, right? And
11 that's what Mr. Munson is saying, I can't, not the case here, I
12 can't just tell sales what to do. The salespeople, whom the
13 plaintiffs ignore, they want to bring in business by narrowing
14 spreads, and Mr. Munson said it would be great to be able to
15 widen spreads, we'd make more money, that's true, but I can't
16 because there's competition. And you will hear testimony from
17 Credit Suisse that Mr. Lawes couldn't do that either. That at
18 Credit Suisse, the traders did not run the show.
19      Just as importantly, ladies and gentlemen, where is
20 the action after all this talk? Where is proof that Credit
21 Suisse quoted a particular spread to a particular customer
22 after this chat? You won't see that. How about Goldman
23 quoting a spread to a customer after this chat? You won't see
24 that. How about RBS? You won't see that either. If they
25 can't even prove to you that there was a quote to -- a spread

MABHFor2          Opening - Mr. Moss          Page 95

1 quote to a customer after this chat, how can they prove to you
2 that they agreed on what spread to quote or that they agreed to
3 widen their spread? We heard "let's make a pact" I don't know
4 how many times. It's the centerpiece of their case, and they
5 didn't even show you the whole thing.
6      Let's drill down a little bit further on the chats
7 involving Credit Suisse. Plaintiffs have 726 chats in which a
8 Credit Suisse trader participated over the 1,491 trading days.
9 That is .49 chats about spreads per day. So what that means is
10 that on an average of about once every other day, one Credit
11 Suisse trader in one chatroom sent or received one chat about
12 one spread in one amount of one currency pair. And from that
13 and Jamie Lawes' chat the plaintiffs want you to just infer
14 that Credit Suisse was involved in a six-year conspiracy with
15 15 other banks to fix prices in the largest financial market in
16 the world. I mean, honestly, this is what you would have to
17 believe to find that Credit Suisse knowingly participated, that
18 this is knowing participation in a 16-bank conspiracy.
19      And, ladies and gentlemen, our witnesses, we have
20 witnesses who will come, the Credit Suisse witnesses will come,
21 and they will testify credibly that Credit Suisse did not enter
22 into a spread widening conspiracy. You will hear from
23 Mr. Yanez. He was the global head of FX. He ran the business.
24 You'll hear from Mr. Condie. He was the head spot trader in
25 New York on the FX desk. Mr. Walker was a senior trader in

MABHFor2          Opening - Mr. Moss          Page 96

1 New York, worked with Mr. Condie. And Mr. Howarth, the
2 salesperson in London, the senior salesperson in London. They
3 will testify credibly. They will explain to you that Credit
4 Suisse did not enter into a conspiracy, and they will explain
5 why. The witnesses will tell you that Credit Suisse was a tiny
6 player in the market in 2007 when this supposed conspiracy
7 started.
8      There is Credit Suisse, number 14 with a whopping
9 1.51 percent market share. And what did Credit Suisse do?
10 They brought in a new team, a team that had had success
11 elsewhere in bringing in business. And what was the plan? The
12 plan was to narrow spreads, to compete for customers, to grow
13 the market share, and to become a top ten player in the market.
14      You do not bring customers in by charging higher
15 prices. The whole plan was to narrow spreads. That is the
16 exact opposite of what companies in a price fixing conspiracy
17 do. In a price fixing conspiracy, the object is to coordinate
18 and not to compete, but Credit Suisse's whole business plan was
19 to compete on spreads, and the evidence is going to show that
20 that is exactly what Credit Suisse did.
21      Here's a chat between a Credit Suisse customer Pharo
22 Management, it's a fund, and Aki Abiola, a Credit Suisse
23 salesperson. The customer says: Aki, can you show a px in 15
24 EURNOK, please? What is that? Px is a price in a $15 million
25 trade in euros for the Norwegian krone. Abiola says: OK. And

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST TRIAL

CORRECTED
October 12, 2022

| MAC3FOR4 | Hatton - Cross | Page 262 |
| --- | --- | --- |

1 　　THE COURT: All right.
2 　　MR. COUGHLIN: Thank you, Mr. Hatton.
3 　　THE WITNESS: Thank you.
4 　　THE COURT: Cross?
5 CROSS-EXAMINATION
6 BY MR. HALL:
7 Q. Good afternoon, Mr. Hatton.
8 A. Good afternoon.
9 Q. You understand that the plaintiffs in this case accuse you
10 of joining a broad conspiracy --
11 　　THE COURT: Could you speak directly into the mic,
12 please.
13 　　MR. HALL: Yes, your Honor.
14 Q. Mr. Hatton, do you understand that the plaintiffs in this
15 case accuse you of joining a broad conspiracy among 16 banks to
16 manipulate FX spreads?
17 A. Yes.
18 Q. Did you join such a conspiracy, Mr. Hatton?
19 A. No.
20 Q. Let's step back. How long have you worked in the FX
21 business?
22 A. Approximately 27 years.
23 Q. How old were you when you first started working at FX?
24 A. I worked in the middle office when I was 21 years old.
25 Q. Right out of college?

| MAC3FOR4 | Hatton - Cross | Page 263 |
| --- | --- | --- |

1 A. Yes.
2 Q. You understand the relevant period for this case is 2007 to
3 2013?
4 A. Yes.
5 Q. I think we established with Mr. Coughlin you were at HSBC?
6 　　THE COURT: I am having trouble hearing and
7 understanding you.
8 　　MR. HALL: Let me get closer.
9 　　THE COURT: Even better. Thank you.
10 Q. You told Mr. Coughlin you were at HSBC for part of that
11 time until 2010; is that right?
12 A. Yes.
13 Q. Then you joined Credit Suisse in 2010?
14 A. Yes.
15 Q. You were there through 2013, and in fact much longer than
16 2013; is that right?
17 A. Yes.
18 Q. When did you leave Credit Suisse?
19 A. I left Credit Suisse in July of this year.
20 Q. What are you doing now, Mr. Hatton?
21 A. I work for an Australian bank in foreign exchange.
22 Q. You are still trading FX?
23 A. Yes, I am.
24 Q. As an FX trader at Credit Suisse, what was your role with
25 respect to particular trades that came in?

| MAC3FOR4 | Hatton - Cross | Page 264 |
| --- | --- | --- |

1 A. When I was hired by Credit Suisse, I was hired to help
2 build their Asian currency capabilities, so, we, I was charged
3 with improving -- building, basically building a business that
4 didn't really exist prior to when I was there.
5 Q. When you say you were charged with building a business,
6 what business were you charged?
7 A. The Asian FX business.
8 Q. Did you typically trade euro/dollar, Mr. Hatton?
9 A. No.
10 Q. Did you typically trade dollar/yen?
11 A. No.
12 Q. Did you typically trade Great British pounds to U.S.
13 dollars?
14 A. No.
15 Q. Thinking back to the time period we've been talking about,
16 when you were asked to quote spot, how much time did you have
17 to turn around with your quote?
18 A. A spot price probably 10 to 15 seconds, probably more like
19 10.
20 Q. Was there an exchange or some kind of electronic platform
21 you could look at that would tell you what the price you needed
22 to turn around and quote, or did you have to use your own
23 judgment?
24 A. There was an electronic platform that usually didn't
25 represent the exact quote that you were making, so I had to use

| MAC3FOR4 | Hatton - Cross | Page 265 |
| --- | --- | --- |

1 my judgment.
2 Q. What factors would you have had to think about in those 10
3 to 15 seconds to turn around a quote?
4 A. What my own position was, what the market was doing at the
5 time, which, you know, which kind of customer was coming in,
6 what orders we might have in our books. So a lot of different
7 factors.
8 Q. You've been shown a series of chats here this afternoon.
9 Those were Bloomberg chats; is that right?
10 A. Yes.
11 Q. Did you have a business reason to use a Bloomberg chat
12 while you were at Credit Suisse, Mr. Hatton?
13 A. While I was at Credit Suisse I did participate in the
14 chatroom as we've seen and we tried to, we talked to customers
15 sometimes, we'd have internal chats, various different chats.
16 Q. Did you have any business purpose for participating in
17 those chats?
18 A. The chats that I was in with customers would be exchanging
19 our views. The chats we had internal would be for economic
20 information, what our economists might give us. And then the
21 chats that I had with other banks might be for market color,
22 what views were, things of that nature.
23 Q. When you referred to market color, what was to be gained
24 with a firm chatting with traders who worked for other banks?
25 A. We would get views, we would try to have a reality check on

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST TRIAL

CORRECTED
October 12, 2022

| MAC3FOR4 | Hatton - Cross | Page 266 |
| --- | --- | --- |

1  where the market was at any particular time.  We dealt with
2  very volatile currencies, so we wanted to make sure we all had
3  a handle on the market.
4  Q.  When you are talking about having a handle on the market,
5  what do you mean specifically?
6  A.  Just so we were pricing liquidity and volatility properly.
7  Q.  Why wouldn't you have just asked other traders at Credit
8  Suisse?  What was to be gained by talking about talking to
9  traders at other banks?
10  A.  The other traders at Credit Suisse were trading their own
11  currencies.  So I was a bit on my own trading Asia.
12  Q.  You've been asked a series of questions here today about
13  one chatroom in particular which The Old Gits chatroom.  Is
14  that right?
15  A.  Yes.
16  Q.  How did you know the people who were The Old Gits chatroom
17  with you?
18  A.  I had been in the market for a while with them.  I
19  considered them friends.  We had all been trading the mostly in
20  the Asian market or emerging markets for quite some time.
21  Q.  We've seen a series of chats where you talked about, among
22  other things, FX spreads in The Old Gits chatroom.  Is that
23  right?
24  A.  Yes.
25  Q.  Would you ever take a spread that was discussed in a

| MAC3FOR4 | Hatton - Cross | Page 267 |
| --- | --- | --- |

1  chatroom and use it to quote a two-way price to a customer
2  without applying your own judgment?
3  A.  No.
4  Q.  Why not?
5  A.  Because it was just one piece of information.  There's so
6  many, as I mentioned before, there is a lot of other pieces of
7  information that goes into making a price to a customer.
8  Q.  What in particular did you get out of information you might
9  have gotten about other traders' opinions on FX spreads?  How
10  did at that help you?
11  A.  Well, I could make sure that my knowledge of volatility and
12  liquidity was right for the time.
13  Q.  Mr. Coughlin read to you from a Credit Suisse policy
14  document.  Do you remember that?
15  A.  Yes.
16  Q.  That was dated October 2010?
17  A.  Yes.
18  Q.  Do you believe as you sit here today, Mr. Hatton, that
19  anything that you did or discussed in The Old Gits chatroom
20  constituted a violation of that policy at the time you said it?
21  A.  No.
22  Q.  As you mentioned a minute ago, Mr. Hatton, you wanted to
23  make sure you were pricing liquidity and volatility accordingly
24  or appropriately.  Could you explain to the jury what that
25  means?

| MAC3FOR4 | Hatton - Cross | Page 268 |
| --- | --- | --- |

1  A.  Sure.  So there was no central marketplace for the
2  currencies that we were trading.  So, I had to put a proper
3  price on amounts that I couldn't necessarily get out of right
4  away, so I might have to hold that position for 10 minutes, 15
5  minutes, 20 minutes, sometimes even longer, depending on the
6  currency and the time of day.
7  Q.  How did that make it important that you price
8  appropriately?
9  A.  So, you know, our goal, our goal was to, you know, do
10  business with the customer as I was building the business, so
11  we had to take into consideration -- try to price the customers
12  competitively, at the same time make sure the risk is priced
13  properly so the bank doesn't lose money.
14      So there is a fine line where you want to find the
15  right thing where the customer's happy and the bank incurs
16  little risk.
17  Q.  We've seen some chats in the course of this afternoon where
18  you seemed pretty unhappy.  Is that fair, Mr. Hatton, at
19  certain moments?
20  A.  Yes.
21  Q.  What's your feeling as you sit here today about seeing some
22  of those chats?
23  A.  I have some of the same feelings now that I'm remembering
24  now that I see them, yeah.
25  Q.  Why is that?

| MAC3FOR4 | Hatton - Cross | Page 269 |
| --- | --- | --- |

1  A.  Because I think that there's still -- at the time and maybe
2  even now, there's still customers that are trying to -- there
3  are certain customers that you don't want to do business with.
4  Q.  Why would you not want to do business with a particular
5  customer at a particular time?
6  A.  So certain customers would have a tendency to deal with
7  multiple banks at the same time, creating a push in the market
8  where the deal that you did, it would go against you most
9  likely very fast and you would lose money.
10  Q.  Can we look at 244A, Plaintiff's 244A.  Mr. Coughlin showed
11  you this chat earlier this afternoon.
12      Mr. Hatton, do you remember that?
13  A.  Yes.
14  Q.  And in particular, I believe Mr. Coughlin focused on a line
15  which is at 13:52:51.  Do you see that?
16  A.  Yes, I see that now.
17  Q.  You're saying here just both quote them wide and same, that
18  way they have no tight price, right?
19  A.  Yes.
20  Q.  What was going on here, Mr. Hatton, when you said that?
21  A.  I was referring to a specific customer who it seemed was --
22  well, was asking someone else for the exact same thing, and it
23  was a customer who was notorious for doing what I just said
24  before with dealing with multiple banks at the same time.
25  Q.  What's wrong with a customer dealing with multiple banks at

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST TRIAL

CORRECTED
October 12, 2022

MAC3FOR4                    Hatton - Cross                    Page 270

1  the same time?
2  A. As I said it's usually, it's a bit unethical at the time
3   and also it creates almost a guaranteed loss for the bank.
4  Q. How's that?
5  A. So if there's -- you're making a price on $20 million, for
6   example. He might deal $20 million with two other people. So
7   $60 million is actually hitting the market rather than 20.
8  Q. How does that affect your own risk?
9  A. So it would, if -- depending on how the other banks acted,
10   it could most likely drive the price against me before I could
11   get out.
12  Q. How does that relate to the chat we are looking at here?
13  A. Directly related.
14  Q. Can you explain to the jury?
15  A. Sure. So this customer was someone who was one of those
16   customers who had a reputation for doing just as I explained.
17   So, the incentive to quote a customer like this is pretty low.
18  Q. Did you want this customer to trade with you at a wide
19   price?
20  A. I didn't want the customer to trade with us at all.
21  Q. Let's look at 2139A. I'll refer you, Mr. Hatton, at the
22   line at 15:12:52 that we just looked at a minute ago with
23   Mr. Coughlin.
24  A. Yeah.
25  Q. What's happening here?

MAC3FOR4                    Hatton - Cross                    Page 271

1  A. I've been invited into the chatroom, and I see who is in
2   the chatroom and I make a comment.
3  Q. What comment did you make?
4  A. "This is a den of thieves."
5  Q. What did you mean by that?
6  A. It's just -- it was a figure of speech. It was if I walked
7   into a bar and saw friends and called them a bunch of losers.
8   It was just a comment. It was meant as a joke.
9  Q. You knew these guys?
10  A. I did.
11  Q. Let's look at Plaintiff's 1944A. And I'll refer you to
12   line 17:28:18.
13  A. Yes.
14  Q. Mr. Coughlin asked you whether the gentlemen in this
15   chatroom were your competitors. Do you remember that?
16  A. Yes.
17  Q. Are you competing with respect to the comments around
18   17:58:18 or are you trading?
19  A. Trading.
20  Q. Why would you be trading with somebody in this chatroom?
21  A. We -- from time to time used chatrooms to try to maximize
22   liquidity for either filling customer orders or the bank's
23   risk.
24  Q. How did that help you do business?
25  A. Well, if we had a customer order, because there was no

MAC3FOR4                    Hatton - Cross                    Page 272

1  electronic platform, it was all -- it was all open cry I guess
2   you would call it. So, you are trying to source liquidity to
3   manage your risk properly and also work customer orders or your
4   own interests with other people that are in the market.
5  Q. Just for clarity for the jury, how can you tell looking at
6   this that this is a question where you're trading and not
7   competing?
8  A. I said I can take, meaning I would buy $5 million, and then
9   the next line I say I can take 5, meaning I will buy 5 at a
10   price.
11  Q. Mr. Cummins agrees to sell it to you, correct?
12  A. Correct.
13  Q. Put that one aside. Let's look at 1191B. I'll refer you
14   to the line at 11:58:14, Mr. Hatton.
15  A. Yup.
16  Q. Before we go to this particular line. This is dated
17   April 19, 2010, do you see that?
18  A. Yes.
19  Q. Where were you working at that time?
20  A. HSBC.
21  Q. We don't need to revisit the specific language, but
22   Mr. Coughlin asked you about this line and suggested that you
23   were threatening the people in this chatroom. Do you remember
24   that?
25  A. I remember that, yeah.

MAC3FOR4                    Hatton - Cross                    Page 273

1  Q. Is that what you were doing, Mr. Hatton?
2  A. No.
3  Q. How do you know?
4  A. Because, first of all, these guys are my friends. It's
5   kind of just the way I would talk to them and the way I would
6   talk to other friends. That's how I talk to friends sometimes.
7   Also there is a lot of context earlier in the chat that I was
8   just frustrated.
9  Q. Frustrated about what?
10  A. Frustrated because I had been asked on a price earlier and
11   I made a price and they didn't trade. Then I found out, then I
12   got the feedback that the person said that they would get a
13   better spread and a bigger amount, which I didn't really
14   believe. And then come to find out they actually dealt on a
15   wider spread, it was just they had found a better price to buy
16   dollars than I had showed. So it was very frustrating.
17  Q. How could a wider spread be a better price, Mr. Hatton?
18  A. Because he got, he knew -- the customer knew which way he
19   wanted to be, he was a buyer of dollars and he got shown a
20   better price to buy dollars than what I showed. Even though we
21   both showed a two-way price.
22  Q. So in other words, a wider spread can actually be a better
23   price depending how the customer wants to trade. Is that fair?
24  A. That's correct.
25  Q. One of the participants in The Old Gits chatroom,

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST TRIAL

**CORRECTED**
October 12, 2022

---

MAC3FOR4                                                          Page 274

1  Mr. Hatton, was a man named Christopher Cummins; is that right?
2  A.  Yes.
3  Q.  Did you ever enter into an agreement of any kind related to
4  FX trading with Mr. Cummins?
5  A.  No.
6  Q.  Plaintiffs asked you about chats where you had
7  conversations with Jason Katz.  Do you remember that?
8  A.  Yes.
9  Q.  Did you ever enter into an agreement relating to FX trading
10  with Jason Katz?
11  A.  No.
12  Q.  Do you understand that Mr. Cummins was criminally
13  prosecuted, Mr. Hatton?
14  A.  I do.
15  Q.  Do you understand that Mr. Katz was criminally prosecuted?
16  A.  I do.
17  Q.  Were you ever criminally prosecuted, Mr. Hatton?
18  A.  No.
19  Q.  Mr. Hatton, did you ever enter into an agreement with
20  anyone to manipulate FX spreads?
21  A.  No.
22       MR. HALL: No further questions.
23       THE COURT: Okay.  You are excused.  Thank you.
24  (Witness excused)
25       MR. COUGHLIN: Your Honor, we are going to put on

---

MAC3FOR4                                                          Page 275

1  another depo clip.  It should bring us to the end of the day.
2       THE COURT: How long is it?
3       MR. COUGHLIN: It's probably 45 minutes.
4       MR. HALL: Do you know who it is?
5       MR. COUGHLIN: Mr. Little.
6       THE COURT: Okay.  I assume you'll read something to
7  tell us all who that is.
8       MR. COUGHLIN: Yes.
9       MR. BURKE: May I address the jury, your Honor?
10       THE COURT: You may.
11       MR. BURKE: We're about to see a video from Mr. Peter
12  Little who is unavailable.  He traded FX at HSBC, Barclays, and
13  Credit Suisse.
14  (Video deposition of Peter Little playing)
15       THE COURT: Why don't we take a break right there.
16  It's hard to get it at exactly the right place, but we've come
17  to the end of the day.  So if we could just resume this
18  tomorrow.
19       MR. COUGHLIN: Yes.
20       THE COURT: Ladies and gentlemen, thank you for your
21  attention and your patience.  We'll see you tomorrow same time.
22  Have a good evening.  Don't talk about the case.  Please leave
23  your notes on the chair.
24  (Jury excused)
25       THE COURT: We are adjourned for the day.  I assume

---

MAC3FOR4                                                          Page 276

1  there is nothing, I have other conferences so if there is, I
2  would probably want to come back.  Is there anything pressing?
3       MR. MOSS: Your Honor, we do have one thing that we
4  would greatly appreciate -- it is a sensitive issue --
5  discussing briefly off the record.  We can do it tonight, we
6  can also do it tomorrow morning before court.  It's not
7  pressing in that regard.
8       THE COURT: Briefly off the record, like really
9  briefly?
10       MR. MOSS: Yes.  Very briefly.
11       THE COURT: Let's be off the record and go ahead.
12  (Discussion off the record)
13  (Adjourned until October 13, 2022, at 9:30 a.m.)
14          PLAINTIFF EXHIBITS
15  Exhibit No.                        Received
16  1191-B, 1142-B, 1974-B, and 2228-B  . . . . . 108
17
18
19
20
21
22
23
24
25

---

Page 277

1              INDEX OF EXAMINATION
2  Examination of:                                Page
3  ERIC JEAN CHRISTOPHE ROBIN
4  Direct By Mr. Noss . . . . . . . . . . . . . . 111
5  Cross By Ms. Roy . . . . . . . . . . . . . . . 164
6  CHRISTOPHER HATTON
7  Direct By Mr. Coughlin . . . . . . . . . . . . 224
8  Cross By Mr. Hall  . . . . . . . . . . . . . . 262
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST TRIAL

CORRECTED
October 13, 2022

---

MAD3FOR1          Katz - Cross          Page 319

1  Q.  You disagree that 40 hours a week times 52 weeks times
2  $400?
3  A.  It's not -- the math might be right.  It's not 40 hours a
4  week.
5  Q.  I am just asking you about the annualized basis but we can
6  move on.
7       Mr. Katz, you're here because the plaintiffs called
8  you to testify in their case, correct?
9  A.  Yes.
10 Q.  Let's talk about the crime to which you pleaded guilty.
11 You were in a chatroom, we covered this, called the ZAR, right?
12 A.  Yes.
13 Q.  Can we take a look please at DTX 2003.
14      Mr. Katz, you worked for Barclays and then PNB Paribas
15 during the time that you were in the ZAR chatroom, right?
16 A.  Yes.
17 Q.  Mr. Cummins was also in the chatroom.  He worked for
18 Citibank, right?
19 A.  Yes.
20 Q.  Mr. Williams was also in the ZAR chat?
21 A.  Yes.
22 Q.  He worked for Barclays, right?
23 A.  Correct.
24 Q.  And Mr. Aiyer, he was the fourth member, correct?
25 A.  Yes.

---

MAD3FOR1          Katz - Cross          Page 320

1  Q.  And he worked for JPMorgan Chase, right?
2  A.  Yes.
3  Q.  Among the four of you there were four banks represented:
4  Barclays, BNP, Citi, and JPMorgan, right?
5  A.  Yes.
6  Q.  There were no other members of the ZAR chatroom, other than
7  you four, correct?
8  A.  Correct.
9  Q.  There was certainly no Credit Suisse trader in the ZAR
10 chatroom, right?
11 A.  Correct.
12 Q.  Mr. Katz, you never pleaded guilty to an antitrust
13 conspiracy involving anyone other than Mr. Cummins, Mr. Aiyer,
14 and Mr. Williams, right?
15 A.  Correct.
16 Q.  All the other traders in the world who weren't in the ZAR
17 chatroom, they weren't part of the conspiracy to which you
18 pleaded guilty, correct, sir?
19 A.  Correct.
20 Q.  And no trader who worked for any other bank participated in
21 the chats or the chatroom, that being the ZAR, that led to your
22 guilty plea, right?
23 A.  Correct.
24 Q.  And we covered ZAR means South African rand, right,
25 Mr. Katz?

---

MAD3FOR1          Katz - Cross          Page 321

1  A.  Yes.
2  Q.  That was one of the -- we covered this with Mr. Burke -- it
3  was one of the CEEMEA currencies?
4  A.  Correct.
5  Q.  CEEMEA stands for Central and Eastern Europe Middle East
6  and Africa, right?
7  A.  Correct.
8  Q.  And I think we covered the currencies, it includes the
9  South African rand, right?
10 A.  Yes.
11 Q.  The Hungarian forint, correct?
12 A.  Yes.
13 Q.  The Polish zloty, right?
14 A.  Yes.
15 Q.  Is that right?
16 A.  Yes.
17 Q.  The Czechoslovakian koruna?
18 A.  Yes.
19 Q.  The Romanian Leu?
20 A.  Yes.
21 Q.  The Russian ruble?
22 A.  Yes.
23 Q.  The Turkish lira, right?
24 A.  Yes.
25 Q.  And the Israeli shekel, right?

---

MAD3FOR1          Katz - Cross          Page 322

1  A.  Yes.
2  Q.  It doesn't include euro/dollar, dollar/yen, Great British
3  pound/yen?
4  A.  Just as crosses, but not as the primary.
5  Q.  The conspiracy to which you pleaded guilty was limited to
6  only the CEEMEA currency pairs, right?
7  A.  Yes.
8  Q.  So, Mr. Katz, before you pleaded guilty, you faced a
9  maximum potential of 10 years in jail, right?
10 A.  Yes.
11 Q.  And you signed the plea agreement with the Department of
12 Justice, correct?
13 A.  Yes.
14 Q.  And the agreement you reached required the government to
15 write a letter to the judge on your behalf to argue that you
16 shouldn't go to jail, right?
17 A.  Correct.
18 Q.  And but Mr. Katz, to get that letter, you had to hold up
19 your end of the bargain, correct?
20 A.  Yes.
21 Q.  Right.  And what that meant, among other things, is you had
22 to cooperate fully and truthfully with the Department of
23 Justice, right?
24 A.  Yes.
25 Q.  And Mr. Katz, the truthfully part, that was important,

---

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST TRIAL

CORRECTED
October 13, 2022

---

MAD3FOR1          Katz - Cross          Page 327

1  Gits, right?
2  A. Yes.
3  Q. When it came time to confess to the government about
4  everything you did wrong, the only ones in this chatroom who
5  you identified as your co-conspirators were Mr. Cummins,
6  Mr. Mullaney, and Mr. Sweeney, right?
7  A. Correct.
8  Q. You didn't conspire with any of the others, correct?
9  A. I didn't believe so.
10  Q. You didn't conspire with Mr. Barisic, right?
11  A. I didn't believe so.
12  Q. Even though he was in The Old Gits chatroom, correct?
13  A. Correct.
14  Q. Even though you think you were conspiring with the other
15  people in The Old Gits chatroom, right?
16  A. Right.
17  Q. You didn't think you conspired with Mr. Cook either, right?
18  A. Correct.
19  Q. Even though he was in The Old Gits chatroom, correct?
20  A. Yes.
21  Q. You didn't think you conspired with Mr. McInerney, right?
22  A. Correct.
23  Q. Even though he was in The Old Gits chatroom, right?
24  A. Yeah.
25  Q. Even though you were conspiring with other people in that

---

MAD3FOR1          Katz - Cross          Page 328

1  chatroom, right?
2  A. Yes.
3  Q. Right. You didn't think you conspired with Mr. Sheppard at
4  Bank of America, right?
5  A. Correct.
6  Q. Even though he was in that same chatroom, correct?
7  A. Yes.
8  Q. And so let's talk about Mullaney and Sweeney. The reason
9  you believed you conspired with Sweeney and Mullaney within
10  this chatroom was that you all traded the ZAR, the South
11  African rand, right?
12  A. Correct.
13  Q. You overlapped currency pairs, right?
14  A. Correct.
15  Q. Right. Meaning you traded the same ones, correct?
16  A. Yes.
17          (Continued on next page)
18
19
20
21
22
23
24
25

---

MADHFor2          J. Katz - Cross          Page 329

1  BY MR. MOSS:
2  Q. And you know, by the way, that the government never
3  prosecuted Mr. Mullaney or Mr. Sweeney, right?
4  A. Right.
5  Q. Now let's focus on Mr. Hatton for a minute.
6          He worked at Credit Suisse for part of the time he was
7  in The Old Gits, correct?
8  A. Correct.
9  Q. Let's be very clear about this for the jury, Mr. Katz. You
10  did not identify Mr. Hatton as a coconspirator when you spoke
11  to the government, right?
12  A. Correct.
13  Q. And in fact, it's your testimony that you never conspired
14  with Mr. Hatton to violate the antitrust laws, correct, sir?
15  A. Yes, I didn't believe so.
16  Q. Right. In fact, you told the government affirmatively that
17  you did not conspire with Mr. Hatton, right?
18  A. I -- correct, I don't believe I did.
19  Q. Right. And that's what you told the government in those 50
20  hours of meetings, right?
21  A. I don't remember if I specifically mentioned him.
22  Q. Let's take a look at your trial testimony from the Aiyer
23  trial. This is page 1093, and it's going to be lines 15 and
24  17.
25          Can we pull that up, please.

---

MADHFor2          J. Katz - Cross          Page 330

1          You recall that you testified --
2  A. I'm sorry. I don't have -- now I'm getting it.
3  Q. You recall, Mr. Katz, you testified in the Aiyer trial?
4          THE COURT: This is not in evidence. You're just
5  asking him about this. We won't display it, but the witness
6  can see it.
7  Q. Mr. Katz, when you testified in the Aiyer trial, you gave
8  truthful testimony, right?
9  A. Yes.
10  Q. Does this refresh your recollection that you testified
11  previously that you affirmatively told the government that
12  Mr. Hatton was not --
13          THE WITNESS: They're showing me the thing, your
14  Honor.
15          MR. MOSS: Sorry. I think we can take it off the
16  screen. Sorry, your Honor.
17  Q. Does this refresh your recollection, Mr. Katz, that you
18  affirmatively told the government that Mr. Chris Hatton was not
19  one of your coconspirators?
20  A. I can't see anything, so...
21  Q. Oh. I'm sorry. I thought it should have been just on
22  Mr. Katz's screen.
23  A. Sorry. I have nothing on mine.
24  Q. You have it now?
25  A. No, I don't.

---

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST TRIAL

CORRECTED
October 13, 2022

| MADHFor2 | J. Katz - Cross | Page 331 |
| --- | --- | --- |

1 THE COURT: Not your fault. It's just a technical
2 issue. If we can find a way to turn --
3 THE WITNESS: I have it.
4 THE COURT: He has it now, but the jury does not,
5 right? OK.
6 BY MR. MOSS:
7 Q. All right. Thank you.
8 Mr. Katz, does this refresh your recollection that you
9 told the government that Mr. Hatton was not one of your
10 coconspirators?
11 A. Correct.
12 Q. Mr. Hatton traded in Asian currencies, right?
13 A. Correct.
14 Q. And you did not trade in Asian currencies at the time,
15 right?
16 A. Other than Singapore, no.
17 Q. One reason you believe you didn't conspire with Mr. Hatton
18 is that you guys traded different currency pairs, right?
19 A. Correct.
20 Q. And you didn't conspire with him even though you were both
21 in the Old Gits chatroom, correct?
22 MR. BURKE: Objection, your Honor. Calls for a legal
23 conclusion.
24 THE COURT: Well, if you just change your words, I'll
25 allow it.

| MADHFor2 | J. Katz - Cross | Page 332 |
| --- | --- | --- |

1 MR. MOSS: Sure.
2 Q. You didn't enter into an agreement with Mr. Hatton, right,
3 even though you were in the same chatroom, correct?
4 A. I don't believe so.
5 Q. Right. And, in fact, you didn't even consider what you did
6 with Mr. Hatton to be an agreement or a relationship. Do you
7 remember giving that testimony?
8 A. I don't believe I was.
9 Q. You don't believe that you had an agreement or a
10 relationship with Mr. Hatton, right?
11 A. Correct.
12 Q. Mr. Katz, you pleaded guilty to a conspiracy involving
13 three other people: Akshay Aiyer, Chris Cummins, and Nicholas
14 Williams, right?
15 A. Correct.
16 Q. That conspiracy was in the ZAR chatroom, correct?
17 A. Yes.
18 Q. And none of those traders worked at Credit Suisse, right?
19 A. Correct.
20 Q. And though you were never charged with anything else, you
21 also believe that you participated in another conspiracy,
22 right?
23 A. Yes.
24 Q. And that conspiracy was with Cummins and Mullaney and
25 Sweeney, right, correct?

| MADHFor2 | J. Katz - Cross | Page 333 |
| --- | --- | --- |

1 A. Mullaney and Sweeney.
2 Q. Just Mullaney and Sweeney?
3 A. Cummins was already in one.
4 Q. So what you told the government was that you participated
5 in one conspiracy with Aiyer and Cummins and Williams, right?
6 A. Yes.
7 Q. And then you participated in another conspiracy with
8 Mullaney and Sweeney, right?
9 A. Right.
10 Q. And that conspiracy, the other one, that was in The Old
11 Gits chatroom, right?
12 A. Correct.
13 Q. And none of those guys, Mullaney and Sweeney, neither of
14 them worked at Credit Suisse either, right?
15 A. Right.
16 Q. And you never participated in any other conspiracy with any
17 other trader other than the two conspiracies I just covered,
18 right?
19 A. I don't believe so.
20 Q. And you certainly never participated in any conspiracy with
21 lots of other FX traders to manipulate spreads or fix spreads
22 in all the currency pairs in the market, right?
23 A. I don't believe so.
24 MR. MOSS: Right. Nothing further, your Honor.
25 Thank you, Mr. Katz.

| MADHFor2 | J. Katz - Cross | Page 334 |
| --- | --- | --- |

1 THE COURT: You're excused. Thank you.
2 We're going to take our midmorning break, but we'll
3 let Mr. Katz get off the witness stand first.
4 (Witness excused)
5 THE COURT: Ten minutes. You can leave your papers on
6 the chair.
7 (Jury excused)
8 (Continued on next page)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST TRIAL

CORRECTED
October 13, 2022

| MAD3FOR3 | Singer - Direct | Page 355 |
| --- | --- | --- |

1  1767.  And ask you the same question.  In reviewing the record
2  evidence, and reaching your conclusions, did you consider
3  Plaintiff's Exhibit 1767, in which Credit Suisse starts off a
4  chat conversation asking how wide is 100 quid.  And then Morgan
5  Stanley trader responds 12 to 15.  And then Bank of America
6  says, hey, per the fed not allowed to ask what you make.  Fear
7  of collusion and PX fixing.  He goes on to say, the Morgan
8  Stanley securities trader goes on to say, wow, what a narc.
9  The Credit Suisse trader responds FX police.
10       Did you review that chat in the course of reaching
11  your conclusions?
12  A.  I did.
13  Q.  In reaching your conclusions, of what significance did you
14  find this conduct?
15  A.  Well, as an economist, we are trying to understand if the
16  evidence is more consistent with a conspiracy or with
17  competitive interaction where firms are pursuing their own
18  independent self-interest.  And when the defendants are
19  referring to their activities as collusion and price fixing, it
20  gives you at least a vantage as to how they see their own
21  conduct, and it helps us to make an assessment of, again,
22  whether the totality of the evidence is pointing in the
23  direction of conspiracy or in competition.
24  Q.  The second element of your paradigm was performance.  What
25  did you conclude with regard to performance?

| MAD3FOR3 | Singer - Direct | Page 356 |
| --- | --- | --- |

1  A.  I concluded that the performance of the industry, once it
2  was subject to the challenged conduct, to the alleged
3  conspiracy, and the erection of this network was extremely
4  valuable to the defendants, and it had had a material
5  improvement on their profitability.  In fact they were
6  concerned when the network -- if and when the network were to
7  come down, their profitability would materially decline.
8  Q.  Could we see, please, Plaintiff's Exhibit 1741.  In your
9  review of the record evidence, did you consider Plaintiff's
10  Exhibit 1741, which states at the beginning:  So the bad news
11  is that this chats days are numbered.  So once again clients
12  can screw us.  It will cost banks millions.  All the fun taken
13  out of the industry and the profitability.
14       Did you consider that chat in reaching your
15  conclusions?
16  A.  I did.
17  Q.  From an economic perspective, Dr. Singer, is it reasonable
18  to infer that conduct that was profitable, if stopping that
19  conduct would cost millions?
20  A.  If I understand your question directly, it is reasonable to
21  infer that if conduct is profitable, then stopping that conduct
22  will end up costing the bank and costing their profitability,
23  yes.
24  Q.  Now that you understood in reviewing that chat?
25  A.  Correct.

| MAD3FOR3 | Singer - Direct | Page 357 |
| --- | --- | --- |

1  Q.  Mr. Katz, Dr. Singer, testified this morning regarding the
2  closing of the chatrooms.  Without us being able to talk we
3  would lose a lot of money.
4       Is that consistent with your understanding and your
5  conclusion?
6  A.  Yes.
7  Q.  Would collusion, Dr. Singer, to wide spreads in the
8  dealer-to-customer market be economically profitable to Credit
9  Suisse and the other defendants?
10  A.  Yes.  In the absence of collusion, the firms would have to
11  compete and they'd have to set their prices individually and in
12  their own self best interest.  And the good thing from a
13  competition perspective from consumers is that means lower
14  prices.  The bad thing from the suppliers' perspective is it
15  means lower prices.
16       And so, if firms are conspiring in the FX market, they
17  can widen the spread, that increases the trading cost to their
18  clients, but increases the profitability to the defendants.
19  Q.  Would these higher profits for the trading dealers have an
20  impact on consumers?
21  A.  Yes, it would harm their clients, it would harm consumers.
22  Consumers want lower trading costs.
23       And so, I think there was an example given by
24  Mr. Robin two days ago but where just a slight inflation in
25  pips, including artificial inflation that can come about from a

| MAD3FOR3 | Singer - Direct | Page 358 |
| --- | --- | --- |

1  price fixing conspiracy, could cause the transaction cost on
2  one trade, he showed us, to go up by $10,000.
3       Now, when you add that up over all the trades, that
4  can come to a very significant amount.  And this is coming out
5  of the pockets of the plaintiffs -- of the class members.  They
6  include the firefighters, the pension funds, so the reduction
7  in their savings means less retirement.  This is a real harm to
8  the consumers, to the class members.
9  Q.  Was increased profitability --
10       MR. MOSS:  Objection.  Move to strike, your Honor.
11       THE COURT:  Overruled.
12  Q.  Dr. Singer, was increased profitability a common goal among
13  the defendants?
14  A.  Yes.  The evidence points in the direction that the common
15  goal across the defendants was to widen the spreads, to keep
16  them wide, don't allow the spreads to get tight, so as to
17  increase the profitability.  And this common goal served to
18  bind the defendants across defendants and across the chatrooms,
19  regardless of what currency pair they were trading.
20  Q.  In the opening statement, defense counsel represented that
21  the defendants' agreements to widen spreads were isolated and
22  did not have a widespread effect.  Do you agree?
23  A.  No, I disagree and for at least two reasons.  The first, as
24  Mr. Robin explained, that all of these prices are
25  interconnected.  And so, if there were, if there was a

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST
TRIAL

CORRECTED
October 13, 2022

| MADHFor4 | Singer - Cross | Page 399 |
|---|---|---|

1 conspiracy, right?
2 A. Correct.
3 Q. And so if we can go down to Mr. Popham-Holloway.
4 Mr. Popham-Holloway says: How wide is 10 eur/Norwegian krone
5 at mom?
6      I think that's at moment, right?  At the moment, does
7 that seem right?
8 A. Yeah, Norwegian krone, at the moment, correct.  Norwegian
9 krone, yes.
10 Q. And Mr. Popham-Holloway is at Westpac, correct?  We just
11 talked about that.
12 A. Sure.
13 Q. So Mr. Popham-Holloway, one of the non-conspirators,
14 allegedly, is asking for a spread in one of these private
15 chatrooms, right?
16 A. Yes.
17 Q. And Mr. Clark responds with a range, 70 to 80, correct?
18 A. Yes.
19 Q. And Mr. Clark is from Citi, which is alleged to be in the
20 conspiracy, right?
21 A. Correct.
22 Q. So here what you have is you have a supposed conspiracy
23 member sharing spread information with a supposed
24 non-conspiracy member, right?
25 A. That is correct.  Bringing a non-defendant bank into the

| MADHFor4 | Singer - Cross | Page 400 |
|---|---|---|

1 ring, into the network, only means matters are worse for
2 consumers.  This is just -- this is just a worse fact pattern
3 for consumers.  They're getting less competition.
4 Q. All right.  Dr. Singer, let's look at another one.
5      Dr. Singer, to cut through it, you know that 600 or so
6 of the chats that you've identified all have non-alleged
7 conspirators in it, right?
8 A. Oh, it could be.  It could be 600 out of the 2,400, but
9 that wasn't the criteria to make it in, right?  To make it in,
10 you had to have at least two defendant banks on a chat in which
11 banks were trying to get at the right price.
12 Q. Dr. Singer, by the way, you've been assuming -- you assume
13 in your -- in your opinions, that a spread discussed in a
14 chatroom was actually quoted to a customer, right?
15 A. I don't think that I'm necessarily assuming that, no.
16 Q. Because you don't know that because you don't get to
17 actually observe the spread that was quoted to the customer,
18 right?
19 A. I think it's fair, just so the jury knows, many of these
20 quotes that occur, the conversations that are occurring between
21 the sales desk and the customer, there is no phone, and there's
22 no recording of the conversation there.  So I will grant you
23 that I was not listening in, and I don't have a recording of
24 those conversations.
25 Q. Because you're not privy to the quote that a particular

| MADHFor4 | Singer - Cross | Page 401 |
|---|---|---|

1 bank makes to its customer, right?  That's what you just
2 explained.
3 A. I think that's fair.
4 Q. Right.  And that information doesn't exist.  It's not
5 captured.  It doesn't exist in the record, right?
6 A. The only time it's captured is when you see in a chat
7 transcript a bank telling you what he has -- a trader telling
8 you what he has quoted to a customer.  Sometimes you see that,
9 but I'll leave it at that.
10 Q. And that's only captured if they're telling the truth,
11 right?
12 A. Correct.
13 Q. And not only are you not privy to the actual spread quotes,
14 but the banks at the time, they were not privy to the spreads
15 that other banks were quoting to their customers, correct?
16 A. They're not privy to it.  However, this is important.
17 If -- if all the information that was being presented was
18 false, this was just a bunch of fake news being spread around
19 to divert, then you'd query why in the world were these guys
20 investing so much time in a chatroom for six-plus years?
21      The other point I'd make, too, that's important for
22 the jury is that if -- if someone said he was going to quote
23 wide in accordance to an agreement cut in a chatroom and he
24 ended up cutting your legs out from under you, right, you would
25 find out.  You'd lose the client.  So the notion that we

| MADHFor4 | Singer - Cross | Page 402 |
|---|---|---|

1 shouldn't take any of this seriously, this is all just cheap
2 talk, is very hard for me as an economist to accept.
3 Q. Dr. Singer, I think I asked you only whether or not it was
4 true that the banks were not privy at the time to the spreads
5 that other banks were quoting to their customers, correct?
6 A. I -- I will grant you that once the conversation was
7 hatched, once the -- the coordination had occurred inside of a
8 chatroom, it would be -- it would be difficult for a given
9 trader to see what his rival ultimately charged to a particular
10 client.  They wouldn't get to see that.  I will grant you that.
11 Q. But once the coordination occurred in the chatroom -- I
12 thought you weren't offering any opinions in this case about
13 whether there was an agreement?
14 A. I didn't say there was an agreement.  I said whether they
15 coordinated on spreads.
16 Q. Dr. Singer, you didn't perform any of your own empirical
17 analysis to determine how frequently the banks shared spreads
18 in chatrooms, right?
19 A. Well, I think I would respectfully disagree.  I think that
20 these 2,400 records are all indicative of an attempt to
21 coordinate on spreads, and I think in my initial report, as you
22 recall, in 2018, I did do a frequency analysis of the
23 conveyance of competitively sensitive information in the
24 chatroom.  You probably recall that.
25 Q. And you're not offering that opinion anymore, right, sir?

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST TRIAL

CORRECTED
October 13, 2022

MADHFor4                Singer - Cross                Page 411

1  A.  Yes.
2  Q.  The factors include the trade size.  That's one, right, the
3  factors include the trade size?
4  A.  My screen went break.
5       THE COURT:  And we couldn't hear you for a moment.
6  Let's back up a second.  I think we lost power in your little
7  box for a moment, so could you just back up.
8  Q.  Of course.  Could you hear me now?
9  A.  I've always been able to hear you.  I was can't -- I was
10  reading along with you, and then my scene went blank.  It's
11  still bank.
12  Q.  So --
13  A.  There you go.
14  Q.  When you talk about the pricing of FX transactions, what
15  are you talking about there?
16  A.  Well, you've only shown me paragraph 30.  So to know the
17  context, I think I'd want to know where this shows up in my
18  report.
19       But you're probably aware that in my initial report,
20  the pricing model that I estimated was for a different price,
21  which is -- which is the price on the inter-bank market.
22  Q.  Let's take a look here, Dr. Singer.
23       You say:  These include market-specific factors as
24  well as factors -- market-specific factors -- let me read the
25  whole thing -- including inter-bank price, trade size,

MADHFor4                Singer - Cross                Page 412

1  volatility, liquidity, and order type, as well as factors
2  specific to the transaction type and the type of customer, such
3  as customer volume, sophistication, and likelihood of being
4  informed.
5       Do you see that?
6  A.  Yes.
7  Q.  And it's true that FX prices depend on the trade size,
8  right?
9  A.  The trade size would inform prices in both the inter-bank
10  segment and the dealer-to-customer segment.
11  Q.  Let's focus on the dealer-to-customer segment.
12  A.  OK.  Great.
13  Q.  The notional amount, the amount of the trade, that would
14  affect prices, right?
15  A.  Yes.
16  Q.  Volatility, correct?  Right?  It's right here,
17  Dr. Singer --
18  A.  Yeah, I know, but to be clear --
19  Q.  -- in your report.
20  A.  I know, and to be clear, my model that I estimate in my
21  report was of the inter-bank segment.  So I think what I'm
22  doing when I'm splitting out that sentence is I'm listing
23  out -- I would need more context, but it's potential that I'm
24  listing out those factors that inform the EBS, that is, the
25  pricing in the inter-bank.

MADHFor4                Singer - Cross                Page 413

1       But I'll grant you -- maybe we can come to a happy
2  place here -- that if the volatility is expected, if it's
3  normal times, right, then I would submit that normal times is
4  not going to affect the quote that's offered in the
5  customer-dealer segment per Mr. Robin's testimony.  If we're
6  talking about abnormal times, that is, extreme volatility,
7  there's some shock to the system, then that kind of volatility
8  could affect the quote that's given to the customer in the
9  dealer-customer segment.
10  Q.  Dr. Singer, do you stand by the statement in your report
11  that the pricing is affected by trade size, volatility,
12  liquidity, order type, customer volume, customer
13  sophistication, and the likelihood of being informed?  It's
14  just a yes-or-no question.
15  A.  I stand by it with the caveat that the pricing here is
16  likely the pricing in either the inter-bank segment or the
17  customer service segment or both.
18  Q.  So let's talk, Dr. Singer -- we can put that down, please.
19       Let's talk about spread stability for a moment.  You
20  talked a little bit about that on direct.
21       You haven't performed any original quantitative
22  analysis about the durability of spreads, right?
23  A.  I think that's fair.  I think that my conclusions with
24  regard to spread stability turn largely on what I call -- there
25  are others' quantitative analysis that is not original

MADHFor4                Singer - Cross                Page 414

1  empiricism or qualitative evidence, I'll grant you.
2       So it's a long way of saying, yes, I don't think I did
3  original empiricism on question of stability.
4  Q.  You're primarily relying on Mr. Robin for the proposition
5  that spreads are stable, right?
6  A.  Not primarily.  I definitely rely on Mr. Robin, but I
7  wouldn't say primarily.
8       I think that if you go into the various sections of
9  my, you know, six-odd reports here, I cite many things.  I know
10  I cite chat transcripts that suggest that the spread in a given
11  currency lasts a long time.  I cite spread matrices.  I cite
12  deposition testimony on what spread matrices mean and how long
13  they last.  But certainly for the purposes of the jury and
14  today, I would defer to Mr. Robin and I lean on Mr. Robin for
15  the notion that the customer's expectation is that once they
16  got that spread matrix, that it would last for the next
17  quarter.
18  Q.  And, Dr. Singer, you did not see in the record, in your
19  review of what the plaintiffs' counsel gave you, any evidence
20  of traders discussing the fact that customer spreads actually
21  changed by the minute or by the second, right?
22  A.  I might need to hear that back, but if it's have I ever
23  seen record evidence that customer spreads changed by the
24  second, I don't think I have, and that's not consistent with my
25  understanding.

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST TRIAL

CORRECTED
October 13, 2022

MADHFor4                Singer - Cross                Page 415

1   Q.  Right.  You've never seen that.
2       So have you ever heard of Niall Condie?
3   A.  Possible, but the name isn't --
4   Q.  He's the head trader on Credit Suisse's FX spot desk, and
5   he had that role for the entire alleged class period.  Does
6   that refresh your recollection?  Have you ever heard of him?
7   A.  I don't -- I don't tend to focus on the names here, but I
8   probably came across his name.
9   Q.  Sure.  Let's take a look, if we can, please, at what's in
10  evidence as DTX 086.
11      If we can jump down to 15:35:55.
12      Mr. Condie says:  No, no, no, there are no such things
13  anymore -- well, can we just jump up and get the -- get the
14  question right above that, the two lines right before that,
15  please.
16      All right.  So Mr. Menzl at Credit Suisse, he's
17  saying:  Yeah, I think I find it very difficult now to give any
18  fix spreadsheets.
19      Do you see that?
20  A.  Yes.  Just note, for the record, this looks like
21  October 20, 2008, the beginning of the great recession.
22  Q.  Thanks, Dr. Singer.
23      Do you see that it says Markus Menzl says:  Yeah, I
24  think I find it very difficult now to give -- to give any --
25  give any fix spreadsheets.

MADHFor4                Singer - Cross                Page 416

1       Do you see that?
2   A.  Yes, this would be a rough time.  If a customer was
3   demanding you to commit to a spread for three months and the
4   world appears to be falling apart, it would be difficult under
5   those extreme circumstances to offer a customer a spread
6   matrix.
7   Q.  And then Mr. Condie writes:  No, no, no, there are no such
8   things as spread matrix anymore.
9       Do you see that?
10  A.  Yes, consistent with my understanding what was happening
11  with the world at that time.
12  Q.  Then Mr. Condie says:  I tell my guys they are to price
13  liquidity accordingly, and that changes every hour, minute,
14  second.
15      Dr. Singer, had you seen this chat?
16  A.  I don't know if I've -- oh, I don't know if I had seen the
17  chat, but the chat is consistent with what Mr. Robin is saying,
18  which is that under normal circumstances, the prices that are
19  quoted in the spread matrix are good for the next quarter.
20  That's an important caveat.  What he's telling you is that when
21  the world appears to be in doom, when we're entering in -- I
22  remember where I was in October of 2008.  When the world looks
23  like it's about to implode, everything goes out the window, and
24  we can no longer commit to our customers that over the next
25  three months, that the spread matrix is going to be good.

MADHFor4                Singer - Cross                Page 417

1   Q.  Let me try it again.
2       When you said that you had never seen any record in
3   the evidence -- any information, any record evidence that any
4   trader discussed the fact that spreads were changing by the
5   minute, by the second, had you seen this chat, yes or no?
6   A.  I had not seen the chat at that time.
7   Q.  Thank you.
8       Let's talk about competition, Dr. Singer.  You
9   performed your analysis with two dueling hypotheses, the
10  competition hypothesis and the conspiracy hypothesis, right?
11  A.  Correct.
12  Q.  And I think you said on direct something along the lines of
13  competition is the opposite of conspiracy, right?
14  A.  Yes.
15  Q.  And the reason they're dueling, competition and conspiracy,
16  is that they can't both be true, right?
17  A.  They cannot both be true, that's correct.
18  Q.  And it's a pretty fair statement that competition is
19  inconsistent with a conspiracy, right?
20  A.  I will grant -- I will agree with you here that at a given
21  moment in time, that you can't have it both ways.  Either firms
22  are coordinating explicitly in the pricing they're charging the
23  consumers or they're competing and choosing prices based on
24  their own unilateral interest.  You can't have both at the same
25  time.

MADHFor4                Singer - Cross                Page 418

1   Q.  And if the banks were acting competitively, then you would
2   have the opposite of a cartel, right, the opposite of a cartel?
3   A.  If the banks were choosing their spreads unilaterally,
4   without coordinating with their rivals, then the spreads would
5   fall down to the competitive levels, yes.
6   Q.  And you would have the opposite of a cartel, right?
7   A.  At least for that moment in time you would absolutely have
8   the opposite of a cartel.
9   Q.  And if there weren't a conspiracy, the banks would have
10  been forced to compete for customers by offering narrower
11  spreads, right?
12  A.  In the absence of the alleged agreement here, competition
13  to an economist would have been more intense.  It would be more
14  cutthroat.  You wouldn't have any floors below which you get in
15  trouble by going below.
16  Q.  You agree that in the absence of the alleged conspiracy,
17  the banks would have been forced to compete for customers by
18  offering narrower spreads, right?
19  A.  Yes.
20  Q.  And it's also true that if one bank were repeatedly
21  undercutting the cartel price, you could draw the conclusion
22  that that bank was not in the cartel, right?
23  A.  I would need you to fill out a little more of the
24  hypothetical.
25      So if you would allow me to just assume that we have

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST

October 14, 2022

MAEHFor1                                                    Page 444

1    I think that, therefore, covers the people who are
2  former Credit Suisse employees, as well as people who are
3  former employees of other banks.
4    Then the last paragraph is basically the same as what
5  you suggested.  I've modified it a little bit:
6    "I caution that you may not find that the
7  plaintiffs have proven their claims against Credit Suisse based
8  solely on the negative inference, if any, you draw from the
9  fact that a witness or multiple witnesses," and then I will
10  say, "have refused to testify based on their Fifth Amendment
11  privilege.  You may consider these negative inferences, but
12  without more, they are not sufficient to prove participation in
13  a conspiracy to restrain trade."
14    So that is my plan.  Anybody have any issues with
15  that?
16    MR. HALL:  Your Honor, obviously, we'll reserve on the
17  question of what it means to be associated, and we'll speak to
18  that when we see it.
19    THE COURT:  OK.  Great.
20    Then I have the plaintiffs' two requests which are
21  based on the argument that Credit Suisse has opened the door to
22  evidence that was not previously allowed.  The first one is the
23  argument that Credit Suisse opened the door in its opening
24  statement by injecting the fact that Credit Suisse had sued
25  other banks and not just the plaintiff, and the plaintiffs are

MAEHFor1                                                    Page 445

1  asking that they be allowed to tell the jury, or that the jury
2  be informed, that the other 15 banks settled or resolved their
3  disputes with the class.
4    I'm not going to grant that request.  In other words,
5  it is denied.  I think that it's been clear from the beginning
6  that there were 15 other banks, and I told the jury then not to
7  speculate about them or what their status is.  And I identified
8  them in voir dire, so it's not secret that they exist.  So I am
9  not going to tell the jury that the other 15 banks settled with
10  the defendant.
11    The second issue, I think, is a more difficult and
12  troubling issue.  The plaintiffs point out statements by
13  defense counsel that "you'll hear no evidence that Credit
14  Suisse was prosecuted," and I think there have been other
15  references besides the opening statement, or at least implied
16  arguments about the fact that Credit Suisse wasn't prosecuted,
17  Credit Suisse wasn't charged.
18    The plaintiffs are asking that the New York Department
19  of Financial Services' order and consent decree be permitted to
20  be introduced to allay any misimpression that somehow Credit
21  Suisse's conduct was blessed by the regulators, and that at
22  this point strikes me as too strong.
23    So my decision at the moment is to reserve on it until
24  I hear the Credit Suisse case.  If Credit Suisse intends to
25  make it -- and I presume you won't in light of this ruling, but

MAEHFor1                                                    Page 446

1  in case you intend to make it a big part of your defense that
2  Credit Suisse was never charged, never prosecuted, and was
3  blessed by the regulators, then I would allow the plaintiffs at
4  that point in a rebuttal case to introduce that.  I presume you
5  will not be doing that.  But in any event, I'm reserving on
6  that issue.
7    I think that's it for rulings that you're waiting for
8  from me.  Are there other issues that you'd like to raise?
9    MR. HALL:  Your Honor, just one ministerial thing.
10  The parties have agreed that DTX 2011 and DTX 2012 can be
11  admitted into evidence, and the Court has an email from my
12  colleague, Mr. Wiley, October 13, to that effect.
13    THE COURT:  I presume there's no objection, is that
14  right?
15    MR. BURKE:  No objection, your Honor.
16    THE COURT:  All right.  They are admitted.
17    (Defendant's Exhibits 2011 and 2012 received in
18  evidence)
19    THE COURT:  Are there any other plaintiffs' exhibits
20  that need to be either corrected or admitted?  I know you're
21  getting close to the end of your case.
22    MR. BURKE:  Yes, your Honor.
23    THE COURT:  OK.  Yes.
24    MR. WASHER:  One issue, your Honor, just with respect
25  to the DFS order.  Obviously, we're mindful --

MAEHFor1                                                    Page 447

1    THE COURT:  Could you speak into the mic, please.  You
2  could pick it up or bring it close.
3    MR. WASHER:  There's no good way to do this.  So
4  mindful of your Honor's reserving on this, just, obviously, we
5  will attempt to stay on the right side of the line with respect
6  to the issue.  It is possible that plaintiffs at some point
7  will be making the argument that -- they may raise the issue of
8  whether Credit Suisse was prosecuted or investigated by
9  regulators, and, obviously, that would present us with a
10  difficult choice.  So I suppose we can talk about that if and
11  when that comes up in connection with the plaintiffs' case or
12  arguments.
13    The only other thing I'd ask your Honor to think about
14  in the meantime is whether the proper remedy for an improper
15  reference to no criminal prosecution would be the admission of
16  the DFS order because, obviously, the DFS is not a criminal --
17  they don't have criminal authority.  So --
18    THE COURT:  And frankly, there's a lot in it that has
19  nothing to do with issues in this case, but --
20    MR. WASHER:  Exactly.
21    THE COURT:  -- some kind of disclosure about the DFS
22  order and that it included conduct relating to spreads might be
23  an appropriate remedy if we were to go in that direction.
24    MR. WASHER:  Yeah.  I think if somehow people were to
25  cross the line and talk about no criminal prosecution, I think

MAEHFor1                                    Page 448

1 the cases that plaintiffs have cited, for example, suggest that
2 the proper remedy would be a limiting instruction, at most, to
3 suggest that the standard of proof in a criminal case is
4 different. So you shouldn't read anything into the fact that
5 they weren't prosecuted.
6     If, of course, we raise the question of no regulatory
7 enforcement against Credit Suisse, that's the kind of thing
8 that we think is more likely to implicate the DFS order and all
9 of that. So I just ask your Honor to think about the
10 distinction.
11     THE COURT: I understand your point, particularly
12 about the differing burdens of proof. I understand the point.
13 I'm not sure the jury will make such fine distinctions, but I
14 understand your argument. Let's see how it all develops.
15     MR. WASHER: Let's hope we don't go there.
16     MS. BERNAY: Your Honor, good morning. Alexandra
17 Bernay. Nice to see you.
18     I wanted to address a couple points based on what
19 Mr. Washer said. One is that defense counsel did elicit
20 testimony that Mr. Hatton was not indicted, again raising some
21 of these criminal issues. I would also -- and we put it in a
22 footnote because we don't intend ever to try to get in evidence
23 regarding foreign regulatory actions. But, frankly, some of
24 the actions in both South Africa that specifically name
25 Mr. Hatton, for example, and then the European commission,

MAEHFor1                                    Page 449

1 which, for all intents and purposes, really is both the
2 criminal and civil because they don't even make that
3 distinction. So, your Honor, while we appreciate what you're
4 saying, and we'll wait and see, we do think there is a way to
5 present at least the relevant portions of the DFS should this
6 come up again or, at a very minimum, a limiting instruction.
7     THE COURT: OK.
8     MS. BERNAY: Thank you.
9     THE COURT: Thank you.
10     All right. We have a few minutes, so let's just break
11 until a couple minutes before 10:00.
12     (Recess)
13     THE COURT: Also on the plaintiffs' side, you'll tell
14 me when we need the Fifth Amendment instruction, right?
15     MR. BURKE: Yes, your Honor.
16     THE COURT: Thank you.
17     (Continued on next page)
18
19
20
21
22
23
24
25

MAEHFor1            Singer - Cross            Page 450

1     (Jury present)
2     THE COURT: Good morning, everyone. Thank you for
3 being prompt. It looks like lousy weather today, so a good day
4 to be in here.
5     We were in the midst of testimony from Professor
6 Singer. Could we proceed.
7     MR. MOSS: Thank you, your Honor.
8     THE COURT: You recall you're still under oath?
9     THE WITNESS: Yes.
10     THE COURT: OK. Thank you.
11 HAL SINGER, resumed.
12 CROSS-EXAMINATION CONTINUED
13 BY MR. MOSS:
14 Q. Good morning, Dr. Singer. Can you hear me OK?
15 A. You're fine. Good morning.
16 Q. Thank you.
17     Dr. Singer, we had a long day yesterday. Just going
18 to cover one more topic, and that's the regression. You recall
19 we touched on that a little bit yesterday, right?
20 A. I don't think we did, but it's your show. You ask me
21 whatever you want, I guess.
22 Q. All right. Thanks. Thank you, Dr. Singer.
23     You know what a regression is, right?
24     MR. HAUSFELD: Objection, your Honor. Beyond the
25 scope of direct.

MAEHFor1            Singer - Cross            Page 451

1     THE COURT: It sounds like it's beyond the scope of
2 direct, but if you want to ask a foundational question that
3 makes it clear that it's within the scope, I'll allow it.
4     MR. MOSS: Well, Dr. Singer testified yesterday -- I
5 can find the transcript note -- that he prepared a regression
6 in this case.
7     THE COURT: Why don't you just ask him whether it's
8 true that he testified that he prepared a regression in this
9 case, and we'll take it from there.
10     MR. HAUSFELD: Your Honor, I apologize, but I don't
11 recall that. If we could get a citation to the page and line.
12     MR. MOSS: Sure. We can find it, your Honor.
13     THE COURT: All right. The word "regression" did not
14 come up in a word search we just did.
15     I recall there was some questioning, and he said he
16 was not testifying on it -- this was actually on cross -- that
17 he was not testifying about certain subjects.
18     MR. MOSS: Yes, your Honor. There was a question and
19 answer -- let me get the cite of the trial transcript. It's
20 page 412 of the trial transcript, and I asked Dr. Singer:
21 "Volatility, correct? It's right here, Dr. Singer."
22     He said: Yeah, I know, but to be clear -- he said:
23 "I know, and to be clear, my model that I estimate in my report
24 was of the inter-bank segment." And that's the model that he's
25 referring to, your Honor.

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST

October 14, 2022

| MAEHFor1 | Singer - Cross | Page 452 |

1    THE COURT: If you want to ask -- so why don't you
2 follow up on that precise question.
3    BY MR. MOSS:
4 Q. Dr. Singer, you created a model in your report regarding
5 spreads in the inter-bank segment, is that correct?
6 A. Yes.
7 Q. And that model is referred to as a regression model, is
8 that correct?
9 A. Yes.
10 Q. And a regression model is a type of econometric analysis,
11 is that correct?
12 A. Yes.
13 Q. And it's basically a statistical method for trying to
14 figure out the effect that one thing has on another,
15 controlling for other variables, correct?
16 A. Yes.
17 Q. And, Dr. Singer, economists like yourself routinely run
18 regressions, correct?
19 A. Yes.
20 Q. And, in fact, Dr. Singer, that's especially true in
21 antitrust cases, isn't it?
22 A. Yes.
23 Q. And, Dr. Singer, how many times have you yourself conducted
24 a regression analysis in your career as a professional expert
25 witness?

| MAEHFor1 | Singer - Cross | Page 453 |

1 A. Many, many times.
2 Q. Can you give us a ballpark? You said you testified over
3 100 times. About how many times did you offer a regression?
4 A. I don't have a good estimate sitting here, but it comes up
5 a lot.
6 Q. And that includes in this case where you prepared your
7 model that we just talked about, right?
8 A. Correct.
9 Q. And in this case, you ran a regression that tried to
10 determine the effect on spreads of the alleged conspiracy
11 during the six-year alleged conspiracy period, correct, sir?
12    MR. HAUSFELD: Your Honor, if I may again, it's beyond
13 the scope of the direct. If the question came up in
14 cross-examination, he answered the question in the
15 cross-examination, but it has nothing to do with the testimony
16 that the plaintiffs presented in support of their case.
17    THE COURT: It's sustained. The testimony that was
18 referenced was in the cross-examination.
19 Q. Dr. Singer, do you agree that the question of whether
20 spreads were discussed with sufficient frequency relative to
21 some arbitrary threshold to make the alleged conspiracy viable
22 is a distraction?
23 A. That's consistent with what I think I testified to
24 yesterday, that I didn't attach -- I didn't apply the 2,400
25 that came back to a level and say because it's above some

| MAEHFor1 | Singer - Cross | Page 454 |

1 arbitrary level, there must be a conspiracy. That is not the
2 inference that I drew from that exercise.
3 Q. And, Dr. Singer, the reason you didn't do that is because,
4 in your opinion, what matters in this case is whether spreads
5 were or were not inflated by the alleged conspiracy, correct?
6    MR. HAUSFELD: Objection, your Honor. Beyond the
7 scope of the issue in the trial. The issue in the trial is
8 just whether there was a conspiracy and whether Credit Suisse
9 participated in the conspiracy.
10    THE COURT: Sustained.
11 Q. Dr. Singer, you've written in this case that the relevant
12 question is what happened to spreads. That that is the
13 relevant question to determine, whether or not the evidence is
14 consistent or not consistent with a conspiracy. You've
15 repeatedly taken that position, correct?
16 A. I have taken that position with respect to the question of
17 proving common impact. My first report in this case, as you
18 are aware, was a class certification report where my assignment
19 was to demonstrate that impact could be proven with common
20 methods and evidence. I believe that question is different
21 from the question that is being resolved in this proceeding.
22 Q. And the question that's being resolved in this proceeding,
23 you address that in your rebuttal report from July of 2022,
24 correct?
25 A. It's possible that I do. I've written so many reports that

| MAEHFor1 | Singer - Cross | Page 455 |

1 it's possible that I address what's relevant. I'd have to see
2 what I said in the July report.
3 Q. That was your most recent report. It was just from a few
4 months ago, right?
5 A. OK.
6 Q. Why don't we take a look at that report. We don't have to
7 publish it to the jury, but we can put it up on the screen
8 here.
9    This is your July 2002 report. You see it references
10 Dr. Mathur. You know it's your July 2002 report, right?
11 A. Yes.
12 Q. And what you say in your July 2002 report is: "Finally,
13 the question of whether spreads were discussed with sufficient
14 frequency relative to some arbitrary threshold to make the
15 alleged conspiracy viable is a distraction" -- and if we could
16 pull up the next sentence also, Armando, please -- "is a
17 distraction. What matters is that spreads were, in fact,
18 inflated by the challenged conduct. This is the relevant
19 question."
20    Did I read that correctly?
21 A. Read it correctly.
22 Q. Do you still stand by that statement that you made a few
23 months ago in your July report?
24 A. Stand by the statement with the proper understanding that
25 it was the debate I was having with your expert, which is for

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST

October 14, 2022

| MAEHFor1 | Singer - Cross | Page 456 |
|---|---|---|

1 the purpose of proving impact, what matters is proof that the
2 spreads widened. I think that the proceeding that we're having
3 here is a related but different question.
4 Q. Dr. Singer, this report was from July 2022, correct?
5 A. Correct.
6 Q. And in this proceeding, you are not offering any opinion,
7 you didn't tell the jury anything about what happened to
8 spreads and whether or not they were, in fact, inflated, even
9 though you said a few months ago that that is the relevant
10 question, right?
11 A. I --
12 Q. Yes-or-no question, Dr. Singer.
13 A. I did not -- I did not testify in my direct on the issue of
14 the fact of injury, that is correct.
15 Q. And you had prepared an analysis. You spent four years
16 working on an analysis to try to show that spreads were wider
17 during the alleged conspiracy period?
18      MR. HAUSFELD: Objection, your Honor.
19      THE COURT: Sustained.
20 Q. And you didn't tell the jury that?
21      THE COURT: Sustained.
22      MR. MOSS: Withdrawn.
23 No further questions.
24      MR. HAUSFELD: Thank you, your Honor.
25      THE COURT: Ladies and gentlemen, just to remind you

| MAEHFor1 | Singer - Cross | Page 457 |
|---|---|---|

1 that the questions of the lawyers is not evidence unless the
2 witness adopts it or agrees with it, only then is it evidence.
3      OK. You're excused. Thank you very much.
4      (Witness excused)
5      THE COURT: Plaintiffs may call their next witness.
6      MR. HALL: Your Honor, we've agreed, if it's
7 acceptable to the Court, to present a witness out of order to
8 accommodate the witness' schedule. So this will actually be a
9 defendant's witness, if that's acceptable.
10      THE COURT: All right. Let me just explain to the
11 jury.
12      Ordinarily in the trial the plaintiffs put all of
13 their witnesses on first and they rest, and then the defendants
14 put all their witnesses on next. I understand from what I just
15 heard that there is a witness who has scheduling issues. So to
16 accommodate that witness, the parties have agreed that that
17 person, who is a defense witness, can go out of turn. So we'll
18 hear from whoever that is now.
19      Who is it?
20      MR. HALL: Your Honor, we'll call Steven Yanez.
21      THE COURT: Thank you.
22      MR. HALL: May I approach, your Honor?
23      THE COURT: You may.
24      Are the two binders the same?
25      MR. HALL: They are.

| MAEHFor1 | Yanez - Direct | Page 458 |
|---|---|---|

1   STEVEN YANEZ,
2      called as a witness by the Defendant,
3      having been duly sworn, testified as follows:
4      MR. HALL: May I proceed, your Honor?
5      THE COURT: You may.
6 DIRECT EXAMINATION
7 BY MR. HALL:
8 Q. Good morning, Mr. Yanez.
9 A. Good morning.
10 Q. Mr. Yanez, are you currently employed?
11 A. I'm retired.
12 Q. When did you retire, sir?
13 A. 2011, June.
14 Q. Where did you work immediately before you retired?
15 A. I worked at Credit Suisse.
16 Q. Would you mind explaining to the jury in brief your career
17 history.
18 A. Sure. I joined Credit Suisse in 1993 as a trading --
19 trading manager. I kind of worked my way up to running
20 different desks. And in 2008 I was asked to run global foreign
21 exchange along with the business that I was running
22 concurrently.
23 Q. When did you join Credit Suisse?
24 A. 1993.
25 Q. What were you doing immediately before the position you

| MAEHFor1 | Yanez - Direct | Page 459 |
|---|---|---|

1 took on in 2008?
2 A. I was a trading manager at another firm.
3 Q. And the position you took on at Credit Suisse in 2008,
4 immediately before that, what were you doing at Credit Suisse?
5 A. I'm sorry. You're saying before 2008?
6 Q. Yes, that's right.
7 A. I was running short-term interest rate trading globally.
8 Q. When did you first have a role in Credit Suisse's FX spot
9 business, Mr. Yanez?
10 A. It was roughly June of 2008.
11 Q. What role did you take on at that time?
12 A. I took on the role of global product head.
13 Q. How did it come to pass that you took that role?
14 A. I was asked by my current boss who was running fixed income
15 if I would like to take that on as well as keep my role running
16 short-term interest rates, Gael de Boissard was my boss.
17 Q. Did Mr. de Boissard say anything to you about why he was
18 asking you to take on the new role?
19 A. Yes. He thought I could be effective growing the business.
20 Kind of moving it from a somewhat irrelevant player to a
21 relevant player.
22 Q. What was your view of Credit Suisse's FX business when you
23 first took over as head of the business back in 2008?
24 A. It was more of a niche business. They weren't competing
25 kind of full stop against the biggest banks.

October 14, 2022

| MAEHFor1 | Yanez - Direct | Page 468 |
|---|---|---|

1    Do you see that, Mr. Yanez?
2  A.  I do.
3  Q.  What is that referring to, "taking existing market share
4    from competitors"?
5  A.  Again, going to back to the pie concept, competitors had a
6    certain part of the pie, and we needed to take more of it.
7  Q.  And was that what you were trying to accomplish back at
8    this time in 2010, Mr. Yanez, in your business?
9  A.  It was.
10  Q.  Was that mandate handed down to your employees by you,
11    Mr. Yanez?
12  A.  It most certainly was.
13  Q.  If we look a little further down this same page under -- on
14    the second bullet under competitive landscape, down toward the
15    bottom, do you see that?
16  A.  Yes.
17  Q.  There's a bullet here says, "CS believes it can take some
18    market share from DB.  DB is watching CS and its new strategy
19    very closely."
20    Do you see that?
21  A.  I do.
22  Q.  What was DB refer to here?
23  A.  That's Deutsche Bank.
24  Q.  Why was Deutsche Bank particularly relevant at this time,
25    Mr. Yanez?

| MAEHFor1 | Yanez - Direct | Page 469 |
|---|---|---|

1  A.  They had the largest market share in the industry.
2  Q.  When talking about taking market share from DB, what is
3    that a reference to?
4  A.  It's part again of what I was saying.  DB had a larger
5    market share than we had, and we wanted to take part of their
6    market share.
7  Q.  How did you intend to go about doing that, Mr. Yanez?
8  A.  By being competitive all the time on anything our clients
9    were looking for.
10  Q.  Mr. Yanez, we've looked at a few documents here about
11    Credit Suisse's plan to win FX market share from its
12    competitors.  Could you speak to whether that effort was
13    successful while you were at Credit Suisse.
14  A.  Sure.  So between 2008 and 2011 when I retired, we roughly
15    grew our market share by just short of four times, or
16    400 percent, so we were quite successful.
17  Q.  And how were you as successful as you were, Mr. Yanez?
18  A.  Well, we had a mission, and everyone knew the mission.  So
19    we were super, super tight on pricing.  We had the ability to
20    take any risk that clients wanted to put off on us.  We were
21    just providing a good service at a very, very sharp price.
22  Q.  You mentioned growing your market share and becoming a top
23    five bank.  What measure are you using to determine whether
24    you're a top five bank?
25  A.  The measure is the Euromoney poll, which is the industry

| MAEHFor1 | Yanez - Direct | Page 470 |
|---|---|---|

1    standard where they actually speak to clients, they ask clients
2    who trades, why they trade, and that kind of thing.  And that's
3    where we measure our market share as a percentage.
4  Q.  We'd like to put up an exhibit that's been preadmitted,
5    DTX 2011.
6    Mr. Yanez, I'll explain to you that this is an exhibit
7    that summarizes the Euromoney surveys you've just been
8    referring to in CS's U.S. market share for the year 2008
9    through '13.
10    I know you left the bank in 2011, is that right?
11  A.  That's correct.
12  Q.  Could you just briefly explain to the jury in terms of what
13    transpired in terms of CS's U.S. market share between 2008 and
14    the time you left in 2011.
15  A.  Certainly.  Well, if you look at the 2008 part, which shows
16    that we had less than 1 percent market share, during our growth
17    period where we kind of put this mission into play, we grew it
18    to, I guess when I left, somewhere -- somewhere around
19    4 percent, so roughly four times.  Continued slightly higher
20    after I left.
21  Q.  Let's look at one more exhibit, which is DTX 2012.
22    Again, Mr. Yanez, in a different format.  Now we're
23    looking at U.S. market share data from the Euromoney surveys
24    2008 through 2013.  You can focus on the part ending in 2011,
25    which is when you left the bank, is that right?

| MAEHFor1 | Yanez - Direct | Page 471 |
|---|---|---|

1  A.  That's right.
2  Q.  So we see a few things, Mr. Yanez, but maybe you can just
3    speak to the market share percentages themselves first and
4    orient the jury to what we're looking at between 2008 and 2011.
5  A.  Sure.  So what we're looking at is basically the same thing
6    as we looked at in the last slide where it shows we had just
7    under 1 percent in 2008.  We kind of grew it consistently
8    through till 2012/'13.  Market share is a measure of the
9    overall amount of trading that you do relative to the overall
10    pie in the market, the total amount traded.
11  Q.  And we had spoken a little bit earlier, Mr. Yanez, about
12    Deutsche Bank in particular.  Could you find Deutsche Bank on
13    this chart from the time when you were at the bank.
14  A.  Yes.  You don't usually have to look very far.  Deutsche
15    Bank is always number one or two.
16  Q.  So if we look at 2008, we see here Deutsche Bank with
17    25 percent market share as compared to CS's 0.95 percent, is
18    that right?
19  A.  That's correct.
20  Q.  What had happened by 2011 to Deutsche Bank's market share?
21  A.  Well, they still were at the top of the charts, but they
22    had given up a lot of market share to the industry.
23  Q.  When you say they had given it up to the industry, what do
24    you mean, Mr. Yanez?
25  A.  Well, if you look at everybody below Deutsche Bank, for the

October 14, 2022

| MAEHFor1 | Yanez - Direct | Page 476 |
|---|---|---|

1  Q.  What do you think about this comment made by Mr. Lawes as
2    you sit here and read it today, Mr. Yanez?
3  A.  It's pretty stupid.  I mean, it's not -- he's in no way a
4    position -- he was a junior trader -- to agree with anything
5    with anybody.  It's bluster.  It's -- what you'd see in a
6    trading world is often folks talk a big game to make themselves
7    feel, like, relevant in the industry, but it's just a stupid
8    statement.
9  Q.  Mr. Lawes, do you see he's referring to any particular
10   currency here, Mr. Yanez?  Take your time with the document if
11   you need to.
12  A.  Can you just make that a little bigger?  Sorry.
13  Q.  If that helps you, move this up a little bit.
14  A.  Oh, yeah, they're talking about the New Zealand dollar.
15  Q.  How do you know?
16  A.  It says "kiwi."  Kiwi's a short name for New Zealand
17   dollar.
18  Q.  All right.  So you see where Mr. Parikh says:  Jules,
19   what's the spread today in 50 kiwi?
20  A.  Yes.
21  Q.  And to you, you know that the kiwi refers to New Zealand
22   dollar, that right?
23  A.  That's right.
24  Q.  Was Mr. Lawes in a position to affect spreads in the New
25   Zealand dollar in January 2008?

| MAEHFor1 | Yanez - Direct | Page 477 |
|---|---|---|

1  A.  Not at all.
2  Q.  Why not?
3  A.  Well, he was, again, a junior trader trading what would be
4    considered a secondary currency, which is currency you don't
5    focus on.  So he had a tiny, tiny market share.  He certainly
6    would not be in a position to drive spreads in the industry for
7    sure.
8  Q.  Well, he could have quoted somebody wide, couldn't he,
9    Mr. Yanez?
10  A.  He can quote whatever he wants.  He just wouldn't be in the
11   business.
12  Q.  What do you mean by that?
13  A.  If you're not -- again, a client trades on one side of a
14   market.  They're either looking for a bid or an offer, which
15   makes a spread.  The spread itself is not relevant.  The price
16   is what matters.  So if your price is not competitive, you're
17   not going to win the trade with the client.  Client will trade
18   somewhere else.
19  Q.  I'm a little confused, Mr. Yanez.  Could you just clear
20   this up.  You said the spread and the price are not the same
21   thing.  Could you just try to explain to us why they're not the
22   same thing.
23  A.  Sure.  Spread is a representation of liquidity in the
24   market.  So as a trader, you might make a spread that is, for
25   argument's sake, five points wide, or whatever, but what's

| MAEHFor1 | Yanez - Direct | Page 478 |
|---|---|---|

1    relevant to the client is where your bid is, where you're
2    willing to buy, or where your offer is, where you're willing to
3    sell.  That's the only thing relevant.
4        The price is when you make your 50-55, whatever the
5    price is, the spread is five points.  But, again, the spread
6    itself is rendered irrelevant if -- if you show a 50-55 market
7    and a competitor shows 51-60, which is a much wider price, if
8    he's looking for the bid, he's going to trade with the
9    competitor, period.  He doesn't care what your spread was.  He
10   cares what the best deal was.
11  Q.  Why would a customer ever ask you for a two-way price if
12   the customer knows which side she wants to be on?
13  A.  To keep you honest.  Honestly, it's an indication of -- he
14   doesn't want to give all the information necessarily to the
15   bank.  So he wants to make sure that you quote something.  He
16   knows inherently you're going to quote a market that's one way
17   or the other based on the risk in your book and things like
18   that, but to keep you honest, they ask for a two-way price.
19  Q.  I understand that.
20        How did what spreads you quoted or what prices you
21   made, two-way prices you made and your traders made, relate to
22   what you were speaking about before in terms of market share,
23   Mr. Yanez?
24  A.  Well, again, it comes back to if you're going to take
25   market share, one of the -- I'll call it the easiest way is

| MAEHFor1 | Yanez - Direct | Page 479 |
|---|---|---|

1    just to have the best price on the market.  So traders are
2    mandated to at all times try to offer the best price on the
3    market.
4  Q.  Now, we just looked at a chat involving Mr. Lawes in a
5    Bloomberg chatrooms.  Did you have a view, Mr. Yanez, while you
6    were running the FX spot business at Credit Suisse, about
7    traders talking to traders at other banks?
8  A.  Sure.  I mean, I didn't love it.  It wasn't where we came
9    from.  I came from the interest rate side.  But I recognized
10   that it was a valuable tool to gain kind of market color, find
11   out what's going on, to build relationships.  Because banks
12   need each other to exit liquidity, to get exit position risk,
13   so you have to have relationships.  So it was valuable from
14   that perspective.
15  Q.  Do you have a view, Mr. Yanez, about traders discussing
16   spreads, in particular, in chatrooms?
17  A.  If the discussion is a generic conversation meaning, you
18   know, kind of what do you think the market's quoting on X
19   amount, then I'm OK with that.  If it's anything more than
20   that, then you're kind of bumping against the line.
21  Q.  All right.  Let's look at a chat that the plaintiffs have
22   on their exhibit list.  It's been preadmitted as Plaintiffs'
23   963-A.
24        Can we look at that one, please.  We can look at the
25   line at 16:15:51 and down to 21:06.

IN RE: FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST

October 14, 2022

MAEHFor1              Yanez - Direct              Page 480

1  A.  OK.
2  Q.  We see here we've got a trader from Credit Suisse,
3  Mr. Piscatelli.  Do you see that?
4  A.  Yes, I do.
5  Q.  Do you know Mr. Piscatelli?
6  A.  I'm sorry?
7  Q.  You know Mr. Piscatelli?
8  A.  I do.
9  Q.  And another trader from Barclays named Ashley Honey.  Do
10  you see that?
11  A.  I do.
12  Q.  Ashley Honey at Barclays says in this chat:  What spread
13  would you show in 100 million euro/CHF.
14      That's euro/Swiss, is that right?
15  A.  That's right.
16  Q.  And Mr. Piscatelli responds:  Is that right?
17  A.  Yes.
18  Q.  It's 8 in the morning; 10 in the afternoon.
19      Do you see that?
20  A.  Yes.
21  Q.  And Ashley Honey says:  Thanks.
22      Do you see that?
23  A.  I do.
24  Q.  What's your reaction, as you sit here today, to a chat like
25  this, Mr. Yanez?

MAEHFor1              Yanez - Direct              Page 481

1  A.  This is pure -- a competitor in the industry comes to us
2  for Swiss-based things, euro/Swiss, dollar/Swiss.  This was
3  just a conversation regarding liquidity.  It's just really
4  talking about what will the market be in the morning, in the
5  afternoon.
6  Q.  And are you uncomfortable with traders exchanging
7  information like this in chatrooms, Mr. Yanez?
8  A.  No, it's very generic.  There's nothing specific to a
9  client or any kind of flow.
10  Q.  Let's look at one more.  Let's look at Plaintiffs' 1624-A,
11  and we could look at the line at 15:05:11.
12      So this is two traders.  We've got John Callaghan at
13  Morgan Stanley and John Munley at Credit Suisse.  Do you see
14  that?
15  A.  I do.
16  Q.  Mr. Callaghan says:  How wide in 100 million New Zealand
17  dollar?  Do you see that?
18  A.  I do.
19  Q.  And Mr. Munley replies, 15.  Do you see that?
20  A.  I do.
21  Q.  Do you understand what this chat relates to?
22  A.  It's the same thing.  It's one bank asking what do you
23  know -- what do you think the market is now on 100 New Zealand
24  dollar, and he's just showing a generic -- a thought of what a
25  generic spread would be.

MAEHFor1              Yanez - Direct              Page 482

1  Q.  Why would traders, though, gather information like this, in
2  your experience, Mr. Yanez?
3  A.  Well, I think there's a limited amount of transparency.  So
4  the trader's always guessing what the real liquidity is like
5  out there.  So they're using this to kind of gauge maybe he's
6  pricing this -- this gentleman from Morgan Stanley might have
7  been pricing something.  It could be a whole host of thing, but
8  he needs to try to gather kind of liquidity information.
9  Q.  He needs to gather it to form his own view, is that what
10  you mean?
11  A.  Yes.
12  Q.  We looked at the Euromoney chart earlier listing all those
13  banks.  I think it was DTX 2012.
14      We could put it up for just a minute.
15      This is for each of these years, 30 banks listed, is
16  that right, Mr. Yanez?
17  A.  That's right.
18  Q.  Do these banks offer FX trading to clients?
19  A.  They do.
20  Q.  Were you competing with all these banks, Mr. Yanez?
21  A.  In some form, yes.
22  Q.  What do you mean "in some form"?
23  A.  There might be some smaller banks down at the bottom that
24  don't all full-service, so they may not be -- we may not be
25  competing with them in euro/Swiss, let's say.

MAEHFor1              Yanez - Direct              Page 483

1  Q.  So that's interesting, Mr. Yanez.  Are you suggesting that
2  different banks are more competitive or less competitive in
3  different currencies; is that what you're saying?
4  A.  Absolutely.
5  Q.  Why is that?
6  A.  Well, there are banks that have natural bias based on where
7  they're from.  That's part of it.  Deutsche Bank is, obviously,
8  a huge player in euros.  They're a European bank.  And some
9  banks just didn't have the personnel to compete in every single
10  currency, so they would pick their currencies that they would
11  compete in, whereas we would try to compete in everything.  And
12  certainly the largest top ten competed in most things.
13  Q.  Just cleaning up a little jargon, Mr. Yanez.
14      You mentioned earlier that traders in chatrooms needed
15  each other to exit liquidity positions.  Could we just draw you
16  out a little bit on what that means, please.
17  A.  Sure.  So there's only a couple of different ways, if
18  you're a market making trader, that you can exit risk that's
19  given to you by a client.  You can have the other side
20  naturally in your book, which means it's just negating your
21  risk, or you can go into the broker market to exit the
22  position, or you can go direct to another bank.  That's kind of
23  the three ways you get out of things.
24      And the relationships that got built on these
25  chatrooms was really to make sure that there's a certain number

| MAH3FOR1 | Melvin - Direct | Page 561 |
|---|---|---|

1 A. Many publications, mainly on the foreign exchange market.
2 Q. Have you published any textbooks?
3 A. I have. My first textbook was in international finance.
4 And that textbook is still going today. I also wrote
5 principles of economics, macroeconomics textbook, and
6 international economics textbook. Those textbooks I let go out
7 of print when I left academia.
8 Q. Are you also an editor of any journals?
9 A. I was. For over 20 years I was co-editor of the Journal of
10 International Money and Finance which is the leading scholarly
11 journal in international finance, and I specialized in the
12 foreign exchange market research publications that we reviewed.
13 Q. Have you ever served as a visiting scholar?
14 A. Yes. I was a visiting scholar at the Federal Reserve
15 Board, the International Monetary Fund, and the Bank for
16 International Settlements.
17 Q. Do you belong to any professional organizations?
18 A. American Finance Association, American Economic
19 Association.
20 Q. Outside of academia, what professional experience, if any,
21 do you have?
22 A. In 2005 I left academia to join Barclays Global Investors
23 which was acquired by BlackRock in 2009. So from 2005 to 2016
24 I was in the industry as a practitioner.
25 Q. Can you describe for the jury your roles and

| MAH3FOR1 | Melvin - Direct | Page 562 |
|---|---|---|

1 responsibilities at BGI and BlackRock?
2 A. Yes. I was hired in a pretty senior level, managing
3 director. I was head of currency research and head of currency
4 investment funds. And I had that role at BGI the whole time,
5 and when BlackRock acquired us, I had that role at BlackRock
6 for a few years.
7 Q. At BGI or BlackRock, did you manage currency investment
8 funds for institutional investors?
9 A. Those were our clients. Our clients were so-called
10 institutional. What that means, an institutional investor, it
11 is not like individuals, households. It's like pension funds,
12 foundations, central banks, big institutions that ask us to
13 manage money for them.
14 Q. In your role at BlackRock, did you have occasion to
15 interact with FX traders?
16 A. Yeah, very closely. So my team would build the portfolios
17 and determine what we would buy and sell. And then we would
18 pass our trade orders to a trading desk where the foreign
19 exchange traders would, it's their job was to trade our orders.
20 So naturally I was very interested in the quality of the
21 execution of our trades. So I spent a lot of time sitting on
22 the foreign exchange desk with the traders. If I wasn't there
23 physically, I was talking to the trading desk. Because we
24 wanted to get the best possible prices for our clients' trades.
25 Our trades, our clients' money.

| MAH3FOR1 | Melvin - Direct | Page 563 |
|---|---|---|

1 Q. Have you ever served as an expert witness before?
2 A. I have.
3 Q. How many times?
4 A. Once. I've been in court once before as an expert witness.
5 Q. Are you being compensated for your work on this case?
6 A. I am.
7 Q. What is your rate?
8 A. It's $1,000 an hour.
9 Q. Is that your standard rate?
10 A. Since last year.
11 Q. To what extent does your compensation depend upon your
12 opinions in this case?
13 A. Not at all.
14 Q. Have you prepared anything that would help you summarize
15 for the jury the opinions you'll be giving today?
16 A. Yes. I prepared some exhibits that I think will be
17 helpful.
18 Q. So why don't we bring up DTX 2023. Can you see that all
19 right?
20 A. I can, yes.
21 Q. Perfect. Okay. Can you just give the jury an overview of
22 these areas that you'll be opining on today.
23 A. This is basically an outline of what I am going to talk
24 about.
25     So I am going to talk about an overview of FX trading,

| MAH3FOR1 | Melvin - Direct | Page 564 |
|---|---|---|

1 but not as much as I was, because I think you've already seen a
2 lot of that and I don't want to be repetitive or redundant.
3     Then I am going to talk about the assertion that
4 spreads are durable, meaning they don't change for long periods
5 of time.
6     And then I am going to talk about the how information
7 sharing, for instance, in the chats, serves a legitimate
8 business purpose.
9     And then I am going to talk about the spread chats. I
10 am going to review them and hopefully explain clearly how they
11 are consistent with discussions of market color.
12     And then lastly, I will talk about how sharing spreads
13 in chats would not have had a wide-ranging impact on the
14 foreign exchange market.
15 Q. What types of materials did you review in forming the
16 opinions you are going to be presenting today?
17 A. Obviously the chats, I've looked at lots of chats, data on
18 prices in the market, trades, so lots of data.
19 Q. Professor Melvin, I understand you were prepared to talk
20 about some of the basics of the FX market, but I think in light
21 of the testimony already presented, I am going to try to
22 streamline things a bit.
23     So did you review the testimony and the slides of
24 plaintiffs' industry expert Mr. Eric Robin?
25 A. I did, yes.

IN RE: FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST

October 17, 2022

MAH3FOR1                    Melvin - Direct                    Page 573

1  getting clients to trade with them, they are not going to make
2  any money, so they want to get more client business, not less.
3        So, someone to trades a lot like -- BlackRock's not
4  the only firm that does a lot of foreign exchange trading.
5  There are certainly other large asset managers and there are
6  also certain specialty investment funds that all they do trade
7  currency and they trade a lot.  So, there are others besides
8  BlackRock that trade lot of currency and are very important
9  clients to banks.
10  Q.  Is it fair to say they, too, would have leverage in price
11  negotiations?
12  A.  Leverage in?
13  Q.  In price negotiations?
14  A.  Leverage in price negotiations.  Well, certainly the more
15  business you can bring to a bank, the better they would like to
16  treat you probably.
17        But, you know, they want to have a range of customers.
18  There aren't just big asset managers, there are medium asset
19  managers, small asset managers, there are non-asset managers
20  like corporations, there are official institutions like central
21  banks, and there are regional banks, small banks that are not
22  market makers.  All of these people, like on this slide,
23  they're all customers of the bank, and some are big and some
24  are small.
25        But, the more of this business that you are

MAH3FOR1                    Melvin - Direct                    Page 574

1  accumulating from all of these people, the more you are going
2  to trade.  And the more you are going to trade, the bigger the
3  revenue should be from your foreign exchange business.
4  Q.  When you were at BlackRock, what types of feedback, if any,
5  did you provide to your FX dealers?
6  A.  Well, there could be real time feedback, if they show you a
7  quote and you think it's a bad quote and you tell them so.  And
8  then there would be systematic feedback at more regular
9  intervals.  We once a month would review all our trades of the
10  prior month, and we would look bank by bank, currency pair by
11  currency pair, to see what kind of execution quality we were
12  getting.  And if the data systematically suggested we weren't
13  getting good pricing from a bank, then we would put them in the
14  doghouse we would say.  We stopped trading with them, and we'll
15  trade with those who are making better prices.
16        And then once a year, there was a global review by the
17  head of overall head of global head of trading, who would meet
18  with the heads of the foreign exchange business at each of
19  these banks and would do a review of the business, piece by
20  piece, all the things we expected.  It is not just prices.  It
21  is primarily prices.  But there are other things, like speed of
22  execution, provision of market color to us, and other factors
23  that would go into our evaluation of banks.  So they would get
24  that feedback once a year.
25  Q.  Are you aware of whether other customers gave similar

MAH3FOR1                    Melvin - Direct                    Page 575

1  feedback?
2  A.  I am.  Yes, I am.  Because, we would hear about -- from
3  banks as well as we had some sense of other firms that were
4  also, like the monthly post trade analytics that we would do,
5  to hold our banks to account, we weren't the only ones.  And
6  then third parties came along who, if you didn't have the
7  resources to have your own trading research group, there are
8  third parties that that's what they do.  They do post trade
9  analytics.  So if you are a smaller fund and you don't have the
10  resources to do this kind of stuff, you can hire someone who
11  reviews your trades and does it for you.  So, it's kind of
12  commoditized now that anybody can have this post trade
13  analytics done.  It's not just -- now this has been going on
14  for many years.
15  Q.  Let's bring up Robin direct slide 27, please.  So,
16  Mr. Robin testified that a spread is a price.  Do you agree
17  with that statement?
18  A.  No.  The spread is the difference between two prices.
19  There is an offer or ask price, and there is a bid price, and
20  the spread is the difference between those two prices.
21        So the spread isn't a price.  It is the difference
22  between two prices.
23  Q.  Mr. Robin pointed out a few Bloomberg chats where FX
24  traders referred to spreads as prices.  Does that change your
25  view in any way?

MAH3FOR1                    Melvin - Direct                    Page 576

1  A.  No.  That's just loose talk, like someone will say here's
2  my view of the spread, and someone will say nice price.
3        MR. BURKE:  Objection.  702, your Honor.
4        THE COURT:  Overruled.
5  Q.  Were you done with your answer, Professor Melvin?
6        THE COURT:  I had overruled the objection.
7        And you were saying, no, that's just loose talk, like
8  someone will say here's my view of the spread and someone will
9  say nice price.
10  A.  Okay.  Yeah, so someone would say nice price.  It's just
11  shorthand for good spread.
12  Q.  In your experience as an FX customer, do customers make
13  trading decisions on spread or on price?
14  A.  Price.  When you contact a bank and request say a two-way
15  price, you know what you want to do.  If you know you want to
16  buy euros, they are going to show you an offer price at which
17  you can buy the euro, and they are going to show a bid price at
18  which you can sell euros to them.
19        If you are a buyer, price is what you care about.
20  That's what really matters.  You are focused on price.
21  Q.  Have you prepared anything to demonstrate this point to the
22  jury?
23  A.  Yes, I have.
24  Q.  Let's bring up DTX 2022, please.  Professor Melvin, can you
25  walk us through this slide.

IN RE: FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST

October 17, 2022

MAH3FOR1                Melvin - Direct                Page 601

1  events in the world happened, market conditions change, spreads
2  change.
3       So, I love this graph because I think it just tells a
4  nice history of the past couple of decades.
5  Q.  Let's move on to the next opinion you have regarding
6  information sharing.  Information sharing serves a legitimate
7  business purpose.
8       Can you briefly describe your opinion on this topic
9  for the jury.
10  A.  Yes.  Did you want me to discuss it right now?
11  Q.  Well, yeah.  Can you just sort of give us an overview if
12  you will of your opinion on this.
13  A.  Think of that slide where I had the determinants of spreads
14  on the top, we had these things that were kind of universal for
15  all traders, and on the bottom we had the trader specific
16  things.  And I said traders must be well informed about the
17  market all day long, because they never know when they are
18  going to get called by someone requesting a quote.  So they
19  have to stay on top of the market.
20       So, how do you learn about this.  Well you look at
21  these computer screens, so-called Bloomberg screen is a very
22  popular one because it's got news streaming across it all day
23  long.  You can learn about market conditions and you also talk
24  to people in chats.  These chats are like a foreign exchange
25  traders social network.  There is a lot of nonsense and talking

MAH3FOR1                Melvin - Direct                Page 602

1  about football games and other things, but there is also
2  information sharing about current market conditions.
3       So you learn from the chats, you learn from looking at
4  the screens in front of you, you talk to people.  All of these
5  sources of information serve a legitimate business purpose,
6  because the more you know about the market, the better prices
7  you can make.  The less you know, and the more uncertainty, the
8  wider the spreads.  The more you know and the more certainty
9  you have about market conditions, the tighter the spread.
10  Q.  You've mentioned market color a few times so far.  Can you
11  define that term for us?
12  A.  I don't know that I've ever seen a definition of market
13  color.  To me it means state of the market.  Current market
14  conditions, market color, is you're asking, you're learning
15  about current market conditions.
16  Q.  Is market color a commonly used phrase in the industry?
17  A.  Oh, very much so.
18  Q.  Is it a new term?
19  A.  New term -- look, I went in the industry in 2005 and people
20  were talking about market color when I got to BGI in 2005.  So,
21  it's been around at least since 2005.  I don't know when the
22  term started, but it was certainly there when I started in the
23  business.
24  Q.  Would you consider discussion about spreads among traders
25  to be market color as you define it?

MAH3FOR1                Melvin - Direct                Page 603

1  A.  The chats that I've seen, indeed, I do.
2  Q.  Mr. Robin testified that he does not consider sharing
3  bid-ask spreads shown to customers to be market color.  Do you
4  agree with that statement?
5  A.  Bid-ask spreads that have been shown, meaning past tense,
6  have been shown to customers, yeah, that's market color.
7  Q.  What do spread discussions tell a market participant about
8  the market?
9  A.  Yeah, in these chats you will see somebody say something
10  like what's the spread in 100 dollar/peso right now or at the
11  moment or these days.  You see different terms.  But all means
12  like right now, what's the spread on 100 dollar/peso.  100
13  million U.S. dollars against pesos.  When you get that answer,
14  that gives you an efficient view of liquidity and volatility.
15       MR. BURKE:  Objection.  702, your Honor.
16       THE COURT:  I'll allow it.
17  Q.  Were you done with your answer, Professor Melvin?
18  A.  Yeah.  I'm saying, people says what is the current spread,
19  and they give you answers.  This is how you learn because the
20  spread will reflect that trader's perception on liquidity and
21  volatility.
22       If you ask what's the volatility, what are they going
23  to say.  It's real volatile today, not so volatile.  When you
24  hear what they see as a relevant spread right now, then you get
25  good information on these factors.

MAH3FOR1                Melvin - Direct                Page 604

1  Q.  How do traders go about collecting market color?
2  A.  As I said, they can look on computer screens to see what's
3  going on in the market.  They can talk to other traders in the
4  trader chats.  They can talk to their customers.  They have
5  bank customer chats and talking to the customers on the phone.
6  So, there are many sources of market color.  Well, "many," I
7  just mentioned three.  So chats with other dealers, discussions
8  with customers, looking at the financial news on the TV or the
9  screens on their computer.
10  Q.  Dr. Singer testified that it would make no sense for
11  competitors to discuss spreads in the absence of an agreement
12  to fix prices, because competitors could take that information
13  to undercut one another.  Do you agree with that statement?
14  A.  No.  I think hearing spreads with people that you believe
15  will exchange information.  That's why you're in the chat with
16  them.  You are in a chat to exchange information, and you give
17  each other views on the current state of the market regularly.
18  Discussions of spreads were not so frequent, but they would
19  occur at times, particularly for large trade sizes.  Generally,
20  when they ask what's the spread, it's for a big trade size.
21  They don't need to know what's the spread for 5 million or 2
22  million.  But for big trades, they want to know, so if
23  they get a call for such a large trade, they have that kind of
24  information.
25  Q.  Mr. Robin testified that banks customer spreads are

| MAH3FOR1 | Melvin - Direct | Page 609 |
| --- | --- | --- |

1   chaps, what's the spread in 300 euro. That's 300 million euros
2   at the moment. That's a big trade. Overwhelmingly the spread
3   discussions regard big trade sizes, which means lots of risk at
4   the bank. Spread in 300. And the asker says 8-10 question
5   mark, and one says well we are 10. And then says no tighter.
6   And so another person says we wider. And says 10/12. And yup.
7   12.
8       So, they are exchanging their views of what they think
9   is the appropriate spread on 300 million euros against U.S.
10  dollars. And again, in my experience, my reading of this, this
11  is perfectly acceptable exchange of market color. Market
12  information.
13  Q. So, based on your review of chat discussions in this case,
14  did you have a view as to the frequency with which traders were
15  discussing spreads with traders at other banks?
16  A. Not until we looked at the data. The data inform us of
17  pretty much everything, so after looking at the data I had a
18  view.
19  Q. What is that view?
20  A. Very infrequent. As I said, there are overwhelmingly for
21  really big trade sizes which you don't do very often. But
22  again, being part of your market knowledge is being prepared to
23  quote a big trade size, so you need to have an idea of what
24  would be an appropriate spread. And you see when you look at
25  the data, the discussions of spreads in the chats that were

| MAH3FOR1 | Melvin - Direct | Page 610 |
| --- | --- | --- |

1   studied were very infrequent.
2   Q. Let's show the next Exhibit PTX 0938A-0001. And this is a
3   September 18, 2008, chat among Brian Walker at Credit Suisse,
4   John Munley at RBS, and Jason Crank at RBS.
5       And Professor Melvin, if you can review -- try not to
6   read it before I actually call off the lines. 11:17:29 through
7   11:54:48 and I assume you're done.
8   A. I am.
9   Q. Is this one of the chats that you reviewed in connection
10  with the opinions you're providing today?
11  A. It is, yes.
12  Q. Can you describe for the jury what's happening here?
13  A. This a great one right here. Look at the date.
14  September 18, 2008. Lehman Brothers went bankrupt
15  September 15, 2008. And the world just went downhill from that
16  day forward for quite a while. This is three days after the
17  Lehman Brothers bankruptcy. It was incredibly crazy.
18      So, volatility at all-time high, illiquidity, nobody
19  wants to trade with anybody because you don't know who was
20  going to go bankrupt next. So, people were scared.
21      And what do you see at the top. Buckle up dude. In
22  other words, this is crazy. Get ready because this is crazy.
23  And it was. So, then what's the spread in 100 million euros,
24  in 50 million euros today. Wow. In those market conditions,
25  to try and trade 100 million euros, good luck with that.

| MAH3FOR1 | Melvin - Direct | Page 611 |
| --- | --- | --- |

1   Because I told you about my paper where I studied this crisis
2   period, and what you saw in the crisis period is one of the
3   factors, one of the things that changed, very interestingly,
4   people stopped trading big size. They started trading small
5   size. And if they had to trade 50 million euros, they would
6   trade it electronically in small clips of like five, five,
7   five, instead of trying to trade all 50 together. Because it
8   would have been so expensive to try and trade 50.
9       So what's the spread in 100 and 50. And you hear so
10  10 yesterday afternoon, no hesitation they dealt. And somebody
11  else says yeah, thinking it wider. Okay. We're outside of
12  that I think. We're 10 in 50 at the moment. Probably a bit
13  too wide. Get out. 7 in 50 question mark. Are you showing 5.
14  We're 8-10 in 100.
15      So they are going back and forth trying to understand
16  this crazy market and get a sense of current market conditions.
17      So, again, in my experience, in my reading of this,
18  this is perfectly acceptable exchange of market color. Plus,
19  there is nothing in these chats that we've reviewed so far
20  about widening spreads. They are talking about what's the
21  current spread. The spread yesterday may have been wider and
22  this is tighter. There is nothing in any of the spreads we've
23  seen about widening spreads. It is just what is the spread
24  right now.
25  Q. Okay. So, we've walked through just a few examples of

| MAH3FOR1 | Melvin - Direct | Page 612 |
| --- | --- | --- |

1   chats that you have reviewed in connection with your opinions.
2   Did you review other chats as well?
3   A. Yes, I did.
4   Q. How would you describe overall that set of chats that you
5   reviewed?
6   A. That chats I reviewed, just like this last one and the
7   other ones, to me, again, my reading of this, my opinion, is
8   these are exchanges of market color, perfectly acceptable
9   exchanges of information on current market conditions.
10  Q. Let's move to the final area of your opinions, which is
11  sharing of spreads would not have a wide-ranging impact on the
12  FX market. Can you just briefly explain what you're referring
13  to here.
14  A. Yeah, if you have four traders in a chat saying what's the
15  current spread at the moment, that's four traders in this chat
16  who know what is being discussed. If you are not in that chat,
17  you are not participating. You don't hear this. You don't
18  have access to that information.
19      So what's discussed in one chat is contained in that
20  chat. What's discussed in one chat is like what's the right
21  spread on a particular currency pair for a particular amount.
22  So, it is the discussion right now, what's the right spread on
23  100 million euro/dollars on September 18, 2008. In that
24  chatroom they are talking about 100 million euros, what's the
25  right spread. And if you are not in that chat with those, I

IN RE: FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST

October 17, 2022

MAH3FOR1                 Melvin - Direct                 Page 617

1    business, because the more aggressive quoters reflecting
2    current market conditions will take their customers away from
3    them.
4         So, that's like I said, the rest of them, that would
5    be a wonderful situation if somebody would actually do that.
6    Q. How about if we change, let's say all 16 of the highlighted
7    banks agreed to coordinate on spreads.
8    A. I can tell you people like State Street and TD and Westpac
9    and BNY Mellon will be all over their customers.  And you know,
10   because if they're not part of this agreement, they are going
11   to be quoting more aggressively, and you will see those market
12   shares of these -- we were told like 90 percent market shares,
13   those will start shrinking and you see that happening in the
14   Euromoney survey.  If 16 are fixing spreads out of line with
15   reality, these other will win the business, take them away from
16   them.
17   Q. Were you here for the video testimony of Natalie Williams?
18   A. I was.  Very entertaining.
19   Q. Do you recall Ms. Williams was asked if she and other
20   participants in the chat had the power to affect spreads in the
21   currency pairs she traded?
22   A. Yeah, I think she said that in the chat.
23   Q. Do you remember her response?
24   A. She said, look, it was a joke, British humor, about four
25   small banks could not possibly have the power to do that.  It's

MAH3FOR1                 Melvin - Direct                 Page 618

1    just another example of her colorful term for gossip and
2    foolishness and discussions.
3    Q. Do you agree with Ms. Williams that those four or five
4    banks didn't have the power?
5    A. No four banks have the power in my mind.
6    Q. Why is that?
7    A. Because you can't do that if you want -- how do you make
8    money?  You make money trading.  How did you get people to
9    trade with you?  You make good prices and they trade with you.
10   You don't make good prices, they go somewhere else.
11        Four banks think they are going to fix spreads out of
12   line with market conditions, out of line with market
13   conditions, that is not, in my experience and based on my
14   studies of this market for many, many years, that's just not
15   sustainable.  Unless they want to lose market share, trade less
16   with their customers and lose revenue in the foreign exchange
17   division of that bank.
18   Q. Professor Melvin, if a group of four or five traders wanted
19   to use the spread information shared in the chatrooms to come
20   to some kind of an agreement on spreads, could they do that?
21        MR. BURKE: Objection, your Honor.
22        THE COURT: Overruled.
23   A. Could three or four banks come to an agreement on spreads?
24   I don't see how they possibly could because the spreads are
25   changing all the time.  If you are going to have an agreement

MAH3FOR1                 Melvin - Direct                 Page 619

1    on spreads, we are going to have to talk continuously because
2    the spread at 8 a.m. London is a different than the spread at
3    5 p.m. London, for instance.  If we are going to be agreeing to
4    fix spreads, we can't just say, okay, we are going to fix the
5    spread here, and there it goes, we are not changing.  That
6    couldn't possibly work.
7         So you would have to have continuous discussions to
8    keep updating, okay, what's the right spread now, what are we
9    going to agree to now.  And this kind of continuous discussion,
10   I think again, based on my experience, just seems completely
11   infeasible and impractical.
12        (Continued on next page)

MAHHFor2                 Melvin - Direct                 Page 620

1    Q. And have you prepared any materials to sort of make this
2    point to the jury?
3    A. Well, I looked at the frequency of discussions of spreads
4    in the chats, which I said was quite infrequent.
5    Q. Well, let's bring up DTX 2025 and talk about this first.
6         Can you explain this graphic for us.
7    A. Yeah.  So here's a day that says again at the top implied
8    spread for 5 million euros against yen July 31, 2012, and we
9    see two dots here.  You see a spread at noon, which is right
10   around maybe a little under 3 pips if you look over to the
11   left, and then we see a spread, it jumps ups at 2 p.m. to
12   5 pips.  And this is a good indication of what can happen on a
13   given day and how silly it would be to think, oh, we're just --
14   let's fix the spread at three or fix the spread at four or fix
15   the spread at five.  You just couldn't do that and have any
16   sustainable business.
17   Q. Let's move to DTX 2020, please.
18        Can you explain your understanding of this slide.
19   A. Yeah.  So this is how I got a sense of the frequency of
20   just the chats in general.  This is across all banks, all
21   currency pairs.  So looking across -- you know, all the
22   observations of Mr. Singer used, we see less that two chats per
23   trading day.  So certainly not close to continuous discussions
24   that you would have to have if you actually thought you could
25   do something like set the spreads at some fixed level.

IN RE: FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST

October 17, 2022

| MAHHFor2 | Melvin - Direct | Page 621 |
|---|---|---|

1 Q. What if we doubled this number?  What if there were four
2 multibank chats per trading day?  Would that affect your
3 opinion?
4 A. No.  As I said, I think you'd have to have continuous
5 discussions of this to be able to do something like that, and
6 even then you don't know what everybody's quoting.  So you may,
7 say, hey, let's all quote seven, and then these other people
8 you're on the chat with, you don't know what they're quoting.
9 There's no way you can observe it.  You can't monitor what
10 they're doing.
11 Q. Thank you, Professor Melvin.
12      Why don't we bring back DTX 2023.  Professor Melvin,
13 if you could summarize your opinions for the jury.
14 A. OK.  So we started with the overview of FX trading, but we
15 really didn't talk too much about that.  But, clearly, the big
16 point there is people care about prices.  They want to buy or
17 sell at the price that they want -- if they're a buyer, they
18 care about the offer price; if they're a seller, they care
19 about the bid price.  That's what really matters.  When you
20 show them two prices, there is a spread implied, the difference
21 between them, but what the client cares about, the customer,
22 the price on the side of the market where they want to trade.
23      Number two, spreads are not durable.  Again, this term
24 "durable" is being used here to suggest spreads don't change,
25 and that's just simply not true.  If you point to these

| MAHHFor2 | Melvin - Direct | Page 622 |
|---|---|---|

1 quarterly spread matrices, they don't change for three months,
2 but that doesn't matter.  That's not what you can trade on.
3 What matters is what you can actually trade with a bank.  Show
4 me the prices where we can trade.  They don't come out of the
5 quarterly spread matrix.
6      And then number -- so spreads change all the time as
7 market conditions change.  The only way you could believe that
8 spreads are "durable," don't change, all those factors around
9 that little circle of the determinants of those spreads, if
10 those things didn't change, spreads wouldn't change.  If
11 they're changing, spreads are changing.
12      Then information sharing serves a legitimate business
13 purpose.  The more you know about the market, the better dealer
14 you can be, the better prices you can make to your customer.
15 So those chats, the information sharing in the chats are
16 absolutely serving a legitimate business purpose because it
17 helps inform your view of market conditions.
18      Four, spread chats reviewed are consistent with market
19 color.  I certainly believe that is the case because they're
20 discussing, hey, what's the right spread on 100 million pesos?
21 And people give you responses.  That gives you their view of
22 liquidity and volatility at that time in the market.  So that's
23 a very efficient way to convey that kind of information.
24      And then sharing of spreads would not have a
25 wide-ranging impact on the foreign exchange market.  Yeah,

| MAHHFor2 | Melvin - Cross | Page 623 |
|---|---|---|

1 they're going to be sharing in one chat one currency pair, one
2 amount in one chat, and if you had a spread on one currency
3 pair for one size, that would not affect the spreads on other
4 currency pairs in different sizes or even the same size.
5      So that is a brief review of my views.
6      MR. WASHER: Thank you, Professor Melvin.
7 I have no further questions.
8      THE COURT: Let's take our morning break.  We'll
9 reconvene in ten minutes.
10      (Jury excused)
11      THE COURT: OK.  We'll adjourn for ten minutes.
12      (Recess)
13      (Jury present)
14      THE COURT: You may be seated.
15      MR. BURKE: Your Honor, may I address the witness?
16      THE COURT: We're still missing one juror.
17      Excuse me just a moment.  I'm going to excuse the
18 missing juror.  Just give me a minute.
19      (Recess)
20      THE COURT: You may proceed.
21      MR. BURKE: Thank you, your Honor.
22 CROSS-EXAMINATION
23 BY MR. BURKE:
24 Q. Dr. Melvin, you were deposed in this action in July of
25 2020.  Do you recall that?

| MAHHFor2 | Melvin - Cross | Page 624 |
|---|---|---|

1 A. Deposed in July 2020, yes.
2 Q. And does your deposition testimony remain truthful and
3 accurate today?
4 A. It does.
5 Q. Like to establish a couple of things that I don't believe
6 you're giving an opinion on.
7      Dr. Melvin, you're not giving an opinion on whether
8 the conduct in multibank chatrooms was pro or anticompetitive,
9 are you?
10 A. No, I'm not.
11 Q. And you're not giving an opinion as to whether there was a
12 conspiracy or agreement to widen spreads, are you?
13 A. I think I'm not supposed to.
14 Q. And you're not giving an opinion as to any characteristics
15 of the foreign exchange market that makes price fixing more or
16 less likely to occur, correct?
17 A. I certainly have views on that.
18 Q. Are you giving that opinion, sir?
19 A. I would be happy to, but I don't know if I'm allowed to.
20 Q. Dr. Melvin, you've never served as an economist for the
21 Department of Justice or Federal Trade Commission or any other
22 governmental agency charged with enforcing the antitrust law,
23 correct?
24 A. Correct.
25 Q. You have no law-related education or professional training?

IN RE: FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST

October 17, 2022

| MAHHFor2 | Melvin - Cross | Page 641 |
|---|---|---|

1 been redacted in 130 million Australian dollar to U.S. dollar?
2 A.  You tell me the redacted words are real firm -- business
3 firm's name and not a type of customer, so you want me to make
4 that assumption and answer accordingly?
5 Q.  I do.
6 A.  OK.  Yeah, then I agree, that's what it says.  There's some
7 real customer whose name we don't know, and he's asking what's
8 the right spread to them in 130 million Aussie dollar against
9 U.S. dollar.
10 Q.  Mr. Leighton responds: Wide.  And you understand "wide" to
11 mean spread, correct?
12 A.  Yeah, a wide spread.
13 Q.  Mr. Ware of Credit Suisse tells the group that Credit
14 Suisse showed 20 pips to this specific customer, but perhaps
15 should be 25 pips, correct?
16 A.  Yes, I see that.
17 Q.  Now, despite being competitors, Mr. Leighton, Mr. Ware, and
18 Mr. Parikh, who work for Merrill, Credit Suisse, and Goldman
19 Sachs, respectively, discussed what to show a particular
20 customer in 130 million Aussie dollar, correct?
21 A.  Yes, I see that.
22 Q.  How does responding to Mr. Parikh's question of Goldman
23 Sachs help B of A or Credit Suisse compete with Goldman Sachs?
24 A.  Well, earlier today I talked about certain customers that
25 have a reputation as being a predatory customer who take

| MAHHFor2 | Melvin - Cross | Page 642 |
|---|---|---|

1 advantage of banks by splitting orders.  Is that what kind of
2 customer we're talking about here where they're going to widen
3 spreads?
4 Q.  No, sir.  It's a central bank.  It's a central bank.
5 A.  A central bank?  OK.  Then what's the right spread to the
6 central bank in 130?  He says, Wide, and the other says, We
7 showed 20, but perhaps it should be 25.  So, you know, there's
8 a range there because the market conditions could be consistent
9 with a spread of 20 or consistent with a spread of 25.
10 Q.  And my question, sir, is by responding to the question from
11 the trader at Goldman Sachs, how does that help Bank of America
12 or Credit Suisse compete with Goldman Sachs?
13 A.  Well, if this is using somebody -- a real counterparty's
14 name, that's a discussion they shouldn't be having.  If they
15 had used BlackRock, we would not have been happy.  If they had
16 used "real money" or, in this case, if they had used "official
17 institution," that would be acceptable, but it would have been
18 unacceptable to me to use somebody's actual name in a chat.  So
19 to me this is a discussion they shouldn't be having.
20         MR. BURKE: Let's put up 1752A, please.
21 Q.  All right.  The participants are Dan Stalker, who's at
22 Credit Suisse; Stuart Dunn of Deutsche Bank, and Jamie Lawes
23 who was at Credit Suisse.  Dr. Melvin, I represent to you that
24 Mr. Dunn testified at trial earlier that Mr. Lawes and
25 Mr. Stalker were indeed working at Credit Suisse, and he was

| MAHHFor2 | Melvin - Cross | Page 643 |
|---|---|---|

1 working for DB in this particular chat.
2         Why don't we show Dr. Melvin lines 135:22 to 136:6.
3         Are you there, sir?
4 A.  Yes, I am.
5 Q.  Mr. Stalker at Credit Suisse writes: Stu, what spread you
6 show Fawlty in 50 quid?
7         Did I read that correctly?
8 A.  Yes, you did.
9 Q.  Do you understand Mr. Stalker is asking Mr. Dunn what is
10 the spread to quote a specific customer, namely Fawlty in
11 50 million pound/dollar?
12 A.  Yes.
13 Q.  Do you know who Fawlty is?
14 A.  Mr. Dunn told us the other day, and I was sitting here when
15 he gave us his testimony.  Probably would have been my guess
16 also, the Bank for International Settlements, because they're
17 in Basel, Switzerland.  And there used to be a comedy show on
18 public television about "Fawlty Towers" where the guy's name
19 was Basel Fawlty.  I think this is more British humor in terms
20 of names.  Yeah, that would be, as Mr. Dunn said, Fawlty was
21 the BIS, he thought.
22 Q.  And Mr. Dunn of Deutsche Bank responds: Six to seven.
23         Did I read that correctly?
24 A.  Yes, he does.
25 Q.  You understand that he's telling Mr. Stalker he shows 6 to

| MAHHFor2 | Melvin - Cross | Page 644 |
|---|---|---|

1 7 pips in 50 million cable to Fawlty, correct?
2 A.  Yeah, that's his recommendation, it seems.
3 Q.  And Mr. Stalker thanks him, correct?
4 A.  Yes.
5 Q.  Is it the case that Mr. Stalker and Mr. Dunn are discussing
6 spreads to show a specific customer?
7 A.  Yes.
8         MR. BURKE: Let's put up 1767A, please.
9 Q.  All right.  The participants in this chat are Michael
10 Krupkin of JPMorgan, John Altadonna of Credit Suisse, Ryan Neff
11 of Morgan Stanley, and Milko Campusano of Bank of America.
12         Do you know which chatroom this is looking at it?
13 A.  The names of the participants.  I don't know the name of
14 the chatroom, no.
15         MR. BURKE: Let's put up 17:39:28 to 18:12:04, please.
16 A.  OK.
17 Q.  At 17:39:28, Mr. Altadonna of Credit Suisse writes: How
18 wide is 100 quid?
19         Did I read that correctly?
20 A.  Yes.
21 Q.  You understand that to mean he's asking the traders in this
22 chatroom how wide in 100 million pound/dollar?
23 A.  Yes.
24 Q.  Because quid is shorthand for pound/dollar?
25 A.  Yes.

| MAHHFor2 | Melvin - Cross | Page 649 |
| --- | --- | --- |

1  A.  Yes, you did.  Now we're in 2012.  So we've gone 2009,
2  2011, 2012.  Again, it looks like these discussions come from
3  the bank compliance department, but as I said, if you have some
4  document from the fed that gives banks orders in this regard,
5  I'm happy to look at it and give you my opinion.
6  Q.  All right.  Let's continue on to 7:15:57 through 7:16:16,
7  sir.  Landes continues:  No asking for spreads.  Bad is.  Hey
8  guys, what is spread on 300 Aussie/kiwi?  That looks like
9  collusion.
10      Did I read that correctly?
11  A.  Yes, you did.
12  Q.  Are you aware that Mr. Landes asserted his Fifth Amendment
13  privilege against self-incrimination in this courtroom when
14  questioned about this chat?
15  A.  I don't remember when -- if this particular chat was
16  presented to him.  He asserted that privilege on every question
17  he was asked by both plaintiff and defendant lawyers.
18  Q.  And you're aware that Mr. Landes asserted his Fifth
19  Amendment right against self-incrimination as to the previous
20  exhibit we just looked at when questioned about that chat in
21  this courtroom, correct?
22  A.  Well, anything he was showed he claimed the Fifth Amendment
23  privilege despite who's asking the question, Credit Suisse or
24  the plaintiffs.
25  Q.  Dr. Melvin, did you investigate for what period of time

| MAHHFor2 | Melvin - Cross | Page 650 |
| --- | --- | --- |

1  traders used multibank chatrooms to discuss spreads?
2  A.  I didn't review, but I know at one point in time they were
3  banned, basically, and all the banks shut them down.
4  Q.  All the chatrooms, not just one or two, all of them?
5  A.  Yeah.  Eventually, they were just no longer viewed worth
6  the trouble and the risk of having them.
7  Q.  They didn't shut them down by currency pair.  They didn't
8  shut them down by trader.  They shut all the chatrooms down,
9  correct?
10      MR. WASHER:  Objection.
11      THE COURT:  Sustained.
12      You can just disregard that answer and question,
13  ladies and gentlemen.
14  Q.  In your opinion traders and competing dealers are still
15  sharing spreads in chatrooms -- sorry.  Withdrawn.
16      Did you investigate why the dealers stopped doing the
17  thing that you believed to be beneficial to both dealers and
18  customers, namely, sharing spreads in chatrooms?
19      MR. WASHER:  Objection.
20      THE COURT:  Overruled.
21  A.  I didn't investigate, but I certainly have an opinion on
22  why.
23  Q.  Well, are you aware that BNP -- you know who BNP is,
24  correct?
25  A.  I do.

| MAHHFor2 | Melvin - Cross | Page 651 |
| --- | --- | --- |

1  Q.  Are you aware that BNP pleaded guilty for fixing prices of
2  certain currency pairs by communicating in multibank chatrooms?
3  A.  Am I aware they pleaded guilty?  No, I'm not aware of that.
4      MR. BURKE:  All right.  Let's put up PTX 2667, please.
5      This is the plea agreement between the United States
6  and BNP.  Let's go to paragraph 4.  4(h) reads:
7      "During the relevant period, the defendant and its
8  cooperator coconspirators, which were also financial
9  institutions acting as competing FX dealers, entered into and
10  engaged in a combination and conspiracy to suppress and
11  eliminate competition by fixing prices for CEEMEA currencies."
12  Q.  Did I read that correctly, sir?
13  A.  Yes, you did.
14  Q.  Under (i) it reads:  "In furtherance of the conspiracy, the
15  defendant and its coconspirators engaged in communications,
16  including near daily conversations through private chatrooms."
17      Did I read that correctly?
18  A.  You did.
19  Q.  You were not aware of this plea agreement, correct, sir?
20  A.  No, I was not.  I have no idea what motivated BNP to do
21  this.  I have no insight into their decision-making.
22  Q.  Let's put up -- do you understand Credit Suisse traders
23  also participated in chatrooms with competing banks, including
24  BNP?
25  A.  Traders of competing banks were in chatrooms, yes.

| MAHHFor2 | Melvin - Cross | Page 652 |
| --- | --- | --- |

1      MR. BURKE:  Let's put up PTX 2995.
2  Q.  Are you familiar with what the ZAR chatroom is, sir?
3  A.  Yeah.  The ZAR chatroom, as shown here in the circle, has
4  four traders in it.
5  Q.  What does "ZAR" stand for; do you know?
6  A.  The ISO code for the South African rand.
7  Q.  And in the blue circle, there's a chat called "The Old
8  Gits."  Are you familiar with The Old Gits?
9  A.  Well, we heard some discussion of that in someone's
10  testimony last week.
11  Q.  When look at the intersection of the ZAR chatroom and The
12  Old Gits chatroom, you'll see the names Chris Cummins of
13  Citibank and Jason Katz of Barclays and BNP Paribas.  Are you
14  there?
15  A.  Yes.
16  Q.  Are you aware that both Mr. Katz and Mr. Cummins pleaded
17  guilty for fixing prices of certain currency by, among other
18  means, communicating in multibank chatrooms?
19  A.  No.
20  Q.  To the left of Mr. Cummins is the name Akshay Aiyer of
21  JPMorgan Chase.  Are you familiar with who that is?
22  A.  Aiyer?
23  Q.  Yes.
24  A.  Trader at JPMorgan Chase, it says.
25  Q.  Are you aware that Mr. Aiyer was convicted by a jury for

| MAH3FOR3 | Howarth - Direct | Page 669 |
| --- | --- | --- |

1  an extremely good flow trader, but didn't interact with clients
2  as much as others.
3  Q.  What about Mr. Lawes.  How long did you work with him?
4  A.  Jamie had two stints at Credit Suisse.  Obviously I worked
5  with him during both stints.  During the first time he was very
6  much the young guy on the desk.  He was always viewed as joker
7  in the pack.  Very friendly, very talkative.  We would take him
8  out to see clients quite often.  The kind of guy if there was a
9  silence in the conversation, he would fill it.  But viewed as a
10  good trader.  Clients did generally like to deal with him.
11  Q.  Finally Ms. Williams, how long did you work with her?
12  A.  I would say, again, maybe two or three years.  I don't
13  remember Natalie as well.  The reason being she was very junior
14  at the time.  She initially joined the sales team, and she was
15  quite shy, which is actually never a good thing for a
16  salesperson.  So, she ended up moving on to the trading desk.
17  They wanted to diversify the team.  And she always seemed to be
18  quite junior.  I wasn't sure if she had a book or not.  But
19  probably a couple years, she was in that position.
20  Q.  Switching gears a bit.  Did you work with a particular type
21  of customer during the relevant time period, that's 2007 to
22  2013?
23  A.  Yes.
24  Q.  What type of clients did you work with during that time
25  period?

| MAH3FOR3 | Howarth - Direct | Page 670 |
| --- | --- | --- |

1  A.  Generally I worked with what we would call investors, so,
2  hedge funds, asset manager, pension funds, and some proprietary
3  trading desks of other banks.
4  Q.  How many customers did you and your team cover over the
5  relative time period?
6  A.  It was well into the hundreds.  Most salespeople might
7  have, most salespeople would have between 15 and 20 clients.
8  It was probably several hundred clients over that period.
9  Q.  Did that change over the 2007-2013 time period?
10  A.  Yes, it did actually.  We increased the number of clients
11  quite substantially during that period.  I had a new manager
12  who wanted to really -- who came from UBS, and UBS was a bigger
13  bank, and he wanted to grow the business and compete with those
14  guys.  So we grew a lot and as a result we had more clients.
15  Q.  Can you give the jury some examples of specific clients
16  your team covered during the relevant time period.
17  A.  Yeah, sure.  UBS Asset Management, Goldman Sachs Asset
18  Management, Merrill Lynch Bank of America, JPMorgan prop, Moore
19  Capital.  Is that enough?
20  Q.  That's plenty, thanks.
21      You mentioned a UBS affiliate and Goldman Sachs
22  affiliate.  Did your customers include affiliates of other
23  banks?
24  A.  Yes.
25  Q.  How would you describe the customers you worked with?

| MAH3FOR3 | Howarth - Direct | Page 671 |
| --- | --- | --- |

1  A.  Can you repeat that?
2  Q.  How would you describe the customers that you worked with?
3  A.  They were very sophisticated.  A lot of these customers
4  were ex-traders, ex-market makers or ex-salespeople.  They had
5  a lot of information in front of them.  They had 20, maybe 15
6  to 20 banks covering them.
7      So if I was covering them every day, calling them with
8  market info color, ideas, themes, they had 15 other sales guys
9  just like me doing the same.  They were smart and
10  sophisticated.
11  Q.  You mentioned adding clients over the relevant time period.
12  Were you involved in that process of adding new clients?
13  A.  Yes, I was.
14  Q.  Was there an onboarding process for new clients?
15  A.  Yes, there is.
16  Q.  Typically, how long does that onboarding process take?
17  A.  It really depends on customer.  For a hedge fund customer,
18  for example, who may have a prime broker, we would get that set
19  up in a couple of hours.  Once the prime broker had sent that
20  designation notice over to us, it could be signed quickly and
21  sent back.  Asset managers who had a number of subfunds and
22  different mandates, that could take from a few weeks to a few
23  months.
24  Q.  As a salesperson at Credit Suisse, what were you selling to
25  clients?

| MAH3FOR3 | Howarth - Direct | Page 672 |
| --- | --- | --- |

1  A.  We were selling the capabilities of the bank, so our
2  economics team, our research, our strategy, we were selling our
3  own idea generation, we were selling our ability to transact.
4  That was -- that would be the main things.
5  Q.  Did clients ever ask you for a spread you were showing in a
6  particular currency pair at a particular notional amount?
7  A.  Yes.
8  Q.  Do you have an understanding as to why they would ask for
9  that information?
10  A.  Yes, I do.
11  Q.  Why in your experience, why would they be asking for that
12  information?
13  A.  They would want to get an idea of the cost of transaction,
14  how liquid a market was at that time.  If they were thinking
15  about putting a trade on, one of the things you have to think
16  about is the cost of putting that trade on and potentially
17  exiting it.  It would be to determine that, and also sometimes
18  as an indicator to see who was good in a particular currency
19  pair.  Which banks were good in currency pairs.
20  Q.  What do you mean by the cost of putting a trade on?
21  A.  I mean that if you wanted to buy or sell a currency, it
22  would take you some time to do it.  You will start to buy and
23  the market will move higher, so every point it moves away from
24  you, you were paying a little bit extra to put that position
25  on.

| MAH3FOR3 | Howarth - Direct | Page 677 |
|---|---|---|

1  Q. Did you have any persistent chats with customers?
2  A. Yes, many.
3  Q. Are you able to approximate how many you had over the
4   relevant time period?
5  A. Several hundred, 3, 400.
6  Q. Were any other individuals included in your persistent
7   chats with customers?
8  A. Yes. Obviously there was the customers, there was myself
9   as the salesperson, I used to also bring in the rest of the
10  sales team, in case I was on the toilet or getting lunch or at
11  a meeting, it was important if I wasn't there, one of my
12  colleagues could pick up the request. Some clients wanted to
13  have traders in the chat as well. And they wanted market
14  color, feel what was going on, and some clients also wanted to
15  have strategists in there. So, some of these persistent chats
16  can be pretty big. Dozens of people.
17  Q. When a request came from a customer for a price, would you
18  know one way or the other whether or not that customer was also
19  seeking a quote from other market makers?
20  A. You'd have an idea. The way the Bloomberg chat function
21  works, it's quite interesting. You type the price request into
22  a dialogue box. And then you can click which banks you want to
23  send that price to. Hit send and it goes instantly to those
24  five, 10, 15 banks, however many you've selected. And a lot of
25  requests came through very generic, no name, just straight

| MAH3FOR3 | Howarth - Direct | Page 678 |
|---|---|---|

1   request. And then when we got feedback, often the case of we
2   asked three or five, so we had an idea when clients were asking
3   other banks and we felt it was in most instances.
4  Q. When you receive a quote from one of your traders, would
5   you have a view as a salesperson as to the appropriateness of
6   the price that was quoted?
7  A. Yes.
8  Q. How would you come to form a view?
9  A. I followed the markets. I am looking at the screens all
10  day long. You spend 12 hours on the desk following markets,
11  following currency pairs, you build a view, you are trading a
12  lot. 30, 40 deals a day sometimes. So you build a picture of
13  what feels right and what doesn't feel right.
14  Q. If you asked a trader for a spread and the trader came back
15  with a quote you didn't think was right, what, if anything,
16  would you do?
17  A. I would ask him why is that wider than I'd think.
18  Q. How often would you have these types of exchanges with
19  traders over the relevant time period?
20  A. Honestly, not that often because it was a time where we
21  were really trying to grow the business. We were on a
22  marketing push to increase the number of clients, grow market
23  share. So we were trying to quote the tightest possible price
24  all the time, because we felt that was really important to us
25  to take market share.

| MAH3FOR3 | Howarth - Direct | Page 679 |
|---|---|---|

1      So it didn't happen too often. And when it did, I
2   would say, 90 percent of the time we did improve, we did
3   tighten up to try to win that client deal.
4  Q. Would you ever change the quote you received from a trader
5   before passing it along to a customer?
6  A. Yes.
7  Q. For what reason?
8  A. Sometimes people on the sales desk would add a point,
9   what's known as markup or no risk, a point or two, to the price
10  to the client.
11  Q. In instances where you did not -- well, what would cause
12  you to maybe add a markup to a particular client's transaction?
13  A. Quite often we put a lot of time and effort into covering
14  these clients. If we were working for a long time on a trade
15  idea or we been working the order in the market for a number of
16  hours, we would put a point on the price to try to make a
17  little bit of extra.
18      I think it's worth pointing out, unlike stocks and
19  shares where you pay commission to trade, in foreign exchange
20  you don't pay a commission. It is essentially a free service.
21  So sometimes we would add a point, if we put a particular lot
22  of work into this client.
23  Q. Was there any risk to adding a point to a transaction for
24  markup?
25  A. Yes. Yeah. The risk is you lose the ticket. It is a

| MAH3FOR3 | Howarth - Direct | Page 680 |
|---|---|---|

1   super competitive industry. If you are a point wider, you
2   might miss that.
3  Q. Were there factors besides spread or price that were
4   important to clients?
5  A. Yes, absolutely. I think the quality of a bank's economic
6   research, that strategy, getting them into the right trades,
7   correct trades, I think coverage, obviously. I'm a sales guy,
8   I am going to say that coverage was super important. If you
9   had a good relationship, you were getting good ideas from that
10  salesperson. I think thinks like efficiency of back office,
11  settlement issues, that was important. Whether the client had
12  a relationship in another part of the bank, that was also
13  important. So there were a number of factors as to why clients
14  chose to deal with us.
15  Q. Earlier today you said that after you would provide the
16  quote to a customer, that customer might trade or the customer
17  might decide not to trade with Credit Suisse.
18      Would clients ever seek to negotiate or ask you to
19  tighten a spread that you had quoted to them?
20  A. Yes.
21  Q. I'd like to bring up DTX 578. If you see here, somewhere
22  buried in here I do believe it's your name. If we can
23  highlight. If we go to the line at 16:14:08. We can see that.
24  Are you BHowarth1?
25  A. That's me. BHowarth0 is the JPMorgan version.

MAH3FOR3           Howarth - Direct           Page 681

1  Q. Do you know what this line indicates?
2  A. Yes. That's saying I basically got to work at 6:14 a.m.
3    and I've just logged on.
4  Q. Can we pull up 7:46:06 to 7:48:54. Can you walk the jury
5    through what's happening in this discussion.
6  A. Yes, absolutely. So, Mark Dray, who was a foreign exchange
7    salesperson based in London, he is asking for a price in dollar
8    India. He is asking for an FX swap and the dates of the swap
9    are the 23rd of September to the 24th of October and it's in 50
10   million dollars. He then says Bref which is the name of the
11   client. So the trader knows the currency pair, the amount, the
12   dates, and the client. Francis, who is the Credit Suisse
13   trader based in Asia, he says MP which is moment please. He
14   then 30 seconds later just over 30 seconds later provides a
15   price which is 12 at 14. So at 12 the customer could sell and
16   at 14 they could buy. Mark shows that to the client. There is
17   about a minute gap between him coming back after Francis gave
18   the price. And he is asking if we can show tighter because the
19   client gets one wide elsewhere question mark. Francis doesn't
20   reply. But he just gives the improved price of 12.5 at 13.5.
21   So the spread has gone from 2 points, 12 to 14, to one point.
22   15 seconds later, thereabouts, Mark says 13.5. So that means
23   the client has dealt and has bought at 13.5.
24  Q. How long did that exchange take that you just walked
25    through?

MAH3FOR3           Howarth - Direct           Page 682

1  A. It took just over two minutes.
2  Q. Before we talked about sometimes spot transactions having a
3    couple second turnaround time. Why in your view is this
4    longer?
5  A. He is asking for an FX swap here. So, the trader has to
6    calculate the interest rate differential between U.S. dollars
7    and Indian rupee. So that takes, that will take a minute or so
8    at least.
9  Q. When Mr. Dray says he gets one wide. What did you, can you
10   explain what that meant?
11  A. Yes. So what I believe happened here is, Mr. Dray gave the
12   client the price and the client said to him, can you tighten
13   that up because I'm generally used to getting one wide from
14   another banks or away.
15  Q. Was it common for a customer to tell you the spreads they
16   were receiving from another bank?
17  A. Yes, it was.
18  Q. How commonly were spreads discussed in the market by market
19   participants, in your experience?
20  A. I think they were discussed very widely. Sales to clients,
21   sales to trader, clients to clients. I think spreads were in
22   many ways what the business was about. So it was liquidity.
23   Trader's job was to assess liquidity. One of the best ways to
24   address liquidity was to talk about spreads. So I think they
25   were widely discussed.

MAH3FOR3           Howarth - Direct           Page 683

1  Q. Here the trader does tighten his price. How common was it
2    for CS to change its quote in response to a customer request?
3  A. We would tighten probably 90 percent of the time. Because
4    we were trying to grow the business and really expand our
5    market share. We would tighten wherever possible.
6  Q. Mr. Soh says in the last line here that's highlighted or
7    that's called out here, I can show 1.5 pip wide. One pip wide
8    not helping us at all.
9      Do you have an understanding as to what that means?
10  A. Yeah, I think my take on this is that Francis is telling
11   Mark, in future I'd look to be 1.5 rather than one. I would
12   suggest in this instance that Francis may have lost money on
13   this deal. And he's sort having a little complaint at Mark
14   saying one is too wide but I'll commit to 1.5 in the future.
15   One not helping us.
16  Q. How common is it for a trader to lose money on a trade
17   because his spread was too tight?
18  A. It was very common. It was certainly on two-way prices.
19   You had to make an assessment on both sides of the market,
20   because the FX industry was competitive, if you wanted to win
21   the ticket, you had to have a tight price. So, it was common,
22   you might underestimate one side, and then you get dealt on
23   that side and all of a sudden you are struggling to cover it.
24   It did happen fairly frequently.
25  Q. Can we turn to DTX 076. Can we pull up again, this shows

MAH3FOR3           Howarth - Direct           Page 684

1  that you entered this chatroom. Can we pull up 14:58:59 to
2  15:01:21. Can you walk the jury what's happening in this
3  discussion.
4  A. Okay. So, Kaitlyn Atherton was an FX salesperson based in
5  New York. She's asking for a price here for one of her
6  customers, Wells Fargo, and the price is -- she wants a
7  dollar/Chile peso price in 3 million dollars for a valid date
8  of 7 of December.
9      Rob Lynch who was our FX trader in New York at the
10  time acknowledges it. And 24 seconds later comes back with a
11  price 21 at 20, or buy them at 81.55. Kaitlyn is giving that
12  price to the customer. And comes back with the feedback he's
13  asking if we can show tighter. Rob agrees to do this. And
14  then shows 81.00 to 81.25 so he's tightened the price from 35
15  points wide, 55 minus 20, to 25 points wide in this instance.
16  Kaitlyn then lets Rob know what's going on because it's about a
17  30 second break between any communication here. Kaitlyn says
18  I'm he still showing this. Tell me if ref. And that means,
19  basically, if you want to refresh the price, if you want to
20  change it, the market's moved, just let me know. And then
21  10 seconds later she says passing. So the client has passed
22  the price. And she makes the assumption that he was
23  potentially on the left-hand side, LHS, so she's quite
24  correctly making the assumption he was probably a seller.
25  81.20, that was a better price to sell on the refresh, 81.00,

| MAH3FOR3 | Howarth - Direct | Page 697 |

1 where Credit Suisse ranked compared to its peers?
2 A. Well, I think just eyeballing it now, a lot of it seems to
3 be white which would suggest we're tighter than average. So I
4 think that puts us in a relatively good place. My eyes are
5 just not good enough to figure out that color between tightest
6 and widest. I want to say we were perhaps tightest on more
7 stuff than we were widest. But it's giving me good color on
8 where we rank vis-a-vis the rest of his counterparts.
9 Q. This e-mail exchange is dated May 2007. Did you continue
10 to receive feedback like this during the 2007 and 2013 time
11 period?
12 A. Yes.
13 Q. As the head of sales, did you observe any trends in the
14 Credit Suisse spread grids over the 2007 to 2013 time period?
15 A. I would say, I would say that over that time period,
16 spreads slightly compressed. Obviously there were, as I said,
17 earlier on there were huge periods of volatility within that
18 time frame. But if I was to sort of hazard a guess between
19 2007 and 2013, I think spreads marginally compressed in some of
20 the G10 major pairs. You can see why. If you look at the
21 process for these spread grids, there is a back and forth, we
22 give our spreads and get feedback and tighten again. That does
23 lead to some compression of spreads.
24 Q. Can we bring up PTX 1754. If we can turn to your original
25 e-mail on the bottom. Can you just describe take a moment to

| MAH3FOR3 | Howarth - Direct | Page 698 |

1 look at it and explain to the jury why you were sending this
2 e-mail.
3 A. Yeah. So what I was doing here is I was sending an e-mail
4 to hashtag GFX sales all. That is the entire Credit Suisse FX
5 sales network across the whole globe. And what I was trying to
6 do here is increase the amount of emerging market business we
7 saw in the London hours. And CE4 is shorthand for the central
8 European 4 which was Poland, Hungary, the Czech Republic,
9 Slovakia. Slovakia has since joined the E.U. so it's CE3, and
10 zar and mxn in London hours only.
11     So, I am trying to make a marketing push here to our
12 sales team. I've prepared a grid, and I have said I am going
13 to put that on their desk, and I just wanted it front and
14 center so when they came in in the morning, they had something
15 to remind of them of emerging markets. And when they talked to
16 their clients, they could hopefully start selling the emerging
17 market business.
18 Q. You said I am getting this grid printed off and laminated.
19 Did you typically laminate spread grids?
20 A. No, not really. This is a marketing push so I wanted to
21 get this in front of them and remind them daily. And I was
22 kind of in my own head, I was thinking if it's a piece of
23 paper, it will end up in the bin. If it's laminated, it's got
24 more chances of survival. Normally I wouldn't go to this
25 trouble to laminate, no.

| MAH3FOR3 | Howarth - Direct | Page 699 |

1 Q. A few moments ago you were talking about your view that the
2 spreads had compressed during the relevant time period. What
3 do you mean by compressed?
4 A. Sorry. Yes. They got tighter. They narrowed in.
5 Q. I'd like to show you a chat discussion the jury has seen a
6 few times now. PTX 1373A. If we can pull up 7:52:45 to
7 7:56:29.
8     Can you take a moment to review that and let me know
9 when you're ready.
10 A. Yup, okay.
11 Q. Can we call out the line at 7:53:09 and line that follows.
12 Mr. Lawes says let's sign a pact on spreads.
13     As someone who knew and worked with Mr. Lawes, how do
14 you read his statement?
15 A. I mean, as I said, it's not -- Jamie was the joker in the
16 pack. I view this as bravado between a few traders in one
17 chatroom. I certainly didn't have any issues with his pricing
18 when dealing with customers. Just not my experience.
19 Q. Can we also call out the line at 7:55:49. Mr. Lawes says
20 wish you widen your spreads yet. Two lines down he says just
21 tell sales then.
22     And if we can get the final line. He says stand your
23 ground man.
24     Are those statements regarding sales consistent with
25 your experience working with him?

| MAH3FOR3 | Howarth - Direct | Page 700 |

1 A. No, they're not. I don't know whether he's sort of trying
2 to wind the other trader up or play devil's advocate here, but
3 we found Jamie to be a reasonably friendly franchise trader.
4 We sent him on a lot of client meetings, and he was viewed as a
5 good flow trader by customers.
6     This is not my experience with Jamie.
7 Q. Over the relevant time period, did you ever ask Mr. Lawes
8 to tighten a spread for a client?
9 A. Yes.
10 Q. What was his response?
11 A. He was usually keen doing business. More often than not,
12 he would tighten that spread up for me.
13 Q. You can take down this exchange.
14     Putting aside this exchange, did you observe anything
15 during the 2007 to 2013 time period working with Mr. Lawes and
16 the other CS traders that led you to believe that any CS trader
17 was providing you with wider spreads than were appropriate?
18 A. No.
19 Q. Did you ever observe any facts during that time period that
20 led you to believe that CS traders had entered into any
21 agreement with traders at other banks to widen spreads?
22 A. No.
23 Q. Do you believe you would have known if they had entered
24 into such agreements?
25 A. I think I would. I mean, ultimately, salespeople are

IN RE: FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST

October 18, 2022

| MAIHFor1 | Condie - Direct | Page 756 |
| --- | --- | --- |

1  usually the same or different about spreads?
2  A.  They're definitely different.
3  Q.  Can you explain that?
4  A.  Well, I think you have -- like, you have -- as we talked
5  about, we assign different currencies to different traders.
6  And, you know, someone who's actually in the seat, dealing with
7  it all the time, that specific currency, would be stronger and
8  know their market better than someone who wasn't.
9  Q.  Well, how about even among two traders or three traders
10  that trade the same currency at different banks?  To what
11  extent are views similar or different?
12  A.  They'd probably be different.
13  Q.  Now, so we were talking about what traders are looking at
14  during the day.  You mentioned news sources.  We talked about
15  EBS and Reuters, the prices there.
16       How about chatrooms?  Were the traders you supervised
17  in chatrooms with traders from other banks?
18  A.  Yes, they were.
19  Q.  And what, if any, understanding do you have as to why
20  traders at one bank would be chatting with traders at other
21  banks?
22  A.  General market color, exchanging -- exchanging information
23  on what they thought was going to happen, you know, on a
24  specific currency, trade ideas.
25  Q.  And can you explain why, if at all, in the FX market that

| MAIHFor1 | Condie - Direct | Page 757 |
| --- | --- | --- |

1  was an important thing to do?
2  A.  The foreign exchange market at times -- it was odd because
3  there wasn't -- in the foreign exchange market, there wasn't
4  exactly -- there wasn't an exchange for foreign exchange;
5  meaning, there was nowhere to go.  If something moved, there
6  was nowhere where you could go and find out why something
7  moved.  If you're sitting there on the desk and you're -- and
8  sterling only moves 50 pips and you have no idea and a client
9  calls up and they want to know, hey, what's going on in
10  sterling and you didn't know, you didn't see the business, you
11  could -- you'd ask another trader at a bank, do you have any
12  idea what just happened in sterling?  So I think it was because
13  there was nowhere to go for information.
14  Q.  So customers expected that you would be up to date on what
15  was going on in the market?
16  A.  They would expect it and I would want to show them that we
17  knew what was going on in the market.
18  Q.  Now, how about you, sir?  Did you chat with traders at
19  other banks?
20  A.  I would say I did, but probably less frequently than
21  others.
22  Q.  How come you didn't do it as much as others may have?
23  A.  Probably just comes down to personality.  I kind of -- kind
24  of one of those people I kind of trust my own views, and I tend
25  to rely on myself.

| MAIHFor1 | Condie - Direct | Page 758 |
| --- | --- | --- |

1  Q.  Any other reasons why you decided to participate in the
2  chatrooms maybe less than others?
3  A.  I mean, there's definitely a lot of off-color jokes in
4  there, a lot of sarcasm, too much personal information, stuff
5  like that.
6  Q.  To what extent, if at all, did you have concerns that
7  things you wrote could get misinterpreted?
8  A.  I mean, I think you're always concerned about that when
9  you're talking to somebody and somebody's looking down and
10  doesn't know who you are and what you mean.  I'm always
11  concerned about that.
12  Q.  So you had some of these concerns, but you were a
13  supervisor, right?
14  A.  Yes.
15  Q.  You knew the traders you supervised were chatting with
16  traders at other banks, right?
17  A.  Yes, I did.
18  Q.  Was that OK with you, given your own personal views?
19  A.  Well, that was my own personal view about what I felt about
20  the chatrooms.  For those, I felt at times, I still do, that it
21  was a legitimate form of conversation.
22  Q.  Now, we've been discussing the role this morning so far,
23  Mr. Condie, the role of the trader, and now I'd like to look at
24  some documents that may reinforce some of the points that we've
25  been discussing.

| MAIHFor1 | Condie - Direct | Page 759 |
| --- | --- | --- |

1       So if we can please pull up DTX 86 in evidence, and
2  this is a chat from 2008 between you and Markus Menzl.
3       Do you see that?
4  A.  Yes, I do.
5  Q.  Do you know Mr. Menzl?
6  A.  Markus was an FX trader in Credit Suisse Zurich.
7  Q.  All right.  So you guys both worked at Credit Suisse at the
8  time?
9  A.  Yes, we did.
10       MR. MOSS:  So let's go down to timestamp 15:31:05.  We
11  can go down to there.
12  Q.  Are you with me there, Mr. Condie?  It's at the top of the
13  page.
14  A.  Yes.
15  Q.  Mr. Menzl says:  You made 15 points in 60.
16       Do you see that?
17  A.  Yes.
18  Q.  And you say:  Yes, right?
19  A.  I do.
20  Q.  Excuse me.  I misread it.  I read it incompletely:  You
21  made 15 points in 60 euryen.
22       Do you see that?
23  A.  Yes.
24  Q.  And you say yes.
25       Can you explain to the jury just that little exchange.

IN RE: FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST

October 18, 2022

MAIHFor1                Condie - Direct                Page 772

1    need a price on 50 million euro, euro/dollar, and they would
2    say that to a salesperson, the salesperson would either stand
3    up and yell to the spot desk or, if they had a line of view,
4    just, hey, price on 50 million euro/dollar for so-and-so.
5    Q.  And then what happens?  So the salesperson calls out for
6      the price.  What happens?
7    A.  Well, the spot desk has to get the price back.  I mean,
8      that's literally talking between two and five seconds, because
9      it is a spot market, and it's moving so quickly.  The spot
10     market relays their price in that amount to the salesperson who
11     repeats it to the client.
12   Q.  All right.  So let's talk about that.  Did you say -- how
13     many seconds did you say in that interaction?
14   A.  It's between two and five seconds you're trying to get the
15     price back to the client.
16   Q.  So let's talk about the two to five seconds.
17         So the trader, the salesperson shouts out, asks for a
18     price.  The trader has two to five seconds to respond.  What's
19     the trader doing in that time?
20   A.  Well, actually, what the trader's been doing all day long
21     is they're staring at the price; they're staring at the market.
22     Like, they're getting ready to make the price.  That's their
23     job.  That's their primary job.  There's not much to really do.
24     They just hear the request, and they're judging liquidity and
25     spitting a price back out to the customer.

MAIHFor1                Condie - Direct                Page 773

1    Q.  And in your view -- by the way, you actually observed this
2      happen, right, as the chief dealer?  You saw this all the time,
3      this interaction between the salesperson and the trader?
4    A.  I mean, definitely.  Everyone -- everyone pays attention to
5      what's going on when a deal comes across the desk.
6    Q.  And sometimes you were on the receiving end of it because
7      sometimes it was a currency pair that you traded, right?
8    A.  Yes.
9    Q.  All right.  In your experience, does the trader have time
10     in those two to five seconds to send a chat to other banks to
11     ask their opinions on spreads, to receive the information from
12     those other banks, and then to incorporate that into his or her
13     quote to the salesperson?
14   A.  There's no time for that at all.
15   Q.  You ever seen that happen?  Have you ever seen a trader at
16     Credit Suisse, when they're asked on the spot and have to
17     respond in two to three seconds, get on and start typing
18     something?
19   A.  No, I have not.
20   Q.  So I want to talk a little bit more about this sequence
21     that you just went through.
22         So salesperson asks for the spread or the two-way
23     price.  Trader provides it in two to five seconds.  To what
24     extent, if at all, did you as the chief dealer in New York have
25     discretion to modify, to change, the spread that the trader

MAIHFor1                Condie - Direct                Page 774

1    quoted to the salesperson?
2    A.  I was allowed to do that.
3    Q.  Did you ever do it?
4    A.  I did, yes.
5    Q.  How come?
6    A.  Various reasons.  Sometimes I would -- I would get involved
7      if I knew it was a new customer that we're trying to get to
8      deal with us that we haven't seen in a while.  We'd want to
9      show them the best price.  So I could get in; I could narrow
10     the price.  There would be other times we'd be in penalty box
11     where the customer hadn't dealt with us for some reason.
12     Something happened in options or forwards.  We hadn't seen them
13     in a while.  We wanted to get them back on board.  I could jump
14     in there and narrow the price.
15   Q.  You mentioned two examples where you would narrow the
16     spread.  Do you recall ever in your seven years telling a
17     trader to widen the spread from the spread he or she quoted?
18   A.  I do not.
19   Q.  All right, Mr. Condie.  So we've discussed the roles of
20     traders, we talk about salespeople, we've talked about how a
21     transaction works, and now I'd like to zoom out a little bit,
22     if we can, and talk about Credit Suisse's strategy and its
23     customers.  You referenced this a little bit in your testimony,
24     but let's go through it in some detail.
25         Just remind the jury, please, when did you come to

MAIHFor1                Condie - Direct                Page 775

1    Credit Suisse?
2    A.  I joined in 2007.
3    Q.  And where'd you come from?
4    A.  I was working at Bank of America at the time.
5    Q.  Did you come with any particular other people?
6    A.  Yes.  Yes, I came over with a group of people.
7    Q.  A group of people.
8         How come you guys came over to Credit Suisse in 2007?
9    A.  Well, in 2007, Credit Suisse was a relatively small player
10     in the FX market, and they had decided to make a push to become
11     a top ten player in the bank, in the foreign exchange market, I
12     should say.  And one of the managers at Credit Suisse reached
13     out to my boss at Bank of America.  He was aware of his
14     reputation and what he had done at other banks, and he had told
15     him what he was looking to do.  And he assembled a team to come
16     over and try to achieve that goal.
17   Q.  What had they done at other banks?
18   A.  We just helped out with, actually, the ranking on the
19     Euromoney surveys at the different banks we were at.  We moved
20     up.  The main guy was Alain, who started at Deutsche Bank.  He
21     helped make them a number one player in FX.  So people were
22     aware of his name.  Clients were aware of us, and we dealt with
23     many people.  So it was just a push to make them a top player
24     so --
25   Q.  And you said Alain.  Just so -- I don't think it's a name

IN RE: FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST

October 18, 2022

| MAIHFor1 | Condie - Direct | Page 792 |

1  That we're very good in the Colombian peso, the Chile, ruble.
2  We're very strong in those currencies.  The problem is I'm not
3  responsible for those currencies, so I'm not going to see their
4  business unless we tighten the spreads.
5  Q.  What'd you do in response to requests like this and others?
6  A.  We tightened the spreads.
7  Q.  You recall doing that?
8  A.  Yes.
9  Q.  And did you do it for just BlackRock or for your other
10  customers, too, sir?
11  A.  We narrowed spreads when asked.
12  Q.  By the way, so they're actually providing, BlackRock is,
13  these rankings.  So these 20, those are spreads from other
14  banks, right?
15  A.  Yes, there are.
16  Q.  So let me ask you, in your experience, where did you get
17  more information about your customers' spreads, from talking
18  directly to other banks, traders in chatrooms or from
19  information that your customers passed along that they used to
20  try to force competition?
21  A.  Mostly from customers.
22  Q.  Now, Mr. Condie, we talked about the strategy.  We saw some
23  documents about this strategy in play.  You recall whether it
24  was that you had any success in growing market share?
25  A.  I recall being very successful.

| MAIHFor1 | Condie - Direct | Page 793 |

1  Q.  Let's take a look at the Euromoney survey from the very
2  next year, DTX 573.  This is the market share for the 2008
3  year, but it's again marked 2009 because the Euromoney survey
4  is backward-looking.
5       So where is Credit Suisse here after one year of you
6  guys competing with your strategy?  Where do you see them?
7  A.  We've jumped into the top ten, and we're at number nine.
8  Q.  And I think you were at 1.51 the year before, is that
9  right?
10  A.  Yes.  The market share had a nice jump.
11  Q.  Is that consistent or inconsistent with your recollection?
12  A.  Consistent.
13  Q.  All right.  So at this point, by the way, was Credit Suisse
14  a dominant player in the FX market?
15  A.  Three percent market share would not make you dominant.
16  Like the big boys up top, the top four banks, were like 15.
17  We're talking like 15, maybe 18 percent of the market.  So
18  we're getting there.  We were much better, but we still weren't
19  close to the big guys.
20  Q.  Did you ever get there?
21  A.  We never did, no.
22  Q.  All right.  So you're aware, right, of the accusation in
23  this case that you and other traders at Credit Suisse were
24  widening -- entered into an agreement to widen spreads, right?
25  A.  Yes, I am.

| MAIHFor1 | Condie - Direct | Page 794 |

1  Q.  So I want to ask you directly.  You're under oath.  Did you
2  ever enter into an agreement with anyone from any other bank to
3  fix, widen, or stabilize spreads?
4  A.  I did not.
5  Q.  All right.  And you supervised all the New York traders who
6  worked at Credit Suisse between 2007 and 2013, right, sir?
7  A.  Yes, I did.
8  Q.  And when they're being asked for quotes every day from the
9  salespeople, you're sitting there watching what happens, right?
10  A.  Yes, I was.
11  Q.  And you had conversations with all of these guys about the
12  market and about their business and how they were doing, right?
13  A.  Yes, I did.
14  Q.  Did you ever have any conversation or did you ever see
15  anything that would lead you to believe that one of those
16  traders entered into an agreement to fix or widen spreads?
17  A.  I did not.
18  Q.  All right.  In your view, Mr. Condie -- by the way, what do
19  you make of this accusation that Credit Suisse and 16 -- 15
20  other banks entered into a single agreement to widen spreads?
21  What do you think of that?
22  A.  I think it's impossible.  Just too many people involved.
23  Too many banks involved.  I don't think it could be
24  orchestrated.
25  Q.  Now, in your view -- last question, Mr. Condie.

| MAIHFor1 | Condie - Cross | Page 795 |

1       We talked about Credit Suisse's strategy of growing
2  its business.  How, if at all, could Credit Suisse have
3  executed and been successful on its strategy of growing its
4  business if it were colluding on spreads with competitors?
5  A.  It would have never worked.  We never would have gotten
6  better or moved up in the rankings.  There would have been no
7  reason to change counterparties and deal with Credit Suisse if
8  we weren't offering a better service.
9       MR. MOSS:  Thank you, Mr. Condie, for your time this
10  morning.  I have nothing further.
11       THE COURT:  Why don't we go ahead and have
12  cross-examination.
13       MR. NOSS:  Your Honor, may I examine the witness?
14       THE COURT:  You may.
15  CROSS-EXAMINATION
16  BY MR. NOSS:
17  Q.  Good morning, Mr. Condie.
18  A.  Good morning.
19  Q.  I took your deposition in this case in June of 2018,
20  correct?
21  A.  Yes, you did.
22  Q.  And you understood you were under oath in that deposition,
23  right?
24  A.  Yes, I did.
25  Q.  And you understand that that oath was the same oath that

IN RE: FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST

October 18, 2022

| Mai3for2 | Walker - Direct | Page 840 |

1  Q.  Typically, how long did it take between the time the
2  salesperson would ask you for a quote and someone from your
3  desk would respond to that request?
4  A.  It would take seconds.
5  Q.  Why was the response time in seconds?
6  A.  You needed to make them the fastest most competitive price
7  so the customer can access the market.  It is not something you
8  can delay on.  They have too many other options to deal on so
9  you are going to -- you are going to get that rate out to them
10  as fast as possible.
11  Q.  What happened if you did delay?
12  A.  They could transact elsewhere.
13  Q.  After you provided your quote to the salesperson, what's
14  your understanding of what would happen next?
15  A.  At that point they are going to relay the price to the
16  customer.  And then customer can decide what they would want to
17  do.  They could either decide to buy or sell on the price we
18  had shown them, or they could change direction and give an
19  indication of what they wanted to have happen.
20        So really was up to them to decide if they wanted to
21  transact on the price, to deal in a different manner, maybe
22  they wanted to just do it at best.  It really depended on the
23  situation and it was up to the customer.
24  Q.  In your experience, did customers ever push back on a quote
25  or ask you to tighten a price?

| Mai3for2 | Walker - Direct | Page 841 |

1  A.  They could do.
2  Q.  In those instances, would you tighten the price?
3  A.  Most likely, yes.
4  Q.  If we can focus on two-way quotes for a moment.  Can you
5  explain what the term spread means in your view.
6  A.  Of course.  Spread is just the difference between the bid
7  and offer.  Where would you buy a currency and where you would
8  sell a currency.  So just the number of points in between
9  creates that -- the spread.
10  Q.  Could you say the spread is charged to a customer?
11  A.  No.
12  Q.  How would you go about determining spread to use for a
13  two-way price?
14  A.  You would use any number of factors.  I mean, there was --
15  depending on the situation in the market, whether there was an
16  economic event, a data release, central bank announcement, we
17  would rely on price, risk we might have, inventory we might
18  retain, and then we would utilize any of our interbank
19  counterparts to get an assessment of what we thought liquidity
20  looked like in the marketplace.
21  Q.  How would you go about collecting that information about
22  liquidity that you just mentioned?
23  A.  You would be in touch with different counterparts across
24  the street.
25  Q.  What do you mean by across the street?

| Mai3for2 | Walker - Direct | Page 842 |

1  A.  Oh, other interbank counterparties, so other banks in the
2  industry.
3  Q.  At what point in the trading day would you seek to assess
4  liquidity?
5  A.  Usually, you know, points of inflection, when things were
6  moving fast and you are trying to assess whether or not the
7  dynamics have changed, right.  So the liquidity events would
8  consistently change, they're constantly changing, so you are
9  always trying to assess whether or not the viewpoint in the
10  marketplace has changed.
11  Q.  While you were at Credit Suisse, did you typically trade
12  with a particular kind of customer?
13  A.  We would trade with all sorts of customers.  They were
14  probably divided by three sectors.  We traded with the hedge
15  fund community, we would trade with asset managers or real
16  money customers, and we would trade corporations.
17  Q.  In your experience, did Credit Suisse's customer base
18  differ from the customer base of other banks?
19  A.  Absolutely.
20  Q.  How so?
21  A.  So, the DNA at all the banks is very specific and
22  different.  So Credit Suisse was focused on the institutional
23  customers, the hedge fund community.  My previous employer for
24  that, Bank of America, would have been focused on corporations,
25  mid-market customers.  And then even going back to NatWest and

| Mai3for2 | Walker - Direct | Page 843 |

1  RBS, they would be focused on European corporates and European
2  asset managers.
3  Q.  How would you describe the customers you traded with?
4  A.  They were typically large sophisticated institutions.
5  Q.  Was it always necessary for a customer to trade through a
6  salesperson or a trader?
7  A.  No.  They could come to their trader directly if they chose
8  to.
9  Q.  Did Credit Suisse also have any trading electronic trading
10  platforms that a customer could use?
11  A.  They did.
12  Q.  Do you have an understanding of how many trades were done
13  via CS's electronic platforms versus voice trade over the
14  relevant time period, 2007 to 2013?
15  A.  I don't know the exact numbers.  It certainly grew over the
16  years.  The industry largely electrified and most people use
17  the electronic platforms, and at that time majority of the
18  trades would go through electronic format.
19  Q.  As a trader, did you have any role in developing or
20  programming Credit Suisse's electronic platform?
21  A.  No, I did not.
22  Q.  Did you ever use the electronic platform?
23  A.  No, I did not.
24  Q.  Did you track Credit Suisse's market share during the
25  relevant time period?

IN RE: FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST

October 18, 2022

---

Mai3for2          Walker - Direct          Page 844

1  A. As best I could.
2  Q. How did you do so?
3  A. There would be any number of consulting surveys that would
4    rate out the different banks in the industry, as well as just
5    feedback from our customers directly.
6  Q. Do you recall Credit Suisse's standing over the 2007 time
7    period?
8  A. At the point that I started the firm, it was a small player
9    in the marketplace. Certainly in the single percentage digits
10   in market share. So in the lower bottom, lower third, lower
11   half of the bottom third of the industry.
12 Q. Did that ever change?
13 A. Absolutely.
14 Q. How did it change?
15 A. We grew our market share quite a bit from 2007 to 2013.
16 Q. Do you have a view as to why you were able to do that?
17 A. We were absolutely the most aggressive bank on the street
18   at that time. Credit Suisse New York.
19 Q. What do you mean by being an aggressive bank?
20 A. So we were the most aggressive in tightest pricing,
21   servicing our clients, making sure they had all the resources
22   and connectivity in the market that they needed.
23 Q. How do you know that the prices that you were quoting were
24   aggressive or --
25 A. Because we gained market share and because the customers

---

Mai3for2          Walker - Direct          Page 845

1    would let us know that.
2  Q. Do you recall any specific clients who would reach out to
3    you to give you that feedback that you were aggressive or
4    tight?
5  A. I mean, there would be any number of customers over the
6    time. Large asset managers like the BlackRocks of the world
7    Putnam, Fidelity, as well as the hedge fund community. Moore
8    Asset Management, Tudor Asset Management.
9  Q. During your time as an FX trader at Credit Suisse, did you
10   use Bloomberg chats?
11 A. Yes.
12 Q. Who would you generally communicate with in your Bloomberg
13   chats?
14 A. Other counterparties at other banks.
15 Q. Did you also use them internally at CS?
16 A. Yes.
17 Q. Do you recall how many traders from other banks you would
18   typically chat with in these chatrooms?
19 A. Roughly 11 or 12 in total.
20 Q. Did you view those 11 or 12 individuals as your
21   competitors?
22 A. No.
23 Q. How did you view them?
24 A. I viewed them as counterparties.
25 Q. What do you mean by that?

---

Mai3for2          Walker - Direct          Page 846

1  A. I viewed them as counterparties because they were providing
2    liquidity to the marketplace. I could use them for liquidity.
3    They would give market color and commentary. It allowed me to
4    provide a service to our customers, provide the best possible
5    price.
6  Q. When you say you would use them for liquidity, does that
7    mean you would trade with the other traders?
8  A. Occasionally.
9  Q. What would you typically discuss with other traders on
10   Bloomberg chats?
11 A. The bulk of it would be, would be banter, could be
12   anything, you know, personal, what's going on at home life.
13   And we would also, we utilize it in moments of inflection where
14   we would look for commentary around liquidity conditions.
15 Q. You mentioned the term market color earlier in your
16   testimony. What does that term mean to you?
17 A. It means any number of things. It really is about, like,
18   opinions on maybe a data release, opinions on a central bank
19   comment, anything that might be fundamental. Research that
20   could be spread across the street, and then as well as opinions
21   on what liquidity looks like, whether the market is slow moving
22   or faster moving, if it's illiquid or has some depth to it.
23 Q. Were there any limitations as to the types of information
24   you could exchange with traders at other banks?
25 A. Yes.

---

Mai3for2          Walker - Direct          Page 847

1  Q. What were those limitations?
2  A. You certainly could not share specific customer information
3    in divulging a name. You would not give any real time
4    information on any specific trade in real time.
5  Q. Why would you not give real time information?
6  A. Because it -- it would not help you. It would disclose too
7    much on that customer about what they are trying to do.
8  Q. Are you familiar with the term P chat or persistent chat?
9  A. I am.
10 Q. Approximately how many persistent chats were you a member
11   of in 2007 to 2013?
12 A. Between 10 and 11.
13 Q. Are you able to estimate the approximate number of chat
14   discussions you would have had in the 2007 to 2013 time period?
15 A. There was probably 250, 260 days in a trading year,
16   multiply that by those amounts, it's got to be in the tens of
17   thousands.
18 Q. Did you ever discuss spreads in chatrooms with traders from
19   other banks?
20 A. Yes.
21 Q. For what purpose were you doing that?
22 A. You are trying to assess liquidity and the conditions
23   around liquidity.
24 Q. How would discussing spreads with other traders inform you
25   about liquidity?

---

IN RE: FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST

October 18, 2022

| Mai3for2 | Walker - Direct | Page 852 |
|---|---|---|

1  wide.  I gave him a range of 150 to 200 points.
2  Q.  Can you describe your response from 8:28:24 to 8:26:39?
3  A.  Another 27 minutes later I chime back in saying sorry 225.
4    Market -- 225 to 250 markets get better should be 200.
5        I'm giving him some ranges in my thoughts, if things
6  stabilize, it should probably be tightened up to 200.
7  Q.  You also say, sorry, was my guess and just asked Niall and
8  he tends to be aggressive so I was way off.
9        What do you mean by that?
10  A.  So, yeah, we're not, at that point, yeah, I'm just guessing
11  at liquidity, right, trying to give my estimate or my opinion
12  on it.  And at some point, clearly about a half an hour later,
13  I probably had asked Niall what his opinion was and he gave
14  something different.  And he is, I view him as an aggressive
15  price maker so I indicated that.
16  Q.  Would traders on the same desk show different spreads for
17  the same volume in the same currency pair?
18  A.  Absolutely.
19  Q.  Why was that?
20  A.  You'd have different mandates, so different reasons to have
21  positioning or not.  Different levels of experience.  You had,
22  you would have different P&L tolerances.  So at times things
23  change across the desk for different people.
24  Q.  Might you have a different view of the market?
25  A.  Absolutely.

| Mai3for2 | Walker - Direct | Page 853 |
|---|---|---|

1  Q.  Do you know if Mr. Crank was asking you for your views on
2  spreads in order to provide a quote to a customer?
3  A.  I do not.  I don't believe Jason ever traded in dollar/mxn.
4  Q.  In this exchange, were you agreeing with Mr. Crank about
5  what spreads you would show to customers?
6  A.  Absolutely not.
7  Q.  What would you say the purpose of this exchange was?
8  A.  Trying to assess, figure out liquidity in that currency
9  pair in that amount.  Really just trying to figure out the
10  conditions at that time over a 30-minute period.
11  Q.  Can we bring up PTX 29A.  Can we highlight the time stamp
12  11:21:05 to 11:22:21.  Can you take a moment to read that and
13  then I'll have a few questions.
14  A.  Okay.
15  Q.  Can you read your question at 11:21:05, please?
16  A.  What is spread in 200 euro/dollar.
17  Q.  What are you asking?
18  A.  I'm asking because I am trying to figure out, again, assess
19  liquidity.  Jason gives an opinion, again, a range between 8
20  and 10 points.
21  Q.  What was your response back to Mr. Crank after he gave you
22  that range of 8 to 10?
23  A.  I was thinking that it was closer to 8 points.  So that was
24  my guess on that liquidity at that time.
25  Q.  Then can you read Mr. Crank's statement at 11:22:15?

| Mai3for2 | Walker - Direct | Page 854 |
|---|---|---|

1  A.  Yeah.  Think 8 will most likely be a struggle but what is
2  expected by the select.
3  Q.  What do you understand him to mean?
4  A.  I think he's saying that 8 points is probably going to be
5  tight, and it would be difficult to liquidate it from beginning
6  to end.  So to clear the risk, to get it down to zero and to be
7  flat in P&L., he thinks it would be a struggle.  So most
8  likely, he's indicating most likely would lose money, and he
9  indicates what is expected by the select.  He's indicating that
10  maybe certain customers would expect that spread.
11  Q.  Do you know one way or the other if Mr. Crank was quoting a
12  customer a spread of 8 to 10 in that currency pair at that
13  time?
14  A.  I have no idea.  I mean, there's too much time that's gone
15  by.  It's not likely.
16  Q.  When you say too much time has gone by, what are you
17  referring to?
18  A.  Because if somebody's asking him for a price in that
19  amount, he has to reply right away.  He doesn't have time to
20  ask me my opinion.  And the exchange happens over a few
21  minutes, it won't happen.
22  Q.  In this exchange, were you agreeing with Mr. Crank about
23  what spreads you would show to customers?
24  A.  No.
25  Q.  What would you say was the purpose of this exchange?

| Mai3for2 | Walker - Direct | Page 855 |
|---|---|---|

1  A.  Trying to figure out liquidity in that amount at that time.
2  Q.  Let's take a look at PTX 933A.  Can we show the time stamps
3  at 12:38:13 to 12:42:39.  Can you take a moment and read that
4  and let me know when you're ready.
5  A.  Okay.
6  Q.  First, the first question is asked by a Maria Wrench.  Who
7  is that?
8  A.  I believe I had worked with Maria, she is a counterpart.  I
9  believe I worked with her maybe at Dresdner.  I am not
10  completely sure.
11  Q.  Do you know where she was working at that time?
12  A.  UBS.
13  Q.  Can you read what she's written to you there in the first
14  time?
15  A.  So brain what will be spread in 1 yard euro/dollar.
16  Q.  What do you understand her to be asking?
17  A.  So she's asking an opinion on what a spread would be in
18  1 billion euros against the U.S. dollar.
19  Q.  Is a yard, a 1 billion, a frequently traded amount in the
20  FX market?
21  A.  Fairly infrequent.
22  Q.  How often have you traded that amount in a currency pair in
23  your career?
24  A.  Over the 28 years, with financial institutions, maybe a
25  couple times at most.

| MAIHFor3 | Walker - Direct | Page 868 |
|---|---|---|

1  A. 7.1.
2  Q. What was the highest that was submitted?
3  A. 12 points.
4  Q. And what was Credit Suisse's submission?
5  A. We indicated 7.
6  Q. And in the 200 million, what was the median that was
7   submitted?
8  A. 12.5.
9  Q. What was the mean?
10  A. 13.4.
11  Q. What was the highest?
12  A. 20.
13  Q. What was Credit Suisse's submission?
14  A. Indicated 12 points.
15  Q. Finally, if we move to Canadian dollars, what was the
16   median submission for the 50 million?
17  A. 5 points.
18  Q. What was the mean?
19  A. 5.5.
20  Q. What was the highest?
21  A. 10 points.
22  Q. What was Credit Suisse's submission?
23  A. Indicated 5 points.
24  Q. And lastly, in the notional amount of 100, what was the
25   median?

| MAIHFor3 | Walker - Direct | Page 869 |
|---|---|---|

1  A. 10 points.
2  Q. What was the mean?
3  A. 9.9.
4  Q. What was the highest?
5  A. 14.
6  Q. And what was Credit Suisse's submission?
7  A. Indicated 8 points.
8      MS. ROY: Thank you. You can take that down.
9  Q. Now, plaintiffs in this case have claimed that some of the
10   chats we reviewed earlier today and others like them reflect
11   agreements by traders -- with traders from other banks to show
12   the specific spreads to customers in the market.
13      Did you at any time enter into an agreement with any
14   trader at any other bank about FX spreads?
15  A. Absolutely not.
16  Q. Do you have a view as to what would have happened if four
17   to five traders got together and agreed on spreads to show
18   customers?
19  A. Would not have seen any business. You would have lost
20   market share across -- across all customer bases.
21  Q. Why do you believe that?
22  A. Because they would go somewhere else. They have plenty of
23   options to deal elsewhere. They're going to deal on the best
24   possible price.
25  Q. When you're saying "they," you're referring to customers,

| MAIHFor3 | Walker - Cross | Page 870 |
|---|---|---|

1   right?
2  A. That's correct.
3      MS. ROY: I have no further questions.
4      THE COURT: Cross.
5      MR. BEREZNEY: Your Honor, I have some binders. May I
6   approach?
7      THE COURT: Yes.
8      MR. BEREZNEY: May I proceed, your Honor?
9      THE COURT: Yes.
10  CROSS-EXAMINATION
11  BY MR. BEREZNEY:
12  Q. Good afternoon, Mr. Walker. My name is Steve Berezney on
13   behalf of plaintiffs.
14      We have not met before, have we?
15  A. No, sir.
16  Q. Are you represented by counsel today?
17  A. I am.
18  Q. Who is paying your counsel?
19  A. Credit Suisse.
20  Q. Now, am I correct that you communicated with Credit Suisse
21   spot traders at the London trading desk about FX?
22  A. That is correct.
23  Q. And you did so on a regular basis, correct?
24  A. Correct.
25  Q. YOU also communicated with Credit Suisse spot traders at

| MAIHFor3 | Walker - Cross | Page 871 |
|---|---|---|

1   the Credit Suisse trading desks in Singapore and Zurich about
2   FX as well, correct?
3  A. Agree.
4  Q. And you did that on a regular basis as well, correct?
5  A. Agreed.
6  Q. Did you talk to FX traders at Credit Suisse on their Tokyo
7   and Hong Kong desks as well about FX?
8  A. I would assume so.
9  Q. Are you familiar with the name Jamie Lawes?
10  A. I'm familiar with the name.
11  Q. Mr. Lawes was on Credit Suisse's London spot desk, correct?
12  A. That is agreed.
13  Q. And you would communicate at times with Mr. Lawes about
14   Credit Suisse's FX business, correct?
15  A. I don't recall, but I would assume so.
16  Q. I'm sorry. Can you say that one more time.
17  A. I assume so.
18  Q. Thank you.
19      Were you aware that Mr. Lawes was in multibank
20   chatrooms?
21  A. I was not aware.
22  Q. Do you know a woman by the name of Natalie Williams?
23  A. I do.
24  Q. And you both worked at Credit Suisse as FX traders for a
25   period of time, correct?

IN RE: FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST

October 18, 2022

---

MAIHFor3      Mathur - Direct      Page 900

1 matter.
2 Q. And to what extent does your firm's compensation depend on
3 the substance of the testimony you're going to give her today?
4 A. Not at all.
5 Q. How about your personal compensation? To what extent does
6 that depend on the opinions that you're going to offer here
7 today?
8 A. It does not.
9 Q. So, Dr. Mathur, before we get into the meat of your
10 testimony, I want to ask you something. Were you here when
11 Dr. Singer testified for the plaintiffs?
12 A. I was.
13 Q. So can you tell us what, if any, reaction you had to
14 Dr. Singer's testimony?
15 A. I was a bit surprised by Dr. Singer's testimony. He
16 offered the opinion that the evidence in this matter is
17 consistent with an alleged agreement to widen spreads, but we
18 didn't see any empirical analyses or data-driven analysis to
19 support those opinions. And that's what economists do,
20 economists analyze data, and so I was a bit surprised by that.
21 Q. Were there any other of Dr. Singer's opinions that you were
22 surprised he didn't support with data?
23 A. Well, for example, he offered the opinion that, in his
24 view, the evidence is not -- is consistent with an alleged
25 agreement to widen spreads. For an economist, the most direct

---

MAIHFor3      Mathur - Direct      Page 901

1 evidence to assess that question would be to in fact study
2 whether spreads were wider during this alleged period, and we
3 didn't see any such analysis.
4      Another example, I believe Dr. Singer offered the
5 opinion that, on profitability, the alleged conspiracy was
6 profitable for the banks. Profitability is again an empirical
7 question. Economists typically study it using financial data
8 or profit and loss statements, and we didn't see any such
9 analysis.
10 Q. Do you recall what Dr. Singer did base his profitability
11 opinion on?
12 A. I believe it was based on some statements by one of the
13 traders in a chat conversation.
14 Q. How about spread grids? The jury's heard a lot about
15 spread grids. Do you recall any reaction -- having any
16 reaction to Dr. Singer's testimony about spread grids?
17 A. It's a similar reaction. I think the allegation here is
18 that the spread grids were used to effectuate an alleged
19 agreement to coordinate on spreads. The most direct evidence
20 to assess that question would be to in fact look at the data in
21 the spread grids, and it's very detailed data in the spread
22 grids, to see if the data reflect an agreement, an alleged
23 agreement on spreads.
24 Q. Did he do that? Did he present that analysis?
25 A. We didn't see any such analysis.

---

Mai3for4      Mathur - Direct      Page 902

1 Q. All right. So, we'll get back to Dr. Singer. But let's
2 move on.
3      And can you just summarize for the jury, please, what,
4 if any, opinions you'll be offering in your testimony here
5 today?
6 A. I have two primary opinions. The first is that the FX
7 marketplace is not conducive to an overarching conspiracy to
8 widen spreads.
9      The second opinion is that the evidence that I've
10 analyzed is not consistent with such an alleged conspiracy.
11 Q. So, let's start with that first opinion, Dr. Mathur. The
12 FX market is not conducive to a conspiracy.
13      Can you explain what that means, to not be conducive
14 to a conspiracy.
15 A. By "conducive" what economists typically mean is whether a
16 marketplace has the features or the characteristics that you
17 would expect to see in a market that might make it more likely
18 or more possible for there to be a conspiracy.
19 Q. When you say a conspiracy, do you have in mind the
20 particular term of art that economists use?
21 A. Yes. When economists, and when I'm referring to a
22 conspiracy, I'm referring to an agreement to increase -- well,
23 an agreement among competitors to increase prices above their
24 competitive level. That's what economists typically mean by a
25 collusive agreement.

---

Mai3for4      Mathur - Direct      Page 903

1 Q. So, why would firms want to raise their prices above
2 competitive levels?
3 A. Well, the idea would be to raise prices above competitive
4 levels in order to make more money and earn more profits.
5 Q. That seems pretty good. How come all firms don't do it?
6 Or do all firms do it?
7 A. Well, in fact, collusive agreements are rare. Most
8 marketplaces don't have the conditions and the features that
9 result in such agreements.
10 Q. Let me show you Dr. Singer's trial testimony at page
11 368:13-15, if we can please pull that up on everyone's screen.
12 This is an answer from Dr. Singer last week:
13 "A. What does a pact does or an agreement does is solve what an
14 economist calls the incentive problem. Cartels are hard.
15 They're hard generally to put together."
16      Do you agree with that?
17 A. I do.
18 Q. Now, why do the conditions of the marketplace matter for
19 this conduciveness analysis?
20 A. Well, the conditions of the marketplace matter because the
21 incentives are complicated, and in particular, there are
22 competing incentives. So on the one hand, collectively, the
23 firms in the marketplace may have an incentive to attempt to
24 increase prices in an effort to earn higher profits. But there
25 is an opposite incentive. Each individual firm also has an

---

Mai3for4                    Mathur - Direct                    Page 908

1   is about six years?
2   A.  That's right.  I believe 73 months.
3   Q.  So how many approximately transactions would there be, FX
4       transactions, in the period that plaintiffs are alleging there
5       was a conspiracy?
6   A.  Well, with about 250 trading days per year and 325,000
7       transactions per day, that gets us to about half a billion
8       transactions over this alleged period.
9   Q.  Now, thinking back to the reaching agreement prong here
10      pillar.  What, if any, conclusions can you draw from the market
11      size?
12  A.  Well, the market size tells us that it would be extremely
13      challenging to form a common understanding in order to be able
14      to reach an agreement on spreads in a marketplace with so many
15      transactions that are also driven by a multitude of factors.
16  Q.  Dr. Mathur, let me push on that for a second.  If each one
17      of these dots just simply represents an FX transaction, why
18      can't they just agree on sort of this is the spread for an FX
19      transaction?  What's so hard about that?
20  A.  That's a slightly overly simplistic view of what each of
21      these trades represent.  Not only is it a large marketplace,
22      there are many factors that add to its complexity.  As I
23      mentioned, there are hundreds of traders, trading across more
24      than 50 currency pairs, each driven by their risk position and
25      their perception of conditions in the marketplace, perceived

Mai3for4                    Mathur - Direct                    Page 909

1   volatility, perceived liquidity, each of which goes to make
2   these transactions very different from each other.
3   Q.  Have you prepared anything to try to explain the potential
4       differences in transactions?
5   A.  Yes.  I have a demonstrative I believe.
6   Q.  Okay.  What are we looking at here, Dr. Mathur?
7   A.  Well, there's a lot going on here.  And I think in some
8       sense, that's the point.  I'm happy to maybe break it down and
9       we can talk about each factor.
10  Q.  All right.  Sounds like a good plan.  Let's start with the
11      left-hand side.  So what are we looking at here?
12  A.  So the left-hand side are examples of some of the customers
13      in this market.  And they include large sophisticated entities,
14      BlackRock, Pimco, KKR, entities we've heard about.  And
15      importantly, these entities are trading FX for their own unique
16      reasons and they have individual relationships with various
17      dealer banks.  That affects the spread or the price and the
18      prices that they receive on the trades that they make.
19  Q.  If we can now highlight the middle section.  Move to there.
20      So what are we looking at here?
21  A.  So in the middle section of the middle panel are just flags
22      and symbols to denote the various currency pairs.  Each trade
23      occurs in one currency pair, but the underlying market
24      conditions in those markets drive the spreads and the prices.
25      So, different currency pairs have different conditions and that

Mai3for4                    Mathur - Direct                    Page 910

1   critically affects the spreads on those trades.
2   Q.  How about the top, those circles at the top?
3   A.  So the circles at the top refer to different sizes of the
4       trade.  I believe the traders call it the notional amount.  And
5       the larger the notional amount, the larger the size of the
6       trade, the more risk that is associated with it, and therefore,
7       typically the wider spreads that are associated with it.  So
8       that's another factor that drives the underlying prices and
9       spreads for a transaction.
10  Q.  How about the bottom, that gray line on the bottom?
11  A.  So the bottom is the time of the day.  And I think as we
12      heard from many of the traders, economic news comes out at
13      certain times of the day, certainly global areas are open and
14      certain desks are closed during different times of the day
15      also, which also affects the liquidity and volatility in the
16      market, and therefore drives the underlying spread.
17  Q.  Let's move to the right and light up the right-hand side.
18      What are we looking at here, Doctor?
19  A.  On the right-hand side, I have the 16 dealer banks that are
20      at issue that have been discussed, as well as a little box at
21      the bottom, because of course there are many other market
22      makers.  Each of these dealers have dozens of traders that
23      specialize in certain currencies, and really have their own
24      view on risk and on the positions they already have, and
25      liquidity and volatility in the market which affects the

Mai3for4                    Mathur - Direct                    Page 911

1   underlying spreads and prices that they quote to customers.
2   And then, of course, we also have the sales folks who are the
3   people who directly interact with the customers and play a role
4   in the final spread or in prices that are provided to
5   customers.
6   Q.  How about all the way on the right-hand side, the dealers?
7   A.  I think I just described that.  It includes here both the
8       16 dealer banks, that we have discussed, as well as the many
9       other market makers outside of these 16.
10  Q.  What about the incentives for different dealers vis-a-vis
11      different customers?
12  A.  Yeah.  As I mentioned right at the beginning, you know,
13      dealers, these customers tend to be very frequently large and
14      sophisticated, and they have particular reasons for trading.
15      And I think, as we've heard, different customers get different
16      spreads.
17          So, for example, if Credit Suisse really wants to
18      trade with the particular customer and really make sure it
19      makes the sale, it may offer -- and it does offer -- a
20      different, better price in order to close on that transaction.
21  Q.  So, what's the punch line with this demonstrative?  Why do
22      all these things matter?
23  A.  There is a long set of factors, so yes, the punch line is
24      what matters.  I think the punch line is this is a really
25      complex marketplace, and the prices and spreads underlying the

IN RE: FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST

October 18, 2022

| Mai3for4 | Mathur - Direct | Page 928 |
|---|---|---|

1 Q. Let's pull up if we can, please, marked for identification
2 DTX 2020. And the jury will perhaps recall this from the
3 opening as well.
4       Can you explain to the jury what we are looking at
5 here, please.
6 A. Yes. This is consistent with the analysis I did. What
7 this shows is the 2571 chats that I understand plaintiffs have
8 identified as evidence in this case, divided by the number of
9 days in the alleged period, which gives the number of
10 approximately two chats that occurred per trading day.
11 Q. You said this is consistent with the empirical analysis you
12 did based on a random sample?
13 A. That's correct.
14 Q. So, we've talked about now your first empirical analysis of
15 the frequency of chats.
16       I'd like to pull up Dr. Singer's trial testimony at
17 trial transcript 403:3. I think I was asking the question a
18 second time, and the question is: "I am asking you today what
19 you are telling the jury. You are not showing the jury any
20 empirical analysis to determine how frequently the banks shared
21 spreads in chatrooms, right?
22 "A. Today I'm not offering the jury an analysis of frequency,
23 but I took your question to mean have I ever performed an
24 analysis of frequency? I apologize but that's how I heard your
25 question."

| Mai3for4 | Mathur - Direct | Page 929 |
|---|---|---|

1       What, if any, reaction do you have to this testimony,
2 Dr. Mathur?
3 A. There's data available about the chats. Economists analyze
4 data because it is valuable and it is objective. And in my
5 view, that is the most reliable way to understand what the
6 chats tell us as an economist with reference to the allegations
7 in this case.
8 Q. I'd like to move to your second chat analysis, and I want
9 to frame it by pulling up plaintiffs' alleged network slide.
10 Do you recall seeing this throughout the trial?
11 A. I do, I believe Dr. Singer presented it as well.
12 Q. I think that's right. Can you explain to the jury what
13 we're looking at here, please, in your own words.
14 A. Well, this appears to be four circles, each of which
15 represents a chatroom. And I believe the inference is that
16 because there was at least one trader from Credit Suisse
17 present in each of these chatrooms at some point in time over
18 the six-year period, that that leads us to conclude that there
19 is somehow a network of chatrooms that perpetuated or enabled
20 this alleged agreement.
21 Q. Well, what do you think?
22 A. Well, I disagree, and the reason for that is, you know,
23 economists analyze networks all the time. They do it, again,
24 using data. And so you would study the size of the network,
25 the depth of the network, the connections across the alleged

| Mai3for4 | Mathur - Direct | Page 930 |
|---|---|---|

1 network.
2       And in this setting, what that would mean is it would
3 be important to look at a host of questions. For example, were
4 there even spread discussions occurring in these chatrooms. If
5 so, on which days? Did they pertain to the same currency pair?
6 Did they pertain to the same notional amount? Because we know
7 that spreads vary based on those factors. Which traders were
8 present? Was it the same traders?
9       Those are the types of questions that you would use
10 the data to assess. And then based on what you found, you
11 would or would not conclude whether a network of chats could in
12 fact support the alleged agreement.
13 Q. Let's stay on that concept of the ability to use empirical
14 data, and let's pull up Dr. Singer's testimony at trial
15 transcript 403:22.
16 "Q. Right. I know you talked about interdependence. You
17 haven't actually done any analysis to determine whether any
18 information discussed in one chatroom was actually transmitted
19 to another chatroom, right?
20 "A. Well, when you say analysis, if you mean empirical
21 analysis, I can't give you a frequency of that, but I have seen
22 record evidence consistent with that.
23 "Q. Right. You are not offering any empirical analysis to --
24 regarding whether any information discussed in one chatroom was
25 actually transmitted to another, correct?

| Mai3for4 | Mathur - Direct | Page 931 |
|---|---|---|

1 "A. I think with the modifier empirical, I think we've reached
2 an agreement."
3       Dr. Mathur, what's your reaction to that testimony?
4 A. It's consistent with what I had described. I think
5 Dr. Singer agrees that he didn't provide any empirical analysis
6 of the alleged network.
7 Q. So let's talk about your analysis. Please tell the jury
8 what you did.
9 A. As I described earlier, I analyzed a sample of trading
10 days, and the second metric that I was interested in was to see
11 whether or how frequently on any day for a particular currency
12 pair, how many traders from different banks were represented.
13 In other words, how frequently were traders across different
14 banks having spread discussions. Again, setting aside whether
15 the spread discussions was appropriate or not, but just how
16 frequently were multiple banks having spread discussions on the
17 same day for a currency pair.
18 Q. I'd like to focus -- let me ask, did you do an analysis on
19 what we've heard is the most frequently traded currency pair,
20 the euro/dollar?
21 A. I did an analysis of all currency pairs, but yes, the
22 euro/dollar is frequently traded, so that's helpful to talk
23 about.
24 Q. What did you find with respect to your analysis on the
25 euro/dollar?

| MAJ3FOR1 | Mathur - Cross | Page 1012 |
|---|---|---|

1  A.  I think I explained there are many factors that economists
2   analyze and that I analyzed in order to assess whether the
3   marketplace is or is not conducive.  The stability of spreads
4   or lack thereof is one factor, certainly, and an important
5   factor, but you look at this in totality, yes.
6  Q.  It was an important factor that you set forth in your
7   report at some length, right?
8  A.  Yes.
9  Q.  Then, we took a look at some documents and we'll take a
10  look at one right now, if we take a look at PTX 2456.  If we go
11  down, this is Nick Ritter and Daniel Wise at Credit Suisse,
12  this is Nick Ritter from Moore Capital.  And he's written a
13  letter.  And he's talking about the spread matrix.  Do you see
14  that he wanted to -- would you mind updating our spread matrix
15  please.
16      Do you see Moore Capital was asking the bank to do
17  that?
18  A.  Yes.
19  Q.  He says we rarely price banks, although we do use a spread
20  matrix as a barometer.
21      Do you see that?
22  A.  Yes.
23  Q.  Then he goes on to say we are interested in consistency and
24  eliminating negative surprise more than the absolute best
25  price.

| MAJ3FOR1 | Mathur - Cross | Page 1013 |
|---|---|---|

1      Do you see that?
2  A.  Yes, I see that.
3  Q.  And was that type of statement, did you see a lot of
4   documents like that from these various customers back to the
5   banks?
6  A.  I understand Moore Capital is one customer.  What's being
7   described here is consistent with what I understand, for
8   example, other customers like BlackRock considered in
9   requesting information on the spread grids.
10 Q.  Let's take a look at the next document which is from
11  BlackRock.  PTX 0003.  If we go to the back of that document
12  which is where the e-mail starts.  Not all the way back.  One
13  up to see -- who it's from.
14      This is from David Turner from BlackRock and he's
15  writing to one of the banks.  And he's sending this to one of
16  he's sending it specifically to BNP.  And he attaches some
17  instructions.
18      If we go to the next page.  If we go to the top
19  instruction.  Do you see that instruction?  We ask you to
20  complete the spreads with a view to where current market
21  liquidity is and with the aim that you did not widen unless
22  market conditions are extreme.  We expect you to hold these
23  spreads at least 90 percent of the time.
24      Do you see that?
25 A.  Yes, I do.

| MAJ3FOR1 | Mathur - Cross | Page 1014 |
|---|---|---|

1  Q.  BlackRock expected the banks to hold the spreads in normal
2   market conditions at least 90 percent of the time.  Correct?
3  A.  I see that's what this says, yes.
4  Q.  And isn't that what those spread matrices show, that in
5   fact the submissions did hold quarter after quarter?
6  A.  No.  They don't.
7  Q.  You disagree with that?
8  A.  I do.  Because as we saw in the spread matrices, even with
9   the lines that you presented, there were many quarters,
10  including, for example, the financial crisis, where they were
11  different.
12 Q.  You understood that the banks did expect -- that the banks
13  did not expect -- that the customers did not expect the banks
14  to collude on these spread matrices, right?
15 A.  Could you repeat that question?  I didn't -- I'm sorry, I
16  couldn't -- could you just repeat that.
17 Q.  You understood that the customers did not expect the banks
18  to be colluding on the spread matrices that they submitted.
19  Correct?
20 A.  That's fair, yes.
21 Q.  Because they were competitors and they shouldn't have been
22  colluding with each other on the matrices they submitted to
23  customers, correct?
24 A.  I think we want to be precise in what you mean by
25  colluding.  If you mean by colluding what an economist means,

| MAJ3FOR1 | Mathur - Cross | Page 1015 |
|---|---|---|

1  which is attempting to raise prices above competitive levels, I
2   completely agree.
3      But I think we've also heard that exchanging
4   information to understand market conditions in order to offer
5   the best guess that they can to fill out these spread matrices
6   is different from that.
7  Q.  So you think that two competitors talking about what
8   numbers to put in the spread matrices, first of all, is not a
9   violation of some internal policy at the company?
10 A.  I'm not a compliance or a legal expert.  I'm not offering
11  any opinions on internal company policies.
12 Q.  You think it raises anticompetitive concerns if two
13  competitors are sharing what numbers to put in a spread matrix
14  that goes to a customer?
15 A.  From an economist perspective, exchanging or sharing
16  opinions on information in the marketplace in order to provide
17  the best guess, I don't think that that is a problem in this
18  setting, given this marketplace and given everything we've
19  heard about this market.
20 Q.  How about a specific spread?  Is that a problem?
21      MR. MOSS:  Objection.
22      THE COURT:  Overruled.
23 A.  I don't follow the question.  How about a specific spread
24  for what?  Sorry.
25 Q.  Between two customers about how to fill in a spread

MAJ3FOR1          Mathur - Cross          Page 1024

1  A.  I see it.  Yes.
2  Q.  Within you heard the testimony here, literally within
3    minutes, he has the spreads of eight banks.  He's able to get
4    that.  And you don't agree that's a form of monitoring?
5  A.  Well, these show ranges across the different banks.  And I
6    think as we've discussed earlier, ranges or even specific
7    spreads are an indication of market conditions.  So yes, he I
8    think understands what other dealers' views of market
9    conditions are.
10       (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

MAJHFor2          Mathur - Cross          Page 1025

1    BY MR. COUGHLIN:
2  Q.  You don't find it odd that he within minutes can find out
3    the spreads of eight other banks that are offering to
4    customers, eight other competing banks?
5  A.  I don't think it's odd.  I think these are chats where
6    they're exchange their opinions and views on market conditions
7    as we've seen occur.  So the fact that they know each other's
8    views on where they think the market might be or might be
9    heading, I don't find that odd.
10  Q.  Yesterday you talked about punishment, that there had to be
11    punishment, and you talked about a certain email.
12       If we could go to next in line PTX -- another chat,
13    PTX 1359A.  And if we could go in on this, this is another chat
14    with Credit Suisse and a number of other banks, at least
15    Toronto-Dominion, Deutsche Bank, Credit Suisse.  If we could go
16    down to page 5 of this, if we could go up to Parikh says, from
17    Goldman Sachs, said:  Jules, you may as well eject him.
18       Stuart Dunn uses some colorful language back, and
19    Jules Munson has removed the following users from the chatroom.
20       Do you see that?
21  A.  I see that.
22  Q.  Now, you know these chatrooms are by invitation only,
23    correct?
24  A.  Yes.
25  Q.  So Mr. Dunn cannot get back in unless they let him back in,

MAJHFor2          Mathur - Cross          Page 1026

1    correct?
2  A.  To this chatroom, he would have to be invited by someone
3    who's in the chatroom.  I understand.
4  Q.  Do you think the chatrooms are all interchangeable?
5  A.  I don't -- what do you mean by "interchangeable"?  I don't
6    think I have a view on that one way or another.
7  Q.  Aren't these chatrooms, for the most part that you've
8    reviewed, specific to certain currency pairs that a trader may
9    be trading so that one chatroom won't be the same as another;
10    that they're not just fungible?
11  A.  I really don't know.  I think they're persistent chats.
12    They go on every day for a long time.  They seem to discuss a
13    lot of things, so I don't really know.
14  Q.  But they don't discuss a lot of different currencies.  Do
15    you understand that?
16  A.  I don't think I know one way or another.  I think in some
17    chats we see references to more than one currency, and others
18    we don't.  As I explained, I haven't -- it's hard to follow the
19    context and the meaning of the chats.  My analysis was
20    therefore empirical and based on the data.
21  Q.  Let's take a look the next in line, PTX 1964A.  Let's go
22    over to -- this is an Old Gits chat with Mr. Cummins and
23    Mr. Hatton, and there are eight individuals here from four
24    different competitor banks:  Citi, Merrill, HSBC.  And if we go
25    over to line 11:15:11, here, Mr. Cummins says:  Note to Gits.

MAJHFor2          Mathur - Cross          Page 1027

1    We have no friends.  You want to be in this chat in six months?
2    Do you understand, then, that you have no friends, no special
3    prices, no stepping up, or any of that garbage?
4       Do you understand that Mr. Cummins is threatening
5    other people in the chat that if they try to undercut or do
6    something that the group feels is undercutting, that they won't
7    be in the chat anymore?
8  A.  I think Mr. Cummins, if I recall, testified, so he'd
9    probably be in the best position to explain.
10       But what I've seen over the course of the trial is
11    that there's a lot of bluster and bravado and, frankly,
12    offensive language in the chats.  I'm not sure I can -- I don't
13    purport to be able to interpret this.
14  Q.  We talked a little bit at your deposition about certain
15    pleas, so I'd like to talk about the pleas of a group called in
16    chats The Cartel.
17       Are you aware of the different pleas that were entered
18    into in this case?
19  A.  I believe we've heard during the trial The Cartel chat and
20    the guilty pleas associated with that.
21  Q.  And that's with -- that RBS, JPMorgan and Citi and Barclays
22    pled guilty to manipulating the spreads?
23       MR. MOSS:  Objection.
24       THE COURT:  Overruled.
25  A.  I'm aware that there was a guilty plea associated with that

MAJHFor2          Mathur - Cross          Page 1032

1    First, let's take a ten-minute break.
2    (Jury excused)
3    THE COURT: We're adjourned for ten minutes.
4    (Recess)
5    THE COURT: Who's doing the summations?
6    MR. COUGHLIN: Christopher Burke.
7    MR. WASHER: Herb Washer.
8    THE COURT: OK.  Where is Mr. Burke?
9    MR. COUGHLIN: He's right outside.
10   THE COURT: OK.
11   MR. COUGHLIN: He's ready to jump in in a minute.
12   THE COURT: Rather than having him make an entrance,
13   maybe we can have him come in.
14   MR. WASHER: Your Honor, could we possibly move the
15   lectern over to where it was for the openings?
16   THE COURT: Yes.
17   (Jury present)
18   THE COURT: Ladies and gentlemen, I've put a copy of
19   the final jury instructions on your chair, and this is your
20   copy.  I suggest you put your initials on the front page.  What
21   I'm going to do is read them to you -- and you don't have a
22   copy?
23   JUROR: I do now.
24   THE COURT: If you're not a visual person, you can
25   just listen.  If you want to follow along, you can do that.  If

MAJHFor2          Mathur - Cross          Page 1033

1    you want to underline things or circle things, make any marks
2    you want to on them, feel free to do that.  This is your copy,
3    and you can take them into the jury room when you deliberate.
4    We will destroy all the copies at the end of the deliberations,
5    so no one will see your notes or your markings.  And the same
6    is true as I mentioned for the notes you've been taking.
7    You'll be able to take the notes into the jury room with you,
8    and then we'll destroy them at the end.
9    So this is a two-sided copy, and you'll see that the
10   first -- after the cover page, the next page is the table of
11   contents.  This is your friend.  You may want to refer back to
12   the table of contents when you are deliberating and you have a
13   question of the law on some issue.  I'm beginning on the first
14   page of text.
15   Members of the jury, you have now heard all of the
16   evidence in the case.  You are about to hear the final
17   arguments of the parties, and then you will undertake your
18   final and most important function as jurors.  You have paid
19   careful attention to the evidence, and I am confident that you
20   will act together with fairness and impartiality to reach a
21   just verdict in this case.
22   My duty at this point is to instruct you on the law,
23   and it is your duty to accept my instructions and apply them to
24   the facts as you determine them, just as it has been my duty to
25   preside over the trial and to decide what testimony and

MAJHFor2          Mathur - Cross          Page 1034

1    evidence was proper under the law for your consideration.
2    You are to consider these instructions together as a
3    whole; in other words, you are not to isolate or give undue
4    weight to any particular instruction.
5    It is a tradition and right of our legal system that
6    parties involved in legal disputes have a jury chosen from the
7    members of their community to render a verdict.  Your role as
8    the jury is to decide the factual issues in this case.  I, as
9    the judge, will instruct you on the law, and you must accept
10   the law as I state it.  Then you will apply the law to the
11   facts as you find them.  The result of your work will be the
12   verdict that you return.
13   You, as jurors, are the sole and exclusive arbiters of
14   the facts.  You determine the weight of the evidence.  You
15   appraise the credibility of witnesses.  You draw the reasonable
16   inferences from the evidence or lack of evidence.  And you
17   resolve such conflicts as there may be in the testimony.  In
18   determining these issues, no one may invade your province or
19   function as jurors.  For you to determine the facts, you must
20   rely on your own recollection of the evidence.  I will instruct
21   you momentarily on what is and is not evidence.
22   Because you are the sole and exclusive arbiters of the
23   facts, I do not mean to indicate any opinion of mine as to what
24   facts or what your verdict should be.  The rulings I have made
25   during the trial are not any indication of my views of what

MAJHFor2          Mathur - Cross          Page 1035

1    your decision should be.  You are expressly to understand that
2    the Court has no opinion as to the verdict you should render in
3    this case.
4    My role as the judge is to instruct you on the law
5    that you are to apply to the facts as you find them.  You, as
6    jurors, are bound to accept my instructions on the law, even if
7    you feel that the law should be different from what I say it
8    is.  Also, if anyone or any document has stated or states
9    during closing argument a legal principle different from what I
10   tell you in my instructions, it is my instructions you must
11   follow.  You should not single out any one instruction or any
12   one word or phrase in an instruction as alone stating the law,
13   but you should consider the instructions as a whole.
14   All parties to a civil lawsuit are entitled to a fair
15   trial.  Therefore, you must make fair and impartial decisions
16   to arrive at a just verdict.  Under your oath as jurors, you
17   are to be guided solely by the evidence, or lack of evidence,
18   presented during the trial, as well as the applicable law,
19   without regard to your feelings, positive or negative, for any
20   party or attorney.  All parties are entitled to the same fair
21   and conscientious consideration.  If you let sympathy or bias
22   interfere with your clear thinking, then there is a risk that
23   you will not arrive at a just verdict.
24   As I've said, in determining the facts, you must rely
25   on your own recollection of the evidence.  What is evidence?

| MAJHFor2 | Mathur - Cross | Page 1048 |
|---|---|---|

1  purpose.
2      A conspiracy may vary in its membership from time to
3  time, and a conspiracy may be formed without all parties coming
4  to an agreement at the same time, such as where competitors
5  separately accept invitations to participate in a plan to
6  restrain trade.  Similarly, it is not essential that all
7  persons or entities acted exactly alike, nor is it necessary
8  that they all possessed the same motive for entering the
9  agreement.  It is also not necessary that all the means or
10  methods claimed by plaintiffs were agreed upon to carry out the
11  alleged conspiracy, nor that all of the means or methods that
12  were agreed upon were actually used or put in operation.  It's
13  also not necessary that all persons or businesses alleged to be
14  members of the conspiracy were actually members.
15      It is the agreement or understanding to restrain trade
16  by widening, fixing, stabilizing, or maintaining spreads in the
17  foreign exchange market that constitutes a conspiracy.
18  Therefore, you may find a conspiracy existed regardless of
19  whether it succeeded or failed.
20      The Sherman Act prohibits agreements among competitors
21  to fix, stabilize, raise, lower, or maintain prices, regardless
22  of whether the agreed-upon prices are reasonable.  Therefore,
23  in order to prove that a price-fixing conspiracy existed,
24  plaintiffs do not need to show that the prices agreed upon were
25  high or low or reasonable or unreasonable or that spreads were

| MAJHFor2 | Mathur - Cross | Page 1049 |
|---|---|---|

1  actually widened.
2      If you find that Credit Suisse engaged in a
3  price-fixing conspiracy, it is not a defense that Credit Suisse
4  acted with good motives, thought it was legal, or that the
5  conduct may have had some good results.
6      Competition may be evidence of the lack of a
7  conspiracy, but evidence of competition about itself does not
8  preclude the existence of a conspiracy.  If you find a
9  conspiracy existed, it is no defense that Credit Suisse and its
10  alleged conspirators actually competed in some respects with
11  each other or failed to eliminate all competition between them.
12  A price-fixing conspiracy is unlawful, even if did not extend
13  to all currency pairs traded by Credit Suisse and its alleged
14  conspirators or did not affect all of their customers or
15  transactions.
16      The fact that Credit Suisse and their alleged
17  coconspirators may have exchanged price-related information,
18  including spreads, does not necessarily establish that they
19  agreed to widen, fix, or maintain spreads.  There
20  may be other legitimate reasons that would lead competitors to
21  exchange such information, and the law recognizes that
22  exchanges of price information may enhance competition and
23  benefit customers.
24      Thus, you may not infer the existence of an illegal
25  agreement to widen, fix, or maintain spreads in the

| MAJHFor2 | Mathur - Cross | Page 1050 |
|---|---|---|

1  foreign exchange market solely from the fact that banks
2  exchanged price-related information.  On the other hand, if you
3  find that price information was exchanged, you may consider
4  whether it was exchanged as part of an agreement to widen, fix,
5  stabilize, or maintain spreads, along with all of the other
6  evidence bearing on whether there was such an agreement.
7      So, as I said, the first question you'll be asked is
8  whether there was a conspiracy.  So now turning to the second
9  question, and that is whether plaintiffs have proved that
10  Credit Suisse knowingly participated in a conspiracy to fix
11  prices.
12      Before you can find that Credit Suisse participated in
13  a conspiracy, the evidence must show that Credit Suisse
14  knowingly joined in the unlawful plan either from the beginning
15  or at some later time with knowledge of at least some of the
16  conspiracy's unlawful purposes and with the intent to advance
17  some purpose of the conspiracy.
18      A person who knowingly joins an existing conspiracy or
19  who participates only in part of a conspiracy with knowledge of
20  the overall conspiracy is just as responsible as if he or she
21  had been one of those who formed or began the conspiracy and
22  participated in every part of it.  You may not find that Credit
23  Suisse was a member of the conspiracy based only on its
24  knowledge of wrongdoing or association with others who were
25  involved in wrongdoing.

| MAJHFor2 | Mathur - Cross | Page 1051 |
|---|---|---|

1      To act knowingly means to act deliberately and not
2  because of mistake, accident, or other innocent reason.  As I
3  have mentioned, a person may become a member of a conspiracy
4  without full knowledge of all of the details of the conspiracy,
5  the identity of all of its members, the scope of the
6  conspiracy, the parts they played, or that their conduct
7  violates the law.  Knowledge of the essential nature of the
8  plan is enough.  On the other hand, a person who has no
9  knowledge of a conspiracy but happens to act in a way that
10  helps the conspiracy succeed does not thereby become a
11  conspirator.
12      Your determination whether Credit Suisse knowingly
13  joined a conspiracy must be based solely on the actions of
14  Credit Suisse.  You should not consider what others may have
15  said or done.  Whether Credit Suisse was a member of the
16  conspiracy must be established by evidence of its own conduct,
17  by what it said or did.
18      Once you have found that any person or entity is a
19  member of a conspiracy, he, she, or it is presumed to remain a
20  member and is responsible for all actions taken by all
21  conspirators during and in furtherance of the conspiracy until
22  it is shown that the conspiracy has been completed or
23  abandoned.
24      If you find there was a conspiracy and that Credit
25  Suisse participated in it, you will also be asked to identify

| MAJHFor2 | Mathur - Cross | Page 1052 |
| --- | --- | --- |

1 the other banks that you find knowingly participated in that
2 conspiracy. You should apply all the principles I just
3 outlined to determine what other banks participated in any
4 conspiracy you may find.
5      The next topic is single or multiple conspiracies.
6      The plaintiffs allege that Credit Suisse and up to 15
7 other banks were all members of one conspiracy. Credit Suisse
8 has denied its participation in any conspiracy. You may find
9 that there was no conspiracy, one conspiracy, or several
10 conspiracies. Whether plaintiffs have proved a single
11 conspiracy or multiple conspiracies or no conspiracies at all
12 is a question of fact that you must decide. If you find that
13 Credit Suisse did enter into a conspiracy with other banks, you
14 will need to answer how many conspiracies Credit Suisse joined.
15      And just to clarify, you'll also be asked which banks
16 were members of each such conspiracy.
17      To prove a single conspiracy, plaintiffs must show by
18 a preponderance of the evidence that each of the alleged
19 members of the conspiracy agreed to participate in what it knew
20 to be a collective venture directed toward a common goal.
21 Multiple conspiracies, on the other hand, may be found when the
22 evidence shows separate agreements or networks operating
23 independently of each other. It is possible for a single
24 entity or single person to participate in more than one
25 conspiracy. Proof that two or multiple groups of people

| MAJHFor2 | Mathur - Cross | Page 1053 |
| --- | --- | --- |

1 pursued similar or even identical activities but did not enter
2 into an agreement to do so does not prove that they were part
3 of a single conspiracy together. However, as I mentioned, a
4 single conspiracy may exist even if all the members did not
5 know each other or never sat down together or did not know what
6 roles the other members would play, even if different members
7 joined at different times, or the membership of the conspiracy
8 changed over time.
9      A single conspiracy also may involve subgroups
10 committing acts in furtherance of an overall objective in
11 different places and over a long period of time. What is
12 controlling is whether the plaintiffs have proved by a
13 preponderance of the evidence that there was one overall
14 agreement on common objectives.
15      After the closing argument, I will go over the verdict
16 form that you will need to fill out at the end of your
17 deliberations. If you find that Credit Suisse participated in
18 a conspiracy, you will be asked how many different conspiracies
19 you find that Credit Suisse participated in, and you will be
20 asked which other banks participated in each conspiracy and
21 during what time periods.
22      You have heard evidence that certain corporations or
23 entities and individuals in the foreign exchange spot market
24 who were not affiliated with Credit Suisse pleaded guilty or
25 were convicted at trial for engaging in an antitrust conspiracy

| MAJHFor2 | Mathur - Cross | Page 1054 |
| --- | --- | --- |

1 in the foreign exchange spot market during the relevant period
2 in violation of Section 1 of the Sherman Act. You may consider
3 those guilty pleas and conviction as evidence that the entities
4 and individuals who pleaded guilty or were convicted, in fact,
5 violated the antitrust laws in the manner and during the period
6 charged. You may consider those guilty pleas and conviction
7 only as evidence of whether there was a conspiracy and not as
8 evidence of whether Credit Suisse joined the conspiracy. You
9 may also consider the criminal convictions of individuals who
10 appeared as witnesses in this case when you assess their
11 credibility.
12      You have heard traders from Credit Suisse and other
13 banks decline to answer questions on the grounds of the Fifth
14 Amendment privilege against self-incrimination. The Fifth
15 Amendment to the United States Constitution affords every
16 person the right to decline to answer questions if he believes
17 that the answers may tend to implicate him in criminal
18 activity.
19      However, because this is a civil case, you are
20 permitted, but not required, to infer that the withheld
21 information would have been unfavorable to the witness'
22 interest and the interest of a party who is closely associated
23 with the witness. Any inference you may draw should be based
24 on all of the facts and circumstances in the case. For
25 example, based on the facts and circumstances, you may or may

| MAJHFor2 | Mathur - Cross | Page 1055 |
| --- | --- | --- |

1 not find a close association between a witness and Credit
2 Suisse if the witness was an employee of Credit Suisse, or if
3 you find that the witness was a conspirator of Credit Suisse.
4      I caution you that you may not find that the
5 plaintiffs have proven their claims against Credit Suisse based
6 solely on the negative inference, if any, you draw from the
7 fact that a witness or multiple witnesses declined to testify
8 in this case. Such inferences are factors you may consider,
9 but without more are not sufficient to prove participation in a
10 conspiracy to restrain trade.
11      You have heard evidence about various banks' internal
12 policies concerning the sharing of spreads. You should not
13 conclude that violation of a company policy necessarily
14 violates the law. Nor should you include that compliance with
15 a company policy necessarily is compliance with the law. I
16 have separately instructed you on the antitrust laws that apply
17 in this case, and you should not look to any bank's policy to
18 provide a statement of the antitrust laws that apply here.
19      So with these instructions in mind, you will next, but
20 not now, hear from the lawyers who will give their closing
21 arguments. I'll give you this reminder right before the
22 closing arguments, too, the arguments aren't evidence, because
23 the lawyers aren't witnesses. It's intended to help you
24 understand the evidence.
25      But before the closing argument, what I suggest, so we

IN RE: FOREIGN EXCHANGE V

October 19, 2022

1    cannot consider these guilty pleas at all as evidence that
2    Credit Suisse participated in the conspiracy.  They may be
3    evidence that these other traders who pled guilty or who were
4    found guilty did something wrong.  But they're not evidence
5    that any Credit Suisse trader participated in a conspiracy.
6         Putting aside that they show nothing about Credit
7    Suisse, do these guilty pleas come close to showing you some
8    sort of massive global conspiracy like the one plaintiffs are
9    claiming here?  They don't.
10        As I said, the guilty plea evidence the plaintiffs
11   showed you involves just two chatrooms.  You heard about both
12   of those chatrooms in great detail.  The ZAR chat with
13   Mr. Cummins, Mr. Katz, Mr. Aiyer, and Nicholas Williams.  And
14   the Cartel chat, with Mr. Ashton, Mr. Gardiner,
15   Mr. Ramchandani, and Mr. Usher.  No Credit Suisse trader was
16   ever in either of those chats.
17        What's more, the plaintiffs' own witnesses testified
18   under oath that those two chatrooms didn't have anything to do
19   with one another.  Chris Cummins told you that the alleged
20   conspiracy involving Mr. Ashton, Mr. Gardiner, Mr. Ramchandani,
21   and Mr. Usher from the Cartel chatroom had nothing to do with
22   his ZAR conspiracy.
23        So, are how on earth could these pleas to isolated
24   misconduct in these two chatrooms, each of which involved just
25   four traders, provide any support for this global market-wide

1    conspiracy?  They can't.  And they don't.
2         So what about those Fifth Amendment assertions that
3    Mr. Burke was talking about?  In their opening, the plaintiffs
4    told you that 26 traders took the Fifth because they didn't
5    want to talk about whether they conspired to fix spreads in
6    electronic chatrooms.
7         The plaintiffs talked about these Fifth Amendment
8    assertions in the same breath that they discussed the guilty
9    pleas, almost suggesting that they're the same thing.
10        But, ladies and gentlemen, it doesn't matter how big a
11   spectacle plaintiffs try to make of those assertions.  Only
12   you -- not the plaintiffs' lawyers, not me -- only you can
13   decide what significance to attach to those Fifth Amendment
14   assertions.
15        When you do, I would respectfully ask you to consider
16   a couple of things.  It's every person's right in this country
17   to decide not to answer questions when asked.  That right is
18   built into the Constitution.  You don't need to have done
19   anything wrong to use that right.  You should look at the
20   testimony of the so-called Fifth Amendment witnesses, and you
21   should decide for yourself why they asserted their Fifth
22   Amendment rights.  Is it because they didn't want to talk about
23   whether they conspired to fix spreads, as the plaintiffs say,
24   or were they taking the Fifth with respect to every single
25   question, no matter the topic.

1         Remember Mr. Landes?  The plaintiffs' one live witness
2    who took the Fifth.  Remember how when the plaintiffs' lawyer
3    asked him whether he worked at BoA and whether he sat for a
4    deposition, he took the Fifth.  Remember when my colleague
5    Mr. Hall asked Mr. Landes, would you take the Fifth to whatever
6    I asked you?  And Mr. Landes took the Fifth in response to that
7    question.
8         All of the plaintiffs' so-called Fifth Amendment
9    testimony is exactly the same.  Witnesses took the Fifth in
10   response to all sorts of perfectly innocent questions.
11        So ask yourselves, is the conclusion that the
12   plaintiffs want you to draw that these folks would have
13   incriminated themselves if they answered, is that really
14   supported by the evidence?
15        Every other trader who testified denied the existence
16   of this big global conspiracy alleged by the plaintiffs.  So is
17   it really right to assume that the witnesses who took the Fifth
18   would have given a different answer if they testified?
19        I'll say one thing.  This is the thinnest of proof of
20   which to base an allegation of a global price fixing
21   conspiracy.  Plaintiffs want you to look at these non-answers,
22   and they want to you have a reaction without looking too
23   closely at the evidence.  Oh, they took the Fifth so they must
24   have done something wrong.
25        But when you actually look at the evidence, the

1    questions that were actually asked of these witnesses, I think
2    you'll see their non-answers are not really proof of anything.
3         So what about the witnesses who did testify?  Did they
4    give you anything on which to hang a finding of the plaintiffs'
5    global spread widening conspiracy?
6         Let's start with the plaintiffs' own witnesses.  The
7    plaintiffs offered testimony from three witnesses who admitted
8    they committed misconduct in the FX market.  Jason Katz, who
9    was here in court.  Chris Cummins, his ZAR chatroom colleague
10   who testified about video.  And then Matt Gardiner, who, as I
11   said, was in the separate Cartel chatroom and testified by
12   video.
13        So these were the plaintiffs' stars.  They were the
14   only witnesses in this trial who admitted to illegal acts in
15   the FX market.  Each cooperated with the authorities, and each
16   of them was under an obligation to tell the truth all about
17   their misconduct and about all of the people they did it with.
18        If anyone was going to testify that there was a global
19   conspiracy to widen spreads among 16 banks, it would have been
20   these three.  They had nothing to lose and everything to gain
21   by admitting to what the plaintiffs allege here, if it actually
22   happened.
23        But did they?  Well, actually just the opposite.
24   Every one of them was asked whether they participated in some
25   broader conspiracy that went beyond the misconduct in the

IN RE: FOREIGN EXCHANGE V

October 19, 2022

| MAJHFor4 | Summation - Mr. Washer | Page 1096 |
|---|---|---|

1    spread widening conspiracy? One thing they didn't show you was
2    any evidence that spreads actually widened during the
3    conspiracy. Dr. Mathur told you that this would have been the
4    most powerful evidence of a spread widening conspiracy, if
5    there was one.
6         Now, that's, just to be clear, not to say a conspiracy
7    has to succeed for it to be a conspiracy, but you would think
8    that if there were a six-year spread widening agreement, the
9    plaintiffs would have shown you some evidence that spreads
10   actually widened, but they don't do anything like that. In
11   fact, the only evidence plaintiffs presented on spreads during
12   the alleged conspiracy was Mr. Robin's conclusion that they
13   stayed the same. You remember that? Based on Mr. Robin's
14   analysis, before the alleged conspiracy, during the alleged
15   conspiracy, after the alleged conspiracy, spreads in the FX
16   market largely stayed the same. They didn't widen.
17        And Mr. Howarth, you remember the Credit Suisse
18   salesperson from London who testified live, he told you that,
19   in his experience, spreads compressed or narrowed over the
20   relevant period. This is a big problem for plaintiffs because
21   Dr. Singer speculated that the 16 banks had the power to widen
22   spreads. Well, if they had that power and they actually
23   agreed, how is there no evidence that spreads actually widened?
24        And what about the customers the plaintiffs' lawyers
25   represent? Some of them were in the courtroom for parts of the

| MAJHFor4 | Summation - Mr. Washer | Page 1097 |
|---|---|---|

1    trial, but did they tell you the spreads they were quoted were
2    wider because of the conduct of Credit Suisse or any bank?
3    They were trading all the time with the banks. They would have
4    had a front-row seat if the spreads were really widening during
5    this period. How easy would it have been to take the witness
6    stand and say that under oath if they thought it was true, but
7    they didn't, and their silence speaks volumes about the
8    plaintiffs' proof or, rather, the lack of it.
9         The plaintiffs always fall back on their chat
10   evidence, but the chats also don't show a conspiracy to widen
11   spreads. Plaintiffs want you to throw all these chats into one
12   bucket. If a spread is discussed, it's a conspiracy chat, but
13   it's just not true. The judge has instructed you that there
14   are legitimate reasons for sharing information, and witness
15   after witness told you that they exchanged views, they
16   exchanged opinions, about the liquidity and volatility in the
17   market so that trades can be priced properly in the market.
18        Think about all the traders who testified on video and
19   live in court who said they routinely discuss spreads in
20   chatrooms. Did they seem like they'd been caught doing
21   something wrong? Just the opposite. They made clear this was
22   just a normal part of the job. They used the chats to stay
23   informed about market liquidity because that's what their
24   customers expected.
25        This is clear from the face of many of the chats that

| MAJHFor4 | Summation - Mr. Washer | Page 1098 |
|---|---|---|

1    plaintiffs are trying to sell to you as proof of the
2    conspiracy. Plaintiffs claim there are 2,500, 2,571 chats, two
3    chats per day, that support their case. They put them all in
4    evidence. They told you at the beginning of the case to trust
5    the chats, but they don't actually seem to want you to do that
6    since they don't show you most of them or even summarize them
7    in any way that you might be able to use. What they do is they
8    just ask you to assume that all the others are like the ones
9    they've shown you, but they're not. Twenty-five percent of
10   them include customers. You remember that? Or traders from
11   banks who aren't alleged to be part of the conspiracy. And
12   they're very different in other ways too.
13        You know, they've shown you the same small group of
14   chats with troubling language again and again, and we'll get to
15   those, but they really aren't representative of the vast
16   majority of the spread chats the plaintiffs put in evidence.
17   So, for example, plaintiffs put into evidence, but didn't show
18   you, chat after chat where traders had different opinions on
19   spreads.
20        Here's one. One trader says 9. Russell Katz thought
21   13.
22        Here's another. UBS trader asks for opinions on
23   spreads in 1 billion euros. The RBS trader said 40, the UBS
24   trader thought 50, and the Credit Suisse, Brian Walker, thought
25   20/22. Vastly different opinions.

| MAJHFor4 | Summation - Mr. Washer | Page 1099 |
|---|---|---|

1    These chats don't show an agreement on spreads. If
2    anything, they show wide disagreement, and they do nothing to
3    prove any spread widening conspiracy. At times customers, the
4    supposed victims of the spread widening conspiracy, were
5    actually in the chatrooms when spreads were discussed. How is
6    that a conspiracy if the customer is in the chatroom?
7         Now, the plaintiffs say, ignore all of this. These
8    traders are sharing spread information in these chats so their
9    sales staff can go out and quote wider spreads. But where's
10   the evidence of that? Where's the evidence that in a single
11   instance traders discussed a spread in a chatroom, the spread
12   is wider than they would quote if they weren't discussing, and
13   then a wider spread is quoted to a customer? They'd need to do
14   that over and over and over again, thousands of times a day.
15   In fact, trader after trader testified that they knew full well
16   what might happen if they did quote a wider spread, right?
17   They'd lose business. And other traders said they actually
18   quoted different spreads, narrower spreads, than what they
19   discussed in the chatrooms. So they talk about 12 in the
20   chatroom, and they'd go ahead and quote 10.
21        Again, how is that a conspiracy to widen spreads? You
22   know, the old saying that actions speak louder than words.
23   Well, where's the action? Where's the actual evidence that the
24   words on the paper plaintiffs have shown you amounted to an
25   agreement to quote wider spreads? The answer is there is none.

MAJHFor4                Rebuttal - Mr. Burke                Page 1116

1    $1,000 an hour to look at chats, plus he gets a piece of the
2    action. He didn't want to tell you that, so I brought it out.
3    He gets a piece. What can we reasonably expect of you after
4    eight days, nine days? You're getting so much information
5    thrown at you, and we're trying to do it in a way that you can
6    absorb and make sense of it.
7            Credit Suisse complains we haven't produced enough
8    chats. You can take 2,571 back with you. I really hope you
9    get to a decision before you go through them all, for your
10   sake, but it's there, and we encourage you to look at the
11   evidence.
12           The 2,571 exemplar chats in evidence provide an
13   abundant record of direct evidence. These were written when
14   nobody thought anyone would ever see them. They're not post
15   hoc justifications. They're the clearest record of the
16   agreement between Credit Suisse and its coconspirator dealers.
17           Ask yourself, as I said in opening, why aren't they
18   competing? Brian Walker, Credit Suisse's trader witness,
19   testified proudly, proudly -- he wasn't trying to hide it --
20   no, we're not competing. If what was going on in those
21   chatrooms was legitimate, we would not have seen 26 traders
22   from 13 banks, including Credit Suisse's former global head of
23   spot trading, assert the Fifth. There's no answer for that.
24   Use your common sense.
25           Not enough chats. There were 2,571 spread chats, 421

MAJHFor4                Rebuttal - Mr. Burke                Page 1117

1    unique chatrooms, 16 coconspirators. The dates range from 2007
2    to 2013.
3            Credit Suisse, there were 726 examples of coordination
4    and outright agreement on spreads. Every other day they were
5    sharing detailed confidential information about what they were
6    showing to customers. And as you learned from Mr. Robin, they
7    didn't need to share spreads every single day, because spreads
8    are durable and they correlate.
9            Credit Suisse is in 101 spread chatrooms with all 15
10   conspirators from 2007 to 2013. And let me clear up one
11   misconception. Mr. Lawes stayed in that chatroom. He just
12   moved banks. He was in Credit Suisse, stayed in that chatroom
13   with Mr. Parikh and Mr. Munson, went to TD, stayed in the
14   chatroom, came back to Credit Suisse, stayed in the chatroom.
15           Now, without the network, you lose that network, we
16   heard that once again clients can screw us. It will cost the
17   banks millions. Nick Williams writes: Emails going out, all
18   chats with inter-bank traders need to be nonpersistent, one on
19   one. So once again clients can screw us. It will cost the
20   banks millions, said Mr. Katz.
21           This is almost the exact same thing, only five years
22   later, that Mr. Parikh complained of in 2007 to Mr. Lawes and
23   Mr. Munson as the justification for the conspiracy: We're all
24   having to quote tighter. It's suicidal. We don't like those
25   silly spreads. What's the answer? Let's get together.

MAJHFor4                Rebuttal - Mr. Burke                Page 1118

1            Let me run this up for you. This case started nine
2    years ago. The Court entrusted us, appointed us class counsel
3    to represent the class, and we were humbled by that, because we
4    represent working people. Oklahoma Firefighters, Chase Rankin
5    up there, he's been here this entire time. Grenville
6    Henderson, Cathy Smith from the Virgin Islands, they've been
7    here the entire time. Jim Nimmo, he was here. He had to go
8    back. He's a fire captain for Oklahoma. He had other
9    responsibilities. He sends his regards and respect. They have
10   a real stake in this litigation, ladies and gentlemen, and
11   represent the other thousands of class members harmed by the
12   conspiracy to widen spreads.
13           We started with 16 defendants. Credit Suisse is here
14   today. We ask you to trust what you saw in the chats, trust
15   your common sense and experience. You can put aside the clever
16   points made by the lawyers on both sides. At root, the case is
17   not that complicated. Credit Suisse and the dealers wanted to
18   make more money. I stood up in front of you on the 11th and
19   said the case is about money, and I showed you the money part.
20   That's all it is, it's about money. They wanted more of it,
21   the banks do.
22           Credit Suisse and the dealers wanted to make more
23   money. They could do so by widening spreads. They did so by
24   forming a network of private invitation-only chatrooms.
25   Really, how gullible to think that chatrooms don't form a

MAJHFor4                Rebuttal - Mr. Burke                Page 1119

1    network, that you don't talk across chatrooms. We showed you
2    that, evidence of that, today. That's how networks work. They
3    connect people; they don't isolate people. Credit Suisse and
4    the dealers used the network of chatrooms to widen spreads.
5    You have a record of what the dealers did, when they did it,
6    and who was involved.
7            The burden here is 50 percent and a feather, OK? It's
8    just this much and plaintiffs prevail. In a case where half
9    the traders took the Fifth, five pled guilty. JPMorgan,
10   Barclays, Citi, BNP, RBS pled guilty to felonies. Now, those
11   are negotiated settlements. They're going to be narrower.
12   That's profound when you can take down banks like that for
13   price fixing in this market for the use of chatrooms, and they
14   want to diminish that. Take some responsibility. We're
15   depending on you.
16           Two traders pled guilty. One went to prison. That
17   doesn't look like a joke to me. Here, the simpler answer is
18   the correct answer. The evidence shows that Credit Suisse was
19   part of a single conspiracy because there was a single goal,
20   and they all ascribed to it: widen the spread, widen the spread
21   at the expense of the customer. Didn't matter which chatroom
22   you were in, didn't matter which currency pair it was, didn't
23   matter who the dealer was. Widen the spread with 15
24   coconspirator dealers from 2007 to 2013.
25           We thank you for your service, and it was our honor to