# EXHIBIT 13

```
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   1:13-cv-07789-LGS
 5   ------------------------------------x
 6   IN RE
 7   FOREIGN EXCHANGE BENCHMARK RATES
 8   ANTITRUST LITIGATION
 9   ------------------------------------x
10
11        REMOTE VIDEOTAPED DEPOSITION OF
12               HAL J. SINGER
13              Washington, D.C.
14            September 15, 2022
15
16
17
18
19
20
21   Reported By:
22   ERIC J. FINZ
23
24
25
```

Page 74

1        HAL J. SINGER
2  was that enough?  It's a legitimate
3  question to ask.
4        But then you go test it and
5  you see if the capacitor prices were
6  inflated during the periods where they
7  were sharing Excel spreadsheets.
8     Q.   Do you have any sense of like
9  how many chats you would have needed to
10 see -- chats that you characterize as
11 spread-fixing, during the alleged
12 conspiracy period, in order to have a
13 factual predicate to run your regression?
14    A.   I don't think there is some
15 threshold.  I just think that what an
16 economist is looking for is qualitative
17 evidence that's consistent with the
18 claims of a conspiracy.  And I think we
19 have that here in spades.
20       But again, I don't make my
21 final conclusion based solely on the
22 existence of a chat.  I mean, these are
23 powerful.  I've never seen -- I've never
24 seen thousands, in any case that I've
25 ever done, where we have thousands of

Page 75

1        HAL J. SINGER
2  indications.  They typically are in the
3  tens or hundreds.
4        But it's a very important
5  indicator.  But I mean, I'm more
6  confident when I combine the record
7  evidence with my empirical evidence to
8  reach my ultimate conclusion that I think
9  that the totality of the evidence here is
10 more consistent with a cartel than with
11 competitive interaction.
12    Q.   So can you tell me, for
13 example, if you had a hundred chats that
14 you interpreted as being spread-fixing,
15 would that have been a sufficient
16 predicate to run the regression?
17    A.   I'm going to, just to make
18 sure I understand, I just want to make
19 sure.  You're going to assume that there
20 is nothing else in the record, you want
21 to ignore the guilty pleas and all the
22 other evidence that we have that's
23 consistent, all the other qualitative
24 evidence that we have that's consistent
25 with a cartel?

Page 76

1        HAL J. SINGER
2     Q.   Well, you haven't mentioned
3  that.  But sure, for these purposes, you
4  know what, for these purposes why don't
5  you assume that there are guilty pleas,
6  but that you only have a hundred chats.
7  Would you still run your regression?
8     A.   But we have obviously way more
9  than just guilty pleas.  I cite to a
10 large range of qualitative evidence.  You
11 know, including the defendants themselves
12 saying we're going to shut these things
13 down.  They're not in compliance with our
14 own antitrust guidelines.
15       So I feel like -- I feel like
16 there is just so much there, but I can
17 entertain hypotheticals and we can wipe
18 this, we can wipe the board clean and
19 wipe out all the qualitative evidence
20 that I've reviewed and entertain a
21 hypothetical where if you just had a
22 hundred chats.
23       I would say if the hundred
24 chats spanned all or almost all of the
25 duration of the class period, and if it

Page 77

1        HAL J. SINGER
2  implicated most of the defendants, I
3  think that that would be sufficient to
4  run a test.
5        Again, it doesn't mean that
6  you're making determinations on the
7  number.  Had my test come back negative,
8  I would have a different opinion of this
9  matter.
10    Q.   What do you mean by
11 "negative"?
12    A.   Oh, had spreads been narrower,
13 during the class period, right?  Had the
14 coefficient on the conduct variable been
15 negative, right?  I certainly couldn't
16 have spoken to the efficacy of the
17 cartel.
18       I mean, I think that the
19 existence of an agreement is fairly
20 certain in light of what we have.  But as
21 an economist, I typically get brought on
22 to speak to anticompetitive effects.
23 And -- and I'll end it there.
24    Q.   So you viewed your regression
25 opinion in this case to be more about

20 (Pages 74 - 77)

Page 78

1  HAL J. SINGER
2  anticompetitive effects than about the
3  existence of an agreement?
4      A.   I think it's both.  But it's
5  the most powerful piece of evidence in
6  terms of effects.  But it also supports
7  the existence of an agreement.
8      Q.   If your regression had turned
9  out negative, meaning if the conduct
10 coefficient had been negative.
11     A.   Right.
12     Q.   Would you still be offering an
13 opinion in this case that the evidence is
14 conducive to a conspiracy?
15     A.   That's an interesting
16 hypothetical.  You know, my understanding
17 is that you could still have a liability
18 case, that is, there could be a cartel
19 that existed a long time and just was
20 really weak at generating price effects.
21          I still think that would be
22 considered grounds for antitrust
23 scrutiny, just on issues -- on the issue
24 of violation of liability.
25          But that hypothetical I think

Page 79

1  HAL J. SINGER
2  is so divorced from the case, I just
3  don't know if I'd be here if that were
4  the case.
5      Q.   So let's take it out of
6  enforcement and let's just talk about
7  economists, because you're an economic
8  expert.  Right?
9      A.   Right.
10     Q.   If the evidence were all the
11 same as it is exactly in this case, and
12 your conduct coefficient had turned
13 negative, would you be able to offer the
14 opinion that the evidence in this case
15 was consistent with a conspiracy?
16     A.   So this is the first time I'm
17 hearing it.  My inclination is to say
18 yes, only because the qualitative
19 evidence is so powerful here.  That is
20 not the standard role that I play in the
21 sense that I'm typically asked to do an
22 analysis of both the qualitative and
23 quantitative evidence.
24          And it's only when both are
25 pointing in the direction of a cartel, do

Page 80

1  HAL J. SINGER
2  I typically make an opinion that this
3  evidence, in its totality, is consistent
4  with.
5      Q.   But I'm asking you to assume
6  the situation where one is pointing in
7  one direction, the qualitative evidence
8  is the same as it is now, and you assume,
9  you say that's consistent with a
10 conspiracy.  And that the regression was
11 negative.
12          And so under those
13 circumstances, in this case, changing
14 nothing but the sign on your conduct
15 coefficient, would you still be able to
16 offer the opinion that the evidence in
17 this case is consistent with a
18 conspiracy?
19     A.   I think so, yes.  It would be
20 a different type of conspiracy, it would
21 be a conspiracy that wasn't very
22 effective in elevating spreads, but it
23 was a conspiracy in any event.  Or
24 consistent with a conspiracy in any
25 event.

Page 81

1  HAL J. SINGER
2      Q.   Have you seen any instance in
3  this case, Dr. Singer, where one bank
4  quoted a narrower spread than the
5  supposed cartel price, and was punished
6  for that by another bank?
7      A.   Well, "punished" is not the
8  word I would use.  I think I've seen
9  evidence where they were cajoled into
10 raising their quote.
11     Q.   Can you explain to me how
12 kicking somebody out of a chat room
13 would -- kicking a trader out of a chat
14 room, would deter that trader from
15 undercutting the cartel price to steer
16 business to itself?  Let me do it again,
17 I spoke a little quickly.
18     A.   No -- let me hear it back.
19     Q.   Can you explain to me how
20 kicking somebody out of a chat room,
21 kicking a trader out of a chat room,
22 would deter that trader from undercutting
23 the cartel price in order to steer
24 business to itself?
25     A.   If I understand it correctly,