**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FOREIGN EXCHANGE
BENCHMARK RATES ANTITRUST
LITIGATION

No. 1:13-cv-07789-LGS

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION**
**<u>FOR A NEW TRIAL</u>**

## TABLE OF CONTENTS

I.   THE WEIGHT OF THE EVIDENCE OF CREDIT SUISSE'S PARTICIPATION IN A CONSPIRACY TO WIDEN SPREADS IS OVERWHELMING. ........................................ 1

II.  CREDIT SUISSE'S COUNSEL CAUSED SIGNIFICANT PREJUDICE AND UNFAIRLY INFLUENCED THE JURY'S VERDICT. ........................................ 2

   A.   Plaintiffs were unfairly prejudiced by being prohibited from rebutting Credit Suisse's false claim to never being "prosecuted". ........................................ 2

   B.   Plaintiffs did not waive their objections. ........................................ 9

   C.   Credit Suisse's experts improperly interpreted chat room discussions. ........................................ 9

   D.   Credit Suisse improperly exploited the Court-ordered stipulation about named plaintiffs. ........................................ 10

III. CONCLUSION ........................................ 10

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Analytical Surveys., Inc. v. Tonga Partners, L.P.*,
  684 F.3d 36 (2d Cir. 2012)...................................................................................2

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................................................2

*Bohnen v. Harrison*,
  232 F.2d 406 (7th Cir. 1956) ............................................................................6

*DePascale v. Sylvania Elec. Prod., Inc.*,
  510 F. App'x 77 (2d Cir. 2013) .........................................................................2

*DLC Mgmt. Corp. v. Town of Hyde Park*,
  163 F.3d 124 (2d Cir. 1998)...............................................................................2

*Duttle v. Bandler & Kass*,
  82-cv-5084, 1990 WL 113187 (S.D.N.Y. 1990) ..............................................7

*Fineman v. Armstrong World Indus., Inc.*,
  774 F. Supp. 266 (D.N.J. 1991), *aff'd*, 980 F.2d 171 (3d Cir. 1992)...............9

*Koufakis v. Carvel*,
  425 F.2d 892 (2d Cir. 1970)................................................................................9

*Lesnow Bros. v. U.S.*,
  78 F. Supp. 829 (Ct. Cl. 1948) ..........................................................................7

*Meide Zhang v. Liang Zhang*,
  16 Civ. 4013, 2019 WL 623879 (S.D.N.Y. Feb. 14, 2019)...............................2

*Pappas v. Middle Earth Condo. Ass'n*,
  963 F.2d 534 (2d Cir. 1992)...............................................................................9

*Poulos v. Summit Hotel Props., LLC*,
  No. CIV 09-4062, 2010 WL 2034634 (D.S.D. May 21, 2010) .........................8

*Raedle v. Credit Agricole Indosuez*,
  670 F.3d 411 (2d Cir. 2012)...........................................................................1, 2

*United States v. Hamdan*,
  537 F. Supp. 3d 870 (E.D. La. 2021).................................................................8

**Statutes, Rules, and Regulations**

Fed. R. Evid. 102 ................................................................................................................7

Fed. R. Evid. 103(b) ...........................................................................................................9

Fed. R. Evid. 408, 1974 & 2006 cmts .......................................................................3, 7, 8

Fed. R. Evid. 801(c) ...........................................................................................................7

**Other Authorities**

https://www.dictionary.com/browse/meaning ....................................................................9

I.   **THE WEIGHT OF THE EVIDENCE OF CREDIT SUISSE'S PARTICIPATION IN A CONSPIRACY TO WIDEN SPREADS IS OVERWHELMING.**

Plaintiffs proved the existence of a conspiracy to widen spreads through thousands of contemporaneous chats.  These chats demonstrate no meaningful difference between Credit Suisse's participation in the conspiracy and that of its co-conspirators.  Credit Suisse discussed spreads to show customers in chat rooms with FX traders who pleaded guilty to or were convicted of fixing prices in the FX market.  And ultimately, via civil prosecution, Credit Suisse paid more than $230 million in fines and agreed not to employ seven of its traders for life.

The evidence of Credit Suisse's participation was overwhelming.  Credit Suisse trader Peter Little testified he was encouraged by his supervisors to be in chat rooms with competitors discussing spreads to show customers.  CTX 6-B at 108:11-18.  No one from Credit Suisse ever denied continuing to discuss spreads with competitors despite being told by other banks in both February 2011 and again in September 2012 not to do so for fear of price-fixing and collusion.  *See* PTX1767A-0002; PTX64A-0002.  Even FX global business head Steve Yanez admitted that Credit Suisse never told its traders not to talk about spreads.  Trial Tr. 498:7-13.  Nor did anyone from Credit Suisse deny discussing the "right" or "correct" spread to quote customers.  *See, e.g.*, PTX1857A-0002; PTX0955A-0001; PTX2943A-0002; PTX2085A-0002.  Credit Suisse FX trader Brian Walker candidly admitted on the stand that he did not compete with traders from other banks with whom he was in chat rooms and that the chat room spread discussions did not help their respective banks compete with one another.  Trial Tr. 877:15-17, 884:11-16.

Citing *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411 (2d Cir. 2012), Credit Suisse argues that the jury was entitled to make credibility calls in its favor and that Plaintiffs are merely seeking a redo.  But the jury verdict *Raedle* was "predicated almost entirely on the jury's assessment of credibility" of trial witnesses.  *Id*. at 418.  In this case, however, there was no

meaningful difference between the testimony of non-Credit Suisse witnesses and Credit Suisse

witnesses.  For example, Angus Greig (Deutsche Bank, HSBC), James Witt (UBS), and Matthew

Gardiner (UBS, Barclays, Standard Chartered) all testified that it was a common market practice

to discuss spreads to show customers with competitors in chat rooms.  *See* Greig, (CTX 6-G at

68:13-17, 168:25-169:02, 169:13-17, 169:22-170:13, 172:21-173:01), Witt (CTX 6-O at 74:15-

74:20), and Gardiner (CTX 6-C at 178:02-16, 180:15-21).  So, too, did Peter Little—not just at

Credit Suisse, but also at Barclays and HSBC.  CTX 6-B at 104:16-105:06.  By answering yes to

Question 1, the jury rejected Credit Suisse's argument that spread discussions among

competitors were proper discussions of market color.

Here, where the verdict was not predicated primarily on the jury's assessment of witness

credibility and conflicting testimony about what was said, a new trial should be ordered because

the verdict is contrary to the weight of the evidence.  *See DePascale v. Sylvania Elec. Prod., Inc.*,

510 F. App'x 77, 79 (2d Cir. 2013) (distinguishing *Raedle* where court "did not rely exclusively

on his own assessment of witness credibility in ordering a new trial").[1]

## II.   CREDIT SUISSE'S COUNSEL CAUSED SIGNIFICANT PREJUDICE AND UNFAIRLY INFLUENCED THE JURY'S VERDICT.

### A.   Plaintiffs were unfairly prejudiced by being prohibited from rebutting Credit Suisse's false claim to never being "prosecuted."

With this mountain of evidence, the jury's answer of "No" to Question 2 defies common

sense.  The anomalous result can be traced directly to Credit Suisse's misleading trial strategy of

---

[1] *Meide Zhang v. Liang Zhang*, 16 Civ. 4013, 2019 WL 623879 (S.D.N.Y. Feb. 14, 2019) is
distinguishable for the same reasons as *Raedle*—it primarily involved credibility determinations.  *Id.* at
*3–*4.  None of Credit Suisse's other cases support its arguments.  *See DLC Mgmt. Corp. v. Town of
Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (appellant argued only that "the district court improperly
applied the Rule 50 standard for judgment as a matter of law in denying their Rule 59 motion"); *Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (addressing summary judgment); *Analytical Surveys.,
Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (same).

juxtaposing "never prosecuted" Credit Suisse with the guilty plea banks.  Credit Suisse predicated its strategy on presenting a story falsely denying facts that linked Credit Suisse to the conspiracy the jury found in response to Question 1.  Credit Suisse presented this fiction knowing that, because of certain evidentiary rulings, Plaintiffs could only rebut its untrue assertions at the risk of a mistrial.  Thus, Credit Suisse fabricated a "meaningful" distinction between itself and its co-conspirators.

Credit Suisse used evidentiary preclusions as both a sword and a shield, deliberately injecting inadmissible and false hearsay of purported non-prosecution, then using *in limine* orders to preclude Plaintiffs from exposing the falsity.  Starting with its opening statement, Credit Suisse repeatedly asserted that absent defendants were solely to blame for illegal collusion because regulators went after them and not Credit Suisse.  But it is a matter of public record that regulators pursued Credit Suisse (three times), Credit Suisse "stipulate[d] and agree[d]" to misconduct, and paid more than $230 million as a result.  Once Credit Suisse chose to make the lack of regulator action the centerpiece of its defense and opened the door, Plaintiffs should have been permitted to present facts undermining the defense.

Credit Suisse asserts that, despite having stipulated and agreed to misconduct in its consent order, it was free to imply that regulators gave Credit Suisse a pass.  Untethered from the consequences of Credit Suisse's past, its witnesses were free to embellish as if investigations never occurred and factual findings made by regulators did not exist.  FRE 408 was meant to eliminate unfair prejudice, not *create* unfair prejudice to the benefit of the party seeking preclusion.  Having voluntarily opened the door in its opening statement, Credit Suisse waived any FRE 408 protections it otherwise might have enjoyed as to the NYDFS consent order.  Credit Suisse used the word "prosecuted" or variations thereof 13 times in opening statements

without qualifying or cabining the use to refer only to "criminal" prosecutions.  Defense counsel

did so four times *prior* to the instance Credit Suisse cites (Opp. at 12) to support its argument

that no prejudice occurred because "defense counsel made explicit that he was referring to

criminal prosecutions" all along.  Fundamental fairness required that Plaintiffs be able to use the

consent order, if not other regulatory decisions, to set the record straight.  Credit Suisse's tactic

precluded the jury from fully weighing its witnesses' credibility.

Credit Suisse's efforts to minimize the impact of opening the door are unpersuasive.  It

first argues that the Court has already considered and rejected these arguments.  Opp. at 11.  But

the Court did not consider these arguments in the full context of what eventually transpired.

Plaintiffs briefed this issue two days into trial.  The Court's ruling could not have anticipated

how the rest of the trial would unfold.  Indeed, after hearing argument on Plaintiffs' motion, the

Court declared that it would reserve making its decision on the motion until it was clear whether

Credit Suisse would make this argument a significant part of its defense.[2]  That is exactly what

happened: Credit Suisse embraced this strategy throughout the trial.

Credit Suisse next argues that any potential negative impact was neutralized because the

Court told Credit Suisse not to do it again.  Opp. at 11.  After the hearing on the morning of

October 14, Credit Suisse simply tweaked its rhetoric by which to mislead the jury.  Instead of

focusing on the lack of prosecution, Credit Suisse diminished Jamie Lawes as junior and stupid

and characterized the "pact on spreads" chat as a joke.  But the NYDFS certainly did not think it

was a joke.  Knowing Plaintiffs were barred from impeaching that testimony with the NYDFS

---

[2]  The Court stated, "If Credit Suisse intends to make it -- and I presume you won't in light of this ruling, but in case you intend to make it a big part of your defense that Credit Suisse was never charged, never prosecuted, and was blessed by the regulators, then I would allow the plaintiffs at that point in a rebuttal case to introduce that. I presume you will not be doing that. But in any event, I'm reserving on that issue." Trial Tr. 445:23-446:6.

prosecution, Credit Suisse elicited the following from its global FX business head, Steve Yanez, about the "pact on spreads":

> Q.  What do you think about this comment made by Mr. Lawes as you sit here and read it today, Mr. Yanez?
> A.  It's pretty stupid. I mean, it's not – he's in no way a position -- he was a junior trader -- to agree with anything with anybody. It's bluster. It's -- what you'd see in a trading world is often folks talk a big game to make themselves feel, like, relevant in the industry, but it's just a stupid statement.

Trial Tr. 476:1:8.  Credit Suisse followed the same game plan with Braden Howarth:

> Q.  Mr. Lawes says let's sign a pact on spreads.  As someone who knew and worked with Mr. Lawes, how do you read his statement?
> A.  I mean, as I said, it's not -- Jamie was the joker in the pack. I view this as bravado between a few traders in one chatroom….

*Id.* at 699:12-17.  Credit Suisse also elicited misleading testimony from Niall Condie who supervised Credit Suisse's New York trading desk (sanctioned by NYDFS for spread collusion):

> Q.  [A]nd you supervised all the New York traders who worked at Credit Suisse between 2007 and 2013, right, sir?
> A.  Yes, I did.
> Q.  And when they're being asked for quotes every day from the salespeople, you're sitting there watching what happens, right?
> A.  Yes, I was.
> Q.  And you had conversations with all of these guys about the market and about their business and how they were doing, right?
> A.  Yes, I did.
> Q.  Did you ever have any conversation or did you ever see anything that would lead you to believe that one of those traders entered into an agreement to fix or widen spreads?
> A.  I did not.

Trial Tr. 794:5-17.  The actual truth, which was kept from the jury, is that:  Credit Suisse agreed not to rehire Mr. Lawes and six other Credit Suisse traders due to their misconduct in multibank chatrooms; Credit Suisse paid NYDFS a $135 million fine and admitted to unsafe and unsound business practices during Mr. Condie's watch; and the NYDFS cited the "pact on spreads" solely and verbatim in a section of the consent order entitled "Spread Collusion."  Yet the jury heard Messrs. Yanez, Condie, and Howarth, and Credit Suisse's experts testify as if nothing happened.

- 5 -

During summation, Credit Suisse hammered home the ruse it foisted on the jury that it was different than the banks and traders who pleaded guilty.  Regarding the "pact on spreads," Credit Suisse told the jury:

> I am not sure I can count the number of times plaintiffs showed you where Mr. Lawes said, "Let's sign a pact on spreads," and I think every time they did, they focused on that language, of course, and the response from the Goldman trader, Mr. Parikh, who said, "Agreed"… So where is the agreement?  Mr. Lawes told you in his video testimony it was really obvious from everything you know it was bluster.  And he knew everyone else in the chat knew that three traders couldn't really make a pact on spreads.

Trial Tr. 1105:12-16; 1105:25-1106:3.  Regarding government prosecutions, the jury was told Credit Suisse was not a part of the conspiracy "[b]ecause Credit Suisse was not involved in the misconduct those traders and those banks pled guilty to."  *Id.* at 1075:2-6.  These arguments were only possible in a world where the jury was kept in the dark about the NYDFS consent order, the European Commission statement of objections regarding the Sterling Lads, and the South African investigation into Mr. Hatton and Credit Suisse.

Had the obverse occurred and Plaintiffs violated the Court's motion *in limine* ruling by telling the jury the whole truth, *viz.*, that Credit Suisse was prosecuted by three regulators in multiple jurisdictions resulting in approximately $230 million in total fines and Credit Suisse's promise not to hire seven FX traders again for life due to their improper collusion in chat rooms, it would have caused a mistrial.

Credit Suisse also argues that it did not open the door because its reference to never being "prosecuted" meant criminal prosecution.  Opp. at 12.  That limitation, however, is mere artifice.  The word "prosecution" is not limited to criminal matters.  ECF No. 1983 at 2 n.2; ECF No. 2023 at 17 (citing *Bohnen v. Harrison*, 232 F.2d 406, 409 (7th Cir. 1956) ("As most commonly used in legal language the word 'prosecute' means 'to seek to obtain, enforce, or the like, by

legal process; as to prosecute a right or claim in a court of law.'") (citing WEBSTER'S NEW INT'L DICTIONARY (2d ed. 1953)); *Lesnow Bros. v. U.S.*, 78 F. Supp. 829, 831 (Ct. Cl. 1948) ("The meaning of the word 'prosecute' not only in its ordinary definitive sense but by the interpretation of many courts, includes the commencement or institution of suits.") (citing cases)).  Because Plaintiffs were barred from presenting evidence of non-criminal prosecutions, the jury likely labored under a fundamental misunderstanding that infected deliberations.

The clear intent of "no prosecutions" was to signal to the jury that Credit Suisse did nothing wrong.  The consent order and other regulatory investigations prove otherwise.  And the implication is significant.  *See Duttle v. Bandler & Kass*, 82-cv-5084, 1990 WL 113187, at *4 (S.D.N.Y. 1990) ("Evidence of a failure to indict, like evidence of an acquittal, should not be offered for the purpose of rebutting any inference of defendants' wrongdoing.  Such evidence constitutes impermissible hearsay, *see* Fed. R. Evid. 801(c), and is more prejudicial than probative.").  Nevertheless, Credit Suisse used FRE 408 as a sword and a shield by citing the governments' *criminal* prosecution decisions while simultaneously preventing any contrary evidence regarding the three different governments' very significant *civil* prosecution of Credit Suisse.[3]  That warps the intent and letter of FRE 408 and violates the very purpose of the evidentiary rules.  *See* Fed. R. Evid. 102 ("[T]hese rules should be construed … to the end of ascertaining the truth and securing a just determination.").  Once Credit Suisse injected the government's prosecutorial discretion into the trial mix, regulatory interest should have been fair game to both parties, and Credit Suisse should not have been allowed to present the misleading, one-sided story that the jury received.

---

[3]  The European Commission's "Sterling Lads" prosecution and the South African investigation into Rand trading, both of which ensnared Credit Suisse, do not neatly distinguish between criminal and civil as is the case in the United States.

Credit Suisse next argues that permitting Plaintiffs to mention the NYDFS consent order would necessarily invite the jury to substitute the regulators' view of Mr. Lawes' "pact on spreads" chat for its own view.  Opp. at 12.  But Credit Suisse asked the jurors to do the same. Credit Suisse's defense framed the idea that the jury should not find it liable because no governmental authority thought that Credit Suisse did anything wrong.  Plaintiffs wanted to use the NYDFS consent order not to convince the jury to defer to a regulator but to expose the post-hoc "talking points" conveniently adopted by Mr. Lawes, Mr. Howarth, Mr. Yanez, Credit Suisse's experts, and Credit Suisse's counsel—that it was just a joke—as a cynical, self-serving farce.  Had their explanation been the whole truth, Credit Suisse would not have "stipulate[d] and agree[d]" to including the "pact on spreads" chat as the paradigmatic example of spread misconduct in ¶¶ 36-37 of the NYDFS consent order.

Alternatively, even if the consent order and other regulatory decisions were properly barred, Plaintiffs should have at least been permitted to notify the jury that various regulators alleged that Credit Suisse engaged in misconduct.  FRE 408's focus is on the settlements themselves and the settling party's statements made within those compromise discussions.  *See* Fed. R. Evid. 408, 1974 & 2006 cmts; *see also United States v. Hamdan*, 537 F. Supp. 3d 870, 884–86 (E.D. La. 2021) (holding FRE 408 barred only settlement agreement but not agency's notice of intent to fine, which constituted the settled claim); *Poulos v. Summit Hotel Props., LLC*, No. CIV 09-4062, 2010 WL 2034634, at *4 (D.S.D. May 21, 2010) (holding notice of legal claims not barred by FRE 408, and collecting cases stating same).  FRE 408 does not bar the fact that regulatory investigations occurred.

### B.    Plaintiffs did not waive their objections.

Credit Suisse argues that Plaintiffs did not object to every instance of defense counsel's misconduct.  But the Court's duty to order a new trial based on attorney misconduct "does not arise only when objections are raised by one of the litigants or his counsel." *Koufakis v. Carvel*, 425 F.2d 892, 900–01 (2d Cir. 1970).  "Repeated improprieties by one counsel severely prejudice his adversary.  Every trial lawyer knows that frequent objection is a potentially dangerous course of action the effect of which upon the jury cannot be estimated." *Id*. at 901; *see also Fineman v. Armstrong World Indus., Inc.*, 774 F. Supp. 266, 272 (D.N.J. 1991) (requiring counsel to object to every single instance of misconduct "would cause considerable prejudice in the eyes of the jury"), *aff'd*, 980 F.2d 171 (3d Cir. 1992).  Moreover, Credit Suisse misstates what is required to preserve a claim of error.  Opp. at 16.  "Once the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Fed. R. Evid. 103(b).[4]

### C.    Credit Suisse's experts improperly interpreted chat room discussions.

Plaintiffs rest on their opening brief regarding the points of alleged error concerning the Fifth Amendment, Drs. Melvin and Mathur, and the regression with one exception.  Credit Suisse argues that Dr. Melvin merely opined "as to the ***meaning*** of certain chats, not the intent of any trader." Opp. at 18.  But the meaning of a chat *is* the intent.[5]  Even by Credit Suisse's own "defense," his testimony was improper.

---

[4]  Credit Suisse also relies heavily on the Court's charge that the jury should follow its instructions rather than counsels', but this was also an insufficient cure. *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992) ("[T]he giving of only the standard jury charge regarding arguments of counsel could only have left the jury with the impression that they might properly be influenced by the improper argument in rendering their verdict.").

[5]  https://www.dictionary.com/browse/meaning (defining "meaning" as "what is intended to be, or actually is, expressed or indicated").

**D.    Credit Suisse improperly exploited the Court-ordered stipulation about named plaintiffs.**

Counsel for Credit Suisse, having first suggested the Court-ordered stipulation that named plaintiffs would not be called as trial witnesses, nevertheless argued at summation, "[h]ow easy would it have been to take the witness stand and say that under oath if they thought it was true, but they didn't, and their silence speaks volumes about the plaintiffs' proof or, rather, the lack of it."  Trial Tr. 1097:5-8.  Such conduct was improper and highly prejudicial.

As an excuse, Credit Suisse blames Plaintiffs for mentioning during summation that Oklahoma Firefighters cared enough about the litigation to attend trial.  Opp. at 23.  But that innocuous statement in putting a face to the class had nothing to do with the stipulation.  The intent of the stipulation was to economize and focus the jury on the matters that were truly in dispute.  Entering into an agreement to remove certain witnesses from focus only for Credit Suisse to argue than an adverse inference should be drawn from their silence violates the spirit of the stipulation.  Had Plaintiffs known Credit Suisse did not intend to honor the stipulation, they would have called the named plaintiffs as witnesses.

## III.    CONCLUSION

The overwhelming evidence demonstrated Credit Suisse's participation in a conspiracy to widen spreads.  Nevertheless, Credit Suisse elicited testimony that misstated the truth to confuse the jury, and Plaintiffs were severely prejudiced by being unable to tell the jury what actually happened.  Plaintiffs respectfully submit that this is a textbook example of a miscarriage of justice, and the Court should grant a new trial.

Dated:  December 7, 2022                    Respectfully submitted,

                                          KOREIN TILLERY, PC

                                          <u>  s/ Christopher M. Burke                    </u>
                                          CHRISTOPHER M. BURKE (CB-3648)
                                          WALTER W. NOSS (WN-0529)
                                          KATE LV (*pro hac vice*)
                                          707 Broadway, Suite 1410
                                          San Diego, CA  92101
                                          Telephone:  619-625-5621
                                          cburke@koreintillery.com
                                          wnoss@koreintillery.com
                                          klu@koreintillery.com

                                          KOREIN TILLERY, LLC
                                          STEPHEN M. TILLERY
                                          STEVEN M. BEREZNEY
                                          505 North 7th Street, Suite 3600
                                          St. Louis, MO  63101
                                          Telephone:  314-241-4844
                                          Facsimile:  314-241-3525
                                          stillery@koreintillery.com
                                          sberezney@koreintillery.com

                                          KOREIN TILLERY, LLC
                                          GEORGE A. ZELCS
                                          205 N. Michigan Avenue, Suite 1950
                                          Chicago, IL  60601-4269
                                          Telephone:  312-641-9760
                                          Facsimile:  312-641-9751
                                          gzelcs@koreintillery.com

                                          HAUSFELD LLP
                                          MICHAEL D. HAUSFELD
                                          REENA ARMILLAY GAMBHIR
                                          TIMOTHY S. KEARNS
                                          NATHANIEL C. GIDDINGS
                                          SARAH LAFRENIERE
                                          888 16th Street NW, Suite 300
                                          Washington, DC  20006
                                          Telephone: 202-540-7143
                                          Facsimile:  202-540-7201
                                          mhausfeld@hausfeld.com
                                          rgambhir@hausfeld.com
                                          tkearns@hausfeld.com

- 11 -

ngiddings@hausfeld.com
slafreniere@hausfeld.com

SCOTT+SCOTT ATTORNEYS AT LAW LLP
DAVID R. SCOTT (DS-8053)
JOSEPH P. GUGLIELMO (JG-2447)
DONALD A. BROGGI (DB-9661)
SYLVIA M. SOKOL (SS-0317)
THOMAS K. BOARDMAN (TB-0530)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
david.scott@scott-scott.com
jguglielmo@scott-scott.com
dbroggi@scott-scott.com
ssokol@scott-scott.com
tboardman@scott-scott.com

*Class Counsel*

ROBBINS GELLER RUDMAN & DOWD LLP
PATRICK J. COUGHLIN (PC-5116)
DAVID W. MITCHELL (*pro hac vice*)
RANDI D. BANDMAN (RB-7278)
ALEXANDRA S. BERNAY (*pro hac vice*)
CARMEN A. MEDICI (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619-231-1058
Facsimile:  619-231-7423
patc@rgrdlaw.com
davidm@rgrdlaw.com
randib@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com

*Additional Trial Counsel for the Class*

- 12 -

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 7, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

s/ Christopher M. Burke
CHRISTOPHER M. BURKE