UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                        :          13 Civ. 7789 (LGS)
                                          :
IN RE FOREIGN EXCHANGE BENCHMARK  :
RATES ANTITRUST LITIGATION           :       **OPINION AND ORDER**
                                          :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

      This case concerns an alleged conspiracy among banks to fix prices in the foreign

exchange ("FX") market.  After a seven-day trial and one day of deliberations, a jury returned a

special verdict finding that Plaintiffs did not prove, by a preponderance of the evidence, that

Defendants Credit Suisse Group AG, Credit Suisse AG and Credit Suisse Securities (USA) LLC

(collectively, "Credit Suisse") knowingly participated in a conspiracy to widen, fix, stabilize or

maintain bid-ask spreads in the FX spot market.  Judgment was entered for Credit Suisse.

Plaintiffs now move for a new trial on the grounds that that jury finding was contrary to the

weight of the evidence and that Credit Suisse engaged in trial misconduct that prejudiced

Plaintiffs.  For the reasons stated below, Plaintiffs' motion is denied.

## I.     BACKGROUND

      Familiarity with the underlying facts and history of this case is assumed.  A brief

summary of the relevant procedural history follows.

      On September 3, 2019, an issue class was certified under Federal Rule of Civil Procedure

23(c)(4) with respect to two issues: (1) the existence of a conspiracy to widen spreads in the FX

spot market and (2) participation in the conspiracy by Credit Suisse.  *In re Foreign Exch.*

*Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422 (S.D.N.Y. 2019).  On August 31, 2022,

Credit Suisse's motion to decertify the class was denied.  *In re Foreign Exch. Benchmark Rates*

*Antitrust Litig.*, No. 13 Civ. 7789, 2022 WL 3971006 (S.D.N.Y. Aug. 31, 2022).

On February 1, 2022, both parties' cross-motions for summary judgment were denied. The case proceeded to trial on the two certified issues. *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789, 2022 WL 294118 (S.D.N.Y. Feb. 1, 2022).

## II.     STANDARD

Under Rule 59(a), a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Among other reasons, "[a] new trial may be granted if (1) the verdict is against the weight of the evidence, [or] (2) misconduct by counsel so tainted the verdict as to warrant a new trial." *Zhang v. Zhang*, No. 16 Civ. 4013, 2019 WL 623879, at *3 (S.D.N.Y. Feb. 14, 2019) (cleaned up), *aff'd in relevant part*, 816 F. App'x 525 (2d Cir. 2020). In general, "[a] trial court should not grant a motion for a new trial unless it is convinced that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018) (cleaned up).

"A decision is against the weight of the evidence if and only if the verdict is (1) seriously erroneous or (2) a miscarriage of justice." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417-18 (2d Cir. 2012) (cleaned up); *accord Hutchinson v. Grace*, No. 19 Civ. 270, 2022 WL 1154347, at *3 (S.D.N.Y. Apr. 19, 2022). Courts "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner," but "must exercise their ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility, and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *Raedle*, 670 F.3d at 418 (cleaned up); *accord Hutchinson*, 2022 WL 1154347, at *3.

"Trial courts possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial." *Matthews v. CTI Container Transp. Int'l Inc.*, 871 F.2d 270, 278 (2d Cir. 1989); *accord Anderson v. Osborne*, No. 17 Civ. 539, 2020 WL 6151249, at *5 (S.D.N.Y. Oct. 20, 2020). "[N]ot all misconduct of counsel taints a verdict to such a degree as to warrant a new trial," and a new trial is warranted only "when the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict." *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992); *accord Anderson*, 2020 WL 6141249, at *5. This will be the case only "rarely," and "[i]n particular, where the jury's verdict finds substantial support in the evidence, counsel's improper statements will frequently be *de minimis* in the context of the entire trial." *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005) (internal quotation marks omitted); *accord FIH, LLC v. Barr*, No. 20-489-cv, 2021 WL 5286659, at *5 (2d Cir. Nov. 15, 2021) (summary order). Where the complaining party fails to object to statements by counsel contemporaneously, "the court will only grant a new trial when the error is so serious and flagrant that it goes to the very integrity of the trial." *Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118, 156 (E.D.N.Y. 2013) (internal quotation marks omitted); *see also Marcic*, 397 F.3d at 127 (holding that unobjected-to "statements were not so inflammatory or so unsupported by the record as to affect the integrity of the trial and entitle [Plaintiff] to a new trial."); *accord FIH*, 2021 WL 5286659, at *5 (noting that where an "error was not objected to contemporaneously," it is reviewed "only for plain error" and "a new trial will be granted only for error that was so flagrant that it goes to the very integrity of the trial" (internal quotation marks omitted)).

III.   **DISCUSSION**

A.   **Weight of the Evidence**

Plaintiffs argue that the verdict was contrary to a "mountain" of evidence that Credit Suisse participated in a conspiracy to widen spreads.  Plaintiffs rely primarily on chat transcripts in evidence at trial, and some witness testimony.  In effect, Plaintiffs argue that the content of certain chats, individually and collectively, can only be interpreted one way and that they unambiguously show Credit Suisse traders agreeing with competitors to fix prices.  In each case, however, Credit Suisse cites testimony or other evidence that rebuts Plaintiffs' interpretation of those chats.  In short, there was substantial evidence going both ways on the key issue of whether chat discussions of spreads were part of a spread-widening conspiracy or instead non-conspiratorial behavior.[1]  "A district court may grant a new trial 'even if there is substantial evidence to support the jury's verdict.'"  *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, No. 18 Civ. 3976, 2022 WL 4080663, at *9 (S.D.N.Y. Sept. 2, 2022) (quoting *Song v. Ives Lab'ys, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992)).  But under the circumstances here, the verdict was not "seriously erroneous" or "a miscarriage of justice" merely because the jury was persuaded by the evidence to adopt Credit Suisse's interpretation of events.  *See Ali*, 891 F.3d at 64.

---

[1]  For clarity, per the Order addressing Plaintiffs' motions *in limine*, the issue was not whether Credit Suisse had legitimate reasons for engaging in a price-fixing conspiracy or whether such a conspiracy in fact had salutary effects, and Credit Suisse was not permitted to offer evidence or argument to that effect.  *See United States v. Aiyer*, 33 F.4th 97 (2d Cir. 2022) (affirming exclusion of evidence on those issues in a similar *per se* antitrust case).  But Credit Suisse was entitled to offer evidence and argument that Plaintiffs' chat evidence was not in fact evidence of a price-fixing conspiracy at all, and the jury was entitled to accept that position.

### 1. The Summary Judgment Opinion

As a threshold matter, the summary judgment decision in this case does not require a different result. Based on the record and argument presented at summary judgment, the Court held that:

> [C]onstruing the evidence in favor of [Credit Suisse] on Plaintiffs' motion, a reasonable jury could conclude that no single overarching conspiracy existed, and that only multiple smaller conspiracies existed. While significant uncontroverted evidence shows at least some conspiratorial activity in the FX market in which Credit Suisse participated, questions remain about the scope of the shared illegal goal and the extent of the conspirators' mutual dependence and assistance.

*In re Forex*, 2022 WL 294118, at *5. At that time, Plaintiffs sought summary judgment on the ground that undisputed facts demonstrated the existence of a "single conspiracy" spanning the global FX market, involving Credit Suisse and all fifteen of its former codefendants. Credit Suisse responded by disputing that claim and arguing instead that Plaintiffs could prove, at most, a series of unconnected "mini-conspiracies." Summary judgment was denied to both parties on the issue of Credit Suisse's participation in a conspiracy because the disputed question of whether there were one or multiple conspiracies "need[ed] to be resolved before asking whether and what Credit Suisse joined." *Id.* at 12. At the time, Credit Suisse "d[id] not argue that, even if there was a conspiracy, they did not participate in it." *Id.* As Credit Suisse argues, such arguments likely would only have raised disputed questions of fact for trial, and Credit Suisse would not have won summary judgment on that ground.

By the time of trial, Plaintiffs had shifted their strategy and sought to prove -- in the alternative if they could not prove the entire global conspiracy -- any smaller conspiracy that the jury might find. Credit Suisse initially proposed a one-sentence verdict form that would have asked the jury whether Plaintiffs had proven the single, global, sixteen-bank conspiracy in every particular alleged in the pleadings. Instead, a modified version of Plaintiffs' proposed verdict

form ultimately was adopted, which would have allowed the jury to find one or more smaller conspiracies if it found that Plaintiffs had not proven the single, global conspiracy in every particular originally alleged.  At trial, Credit Suisse thus focused more on disputing whether its traders' conduct was conspiratorial at all, and less on the precise scope of the conspiracy.  As a result, as described in more detail below, evidence that was uncontroverted at summary judgment was controverted at trial.

### 2.  Plaintiffs' Evidence

During trial, Plaintiffs entered thousands of chat transcripts in evidence.  Plaintiffs argue that the transcripts constitute incontrovertible evidence of a price-fixing conspiracy.  In response, Credit Suisse points to trial testimony that rebuts those arguments.  In context, it was not an "egregious" error for the jury to credit the interpretation urged by Credit Suisse.

Plaintiffs cite many chats in which Credit Suisse employees discuss what the spread "should be" or what the "right" or "correct" spread is.  Plaintiffs reference hundreds more chats involving Credit Suisse in which traders from different banks discuss spreads.  Plaintiffs also cite testimony to the effect that Credit Suisse management encouraged its traders to engage in these discussions.  Plaintiffs argue one interpretation in which these chats show Credit Suisse participating in a price-fixing conspiracy, but that is not the only reasonable interpretation.  Plaintiffs argued at trial, and argue again now, that competitors discussing the "right" spread makes sense only in the context of a price-fixing conspiracy.  Credit Suisse countered by arguing that spreads were discussed as proxies for liquidity and volatility -- essentially, risk.  Under that interpretation, any one trader's views on the "right" spread are merely "market color" -- an indication of what spread will sufficiently protect the trader from current market risks, which information helps the trader make a final, informed (but independent) decision on what to quote

his customer.  The jury heard that other factors could affect the spread actually quoted to a customer, such as the influence of a salesperson.  The jury did *not* hear that after traders discussed the "right" spread, they proceeded to quote that spread to customers.  The jury was entitled to weigh that evidence and reject Plaintiffs' interpretation of the chats as agreements on the price that would be quoted to customers.

Plaintiffs also specifically argue that a combination of particular chats and testimony unmistakably implicate several specific Credit Suisse traders in a conspiracy, including Brian Walker, Jamie Lawes and Christopher Hatton.  With respect to Mr. Walker, Plaintiffs focus on his statements on cross-examination that he did not view other banks' traders in chatrooms as competitors, and that discussing spreads did not help Credit Suisse compete with them.  Credit Suisse argues that his testimony is better understood in the context of his testimony on direct, when Mr. Walker said (1) he thought of the other chatroom participants as "counterparties" because they provided liquidity to the market, including to Credit Suisse, and (2) he did not see them as competitors because they served different types of customers.  In light of other witnesses' testimony that spread discussions were discussions about risk and liquidity, the jury committed no egregious error if it credited Mr. Walker's explanation over Plaintiffs'.

With respect to Mr. Lawes, Plaintiffs rely on a chat in which he suggested that several participants "sign a pact on spreads."  In response, Credit Suisse notes that Mr. Lawes testified that his comment was a joke, and his testimony was corroborated by a Credit Suisse salesman with whom he worked and by Credit Suisse's Global Head of FX.  Acknowledging that evidence, Plaintiffs argue, without citation, that Mr. Lawes discussed spreads to show customers in about 300 other chats with traders at other banks.  Given the evidence in the record about other potential reasons for those chats, it was not unreasonable for the jury to find Mr. Lawes and

7

other Credit Suisse witnesses' denials credible, and to discount the implications of conspiracy urged by Plaintiffs' counsel.

With respect to Mr. Hatton, Plaintiffs argue that two non-Credit Suisse traders' testimony implicated him in a conspiracy. But the jury heard from both of those traders -- Jason Katz and Christopher Cummins -- that they did *not* conspire with Mr. Hatton or with Credit Suisse. The jury also heard Mr. Hatton's own denial that he engaged in a conspiracy. The jury was entitled to find that testimony credible and conclude that the chat of Mr. Hatton's that Plaintiffs cite -- in which he suggests that chat room participants "just both quote [a customer] wide and same that way they have no tight price" -- was merely a suggestion and did not result in an agreement to fix prices.

Plaintiffs also make various arguments to the effect that *some* conspiracy existed in this market, so it was irrational for the jury to find that Credit Suisse was not involved. Plaintiffs cite chats in which Credit Suisse traders discuss new rules limiting the practice of discussing spreads because of worries about "collusion" and "price fixing," before continuing to discuss spreads. Plaintiffs cite statements by Credit Suisse's counsel acknowledging that there was at least some misconduct in the industry, and suggest that is an admission of Credit Suisse's own involvement. And Plaintiffs argue that the jury *must* have credited Plaintiffs' interpretation of the chats as conspiratorial, given that the jury found a spread-widening conspiracy existed somewhere in the market.

These arguments are unpersuasive because Plaintiffs offered ample evidence of a conspiracy that had nothing to do with Credit Suisse. For example, non-Credit Suisse trader Mr. Katz was asked, "Did you engage in a conspiracy to suppress and eliminate competition by fixing prices for CEEMEA currencies in the United States from January '07 to July '13?" and he

answered "Yes."  Mr. Katz testified that none of his co-conspirators worked for Credit Suisse. There is no inconsistency between the jury finding -- and Credit Suisse's counsel acknowledging -- that some wrongdoing in the FX market had occurred, and the jury finding that Plaintiffs did not prove Credit Suisse's participation in the conspiracy.  Nor was it inconsistent for the jury to find both that (1) banks were rightfully concerned that spread discussions *could* be used to facilitate price-fixing or collusion and (2) the specific spread discussions in which Credit Suisse participated were not the kind of chats that motivated those new restrictions.

Plaintiffs' other arguments have been considered and rejected.  First, Plaintiffs argue the evidence shows the chat rooms constituted an exclusive, private "network" that gave participants an edge over non-participants.  The existence of such a "network" is only relevant to the extent Credit Suisse agreed with the other participants in that network to fix spreads.  As discussed above, the jury was entitled to conclude otherwise.  Second, Plaintiffs overstate the significance of Dr. Melvin's testimony that a particular spread chat using a specific customer's name was "a discussion [the participants] shouldn't be having."  That comment came moments after Dr. Melvin had testified that his former employer, Blackrock, would not have been happy if traders had been using its name in similar chats.  In context, the jury reasonably could have concluded that Dr. Melvin was commenting on the appropriateness of disclosing a customer's confidential information, not on whether the conversation represented price-fixing.  Third, Plaintiffs mention that several Credit Suisse witnesses invoked their Fifth Amendment privilege against self-incrimination in response to questions about whether they engaged in spread-fixing conspiracies. The jury was expressly instructed that it was "permitted, but *not required*" to draw adverse inferences based on those invocations.  *Mirlis v. Greer*, 952 F.3d 36, 44 (2d Cir. 2020) (emphasis added and internal quotation marks omitted).

9

### B.      Misconduct of Counsel

Plaintiffs argue that Credit Suisse's counsel engaged in at least six different kinds of misconduct that explain how the jury could have reached the result it did and provide a separate ground for a new trial.[2]  Plaintiffs argue that Credit Suisse either violated or unfairly took advantage of the Court's rulings on motions *in limine* and other pretrial orders, and in one case that Credit Suisse's counsel misstated the law.  These arguments are largely unpreserved.  Even to the extent they were preserved, for the most part they do not describe misconduct at all, let alone the kind of misconduct that would warrant a new trial.  To the extent Plaintiffs' arguments address actual misconduct, it was not sufficiently prejudicial to require overturning the verdict.  Plaintiffs' motion for a new trial on the basis of misconduct by Credit Suisse's counsel is denied.

### 1.   Arguments that Credit Suisse Was Never "Prosecuted"

Prior to trial, Credit Suisse moved *in limine* to preclude, among other things, (1) evidence or argument concerning a consent order between Credit Suisse and the New York Department of Financial Services ("NYDFS") and (2) evidence or argument about the fact that certain other banks, and certain of those banks' FX traders, were criminally prosecuted, pleaded guilty or were convicted of Sherman Act or other criminal violations.  The former was granted and the latter

---

[2] Plaintiffs raise an additional argument, that Credit Suisse's counsel misstated the law of conspiracy in summation, by suggesting that the "rules of conspiracy" limited any conspiracy to the participants in a single chatroom.  That argument is forfeited because it is raised only in a footnote.  *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12 Civ. 7372, 2020 WL 264146, at *2 (S.D.N.Y. Jan. 17, 2020).  That argument also is unpreserved because Plaintiffs did not object at the time or at the close of Credit Suisse's summation.  In any event, there is no indication that this comment "cause[d] prejudice to the opposing party [or] unfairly influence[d] a jury's verdict."  *Pappas*, 963 F.2d at 540.  One of the chats referenced by Credit Suisse's counsel involved Credit Suisse, so the "rules of conspiracy" referenced would not exclude Credit Suisse.  Moreover, the jury was instructed repeatedly that it could take the law only from the Court.  Applying the clear error standard to this unpreserved objection, Credit Suisse's counsel's brief statement was not so "flagrant that it goes to the very integrity of the trial."  *Claudio*, 955 F. Supp. 2d at 156 (internal quotation marks omitted); *see FIH*, 2021 WL 5286659, at *5.

denied.  Plaintiffs thus were permitted to use non-Credit Suisse banks' and traders' guilty pleas but *not* Credit Suisse's settlement with the NYDFS at trial.

Plaintiffs' argument that Credit Suisse unfairly used the exclusion of the NYDFS order as both a sword and a shield is unpersuasive.  Plaintiffs argue that Credit Suisse misled the jury by claiming during its opening that the jury would "hear no evidence that Credit Suisse was prosecuted," and by asking Mr. Hatton whether he was "ever criminally prosecuted," to which he responded, "No."  Plaintiffs argue that the word "prosecute" can refer to civil actions as well as criminal, and that Credit Suisse and Mr. Hatton specifically were "prosecuted," by NYDFS and also by authorities in the European Commission ("EC") and South Africa.

In context, Credit Suisse's comments were not misleading.  It is doubtful that a lay jury would understand the word "prosecute" to encompass civil actions, but even if it did, Credit Suisse's comments dispelled any confusion.  Credit Suisse's questioning of Mr. Hatton clearly referred to "criminal" proceedings, to distinguish him from Messrs. Katz and Cummins.  Credit Suisse's opening statement also clearly referred to "criminal prosecutions":  "The first point you'll hear about these criminal prosecutions, you'll hear no evidence that Credit Suisse was prosecuted and no evidence that Credit Suisse pleaded guilty . . . ."

Neither the existence of the civil action by NYDFS, nor the international proceedings (which Plaintiffs never sought to introduce at trial), render those statements misleading in context.  Indeed, Plaintiffs argue that Mr. Hatton's testimony was misleading even though they concede he was only "named in documents related to a prosecution," not named as a defendant.  Plaintiffs provide no details on the EC proceeding against John Erratt, and do not explain its relevance to the issues in this case.  The EC proceeding against Credit Suisse ended, like the NYDFS proceeding, in a civil settlement.

11

Plaintiffs made much of other banks' guilty pleas with the Department of Justice in their opening and throughout trial.  Plaintiffs also repeatedly tried to tie Mr. Hatton to Mr. Katz's and Mr. Cummins's guilty pleas.  Credit Suisse's counsel's remarks, to the effect that Credit Suisse was not prosecuted, were fair comments on the evidence Plaintiffs offered.  Plaintiffs opened the door to those remarks by suggesting Credit Suisse and Mr. Hatton were guilty by association. Plaintiffs argue that it was misleading for Credit Suisse to imply that it was "different" from the banks that pleaded guilty.  But civil settlements are different from guilty pleas.[3]

Plaintiffs also argue that Credit Suisse took advantage of the exclusion of the NYDFS order by downplaying the chat in which Credit Suisse trader Mr. Lawes suggested, "lets sign a pact . . . on spreads."  Plaintiffs note that this chat was specifically highlighted by the NYDFS as evidence of a conspiracy.  A similar argument was considered and rejected in ruling on Credit Suisse's motion *in limine*.  The jury had ample opportunity to review Mr. Lawes's chats for themselves and heard evidence from both sides about how to interpret the chat in question.  The NYDFS's views on the significance of the chat, outside of any adversary presentation at trial, had very limited incremental probative value, and carried a significant risk of prejudice if the jury substituted the regulator's views for its own.

Plaintiffs' other arguments are similarly unavailing.  The terms of the NYDFS order -- including any agreement to fire and not rehire Mr. Lawes and certain other traders because of the

---

[3] Plaintiffs have repeatedly asserted, including in briefing this motion, that Credit Suisse "stipulated and agreed" that it had committed the relevant misconduct in its settlement with the NYDFS.  For clarity, this overstates the extent of the admissions in the NYDFS order.  The NYDFS order discusses "spread collusion" and the "pact on spreads" chat in two paragraphs out of more than eighty paragraphs of "The Department's Findings After Investigation" that largely focus on other alleged issues.  Unlike guilty pleas, and unlike another bank's settlement with the NYDFS, Credit Suisse's NYDFS order contains no stipulated statement of facts nor admission of any specific alleged misconduct.  It contains only general admissions, such as that "Credit Suisse has conducted business in an unsafe and unsound manner."

charged conduct -- were excluded under Rule 408.  No comments or evidence at trial opened the door.  The fact that Credit Suisse fired Mr. Lawes and others also was excluded under Rule 407.  Credit Suisse did not open the door to that evidence either.  For example, Credit Suisse did not imply that Mr. Lawes was a model employee.  One of its witnesses referred to the chat at issue as "pretty stupid."  Credit Suisse also forfeited any argument that it should have been permitted to introduce excluded evidence to impeach Niall Condie by failing to make that application at trial.

### 2.  Questioning About Dr. Singer's Regression Analysis

On September 30, 2022, Credit Suisse's *Daubert* motion to preclude certain testimony by Plaintiffs' expert Dr. Hal Singer was granted in part.  On October 21, 2022, an opinion was issued elaborating on the reasons for that decision.  Dr. Singer was precluded from opining that the "Conduct coefficient" produced by a regression analysis he performed measured the average difference in spreads between the entire alleged conspiracy period and the post-conspiracy period he analyzed.  Dr. Singer was permitted, however, to opine that the Conduct coefficient measured the average difference between the last six months of the alleged conspiracy period and the first six months after that period ended, among other opinions.  Credit Suisse was precluded from "directly or indirectly referenc[ing] the Court's ruling as the reason for Dr. Singer's opinion being revised."  At trial, Plaintiffs elected not to offer any evidence about Dr. Singer's regression analysis.  Plaintiffs argue that Credit Suisse violated the *Daubert* Order and misled the jury by questioning Dr. Singer and Credit Suisse's own experts about quantitative analysis of spread-widening, including Dr. Singer's regression analysis.  Plaintiffs' arguments conflate a few different potential issues, none of which amounts to misconduct that might require a new trial.

First, Plaintiffs argue that Credit Suisse's cross-examination of Dr. Singer exceeded the scope of direct, because Plaintiffs did not question him at all about his regression analysis.  Most

of the questions Plaintiffs reference addressed Dr. Singer's opinions about the significance of

spread-widening and whether he could say, quantitatively, that spreads were widened.  Those

questions were fairly within the scope of direct.  Dr. Singer testified on direct that the alleged

conspiracy had a "widespread effect" on the widening of spreads, and that "the performance of

the industry" was consistent with his conclusion that a conspiracy existed.  Even if Dr. Singer

had never performed a regression and the *Daubert* motion never happened, Credit Suisse would

have been entitled to probe the basis for those conclusions.  Similarly, Dr. Singer testified on

direct about what factors he looks for in determining whether collusion is likely present in a

market.  Credit Suisse was entitled to question Dr. Singer about recent changes in those opinions

-- i.e., Dr. Singer's previously, repeatedly stated opinion that whether spreads were widened was

important circumstantial evidence of whether a conspiracy existed.

Credit Suisse did ask several questions that arguably went beyond the scope of direct.

Credit Suisse asked several questions specifically about Dr. Singer's regression model, rather

than about the lack of analysis underlying Dr. Singer's opinions.  In some cases, Credit Suisse

continued that questioning after several of Plaintiffs' objections were sustained.  In particular,

Credit Suisse's counsel walked up to the line in questioning Dr. Singer about how he "spent four

years working on an analysis" he did not show the jury, and arguably crossed it by continuing

that precise line of questioning after an objection was sustained.  But there is no reason to think

that exchange or any other on this issue unfairly prejudiced Plaintiffs or affected the verdict.  The

opinions at issue and the evidence Credit Suisse elicited pertained almost exclusively to the

question of whether a conspiracy existed, on which the jury found for Plaintiffs.

Second, Plaintiffs argue that Credit Suisse's questioning on this issue of both Dr. Singer

and Credit Suisse's own expert, Dr. Divya Mathur, misled the jury on the law.  Specifically,

Plaintiffs argue Credit Suisse improperly implied that quantitative analysis of spread widening was *required* to prove an element of Plaintiffs' claim.  This argument fails because, contrary to Plaintiffs' argument, Credit Suisse was within its rights to argue that actual widening of spreads would be important circumstantial evidence of whether a conspiracy existed.  Credit Suisse also was entitled to argue that Plaintiffs' failure to offer such evidence, among other things, meant Plaintiffs failed to carry their burden of proof.  Credit Suisse did not say outright or imply that a conspiracy *had* to be successful in order to exist or in order to violate the Sherman Act.  If any confusion or prejudice existed, it was dispelled by the jury instructions.  The jury was told that it "may find a conspiracy existed regardless of whether it succeeded or failed" and that "in order to prove that a price-fixing conspiracy existed, Plaintiffs do not need to show that the prices agreed upon were high or low or reasonable or unreasonable or that spreads were actually widened." Credit Suisse's remark on this issue in its summation was consistent with that instruction.  Thus, Credit Suisse's questioning and Dr. Mathur's answers were not misleading.  Even if they were, the lack of prejudice is particularly clear in this instance given that the jury ultimately found in Plaintiffs' favor on the question of whether a conspiracy existed.

Third, Plaintiffs are incorrect in arguing that Credit Suisse violated one or more orders. The order Plaintiffs cite -- which excluded "[a]ny reference to the fact that Dr. Singer performed a regression analysis" -- was issued days *after* Dr. Singer testified and was directed to the anticipated testimony of a different Credit Suisse expert who would have further criticized Dr. Singer's analysis.  Credit Suisse did not violate the *Daubert* order, which precluded Defendants from eliciting that Dr. Singer's opinions changed because a portion of his opinion was excluded. Nor is it accurate for Plaintiffs to suggest that *their* hands were tied by any Order, precluding them from responding to Credit Suisse's insinuations that Plaintiffs had not met their burden of

proof.  Plaintiffs made a strategic choice not to use the portions of Dr. Singer's analysis that were not precluded, and Credit Suisse was permitted to comment on that lack of evidence.

### 3.  Expert Testimony About Pro-Competitive Justifications and Intent

Prior to trial, Plaintiffs moved *in limine* to preclude evidence and argument regarding purported pro-competitive justifications or absence of anticompetitive effects, and also to preclude expert testimony regarding traders' intent, state of mind or motive.  Both were largely denied as moot based on Credit Suisse's representations that it did not intend to offer such evidence.  Contrary to Plaintiffs' arguments, Credit Suisse's experts did not violate the terms on which those motions were resolved.

### a.  Evidence of Pro-Competitive Justifications

Plaintiffs' motion *in limine* to preclude pro-competitive justifications for Credit Suisse's conduct was denied in part as moot and otherwise denied.  Because price-fixing conspiracies are *per se* prohibited by the antitrust laws, Credit Suisse was not permitted to offer evidence or argument that acts of price-fixing were reasonable, beneficial or a legitimate business practice. *See Aiyer*, 33 F.4th at 118.  Part of the motion was moot because Credit Suisse represented that it did not intend to offer such evidence.  However, Credit Suisse was permitted to argue that its actions did not constitute price-fixing at all, and Plaintiffs' motion was denied to the extent it encompassed such evidence and argument.  For example, Credit Suisse could and did argue that the chats in which Plaintiffs saw price-fixing were in fact not agreements to fix spreads but mere information-sharing, or "market color."

Plaintiffs take issue with certain testimony from Dr. Melvin, which boils down to: "Information sharing serves a legitimate business purpose."  That falls on the permissible side of the line described above.  As the jury was charged, exchange of price-related information, such

as spreads, is not the same as a conspiracy to fix prices, and is not *per se* illegal.  Had Plaintiffs challenged the practice of information-sharing as such, it would have been evaluated under the rule of reason, where it would have been appropriate to weigh any purported procompetitive benefits.  *See Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001); *accord City of Philadelphia v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 532 (S.D.N.Y. 2020).  This was not tried as a rule-of-reason case, but Credit Suisse was permitted to argue that its conduct was not price fixing and thus fell outside of the *per se* framework in which Plaintiffs would place it.  In doing so, Dr. Melvin was permitted to opine on economically rational (and potentially lawful) reasons for conduct that was not price fixing.

### b.  Expert Testimony on Traders' Intent or State of Mind

Plaintiffs' motion to preclude expert testimony on traders' intent and state of mind was denied in part as moot and otherwise granted in part.  Again, Credit Suisse represented that it did not intend to offer such evidence, mooting part of the motion.  The motion was granted in part to the extent Credit Suisse's experts would testify to opinions similar to those that Plaintiffs quoted in their memorandum of law.  For example, in his report, Dr. Melvin opined that certain chats specifically identified in another expert's report "indicate that the traders were likely searching for insight on market liquidity conditions and crucially, do not appear to indicate any attempt to agree on certain spreads to quote to customers."  In that report, Dr. Melvin went on to address specific traders by name and speculated as to those individuals' intents.  Opinions like those were precluded at trial, but more general opinions on the likely meanings of words used in the jargon-heavy chat rooms were not.

Plaintiffs take issue with Dr. Melvin's answer to one question.  Dr. Melvin had just testified to his opinion that a "spread" is not a "price."  Credit Suisse's counsel asked if certain

chats using those terms interchangeably changed his mind, and Dr. Melvin said "no," that those

uses of "price" were just "loose talk."  This testimony does not cross the line laid out above.  In

context, Dr. Melvin was commenting generally on the usage of those words, not attempting to

place himself in the heads of individual traders.  Even if Dr. Melvin had slipped up, this brief

testimony was on an ancillary issue, that was primarily relevant to the question on which the jury

found for Plaintiffs, and could not have caused prejudice or affected the jury's verdict.

Plaintiffs also argue that Dr. Mathur impermissibly speculated about traders' intent, but

those arguments are unavailing.  First, Plaintiffs take issue with Dr. Mathur's testimony that

chats contained "bluster and bravado."  That does not violate the *in limine* decision because

whether the chats contain "bluster and bravado" has little bearing on what the traders intended to

do in the chatrooms.  Indeed, Dr. Mathur said repeatedly, including immediately following the

above-quoted statement, that she could not "follow what is intended."

Second, Plaintiffs challenge Dr. Mathur's testimony that addressed the possibility that a

spread discussion might be mere information-sharing rather than agreement to fix prices.  For

example, Dr. Mathur testified that she did not find it odd that traders knew each other's spreads.

She also testified that there could be economically rational, non-price-fixing explanations for

certain kinds of information-sharing.  That did not constitute misconduct by Credit Suisse's

counsel, since Dr. Mathur made those statements in response to questions from Plaintiffs'

counsel.  Nor did it constitute misconduct by Dr. Mathur.  Plaintiffs' questions often were loaded

with assumptions that the traders were involved in a conspiracy, which Dr. Mathur simply

declined to adopt, citing other witnesses' testimony.  For example, when Plaintiffs' counsel tried

to get Dr. Mathur to agree that traders "shouldn't have been colluding" on spreads, Dr. Mathur

agreed that they should not have been engaged in price-fixing, but noted that other witnesses had

testified to possible non-price-fixing explanations for traders' conduct.  When Plaintiffs' counsel asked Dr. Mathur to agree that it was "odd" that traders could quickly find out each other's spreads, Dr. Mathur again resisted the assumption that a price-fixing conspiracy was the only explanation.  Dr. Mathur's answers were not always particularly responsive to Plaintiffs' hypotheticals, but her conduct did not violate any court order or rise to the level of misconduct.

### 4.  Testimony About the Closing of Multi-Bank Chatrooms

Another of Credit Suisse's motions *in limine* sought to preclude evidence of subsequent remedial measures under Rule 407.  That motion was granted, including to the extent of precluding evidence that banks eventually closed down the chat rooms.  At trial, during Plaintiffs' cross-examination of Credit Suisse expert Dr. Melvin, Plaintiffs' counsel asked, "Dr. Melvin, did you investigate for what period of time traders used multibank chatrooms to discuss spreads?"  In response, Dr. Melvin mentioned that he knew the chat rooms had been closed at some point, volunteering part of the information that Credit Suisse had sought to preclude. Plaintiffs' counsel continued that line of questioning, despite the motion *in limine*, asking, "All the chatrooms, not just one or two, all of them?"  Dr. Melvin responded, "Yeah," and then volunteered his view that the reason for the closure was that the banks did not see them as "worth the trouble and the risk of having them."

Plaintiffs now argue that they were prejudiced because they were not allowed to continue following up on that line of questioning, which they initiated and which was precluded by a ruling *in limine*.  Plaintiffs sought no relief at the time or at any time during trial.  Even assuming this argument had been preserved, this incident could not amount to misconduct by defense counsel.  Plaintiffs received a surprising admission from Credit Suisse's expert and made a strategic choice to press its advantage and pursue a line of inquiry that was precluded by a

motion *in limine*.  Dr. Melvin's testimony that Credit Suisse tried to keep out -- that the chat rooms were closed because they were not worth the risk -- might have helped Plaintiffs' case. Indeed, in an order clarifying the decision on Credit Suisse's motions *in limine*, Plaintiffs were permitted to put chats in evidence, discussed above, about new limitations on spread discussions due to concerns about fears of "collusion" and "price fixing."[4]  While Plaintiffs have decided they do not like the answer they got to their own question, that does not require a new trial.

### 5.  Arguments About Witnesses Who Invoked the Fifth Amendment

Plaintiffs argue that, during its summation, Credit Suisse misstated the law concerning the permissibility of drawing adverse inferences from invocations of the Fifth Amendment.  This argument fails for several reasons, including because Plaintiffs do not cite any legal authority or explain what the law is or how Credit Suisse misstated it.  Plaintiffs did not object during Credit Suisse's summation or any time thereafter or explain how any misstatement was so "flagrant that it goes to the very integrity of the trial." *FIH*, 2021 WL 5286659, at *5; *Marcic*, 397 F.3d at 124.

At trial, several Credit Suisse witnesses invoked the Fifth Amendment in response to all or nearly all of the questions they were asked.  These included not only questions about the substance of Plaintiffs' claims but also general background questions.  During summation, Credit Suisse's counsel reiterated the substance of the jury instruction that the jury is "permitted, but not required, to infer that the withheld information would have been unfavorable."  Credit Suisse's counsel asked the jury to consider "why they asserted their Fifth Amendment Rights.  Is it because they didn't want to talk about whether they conspired to fix spreads, as the plaintiffs say, or were they taking the Fifth with respect to every single question, no matter the topic."

---

[4] After the decision on Credit Suisse's motions *in limine*, the parties sought clarification as to certain disputed exhibits.  On October 3, 2023, the Court held that the chats discussed above were admissible because they are not subsequent remedial measures.

Counsel proceeded to give examples of witnesses who "took the Fifth in response to all sorts of perfectly innocent questions." Counsel asked the jury repeatedly to consider the evidence and question whether the inferences Plaintiffs wanted them to draw, about what the answers would have been to particular questions, were appropriate.

Taken as a whole, in context, Credit Suisse's remarks merely asked the jury to draw one of two permissible inferences. Plaintiffs asked the jury to draw the opposite, adverse inference during their own summation. Consistent with the jury charge, Credit Suisse reminded the jury in substance that "[a]ny inference [it] may draw should be based on all of the facts and circumstances in the case." Credit Suisse did not misleadingly suggest that any one fact was dispositive, or that the jury *could not* draw an adverse inference merely because the witnesses took the Fifth Amendment in response to innocent-seeming questions. Rather, Credit Suisse pointed out that an invocation of the Fifth Amendment is not necessarily a reliable indication that any particular answer would have been incriminating or unfavorable. *See Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 170 (2d Cir. 2017) ("Such adverse inferences are appropriately admitted, however, only if they are relevant, re-liable, and not unduly prejudicial." (citing *Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983)). Credit Suisse was entitled to argue to the jury how much probative value they should attach to any given invocation.

### 6.  Arguments About Class Plaintiffs

On October 3, 2022, the parties' stipulation was so-ordered providing that neither party would call any class plaintiffs at trial. That stipulation also stated that the jury would be told the undisputed fact that two such plaintiffs, "Oklahoma Firefighters and Virgin Islands traded FX during the Class Period with Credit Suisse and one or more of the other 15 settling Defendants."

21

Representatives of those two class plaintiffs were present for opening statements and most of

trial.  During their opening, Plaintiffs' counsel introduced those individuals to the jury, and

during their summation, Plaintiffs' counsel stated:

> The Court entrusted us, appointed us class counsel to represent the class, and we
> were humbled by that, because we represent working people.  Oklahoma
> Firefighters, Chase Rankin up there, he's been here this entire time.  Grenville
> Henderson, Cathy Smith from the Virgin Islands, they've been here the entire
> time.  Jim Nimmo, he was here.  He had to go back.  He's a fire captain for
> Oklahoma.  He had other responsibilities.  He sends his regards and respect.  They
> have a real stake in this litigation, ladies and gentlemen, and represent the other
> thousands of class members harmed by the conspiracy to widen spreads.

Plaintiffs argue that Credit Suisse's counsel engaged in prejudicial misconduct by

arguing in summation the following:

> And what about the customers the plaintiffs' lawyers represent?  Some of them
> were in the courtroom for parts of the trial, but did they tell you the spreads they
> were quoted were wider because of the conduct of Credit Suisse or any bank?
> They were trading all the time with the banks.  They would have had a front-row
> seat if the spreads were really widening during this period.  How easy would it
> have been to take the witness stand and say that under oath if they thought it was
> true, but they didn't, and their silence speaks volumes about the plaintiffs' proof
> or, rather, the lack of it.

Plaintiffs' argument is unpersuasive at two levels.  First, Plaintiffs complain that Credit

Suisse misstated the law by suggesting that Plaintiffs had not met their burden of proof in part

because they had not proven that the conspiracy was successful in widening spreads.  That

argument was addressed at length in prior orders and above.  Credit Suisse was permitted to

argue that the failure to put in certain circumstantial evidence of conspiracy, such as actual

widening of spreads, was one reason why Plaintiffs failed to carry their burden.  Credit Suisse

was not permitted to and did not argue that evidence of success or spread-widening was required

to prove any element of any claim.  If Credit Suisse's rhetoric might have confused any juror,

that confusion was addressed by the jury instructions on this issue.

Second, Plaintiffs complain that Credit Suisse referred to the fact that no representatives of the named Plaintiffs had taken the stand, after the parties agreed by stipulation that those witnesses would not be called.  Again, Plaintiffs did not object to Credit Suisse's argument during or after its summation until filing this motion.  Even if this argument is preserved, it is unsuccessful because Plaintiffs opened the door.  Plaintiffs told the jury that their clients -- "working people," including a "fire captain" -- had been harmed by Credit Suisse and its co-conspirators, without subjecting those witnesses to cross-examination.  It was not unfairly prejudicial for Credit Suisse to comment on the lack of proof supporting that assertion.

## C.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a new trial is DENIED.

The Clerk of Court is respectfully directed to close the motion at Docket Number 2022.

Dated: February 16, 2023
      New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

23