**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | No. 1:13-cv-07789-LGS |

**DECLARATION OF LOREE KOVACH IN SUPPORT OF PLAINTIFFS' MOTION FOR ENTRY OF AN ORDER APPROVING CLAIM'S ADMINISTRATOR'S DETERMINATIONS REGARDING UNAUTHORIZED AND DISPUTED CLAIMS**

I, Loree Kovach, declare and state as follows:

1.      I am a Senior Vice President at Epiq Class Action & Claims Solutions, Inc. ("Epiq"). Garden City Group, LLC, the Court-appointed Claims Administrator in connection with 15 Settlement Agreements approved by the Court in the above-captioned Action, was acquired by Epiq on June 15, 2018, and is now continuing operations as part of Epiq. The following statements are based upon my personal knowledge and experience and information provided to me by other experienced Epiq employees working under my supervision, in addition to information provided to me by Velador Associates Ltd. ("Velador") and Ankura Consulting Group, LLC ("Ankura") (collectively the "Settlement Experts"), and if called on to do so, I could and would testify competently thereto.

2.      Unless otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Stipulations and Agreements of Settlement filed with the Court at ECF Nos. 481 (Ex. 1-9), 822 (Ex. 1-5), and 877 (Ex. 1). The foregoing Stipulations are collectively referred to as the "Settlements" or the "Settlement Agreements."

## I.      BACKGROUND

3.      As Claims Administrator, Epiq implemented the notice and administration terms of the Settlements by, among other things: (i) disseminating the Mail Notice of Class Action Settlement ("Notice") and the proof of claim and release form ("Claim Form") (collectively with the Notice, the "Notice Packet") to potential Settlement Class Members;[1] (ii) maintaining a toll-free hotline, email address, and P.O. Box to receive Settlement Class Members' questions and requests; (iii) maintaining and updating a case-specific Settlement Website and posting case-specific documents on said website during the course of the administration; (iv) causing the Publication Notice of Class Action Settlement to be published; (v) providing, upon request, additional copies of the Notice Packet to brokers, nominees, and Settlement Class Members, including translations of the Notice Packet; (vi) receiving objections and requests for exclusion; and (vii) receiving and processing Claim Forms, transaction data, and documentation.

4.      All claimants submitted their Claim Forms to Epiq.  Those claimants for whom transaction data was available from Settling Defendants were able to submit their claims under either "Option 1" or "Option 2."  Claimants for whom no transaction data was available from Settling Defendants could only submit their claims under Option 2.  As described in the Notice, Claim Form, and Settlement Website, under Option 1 (the Estimated Claim Option), claimant payments are calculated using transaction data provided by Settling Defendants.  Under Option 2 (the Documented Claim Option), claimant payments are calculated using transaction data provided by the claimant.  The Notice and Claim Form advised claimants that Option 1 is not recommended

---

[1] For purposes of foreign data privacy compliance, certain Settling Defendants hired Rust Consulting, Inc. ("Rust") to distribute Notice Packets to certain potential Settlement Class Members, primarily those domiciled outside of the United States.  Further, certain Settling Defendants themselves distributed Notice Packets.

for all claimants because certain types of trades by claimants would not be identifiable in Settling Defendants' data.

5.    Once the calculations are complete, Epiq notifies the claimant by email that a "Claim Assessment Notification" is available for review via the claims portal page of the Settlement Website.   A Claim Assessment Notification provides, among other things, the transaction volume and payment range estimate associated with a particular claim.

6.    In addition, the Claim Assessment Notification informs claimants who submitted their claim under Option 1 that: (i) they can request the transaction data provided by Settling Defendants upon which their claim was calculated, and (ii) they can convert their claim to Option 2 by providing their own transaction records within 30 days.

7.    The Option 2 Claim Assessment Notification likewise informs claimants that they can request the transaction data upon which their claim was calculated.  These files consist of the transaction data the claimant submitted with additional columns showing, among other things, the "Settlement Transaction Volume" and "Eligible Participation Amount" calculated pursuant to the Plan of Distribution for each submitted trade.  Further, Option 2 claimants are informed that if they received transaction volume and payment estimates under both Option 1 and Option 2, they will automatically receive the higher amount without any further action required.

8.    To date, there have been five distributions to Authorized Claimants (or claims) from the Settlement Fund.  On March 8, 2019, the Court entered an Order approving an initial distribution from the Settlement Fund (*See* ECF No. 1230), authorizing Epiq to distribute $54,006,248.60 to 26,937 Authorized Claims ("Initial Distribution Claims").  Beginning on April 12, 2019, Epiq commenced the Initial Distribution.  On November 29, 2021, the Court authorized Epiq to distribute $435,114,487.03 to 22,904 Authorized Claims ("Second Distribution Claims").

*See* ECF No. 1633.  Beginning on January 7, 2022, Epiq commenced the Second Distribution.  On July 11, 2022, the Court authorized Epiq to distribute $270,951,068.24 to 2,031 Authorized Claims ("Third Distribution Claims").  *See* ECF No. 1698.  Beginning on August 10, 2022, Epiq commenced the Third Distribution.  On October 4, 2022, the Court authorized Epiq to distribute $225,204,639.84 to 160 Authorized Claims ("Fourth Distribution Claims").  *See* ECF No. 1951. Beginning October 31, 2022, Epiq commenced the Fourth Distribution.  On July 19, 2023, the Court authorized Epiq to distribute $190,000,182.70 to 98 Authorized Claims ("Fifth Distribution Claims").  *See* ECF No. 2068.  Beginning August 15, 2023, Epiq commenced the Fifth Distribution.  Certain payments remain unnegotiated from these five distributions because checks were returned as undeliverable, checks were not cashed, wires failed, claims were withdrawn, or payments were held at the request of the Claimant.  To the extent these funds remain unnegotiated, the funds will return to the Settlement Fund and be available for future distributions.

9.      In accordance with the terms of the Settlement Agreements and the Court-approved Plan of Distribution (ECF No. 1095), Epiq has received and completed the processing of the additional claim listed in Exhibit 1 attached hereto, and respectfully submits its administrative determinations accepting, in part, this claim.

10.     Additionally, as detailed further in this declaration, the claims listed in Exhibit 2 all have various issues that render them ineligible for payment, have been provided the opportunity to cure or correct those issues, and have not done so.  Accordingly, Epiq respectfully submits its administrative determinations rejecting these claims ("Unauthorized Claims").

11.     Lastly, as detailed further in this declaration, the claims listed in Exhibit 3 all have indicated their intent to seek Court review of Epiq's administrative determinations (the "Disputed Claims").  Exhibit 3 also includes the dispute letters submitted by each of the Disputed Claims.

Each of the Disputed Claims has received follow-up letters explaining why their claim is being rejected, but the dispute could not be resolved. Therefore, Epiq respectfully submits its administrative determinations rejecting four of these claims and paying one in full under Option 2 in accordance with the Plan of Distribution.

## II.    DISTRIBUTION STATISTICS

12.    Epiq has processed the one (1) Authorized Claim covered by this Declaration and administratively accepts this claim, in part ("Authorized Claim"). The Authorized Claim represents 0.002% percent of the total number of Estimated Authorized Claims – a metric that is defined and further described in §II.A., *infra*. When combined with those claims approved in the Initial, Second, Third, Fourth, and Fifth Distributions, 99.990% percent of the total number of Estimated Authorized Claims have been processed and administratively accepted, in whole or in part. Claims falling within the Unauthorized Claim categories described in §V., *infra*, are not included in the above percentage calculations.

13.    The Authorized Claim was submitted under Option 2 and falls within the pro rata category. *See* Exhibit 1. This Option 2 claim has completed the processing steps outlined below, and the period to submit additional information to cure or seek Court review of final administrative determinations has expired or has been waived by the claimant.

14.    The Authorized Claim was accepted in part and rejected in part but was otherwise eligible for payment ("Partially-Accepted Claim").

15.    In total, the Authorized Claim will be paid $1,200,000.00 if the distribution is approved.

A.      **Estimated Total Count of Authorized Claims**

16.      To date, a total of 108,746 claims[2] have been submitted.  Of the total submitted claims, 65,585 were postmarked or received by the May 16, 2018 claims-filing deadline ("Timely Claims").  The remaining 43,161 claims were submitted after May 16, 2018 ("Late Claims"). Class Counsel had pre-authorized late filings for certain of the Late Claims and has exercised their authority pursuant to the Settlement Agreements to accept the remaining Late Claims because no delay of distribution has resulted from their acceptance.  This Declaration does not distinguish between Timely Claims and Late Claims because Class Counsel has directed Epiq to treat the Late Claims included in all Distributions as Timely Claims.

17.      Epiq reviewed the Authorized Claim to ensure it was not submitted by, or on behalf of, "Excluded Persons," to the extent the identities of such persons or entities were known to Epiq through the Settlement Agreements, the Notice, and through Claimants' certifications on the Claim Forms.  Epiq also reviewed the claim against the list of persons and/or entities who submitted valid requests for exclusion from the Settlement Classes as set forth in Exhibit 1 to each of the orders granting final approval to the Settlement Agreements (ECF Nos. 1096-1110).  Epiq confirms the Authorized Claim was not submitted on behalf of an Excluded Person.

III.      **DISTRIBUTION PLAN FOR THE AUTHORIZED CLAIM**

18.      Should the Court concur with Epiq's administrative determinations concerning the Authorized Claim, Epiq recommends the following distribution plan:

     a.   The Authorized Claim, identified in Exhibit 1 attached to this Declaration, whose claim falls within the pro rata payment category, will be paid its respective pro rata share subject to a 40% percent holdback.

---

[2] Claimants that received multiple Claim Forms (as a result of, for example, being identified by multiple Settling Defendants as potential Settlement Class Members) could request consolidation of their multiple claims into one master claim for purposes of submission.  The statistics presented in this Declaration count a master claim and the sub-claims consolidated under it as one Claim.

     b.   The Authorized Claim, identified in Exhibit 1 attached to this Declaration, will have the ability to receive their payment via wire transfer or check.  If the Authorized Claimant has elected to have its payment sent via wire transfer and subsequently the wire is rejected or returned, the payment will be reissued in the form of a check.

     c.   In order to encourage Authorized Claimants to promptly deposit their distribution checks, and to avoid or reduce future expenses relating to unpaid distribution checks, all distribution checks will bear a notation "CASH PROMPTLY; VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT CASHED BY [DATE 90 DAYS AFTER ISSUE DATE]."

## IV.    CLAIMS PROCESSING AND VALUATION

19.    Paragraphs 25 through 31 of Epiq's Declaration in support of the Initial Distribution (ECF No. 1216) describe Epiq's procedures for processing claims as they were received.

20.    Upon receipt, Claims were first reviewed by Epiq's team of processors to ensure various "threshold" Claim requirements were satisfied before the Claims were provided to the Settlement Experts for further review and valuation.

21.    As an initial matter, all Claims were required to be signed under penalty of perjury by a person authorized to sign on behalf of the Claimant.  Often, in particular in the case of Claims filed by third-party claim filers, documentary proof of the signatory's authority to make decisions on behalf of the Claimant was required.  Epiq reviewers confirmed these requirements were met and made note in its system of record for Claims that were deficient with respect to this requirement.

22.    Certain claims were subject to review and confirmation by Rust or by certain Defendant Banks due to international data privacy laws.  Upon receipt of such Claims and after verifying the claim was signed by the appropriate signatory, Epiq provided those Claims to Rust or the appropriate Defendant bank for verification before the claim could proceed further in the review process.  Rust and the Defendant Banks in turn notified Epiq as their review and verification

was complete.  Certain Claims could not be confirmed via this process and were noted accordingly in Epiq's system of record.

23.     Epiq further reviewed all Claims received for completeness once the above review steps were completed and before passing Claims to the Settlement Experts for further review and valuation.  In particular, Claimants were required to make an election as to whether they wanted to proceed under Option 1 or Option 2, and to provide their country of domicile.  Option 1 Claimants who indicated they transacted in Exchange-traded instruments, and all Option 2 Claimants, had to provide data files in the appropriate format to accompany their Claim.  Notes were made in Epiq's system of record on Claims missing any of these components, but because in some instances Claims could still be valued without these components, these defects were considered non-fatal.

24.     If a claim was deemed deficient based on the threshold review described in Paragraphs 20 through 23, *supra*, a threshold deficiency notice was sent to the Claimant.  Where practicable, all threshold deficiencies were identified in a single letter.  All threshold deficiency notices gave Claimants a 30-day timeframe within which to respond, and informed the Claimant that failure to respond, or a response that fails to cure the deficiency, would result in rejection of the claim in its entirety.

25.     Claimants' responses to the threshold deficiency notices were reviewed by Epiq's team of processors.  Claimants who cured the threshold deficiencies present on their claim proceeded to the next stage of review, along with Claimants whose initial submissions had no threshold deficiencies.  Where possible, Claims with only non-fatal defects described in Paragraph 20 through 23, *supra,* would still be provided to the Settlement Experts for further review.  Claims where the Claimant did not respond to the threshold deficiency letter, or those who did not correct

the deficiency via their response, were marked as rejected in Epiq's system and did not proceed further in the review process.

26.     As Option 1 Claims were filed, and contemporaneous to the review described in Paragraphs 20 through 25, *supra*, Epiq communicated with the Settlement Experts to determine, as a preliminary manner, whether an Option 1 Eligible Participation Amount ("EPA," as described in the Plan of Distribution) could be calculated from the data provided by the Settling Defendant Banks.  If the Settlement Experts informed Epiq that no Option 1 data existed for a Claimant, or that there was no eligible EPA within the Option 1 data, Epiq would send a deficiency letter to the Claimant informing them of this and inviting them to convert their claim to Option 2 and submit their own data, in the required format, in order to proceed.  Where possible, this type of deficiency notice also included any deficiencies identified in the review described in Paragraphs 20 through 23, *supra*, because if the Claimant were to convert to Option 2, the threshold deficiencies on the claim would still need to be cured in order for the claim to proceed.

27.     Option 1 Claims that had eligible transaction volume in the Defendant data, and/or eligible Exchange data, and which had no threshold deficiencies, were evaluated by the Settlement Experts based on the Plan of Distribution and a final administrative decision was issued by Epiq with the Option 1 EPA.  The Claimant could accept this EPA and take no further action or convert to Option 2 and submit their transactional data in the required format.

28.     Claims that were converted to Option 2 or those that were initially filed under Option 2, and for which data files were provided, and which had no threshold deficiencies, were evaluated by the Settlement Experts according to the Plan of Distribution.  Processing Option 2 claims (and claims converted from Option 1 to Option 2) requires several steps.  First, the Settlement Experts perform an algorithmic trade-by-trade review of the claimant's transaction data

and calculate claim value.  The algorithms flag ineligible or erroneous transactions for further review and/or auditing.  If there are no transaction-level deficiencies flagged by the algorithms, the claim is considered an "Authorized Claim" eligible for payment.  After this evaluation was complete, Claimants were issued an administrative determination either accepting their Option 2 submission in whole or in part or rejecting it in full.

29.     Where possible, a letter rejecting an Option 2 submission in part or in full included descriptions of the specific reasons for rejection of the data.  In addition, where possible, Claimants were able to request their processed data, which identified rejected transactions and the reason(s) for rejection.  Claimants were given an opportunity to correct their data with respect to any rejected trades.  Each letter rejecting an Option 2 claim in whole or in part provided a 30-day timeframe within which the Claimant could respond with amended data or documentation in order to correct their submission.  Where a Claimant provided amended data, that data was further reviewed by the Settlement Experts and a final administrative decision was issued by the Claims Administrator, accepting the claim in full or in part, or rejecting it in full.

30.     The common reasons for a claim being partially rejected include:

   a.  Inclusion of trades that are ineligible under the Settlements, including trades with non-defendants, outside the Class Period, in non-FX products (e.g., precious metals or interest rates), on ineligible venues, or outside of the United States (i.e., non-U.S. domiciled claimant trading with non-U.S. desk of a defendant).

   b.  Submission of trades with invalid or missing mandatory fields, including ISO codes (standardized currency pair codes), contract codes (for futures), product type, base amounts, contra amounts, value dates, and/or trade rates.  These are mandatory fields because the Plan of Distribution requires these data points to calculate claim value.  Trades missing these fields are therefore rejected.

   c.  Where the trade rate supplied is materially different from the prevailing daily rate and the claimant has not substantiated the trade with third-party documentation showing the trade is genuine.

10

    d.  Where the trade size supplied is unusual or implausible and the claimant has not
        substantiated the trade size with third-party documentation showing the trade is
        genuine.

## V.    UNAUTHORIZED CLAIMS

31.    As of October 13, 2023, 56,751 Claims have failed to cure one or more deficiencies
in the claim via the process described in Paragraphs 20 through 29, *supra*.  All 56,751
Unauthorized Claims have received deficiency notices and had 30 days to cure by removing
ineligible trades and/or submitting additional information to substantiate the claim.  The deadline
for responding to deficiency notices has expired for all Claims.  Some Unauthorized Claims have
remained uncured for more than 1,200 days.  As such, Epiq recommends rejecting in full these
56,751 claims, hereinafter referred to as the Unauthorized Claims.  Detailed descriptions of the
reasons for rejection are below.  *See* Exhibit 2.

### A.    Threshold Deficiencies

32.    Epiq recommends rejection of 3,199 Claims for failure to cure threshold
deficiencies.  These Claimants have been provided notices identifying the issues with their Claims
and have either failed to respond or their response did not cure the deficiency with the Claim.
These Claims are further described below.

    a.  *Claims Missing Signature from Person with Appropriate Authorization.*  There are
        1,895 Claims that are currently missing a signature altogether or are missing
        required documentation to show that the person who signed the Claim Form had
        the authority to do so on behalf of the Claimant.  All such Claims have received a
        letter giving them an opportunity to correct this deficiency.  The majority of these
        Claims, 98%, were sent letters in 2018, with no further substantive activity on the
        claim thereafter.  The Claims sent letters most recently, in February of 2020,
        likewise had no substantive further activity on the Claim.

    b.  *Claims Missing Appropriate Signature and Which Required Rust or Bank
        Verification.*  In addition to the above, there are 1,025 Claims which were missing
        a signature altogether or which were missing documentation showing the signatory
        had appropriate authority, and which would need to be verified by Rust or a
        Defendant Bank pursuant to international privacy laws.  Because Rust and the
        Banks would not communicate with a Claimant for this verification without first

confirming the claim was appropriately filed, these Claims were not sent for this verification because of the signatory deficiency.  All of these Claims were sent letters in February of 2020, and had no substantive further activity on the Claim.

    c.   *Claims with Rust or Bank Objections*.  There are 235 Claims that were not confirmed by either Rust or the Defendant Banks via the confirmation process required by international data privacy laws.  These Claims cannot proceed to valuation without this confirmation and are thus ineligible.

    d.   *Excluded Persons*. Epiq reviewed all Claims to ensure that they were not submitted by, or on behalf of, "Excluded Persons," to the extent the identities of such persons or entities were known to Epiq through the Settlement Agreements, the Notice, and through Claimants' certifications on the Claim Forms. Epiq also reviewed all Claim Forms against the list of persons and/or entities who submitted valid requests for exclusion from the Settlement Classes as set forth in Exhibit 1 to each of the orders granting final approval to the Settlement Agreements (ECF Nos. 1096-1110). Epiq identified 44 Claim Forms submitted on behalf of Excluded Persons that should be rejected.

**B.**    **Substantive Deficiencies**

33.    Epiq recommends rejection of 32,727 Claims for failure to cure substantive deficiencies. These Claimants have been provided notices identifying the issues with their Claims and have either failed to respond or their response did not cure the deficiency with the Claim. These Claims are further described below.

    a.   *Option 1 Claims with No Eligible Option 1 Data*.  As discussed in Paragraph 26, *supra*, the Settlement Experts determined certain Claims filed as Option 1 either had no transactions in the Defendant data or had no eligible EPA in the transactions in the Defendant data.  These Claimants could only cure this deficiency by converting to Option 2 and submitting their own data.  There are 16,672 such Claims that were notified of the lack of Option 1 eligibility and provided the opportunity to respond and convert their claim to Option 2, but which did not do so within the time provided.

    b.   *Claims Filed Under Option 2 with No Data Files and with No Option 1 Volume*. There are 1,337 Claims that were filed under Option 2, but which did not provide Option 2 data that could be processed by the Settlement Experts.  These Claimants were notified of the missing data but did not respond by providing their own data. Where possible, the Settlement Experts also reviewed these claims for Option 1 volume, but none was available.

    c.   *Claims Filed Under Option 2 that were Rejected in Full.*  There are 14,718 Claims that submitted Option 2 data that could not be processed.  In each instance, the

Claimant received a letter describing the issues with their data, and either failed to respond or their responsive submission did not correct the issues with their data.

**C.    Other Claim Rejection Reasons.**

34.    *OFAC Rejections.*  In accordance with the regulations and guidelines of the U.S. Treasury Department Office of Foreign Assets Control ("OFAC"), prior to issuing payment to Claimants approved by the Court in each of the five Distribution Orders issued to date, Epiq conducted an OFAC check for all Authorized Claimants.  Specifically, Epiq compared all payees in each of the six distributions against the federal government's list of persons or entities prohibited from receiving payment from a person or entity in the United States.  There were two (2) payees in the initial distribution and two (2) payees in the second distribution that matched records on the OFAC list based on multiple data points.  Epiq sent each of these Claimants a letter explaining the match and providing the Claimants with an opportunity to prove they were not the entity on the OFAC list.  None of these four (4) Claimants responded to this letter.  Accordingly, Epiq recommends rejecting their claims in full and rescinding this Court's prior authorization of their claims.

**D.    Withdrawn Claims**

35.    Certain Claimants have contacted Epiq requesting to withdraw their claim ("Withdrawn Claims").  To date, there are 20,821 Withdrawn Claims that will not receive a distribution from the Settlement Fund.  The majority of the Withdrawn Claims are due to a third-party Claims aggregator/filer impermissibly submitting thousands of Claims under both Options 1 and 2 simultaneously for each of their clients or accounts.  When notified this was impermissible, these filers withdrew one of the two Claims for each client, thus resulting in a high number of withdrawals.  Claims were withdrawn by Claimants for various other reasons, including Claims withdrawn on behalf of investment funds that were dissolved, or Claims withdrawn by Claimants

who were not able to respond to data or documentation requirements for a Claim.  Claims were

withdrawn at various stages of the process.

   a. 4,730 Claim Forms were withdrawn by the Claimant after the Claim Form was filed but before the Claim Form was sent a deficiency letter or assessment notification.

   b. 16,091 Claim Forms were withdrawn after the Claimant received a deficiency letter of any sort or a Claim Assessment Notice.

## VI. DISPUTE CLAIMS

   36. In all deficiency notifications and final administrative determinations that are

issued, Claimants are notified of their right to request Court review of Epiq's administrative

determinations and the process for doing so.  In order to seek Court review, a Claimant is directed

to submit to Epiq a "Dispute Letter" that must: (1) list the claim number(s) that are covered by the

Dispute Letter; (2) state the reasons for requesting Court review of the administrative rejection of

the claim; (3) state the argument(s) for why the claim should be accepted; (4) attach any supporting

documents to support those argument(s); (5) be signed; and (6) include a copy of the deficiency

notification.  Claimants are directed to submit their Dispute Letters to Epiq via email within 20

days of the deficiency notification.  To date, Epiq has received Dispute Letters for 103 claims.  For

all Dispute Claims, Class Counsel attempted to meet and confer with the Claimants or otherwise

resolve the disputes, and 98 were successfully resolved or withdrawn by the Claimants.

   37. The remaining five (5) disputes were not able to be resolved and are being presented

to the Court in Plaintiffs' Motion for Entry of an Order Approving the Claims Administrator's

Determinations Regarding Unauthorized Claims and Disputed Claims for review.  Of the five (5)

disputes being presented to the Court, four (4) were rejected in full, and one (1) was rejected in

part. These claimants (i) submitted transactions that do not qualify under the Court-approved

settlement class definition; (ii) failed to submit any transactions under Option 2, and Option 1 was

not available to the claimant; or (iii) submitted transactions that had a net delta risk of zero and were valued using the conversion ratio in the Court-approved Plan of Distribution.  *See* Exhibit 3.

**VII.    CONCLUSION**

38.     Epiq respectfully requests that the Court enter an order approving its administrative determinations presented herein.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct and was executed in Seattle, Washington on October 13, 2023.

_____
Loree Kovach