# EXHIBIT 1

October 18, 2023

Honorable Judge Lorna G. Schofield  
U.S. District Court  
Southern District of New York  
Thurgood Marshall Courthouse

In re Foreign Exchange Benchmark Rates Antitrust Litigation  
Case No. 1:13-cv-07789-LGS (S.D.N.Y.)

**Claimant Opposition Brief in Support of Option 2 Claim No. 10000935**

**Request to be Granted Claim Assessment Notification Of Record**

On April 25, 2022 Class Counsel and the Claims Administrator issued an approved Claim Assessment Notification, (CAN), for Option 2 claim no. 10000935 of assessment for restitution remittance, (attached as Exhibit A), that Claimant agreed to. Epiq Audit thereafter took opposition against Class Counsel and the Epiq Administrator Assessor's April 25, 2022 approved Claim Assessment Notification for claim no. 10000935 primarily on the grounds that Claimant's spot forex trades did not settle as institutional transactions, but retail, and subsequently rejected the option 2 submission. In contrast to this, the Claims Administrator continually reiterated that retail forex investors who entered into forex trades within the timeframe of the In re Foreign Exchange Benchmark Rates Antitrust Litigation guidelines were eligible to submit documented option 2 claims. It had been resolutely confirmed to Claimant in scheduled calls with Garden City Group, (now Epiq), Project Manager Cody Cervantes that retail Forex trade transaction participants are eligible to submit Option 2 claims to the In re Foreign Exchange Benchmark Rates Antitrust Litigation and are not excluded on the basis of being Retail. Claimant at no time received any notice of record thereafter from the Claims Administrator stating that retail participants had been outright removed from Option 2 claim submissions and no longer represented in the In re Foreign Exchange Benchmark Rates Antitrust Litigation, (a position the Epiq Auditor presently conveys; albeit it is a contention Class Counsel does not validate to be effective).

*Contant, et al. v. Bank of America Corp., et al, 1:17-cv-03139-LGS (S.D.N.Y. 2020 )*; judicially affirmed that retail spot forex transactions are eligible for restitution remittance in the In re Foreign Exchange Benchmark Rates Antitrust Litigation. In *Contant*, the generalization that the Defendant Banks were only counterparties to Institutional spot forex trades that settled on T+2 value date terms was deemed unsubstantiated to lawfully authorize claim assessment restitution to transaction record documented retail spot forex trades.

The claims audit has utilized switch and bait tactics in what is only applicable to Institutional Eligible Contract Participants, (ECPs), (as defined in the U.S. Commodity Exchange Act), and what is applicable to individual Retail investor participants in spot over-the-counter forex trade transactions. Claimant in claim no. 10000935 is an individual retail participant in each of the documented spot forex transactions; in this regards, Claimant has been mischaracterized before the Court, (as further indicated in the October 9, 2023 audit delegated dispute letter and subsequent motion filing).

In Retail FX trades, Value Dates are not payment delivered on T+2 settlement basis and individual retail forex investors do not go through onboarding that requires International Swaps and Derivatives Association, ("ISDA") agreements to be established of which does not apply to individual retail FX participants.

The Claimant conducted all documented spot forex transactions on a Metatrader 4, (MT4), platform that was connected to the forex marketplace by Integral, (see link: https://www.integral.com/mt4-connectivity/). Integral was the interconnected venue to the MT4 platform of which, International Capital Markets Pty Ltd, (ICM), was the forex merchant dealer, not the actual connectivity venue to the Defendant Bank counterparties for forex transactions, but rather an Introducing Broker, (IB), to the forex marketplace. In reference to this fact of record, it was clearly instructed and stated in the Option 2 submission guidelines that the Venue was to be input as 'Integral', not MT4, (the platform), or ICM, (the FX merchant IB), of which had also been confirmed by the Garden City Group, (now Epiq), Project Managers to the Claimant.

"The IC Markets MetaTrader 4 servers are currently located in the Equinix NY4 data centre in New York and is co-located with their ECN provider partner Integral as well as their liquidity providers including accredited banks and dark pool liquidity venues." - stated in ICM product disclosures and marketing publications.

The statement, "*The audit documentation also proved that ICM was the counterparty to all transactions*", (Dispute Letter, Doc. 2074; pg. 3), is erroneous and inaccurate for the following reasons:

- Claim audit record solely bases this assertion on a revised amended ICM Product Disclosure Statement effective issued from <u>March 2021</u>, that pertains to ICM's standard Dealer Desk model platform. Claimant did not conduct any spot forex transactions on or after March 2021, (of which would not be transaction date eligible to be submitted to the Option 2 claim), and at no time participated in any forex transactions on the cited dealer desk platform that did not have the same counterparties the claimant entered spot forex transactions with.

- The May 2013 ECN Counterparties disclosure statement, (Exhibit B), proves that the Claimant's spot forex transactions were done with Defendant Banks.

*It can be noted back from 2013/2014+ the main homepage of ICM, (forex merchant dealer), prominently featured each of the Defendant Banks, (with official bank entity logos), as Liquidity Provider Counterparties to the electronic communication network, (ECN), straight-through processing MT4 forex platform. ICM affirms they are not a counterparty to Claimant's forex trades by Exhibit B.

Audit cited Claimant's FX data pertaining to JPY quote currency pairs for correction, and because each JPY quote currency trade was entered in the same method as all other currency forex trades, Claimant had requested if there was an example of the audit notation to amend any discrepancy with a JPY entry, (of which was never provided), and as of October 9, 2023, the audit asserts there is a GPB/JPY transaction that has a value date that does not institutional close settle to then conclude as a result of this, the Claimant's value date entry for the forex trade is false. However, for a retail spot forex transaction, the value date is true and accurate as each of the Claimant's value dates is entered consistent with the documented Master Forex Transaction Record, (submitted to claim no. 10000935), that has an open and close timestamp of each of the Claimant's spot forex transactions. Furthermore, the FX trade record is verifiable proof that there is not one single false or fabricated trade value date in claim no. 10000935. Such connotation is a mistruth, and it can be found was at no time ever stated in any audit notice to Claimant.

The Plan of Distribution section VIII Calculating Settlement Transaction Volume A(1)(b) states: "For FX spot transactions, the notional value of the transaction needs no conversion before the application of the Relative Damage Factors."

Auditor[1] has also contended that claimant's JPY trade inputs did not adhere to submission guidelines on the basis that they were not converted to USD notational values, however, claims management previously stated such conversion calculations were to be done by the claims damage assessors in accordance to the In re Foreign Exchange Benchmark Rates Antitrust Litigation Plan of Distribution, (cited above), of which the Claimant has abided by.

### Conclusion

The April 25, 2022 Claim Assessment Notification was issued to claim no. 10000935 for being in complete compliance with retail Option 2 submission guidelines. For the foregoing reasons, claimant objector therefore requests that the administrator approved April 25, 2022 Claim Assessment Notification remain effective for the stated maximum eligible restitution amount.

Respectfully submitted,

Sean Waraich - Claimant

*[signature]*

2516 Commonwealth St, #201
Houston, TX 77006
Ph: 832 229-1652

_____

[1] The Claim Auditor's assertions for the 'Contra Amount' that was cited in the June 9, 2022 rejection notice had been disproven by June 13, 2022 petition statement, (in tandem with the cited Exhibit 2).

**Certificate of Service**

I hereby certify a true and correct copy of the Claimant Opposition Brief and Exhibits was Court filed via e-mail on 10-18-2023 to Class Counsel and Claims Administrator in accordance to the 10-9-2023 dispute letter instructions notice.

_____
Sean Waraich

**Exhibit A**



# FOREIGN EXCHANGE ANTITRUST LITIGATION

## Claim Assessment Notification

## Option 2 Determination

You filed a claim under Option 2 (Documented Claim Option). This Claim Assessment Notification provides you with information about the Claims Administrator's calculations and estimates. We have reviewed your dispute and updated your claim assessment. Unless you respond in 20 days we will consider your dispute resolved. Please note also that the Claims Administrator's auditing process is ongoing. The Claims Administrator will notify you if your claim is selected for audit. You are therefore advised to keep documentation related to your transactions because having documentation will be important to substantiating your claim if it is selected for audit.

The Claims Administrator has calculated the Eligible Transaction Volume (ETV), Settlement Transaction Volume (STV) and Eligible Participation Amount (EPA) for your claim based on the data you submitted.  [1]  The Claims Administrator has also calculated the ETV, STV and EPA for your claim based on the data [2] provided by the settling defendant banks ("Option 1 Values"). A summary of the totals for your claim under Option 1 and Option 2 and your payment resolution category.

**Claim Number:**                                                        10000935

### Your Transaction Volumes Under Option 1 and Option 2

|                                         | Option 2        | Option 1 |
|-----------------------------------------|-----------------|----------|
| **Eligible Transaction Volume (ETV)**   | 8,214,956,378   |          |
| **Settlement Transaction Volume (STV)** | 8,214,956,378   |          |
| **Eligible Participation Amount (EPA)** | 64,213,668,439  |          |

Please note that ETV, STV and EPA do not represent payment amounts. Rather these are metrics representing your eligible trading volumes being converted into eligible participation units calculated pursuant to the Plan of Distribution.

---

[1] ETV is the Estimated Transaction Volume, which represents the notional amount of all eligible trades.
STV is the Settlement Transaction Volume which, represents the notional amount of trades multiplied by the applicable conversion ratio(s).  EPA is the Eligible Participation Amount, which represents the outcome of the Plan of Distribution's five factors and heuristic processes calculated on a trade-by-trade basis. Information on how these amounts were calculated is available in the Plan of Distribution at http://www.fxantitrustsettlement.com/courtdocs.

[2] If you would like to review the data used to calculate your claim, please send a request to FXDataRequest@FXantitrustsettlement.com. In your request, please reference your claim number.



# FOREIGN EXCHANGE ANTITRUST LITIGATION

**Your estimated claim resolution category under Option 2 vs Option 1 is:**



Based on claims processed to date, your payment amount is currently estimated to be between $75,000 and $500,000.  Please note that this is an estimate, and it is possible that your payment will fall outside this band.  The exact amount will not be known until all claims have been fully processed.

**Acknowledgement:**

You will automatically receive the higher of the Option 1 and Option 2 EPA values reported in this notice. No further action from you is required at this time.

We do not know when payments will be made, as claims processing has not completed. Please check the Settlement Website for updates.

Claim Number:   10000935           Page 2 of 4           Issue date: 4/25/2022



# FOREIGN EXCHANGE ANTITRUST LITIGATION

## Option 2 Transaction Volume Summary

**SUMMARY OF DATA SUBMITTED BY CLAIMANT ON WHICH CLAIMS ADMINISTRATOR'S DETERMINATION WAS BASED**

Eligible Transaction Volume (ETV) Based on Option 2 Claim Submission
(Trades of U.S. Domiciled Claimants or Trades of Non-U.S. domiciled Claimants with Trade Location Information)

| Time Period | Spot | Forwards | Swaps | OTC Options | Other FX Products | Total |
|---|---|---|---|---|---|---|
| Pre-2008 | | | | | | |
| 2008-2013 | 7,641,966,105 | | | | | 7,641,966,105 |
| Post-2013 | 572,990,273 | | | | | 572,990,273 |
| Total | 8,214,956,378 | | | | | 8,214,956,378 |

Eligible Transaction Volume (ETV) Based on Option 2 Claim Submission
(ECN Trades - U.S. Domiciled)

| Time Period | Spot | Forwards | Swaps | OTC Options | Other FX Products | Total |
|---|---|---|---|---|---|---|
| Total | | | | | | |

Eligible Transaction Volume (ETV) Based on Option 2 Claim Submission
(ECN Trades - Non-U.S. Domiciled)

| Time Period | Spot | Forwards | Swaps | OTC Options | Other FX Products | Total |
|---|---|---|---|---|---|---|
| Total | | | | | | |

Claim Number:   10000935          Page 3 of 4          Issue date: 4/25/2022

# FOREIGN EXCHANGE ANTITRUST LITIGATION

**Eligible Transaction Volume (ETV) Based on Option 2 Claim Submission**
**(Trades of Non-U.S. Domiciled Claimants with no Trade Location Information)**

| Time Period | Spot | Forwards | Swaps | OTC Options | Other FX Products | Total |
|---|---|---|---|---|---|---|
| Pre-2008 | | | | | | |
| 2008-2013 | | | | | | |
| Post-2013 | | | | | | |
| Total | | | | | | |

**Eligible Transaction Volume (ETV) For FX Exchange Traded Instruments Based on Option 2 Claim Submission**
**(FX Exchange Trades - U.S. Domiciled)**

| Time Period | Futures | Options on Futures | Other FX Products | Total |
|---|---|---|---|---|
| Pre-2008 | | | | |
| 2008-2013 | | | | |
| Post-2013 | | | | |
| Total | | | | |

**Eligible Transaction Volume (ETV) For FX Exchange Traded Instruments Based on Option 2 Claim Submission**
**(FX Exchange Trades - Non-U.S. Domiciled)**

| Time Period | Futures | Options on Futures | Other FX Products | Total |
|---|---|---|---|---|
| Pre-2008 | | | | |
| 2008-2013 | | | | |
| Post-2013 | | | | |
| Total | | | | |

Claim Number: 10000935    Page 4 of 4    Issue date: 4/25/2022

# Exhibit B



# ECN Counterparties

**May 2013**



**1. Straight-Through Processing (STP) - Introduction**

IC Markets is an agent, (not a market maker), to STP FX transactions with ECN liquidity provider counterparties to Qualified Eligible Person clients. This is in accordance to ASIC regulations in conjunction with other agency compliance polices.

Credit risk is the risk that a counterparty to IC Markets fails to perform its obligations which results in financial loss for IC Markets. IC Markets management of credit risk is intended to protect the company and clients from any sudden changes in the liquidity, credit quality or solvency of our banks. Thus, we have in place internal risk management procedures to manage overexposed short positions.

IC Markets primarily takes on market risk to facilitate instant execution of client trades; therefore, IC Markets market risk limits are generally conservative.

This policy covers how IC Markets deals with:

- market risk;
- credit risk; and
- selecting and assessing counterparties.

**2. Market Risk Mitigation, Monitoring and Reporting**

IC Markets does not take proprietary positions based on an expectation of market movements and as a result does not customarily hedge against client transactions. In adverse market conditions, IC Markets may have a net position with a hedging counterparty in any of the markets on which it offers products to reduce market risk exposure in residual un-hedged entries.

IC Markets has in place internal market risk procedures for setting limits, for every financial market in which our clients trade, as well as certain groups of markets which we consider to be correlated. These rules limit the net exposure arising from client activities and hedging consistent with our risk appetite.

Our risk management systems allow us to continually monitor our exposure against these limits in real time. If our exposure exceeds the limits as a result of clients' activities, we will carry out sufficient hedging to bring the exposure back within the defined limit.

Changes to market risk policy require review by the Board of Directors.

**3. Credit Risk Mitigation and Reporting**

We have internal counterparty credit risk procedures for assessing credit risk and setting credit risk limits. These procedures are reviewed annually and presented to the Board for approval should any changes be proposed.

We review the credit quality of our major counterparties on an on-going basis, with a formal risk review for each counterparty performed at a minimum on an annual basis and more frequently if there is a significant change in market conditions or relevant news.

Our exposures to each counterparty are monitored on a daily basis and reported to our Risk Manager. It is our policy to reduce the risk of counterparty failure through diversification and by setting each counterparty a risk-assessed exposure limit.

### 4. Criteria for selecting a liquidity provider counterparty

We assess a potential counterparty against a list of qualifying criteria that address whether they are of adequate financial standing. We do not accept a potential counterparty unless they meet the minimum qualification criteria, which require the counterparty to:

- have adequate financial and compliance resources;
- have an adequate financial license and creditworthiness;
- maintain proper reporting records and regulatory oversight; and
- have a good reputation within the financial services industry.

Addition of new counterparties or changes to existing counterparty limits require approval by the Board of Directors.

### 5. Current Liquidity Providers

Currently our Electronic Communication Network venue cooperates with the following counterparties:

- Royal Bank of Scotland plc;
- BNP Paribas, S.A.;
- Citibank, N.A.;
- UBS Group AG;
- JPMorgan Chase Bank, N.A.;
- HSBC Bank plc;
- Bank of America Corporation;
- Goldman Sachs; and
- Morgan Stanley

These counterparties are defined as Tier 1 liquidity providers for foreign exchange transactions and supply exchange rates for all currency pairs on the ECN platform.

IC Markets accesses an ECN STP network to execute trade orders on a no dealing desk basis as entered transactions revert to our Tier 1 liquidity providers. IC Markets does not have a dealing desk that creates its own prices.

If you require any additional information, please feel free to contact us at support@icmarkets.com

International Capital Markets Pty Ltd
Level 6, 309 Kent Street
Sydney NSW 2000
www.icmarkets.com
phone: +61(0)2 8014 4280

2