UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | No. 1:13-cv-07789-LGS |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR ENTRY OF AN ORDER APPROVING THE CLAIMS ADMINISTRATOR'S DETERMINATIONS <u>REGARDING UNAUTHORIZED CLAIMS AND DISPUTED CLAIMS</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................. 1

ARGUMENT .................................................................................................................................. 2

    I.    THE COURT SHOULD REJECT THE ARGUMENTS MADE BY THE DISPUTED CLAIMS ................................................................................................................... 2

        A.  Sean Waraich, Disputed Claim No. 3 (Claim No. 10000935), submitted ineligible trade data and failed to substantiate his claim with audit documentation. ................................................................................................... 2

        B.  Gregor L. McIntosh, Disputed Claim No. 5 (10013447), traded ten FX futures rolls that were appropriately discounted under the Plan of Distribution § IX.D... 6

CONCLUSION ............................................................................................................................. 11

i

**PRELIMINARY STATEMENT**

As detailed in Plaintiffs' opening memorandum of law in support of motion for entry of an order approving the Claims Administrator's determinations regarding unauthorized claims and disputed claims ("Claims Memorandum" or "Claims Mem.") (ECF No. 2075), Class Counsel and the Court-approved claims administrator, Epiq Class Action & Claims Solutions, Inc. ("Epiq"), recommend that the Court approve Epiq's final administrative determinations regarding five Disputed Claims, 56,751 Unauthorized Claims, and one Authorized Claim.

Out of the five disputes where claimants indicated their intent to seek Court review of Epiq's administrative determinations (the "Disputed Claims"), only two claimants filed replies to the Claims Memorandum by the deadline of October 27, 2023: (i) Sean Waraich (Claim No. 10000935); and (ii) Gregor L. McIntosh (Claim No. 10013447). Waraich and McIntosh both make erroneous arguments that misinterpret the Plan of Distribution, the Settlements, and the Claims Administrator's rejection determinations.

***First,*** Sean Waraich submitted Option 2 data that was substantially deficient, with non-Defendant counterparties, incorrect trading venues, and incorrect trade and value dates. Additionally, the audit documentation Waraich provided failed to substantiate the Option 2 data submission because there were no value dates provided and no proof of trading directly with Defendant banks. Waraich's response brief fails to present any reason for the Claims Administrator's full rejection determination to be overruled.

***Second,*** Gregor L. McIntosh submitted FX futures and FX options on futures. The Claims Administrator determined that 10 FX futures contracts were "rolls" where the delta risk is equal and opposite, so the net delta risk is zero, mirroring an over-the-counter FX swap transaction. Because rolls are not an instrument for which the Plan of Distribution provided a specific formula

1

for determining claim value, these transactions fall under § VIII.A.7 of the Plan of Distribution entitled "other FX products," and the Claims Administrator applied the conversion ratio that is applied to FX swaps under the Plan of Distribution § IX.D. McIntosh's response brief contests that his trades were executed concurrently, but without providing any documentation of timestamps, there is no basis to set aside the Claims Administrator's determination that these FX futures are rolls with a net delta risk of zero.

Therefore, Plaintiffs request that the Court enter the [Proposed] Order Approving the Claims Administrator's Determinations Regarding Unauthorized Claims and Disputed Claims (ECF No. 2078) to finally resolve all claims in this claims administration, bar the submission or modification of claims for any reason as of October 13, 2023, and release claims related to the administration process.

## ARGUMENT

I. **THE COURT SHOULD REJECT THE ARGUMENTS MADE BY THE DISPUTED CLAIMS**

    A. **Sean Waraich, Disputed Claim No. 3 (Claim No. 10000935), submitted ineligible trade data and failed to substantiate his claim with audit documentation.**

Sean Waraich ("Waraich") is a retail trader who submitted Option 2 data that was substantially deficient, showing that he executed trades non-Defendant counterparties on ineligible trading venues with incorrect trade and value dates. As background, the Claims Administrator has sent Waraich one audit request and four Option 2 rejection notices resulting in five opportunities to cure his claim.[1] Each time, Waraich failed to cure his claim by submitting audit documentation

---

[1] The first non-final rejection notice was sent on 9/02/2020; the second full rejection notice was sent on 6/09/2021; the third full rejection notice was sent on 6/09/2022; and the final full rejection notice was sent on 7/07/2022. Supplemental Declaration of Loree Kovach Regarding Disputed Claims ("Supp. Kovach Decl."), Exs. 1-2, 6.

2

proving he has a valid Option 2 claim.[2] Now, Waraich's response brief ("Waraich Br.") to the Claims Memorandum regurgitates erroneous arguments to the Claims Administrator's determinations and concedes that his FX trades were all retail without providing any proof of trading with a Defendant bank. *See Contant v. Bank of Am. Corp.*, No. 17-cv-3139-LGS, ECF No. 516 (S.D.N.Y. Oct. 29, 2021) (accepting class counsel's third-party documentation argument and stating that the "settlement requires claimants to support their claims 'by such documents or proof as Class Counsel and the Claims Administrator, in their discretion, may deem acceptable'"). As detailed below, Waraich failed the Claims Administrator's mandatory audit and could not produce any eligible trades under the Settlements and Plan of Distribution and his Option 2 claim was appropriately rejected.

On May 6, 2022, Waraich received an audit request to validate the integrity of his Option 2 data submission, and received notice that his April 25, 2022 Claim Assessment Notification ("CAN") was being placed in abeyance pending his response to the audit. Supp. Kovach Decl., ¶ 8. Waraich's reply alleges that he, "at no time received any notice of record thereafter from the Claims Administrator stating that retail participants had been outright removed from Option 2 claim submissions….", but this is patently untrue. Waraich Br. at 1. Waraich received notice his retail trades were not eligible because he did not trade with Defendant banks as far back as September 2, 2020 (Supp. Kovach Decl., ¶ 5; *id.*, Ex. 1), again on June 9, 2021 (*id.* ¶ 6; *id.*, Ex. 2), for a third time on June 9, 2022 (*id.* ¶ 9; *id.*, Ex. 5), and for a final time on July 7, 2022 (*id.* ¶ 10; *id.*, Ex. 6). On July 7, 2022, Epiq transmitted to Waraich a final rejection letter detailing the

---

[2] Epiq does not have transaction data provided by Settling Defendants to calculate a payment for Waraich's claim under Option 1.

3

ineligibility of his retail trades among other fatal claim deficiencies.[3] *See Blank v. Jacobs*, No. 03-CV-2111(JS)(WDW), 2013 WL 1310503, at *5 (E.D.N.Y. Mar. 27, 2013) (approving decision to reject claims with no eligible transactions). Put simply, Waraich failed to cure his claim multiple times, failed the mandatory audit, and failed to understand that his retail trades with zero proof of trading with Defendants were ineligible under the Settlements.

Waraich failed to provide any audit documentation proving his counterparties were Defendant banks, and his reply brief concedes he traded in the retail market. *See* Waraich Br. at 1 (stating "Claimant in claim no. 10000935 is an individual retail participant in each of the documented spot forex transactions."). Waraich submitted "Tier 1 Bank Consortium" as the counterparty field for his transactions, but the audit documentation proved that International Capital Markets ("ICM") was the counterparty to all transactions.[4] Declaration of Reto Feller Regarding Disputed Claims ("Feller Decl."), ¶ 9(e). Indeed, ICM's current order execution policy clearly states in section 11:1, "Although we may transmit your orders for execution to third party liquidity providers, contractually, IC Markets Ltd is the sole counterparty to your trades and any execution of orders is done in our name. Therefore, we are the sole Execution Venue for the

---

[3]     Epiq's July 7, 2022 final rejection letter clearly stated: "Your status as a retail trader means that you are not trading in the spot FX market, but in the retail market. As a retail client, you would not know the value date because you were not a party to that hedging transaction between your retail broker and potentially a defendant bank. Therefore, it is impossible for you to submit a value date, which is a mandatory field in an Option 2 submission." Supp. Kovach Decl. Ex. 6.

[4]     *See* ECF No. 2077, at 108. The audit documentation has inconsistent formatting, and the bottom of the pages has a link to pdfcrowd.com, which is an html to pdf document converter allowing editing and redaction. Also, at the bottom of page 108, one-line reads, "Tier 1 ECN Counterparty [QEP Client]: BOA, UBS, Citibank, BNP Paribas, Goldman Sachs, Morgan Stanely [sic] JPMorganChase, RBS". The incorrect spelling of Morgan Stanley and the inconsistent fonts are not what one would expect from a large service provider. The Claims Administrator therefore has suspicion that this document is not the original statement from IC Markets.

execution of Clients' orders."[5] Not only is ICM the direct counterparty, but there is also no indication that Defendant banks ultimately took the risk from each trade. ICM's help page states, "In order to provide you with better price certainty and to ensure fast execution speed we do not offset each and every position with our liquidity providers."[6] If Waraich did trade directly with Defendant banks, then there would have been onboarding documentation and ISDA agreements, but Waraich could not provide such proof because of his claim's retail nature, or, in the words of the Plan of Distribution, Waraich did not enter "into one or more FX Instruments directly with a Defendant." Feller Decl. ¶ 9(f); *see* Plan of Distribution at 9.

Furthermore, the ICM documentation provided by Waraich does not contain a single correct value date for any of the transactions. Feller Decl. ¶ 9(c). Value date is a required field for all Option 2 claim submissions because, among other things, it is required to validate that a transaction in a claimant's Option 2 data is the type of trade it is purported to be. Most of Waraich's transactions have the trade date as the value date or have only one day between these two dates, which is not credible. For example, there are JPY trades occurring on the same day executed in a U.S. time zone, which is impossible due to cut-off times for payments when you are a U.S. based customer and proves that these dates are inaccurate. Waraich's documentation also only shows trade opening dates and times and a corresponding closing date and time. The trade date and value date (or settlement date) for an eligible FX transaction do not relate to the concepts of "opening" or "closing" a transaction. "Opening" or "closing" are concepts from retail FX when clients trade into and out of positions. Feller Decl. ¶ 9(d). Retail FX clients like Waraich do not directly trade

---

[5]  *See* https://cdn.icmarkets.com/uploads/SCB/Order_Execution_Policy.pdf at 9.

[6]  *See* "Is IC Markets Global an ECN/STP broker or a Market Maker?", https://www.icmarkets.com/global/en/help-resources/help-centre.

with Defendant banks because the retail platform utilized to facilitate the trade provides the liquidity, and hence assumes all trading risk with the retail client. Waraich would not know the value date because he was not a party to that hedging transaction between the retail broker and liquidity provider. Feller Decl. ¶ 9(a).  Therefore, it was impossible for Waraich to submit a value date associated with a Defendant counterparty, which is a mandatory field in an Option 2 submission. *Id.* ¶ 9(b).

Waraich's reply also incorrectly asserts that, "*Contant, et al. v. Bank of America Corp., et al*, 1:17-cv-03139-LGS (S.D.N.Y. 2020); judicially affirmed that retail spot forex transactions are eligible for restitution remittance in the In re Foreign Exchange Benchmark Rates Antitrust Litigation." Waraich Br. at 1. *Contant* is a separate action, and as explained in numerous rejection notices and email correspondence, Waraich fails to understand that retail spot FX transactions with no proof of Defendant banks as counterparties are ineligible for payment under the Settlements and Plan of Distribution.[7] Moreover, Waraich's audit documentation shows ICM as the venue (not Integral) and counterparty, and there are remaining data deficiencies where he also failed to provide credible trade and value dates. Because Waraich failed to provide sufficient audit documentation, in addition to the data deficiencies remaining in the claim, Waraich's Option 2 claim should remain fully rejected.

### B. Gregor L. McIntosh, Disputed Claim No. 5 (10013447), traded ten FX futures rolls that were appropriately discounted under the Plan of Distribution § IX.D.

McIntosh contests the Claims Administrator's application of the conversion ratio in the Plan of Distribution to ten FX futures, and recommendation for payment of these futures "rolls"

---

[7] On April 25, 2023, Waraich was sent a response email regarding his eligibility as a class member in *Contant*, which stated, "To the extent you have questions about the *Contant* case, you should direct those questions to the attorneys in that case." Supp. Kovach Decl., Ex. 8.

under the Plan of Distribution Section IX.D.  As discussed in the Claims Mem. at 9-10, McIntosh held a short position that was due to expire in December 2011.  Prior to this date, to avoid or postpone delivery of the underlying currency, the claimant engaged in a transaction known as a "roll," in which a trader rolls an existing position from one future expiry date to a new expiry date further in the future.  When this occurs, the delta risk of the two futures transactions is equal and opposite, resulting in a zero net delta risk.  Because rolls are not an instrument for which the Plan of Distribution provided a specific formula for determining claim value, these transactions fall under §VIII.A.7 of the Plan of Distribution entitled "other FX products."  Other FX products "will be decomposed into the [specifically listed] individual instrument where possible" (*i.e.*, spot, forward, swap, option, future) and valued consistently with such instrument.  Plan of Distribution § VIII.A.7.[8]  Rolls of futures positions on an exchange mirror over-the-counter FX swap transactions where the two swap legs; *e.g.*, spot and forward are of equal size.  In this instance, there also is net delta risk of zero.  Therefore, for futures "rolls" where there was no risk on the transactions, the Claims Administrator applied the conversion ratio that is applied to FX swaps under the Plan of Distribution §IX.D.  *See* Feller Decl. ¶ 7.

In his response brief ("McIntosh Br."), McIntosh contends that the Claims Administrator's application of the Plan of Distribution as an "unsupported administrative determination" (*id.* at 4) and states that the "Claims Administrator and Plaintiffs have ignored the realities behind the Trades" (*id.* at 8).  As required by the Settlement Agreements and Plan of Distribution, the Claims Administrator provided McIntosh with the required procedure in processing his claim and presenting his dispute.  On May 2, 2022, McIntosh was provided with a Claim Assessment

---

[8] Available at http://www.fxantitrustsettlement.com/docs/PlanofDistribution.pdf.

Notification ("CAN").[9]  Supp. Kovach Decl. ¶ 13.  As detailed in the Claims Mem. at 4, the claim value contained in McIntosh's CAN was calculated from the Settlement Experts' (Ankura Consulting Group LLC and Velador Associates Ltd.) algorithmic, trade-by-trade review of the claimant's transaction data.  Far from an "unsupported administrative determination," the CAN is a culmination of an intensive process by the Settlement Experts that vigorously analyzes each trade to determine its value.

McIntosh initially raised concern with the Claims Administrator over the calculation of his Eligible Participation Amount via email on May 26, 2022, and that same day, the Claims Administrator promptly provided McIntosh with the data files containing the values of each trade submitted.  *Id.* ¶ 14; *id.* Ex. 10.  On June 3, 2022, McIntosh questioned the treatment of ten of his trades, to which the Claims Administrator and Settlement Experts thoroughly examined and provided a response to McIntosh by email on June 15, 2022.  *Id.* ¶ 15; *id.* Ex. 12.  On June 29, 2022, McIntosh further questioned the treatment of the ten trades, which the Claims Administrator then explained again via telephone on July 7, 2022.  *Id.* ¶¶ 17-18; *id.* Exs. 13-14.  McIntosh submitted his formal dispute letter on July 29, 2022 (ECF No. 2077-4, at 60-103), which the Claims Administrator, Settlement Experts, and Class Counsel thoroughly reviewed and considered prior to submitting to the Court. This course of conduct in no way "ignoring the realities" of the arguments presented by McIntosh regarding his trades.  Class Counsel determined there was no merit to McIntosh's argument and attempted to explain the Plan of Distribution to him.

---

[9]   To the extent McIntosh references two prior CANs (McIntosh Br. at 4), they have been superseded by the May 2, 2022 CAN and do not require further discussion.  Thus, his mention of missing trades executed through Citigroup and Morgan Stanley are not a current issue before the Court.

8

Turning to the other arguments raised in McIntosh's response, each can easily be rejected. McIntosh admits that his documentation does not contain trade timestamps to corroborate his classification of the ten trades as non-rolls and that such documentation would be required to show his trades were not executed simultaneously. *See* McIntosh Br. at 5 (stating that "[b]uy and sell side Trades of equal size during a single trading session, for different maturities, were therefore not executed simultaneously, nor necessarily within minutes of each other"); *see also id.* ("Claimant has meanwhile reached out to his last known contact and account relationship officer at Morgan Stanley . . . in an effort to seek Brokers' confirmation, by way of trade timestamps or otherwise, that Trades were not executed simultaneously"); ECF No. 2077-4, at 77-98 (McIntosh's trade documentation without trade time stamps). Because he traded FX futures and FX options on futures, McIntosh submitted his claim under Option 2, the "Documented Claim Option." As the Plan of Distribution,[10] Notice,[11] and Proof of Claim Form[12] make clear, under Option 2, the claimant is required to fully document their eligible transaction volume using their own records and to submit such records to the Claims Administrator. These documents also stated that this was the only option available to claimants that traded in FX Exchange-Traded Instruments, like McIntosh. Therefore, McIntosh's statement and submission of supporting Exhibit 2 (ECF No. 2081-2, at 12-13) to illustrate "that neither of the Brokers (Defendants Citigroup and Morgan Stanley) has supplied or been asked by Claims Administrator to provide it with data, including trade timestamps if any, relating to the Trades" is of no consequence. At all times, by submitting

---

[10]   Available at http://www.fxantitrustsettlement.com/docs/PlanofDistribution.pdf at 4, 18-20.

[11]   Available at http://www.fxantitrustsettlement.com/docs/FEX_DB_Notice.pdf at 7.

[12]   Available at http://www.fxantitrustsettlement.com/docs/FEX%20POC_DB_4.5.18.pdf at 4, 6.

his claim under Option 2, McIntosh was apprised of the fact that an obligation to obtain such information was on the claimant, not the Claims Administrator or Defendants. Without proper documentation of his classification of his trades through timestamps, the Claims Administrator is unable to accept McIntosh's characterization of the ten trades. Instead, the documentation provided by McIntosh, and reviewed and considered by the Settlement Experts prior to submitting McIntosh's dispute to the Court, supports the classification of the ten trades as futures rolls.

Further, McIntosh himself states that the purpose of the ten trades was to "defer[] the delivery of the underlying currencies on settlement of the nearby expiring FX future" and "maintain existing currency market exposures[.]" McIntosh Br. at 5. These are exactly the characteristics and purpose of a "roll" when trading FX futures. McIntosh also states that he sought, "through short term fluctuations in the EUR:USD spot rate, to minimise negative carry or maximise positive carry resulting from the Trades in FX futures with different expiration dates." *Id.* However, a review of McIntosh's Option 2 submission shows that he did not engage in such a trading strategy, and to suggest that he did so, but only on specific days ahead of an expiry date for ten trades, is not a credible strategy for an FX trader.

For the first time in challenging the Claims Administrator's classification of his trades, McIntosh presents Exhibit 3, which he asserts "show[s] beyond doubt that the alleged FX swap trades did not involve simultaneously executed transactions in the nearby expiring and further out settlement date FX futures." McIntosh Br. at 8, Ex. 3. Initially, the column titled "No. of days between trade & contract expiry dates" is not a correct comparison to calculate forward points. Feller Decl. ¶ 3(a). The relevant day count would be the days between the near expiry date to the far expiry date. *Id.* Second, McIntosh's calculation of interest rate differential is not consistent because he mistakenly makes rows 2, 3, and 4 negative, where they should be positive, and

10

differential 5 should be negative. *Id.* ¶ 3(b). As a result, the purported "[d]eviations between trade rates and FV of the later expiring FX future" are not as McIntosh presents them to the Court (McIntosh Br. at 8) and are illusory numbers not useful for a comparison. Feller Decl. ¶ 4. Thus, McIntosh's conclusion that the rates "are of a size which cannot be explained otherwise than by non-simultaneous Trades in the two FX futures" is erroneous. McIntosh Br. at 8. The Settlement Experts, using purchased trade data which was relied on for the entire claims process to calculate the forward curve, a process that was applied to all claimants and claim processing, confirmed that the actual prevailing forward points on McIntosh's trade dates are nearly identical with the forward points of the executed trade. Feller Decl. ¶ 5. Therefore, the trade data confirms the Settlement Experts' assessment that these trades are not stand-alone trades, but rolls. *Id.* ¶ 7.

For the reasons stated above, McIntosh's arguments lack merit and should be rejected. Accordingly, Class Counsel respectfully request that the Court uphold the Claims Administrator's application of the conversion ratio to Disputed Claim No. 5 and payment of futures "rolls" under the Plan of Distribution Section IX.D and administrative determination to accept this claim in part.

### CONCLUSION

For the reasons stated herein and in the Claims Memorandum, Plaintiffs respectfully request that the Court enter the Proposed Order Approving the Claims Administrator's Determinations Regarding Unauthorized Claims and Disputed Claims, and authorizing payment of the final Authorized Claim.

Dated: November 8, 2023

| KOREIN TILLERY PC | HAUSFELD LLP |
|---|---|
| *s/ Christopher M. Burke* | *s/ Michael D. Hausfeld* |
| CHRISTOPHER M. BURKE | MICHAEL D. HAUSFELD |
| 707 Broadway, Suite 1410 | REENA A. GAMBHIR |
| San Diego, CA 92101 | TIMOTHY S. KEARNS |

11

| | |
|---|---|
| Tel: (619) 6225-5620<br>cburke@koreintillery.com<br><br>-and-<br><br>SCOTT+SCOTT ATTORNEYS AT LAW LLP<br><br>*s/ Kristen M. Anderson*<br>KRISTEN M. ANDERSON (*pro hac vice*)<br>DAVID R. SCOTT (DS-8053)<br>JOSEPH P. GUGLIELMO (JG-2447)<br>DONALD A. BROGGI (DB-9661)<br>The Helmsley Building<br>230 Park Avenue, 17th Floor<br>New York, NY 10169<br>Telephone: 212-223-6444<br>Facsimile:  212-223-6334<br>kanderson@scott-scott.com<br>david.scott@scott-scott.com<br>jguglielmo@scott-scott.com<br>dbroggi@scott-scott.com | SARAH R. LAFRENIERE<br>888 16th Street NW, Suite 300<br>Washington, DC 20006<br>Telephone: 202-540-7143<br>Facsimile:  202-540-7201<br>mhausfeld@hausfeld.com<br>rgambhir@hausfeld.com<br>tkearns@hausfeld.com<br>slafreniere@hausfeld.com<br><br>-and-<br><br>HAUSFELD LLP<br>MICHAEL P. LEHMANN<br>CHRISTOPHER L. LEBSOCK<br>600 Montgomery Street, Suite 3200<br>San Francisco, CA 94111<br>Telephone: 415-633-1908<br>Facsimile:  415-358-4980<br>mlehmann@hausfeld.com<br>clebsock@hausfeld.com |

## **CERTIFICATE OF SERVICE**

     I hereby certify that on November 8, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

                                    *s/ Michael D. Hausfeld*
                                    Michael D. Hausfeld