## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIGATION | No. 1:13-cv-07789-LGS |

## DECLARATION OF LOREE KOVACH IN SUPPORT OF PLAINTIFFS' MOTION FOR ENTRY OF AN ORDER APPROVING DISTRIBUTION OF THE NET SETTLEMENT FUND

I, Loree Kovach, declare and state as follows:

1. I am a Senior Vice President at Epiq Class Action & Claims Solutions, Inc. ("Epiq"). Garden City Group, LLC, the Court-appointed Claims Administrator in connection with 15 Settlement Agreements approved by the Court in the above-captioned Action, was acquired by Epiq on June 15, 2018, and is now continuing operations as part of Epiq. The following statements are based upon my personal knowledge and experience and information provided to me by other experienced Epiq employees working under my supervision, in addition to information provided to me Ankura Consulting Group, LLC ("Ankura"), and if called on to do so, I could and would testify competently thereto.

2. Unless otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Stipulations and Agreements of Settlement filed with the Court at ECF Nos. 481 (Ex. 1-9), 822 (Ex. 1-5), and 877 (Ex. 1). The foregoing Stipulations are collectively referred to as the "Settlements" or the "Settlement Agreements."

3. Epiq respectfully submits this Declaration to the Court in support of Plaintiffs' Motion for Entry of an Order Approving Distribution of the Net Settlement Fund, as detailed below.

**I.     BACKGROUND**

4.     As Claims Administrator, Epiq implemented the notice and administration terms of the Settlements by, among other things: (i) disseminating the Mail Notice of Class Action Settlement ("Notice") and the proof of claim and release form ("Claim Form") (collectively with the Notice, the "Notice Packet") to potential Settlement Class Members;[1] (ii) maintaining a toll-free hotline, email address, and P.O. Box to receive Settlement Class Members' questions and requests; (iii) maintaining and updating a case-specific Settlement Website and posting case-specific documents on said website during the course of the administration; (iv) causing the Publication Notice of Class Action Settlement to be published; (v) providing, upon request, additional copies of the Notice Packet to brokers, nominees, and Settlement Class Members, including translations of the Notice Packet; (vi) receiving objections and requests for exclusion; (vii) receiving and processing Claim Forms, transaction data, and documentation; and (viii) issuing payments to Authorized Claimants.

5.     All claimants submitted their Claim Forms to Epiq. To date, a total of 108,746 claims[2] have been submitted. In accordance with the terms of the Settlement Agreements and the Court-approved Plan of Distribution (ECF No. 1095), Epiq has completed the processing of all 108,746 claims that were submitted. Paragraphs 25 through 31 of Epiq's Declaration in support of

---

[1] For purposes of foreign data privacy compliance, certain Settling Defendants hired Rust Consulting, Inc. ("Rust") to distribute Notice Packets to certain potential Settlement Class Members, primarily those domiciled outside of the United States. Further, certain Settling Defendants themselves distributed Notice Packets.

[2] Claimants that received multiple Claim Forms (as a result of, for example, being identified by multiple Settling Defendants as potential Settlement Class Members) could request consolidation of their multiple claims into one master claim for purposes of submission. The statistics presented in this Declaration count a master claim and the sub-claims consolidated under it as one Claim.

the Initial Distribution (ECF No. 1216) describe Epiq's procedures for processing claims as they were received.

6. On April 5, 2024, the Court approved Epiq's administrative determinations on all 108,746 claims that were submitted and barred any new claims and modifications to existing claims as of October 13, 2023. *See* ECF Nos. 2089 and 2090. Of the total claims submitted, 51,991 were accepted in full or in part as Authorized Claims, and 56,755 were rejected in full as Unauthorized Claims.

7. To date, there have been six distributions to Authorized Claimants (or Claims) from the Settlement Fund. On March 8, 2019, the Court entered an Order approving an initial distribution from the Settlement Fund, authorizing Epiq to distribute $54,006,248.60 to 26,937 Authorized Claims ("Initial Distribution"). *See* ECF No. 1230. Beginning on April 12, 2019, Epiq commenced the Initial Distribution. On November 29, 2021, the Court authorized Epiq to distribute $435,114,487.03 to 22,904 Authorized Claims ("Second Distribution"). *See* ECF No. 1633. Beginning on January 7, 2022, Epiq commenced the Second Distribution. On July 11, 2022, the Court authorized Epiq to distribute $270,951,068.24 to 2,031 Authorized Claims ("Third Distribution"). *See* ECF No. 1698. Beginning on August 10, 2022, Epiq commenced the Third Distribution. On October 4, 2022, the Court authorized Epiq to distribute $225,204,639.84 to 160 Authorized Claims ("Fourth Distribution"). *See* ECF No. 1951. Beginning October 31, 2022, Epiq commenced the Fourth Distribution. On July 19, 2023, the Court authorized Epiq to distribute $190,000,182.70 to 98 Authorized Claims ("Fifth Distribution"). *See* ECF No. 2068. Beginning August 15, 2023, Epiq commenced the Fifth Distribution. On April 5, 2024, the Court authorized Epiq to distribute $1,200,000.00 to one (1) Authorized Claim ("Sixth Distribution"). *See* ECF No. 2090. Beginning April 26, 2024, Epiq commenced the Sixth Distribution.

8. In accordance with the Court-approved Plan of Distribution (ECF No. 1095), each claimant's payment fell into one of three resolution categories: *De Minimis* Payment, Automatic Payment, or *Pro Rata* Payment. Authorized Claims falling into the *De Minimis* and Automatic Payment categories have been paid in full. The total number of Authorized Claims falling into the *De Minimis* category is 17,926, and the total number of Automatic Payment Claims is 14,841. Authorized Claims falling into the *Pro Rata* Payment category have not been paid in full as their distribution payments were reduced by a holdback amount (the "Reserve"). Pursuant to estimated calculations performed by Class Counsel and Ankura, Authorized Claims paid in the Initial Distribution were subject to a 35% holdback, and Authorized Claims paid in the Second through Sixth Distributions were subject to a 40% holdback.

9. Certain payments remain unnegotiated from the distributions because checks were returned as undeliverable, checks were not cashed, wires failed, or claims were withdrawn ("Forfeited Funds"). Pursuant to the Court orders authorizing the six distributions (the "Distribution Orders"), Authorized Claimants with Forfeited Funds are deemed to forfeit their right to payment under the Settlements and are barred from participating in future distributions. Further, the Distribution Orders provide that any Forfeited Funds shall be reallocated to eligible Authorized Claims in subsequent distributions.

10. In each of the distributions with unnegotiated payments, Epiq performed extensive follow-up via personalized telephone calls and emails in order to urge Claimants to negotiate the checks, submit revised wire instructions, or request re-issues. For distribution checks that were returned to Epiq as undeliverable, in addition to personalized outreach, Epiq attempted to locate new addresses by running the undeliverable addresses through the USPS National Change of Address database and, where appropriate, via Internet search techniques. Where a new address

was located, Epiq updated the database accordingly and re-issued a distribution check to the Authorized Claimant at the new address.

11. Printed on the distribution checks and mentioned in Epiq's outreach, Authorized Claimants were informed that if they do not cash their checks within 90 days from the issue date, their entitlement to recovery is subject to being irrevocably forfeited and the funds re-allocated to other Authorized Claimants in subsequent distributions.

## II. DISTRIBUTION STATISTICS

### A. The Reserve

12. As described in Paragraph 8, *supra*, Authorized Claims falling into the *Pro Rata* Payment category were subject to the reduction of a Reserve from their distribution payment. The Initial Distribution consisted of 7,200 *Pro Rata* Payments, all of which were subject to a 35% holdback. The Second through Sixth Distributions consisted of 12,142 *Pro Rata* Payments, all of which were subject to a 40% holdback. In total, $767,336,080.17 was held back in the Reserve.

13. As described in Paragraph 9, Authorized Claims falling under the *Pro Rata* Payment category must negotiate their distribution payments in order to be eligible to receive their Reserve and any future distribution payments. Of the 19,224 total Authorized Claims falling in the *Pro Rata* Payment category, 17,427 have negotiated their payments and are, therefore, eligible to receive their Reserve payment and participate in the distribution of the Net Settlement Fund.

14. If approved, the Reserve amount of $767,336,080.17 will be distributed to the 17,427 Authorized Claims falling in the *Pro Rata* Payment category who negotiated their payments.

**B.    Forfeited Funds**

15.    As described in Paragraphs 7 through 10, *supra*, Epiq conducted six distributions to Authorized Claims in accordance with the Court's distribution orders. Certain payments remain unnegotiated from the distributions because checks were returned as undeliverable, checks were not cashed, wires failed, or claims were withdrawn. Epiq has conducted extensive outreach and address research for Authorized Claims whose distribution payments have not been negotiated.

16.    In the Initial through Sixth Distributions, there is a total of $14,049,720.70 in Forfeited Funds. If approved, the Forfeited Funds will be re-distributed to Authorized Claims falling in the *Pro Rata* Payment category who negotiated their payments (*see* Paragraph 13, *supra*).

### III.    DISTRIBUTION PLAN FOR THE RESERVE AND FORFEITED FUNDS

17.    Epiq recommends the following distribution plan for the Net Settlement Fund:

> a.    The Authorized Claims, identified in Exhibit 1 attached to this Declaration, who fall within the *Pro Rata* Payment category and negotiated their distribution payments, will be paid their respective Reserve amounts (the "Reserve Distribution").
>
> b.    In calculating the Reserve Distribution payment amounts, any Authorized Claim whose payment calculates to less than $10.00 will be eliminated from the distribution. After eliminating Authorized Claims who would have received less than $10.00, the *pro rata* shares for the remaining eligible Authorized Claims will be recalculated.[3]
>
> c.    After the Reserve Distribution, the Authorized Claims, identified in Exhibit 1 attached to this Declaration, who fall within the *Pro Rata* Payment category and negotiated their Reserve Distribution payments, will be paid a *pro rata* share of the balance of the Net Settlement Fund, including interest and a *pro rata* share of the Forfeited Funds, after deduction of costs and expenses approved by the Court (the "Interest Distribution").

---

[3] To the extent that Authorized Claims have payment amounts calculated to less than $10.00 in subsequent distributions, those Authorized Claims will be eliminated from the subsequent distributions. Such "*de minimis*" amounts are regularly established to promote cost effective distributions and to avoid incurring costs that surpass the amounts paid to claimants.

d. If cost effective, subsequent re-distributions of the funds remaining in the Net Settlement Fund to Authorized Claimants, who have cashed their prior checks, after deduction of costs and expenses approved by the Court, will take place in reasonable intervals thereafter until it is no longer economically feasible to do so. At such time as Class Counsel, in consultation with Epiq, determine that further re-distribution is not cost effective, such remaining balance shall be donated to an appropriate 501(c)(3) non-profit organization selected by Class Counsel, which shall so notify the Court of such contribution.

e. Authorized Claimants will have the ability to receive their payment via wire transfer or check. Because there is usually some percentage of wire payments that are returned resulting in a fee for returned/rejected wires, Authorized Claimants whose payment in any Distribution is under $1,000 (i.e., not part of a bulk submission or multiple payments going to a single filer) will be excluded from the wire payment population and default to payment via check. For those Authorized Claimants who meet the criteria to have the option to receive a wire transfer and have elected to have their payment sent via wire transfer and subsequently the wire is rejected or returned, the payment will be reissued in the form of a check.

f. In order to encourage Authorized Claimants to promptly deposit their distribution checks, and to avoid or reduce future expenses relating to unpaid distribution checks, all distribution checks will bear a notation "CASH PROMPTLY; VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT CASHED BY [DATE 90 DAYS AFTER ISSUE DATE]."

g. In an effort to have as many Authorized Claimants as possible timely negotiate their payments, Epiq will perform extensive follow-up with those Authorized Claimants whose wires failed or checks are initially uncashed, either because they are returned to Epiq as undeliverable or because they simply did not cash the check after a period of time elapsed. For Authorized Claimants whose checks are returned as undeliverable, Epiq will endeavor to locate new addresses by running the undeliverable addresses through the USPS National Change of Address database and, where appropriate, via Internet search techniques, and by calling or emailing the Authorized Claimants. Where a new address is located, Epiq will update the database accordingly and re-issue a distribution check to the Authorized Claimant at the new address. For any Authorized Claimants whose distributions are not returned, but who simply do not cash their checks, Epiq will use a mix of automated and personalized telephone calls and emails to urge such Authorized Claimants to cash their distribution checks. Authorized Claimants will be informed that if they do not cash their checks within 90 days from the issue date, their entitlement to recovery is subject to being irrevocably forfeited and the funds re-allocated to other Authorized Claimants in subsequent distributions.

h. In the event an Authorized Claimant loses or damages his, her, or its check, or otherwise requires a new check, Epiq will issue replacements. Check re-issues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the first check, where appropriate. If

      i. a check is deemed lost, Epiq will void the initial payment check prior to re-issuing a payment.

      i. In addition, and to maximize efforts to have all wires completed and checks cashed, Epiq has trained the staff at our Call Center as well as the team monitoring the case email inbox to handle the various issues that likely will arise during the distribution. Typically, the Call Center and inbox receive inquiries with respect to the calculation of payments and the timing of any future distributions. We expect a high call and email volume during the weeks immediately following dissemination of the payments.

      j. Authorized Claimants who do not negotiate their funds within the time allotted will be presumed to forfeit any recovery for their respective Claims from the Settlement Fund, unless otherwise determined by Class Counsel. Any forfeited recoveries will become available for re-distribution as part of subsequent distributions.

## IV. CONCLUSION

18. Epiq respectfully requests that the Court enter an order approving the proposed plan for distributing the Net Settlement Fund as presented herein.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct and was executed in Seattle, Washington on July 19, 2024.

_____
Loree Kovach